**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**



_____
Guy R. Humphrey
United States Bankruptcy Judge

**Dated: April 28, 2011**

_____

### UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | |
|---|---|
| In re:  THE ANTIOCH COMPANY, ET AL.,<br><br>*Debtor* | Case No.    08-35741 through 08-35747<br>(Jointly Administered Under Case No. 08-35741)<br><br>Adv. No.    09-3409 |
| THE ANTIOCH COMPANY LITIGATION TRUST, W. TIMOTHY MILLER, TRUSTEE,<br><br>*Plaintiff*<br><br>v.<br><br>LEE MORGAN ET AL.,<br><br>*Defendants* | Judge Humphrey<br>Chapter 11 |

**Recommendations for the United States District Court for the Southern District of Ohio to Deny in Part and Grant in Part Various Defendants' Motions to Dismiss Certain Non-Core Causes of Action**

**TABLE OF CONTENTS**

I. Introduction ............................................................................................................ 6

II. Procedural Background ......................................................................................... 6

III. Factual Background ............................................................................................... 8

    A. The Defendants ................................................................................................ 8

    B. The 2003 Transaction .....................................................................................10

    C. Events Following the 2003 Transaction ...........................................................15

    D. The Levimo Transaction ..................................................................................16

    E. Sale Considerations .........................................................................................17

    F. The First Sale Proposal and the Replacement of Antioch's Board ...................22

    G. Defaults under the ESOP Notes ......................................................................22

    H. The Second Sale Proposal ............................................................................. 24

    I. The Bankruptcy Filing ................................................................................... 24

IV. The Litigation Trustee's Claims and the Defendants' Responses ....................... 24

V. Legal Standard and Analysis ...............................................................................27

    A. Legal Standard for Determining Motions to Dismiss .......................................27

    B. Choice of Law ................................................................................................ 29

    C. Subject Matter Jurisdiction .......................................................................... 29

    D. The Reservation of Rights in the Confirmed Plan Meets the Requirements
        of *Browning v. Levy* with respect to All of the Defendants ............................ 36

    E. ERISA Preemption (Claims 1 - 12) ............................................................... 46

        1. Law of ERISA Preemption ........................................................................ 46

2. The Claim for Aiding and Abetting Breach of Fiduciary Duty against
GreatBanc Trust Company is Preempted by ERISA .................................................... 54

3. The Claim for Professional Negligence against Reliance is
Preempted by ERISA .......................................................................................... 56

4. The Claims against Evolve Bank & Trust are Preempted by ERISA ........................ 58

5. Possible ERISA Claims against the ESOP Trustees ...................................................... 59

6. The Non-Core Causes of Action against Lee Morgan, Asha Morgan
Moran, and Chandra Attiken are not Preempted by ERISA ..................................... 60

7. Causes of Action against Marty Moran are not Preempted ...................................... 69

8. The Professional Negligence Counts Fail to State a Claim upon which
Relief can be Granted .......................................................................................... 69

F. Statute of Limitations (Claims 1-3) ................................................................................... 71

1. Positions of the Parties ....................................................................................... 71

2. The Litigation Trustee is an Assignee and Succeeds to All Rights of
Antioch, Subject to Any Defenses and Limitations ................................................ 74

3. Applicable Law Concerning the Statute of Limitation ............................................ 75

4. ORC § 2305.09 and the "Discovery Rule" ............................................................ 77

5. Equitable Tolling Principles under Ohio Law ......................................................... 80

6. The Doctrine of Adverse Domination ................................................................... 87

    a. General Principles under the Adverse Domination Doctrine ......................... 87

    b. Relationship to Agency Law ....................................................................... 89

    c. Relationship to Close Corporation Law ...................................................... 90

    d. Ohio has Long Recognized the Corporate Agency Principles
    Underlying the Adverse Domination Doctrine .............................................. 91

    e. Ohio Close Corporation Law Supports Application of the
    Adverse Domination Doctrine. .................................................................... 93

3

f.  There is not a Sufficient Basis to Conclude that the Supreme
Court of Ohio would Recognize Adverse Domination as a
Separate Doctrine to Toll a Statute of Limitation. ........................................... 94

7.  Conclusion as to the Statute of Limitation Pertaining to Counts 1, 2, and 3 ........... 95

G.  Breaches of Fiduciary Duties (Counts 1, 3, 6, 8 and 10) .................................................... 95

1.  Fiduciary Duties of Directors and Officers Generally .................................................. 95

2.  Count 1:  Breach of Fiduciary Duty in Connection with the 2003 Transaction ......... 98

3.  Count 3: Breach of Fiduciary Duty Related to the Condor Transaction .................. 98

a.  It is Premature to Dismiss Counts 3, 8, and 9 against CRG
Based on CRG's Contractual Agreement with Antioch ................................... 99

b.  The Litigation Trustee has Plead Sufficient Facts to State
a Claim for Breach of Fiduciary Duty as to the Condor
Transaction against All of the Count 3 Defendants ....................................... 103

c.  Count 3 and Other Counts Against CRG, Epstein, and Ravaris
should not be Dismissed at this Stage of the Litigation Based
on the Doctrine of In Pari Delicto ................................................................... 106

d.  Count 3 is not Barred by the 4 Year Statute of Limitation ........................... 108

4.  Count 6: Breach of Fiduciary Duty with respect to the Levimo Transaction .......... 108

5.  Count 8: Breach of Fiduciary Duty with respect to the Sale Process
(The Recapitalization or Refinancing Alternative Strategy) .................................... 112

6.  Count 10: Breach of Fiduciary Duty with respect To the Sale Process
(The J.H. Whitney Offer) .......................................................................................... 117

7.  Summary as to the Breach of Fiduciary Duty Counts ............................................... 118

H.  Aiding and Abetting Breaches of Fiduciary Duty (Counts 2, 7, 9, & 11) .......................... 119

1.  Count 2:  Aiding and Abetting Breach of Fiduciary Duty in Connection
with the 2003 Transaction ....................................................................................... 123

2. Count 7:  Aiding and Abetting Breach of Fiduciary Duty with respect
to the Levimo Transaction .......................................................................... 125

3. Count 9:  Aiding and Abetting Breach of Fiduciary Duty with respect
to  Sale Process (The Recapitalization and Refinancing Alternatives) ................... 127

4. Count 11:   Aiding and Abetting Breach of Fiduciary Duty with respect
to Sale Process (Interference With the J.H. Whitney Sale Offer)........................... 132

I. Count 12:  Tortious Interference With Business Contracts with respect
to Sale Process................................................................................................. 134

1. Candlewood ........................................................................................... 137

2. Lee Morgan............................................................................................. 138

3. Marty Moran ........................................................................................... 140

J. Count 15:  Attorney Fees .......................................................................... 140

VI.  Conclusion ................................................................................................. 143

## I.       INTRODUCTION

W. Timothy Miller, as Trustee of The Antioch Company Litigation Trust (the "Litigation Trustee"), initiated this adversary proceeding on December 23, 2009 against thirty defendants, most of whom were identified in the complaint either as former trustees of the Antioch Company's employee stock ownership plan, or current or former officers and directors who served on the Antioch board of directors at various times from 2003 to the Chapter 11 filing.  In addition to tort claims, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, professional negligence and tortious interference with contracts, the Litigation Trustee is asserting bankruptcy claims for equitable subordination and preferential transfers.  The tort claims concern the role that the defendants played in connection with a transaction designed to transfer all of Antioch's equity to Antioch's employee stock ownership plan, decisions subsequent to that transaction, and the financial debacle that ensued.  In a nutshell, the Litigation Trustee alleges that some of the defendants either placed their own interest ahead of that of the company, its employees, and creditors or assisted other defendants in furthering that aim.  All of the defendants filed motions to dismiss the complaint.  For the reasons discussed below, the court recommends that the motions to dismiss the tort claims be denied in part and granted in part.

## II.      PROCEDURAL BACKGROUND

This adversary proceeding arises out of the Chapter 11 bankruptcy cases filed by The Antioch Company and certain of its subsidiaries on November 13, 2008 ("Antioch" or the

"Company").[1] Cplt. ¶ 6. On January 27, 2009 the court entered an order confirming the Second Amended Joint Prepackaged Plan of Reorganization (the "Plan" and "Confirmation Order"). *Id.* The litigation trust (the "Litigation Trust") was established through the Plan and the Confirmation Order. Cplt. ¶ 7. Pursuant to the Plan and the Confirmation Order, Antioch transferred certain assets to the Litigation Trust as of February 6, 2009, among which are certain causes of action. *Id.* The Litigation Trustee has authority to prosecute, settle and compromise all of the claims transferred as a representative of the Debtors' estate pursuant to Section 1123(b) of Title 11 of the United States Code.[2] Cplt. ¶ 8.

On December 23, 2009 pursuant to its authority under the Litigation Trust, the Litigation Trustee filed a complaint with jury demand (the "Complaint") (Adv. Doc. 1). All of the defendants filed motions to dismiss the Complaint (Adv. Docs. 80, 92, 98, 99, 104, 107, 109, 147, 150, 153, 156 & 159) (the "Motions to Dismiss").[3]

On March 22, 2010 the Litigation Trustee filed *Plaintiff's Consolidated Memorandum in Opposition to Motions to Dismiss Filed by Defendants Candlewood Partners, LLC, CRG Partners Group, LLC, Michael Epstein, Evolve Bank and Trust; Houlihan Lokey, Howard & Zukin, Inc.; James*

---

[1] Those subsidiaries were Antioch International, Inc., Antioch International – Canada, Inc., Antioch International – New Zealand, Inc., Antioch Framers Supply Company, zeBlooms, Inc. and Creative Memories Puerto Rico, Inc.

[2] Unless otherwise noted, all statutory references are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. §§ 101-1532, cited hereinafter in this decision as "§____."

[3] In addition to his motion to dismiss, defendant James Northrop also filed an answer to the Complaint (Adv. Doc. 79). Defendants Lee Morgan, Asha Morgan Moran, Marty Moran, Chandra Attiken, Lee Morgan GDOT Trust #1; Lee Morgan GDOT Trust # 2, Lee Morgan GDOT Trust # 3; Lee Morgan Pourover Trust 31 and Lee Morgan Pourover Trust # 2 filed a *Motion to Partially Withdraw the Reference to The Bankruptcy Court And Memorandum in Support* (Adv. Doc. 145 and a *Motion of Certain Defendants For Limited Stay Pending a Decision by The District Court on Their Motion to Partially Withdraw The Reference to The Bankruptcy Court, And Memorandum in Support* (Adv. Doc. 146). This court denied the stay motion (Adv. Doc. 210) and the United States District Court for the Southern District of Ohio denied the motion to withdraw the reference (Adv. Doc. 219).

*Northrop; Paul Ravaris; And Reliance Trust Company* (Adv. Doc. 148) and on April 12, 2010 the Litigation Trustee filed *Plaintiff's Consolidated Memorandum in Opposition to Motions to Dismiss Filed by Defendants Lee Morgan, Asha Morgan Moran, Chandra Attiken, Martin Moran, Lee Morgan GDOT Trust #1, Lee Morgan GDOT Trust #2; Lee Morgan Pourover Trust #1, Lee Morgan Pourover Trust #2, Nancy Blair, Wayne Allen Luce, Frederick Walker; Ben Carlson, Jeanine McLaughlin; Denis Sanan, Malte vonMatthiessen. GreatBanc Trust Co, Steve Bevelhymer; Karen Felix, Barry Hoskins, and G. Robert Morris* (Adv. Doc. 186).

The court heard oral arguments on the Motions to Dismiss on September 1, 2010.

## III.   FACTUAL BACKGROUND

The facts asserted in the Complaint, which is 53 pages long and contains 263 paragraphs, are assumed as true for purposes of the defendants' Motions to Dismiss, but do not constitute the findings of the court.  All factual references related to the Complaint discussed in these recommendations, whether stated or not, are as alleged only.

### A.   The Defendants

Lee Morgan ("Morgan"), the father of Asha Morgan Moran, was the chief executive, ESOP trustee and chairperson of the board of directors of Antioch, a member of the Antioch Committee ESOP Advisory Committee, and an insider of Antioch. Cplt. ¶ 9.  Asha Morgan Moran ("Moran") served as chief operating officer of Antioch from September 2000 through July 2008 when, upon her father's retirement, she was appointed president and chief executive of Antioch and was a director of Antioch, a member of the Antioch Committee ESOP Advisory Committee, and an insider of Antioch. Cplt. ¶ 10.  She is the spouse of Marty Moran, himself an insider of Antioch. Cplt. ¶ 25.

8

Chandra Attiken ("Attiken") was the Vice President – Human Resources of Antioch, a member of the Antioch Committee ESOP Advisory Committee, and an Antioch insider. Cplt. ¶ 11.

Steve Bevelhymer ("Bevelhymer") was Antioch's treasurer and an officer of Antioch. Nancy Blair ("Blair") was an officer, director and insider of Antioch and the chair of Antioch's special committee. Ben Carlson ("Carson") was a director and insider of Antioch. Cplt. ¶¶ 12-14.

Karen Felix ("Felix") was the chief financial officer and an insider of Antioch. Barry Hoskins ("Hoskins") was also a chief financial officer and was the ESOP trustee and an officer and insider of Antioch. Cplt. ¶¶ 18, 19.

Kimberly Lipson-Wilson ("Lipson-Wilson") was the former director of compliance, Sub-Trust trustee, ESOP trustee, and an officer and insider of Antioch. Cplt. ¶ 22.

Wayne Allen Luce ("Luce"), Jeannine McLaughlin ("McLaughlin"), G. Robert Morris ("Morris"), James Northrop ("Northrop"), Denis Sanan ("Sanan") and Malte vonMatthiessen ("vonMatthiessen") were directors and insiders of Antioch. Cplt. ¶¶ 23, 24, 27, 28, 30 & 31.

Frederick Walker ("Walker") was the President of Creative Memories, North America, a subsidiary of Antioch and an officer and insider of Antioch. Cplt. ¶ 32.

In addition to those individuals, Lee Morgan GDOT Trust #1, Lee Morgan GDOT Trust #2, Lee Morgan GDOT Trust # 3, Lee Morgan Pourover Trust #1 and Lee Morgan Pourover Trust #2 were established to hold legal title to certain interests for the benefit of Morgan

and members of his family (the "Morgan Trusts"). The Morgan Trusts were insiders of Antioch. Cplt.¶ 26.

Also named as defendants, whose roles will be further detailed during the course of these recommendations, are Candlewood Partners, LLC ("Candlewood"), the Morgan Family's[4] private financial advisor [Cplt. ¶ 115]; CRG Partners, LLC ("CRG"), a turnaround firm and two of its employees, Michael Epstein ("Epstein") and Paul Ravaris ("Ravaris") [Cplt. ¶ 16]; Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan Lokey") [Cplt. ¶ 21]; and the entities that served as ESOP trustees – Evolve Bank & Trust ("Evolve") [Cplt. ¶ 17], GreatBanc Trust Co. ("GreatBanc") [Cplt. ¶ 19], and Reliance Trust Company ("Reliance") [Cplt. ¶ 29].

### B.     The 2003 Transaction

In 1979 Antioch established an employee stock ownership plan ("ESOP") to provide retirement benefits to Antioch employees. Cplt. ¶ 42. When an employee retired, she could redeem her stock in cash or installment payments. *Id.* Antioch's average historic repurchase liability between 1998 and 2003 was approximately $12 to $14 million each year. *Id.*

In 2003 Antioch had over 1,200 full time employees and the ESOP owned 42.8% of the Company. Cplt. ¶ 43. Approximately 47 individuals and trusts owned the remaining stock. *Id.* Among those individuals were Morgan, Moran, Carson, McLaughlin, Sanan and vonMatthiessen, who served as directors of Antioch, and Blair, Hoskins and Attiken who served as officers. *Id.* The ESOP was governed by an advisory committee which, in 2003, consisted of Morgan, Moran and Attiken, with Morgan serving as the chairperson, removable

---

[4] The term "Morgan Family" includes Morgan and Moran, as well as certain of Morgan's grandchildren, which held "significant subordinated debt and equity interests in the Debtors." Cplt. ¶ 38.

only by unanimous consent of the board of directors (excluding his vote). Cplt. ¶ 46.  Morgan, Moran, and Attiken, by virtue of their positions on the ESOP advisory committee, were fiduciaries. *Id.* Hoskins also served as the ESOP directed trustee designated by Morgan, Moran, and Attiken. Cplt. ¶ 50.

As a result of Antioch's subchapter S status, while the non-ESOP shareholders were required to pay taxes on corporate earnings, the ESOP was not subject to tax liability on dividends or other distributions. Cplt. ¶ 44.  Antioch historically distributed approximately 45% of its taxable income to its shareholders. *Id.*  The non-ESOP shareholders used their portion of the distribution to pay their income taxes while the ESOP allocated its share to each participant's account.  *Id.*

During 2003 Morgan and Moran sought to diversify their assets and liquidate their personal holdings in Antioch while maintaining control of Antioch and reaping tax savings. Cplt. ¶ 45.  To that end, assisted by Deloitte & Touche LLP ("Deloitte") and Antioch's counsel, they proposed a transaction through which Antioch would make a tender offer to purchase the shares of the non-ESOP shareholders and then merge into a new company wholly owned by the ESOP. Cplt. ¶ 49.   The transaction would save the non-ESOP shareholders approximately $290 million in federal income tax with the Morgan Family, the largest non-ESOP shareholders, reaping the majority of those savings. Cplt. ¶ 47.

In August 2003 to remedy the inherent conflict of interest that existed with Hoskins being a non-ESOP shareholder and ESOP directed trustee, Antioch retained GreatBanc to serve as an independent ESOP trustee. Cplt. ¶ 50.  It also retained Houlihan Lokey to provide an opinion "on the transaction's fairness." *Id.*

To establish the consideration that each non-ESOP shareholder would receive, Antioch valued its shares at $850 per share despite Business Valuations, Inc. ("BVI") having valued such shares one year earlier at $680 per share. The lower share value arrived at by BVI considered Antioch's repurchase liability and the lack of marketability and valued Antioch's total equity at $333.2 million on "a minority interest basis." Cplt. ¶51.

The Complaint alleges that members of Antioch's board contained conflicts of interest at the time that the ESOP transaction was considered and approved by the board, Specifically, at the time of the proposed ESOP transaction, Antioch's board consisted of Morgan, Moran, Carson, Luce, McLaughlin, vonMatthiessen, and Sanan and two ESOP shareholders, Sandy Borstad and Deborah Brooks-Cain. Cplt. ¶ 53. With the exceptions of Luce, Borstad, and Brooks-Cain, all of the directors were non-ESOP shareholders who stood to greatly profit from the transaction and were therefore conflicted. *Id.* Members of the Morgan Family collectively owned 32.3% of the total outstanding non-ESOP shares of Antioch and stood to gain $189,767,600 from the transaction. In particular, Morgan and the Morgan Trusts owned 68,639 shares (14.2% of the total outstanding shares) and stood to gain $58,112,800; Moran owned 94,721 shares (19.7% of the total outstanding shares) and stood to gain $80,512,850; Morgan's son and certain of the Morgan grandchildren owned 60,167 shares (12.6% of the total outstanding shares) and stood to gain $51,941,950. Cplt. ¶ 54. Carson, with 1,750 shares, stood to gain $1,487,500; McLaughlin, with 2,596 shares, stood to gain $2,206,600; Sanan, with 6,880 shares, stood to gain $5,848,000; and vonMatthiessen, with 1,270 shares, stood to gain $1,079,500. Cplt. ¶¶ 55-58. Collectively, Antioch's board of

directors directly or indirectly owned 85.9% of the non-ESOP shares and stood to gain $200,618,700 from the transaction. Cplt. ¶ 59.

The conflicted board members failed to fully disclose their interests to the non-conflicted board members. Cplt. ¶ 60. In addition, Morgan and Hoskins considered removing GreatBanc as trustee upon GreatBanc expressing concerns about the disproportionate benefits that the transaction would confer upon the non-ESOP shareholders. Cplt. ¶ 61. Morgan refused to follow GreatBanc's advice to obtain an independent appraisal and dismissed concerns about the considerable amount of debt that Antioch would incur to purchase the non-ESOP shares. Cplt. ¶¶ 61 & 62.

After Morgan assured the directors that they would be indemnified in the event the transaction triggered litigation and, relying on Houlihan Lokey's opinion that "expressly disclaimed any advice as to whether Antioch should engage in the transaction," Antioch's board voted to approve the transaction on October 30, 2003. Cplt. ¶¶ 65-67.

Antioch made the tender offer to all the shareholders to purchase all of Antioch's shares for $850 in cash or, alternatively, a package of consideration consisting of $250 cash, a $280 subordinated note due in 2010, and a warrant to purchase one share at an exercise price of $850 in 2014. Cplt. ¶ 68. Antioch did not limit the amount of cash shareholders could elect to take as a part of the transaction, but it limited the number of non-ESOP shareholders who could elect to take the package consideration. *Id.* While the tender offer contained statements that the transaction was fair to the non-ESOP shareholders, it contained little information regarding the fairness of the transaction to Antioch and claimed that the transaction would not impair Antioch's long-term viability. Cplt. ¶ 72. The officers and

13

directors of Antioch, and Morgan and Moran in particular, engaged in a comprehensive public relations campaign to convince stakeholders that the transaction was in Antioch's and its employees' best interests. Cplt. ¶ 73.

The transaction was conditioned on GreatBanc's refusal to tender the ESOP shares. Cplt. ¶ 75. Without obtaining an independent fairness opinion and relying instead on the informal valuation prepared for Antioch by Deloitte and the fairness opinion prepared by Duff & Phelps that used a flawed methodology, GreatBanc agreed to decline to sell any ESOP shares in the tender offer in exchange for a Put Price Protection Agreement.[5] Cplt. ¶ 76. The Put Price Protection Agreement established special distribution rules applicable to all ESOP participants who terminated their employment during the period commencing on January 1, 2003 and terminating on September 30, 2006. Cplt. ¶ 77. The transaction closed on December 16, 2003 (the "2003 Transaction") and GreatBanc's engagement as trustee ended shortly thereafter. *Id.*

As a result of the 2003 Transaction, Morgan, Moran, and other members of the Morgan Family received approximately $111,424,500 in cash while other directors, including Carlson, McLaughlin, Sanan and vonMatthiessen, collectively received at least $25 million in consideration. Cplt. ¶ 78.

The 2003 Transaction was the product of a conflicted board comprised only of interested directors. Cplt. ¶79. By failing to obtain an independent appraisal as to the fairness and effects of the transaction to Antioch, Antioch's officers and directors engaged in

---

[5] The Duff & Phelps opinion failed to take into account the effect of Antioch's repurchase liability and the shares' lack of marketability. Cplt. ¶ 76. In addition, the opinion was concentrated on whether the transaction was financially fair to the ESOP and not to the Company itself. *Id.*

self-dealing, wasted and mismanaged corporate assets and, as a result, deliberately relinquished their fiduciary duties of good faith, loyalty and disclosure to Antioch. *Id.* Antioch's officers and directors knew or reasonably should have known that a majority of Antioch's board was conflicted, approval of the 2003 Transaction would violate their fiduciary duties, the transaction was a "prohibited transaction" under ERISA sections 406 and 408, which might disqualify the ESOP and trigger the loss of Antioch's 100% S-Corp and tax exempt status, and the 2003 Transaction would be voidable unless it could be shown to be fair to Antioch, thereby resulting in substantial injury to Antioch. Cplt. ¶¶ 81-87.

C.      **Events Following the 2003 Transaction**

The issuance of notes and warrants to some of the non-ESOP shareholders substantially diluted the ESOP's 100% ownership of Antioch and, as a result of the 2003 Transaction, the ESOP received 25% less in annual distributions than it had in previous years. Cplt. ¶¶ 88 & 89. The financing of the 2003 Transaction forced Antioch to pay out $46 million in cash and borrow an additional $109 million, resulting in Antioch's interest-bearing debt rising from $108 million as of December 31, 2002 to $201 million a year later. Cplt. ¶ 90.

The report that Prairie Capital Advisors issued, consistent with the Put Price Protection Agreement requirement that Antioch's stock be appraised at the end of each year, valued Antioch stock at $894 per share as of December 31, 2003 on an ESOP minority interest basis, applying a 5% lack of marketability discount, but did not discuss Antioch's repurchase liability. Cplt. ¶¶ 92-94.

Sales began to decline prior to October 1, 2004. In addition, the termination or resignation of numerous employees triggered the Put Price Protection Agreement and locked

in the value of the departing employees' ESOP accounts at $894 per share according to Prairie Capital Advisors' valuation. Cplt. ¶ 95. Thus, between 2004 and 2007, as a result of the termination or resignation of 800 employees, Antioch's repurchase liability reached $190 million compared to its pre 2003 Transaction's repurchase liability which averaged between $12 and 14 million each year. Cplt. ¶¶ 91 & 95.

Because of its increased repurchase liability, Antioch breached its financial covenants with its lenders and was forced to restructure its debt to borrow additional funds to meet its repurchase liability. Cplt. ¶ 97. By the end of 2004, Antioch had paid out close to $75 million and issued notes for an additional $30 million to satisfy its repurchase obligations to departing employees. Cplt. ¶ 98.

This downward spiral continued through 2004 and 2005 spurred by a further decline in sales. Cplt. ¶ 99. Still, the officers and directors ignored warnings that financial projections were too optimistic and the multiple conflicts presented by the Morgan Family's ownership of debt and warrants and Hoskins serving as both a directed trustee for the ESOP and as trustee for the Morgan Family subordinated notes. Cplt. ¶¶ 99-100. By early 2007 Antioch was in severe financial distress and in "the zone of insolvency." Cplt. ¶ 101.

On March 20, 2007 the board hired Houlihan Lokey to help identify potential purchasers or lenders. Cplt. ¶ 102.

**D.    The Levimo Transaction**

On April 9, 2007 Antioch's board approved a sale and leaseback transaction pursuant to which Levimo, LLC ("Levimo"), an entity wholly owned and controlled by the Morgan Family, purchased two buildings in St. Cloud, Minnesota from Antioch and leased both

buildings back to Antioch (the "Levimo Transaction"). Cplt. ¶¶ 103-104. Morgan and Marty Moran negotiated the sale on behalf of Levimo. Cplt. ¶ 103. The lease purported to waive the conflict that existed between certain of Levimo's affiliates and Antioch even in the event of bankruptcy and contained a series of terms favorable to Levimo in case of default. Cplt. ¶ 104-105.

E.       Sale Considerations

Despite the money that the Levimo Transaction injected into its coffers, Antioch's financial woes continued and on April 17, 2007 it was forced to enter into a new refinancing agreement with its senior lenders. Cplt. ¶ 107. The board of directors, consisting of Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, and an employee owner representative formed a special committee composed of Morgan, Moran, Blair, and vonMatthiessen (the "Special Committee") to examine Antioch's alternatives to restructuring. Cplt. ¶ 108. Bevelheymer indicated to Morgan and Moran that, in light of the declining sales, Antioch would not be able to meet its financial covenants and that a sale of the Company was necessary. *Id.* As late as May 30, 2007 Antioch's officers and directors had still not informed Antioch's senior lenders of the engagement of Houlihan Lokey to attempt a sale. *Id.*

The 100% ESOP S-Corp structure resulting from the 2003 Transaction as well as the ESOP Notes, subordinated notes, and warrants that partially funded the transaction complicated the restructuring alternatives available to Antioch. Cplt. ¶ 109. In particular, the "change of control" provisions in the subordinated notes and warrants that made the notes immediately payable and the warrants exercisable in full ensured that any change in power

over Antioch would benefit Morgan, Moran, and Attiken and the conflicted directors who held subordinated notes and warrants at a great cost to Antioch. *Id.*  Also complicating matters for Antioch and the ESOP were the significant debt and warrants held by the Morgan Family and Morgan in particular that jeopardized compliance with the so-called "anti-abuse" provisions of the Internal Revenue Code. Cplt. ¶¶ 110-111.  Antioch employees, particularly Lipson-Wilson, spent hours devising a strategy to maintain compliance with the Internal Revenue Code in light of Morgan's interest in Antioch. In order to maintain compliance with the anti-abuse rules of Section 409p of the Internal Revenue Code and to maintain less than 48% ownership by disqualified persons as directed by the ESOP plan documents, on August 22, 2007 the Antioch board resolved to transfer Morgan's shares to a sub-trust of the Antioch Employee Savings Plan. *Id.*

After it became clear that Antioch's interests conflicted with those of the Morgan Family, Morgan and Moran were excluded from the Special Committee and replaced by McLaughlin, Luce, and Sanan along with Blair and vonMatthiessen. Cplt. ¶ 112.  In June 2007 Antioch's board retained Reliance to serve as "independent" ESOP trustee replacing Lipson-Wilson and in August 2007 the board retained Reliance to serve as discretionary ESOP trustee to approve any transaction. Cplt. ¶ 113.

Houlihan Lokey identified three prospects who indicated that if they purchased the Company, they would not allow Morgan and Moran to continue in their current positions. Cplt. ¶114.  Dissatisfied with these overtures, in August 2007 Morgan, with assistance and input from Moran and Marty Moran, separately hired Candlewood to explore refinancing or recapitalization options that would allow Morgan and Moran to retain their interests and

power in Antioch. Cplt. ¶ 115. The Morgan Family began exploring alternatives to the sale before Houlihan Lokey reported to the board the ultimate results of its efforts to find a buyer for Antioch. *Id.*

Despite being aware that Candlewood's and Houlihan Lokey's respective work interfered with each other and jeopardized a potential successful outcome for Antioch, the board permitted them to pursue a dual sale process, paid both, allowed both to sit in board meetings, and continued to engage in discussions with both. Cplt. ¶¶ 116-118. Attiken, Lipson-Wilson, Felix, Bevelhymer, Epstein, Ravaris, and Walker, as officers, were aware of the advisors' simultaneous engagement, but inconsistent objectives, and assisted the Morgan Family in pursuing recapitalization efforts. *Id.* In doing so, Antioch's officers and directors jeopardized the Company's future and wasted its sparse resources on professional fees. Cplt. ¶ 122. In the one year prior to the petition date, Antioch paid Houlihan Lokey, CRG, and their legal advisors in excess of $5 million and Candlewood in excess of $500,000. Cplt. ¶ 164.

Houlihan Lokey's task was made more difficult by Antioch's failure to prepare accurate financial projections. Cplt. ¶ 121. Morgan and Moran disregarded information provided to them regarding Antioch's financial crisis and insisted upon using numbers that were more optimistic than realistic to hide from other stakeholders the dire financial straits in which Antioch found itself. Cplt. ¶ 121.

By October 2007 two potential purchasers identified by Houlihan Lokey expressed an interest in acquiring the Company. However, both declined to submit formal bids after Antioch made multiple adjustments to its financial forecasts. Cplt. ¶ 123. Subsequent to one

of the potential buyers disclosing its concern regarding the accuracy of the ESOP valuations to the entire board, Morgan pressured the Special Committee and Antioch's directors to grant Candlewood an exclusive period to find an investor or financing supporting the Morgan Family's continuing control. *Id.* Morgan also repeatedly informed the Special Committee that as Antioch's largest creditor, the Morgan Family would not support a sale to an outside buyer, even if in the best interest of the Company, if such sale compromised the obligations owed by the Company to the Morgan Family. Cplt. ¶ 126.

Pressured by Morgan and Moran to curtail Reliance's independence, the directors passed a resolution on October 4, 2007 instructing Reliance that Antioch's board would not support any proposed sale of the Company that would not fully pay all outstanding debts and result in some value to the shareholders. Cplt. ¶ 124.

In November 2007 at the request of its senior lenders, Antioch engaged CRG to assist the Company with the preparation of a 13-week cash flow analysis and, during the course of CRG's engagement, appointed Ravaris and Epstein as chief restructuring officer and chief financial officer respectively. Cplt. ¶ 125.

On November 28, 2007 Reliance gave formal notice of its resignation as ESOP trustee to be effective as of December 28, 2007, expressing concerns about the "ineffectual and conflicted management" that led to an erosion of the ESOP's interest in Antioch. Cplt. ¶¶ 127-131. It did not file a comprehensive report regarding the ESOP upon its resignation as required by the ESOP trust agreement. Cplt. ¶ 130. Despite Lipson-Wilson sharing this information with Felix and Blair and Antioch's counsel and other members of the board later learning of Reliance's concerns, no action was taken. Cplt. ¶¶ 128, 131-132.

20

Following Reliance's resignation, Evolve was recruited to serve as the new ESOP trustee. Reliance's counsel shared with Evolve the reasons underlying Reliance's resignation. Cplt. ¶ 133. Antioch's officers and directors told Evolve that Reliance had resigned because its engagement required more time than projected when it established its fees. Cplt. ¶ 134. Evolve failed to take any action respecting the 2003 Transaction and the officers' and directors' conflicts of interest. Cplt. ¶ 135.

In February 2008 Morgan, Moran, and certain directors, attorneys, and financial advisors participated in a meeting in Chicago at which it was agreed that the Morgan Family could work toward a consensual transaction that would leave the Morgan Family in control in preference to a deal that would allow independent buyers to acquire a controlling interest in Antioch. Cplt. ¶ 136.

Morgan was warned by all of the professionals, including his own advisors, that Antioch's restructuring hinged on a negotiated resolution with the ESOP noteholders and that such resolution would be extremely difficult to accomplish outside bankruptcy. However, the Morgan Family continued to pursue deal structures that would favor them over the other unsecured creditors, including the ESOP noteholders. Cplt. ¶¶ 137-138.

The preference announced by Antioch's board for a deal designed by and for the benefit of Morgan Family had a chilling effect on prospective purchasers who realized that their attempt to acquire Antioch ultimately would be futile. Cplt. ¶ 139.

The board continued to allow Morgan, Moran, and Candlewood to pursue alternatives that failed to address Antioch's urgent need for cash and jeopardized and ultimately doomed Houlihan Lokey's efforts. Cplt. ¶¶ 137 & 140.

### F.      The First Sale Proposal and the Replacement of Antioch's Board

Despite the difficulties created by the board's ambivalence, the Morgan Family's interference, and repeated pressures to terminate its engagement, in early June 2008, Houlihan Lokey was working to close on the sale of Antioch's assets to J. H. Whitney for $54 million to be achieved through a bankruptcy sale. Cplt. ¶¶ 142-143.

With knowledge of the J.H. Whitney offer, the Morgan Family created Mamamo, LLC ("Mamamo") for the purpose of making an offer to recapitalize Antioch using a lien facility of up to $8 million and a letter of credit in the amount of $7 million (the "Mamamo Offer"), which the Special Committee rejected on June 4, 2008. Cpt. ¶¶ 144 & 145.

The rejection of the Mamamo Offer prompted the Morgan Family to pressure Evolve and Lipson-Wilson, in her capacity as trustee of the SubTrust, to fire the board in order to thwart the Whitney deal. Cplt. ¶ 146.  On June 5, 2008 Evolve and Lipson-Wilson voted to fire the directors and replace them with Morgan, Moran, and Morris, an attorney selected by Evolve. Cplt. ¶ 147.  Also on June 5, 2008 during a meeting with its financial advisors and senior lenders, Antioch informed its senior lenders of the new board. Cplt. ¶ 148.

The firing of the board caused J.H. Whitney to withdraw its offer and on June 6, 2008 its senior lenders declared Antioch in default. Cplt. ¶ 149.

### G.      Defaults under the ESOP Notes

Antioch issued four rounds of notes to satisfy its financial obligations to its departing employees (collectively the "ESOP Notes"). Cplt. ¶¶ 98 & 152.  As a result of the default call by its senior lenders, Antioch found itself unable to make certain payments due on August 1, 2008 under some ESOP Notes. Cplt. ¶¶ 151 & 153.  This situation should not have caused a

problem because Antioch was required to obtain adequate security for the ESOP Notes. Cplt. ¶ 151. Condor Insurance Limited ("Condor Insurance") originally guaranteed the first three issues of ESOP Notes dated August 20, 2004, July 11, 2005, and August 2, 2006 through the issuance of bonds. These bonds were later transferred to Condor Guaranty, Inc. ("Condor Guaranty"). Cplt. ¶ 152. Despite having knowledge that Condor Insurance had filed for bankruptcy protection on or about July 26, 2007, Antioch's officers, including Lipson-Wilson, Felix, Bevelhymer, Blair, Morgan and Moran, caused the fourth round of ESOP Notes to be issued with Condor Guaranty as surety. No later than January 2008 all of Antioch's directors and officers knew of Condor's bankruptcy and in August 2008, Ravaris and Epstein renewed the Condor coverage and later notified Condor of Antioch's default on the ESOP Notes payments due August 1, 2008. Cplt. ¶¶ 152 & 154. However, Condor has never made a payment and the holders of the ESOP Notes have not received any payments since early 2008. Cplt. ¶ 154.

Despite Antioch's dire financial situation, Moran, in various written communications with the ESOP noteholders, prepared with the assistance of Ravaris, Epstein, and CRG, informed them that Antioch's senior lenders had refused to allow the Company to make the August 2008 payment, assured those noteholders that payment on the notes was guaranteed by Condor and, as late as November 1, 2008, assured the holders of the ESOP Notes that the Company was financially strong. Cplt. ¶¶ 155-157.

### H. The Second Sale Proposal

In August 2008 Antioch reapproached J.H. Whitney and two other potential purchasers. Cplt. ¶ 159. In September 2008 Antioch rejected J.H. Whitney's second offer to purchase Antioch's assets, this one for $22 million. Cplt. ¶ 160.

### I. The Bankruptcy Filing

On November 12, 2008 the board approved resolutions to file for relief under Chapter 11. Cplt. ¶ 162. The prepackaged plan of reorganization that Antioch filed did not contemplate a sale, allowed Antioch to strip itself of its obligations to the ESOP noteholders and certain other disfavored creditors, left the Morgan Family in day-to-day operational control of the Company, and provided the Morgan Family with a controlling interest in the reorganized debtors. Cplt. ¶ 164.

## IV. THE LITIGATION TRUSTEE'S CLAIMS AND THE DEFENDANTS' RESPONSES

The Litigation Trustee's claims include five breach of fiduciary duty claims, Counts 1, 3, 6, 8 and 10, each one being associated with a particular transaction and set of defendants. Count 1 is brought in connection with the 2003 Transaction against Morgan, Moran, Carson, McLaughlin, Sanan, vonMatthiessen, Blair, and Attiken. Count 3 is brought against Morgan, CRG, Epstein, Ravaris, Lipson-Wilson, Felix, Hopkins, and Bevelhymer in connection with the Condor Transaction. Count 6 is brought against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, and Attiken in connection with the Levimo Transaction. Count 8 is brought against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, Attiken, Northrup, CRG, Ravaris, Epstein, and Walker in connection with the recapitalization or refinancing alternative

strategy.  Finally, Count 10 is brought against Morgan, Moran and Morris in connection with the JH Whitney offer to purchase the Company.

Other than the claim relating to the Condor Transaction, the Litigation Trustee's remaining claims are aiding and abetting claims related to the other transactions.  Count 2, related to the 2003 Transaction is brought against Morgan, Moran, Carson, McLaughlin, Sanan, vonMatthiessen, Blair, Attiken, GreatBanc and Houlihan Lokey.  Count 7, related to the Levimo Transaction, is brought against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, Attiken and Marty Moran.  Count 9, related to the recapitalization or refinancing alternative strategy, is brought against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, Attiken, Northrup, CRG, Ravaris, Epstein, Walker, Candlewood, Marty Moran and Houlihan Lokey.  Finally, Count 11, related to the JH Whitney offer to purchase the Company, is brought against Morgan, Moran, Morris, Evolve and Lipson-Wilson.

Counts 4 and 5 allege claims of professional negligence against Reliance and Evolve and Count 12 alleges a claim for tortious interference with business contracts against Morgan, Marty Moran, and Candlewood.

In addition to these non-core claims, through Count 13 the Litigation Trustee seeks to equitably subordinate claims of Morgan, Moran, and the Morgan Trusts against Antioch and through Count 14 he seeks to avoid and recover preferential transfers from Morgan, Moran, Attiken, Bevelhymer, Blair, Felix, Levimo, Luce, McLaughlin, Morris, Northrop, Sanan, vonMatthiessen, Walker, and Lipson-Wilson.   These core bankruptcy claims are addressed in

a separate decision of this court and are not part of the recommendations to the United States District Court for the Southern District of Ohio (the "District Court").

Finally, Count 15 seeks attorney fees under applicable state and federal law for prosecution of all the other claims.

All of the defendants argue that the Complaint fails to plead sufficient facts to pass muster under the pleading standards established by the United States Supreme Court in the *Twombly* and *Iqbal* decisions, which are detailed below. The defendants' other arguments, in support of their respective Motions to Dismiss, fall into one of the following categories.[6]

The Morgan Family focuses on ERISA preemption arguing that the state law claims against them are disguised ERISA claims that do not belong to the Litigation Trust. The institutional ESOP trustees, GreatBanc, Reliance, and Evolve, also rely on ERISA preemption, arguing that, as ESOP trustees, their duty was to the ESOP participants and not to Antioch. The other individual defendants, all former directors or officers of Antioch, against whom the Litigation Trustee has brought a claim for breach of fiduciary duty, argue that the business judgment rule protects them because they acted in good faith, in the best interest of Antioch, and with the care that a reasonably prudent person would use under the circumstances.

The defendants against whom the Litigation Trustee has brought a claim of aiding and abetting breach of fiduciary duty assert that Ohio law does not recognize such a claim, that even if it does, the Litigation Trustee has not plead enough facts to support the allegations, and that such a claim cannot be brought against a fiduciary. Finally, those

---

[6] This summary reviews only the generic grounds for dismissal that are common to the various categories of defendants. The grounds specific to each defendant will be address separately in the discussion section.

defendants against whom the Litigation Trustee has brought claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty with respect to the 2003 Transaction and Moran in connection with the breach of fiduciary duty claim related to the Condor Transaction, assert that those claims are barred by the applicable 4 year statute of limitation under Ohio law.

## V.  LEGAL STANDARD AND ANALYSIS

The court will first discuss the legal standard for a motion to dismiss for failure to state a claim, a challenge to this court's subject matter jurisdiction over this adversary proceeding, and a threshold argument about whether res judicata, pursuant to the confirmed Plan, bars the Litigation Trustee from pursuing certain claims.  Next, these recommendations will address legal arguments concerning certain applicable statutes of limitation and the ERISA preemption statute, both of which encompass multiple counts and defendants.    Finally, the court will address each of the arguments raised by various defendants as to why the non-core causes of action should be dismissed.

### A.    Legal Standard for Determining Motions to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure ("BR") 7012, for failure to state a claim upon which relief can be granted challenges the legal sufficiency of a complaint.  In determining a motion to dismiss, the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Jones v. City of Cincinnati,* 521 F.3d 555, 559 (6th Cir. 2008), *quoting, DirecTV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007).  However, in

determining such a motion, a court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.*

The Supreme Court recently clarified the law concerning what a plaintiff must plead in order to survive a FRCP 12(b)(6) motion. *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009). Under the standard established by *Bell Atlantic Corp. v. Twombly*, the Supreme Court had instructed lower courts to dismiss claims not supported by factual allegations sufficient to "state a claim to relief that is *plausible* on its face." 550 U.S. 544, 570 (2007) (emphasis added). Some courts interpreted *Twombly* to only apply in antitrust cases and other courts found that *Twombly's* pleading requirements could be overcome with a mere assertion of a defendant's responsibility. *Iqbal* makes clear that *Twombly* is not so limited and buttresses the *Twombly* plausibility standard. In *Iqbal*, quoting *Twombly*, the Supreme Court held that FRCP 8(a) requires "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (internal citations omitted). Furthermore, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

According to the Court, deciding the adequacy of a complaint requires a two-step analysis. First, a court should identify and reject legal conclusions unsupported by factual allegations, because conclusions masquerading as allegations "are not entitled to the assumption of truth." *Id.* at 1950. Insufficient are "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements", "labels and conclusions", and "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 1949. In sum, a complaint that alleges that a defendant caused a plaintiff's injury, without explaining how,

28

does not meet the requirements of FRCP 8(a) and therefore cannot survive a FRCP 12(b)(6) motion. Second, a court should assume the veracity of "well-pleaded factual allegations" and should conduct a "context-specific" analysis that "draw[s] on [the court's] judicial experience and common sense" to determine whether the allegations "plausibly give rise to an entitlement to relief." *Id.* at 1950. Well-pleaded facts that "do not permit the court to infer more than the mere possibility of misconduct" are insufficient to show that plaintiff is entitled to relief. *Id.*

"A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New England Health Care Emps. Pension Fund v. Ernst & Young, LLP,* 336 F.3d 495, 501 (6th Cir. 2003); *See also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 655, n. 1 (6th Cir. 2005) (Fed. R. Evid. 201 states that "'[a] court may take judicial notice, whether requested or not' of a 'judicially noticed fact' which 'must be one not subject to reasonable dispute,' a requirement satisfied if the fact is '(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'").

### B. Choice of Law

All the parties agree that substantive Ohio law applies to the non-core causes of action.

### C. Subject Matter Jurisdiction

As will be explained, this court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it is related to a case under Chapter 11. Causes of action 1 – 12 are non-core proceedings. 28 U.S.C. § 157(b). The Litigation Trustee concedes

those claims do not meet any of the categories of core proceedings within 28 U.S.C. § 157(b)(2). *See Stipulation of Plaintiff and Certain Defendants Concerning Core or Non-Core Nature of Claims and Certain Jurisdictional Issues* (Adv. Doc. 226). Because this memorandum addresses the non-core proceedings as proposed findings of fact and conclusions of law, the court is submitting these proposed findings of fact and conclusions to the District Court pursuant to 28 U.S.C. § 157(c)(1) and BR 9033(a). The Clerk, pursuant to BR 9033(a), "shall serve forthwith on all parties by mail" these proposed findings of facts and conclusions of law and "note the date of mailing on the docket."

Defendants McLaughlin, Sanan, vonMatthiessen, and Carlson ("Certain Director Defendants") suggest this court lacks subject matter jurisdiction over the non-core claims in the Complaint due to the language of the Plan and Litigation Trust Agreement and, regardless of such language, the limits of this court's jurisdiction. The court must examine its subject matter jurisdiction at any time the issue is raised and dismiss the action if it lacks subject matter jurisdiction. FRCP 12(h)(3), applicable by BR 7012(b).[7] Further, the court has an independent obligation to investigate and police the boundaries of its jurisdiction. *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997). Bankruptcy jurisdiction is based on 28 U.S.C. §§ 157 and 1334. *Thickstun Bros. Equip. Co., Inc. v. Encompass Servs. Corp. (In re Thickstun Bros. Equip. Co., Inc.)*, 344 B.R. 515, 520 (B.A.P. 6th Cir. 2006). Pursuant to 28 U.S.C. § 1334, the district court has jurisdiction over "all cases under title 11"

---

[7] The court previously addressed this argument in its decision denying without prejudice the Litigation Trustee's motion to interpret the confirmation order and to abstain. *See Decision Denying Without Prejudice Motion of the Trustee of the Antioch Company Litigation Trust . . .* (Est. Doc. 460). The Certain Director Defendants attempt to distinguish that finding of jurisdiction because the court was interpreting its own order. As explained, the court's jurisdiction concerning the Litigation Trust is not limited to those narrow circumstances.

and proceedings "arising under," "arising in," or "related to a case under title 11." 28 U.S.C. § 1334. Since these categories are disjunctive, the Sixth Circuit has stated that "it is necessary only to determine whether [the] matter is at least 'related to' the bankruptcy." *Mich. Employment Sec. Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1141 (6th Cir. 1991).

In *Pacor, Inc. v. Higgins*, the Third Circuit found a matter was "related to" an underlying case if "*the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.*" 743 F.2d 984, 994 (3rd Cir. 1984) (italics in original). The Sixth Circuit has adopted this test. *Wolverine Radio*, 918 F.2d at 584. A literal interpretation of this test would almost eliminate post-confirmation jurisdiction because the estate ceases at confirmation. *See* 11 U.S.C. § 1141(b); *Thickstun*, 344 B.R. at 521, n. 2. The Third Circuit found that, in determining post-confirmation jurisdiction, "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Binder v. Price Waterhouse Co., LLP (In re Resorts Int'l)*, 372 F.3d 154, 166-67 (3rd Cir. 2004). "[T]he interpretation, implementation, consummation, execution, or administration of [a plan] will typically have the requisite close nexus." *Id.* at 167.

A Chapter 11 plan, regardless of its language, may not confer jurisdiction where it does not otherwise exist. *Thickstun Bros.*, 344 B.R. at 522, *citing, Resorts Int'l*, 372 F.3d at 161. However, the Bankruptcy Appellate Panel of the Sixth Circuit has determined that "[w]hile the effect of [retention of jurisdiction] provisions would not be to deprive the court of jurisdiction otherwise afforded by 28 U.S.C. § 1334, retention of jurisdiction provisions might

condition or limit the court's *exercise* of post-confirmation jurisdiction." *Thickstun Bros.*, 344 B.R. at 522. In essence, the Litigation Trustee is limited by both the extent of this court's statutory jurisdiction and the rights and privileges given to him in the language of the Plan and the Litigation Trust Agreement. The court will now review the extent of its jurisdiction under these two limitations – first, under its statutory jurisdiction; and, second, under any limitations imposed by the Plan and the Litigation Trust Agreement.

First, the court has jurisdiction over this proceeding because it is related to the underlying bankruptcy case. The Certain Director Defendants argue that this litigation is beyond the scope of this court's jurisdiction because it is not related to this bankruptcy case. Specifically, they argue that bankruptcy courts cannot exercise jurisdiction over the Litigation Trust because state law issues predominate and the Litigation Trust does not have a close nexus to the confirmed Plan. Of course, the language of the Plan and related documents, as discussed, do not establish jurisdiction where none could exist. *Thickstun Bros.*, 344 B.R. at 522 (jurisdiction derives from 28 U.S.C. § 1334 and not the terms of a confirmed plan).

However, this court finds the reasoning of *Morris v. Zelch (In re Regional Diagnostics, LLC)* persuasive as to this court's jurisdiction. 372 B.R. 3, 22-25 (Bankr. N.D. Ohio 2007). The decision recognizes that, post-confirmation, the close nexus test must be applied. *Id.* at 22. The court determined that the claims related to pre-petition conduct; were retained under the plan for the benefit of former creditors of the estate; and had the claims been pursued pre-confirmation, the court's jurisdiction would have been uncontested. *Id.*

The facts here are as least as compelling as those of *Regional Diagnostics.* The primary beneficiaries of the Litigation Trust are the remaining unpaid non-priority unsecured creditors. The defendants are individuals who were involved in the pre-petition events that led to the Company's filing of the Chapter 11 petitions. The Official Committee of Unsecured Creditors negotiated for the creation of the Litigation Trust and its creation was not tangential, but central to the confirmation of the Plan. It provided a mechanism for the estate's creditors to be the primary beneficiaries of the Litigation Claims, including the pre-petition non-core claims alleged in the Complaint. The "close nexus" exists.

The Certain Director Defendants insist that jurisdiction should be limited to interpretation or implementation of the Plan. This narrow view of "related to" post-confirmation jurisdiction would prevent bankruptcy courts from exercising subject matter jurisdiction over non-core claims prosecuted through a post-confirmation trust, such as a litigation trust, even if the trust was specifically created by a plan and only transferred pre-petition causes of action from the debtor to the trust for the express purpose of pursuing claims related to the debtor's pre-bankruptcy business activities with the primary beneficiaries of the trust being the unsecured creditors of the debtor's Chapter 11 estate. Cf. *Resorts Int'l*, 372 F.3d at 157 (court lacked *post-confirmation* jurisdiction concerning litigation which concern events which occurred post-confirmation). The Certain Director Defendants do not cite a single authority within the Sixth Circuit, and the court is not aware of any, which holds that post-confirmation jurisdiction of the bankruptcy courts is this narrowly defined. Such an interpretation is inconsistent with the broad interpretation the Sixth Circuit has given to "related to" jurisdiction. *See Lindsey v. O'Brien, Tanski, Tanzer and Young*

33

*Health Care Providers of Connecticut (In re Dow Corning Corp.)*, 86 F.3d 482, 488-95 (6th Cir. 1996).  *See also Mayor and City Council of Baltimore, Maryland v. State of West Virginia (In re Eagle-Picher Indus., Inc.)*, 285 F.3d 522, 524 (6th Cir. 2002), *cited in, Resorts Int'l*, 372 F.3d at 165, n. 8 (assuming, without discussion, post-confirmation jurisdiction by the bankruptcy court of a dispute involving a post-confirmation settlement trust).

Second, the Plan and Litigation Trust Agreement do not restrict or limit this court's exercise of jurisdiction over this adversary proceeding; but rather, retain and underscore that jurisdiction.  The Certain Director Defendants review the language of the Plan and assert "the Plan and Confirmation Order provide repeatedly that the Litigation Trustee and the Reorganized Debtors may take action under the Litigation Trust and operate their business going forward without further authorization oversight of this Court." (Adv. Doc. 227, p. 17).  Of course, the Plan does largely remove the reorganized debtors from the jurisdiction of this court.[8]  However, the reorganized debtors and the Litigation Trust are not one and the same.

The Plan specifically transfers certain causes of action, including the "Litigation Claims" at issue in this adversary proceeding to the Litigation Trust and provides that this court shall retain jurisdiction over the Litigation Trust (*See* Est. Doc. 319, Exh. A [Article XI(j); Article I, § 1.75 and 1.76; Plan Schedule 10.5] and Exh. B [The Litigation Trust Agreement]). The Litigation Claims did not vest back in the reorganized debtors, but rather, were assigned to the Litigation Trust.

---

[8] The lead estate case was closed by the Clerk on December 30, 2010 (Est. Doc. 616).

The Certain Director Defendants cite Section 8.4 of the Plan as supporting their argument. Section 8.4 of the Plan is simply a reservation of rights granting the Litigation Trustee the exclusive authority to address any claims asserted by an insider or a defendant to a Litigation Claim. This language defines the rights of the Litigation Trust and has no effect upon this court's jurisdiction. To the extent a retention of jurisdiction clause is required for this court's *exercise* of jurisdiction, Article XI, Retention of Jurisdiction, provides that "[p]ursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to . . . hear and determine causes of action by or on behalf of the . . . Litigation Trust." (Est. Doc. 319, Exh. A, pp. 39-40). Further, Article VII, ¶ 7.1 of the Litigation Trust Agreement states that "[t]he Bankruptcy Court shall have continuing jurisdiction over the Litigation Trust, the Trustee and the Trust Assets as provided herein, including the determination of all controversies and disputes arising under or in connection with the Litigation Trust." (Est. Doc. 319, Exh. B, p. 16). This language provides more than sufficient authority for this court to exercise its jurisdiction over this litigation.

For these reasons, the court determines that it has subject matter jurisdiction over the non-core claims in this adversary proceeding.

**D.** **The Reservation of Rights in the Confirmed Plan Meets the Requirements of *Browning v. Levy* with respect to All of the Defendants**

Citing *Browning v. Levy*, Defendants CRG, Epstein and Ravaris[9] argue that the Debtors' confirmed Second Amended Plan of Reorganization constitutes res judicata as to all the claims brought by the Litigation Trustee because the reservations within the Plan were insufficient to preserve such claims. The Complaint includes three non-core causes of action against CRG, Epstein and Ravaris, all of which concern breach of fiduciary duty or aiding and abetting breach of fiduciary duty. *See* Adv. Doc. 1 (Counts 3, 8, and 9).

Confirmation of a reorganization plan "constitutes a final judgment in bankruptcy proceedings." *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 480 (6th Cir. 1992). The bankruptcy court's confirmation of a Chapter 11 plan "has the effect of a judgment by the district court and res judicata principles bar relitigation of any issues raised or that could have been raised in the confirmation proceedings." *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 463 (6th Cir. 1991).[10] A confirmation order constitutes a final judgment and binds all claims that should have been raised in the confirmed plan. *Id.*

Section 1123(b)(3)(B) provides an exception to the res judicata effect of a confirmed plan of reorganization. It specifically provides that a Chapter 11 "plan may provide for . . . the

---

[9] Defendant Walker, a former officer of the Company, who was also not listed in Schedule 10.5, adopted the arguments of CRG, Epstein and Ravaris. The analysis is the same for Walker.

[10] "A claim is barred by the res judicata principles of prior litigation if all of the following elements are present: (1) a final judgment on the merits of a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies' (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action." *Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002). The parties do not dispute, absent a reservation in compliance with *Browning*, res judicata would apply.

retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any . . . claim or interest [belonging to the debtor or to the estate]". 11 U.S.C. § 1123(b)(3)(B). Thus, a plan may reserve for the reorganized debtor, the trustee, or a representative of the bankruptcy estate claims that would otherwise be extinguished by the res judicata effect of a confirmed plan.

The issue raised by CRG, Ravaris, and Epstein – whether the Plan and Confirmation Order reserved the claims against them with sufficient specificity to avoid the res judicata effect of the Plan and Confirmation Order, is a critical issue that has been litigated with various outcomes.[11]

 In assessing whether a reservation of claims provided for by a plan or confirmation order is sufficient with respect to particular claims, it is important to understand the purpose of § 1123(b)(3)(B). The function of § 1123(b)(3)(B) "is not [to provide] notice to potential defendants, it is [to provide] notice to creditors generally that there are assets yet to be liquidated that are being preserved for prosecution by the reorganized debtor or its designee." *Elk Horn Coal Co., LLC v. Conveyor Mfg. & Supply, Inc.* (*In re Pen Holdings, Inc.*), 316 B.R. 495, 501 (Bankr. M.D. Tenn. 2004). Judge Lundin reviewed the legislative history on this issue and stated that:

> This review of legislative history illuminates the question at hand. Defendants would characterize § 1123(b)(3) as a "notice" provision of an altogether different sort: Notice to individuals that they are, or may be, a potential defendant in an action that the reorganized debtor will retain. Conceived in this way--contrary to its legislative history--§ 1123(b)(3) would be appropriately

---

[11] See *Elk Horn Coal Co., LLC v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.), 316 B.R. 495, 501* (Bankr. M.D. Tenn. 2004) ("The silence in § 1123(b)(3) with respect to the language necessary or sufficient to preserve a particular claim or cause of action has generated considerable disagreement in reported cases."). The *Pen Holdings* decision contains a discussion of the various pronouncements of different courts on that issue. *See also In re MPF Holding US LLC,* 443 B.R. 736 (Bankr. S.D. Tex. 2011) for a more recent discussion on this issue.

> interpreted to require language in a plan specific to the identity of the entities
> that are potential defendants in post confirmation actions. As the history of
> § 1123(b)(3) plainly shows, however, the notice at issue in § 1123(b)(3) is not
> notice to potential defendants, it is notice to creditors generally that there are
> assets yet to be liquidated that are being preserved for prosecution by the
> reorganized debtor or its designee.

*Pen Holdings*, 316 B.R. at 500-01.  Thus, the focus of an analysis of whether a reservation of claims is sufficient is not on whether the language provides sufficient notice to the target defendants that they might be sued, but rather, whether the language enables the court, creditors, and other parties to the bankruptcy to value the claims in relation to the disposition of the debtor's bankruptcy estate.  *Browning v. Levy*, 283 F.3d 761, 774 (6th Cir. 2002).  "The words sufficient to satisfy § 1123(b)(3) must be measured in the context of each case and the particular claims at issue: Did the reservation allow creditors to identify and evaluate the assets potentially available for distribution?" *Pen Holdings*, 316 B.R. at 504.

Further, in conducting its analysis to determine if the language sufficiently apprises the court and parties to the bankruptcy as to the claims being reserved, a court is to collectively examine all of the documents relating to the reservation of claims, which usually would be the Chapter 11 plan, its accompanying disclosure statement, and the confirmation order. *IBM Southeast Employees Federal Credit Union v. Collins*, 2008 WL 4279554, at *5 (M.D. Tenn. Sept. 17, 2008); *Zelch*, 372 B.R. at 12-13 ("There is ample well-reasoned authority to justify reading the disclosure statement in congruence with the plan.").  In *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 487 F. Supp. 2d 914, 925-28 (S.D. Ohio 2007) Judge Sargus found that "although the general reservation of claims [in the plan] is insufficient to preserve claims against PwC, the specific reservation of claims in the Disclosure Statement is sufficient to preserve the claims."

The Sixth Circuit has considered whether claims were adequately reserved for later litigation on several occasions. First, in an unreported decision, the court held that language in a Chapter 11 plan providing that "all causes of action which the debtor may choose to institute shall be vested with the debtor" was a generic reservation of rights which was insufficient to avoid the effect of res judicata. *In re Micro-Time Mgmt. Sys., Inc.*, 983 F.2d 1067, 1993 WL 7524, at *5 (6th Cir. Jan. 12, 1993) (table decision). Next, in *Browning v. Levy*, relying on *Micro-Time*, the court again held that "a general reservation of rights does not suffice to avoid res judicata." *Browning v. Levy*, 283 F.3d at 774. The reservation clause in *Browning* preserved all actions arising out of Chapter 5 of the Bankruptcy Code.[12] The clause was found to be insufficient because "it neither names [the target defendant] nor states the factual basis for the reserved claims." *Id.* at 775. Finally, in the context of an order approving a sale of assets pursuant to § 363, the Sixth Circuit held that the language of the sale order preserving claims of non-debtor entities against potential defendant targets was sufficiently specific, but only preserved claims of the non-debtor entities and not those of the debtor entities and, therefore, precluded the debtor entities from pursuing claims against those same defendants. *Winget v. J.P. Morgan Chase Bank, N.A.*, 537 F.3d 565 (6th Cir. 2008).

Bearing all of this in mind, the court will now review the pertinent documents and arguments in this case, beginning with the Disclosure Statement. The Disclosure Statement (Est. Doc. 28) was filed at the commencement of the cases before the Official Committee of Unsecured Creditors was appointed and before the concept of the reservation and

---

[12]The reservation of rights stated "In accordance with section 1123(b) of the Bankruptcy Code, the Company shall retain and may enforce any claims, rights, and causes of action that the Debtor or its bankruptcy estate may hold against any person or entity, including, without limitation, claims and causes of action arising under sections, 542, 543, 544, 547, 548, 550 or 553 of the Bankruptcy Code." *Browning*, 283 F.3d at 769.

assignment of claims to the Litigation Trust was developed and was never amended to incorporate any discussion concerning those matters. Nevertheless, the Disclosure Statement is illuminating.  It identifies Moran, Epstein, Ravaris, Attiken, Walker, Morgan and Morris as officers of the Company prior to the filing of the cases and identifies Epstein and Ravaris as being partners of CRG. Disclosure Statement, pp. 21-22 (Est. Doc. 28).  It also details the "Events Leading to Restructuring," including the involvement of both Houlihan Lokey and Candlewood, the two rejected bids by J.H. Whitney, the retention of CRG, the failed sale and recapitalization efforts leading to the bankruptcy filings, and the involvement of Condor in issuance of the surety bonds intended to insure the Company's obligations under the ESOP Notes.  Disclosure Statement, pp. 22-24 (Est. Doc. 28).

The provisions regarding the reservation and assignment of claims to the Litigation Trust did not appear in the Plan until the Official Committee of Unsecured Creditors was appointed. The assignment and reservation of claims by the Company to the Litigation Trustee was accomplished through the amendments to the original plan contained in the Second Amended Joint Prepackaged Plan of Reorganization, the Confirmation Order, and the Trust Agreement.  The Plan is attached to the Confirmation Order and the Litigation Trust Agreement is attached as Exhibit B to the Plan.  Est. Doc. 319.

Section 5.13 of the Plan provides for the establishment of the Litigation Trust with the "Litigation Trust Assets" being transferred by the Debtors to the Litigation Trustee.  The Litigation Trust Agreement defines the Trust Assets as including "the Litigation Claims (as defined in Section [1.75] of the Plan) and any proceeds thereof . . . ."  Section 1.75 defines Litigation Claims as being "all claims, rights of action, suits or proceedings by any Debtor or

Estate, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any person, including all Avoidance Actions that are not Authorized Creditor Payment Avoidance Actions, but excluding (i) all claims, rights of action, suits or proceedings that are affirmatively released by the Debtors pursuant to this Plan and (ii) all Business Litigation Claims." Without anything more, this definition of Litigation Claims would fall within the realm of being a general reservation of claims that the Sixth Circuit found to be insufficient in *Micro-Time* and *Browning*. However, the Confirmation Order further expounds upon the claims being reserved and assigned to the Litigation Trustee.

Paragraphs M, 30 and 40 of the Confirmation Order (Est. Doc. 319) provide that the Debtors and their estates shall retain, consistent with § 1123(b)(3), the Litigation Claims and Business Claims "including, but not limited to, those listed on Plan Schedule 10.5." Those provisions then further provide for the assignment of those claims to the Litigation Trustee. The Litigation Trustee's non-core causes of action are not Business Litigation Claims (Cf. 1.16 and 1.75 of the Plan), but instead, would fall within the parameters of the term "Litigation Claims." Paragraph 40 of the Confirmation Order states that: "The Debtors, with the consent of the Creditors' Committee, have used their best efforts to identify Litigation Claims and Business Litigation Claims, which are set forth on Plan Schedule 10.5. Nothing herein or in the Plan, however, shall operate as res judicata against the Reorganized Debtors in prosecuting Business Litigation Claims or against the Litigation Trustee in prosecuting Litigation Claims." Of course, this latter statement does not preclude the court from applying res judicata if the reservation is not sufficient. *See* Est. Doc. 319, ¶ 40.

Plan Schedule 10.5 is the document which the Debtors used to describe the specific claims that might be pursued by the Reorganized Debtors (the Business Litigation Claims) and the Litigation Trustee (the Litigation Claims). *See* Est. Docs. 319 & 333.  That document in relevant part states as follows:

4.  The Litigation Claims include all claims, rights of action, suits or proceedings by any Debtor or Estate, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any person, including all Avoidance Actions that are not Authorized Creditor Payment Avoidance Actions, but excluding (i) all claims, rights of action, suits or proceedings that are affirmatively released by the Debtors pursuant to the Plan and (ii) all Business Litigation Claims. The Litigation Claims include claims against insiders and Non-insiders of the Debtors and the Non-debtor Affiliates, including, but not limited to, the following parties:

Chandra Attiken; Steve Bevelhymer; Nancy Blair; Mike Boos; Greg Brasel; Anita Brown; Ben Carlson; Greg Carlson; Crowe Howarth LLP (aka Crowe Chizek and Company LLC); Ole Dam; Deloitte; Tom Dosch; Duff & Phelps; Evolve Bank & Trust Company; Karen Felix; Keith Finikin; Joseph Foster; Great Banc & Trust Company; Greg Haakonson; Ken Hartley; Robert Hill; Rose Hohensee; Barry Hoskins; Houlihan Lokey Howard & Zukin Financial Advisors, Inc.; Levimo, LLC; Cheryl Lightle; Alan Luce; Troy Lundell; MAMAMO, LLC; Malte vonMatthiessen; McDermott, Will & Emery; Jeanine McLaughlin; Jill Melby; Asha Moran; Lee Morgan; Jim Northrop; Prairie Capital Advisors, Inc.; Reliance Trust Company; Trucker Huss, APC; Tom Rogers; Denis Sanan; Paul Slocombe; and Kim Wilson

**Such claims include, but are not limited to, the following:**

Actions to avoid, recharacterize or subordinate claims;
Actions to establish a constructive or resulting trust;
Actions for violations of ERISA;
**Aiding and abetting any of the Litigation Claims;**
Avoidance and recovery of preferential transfers;
Breach of contract;
Breach of duty of good faith and fair dealing;
**Breach of fiduciary duty;**
Causes of action arising under chapter 5 of the Bankruptcy Code;
Civil conspiracy;

Conversion;
Fraud and/or misrepresentation under state or federal law;
Fraudulent transfer;
Fraudulent conveyance;
Gross negligence;
Indemnification;
Intentional infliction of emotional distress;
Insurance policy recoveries
Negligence;
Oppression by controlling shareholders;
Price fixing;
Recklessness;
Rescission;
Tortious interference;
Trust fund doctrine;
Turnover of property of the Debtors' estates;
**Unlawful distribution or waste of corporate assets**; and
Violations of the Racketeer Influenced and Corrupt Organizations Act
  \* \* \*

6.   **The potential** causes of action and **defendants listed on this Plan Schedule 10.5 are not exhaustive**, but are reflective of current knowledge. To the extent not specifically released under the Plan, Reorganized Antioch and the Litigation Trust reserve all rights to bring any claims, rights of action, suits or proceedings against any defendant, in each case not specifically referenced above, but that may be identified following the Effective Date through formal or informal discovery or in litigation.

(Est. Doc. 333) (emphasis added). Thus, Schedule 10.5 specifically references breach of fiduciary duty and "Aiding and Abetting any of the Litigation Claims" as potential Litigation Claims. The definition of Litigation Claims as including a non-exclusive list of a variety of claims and paragraph 6 of Schedule 10.5 demonstrate the Litigation Trustee's intention to cast a broad net in pursuing causes of action for the Litigation Trust's beneficiaries. Further, the detail provided in Schedule 10.5 distinguishes it from the plan in *Browning* and *Micro-Time.* Schedule 10.5 of the Plan is not a general reservation clause, but is quite specific in its terms and is prominently located as a separate Schedule to the Plan.

43

Moreover, the creation of the Litigation Trust (*See* 5.13 of the Plan) and the Litigation Trust Agreement further put all parties on notice that the Litigation Trustee may pursue any potential Litigation Claim for the benefit of the Litigation Trust's beneficiaries.  Significantly, unlike in *Browning*, not only could parties in interest consider the potential value of these claims, but that potential value is what resolved the Committee's objection to the original plan of reorganization.  The formation of the Litigation Trust represented a significant amendment to the Debtors' original proposed plan.  Unlike the facts in *Browning*, the court is not concerned the Plan was confirmed without "the value of [the Debtors and estates]'s claims to be taken into account in the disposition of the debtor's estate."[13] *Browning*, 283 F.3d at 775.

CRG, Ravaris and Epstein argue that the reservation language was not sufficient because, of all the defendants named in the Complaint, they were among the very few not specifically listed in the reservation of rights in the confirmed Plan.  However, while *Browning* notes the failure to list a specific defendant as a factor for finding that the general reservation in that case was not sufficient, it does not mandate all target defendants be specifically identified.  Instead, *Browning* suggests that the failure to list CRG, Epstein and Ravaris is a factor to consider. *See also Pen Holdings*, 316 B.R. at 504 ("The words sufficient to satisfy § 1123(b)(3) must be measured in the context of each case and the particular claims at issue . . . .").  While these defendants' names were not included in the itemized listing of names contained in Schedule 10.5, the language of Schedule 10.5 is clear that the list of

---

[13] CRG, Epstein and Ravaris argue that their situation is unique because the reorganized debtors are required to indemnify them.  Even if the court could consider such an argument upon a motion to dismiss (which it cannot), this argument is not relevant to the res judicata question decided in *Browning*.

potential defendants may be under-inclusive (and over-inclusive) with respect to whom would eventually become an actual defendant.

Based on these facts, the court recommends that the District Court find the reservation language to be sufficient as to all defendants, including CRG, Epstein, and Ravaris: the Disclosure Statement described Epstein and Ravaris as pre-petition officers of the Company and as partners of CRG and described the basic facts that are the subject of Counts 3, 8, and 9 as events "leading to" the Company's restructuring; the provisions of the Plan and Confirmation Order providing for the establishment of the Litigation Trust to pursue the Litigation Claims for the beneficiaries of the Litigation Trust; Plan Schedule 10.5's specific identification of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and "unlawful distribution or waste of corporate assets" as claims that might be pursued by the Litigation Trustee; and Schedule 10.5's proviso that "[t]he potential causes of action and defendants listed on this Plan Schedule 10.5 are not exhaustive." Overall, the language in Schedule 10.5 of the Plan is significantly more specific than in *Browning* and *Micro-Time* and preserves the causes of action against CRG, Epstein, and Ravaris. Cf. *JP Morgan Trust Co., Nat'l Ass'n v. Mid-America Pipeline Co.*, 413 F. Supp. 2d 1244, 1277-80 (D. Kan. 2006) (reservation clause more specific than *Browning* preserved post-confirmation lawsuit by liquidating trustee). *See also Kmart Corp. v. Intercraft Co.* (*In re Kmart Corp.*)*,* 310 B.R. 107, 124 (Bankr. N.D. Ill. 2004) ("Bergner [*P.A. Bergner & Co. v. Bank One, Milwaukee, N.A.* (*In re P.A. Bergner & Co.*), 140 F.3d 1111 (7th Cir. 1998)] stands for the proposition that plan provisions identifying causes of action by type or category are not mere blanket reservations. Therefore, categorical reservation can effectively avoid the *res judicata* bar.

45

Dispensing with a requirement of cataloging claims by name comports with the Court's view in Bergner that section 1123(b)(3) does not require 'specific and unequivocal' identification.").

For all these reasons, the court recommends that the Plan not be found to have preclusive effect under res judicata as to the causes of action against CRG, Epstein, Ravaris or Walker.

### E. ERISA Preemption (Claims 1 - 12)

The institutional ESOP trustees, GreatBanc, Reliance and Evolve, as well as Morgan, Moran, Attiken, and Marty Moran also raise the issue of whether ERISA preempts certain claims asserted against them.

#### 1. *Law of ERISA Preemption*

These defendants argue that various causes of action in the Complaint are preempted by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 – 1461 ("ERISA"). The focus of this argument is that the Litigation Trustee's non-core causes of action relate to ESOP events that are governed by and, therefore, preempted by ERISA. An ESOP is an ERISA qualified plan. *See* 29 U.S.C. § 1107(d)(6) (defining the term "employee stock ownership plan"). Specifically, the defendants argue that the events that are the subject of the Complaint are the actions and transactions of the Company that led to the ESOP's acquisition of 100% of the shares of the Company in 2003.

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "The [ERISA] pre-emption clause is conspicuous for its breadth." *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990). This is so because

46

ERISA's purpose "is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).  "[A] distinctive feature" of ERISA is its "integrated enforcement mechanism," which is codified in 29 U.S.C. § 1132(a). *Id.*  Any state law cause of action that "duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Id.* at 209.

However, ERISA preemption is not unlimited.  More recent decisions have recognized that the phrase "relate to" in 29 U.S.C. § 1144(a) can be interpreted to be so broad that "if the term . . . was allowed to reach its most logical extension, 'preemption would never run its course.'" *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005) ("*PONI*").  The Supreme Court has determined that such a reading is inconsistent with the purpose of 29 U.S.C. § 1144(a) and to "read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).  In interpreting 29 U.S.C. § 1144(a), courts "must go beyond the frustrating difficulty of defining its key term, and to look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656.  This language is significant because it unambiguously informs the lower federal courts that applying a strictly denotative plain meaning analysis to the ERISA preemption phrase of "relate to" is not appropriate.

ERISA's purpose is "to avoid conflicting federal and state regulation and to create a nationally uniform administration of employee benefit plans." *PONI*, 399 F.3d at 698.  To that

end, "ERISA preempts state laws that (1) 'mandate employee benefit structures or their administration;' (2) provide 'alternate enforcement mechanisms;' or (3) 'bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself.'" *Id., quoting, Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir. 1996). When a state law claim's effect on the ERISA plan "is merely tenuous, remote or peripheral," the claim is not preempted. *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991).

*Davila* helps explain the broad scope of ERISA preemption. Individuals sued health maintenance organizations for failure to provide ordinary care in coverage decisions. *Davila*, 542 U.S. at 204. The health care plans at issue were employee health care plans and therefore governed by ERISA. *Id.* The plaintiffs sued under the Texas Health Care Liability Act ("THCLA") and the Supreme Court unanimously held that the THCLA claims were completely preempted by ERISA. *Id.* The court noted that "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Id.* at 209. In this instance, the Court found "if an individual brings suit complaining of denial of coverage for medical care, where the individual is entitled to such coverage only because the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated, then the suit [is preempted]." *Id.* at 210.

The *PONI* decision applied the principles of *Davila.* In *PONI*, an employer maintained a pension plan, an ESOP, and a savings plan. 399 F.3d at 695. When the pension plan was

48

terminated, all the employees but one elected to cash out the insurance portion of their accrued benefits. *Id.* One "key" employee rolled the cash value of his accrued insurance benefits into the savings plan. *Id.* However, that cash value was incorrectly valued at one dollar. *Id.* As a result, the ESOP and savings plan became "top-heavy" in violation of the Internal Revenue Code.[14] *Id.* The employer eventually had to pay a fine of $5,000, make a minimal contribution of $137,087.17 to the savings plan and ESOP, and incur other charges at a total cost to the company of $177,087.17. *Id.* at 696. The employer sued the bank which acted as ERISA trustee for the savings plan and a separate record keeper for the ESOP under state law breach of contract claims. *Id.* The court determined that the claims against the bank were preempted. *Id.* at 700. The employer argued that the bank acted as a non-ERISA fiduciary with regard to its record-keeping functions. The *PONI* decision recognized that "where the alleged conduct by the fiduciary is 'entirely unrelated to and outside the scope of [the fiduciary's] duties under the plan or in carrying out the terms of the plan,' courts have found that ERISA's core objectives are not implicated and state-law claims may proceed." *Id.* at 699, *citing, Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 193 (4th Cir. 2002). However, the court determined that the breach of contract claim against the bank was preempted because the contract at issue was the ERISA plan and therefore the state law claim interfered with the enforcement scheme of ERISA. *Id.* at 700. By contrast, the claim against the record keeper was not preempted because it was not a "traditional ERISA plan" entity and the claim was not "based on any rights under the plan; there is no

---

[14] As explained in *PONI*, "[a] plan is considered top-heavy when too great a percentage of the assets are dedicated to key employees, defined as officers earning above a specified compensation level or employees with high salaries and sufficient ownership interests. Internal Revenue Code § 416(i)(1)(A). The Internal Revenue Code seeks to protect non-key employees by ensuring that a minimum amount of the assets from an employer's pension plan are dedicated to them." 399 F.3d at 695-96.

allegation that any of the plan's terms have been breached. Nor is there any effort to enforce or modify the terms of the plan." *Id.* at 700-01, *quoting, Airparts Co., Inc. v. Custom Benefit Servs of Austin, Inc..,* 28 F.3d 1062, 1066 (10th Cir. 1994).

The need for a cause of action to be grounded in a legal obligation separate from ERISA's comprehensive enforcement scheme is crucial. In *Briscoe v. Fine,* former employees brought a class action against the employer's former officers and directors and the third-party administrator of the healthcare plan. 444 F.3d 478, 482 (6th Cir. 2006). The claims were brought under ERISA and state law. *Id.* The court found that the state law causes of action – based on the defendants' failure to disclose the financial condition of the healthcare plan – were preempted because they provided an alternative enforcement mechanism to ERISA and were not based on "any violation of a legal duty independent of ERISA." *Id.* at 498-99, *quoting, Davila*, 542 U.S. at 214. As the Sixth Circuit explained:

> [T]he plaintiffs have not pointed to "any violation of a legal duty independent of ERISA." *Davila,* 542 U.S. at 214, 124 S.Ct. 2488. Any duty to disclose the financial condition of the plan that the Fines might have owed to the plan beneficiaries arose not out of an independent source of law, but out of the existence and nature of the plan itself, including any duties that the plan imposed on the officers and directors. *See id.* In other words, the plaintiffs' state-law claims against the Fines and PHP are simply a way of restating the claims for breach of fiduciary duty that they also allege under ERISA. The Supreme Court, however, has repeatedly refused to permit plaintiffs to "'elevate form over substance and [to] allow parties to evade' the preemptive scope of ERISA simply by 'relabeling their'" claims. *Id.* (quoting *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *see also Smith v. Provident Bank,* 170 F.3d 609, 613 (6th Cir.1999)) ("Common law breach of fiduciary duty claims are clearly preempted by ERISA."). That the plaintiffs have captioned what is essentially a breach-of-fiduciary-duty claim as a suit for fraud, misrepresentation, and concealment does not alter the fact their state-law cause of action mirrors their federal claim under ERISA.

*Briscoe*, 444 F.3d at 499.  However, the Sixth Circuit reached the "opposite conclusion with respect to the claim that the Fines breached a duty by failing to disclose the overall financial condition of the Company." *Id.* at 500.  The court focused on the independent legal duty: "Unlike the other causes of actions . . ., the plaintiffs could have alleged such a breach of duty even if the Company had never sponsored an ERISA-covered plan." *Id.*

*Hutchison v. Fifth Third Bancorp* further examines the need for a duty independent of ERISA. 469 F.3d 583 (6th Cir. 2007).   Suburban Federal Savings Bank and Fifth Third Bank negotiated a "merger 'Affiliation Agreement'" between the two banks. *Id.* at 584.  The Affiliation Agreement addressed the Suburban ESOP. *Id.*   Based on representations in the Affiliation Agreement, certain members of the Suburban ESOP voted in favor of merger, which was consummated. *Id.*   Post-merger, Fifth Third Bank became the successor ESOP sponsor and was also the trustee. *Id.* at 586.  The Affiliation Agreement included provisions to distribute funds to former Suburban employees, but instead, Fifth Third Bank amended the ESOP to distribute the funds to Fifth Third Bank employees.  The former Suburban employees became class members who brought a breach of contract claim in state court. *Id.* The Sixth Circuit ultimately determined that the breach of contract claim was preempted by ERISA.  The language of the Sixth Circuit's decision is instructive:

> Preemption in this case is also consistent with our post- *Davila* case law. In *Briscoe,* former employees sued, among others, former officers and directors of a bankrupt employer, alleging violation of fiduciary duties under ERISA and various torts under Kentucky law. 444 F.3d at 498.  We held that ERISA preempted the state law claims for fraud, misrepresentation, concealment, and failure to disclose the financial condition of the employee benefit plan. In doing so, we followed *Davila* and also our reasoning in *PONI*, finding that the two cases were fully consistent. *Id.* at 499-500.  However, we held that ERISA did not preempt the employees' state-law claim that defendants breached a duty that they owed to employees by failing to disclose the overall financial

condition of the corporation. Our reasoning in that case simply does not extend to the instant case, because, as we noted in *Briscoe*:

> with respect to the claim that the [former officers and directors of the company] breached a duty by failing to disclose the overall financial condition of the Company, . . . the plaintiffs could have alleged such a breach of duty even if the Company had never sponsored an ERISA-covered plan.

*Id.* at 590. In *Hutchison*, unlike *Briscoe*, no separate legal duty existed.

Another consideration is whether the relationship to the ERISA plan is too tenuous for preemption to be applied. *Husvar v. Rapoport* is a decision that helps define the outer limits of the "relate to" ERISA preemption language. 430 F.3d 777 (6th Cir. 2005). In *Husvar*, the Sixth Circuit determined that state claims concerning conduct taken which affects the stock price of shares held by an ESOP are not necessarily preempted by ERISA. *Id.* at 782-83. Former employees and shareholders brought a state court action against their former employer and members of the board of directors. *Id.* at 778. The lawsuit alleged the defendants' mismanagement reduced the value of the company stock. *Id.* However, the company stock was held by an ESOP. *Id.* at 779. The defendants "argued that the ESOP was an ERISA-covered plan and that the complaint's perceived allegations of improper management of that plan resulted in the complete federal preemption of all matters relating to that entity." *Id.* The court cited *Smith v. Provident Bank* and noted the principle that a state law breach of fiduciary claim is preempted by ERISA. *Id.* at 782, *citing, Smith*, 170 F.3d 613. However, the court found this general principle inapplicable to the facts before it:

> In this case, however, the complaint being examined does *not* challenge the actions of a plan fiduciary. Instead, the complaint merely questions the propriety of certain business decisions made by the company's board of directors. Although those decisions, without question, affected the value of the company stock that comprised the employees' benefit plan assets, that

fact alone does not transform a state-law breach of fiduciary duty claim into a federal ERISA action. As this court concluded in *Grindstaff v. Green,* 133 F.3d 416, 423-24 (6th Cir.1998), quoting from the Eighth Circuit decision in *Hickman v. Tosco,* 840 F.2d 564, 566 (8th Cir.1988):

> "ERISA does not prohibit an employer from acting in accordance with his interests as an employer when not administering the plan or investing the assets." In fact, in *Hickman,* the Eighth Circuit specifically observed that "day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits [do not have to] be performed solely in the interest of plan participants." In *Martin v. Feilen,* [965 F.2d 660 (8th Cir.1992)], the court concluded that *Hickman* applied to ESOPs, noting that "[v]irtually all of an employer's significant business decisions affect the *value* of its stock, and therefore the benefits that ESOP plan participants will ultimately receive." 965 F.2d at 666 (observing that section 1104 only applies to "transactions that involve investing the ESOP's assets or administering the plan.")

A close examination of the plaintiffs' complaint reveals that nowhere in that document do the former employees allege that the defendants themselves mismanaged any fund designated as a pension benefit plan for company workers. Instead, the complaint is replete only with allegations that the individual defendants mismanaged the company so as to result in a dramatic decrease in the value of Mosler stock-a result that, in turn, happened to devalue the ESOP funded with such stock. **A claim that company directors did not operate the business itself in conformity with sound business practices does not, however, implicate the protections afforded by ERISA. Absent any indication in the complaint that the plaintiffs intend to challenge the decisions or actions of *plan fiduciaries,* the filing contains no claims arising under federal law.** We conclude, therefore, that the district judge erred in denying the plaintiffs' motion to remand this matter to the state court system for resolution.

*Husvar,* 430 F.3d at 782 (bold added; italics in original). *See also Sengpiel v. The B .F. Goodrich Co.,* 156 F.3d 660, 666 (6th Cir. 1998) ("[T]he fact that an action taken by an employer to implement a business decision may ultimately affect the security of employees' welfare benefits does not automatically render the action subject to ERISA's fiduciary duties.");

*Thurman v. Pfizer, Inc.,* 484 F.3d 855, 865 (6th Cir. 2007) ("We simply hold that employers

53

who misrepresent certain benefits provided by ERISA-governed plans to prospective employees cannot later use preemption as an end-run around liability for fraudulent or innocent misrepresentations.").

Keeping the quite broad, but not unlimited, standard for ERISA preemption in mind, the court considers the preemption arguments made by certain defendants.

> 2. *The Claim for Aiding and Abetting Breach of Fiduciary Duty against GreatBanc Trust Company is Preempted by ERISA*

GreatBanc is being sued under Count 2 – aiding and abetting the breach of fiduciary duty in regard to the 2003 Transaction. Cplt ¶¶ 165-170. At the time of the 2003 Transaction, GreatBanc was the ESOP trustee and its role as the ESOP trustee ended with the consummation of the 2003 Transaction. Cplt. ¶ 77. GreatBanc (1) "agreed to decline to sell ESOP shares in the tender offer and to approve the transaction in exchange for a Put Price Protection Agreement" [Cplt. ¶ 77]; (2) failed to engage in a good faith process to determine the fair market value of the non-ESOP shares; (3) failed to obtain an independent appraisal for the price the Company was to pay for the non-ESOP shares, instead relying on a flawed fairness opinion and informal valuation by Deloitte. The fairness opinion failed to account for the effect of the liability for the repurchase of shares and the shares lack of marketability. Cplt. ¶ 76. According to the Complaint, "the [fairness opinion] was narrowly focused on whether the consideration and other terms and conditions of the transaction were fair to the ESOP from a financial point of view, and the opinion failed to analyze whether the transaction was in the best interest of the Company." *Id.* Finally, in return for not selling ESOP shares in the tender offer (a condition of the closing) and approving the transaction, the ESOP trustee agreed upon a Put Price Protection Agreement to establish

54

rules for distribution for ESOP participants which terminated their employment. Cplt. ¶¶ 75-77.

An ESOP trustee holds a single fiduciary duty which runs to the ESOP, not to the company. *N.L.R.B. v. Amax Coal Co.,* 453 U.S. 322, 332 (1981), *citing,* 29 U.S.C. § 1104(a)(1) ("Whatever may have remained implicit in Congress' view of the employee benefit fund trustee under the act became explicit when Congress passed [ERISA] . . . . Section 404(a)(1) of ERISA requires a trustee to 'discharge his duties . . . solely in the interest of the participants and beneficiaries . . . .'"). The Complaint does not contain a single allegation that suggests GreatBanc made any decision, good, bad or otherwise, outside of its fiduciary role as the ESOP trustee. The Complaint does not indicate GreatBanc held any position, fiduciary or otherwise, with the Company.[15] Thus, the Complaint fails because it seeks to change the role of the ESOP trustee in a way ERISA does not contemplate. An ESOP trustee – when acting within its defined role – has no duty to a company, but has a single unwavering fiduciary duty to the ESOP's beneficiaries. *Amax Coal,* 453 U.S. at 333. The Complaint's allegations necessarily interfere with the comprehensive ERISA enforcement scheme.

The Complaint alleges that the ERISA trustees must have a duty to the Company because the ESOP wholly owned the Company following the 2003 Transaction. However, while it is logical that decisions made by the ESOP trustee affect the Company in such

---

[15] To the extent the Litigation Trustee is arguing the ESOP trustees held a duty to the Company because they were paid by the Company, who was the plan sponsor or administrator of the ESOP, the court finds this argument not well-taken. Such an analysis would negate an ESOP trustee's mandate to exercise its fiduciary duty solely to the ESOP.

circumstances, it does not follow that the ESOP trustee has a duty to the Company.[16] Congress created certain exceptions to ERISA when it was expanded to include an ESOP as an ERISA qualified plan, but left the traditional role of a trustee the same for an ESOP as any other ERISA qualified plan. *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995). The Complaint does not allege a separate hat worn by GreatBanc that could have created an independent duty to the Company.

Accordingly, the court recommends that the cause of action against GreatBanc be dismissed on account of its being preempted by ERISA.

### 3. The Claim for Professional Negligence against Reliance is Preempted by ERISA

Reliance is being sued under Count 4 – professional negligence. The Complaint concerns Reliance's failure to address the 2003 Transaction and the conflicted board. Cplt. ¶ 131.

In June 2007 Reliance was engaged to serve as an "independent" ESOP trustee, replacing Lipson-Wilson. Cplt. ¶¶ 22, 113. "In August 2007, the directors retained Reliance as

---

[16] The Litigation Trustee's alternative argument is apparently that some or all of the ESOP trustees may have had a separate duty to the Company in some other undefined role with the Company and presumably, from the mandated narrow focus of an ESOP Trustee, an improper one. It is possible that this argument is legally cognizable. *See NLRB v. Amax Coal Co.*, 453 U.S. 322, 333, n. 16 (1981) ("Although § 408(c)(3) of ERISA permits a trustee of an employee benefit fund to serve as an agent or representative of the union or employer, that provision in no way limits the duty of such a person to follow the law's fiduciary standards while he is performing his responsibilities as trustee."). However, the Complaint makes no such allegation, but instead incorrectly claims that an ESOP trustee has a duty to the Company when it is wholly owned by the ESOP. Moreover, the Litigation Trustee cannot be given an open ended invitation to discovery based on speculation about other hats worn by the ESOP trustees. Prior to the filing of the Complaint, this court already approved broad discovery by the Litigation Trustee over the objection of certain defendants to this litigation. *See The Antioch Company, Decision and Order Granting Motion of Trustee the Antioch Company Litigation Trust for Order Pursuant to Federal Bankruptcy Rule 2004 Authorizing the Examination of Certain Entities and Persons* (Bankr. S.D. Ohio Aug. 6, 2009) (Est. Doc. 423). This discovery was in addition to information counsel for the Litigation Trustee received in the District Court litigation against McDermott Will and Emery, LLP and gathered as counsel for the Official Committee of Unsecured Creditors.

a discretionary ESOP trustee to approve any transaction." Cplt. ¶ 113. "On November 28, 2007 Reliance gave formal notice of its resignation as ESOP trustee, effective December 28, 2007, explaining that it believed the entire board should be removed and members of key management replaced." Cplt. ¶ 127. Reliance failed to file a report upon resignation as required by the ESOP Trust agreement. Cplt. ¶ 130. "Despite its concerns, Defendant Reliance ignored its fiduciary duty to the ESOP and resigned rather than taking any action to deal with the 2003 Transaction and the conflicted board." Cplt. ¶ 131.

The Complaint alleges that during the time that Reliance served as an ESOP trustee various insiders of the Company sought to stop a sale process being pursued by Houlihan Lokey and pursued an alternative recapitalization strategy. Cplt. ¶ 123. Upon resigning, "Reliance told Defendant Lipson-Wilson that the members of the board holding subordinated debt were completely conflicted and that the Company should have pursued a turnaround effort three years earlier." Cplt. ¶ 127.

These allegations concern Reliance's deficient performance as an ERISA trustee for the ESOP, including a violation of the ESOP trust agreement. The Complaint does not allege Reliance acted beyond its mandated role as an ERISA trustee. Although the Complaint asserts Reliance "owed a duty to the Company" [Cplt. ¶ 185], the Litigation Trustee has not cited any authority for that proposition and that assertion is not correct because as previously noted, as an ESOP trustee its duty was solely to the ESOP. At best, the Complaint shows that acts of Reliance had an effect on the downturn of the Company. As noted, this is unsurprising in that the ESOP wholly owned the Company. But one of the main purposes of ERISA is to limit trustees' fiduciary duty to ERISA participants and to ensure, regardless of

57

the effect of their decisions on third parties, an unwavering duty to the ESOP remains. *Amax Coal*, 453 U.S. at 334 (internal citation omitted) ("[T]he fiduciary provisions of ERISA were designed to prevent a trustee from being put into a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.").

Since Reliance had no duty to the Company and its exclusive purpose as ESOP trustee was limited to acting in the interests of the ESOP, the Litigation Trustee's claims interfere with ERISA's comprehensive enforcement scheme and are preempted by ERISA. The court recommends the cause of action against Reliance also be dismissed on account of its being preempted by ERISA.[17]

### 4.   *The Claims against Evolve Bank & Trust are Preempted by ERISA*

Evolve became the ESOP trustee in January 2008 after Reliance resigned. Cplt. ¶ 133. Reliance's counsel recruited Evolve to serve as ESOP trustee and acted as counsel for Evolve. *Id.* The allegations against Evolve concern its role in the unconsummated sale process with J.H. Whitney. Specifically, the Complaint alleges that Evolve "failed to take any action regarding the 2003 Transaction and the directors' and officers' conflicts." Cplt. ¶ 135. In June 2008 the Company "was in the late stages of a sale process under a letter of intent signed by J.H. Whitney." Cplt. ¶ 143. Whitney was to purchase the Company in a sale for 54 million dollars. *Id.* Morgan and Moran did not want the J.H. Whitney sale to close. Cplt. ¶ 144. After the Morgan Family attempted to recapitalize the Company, Morgan and Moran

---

[17] Reliance also raised the defense of in pari delicto, but that issue is moot since Count 4 is being dismissed, without prejudice to any ERISA claims being raised by the Litigation Trustee in any amended complaint. The in pari delicto defense is discussed later as to Defendants CRG, Epstein, and Ravaris.

sought to replace the board of directors. Cplt. ¶ 146. "Evolve . . . followed Defendants Lee's and Asha's instructions." Cplt. ¶ 147. They voted to fire the directors and to replace them with a board consisting only of Morgan, Moran and Morris, a lawyer selected by Evolve, the "New Board." *Id.* The chaos caused J.H. Whitney to withdraw its offer, which later offered only 22 million dollars for the Company in September 2008, which offer was rejected. Cplt. ¶ 160.

Count 5 (professional negligence) and Count 11 (aiding and abetting breach of fiduciary duty related to the JH Whitney offer to purchase the Company) are being prosecuted against Evolve. While it is essentially alleged that as the ESOP trustee, Evolve failed to act in the interests of the ESOP and Evolve's decisions certainly affected the Company, the Complaint does not allege that Evolve ever wore a second hat. Unlike an officer or director which also serves as an ERISA fiduciary, Evolve was hired solely to be an ESOP trustee. Its failure to act in regard to the 2003 Transaction or its failure to prevent the "New Board" from scuttling the J.H. Whitney sale may provide a basis for a claim under ERISA, but the professional negligence claim would only supplement such a claim, and ERISA does not permit interference with its comprehensive enforcement scheme. Accordingly, for these reasons and because Evolve only owed duties to the ESOP as an ESOP trustee, the court recommends the causes of action against Evolve be dismissed on account of its being preempted by ERISA.

### 5.   *Possible ERISA Claims against the ESOP Trustees*

Pursuant to 29 U.S.C. § 1132(a)(2) only the Secretary for the Department of Labor, plan participants, beneficiaries and fiduciaries are authorized to pursue claims for ERISA

breaches of fiduciary duty. At oral argument the Litigation Trustee raised the possibility of his pursuit of such an ERISA claim as a fiduciary – specifically, as the plan sponsor or administrator of the ESOP -- if certain state law claims were found to be preempted. As noted recently by Judge Black in his decision denying a motion to dismiss a separate lawsuit brought by the Litigation Trustee against the law firm of McDermott Will & Emery LLP, "[w]hether an employer such as Antioch, who is also an ERISA plan administrator, is a fiduciary of the plan generally requires a detailed factual analysis that is not appropriate upon a motion to dismiss." *Antioch Litig. Trust v. McDermott Will & Emery LLP*, 738 F. Supp. 2d 758, 771 (S.D. Ohio 2010), *citing, Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000). Accordingly, the dismissal of the causes of action against the ESOP trustees (GreatBanc, Reliance and Evolve), is without prejudice to the Litigation Trustee moving to amend his Complaint to assert ERISA causes of action against those defendants.[18]

6. *The Non-Core Causes of Action against Lee Morgan, Asha Morgan Moran, and Chandra Attiken are not Preempted by ERISA*

Morgan, Moran, and Attiken also assert that the claims asserted against them are preempted by ERISA because they all relate to their role as ESOP fiduciaries or otherwise relate to the ESOP (Cplt. ¶¶ 9-11). It is true that the Complaint alleges all three defendants were ESOP fiduciaries. However, the Complaint also asserts all of these defendants were corporate officers and insiders of the Company. *Id.* As will be explained, all the claims against these defendants are based on independent legal duties owed in their roles as

---

[18] However, it is also true that ERISA claims brought by a fiduciary are effectively derivative because such claims are owned by the ERISA plan and not the debtor. *See Antioch Co. Litig. Trust v. Hardman,* 438 B.R. 598, 606, n. 8 (S.D. Ohio 2010) (Black, J.). This decision also states that "it is [the Trustee's] contention that no ERISA claim arises . . . from the 2003 ESOP Transaction." *Id.*

corporate fiduciaries – not to the ESOP – but to the Company. The decisions they make in such roles are ultimately subject to the same corporate fiduciary duties of all officers and directors – whether a particular Company is owned – in part or in whole – by an ESOP. Under such circumstances, a director or officer has fiduciary obligations to multiple constituencies.

Morgan, Moran, and Attiken are being sued under Count 1 (breach of fiduciary duty as to the 2003 Transaction) and Count 2 (aiding and abetting a breach of fiduciary duty as to the 2003 Transaction). Moran is a defendant under Count 3 (breach of fiduciary duty as to the Condor Transaction). Morgan, Moran, and Attiken are defendants in Count 6 (breach of fiduciary duty with respect to the Levimo Transaction) and Count 7 (aiding and abetting a breach of fiduciary duty as to the Levimo Transaction). Counts 8 and 10 include Morgan and Moran for breach of fiduciary duty relating to the alternative recapitalization or refinancing strategy. Counts 9 and 11 name Morgan and Moran as defendants for aiding and abetting breach of fiduciary duty with respect to the JH Whitney offer to purchase the Company. Count 12 alleges Morgan tortiously interfered with the Houlihan Lokey contract with the Company.

Morgan, Moran, and Attiken rely heavily on *Smith v. Provident Bank*, 170 F.3d 609 (6th Cir. 1999). As this decision found that common law claims for breach of fiduciary duty were preempted by ERISA, it is important to explain why *Provident* is inapplicable to the legal theories presented by the Complaint. In *Provident*, two ERISA plans and a participant sued the former plan trustee under state law. The lawsuit concerned errors with missing shares from an ERISA profit-sharing and pension plan. The decision states that "[c]ommon law

breach of fiduciary duty claims are clearly preempted by ERISA." *Id.* at 613, *citing, Perry v. P*I*E Nationwide, Inc.*, 872 F.2d 157, 161 (6th Cir. 1989).[19]  Later decisions clarified that this statement is not dispositive and was not unconditional.  First, in *Provident*, unlike Morgan, Moran, and Attiken, the former plan trustee was being sued as an ERISA fiduciary and wore no other hat.  This difference between the allegations in *Provident* and those of the Litigation Trustee in the Complaint is crucial as it suggests that the Litigation Trustee has not merely re-labeled ERISA claims under state law theories as the plaintiffs had done in *Provident*. *Id.* at 615.  Nor is the Litigation Trustee supplementing ERISA claims to provide for an additional theory of recovery or to ensure the Company has standing to sue.  Rather, the Litigation Trustee is suing Morgan, Moran, and Attiken in their separately defined roles with the Company and in connection with actions taken while wearing the hats related to those roles. *See Husvar*, 430 F.3d at 782 (distinguishing *Provident* when the complaint concerned mismanagement of a company).  The difference is substantive and not merely semantic.

Morgan, Moran, and Attiken also rely on the decision of *Johnson v. Couturier* to support their arguments that the Litigation Trustee's non-core causes of action are

---

[19] The basis for the decision in *Nationwide* that the breach of fiduciary claim was preempted was, in part, that "[p]reemption applies to this particular claim because ERISA provides a specific remedy for breach of fiduciary duty with respect to the establishment of an ERISA plan. *See* 29 U.S.C. §§ 1104, 1132(a)." *Perry v. P*I*E Nationwide, Inc.,* 872 F.2d 157, 161 (6th Cir. 1989).  The Complaint, even with regard to the 2003 Transaction, is not simply about the change in the ESOP.  Rather, it concerns decisions by insiders of the *Company* to purchase *non-ESOP* shares through a tender offer by the *Company* and structure the transaction, not for the benefit of the *Company*, but for the benefit of the Morgan Family and others.

The Morgan defendants assert that "[s]eeking to impose greater obligations and higher duties than Congress itself imposed on alleged ERISA fiduciaries, the Litigation Trust argues that ERISA preemption does not apply, because it is a 'corporate plaintiff' bringing claims against 'directors and officers.'  But this is the refuge of all plaintiffs whose common law claims fall within preemption." (Adv. Doc. 199, p. 3).  While this may be generally true, it is not true that an ERISA fiduciary cannot wear a separate hat as a corporate officer or director and have an independent legal duty – separate from an ERISA qualified plan – to act in the Company's interest.

preempted. 572 F.3d 1067 (9th Cir. 2009).   In *Couturier*, ESOP participants of a closely-held corporation sued the corporation's president and directors, claiming the president was vastly overcompensated.  The lawsuit included ERISA causes of action as well as actions based on "directorial misconduct." *Id.* at 1074.  The plaintiffs sought recovery for losses to the ESOP related to the misconduct. *Id.*

At issue in *Couturier* were indemnification agreements in favor of the various directors and ESOP trustees which covered all liability in their service, excepting intentional conduct or gross negligence. *Id.* at 1074-75.  One of the defendants argued that the district court lacked jurisdiction because the plaintiffs were challenging business decisions not subject to ERISA.  The *Couturier* court rejected this argument by stating:

> Decisions relating to corporate salaries generally do not fall within ERISA's purview. But where plan assets include the employer's stock, the value of those assets depends on the employer's equity. Employee compensation levels are, of course, one of the many business expenditures reducing the value of the overall equity of any company. On the other hand, "[v]irtually all of an employer's significant business decisions affect the *value* of its stock, and therefore the benefits that ESOP plan participants will ultimately receive." *Martin v. Feilen,* 965 F.2d 660, 666 (8th Cir. 1992). Taken to its logical conclusion, therefore, this line of thinking would, in the case of an ESOP, extend the application of ERISA to a corporation's annual expenditures on office supplies-clearly an absurd result. The Eighth Circuit has on this basis limited an ERISA fiduciary's duties "to transactions that involve investing the ESOP's assets or administering the plan." *Id.* Setting executive compensation levels does not obviously fall into either category. *See Eckelkamp v. Beste,* 201 F.Supp.2d 1012, 1023 (E.D. Mo. 2002) (holding that a corporate director is not acting as an ESOP fiduciary in setting compensation levels).

> Nonetheless, we conclude that applying ERISA to the instant case does not risk encompassing within its confines any and all day-to-day corporate decisions shielded by the business judgment rule. Where, as here, an ESOP fiduciary also serves as a corporate director or officer, imposing ERISA duties on business decisions from which that individual could directly profit does not to us seem an unworkable rule. To the contrary, our holding merely comports with congressional intent in establishing ERISA fiduciary duties as "the highest

> known to the law." *Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir.1996)
> (quotation omitted). To hold otherwise would protect from ERISA liability
> obvious self-dealing, as Plaintiffs allege occurred here, to the detriment of the
> plan beneficiaries.

*Id.* at 1077.   The court affirmed the granting of a preliminary injunction to deprive the defendants of an advance of their indemnification rights because if the defendants were ultimately found to have violated ERISA, the indemnification agreement would be void. *Id.* at 1083.

Morgan, Moran, and Attiken argue that *Couturier* creates a specific three-part test for ERISA preemption in favor of corporate officers and directors, which  requires the officers or directors to also be ERISA fiduciaries, have an interest in the transaction at issue, and the corporate entity involved to be wholly-owned by an ESOP.  However, an application of this suggested test would do nothing more than immunize officers and directors of an entity wholly-owned by an ESOP from allegations of self-dealing by the corporate entity to which they have defined independent legal obligations -- fiduciary duties to the Company.[20]

*Courturier* does not directly address when an ERISA fiduciary has corporate liability. Instead, it states that an ERISA fiduciary, who is also an officer or director, may be liable under ERISA for business decisions from which he or she directly profits.   Under such circumstances, the officer or director is not protected by the business judgment rule. *Couturier* allows those generally entitled to sue under ERISA, such as ESOP participants, to pursue their claims under ERISA's high fiduciary standard.   *Couturier* does not hold that

---

[20] Also, some of the allegations do not meet this three-part test.   The 2003 Transaction concerns actions which led to the Company ultimately being wholly-owned by the ESOP.  The key events happened prior to the closing of that transaction.   Moreover, in the tender offer of the non-ESOP shares, the buyer in this transaction was not the ESOP, it was the Company.

actions which may also have violated defined fiduciary duties to a Company are without remedy.

The court is not adopting such a proposed three-part test because it is inconsistent with the "multiple hats" analysis appropriate to ERISA fiduciaries who play other roles within a corporate entity. A director and ERISA fiduciary, depending on the circumstances, can take actions which cause damage to an ESOP and a company. *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000) ("[T]he analogy between ERISA fiduciary and common law trustee becomes problematic. This is so because the trustee at common law characteristically wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats."); *Akers v. Palmer*, 71 F.3d 226, 229 (6th Cir. 1995) ("ERISA is designed to accomplish many worthwhile objectives, but the regulation of purely corporate behavior is not one of them."); *Sengpiel*, 156 F.3d at 665 (ERISA law distinguishes between general business decisions and the administration of an ERISA plan); *See In re Huntington Bancshares, Inc. ERISA Litigation*, 620 F. Supp. 2d 842, 850 (S.D. Ohio 2009) (similar). *See also Averhart v. US WEST Mgmt. Pension Plan*, 46 F.3d 1480 (10th Cir. 1994) (An employer can wear "two hats", as an ERISA fiduciary and as an employer); *Great Lakes Steel, Div. of Nat'l Steel Corp. v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983) (employer can occupy two roles – an employer and an ERISA fiduciary); *In re Delphi Corp. Securities, Derivative & "ERISA" Litigation*, 602 F. Supp. 2d 810, 821 (E.D. Mich. 2009) (an ERISA trustee can wear different hats). *Couturier*, being a decision in favor of ERISA *plaintiffs* on a narrow issue concerning a preliminary injunction and an indemnification agreement, cannot be read to impose such an apparently unprecedented limitation of corporate fiduciary liability. Having rejected

65

Morgan, Moran, and Attiken's primary ERISA preemption arguments, the specific counts will next be addressed.

Counts 1 and 2, concerning events that led to the consummation of the 2003 Transaction, are not about whether Morgan, Moran, and Attiken, in their roles as ERISA fiduciaries, failed to act in the best interest of the ESOP. These counts are about the independent legal duty these defendants had to the Company and how they breached it. The 2003 Transaction, resulting in the ESOP owning 100% of the Company, was an effort by Lee and Asha "to liquidate their personal substantial holdings in Antioch and to diversify their assets---all while reaping tax savings and maintaining their leadership positions in the Company." Cplt. ¶ 45.

It is true that the Litigation Trustee asserts that "Lee, Asha, and Attiken, by virtue of their positions on the ESOP Advisory Committee, were fiduciaries under ERISA and were uniquely situated to investigate and implement changes to the ESOP that would benefit the non-ESOP shareholders." Cplt. ¶ 46. However, it was also Morgan, Moran, and Attiken's prominent role as officers and directors of the Company, not as ERISA fiduciaries to the ESOP advisory committee,[21] which ultimately allowed the 2003 Transaction to be consummated. Cplt. ¶¶ 48-50, 61-67, 73, 84-87. This transaction benefited the non-ESOP

---

[21] Morgan, Moran, and Attiken point to the multiple references to ERISA and the ESOP in the Complaint and even the similarities between this Complaint and an ERISA complaint pending in the District Court for the Northern District of Illinois which arises out of the events leading to the 2003 Transaction. The Complaint is perhaps distinguishable from *Husvar* in its drafting, but fundamentally it is not. ERISA case law teaches that the court must focus on the true nature of the causes of action and not on the form of the complaint. *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991) ("It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit."). A careful review of the entirety of the Complaint indicates that it pursues actions against state law corporate fiduciaries for the failure to act upon independent legal duties to the Company and the damages these actions caused the Company.

shareholders, particularly Morgan and Moran, to the detriment of the Company. Cplt. ¶ 78. The decision to purchase the non-ESOP shares was made not by the ESOP, but rather by the Company (Cplt. ¶¶ 48-49), and the ultimate liability fell upon the Company (Cplt. ¶ 90).

The Complaint does not seek remedies which bind an employer to specific benefit structures, seek alternative remedies beyond what ERISA provides for issues related to an ERISA qualified plan, or interfere with the uniform procedures for ERISA qualified plans. *See PONI*, 399 F.3d at 698. Instead, the Complaint addresses a series of individuals – in their hats as corporate fiduciaries – and the role they played in the downward spiral of the Company.

The allegations relating to the post-2003 Transaction events have no discernable relationship to the ESOP except for the fact the Company was wholly-owned by the ESOP after the transaction. The Condor cause of action (Count 3) concerns obligations of the Company to pay the ESOP Notes. *See* Cplt. ¶ 98 ("The restructure did not solve Antioch's financial problems. By the end of 2004, Antioch had paid out almost $75 million in ESOP repurchase obligations and had undertaken an additional $30 million in note debt to departing employees . . . ."). The allegation is that the failure to provide adequate security for these obligations damaged the Company because the Company, not the ESOP, was liable under the ESOP Notes. The Levimo Transaction did not involve the ESOP as a party. The other counts all concern the failed sale process and the asserted resulting damages from the actions of Morgan, Moran, and Attiken as officers of the Company. These allegations include, but are not limited to, Morgan and Moran's failure to act in the Company's interests when serving on the Special Committee (Cplt. ¶¶ 112, 116, 123, 126, 137 & 141), Morgan, Moran, and Attiken's failure to cooperate with Houlihan Lokey (Cplt. ¶¶ 119 – 122), and the

influence Morgan and Moran used in the firing of the board of directors against the Company's interests (Cplt. ¶¶ 141 – 149).

Finally, Morgan, Moran, and Attiken argue that the damages sought in the Complaint are the reduction of value of the ESOP stock and, therefore, the Company has not alleged any separate damages.   In paragraph 1, the Complaint states, in part, that "[a]lthough the Company reorganized . . . , the beneficiaries of the Trust received nothing—current and former employees lost their retirement savings, and disfavored creditors received no distributions."  At first blush, such statements seem akin to those made by the plaintiff in *Thurman v. Pfizer, Inc.*, which forbids expectation damage calculations based on a loss related to the ERISA plan. 484 F.3d at 862.  While this background is included in the Complaint, the Complaint also describes specific actions, such as the tender offer for the non-ESOP shares that relate directly to damage to the Company. *See* Cplt. ¶ 98.  The defendants have not cited any authority that requires the Litigation Trustee to specifically calculate damages at this stage of the litigation.  Moreover, to the extent the Litigation Trustee referenced losses to the ESOP as a method "to articulate 'specific, ascertainable damages'" based on claims grounded in a duty independent of ERISA, such references do not mandate preemption. *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 452 (6th Cir. 2003), *quoting, Wright v. General Motors Corp.*, 262 F.3d 610, 615 (6th Cir. 2001).

Based on the foregoing, the court recommends that none of the causes of action against Morgan, Moran, or Attiken be dismissed under the theory of ERISA preemption.

### 7. Causes of Action against Marty Moran are not Preempted

Marty Moran is the spouse of Moran, but held no position, fiduciary or otherwise, with the Company. Marty Moran is named as a defendant in Counts 7 (aiding and abetting breach of fiduciary duty as to the Levimo Transaction), 9 (aiding and abetting as to the sale process), and 12 (interference with the Houlihan Lokey business contract). The fact that Marty Moran was not a fiduciary of the ESOP would not necessarily preclude these causes of action from being preempted by ERISA. *See Provident Bank*, 170 F.3d at 615-16 (Claims which "merely attach new, state law-labels" to ERISA claims against non-fiduciaries are preempted.). However, as previously explained, the only relationship that the Levimo Transaction, the sale process, and the hiring of Candlewood have to the ESOP is that the Company was wholly-owned by the ESOP when those events occurred. Marty Moran argues that all of these events ultimately relate to the 2003 Transaction and any entity seeking recovery can only look to ERISA. Even if this premise was correct – which it is not -- the acts complained of in these counts were too detached from the 2003 Transaction to sufficiently "relate to" the ESOP to fall under the ERISA preemption umbrella.

Therefore, the court recommends that the causes of action against Marty Morgan not be dismissed under the theory of ERISA preemption.

### 8. The Professional Negligence Counts Fail to State A Claim upon which Relief can be Granted

As the analysis of Counts 4 and 5 is so closely related to the ERISA preemption analysis, it is addressed here.

The Complaint alleges professional negligence against Reliance (Count 4) and Evolve (Count 5). A claim for professional negligence requires the existence of a duty or standard

of care, a breach of that duty, proximate cause and harm. *Ballreich Bros., Inc. v. Criblez*, 2010 WL 2735733, at *4 (Ohio Ct. App. July 12, 2010). Even if these causes of action were not preempted by ERISA, both counts fail under essentially the same analysis. That is, although the Complaint alleges both Reliance and Evolve owed a duty to the Company, their status as an independent trustee means that their exclusive duty was to the ESOP. As noted earlier in the section concerning ERISA preemption, it is not relevant that the Company, as plan administrator or sponsor, hired and paid for the services of Reliance and Evolve.[22]

Accordingly, the court recommends that Counts 4 and 5 be dismissed for failure to state a claim upon which relief can be granted.

---

[22] The parties dispute the meaning of Reliance's retention letter. Upon consideration, the court does not find this letter to be clearly within the exceptions to matters outside the Complaint that can be considered in ruling upon a Rule 12 motion to dismiss and are excluded pursuant to FRCP 12(d) (applicable by BR 7012). To the extent the letter could be considered upon a motion to dismiss as "incorporated by reference or integral to the [Complaint]" [*See In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 978-79 (S.D. Ohio 2008) (Rice, J.)], the letter does not reflect Reliance entered into a contract with the Company. *See* Doc. 173-1 (Exh. A) (the "Retention Letter"). When Reliance was retained by the Company, the Company was acting within its role as the plan sponsor or administrator for the ESOP, as an ERISA fiduciary. *See* 29 U.S.C. § 1103(a) (The assets of an employee benefit plan are held in trust and the trust is appointed by a named fiduciary). The Retention Letter is clear that "Reliance . . . hereby agrees to serve as discretionary trustee under the Plan." Doc. 173-1, Exh A, ¶ 1. Although the Retention Letter does not reference the Company signing the agreement within its role as the plan sponsor or administrator, the letter does not suggest any agreement for Reliance to act directly on behalf of the Company. In fact, the Retention Letter limits Reliance's duty to that of a discretionary trustee for the ESOP. Therefore, since Reliance's retention was limited to that of a plan trustee, the Company could only have agreed to such retention as the plan administrator or sponsor. Although the Litigation Trustee seeks discovery upon these issues, discovery would not change the language of the Retention Letter that limits Reliance to this agreement and other written agreements (Doc. 173-1, Exh. A, ¶ 6). As to any other such possible written documentation, the court allowed broad discovery prior to the Complaint being filed and the Litigation Trustee has no reason to believe such a document exists. The circumstances of Reliance's resignation or the effect of Reliance's actions upon the Company do not change the parameters of the Retention Letter. As the court expanded upon in the section concerning ERISA preemption, as a plan trustee, Reliance had an unwavering duty to the ESOP. Under such circumstances, there is no duty to the Company.

F.      **Statute of Limitations (Claims 1-3)**

1.      *Positions of the Parties*

The defendants included in Counts 1, 2 and 3 argue that those counts are barred by the statute of limitation.  As the parties asserting this affirmative defense, they have the burden of proving that the applicable statute of limitation bars those claims. *See King v. Branch Motor Express Co.*, 435 N.E.2d 1124, 1127 (Ohio Ct. App. 1980); *Gold v. Deloitte & Touche, LLP (In re NM Holdings Co.)*, 405 B.R. 830, 839 (Bankr. E.D. Mich. 2008).  While the Litigation Trustee does not challenge the defendants' assertion that the applicable statute of limitation otherwise bars Counts 1 and 2 and at least part of the acts complained of in Count 3, he argues that the limitation period should be tolled.

The parties agree that Ohio Revised Code ("ORC") § 2305.09(D) provides the applicable statute of limitation for breach of fiduciary duty claims under Ohio law. *Cundall v. U.S. Bank*, 909 N.E.2d 1244, 1249-50 (Ohio 2009); *Crosby v. Beam*, 615 N.E.2d 294, 300 (Ohio Ct. App. 1992); *Nixon v. Bank One of Eastern Ohio, N.A.*, 599 N.E.2d 742, 743-44 (Ohio Ct. App. 1991); *Antioch Litig. Trust v. McDermott Will & Emery LLP*, 738 F. Supp. 2d at 773; *In Re Keithley Instruments, Inc., Derivative Litig.*, 599 F. Supp. 2d 875, 906 (N.D. Ohio 2008). ORC § 2305.09(D) states that the statute of limitation is 4 years "[f]or an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 1304.35, 2305.10 to 2305.12, and 2305.14 of the Revised Code."

ORC § 2305.09(D) also applies to claims for aiding and abetting breaches of fiduciary duties since they too would fall under its general catch-all provision.  In addition, claims that are ancillary to another claim, such as aiding and abetting breach of a fiduciary duty, carry

the same statute of limitation as the primary claim. *Balta v. Ayco Co.,* 626 F. Supp. 2d 347, 359 (W.D.N.Y. 2009) (limitation period for breach of fiduciary duty applies to claim for aiding and abetting breach of fiduciary duty).

The parties also agree that the statute of limitation accrued with respect to Counts 1 and 2, at the latest, on December 16, 2003 when the 2003 Transaction closed. In Count 1, the Litigation Trustee seeks to recover from Morgan, Morgan, Carlson, McLaughlin, Sanan, VonMatthiessen, Blair and Attiken on account of their breach of their fiduciary duties in connection with the 2003 Transaction. Count 2 seeks the same relief against these same defendants and, in addition, against GreatBanc and Houlihan Lokey, for aiding and abetting the breach of fiduciary duties alleged in Count 1.[23] Under Ohio law, a plaintiff's cause of action for breach of fiduciary duty "accrues when his interest is impaired by such a breach." *Jim Brown Chevrolet, Inc. v. S.R. Snodgrass, A.C.,* 752 N.E.2d 335, 338 (Ohio Ct. App. 2001); *Nixon,* 599 N.E.2d at 744, *citing Kunz v. Buckeye Union Ins. Co.,* 437 N.E.2d 1194, 1196 (Ohio 1982). The conduct complained of in Counts 1 and 2 occurred in 2003, more than four years prior to the filing of the Complaint. Further, there is no dispute that the impairment of Antioch's interests arising out of the 2003 Transaction occurred on December 16, 2003 when the 2003 Transaction closed. Thus, Antioch's causes of action under Counts 1 and 2 accrued, at the latest, on December 16, 2003 and absent the tolling of the statute of limitation, the four year statute of limitation would bar those claims.

---

[23] To the extent that these two claims are duplicative as to particular defendants, the Litigation Trustee has acknowledged that he may only recover on one of the two claims in that these claims are plead in the alternative.

Because Count 3 of the Complaint is predicated upon the issuance of the ESOP Notes, the purchase and renewal of the Condor bonds, and certain alleged misrepresentations which occurred at different times, some of the acts complained of in that count may be outside the four year period provided by ORC § 2305.09(D) while some of the acts may fall within that period. Through Count 3 the Litigation Trustee seeks to recover from Morgan, CRG, Epstein, Ravaris, Lipson-Wilson, Felix, Hoskins and Bevelhymer on account of their breach of their fiduciary duties relating to the issuance of the ESOP Notes with the knowledge that "the Condor bond did not provide adequate security for the Company's obligations" and on account of the renewal of the Condor bonds. Cplt. ¶¶ 178 & 179. There were four rounds of ESOP Notes, issued August 20, 2004, July 11, 2005, August 2, 2006, and October 1, 2007 respectively, with purchase of the Condor bonds at those times. Cplt. ¶ 152. In addition, the Condor bonds were renewed in August 2008. The impairment with respect to the first two rounds occurred and, therefore the statute of limitation accrued, more than four years prior to the filing of the Complaint. Accordingly, absent the tolling of that limitation period, the statute of limitation would bar Count 3 with respect to the first two rounds of the ESOP Notes. Conversely, the alleged impairment with respect to the third and fourth rounds and the renewal of the Condor bonds occurred and, as a result, the statute of limitation accrued, within four years of the filing of the Complaint. Therefore, the statute of limitation does not bar Count 3 with respect to the third and fourth rounds of issuance of the ESOP Notes and with respect to the renewal of the Condor bonds.

While the parties agree that, absent tolling of the statute, the four year statute of limitation set forth in ORC § 2305.09(D) bars Counts 1, 2 and at least part of Count 3, they

disagree as to whether it should be tolled.  The Litigation Trustee argues that Counts 1, 2 and 3 are timely because the statute of limitation was tolled under one of two theories – the doctrine of adverse domination, also known as adverse dominion, and the doctrine of equitable tolling.  According to the Litigation Trustee, the court should apply adverse domination and equitable tolling because "this case provides a textbook argument for adopting these theories." Adv. Doc. 186, p. 22.  The defendants respond that no Ohio cases apply the doctrine of adverse domination, courts rarely use the doctrine of equitable tolling and the alleged facts do not support equitable tolling.

The plaintiff has the burden of "plead[ing] circumstances which would indicate why the [cause of action] was not discovered earlier and which would indicate why the statute should be tolled." *Owner Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank*, 540 F. Supp. 2d 925, 929 (S.D. Ohio 2008), *quoting, Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 356 (6th Cir. 1987).  *See also Twee Jonge Gezellen, Ltd. v. Owens-Illinois, Inc.*, 238 Fed. Appx. 159, 161-62, 2007 WL 2141929 at *2 (6th Cir. 2007) (Defendant's burden is to prove that the statute of limitation has run the plaintiff's burden is to prove an exception applies).

> ### 2.    The Litigation Trustee is an Assignee and Succeeds to All Rights of Antioch, Subject to Any Defenses and Limitations

The Litigation Trust was assigned claims formerly held by Antioch and has the authority to pursue those claims as the assignee. Cplt. ¶¶ 7 & 8.  As assignee, the Litigation Trustee succeeds to all rights and benefits of Antioch relating to those claims, but takes them subject to all defenses, limitations and infirmities. *In re Reardon*, 51 B.R. 182, 184 (Bankr. S.D. Ohio 1985); *Cleveland Trust Co. v. Beidler*, 95 N.E.2d 398, 402-03 (Ohio Ct. App. 1950); *Citizens Fed. Bank, F.S.B. v. Brickler*, 683 N.E.2d 358, 363 (Ohio Ct. App. 1996); *Leber v. Buckeye*

*Union Ins. Co.*, 708 N.E.2d 726, 733 (Ohio Ct. App. 1997). Thus, to the extent any claims would be barred if held by Antioch, including by an applicable statute of limitation, those claims would also be barred against the Litigation Trustee.

### 3. Applicable Law Concerning the Statute of Limitation Issues

In determining the substance of state law, the federal courts are bound by decisions of the state's highest court, "unless that court would overrule its decisions on similar facts." *Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 624 (6th Cir. 2008). When the state's highest court has not spoken on the issue, a federal court must make the "best prediction, even in the absence of direct state precedent, of what the [state] Supreme Court would do if confronted with [the] question." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004); *Welsh v. U.S.*, 844 F.2d 1239, 1245 (6th Cir. 1983), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009). In performing this inquiry, the court "may rely upon analogous cases and relevant dicta in the decisional law of the State's highest court, opinions of the State's intermediate appellate courts to the extent that they are persuasive indicia of State Supreme Court direction, and persuasive opinions from other jurisdictions, including the 'majority rule.'" *Welsh*, 844 F.2d at 1245. *See generally Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). Significantly, whether this court would find this rule advisable or fair is immaterial in the analysis. *See Combs*, 354 F.3d at 577; *Kurczi v. Eli Lilly and Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997). *Owensby v. City of Cincinnati*, 385 F. Supp. 2d 626, 631 (S.D. Ohio 2004); *Chesher v. Neyer*, 392 F. Supp. 2d 939 (S.D. Ohio 2005).[24]

---

[24] Because the tort claims are governed by Ohio law, this court is not considering federal common law. Thus, the court finds discussion of equitable tolling principles in the context of federal claims to be irrelevant. *See*

The Supreme Court of Ohio has emphasized the importance of statutes of limitation:

> Statutes of limitations foster important public policies: ensuring fairness to the defendant, encouraging prompt prosecution of causes of action, suppressing stale and fraudulent claims, and avoiding the inconvenience engendered by delay and by the difficulty of proving older cases . . . .  We apply them consistently to ensure the proper administration of justice.

*Cundall*, 909 N.E.2d at 1249; *see also Flagstar Bank v. Airline Union's Mortgage Co.*, 2011-Ohio-1961, at *4 (Ohio April 27, 2011) (slip opinion) (similar).  However, while statutes of limitation are an integral part of our justice system, they do not constitute fundamental rights and are considered to be remedial and procedural in nature.   The United States Supreme Court noted that statutes of limitation are not fundamental rights, stating:

> Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost . . . . They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation . . . . They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a "fundamental" right or what used to be called a "natural" right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

*Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945) (footnote omitted). *See also Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 893 (1988) ("statute of limitation defenses are not a fundamental right").  *See also Evans v. Toys R Us Ohio, Inc.*, 221 F.3d 1334, 2000 WL 761803, at *6 (6th Cir. 2000); *Baird v. Loeffler*, 433 N.E.2d 194, 196 (Ohio 1982),

---

*Resolution Trust Corp. v. Wood*, 870 F. Supp. 797 (W.D. Tenn. 1994) (Because the claims are based upon state law, state law determines whether adverse dominion applies).

*overruled on other grounds by Mominee v. Scherbarth*, 503 N.E.2d 717 (Ohio 1986). Because statutes of limitation are remedial and procedural, they are to be liberally constructed to permit the deciding of cases on their merits. Ohio Revised Code § 1.11; *Rahm v. Hemsoth*, 372 N.E.2d 358, 359 (Ohio Ct. App. 1976); *Baldine v. Klee*, 237 N.E. 2d 905, 908 (Ohio Ct. App. 1968). Such statutes should be construed "to mean that a litigant, where possible, should win or lose his case on the merits and not on a procedural matter." *Id. See also O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727, 731-32 (Ohio 1983); *Rahm v. Hemsoth*, 372 N.E. 2d at 359; *Fritz v. Cox Bruner, LLP*, 756 N.E. 2d 740, 744 (Ohio Ct. App. 2001).

### 4. ORC § 2305.09 and the "Discovery Rule"[25]

The defendants' primary contention regarding the statute of limitation issues is that ORC § 2305.09 provides a four year limitation, the acts complained of in Counts 1, 2, and 3 fall outside that four year period, and the discovery rule provided by that section is not applicable to the causes of action alleged by the Litigation Trustee. ORC § 2305.09 states in pertinent part that:

> [A]n action for any of the following causes shall be brought within four years after the cause thereof accrued:
> * * *

---

[25] Referring to this section as addressing the "discovery rule" is somewhat misleading in that Ohio has recognized both this statutory discovery rule and a common law discovery rule. Thus, the Supreme Court of Ohio has applied a common law discovery rule to asbestos claims [*O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727 (Ohio 1983)], medical malpractice claims [*Melnyk v. Cleveland Clinic*, 290 N.E.2d 916 (Ohio 1972); *Oliver v. Kaiser Cmty. Health Found.*, 449 N.E.2d 438 (Ohio 1983)] and in actions by purchasers of real property against builders for construction defects [*Harris v. Liston*, 714 N.E.2d 377 (Ohio 1999)]. This common law discovery rule "applies where the application of the general rule that a cause of action exists from the time the negligent act was committed would lead to the unconscionable result that an injured party's right to recovery can be barred by the statute of limitations before he is even aware of its existence." *Burden v. Lucchese*, 877 N.E.2d 1026, 1032 (Ohio Ct. App. 2007); *Flagstar Bank v. Airline Union's Mortgage Co.*, 2011-Ohio-1961, at *5 (Ohio April 27, 2011) (slip opinion) (reaffirming when the common law discovery rule should be used). However, since the claims described in Counts 1, 2, and 3 are governed by a statute of limitation which includes a specific discovery rule, the common law discovery rule does not apply. *Flagstar* at *6.

(D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 1304.35, 2305.10 to 2305.12, and 2305.14 of the Revised Code[.]

* * *

If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered.

The paragraph at the end of ORC § 2305.09 constitutes what is known as the statutory "discovery rule." This provision, when applicable, provides that a cause of action accrues at the time the plaintiff discovers, or in the exercise of reasonable care, should have discovered, the injury. *Investors REIT One v. Jacobs*, 546 N.E. 2d 206, 209 (Ohio 1989).

The courts interpreting Ohio law have consistently held that the discovery rule does not apply to breach of fiduciary duty claims premised upon negligence. *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 737-38 (S.D. Ohio 2009); *Helman v. EPL Prolong, Inc.*, 743 N.E.2d 484, 497-98 (Ohio Ct. App. 2000); *Kondrat v. Morris,* 692 N.E.2d 246, 251 (Ohio Ct. App. 1997); *Herbert v. Banc One Brokerage Corp.*, 638 N.E.2d 161, 164 (Ohio Ct. App. 1994). However, the issue of whether the discovery rule applies to claims for breach of fiduciary duty that are predicated upon acts other than negligence and, if so, what type of breaches of fiduciary duties gives rise to application of the discovery rule was less certain under Ohio law .

This uncertainty may have emanated, at least in part, from the Supreme Court of Ohio's decision in *Investors REIT One.* The syllabus, in pertinent part, stated that:

2a. The discovery rule is not available to claims of professional negligence brought against accountants.

2b. However, by the express terms of R.C. 2305.09(D), the four-year limitations period does not commence to run on claims presented in fraud or

> conversion until the complainants have discovered, or should have discovered, the claimed matters.

*Investors REIT One*, 546 N.E 2d at 208. The Court declared that the statutory discovery rule contained within ORC § 2305.09 could only be applied to the torts expressly mentioned in ORC § 2305.09. Therefore, the court continued, since negligence claims were excluded from those torts, the doctrine of expressio unius est exclusio alterius precluded the application of the rule to accountant malpractice claims premised upon the defendants' negligence. *Id.* at 211. However, while the court applied this doctrine to find that negligence claims could not be subject to the discovery rule under ORC § 2305.09, the Court also stated that "[s]ince the discovery rule set forth in R.C. 2305.09(D) is applicable to claims founded in fraud, conversion **and breach of trust** by the terms of the statute, the court of appeals appropriately reversed and remanded the summary judgments granted on such claims." *Id.* at 211-12 (emphasis added). However, "breach of trust" claims are not referenced in ORC § 2305.09(D) or the syllabus holding.

The Sixth Circuit addressed *Investor REIT One's* apparent inconsistency by applying the Ohio syllabus rule,[26] stating that since in the syllabus in *Investor REIT One* only mentions "fraud and conversion" claims as being subject to the discovery rule, breach of trust or breach of fiduciary duty claims are not subject to the discovery rule. *See Bell v. Bell*, 132 F.3d 32, 1997 WL 764483, at *6-7 (6th Cir. Dec. 3, 1997). *See also Helman*, 743 N.E.2d at 497-98 (discovery rule of ORC § 2305.09(D) does not apply to breach of fiduciary duty claims). Other decisions have explained that breach of fiduciary claims based on fraud are subject to

---

[26] Prior to May 1, 2002, the holding of a decision of the Supreme Court of Ohio was contained only in the syllabus. *See Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 313 B.R. 732, 738, n. 2 (Bankr. S.D. Ohio 2004).

the discovery rule. *Orvets v. Nat'l City Bank, Ne.,* 722 N.E.2d 114, 120 (Ohio Ct. App. 1999); *Scotts Co.,* 606 F. Supp. 2d at 738 ("[w]here a claim for breach of fiduciary duty is based on negligence or matters other than fraud, the discovery rule does not apply.").

However, the Litigation Trustee has not plead a fraud claim nor has he plead, at least with the necessary specificity, breach of fiduciary duty based on fraud.  Accordingly, while the Litigation Trustee alleges conflicts of interest and self-dealing, the Litigation Trustee has not plead fraud or conversion as underlying those claims and certainly has not plead fraud with particularity as would be required under FRCP 9(b). *See Glimcher Co., LLC v. Deavers,* 2010 WL 1610709, at *8 (S.D. Ohio April 19, 2010), *citing Scotts Co.,* 606 F. Supp.2d at 735 ("When a breach of fiduciary duty claim rests on averments of fraud, the allegations of fraudulent conduct must satisfy Rule 9(b)."); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.,* 504 F. Supp. 2d 287, 311 (S.D. Ohio 2007) (same). Accordingly, based upon Ohio law and the Complaint, this court recommends that the discovery rule provided by ORC § 2305.09 be found inapplicable to Counts 1, 2, and 3 without prejudice to any amended complaint the Litigation Trustee may file.

### 5.    *Equitable Tolling Principles under Ohio Law*

In addition to the statutory and common law discovery rules, "Ohio recognizes that the doctrine of equitable tolling may be used to avoid the inequitable use of the statute of limitations." *Wuliger v. Star Bank,* 2008 WL 2323887, at *4 (N.D. Ohio June 4, 2008), *citing, Livingston v. Diocese of Cleveland,* 710 N.E. 2d 330 (Ohio Ct. App. 1998); *Sharp v. Ohio Civil Rights Comm'n,* 2005 WL 589889, at *2 (Ohio Ct. App. March 10, 2005).  However, equitable

tolling is only applied in very limited circumstances to "prevent gross injustice to a plaintiff." *Crego v. Baldwin-Lima-Hamilton Corp.*, 1998 WL 80240, at *6 (Ohio Ct. App. Feb. 27, 1998).

Ohio courts have applied equitable tolling and related principles in a myriad of different circumstances under many different names. In particular, Ohio courts have tolled statutes of limitation through use of equitable estoppel,[27] the delayed damages rule,[28] the termination rule,[29] the continuing tort doctrine[30] and general equitable tolling principles.

Equitable tolling is used to toll a statute of limitation for a period of time depending upon the particular circumstances. Equitable tolling differs from the "discovery rule" in that

---

[27] Under the doctrine of equitable estoppel the defendant is estopped from use of the statute of limitation as a bar to the plaintiff's recovery when: (1) the defendant made a factual misrepresentation; (2) that is misleading; (3) induced actual reliance which is reasonable and in good faith; and (4) the reliance caused detriment to the relying party. *Doe v. Blue Cross/Blue Shield of Ohio* 607 N.E.2d 492, 498 (Ohio Ct. App. 1992); *Hutchinson v. Wenzke*, 723 N.E.2d 176, 177 (Ohio Ct. App. 1999).

[28] Under the delayed damages doctrine, as previously applied by Ohio courts, a cause of action might not have accrued until the plaintiff suffered damages, as opposed to when the negligent or wrongful act was committed. *See Kunz v. Buckeye Union Ins. Co.*, 437 N.E.2d 1194, 1196 (Ohio 1982); *Fritz v. Bruner Cox, L.L.P.*, 756 N.E.2d 740, 743-44 (Ohio Ct. App. 2001) and *JP Morgan Chase Bank NA v. Lanning*, 2008 WL 588804, at *2 (Ohio Ct. App. March 3, 2008). However, the Supreme Court of Ohio's recent decision in *Flagstar* that the doctrine of delayed damages is not applicable to claims for professional negligence and malpractice, including claims against accountants and appraisers, at a minimum, raises questions as to the viability of the delayed damages doctrine in Ohio. *See Flagstar Bank v. Airline Union's Mortgage Co.*, 2011-Ohio-1961 (Ohio April 27, 2011) (slip opinion).

[29] Ohio has recognized the termination rule for medical and legal malpractice claims and for "breach of trust" or breach of fiduciary duty claims against trustees of an express trust. Under the termination rule, claims do not accrue and commence to run until the attorney-client or doctor-patient relationship terminates or the trustees' duties with respect to the trust are terminated. *See State ex rel. Lien v. House*, 58 N.E.2d 675 (Ohio 1944); *Jim Brown Chevrolet, Inc. v. S.R. Snodgrass, A.C.*, 752 N.E.2d 335 (Ohio Ct. App. 2001) and *Beechler v. Touche Ross & Co.*, 611 N.E.2d 33 (Ohio Ct. App. 1992) (explaining the termination rule and refusing to apply it to claims for accountant negligence). However, the Supreme Court of Ohio limited the termination rule with respect to trustees of express trusts to situations in which "the trustee's misconduct is surreptitious or obscured and remains so until the trustee's death or removal." Once a beneficiary of an express trust knows of misconduct by a trustee, the statute of limitation commences to run. *Cundall v. U.S. Bank*, 909 NE.2d 1244, 1249-50 (Ohio 2009). *See also Cassner v. Bank One Trust Co.*, 2004 WL 1470806 (Ohio Ct. App. July 1, 2004) (distinguishing trust-related and non-trust related causes of action).

[30] *See Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 522-23 (6th Cir. 1997) and *Boll v. Griffith*, 535 N.E.2d 1375, 1375-77 (Ohio Ct. App. 1987).

the discovery rule postpones the accrual or running of the statute of limitation until the injury to the plaintiff's rights is discovered while equitable tolling generally tolls the running of the statute of limitation during the period for which the incapacitating or disabling condition exists.

Ohio courts have applied equitable tolling in different types of cases.[31]  In *Crego*, the court held that the doctrine of equitable tolling could be used to preserve product liability claims against the supplier of an allegedly defective product when the plaintiff has used reasonable diligence to ascertain the financial condition of the manufacturer of the product and later, after the statute of limitation would have otherwise expired, determined that the manufacturer was insolvent. *Id.*[32]  The court tolled the limitation period against the supplier of the product until it was determined that the manufacturer was insolvent. *Id.* at *4.

---

[31] Until the Ohio General Assembly adopted a specific statute of limitation governing such claims, the Supreme Court of Ohio also applied the doctrine to toll the running of the statute of limitation in the context of childhood sexual abuse cases until "the victim recalls or otherwise discovers that he or she was sexually abused, or when, through the exercise of reasonable diligence, the victim should have discovered the sexual abuse." *See Ault v. Jasko*, 637 N.E.2d 870, 873 (Ohio 1994).  However, as Defendants McLaughlin, Sanan, vonMatthiessen, and Carlson noted in their *Notice of Supplemental Authority* (Adv. Doc. 206), *Ault* is no longer good law because in 2006 the Ohio General Assembly adopted ORC § 2305.111(C) which provides a specific limitation period governing these claims.  In *Pratte v. Stewart*, 929 N.E. 2d 415, 424 (Ohio 2010), the Supreme Court of Ohio noted that the Ohio General Assembly did not legislate a tolling provision for claims involving "repressed-memory" after providing in that legislation a 12 year limitation period and a specific exception for the accrual of the limitation period based upon fraudulent concealment.  In their *Notice of Supplemental Authority* (Adv. Doc. 206) these defendants argue that *Pratte* "addresses whether a court can add a tolling exception to a statute of limitations."  However, the court did not make any pronouncement on the doctrine of equitable tolling generally other than finding that in recently enacting a statute of limitation for childhood sexual abuse claims through ORC § 2305.111(C) the Ohio General Assembly did not legislate a tolling provision for claims involving "repressed-memory" after providing in that legislation for a 12 year limitation period and a specific exception for the accrual of the limitation period based upon fraudulent concealment.  Thus, this court does not find that the Supreme Court of Ohio established any law in Ohio with that decision other than the very specific and limited principles concerning the statute of limitation for childhood sexual abuse claims.

[32] The applicable statute, ORC § 2307.78, permits actions to proceed against suppliers of allegedly defective products only under limited circumstances, including when the "claimant will be unable to enforce a judgment against the manufacturer of that product due to actual or asserted insolvency of the manufacturer." Ohio Revised Code § 2307.78(B)(2).

The Ohio courts have also used equitable tolling in employment litigation, considering the following five factors to determine whether equitable tolling should be applied: (1) lack of actual notice of the filing requirement; (2) lack of constructive notice of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant, and (5) a plaintiff's reasonableness in remaining ignorant of the filing requirements. *McNeely v. Ross Corr. Inst.*, 2006 WL 2949014 at *3 (Ohio Ct. App. Oct. 17, 2006)*, citing, Gray v. Allstate Ins. Co.*, 2005 WL 2372845 (S.D. Ohio Sept. 26, 2005). *See also Sharp*, 2005 WL 589889, at *2.

The District Court for the Northern District of Ohio recently applied the equitable tolling doctrine. *See Wuliger*, 2008 WL 2323887.  *Wuliger* arose out of the extensive *Liberte Capital Group* litigation relating to an investment scheme in which investors were fraudulently induced to invest in viatical investments supported or purportedly supported by life insurance policies.  Mr. Wuliger was appointed receiver over the entity that served as escrow agent and fiduciary for the companies that marketed the viatical settlements. *See Liberte Capital Group, LLC v. Capwill,* 462 F.3d 543, 547 (6th Cir. 2006).  The receiver filed a complaint against the banks in August 2002 alleging Ohio state law claims for aiding and abetting fraudulent conduct, negligence, breach of duty of good faith, conspiracy, and contribution and indemnity.  The banks asserted a statute of limitation defense. *Wuliger,* 2008 WL 2323887, at *2.  The court applied the four year statute of limitation provided in ORC § 2305.09. *Id.* at *4.  Noting Ohio courts' recognition of the doctrine of equitable tolling, that the receiver did not have control over the escrow agent's bank records until 1999 and that he was not authorized to pursue claims against the banks until May 2002, the court

found the action timely through the application of equitable tolling even though the escrow

agent's rights (and the rights of its subsidiaries) were impaired more than four years prior to

the filing of the complaint. The court stated:

> This particular set of circumstances and the unusual evolution of the *Liberte* litigation is such that it renders the situation exceptional and application of the doctrine of equitable tolling appropriate. Until there was an appointment of a receiver and access to the relevant bank accounts, it cannot be said that there was notice of what cause of action existed nor was it capable of being asserted until the receiver was able to examine those records. Based upon these circumstances, the Receiver acted as diligently as possible in attempting to preserve the legal rights of VES and CFL. A conservative application of the equitable tolling doctrine commencing at the end of 1999, in the light of these particular circumstances, is appropriate. As the complaint was filed within four years of November 1999, the claims therein are timely and the parties may proceed to discovery on the remaining claims.

*Id.* at *4.[33] Thus, in *Wuliger* the court tolled the running of the limitation period while the

necessary records were not in possession of the receiver who acquired the claims upon his

appointment. *Id.*

---

[33] The defendants assert that a plaintiff must allege and establish fraudulent concealment, misrepresentation, or promise of a better settlement offer to obtain the benefit of the equitable tolling doctrine. Some of the Ohio appellate court decisions discussing the doctrine of equitable tolling contain such statements. See *Sabouri v. Ohio Dep't of Job & Family Servs.*, 763 N.E.2d 1238 (Ohio Ct. App. 2001); *Livingston v. Diocese of Cleveland*, 710 N.E.2d 330 (Ohio Ct. App. 1998); *State v. Carter*, 2008 WL 5228925 (Ohio Ct. App. Dec. 15, 2008) and *Weikle v. Skorepa*, 69 Fed. Appx. 684, 2003 WL 21540980 (6th Cir. 2003). However, Ohio appellate court decisions have not limited the use of equitable tolling to those fact patterns. *Crego* and *Wuliger* did not involve circumstances involving fraudulent concealment or other similar facts. Different formulations of equitable tolling have been used by the Ohio courts depending upon the context or nature of the claim, with the doctrine being more limited in employment claims. Thus, in *Sharp*, the court noted that "[f]raudulent concealment may be used as grounds for equitable tolling." *Sharp v. Ohio Civil Rights Com'n*, 2005 WL 589889, at *2 (Ohio Ct. App. March 10, 2005). However, that court noted that equitable tolling is to be used "to prohibit inequitable use of the statute of limitations" and did not limit the doctrine to such a situation, further finding that "[e]quitable tolling is only available in compelling cases which justify a departure from established procedure." *Id.* This case does not involve facts under which those more limited formulations of the doctrine have been applied by the Ohio courts. Accordingly, given the fact that the Supreme Court of Ohio has not addressed the issue and the varying pronouncements of the Ohio appellate courts, this court finds that the doctrine of equitable tolling is not limited to circumstances of fraudulent concealment, misrepresentation or promise of a better settlement and could apply to this Complaint.

The allegations set forth in the Complaint contain elements of many of the equitable tolling principles recognized by the Ohio courts.  Antioch's Board of Directors and Antioch's officers, including Morgan, Moran, Attiken and Hoskins, had significant conflicts of interest with respect to the 2003 Transaction, particularly with respect to the substantial sums of money and other interests, such as the stock options, they would receive from the transaction if it was effectuated. *See* Cplt. ¶¶ 34, 40, 43, 45-48, 50, 53-60, 66, 78-79, 84, 88-89, 100, 109-110, 112, 123, 126-127, 132, 138 and 169.  Morgan and Moran so controlled Antioch's Board of Directors and actions that when the Board did not comply with their wishes they saw to the removal of those noncompliant Board members and the narrowing of the Board to three members, assuring their control of the Board. *See* Cplt. ¶¶ 39-40, 45-46, 48, 54, 61, 64-66, 70, 73, 110, 115-116, 123, 124, 126, 136-139, 141, 146-149 and 164.  Finally, the Complaint contains multiple allegations concerning these defendants' nondisclosure, concealment, and misleading statements made to the ESOP Noteholders, ESOP participants, and other interested persons and stakeholders as to material matters, including as to the Condor bond issues. *See* Cplt. ¶¶ 60, 62, 64-66, 72-74, 99, 108, 109, 121, 129, 132, 134, 154, 155-157 and 181.

The potential claims were ignored until the directors were terminated from their roles and the Litigation Trustee was appointed under the Plan and Litigation Trust Agreement. *See* Cplt. ¶¶ 124, 126, 129, 132, 136, 141, 146-149 and 164.  In addition, the Complaint establishes damage to the Company on the date of the closing of the 2003 Transaction in the form of the $111,424,500 in cash paid to the Non-ESOP Shareholders and the "Put Price Protection Agreement" fixing the stock value for all ESOP participants who

terminated their employment during the period of January 1, 2003 through September 30, 2006. However, it was not until later that much of the damage caused by the 2003 Transaction transpired when Antioch incurred substantial liability to employees who terminated their employment to redeem their interests in the ESOP and the Company became indebted to them and had to borrow substantial sums of money to meet its obligations. *See* Cplt. ¶¶ 95-96, 99 and 101. The possibility of pursuing appropriate remedial action relating to the 2003 Transaction was further hampered because interested stakeholders were deceived as to the downward financial spiral caused by the 2003 Transaction. *See* Cplt. ¶¶ 99, 108, 121, 134 and 155-157. All of these allegations as well as others assert continuous acts of the defendants that may have kept the wrongs from being pursued by Antioch. *See* previously cited paragraphs and Cplt. ¶¶ 108, 115, 119, 122-124, 126-127, 129, 134, 137, 140-141, 145-146, 147, 154, 155, 156, and 160.

Even if the discovery and termination rules and delayed damages, fraudulent concealment, and continuing tort doctrines are not directly applicable, the Complaint's allegations, if established as facts, could be considered in determining whether the doctrine of equitable tolling applies. The court agrees with the Litigation Trustee that even if his allegations regarding misrepresentations and omissions are not sufficient to invoke the discovery rule under ORC § 2305.09, those allegations may be considered in the context of determining whether the doctrine of equitable tolling may be appropriate. Cf. *Kandel v. Society Bank (In re Bendle)*, 1994 WL 530334, at *3 (Bankr. N.D. Ohio Sept. 13, 1994) ("[w]hile these allegations are not sufficient by themselves to permit the Trustee to toll the limitations period, they are sufficient to permit the Trustee's Complaint to survive"). *See also*

*Official Comm. of Admin. Claimants v. Bricker*, 2010 WL 3781662, at *10 (N.D. Ohio Sept. 22, 2010) ("This Court finds that it is too early in this litigation to resolve the statute of limitations issue."). Thus, this court recommends that the defendants' motions to dismiss Counts 1, 2, and 3 on statute of limitations grounds be denied without prejudice so that discovery may proceed with the court being able to later determine whether the facts, as may be developed through discovery, will establish exceptional and extraordinary circumstances warranting the application of the doctrine of equitable tolling under the equitable tolling principles described by *Crego, Wuliger* and other Ohio law.

### 6. *The Doctrine of Adverse Domination*

#### a. General Principles under the Adverse Domination Doctrine

Adverse domination or adverse dominion is an equitable doctrine that tolls statutes of limitation for claims by a corporation against its officers, directors, lawyers, and accountants as long as the corporation is controlled by those acting against its interests. *Chinese Merchants Ass'n v. Chin,* 823 N.E.2d 900, 903 (Ohio Ct. App. 2004). Under this doctrine, the statute of limitation is tolled because controlling wrongdoers "are unlikely to initiate actions or investigations for fear that such actions will reveal their own wrongdoing" and because, in such circumstances, outsiders do not generally have access to facts from which they could discover the wrongdoing. *Resolution Trust Corp. v. Gardner*, 798 F. Supp. 790, 795 (D.D.C. 1992). *See also Fed. Deposit Ins. Corp. v. Bird*, 516 F. Supp. 647, 651 (D.P.R. 1981); *Shields v. Nat'l Union Fire Ins. Co. of Pittsburgh (In re Lloyd Secs., Inc.)*, 153 B.R. 677, 683

(E.D. Pa. 1993); *Wilson v. Paine*, 288 S.W.3d 284, 288-89 (Ky. 2009); and *NCP Litigation Trust v. KPMG*, 945 A.2d 132, 148 (N.J. Super. Ct. Law Div. 2007).[34]

The crux of adverse domination is that the individuals who are in the position of bringing the claims are ill-suited from a motivational, ethical, and practical perspective to bring such claims due to their needing to take adverse action against themselves or actions attacking their own decisions, actions, or transactions. Those individuals, and the corporation which they control, are in effect incapacitated from bringing the claims.  In adverse domination, the statute of limitation is tolled until those persons no longer control or "dominate" the corporation and the corporation is in the hands of those who have the right, ability and capacity to sue for the wrong done.  *See O.E.M./Erie, Inc. v. McCallum (In re O.E.M./Erie, Inc.)*, 405 B.R. 779, 786 (Bankr. W.D. Pa. 2009) and *Wilson*, 288 S.W.3d at 287-88. Thus, the doctrine of adverse domination is not necessarily dependent upon the "discovery" of a wrong – it is premised upon the appropriate parties being in a position to assert the claims against the wrongdoers.

Based on two Ohio decisions from the same appellate court, the defendants assert that the doctrine of adverse domination has not been applied in Ohio either by statute or judicial decision.  In *Squire v. Guardian Trust Co.*, the court declined to toll the statute of limitations under the doctrine of "continuing dominion," stating that: "[i]n the absence of

---

[34] Several law review articles have addressed this doctrine in depth.  *See* Michael E. Baughman, *Defining the Boundaries of the Adverse Domination Doctrine: Is There Any Repose for Corporate Directors?*, 143 U. Pa. L. Rev. 1065 (1995); Matthew G. Dore, *Statutes of Limitation and Corporate Fiduciary Claims: A Search for Middle Ground on the Rules/Standards Continuum*, 63 Brooklyn L. Rev. 695 (1997).  Although the doctrine of adverse domination had its origin long before the numerous takeovers of financial institutions and their assets by the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation, and the Resolution Trust Corporation in the late 1980's and early 1990's, its use grew at that time when federal courts frequently applied it in actions against directors and officers of failed financial institutions. *See* Dore at p. 705; and Baughman at p. 1067.

statute or controlling authority, the doctrine of continuing dominion will be rejected as a basis for tolling the statute of limitations." 72 N.E. 2d 137, 147 (Ohio Ct. App. 1947). In *Chinese Merchants Assoc.,* that same court declared that: "[w]e find that this doctrine has no support in Ohio either by statute or judicial decision and, thus, conclude that Ohio has not adopted the doctrine of adverse domination to toll the running of the statute of limitations in legal malpractice claims. Therefore, we decline to apply this doctrine to the instant case." *Chinese Merchants Assoc.,* 72 N.E.2d at 903-04 (footnote omitted). The Supreme Court of Ohio has not addressed the applicability of this doctrine, and neither has another Ohio appellate court in a reported decision. The doctrine of adverse domination is consistent with Ohio corporate and agency law, but ultimately the court concludes that Ohio courts do not presently recognize this doctrine and there is not a sufficient basis to conclude that the Supreme Court of Ohio would adopt it.

b.      Relationship to Agency Law

Agency law serves as a foundation for the adverse domination doctrine. Upon a bankruptcy court's certification of the question of whether Kentucky recognizes the adverse domination doctrine, the Supreme Court of Kentucky noted:

> The doctrine is rooted in the long-established principles of agency law. Adverse domination is premised on the notion that knowledge is not imputed if the agent is acting in a manner adverse to the interests of the principal. This rule is consistent with Kentucky agency law. Thus, "[t]he knowledge of the agent is the knowledge of the corporation he serves when the knowledge relates to some matter over which the agent has control and with which his duties are connected and when they relate to matters over which he has authority . . . ." In the corporate context, the corporation is the principal and the board of directors as a whole is the agent. When the board of directors is accused of breaching its duty to the corporation, it necessarily is accused of acting adversely to the principal's interests.

*Wilson*, 288 S.W.3d at 287-288 (citations omitted). *See also Hecht v. Resolution Trust Corp.*, 635 A.2d 394, 405-06 (Md. 1993); Michael E. Baughman, *Defining the Boundaries of the Adverse Domination Doctrine: Is There Any Repose for Corporate Directors?*, 143 U. Pa. L. Rev. 1065, 1092 (1995) ("It is a well-settled principle of agency law that when an agent is acting adversely to the interests of the principal, any knowledge gained by that agent will not be imputed to the principal[.]").   As will be explained, these principles are also rooted in Ohio law.

c.   Relationship to Close Corporation Law

The doctrine has also been tied to contemporary principles applicable to close corporations.  The bankruptcy court for the Western District of Pennsylvania was asked, like this court is, to apply the doctrine of adverse domination. *In re O.E.M./Erie, Inc.,* 405 B.R. at 786.  The court noted that, like other courts, Pennsylvania state courts recognized various tolling principles to toll statutes of limitation but had not yet applied the doctrine of adverse domination. *Id.* at 785.   In concluding that the adverse domination theory was applicable to equitably toll statutes of limitation for Pennsylvania claims, the court found that:

> Allowing adverse domination to toll the statute of limitations makes particular sense in a closely held corporation context . . . where there may only be a few shareholders who also act as the corporate entity's officers and directors. If all the shareholders/officers and directors in the closely held corporation engaged in some activity that harmed the corporate entity, there would be no one left to protect the interests of the corporation. The culpable individuals may then be able to continuously engage in activities that harm not only the corporation, but also the corporation's creditors while escaping liability.

*Id.* at 786.  As will be explained, these principles are also rooted in Ohio law.

90

> d.      Ohio has Long Recognized the Corporate Agency
>         Principles Underlying the Adverse Domination Doctrine

Knowledge of a corporate officer does not necessarily equate to knowledge of the corporation.  It has been stated that:

> Knowledge of a corporate officer is not, ipso facto, the knowledge of the corporation merely because he occupies a corporate office . . . .  If knowledge acquired is not within the scope of his authority, or if he is acting fraudulently or adversely to the corporation, the corporation is not bound by the knowledge of its officers where the relation of the agent to the subject matter renders it certain that he will not disclose such knowledge.

*B-G Leasing Co. v. First Nat'l Bank*, 1991 WL 87113, at *5 (Ohio Ct. App. May 24, 1991).

The principle in Ohio law that the knowledge of corporate officers or agents acting adversely to the corporation is not imputed to the corporation appears to date back at least to decisions of Chief Justice Taft when he sat on the Cincinnati Superior Court.  Thus, in *Sayler v. Simpson*, 12 Ohio Dec. 148, 1888 WL 307 (Cincinnati Sup. Ct. 1888), Chief Justice Taft addressed a case in which partners of a partnership were alleged to have converted their partnership into a corporation and to have released their subscription agreements for worthless consideration.  The assignee for the benefit of the creditors filed suit against the stockholders to recover the amounts due under the stock subscriptions. *Id.* at *1.  The defendants asserted that the action was barred by the four year statute of limitation. *Id.* at *2.  In rejecting the defendants' arguments that the corporation knew of the fraud involved in releasing the stock subscriptions for worthless consideration since the time of that transaction, the court noted that "the creditors had no knowledge of the fraudulent transactions complained of until after the assignment [for the benefit of creditors].  Until then no cause of action arose, and the statute did not begin to run." *Id.* at *4, citing *Scovill v.*

91

*Thayer*, 105 U.S. 143 (1881). The court remarked that a corporation "cannot be affected with notice to its stockholders or directors in matters in which they have an interest opposed to it." *Id.* at *2. *See also Antioch College v. Carroll*, 11 Ohio Dec. Reprint 220, 1890 WL 422 (Cincinnati Sup. Ct. 1890) (knowledge of interested director who personally collected and retained amounts due to the college not imputed to the college).[35]

In an appeal from an Ohio court, the Sixth Circuit discussed the principle that the knowledge of interested officers and directors of a corporation is not imputed to the corporation and applied many of the principles underlying the doctrine of adverse domination. *Yeiser v. United States Board & Paper Co.*, 107 F. 340 (6th Cir. 1901). *Yeiser* involved interested or conflicted directors implicated in the sale of a paper mill by an Indiana corporation. The stockholders were not aware of the true price paid by the corporation for the mill. Upon discovering the true price, the stockholders sought to have the wrongdoers' stock interests cancelled. In affirming the lower court's cancellation of the wrongdoers' stock, the Sixth Circuit stated:

> When . . . Browne and Stuart made their proposition to sell the mill to their company, and they and their cooperating associates, acting as the board of directors, accepted it for the company, the company was completely in fetters. While it was made to be a purchaser, it was dominated by the seller. It had no organ for seeing, hearing, or even knowing what was going on. Its whole constituency was engaged in bringing about the sale for the sellers. We have, on several occasions, held that where one who assumes to act as the agent of another in a given transaction is really acting as the agent of a third person, or in behalf of some scheme of his own, his apparent principal, having no knowledge of such alien purpose, is not bound by such pretended agent's acts, nor by any notice or knowledge of facts which such agent had at the

---

[35] The District Court for the Southern District of Ohio raised this very issue in related litigation when it stated: "However, it is conceivable that the company did not have sufficient knowledge of its claim to trigger the statute until some later date." *See Antioch Litig. Trust v. McDermott Will & Emery LLP*, 738 F. Supp. 2d 758, 773 (S.D. Ohio 2010).

time the transaction was going forward. . . . This rule is supported by still stronger reasons where the principal is in such condition that it can by no possibility either learn the facts or have any judgment to form its own course with regard to them.

The farcical nature of this transaction must have been apparent to the actors, for it was subsequently arranged that it should be confirmed after the cash subscriptions to the stock had been obtained and paid in. . . . In truth, however, the corporation was still as completely in the hands of the parties who were seeking to sell the mill to it for $100,000 as before. They had a majority of the board, and could pass the measure whether opposition was made or not. . . .

* * * *

And thus, again, when the transaction was finally consummated, the company not only had no notice of the fact, but was helpless to protect itself if it had had such notice, and all of the stockholders who were not in the scheme were still equally ignorant of the fact thus purposely concealed.

*Id.* at 345-46. *See also Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters.),* 617 F. Supp. 2d 700, 717 (S.D. Ohio 2009) ("Nonetheless, the complaint sufficiently invokes an exception to the rule — the adverse interest exception, whereby the principal is not charged with the knowledge or conduct of the agent in a matter when the agent's interests are adverse to those of the principal.").

Accordingly, Ohio and the Sixth Circuit have long recognized the corporate agency principle underlying the adverse domination doctrine that notice to conflicted and interested directors of a corporation is not notice to the corporation.

> e. Ohio Close Corporation Law Supports Application of the Adverse Domination Doctrine.

Twenty years ago the Supreme Court of Ohio recognized the particular characteristics of closely held corporations in the context of breach of fiduciary duty claims

93

and acknowledged that majority shareholders of a closely held corporation owe minority shareholders fiduciary obligations, stating:

> Close corporations bear a striking resemblance to a partnership. In essence, the ownership of a close corporation is limited to a small number of people who are dependent on each other for the enterprise to succeed. Just like a partnership, the relationship between the shareholders must be one of trust, confidence and loyalty if the close corporation is to thrive. While a close corporation provides the same benefits as do other corporations, such as limited liability and perpetuity, the close corporation structure also gives majority or controlling shareholders opportunities to oppress minority shareholders. For example, the majority or controlling shareholders may refuse to declare dividends, may grant majority shareholders-officers exorbitant salaries and bonuses, or pay high rent for property leased from the majority shareholders.

*Crosby v. Beam*, 548 N.E. 2d 217, 220 (Ohio 1989). Thus, the Supreme Court of Ohio acknowledged the increased protections needed in the context of close corporations. *Id.* The doctrine of adverse domination carries out those protections by preventing dominating officers and directors from avoiding responsibility for fiduciary duty obligations by simply dominating and controlling the corporation until the statute of limitation has run. *See In re O.E.M./Erie,* 405 B.R. at 786. Accordingly, the adverse domination doctrine fits with contemporary Ohio corporate law relating to close corporations.

> f.     There is not a Sufficient Basis to Conclude that the Supreme Court of Ohio would Recognize Adverse Domination as a Separate Doctrine to Toll a Statute of Limitation.

Despite the fact that the underlying policy of adverse domination is consistent with principles of Ohio corporation and agency law, the court concludes Ohio presently does not recognize it as a separate equitable doctrine as an exception to the statute of limitation. First, the doctrine has never been recognized in any decision or statute in Ohio. Second, in

94

*Squire*, the Eighth District Court of Appeals of Ohio failed to recognize the doctrine of "continuing dominion." *Squire*, 72 N.E.2d at 146-47. In *Chinese Merchants*, the same appellate court rejected adverse domination, stating "[continuing dominion] is essentially identical to that of adverse domination." 823 N.E.2d at 903. In *Investors REIT One*, the Supreme Court of Ohio, although addressing ORC § 2305.09(D) in its holding, cited favorably to *Squire* and noted in dicta it is "still good law." 546 N.E.2d at 211. While the doctrine has been adopted in the federal courts and in many states, this court cannot recommend a finding that the Supreme Court of Ohio presently would adopt this doctrine. Cf. *Resolution Trust Corp. v. Armbuster*, 52 F.3d 748, 751-52 (8th Cir. 1995) (Arkansas does not recognize adverse domination); *Fed. Deposit Ins. Corp. v. Cocke*, 7 F.3d 396, 401-04 (4th Cir. 1993) (Virginia does not recognize adverse domination).

**7.** **Conclusion as to the Statute of Limitation**
**Pertaining to Counts 1, 2, and 3**

This court recommends that the Motions to Dismiss Counts 1, 2, and 3 based upon statute of limitation grounds be denied without prejudice. Once discovery is completed, the court recommends that the parties be permitted to re-assert the statute of limitation as a bar to these claims through appropriate filings.

**G.** **Breaches of Fiduciary Duties (Counts 1, 3, 6, 8 and 10)**

**1.** **Fiduciary Duties of Directors and Officers Generally**

In Ohio "the relation between the officers and directors and their corporation and its stockholders is one of trust . . . . It is a fiduciary relation[.]" *Koos v. Central Ohio Cellular, Inc.,* 641 N.E.2d 265, 272 (Ohio Ct. App. 1994); *see also Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust (In re Amcast Indus. Corp.)*, 365 B.R. 91, 103 (Bankr. S.D. Ohio 2007),

95

*citing, Radol v. Thomas,* 772 F.2d 244, 256 (6th Cir. 1985); *Wing Leasing, Inc. v. M & B Aviation, Inc.,* 542 N.E.2d 671, 676 (Ohio Ct. App. 1988).  ORC §§ 1701.59 and 1701.60 codify the scope of a director's fiduciary duty and standard of care. *Radol,* 772 F.2d at 256; *Koos,* 641 N.E.2d at 272.  Unlike those of directors, the fiduciary obligations of corporate officers have not been codified. *Amcast,* 365 B.R. at 103.  However, Ohio courts have held that corporate officers may be held personally liable for acts of a corporation if they took part in the act, specifically directed the act to be done, or participated or cooperated in the commission of the act. *State ex rel. Fisher v. Am. Courts, Inc.,* 644 N.E.2d 1112 (Ohio Ct. App. 1997); *see also Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re National Century Financial Enterprises, Inc.),* 617 F. Supp. 2d 700, 718 (S.D. Ohio 2009); *Cash Amer. Fin. Svcs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 113 (B.A.P. 6th Cir. 2007).

ORC § 1701.59 requires a director to perform his duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." Ohio Revised Code § 1701.59(B).  A director who performs his duties in accordance with this standard shall have no liability imposed because of his position as director of the corporation. Ohio Revised Code § 1701.59(C); *Radol,* 772 F.2d at 257.  In evaluating a director's compliance with these duties, courts adhere to the "business judgment rule," a judicially created rule under which courts defer to the business judgment of directors who are making corporate decisions within their broad discretion. *Id.* at 256. The rule recognizes that "many important corporate decisions are made under conditions of

uncertainty" and, consequently, courts are not to "inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith or abuse of discretion." *Id.* at 256-57.

However, the business judgment rule only protects "disinterested directors." *Koos*, 641 N.E.2d at 272*, citing, Gries Sports Ents., Inc. v. Cleveland Browns Football Co.*, 496 N.E.2d 959, 964 (Ohio 1986). A disabling interest exists when directors either "appear on both side of the transaction [or] expect to derive any personal benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* Directors who waste corporate assets of an insolvent company and those who are uninformed, not independent, or grossly negligent are also not protected by the business judgment rule. *See Ohio Drill & Tool Co. v. Johnson,* 625 F.2d 738, 742 (6th Cir. 1980); *DeNune v. Consol. Capital of N. Am., Inc.,* 288 F. Supp. 2d 844, 859 (N.D. Ohio 2003) and *NCS Healthcare, Inc. v. Candlewood Partners, LLC*, 827 N.E.2d 797, 803 (Ohio Ct. App. 2005). Also unsheltered by the rule are directors who fail to act on knowledge of another director's waste of corporate assets or self-dealing. *Biggins v. Garvey*, 630 N.E.2d 44, 55 (Ohio Ct. App. 1993).

In Ohio, to state a claim for breach of fiduciary duty, a plaintiff needs to allege the existence of a duty on the part of the alleged wrongdoer, a breach of that duty, and a resulting injury. *McConnell v. Hunt Sports Ents.,* 725 N.E.2d 1193, 1215 (Ohio Ct. App. 1999). In order to prove that a director has breached his duties, it must be demonstrated, by "clear and convincing evidence that the director has not acted in good faith, in a manner that the director reasonably believes to be in or not opposed to the best interests of the corporation . . . ." Ohio Revised Code § 1701.59(C). Furthermore, for that director to be liable for damages

97

in any action that he takes or fails to take, it must be proven by "clear and convincing evidence . . . that the director's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation." Ohio Revised Code § 1701.59(D).

### 2. Count 1: Breach of Fiduciary Duty in Connection with the 2003 Transaction

With respect to Count 1, the Litigation Trustee alleges that (1) Morgan, Moran, Carson, McLaughlin, Sanan, vonMatthiessen, Blair, and Attiken (the "Count 1 Defendants") as officers or directors of Antioch owed fiduciary duties to Antioch of good faith, loyalty, and disclosure and to refrain from self-dealing; (2) they breached their fiduciary duties to Antioch by failing to obtain an independent fairness opinion with respect to the 2003 Transaction and by approving that transaction despite their conflicts of interest; (3) the 2003 Transaction was against the best interests of Antioch and in the best interests of those officers and directors; and (4) as a result of those breaches of duty, Antioch increased its debt obligations and started a downward spiral into bankruptcy.

The Count 1 Defendants' only basis in support of their argument for dismissal of this breach of fiduciary duty claim is that it is barred by the 4 year statute of limitation provided by ORC § 2305.09(D). As discussed, the court recommends that Count 1 not be dismissed based on the statute of limitations.

### 3. Count 3: Breach of Fiduciary Duty Related to the Condor Transaction

With respect to Count 3 against Moran, CRG, Epstein, Ravaris, Lipson-Wilson, Felix, Hoskins, and Bevelhymer (the "Count 3 Defendants"), the Litigation Trustee alleges that

(1) as officers and directors of Antioch, the Count 3 Defendants owed Antioch fiduciary duties of good faith, loyalty, disclosure, and to refrain from self-dealing and to avoid wasting and mismanaging corporate assets; (2) by selecting Condor Guaranty, a company they knew was in financial distress, to guaranty payment of the ESOP Notes and by renewing the Condor bonds, they breached those duties because knowing that Condor Insurance had filed for bankruptcy on or about July 26, 2007 they knew or should have known that Condor Guaranty would be unable and unwilling to honor its commitment, and therefore, they failed to provide adequate security for those ESOP Notes;[36] (3) Moran, Epstein, and Ravaris mislead the ESOP Noteholders by advising them in subsequent correspondence that Antioch's senior lenders would not allow the Company to make payment on the Notes; (4) Antioch was exposed to liability for violations of ERISA and tax laws through these actions; and 5) as a consequence of all of these acts, the Company suffered damages. The Count 3 Defendants advanced several arguments in support of their request to dismiss Count 3.

> a.   It is Premature to Dismiss Counts 3, 8, and 9 Against CRG
> Based on CRG's Contractual Agreement with Antioch

CRG argues principally that under the terms of its contractual agreement, Antioch specifically acknowledged the absence of any fiduciary relationship between CRG and Antioch, which agreement, CRG continues, this court approved. *See* Est. Doc. 164. Accordingly, CRG concludes that Count 3 and all counts involving alleged breach of fiduciary

---

[36] The fact that CRG, Epstein, and Ravaris had not been retained as of the time of the issuance of the ESOP Notes and the original issuance of the Condor bonds, but were on board at the time of the renewal of the Condor bonds appears to explain why the title to Count 3 of the Complaint includes CRG, Epstein, and Ravaris as defendants, but ¶ 178 does not reference them. See Cplt. ¶¶ 125, 152, 154, 178 & 179.

duties should be dismissed as to it.  The court disagrees with CRG and finds that it is premature to dismiss Count 3 on that basis. The court's conclusion is also dispositive of CRG's argument with respect to Counts 8 and 9 as CRG invokes the same basis for dismissal of those counts.

In Count 3 the Litigation Trustee links CRG to a chronology of events that spanned from January 2008 to November 2008.  CRG maintains that Count 3 should be dismissed because "the debtors expressly acknowledged the absence of any fiduciary relationship with CRG" in the engagement letter signed by Antioch and CRG. Adv. Doc. 98, p. 4.  CRG emphasizes that this court's order approving the post-petition retention of CRG further supports dismissal of Count 3.  Citing *In re Huffy Corporation Securities Litigation* and cases cited in that decision, CRG requests that this court consider the retention order and the engagement letter even though those materials are outside the pleadings because they are items appearing in the record of the estate case. 577 F. Supp. 2d 968, 978 (S.D. Ohio 2008).  The Litigation Trustee opposes this court's consideration of those materials and cites relevant case law for the proposition that matters outside the pleadings may not be considered on a motion to dismiss if they present "additional, new information that would provide the basis upon which [a] court would necessarily rely in deciding the merits of [a defendant's] substantive argument. Adv. Doc. 148, p. 13.  *See Nationwide Children's Hosp. Inc. v. W. Dickey & Son, Inc., Employee Health and Welfare Plan*, 2009 WL 5216041, at *7 (S.D. Ohio Dec. 29, 2009), *citing, Yeary v. Goodwill Industries-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (court may refer to matters outside the pleadings when it adds nothing new and merely fills in the "contours

and details" of a complaint). However, it is not necessary to refer to the engagement letter or the retention order to determine the merits of CRG's motion to dismiss.

First, contrary to what CRG implies, the retention order approving CRG's post-petition retention as Antioch's financial advisor has no bearing on Antioch's retention of CRG pre-petition.  The retention order, entered after proper service and notice of the related motion, only sanctioned the terms and conditions of CRG's post-petition engagement and nothing else.  It certainly did not pertain to the terms of the pre-petition relationship between CRG and Antioch.  Further, if the need arises, bankruptcy courts are free to sua sponte question the propriety of their prior orders. *In re Allegheny Int'l, Inc.*, 100 B.R. 244, 246 (Bankr. W.D. Pa. 1989) (altering its previous orders approving retention of professionals to remove language in indemnification provisions of engagement agreements that provided for indemnification of professionals for breach of fiduciary duty).  Therefore, CRG's reliance on the retention order to support an implication that this court approved the contracting away of fiduciary duties is misplaced.

Second, CRG's argument that it "was never an officer or director of any of the Debtors and, accordingly, was not an insider and never owed [Antioch] any fiduciary duty" brings to the forefront the initial and overarching issue as to whether the facts and circumstances surrounding CRG's engagement gave rise to a fiduciary relationship. Adv. Doc. 98, p. 3.  The creation of a fiduciary obligation may arise out of a contract or out of an informal relationship when both parties understand that special trust or confidence has been reposed. *Thompson v. Cent. Ohio Cellular, Inc.*, 639 N.E.2d 462, 468 (Ohio Ct. App. 1994).  Moreover, inquiries as to whether a fiduciary relationship exists are fact intensive and,

therefore, a claim alleging the existence of a fiduciary obligation is generally not well-suited for dismissal under FRCP 12(b)(6).  *Antioch Litig. Trust v. McDermott Will & Emery LLP*, 738 F. Supp. 2d at 772, *citing, JP Morgan Chase Bank v. IDW Group*, 2009 WL 321222, at *3-4 (S.D.N.Y. Feb. 9, 2009).  Thus, regardless of the terms of the engagement letter, a threshold issue arises, both prior to and subsequent to Epstein and Ravaris being appointed officers of Antioch in April and August 2008 respectfully, as to whether the facts and circumstances surrounding CRG's engagement beginning in November 2007 gave rise to a fiduciary relationship. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 567 (6th Cir. 2006) (discussing a breach of fiduciary duty claim against a bank and the four elements necessary under Ohio law to create an agency relationship).  The answer to that question requires consideration of evidence outside the Complaint.  The question as to whether the engagement letter between CRG and Antioch seeking to exclude any fiduciary duties successfully achieved that goal based on traditional principles of contract interpretation should be reviewed and determined as part of the court's determination of the overarching issue of whether a fiduciary relationship between CRG and Antioch was created.

Last, Ohio law allows an injured party to sue the principal, the agent, or both. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Wuerth*, 913 N.E.2d 939, 944 (Ohio 2009).  Thus, it is well-established that under the doctrine of respondeat superior, an employer may be liable for the torts of its employee. *Id.* (holding that a law firm may be vicariously liable for legal malpractice only when one or more of its principals or associates are liable for legal malpractice); *see also Custom Rubber Corp. v. ATS Specialized, Inc.*, 633 F. Supp. 2d 495, 511-12 (N.D. Ohio 2009)  (discussing creation of an agency relationship under Ohio law and noting

that knowledge of the agent shall be imputed to the principal when the agent is "acting within the scope of his authority and the knowledge pertains to matters within the scope of the agent's authority." (internal citations omitted)). Therefore, if Epstein or Ravaris owed and breached fiduciary obligations to Antioch, CRG may also be vicariously liable. *Id*.

The Litigation Trustee's allegation that, as the employer of Epstein and Ravaris, CRG owed a fiduciary duty to Antioch sufficiently raises a claim for which relief may be granted. Because of the factual questions which must be answered, it is premature to dismiss Claim 3 against CRG based on the terms of the engagement letter. Therefore, the court recommends that Count 3 against CRG not be dismissed on that basis.

> b.  The Litigation Trustee has Plead Sufficient Facts to
> State a Claim for Breach of Fiduciary Duty as to the
> Condor Transaction against All of the Count 3 Defendants

Except for Moran who relies on another argument to support her dismissal request, all the Count 3 Defendants assert that the Litigation Trustee has failed to plead sufficient facts to support his breach of fiduciary duty claim and that the business judgment rule protects their actions. These defendants maintain that the Litigation Trustee has failed to rebut the presumption afforded by the business judgment rule because the Litigation Trustee does not contend that those defendants acted in bad faith, that their conduct was fraudulent, that they benefited from the transaction, or that alternate security for the ESOP Notes was available had the officers and directors attempted to obtain it. They also argue that the Litigation Trustee elevates form over substance because, on the one hand, he alleges that, upon Antioch's default, Antioch's lenders "seized Antioch's cash" and, on the

other hand, he alleges that the statement that "Bank of America would not allow Antioch to make the payment due in the ESOP Notes" is misleading.

The Count 3 Defendants misapprehend the Litigation Trustee's burden at this early stage of the litigation.  First, all a plaintiff need do in a complaint is allege enough facts to support her claim. *McDermott Will & Emery LLP*, 738 F. Supp. 2d at 765, *citing, Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002).  In this instance, the Litigation Trustee has alleged sufficient facts in the Complaint to support his claim of breach of fiduciary duty in connection with the Condor Transaction to meet the *Iqbal* and *Twombly* pleading standards. Count 3 is brought against individuals, who, at the time of the renewal of the Condor Guaranty, were all officers and directors of Antioch and who, therefore, under Ohio law, owed fiduciary duties to Antioch.[37]  The Litigation Trustee alleges that by selecting a guarantor for the ESOP Notes that the Count 3 Defendants knew was in financial distress and then renewing the Condor bonds they breached their duties and that Moran further breached her fiduciary duty by advising the ESOP noteholders that Antioch's inability to make the 2008 payment on the ESOP Notes was essentially through no fault of its own but because it was precluded from doing so by its lender.  These allegations are enough to state a claim that is plausible on its face. *Twombly*, 550 U.S. at 570.

---

[37] Defendants Epstein and Ravaris observe that "by January, 2008, the die had been cast with Condor Guaranty serving as the surety for all rounds of ESOP Notes" and that, at that time, they were not officers of Antioch having respectively been appointed as Chief Restructuring Officer in April 2008 and as Chief Financial Officer in August 2008. Epstein and Ravaris Motion to Dismiss. Adv. Doc. 99, p. 19. The Litigation Trustee alleges however that Antioch retained CRG, Epstein's and Ravaris' employer, in November 2007. Cplt. ¶ 125.  While there might be an issue of fact as to whether Epstein and Ravaris owed fiduciary duties to Antioch prior to their official appointment as officers, they certainly owed fiduciary duties to Antioch from the time of their appointment and at the time the Condor Guaranty was renewed in August 2008 and when the allegedly misleading letters were sent to the ESOP noteholders.

Second, the Count 3 Defendants are also misguided as to the Litigation Trustee's pleading burden in connection with the business judgment rule. The Count 3 Defendants argue that the Complaint fails to allege specific facts to overcome the protection of the rule. In support of their arguments, they cite to an Ohio appellate court decision and a Delaware chancery court decision. *See NCS Healthcare, Inc.*, 827 NE.2d at 802-03; *In re Nat'l Auto Credit, Inc. Shareholders Litig.*, 2003 WL 139768, at *14 (Del. Ch. Jan. 10, 2003). However, the District Court for the Southern District of Ohio has rejected arguments similar to those the Count 3 Defendants are making. *In re Nat'l Century Fin. Enters, Inc.*, 504 F. Supp. 2d 287, 312 (S.D. Ohio 2007). After acknowledging that Delaware law imposes a heightened pleading standard in connection with actions challenging corporate officers' business decisions, the *National Century* court noted that "Ohio law appears to be different." *Id., quoting, Marsalis v. Wilson*, 778 N.E.2d 612, 616 (Ohio Ct. App. 2002) (when a plaintiff alleges "breach of fiduciary duty on the [corporate officer's] part, the business judgment rule would impose on plaintiffs a burden at trial to present evidence to rebut the presumption the rule imposes. However, plaintiffs are not likewise obligated to plead operative facts in their complaint that would rebut the presumption."). Regardless of those state law pleading standards, the *National Century* court continued, "federal courts are to apply federal procedural law" and federal procedural law only requires that "a plaintiff whose complaint challenges a director's business action or decision must plead, under the Rule 8 standard, an exception to the business judgment rule." *Id*. at 313 (internal citations omitted).

The Complaint pleads sufficient facts to overcome a motion to dismiss based upon the business judgment rule. As noted, the Complaint alleges that despite their knowledge of

the precarious financial situation of both Antioch (unable to pay its obligations under the ESOP Notes) and Condor Guaranty (in financial distress), the Count 3 Defendants, except CRG, Epstein, and Ravaris, oversaw the Company's issuance of the ESOP Notes in the first place and then all of the Count 3 Defendants oversaw the Company's renewal of the Condor bonds that they knew or should have known were very likely to be worthless and some of those Count 3 Defendants, in an attempt to allay the noteholders' concerns, misled affected parties as to why Antioch could not pay the ESOP Notes.  Under Ohio law, the business judgment rule does not protect officers or directors who engage in, among other actions, self-dealing or act with bad faith, or fail to prevent waste or self-dealing which a director knew or should have known was being committed by another director or officer. *Natl. Century Fin. Enters, Inc.*, 504 F. Supp. 2d at 317.

Whether the business judgment rule ultimately protects the Count 3 Defendants' decision to issue the ESOP Notes and then to renew the Condor bonds is an issue of fact. Accordingly, the court concludes that the Litigation Trustee has sufficiently stated a claim for breach of fiduciary duty against the Count 3 Defendants and recommends that Count 3 not be dismissed as to any defendant.

        c.      Count 3 and Other Counts against CRG, Epstein, and Ravaris should not be Dismissed at this Stage of the Litigation Based on the Doctrine of In Pari Delicto

CRG, Ravaris, and Epstein also argue the claims against them (Counts 3, 8 & 9) should be dismissed based on the defense of in pari delicto.  However, the court recommends that claims not be dismissed at this stage of the litigation under the doctrine of in pari delicto.

In pari delicto "is an equitable defense that refers to plaintiff's participation in the same wrongdoing as the defendant." *Terlecky v. Hurd (In re Dublin Sec., Inc.)*, 133 F.3d 377, 380 (6th Cir. 1997). In pari delicto can be raised against a bankruptcy trustee to the extent it could be raised against a debtor. *Id.* at 380-81; *In re Donahue Sec., Inc.*, 304 B.R. 797, 799, n. 4 (Bankr. S.D. Ohio 2003). It also can be raised upon a motion to dismiss. *Donahue Sec.*, 133 F.3d at 380. However, in pari delicto is generally inapplicable because CRG, Ravaris, and Epstein were all corporate insiders. *Litig. Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91, 124 (Bankr. S.D. Ohio 2007).

CRG, Ravaris and Epstein assert that the "sole actor" principle supports application of the in pari delicto doctrine to bar the Litigation Trustee's claims against them. They insist that the Morgan Family were the "sole actors" responsible for the wrongdoing, as alleged in the Complaint, and, therefore, under the "sole actor" exception, in pari delicto can be conclusively established at this early stage of the litigation. The Complaint, while certainly emphasizing a primary role played by the Morgan Family, does not allege that they were the sole actors. Cf. *The State Bank and Trust Co. v. Spaeth*, 371 B.R. 281, n. 6 (Bankr. S.D. Ohio 2007) (In pari delicto applies where trustee admits the "sole owner and principal officer and director of the Debtor" participated in the wrongdoing.).

The Complaint does not establish conclusively that the in pari delicto defense applies. *See The Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Fin. Ents., Inc., Inv. Litig.)*, 617 F. Supp. 2d 700, 712 (S.D. Ohio 2009) (in pari delicto must be established conclusively upon a motion to dismiss). Accordingly, the court recommends that no counts be dismissed at this time under that defense. However, the court expresses no opinion as to

whether the in pari delicto defense may be successfully applied in later stages of this litigation. Cf. *See The Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Fin. Ents., Inc., Inv. Litig.)*, 604 F. Supp. 2d 1128, 1142-43 (S.D. Ohio 2009) (In pari delicto defense asserted by insider investment banker cannot be resolved upon a motion to dismiss).

        d.        Count 3 is not Barred by the 4 Year Statute of Limitation

For the reasons discussed above, the court recommends that Moran's argument in support of her request to dismiss Count 3 on account of the 4 year statute of limitation be rejected.

        **4.**        ***Count 6: Breach of Fiduciary Duty with respect to the Levimo Transaction***

Count 6 of the Complaint alleges that defendants Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, and Attiken (the "Count 6 Defendants"), as directors and officers, breached their fiduciary duties to Antioch and to Antioch's creditors by approving the Levimo Transaction despite being conflicted and because the transaction was not in Antioch's best interest due to its terms favoring Levimo, the lessor.   The burden of proof at trial on the issue of fairness of a challenged transaction under ORC § 1701.60(A)(1)(c) rests on the officer or director charged with violating his or her fiduciary duties.  *Skeddle*, 940 F. Supp. at 1151; *see also Gries Sports Ents.*, 496 N.E.2d at 969.

Defendants Bevelhymer, Felix, and Lipson-Wilson request dismissal of Count 6 because they argue that none of them could have approved the Levimo Transaction based on the Litigation Trustee's own allegations that "the board of directors approved" the Levimo Transaction and that none of them were members of the board of directors. Bevelhymer was Antioch's treasurer, Felix was chief financial officer, and Lipson-Wilson was

the former director of compliance, Sub-Trust trustee and ESOP trustee. Cplt. ¶¶ 12, 18, & 22.
At no point in the Complaint does the Litigation Trustee allege that those defendants were
members of the board of directors at the time the Levimo Transaction occurred. While
Bevelhymer, Felix, and Lipson-Wilson, as officers, owed fiduciary duties to Antioch, *see*
O.R.C. §§ 1701.50 and 1701.60, the Complaint is devoid of any allegations that as officers they
were instrumental in structuring the transaction or in advising or influencing the board to
approve the transaction. The Complaint fails to link those defendants to the Levimo
Transaction and that critical missing link renders his allegations insufficient to state a claim
for which relief can be granted. Likewise, the Litigation Trustee fails to link Attiken, an
officer of Antioch, to the board's approval of the Levimo Transaction.[38] The inference that
the Litigation Trustee would have this court draw, that one can be liable per se by
association with Antioch as a fiduciary, without more -- is untenable. Therefore, the court
recommends that Count 6 be dismissed as to defendants Bevelhymer, Felix, Lipson-Wilson,
and Attiken.

Morgan and Moran respond that Count 6 must be dismissed because they fully
disclosed the Morgan Family's interest in Levimo to Antioch's board of directors which, in
turn, waived any conflict in writing in the lease and therefore released any such claims. The
Morgan Family adds that the Litigation Trustee makes no allegation that the Levimo
Transaction was not fair and that Antioch's assumption of the lease during the bankruptcy
underscores its fairness and benefit. All of the other Count 6 Defendants' arguments

---

[38] The only reference to Bevelhymer, Felix, Lipson-Wilson, and Attiken's role as officers relates to their alleged
failure to address the conflict of interest that arose between Antioch and Levimo. Cplt. ¶ 105. Such an
allegation is too vague to permit the court to draw a reasonable inference of liability.

advance substantially similar arguments in support of dismissal.  They all assert that because there is no allegation of any wrongdoing on their part and of any damages to Antioch, the business judgment rule protects their actions in approving the Levimo Transaction.

ORC § 1701.60 codifies the requirements for transactions between a corporation and one or more of its directors or officers.  It provides in pertinent part:

> No contract, action or transaction shall be void or voidable with respect to a corporation for the reason that it is between or affects the corporation and one or more of its directors or officers or between or affects the corporation and any other person in which one or more of its directors or officers are directors . . . or have a financial or personal interest, . . . if any of the following apply:
>
> (a)  The material facts as to his or their relationship or interest and as to the contract, action or transaction re disclosed or are known to the directors or the committee and the directors or the committee, in good faith reasonable justified by such facts, authorizes the contract, action or transaction by the affirmative vote of majority of the disinterested directors . . . .
>
> * * *
>
> (c) The contract, action, or transaction of fair as to the corporation as of the time it is authorized or approved by the directors, a committee of the directors . . . .

Ohio Revised Code § 1701.60(1)(a) & (c).  In other words, transactions between a corporation and its officers and directors are permitted, as long as a disinterested majority of the board of directors approves the transaction after full disclosure by the interested directors or, if the transaction is fair. *Id.*  The approval of a transaction by disinterested directors does not, in and of itself, absolve disinterested directors of liability. *See Geygan v. Queen City Grain Co.,* 593 N.E.2d 328 (Ohio Ct. App. 1991) (passive participation in the decision-making process does not insulate a director from a breach of fiduciary duty claim).  Likewise, "[d]irectors may not shut their eyes to corporate misconduct and then claim that because they did not

see the misconduct, they did not have a duty to look. The sentinel asleep at his post contributes nothing to the enterprise he is in charge to protect." *Id.* at 333. Finally, when a director has knowledge of a fellow director's improprieties and does not act upon the information, her decision to stand idly by is not a defense. *Id*. *See also United States v. Skeddle*, 989 F. Supp. 873, 881 (N.D. Ohio 1997) (Under Ohio law, a corporate director's duty to refrain from profiting at the expense of the corporation applies regardless of any disclosure that may have been made concerning the relationship that gave rise to the potential for self-enrichment.)

In Count 6, the Litigation Trustee alleges that Antioch's board of directors inappropriately approved a lease transaction, the terms of which were overreaching and detrimental to Antioch's best interest, as evidenced by the existence of the waiver granted by Antioch in favor of Levimo. The determination of whether the board's actions were appropriate and, as a corollary, whether the business judgment rule shields those directors from liability are questions of fact that cannot be addressed on a motion to dismiss. As discussed, the business judgment rule is not an impenetrable shield and that shield may be pierced if directors are engaged in self-dealing, act in bad faith or fail to attempt to prevent self-dealing by other directors of which they were aware. *Nat'l Century Fin. Enter., Inc.*, 504 F. Supp. 2d at 313.

Also premature to address on a motion to dismiss are issues related to whether the terms of the Levimo lease were fair to Antioch and whether the waiver provision of the lease is enforceable. Contrary to what Morgan and Moran argue, the fact that Antioch assumed the lease during the bankruptcy does not prove that the lease is fair and benefits

Antioch.  It may just as well mean that Antioch had no choice but to assume the lease of its only manufacturing facility if it wanted to continue to operate and therefore chose the least of two evils.

When viewed in a light most favorable to the Litigation Trustee, the court finds that the facts alleged against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, and Sanan concerning the Levimo Transaction assert a claim for breach of fiduciary duty that may not be protected by the business judgment rule. Cf. *Twombly*, 550 U.S. at 556. Accordingly, the court recommends that Count 6 be dismissed as to defendants Bevelhymer, Felix, Lipson-Wilson, and Attiken, but not as against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, and Sanan.

### 5. Count 8: Breach of Fiduciary Duty with respect to the Sale Process (The Recapitalization or Refinancing Alternative Strategy)

Count 8 of the Complaint alleges that defendants Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, Attiken, Northrup, CRG, Epstein, Ravaris, and Walker (the "Count 8 Defendants") breached their fiduciary obligations of good faith, loyalty, and disclosure and wasted and mismanaged corporate assets by: a) allowing and assisting Candlewood, the financial advisors privately hired by the Morgan Family, to pursue refinancing and recapitalization options for Antioch which were incompatible with and duplicative of Houlihan Lokey's efforts to sell the Company; b) allowing Candlewood to sit in on Antioch's board meetings; and c) paying Candlewood with corporate funds.  The Litigation Trustee essentially alleges that, despite Antioch's fast deteriorating financial situation and the need for quick action, Antioch's board, as well as the Special Committee formed to examine Antioch's restructuring options, bowed to the

Morgan Family's pressures and assisted the Morgan Family in seeking to retain control of Antioch, thwarting Houlihan Lokey's efforts to find a purchaser for Antioch and causing the Company's financial situation to further deteriorate.

Defendants Bevelhymer, Felix, and Lipson-Wilson respond that the Litigation Trustee fails to make any allegation that they played a role in the allegedly duplicative hiring of Candlewood and Houlihan Lokey and that, even if they did, the business judgment rule insulates them from liability.

Also relying on the business judgment rule to shield them from liability are defendants Blair, Luce, and Walker.  Blair, Luce, and Walker add that allegations of harm are lacking in the Complaint and that even if their actions or inactions damaged Antioch, they had no means of preventing the Morgan Family's allegedly harmful conduct.  Finally, they assert that the Litigation Trustee fails to state a claim for corporate waste.

Defendants Epstein and Ravaris argue that the Litigation Trustee fails to allege any facts connecting them to the events surrounding the attempts to sell Antioch and reject any involvement in the hiring of Candlewood and Houlihan Lokey.  Further, they claim that they are protected by the business judgment rule for any actions they took as officers.  They note that CRG and, consequently, Epstein and Ravaris, was not hired until November 2007 and that Epstein did not become chief restructuring officer before April 2008 and Ravaris chief financial officer until August 2008.  CRG asserts that the Litigation Trustee fails to allege that CRG owed fiduciary obligations to Antioch, renews its assertion that it expressly contracted out of any fiduciary obligations, contentions  the court has already disposed of in the Count 3 discussion, and join defendants Epstein and Ravaris in their arguments.

Finally, Northrup argues that he had a very limited tenure on Antioch's board and that paragraph 136, the sole paragraph in the Complaint that could suggest wrongful conduct on his part, fails to name him as a director and therefore no nexus exists to link him to the allegations set forth in Count 8.   The allegations are, in part, as follows:

> In February 2008, Defendants Lee, Asha, and certain of the directors, attorneys and financial advisors attended a meeting in Chicago, Illinois. The participants at the meeting agreed to permit the Morgan family to work toward a consensual transaction that would allow the Morgan family to retain controlling positions in Antioch.

Cplt. ¶ 136.

Again, the Count 8 Defendants overstate the Litigation Trustee's burden at this stage of the litigation and misconstrue the protection afforded by the business judgment rule.  At the pleading stage, even under the heightened pleading standard imposed by *Iqbal* and *Twombly*, all that the federal rules require is that the Litigation Trustee make sufficient factual allegations to raise a right to relief above the speculative level on the assumption that all of the Complaint's allegations are true. *Jones*, 521 F.3d at 559 (internal citations omitted).   The court finds that he did as to Count 8.

At the time of the Morgan Family's hiring of Candlewood about August 2007, all the Count 8 Defendants except CRG are alleged to have been either officers or directors of Antioch.  CRG, Epstein, and Ravaris' engagement began in November 2007, during the time period Candlewood and Houlihan Lokey were employed by Antioch.  Northrup's argument that he was not specifically named in paragraph 136 of the Complaint is to no avail because paragraph 136 includes all of the directors and officers of Antioch other than Morgan and Moran and because paragraph 28 of the Complaint establishes that Northrup was a director

of Antioch. Therefore, the Litigation Trustee has sufficiently alleged facts from which it could be inferred that Northrup, as a director of Antioch, was among those directors present at the February 2008 meeting.

The Litigation Trustee does not allege that the Count 8 Defendants could have prevented the Morgan Family from hiring their own personal financial advisors. Rather, the Litigation Trustee alleges that, during a continuous period of time running from as early as August 2007 until Antioch's bankruptcy filing, the Count 8 Defendants' failure to resist the Morgan Family's imposition of its personal financial advisor, Candlewood, upon the Company and their backing of the self-serving refinancing and recapitalization alternatives geared towards allowing the Morgan Family to maintain control of Antioch not only hampered Houlihan Lokey's efforts to sell Antioch -- and was incompatible with those efforts because potential purchasers were aware of the board's support for the Morgan Family's conflicting efforts -- but amounted to an abdication of their fiduciary obligations to Antioch. The Litigation Trustee adds that the wasted time and the Count 8 Defendants' acquiescence to the payment by Antioch of Candlewood's fees further depleted Antioch's already scare resources. The court finds that Count 8 states a claim for breach of fiduciary duty.

Ohio law imposes on corporate directors and officers duties of good faith, loyalty and care to avoid corporate waste and refrain from self-dealing. Ohio Revised Code § 1701.59; *Koos,* 641 N.E.2d at 272; *Ohio Drill & Tool Co. v. Johnson,* 625 F.2d 738, 742 (6th Cir. 1980). Contrary to what Luce, Blair and Walker argue, under Ohio law, corporate waste and gross mismanagement are ways in which a corporate director's fiduciary duty can be breached,

not separate causes of action independent of a fiduciary breach. *In re Keithley Instruments, Inc., Derivative Litig.,* 599 F. Supp.2d 875, 903, n. 25 (N.D. Ohio 2008); *See also Ohio Drill & Tool Co.,* 625 F.2d at 738 ("[D]irectors of a corporation occupy a fiduciary relationship to the corporation and its shareholders and are held strictly accountable and liable if the corporate funds or property are wasted or mismanaged due to the inattention to their duties of their trust."). The cases on which Blair, Luce and Walker rely for the proposition that the Litigation Trustee has failed to properly assert a claim for corporate waste are all cases applying law inapposite to Ohio law.

The allegations in the Complaint are amply sufficient to state a claim for breach of fiduciary duty against all the Count 8 Defendants. An officer or director's willful ignorance of another officer's or director's malfeasance is no defense to a breach of fiduciary duty claim. *See e.g., Geygan,* 593 N.E.2d at 333 (a director's decision to do nothing when she has knowledge of another director's improprieties is not a defense to a breach of fiduciary duty claim); *Biggins,* 630 N.E.2d at 55 (finding that a director breached her fiduciary duties by failing to act on knowledge of fellow director's waste of corporate assets). Further, whether the Count 8 Defendants have adequate defenses to Count 8 is a question of fact left for another day. Therefore, construing the allegations in the Complaint in the light most favorable to the Litigation Trustee and accepting these allegations as true, the court finds that the Litigation Trustee has sufficiently plead a claim for breach of fiduciary duty against all the Count 8 Defendants and recommends that Count 8 not be dismissed.[39]

---

[39] CRG argued at the oral argument that permitting the Litigation Trustee's claims to proceed against the turnaround professionals, such as CRG and its employees, Epstein and Ravaris, would have a chilling effect on individuals or entities, such as turnaround professionals, involved in the attempted turnaround of a company.

**6.      *Count 10: Breach of Fiduciary Duty with respect
to the Sale Process (The J.H. Whitney Offer)***

Count 10 alleges that Morgan, Moran, and Morris (the "Count 10 Defendants") as directors of Antioch owed fiduciary duties to Antioch of good faith, loyalty, and disclosure and to refrain from self-dealing and other conflicts of interest and to avoid wasting and mismanaging corporate assets. Cplt. ¶ 214.   Count 10 further asserts that the Count 10 Defendants breached those duties by rejecting the J.H. Whitney offer to purchase Antioch's assets for $54 million thereby causing J.H. Whitney to withdraw as a potential purchaser and by continuing to employ professionals to provide "duplicative services that were unlikely to be successful and were not successful which amounted to a waste of Antioch's assets." Cplt. ¶¶ 215-217.

Morgan and Moran rely on the ERISA preemption argument to support their motion to dismiss Count 10.   Morris contends that the Litigation Trustee does not state a viable claim under the *Iqbal* and *Twombly* pleading standards and that even if he does, Morris' actions are protected by the business judgment rule because allegations of bad faith, fraud, or intent to derive personal benefit are lacking.   The court has determined that the Litigation Trustee's claims against Morgan and Moran, including Claim 10, do not fall within the ambit of ERISA preemption.   Likewise, the court has concluded that whether the actions or inactions of a fiduciary are protected by the business judgment rule involves issues of fact

---

According to counsel, those people "volunteer to go into trouble" and no matter how hard they try and what decisions they make, Monday morning quarterbacking is inevitable when those decisions turn out poorly because they cannot salvage the situation. (Adv. Doc. 231, pp. 19-20 & 63).   The court appreciates CRG's legitimate concern.   However, any haven such individuals or entities may have is provided by the business judgment rule and is limited by the parameters of the business judgment rule.

that are not proper to address on a motion to dismiss.  Therefore, Morgan's and Moran's motion to dismiss on that basis is denied.

The court rejects the remaining argument, Morris' claims of insufficiency of the pleadings and the failure to plead around the business judgment rule.  As noted, allegations of bad faith, fraud, and intent to derive personal benefit are not necessary to assert a claim for breach of fiduciary duty.  *See Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d at 613 (collecting cases).

A director's willful ignorance of another's malfeasance or passive participation in a decision-making process does not insulate that director from a breach of fiduciary duty claim. *See Geygan*, 593 N.E.2d 332-33.  Further, as noted, it is, at best, disingenuous for Morris to allege that the Litigation Trustee fails to allege any damage to Antioch as a result of the alleged breach.  The Complaint paints a picture of how, starting with the 2003 Transaction and continuing until the filing of the Chapter 11 bankruptcy petition, the alleged actions and inactions of certain officers and directors enabled the self-interested officers and directors, and the Morgan Family in particular, to irreparably damage Antioch in disregard of the fiduciary obligations that those officers and directors had.

Accordingly, the court recommends that Count 10 not be dismissed.

### 7.    *Summary as to the Breach of Fiduciary Duty Counts*

In sum, the court recommends that Counts 1, 3, 8 and 10 not be dismissed against any of the defendants included in those counts and Count 6 be dismissed against Bevelhymer, Lipson-Wilson, Felix and Attiken and not be dismissed against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen and Sanan.

**H.     Aiding and Abetting Breaches of Fiduciary Duty (Counts 2, 7, 9, & 11)**

Counts 2, 7, 9, and 11 of the Complaint set forth claims that certain defendants aided and abetted breaches of fiduciary duty in connection with the 2003 Transaction, the Levimo Transaction, and the two counts related to the sale process. The defendants concerned by those claims request dismissal of those claims based on several theories.  All contend that aiding and abetting a breach of fiduciary duty is not a cognizable cause of action under Ohio law and that even if it is, the Litigation Trustee has failed to allege sufficient facts to survive dismissal under the *Iqbal* and *Twombly* pleading standards.  Some defendants also assert that those counts must be dismissed because the Complaint alleges that they are fiduciaries and that such claims can only be brought against a non-fiduciary defendant.[40]

Ohio law recognizes a common law cause of action for aiding and abetting. *Amcast,* 365 B.R. at 112, *citing Great Central Ins. Co. v. Tobias*, 524 N.E.2d 168, 172 (Ohio 1988) and *Aetna Cas. and Sur. Co. v. Leahey Constr. Co., Inc.*, 219 F.3d 519, 523 (6th Cir 2000).[41]  In *Aetna Casualty*, the Sixth Circuit, citing the Ohio Supreme Court decision in *Tobias*, 37 Ohio St.3d at 524, alluding to the possibility that aiding and abetting may be actionable under Ohio law, concluded that the Ohio Supreme Court "would recognize aiding and abetting liability if squarely faced with the issue[.]" *Aetna Cas.,* 219 F.3d at 533-37.  In the absence of a

---

[40] The court has already determined that it was premature to rule on whether the aiding and abetting breach of fiduciary duty claim in connection with the Levimo Transaction was barred by the statute of limitation.

[41] Some courts have held that it was unclear whether a cause of action exists in Ohio for civil aiding and abetting.  *See Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 570 (6th Cir. 2006); *Federated Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio Ct. App. 2000).  However, while not deciding the viability of such a claim, the District Court for the Southern District of Ohio has consistently declined "to dismiss aiding and abetting claims on a Rule 12(b)(6) motion because it cannot be said that Ohio law does not recognize such a cause of action." ' *The Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters., Inc., Inv. Litig.)*, 604 F. Supp. 2d 1128, 1155 (S.D. Ohio 2009).

subsequent change in state law, this court is bound to follow the Sixth Circuit's opinion regarding Ohio law in *Aetna Casualty. See Shandwick Holdings Ltd. v. Carver Boat Corp.,* 93 F. Supp.2d 1043, 1047 (E.D. Wisc. 2000) (district court must follow prediction of circuit court concerning state law absent intervening events which would persuade circuit court to overrule its earlier pronouncement); *Scadron v. City of Des Plaines,* 734 F. Supp. 1437, 1452 (N.D. Ill. 1990) (where circuit court has made determination of how state's supreme court would decide issue of state law, that determination is binding on district courts within the circuit absent a subsequent change in state law); *Nixon v. Celotex Corp.,* 693 F. Supp. 547, 553 (W.D. Mich. 1988) (absent controlling precedent from state court, district court is bound by Sixth Circuit opinion regarding state law). Further, when the law is unsettled and it cannot be said conclusively that the controlling state law does not recognize an aiding and abetting theory, a court may decline to dismiss the aiding and abetting claim on a motion to dismiss. *Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd.,* 476 F. Supp. 2d 809, 828 (S.D. Ohio 2007); *see also Nat'l Century Fin. Enters, Inc.,* 504 F. Supp. 2d at 319-320 (declining to dismiss an aiding and abetting claim on a Rule 12(b)(6) motion "because it cannot be said conclusively that Ohio law does not recognize such a cause of action.").

This court agrees with *Amcast* that, based on controlling precedent, Ohio law would recognize aiding and abetting tortious conduct is an actionable claim. However, even accepting the argument that the status of the law remains unsettled, dismissal on a motion

to dismiss is improper. Therefore, the court recommends that this basis for dismissing the aiding and abetting claims be rejected.[42]

Some of the defendants argue that these counts should be dismissed because the Complaint alleges that they are fiduciaries of Antioch and that there is no participation in the claimed wrong by a non-fiduciary. The court also disagrees with this theory as being a basis for dismissing those counts. FRCP 8, applicable to this adversary proceeding through BR 7008, allows pleading alternative or inconsistent theories of recovery. *See* FRCP 8(d)(2) & (3). Further, even if as argued by some defendants, Ohio law is unclear as to whether it would recognize a claim for aiding and abetting against a fiduciary, such a count is permissible if plead in the alternative. *See Vucelic v. Ideal Elec. Co. (In re I.E. Liquidation, Inc.),* 2009 WL 2707223, at *7, n. 9 (Bankr. N.D. Ohio Aug. 25, 2009). In this instance, no determination has been made at this juncture as to which defendants are fiduciaries. Contrary to what certain defendants argue, the Litigation Trustee is not trying to get a second bite at the apple; he is biting into two different apples. Therefore, it is not improper for the Litigation Trustee to plead the breach of fiduciary duty claims and aiding and abetting breaches of fiduciary claims in the alternative against the same defendants. *See Amcast,* 365 B.R. at 112-113. Accordingly, the court recommends that the Motions to Dismiss Counts 2, 7, 9, and 11 on that basis be denied.

As an additional basis for dismissing these counts, some defendants argue that the Litigation Trustee has failed to allege sufficient facts to survive dismissal under the *Iqbal* and

---

[42] Greatbanc and Evolve also raise this argument, but the court has recommended that all claims against the ESOP Trustees be dismissed as being preempted by ERISA, without prejudice to any ERISA claims the Litigation Trustee may choose to assert in any amended complaint.

*Twombly* pleading standards.   Accordingly, the court will now discuss the elements of a cause of action for aiding and abetting under Ohio law, which are: (1) knowledge that the primary party's conduct is a breach of duty; and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act. *Aetna Cas.*, 219 F.3d at 533.  While the aider and abettor needs to have actual knowledge of the underlying tortious conduct, "a plaintiff need not allege that the aider and abettor had actual knowledge of 'all the details of the primary party's scheme.'"  *Id.* at 533 & 536.   A general awareness of his role in the primary defendant's tortious conduct is sufficient for liability to attach to an aider and abettor and circumstantial evidence may be used to support an inference of actual knowledge. *Id.* at 534-35 (internal citations omitted).  While some courts have found that "inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement," *Official Comm. of Admin. Claimants v. Bricker*, 2010 WL 3781662, at *15, n. 4 (N.D. Ohio Sept. 22, 2010), *quoting, Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 126 (3rd Cir. 1999), others, as will be examined later, have held that inaction or silence cannot constitute aiding and abetting unless the plaintiff and defendant had a confidential or fiduciary relationship or the defendant owed an independent duty directly to the plaintiff.   In determining what constitutes substantial assistance to a wrongdoer, courts look to "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the fact, his relation to the other and his state of mind." *Restatement (Second) of Torts* § 876 comment on clause (b). Further, a person who encourages another to commit a tortious act is not ordinarily responsible for other acts that, although done in connection with the intended tortious act,

were not foreseeable by him.  In determining liability, the factors are the same as those used in determining the existence of legal causation when there has been negligence.  *Id.*

The court finds that the Litigation Trustee has plead sufficient facts from which one could reasonably infer that the defendants whom the court has not recommended be dismissed from the underlying breach of fiduciary duty counts had knowledge that the fiduciaries' conduct was a breach of duty and that these defendants provided substantial assistance or encouragement to the fiduciaries in breaching their fiduciary obligations to Antioch.  Thus, to the extent that these defendants are not determined to be fiduciaries in the underlying breach of fiduciary duty counts, they may be liable for aiding and abetting those breaches of fiduciary duties and the court recommends that those counts not be dismissed under the *Twombly* and *Iqbal* pleading standards.

The court will now turn to the sufficiency of each count with respect to defendants in connection with whom the court has recommended that the applicable breach of fiduciary duty count be dismissed or who were not included in such counts.  The following defendants are concerned:  Houlihan Lokey (Counts 2 and 9), Marty Moran (Count 9), Lipson-Wilson, Felix, Bevelhymer and Attiken (Count 7) and Candlewood (Count 9).

1.   *Count 2:  Aiding and Abetting Breach of Fiduciary Duty*
     *In Connection with the 2003 Transaction*

In addition to those defendants the court recommended not be dismissed from Count 1, Count 2 alleges that Houlihan Lokey aided and abetted the breaches of fiduciary duties of certain officers and directors of Antioch in connection with the 2003 Transaction. Cplt. ¶¶ 171-175.  The Complaint alleges that Antioch's "officers and directors never obtained an independent appraisal from the perspective of the Company before determining whether

123

to approve the transaction. Instead, they relied on a letter from Defendant Houlihan Lokey, even though that letter expressly disclaimed any advice as to whether Antioch should engage in the transaction." Cplt. ¶ 67. Later, the Complaint concludes that Houlihan Lokey "appeared to be focused on structuring and justifying the transaction to benefit the selling non-ESOP shareholders rather than providing objective advice as to whether the transaction was in the best interests of Antioch." Cplt. ¶ 86.

Houlihan Lokey argues that the Litigation Trustee fails to state a claim for which relief can be granted because the Complaint lacks any allegation that it assisted with or encouraged the other defendants' breach of fiduciary duty. Houlihan Lokey explains that, consistent with its engagement, it provided to Antioch's board an opinion as to whether the 2003 Transaction was fair to the non-ESOP shareholders and, as the Complaint alleges, "the letter expressly disclaimed any advice as to whether Antioch should engage in the transaction." Cplt. ¶ 67. Houlihan Lokey asserts that simply providing the narrowly drafted opinion letter falls short of qualifying as assistance or encouragement to the fiduciary defendants to breach their duties. For reasons not unlike those previously discussed, the court disagrees.

As explained, the Complaint sufficiently pleads a claim of breach of fiduciary duty by Antioch's officers and directors. Further, it is not unreasonable to infer based on its retention by Antioch, that Houlihan Lokey, a firm of consulting professionals, had some awareness that the majority of Antioch's board was conflicted and that the proposed ESOP Transaction would result in a breach of some of Antioch's officers' and directors' fiduciary duties. The Litigation Trustee is not arguing that Houlihan Lokey did not do what it was

hired to do — provide an opinion that the $850 per share consideration to be received by the non-ESOP shareholders in connection with ESOP transaction was fair to those particular shareholders from a financial standpoint or that Houlihan Lokey disclaimed any other opinion as to whether Antioch should engage in the ESOP transaction. The Litigation Trustee is alleging that, given its position as a firm of professionals engaged by a conflicted board, Houlihan Lokey, by turning a blind eye to the other aspects of the 2003 Transaction, assisted Antioch's directors and officers in breaching their fiduciary obligations. Implicit in those allegations is the fact that Houlihan Lokey could or should have foreseen the consequences of these fiduciary breaches on Antioch. At this stage of the proceeding, the Complaint presents sufficient factual allegations regarding Houlihan Lokey's knowledge and participation in the asserted breaches to survive a motion to dismiss.[43]

Accordingly, the court recommends that Count 2 against Houlihan Lokey not be dismissed.

### 2. Count 7: Aiding and Abetting Breach of Fiduciary Duty with respect to the Levimo Transaction

Count 7 alleges that, in addition to those defendants as to whom the court recommended that Count 6 not be dismissed, Lipson-Wilson, Felix, Bevelhymer, Attiken, and Marty Moran aided and abetted certain of Antioch's officers' and directors' breach of

---

[43] Houlihan Lokey urges the court to consider the engagement letter as part of its motion to dismiss. Houlihan Lokey explains that the reference to the engagement letter in the Complaint brings it within the narrow circumstances in which matters outside the pleading may be properly considered on a motion to dismiss without converting such motion to one for summary judgment. *See* Houlihan Lokey Motion to Dismiss, p. 3, n. 2; *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 978-79 (S.D. Ohio 2008) (citing cases). The court acknowledges that the engagement letter may be appropriate for consideration. However, the court need not decide that issue. The additional facts set forth in the engagement letter are not necessary for the court to conclude that based upon the allegations in the Complaint, the Litigation Trustee has plead sufficient facts to state a claim for which relief may be granted against Houlihan Lokey.

fiduciary duties in connection with the Levimo Transaction.  The Complaint alleges that Marty Moran is an insider of Antioch and the spouse of Asha Moran. Cplt. ¶ 25.  The court recommended that Lipson-Wilson, Felix, Bevelhymer and Attiken be dismissed from Count 6 because they were not on the board of directors at the time of the Levimo Transaction and the Complaint lacks any allegation that links them to the Levimo Transaction.  Because the court recommended that the underlying claim against them be found to be deficient, the court recommends that Count 7 be also found to be deficient.  All are alleged to be fiduciaries of Antioch, and as fiduciaries, had they encouraged or assisted other fiduciaries in breaching their obligations, they would have themselves breached their own fiduciary obligations.  Even assuming the existence under Ohio law of an aiding and abetting breach of fiduciary duty claim against a fiduciary, the Complaint still lacks any fact from which to infer that these defendants assisted in the fiduciaries' breach beyond the vague allegation that they failed to address the conflict of interest generated by the Levimo Transaction which they did not approve as more particularly discussed in Section G above.  Accordingly, the court recommends that Count 7 be dismissed with respect to Lipson-Wilson, Felix, Bevelhymer, and Attiken.

However, the court recommends that Count 7 not be dismissed as to Marty Moran. The Complaint asserts that Marty Moran in negotiating the Levimo Transaction with Morgan on behalf of Levimo, knew that Antioch's board of directors was breaching its fiduciary duties in approving the Levimo Transaction and assisted with or encouraged that breach by failing to address the Morgan Family's conflict of interest in the transaction. Cplt. ¶¶ 103-

105; 198-200. Marty Moran argues that the Litigation Trustee's allegations fall short of meeting the *Iqbal* and *Twombly* standards.

The Litigation Trustee has alleged that the directors and officers owed fiduciary duties to Antioch, that Marty Moran, because of his position as an insider (Moran's husband and Morgan's son in law), knew that the members of the board and officers were breaching their duties because some members of Antioch's board, Morgan in particular, were on both sides of the transaction, the terms of which were onerous to Antioch and beneficial to Levimo. The Complaint also explains that Marty Moran negotiated the Levimo Transaction along with Morgan. A reasonable inference can be made from these facts that Marty Moran, in negotiating the Levimo Transaction, a transaction allegedly unfair to Antioch, assisted and encouraged Morgan, whom he knew was conflicted due to his controlling position in both Antioch and Levimo, in breaching his fiduciary obligations to Antioch. Therefore, the court recommends that Count 7 against Marty Moran not be dismissed.

### 3. Count 9: Aiding and Abetting Breach of Fiduciary Duty with respect to Sale Process (The Recapitalization and Refinancing Alternatives)

Count 9 alleges that, in addition to those defendants as to whom the court recommended that Count 8 not be dismissed, Candlewood, Marty Moran, and Houlihan Lokey (the "Count 9 Defendants") aided and abetted certain of Antioch's officers' and directors' breach of fiduciary duties relating to the sale of the Company in connection with Candlewood's and the Morgan Family's recapitalization and refinancing efforts. As explained, Count 8 essentially alleges that despite Antioch's fast-deteriorating financial situation, the Count 8 Defendants bowed to the Morgan Family's pressures and allowed the Morgan Family to pursue or failed to prevent the Morgan Family from pursuing

recapitalization alternatives, which resulted in damages to Antioch due to the payment for duplicative services, the wasting of Antioch's assets, and the thwarting of Houlihan Lokey's efforts to find a purchaser for Antioch. Cplt. ¶¶ 204-207.

Candlewood and Marty Moran assert that the Litigation Trustee's allegations in Count 9 are merely the recital of the elements of a cause of action of the type that *Twombly* specifically rejected and therefore should be dismissed. Houlihan Lokey bases its dismissal request on the contention that the Complaint is devoid of any allegations that Houlihan Lokey acted improperly. The court disagrees with these defendants and for the reasons set forth, recommends that Count 9 not be dismissed as to them.

While most of the allegations in the Complaint indicate that, despite the difficult climate in which it was working, including the obstacles arising out of the Morgan Family's interests, Houlihan Lokey worked hard to find a purchaser and found one, the Litigation Trustee suggests that it may have been improper on Houlihan's Lokey's part to continue to work in parallel with Candlewood when Houlihan Lokey knew that Candlewood's efforts interfered with its own. "Both Defendant Houlihan Lokey and Defendant Candlewood thought that the other professional's work interfered with and jeopardized the potential for a successful outcome for the Company. However, both […] continued to remain engaged and to demand payment from the Company for their services." Cplt. ¶ 117. The Complaint supports a reasonable inference that, by continuing to proceed with sale efforts in an environment that it knew was inimical to its and the Company's objective of selling the Company or failing to take any action to address the problems caused by the conflicting, detrimental, and duplicative efforts of Candlewood and the Morgan Family, Houlihan Lokey

substantially assisted the Count 8 Defendants' breach of fiduciary duties.  At this stage of the proceeding, it is not the court's role to weigh the ultimate outcome of a claim.  It only needs to determine whether the allegations of the Complaint, on their face, are sufficient to raise a plausible claim of liability.  The court finds that the allegations against Houlihan Lokey in Count 9 are sufficient and, therefore, recommends that Count 9 not be dismissed as to Houlihan Lokey.

Likewise, the court recommends that Count 9 against Candlewood and Marty Moran not be dismissed.  Contrary to Candlewood's argument, it can be inferred from the Complaint that Morgan and Moran retained Candlewood to devise alternatives to an outright sale of Antioch which were inimical to Houlihan Lokey's efforts and designed to maintain the Morgan Family's control of Antioch, and that Candlewood had, at a minimum, a general awareness that Morgan, as a director of Antioch, and Moran, as a director and officer, were breaching their fiduciary obligations. Cplt. ¶ 115.  Candlewood's general awareness can only have been increased by its participation in Antioch's board meetings. Cplt. ¶ 116.  The Complaint supports a reasonable inference that due to its participation in those board meetings, Candlewood knew that Antioch was in a precarious financial situation, that the board had retained Houlihan Lokey to market Antioch, that time was of the essence, and that by assisting Morgan and Moran in their competing and inimical efforts, they encouraged them to breach their fiduciary obligations.

Candlewood argues that a failure to act can only constitute substantial assistance if the defendant owes a duty to the plaintiff. *See Nat'l Century Fin.,* 504 F. Supp. 2d at 320. Therefore, Candlewood continues, since there is no allegation that it owed a duty to Antioch

and because it was hired separately by the Morgan Family, any failure to act on its part cannot result in substantial assistance and Count 9 must be dismissed as to it.

While this court has not found any case law directly on point in Ohio, some courts do require the existence of a fiduciary or confidential relationship that gives rise to a duty to disclose or an otherwise independent duty owed directly by the defendant to the plaintiff to find that silence or inaction constitutes substantial assistance under an aiding and abetting claim. *See e.g. Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 295 (2nd Cir. 2006) ("The rule that liability for aiding and abetting is limited to those with a duty to disclose is based on the common-law principle that 'since there is ordinarily no duty to take affirmative steps to interfere, mere presence at the commission of the wrong . . . is not enough to charge one with responsibility.'" W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 46 at 323-24 (5th ed.1984)); *Glidden Co. v. Jandernoa,* 5 F. Supp. 2d 541, 556-57 (W.D. Mich. 1998) (internal citations omitted) (granting summary judgment to defendant bank on an aiding and abetting claim based on the fact that, applying New York law "there [were] no allegations or evidence that the [b]anks themselves made any misrepresentations or took any actions to affirmatively hide their client's misdeeds"); *El Camino Resources, LTD v. Huntington Nat'l Bank,* 722 F. Supp. 2d 875, 911-12 (W.D. Mich. 2010) (silence, or failure to act, generally does not constitute substantial assistance); *Lawyers Title Ins. Corp. v. United Amer. Bank of Memphis,* 21 F. Supp. 2d 785, 799 (W.D. Tenn. 1998); *In re Welding Fumes Product Liability Litig.* 526 F. Supp. 2d 775, 807 (N.D. Ohio 2007) ("Mere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting" (internal citations omitted)).

However, Candlewood misconstrues the Litigation Trustee's allegations. The Litigation Trustee alleges that Candlewood's actions, as opposed to inactions, in continuing to advise the Morgan Family in connection with recapitalization options and in providing the board with recapitalization proposals, provided substantial assistance to the Morgan Family in breaching their fiduciary duties. In addition, Candlewood neglects to note that because it was retained separately by the Morgan Family to represent the Morgan Family's interests, and because only Houlihan Lokey was retained to represent the Company's interest, Candlewood's participation in Antioch's board meetings and acceptance of fees from Antioch directly, were actions that support a plausible claim that Candlewood aided and abetting the Count 8 Defendants' breach. Cplt. ¶¶ 116, 118. In summary, the Litigation Trustee alleges facts regarding Candlewood's knowledge of the Count 8 Defendants' fiduciary duties and facts concerning Candlewood's actions and inactions relating to the competing sale and recapitalization processes. Those allegations are sufficient to overcome a motion to dismiss at this early stage of the proceeding. The evidence garnered through discovery will determine whether Candlewood's actions were sufficient to constitute "substantial assistance" to the alleged Count 8 Defendants' breaches of fiduciary duty or whether Candlewood's inaction or silence rises to the level of "substantial assistance" because of a special relationship to or duty to the Company. As Judge Black noted, the existence of plausible defenses does not foreclose the existence of plausible claims. *McDermott, Will & Emery, LLP*, 738 F. Supp. 2d at 775.

For all these reasons, the Litigation Trustee has alleged a plausible claim that Candlewood aided and abetted the breaches of fiduciary duty alleged in Count 8. Accordingly, the court recommends that Count 9 not be dismissed against Candlewood.

Likewise, reasonable inferences can be drawn from the Litigation Trustee's allegations, that Marty Moran, as an insider, aided and abetted at least Moran and Morgan's breaches of fiduciary duty by taking part in Candlewood's hiring and by presenting inadequate alternatives to a sale that only worsened Antioch's situation. Cplt. ¶¶ 115, 140. Therefore, the court recommends that Count 9 against Marty Moran not be dismissed.

4. **Count 11: Aiding and Abetting Breach of Fiduciary Duty with respect to Sale Process (Interference With the J.H. Whitney Sale Offer)**

Count 11 alleges that among other defendants, Lipson-Wilson aided and abetted certain of Antioch's officers' and directors' breach of fiduciary duty alleged in Count 10.

The Litigation Trustee alleges that Lipson-Wilson spent hours devising a strategy to allow Morgan, because of his significant holdings in Antioch, to maintain compliance with the Internal Revenue Code anti-abuse provisions involving ESOP plans and subchapter S corporations, which if left unaddressed would have negated most of the tax advantages sought by Morgan in structuring the 2003 Transaction. Cplt. ¶ 110. The Litigation Trustee further contends that when it gave notice of its resignation in late November 2007, Reliance communicated to Lipson-Wilson that "it believed that the entire board should be removed and members of key management replaced . . . [and] that the members of the board holding subordinated debt were completely conflicted and that the Company should have pursued a turnaround effort three years earlier." Cplt. ¶ 127. According to the Litigation Trustee, Lipson-Wilson bowed to Morgan's and Moran's pressure to fire Antioch's board after it

rejected the Mamamo Offer and replaced it with a board composed of Morgan, Moran, and Morris that would presumably be more amenable to approve a recapitalization deal and keep the Morgan Family in power. Cplt. ¶ 146-147. As noted before, the Mamamo Offer was presented by the Morgan Family in June 2008 after J.H. Whitney presented its offer to purchase Antioch for $54 million. Cplt. ¶ 145. As a result of the firing of the board, J.H. Whitney withdrew its offer. Cplt. ¶ 149.

Lipson-Wilson argues that because the new board which Lipson-Wilson helped to elect never consummated any deal proposed by Mamamo, Antioch never suffered damages even if Lipson-Wilson breached her fiduciary duties and an action for breach of fiduciary duty cannot lie without harm. Lipson-Wilson adds, because Count 10 has been insufficiently plead, Count 11 cannot survive.

Even though the Complaint alleges that Lipson-Wilson is an officer of Antioch, the Litigation Trustee did not assert a direct breach of fiduciary duty claim against her but asserts an aiding and abetting claim against her. The court notes that the status of an aiding and abetting claim against a fiduciary is uncertain under Ohio law. *See I.E. Liquidation, Inc.*, 2009 WL 2707223, at *7, n. 9. Assuming that Ohio law recognizes such a claim, Lipson-Wilson's argument that Count 10 was not properly plead must fail because the court has recommended that the Count 10 allegations be found sufficient to survive a motion to dismiss. As to her remaining arguments, they also fail to provide any relief to Lipson-Wilson at this stage of the proceeding. The Complaint sufficiently alleges that that Lipson-Wilson had knowledge of the Count 10 defendants' breach and that by participating in the firing of

the board, she substantially assisted that breach.  Accordingly, the court recommends that Count 11 against Lipson-Wilson not be dismissed.

In sum, the court recommends that: Count 2 not be dismissed against Morgan, Moran, Carson, McLaughlin, Sanan, vonMatthiessen, Blair, Attiken and Houlihan Lokey but be dismissed against GreatBanc; Count 7 not be dismissed against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, and Marty Moran and be dismissed against Lipson-Wilson, Felix, Bevelhymer, and Attiken; Count 9 not be dismissed as against any of the Count 9 defendants;  and, Count 11 not be dismissed against Morgan, Moran Morris, and Lipson-Wilson but be dismissed against Evolve.

I.     **Count 12:  Tortious Interference with Business Contracts with respect to Sale Process**

Morgan, Marty Moran, and Candlewood all move to be dismissed from Count 12 – tortious interference with business contracts with respect to the sale process – for failure to state a claim.  In Ohio, the tort for interference with business contracts is based on Section 766 of the Restatement (Second) of Torts.  In Ohio the tort requires (1) the "existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification or privilege; and (5) resulting damages." *Cincinnati Bengals, Inc. v. Bergey*, 453 F. Supp. 129, 145 (S.D. Ohio 1974); *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (Ohio 1995); *Siegel v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999).   Prior to *Kenty* formally adopting this tort in Ohio, the Sixth Circuit found that Ohio law is not clear in this area and that instead of the strict application of those elements, "[o]ther courts have utilized more general language "One who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or

134

continue, a business relationship with another, or perform a contract with another is liable to the other for the harm caused thereby." *Dougherty v. Parsec, Inc.*, 872 F.2d 766, 769 (6th Cir. 1989), *quoting, Heheman v. E. W. Scripps Co.*, 661 F.2d 1115, 1127 (6th Cir. 1981).  In this vein, the Sixth Circuit concluded that a determination that an actual breach of the underlying contract has occurred is not necessary to establishing a claim for tortious interference with a contract, but rather, "only whether there was an interference . . . that in some way affected the business relationship . . . ." *Id.* at 770.  After *Kenty* and *Siegel*, the Sixth Circuit, citing *Dougherty*, has continued to adhere to the principle that a breach of contract is not required. *Am. Mar. Officers v. Marine Eng'rs Benefit Ass'n*, 503 F.3d 532, 537 (6th Cir. 2007).  *See also Moonscoop S.A.S. v. American Greetings Corp.*, 709 F. Supp. 2d 583, 594, n. 2 (N.D. Ohio 2010) (breach of contract not an essential element of tortious interference under Ohio law; following *Marine Engineeers*).  *But see Union of Needletrades, Indus. and Textile Employees AFL-CIO v. Amer. Capital Strategies, Ltd.*, 546 F. Supp. 2d 546 (S.D. Ohio 2008) ("'Intentional procurement' refers to conduct that causes the third party to breach the contract, or that leaves the third party with no choice but to breach the contract.").

Based upon comments to Section 767 of the Restatement (Second) of Torts, a factor test has developed for determining whether interference was "privileged" or "improper interference."  The factors are "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the proximity or remoteness of the actor's conduct to the interference; (6) the social interests in protecting the freedom of contract and the interference with such; and (7) the relations between the parties." *Franklin Tractor Sales v.*

*New Holland North Am., Inc.*, 106 Fed. Appx. 342, 2004 WL 1770556 (6th Cir. Aug. 5, 2004), *citing, Kand Medical v. Freund Med. Prods.*, 963 F.2d 125, 128 (6th Cir. 1992).   The burden at trial to allege facts of an improper interference, as an element of the cause of action, rests with the Litigation Trustee.

Further, tortious interference is not a viable cause of action "when the defendant is an agent (employee) of the principal (employer) and he or she acts within the scope of his or her duties." *Russell v. City of Northwood*, 1998 WL 102137, at * 3 (Ohio Ct. App. Feb. 27, 1998), *citing, Anderson v. Minter*, 32 Ohio St.2d 207, 213 (Ohio 1972).  A tortious interference claim requires the evidence to show "that, in interfering in the principal's business relationship, the agent acted solely in his or her personal capacity." *Id.* at *3; *Miller v. Wikel Mfg. Co., Inc.*, 545 N.E.2d 76, 79 (Ohio 1989).

The Complaint alleges in Count 12 that Candlewood, Morgan, and Marty Moran interfered with the Company's contract with Houlihan Lokey.  Paragraph 225 states that "Antioch entered into a contract with Houlihan Lokey in 2007 to explore a sale or restructuring of the Company."  Paragraphs 226 – 232 essentially list the elements of tortious interference with a business contract.  The Complaint further states that "Houlihan Lokey received letters of interest from at least three separate entities" to purchase the Company as a going concern and those entities "made it clear" Morgan and Moran would not continue with the Company. Cplt. ¶ 114.  According to the Complaint, Morgan "with input from [Moran] and the assistance of Defendant Marty Moran, separately hired Defendant Candlewood to explore refinancing or recapitalization options that would allow the Morgan Family to maintain their interests and power in Antioch." Cplt. ¶ 115.  Further, Morgan

"pressured" the Special Committee to include "Candlewood in meetings regarding the sale process and to compensate Candlewood and Defendant Lee's personal attorneys for their work." Cplt. ¶ 116. "Both Defendant Houlihan Lokey and Defendant Candlewood thought that the other professional's work interfered with and jeopardized the potential for a successful outcome for the Company. However, both Defendant Houlihan Lokey and Defendant Candlewood continued to remain engaged and to demand payment from the Company for their services." Cplt. ¶ 117.

By October 2007 Houlihan Lokey had received indications of interest from two potential purchasers. However, after various downward adjustments to the Company's financial forecasts, formal bids were never submitted. Cplt. ¶ 123. Morgan "seized the opportunity to pressure the Special Committee and the directors to grant Defendant Candlewood an exclusive period to find an investor or financing . . . to compensate Candlewood and Lee for their efforts in trying to effect a transaction with the Morgan family." *Id.*

### 1.    *Candlewood*

The Complaint fails to state a claim for relief against Candlewood for tortious interference with a business contract. The Complaint contains allegations regarding many of the elements of a tortious interference claim against Candlewood, including the existence of a contract between Houlihan Lokey and the Company, Candlewood's knowledge of that contract, the detrimental effects that Candlewood's efforts had on Houlihan Lokey's performance of its contract, and the damages which the Company suffered as a consequence. Yet the claim is deficient because it lacks an allegation that Candlewood acted

outside the scope of its contract with Morgan or was acting in its own personal interests. Rather, the Complaint as drafted by the Litigation Trustee establishes that: Candlewood was hired by Morgan on behalf of the Morgan Family, with the assistance of Moran and Marty Moran, to pursue a refinancing or recapitalization strategy (Cplt. ¶ 115); and Candlewood acted on behalf of Morgan in pursuing this strategy and accepted payments for its services. Cplt. ¶ 115-117.   The Complaint infers that Candlewood should not have accepted this retention because by doing so it interfered with the contract of the Company with Houlihan Lokey.   However, the Complaint never alleges Candlewood acted beyond the scope of the duties for which it was retained.   Further, it does not point to a single specific incident in which Candlewood directly sought to interfere with Houlihan Lokey's contract with the Company.   The Complaint never alleges Candlewood acted solely for its own personal benefit.   While it is alleged that Candlewood's retention per se created an interference with the sale strategy, it nevertheless pursued the course of action for which it was hired to do as an agent of its principal -- Morgan. Cplt. ¶ 117.

The Complaint alleges that the Company may have paid for some of Candlewood's services. Cplt. ¶ 116.   However, the Complaint never explains how Candlewood owed a separate duty to the Company and, even if it did, how it went beyond its scope as an agent of Morgan.

### 2. *Lee Morgan*

Morgan, by contrast, is alleged to have taken multiple steps in order to interfere with Houlihan Lokey's ability to complete its contractual duty to the Company to attempt to sell the Company as a going concern.   Morgan was aware of the Houlihan Lokey contract and

the allegations are more than sufficient to infer that he intentionally attempted to procure its breach. Morgan asserts that the Complaint, in derogation of *Twombly*, alleges no specific facts to support the claim against him. However, paragraph ¶ 224 incorporates all the previous paragraphs in the Complaint and the details in support of the allegations are to be found in those earlier paragraphs.

The following facts are alleged or may be inferred: 1) Morgan hired Candlewood in order to ensure the Houlihan Lokey sale strategy would not be successful (Cplt. ¶ 115-118); 2) Morgan failed to provide accurate financial projections to Houlihan Lokey in order to interfere with its ability to obtain formal bids for the Company's purchase (Cplt. ¶ 121); 3) Morgan pressured both the Special Committee and the directors to provide Candlewood an exclusive period to pursue a strategy in conflict with the reason Houlihan Lokey was hired (Cplt. ¶ 123); 4) Morgan refused to compromise his individual and the Morgan Family's financial interests in the Company to support a sale (Cplt. ¶¶ 124, 126); 5) Morgan presented proposals to the Company that were inadequate and ultimately destroyed any chance of a going concern sale (Cplt. ¶ 140); and 5) "[t]hroughout this process, Defendant Lee pressured the Special Committee to terminate Defendant Houlihan Lokey and to cease any pursuit of a sale process to an outside buyer." Cplt. ¶ 141. These facts are more than sufficient to plead the intentional procurement element of this claim. Finally, the Litigation Trustee pleads damages and the underlying facts in the Complaint demonstrate how Morgan's actions damaged the Company. The Litigation Trustee has no obligation to provide a detailed calculation of such damages at this stage.

### 3. Marty Moran

Marty Moran is the husband of Asha Morgan Moran. Cplt. ¶ 125. Marty Moran assisted in the hiring of Candlewood as a financial advisor for the Morgan Family. Cplt. ¶ 115. Marty Moran was among the defendants who presented to Antioch inadequate proposals which did not involve "committed financing" and failed to "adequately address[] the structural, financial, and legal issues Antioch faced." Cplt. ¶ 140. As stated earlier, at this stage of the proceeding, it is not the court's role to weigh the ultimate outcome of a claim. It only needs to determine whether, the allegations of the Complaint, on their face, are sufficient to raise a plausible claim of liability. From these allegations, a reasonable inference can be made that Marty Moran proposed unworkable proposals on behalf of the Morgan Family to interfere with the Company's goals of an asset sale. Additionally, the court agrees with the Litigation Trustee that Marty Moran need not have a duty to the Company to tortiously interfere with the Houlihan Lokey contract. *Siegel*, 707 N.E.2d at 855-56. The court finds that the allegations against Marty Moran as to this tortious interference claim are sufficient to overcome a motion to dismiss and, therefore, recommends that Count 12 not be dismissed as to Marty Moran.

For all these reasons, the court recommends that the Motions to Dismiss Count 12 be granted as to Candlewood, but denied as to Morgan and Marty Moran.

### J. Count 15: Attorney Fees

The Litigation Trustee seeks the recovery of attorney fees through Count 15. This count states: "Under applicable state and federal law, the Defendants are liable to the Litigation Trustee for his fees and costs in prosecuting the claims described in Counts 1

through 14 of this Complaint." Cplt. ¶ 263.  Certain defendants[44] have moved to dismiss Count 15 arguing that a claim for attorney fees is a remedy and not a cause of action and also that Count 15 insufficiently provides a basis for attorney fees for each of the previous counts plead in the Complaint.

Bankruptcy Rule 7008(b) specifically requires that "[a] request for an award of attorney's fees shall be pleaded as a claim in a complaint, cross-claim, third-party complaint, answer, or reply as may be appropriate." BR 7008(b).  Thus, the argument that a request for attorney fees is not a separate cause of action, at least for pleading purposes, contradicts the plain language of Bankruptcy Rule 7008(b) and is rejected. *Dukett v. Hess (In re Hess)*, 2009 WL 1617103, at *6, n. 2 (Bankr. N.D. Ohio March 12, 2009).

Further, the Sixth Circuit has ruled that "[c]laims for attorney fees are items of special damage which must be specifically plead under Federal Rule of Civil Procedure 9(g). In the absence of allegations that the pleader is entitled to attorney's fees, therefore, such fees cannot be awarded." *American Cas. Co. v. City of Detroit (In re American Cas. Co.)*, 851 F.2d 794, 802 (6th Cir. 1988), *quoting, Maidmore Realty Co. v. Maidmore Realty Co., Inc.*, 472 F.2d 840, 843 (3rd Cir. 1973).  FRCP 9(g) applies to this adversary proceeding pursuant to BR 7009.

FRCP 8(a)(2), incorporated through BR 7008 sets out a plaintiff's requirements for pleading a claim in federal civil actions.  It provides that a "claim for relief" must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

---

[44] *Motions to Dismiss* – Adv. Docs. 143, 147 and 153.  The Defendants are Nancy Blair, Wayne Alan Luce, Frederick Walker, Chandra Attiken, Lee Morgan, Asha Morgan Moran, Lee Morgan GDOT Trust #1, Lee Morgan GDOT Trust #2, Lee Morgan GDOT Trust #3, Lee Morgan Pourover Trust #1 and Lee Morgan Pourover Trust #2, Jeanine McLaughlin, Denis Sanan and Malte vonMatthiessen.

Further, as noted above, under *Twombly* and *Iqbal,* threadbare conclusory allegations and requests are not sufficient to state a claim for relief.  Rather, the allegations must be sufficient to "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1950.  Count 15 does not show that the Litigation Trustee is entitled to the relief requested in that count.

In order to meet the particularity requirement of FRCP 9(g) and the requirement that the pleader show that it is entitled to the relief, this court holds that a request for attorney fees in an adversary proceeding must: a) be plead as a separate claim pursuant to BR 7008(b); b) state the legal basis for the pleader's entitlement to attorney fees, including the particular independent but related counts for which attorney fees are sought and the statute or common law principle providing for the recovery of attorney fees under such count; and c) state the facts that support the pleader's recovery of attorney fees under the applicable count and statute or common law principle.  The facts supporting the pleader's entitlement to attorney fees, as is commonly done, may be incorporated from other parts of the complaint.  Without such elements being stated, the court cannot determine that the pleader may be entitled to attorney fees.

Accordingly, as relates to the non-core causes of action (Counts 1-12), the court recommends that the Litigation Trustee be required to plead the specific underlying basis entitling him to the remedy of attorney fees for each of the remaining counts.  Thus, the court recommends Count 15 be dismissed, without prejudice to the pleading of the underlying basis for the attorney fees for Counts 1-12.[45]

---

[45] The Complaint should be amended to clearly describe the counts for which the Litigation Trustee is seeking attorney fees and the legal bases, such as the statute or common law principle, entitling the Litigation Trustee to attorney fees for such counts.  The Defendants are unable to challenge the Litigation Trustee's request for

## VI.    CONCLUSION

The court recommends that Count 1 not be dismissed against any of the defendants; Count 2 not be dismissed against Morgan, Moran, Carson, McLaughlin, Sanan, vonMatthiessen, Blair, Attiken, and Houlihan Lokey but be dismissed against GreatBanc; Count 3 not be dismissed as to any defendants; Count 4 be dismissed against Reliance; Count 5 be dismissed against Evolve; Count 6 be dismissed against Bevelhymer, Lipson-Wilson, Felix, and Attiken and not be dismissed against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, and Sanan; Count 7 not be dismissed against Morgan, Moran, Blair, McLaughlin, Luce, vonMatthiessen, Sanan, and Marty Moran but be dismissed against Lipson-Wilson, Felix, Bevelhymer, and Attiken; Counts 8, 9, and 10 not be dismissed against any of the defendants; Count 11 not be dismissed against Morgan, Moran, Morris and Lipson-Wilson but be dismissed against Evolve; Count 12 not be dismissed against Morgan and Marty Moran, but be dismissed against Candlewood; and Count 15 be dismissed as to all defendants, without prejudice.  Finally, the court recommends that all the counts dismissed against the ESOP Trustees (Greatbanc, Evolve and Reliance) be dismissed without prejudice to any ERISA claims the Litigation Trustee may include in any amended complaint.

**Copies to:**

All Filing Parties

---

attorney fees if they are not apprised of the counts for which the Litigation Trustee is seeking attorney fees and the legal justification for such request. The American Rule disallowing attorney fees to the prevailing party except when specifically recognized by statute or common law, such as under a contractual provision for the payment of attorney fees, is still the prevailing rule both under federal law and Ohio law. *See Riddle v. Egensperger*, 266 F.3d 542 (6th Cir. 2001); *Argentine v. United Steelworkers of Am.*, 287 F.3d 476, 488-89 (6th Cir. 2002); *Davidson v. Weltman, Weinberg & Reis*, 285 F. Supp.2d 1093 (S.D. Ohio 2003); *Wilborn v. Bank One Corp.*, 906 N.E.2d 396 (Ohio 2009) and *Nottingdale Homeowners' Ass'n, Inc. v. Darby*, 514 N.E.2d 702 (Ohio 1987).

MaryAnne Wilsbacher, U.S. Trustee Office, 170 North High Street, Suite 200, Columbus, OH 43215 (Assistant United States Trustee)

Jeremy Shane Flannery, Office of the United States Trustee, 170 North High Street, Suite 200, Columbus, OH 43215 (Counsel for the United States Trustee)

###