Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy  Miller

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

*   *   *

In Re: The Antioch Company, et al.,
         Debtors.                  CASE NO. 3:10-CV-156

THE ANTIOCH LITIGATION TRUST,
W. TIMOTHY MILLER, TRUSTEE,   BANKRUPTCY CASE NO.
         Plaintiff,                      08-35741

         vs.                       ADV. PRO. CASE NO.
                                        09-3409
LEE MORGAN, et al.,
         Defendants.          Volume I

*   *   *

Deposition of W. TIMOTHY MILLER,

Plaintiff herein, called by the Defendants Lee

Morgan, Asha Morgan Moran, Chandra Attiken, Marty

Moran, Lee Morgan GDOT Trust #1, Lee Morgan GDOT

Trust #2, Lee Morgan GDOT Trust #3, Lee Morgan

Pourover Trust #1, and Lee Morgan Pourover

Trust #2 for cross-examination pursuant to the

Rules of Civil Procedure, taken before me, Kathy

S. Wysong, a Notary Public in and for the State of

Ohio, at the offices of Taft, Stettinius &

Hollister, LLP, 1800 US Bank Tower, 425 Walnut

Street, Cincinnati, Ohio, on Monday, December 17,

2012, at 10:01 a.m.

*   *   *

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                    W. Timothy Miller

---

Page 2

```
1         EXAMINATIONS CONDUCTED        PAGE
2    BY MR. SCHEIER:.....................    6
3    BY MR. PRENTISS:....................   148
4    BY MS. BRENNAN:.....................   199
5
6         EXHIBITS MARKED
7    (Thereupon, Exhibit 788, notice of       11
8    deposition of W. Timothy Miller, was
9    marked for purposes of
10   identification.)....................
11   (Thereupon, Exhibit 789, The Antioch     79
12   Company Litigation Trust's response
13   to first set of interrogatories of
14   defendants Lee Morgan, Asha Moran,
15   Chandra Attiken, Marty Moran, and
16   certain named trust defendants
17   directed to plaintiff The Antioch
18   Company Litigation Trust, was marked
19   for purposes of identification.)......
20   (Thereupon, Exhibit 790, The Antioch    168
21   Company Litigation Trust's response
22   to first set of interrogatories of
23   James A. Northrop, was marked for
24   purposes of identification.).........
25
```

---

Page 3

```
1    APPEARANCES:
2    On behalf of the Plaintiff:
3        Taft Stettinius & Hollister LLP
4    By: Marcia Voorhis Andrew
         Emily McNicholas
5        Attorneys at Law
         1800 US Bank Tower
6        425 Walnut Street
         Cincinnati, Ohio 45202-3957
7
     On behalf of the Defendants Lee Morgan, Asha
8    Morgan Moran, Chandra Attiken, Marty Moran, Lee
     Morgan GDOT Trust #1, Lee Morgan GDOT Trust
9    #2, Lee Morgan GDOT Trust #3, Lee Morgan
     Pourover Trust #1, and Lee Morgan Pourover
10   Trust #2:
11   Keating Muething & Klekamp
12   By: Michael L. Scheier
         Brian Muething (Telephonically)
13       Attorneys at Law
         One East Fourth Street
14       Suite 1400
         Cincinnati, Ohio 45202-3752
15
     On behalf of the Defendant McDermott Will &
16   Emery LLP:
17       Faruki Ireland & Cox P.L.L.
18   By: Jeffrey S. Sharkey
         Attorney at Law
19       500 Courthouse Plaza, S.W.
         10 North Ludlow Street
20       Dayton, Ohio 45402
21
22
23
24
25
```

---

Page 4

```
1    On behalf of the Defendants Nancy Blair, Wayne
     Alan Luce, and Frederick Walker:
2
3        Coolidge Wall
4    By: Daniel J. Gentry
         Terrence Fague (Telephonically)
5        Attorneys at Law
         Suite 600
         33 West First Street
6        Dayton, Ohio 45402
7    On behalf of the Defendants Ben Carlson, Denis
     Sanan, Jeanine McLaughlin, and Malte
8    vonMatthiessen:
9        Thompson Hine, LLP
10   By: Jennifer Maffett
         Thomas A. Knoth
11       Attorneys at Law
         Austin Landing I
12       10050 Innovation Drive
         Suite 400
13       Dayton, Ohio 45342-4934
14   On behalf of the Defendants Houlihan Lokey
     Howard & Zukin, Inc.; Houlihan Lokey Howard &
15   Zukin Financial Advisors, Inc.; and Houlihan
     Lokey Howard & Zukin Capital, Inc.:
16
         DLA Piper LLP
17
18   By: Andrew Fraerman (Telephonically)
         Eric Roberts (Telephonically)
19       Attorneys at Law
         203 North LaSalle Street
20       Suite 1900
         Chicago, Illinois 60601
21
22
23
24
25
```

---

Page 5

```
1    On behalf of the Defendant Candlewood Partners,
     LLC:
2
         McCarthy, Lebit, Crystal &
3        Liffman Co., L.P.A.
4    By: Kimberly A. Brennan
         101 West Prospect Avenue
5        Suite 1800
         Cleveland, Ohio 44115
6
7    On behalf of the Defendants Barry Hoskins,
     G. Robert Morris, Kimberly Lipson Wilson, Karen
8    Felix, and Steve Bevelhymer:
9        Law Office of Robert A. Klingler
         Co., L.P.A.
10
11   By: Robert A. Klingler
         Attorney at Law
12       525 Vine Street
         Suite 2320
         Cincinnati, Ohio 45202-3124
13
     On behalf of the Defendant James Northrop:
14
15       R. Daniel Prentiss, P.C.
16   By: R. Daniel Prentiss
         Attorney at Law
17       One Turks Head Place
         Suite 380
         Providence, Rhode Island 02903
18
     ALSO PRESENT:
19
20       Richard Stevens, Videographer
                 * * *
21
22
23
24
25
```

---

2 (Pages 2 to 5)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                                    W. Timothy Miller

---

Page 6

1    THE VIDEOGRAPHER: We're on the
2  record.
3          W. TIMOTHY MILLER
4  of lawful age, Plaintiff herein, having been first
5  duly cautioned and sworn, as hereinafter
6  certified, was examined and said as follows:
7          CROSS-EXAMINATION
8  BY MR. SCHEIER:
9      Q. Please state your name for the
10  record.
11     A. W. Timothy Miller.
12     Q. And, Mr. Miller, I assume you're
13  here to testify on behalf of The Antioch
14  Company Litigation Trust; is that correct?
15     A. That is correct.
16     Q. May I call you Tim?
17     A. Whatever is appropriate in the
18  context. I'm fine with that if the Court is
19  fine with that.
20     Q. It's completely up to you.
21     A. I'll defer to my counsel on that
22  one. Whatever the Court and the jury would
23  prefer.
24     Q. Okay. Well, then I'll call you
25  Mr. Miller.

---

Page 7

1      THE WITNESS: Is that fine?
2      MS. ANDREW: Whatever --
3      THE WITNESS: Very good. Okay.
4  BY MR. SCHEIER:
5      Q. All right. Did you prepare for
6  this deposition, Mr. Miller?
7      A. Yes, I did.
8      Q. And did you read any deposition
9  transcripts in preparing for the deposition
10  today?
11     A. I did review some of the
12  deposition transcripts, yes.
13     Q. What deposition transcripts did
14  you review?
15     A. There are various of them.
16  Certain of the -- I reviewed bits and pieces of
17  the various outside directors. Lee Bloom. I
18  recall one or more of the Houlihan people.
19  Let's see. A couple of the Deloitte people.
20  Let's see. Guy Walker, Chandra -- parts of
21  Chandra Attiken, parts of Guy Walker. That's
22  what I'm recalling right now.
23     Q. Did you review Marty Moran's
24  deposition?
25     A. I did review parts of Mr. Moran's

---

Page 8

1  deposition.
2      Q. Did you review Lee Morgan's
3  deposition transcript?
4      A. Not for -- in preparation for the
5  deposition, no. I may have looked at it some
6  time ago but not recently.
7      Q. Did you review Asha Moran's
8  deposition transcript?
9      A. I recall reviewing that some time
10  ago as well, but not -- not in preparation for
11  the deposition today.
12     Q. Why didn't you review Lee Morgan
13  or Asha Moran's deposition transcript in
14  preparation for this deposition today?
15     A. I focused my review on the
16  deposition exhibits, there were seven hundred
17  and eighty-seven of those, I believe, and I
18  viewed those being the contemporaneous written
19  record of what went on at the time to be the
20  best evidence and really the best place to
21  focus my efforts in terms of preparing for the
22  deposition today.
23     Q. When you said you reviewed
24  portions of Miss Attiken's transcript, how did
25  you choose what portions to review and what

---

Page 9

1  portions not to review?
2      A. I think with Attiken I probably
3  went through the early part of it and to some
4  later parts looking for, you know, again --
5  typically was looking for our examination of
6  her and what she said in response to some of
7  those things.
8      Q. The same with Mr. Moran's
9  deposition, you were principally looking for
10  the Trust's cross-examination of Mr. --
11     A. Primarily that.
12     Q. Yeah, one thing, Mr. Miller, if
13  you would be so kind as to permit me to
14  complete my  question and --
15     A. Of course. I'm sorry.
16     Q. No, no, that's okay -- and I will
17  try to allow you to complete your answer before
18  I follow up.
19     A. Excellent. Thank you.
20     Q. Would it be the same for
21  Mr. Moran's deposition, you chose to focus only
22  on the Trust's cross-examination of Mr. Moran?
23     A. Typically I would read the early
24  portions of the deposition to get a sense of
25  the background, and then would, yeah, try to

---

Mike Mobley Reporting  937-222-2259

Page 10

1  probably more focus in on our examination.
2       MR. SCHEIER: Marcia, I'm going to
3  reserve my rights to see what Mr. Miller notes
4  today. I think it's not appropriate he didn't
5  review certain deposition transcripts, and so we
6  can take that up and see how things go. I just
7  wanted to raise that with you now.
8       MS. ANDREW: Noted.
9  BY MR. SCHEIER:
10      Q. Other than reviewing each of the
11 seven hundred and eighty-seven deposition
12 transcripts and excerpts from some depositions,
13 did you review any other materials to prepare
14 for the deposition today?
15      A. I reviewed the complaint. I
16 believe I reviewed the discovery responses --
17 written discovery responses. That's all that's
18 occurring to me now. There were some -- no, I
19 think that's it for now that I can recall.
20      Q. Did you review the Trust's
21 discovery responses to the interrogatories that
22 were served on the Trust by Lee Morgan, Asha
23 Moran, Chandra Attiken, and Marty Moran?
24      A. Yes, I believe I did.
25      Q. Did you review the Trust's

Page 11

1  responses to the interrogatories, that sort of
2  information, about the damages the Trust is
3  claiming --
4       A. Yes.
5       Q. -- in this case?
6       A. Yes, I did.
7       Q. Did you review any other materials
8  relating to the calculation of damages that the
9  Trust is seeking in this case?
10      A. No. Outside the deposition
11 exhibits, no.
12      Q. Okay. Did you meet with any
13 witnesses in this case to prepare for this
14 deposition who have firsthand knowledge of the
15 facts?
16      A. No, I did not.
17      Q. Other than meeting with your
18 counsel, did you meet with any professional
19 advisor in preparation for today's deposition?
20      A. No, I did not.
21      (Thereupon, Exhibit 788, notice of
22 deposition of W. Timothy Miller, was marked for
23 purposes of identification.)
24 BY MR. SCHEIER:
25      Q. If you would look at the exhibit I

Page 12

1  placed before you, Mr. Miller, it's Exhibit
2  788.
3       A. Okay.
4       Q. Have you seen this exhibit before?
5       A. I have. Yes.
6       Q. This is the notice of deposition
7  that brings us here today; is that right?
8       A. That is correct.
9       Q. And did you have a chance to look
10 through, beginning on page two, the topics that
11 were designated for today's examination of the
12 Trust?
13      A. I did.
14      Q. Is there any topic there that you
15 did not prepare for?
16      A. It was my understanding that there
17 were certain topics that were in dispute, and I
18 have not reviewed or prepared with respect to
19 those.
20      Q. Any -- do you recall which topics
21 are in dispute that you didn't prepare for?
22      A. Let's see. I believe that they
23 were -- let's see. Items nine, maybe,
24 through -- I'll have my counsel correct me here
25 if I'm wrong, but items nine through sixteen, I

Page 13

1  believe.
2       Q. Mr. Miller, I'm handing you what's
3  been marked in a prior deposition as Exhibit
4  22. I understand it to be a copy of the trust
5  agreement that established The Antioch Company
6  Litigation Trust. Is Exhibit 22 in fact the
7  trust agreement that established The Antioch
8  Company Litigation Trust?
9       A. I'm looking through it, but it
10 certainly does appear to be.
11      Q. Yeah, I ask because on the page
12 that immediately follows page twenty of the
13 document, it has the document control number
14 TRUST 00021, there's a space for your signature
15 and that's blank. I just want to confirm that
16 you signed
17 a -- signed this agreement at some point.
18      A. It is on the very next page.
19      Q. Oh, you're right. I missed that.
20 Thank you. I got it.
21      A. Yes.
22      Q. Thank you. And that is your
23 signature, in fact?
24      A. Yes, it is.
25      Q. Thank you. Mr. Miller, if you'd

Page 14

1 turn to the first page of the trust agreement
2 just after the cover page.
3        A.  Uh-huh.
4        Q.  You'll see in the opening
5 paragraph, among a lot of other verbiage, it
6 identifies the two classes of trust
7 beneficiaries that are known as allowed Class 5
8 impaired unsecured claims and allowed Class 7
9 ESOT allocated stock interests.  Do you see
10 that?
11       A.  Yes, I do.
12       Q.  With regard to the Class 5
13 impaired unsecured claims, can you describe for
14 the jury generally who populates that class of
15 trust beneficiaries?
16       A.  Those would be the unsecured
17 creditors of The Antioch Company, the debtor,
18 who were not paid during the course of the
19 bankruptcy pursuant to an order of the
20 bankruptcy court that authorized the payment of
21 certain but not all unsecured creditors in that
22 case.
23       Q.  And what sort of unsecured claims
24 do the majority of the Class 5 impaired
25 unsecured claims hold, if you know?

Page 15

1        A.  When you say majority, by
2 amount -- number is what you're talking?
3        Q.  By --
4        A.  Yeah.
5        Q.  Well, by raw number at this point.
6        A.  Yeah.  By raw number, it would
7 be -- the Class 5 claims would be subordinated
8 note holders and ESOP note holders from the
9 company that were -- I guess that's the terms
10 that are used for those -- that class is.
11       Q.  And do you know how the
12 subordinated note holders came to become
13 creditors of The Antioch Company?
14       A.  Those were notes that were in
15 coordination with the 2003 ESOP transaction,
16 and then there were a few notes I believe that
17 were issued subsequently with respect to
18 certain warrants for the Morgan family; but
19 that's primarily -- they all arose from the
20 2003 ESOP transaction.
21       Q.  And with regard to the ESOP notes,
22 do you have a general understanding of how
23 those folks that hold ESOP notes came to
24 creditors of The Antioch Company?
25       A.  Yes, those notes were issued, I

Page 16

1 guess, annually following the ESOP -- the 2003
2 ESOP transaction.  So I believe the first
3 series was in 2004 and then our subsequent
4 series in '05, '06, and probably '07.  And
5 those were with respect to the company's
6 obligation to pay for shares of -- or the
7 interest of those creditors in the ESOP.
8        Q.  Do you understand -- is it your
9 understanding that the people that hold ESOP
10 notes are former Antioch employees that either
11 voluntarily or involuntarily terminated
12 employment and that the notes were issued, in
13 part, to provide them with the value of their
14 retirement accounts in the ESOP?
15       A.  That is my understanding, yes.
16       Q.  Can you describe generally the
17 nature of the claims or the trust beneficiaries
18 that held at one time in the bankruptcy class
19 seven claims?
20       A.  The class seven claims, my
21 understanding is that those are the folks who
22 were ESOP participants as of the time of the
23 bankruptcy filing.  Those were existing
24 employees who had interest in the ESOP at the
25 time of the filing in November of 2009.

Page 17

1        Q.  Might some of those people be
2 current Antioch employees, to the best of your
3 knowledge?
4        A.  They may well be.
5        Q.  With regard to that class of
6 claimants, have you been in contact with Evolve
7 Bank & Trust who purports to be the current
8 ESOP trustee?
9        A.  No, I have not.
10       Q.  Okay.  Are you aware that Evolve
11 Bank & Trust purports to be the ESOP trustee
12 representing the interests of former
13 participants in the ESOP who remain
14 participants as of the bankruptcy petition date
15 in this case?
16       A.  I don't have -- I don't have any
17 knowledge of that, I guess, one way or the
18 other.
19       Q.  If you wouldn't mind, Mr. Miller,
20 with regard to the Class 5 claims, can you --
21 focusing on Exhibit 22, flip to the page in
22 that exhibit that begins with the document
23 control number TRUST 41.  It's toward the back.
24       A.  I didn't bring my reading glasses.
25       Q.  I know, this one is tough.  This

Page 18

1    one is tough. I don't need reading glasses and
2    it's hard to read.
3           Generally are you aware of what
4    the spreadsheet that begins on Exhibit 22,
5    document number 41, represents?
6        A. I will be honest with you, I'm
7    having a difficult time reading it. Let me see
8    what it might be. The ESOP note holders.
9        Q. Let me maybe try to help. It
10   appears to be a listing of the beneficiaries of
11   the trust who are known as -- were known in the
12   bankruptcy as Class 5 claimants --
13       A. Okay.
14       Q. -- and the value of their claims;
15   and I just wanted to confirm that, to the best
16   of your knowledge, that's what it is, the
17   spreadsheet that is?
18       A. It certainly appears to be. And
19   the other thing I will say about that, just so
20   we're clear, that these folks had to elect to
21   participate in the trust. So it's not
22   everybody who was as of the petition date
23   within that classification. It's everybody who
24   was within that classification as of the
25   petition date who then subsequently elected to

Page 19

1    participate as beneficiaries in the trust.
2        Q. And the information that is
3    contained on the spreadsheet we were just
4    looking at that begins at document control page
5    41 of Exhibit 22, was that derived from the
6    claims that these individuals had made against
7    the bankruptcy estate prior to electing to
8    become trust beneficiaries?
9        A. I had thought that this
10   information had come from the company and the
11   company's records. Although, they did -- I'm
12   sure certain of these people filed claims and
13   when they were to elect to participate, they
14   were to put the claim amounts in the election
15   form, although, not all of them did that. But
16   I believe that these numbers came from the
17   company.
18       Q. Is it fair to say that the
19   individuals who are listed in the spreadsheet
20   and are beneficiaries of the trust voluntarily
21   gave up their claims against the bankruptcy
22   estate to become beneficiaries of the trust
23   which are the trustee?
24       A. They certainly elected to
25   participate -- their claims against the

Page 20

1    bankruptcy estate were going to be discharged
2    regardless. What they agreed to give up were
3    claims against the banks. So, yeah, I mean, it
4    was -- there was no question that the claims
5    were going to be discharged pursuant to the
6    plan and provided with some other sort of
7    treatment in lieu of cash money. It was a
8    question of what the treatment would be. So in
9    terms of affirmatively giving up anything, they
10   gave up claims against the lending
11   institutions.
12        And, again, so we're clear, this
13   is not -- we talked about ESOP folks; but it's
14   not just ESOP, there were other, you know,
15   trade creditors. Like the first one on the
16   list is a landlord whose lease was not assumed.
17   And I believe the U.S. Custom Service is
18   in here for a decent amount of money. So there
19   are other -- it is not just ESOP note holders
20   within the class, just so we're clear on that.
21       Q. That's okay. I appreciate the
22   clarity.
23        Would you say -- what would you
24   estimate the amount of nonsubordinated debt,
25   nonESOP note holder claims are against the

Page 21

1    Trust?
2        A. Just looking at this, I would say
3    it's around a couple million dollars or more.
4        Q. And looking at the total number of
5    claims held by the beneficiaries of the trust
6    who helped classify the claims against the
7    estate, what is that total?
8        A. I don't know that I can see it on
9    here if it's in here.
10       Q. Well, it is.
11       A. I apologize.
12       Q. It's on the last page of the
13   spreadsheet, sir. It looks to be about
14   seventy -- just under seventy-five million
15   dollars?
16       A. Yes, that's -- well, is that
17   everybody? I think that -- okay. That's
18   everybody. So, yeah, okay, you're looking at
19   seventy-three million, roughly, versus two
20   million. Yeah, that's correct.
21       Q. Do you know what the value of the
22   claims that trust beneficiaries have or
23   interest that trust beneficiaries have in the
24   trust who formerly held class seven claims
25   against the estate?

Page 22

1      A. I don't believe that we were
2  provided with dollar amounts for those claims.
3      Q. Are those trust beneficiaries
4  entitled to a distribution from the trust on
5  account of their interests in the trust if the
6  trust, in fact, by way of settlement or
7  judgment, comes into money from this case?
8      A. They are after all of the Class 5
9  claims are paid in full.
10      Q. And if Class 5 claims are paid in
11  full and you need to make cash distribution to
12  claimants that at one time were ESOP
13  participants as of the petition date, how would
14  you go about calculating payments to those
15  claimants without the -- without information as
16  to the value of the interest they held in the
17  ESOP at the time of the bankruptcy?
18      A. We have percentages. We have --
19  that was the information that was provided to
20  us by the debtors are percentages; and if
21  further investigation of that is necessary at
22  the time, that's certainly something we would
23  undertake to do.
24      Q. If both the trust beneficiaries
25  who held Class 5 claims and the trust

Page 23

1  beneficiaries who held class seven claims are
2  paid in full and money that the Trust has in
3  trust for the beneficiaries remains, how is
4  that to be distributed, to the best of your
5  understanding?
6      A. Well, if all there is are
7  percentages for the class seven folks, then
8  those dollars would go among those percentages,
9  period. If there are claim amounts, specific
10  amounts, then, you know, there would be
11  additional dollars left over.
12          I don't believe that the trust
13  agreement or necessarily the plan addresses
14  that eventuality, at least not to my
15  recollection, and to the extent it doesn't, we
16  would -- and that eventuality were to occur, we
17  would presumably go back to the bankruptcy
18  court for further instruction with respect to
19  that.
20      Q. Could you turn to page three of
21  Exhibit 22? It has the document control number
22  4 on the bottom right.
23      A. Okay.
24      Q. I want you to focus your
25  attention, if you would, Mr. Miller, on Section

Page 24

1  1.4.
2      A. Okay.
3      Q. The first sentence of Section 1.4
4  reads, on or after the effective date, at the
5  request of the trustee, the reorganized debtors
6  will provide to the Litigation Trust a loan of
7  up to two hundred and fifty thousand dollars.
8  Did you, in fact, request from the organized
9  debtor, that I understand is still called The
10  Antioch Company, a two hundred and fifty
11  thousand dollar loan for the trust?
12      A. It's my understanding that we're
13  into the area where -- that we're -- there's a
14  dispute as to whether or not we would be
15  providing or testifying as to that information.
16      Q. Well, that might be but I still
17  need you to answer the question.
18      A. Okay. I think from the Trust
19  standpoint, the internal dollars and
20  back-and-forth of the Trust is not public
21  information and that's not something that we
22  would be disclosing publicly.
23      Q. Well, that's okay. I'll keep this
24  portion of the record confidential. So the
25  question is, did you, in fact, request from the

Page 25

1  company the two hundred and fifty thousand
2  dollar loan that you're entitled to request
3  pursuant to Section 1.4 of the trust agreement?
4          MS. ANDREW: I think you can answer
5  that.
6          THE WITNESS: Okay. Yes, I did.
7  BY MR. SCHEIER:
8      Q. And is it also true that the Trust
9  also received a two hundred and fifty thousand
10  dollar payment from the company to assist it in
11  prosecuting litigation in addition to the two
12  hundred and fifty thousand dollar loan
13  requested?
14      A. Yes, it did.
15      Q. If you'll notice, the other
16  language in Section 1.4 obligates the Trust to
17  repay the company before any trust
18  beneficiaries are repaid from any proceeds that
19  the Trust takes in. Do you generally recall
20  that provision?
21      A. Yes, I do.
22      Q. Okay. Do you recall that the
23  Trust settled with a few of the defendants in
24  this case, namely CRG, Michael Epstein, and
25  Paul Ravaris?

7 (Pages 22 to 25)

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 26

1      A.  Yes, they did.
2      Q.  Did the Trust use any of the
3    proceeds of that settlement to repay a part of
4    or all of the loan it took from The Antioch
5    Company?
6      A.  Yes, it did.
7      Q.  And does the Trust still owe the
8    Antioch -- owe The Antioch Company any money?
9      A.  No, it does not.
10     Q.  If you'd now turn your attention,
11   Mr. Miller, to Section 1.5 of the agreement on
12   the same page that we're looking at now.
13     A.  Uh-huh.
14     Q.  It's titled valuation of trust
15   assets, and it appears to obligate the trustee
16   to make a good faith valuation of trust assets.
17   Do you see that?
18     A.  Yes.
19     Q.  Did the trustee, in fact, do so as
20   we sit here today?
21     A.  No.
22     Q.  Why not?
23     A.  I think at the time that we got --
24   there was no -- very -- basically what the
25   Trust got was two hundred and fifty thousand

Page 27

1    dollars plus litigation claims, and at that
2    juncture we had no -- beyond the two hundred
3    and fifty thousand dollars, no way at that
4    juncture of accurately valuing those litigation
5    claims.
6      Q.  And is that true to today, that
7    the Trust has no -- in the Trust's view, it is
8    unable to value the Trust claims?
9      A.  Aside from the -- you know, what
10   we've said thus far in terms of the
11   interrogatory answers on damages, you know,
12   that's about as much as we could do in terms of
13   valuing those claims.
14     Q.  If you would, please, Mr. Miller,
15   turn to the very next page of Exhibit 22.  It's
16   internal page four and document control page 5.
17     A.  Okay.
18     Q.  And you'll see Section 1.7 refers
19   to a trust advisory board.
20     A.  Uh-huh.
21     Q.  I just wanted to know who the
22   members of that board are currently.
23     A.  John Moore, Heidi Everett, Lisa
24   Drew, and Kay Richter.
25     Q.  And have they been the members of

Page 28

1    the trust advisory board since that entity has
2    been established?
3      A.  Yes.  They were members of the
4    official committee of unsecured creditors that
5    was appointed by the office of the United
6    States Trustee during the bankruptcy case.
7      Q.  Are any of those four
8    beneficiaries of the trust?
9      A.  Yes, all of them are.
10     Q.  How did John Moore's interest in
11   the trust arise, to the extent that you know?
12     A.  He is an attorney in Dayton.  His
13   client is the first entity, the landlord entity
14   listed on the attachment, the 2327 Commerce
15   Center Boulevard, LLC.
16     Q.  And Kay Richter, do you have
17   knowledge of how her interest in the trust
18   arose?
19     A.  She is an ESOP note holder.
20     Q.  Heidi Everett, do you know how her
21   interest in the trustee arose?
22     A.  She was also an ESOP note holder.
23     Q.  And Lisa Drew, do you know how her
24   interest in the trust arose?
25     A.  She was also an ESOP note holder.

Page 29

1      Q.  Is the trust advisory board able
2    to -- strike that.
3          Do you as trustee take direction
4    from the trust advisory board in terms of your
5    prosecution of this litigation?
6      MS. ANDREW:  You can answer that in
7    general.  I don't want you to reveal any
8    attorney-client communications specifically.
9      THE WITNESS:  Yes.
10   BY MR. SCHEIER:
11     Q.  And have they, in fact, done so in
12   this case?
13     MS. ANDREW:  You may answer.
14     THE WITNESS:  Yes.
15   BY MR. SCHEIER:
16     Q.  If you could turn now to --
17   sticking with Exhibit 22, Mr. Miller -- page
18   eleven, and that's the internal number and it's
19   document control number 12.  I'd like you to
20   focus your attention, to be so kind, on Section
21   2.7.
22     A.  Okay.
23     Q.  Section 2.7 is titled trustee's
24   compensation, indemnification, reimbursement.
25   Do you see that?

8 (Pages 26 to 29)

Page 30

1   A. Uh-huh.
2   Q. Is that a yes?
3   A. I'm sorry. Yeah.
4   Q. Yeah, that's okay.
5   A. Yes.
6   Q. Okay. It also refers to in
7   Exhibit C that purported to be the engagement
8   letter between you and the Trust, and the copy
9   of this document I have didn't have Exhibit C
10  attached.
11  A. Okay.
12  Q. Would you please then describe for
13  the jury how you as trustee are compensated for
14  the services you provide in this case to the
15  trust?
16  MS. ANDREW: We're going to object.
17  That's one of the areas that we objected to in
18  advance of the deposition. We don't see how the
19  trustee's compensation is relevant to any of the
20  claims or defenses in this case.
21  MR. SCHEIER: Oh, it goes to bias --
22  the trustee's bias in prosecuting the case and the
23  trustee's financial interest in the case; and the
24  jury or the judge who might be trying the facts is
25  entitled to know that the plaintiff has a

Page 31

1   financial interest in the case even though he
2   purports to be an independent fiduciary.
3   MS. ANDREW: Well, the trustee will
4   not be testifying to any personal knowledge so the
5   issue of bias is really a red herring. Bias goes
6   to whether the bias of a witness is likely to make
7   his testimony as to facts more or less credible in
8   the case, but he's not going to be testifying to
9   personal knowledge because he has none regarding
10  the underlying facts at issue.
11  MR. SCHEIER: I believe that -- well,
12  two responses, and I don't want to argue it out
13  here, but Exhibit C is not included and that sets
14  forth the compensation arrangement and the
15  engagement, and for whatever reason, it's not
16  here.
17  MS. ANDREW: Right, it --
18  MR. SCHEIER: And so if you're going
19  to produce it here in this deposition for us to
20  look at, then it might avoid some of the
21  questions. But without Exhibit C, I'm unable to
22  know what the trustee's compensation arrangement
23  is; and I believe it goes to the bias of the
24  plaintiff in this case. Mr. Miller is prosecuting
25  claims seeking, based on your interrogatory,

Page 32

1   hundreds of millions dollars of damages from the
2   defendants in this case and the jury should know
3   whether or not his compensation is based on a
4   percentage of the money that he may or may not
5   take in as a result of the case.
6   MS. ANDREW: Well, we disagree that
7   his compensation has any relevance. I'm sure the
8   jury would understand that he's not a victim
9   and that he would be compensated just as all the
10  attorneys in the case are compensated for their
11  work in connection with the case. The --
12  MR. SCHEIER: Well, here's the -- are
13  you taking a privilege objecting, instructing him
14  not to answer, because an instruction not to
15  answer on relevancy grounds is not proper?
16  MS. ANDREW: Well, we can --
17  MR. SCHEIER: It's a deposition and
18  you can take it up later with the Court and that
19  can be excluded from the record that the jury will
20  hear if you're, in fact, correct.
21  MS. ANDREW: The Exhibit C was not
22  included on this exhibit because it was not in
23  existence at the time that this was filed with the
24  Court. So perhaps at a break we can look into
25  whether we can produce the ultimate engagement

Page 33

1   letter between the Trust and --
2   MR. SCHEIER: I don't mean to cut you
3   off. I have limited time.
4   MS. ANDREW: Yeah.
5   MR. SCHEIER: I don't believe it's
6   appropriate to instruct not to answer based on
7   relevancy. That's an objection that you preserve
8   and you can object to the judge at the time of
9   trial; and if the judge agrees that Mr. Miller's
10  testimony about his compensation in this case is
11  irrelevant to the claimed defenses or that bias is
12  something that is not appropriate to bring in
13  front of the jury, he'll so rule and the testimony
14  will be excluded.
15  MS. ANDREW: Well, we make our
16  objection for the record. I would allow the
17  witness to testify generally as to the terms of
18  the trustee's compensation arrangement.
19  THE WITNESS: Okay. The trustee
20  compensation piece is the compensation piece
21  applicable to a Chapter 7 bankruptcy trustee as
22  set forth in the United States Code. I believe
23  it's Section 325. It's a sliding scale percentage
24  based upon funds distributed to creditors and --
25  so, yeah, that's what -- that's what it provides.

9 (Pages 30 to 33)

Page 34

1  There's no -- it's purely based upon what a -- you
2  know, what a trustee in a liquidating case, in a
3  Chapter 7 case would be paid.
4  BY MR. SCHEIER:
5      Q.  Okay.  This is, of course -- or
6  the bankruptcy, of course, was not a
7  liquidating bankruptcy, correct?
8      A.  Correct.
9      Q.  The Antioch Company reorganized
10 and is currently operating; is that correct?
11     A.  That is correct.
12     Q.  With regard to your compensation,
13 is it also correct that the more assets you
14 take in through this particular piece of
15 litigation distributed to creditors, the
16 greater the compensation you'll receive as
17 trustee?
18     A.  The trustee fee portion inasmuch
19 as it is a percentage, yes, a sliding scale
20 percentage up to I think three percent is
21 the -- you know, as the -- the larger it gets,
22 the larger the percentage -- the smaller the
23 percentage becomes basically.
24     Q.  Now, you're also an attorney; is
25 that correct, Mr. Miller?

Page 35

1      A.  I am.
2      Q.  And you are a law partner of Miss
3  Andrew who's prosecuting this case on behalf of
4  the Trust; is that right?
5      A.  Yes, I am.
6      Q.  And will your compensation as a
7  partner -- strike that.
8          You are a partner in the Taft law
9  firm; is that right?
10     A.  I am.
11     Q.  And Miss Andrew is a partner in
12 the Taft law firm?
13     A.  Yes, she is.
14     Q.  Will the compensation you received
15 -- you receive as a part of the Taft law firm
16 be in any way impacted by the amount of damages
17 that you can bring into the trust by way of
18 settlement or judgment?
19         MS. ANDREW:  If you know.
20         THE WITNESS:  I don't.  As I -- no, I
21 don't know as I sit here today.
22 BY MR. SCHEIER:
23     Q.  Is there a possibility that the
24 fee that Taft will take in in this case will
25 impact one way or the other the compensation

Page 36

1  you receive as a partner of the law firm?
2      A.  Again, as I -- I think I just
3  answered that question or maybe I
4  misunderstood, but I -- as I sit here today, I
5  don't know that one way or the other.
6      Q.  Is it a possibility?
7      A.  Is it a possibility?  I suppose
8  it's a possibility, sure.
9      Q.  Okay.  If you could turn your
10 attention now to the same page, page eleven of
11 the trust agreement, Section 2.7, Subsection
12 (c).
13     A.  Uh-huh.
14     Q.  If you would look at that, it
15 reads, the trustee is hereby authorized to
16 obtain all reasonably and necessary insurance
17 coverage, if any, for himself, and then it goes
18 on a little bit.  Do you see that?
19     A.  Yes.  Uh-huh.
20     Q.  Did you, in fact, obtain insurance
21 coverage for yourself in this case?
22     A.  Again, I think we get into kind of
23 the internal workings of the trust.  I don't
24 understand how that is --
25     Q.  Well, I don't mean to -- I don't

Page 37

1  mean to be offensive about it, but that's --
2  your understanding of why I'm asking the
3  question is not so relevant, you just need to
4  answer the questions unless your attorney
5  instructs you not to answer.  That's how this
6  works.
7      A.  Okay.  Could you read the question
8  back to me again, please?
9          (Record read.)
10         THE WITNESS:  No.
11 BY MR. SCHEIER:
12     Q.  Do you know whether your service
13 as the trustee of the Antioch Litigation Trust
14 comes under any insurance coverage that the
15 Taft law firm has purchased?
16     A.  I don't know that.
17     Q.  You can put that exhibit aside
18 now.
19     A.  Very good.
20     Q.  Now is about the time for me to
21 introduce myself to you, Mr. Miller, because
22 we're going to be talking about my clients.
23 I'm Mike Scheier, and I represent Lee Morgan,
24 Asha Moran, Marty Moran, Chandra Attiken, and a
25 series of Morgan family-related trusts that

Page 38

1    have been named as defendants in the case.
2        A.  Very good.
3        Q.  And for the next segment of the
4    deposition I'm going to ask you some questions
5    about my clients.
6        A.  Okay.
7        Q.  The first one I'd like to talk to
8    you about is Marty Moran.
9        A.  Okay.
10       Q.  And maybe to help us with this
11   segment of my cross-examination we'll take a
12   look at the amended complaint in this case.  My
13   understanding is it's been previously marked as
14   Exhibit 42 --
15       A.  Okay.
16       Q.  -- so why don't we treat it as
17   such.
18       A.  Very good.
19       Q.  Mr. Miller, I understand that you
20   reviewed this complaint in preparation for your
21   deposition; is that right?
22       A.  I did.
23       Q.  And did you review the amended
24   complaint before it was filed with the court?
25       A.  Yes.

Page 39

1        Q.  And did you authorize your counsel
2    to file this amended complaint?
3        A.  Yes.
4        Q.  If you could turn to page
5    forty-three of the complaint --
6        A.  Okay.
7        Q.  -- which is Exhibit 42.  You'll
8    see there's a count four and a count five
9    relating to something known as the LEVIMO
10   transaction.
11       A.  Uh-huh.
12       Q.  Do you see that?
13       A.  Yes, I do.
14       Q.  You'll notice that my client Marty
15   Moran is named as a defendant in count five?
16       A.  Yes.
17       Q.  And you and your lawyers have
18   accused him of aiding and abetting breach of
19   fiduciary duty with respect to the LEVIMO
20   transaction.  Do you see that?
21       A.  Yes.
22       Q.  Okay.  Can you describe for me all
23   facts that the Trust knows of that support the
24   allegation that Mr. Moran aided and abetted in
25   breaches of fiduciary duty by corporate

Page 40

1    officers and directors with respect to the
2    LEVIMO transaction, please?
3        A.  Again, based on my review of
4    the -- primarily the deposition exhibits and,
5    as I've indicated, certain parts of certain
6    depositions, it appeared to me from the Trust
7    perspective that Mr. Moran was very much
8    actively involved in the LEVIMO transaction
9    and, in fact, manages that real estate, as I
10   understand it, for -- for LEVIMO.  That -- you
11   know, I think the Trust's view of that
12   transaction is that it was not a proper thing
13   for the --
14       Q.  Well, I'm asking about Marty
15   Moran, not the Trust's view on the transaction,
16   so let's stick with the question asked in the
17   meantime.
18           What specific facts can you
19   identify for me that support the allegation
20   that Marty Moran specifically participated in
21   what the Trust calls the LEVIMO transaction?
22       A.  I believe that there are
23   documents, e-mail exchanges, et cetera, about
24   that building and about the transaction and the
25   lease.  My recollection of the documents is

Page 41

1    that he may have been copied on the documents
2    pertaining to the LEVIMO lease.  The documents
3    at least certainly indicate that he was
4    involved and facilitating the transaction on
5    the LEVIMO side.  And, again, the allegation is
6    that he facilitated the board in breaches of
7    fiduciary duty, and the Trust's view is that
8    the board breached their fiduciary duty by
9    entering into that transaction with LEVIMO.
10       Q.  My question is, can you identify
11   for me any specific action on the part of
12   Mr. Moran that indicates he participated in the
13   LEVIMO transaction based on the documents that
14   you reviewed in preparation for this
15   deposition?
16       A.  Well, again, without the documents
17   in front of me, my recollection of them is that
18   there is back -- that he is involved in
19   connection
20   with -- on behalf of LEVIMO getting that lease
21   transaction done and then subsequently managing
22   the property on a go-forward.
23       Q.  What -- since you were supposed to
24   prepare for this deposition and one of the
25   topics, which was specifically topic five, you,

11 (Pages 38 to 41)

Page 42

1    was all facts in the Trust knowledge that
2    support your allegations in the aiding and
3    abetting LEVIMO transaction count --
4        A. Uh-huh.
5        Q. -- I'll try it one more time.
6    What was Mr. Moran's involvement? What facts
7    does the Trust have that, in fact, Mr. Moran
8    was involved in negotiating the LEVIMO
9    transaction?
10       A. Again, I think we'd have to look
11   through the documents. I believe we've got and
12   brought documents here today to go through and
13   look at, and we can go through and do that --
14       Q. Okay.
15       A. -- and that's what -- you know,
16   that's what we want to do.
17       Q. That's fine.
18       A. Make sure that you're aware of
19   that.
20           MR. SCHEIER: You want to go off the
21   record and have him get those documents?
22           MS. ANDREW: Yes.
23           THE VIDEOGRAPHER: We're off the
24   record.
25           (Pause in proceedings.)

Page 43

1            THE VIDEOGRAPHER: We're on the
2    record.
3    BY MR. SCHEIER:
4        Q. Sir, have you had a chance to
5    review the documents?
6        A. I have. And I think what we have
7    here is Exhibit Number 317, which is an e-mail
8    that looks like it was done -- e-mail exchange
9    shortly after the transaction in July 17th as
10   between Ole Dam and Mr. Morgan with respect to
11   excess space in the property that was sold in
12   the LEVIMO transaction and several references
13   to Marty being involved with respect to showing
14   the property, et cetera. And it looks like
15   there's an e-mail from him here, essentially
16   information geared toward, you know, managing
17   the real estate with respect to this.
18       Q. And that's managing the real
19   estate after the transaction closed?
20       A. Shortly after. It looks like to
21   me it would have been in the -- shortly after
22   that the transaction closed.
23       Q. I --
24       A. And then there were subsequent
25   e-mails with respect to defaults, I think, in

Page 44

1    which he may be copied or involved, let's see,
2    with respect to rent amounts in May of '08.
3        Q. Other than -- do you have the date
4    on Exhibit 317?
5        A. Yeah. It looks like the e-mail is
6    July 18th, 2007.
7        Q. And do you know the date that the
8    LEVIMO transaction closed?
9        A. Let's look. It was in April
10   of '07.
11       Q. Are you able to identify any
12   conduct on Marty Moran's part that occurred
13   prior to the closing of the LEVIMO transaction
14   that support the Trust claims that he aided and
15   abetted board members in their breaches of
16   fiduciary duty in entering into that
17   transaction?
18       A. Not based on -- I mean, beyond
19   what I've just pointed out here, no; but this
20   clearly -- the documents here are not the
21   entire universe and, you know, I think the
22   impression that the Trust had from these
23   documents is that -- or at least the e-mail
24   exchanges, that he was actively involved in the
25   management of the real estate.

Page 45

1        Q. And that would be after the
2    transaction closed, correct?
3        A. That's when that e-mail is dated.
4        Q. I'm trying to find out when you
5    understand the Trust understood that Mr. Moran
6    was actively involved in the management of the
7    real estate. That was after the transaction
8    closed?
9            MS. ANDREW: Object to form.
10   BY MR. SCHEIER:
11       Q. Well --
12       A. The e-mail was dated after the
13   transaction.
14       Q. Unrelated to the e-mail.
15       A. Okay.
16       Q. The Trust does not allege that --
17   the Trust's allegation with regard to Mr.
18   Moran's management of the real estate --
19       A. Yeah.
20       Q. -- is that based on your review of
21   documents, that occurred after the transaction
22   closed?
23       A. Based on what I've seen here, yes.
24       Q. Okay. And you fully prepared
25   pursuant to the notice of deposition, correct?

12  (Pages 42 to 45)

Page 46

1     A.  Again, I've reviewed a lot of -- a
2  lot of documents.
3     Q.  Okay.
4     A.  It's possible I've seen something
5  and have simply forgotten it.
6     Q.  When did you review the documents?
7     A.  Well, a lot of them within the
8  last few days.  Some of them --
9     Q.  Okay.  Very well.  Other than
10 Exhibit 317 which was dated a number of months
11 after the transaction, can you identify any
12 document at all that indicates Mr. Moran
13 participated in any way in arranging the LEVIMO
14 transaction or assisting the board with regard
15 to the LEVIMO transaction prior to April of
16 2007?
17    A.  Not as I sit here presently.
18    Q.  And how about as you reviewed the
19 documents over the last few days to prepare for
20 this deposition on this topic?
21    A.  My recollection was that I had
22 seen something that was prior to the closing.
23    Q.  Okay.  Then we need to go off the
24 record and you need to find that for me,
25 please.

Page 47

1        THE VIDEOGRAPHER:  We're off the
2  record.
3        (Pause in proceedings.)
4        THE VIDEOGRAPHER:  We're on the
5  record.
6  BY MR. SCHEIER:
7     Q.  Mr. Miller, on that last break
8  were you able to find the document that you
9  thought you saw where Mr. Moran was involved in
10 the LEVIMO transaction before April of 2007?
11    A.  I was not, and I may have been
12 mistaken.
13    Q.  Okay.  Thank you.  Do you know of
14 any facts indicating that Mr. Moran negotiated
15 the LEVIMO transaction on LEVIMO's behalf with
16 any member of the board?
17    A.  No, I do not.
18    Q.  And do you know of any facts that
19 Mr. Moran promoted the LEVIMO transaction among
20 any members of the board of directors?
21    A.  As I sit here today and based on
22 what I've reviewed, no, I don't.
23    Q.  Thank you.  Can you -- I think I
24 heard you say earlier that in the Trust's view,
25 the LEVIMO transaction was unfair to The

Page 48

1  Antioch Company.  Did I hear you correctly?
2     A.  I don't know if I used the word
3  unfair, but --
4     Q.  Well, then let's talk about that.
5     A.  Okay.
6     Q.  Do you believe the LEVIMO
7  transaction was in some way unfair to The
8  Antioch Company?
9     A.  I think our view of it was that it
10 was a breach of the director's fiduciary duties
11 to have entered into that transaction with
12 LEVIMO given --
13    Q.  My question, sir --
14    A.  Okay.
15    Q.  -- is whether the Trust's view is
16 the LEVIMO transaction and its terms were
17 unfair to The Antioch Company?
18    A.  And my answer is that given where
19 the company had been and where it was at in
20 that time and appeared to be going, that
21 entering into a transaction where the Morgan
22 family, through the LEVIMO entity, became the
23 owner of and landlord to what was probably one
24 of the most significant assets of the company
25 was not a prudent thing or was not something

Page 49

1  that the board should have done.
2     Q.  And why not?
3     A.  Well, because the company was in,
4  at that juncture, fairly severe financial
5  distress.  They were in the spring of '07.
6  They are -- have bank debt that is maturing
7  soon.  They've been told that they cannot
8  extend and the bank won't extend that bank debt
9  unless there's a significant pay-down.  They
10 are unable to get a clean audit because of
11 that; and that financial situation, in the
12 Trust's view, is driven by the 2003 ESOP
13 transaction and everything that followed on
14 that.  And the other things that followed on
15 that were continuing management by Lee Morgan
16 and the Morgan family that watched the sales
17 and performance of the company consistently
18 deteriorate from possibly as late as -- as
19 early as 2002.
20    Q.  Mr. Miller, I --
21    A.  I'm not done with my answer.
22    Q.  No, here's the question.  You're
23 not answering my question and when your lawyer
24 wants to direct examine you on the record, you
25 can answer her questions.

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                      W. Timothy Miller

---

Page 50

1       My question is, can you point to
2   any provision of the LEVIMO lease that was
3   unfair to The Antioch Company?
4       MS. ANDREW: All right. Well, that's
5   a different question than the one he was answering
6   which was why he -- why he, the Trust, thought
7   that the transaction was not a good transaction
8   for the company --
9       MR. SCHEIER: The question --
10      MS. ANDREW: -- and he was answering
11  and you cut him off.
12      MR. SCHEIER: The question was
13  whether it was fair or -- what was unfair about
14  the transaction of the company. That was the
15  question.
16      MS. ANDREW: That was not the
17  question he was answering.
18      MR. SCHEIER: Well, that's the
19  question that was asked --
20      MS. ANDREW: No, I would like --
21      MR. SCHEIER: -- so --
22      MS. ANDREW: -- her to read it back
23  and let him finish answering the question.
24      MR. SCHEIER: Well, no, it's my
25  deposition and at this point --

Page 51

1       MS. ANDREW: But you're not allowed
2   to interrupt the witness.
3       MR. SCHEIER: Then I'll withdraw the
4   last question.
5   BY MR. SCHEIER:
6       Q. And the question is, can you point
7   to any provision in the LEVIMO lease or the
8   LEVIMO transaction that was unfair to The
9   Antioch Company?
10      A. Well, again, consistent with the
11  earlier answer, I think the biggest part of the
12  unfairness is putting the Morgans in that
13  position of control at that point in time
14  through that lease.
15      Q. Okay. Other than the fact that
16  the Morgans had an interest in the LEVIMO
17  transaction, can you point to any other term of
18  that lease that was unfair to The Antioch
19  Company?
20      A. No, not as I sit here today.
21      Q. Are you aware of any other --
22  strike that.
23      I'm sticking now back with
24  Mr. Moran. I'd like to move to another count
25  that he's named in, and that's count seven and

Page 52

1   it's on page forty-five. And in count seven of
2   page forty-five the Trust alleges that
3   Mr. Moran aided the board of directors in
4   breaching fiduciary duty with respect to the
5   sale process. Do you see that, Mr. Miller?
6       A. Yes.
7       Q. Can you describe for me all facts
8   within the Trust's knowledge that it gained
9   from discovery in this case that supports the
10  allegation that Mr. Moran aided and abetted any
11  member of The Antioch Company special
12  transaction committee in regard to any alleged
13  breaches of fiduciary duties on their part?
14      A. Yeah. I think with respect to the
15  sale process, my recollection of the exhibits
16  is that there are more of those, and in
17  particular I'm thinking in the May 2008 time
18  frame, where Mr. Moran was engaged, and I
19  believe that there may be earlier e-mails as
20  well, where he and he through ClearPath are
21  engaged in connection with Candlewood and
22  Mr. Morgan with respect to making proposals to
23  the special committee that had the effect of,
24  in the Trust's view, stalling, hindering a sale
25  process, a sale of the company, a change of

Page 53

1   control transaction, and that there is e-mail
2   traffic to that effect within those time
3   frames.
4       Q. Anything other than Mr. Moran's
5   service to Candlewood through ClearPath that
6   you can point to that supports your allegation
7   that Mr. Moran aided and abetted any of the
8   special transaction committee members in
9   alleged breaches of their fiduciary duty with
10  respect to the sale process?
11      A. Again, these proposals that he
12  from the e-mail exchanges appear to have been
13  involved in facilitating or pursuing were
14  submitted to the special committee and the
15  special committee -- and there was a lengthy
16  process of that, going back to the late October
17  2007 time frame, where the intent or approach
18  seemed to be to forestall a change of control
19  or sale process.
20      Q. Did Mr. -- do you have any facts
21  that Mr. Moran negotiated directly with any
22  member of the special transaction committee on
23  behalf of Candlewood or ClearPath or
24  Mr. Morgan?
25      A. I don't think I've seen anything

14 (Pages 50 to 53)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 54

1   with respect to specific negotiations.
2       Q.   What facts does the Trust know
3   about Mr. Moran's specific conduct in assisting
4   Candlewood with regard to making proposals to
5   the special transaction committee?
6       A.   Well, again, I think we do that by
7   reference to the e-mails; but I believe that
8   there's certainly e-mails in the May '08 time
9   frame with -- there's a proposal geared toward
10  paying off the ESOP notes or backstopping the
11  ESOP notes that I believe Mr. Moran was
12  involved in, if I recall correctly.  And there
13  may have been earlier exchanges in the 2008
14  time frame with respect to earlier offers,
15  possibly the GSC deal.  That one I'm a little
16  fuzzy on.  I'd need to look at the documents.
17      Q.   Okay.  Anything other than
18  Mr. Moran suggesting or assisting in an effort
19  to negotiate, as you term it, backstopping the
20  ESOP notes that you can identify that supports
21  the allegation that he aided and abetted The
22  Antioch Company board members in breaching
23  their fiduciary duty in regard to the sale
24  process?
25      A.   Again, I guess we could look at

Page 55

1   the specific e-mails.
2       Q.   Okay.  Let's go off the record and
3   do that.
4       A.   Okay.
5           THE VIDEOGRAPHER:  We're off the
6   record.
7           (Pause in proceedings.)
8           THE VIDEOGRAPHER:  We're on the
9   record.
10  BY MR. SCHEIER:
11      Q.   Mr. Miller, were you able to
12  identify any documents that support the Trust's
13  allegations that Mr. Moran in any way aided and
14  abetted any members of The Antioch Company
15  board of directors in respect to the alleged
16  breaches of fiduciary -- breaches of fiduciary
17  duty with regard to the sale process?
18      A.   Yes.
19      Q.   And can you identify those by
20  exhibit number if possible?
21      A.   Yes.  Exhibit 203.  Exhibit 204.
22  Let's see, what is this one?  Exhibit 243.
23  Exhibit 231.  Exhibit 244.  Exhibit 276.
24          MR. GENTRY:  I'm sorry, was that 276?
25          THE WITNESS:  Yes, 276.

Page 56

1           MR. GENTRY:  Thank you.
2           THE WITNESS:  Exhibit 331.  Exhibit
3   332.  Exhibit 333.  Let's see.  Exhibit 321.
4   Exhibit 320.
5           MR. SCHEIER:  Go off the record a
6   moment.
7           THE VIDEOGRAPHER:  We're off the
8   record.
9           (Thereupon, an off-the-record
10  discussion was had.)
11          THE VIDEOGRAPHER:  We're on the
12  record.
13  BY MR. SCHEIER:
14      Q.   To my understanding is you've
15  identified another four exhibits in addition to
16  the ones that you read in the record
17  previously, and those are Exhibits 323, 746,
18  324, and 309?
19      A.   Correct.
20      Q.   Okay.  Other than all the exhibits
21  you just read off and put into the record, are
22  there any other documents that you reviewed
23  that support the Trust's claims against
24  Mr. Moran in count seven?
25      A.   No, those are the ones that I

Page 57

1   reviewed.
2       Q.   Thank you.  Now I'd like you to
3   turn your attention to count ten, which is the
4   last of the three counts where you sued
5   Mr. Moran.  And that count is tortious
6   interference with business contracts with
7   respect to the sales process.  Do you see that?
8   It's on page forty-seven of the complaint.
9       A.   Okay.  Yes.
10      Q.   What facts does the Trust have to
11  support its allegation that Mr. Moran
12  tortiously interfered with the agreement
13  between Houlihan Lokey and The Antioch
14  Company --
15      A.   Again --
16      Q.   -- in the 2007 and 2008 time
17  frame?
18      A.   Again as reflected in certain of
19  the documents or the exhibits whose numbers I
20  just gave you, it appears that Mr. Moran was
21  actively engaged in the retention of
22  Houlihan -- I'm sorry, of Candlewood and --
23  both on the front end and even renegotiating, I
24  guess, toward the back end and also -- and I
25  think the notion there is, you know, Candlewood

Page 58

1  came into that situation and, in our view,
2  interfered with -- in the Trust's view, I
3  should say, interfered with the existing
4  relationship contract between the company and
5  Houlihan with respect to a sale process. And
6  it appears from the e-mail traffic and notes, I
7  guess one of those is the notes of a meeting,
8  that Mr. Moran was actively engaged or involved
9  in bringing Candlewood into -- into the
10  situation.
11       Q.  Other than what you've just
12  testified to, does the Trust know of any facts
13  that supports an allegation that Mr. Moran
14  somehow interfered with either Houlihan or The
15  Antioch Company's ability to execute their
16  obligations under the engagement letter between
17  The Antioch Company and Houlihan?
18       A.  Well, and, again, I think in the
19  May time frame at least there appeared to me to
20  be e-mail or exchange with respect to, you
21  know, competing proposals submitted, and that
22  would be in addition -- you know, an additional
23  item.
24       Q.  Can you identify any specific
25  communications or documents that support the

Page 59

1  Trust's claims that Mr. Moran tortiously
2  interfered with the contract between Houlihan
3  and the company other than the list of exhibits
4  you read off beforehand?
5       A.  Based on everything that I've
6  reviewed, those are the ones that demonstrate
7  his involvement or show his involvement.
8       Q.  Are you aware of any facts that,
9  in fact, the company breached its agreement
10  with Houlihan?
11       A.  Well, I think that bringing
12  Candlewood into the situation, in the Trust's
13  view, was a breach of the exclusivity provision
14  in the Houlihan arrangement.
15       Q.  Do you know of any facts that
16  Houlihan shares the Trust's view? Have you
17  seen any documents or testimony indicating that
18  Houlihan shares the Trust's view in this
19  litigation that the exclusivity provision was
20  breached?
21       A.  I don't believe that I've seen
22  documents to that effect. There was certainly
23  some -- I believe there were some e-mails back
24  and forth as to the Houlihan/Candlewood
25  relationship but --

Page 60

1       Q.  Have you seen any documents or
2  testimony indicating that Houlihan believed The
3  Antioch Company breached its agreement with
4  Houlihan?
5       A.  As I sit here today, I don't
6  recall seeing any documents to that effect.
7       Q.  Tim, other than what we've talked
8  about over the last forty-five minutes or so
9  with regard to Mr. Moran and the three counts
10  where he's named as a defendant, can you think
11  of any other specific act by Mr. Moran that
12  damaged The Antioch Company?
13       A.  I think, again, based on a review
14  of the deposition exhibits, that's -- those are
15  the items. That's the information that we
16  have -- that I have presently.
17       Q.  I'd like now to move to my client
18  Chandra Attiken. The Trust has sued her for
19  alleged conduct relating to both the 2003 ESOP
20  transaction and the sale process that occurred
21  in 2007 and 2008. I'll represent that to you.
22       I'd like to start first with the
23  sale process in 2007 and 2008; and in that
24  regard, I'd like to have you turn your
25  attention to page forty-four of the amended

Page 61

1  complaint, count six. And when you get there,
2  let me know.
3       A.  I'm there.
4       Q.  Okay. Count six alleges that --
5  alleges that Miss Attiken directly breached her
6  fiduciary duty as an officer of The Antioch
7  Company in respect to the sale process. Do you
8  see those allegations?
9       A.  Yes.
10       Q.  Okay. Can you describe for me all
11  facts that you're aware of that support the
12  allegation that any conduct on Miss Attiken's
13  behalf constituted a breach of her fiduciary
14  duty to The Antioch Company in regard to the
15  sale process, please?
16       A.  Once again I think we're going to
17  need to look at the documents. She was an
18  officer of the company. She was --
19       Q.  Do you know what her title was in
20  that time frame?
21       A.  I understood that she was a vice
22  president or director of human resources --
23       Q.  Very well.
24       A.  -- and would have had the -- dealt
25  with the various employees leaving,

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 62

1    terminating, that sort of stuff.
2        Q.  Do you want to look at documents?
3        A.  I guess we can.  Yeah, that would
4    be fine.
5        Q.  Thank you.
6            MR. SCHEIER:  Go off the record,
7    please.
8            THE VIDEOGRAPHER:  We're off the
9    record.
10           (Pause in proceedings.)
11           THE VIDEOGRAPHER:  We're on the
12   record.
13   BY MR. SCHEIER:
14       Q.  Mr. Miller, are you able to
15   identify any documents that in your view
16   support the Trust's claim that Miss Attiken
17   breached her fiduciary duty as the director or
18   the vice president of human resources to the
19   company?
20       A.  Yes.  The documents that we have
21   are Exhibit 219, 288, and then 196 and 311.
22       Q.  Okay.  Any others that you've seen
23   in the binders, other than those four
24   documents, that support your claims against
25   Miss Attiken in count six?

Page 63

1        A.  These are the ones that we've been
2    able to identify --
3        Q.  Okay.
4        A.  -- today.
5        Q.  Do you -- does the trust -- has
6    the Trust gained knowledge of any facts through
7    discovery through -- strike that.
8            Has the Trust gained knowledge of
9    any facts through discovery, other than the
10   four documents you've identified, that support
11   your claims against Miss Attiken in count six?
12       A.  I think the four documents and,
13   you know, her position, role, et cetera at the
14   company, those are what we know now.
15       Q.  Well, discovery is closed --
16       A.  Okay.  Yes.
17       Q.  -- so I'm asking you now that
18   discovery is closed --
19       A.  That's --
20       Q.  -- is the four documents that you
21   just --
22       A.  These were the ones that were
23   identified, yes, but we've produced thousands
24   of pages of documents in discovery.  You have
25   everything we have.

Page 64

1        Q.  Well, I understand, but I'm not
2    making the claims.
3        A.  Okay.  Sure.
4        Q.  What I need to know, sir --
5        A.  No, I understand.
6        Q.  -- is whether you're relying --
7        A.  Sure.
8        Q.  -- on anything other than those
9    four documents to support your claims against
10   Miss Attiken as alleged in count six.
11       A.  At this juncture, this is what
12   we're aware of in addition to, just generally
13   speaking, her role in the company as to those
14   claims, et cetera.
15       Q.  Well, what specifically about her
16   role in the company are you relying upon?
17       A.  She's an officer of the company
18   and in that capacity, it looks like from the
19   documents, she was involved in hiring the ESOP
20   trustee that came in that was Reliance.
21   Reliance made a rather noisy withdrawal.
22   Again, as head of HR, she had a role there.
23   One of the overriding themes or issues here, in
24   the Trust's view, is the fact that various
25   people who could have spoken up did not speak

Page 65

1    up.
2        Q.  Other than that, what you've just
3    stated and the documents you've referenced, is
4    there any other facts that the Trust gained
5    knowledge of through the full discovery process
6    that support the claims in count six against
7    Miss Attiken?
8        A.  Again, as I sit here today, this
9    is what I'm aware of.  Yes, this is what I've
10   seen.
11       Q.  You've also sued Miss Attiken in
12   count seven for aiding and abetting the board's
13   breach of fiduciary duty with regard to the
14   sales process.  Are there documents other than
15   the four that you mentioned previously in
16   support of count six that support your aiding
17   and abetting claim?
18       A.  Again, I think that -- I think
19   that that is it.  Let's see.  There's another
20   that -- well -- that might bear on it.  290.
21   Let's add that to the list --
22       Q.  Okay.
23       A.  -- but it's not dated.
24       Q.  Can I see 290?  Thank you.  So
25   your testimony in regard to facts that the

Page 66

1  Trust learned through the essential discovery
2  process in support of count six are the same
3  facts that support the claims in count seven
4  for aiding and abetting the board's alleged
5  breach of fiduciary duty with regard to the
6  sale process; is that right?
7       A.  Yes.
8       Q.  Okay.  Moving on to the 2003
9  transaction, the allegation against Miss
10  Attiken, what specific facts are you aware of
11  that support an allegation in count one that's
12  on page forty of the amended complaint, Exhibit
13  42, that Miss Attiken breached her fiduciary
14  duties to the company as a corporate officer in
15  respect to the 2003 transaction?
16       A.  She appears to have been heavily
17  involved in the communication process in terms
18  of communicating the transaction to the
19  employees, and in that regard had -- appears to
20  have had a fair amount of access to
21  information, at least is my recollection.
22           She also received consideration in
23  connection with that transaction in excess of
24  four hundred thousand dollars, I believe, as
25  well as possibly subordinated note and

Page 67

1  warrants.
2           As head of HR and as a member of
3  the ESOP advisory committee, again, this goes
4  to the issue of people in positions to say,
5  hey, wait a minute, should we be doing this,
6  she appears to us and to the Trust who have
7  been in that position and should have -- with
8  somebody who should have had access to that
9  level of information and certainly with respect
10  to things like the repurchase obligations and
11  that sort of stuff, you know, I think the
12  Trust's view is that she was in a position to
13  know these things and to have raised issues
14  about them but she had a personal financial
15  interest in not doing so, it appears to us.
16       Q.  Can you identify any facts that
17  indicate Miss Attiken was involved in the
18  negotiation of the 2003 transaction?
19       A.  The negotiation of the 2003
20  transaction?  That would assume that there was
21  a negotiation.  She was head of HR.
22       Q.  Well, if you believe there wasn't
23  any, say so.
24       A.  I mean, she was head of HR at the
25  time.

Page 68

1       Q.  Uh-huh.
2       A.  And, as I said, I think -- I don't
3  recall seeing anything that showed her in the
4  negotiations but, I -- I would -- I'd have to
5  look back at the board meeting minutes to see
6  and who all was there, but I don't --
7       Q.  Well, I'm very sorry to do this,
8  Tim, but you've alleged many millions of
9  dollars of damage against these people,
10  including Miss Attiken, so if you need to take
11  another break so you can look through the board
12  minutes, then let's do that.  Shall we?
13           MS. ANDREW:  If that's a document you
14  need to see to refresh your recollection.
15  BY MR. SCHEIER:
16       Q.  Well, I'm not asking you to
17  refresh your recollection.  I want to know what
18  evidence the Trust has that Miss Attiken was
19  involved in the negotiation or the development
20  of the 2003 transaction and its terms; and with
21  that question in mind, if you need to look at
22  documents, then let's take a break and do so.
23       A.  As I sit here right now, I
24  don't -- I don't recall seeing her involvement
25  in the negotiation of the terms to the extent

Page 69

1  that -- and, again, I'm not convinced there was
2  necessarily a negotiation, per se.  There were
3  meetings held.  There were --
4       Q.  Well, then let's -- do you have --
5  I'd like to know if you can identify any
6  meeting that Miss Attiken was involved in
7  relating to the 2003 transaction where anyone
8  representing the ESOP and anyone representing
9  the company was involved.
10       A.  So you're talking about a
11  negotiation between the ESOP trustee and the
12  company.  I'm not following the question.
13       Q.  I'm trying to understand what Miss
14  Attiken did that was wrong that supports your
15  claim with regard to the 2003 transaction.
16       A.  Well, I think our view of it is
17  that she had knowledge of the transaction.  As
18  the HR person, she should have had some
19  knowledge of the ESOP and how it worked.  And
20  the fact that people who had cashed out of the
21  ESOP, and that she or somebody should have
22  raised their hand and said, hey, wait a minute,
23  if we see all of upper management taking large
24  dollars out of the company and we have an
25  ability to do the same thing, you know, isn't

Page 70

1  there a decent likelihood that we're going to
2  do that.
3        And it's not clear to me, as I
4  look at this transaction, there's many
5  references to a significant repurchase
6  liability but then -- and there's a lot of
7  dollars going out to a lot of people but nobody
8  seems to step up and say, hey, wait a minute,
9  don't you think that when all of our upper
10 management and Miss Attiken herself and others
11 take large dollars out, don't you think that
12 other people in the company if they can do that
13 are going to want to do that.  And I don't see
14 where she stood up and said, hey, wait a
15 minute, we shouldn't be doing this --
16       Q.  Okay.
17       A.  -- or maybe we should give some
18 further consideration to that.
19       Q.  Other than her failure to stand up
20 and say let's not do this or maybe let's give
21 it further consideration, can you identify any
22 fact that gives rise to evidence that supports
23 the claim that Miss Attiken breached her
24 fiduciary duty of the company?
25       A.  Again, with the -- I thought that

Page 71

1  she was involved in connection with the
2  communication package, the train-the-trainer
3  sort of stuff and the things that went to
4  ultimately the employees and the ESOP
5  participants with respect to their vote.
6        Q.  Okay.
7        A.  I would -- I need to see a
8  document or two on that one to confirm it; but
9  that's my recollection of my review of the
10 documents that as HR person, she was involved
11 in that.
12       Q.  So my understanding is the facts
13 that you have in support of a claim against
14 Miss Attiken in counts one and two for
15 breaching a duty in regard to the 2003
16 transaction and aiding and abetting breaches of
17 duty are as follows:  She was involved in the
18 communication of the terms of the transaction
19 to employee-owners; is that right?
20       A.  That's my recollection of the
21 documents as I sit here, yes --
22       Q.  Okay.
23       A.  -- but as I said, I'd want to see
24 it.
25       Q.  That she participated in the

Page 72

1  transaction because she held nonESOP shares?
2        A.  I don't know whether that was
3  through shares or whether those were options
4  that she was able to execute, but clearly the
5  documents indicate that she took -- she had
6  shares that she exchanged or were purchased.
7        Q.  And third is she had some duty, in
8  your mind, to stand up and say something about
9  the nature of the transaction and the effect it
10 might have on the company?
11       A.  Big picture, yes.  Broad brush,
12 yes, I think that covers it.
13       Q.  Okay.  Other than those three
14 points, is there anything else, any other facts
15 that you can testify to today on behalf of the
16 Trust that supports claims in counts one and
17 two against Miss Attiken?
18       A.  Not as I sit here today.
19       Q.  Thank you.  While we're on the
20 2003 transaction, do you know the date that
21 they closed?
22       A.  December 16th, 2003.
23       Q.  Does the Trust take the position
24 that the statute of limitations has not run on
25 that transaction?

Page 73

1        A.  We take the position that the
2  statute of limitations should be equitably
3  tolled.
4        Q.  Okay.  Is it the Trust's view that
5  the statute of limitations began running at any
6  time on the 2003 transaction?
7        A.  No.  I mean, I think from --
8  inasmuch as the bankruptcy tolled, did the
9  statute of limitations, I think the Trustee's
10 position is -- the Trust's position is all of
11 the folks that were in a position to do
12 something about this did not do something about
13 it.
14       Q.  So the Trust takes the position
15 that the statute has not yet begun to run?
16       A.  Well, I guess, you know, once the
17 bankruptcy is filed and, you know, information
18 is out there; but I think our view of it is the
19 bankruptcy tolled the running of the
20 limitations.
21       Q.  Okay.  What facts do you have that
22 support the position by the Trust that the
23 statute of limitations on the 2003 transaction
24 is equitably tolled?
25       A.  Well, I think we have to look at

Page 74

1    the transaction in total; but you're looking at
2    various people, board members, others who had
3    access to information about the transaction,
4    knew what had occurred in the transaction, knew
5    that the transaction -- or should have known
6    that the transaction in the Trust's view
7    violated Ohio corporate law and violated Ohio
8    fraudulent conveyance law.
9           That upon following the
10   transaction -- fairly early on following the
11   transaction the company began experiencing
12   significant financial issues; and that at any
13   point in time after the transaction, those
14   various individuals who had been involved and
15   who had profited from the transaction could
16   well have attempted to unwind it and had a
17   legal basis for doing so in the Trust's view
18   and failed to do so, and failed to do so really
19   ever. I mean, no one, you know, who was in a
20   position, and that includes counsel and that
21   includes, you know, board members, you know,
22   did anything about that, and that includes
23   officers of the company.
24          Q. Any -- do you have any other facts
25   that support the Trust's equitable tolling

Page 75

1    position in this case?
2           A. Again, there are --
3           Q. I'm not asking you to repeat what
4    you already said. In addition to what you
5    said, are there additional facts that you can
6    testify to that support the Trust's position
7    that the statute of limitations on the 2003
8    transaction was equitably tolled?
9           A. Well, as you follow on the 2003
10   transaction, there are various things and
11   various facts that occur; and any and all of
12   those facts could have given a board member or
13   somebody a view that, hey, maybe we shouldn't
14   have done this transaction and maybe we should
15   look at unwinding it.
16          And those things are like, for
17   example, and not by way of everything possible,
18   but those things are like the significant
19   uptick in the repurchase obligation in '04, the
20   fact that the company was in default of its
21   loan documents within thirteen days after it
22   closed that transaction in December, the fact
23   that the company was in default of its
24   financial covenants in 2004 as a result of the
25   repurchase and the ESOP issues.

Page 76

1           Q. By the way, are you aware the
2    banks waived that covenant default in 2004?
3           A. Oh, I'm aware that they did, yes.
4    Absolutely.
5           Q. Okay. Go ahead.
6           A. They also modified the loan
7    agreement and I believe increased the interest
8    rate on the company.
9           Q. I think you're wrong. You'll
10   notice the interest rate got better for the
11   company, as did the various ratios because the
12   company, if you study the documents,
13   Mr. Miller, will show performed way ahead of
14   schedule in terms of paying down the bank loan;
15   but go ahead with your answer, please.
16          A. Okay. Well, I would stand to be
17   corrected. If I missed it, I --
18          Q. Okay. Very well. Anything else
19   that supports the equitable tolling argument
20   other than some issue that the board members
21   didn't sue the company or seek to unwind the
22   transaction after 2003?
23          A. Well, again, not just board
24   members but as Miss Attiken, officers were
25   involved, officers saw the deterioration of the

Page 77

1    company beyond, and certainly somebody in her
2    position saw the significant outflow of
3    personnel since that transaction and that it
4    continued to occur.
5           You know, my recollection of the
6    document is eight hundred employees left
7    in '04, '05, and '06 following the transaction.
8    A hundred and ten million dollars of liability
9    in the first year and another forty in each of
10   the subsequent years, I think.
11          Q. But I'm trying to understand,
12   though, am I understanding from you that the
13   facts that equitably toll the statute is that
14   there were interested officers and directors
15   who didn't bring suit even though they could
16   have?
17          A. They all, as well as counsel; and,
18   yes, all of those folks knew or should have
19   known that there was an issue there.
20          Q. Okay. Other than the fact that
21   the officers and directors that you named as
22   defendants in this case didn't themselves bring
23   suit against the company as you did, do you
24   know of any other facts that support the
25   Trust's equitable tolling argument?

20 (Pages 74 to 77)

Page 78

1        A.  I think, as I sit here today,
2   those are, you know, big picture, those are the
3   primary things.  And as I said, that breaks
4   down into, you know, there are specific
5   documents here or there that I think indicate
6   that people knew there was an issue.
7        Q.  I'm with you there.
8        A.  Okay.
9        Q.  I understand exactly what you're
10  saying.  I just want to --
11       A.  I don't want to have that -- I
12  don't want to suggest that --
13       Q.  I understand your position is
14  people knew things.
15       A.  Yes.
16       Q.  I just want to understand that the
17  basis for your equitable tolling argument, you
18  being the Trust, is that interested officers
19  and directors did not bring a lawsuit against
20  themselves or the company as you did later on
21  and that is why you're alleging the statute of
22  limitations had been equitably tolled?
23       A.  Again, that's my -- and that is
24  consistent, I guess, with my understanding of
25  equitable tolling; but, yes, that something

Page 79

1   should have been done and was not done and that
2   in equity those claims should be able to be
3   brought.
4        Q.  Thank you.
5            (Thereupon, Exhibit 789, The Antioch
6   Company Litigation Trust's response to first set
7   of interrogatories of defendants Lee Morgan, Asha
8   Moran, Chandra Attiken, Marty Moran, and certain
9   named trust defendants directed to plaintiff The
10  Antioch Company Litigation Trust, was marked for
11  purposes of identification.)
12  BY MR. SCHEIER:
13       Q.  Mr. Miller, I'm handing you what
14  I've -- oh, you can put Exhibit 42 aside for
15  now.  Thank you.
16           I'm handing you what's been marked
17  as Exhibit 789.  You'll see it's the Trust's
18  responses to my client's first set of
19  interrogatories.  And my question is going to
20  focus on the damages-related interrogatories
21  that begin on page three and continue on
22  through page six.
23       A.  Okay.
24       Q.  And I want to first focus on
25  question two and the response, so when you're

Page 80

1   there, let me know.
2        A.  I'm here.
3        Q.  Okay.  You'll see interrogatory
4   two generally asks for a detail about the
5   damages that the Trust is asking for in this
6   case.
7        A.  Uh-huh.
8        Q.  And the first response the Trust
9   writes, the Trust previously disclosed that its
10  damages include, but are not limited to, the
11  difference between the consideration paid to
12  the selling shareholders in the -- in 2003 for
13  their shares of Antioch stock and the actual
14  fair market value of those shares.  Did I read
15  that correctly?
16       A.  Correct.
17       Q.  Does that remain the Trust's
18  position, that that's an accurate measure of
19  damages?
20       A.  It is one measure of damages, yes.
21       Q.  Okay.  Do you recall what the
22  share -- what the price per share was paid to
23  the nonESOP shares in the 2003 transaction?
24       A.  I believe it was eight hundred and
25  fifty dollars per share.

Page 81

1        Q.  That is correct.  What does the
2   Trust assert now was the fair market value of
3   the nonESOP shares that should have been paid?
4        A.  In connection with the damages and
5   the damages calculations, I think the Trust's
6   view is that is something that is properly the
7   province of expert testimony, and that is
8   something that we would -- the Trust would
9   anticipate having an expert testify with
10  respect to.
11           So at this juncture, where we are
12  in the case, having not yet engaged or gone
13  forward with expert testimony -- or, you know,
14  identifying testifying experts and that sort of
15  stuff, I think our answer is with respect to
16  the damages very much remain what we've placed
17  in this interrogatory, that these are the
18  various categories of damages and that, you
19  know, through the use of a testifying expert,
20  we would expect to put specific dollar amounts
21  on that.
22       Q.  And all I'm asking you for is as a
23  matter of fact --
24       A.  Uh-huh.
25       Q.  -- what is the Trust's position

21 (Pages 78 to 81)

Page 82

1    this late in the litigation, if discovery is
2    closed, as to what the fair market value of the
3    outside shares of The Antioch Company were in
4    December of 2003?
5         A.   And, again, I think that that is
6    something that is appropriate for expert
7    testimony.  I am not an expert -- a valuation
8    expert.
9         Q.   Well, I'm not asking your opinion
10   of what is appropriate and what is not
11   appropriate.  I'm asking you, as you sit here
12   today, can you tell me as a matter of fact what
13   the Trust's view is as to what the fair market
14   value of the outside shares of The Antioch
15   Company was in December of 2003?
16        MS. ANDREW:  Objection.
17        THE WITNESS:  Again, without expert
18   testimony, there are various points of value that
19   one could look to, and there are -- from -- in
20   terms of the facts in the case.  There's the
21   valuation at the end of 2002, which was six
22   eighty, I believe.
23   BY MR. SCHEIER:
24        Q.   Uh-huh.
25        A.   There's also the issue of

Page 83

1    application of a lack of marketability discount
2    in terms of those shares on the eight fifty
3    itself.
4            There's an issue of a control
5    premium with respect to the Morgans in terms of
6    the shares that they got.  Should they have
7    gotten -- whatever the price was, should they
8    have gotten the full price that everybody else
9    did since they were able to maintain control.
10          So it's a fairly complicated area.
11   It's something that I think expert testimony
12   would be most appropriate for.  And from the
13   Trust's standpoint, we see various points of
14   value -- or value applied to that stock.
15        Q.   Well, as you sit here today, has
16   the Trust not made a determination yet as to
17   the fair market value of what the shares
18   were -- regardless of whether it was the
19   Morgans or other selling shareholders, was as
20   of December of 2003?
21        A.   No.  That is something that we
22   would look to have an expert testify to; and
23   no, we have not.  No.
24        Q.   Okay.  The second category of
25   damages is interest, fees, and other charges on

Page 84

1    debt incurred by Antioch in order to finance
2    the 2003 stock purchases and subsequent
3    repurchase obligations in connection with the
4    departing employees.  Do you see that?
5         A.   Uh-huh.
6         Q.   Okay.  How much in interest, fees,
7    and other charges are you seeking with regard
8    to damages in this case?
9         A.   Again, that's another thing that
10   we would expect an expert to go through the
11   financials and calculate that.
12        Q.   So the Trust to date has not made
13   that calculation?
14        A.   We have not made that calculation
15   to date.
16        Q.   Okay.  With regard to number
17   three, fees and expenses paid to restructuring
18   professionals as a result of the deepening
19   insolvency of Antioch.  Did the Trust calculate
20   what those fees and expenses are as of today?
21        A.   Again, that's something I think
22   we'd have an expert do.
23        Q.   Well, is the answer no,
24   Mr. Miller, that the Trust has not done that
25   yet?

Page 85

1         A.   The answer is no.
2         Q.   Okay.  Category number five of
3    damages is the loss in enterprise value that
4    resulted from the tender offer and the sale
5    process.  Do you see that?
6         A.   Yes.
7         Q.   Has -- well, first of all, can you
8    tell the jury your understanding what
9    enterprise value is in that response?
10        A.   Well, I think it would be the
11   value assigned by a third party to the
12   enterprise; and, again, this is usually done
13   through a multiple, it looks like, of EBITDA
14   and would approximate, I suppose, the approach
15   that the valuation people took in valuing --
16   in valuing the company for the 2003 ESOP
17   transaction.  But that approach was also taken
18   or at least initially indicated by certain of
19   the parties in the 2007 sale transaction in
20   terms of how they would approach a valuation of
21   it.
22           So, again, this is something --
23   and particularly this would be something that
24   would be the basis, in our view -- in the
25   Trust's view of expert testimony.  I'm not a

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                    W. Timothy Miller

Page 86

1    valuation expert.
2         Q.   To this date has the Trust
3    determined what the loss in enterprise value is
4    from the company allegedly resulting from the
5    tender offer and the sale process?
6         A.   No.
7         Q.   Okay.  Other than the five
8    categories of damages that are listed in the
9    first paragraph of the Trust's response,
10   interrogatory number two, are there any other
11   additional categories of damages that the trust
12   has identified since it served these
13   interrogatory responses through today?
14        A.   I think this is it.  I think this
15   pretty much covers it.
16        Q.   Okay.
17             MR. SCHEIER:  Take a short break.
18             MS. ANDREW:  Okay.
19             THE VIDEOGRAPHER:  We're off the
20   record.
21             (Pause in proceedings.)
22             THE VIDEOGRAPHER:  We're on the
23   record.
24   BY MR. SCHEIER:
25        Q.   Mr. Miller, could you put before

Page 87

1    you again Exhibit 42, which is the amended
2    complaint?
3         A.   Yeah.  And before we go too far,
4    it occurred to me on a break, in response to
5    your earlier question about the factual basis
6    in support of the equitable tolling, we talked
7    about, you know, the individuals who knew,
8    didn't speak up.
9              It also occurs to me that, you
10   know, one of the other issues the Trust has
11   made and I think is -- is that the disclosure
12   that was given was not accurate and/or
13   adequate -- you know, that there were issues
14   with the tender offer document, shall I say, in
15   terms of the adequacy of the disclosure and
16   that there were inaccuracies in that document
17   in the Trust's view to the extent that that
18   bears on the issue with respect to -- so I
19   don't want to foreclose.  I wanted to make
20   certain that that got into the mix.
21        Q.   Two follow-up questions.  Did you
22   discuss that issue with your counsel during the
23   break just now and they reminded you of that
24   point?
25        A.   Yes, they did.

Page 88

1         Q.   Okay.  And who did you discuss
2    that with?  Miss Andrew?
3         A.   Miss Andrew.
4         Q.   Okay.  Secondly, can you identify
5    any specific disclosure that was inaccurate in
6    the tender offer materials?
7         A.   Well, we could go through the
8    tender offer materials if we'd like to do that
9    but --
10        Q.   Well, I'd like to know first of
11   all, as a matter of fact, as you sit here
12   today, can you identify for me any disclosure
13   in the tender offer materials that was
14   inaccurate?
15        A.   Yes.
16        Q.   Okay.
17        A.   I mean, in terms of the conflict
18   of interest and in terms of the assertion --
19   basically the impression given and also in that
20   conflict of interest statement that Houlihan
21   had essentially blessed the transaction or had
22   determined that the transaction was fair to the
23   company.
24             There is a -- in that provision
25   there is a section that deals with the

Page 89

1    conflicts of interest and cites the Ohio law
2    with respect to conflicted director
3    transactions and gives three tests.  And in the
4    view of the Trust, none of those tests were
5    met.
6              The other failures to disclose
7    with respect to that document is that there's
8    no mention in there that the transaction is
9    avoidable as a fraudulent conveyance under Ohio
10   law.  What are the consequences of that so that
11   people obtaining this information would
12   potentially know that they might have to pay
13   the money back.  Those are two off the top of
14   my head.
15        Q.   I need more than off the top of
16   your head.  I need to know, in fact, what
17   was -- what was -- what was not disclosed in
18   that document or what was improperly -- or
19   disclosed inaccurately in the document?
20             MS. ANDREW:  Well, it's not a test of
21   his memory so let him look at the document.
22             MR. SCHEIER:  Let's go off the
23   record.
24             THE VIDEOGRAPHER:  We're off the
25   record.

23 (Pages 86 to 89)

Page 90

1          (Pause in proceedings.)
2          THE VIDEOGRAPHER: We're on the
3    record.
4    BY MR. SCHEIER:
5          Q.  Mr. Miller, we were giving you the
6    opportunity to look through the tender offer
7    document.  For the record it's been previously
8    marked in this case as Exhibit 560.
9          A.  Okay.
10         Q.  You initially mentioned that there
11   was either a nondisclosure or an inaccurate
12   disclosure in the conflicts of interest
13   section; is that right?
14         A.  That, and there are other issues
15   as well.
16         Q.  Okay.  Let's go -- we're going to
17   need to cover those issues so I understand what
18   issues you have with the plan.  With regard to
19   the conflicts of interest section --
20         A.  I prefer to start at the beginning
21   of the document and work our way through.
22         Q.  That might be your preference but
23   I want to first start with the conflicts of
24   interest section which is on page eighty-three
25   of the document.  I believe that the Bates

Page 91

1    control number is MOR001295.
2          A.  Okay.  I'm working off of Exhibit
3    31, so we're clear, but we'll make it work.
4          Q.  Do you have a -- okay.  It's page
5    eighty-three internally of the document?
6          A.  Yes.
7          MR. SCHEIER: I think probably
8    counsel should get him Exhibit 560.
9          MS. ANDREW: Well, we could do that
10   but the one that --
11         MR. SCHEIER: Well, I want to go off
12   the record.  I'd like to go off the record,
13   please.
14         THE VIDEOGRAPHER: We're off the
15   record.
16         (Pause in proceedings.)
17         THE VIDEOGRAPHER: We're on the
18   record.
19   BY MR. SCHEIER:
20         Q.  Okay.  Your counsel has agreed
21   that although you're working off of Exhibit 31,
22   I'm working off of Exhibit 560, there will be
23   no objection on that basis because we're going
24   to be now using the internal document numbers
25   that should be the same in both exhibits.

Page 92

1          MR. SCHEIER: Is that right, Marcia?
2          MS. ANDREW: That's correct.
3          MR. SCHEIER: Great.
4    BY MR. SCHEIER:
5          Q.  So if you turn your attention to
6    internal page eighty-three.
7          A.  Uh-huh.
8          Q.  And if you can show me there
9    anything that's inaccurately disclosed or that
10   was not disclosed.
11         A.  My recollection of this is that
12   the list appeared, at least as it pertains to
13   the Morgans, may well not contain the full
14   number of shares that they transferred and the
15   total consideration received because that seems
16   a little -- the number seems light to me.
17         There is a tally sheet that was
18   done right after the transaction or right
19   before the closing that lists out what
20   everybody got and how many shares they
21   exchanged and you, know, those two things
22   either match up with this or they don't.
23         Q.  Okay.
24         A.  But be that as it may, I think --
25         Q.  Well, I need to know factually.

Page 93

1    Do you -- can you point to any document that
2    indicates that the disclosure of the amount of
3    shares listed as beneficially owned by Lee
4    Morgan in this document or beneficially owned
5    or controlled by Asha Moran in this document is
6    incorrect because it was carried over into your
7    interrogatory response into -- in terms of the
8    basis for the damages you are going to be
9    seeking?
10         A.  Well, I would look to the tally
11   sheet in terms of the basis of the damages in
12   terms of how many dollars came out --
13         Q.  Okay.  So as you sit here today --
14         A.  -- and where they went.
15         Q.  As you sit here today, you don't
16   know whether or not the disclosure with regard
17   to Mr. Morgan or Miss Moran were inaccurate
18   here with regard to the amount of shares they
19   beneficially held as of the date that this
20   document, Exhibit 560 and Exhibit 31, were
21   published?
22         MS. ANDREW: Objection.
23   Mischaracterizes his testimony.
24   BY MR. SCHEIER:
25         Q.  Well, do you have --

24  (Pages 90 to 93)

Page 94

1     A.  I'm telling you that I'd like to
2  compare those two things.
3     Q.  Okay.  Well then, we have --
4     A.  Let's do it.
5     Q.  -- go off the record and do it.
6     A.  Very good.
7        THE VIDEOGRAPHER:  We're off the
8  record.
9        (Pause in proceedings.)
10        THE VIDEOGRAPHER:  We're on the
11  record.
12  BY MR. SCHEIER:
13     Q.  Okay.  Mr. Miller, you pulled out
14  a document I think that's been marked
15  previously as Exhibit 294, which I don't have
16  the benefit of looking at but I'll ask --
17  that's okay, you can look at it.  What about
18  that document indicates to you that the
19  pretransaction disclosure on page eighty-three
20  with regard to conflicts of interest was in any
21  way inaccurate?
22     A.  Well, it appears to me from this
23  document as if there are considerably more
24  shares listed in the name of Asha Morgan Moran,
25  particularly those held in what appear to be

Page 95

1  five different trusts.  That the total here on
2  Miss -- on Exhibit -- what I'm looking at is
3  page eighty-three of the tender offer document,
4  lists ninety-four thousand seven hundred and
5  twenty-one shares and in Exhibit 294 there's a
6  list -- there are six numbers listed with
7  respect to Miss Moran and her trust and those
8  amounts are as follows:  Two million five --
9  I'm sorry, two thousand five hundred and
10  eighty-six shares, eighty thousand six hundred
11  and eleven shares, twenty-three thousand eight
12  hundred and twenty-one shares, twenty-three
13  thousand eight hundred and twenty-two shares,
14  eleven thousand six hundred and eighty-one
15  shares, and twelve thousand one hundred and
16  sixty-eight shares.  And so that -- I have not
17  done that total, done the math, but it appears
18  to me that it clearly exceeds the ninety-four
19  thousand seven hundred and twenty-one shares
20  listed on page eighty-three.
21     Q.  And in your view, would that be
22  material for someone to know that Miss Moran
23  was going to be able to take out at a minimum
24  eighty million dollars, but possibly more, in
25  terms of the shares she held both personally

Page 96

1  and as trustee of certain trusts?
2     A.  Yes.  I mean, if we're talking
3  about making full disclosure --
4     Q.  Uh-huh.
5     A.  -- in the Trust's view, that is
6  not full disclosure what is in the trust --
7  what is in the document.
8     Q.  If you look at page sixty-six of
9  your exhibit, and let me know if all or some of
10  the shares you just mentioned are disclosed on
11  that page in regard to additional shares that
12  were held by trusts where Miss Moran serves as
13  the trustee.
14     A.  Let's see.
15     Q.  You'll see it's a total of about
16  sixty thousand additional shares being
17  disclosed there in addition to the ninety-four
18  thousand shares she held primarily as a
19  trustee.
20     A.  I'm sorry, are we looking at the
21  top of this page here with her name --
22     Q.  Yes, sir, you'll see the top of
23  page sixty-six --
24     A.  -- is that where we're talking
25     Q.  -- lists all of the shares -- all

Page 97

1  of the outside -- strike that.
2        The top of page sixty-six lists
3  all of the shares in The Antioch Company held
4  outside of the ESOP as of the date that this
5  was published as well as the shares held within
6  the ESOP.  It purports to disclose all shares
7  held in The Antioch Company.  Do you see that?
8     A.  Yes, I do.
9     Q.  Okay.  You were just stating that
10  the disclosure on page eighty-three omitted to
11  disclose some number of shares that Miss Moran
12  held as trustee, and I'm asking you if the
13  disclosure -- the lack of disclosure that you
14  were referencing is actually made on page
15  sixty-six of the Exhibit 31 that you have and
16  Exhibit 560 that I had?
17     A.  I would tell you I've not done the
18  math, but the numbers on page sixty-six still
19  look light to me in comparison to here, so why
20  don't you let me just do the math real quick.
21     Q.  Sure.
22     A.  We can go off the record and save
23  you time.
24     Q.  Sure.
25        THE VIDEOGRAPHER:  We're off the

Page 98

1    record.
2              (Pause in proceedings.)
3         THE VIDEOGRAPHER: We're on the
4    record.
5    BY MR. SCHEIER:
6         Q.  Okay, Mr. Miller, were you able to
7    do the calculation?
8         A.  I was.  They do appear to be very
9    close.
10        Q.  Sufficient enough for it to be
11   full disclosure in your mind?
12        A.  No, because --
13        Q.  Then what's the difference between
14   what's disclosed and the amounts shown on
15   Exhibit 294, assuming that exhibit is accurate?
16        A.  Because these numbers don't show
17   up under the conflict of interest section.
18        Q.  Oh, I'm sorry.  I'm sorry.  Let's
19   take a step back.  I'm talking about now on
20   page sixty-six --
21        A.  On sixty-six?
22        Q.  Yes -- to ask you whether --
23        A.  It appears that this matches up,
24   the following two -- it's a discussion of the
25   share ownership and the stock split and that's

Page 99

1    a listing of everything that appears to be in
2    there, and that listing appears to match up --
3    let me be more precise.
4         Q.  Well, let me ask a different
5    question.
6         A.  Okay.
7         Q.  Do the number of shares that are
8    shown as being beneficially held by Asha Morgan
9    Moran either individually or as a trustee
10   match -- on page sixty-six of the disclosure
11   document match with the number of shares that
12   Miss Moran beneficially owned either
13   individually or as trustee that were exchanged
14   in the tender offer that appear on Exhibit 294?
15        A.  The amounts are very close, yes.
16        Q.  Okay.  Are they materially
17   different?
18        A.  No.
19        Q.  Okay.  Thank you.  Other than the
20   number of shares that -- other than the issue
21   with regard to the number of shares that are
22   identified on page eighty-three of Exhibit 31
23   and Exhibit 560, is there any other disclosure
24   under the conflicts of interest section on page
25   eighty-three that you take issue with?

Page 100

1         A.  Yes.  And as I mentioned earlier,
2    the following -- on that page following the
3    disclosure of the shares there's a discussion
4    of the Ohio general corporation law, and the
5    last item of which is that the contract,
6    action, or transaction is fair to the
7    corporation at the time that it's authorized or
8    approved by the directors, and it then proceeds
9    to discuss the Houlihan opinion with respect to
10   the fairness of the consideration offered in
11   the transaction, the board has approved the
12   transaction, determined that it's fair in
13   reliance on the Houlihan opinion, but that was
14   clearly not the purpose for which the Houlihan
15   opinion was obtained --
16        Q.  Let me --
17        A.  -- by the terms of that opinion.
18        Q.  Was the opinion, to the best of
19   your understanding, attached as Appendix D to
20   the disclosure document that is Exhibit 560 and
21   31?
22        A.  Yes, I believe that it was.
23        Q.  Okay.  Thank you.  Anything else
24   under the conflicts of interest section that
25   is, to your mind, an inaccurate disclosure?

Page 101

1         A.  I think that that's -- those items
2    are the ones that the Trust has identified.
3         Q.  Okay.  Are there any other
4    inaccurate disclosures that the Trust believes
5    exists in Exhibit 31 and 560?
6         A.  Yes.
7         Q.  Okay.  Can you point those out,
8    please?
9         A.  Sorry.  I'm moving as fast as I
10   can.
11             There's a discussion on page five
12   of that document in terms of what are the goals
13   of the transaction, and that discussion occurs
14   in other places as well.
15        Q.  Is the --
16        A.  Page twenty, for example, is
17   another place.
18        Q.  Well, let's go back.
19        A.  Sure.
20        Q.  I understand you want to go
21   through it quickly, but I need to get into a
22   little bit more detail with you.
23        A.  Okay.
24        Q.  Are you referring -- with regard
25   to what are the goals of the transaction, that

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

| Page 102 | Page 104 |
|---|---|

**Page 102**

1    question and then the answer on page five?
2         A.  Yes, the very first bullet point
3    that says the transaction is designed to
4    address an issue related to the ESOP's benefit
5    allocation structure.
6         Q.  Okay.  You believe that to be
7    inaccurate?
8         A.  Yes, in terms of what actually
9    occurred as a result of the transaction.
10        Q.  Well -- but I'm asking as -- did
11   you believe that was an inaccurate disclosure
12   of what the board considered to be a goal of
13   the transaction, that being to address an issue
14   related to the ESOP's benefit allocation
15   structure?
16        A.  Yes, because this doesn't address
17   that goal.  So the representation is that this
18   is a goal of the transaction that the
19   transaction is going to address, it says, and,
20   in fact, it doesn't.  The benefit allocation
21   issue continues post the transaction.  In fact,
22   the company in the equity holder agreement
23   agrees that those future dividends will be
24   portioned by account, which was the issue with
25   the S corporation distributions that the board

**Page 103**

1    originally thought they might address by this
2    transaction.
3         Q.  Anything else about the answer to
4    what are the goals of the transaction that you
5    believe to be inaccurate?
6         A.  Again, from the Trust perspective,
7    the statement in the second bullet point that
8    the company has structured this transaction in
9    a manner to offer this liquidity to
10   shareholders without impairing the long-term
11   survivability of the company, we think that
12   that is inaccurate inasmuch as the transaction
13   rendered the company balance sheet insolvent in
14   a big way.
15        Q.  Do you believe that any of the
16   directors intended to impair the long-term
17   survivability of the company at the time they
18   published this document?
19        A.  Did they intend to -- I believe
20   that that was some -- that they did not dig in
21   hard enough on those issues, I think, is our --
22   is the Trust's position.  That they did not --
23   they breached their fiduciary duties by not
24   digging into the question in prior board
25   meetings and otherwise of what is really the

**Page 104**

1    impact of this on the company long term.
2         And frankly, even to some extent
3    ignoring the short-term impacts on the company
4    in terms of what they showed as the negative
5    cash flow as well as, you know, just -- it's
6    interesting to me that the language used here
7    and throughout is the long-term survivability
8    of the company because the transaction in and
9    of itself is predicated on benefits -- tax
10   benefits accruing over a period of time and all
11   of the projections seem to show that the
12   positives of that really don't kick in until
13   2007 or later.
14        Q.  In preparing for this deposition,
15   did you have a look at Deloitte & Touche's
16   feasibility report that was prepared and
17   presented to the board in July of 2003?
18        A.  I'm sure, yes.
19        Q.  You did?  Do you believe that
20   Deloitte & Touche was at the time competent to
21   prepare such a feasibility analysis based on
22   your understanding of that entity?
23        A.  I presume that they were, yes.
24        Q.  Do you believe that the board of
25   directors were entitled to rely upon the advice

**Page 105**

1    and opinions of their financial advisor
2    Deloitte & Touche that, in fact, the
3    transaction as structured by Deloitte & Touche
4    was not going to impair the long-term
5    survivability of the company?
6         A.  No.  Deloitte & Touche was brought
7    into this by the Morgan family, from what the
8    documents indicate to us.  That Deloitte &
9    Touche was doing estate planning for the
10   Morgans.
11        There are a fair number of
12   documents throughout whereas in the earlier
13   portions of this transaction, that -- where
14   it's clear that Deloitte is looking out for the
15   Morgans in this in terms of what is the impact
16   of this transaction on the Morgans.  Deloitte
17   did not undertake to issue any sort of opinions
18   in connection with this.
19        And if we're talking about the
20   same July presentation that I think we are, I
21   believe that that initial presentation by
22   Deloitte involved a six hundred and eighty
23   dollar per share share price and involved
24   seller notes and no outside bank indebtedness.
25   So it was an entirely different transaction

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

| | |
|---|---|
| **Page 106** | **Page 108** |

Page 106

1  than what ultimately occurred.
2      Q.  And did you review Deloitte's
3  subsequent remodeling of the transaction as the
4  negotiations were proceeding and its
5  determination that the transaction would not
6  negatively impact the company's long-term
7  survivability?
8          MS. ANDREW:  Objection to the form.
9          THE WITNESS:  I don't recall seeing
10 any opinion from Deloitte to that effect.
11 BY MR. SCHEIER:
12     Q.  Do you recall studying their
13 spreadsheets to look at the numbers to
14 determine what --
15     A.  I did look at them --
16     Q.  -- to determine whether --
17     A.  I'm sorry.
18     Q.  -- the numbers that Deloitte was
19 presenting to the board indicated the long term
20 survivability of the company?
21     A.  The numbers indicated that there
22 were significant, you know, negative cash
23 position in the first four years, in my
24 recollection, and stepping up.  And, again, the
25 numbers were predicated upon sales projections

Page 107

1  for the company.  And I believe the Deloitte
2  people were real clear that they just took the
3  numbers from the company and plugged them into
4  their model.
5          And so, you know, yes, there were
6  spreadsheets out there that Deloitte prepared;
7  but, again, I think it's up to the board and
8  the board members to question those numbers
9  knowing Deloitte's dual role in the
10 transaction, involved on behalf of the Morgans
11 as well as apparently running numbers for the
12 company.  And its incumbent upon the board
13 members in that instance to really drill down.
14         And I think, you know, in looking
15 through some of those things, the other issue
16 in the unknown here -- a couple things -- is
17 the repurchase obligation and the extent to
18 which Deloitte, or frankly anyone, dug very
19 hard into those numbers.
20         And also the company's financial
21 situation.  There are references in board
22 minute -- board meeting minutes in early '03
23 and onward with respect to declining sales, and
24 there are references in Mr. Morgan's monthly
25 reports in 2003 to declining productivity,

Page 108

1  which is more significant.
2          And, in fact, we see in '05, '06
3  time frame when Richard Wiser comes in to start
4  modeling things, that, wow, you know, that
5  declining productivity is indicative of the
6  company experiencing and the start of a long
7  downturn downturn.
8          So it's not clear to me from the
9  documents that Deloitte had all of that
10 information.  It's not clear from the board
11 minute -- meeting minutes necessarily, although
12 I presume -- well, I shouldn't presume.  That
13 information was clearly out there and
14 circulating.  I don't necessarily see it
15 reflected in all the projections --
16     Q.  So you don't know --
17     A.  -- but --
18     Q.  Go ahead.  I'm sorry.
19     A.  Again, I'm not a financial expert
20 but just based on my review of that, I don't
21 see that.
22         MR. SCHEIER:  We just need to take a
23 short break for the videographer to change the
24 tape.
25         THE VIDEOGRAPHER:  We're off the

Page 109

1  record.
2          (Pause in proceedings.)
3          THE VIDEOGRAPHER:  We're on the
4  record.
5  BY MR. SCHEIER:
6      Q.  A couple of follow-up questions.
7      A.  Okay.
8      Q.  Do you know of any facts
9  indicating that Deloitte didn't properly
10 execute its duties to the board of directors as
11 the board of directors' financial advisor
12 because they had done some estate planning work
13 for the Morgans?
14     A.  My understanding is that Deloitte
15 was engaged to do some initial feasibility
16 studies with respect to an ESOP.
17     Q.  Uh-huh.
18     A.  They do not appear in any of the
19 disclosures here as the financial advisor to
20 the board or as the ones who were doing the --
21 a fairness analysis for the company, was this
22 fair to the company, and there was certainly no
23 opinion ever issued by Deloitte.
24     Q.  Sir, I understand you kind of want
25 to make statements on the record and I respect

Page 110

1  that, but my question was relatively simple.
2  Do you know of any facts indicating that
3  Deloitte didn't loyally execute its duties to
4  the board of directors as a result of work it
5  had done previously for the Morgans in regard
6  to estate planning?
7       A.  No.
8       Q.  Okay.  With regard to sales in
9  2003, did you review any documents indicating
10 that, in fact, sales in 2003 increased over the
11 level of sales that the company had recognized
12 and achieved in 2002 but simply had not met
13 plan?
14      A.  That is correct.
15      Q.  Okay.  I thought you mentioned
16 something about sales declining between 2002
17 and 2003, but that's not what you were saying,
18 correct?
19      A.  Productivity declined.
20      Q.  We can get to productivity in a
21 moment.
22      A.  If I misstated that --
23      Q.  I think you did.
24      A.  Okay.  I apologize.
25      Q.  So you're not testifying that the

Page 111

1  board of directors was in a situation where
2  sales had declined between 2002 and 2003,
3  correct?
4       A.  They were not meeting plan.
5       Q.  But sales increased in 2003 over
6  the sales levels in 2002, correct?
7       A.  Correct.
8       Q.  Okay.  In terms of productivity,
9  do you have -- or do you know of any facts
10 indicating that the board of directors did not
11 take into account declining productivity among
12 its sales force or the consultants, rather, out
13 in the field?
14      A.  I don't see any reference to the
15 declining productivity in the board meeting
16 minutes or in presentations --
17      Q.  Okay.  Did you look in --
18      A.  -- but -- I'm sorry.
19      Q.  Go ahead.
20      A.  -- but that's not to say that that
21 wasn't -- those facts were not in the mix.
22      Q.  Okay.  Very good.  Thank you.
23 Earlier you had gone through some depositions
24 that you reviewed.  You didn't mention
25 Mr. Wiser's deposition.  Did this -- talking

Page 112

1  about this issue refresh your recollection that
2  you reviewed Mr. Wiser's deposition?
3       A.  I probably reviewed portions of
4  it, you know, with respect to certain exhibits,
5  I think.
6       Q.  Did you review the portion of
7  Mr. Wiser's testimony that productivity is only
8  one of many --
9       A.  Oh, yes.
10      Q.  -- indicators that would show
11 future financial performance?
12      A.  Yes, I did, although I thought
13 there was also something in his deposition, and
14 I may have it confused with another, that it is
15 somewhat of a leading indicator that when it --
16 when productivity is going down and
17 consistently going down, that that may well --
18 again, so we're clear, the folks out in the
19 field, the revenue generation for this company
20 is the consultants; and if they're ordering
21 less on average on a consistent basis over
22 time, sales are going to go down.
23          And there was also some indication
24 of that being a product issue, that they --
25 that the products aren't such that they

Page 113

1  would -- the salespeople are buying as many of
2  them.
3       Q.  Bottom line is --
4       A.  That's my recollection.
5       Q.  -- you don't know one way or the
6  other whether the board in 2003 had the data
7  before them and considered productivity of the
8  field consultants?
9       A.  Since the decline in productivity
10 was mentioned in Mr. Morgan's monthly reports,
11 I would have thought the board would have that
12 information since --
13      Q.  Okay.  Yeah, I think they did have
14 the information so that indication is correct.
15          Anything else about the disclosure
16 materials that you feel is inaccurate other
17 than what we discussed in regard to shares
18 being tendered to the company by the outside
19 shareholders and what you identified in regard
20 to the response to a Q and A portion on page
21 five about the goals of the transaction.
22      A.  Well, we talked about the goals of
23 the transaction, again, over on pages eighteen
24 and nineteen.
25      Q.  Okay.  Don't need to -- I

Page 114

1    understand your position there.
2            Anything else that's contained in
3    this document that the trust considers to be an
4    inaccurate disclosure?
5        A.   And I will throw into the
6    inaccurate list and complete, again, page
7    twenty-four Houlihan talks about how they
8    approached the eight fifty per share number,
9    and they're talking in terms of enterprise
10   value and subtracting out the company's debt of
11   twenty-one point one million to arrive at a
12   range of value of the share of eight fifty or I
13   guess to eight twenty-five to nine twenty a
14   share.
15           And if you look at the pro forma
16   balance sheets over here on pages fifteen and
17   what have you and you see the amount of debt
18   that the company takes on, it's just -- it's
19   interesting to me and to the Trust that there
20   isn't that disclosure of you're looking at
21   enterprise value but it's enterprise value that
22   appears to be not taking into account the
23   effects of the transaction on the enterprise.
24       Q.   Okay.  Fair enough.  Do you -- did
25   you come into knowledge in preparing for this

Page 115

1    deposition that after the transaction closed, a
2    valuation firm that was engaged at the behest
3    of the independent trustee during the
4    transaction to value the company had taken into
5    account the debt that it took on in the
6    transaction?
7        A.   Yes, I understand that there was
8    an ESOP share valuation done.
9        Q.   And do you understand that that
10   valuation valued the shares as of December
11   31st, 2003, about two weeks after the
12   transaction, at eight hundred and ninety-four
13   dollars per share?
14       A.   Yeah, I believe that was correct.
15   Uh-huh.
16       Q.   Okay.
17       A.   And there are also e-mails
18   subsequently in the sale transaction phase
19   where I recall it was -- we'll have to find it,
20   but somebody is wondering why Barry Hoskins as
21   the CFO wasn't pushing back to the valuation
22   firm in terms of that valuation but --
23       Q.   Oh.  Do you have any facts
24   indicating that the valuation firm did anything
25   wrong in valuing the shares as of December

Page 116

1    31st, 2003?
2        A.   Aside from what may be in that
3    e-mail and I guess comparing that to what the
4    Duff & Phelps folks expected, which was a
5    decline in the value post the transaction,
6    which apparently didn't occur, and the surprise
7    that I believe Mr. Morgan indicates in his
8    monthly reports as to where the valuations came
9    in, no.
10       Q.   Okay.
11           MR. SCHEIER:  Can I see the question?
12   Okay.
13   BY MR. SCHEIER:
14       Q.   Anything else in the disclosure
15   statements, Exhibit 560 or Exhibit 31, that you
16   believe inaccurately discloses anything about
17   the transaction to the recipients of the
18   document?
19       A.   I'll keep looking.  Oh, page
20   thirty, conditions to the tender offer.  This
21   lists out five conditions, one of which is the
22   execution and delivery of the equity holder's
23   agreement.  And if you go two paragraphs down,
24   it says except for the condition in four above,
25   the conditions to the closing of the tender

Page 117

1    offer are for the sole benefit of the company
2    and may be asserted by the company at its sole
3    discretion regardless of the circumstances
4    giving rise to any such condition or may be
5    waived by the company in sole discretion in
6    whole or in part.  That statement is not
7    accurate.
8            The equity holder's agreement
9    reflects an agreement between the company and
10   the ESOP trustee with respect to the valuation
11   of the shares.  And, really, the document
12   itself doesn't really explain the genesis of
13   that, which I think is material to people.  And
14   it's material in the sense that in the
15   September '07 time frame, Duff & Phelps pushes
16   back and says, hey, eight fifty, and
17   particularly with respect to the warrant, is
18   too -- too expensive.  The number needs to be
19   less.  There's more value here in the warrant
20   than what you are attributing, Houlihan, and
21   that number needs to be less.
22           And there was a significant amount
23   of back-and-forth over a period of about a
24   month with respect to that, and what resulted
25   was the agreement that's reflected in the

Page 118

1  equity holder's agreement. And that agreement
2  is the basis upon which Duff & Phelps was able
3  to issue its fairness opinion and the ESOP
4  trustee was then able to agree to not tender
5  the ESOP shares in connection with this
6  transaction.
7         None of that, unless I've missed
8  it, is disclosed in here. And, in fact, when
9  we get to a discussion of the equity holder's
10 agreement, the impression -- or at least the
11 reader is left with the impression that the
12 company -- this is all up to the company and
13 the company can do this and that no one else --
14 that the ESOP trustee would not have an issue
15 if the company didn't enter into and deliver
16 that equity holder's agreement.
17        Q. Anything other than that?
18        A. Let's keep looking. Page
19 forty-four is kind of the flip side of the
20 earlier issue about what the -- the goal of the
21 transaction. And, again, this is another
22 consequence of the equity holder's agreement.
23        Q. Can you point to the section,
24 please, you're referring to?
25        A. I'm sorry.

Page 119

1         Q. You just said page forty-four so
2  I --
3         A. The very end section, amendment to
4  the ESOP. On October 30th the ESOP was amended
5  to make certain changes. The ESOP now provides
6  that effective January 1, 2004 all dividends
7  received by the ESOP will be allocated among
8  participants' accounts on a per share basis.
9         And we've heard two or three times
10 earlier in the document that we've done the
11 transaction to avoid having to do this, but on
12 page -- forty-four pages in, at one place,
13 three or four -- we've got two or three other
14 places where it's the other way, we're
15 disclosing that, gee, we're not -- that's not
16 how we're going to do it.
17        Q. Well, that's just the -- that was
18 just for the dividend portion --
19        A. Correct.
20        Q. -- that GreatBanc had negotiated,
21 correct?
22        A. Correct.
23        Q. Okay. Got it.
24        A. But, yes, the deal was that all of
25 those would be on a per share basis.

Page 120

1         Q. And you understood that the
2  contributions post-transaction were going to be
3  made on a compensation-based -- a
4  compensation-based allocation?
5         A. That's not clear from this
6  document, I don't think, as I read it.
7         But, in any event, there was only
8  one of those that was required by the equity
9  holder's agreement and that was in 2004 at
10 twenty-one percent. Beyond that the company
11 had no obligation to make any of those sorts of
12 contributions and were not undertaking to do
13 so, it appears.
14        Q. And do you know what the amount of
15 the dividends were that the -- the obligatory
16 dividends that the company was going to have to
17 pay into the ESOP as negotiated by GreatBanc?
18        A. Eight million in year one and two
19 point five million in year, what, four, five,
20 six, seven, and eight, I believe.
21        Q. Okay.
22        A. If I recall that correctly.
23        Q. Go ahead.
24        A. The repurchase obligations, page
25 seventy at the top.

Page 121

1         Q. Yes, sir.
2         A. There's no numbers put on this.
3  The company will experience significant
4  repurchase obligations. Yeah, on this one it
5  strikes me that in terms of disclosure, that
6  there ought to be something in there with
7  respect to what the anticipated repurchase
8  obligations are and what the impact would be.
9         It's also -- the same issue over
10 on page seventy-one, conflict of interest,
11 retention of management, a consideration or a
12 concern that key managers may decide to leave
13 but no consideration with respect to employees
14 that might leave. There's information, I
15 think, in one or more of the slides or
16 presentations that there may be forty or more
17 people who have more than a million dollars in
18 their account. And there's no indication that
19 these folks that are, you know, at that stage
20 as a result of this transaction might decide to
21 leave, particularly when they see management
22 and others taking dollars out of the company.
23 It -- that piece is -- you know, there's no
24 indication or disclosure of that or the number
25 of people that have those million dollar

31 (Pages 118 to 121)

Page 122

1    accounts or half million dollar accounts or
2    what that potential impact might be.
3         Q.  Do you know of any facts
4    indicating that any of those people's decision
5    to leave, those people being folks who had
6    large account balances, was motivated by the
7    fact the outside tendering shareholders
8    received cash for their shares outside the
9    ESOP?
10        A.  No, not as I sit here today.
11        Q.  Okay.
12        A.  But it seems to me to be a very
13   logical conclusion that one could draw from the
14   circumstances.
15        Q.  You're just guessing?  You don't
16   know what motivates people, anyone in
17   particular at Antioch, to stay or leave; is
18   that right?
19        A.  In any particular individual, no.
20        Q.  Yes.  And nor was that within the
21   ability of management to determine whether any
22   individual person would stay or leave with the
23   company, do you?
24        A.  Well, it strikes me that that
25   might have been an exercise worth undertaking.

Page 123

1         Q.  Do you understand that the company
2    made a conscious decision not to because their
3    experience shows that employees typically do
4    not want to disclose to management whether or
5    not they're going to be leaving the company and
6    that's not an accurate indicator of actually
7    what an employee's thinking is?
8         A.  Why not go get employment
9    agreements with people?
10        Q.  Is that your position, that that's
11   what the board should have done?
12        A.  It's a suggestion, but I think in
13   terms of -- it doesn't appear that there was a
14   lot of effort spent with respect to the
15   potential repurchase obligation.  It's
16   mentioned various places; but in looking at
17   this transaction, it looks to be like a huge
18   miss in terms of the dollars that subsequently
19   go out for that, particularly when -- you know,
20   again -- well --
21        Q.  Well, let me ask you this:  Do you
22   know of any facts indicating that at any time
23   between 2003 and the end of 2007 the company
24   defaulted on any obligation it had to any of
25   its terminating employees?

Page 124

1              MS. ANDREW:  I'm sorry, what was the
2    time period?
3              MR. SCHEIER:  2003 to the end of
4    2007.
5              THE WITNESS:  The -- as best we can
6    tell and the facts indicate that it does not
7    appear that those ESOP notes were ever adequately
8    secured.
9    BY MR. SCHEIER:
10        Q.  Other than the adequate security
11   issue, did the company -- do you know of any
12   facts indicating that the company did not make
13   payments to any of its terminating employees
14   between the years 2003 and the end of 2007
15   based on their ESOP accounts and the value of
16   those accounts?
17        A.  It's my understanding that all
18   those payments were made up until that point in
19   time.
20        Q.  And do you know of any facts
21   indicating that The Antioch Company at any time
22   between 2003 and the end of 2007 failed to make
23   a timely payment to its secured lenders?
24        A.  I'm not aware of them not making
25   payments timely to the secured lenders.  Could

Page 125

1    we take a lunch break?  Would this be a good
2    time to break for lunch?
3         Q.  Here at your convenience.
4              MS. ANDREW:  Sure.  Let's go off the
5    record.
6              THE VIDEOGRAPHER:  We're off the
7    record.
8              (Pause in proceedings.)
9              THE VIDEOGRAPHER:  We're on the
10   record.
11   BY MR. SCHEIER:
12        Q.  Mr. Miller, other than the
13   provisions you've pointed out so far that
14   contain what you deem to be an inaccurate
15   disclosure, are there any others in Exhibit
16   560, which is the same as Exhibit 31, that you
17   deem to be inaccurate?
18        A.  Well, in the -- pardon me -- in
19   the area of inaccuracy, I mean, I think there's
20   also the question of omissions; and I think
21   it's a worthwhile exercise to compare what's in
22   this and --
23        Q.  Let's take omissions in a moment.
24   We can get back to that.  I'm asking you right
25   now, other than what you've testified to as

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 126

1   being inaccurate statements in Exhibit 31,
2   Exhibit 560, are there any others in addition
3   to what you've testified to?
4        A.   Inaccuracies?  As I sit here
5   presently, none is occurring to me.  I was more
6   focused on the omission side of things in terms
7   of what isn't disclosed.
8        Q.   Well, let's get there in a moment.
9   What I need to know is whether or not there are
10  other disclosures in either of those exhibits,
11  560 or 31, that the Trust deems to be
12  inaccurate other than the ones you've already
13  testified to?
14       A.   Again, I think that what I've
15  identified so far are the ones that stick out
16  to me as being inaccurate.
17       Q.   All right.  Now, you had mentioned
18  something about omissions.
19       A.   Yes.
20       Q.   What disclosures do you think were
21  legally required to be made that were not made
22  in Exhibit 560 and Exhibit 31?
23       A.   Well --
24            MS. ANDREW:  I just object to the
25  extent you're asking for his legal opinion, but --

Page 127

1   and the question assumes that.
2            THE WITNESS:  I think I mentioned
3   earlier in terms of the risk factors, there's no
4   mention with respect to the possibility that the
5   transaction could be unwound either as violating
6   Ohio corporate law or as violating Ohio fraudulent
7   conveyance law.  Also --
8   BY MR. SCHEIER:
9        Q.   Strike that.  Do you believe that
10  to be a material -- that would be a material
11  disclosure to the employee-owners and outside
12  shareholders being called upon to vote on the
13  transaction?
14       A.   Yes.
15       Q.   Okay.
16       A.   Yes.
17       Q.   Anything else?
18       A.   In comparing -- in comparing this
19  to what the board is shown, I don't see
20  anything in here that discloses like the
21  aggregate value that's going out of the company
22  in exchange for the shares and what the company
23  is getting in return for that.
24            And there are references, I know,
25  in e-mails and possibly in the Duff & Phelps

Page 128

1   evaluation analysis because -- that -- that with
2   respect to a present value analysis of the tax
3   savings over the ten years.  When the deal was
4   presented to the board, it's presented in terms
5   of, gee, there's all this money that's going to
6   come from a tax savings -- pardon me -- now
7   that we are a one hundred percent ESOP, we
8   don't have to pay these dollars out in taxes or
9   in distributions to the ESOP, that money is
10  going to stay in the company.
11           And as I view the transaction,
12  that present value number, there's a reference
13  in a D&T e-mail to it being sixty million
14  dollars.  There's a reference, I think, in the
15  Duff & Phelps materials to it maybe being in
16  the seventy-some million dollars, but the
17  company is incurring two hundred and forty-four
18  million dollars of obligation.  Again, the
19  sources and uses are two hundred and forty-four
20  million.  Now, part of that includes the
21  warrant values ascribed; but, you know,
22  basically well in excess of a present value of
23  sixty million dollars is going out of the
24  company in December.
25       Q.   Can you identify the document

Page 129

1   where you're deriving that present value from?
2        A.   There is a -- an e-mail from Helen
3   Morrison, and this is in connection with the
4   back-and-forth with Duff & Phelps.  It has an
5   odd subject line to it.  Deep thoughts.  It's
6   the deep thoughts e-mail where she references
7   it being sixty million dollars.
8            In the Duff & Phelps, I think we'd
9   have to look, is their -- it's their initial
10  indication of value, I believe that initial
11  presentation that they give -- gave to the ESOP
12  trustee that, I guess, was shared with the
13  company in late October.  I believe that there
14  was a line item there where they are comparing
15  the present value -- what I understood to be
16  the present value from the tax savings to the
17  present value that the ESOP would have received
18  had they not done the transaction.
19           So I believe those are the two
20  places where I've seen references to present
21  value; but it's interestingly missing from the
22  board presentations, at least in terms of the
23  PowerPoint pieces.
24       Q.   And are those the board
25  presentations that Deloitte made to the board?

33 (Pages 126 to 129)

Page 130

1     I'm not sure what board presentations you're
2     talking about.
3          A.  Well, they would have been -- I
4     believe there were -- we may be going back to
5     the one in July that you mentioned earlier,
6     possibly the one in August, and, you know,
7     subsequently there were -- I think they did
8     those in October as well, at the end of
9     October.  The representation was that there
10    were substantial dollars to be gained over
11    time.
12         Again, there's no -- I don't
13    see -- did not see in here a discussion of
14    aggregate and then when you get the aggregate,
15    you know, how much -- what percentage is
16    everybody getting, the Morgans versus everybody
17    else.
18         On the conflict page --
19         Q.  Well, I'm not sure, are you still
20    answering my question?  Is this a different --
21    I'm just trying to get the universe of
22    omissions.
23         A.  Omissions.  Yeah, I'm trying to
24    get -- yeah, this -- yeah.
25         Q.  Okay.  So --

Page 131

1          A.  One omission is, you know, there's
2     no sources and uses and there's no comparison
3     of present values to the company, what's going
4     out in December versus what does the company
5     expect to get back for it.
6          Q.  I don't understand.  First of all,
7     what do you mean by sources and uses?
8          A.  Well, there are several sources
9     and uses in the documents, the presentations to
10    the boards.  Where the dollars are coming from,
11    bank debt, you know, versus what it's going to.
12         Q.  Okay.  With regard to sources, are
13    you testifying that this document doesn't
14    disclose the sources of the cash that's going
15    to be used to fund the transaction?
16         A.  No, the aggregate amounts.  It
17    shows -- it totals up to two forty-four -- two
18    hundred and forty-four million bucks, I
19    believe, or two hundred and forty-five million
20    dollars, and you see them in terms of the
21    transaction of, you know, so much for the
22    warrants, so much for the -- and then where is
23    the cash coming from to pay for those things
24    or, you know, what's the -- that I'm not seeing
25    in here.

Page 132

1          And, you know, while there are
2     balance sheets, you know, it seems to me there
3     could be a clearer disclosure and possibly
4     there could have been a clearer disclosure to
5     the board, maybe there was, I don't know; but
6     in terms of present values, you know, what are
7     we getting today versus what we're giving out
8     today.
9          Q.  And in terms of your counsel's
10    objection that I asked for a legal conclusion,
11    what expertise do you bring to bear in offering
12    the opinion of what should have been disclosed
13    in this document?
14         A.  Well, I think it's a question of,
15    you know, what any person looking at this would
16    say.  If I have shares in this company, what's
17    going to matter to me?  I mean, does it matter
18    to me that if I do this deal, somebody might be
19    able to come get the money back from me in the
20    future?  It might.
21         Q.  And --
22         A.  Does it matter to me if, you
23    know --
24         Q.  Well, let's take a step --
25         A.  Sure.

Page 133

1          Q.  The people who they'd be clawing
2     the money back from are the people that you're
3     attempting to claw the money back from in this
4     lawsuit, correct?
5          A.  Correct.
6          Q.  Okay.
7          A.  Yes.
8          Q.  Anyone else --
9          A.  Among others.
10         Q.  Well, and who are those others?
11         A.  Well --
12         Q.  The ESOP certainly didn't tender
13    any shares or give any money or get any money
14    from the transaction, correct?
15         A.  I think, we're -- the list of
16    people is on Exhibit 294, right?
17         Q.  Oh, I don't know, sir.  I didn't
18    see 294.  You had mentioned it.  I don't know
19    what it is.
20         A.  Yeah.  That is the tally of
21    shareholder transmittals --
22         Q.  Okay.
23         A.  -- offer to purchase shares,
24    December 15th, 2003.
25         Q.  All right.  And would you say the

34 (Pages 130 to 133)

Page 134

1    Morgans are the individuals who tendered the
2    majority of the shares and received the
3    majority of the cash as reflected on 294 --
4        A.  Yes.
5        Q.  -- Exhibit 294?  Okay.  So if the
6    Morgans felt the disclosure was accurate at
7    least as to them, your omission is not
8    particularly pertinent?
9        A.  I don't agree with that at all.
10       Q.  Okay.  Who else should that
11   disclosure have been made to other than the
12   Morgans?
13       A.  The -- everyone to whom this was
14   sent the disclosure should have been accurate.
15   Are you suggesting that they should send less
16   than accurate disclosures to one group of
17   people and more than accurate disclosures to
18   another?
19       Q.  No, you're asking for a disclosure
20   that relates to clawback of money; and as far
21   as I know, the only parties that received money
22   in the transaction were the individuals that
23   tendered outside shares.
24       A.  Uh-huh.
25       Q.  So other than those individuals,

Page 135

1    to whom do you believe that disclosure was
2    warranted?
3        A.  I think that everyone who received
4    a copy of this document.
5        Q.  Okay.  Even if they were not
6    tendering shares and weren't at risk of having
7    any money taken back from them had the
8    transaction been unwound?
9        A.  Well, because is there not --
10       Q.  Well, the answer is really just
11   yes or no to that question and then you can
12   explain it.
13           Do you believe that such a
14   disclosure of a risk should be made to
15   individuals who were not receiving money that
16   might be clawed back at some point in the
17   future by someone like you who chooses to bring
18   a lawsuit?
19       A.  Yes, and, again -- yes, I do.
20       Q.  Okay.  And why?  Why is that your
21   opinion?
22       A.  Because if you're going to
23   disclose -- they had asked that the
24   shareholders vote -- the participants vote with
25   respect to this, right, as to approval of the

Page 136

1    margin?  Not that the vote or that the
2    shareholders vote was necessarily required to
3    have that done but they did and it's out there.
4           And if you're going to make that
5    level of disclosure, it strikes me that
6    everyone should receive the same disclosure and
7    they -- you know, clearly no one received, in
8    the Trust's view, adequate disclosure of what
9    went on here.
10       Q.  Well, you say what went on here.
11   We're talking --
12       A.  Of this transaction basically and
13   issues with respect to the transaction and
14   risks with respect to the transaction.
15       Q.  Okay.  What else, other than the
16   lack of disclosure that a number of
17   shareholders might have money clawed back from
18   them and the sources and uses disclosure that
19   you referenced is a material omission from the
20   disclosure documents, Exhibit 31, Exhibit 560?
21       A.  Well, let's be clear about the
22   sources and uses so we don't cat -- what we're
23   saying is -- what I'm saying is a present value
24   analysis of the benefits, you know, what the
25   company is giving up versus what --

Page 137

1        Q.  Oh, I understood what you
2    testified to.
3        A.  Okay.
4        Q.  Other than that and other than the
5    omission that someone like you might come along
6    and file a lawsuit to claw the money back, what
7    other material omissions were made or exist
8    with regard to the disclosure document that's
9    Exhibit 560 and Exhibit 31?
10       A.  I think I mentioned in my earlier
11   answers, although I wasn't clear that I was
12   answering in two different areas, any
13   disclosure with respect to how they got to the
14   equity holder's agreement.  I think I testified
15   to that earlier in the context of what I guess
16   you were now calling instead of omissions, I
17   guess, inaccuracies or inconsistent -- I'm
18   sorry, I've forgotten your word, but I believe
19   that -- and that was in reference to an earlier
20   part of the document.  That -- that I -- that
21   that -- if you want to throw something under
22   the omissions heading, that is one of those
23   things.
24       Q.  How they got to the equity
25   holder's agreement?  I don't understand what

35 (Pages 134 to 137)

Page 138

1  you mean.
2      A.  The back-and-forth between Duff &
3  Phelps and Houlihan and the company that
4  resulted in the equity holder's agreement that
5  is represented in here to not be a condition of
6  the deal or a condition that the company can
7  waive when, in fact, it cannot.
8      Q.  Okay.  Anything in addition to --
9      A.  I mean, I think it's material to
10 know that somebody -- that one of the
11 professionals looked at this and said that the
12 price is too high.
13     Q.  Okay.
14     A.  And their solution for that was
15 not to lower the price but to take more out.
16     Q.  What professional are you
17 referring to?
18     A.  Duff & Phelps.
19     Q.  Okay.  Are you aware that
20 ultimately Duff & Phelps analyzed the share
21 price and found that the eight hundred and
22 fifty share price fell within the range that
23 was acceptable to them?
24     A.  They issued an opinion to the ESOP
25 trustee that said that the transaction was fair

Page 139

1  to the ESOP from a financial point of view and
2  that any dilution caused as a result of the
3  share price or the transaction was adequately
4  addressed and it was adequately addressed, as I
5  understand it, through the terms of the equity
6  holder's agreement.
7      Q.  Okay.  So bottom line is that
8  the -- do you have -- do you know of any facts
9  that either Duff & Phelps or GreatBanc
10 disagreed that eight hundred and fifty dollars
11 was a fair price to pay the tendering
12 shareholders for their shares in the context of
13 the transaction?
14         MS. ANDREW:  I'm going to object to
15 the form.
16         THE WITNESS:  They -- there was
17 definitely a lot of back-and-forth --
18 BY MR. SCHEIER:
19     Q.  Well, I understand there was
20 negotiation.
21     A.  -- right?
22     Q.  What I'm asking is whether Duff &
23 Phelps or GreatBanc --
24     A.  There was a negotiation.  So there
25 was an issue whether that was correct.

Page 140

1      Q.  Well, there was negotiation --
2      A.  Uh-huh.
3      Q.  -- and I'm asking whether you can
4  identify any fact indicating that Duff & Phelps
5  advised GreatBanc that eight hundred and
6  fifty -- eight hundred and fifty dollars per
7  share was not a fair price?
8         MS. ANDREW:  To whom?
9  BY MR. SCHEIER:
10     Q.  To any constituency in the
11 transaction.
12     A.  They weren't looking at it from a
13 perspective of the company.
14     Q.  Okay.  Then from the perspective
15 of the ESOP --
16     A.  From the perspective --
17     Q.  -- do you know of any facts
18 indicating that Duff & Phelps advised GreatBanc
19 the eight hundred and fifty dollars per share
20 to be paid to the selling shareholders was
21 unfair from a financial perspective to the
22 ESOP?
23     A.  Again, I guess aside from the
24 back-and-forth that ensued from the September
25 time frame into October until they reached a

Page 141

1  deal, they both ended up settling on the eight
2  fifty number, so no; but neither of them were
3  looking out for the company.  Neither of them
4  were retained to issue an opinion.
5      Q.  I understand you want to kind of
6  express on the record your client's position in
7  the case, but I'm not interested in that.  I'm
8  interested in facts, not your opinion.
9         The facts are that Duff & Phelps
10 deemed eight hundred and fifty dollars per
11 share to be a price that was financially fair
12 to the ESOP and its participants; is that
13 right, based on your review of the record?
14         MS. ANDREW:  Object to the form.
15         THE WITNESS:  Yes, for the limited
16 purpose that they were doing it, which was for the
17 ESOP, that's what they settled on.
18 BY MR. SCHEIER:
19     Q.  Very well.  And other than what
20 we've discussed to this point, what disclosure
21 do you believe should have been made that
22 wasn't made in addition to the ones you've
23 testified to so far in the record?
24     A.  In the conflicts of interest, I
25 don't see the officers listed.

36 (Pages 138 to 141)

Page 142

1     Q.  Okay.  Do you understand that
2   conflicts of interest section to be a
3   disclosure of directors who would be voting on
4   the transaction and financial interests that
5   they have?
6     A.  I do, but I don't see them
7   disclosed anywhere else either.  I mean the
8   officers.
9     Q.  I understand.  Is it your
10  understanding the officers -- is it correct to
11  say that based on your review of the record,
12  the officers of the company had no right to
13  vote one way or the other on whether the
14  company would pursue the transaction?
15    A.  That is my understanding.  Yes,
16  that's correct.
17    Q.  Very well.  Any other omission
18  that you can identify that in your opinion
19  should have been disclosed?
20    A.  Well, I want to go back to the
21  last point that you made.
22    Q.  I didn't make any point.  I'm just
23  asking questions.
24    A.  Okay.  With respect to the
25  officers, one of the officers who profited

Page 143

1   significantly from the transaction obviously
2   was Barry Hoskins who was the CFO.  There's no
3   disclosure in here that I've seen that explains
4   how much he's getting out of this.  And --
5     Q.  Well, is it your --
6     A.  -- you know, a lot of this is
7   based upon financial information, et cetera,
8   and there's a lot of financial information in
9   here.  That strikes me that would be, you
10  know, a relevant fact, a material fact that
11  somebody might want to know about.
12    Q.  You haven't alleged in your
13  complaint that Barry Hoskins did anything wrong
14  with regard to the 2003 transaction; isn't that
15  right?
16    A.  That is correct.
17    Q.  Okay.  Very well.  Anything else
18  that you deem to be in your opinion an omission
19  from the disclosure statement that should have
20  been disclosed?
21    A.  I think, as I sit here right now,
22  that's what I'm remembering.
23    Q.  Okay.  And is there any document
24  that you should look at now that would have you
25  remember anything else because I need to close

Page 144

1   the record here and understand the Trust's
2   position and you were supposed to be prepared
3   to testify to the Trust's position.  So I guess
4   I need to ask, as we sit here today --
5     A.  Uh-huh.
6     Q.  -- are you satisfied now that
7   you've testified completely and accurately as
8   to what the Trust views as either omissions
9   from the disclosures or inaccurate disclosures
10  in Exhibits 560 and 31, which are the same
11  document?
12    A.  I believe that I have so testified
13  to the best of my recollection.  Again, I don't
14  view this as -- and it shouldn't be, I don't
15  think, a test of your memory.
16    Q.  No, your counsel mentioned that
17  earlier and I've been very solicitous of
18  letting you take time off the record and look
19  at the thirty binders you have right behind
20  you.  What I'm inviting you to do is to do that
21  so when I leave here today your lawyer doesn't
22  put something in a brief or in other papers
23  that you didn't testify to saying that you just
24  didn't remember.  So I'm inviting you again go
25  off the record and look at the twenty-five or

Page 145

1   thirty binders to determine whether or not
2   there's any other omission or inaccuracy
3   relating to Exhibits 560 and 31 so I understand
4   the full position of the Trust as we sit here
5   today.
6     A.  Well -- I think that I am -- based
7   on everything I've seen here, I'm comfortable
8   with that notion, say, for the financial
9   information in this that would be subject to
10  review by an expert witness, you know, that
11  piece.  I'm not a financial expert, I'm not a
12  valuation expert so, you know, that piece -- I
13  would say if there are inaccuracies in that
14  piece of it, that's something that would be the
15  subject of expert testimony.
16    Q.  As you sit here today, has anyone
17  brought to your attention that there are
18  inaccuracies in those financial disclosures?
19    A.  No.
20    Q.  Okay.  Do you consider yourself an
21  expert in the area of disclosures as required
22  by the SEC when it comes to public companies
23  and tender offer transactions that they enter
24  into?
25    A.  No.

37 (Pages 142 to 145)

Page 146

```
 1        Q.  Okay.  I'd like to, if you could,
 2   please, Mr. Miller, put Exhibit 31 aside and
 3   place before you again Exhibit 42.  And if you
 4   would please direct your attention to count
 5   thirteen on page fifty-two.
 6             Is the trustee continuing to
 7   pursue attorney's fees from any of the
 8   defendants in this action?
 9        A.  Well, I think at the time that we
10   did the amended complaint, as indicated in the
11   complaint, that there are -- were Ohio case law
12   giving Ohio trial courts the discretion to
13   award attorney's fees.
14        Q.  Did you review any of that case
15   law yourself?
16        A.  I did not.
17        Q.  Do you believe that that case law
18   in fact exists as we sit here today?
19        A.  I have no reason to believe that
20   it does not.
21        Q.  Okay.  You're not basing your
22   attorney's fees claim on any particular fee
23   shifting provision in any contract that we're
24   talking about in this case --
25        A.  No, sir.
```

Page 147

```
 1        Q.  -- is that right?
 2        A.  No.
 3        Q.  And you're not basing your
 4   attorney's fees claim on any statute that would
 5   shift fees from the plaintiff to the
 6   defendants --
 7        A.  No.
 8        Q.  -- in this -- if you'd let me
 9   finish.
10        A.  Oh, I'm sorry.
11        Q.  Okay.  To a piece of -- in your
12   attorney's fees claim you're not relying on any
13   statute that shifts the responsibility for
14   attorney's fees from a plaintiff like yourself
15   to defendants in the case; is that right?
16        A.  That is correct.
17        Q.  Okay.
18             MR. SCHEIER:  At this point,
19   Mr. Miller, I have no further questions.  Thank
20   you for your time.
21             THE WITNESS:  Thank you.
22             MS. ANDREW:  Off the record.
23             THE VIDEOGRAPHER:  We're off the
24   record.
25             (Pause in proceedings.)
```

Page 148

```
 1             THE VIDEOGRAPHER:  We're on the
 2   record.
 3             CROSS-EXAMINATION
 4   BY MR. PRENTISS:
 5        Q.  Mr. Miller, I am Dan Prentiss.  I
 6   represent James Northrop who is an outside
 7   director whom you've sued.  Just before I
 8   started you asked to have a few documents in
 9   front of you in order to be prepared to answer
10   my questions.
11        A.  Yes.
12        Q.  Can you just identify what
13   documents you wanted to get?
14        A.  I have Exhibit 631, which is an
15   Antioch Company contingency plan.  I have an
16   Exhibit 401, which is the April 19th, 2006
17   minutes of The Antioch Company board of
18   directors meeting.  I have a Exhibit 188, which
19   is the J.H. Whitney & Company offer of May 8th,
20   2008.  And then, let's see, I have Exhibit 432,
21   which is e-mails dated May 9th, 2008.  Let's
22   see.  I guess I have Exhibit 271, which is our
23   e-mails dated May 19th, 2008.  Exhibit 438,
24   also an e-mail string from about that same time
25   period.  Exhibit 278, a May 28th, 2008 e-mail.
```

Page 149

```
 1   Exhibit 506, May 28th, 2008 e-mail string.
 2   June the 3rd, 2008 e-mail string is Exhibit
 3   430.  I'm sorry, Exhibit 430, which is a June
 4   the 3rd, 2008 e-mail string.  Exhibit 324,
 5   which is a June the 4th, 2008 e-mail string.
 6   And that appears to be all of them.
 7        Q.  What is it about those documents
 8   that you -- that made you select those to be
 9   prepared to answer my questions?
10        A.  Those are all documents -- well,
11   those are all documents that Mr. Northrop is
12   mentioned in or -- as having, I think -- or at
13   least in terms of the e-mail is copied on or
14   things as special committee he should have
15   gotten, and this contingency plan, I believe,
16   is something that he prepared for the
17   company --
18        Q.  All right.
19        A.  -- early on.  I think that's the
20   universe that's -- that's not to say -- that's
21   why they're here.  That's not to say that those
22   are the universe of documents relevant to him.
23        Q.  All right.  In -- by 2007, is it
24   true that The Antioch Company was in severe
25   financial distress and the zone of insolvency?
```

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                                    W. Timothy Miller

Page 150

1        A.  The company was rendered balance
2    sheet insolvent by the 2003 ESOP transaction;
3    and if you look at the financials annually,
4    that never changes.  So in terms of being in
5    the zone of insolvency, yes, I mean, I think
6    they were there.  And in terms of the financial
7    situation, they were having to do a sale and a
8    leaseback of the real estate to be able to get
9    the banks to renew and extend their credit
10   agreement, so yes.
11       Q.  So the answer is yes?
12       A.  Yes.
13       Q.  The answer is yes --
14       A.  Yes.
15       Q.  -- in 2007 --
16       A.  Yes.
17       Q.  -- the company was in severe
18   financial distress --
19       A.  Yes.
20       Q.  -- and in the zone of insolvency?
21       A.  Yes.
22       Q.  And is it true that in those
23   circumstances, the proper and prudent course of
24   action for the board of Antioch to take would
25   be to maximize the value of the company for the

Page 151

1    maximum number of stakeholders through pursuit
2    of the sale of the company to a third party
3    through a change of control transaction?
4        A.  I think that -- yes, I think that
5    is the -- yes, that they --
6        Q.  Thank you.
7        A.  -- should have maximized the value
8    of the company.
9        Q.  Your answer to my question is yes,
10   that is the prudent and appropriate course of
11   action the board should have taken in 2007,
12   correct?
13       A.  Correct.
14       Q.  And, in fact, that is what the
15   board hired Houlihan Lokey to do in March of
16   2007, correct?
17       A.  Yes.
18       Q.  So you have no quarrel and you
19   agree that what -- the action of the board in
20   hiring Houlihan Lokey in March of 2007 was a
21   prudent and appropriate course of action for
22   the board to take at that time?
23       A.  At that juncture, that appeared to
24   be, yes, something that the -- yes, a prudent
25   course of action on the board's part then.

Page 152

1        Q.  So the board in voting to enter
2    into an agreement with Houlihan Lokey in March
3    of 2007 was not breaching its fiduciary duties
4    as board members, correct?
5        A.  Yes.  I'm not aware that they
6    were, no.
7        Q.  Well --
8        A.  Yes.  I mean, I --
9        Q.  You have sued members of the board
10   for breach of fiduciary duty.
11       A.  Yes.
12       Q.  You're agreeing with me that the
13   hiring of Houlihan Lokey in March of 2007 was
14   not such a breach, correct?
15       A.  Correct.
16       Q.  And when the board modified the
17   agreement with Houlihan Lokey in January 2008,
18   that also was a prudent and appropriate course
19   of action for the board to take, correct?
20       A.  No.
21       Q.  Are you familiar with what
22   Houlihan Lokey was tasked to do under the
23   January 2008 modification to its agreement?
24       A.  Why don't we see a copy of it.
25       Q.  I'll pass you down Exhibit 208.

Page 153

1    Do you have that -- you're familiar with
2    Exhibit 208, are you not?
3        A.  I have definitely seen it, yes.
4        Q.  And Exhibit 208, the first four
5    pages are -- constitute the January 25, 2008
6    modification to the Houlihan Lokey agreement
7    executed in March of 2007, correct?
8        A.  I'm sorry, run that by me again.
9        Q.  Yes.
10       A.  Could you read it back?
11       Q.  The first four pages of Exhibit
12   208 --
13       A.  Uh-huh.
14       Q.  -- constitutes the modification to
15   the March 2007 agreement between Antioch and
16   Houlihan Lokey, correct?
17       A.  Yes, that is what it says.  Yes.
18       Q.  And page two of Exhibit 208
19   defines the task that Houlihan Lokey was to
20   pursue under this modification of the
21   agreement, correct?
22       A.  We're looking at page two up here
23   at the top under A for the purposes of this
24   agreement and transaction, is that what you're
25   referring to?

                                   39 (Pages 150 to 153)

Page 154

1    Q.  I'm -- that's exactly correct.
2    A.  Okay.
3    Q.  And would you agree with me that
4  the transaction as defined there, that
5  paragraph of this modification of the
6  agreement, is a sale of the company to a third
7  party through a change of control transaction?
8    A.  Let me just --
9      MS. ANDREW:  Objection.
10     THE WITNESS:  If you would just let
11  me take a moment to read it, I would appreciate
12  it.
13  BY MR. PRENTISS:
14   Q.  Take all the time you need.
15   A.  Thank you.  Yes.  I think the
16  answer to the question is yes.  They were -- it
17  contemplates a change in control transaction,
18  among other things.
19   Q.  So as of January 2008, was it
20  still a prudent and appropriate course of
21  action for the board of The Antioch Company to
22  pursue a sale of the company to a third party
23  in a change of control transaction?
24   A.  Yes --
25   Q.  And --

Page 155

1    A.  -- it was.
2    Q.  -- this agreement, the March
3  2008 -- excuse me, January 2008 amendment to
4  the Houlihan Lokey agreement, continues to task
5  Houlihan Lokey with being an investment banker
6  to find a purchaser -- a third-party purchaser
7  of the company in a change of control
8  transaction, correct?
9    A.  Correct.  It -- yes, it does.
10  Uh-huh.
11   Q.  So this -- the continuation of the
12  relationship between Antioch and Houlihan
13  Lokey in January 2008 was a prudent and appropriate
14  course of action for the board to take,
15  correct?
16   A.  Well --
17     MS. ANDREW:  Objection.
18     THE WITNESS:  But this isn't
19  everything that was going on.
20  BY MR. PRENTISS:
21   Q.  I didn't ask you that, Mr. Miller.
22   A.  I understand you didn't.
23   Q.  So let's just focus on my
24  question.
25   A.  Well, but in connection with this,

Page 156

1  did not Houlihan at the behest of the special
2  committee agree that they were not going to
3  talk to anybody who they hadn't talked to as of
4  the end of December?  Wasn't that part of the
5  deal?  And I'm looking through this document
6  looking for that right now but --
7    Q.  I'm not here to answer your
8  questions, Mr. Miller.  I'm asking you whether
9  this agreement -- the entering into this
10  agreement in January of 2008 by the Houlihan --
11  by the Antioch board in pursuit of the
12  prudent and appropriate course of action for
13  the board, which is to seek a third-party buyer
14  in a change of control transaction?
15   A.  Oh, here we are.  I guess -- in
16  looking at this, my recollection of the
17  documents were that Houlihan agreed to limit
18  who it was going to sell to, to who it was going
19  to market to; and so engaging them, while in
20  the abstract the question you're asking, is it
21  not prudent that they're engaging somebody to
22  engage in a sale transaction, your question
23  ignores the fact that Houlihan under their
24  initial engagement brought parties in and in
25  November of '07 those parties disappear, in

Page 157

1  particular Sun Capital, with really no
2  explanation as to why that happened and why it
3  went away, yet with Houlihan and everybody
4  saying, gee, we need to make a counter to Sun.
5  Because in terms of the valuations, Sun was the
6  one who came back with we're going to take care
7  of the debt and I think some portion of --
8  something beyond just the secured debt, the
9  bank debt.
10     And that went away and it went
11  away in favor of a proposal that was put on the
12  table by Candlewood and Lee Morgan in the late
13  October time frame that -- my understanding
14  that -- I confuse them a little bit in my head,
15  but my recollection was Houlihan was not in
16  favor of that but acquiesced.  And so you have
17  a situation where at the beginning of the year
18  in January Houlihan is acquiesced and a buyer
19  -- a potential buyer has gone away.
20     So I'm troubled with the notion
21  that it is -- that involving Houlihan without
22  taking into consideration what's gone on before
23  is automatically the prudent thing that the
24  board should do.  And particularly also, again,
25  I recall e-mail correspondence between Nancy

| Page 158 | Page 160 |
|---|---|

**Page 158**

1  Blair -- I think it's Nancy Blair and Houlihan
2  regarding their agreement not to solicit anyone
3  else because right at this time Lee Morgan is
4  sending his letter to the special committee,
5  January 2nd or whenever that was, 2008, saying
6  I'm not going to waive my subdebt and you need
7  to give me more access and this, that, and the
8  other. And so the special committee is
9  acquiescing in that on a go-forward.
10        Q. We'll talk about acquiescing. I'm
11  asking you specific reference to the January
12  25, 2008 agreement. Is there any term of this
13  agreement that was authorized by the Antioch
14  board which you feel is -- constitutes a breach
15  of fiduciary duty by the board in agreeing to
16  that term?
17        A. Aside from, again, what I've just
18  stated, the fact that Houlihan appears to have
19  acquiesced in not moving forward with a sale of
20  the company in the fall 2007 time frame and
21  whether or not under those circumstances
22  Houlihan should continue to be retained because
23  that piece isn't clear, this agreement itself,
24  the notion that Houlihan should be protected in
25  the event of a bankruptcy filing that they get

**Page 159**

1  their fees and that they're going to continue
2  to market the company, I -- I'm troubled by it,
3  I guess. I can't -- you know, I'm sorry but
4  I'm troubled by it.
5        Q. All right. You're troubled by it,
6  but you've made an allegation in the complaint
7  that certain people breached their fiduciary
8  duties.
9        A. Yes.
10        Q. You know that, right?
11        A. Yes.
12        Q. Is it your testimony that the
13  board of directors of Antioch breached their
14  fiduciary duties by signing this amendment to
15  the Houlihan Lokey agreement?
16        MS. ANDREW: Objection. Foundation.
17  The board didn't sign the letter.
18        THE WITNESS: I think -- it's not
19  clear to me that the board considered the impact
20  of basically every --
21  BY MR. PRENTISS:
22        Q. Mr. Miller, the question asks --
23  you have made allegations of breach of
24  fiduciary duty.
25        A. Uh-huh.

**Page 160**

1        Q. The board of directors voted to
2  enter into a modification of the Houlihan Lokey
3  agreement.
4        A. Uh-huh.
5        Q. And the company did so as of
6  January 25, 2008.
7        A. Yes.
8        Q. Was that a breach of fiduciary
9  duty by the board members who voted?
10        MS. ANDREW: Objection. Foundation.
11        THE WITNESS: Again, I think without
12  explanation from Houlihan with respect to their
13  acquiescence as to why this didn't go forward --
14  why the Sun deal didn't go forward and why they
15  didn't move forward and Houlihan insist upon a 363
16  sale in this circumstance, and those are all
17  questions the board should be asking, I mean --
18  prior to entering into this.
19  BY MR. PRENTISS:
20        Q. But the board -- do you agree that
21  the board did authorize this amendment to the
22  agreement?
23        A. They clearly did.
24        Q. And was that authorization a
25  breach of their fiduciary duty?

**Page 161**

1        MS. ANDREW: Objection to the extent
2  it calls for a legal conclusion.
3        THE WITNESS: Again, I think they
4  failed to take into consideration in entering into
5  this --
6  BY MR. PRENTISS:
7        Q. You know, we're going to be here
8  for a long time. I mean, there's -- there's a
9  yes or a no answer to that question. I suppose
10  there's an I don't know if you want to pick
11  that one.
12        Did the authorization of the
13  January 25, 2008 Houlihan Lokey agreement
14  constitute a breach of fiduciary duty? Yes,
15  no, I don't know?
16        A. Again, I have a hard time
17  divorcing it from the -- from what went on.
18  You can't take it out --
19        Q. You can't answer the question?
20        A. You can't take it out of the
21  context.
22        Q. If you can't answer the question,
23  that's okay, too.
24        A. Well, I mean, my view of it is
25  that the company needed to do a sale

41 (Pages 158 to 161)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 162

1  transaction and Houlihan was in the best
2  position to make that happen but they didn't
3  make that happen.  It's not clear why it didn't
4  happen with the Sun -- in the Sun transaction.
5        And in January of '08 if the board
6  isn't going to pursue a 363 transaction here,
7  and, again -- you know, Houlihan is acquiescing
8  in not doing that, they're not the ones to get
9  the company -- to maximize the value for the
10 company here.
11      Q.  That's the answer to my question?
12 That's your answer?
13      A.  Well, I question, I guess, the
14 board's continuing to involve Houlihan when the
15 Sun deal went away; but I suppose at this
16 juncture, you know, somebody needed to be in
17 there selling the company.
18      Q.  So what's your source of
19 information regarding Sun Capital?  You've
20 talked about Sun Capital having an interest and
21 then not having an interest.  Where do you get
22 your information about Sun Capital?
23      A.  Well, there are e-mails to that
24 effect.
25      Q.  Whose e-mails?

Page 163

1        A.  I believe there was something in
2  there from Houlihan about Sun having given an
3  expression of interest.
4           There's a -- Houlihan did a
5  lengthy timeline in early November about
6  everybody who was out there.
7           There were several e-mails
8  following on the '07 time frame about the need
9  to get back to Sun Capital and make a response
10 to Sun Capital because they had given a verbal
11 expression of interest with respect to the
12 company at the bank debt plus -- my
13 recollection is various things, but bank debt
14 plus some dollars.
15      Q.  So would the answer to my question
16 be the source of your information regarding Sun
17 Capital is Houlihan Lokey?
18      A.  Well, ultimately they were the
19 ones who were dealing and having that --
20      Q.  Right.
21      A.  -- so, yes, they would have
22 been --
23      Q.  Yeah, I don't need the reasons.
24 You've tried to derive information -- you're
25 giving testimony regarding information that

Page 164

1  you've derived from various documents, right?
2        A.  Yes, that's what I'm doing.
3        Q.  And your information about Sun
4  Capital is from Houlihan Lokey, correct?
5        A.  Yes, and there are other -- you
6  know, Sun is mentioned, I presume -- I believe
7  in other e-mails from other people; but
8  certainly it's out there, yes.
9        Q.  But the source of your information
10 when you're describing the course of the
11 negotiations with Sun Capital is Houlihan
12 Lokey's presentations to the Antioch board,
13 right?
14      A.  Correct.  And e-mail
15 correspondence following that, yes.
16      Q.  By the way, does the Trust take
17 any position that Houlihan Lokey failed to
18 perform under the contracts which are Exhibit
19 208?
20      A.  Well, I'd say it was a combination
21 of things.
22      Q.  No.  The question is, does the
23 Trust take the position that Houlihan Lokey
24 failed to perform its contractual obligations
25 under the agreement and the amended agreement

Page 165

1  which are in Exhibit 208?
2        A.  I don't believe that the Trust
3  makes that allegation in the complaint.
4        Q.  Well, does the Trust take the
5  position that Houlihan Lokey satisfied its
6  contractual obligations under its agreements
7  with Antioch?
8        A.  In -- not -- I think in the
9  Trust's view, in not aggressively moving
10 forward to get the company to do a Section 363,
11 a bankruptcy-type sale, a change of control
12 transaction here, and in acquiescing in a
13 process that allowed what, from all
14 appearances, for some period of time had been a
15 melting ice cube, a company whose value is
16 decreasing over time through decreasing sales
17 and operations and it's overloaded with debt,
18 that in not really forcing the issue when the
19 initial valuation indications come back, that
20 there's only enough to pay a certain amount of
21 the debt here and there's nothing for the
22 equity, and instead of acquiescing in a process
23 where value continues to erode and a sale never
24 happens, you know, I think the Trust's position
25 is that that facilitated a breach of fiduciary

42 (Pages 162 to 165)

Page 166

1  duty by the directors by not getting --
2  maximizing the value here and selling the
3  company and selling the assets at a time when
4  the value can be maximized.
5       And the delay was based upon
6  what -- were proposals from the Morgan family
7  and Candlewood, yet were not -- unfunded
8  proposals. There was never financing obtained,
9  and Lee Morgan was abundantly clear in a
10  November e-mail -- '07 e-mail saying he was not
11  going to put any more money into the company.
12       So under those circumstances, as
13  your -- the party that's supposed to sell the
14  company, the valuations come that the only
15  way the company can get sold is in bankruptcy
16  because you have to get consent of all the
17  other classes below what the value is out
18  there, the recommendation to the board has to
19  be you need to sell this company in bankruptcy.
20  When the board doesn't take your advice, you
21  need to withdraw. That's the Trust's position.
22       Q. Does that constitute a breach by
23  Houlihan Lokey of its agreements with Antioch?
24       A. As --
25       MS. ANDREW: Objection.

Page 167

1       THE WITNESS: I think that it
2  constitutes a breach of their duty to the company
3  in terms of what they -- but contractually is
4  there anything that contractually requires them to
5  force that? I don't see it in here.
6  BY MR. PRENTISS:
7       Q. Well, the only relationship here
8  is contractual, right?
9       A. Well -- correct.
10      Q. And so if there's a duty, it's a
11  duty that arises out of the contract, a duty
12  from Houlihan Lokey to Antioch?
13      A. But they're engaged to provide
14  services to sell the company and provide their
15  best advice at doing that, right? And the
16  valuation indications came back considerably
17  under, and the only way to do a sale in that
18  circumstance is in bankruptcy, and they
19  suggested that and the company didn't do it.
20      Q. You didn't sue Houlihan Lokey for
21  breach of contract, right?
22      A. Correct. That is correct.
23      Q. So even though you have questions,
24  somehow your questions didn't rise to whatever
25  your threshold was for actionable claim?

Page 168

1       A. That is correct.
2       Q. Now, you filed -- you prepared
3  answers to interrogatories with respect to my
4  client, Mr. Northrop. Do you remember doing
5  that?
6       A. Yeah, I'm not sure. Let me see
7  them.
8       Q. Yeah.
9       MR. PRENTISS: This is one I didn't
10  make copies of. Why don't we mark that as I think
11  the next one is 790. Do you have a sticker you
12  can put on that somewhere.
13       (Thereupon, Exhibit 790, The Antioch
14  Company Litigation Trust's response to first set
15  of interrogatories of James A. Northrop, was
16  marked for purposes of identification.)
17  BY MR. PRENTISS:
18       Q. Now, do you recall compiling
19  answers or signing a set of answers to
20  questions submitted to you on behalf of
21  Mr. Northrop?
22       A. Yes, I do.
23       Q. Okay. Do you remember being asked
24  a question, the very first question, state all
25  facts on the basis of which plaintiff, that's

Page 169

1  you, allege that Northrop allowed the Morgan
2  family to pursue or failed to prevent the
3  Morgan family from pursuing recapitalization
4  alternatives?
5       A. Uh-huh.
6       Q. Do you remember that?
7       A. Uh-huh.
8       Q. You have to say yes or no.
9       A. Oh, I'm sorry. Again, it -- yes.
10      Q. And I'd like you to turn to page
11  four of the document which is the second page
12  of your answer to that first interrogatory
13  number one.
14      A. Uh-huh.
15      Q. And among the things that you
16  accuse my client of doing or failing to do is
17  failed to provide the company with prudent
18  direction and a necessary sense of urgency. Do
19  you see that?
20      A. I haven't found it yet but --
21      Q. It's beginning of the latter part
22  of the second line from the top.
23      A. Oh, okay. Let me see.
24      Q. Do you have it now?
25      A. Yes, I do. Uh-huh.

Page 170

1      Q.  And is that your position, that
2  Northrop and the other board members in 2008
3  failed to provide the company with prudent
4  direction and a necessary sense of urgency?
5      A.  Yes.
6      Q.  And the necessary sense of urgency
7  relates back to your position that the company
8  was in dire financial straits and the zone
9  of insolvency at least as early as 2007?
10     A.  And declining in value.
11     Q.  And declining in value?
12     A.  Yes.
13     Q.  Okay.  Now, going back -- turn
14 back one page to page three of the document,
15 the first part of your answer where you
16 identify some of the things that you say
17 Mr. Northrop did wrong here as a board member.
18 And I want to look here at the -- it's about
19 seven or eight lines down in this answer on the
20 page where you say Northrop sanctioned the
21 pursuit of sale efforts by Houlihan Lokey while
22 simultaneously supporting or failing to stop
23 the efforts of the Morgan family.  Do you see
24 that?
25     A.  Yes.  Uh-huh.

Page 171

1      Q.  What exactly did Northrop do to
2  support the efforts of the Morgan family?
3      A.  Well, I mean, the entire special
4  committee of which Mr. Northrop was a part
5  continued to delay any sort of sale of the
6  company, a change of control sale, while
7  waiting on and getting proposals in February
8  and late January there was -- I believe it was
9  late January of '08 there was the Article 9
10 proposal, and then in February -- or maybe it
11 was February is the Article 9 proposal, again,
12 not -- my recollection of that, that there was
13 really no financing behind it.
14         And then the GSC deal, which was a
15 very complex term sheet with some significant
16 issues that I recall Houlihan expressed with
17 respect to that, yet then the special committee
18 voted to give exclusivity to GSC through the
19 March and April time period.  And then in mid
20 April GSC decides that they're not going
21 forward.
22         And even up until May you have
23 Candlewood and the Morgans coming back then I
24 believe with the -- continuing to be looking
25 for other financing sources, I suppose, but

Page 172

1  also then -- that was the backstopping of the
2  ESOP notes was in late May.
3         So there's this whole long string
4  of the company never moving to a sale process
5  and, you know, all the while there are at least
6  at this time three parties interested.  Was it
7  Marlin, Monomoy, and J.H. Whitney interested in
8  doing a change of control sale transaction, and
9  all of those folks get put on hold with the
10 approval of the special committee.
11     Q.  When you say put on hold, let's --
12 I understand -- so Northrop did bad by
13 supporting the Morgan family effort to
14 recapitalize; and by supporting, you mean that
15 Northrop and the members of the board did not
16 sell to somebody else?  Is that what you're
17 saying?
18     A.  Did not maximize the value of the
19 company in a change of control transaction.
20     Q.  Whose buyer they should have sold
21 to?
22     A.  Whoever submitted the highest and
23 best bid for the company in an auction in a
24 bankruptcy, that's who they should have sold
25 to.

Page 173

1      Q.  So your testimony is that it's a
2  breach of fiduciary duty of the board of
3  directors of Antioch as of, let's say, March of
4  2008 for having refused to put the company into
5  bankruptcy at that point?
6      A.  To have maximized the value of the
7  company.  And, again, let's think about this.
8  Mr. Northrop was originally engaged as a
9  consultant and did this contingency analysis,
10 right?  He knew that there were significant
11 issues with the company.
12         Those significant issues had been
13 out there for some amount of time, and,
14 frankly, traced their way back to the 2003 ESOP
15 transaction, and who is in control of the
16 company at all these times?  Who's the CEO?
17 Who remains in control or remains the CEO?
18 After Mr. Northrop knowing all these issues
19 comes on and joins the board.
20     Q.  So you've sued him for breach of
21 fiduciary duty.  Is it your testimony that the
22 board and Mr. Northrop should have voted in
23 March of 2008 to file for bankruptcy?
24     A.  If the indications of value were
25 coming back from the transaction -- or the

44 (Pages 170 to 173)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 174

1    process that Houlihan ran, if those indications
2    were coming back in the fall that there's only
3    enough money to cover the debt -- the bank's
4    debt and a little bit beyond that and there's
5    nobody else out there, Mr. Morgan, who has
6    known about the sale process and the decision
7    to sell the company since February of 2007, and
8    in November has no financing or money to do it
9    with and is adamant that he's not going to put
10   more money in, that's the point in time at
11   which if the company -- if we're going to
12   maximize value, the maximization of the value
13   should have happened then.
14       Q.  When?  Then meaning when?
15       A.  November -- November -- as soon as
16   a deal could have been struck, if one were to
17   be struck, between Sun and whomever or whomever
18   else may have come forward.  Houlihan was
19   tasked at that point in time in going back out
20   and seeing if it could find distressed buyers
21   at that juncture.  Whomever else it might have
22   found at that juncture.
23       Q.  Well, did you read Houlihan's
24   presentation as to all of its efforts,
25   including Sun?

Page 175

1        A.  Yes, I did.
2        Q.  And did Houlihan explain that Sun
3    took a walk on this deal?
4        A.  Ultimately they did, yes, but
5    no -- there's been no -- there was never --
6    we've never found or I've not seen a document
7    or any explanation as to why there wasn't a
8    counteroffer because --
9        Q.  Was there ever -- do you have
10   evidence of an offer being made by Sun Capital
11   for Antioch Company?
12       A.  There are e-mails indicating that
13   there were expressions -- that there was an
14   expression of interest.
15       Q.  Listen to my question.  You're a
16   lawyer -- you're a transaction lawyer?
17       A.  Uh-huh.  A bankruptcy lawyer.
18       Q.  A bankruptcy lawyer.  Do you know
19   what an offer is?
20       A.  Yes.
21       Q.  One of the exhibits you looked at
22   was an offer by J.H. Whitney for the company
23   for fifty-four million dollars, right?
24       A.  Letter of intent, yes.
25       Q.  Letter of intent.  Did Sun

Page 176

1    Capital --
2        A.  No.
3        Q.  -- ever submit a letter of intent?
4        A.  No, they did not.
5        Q.  Did --
6        A.  But, again, the company -- from
7    the e-mail and from the documentation, it
8    appears that there was never a response to
9    their indication of interest.
10       Q.  What form did the indication of
11   interest take?
12       A.  It was verbal was -- from the
13   documentation.
14       Q.  You ever seen Exhibit 183?
15       A.  I'm sure I have.
16       Q.  Do you recognize that?
17       A.  Yes.
18       Q.  It's a presentation by Houlihan
19   Lokey --
20       A.  Yes.
21       Q.  -- correct?  And it's a
22   presentation that as of November 5, 2007, which
23   is intended to give a detailed and accurate
24   timeline of its work with potential buyers of
25   the company?

Page 177

1        A.  Uh-huh.
2        Q.  Yes?
3        A.  Yes.  I'm sorry.  Yes.
4        Q.  And do you rely on this, in part,
5    for your information as to what actions
6    Houlihan Lokey took and what actions potential
7    buyers took?
8        A.  It is -- yes, it is certainly some
9    of the information that we have.
10       Q.  And isn't it true that Houlihan
11   Lokey explains in this presentation that both
12   Jostens and Sun Capital, upon further
13   investigation of Antioch, decided to take a
14   walk?
15       A.  I'm looking for that right now.
16           MS. ANDREW:  Objection.  I think that
17   misstates the evidence.  Take your time to look
18   through the entire document.
19           THE WITNESS:  I will do that, yes.
20   BY MR. PRENTISS:
21       Q.  You might want to look at internal
22   page -- document control number PCA0004162 and
23   4163.
24       A.  Okay.  Give me just a moment.  62.
25   Okay.  Uh-huh.  Uh-huh.  Yeah.  Why don't you

45 (Pages 174 to 177)

Page 178

1  take a look at PCA-004164. HLZ is seeking on
2  October 24th to go back to Sun Capital with
3  counteroffer approved by the committee special
4  transaction -- approved by the company's
5  special transaction committee. HLZ is waiting
6  for -- HLHZ, I'm sorry, is waiting for approval
7  on action items to execute next steps. That's
8  where it ends.
9         Q.  Let's look at the previous page.
10  Do you read this, on October 24th, 2007, Sun
11  Capital delivered a message that they were not
12  going to be in a position to mark-up a purchase
13  agreement --
14         A.  Uh-huh.
15         Q.  -- as they believed their
16  valuation was significantly below what they
17  believe seller expectations were?
18         A.  Yes. I saw that.
19         Q.  Do you have any reason to doubt
20  that that's, in fact, what Sun Capital told
21  Houlihan Lokey?
22         A.  Well, no, I don't; but if you read
23  down the page, it talks about -- let's see.
24  Sun believes they have done a tremendous amount
25  of work on the opportunity and also performed

Page 179

1  independent research, and as such, would
2  potentially be willing to move forward under
3  the following scenario. Senior lenders would
4  need to be willing to rollover the position.
5  Sun would assume approximately what they
6  believe to be unfunded consultant retirement
7  obligations. No cash proceeds with a
8  possibility of some potential subdebt.
9         That's a -- we understood to be a
10  verbal proposal, and here is Houlihan saying
11  they've delivered this information to the board
12  and they're looking for board approval or
13  special committee approval to go back to Sun
14  with a counteroffer, and that is consistent
15  with e-mails at that time. And what we don't
16  understand is why that never happened from what
17  we can tell. And if somebody has a document or
18  found a document that answers that question, I
19  would be happy to see it because we don't know
20  what happened from that point.
21         Q.  So your position is that the board
22  committed a breach of fiduciary duty by not
23  making a counteroffer to Sun?
24         A.  Yes. I mean, if somebody is out
25  there with an expression of interest, I think

Page 180

1  you go back -- again, the decision was made in
2  February to sell. They go through a sale
3  process, and what Houlihan is saying is that
4  the indications of value are coming back
5  because the company's financials and its
6  operations is deteriorating with time, and
7  somebody has come back and said, well, you
8  know, we don't want to -- we don't see doing
9  the deal that you guys have proposed but here's
10  an alternative deal. I think you respond to
11  that if the original decision of the board in
12  February was to sell, and we can't see anywhere
13  where they responded to.
14         We do know, though, that they got
15  sidetracked by an offer in the interim here
16  from Lee and Candlewood. And, again, it was an
17  offer with a lot of issues. I use the word
18  offer very loosely. It was an expression of
19  interest I would say.
20         Q.  Well, do you distinguish between
21  the expression of interest of -- that you're
22  referring to from Mr. Morgan and whatever
23  expression that you believe Sun Capital made?
24         A.  No. I would put those things in
25  the same ballpark. I think the board

Page 181

1  should have been responding to that, but Sun --
2  there's no indication -- unlike from
3  Mr. Morgan, there's no indication from Sun that
4  they weren't going to put any money in at least
5  or didn't have an ability to do a deal that
6  involved them putting money in. I guess they
7  don't -- their initial indication was they
8  didn't want to have to put money in, they
9  wanted the banks to roll stuff over; but, you
10  know, these are private equity funds.
11         Q.  What's the distinction of it being
12  a private equity fund? How does that make a
13  difference over the fact that it doesn't offer
14  any money into the deal?
15         A.  Well, it's probably a poor
16  distinction, let's leave it at that.
17         Q.  Elsewhere in your interrogatory
18  answer you talk about -- one of the failings of
19  the board of directors and of Jim Northrop was
20  that it was -- it led the company to jeopardize
21  realistic alternatives for the company and
22  create confusion in the marketplace. Do you
23  remember giving that answer? And this is still
24  on page three.
25         A.  Let me find it.

Page 182

1    Q.  Just further down.
2    A.  We're on page -- I'm terribly
3  sorry but I'm not seeing what you're talking
4  about.  I'm sorry.
5    Q.  Page three, the first page of your
6  answer to interrogatory number one?
7    A.  Okay.  Thank you.
8    Q.  The special committee, including
9  Northrop, approved the engagement of multiple
10  professionals -- do you see that?
11    A.  Yes.
12    Q.  -- sanctioning the actions of
13  multiple professionals thereby jeopardizing
14  realistic alternatives.  Do you see all that
15  answer?
16    A.  Yes.  Uh-huh.
17    Q.  Okay.  First, what did Northrop do
18  to sanction the actions of multiple
19  professionals?
20    A.  Well, I think you've got Houlihan
21  involved.  You've got Candlewood involved and
22  looking to get paid from the company.  You've
23  got legal counsel involved.  And all these
24  folks are continuing on in a process through
25  2008 that I think I just mentioned that when

Page 183

1  you have -- as I said, there were three
2  parties -- pardon me -- in the March time
3  frame -- March to April time frame coming
4  forward with offers to purchase the company in
5  a change of control transaction -- pardon me --
6  that would be done through a bankruptcy; and
7  instead of pursuing any of those really in any
8  earnest until probably, from what I could tell,
9  mid to late April, the special committee is
10  entertaining offers from Candlewood first as an
11  Article 9 sale, which doesn't make any sense
12  whatsoever in this circumstance and Houlihan
13  does a very good job -- there's a very lengthy
14  e-mail from Houlihan that explains why that's a
15  really bad idea.
16    And then there is -- they go back
17  to the drawing board and there's something
18  else, I think, in February that ultimately
19  becomes maybe the GSC deal, and Houlihan again
20  raises questions and issues with that and the
21  ability to get it done.  And, in fact, Houlihan
22  is telling -- I think is telling the special
23  committee that they have real concerns about
24  GSC and how real this is.
25    But the special committee goes

Page 184

1  ahead and agrees to give GSC exclusivity, which
2  means really the company is dealing exclusively
3  with them, putting the company kind of on hold
4  for thirty days while GSC does due diligence,
5  and then gets toward the end of that due
6  diligence period in mid April and GSC backs out
7  and the company, you know, is still out there.
8    And now at this juncture, and it's
9  really not until then that the special
10  committee does something significant and
11  serious in terms of asking Mr. Morgan to step
12  down and bring in, you know, a professional
13  turnaround person who has kind of been there in
14  the wings all the time but nobody is really
15  using in favor of keeping Mr. Morgan in place.
16    And, again, Mr. Morgan is -- and
17  the Morgan family are the ones who have kind of
18  presided over the company getting to the place
19  that it is.  And --
20    Q.  But -- my question was, what did
21  Northrop do to sanction the actions of multiple
22  professionals?  Your answer is that he and the
23  members of the special transaction committee
24  looked at proposals submitted by Candlewood or
25  the Morgan family, correct?

Page 185

1    MS. ANDREW:  Objection.
2    THE WITNESS:  Well, they entertained
3  those proposals and they did that to the exclusion
4  of other proposals.
5  BY MR. PRENTISS:
6    Q.  How do you know it was to the
7  exclusion of other proposals?
8    A.  Because they weren't proceeding
9  with the other proposals.
10    Q.  Marlin -- are you talking about
11  Marlin Equity?
12    A.  Marlin and Whitney and Monomoy --
13    Q.  Okay.
14    A.  -- right?
15    Q.  Well, let me ask you about Marlin.
16  How much of an offer did Marlin make?
17    A.  I'd have to look back at the
18  documents, but my recollection was one of them
19  was in the forty-some millions.
20    Q.  So is it your testimony that the
21  board should have executed a sale with Marlin
22  at forty million dollars?
23    A.  No, that's not my testimony.
24    Q.  Is that the realistic alternative
25  that you say that the board was jeopardizing in

47 (Pages 182 to 185)

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                           W. Timothy Miller

Page 186

1   this answer, the Marlin Equity deal?
2       A. No. I think what ultimately came
3   out of the process, and the process was delayed
4   at least thirty days, if not more, was the J.H.
5   Whitney offer that they were moving forward to
6   in May that was at, my recollection, fifty-four
7   or fifty-two million, somewhere in there, for a
8   363 sale process and bankruptcy.
9       Q. Was the Marlin Equity deal one of
10  the deals you refer to when you say that
11  Northrop jeopardized realistic alternatives for
12  the company? Yes or no?
13      A. Yes.
14      Q. What other specific offers --
15      A. Well --
16      Q. -- do you refer to as being
17  realistic alternatives that Northrop
18  jeopardized?
19      A. I think from the -- from what
20  unfolded, as I understood it, by May, there
21  were at least three different offers, Monomoy,
22  Marlin, and Whitney, and the company was at
23  that time proceeding, purportedly, for a
24  deal -- a 363 deal with Whitney.
25      And, again, one of the things that

Page 187

1   seems to be missing here is that you're not
2   talking about doing the deal at that offer.
3   You're talking about doing the deal in a 363
4   sale in a bankruptcy, and that offer is the
5   starting place for the other offers because a
6   363 sale is an auction and you've got three
7   parties vying to be the entity that starts the
8   auction.
9       So we don't know how much somebody
10  would have paid at the auction because it never
11  happened. It never got started.
12      Q. Is this true, Mr. Miller: When
13  you say that the board's actions caused or
14  created confusion in the marketplace, you could
15  not identify a single potential buyer which
16  either backed out of engaging in a possible
17  sale or declined to get involved in a possible
18  purchase of the company because of confusion?
19      A. I don't know that that's -- I
20  don't know that that's accurate, but --
21      Q. Well, then, identify the actor,
22  the potential buyer that backed away from being
23  involved in this process because it was
24  confused by the actions of the board of
25  directors.

Page 188

1       A. My recollection is that there is
2   e-mail traffic on it somewhere that -- but I'd
3   have to go back and look. There are too -- I
4   mean --
5       Q. Well, this is important so why
6   don't we go --
7       A. I understand.
8       Q. -- off the record and you find the
9   e-mails. And so that we're very clear on the
10  record what I'm asking for, I'm asking you to
11  identify a single or multiple entities --
12      A. Uh-huh.
13      Q. -- that declined to be involved in
14  purchase of The Antioch Company because it or
15  they were confused by the actions of the board
16  of directors of Antioch. Do you understand
17  that?
18      A. I do.
19      Q. Fine. Let's go off the record and
20  see what you can find.
21      A. Okay.
22      THE VIDEOGRAPHER: We're off the
23  record.
24      (Pause in proceedings.)
25      THE VIDEOGRAPHER: We're on the

Page 189

1   record.
2   BY MR. PRENTISS:
3       Q. Mr. Miller, have you identified a
4   potential buyer that either backed out of or
5   declined to get involved in possible purchase
6   of The Antioch Company because it was confused
7   by the actions of the Antioch board of
8   directors?
9       A. No, but I have identified a
10  document indicating a confusion among the
11  bidders.
12      Q. That wasn't my question.
13      A. Okay.
14      Q. Thank you.
15      A. As I sit here today, no, I have
16  not, that backed away.
17      Q. Now, in further answers -- your
18  answers to interrogatories, I'm going to ask
19  you to turn back to your answer to the question
20  involving damages, interrogatory number
21  fourteen and your answer beginning at page --
22  page fifteen.
23      And I'm specifically going to ask
24  you questions about the topic that begins in
25  boldface below the half of the page on page

48 (Pages 186 to 189)

Page 190

1    sixteen, loss in enterprise value.
2         A.  Uh-huh.
3         Q.  Do you see that?
4         A.  Yes.
5         Q.  That's your answer talking about
6    an element of damages that you claim in this
7    case?
8         A.  Yes.
9         Q.  And is it true that the loss of
10   enterprise value that you're claiming as
11   damages resulted both, in your opinion, from
12   the tender offer and the sale process?
13        A.  That's what -- yes, that's what
14   the answer says.  Yes.
15        Q.  And the sale process is the
16   process that I've been asking you questions
17   about that took place during 2007 and 2008,
18   correct?
19        A.  Correct.
20        Q.  The tender offer is the 2003 ESOP
21   transaction?
22        A.  That is correct.
23        Q.  And you can't differentiate or
24   apportion what you call loss in enterprise
25   value damages between those two causes, can

Page 191

1    you?
2         A.  Well, no, it's saying that we are
3    expecting to offer expert testimony on the loss
4    of enterprise that resulted from the tender
5    offer process and the sale process.  That's
6    what it says.
7         Q.  Well -- but you go on in your
8    answer to actually give some figures --
9         A.  Yeah.
10        Q.  -- on what you claim as being loss
11   of enterprise value, right?
12        A.  And those come from -- at least
13   the figures come from the sale process, right?
14        Q.  Well, I'm asking you.  The figures
15   you've got here for loss of enterprise value,
16   are those figures that you attribute both to
17   the tender offer and the sale process?
18        A.  I think that you would logically
19   look at it from a standpoint of the company has
20   a value at the time of the tender offer, okay,
21   and in the summer of '07 what this is saying,
22   there are expressions of interest that put the
23   value between one forty-eight and one
24   eighty-five.  And then by May of 2008 you have
25   a J.H. Whitney offer at fifty-four million.

Page 192

1         So there are three points in time.
2    There's a value at the time of the tender
3    offer, there's expressions of interest in the
4    summer, and then there are -- then there's a
5    value -- then there's a J.H. Whitney offer, and
6    those are decreases at each point in time.
7    So -- and, again, it's all subject to having an
8    expert really weigh in on that and provide
9    greater specificity, detail, et cetera.
10        Q.  Well, your figure of a hundred and
11   twenty-one million then, that's a number you
12   blame on my guy, Jim Northrop?
13        A.  Basically.
14        Q.  Okay.  Now, let's start with
15   the -- your fifty-four million dollar figure.
16   Is it the Trust's position that the enterprise
17   value of Antioch in May of 2008 was fifty-four
18   million dollars?
19        A.  Again, we don't have a testifying
20   expert with respect to this; but there was an
21   offer by J.H. Whitney of fifty-four million
22   dollars in May and the company was proceeding
23   forward to move forward on that with a 363
24   sale.
25        As I indicated earlier, a 363 sale

Page 193

1    is an auction process.  So fifty-four million
2    is the starting place.  We do not know, and as
3    we sit here today, do not know what the value
4    might have been had an auction occurred.
5         Q.  Well, is it the position of the
6    Trust -- I mean, you signed these answers,
7    correct?
8         A.  Yes.
9         Q.  These are the answers of the
10   Trust, correct?
11        A.  Yes, and --
12        Q.  These are the answers of you as
13   the trustee, the plaintiff in this lawsuit?
14        A.  On behalf of the Trust in August
15   of 2011, yes.
16        Q.  All right.  And it's the position
17   of the trust that the value of -- the
18   enterprise value of the company, Antioch
19   Company, was at least fifty-four million as of
20   May 2008?
21        A.  The company's value had declined
22   to approximately fifty-four million --
23        Q.  So --
24        A.  -- based on that offer.
25        Q.  -- the answer is yes?

49 (Pages 190 to 193)

Page 194

1      A.  Based on the offer.  That's --
2  that's the only offer that -- I mean, that was
3  what was out there in terms of the best offer
4  in May of 2008.
5      Q.  That's a benchmark?
6      A.  It's what somebody was willing to
7  sign off and be a stocking horse in an auction
8  pursuant to an LOI, although they had not
9  reached -- there was not definitive terms of an
10  agreement at that juncture.  That was a letter
11  of intent.
12      Q.  But there was sufficient evidence
13  in your mind to be able to say the value of the
14  company was at least fifty-four million dollars
15  in May 2008 because there was a letter of
16  intent, arm's length transaction --
17      A.  Again, we say --
18      Q.  -- offer?
19      A.  -- by May the company's value had
20  declined based on that proposal.
21      Q.  Now --
22      A.  I don't -- yeah.
23      Q.  Okay.  Now, let's -- so that's the
24  basis of the fifty-four million dollar figure.
25  Go back a page to your discussion of Jostens

Page 195

1  and Sun Capital.
2      A.  Uh-huh.
3      Q.  Do you see that?
4      A.  Yes.
5      Q.  Are you meaning to imply with this
6  answer that Jostens and Sun Capital made
7  expressions that they or either of them valued
8  The Antioch Company at between a hundred and
9  forty-eight and a hundred and eighty-five
10  million dollars?
11      A.  I understood -- I mean, I think
12  that there are documents from -- or reports
13  from Houlihan with respect to Jostens and Sun
14  Capital placing expressions of interest of the
15  four to five times EBITDA.  In fact, I think
16  that exhibit we just looked at may have
17  mentioned that.
18      Q.  Well, why don't you just pick that
19  up and you show me within Exhibit 183 or
20  anyplace else where Houlihan communicates that
21  either Jostens or Sun Capital valued The
22  Antioch Company at between a hundred and
23  forty-eight and a hundred and eighty-five
24  million dollars.
25      A.  I don't see the exhibit here.  It

Page 196

1  was the one he handed me.
2      Q.  Yeah, you should have it.
3      MR. SCHEIER:  Isn't this it?
4      THE WITNESS:  Yes, you may be right.
5  I just didn't flip far enough.  Sorry.  Thank you.
6      MS. ANDREW:  It was masquerading as
7  an e-mail.
8      THE WITNESS:  Yeah.  Yeah, these were
9  the references to the initial letters on
10  PCA-00041363, four times to five times sustainable
11  run rate EBITDA to Sun Capital.
12  BY MR. PRENTISS:
13      Q.  Tell me what -- you gave me a
14  number that doesn't --
15      A.  416 -- PCA-4163.
16      Q.  Okay.
17      A.  Page eighteen is at the top.  Sun
18  Capital outlined a valuation in their initial
19  bid letter four times to five times sustainable
20  run rate EBITDA.
21      Let's see, what does Jostens say?
22  Let's see.
23      Q.  Well, let's just stay with the Sun
24  Capital.
25      A.  Well, I'll tell you I think it's

Page 197

1  probably in the August 30th portion because
2  they submitted those expressions of interest in
3  the summer, and I think EBITDA then
4  subsequently goes down.  But I think that this
5  document or something similar to it may be --
6  well be where those numbers came from.
7      Q.  Well, sustainable run rate
8  EBITDA --
9      A.  Uh-huh.
10      Q.  -- means an EBITDA level that can
11  reliably be expected to continue into the
12  future, right?
13      A.  That would be my understanding of
14  that, yeah.
15      Q.  And did anybody ever as -- in this
16  Houlihan document or elsewhere, say that
17  Antioch in the summer of 2007 had a sustainable
18  run rate EBITDA of thirty-seven million
19  dollars?
20      A.  Well, I imagine at the -- no, I
21  mean, clearly that was decreasing with time.
22  Although when people became aware of that, you
23  know, is another question.
24      If you look back on -- here's a
25  comparison of the two offers -- or the

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 198

1  expressions -- indications of interest on page
2  thirty-four of that exhibit at 4179, and
3  that's -- there's a thirty-seven million dollar
4  EBITDA number there with four and five times.
5  And, again --
6       Q.  This is far from an evaluation of
7  the enterprise value of a corporation, an
8  initial indication of interest, correct?
9       A.  Yeah, it's an expression of
10 interest.  Yes, that's absolutely right.  Yes.
11 Absolutely.
12           MR. PRENTISS:  Thanks.  I have
13 nothing further.
14           MS. BRENNAN:  I can start if no one
15 has any objection to me starting.  I might even
16 get through in a half hour.
17           MR. GENTRY:  That's fine.
18           MS. BRENNAN:  Okay.  We're going to
19 go ahead though and change the tape right now
20 since there's only five minutes left.
21           THE VIDEOGRAPHER:  We're off the
22 record.
23           (Pause in proceedings.)
24           THE VIDEOGRAPHER:  We're on the
25 record.

Page 199

1           CROSS-EXAMINATION
2  BY MS. BRENNAN:
3       Q.  Mr. Miller, my name is Kimberly
4  Brennan.  I represent Candlewood Partners in
5  this matter.  I'm going to be asking you some
6  questions regarding the allegations that the
7  Trust has made against my client.
8           Before I begin, I see that you
9  have a binder full of documents --
10      A.  Yes.
11      Q.  -- in front of you.  Are those
12 documents that relate to Candlewood Partners?
13      A.  There are some in here, yes, to
14 that effect.  Yes.
15      Q.  And would you identify the
16 specific exhibits that you are relying upon?
17      A.  This -- these are deposition
18 exhibits.  I think it's pretty much everything
19 but just in chronological order.  I don't think
20 -- these aren't just specific to Candlewood.
21 But I guess I may or may not need to rely on
22 them depending on what your questions are, I
23 just wanted to have it ready to try to minimize
24 any time delay if I -- if I needed to look at
25 something.  The document that is open in front

Page 200

1  of me, however, is Exhibit 241, which is an
2  e-mail from Glenn Pollack to Lee Morgan dated
3  6-28-07.
4       Q.  Okay.  And in preparation for
5  today's deposition, you testified that you
6  reviewed the deposition exhibits; is that
7  correct?
8       A.  Yes.
9       Q.  And you also testified that you
10 reviewed portions of deposition transcripts;
11 but if I understood your testimony, you didn't
12 read every deposition transcript that has been
13 taken in this case; is that correct?
14      A.  That is correct.
15      Q.  When you were reviewing deposition
16 exhibits, did you also review the deposition
17 testimony that related to that exhibit?
18      A.  Yes.  With certain exhibits, yes.
19 Yes.
20      Q.  Not with every exhibit?
21      A.  Not with every exhibit, no.
22      Q.  Okay.  Do you recall what exhibits
23 you also looked back at the deposition
24 testimony?
25      A.  Not as I sit -- no.  I mean, not

Page 201

1  as I sit here.  I mean --
2       Q.  Did you review the deposition
3  transcript of Mr. Glenn Pollack?
4       A.  I'm thinking that I may have with
5  respect to certain exhibits but I don't
6  precisely recall which ones.  I apologize but
7  there are enough of them that it -- to some
8  extent it kind of runs together in my head, but
9  I don't have a firm recollection of having
10 reviewed his depo exhibit.
11      Q.  Okay.  Or his transcript?
12      A.  I'm sorry, the exhibits
13 definitely.  I definitely reviewed the
14 exhibits.  The transcripts, I can't recall for
15 certain that I -- yeah, I just don't remember.
16      Q.  Okay.  Did you review the
17 deposition transcript of Stephen Spencer from
18 Houlihan Lokey?
19      A.  I believe I reviewed portions of
20 that with respect to certain exhibits.
21      Q.  Do you recall what portions you
22 reviewed?
23      A.  I don't.
24      Q.  Okay.  I want to go back to the
25 preparation that the Trust undertook prior to

Antioch Litigation Trust, et al.   v. McDermott Will & Emery LLP                                    W. Timothy Miller

---

Page 202

1   filing both the original complaint and the
2   amended complaint.  Was there any type of
3   informal interview process that was done prior
4   to filing the complaint?  For example, did
5   either you or anyone associated with the Trust
6   conduct informal interviews with people who
7   were either currently employed by The Antioch
8   Company or had been employed by The Antioch
9   Company prior to the filing of the bankruptcy?
10      A.  I don't believe that we conducted
11  informal interviews of anyone.  During the
12  bankruptcy case itself the committee was
13  permitted to take -- I don't know what the best
14  word to call them.  They were not depositions.
15  Maybe they were, at best, informal interviews.
16  There were no transcriptions from that.  But
17  that was done, you know, in connection with the
18  committee's investigating and, you know,
19  basically formulating a response to the
20  proposed plan of reorganization that was going
21  through the bankruptcy at a very fast pace at
22  that time.
23      Q.  And when you refer to the
24  committee, you are referring to the official
25  committee of the unsecured creditors?

---

Page 203

1       A.  Correct.
2       Q.  Okay.  And do you recall who was,
3   for lack of a better word, interviewed by the
4   committee?
5       A.  Not everyone, but I'm pretty
6   certain that Asha Morgan Moran was interviewed.
7   Michael Epstein, I think, was interviewed.  I
8   think Lee Morgan was interviewed.  I know that
9   there were others, but off the top of my head,
10  I don't recall precisely who all was
11  interviewed.
12      Q.  Do you remember if anyone from
13  Candlewood Partners was interviewed during the
14  bankruptcy?
15      A.  I do not remember if they were,
16  and I'm not aware that they -- I mean, I don't
17  remember that they were, and I don't know --
18  given what was going on in the bankruptcy at
19  the time, I don't know that they would have
20  been somebody that would have been interviewed
21  at that time.
22      Q.  Do you know whether or not anyone
23  from Houlihan Lokey was interviewed at that
24  time?
25      A.  Again, I don't recall

---

Page 204

1   specifically; but I don't think -- think so.
2   There were a limited number of people that were
3   made available over a limited period of time
4   because time was very short.
5       Q.  Okay.  And prior to the filing of
6   the complaint, were documents reviewed?
7       A.  Yes.
8       Q.  And were those documents from The
9   Antioch Company itself or were they documents
10  from outside sources?
11      A.  There were documents from The
12  Antioch Company itself.  There were documents
13  from outside sources as well.  So, yes, both.
14      Q.  Okay.  And, in fact, the Trust
15  served subpoenas on various entities, including
16  Candlewood Partners; is that correct?
17      A.  My recollection is that we asked
18  for authority from the bankruptcy court to do
19  2004 exams, and that the bankruptcy court
20  declined to give us that authority and instead
21  asked that we go ask informally and then come
22  back to the court if there was an issue.  All
23  of this would be in the docket of the
24  bankruptcy case.  And this would have been in
25  the summer of 2009 time frame.

---

Page 205

1       Q.  Okay.
2       A.  So, again, whether or not that
3   resulted in a subpoena to Candlewood, I
4   honestly don't recall sitting here today.
5       Q.  Okay.  In the first amended
6   complaint, which I believe you have in front of
7   you as Exhibit 42, there are some very specific
8   factual allegations, and I'm going to direct
9   your attention to Paragraph 117.
10          And if you look at the second
11  sentence of that paragraph, it reads defendant
12  Houlihan and defendant Candlewood thought the
13  other professional's work interfered with and
14  jeopardized the potential for a successful
15  outcome for the company, period.  Did I read
16  that sentence accurately?
17      A.  Yes.
18      Q.  And can you tell me the factual
19  basis for that statement?
20      A.  I think that there are e-mails
21  where we have Mr. Pollack from Candlewood
22  essentially complaining about the Houlihan
23  people.  One I'm thinking in particular is the
24  GSC meeting -- the management presentation to
25  GSC that's to take place in New York, I

---

Page 206

1  believe, sometime in February of 2008 where Mr.
2  Pollack is talking about, you know, being
3  certainly unhappy that Houlihan is involved and
4  wanting to be involved in that process and
5  saying something about having Mr. Spencer sit
6  down and sit in the corner and be quiet is my
7  recollection of that, but that could be wrong.
8  But there is -- that's an example.
9         And then I know there are
10  e-mails -- or there's at least an e-mail from
11  Mr. Spencer expressing doubts about
12  Candlewood's ability to get to a deal I think
13  in that same time frame, and maybe it's with
14  respect to GSC but it may also be with respect
15  to something earlier. I'd have to look back
16  and see those e-mails, but that's what comes
17  immediately to mind.
18     Q.  Assuming for purposes of my
19  question that there may have been personality
20  conflicts between Mr. Spencer and Mr. Pollack,
21  I will represent to you that there has been
22  ample testimony in this case so far that
23  Houlihan and Candlewood actually worked
24  together and that neither interfered with the
25  other's ability to do the role it had been

Page 207

1  assigned. Do you have any facts -- does the
2  Trust have any facts as we sit here today that
3  would contradict that testimony?
4     A.  Well, the e-mails that I just
5  mentioned.
6         There is -- I can think of an
7  e-mail exchange I believe in the April time
8  frame -- I think it's April time frame where
9  Mr. Morgan is looking to get financial
10  information I think for Candlewood to use from
11  Mr. Bevelhymer with the company and
12  Mr. Bevelhymer is, I believe, busy trying to
13  get information for Houlihan, and I think
14  Mr. Morgan expresses some frustration about
15  that.
16         There are other e-mails, I think,
17  where there is -- there are some issues there
18  as between the two, you know, parties not --
19  initially not cooperating.
20         In fact, there's some amount of
21  discussion in the January time frame about --
22  in response to Mr. Morgan's letter on January
23  2nd, I believe it is, of '08, you know, wanting
24  to get Houlihan and Candlewood to cooperate
25  more because they hadn't been up until that

Page 208

1  point.
2     Q.  And are you aware that Mr. Spencer
3  testified that although there were issues in
4  the beginning as to what the scope -- the
5  division of scope was going to be, that
6  Candlewood and Houlihan actually worked out
7  their differences and ended up working in
8  collaboration? Are you aware that he testified
9  to that effect?
10     A.  I wouldn't -- I don't recall
11  seeing that testimony; but if he did at this
12  juncture, I -- okay.
13     Q.  And would you agree with me that
14  Mr. Spencer from Houlihan would probably be in
15  the best position to make a determination as to
16  whether or not Candlewood's actions interfered
17  with the process Houlihan was attempting to
18  undertake?
19     A.  Well, it strikes me that the
20  contemporaneous written back-and-forth that was
21  going on at the time the transaction was going
22  on as between Houlihan and Candlewood and what
23  one was saying about the other or doing with
24  respect to the other is probably better
25  evidence of what was going on at that time, in

Page 209

1  my view, than some, you know -- a testimony a
2  few years subsequent is, I guess, my view.
3     Q.  If I understood your response just
4  now, you're discounting the testimony that
5  Mr. Spencer gave under oath in his deposition
6  in favor of e-mails he may have written out of
7  frustration during a very complicated process
8  and a very pressured-filled process?
9     A.  Yes.
10     Q.  Okay. Is it the Trust's position
11  that the dual process undertaken by Houlihan
12  and Candlewood was harmful to The Antioch
13  Company?
14     A.  Yes.
15     Q.  And why was it harmful to The
16  Antioch Company?
17     A.  Well, you heard me testify
18  earlier, for example, about the Sun expression
19  of interest in the February time frame to which
20  there was ultimately no response, from what we
21  could tell, from the company coming back
22  despite Houlihan having requested it several
23  times.
24         And really the only thing, you
25  know, that changed the mix at that juncture,

Page 210

1 beyond where that expression of interest was
2 at, was a proposal interposed by Candlewood and
3 Mr. Morgan at about that same time.
4          And, again, it's some of what I've
5 already talked about, I think, in connection
6 with the questions from Mr. Prentiss.
7          Q. Let me interrupt you just --
8          A. Okay.
9          Q. -- because I'm going to follow up
10 on an answer you actually gave Mr. Prentiss. I
11 believe you testified that the Sun expression
12 of interest disappeared because of the Lee
13 Morgan/Candlewood proposal in November of 2007.
14 Did I understand your testimony correctly?
15          A. I think that looking at the
16 documents and the timing of everything, what we
17 can see is those expressions of interest are
18 there and the Lee Candlewood proposal is there
19 and we don't see any sort of response to the
20 Sun expression of interest despite requests of
21 Houlihan, and I think that there are other
22 e-mails that talk about needing to do that
23 request -- or I'm sorry, respond to the Sun
24 expression of interest in that same time frame.
25          So those two things do occur in

Page 211

1 fairly close proximity to one another, but
2 that's my -- we don't know why there wasn't a
3 response to Sun. We just know that there
4 wasn't one.
5          Q. Earlier you testified about the
6 GSC proposal that was brought by Candlewood and
7 the fact that GSC received a period of
8 exclusivity.
9          A. Yes.
10          Q. Do you recall that testimony?
11          A. Yes.
12          Q. Okay. And were you aware that the
13 senior lenders approved granting GSC
14 exclusivity?
15          A. I saw an e-mail to that effect.
16 That e-mail was not from the senior lenders, I
17 don't believe, but I did see an e-mail to that
18 effect. I don't recall precisely who the
19 author of that e-mail was.
20          Q. Okay. Has the Trust spoken with
21 any representatives of the senior lenders?
22          A. No.
23          Q. Has the Trust spoken with anyone
24 from Sun Capital as to why they disappeared?
25          A. No.

Page 212

1          Q. How about Jostens?
2          A. No.
3          Q. Is it the Trust's position that it
4 was inappropriate for Mr. Morgan to retain
5 Candlewood Partners?
6          A. Well, as president and CEO of a
7 corporation that had previously decided that it
8 should enter into a sale process for the
9 corporation in February, hired an investment
10 banking firm to do that in March, and then
11 proceeded to go down that road, albeit, you
12 know, it seemed to take a while, yes, I don't
13 understand why, again, if -- unless he was
14 contemplating, you know, interposing his own
15 bid for the company which -- but -- and while
16 there were expressions of interest made
17 beginning in November and there were then other
18 things made, it wasn't a sale transaction. It
19 was a transaction that it was contrary to what
20 the board had previously decided in February
21 and it was a transaction that, you know, again,
22 not only could they not find financing to do it
23 outside of bankruptcy, there were huge issues
24 as to whether or not even if they were able to
25 find the financing, the rest of it could be

Page 213

1 done out of bankruptcy or how it would be done,
2 and that was never really adequately fleshed
3 out.
4          Q. And is it your position that the
5 company shouldn't have pursued a dual track,
6 the sale of the company that was being
7 addressed by Houlihan and a recapitalization
8 that was being addressed by Mr. Morgan with
9 funds out of Mr. -- certainly funds for his own
10 investment banker coming out of his own pocket?
11 Is it your testimony that the Trust believed
12 that that dual process should not have
13 occurred?
14          A. Correct. That the company made a
15 decision to sell and was proceeding in that
16 way, and Candlewood -- and they have an
17 exclusive financial advisor, investment banker
18 to do that with knowledge and in violation of
19 that exclusivity, you know, Candlewood is
20 coming in to essentially run a different
21 process at the same time that the company was
22 supposedly running a sale process, yes, the
23 Trust's position is that they shouldn't be
24 running a dual process that had two different
25 end objectives. One was leaving existing

54 (Pages 210 to 213)

Page 214

1 management in place, the same management that
2 had gotten the company in the place that it was
3 at, and the other being a change in control
4 with, you know, new ownership, new money coming
5 in to do something with the company.
6          Q.   In your experience, is it unusual
7 for a company that is in the position that The
8 Antioch Company found itself in 2007, 2008 to
9 run a dual track process?
10         A.   With two separate advisors doing
11 two separate things, yes.
12         Q.   So if I understand your testimony,
13 if the company had engaged Houlihan to run two
14 separate tracks, that would have been
15 acceptable to the Trust?
16         A.   It would have been less
17 problematic in the sense that one of the issues
18 with having two separate advisors is that each
19 of them are looking for getting a percentage
20 fee typically in that type of transaction from
21 anybody who comes in and buys the company
22 because they're out marketing the company.
23 Exclusivity is a key consideration.
24         There's an e-mail somewhere to
25 Mr. Morgan, and I forget who authors it, early

Page 215

1 on before he engages Candlewood, at the time
2 they're talking about engaging Houlihan
3 where -- where the author is explaining to
4 Mr. Morgan the exclusivity piece of it and how
5 once you get them engaged, you're probably
6 going to be -- you know, you want to be certain
7 that this is who you want because once you get
8 them engaged, they're exclusive, they're going
9 to be the ones that are going to work for you
10 on the go-forward because of the exclusivity.
11         You have then -- you don't have
12 exclusivity, you have them competing with
13 respect to buyers so you see the situation that
14 actually unfolded here which was in January,
15 Houlihan is being asked to not go out in the
16 market and market to certain people but
17 Candlewood is.
18         And then we have confusion in the
19 marketplace, there's an e-mail from Marlin in
20 April talking about who's running the process
21 basically and we feel like we're being played
22 and are you really selling or are we just
23 trying to get value up, you know, while the
24 family goes and takes the company?
25         Q.   Are you aware that the day after

Page 216

1 George Case from Marlin expressed his concern
2 there was -- both Marlin and Whitney expressed
3 interest and made -- I'm sorry -- issued --
4 made expressions of interest and, in fact, a
5 second bid was received by Marlin in May with a
6 higher cash purchase price than its original
7 bid?
8          A.   I'm aware that there was continued
9 interest in the company, yeah.
10         Q.   So obviously the confusion didn't
11 stop Marlin from being interested in the
12 company?
13         A.   Apparently not, no.
14         Q.   Mr. Miller, I have almost 4:30 on
15 the dot, and it's my understanding that you
16 need to stop at 4:30; is that correct?
17         A.   I believe my counsel -- yes, I
18 believe we do.
19         MS. ANDREW:  Kim, I don't know how
20 much more you think you have.  I mean, if you
21 think you'll be done in ten or fifteen minutes, we
22 could continue.
23         MS. BRENNAN:  I actually do.
24         MS. ANDREW:  If it's much more than
25 that, I'd like to stop now.

Page 217

1          MS. BRENNAN:  No, I actually am
2 also -- I'm pretty close to being done.
3          MS. ANDREW:  Okay.  Well, let's just
4 keep going.  But thank you for checking.
5 BY MS. BRENNAN:
6          Q.   Are you aware of any facts to
7 support the allegation that Candlewood
8 improperly participated in meetings of the
9 special transaction committee?
10         A.   Well, again, I think this goes to
11 an issue with the board that to the extent they
12 permitted that involvement, that, you know, the
13 board chose a course of action in February
14 of '07 to sell the company, they start down
15 that road, they incur that cost, they have
16 Houlihan involved, they go out to the market
17 and run a process, they don't like where the
18 valuations are coming back, and right when the
19 valuations aren't coming back where they want,
20 Candlewood and Mr. Morgan submit a proposal and
21 that -- again, we don't know precisely but Sun
22 goes away.
23         In January, Mr. Morgan makes a big
24 issue with the special committee about not
25 wanting to compromise his debt, not feeling

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                          W. Timothy Miller

Page 218

1   like he's been involved enough, wanting to be
2   part of the special committee meetings, and the
3   special committee permits him to do that.
4           And then, you know, what ensues is
5   more, you know, we're not getting to a sale.
6   You know, there's more -- there's more delay,
7   there's more -- and all the time, you know, the
8   company is -- you know, is delaying the process
9   and we're never getting to a sale process, and
10  we ultimately never do get to a sale process.
11          So, you know, participation of
12  Candlewood, you know, on behalf of Mr. Morgan
13  who is not -- who is looking out for Mr. Morgan
14  in that instance, in the Trust view, and not
15  looking out for the best interest of the
16  company is not productive and we think, you
17  know, is aiding -- is assisting in that breach
18  of fiduciary duty.
19          Q.  Is it the Trust's position that
20  the fact that Candlewood was seeking a
21  recapitalization on behalf of Mr. Morgan, that
22  that somehow delayed or stopped what Houlihan
23  was doing to try and find a sale?
24          A.  Yes.
25          Q.  And what does the Trust base that

Page 219

1   upon?
2           A.  Well, I think if you look at the
3   timeline, again, you've got initial indications
4   of value that come back in October saying there
5   isn't enough value here to pay all of the debt
6   in full and so we've got to kind of go back to
7   the drawing board and think about a different
8   process.  This is a distressed sale now.
9           But in the midst of that,
10  Candlewood and Mr. Morgan come in with a
11  proposal that talks about a different type of
12  transaction that would not be a change of
13  control transaction but would somehow end up
14  getting value to other parties, although it's
15  not abundantly clear how.
16          And the Sun offer goes -- the
17  Sun -- I say offer, I apologize, it's an
18  expression of interest.  The Sun offer
19  expression of interest, there's no response to
20  it.  We don't know what happens there.
21          So -- and then there's nothing
22  really, it seems, that happens beyond until the
23  end of the year, and then we have a couple
24  proposals.  A Candlewood proposal in, I think
25  it's late January, the Article 9 proposal that

Page 220

1   clearly -- this is not a situation, and
2   Houlihan, as I said earlier, did a pretty good
3   job of explaining why Article 9 doesn't work
4   here and wouldn't work here, which is something
5   that one would think that Candlewood would know
6   before they interpose the proposal.
7           Q.  Well, and the special transaction
8   committee, though, didn't accept any of those
9   proposals, did they?
10          A.  Ultimately, no; but the process is
11  delayed while they're looking at them,
12  considering them, waiting for them.  And then,
13  you know, we're into February now.  We're a
14  year into the process and we don't really have
15  a buyer identified even though several, you
16  know -- at least there's been some indications
17  of interest, and now Houlihan is running a
18  distressed process and there are -- appear to
19  be various management meetings and things going
20  on with various parties.
21          And you've got, I think, in
22  March -- the March time frame the 363 folks
23  come out, Marlin and Monomoy and Whitney, and
24  they're all interested at certain levels but
25  they all want 363.

Page 221

1           And once again there is this, you
2   know, term sheet that, again, Houlihan
3   expresses real concern over with respect to
4   Candlewood's ability to get it done with GSC
5   and, you know, it doesn't make -- the proposal
6   doesn't make a lot of sense but -- at least
7   initially but yet exclusivity is given --
8           Q.  Let me stop you there.
9           A.  -- and it's another thirty days.
10          Q.  Exclusivity was given with respect
11  to which --
12          A.  The GSC proposal, although, I'm a
13  little fuzzy, I guess, which one, but I think
14  it was sort of -- it was yet another -- it was
15  a recapitalization-type deal that GSC was
16  proposing.
17          Q.  And that was the only time that a
18  proposal brought by Mr. Morgan and Candlewood
19  was actually granted exclusivity; isn't that
20  correct?
21          A.  That is correct.
22          Q.  Okay.  So I guess I'm not
23  understanding where the delay comes in.  I
24  understand that Mr. Morgan and Candlewood
25  presented various options to the special

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                    W. Timothy Miller

---

Page 222

1  transaction committee, all of which were
2  ultimately rejected by the special transaction
3  committee; but I just want to be clear, is it
4  your testimony that while those proposals were
5  being made to the special transaction
6  committee, Houlihan was not moving forward in
7  its process?
8      A.  From the documents, it appears to
9  me that the delay was from the early November
10 2007 time frame up through probably, what,
11 certainly that time in April, late April, and
12 maybe into May there were still -- you know,
13 there were proposals being made up -- as I'm
14 sure you know, up until late May, early June
15 time frame, the backstopping of the ESOP notes
16 which frankly was rejected twice, I guess, by
17 the banks.  It got submitted once and rejected
18 and then a week later submitted again by
19 Candlewood and the people were asking, well,
20 what's different about this.  Really nothing.
21     Q.  My question, though, was a little
22 bit more specific.  Is it the Trust's position
23 that while Candlewood was doing what it was
24 doing and making its proposal Houlihan just
25 stopped working?

---

Page 223

1      A.  There was a time that they -- it
2  appears that there were issues.  And there's a
3  reference to that, I think, in an e-mail in the
4  November time frame when Houlihan was wanting
5  to get their carve-out, and that's a Houlihan
6  issue.
7      Q.  Yes.
8      A.  So I'm not suggesting that's a
9  Candlewood issue, but Candlewood obviously had
10 already entered into the process at that
11 juncture.
12         It certainly appears that beyond
13 that and beyond the -- the -- sorry, it's
14 late -- the January -- basically beyond that
15 time period in January, that the parties
16 were -- that Houlihan appears to have been
17 doing things and both of them appear -- but
18 Candlewood appears to have been doing things
19 with Mr. Morgan and Houlihan appears to have
20 been doing things as well in terms of
21 management meetings and what have you.
22         And, frankly, Candlewood -- the
23 other thing, Houlihan is assessing the
24 Candlewood offers, I guess that's the other
25 thing as it goes.

---

Page 224

1      Q.  Wasn't that Houlihan's role as the
2  exclusive financial advisor to the company?
3      A.  Yes.
4      Q.  Okay.  There are allegations in
5  the complaint, specifically Paragraph 116, that
6  talks about payments made or payments planned
7  to be made to Candlewood.  With respect to the
8  portion of that allegation that refers to
9  planned to make payments to Candlewood, it is
10 my understanding that ultimately the special
11 transaction committee agreed that if Candlewood
12 brought a successful proposal to the -- to the
13 company and a recapitalization did, in fact,
14 occur, that the company would at least pay a
15 portion of Candlewood's fee; but that never
16 happened, did it?
17     A.  No, it did not.  Although, the
18 company -- I thought that the company had paid
19 a portion of Candlewood's expenses and some
20 sort of fee in the -- for the August, September
21 time frame --
22     Q.  Yes.
23     A.  -- of '07.
24     Q.  My understanding is that there was
25 a payment made based upon work that Candlewood

---

Page 225

1  had done prior to being retained by Mr. Morgan.
2      A.  Yes.
3         MS. BRENNAN:  I do not have any
4  further questions at this time.  Thank you very
5  much.
6         THE WITNESS:  Thank you.
7         THE VIDEOGRAPHER:  We're off the
8  record.
9         (Thereupon, the deposition was
10 adjourned at 4:39 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

57 (Pages 222 to 225)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 226

1    I, W. TIMOTHY MILLER, do hereby certify
2    that the foregoing is a true and accurate
3    transcription of my testimony.
4
5
6            _ _ _ _ _ _ _ _ _ _ _ _ _ _
7
8    Dated _ _ _ _ _ _ _ _ _ _ _ _ _ _
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 228

1    IN WITNESS WHEREOF, I have hereunto set
2    my hand and seal of office at Dayton, Ohio, on
3    this _ _ _ _ day of _ _ _ _ _ _ _ _, 2012.
4
5            _ _ _ _ _ _ _ _ _ _ _ _ _ _
     KATHY S. WYSONG, RPR
6    NOTARY PUBLIC, STATE OF OHIO
     My commission expires 12-1-2013
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 227

1    STATE OF OHIO        )
2    COUNTY OF MONTGOMERY ) SS: CERTIFICATE
3            I, Kathy S. Wysong, a Notary
4    Public within and for the State of Ohio, duly
5    commissioned and qualified,
6            DO HEREBY CERTIFY that the
7    above-named W. TIMOTHY MILLER, was by me first
8    duly sworn to testify the truth, the whole truth
9    and nothing but the truth.
10           Said testimony was reduced to
11   writing by me stenographically in the presence
12   of the witness and thereafter reduced to
13   typewriting.
14           I FURTHER CERTIFY that I am not a
15   relative or Attorney of either party, in any
16   manner interested in the event of this action,
17   nor am I, or the court reporting firm with which
18   I am affiliated, under a contract as defined in
19   Civil Rule 28(D).
20
21
22
23
24
25

Mike Mobley Reporting  937-222-2259

227

```
 1  STATE OF OHIO          )

 2  COUNTY OF MONTGOMERY )  SS: CERTIFICATE

 3              I, Kathy S. Wysong, a Notary

 4  Public within and for the State of Ohio, duly

 5  commissioned and qualified,

 6              DO HEREBY CERTIFY that the

 7  above-named W. TIMOTHY MILLER, was by me first

 8  duly sworn to testify the truth, the whole truth

 9  and nothing but the truth.

10              Said testimony was reduced to

11  writing by me stenographically in the presence

12  of the witness and thereafter reduced to

13  typewriting.

14              I FURTHER CERTIFY that I am not a

15  relative or Attorney of either party, in any

16  manner interested in the event of this action,

17  nor am I, or the court reporting firm with which

18  I am affiliated, under a contract as defined in

19  Civil Rule 28(D).

20

21

22

23

24

25
```

228

1          IN WITNESS WHEREOF, I have hereunto set

2    my hand and seal of office at Dayton, Ohio, on

3    this ___31st___ day of ____December____, 2012.

4                         _Kathy J. Wysong_

5

6                         KATHY S. WYSONG, RPR
                          NOTARY PUBLIC, STATE OF OHIO
7                         My commission expires 12-1-2013

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 229

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

\* \* \*

In Re: The Antioch Company, et al.,
        Debtors.          CASE NO. 3:10-CV-156

THE ANTIOCH LITIGATION TRUST,
W. TIMOTHY MILLER, TRUSTEE,   BANKRUPTCY CASE NO.
        Plaintiff,                     08-35741

        vs.                      ADV. PRO. CASE NO.
                                        09-3409
LEE MORGAN, et al.,
        Defendants.          Volume II

\* \* \*


          Continuation of the deposition of

W. TIMOTHY MILLER, Plaintiff herein, called by the

Defendants Lee Morgan, Asha Morgan Moran, Chandra

Attiken, Marty Moran, Lee Morgan GDOT Trust #1,

Lee Morgan GDOT Trust #2, Lee Morgan GDOT Trust

#3, Lee Morgan Pourover Trust #1, and Lee Morgan

Pourover Trust #2 for cross-examination pursuant

to the Rules of Civil Procedure, taken before me,

Kathy S. Wysong, a Notary Public in and for the

State of Ohio, at the offices of Taft, Stettinius

& Hollister, LLP, 1800 US Bank Tower, 425 Walnut

Street, Cincinnati, Ohio, on Tuesday, December 18,

2012, at 9:36 a.m.

\* \* \*

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

## Page 230

1          EXAMINATIONS CONDUCTED          PAGE
2    BY MR. KNOTH:......................    235
3    BY MR. KLINGLER:...................    292
4    BY MR. GENTRY:.....................    348
5    BY MR. OTSUKA:.....................    411
6    BY MR. SCHEIER:....................    458
7
8          EXHIBITS MARKED
9    (Thereupon, Exhibit 791, defendants    349
10   Nancy Blair, Wayne Alan Luce, and
11   Frederick Walker's notice of
12   deposition of The Antioch Company
13   Litigation Trust pursuant to Fed. R.
14   Civ. P. 30(b)(6), was marked for
15   purposes of identification.)..........
16   (Thereupon, Exhibit 792, excerpt of    402
17   Exhibit 319, was marked for purposes
18   of identification.)..................
19   (Thereupon, Exhibit 793,               404
20   correspondence from Jeanine
21   McLaughlin, Alan Luce, Denis Sanan,
22   and James Northrop to Miss Andrew or
23   Christina Fischer, was marked for
24   purposes of identification.)..........
25

## Page 231

1    (Thereupon, Exhibit 794, The Antioch   411
2    Company Litigation Trust's response
3    to first set of interrogatories of
4    defendants Houlihan Lokey, Inc.,
5    Houlihan Lokey Financial Advisors,
6    Inc. and Houlihan Lokey Capital,
7    Inc., was marked for purposes of
8    identification.)....................
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 232

1    APPEARANCES:
2       On behalf of the Plaintiff:
3          Taft Stettinius & Hollister LLP
4       By:  Marcia Voorhis Andrew
              Emily McNicholas
5          Attorneys at Law
           425 Walnut Street
6          Suite 1800
           Cincinnati, Ohio  45202-3957
7
       On behalf of the Defendants Lee Morgan, Asha
8       Morgan Moran, Chandra Attiken, Marty Moran, Lee
       Morgan GDOT Trust #1, Lee Morgan GDOT Trust
9       #2, Lee Morgan GDOT Trust #3, Lee Morgan
       Pourover Trust #1, and Lee Morgan Pourover
10      Trust #2:
11         Keating Muething & Klekamp
12      By:  Michael L. Scheier
           Brian Muething (Telephonically)
13         Attorneys at Law
           One East Fourth Street
14         Suite 1400
           Cincinnati, Ohio  45202-3752
15
       On behalf of the Defendant McDermott Will &
16      Emery LLP:
17         Faruki Ireland & Cox P.L.L.
18      By:  Jeffrey S. Sharkey
           Attorney at Law
19         500 Courthouse Plaza, S.W.
           10 North Ludlow Street
20         Dayton, Ohio  45402
21
22
23
24
25

## Page 233

1    On behalf of the Defendants Nancy Blair, Wayne
     Alan Luce, and Frederick Walker:
2
3       Coolidge Wall
4    By:  Daniel J. Gentry
          Terrence Fague (Telephonically)
5       Attorneys at Law
        Suite 600
6       33 West First Street
        Dayton, Ohio  45402
7    On behalf of the Defendants Ben Carlson, Denis
     Sanan, Jeanine McLaughlin, and Malte
8    vonMatthiessen:
9       Thompson Hine, LLP
10   By:  Jennifer Maffett
          Thomas A. Knoth
11      Attorneys at Law
        Austin Landing I
12      10050 Innovation Drive
        Suite 400
13      Dayton, Ohio  45342-4934
14   On behalf of the Defendants Houlihan Lokey
     Howard & Zukin, Inc.; Houlihan Lokey Howard &
15   Zukin Financial Advisors, Inc.; and Houlihan
     Lokey Howard & Zukin Capital, Inc.:
16
        DLA Piper LLP
17
     By:  Greg Otsuka (Telephonically)
18      Attorney at Law
        203 North LaSalle Street
19      Suite 1900
        Chicago, Illinois  60601
20
21
22
23
24
25

2 (Pages 230 to 233)

Page 234

1    On behalf of the Defendant Candlewood Partners,
     LLC:
2
        McCarthy, Lebit, Crystal &
3       Liffman Co., L.P.A.
4    By: Kimberly A. Brennan
        Christina E. Niro (Telephonically)
5       Attorneys at Law
        101 West Prospect Avenue
6       Suite 1800
        Cleveland, Ohio 44115
7
     On behalf of the Defendants Barry Hoskins,
8    G. Robert Morris, Kimberly Lipson Wilson, Karen
     Felix, and Steve Bevelhymer:
9
        Law Office of Robert A. Klingler
10      Co., L.P.A.
11   By: Robert A. Klingler
        Attorney at Law
12      525 Vine Street
        Suite 2320
13      Cincinnati, Ohio 45202-3124
14   On behalf of the Defendant James Northrop:
15      R. Daniel Prentiss, P.C.
16   By: R. Daniel Prentiss
        Attorney at Law
17      One Turks Head Place
        Suite 380
18      Providence, Rhode Island 02903
19   ALSO PRESENT:
20      Richard Stevens, Videographer
21          * * *
22          THE VIDEOGRAPHER: We're on the
23   record.
24
25

Page 235

1              W. TIMOTHY MILLER
2    of lawful age, Plaintiff herein, having been first
3    duly cautioned and sworn, as hereinafter
4    certified, was examined and said as follows:
5              CROSS-EXAMINATION
6    BY MR. KNOTH:
7        Q.   Mr. Miller, my name is Tom Knoth.
8    We met yesterday.
9        A.   Yes.
10       Q.   I represent four of the outside
11   director defendants, Ben Carlson, Jeanine
12   McLaughlin, Denis Sanan, and Malte
13   vonMatthiessen.  Okay?
14       A.   Okay.
15       Q.   I'm going to ask you some
16   questions today.  A lot of them are going to be
17   follow-ups to yesterday.  There may be a couple
18   additional new categories.
19       A.   Okay.
20       Q.   Let me start off with what you
21   testified yesterday about potential fraudulent
22   conveyances, and I want to make sure I
23   understood your testimony correctly and then
24   I'm going to ask you some questions.  Am I
25   correct that you believe that the 2003

Page 236

1    transaction was a fraudulent conveyance?
2        A.   Yes.
3        Q.   And also you believe that the
4    tender offer should have disclosed that the
5    transaction was voidable because it was a
6    fraudulent conveyance; is that right?
7        A.   Yes.
8        Q.   Okay.  Can you explain to us why
9    you contend that this 2003 transaction was a
10   fraudulent conveyance?
11       A.   Of course.  Approximately, if I
12   recall the numbers correctly, two hundred and
13   forty-four million dollars of value went out of
14   the company in the form of cash, debt, and I
15   guess some portion of that are the warrants,
16   which would be -- I would probably deduct from
17   that two forty-four the warrant value, but that
18   much value went out of the company.  Nothing
19   came in.  And the company was clearly rendered
20   balance sheet insolvent as a result of that
21   transaction.
22       Q.   Anything else?
23       A.   Those are -- yeah, I mean, that --
24   you know, those are the elements.  You know,
25   we've got no value in exchange and the company

Page 237

1    is rendered balance sheet insolvent.
2        Q.   Okay.  As far as nothing coming
3    in, the company acquired the shares of the
4    nonESOP shareholders, didn't they?
5        A.   Those became treasury stock, yeah.
6    Uh-huh.
7        Q.   So the company did acquire those
8    shares?
9        A.   Yes.
10       Q.   And Deloitte had projected in
11   addition to the receipt of the shares that the
12   company stood to gain on a net basis a hundred
13   and thirty million dollars over ten years if
14   the transaction proceeded as projected; is that
15   correct?
16       A.   My understanding of the numbers
17   was that there was a stream of payments
18   purported tax savings over a period of time and
19   that the present value of that stream was, like
20   I said -- I think I testified yesterday my
21   recollection of the documents is that there was
22   a reference in the Deloitte e-mail to it being
23   sixty million and I thought the Duff & Phelps
24   valuation might have put it in the seventy-four
25   million dollar range.

Page 238

1      Q.   And that's the present value,
2   correct?
3      A.   Present value of that stream of
4   payments.
5      Q.   The actual dollar amount was a
6   hundred and thirty million dollars projected by
7   Deloitte; is that right?
8      A.   I don't know that it was -- I
9   don't recall that number being specifically a
10  hundred and thirty million dollars.  I don't
11  know where you're getting that number from, I
12  guess.
13     Q.   You don't recall that as being the
14  net proceeds after you deduct out the financing
15  and the interest and things like that?
16     A.   You'd have to show me the exhibit
17  you're talking about.
18     Q.   Based upon your review of the
19  record, are you aware of any facts indicating
20  that the outside directors were ever advised by
21  any of the advisors or by management that the
22  transaction was a possible fraudulent
23  conveyance?
24     A.   I've not seen anything indicating
25  that they were advised of such, I guess.  I'm

Page 239

1   not -- that's not to say, I guess, that there's
2   something somewhere but I haven't seen it.
3      Q.   And has anyone ever sued Antioch
4   or the outside directors claiming that the 2003
5   transaction was a fraudulent conveyance?
6      A.   Not that I'm aware.
7      Q.   You have not asserted such a claim
8   in this lawsuit, correct?
9      A.   That's correct.
10     Q.   Those sorts of claims were
11  transferred to the liquidation trust in the
12  bankruptcy action, wasn't it?
13     A.   Well, yes, there were claims
14  that -- yes, all of the litigation claims that
15  were out there were transferred.
16     Q.   And that would have included any
17  potential fraudulent conveyance claim, correct?
18     A.   Yes.
19     Q.   Can you tell us why you have not
20  sued anybody claiming that this was a
21  fraudulent conveyance?
22     A.   We chose to pursue breach of
23  fiduciary duty-type claims.  That was, you
24  know, a decision, again, within -- that we
25  decided to make within the -- within the Trust.

Page 240

1      Q.   You can't tell us specifically
2   what the reasons were why?
3      A.   I wouldn't get into the specifics
4   of, you know, why we brought particular claims
5   and didn't bring particular claims.
6      Q.   Well, I understand you may not
7   want to get into it but my question is can you
8   tell us --
9      A.   I think that that's --
10     Q.   -- what reasons you had not --
11     A.   I think that's privileged and
12  product-type information with respect to what
13  the Trust did or what it -- you know, what
14  claims it decided to bring.
15     Q.   So you are claiming an
16  attorney-client privilege communication and
17  you're not going to answer the question; is
18  that right?
19          MS. ANDREW:  That's correct.  Yes.
20  BY MR. KNOTH:
21     Q.   You used the term balance sheet
22  insolvent.  What do you mean by balance sheet
23  insolvent?
24     A.   Well, it means taking a look at
25  the balance sheet of the company, and in both

Page 241

1   the pro forma balance sheet and the tender
2   offer, as well as the actual subsequently
3   audited financial statements, the assets -- or
4   the liabilities exceed the assets by a
5   significant amount of money.  I believe that it
6   was -- in the tender offer document it was in
7   the ninety-one million dollar range.  In the
8   first audited financial statement I think it
9   was in the seventy-three, seventy-five million
10  dollar range, and that simply got worse with
11  time.
12     Q.   Now, those asset values are book
13  values; is that right?
14     A.   That is correct.
15     Q.   Have you attempted to do a
16  valuation of the assets in 2003 or as an
17  ongoing concern using fair market value?
18     A.   I have not, but I would expect
19  that to be the subject of potential expert
20  testimony.
21     Q.   As you sit here today, do you have
22  a fair market value for the assets of The
23  Antioch Company in December 2003 on an ongoing
24  basis?
25     A.   Not other than what's in the

Page 242

1  balance sheets.
2      Q. And that's book value?
3      A. That is whatever the auditors
4  agreed, you know, was the appropriate value to
5  record under GAP is what I understand that to
6  be.
7      Q. But not a fair valuation?
8      A. I have not -- I mean, I -- yeah, I
9  don't know. That's what the auditors
10 reported -- or signed off on.
11     Q. When you used the word insolvent
12 when you -- for the term balance sheet
13 insolvent, what do you mean by insolvent?
14     A. Liabilities exceed the assets at a
15 fair valuation.
16     Q. Okay. And that's part of the
17 balance sheet insolvency that you were talking
18 about?
19     A. Yes.
20     Q. And I was -- I'm a little confused
21 here. You haven't done a fair valuation of the
22 assets for the company as of December of 2003,
23 right?
24     A. No. Again, I've explained to you
25 that I believe that to be a subject of expert

Page 243

1  testimony.
2      Q. So I'm not following your
3  testimony here. You used the word balance
4  sheet insolvency and you say that by insolvent
5  you mean that the -- that the fair valuation,
6  the assets are exceeded by the liabilities --
7      A. Uh-huh.
8      Q. -- but you haven't done that
9  analysis; is that right?
10     MS. ANDREW: Objection.
11     THE WITNESS: That's correct.
12 BY MR. KNOTH:
13     Q. So are you saying that you are
14 incorrectly using the term balance sheet
15 insolvent since you don't know if the company
16 was insolvent at the time of the transaction
17 using a fair valuation?
18     A. I know what is in the audited
19 financial statements of the company.
20     Q. Which is not necessarily a fair
21 valuation, correct?
22     A. It may or may not be.
23     Q. Are you claiming that the
24 transaction was a fraudulent conveyance using
25 any other sort of insolvency theory other than

Page 244

1  the concept that the liabilities exceeded the
2  assets?
3      A. Again, I would leave that, I
4  suppose, to expert testimony on that issue with
5  respect to whether the company was left with
6  unreasonably small capital to continue on a
7  go-forward. I would not foreclose that
8  possibility, no.
9      Q. As you sit here today, are you
10 taking that position?
11     A. I am sitting here today taking the
12 position that we are not foreclosing the
13 possibility that we would assert that the
14 company is left with unreasonably small capital
15 and insufficient assets to pay its debts as
16 they become due in the future.
17     Q. You're not really answering the
18 question. It's a yes or no question. Are you
19 taking the position today --
20     A. Uh-huh.
21     Q. -- that -- that there's some other
22 theory of insolvency other than the concept of
23 liabilities exceeding assets at a fair
24 valuation?
25     A. As I sit here today, no; but I'm

Page 245

1  not foreclosing the possibility of taking that
2  position in the future.
3      Q. Let's look at what the directors
4  were told in December of 2003 or in the months
5  leading up to that about issues having to do
6  with insolvency or asset values and things like
7  that.
8      As you sit here today, are you
9  aware of any facts indicating that any of the
10 advisors or management ever informed the
11 outside directors that Antioch would not be
12 able to pay its debts as they became due after
13 the transaction?
14     A. Specifically as to that, I can't
15 think of anything, no, as I sit here presently.
16     Q. And is it fair to say that the
17 financial advisors to the company did inform
18 the outside directors that the debt ratios for
19 the company were good and sufficient to pay
20 debts after the transaction based upon their
21 calculations?
22     A. You'd have to show me the
23 document.
24     Q. As you sit here today, can you
25 dispute that one way or the other?

5 (Pages 242 to 245)

Page 246

1    A. I'm not aware of there being a
2  document that says that, I guess. I know
3  that -- well, I don't know that I've seen a
4  document that says that.
5    Q. Okay. Let's put it the other way,
6  the converse. Are you aware of any facts
7  indicating that the outside directors were ever
8  informed that the debt coverage ratios were not
9  satisfactory to establish that the company
10  would be able to pay its debts going forward
11  once the transaction closed?
12    A. Again, I'm not aware of anything
13  as I sit here today to that effect.
14    Q. I think you testified yesterday
15  that one of your criticisms of the board was
16  that, in your opinion, the directors did not
17  dig into the financials sufficiently. Is that
18  correct?
19    A. That is correct.
20    Q. Okay. Are you aware that the
21  board of directors ordered the financial
22  advisors to do a sensitivity analysis?
23    A. Yes, I've seen reference to that.
24  Yes.
25    Q. And do you have any criticisms of

Page 247

1  the sensitivity analysis as you sit here today?
2    A. Well, there were various documents
3  that I think may have been referred to as a
4  sensitivity analysis. There's one in
5  particular, I guess, that comes to mind with
6  respect to the December 4th board meeting; and,
7  yes, I mean, I think we could take a look
8  through that document if you'd like to take a
9  look through that document.
10    Q. Do you -- as you sit here today,
11  do you have any criticisms?
12    A. Yes, I think I do. There was a
13  question as to who actually prepared the
14  document, I think. The best that I could tell
15  from what I had seen it was -- there was
16  some -- a director or two thought it was
17  Deloitte but others indicated, I thought, that
18  it was really the company who prepared that
19  because it doesn't have Deloitte's name on it
20  anywhere, and so there was an issue with
21  respect to that.
22    And my recollection of the
23  document is that there wasn't a lot in the way
24  of support for the ESOP repurchase liability
25  and how they got to that and whether they took

Page 248

1  into consideration the impact on the employees.
2  There were forty-plus employees that had a
3  million dollar accounts and there were a decent
4  number of others that had in excess of a half
5  million dollars and what those employees were
6  likely to do when they saw management, you
7  know, essentially cashing out, and so that
8  piece is unclear to me.
9    My recollection of the analysis is
10  that it showed significant negative cash flow
11  in the first few years. That -- you know, I
12  don't -- it wasn't clear how the company was
13  going to manage that piece.
14    Again, it's the -- a lot of the
15  benefits to the transaction appear to be
16  back-loaded timewise. There's a -- again, it's
17  a whole present value issue, and I don't know
18  that the present value issue was ever disclosed
19  or explained in that in terms of, you know, a
20  lot of value is going out now in exchange for
21  the possibility of us getting value in the
22  future and that possibility is entirely tied to
23  the companies doing the various projections --
24  you know, doing the sales and the projections
25  that all these numbers are based upon. If they

Page 249

1  don't have the revenues or their expenses are
2  high -- you know, if they don't -- there aren't
3  going to be the tax savings if there aren't the
4  revenues there or if the expenses are out of
5  whack so, you know, there isn't going to be the
6  value that these folks are projecting will come
7  back to the company over a period of time.
8    So, I mean, those are the things I
9  can think of off the top of my head. That may
10  or may not be everything.
11    Q. Is there something you need to
12  consult in order to come up with everything?
13    A. Well, you've mentioned the
14  sensitivity analysis. Why don't you show me
15  what sensitivity analysis you're talking about.
16    Q. I'm referring to the same December
17  4th --
18    A. Are you?
19    Q. -- 2003.
20    A. Okay. Well, let's pull a copy of
21  it.
22    MR. KNOTH: Let's go off the record
23  for a second.
24    THE VIDEOGRAPHER: We're off the
25  record.

6 (Pages 246 to 249)

Page 250

1    (Pause in proceedings.)
2    THE VIDEOGRAPHER: We're on the
3  record.
4  BY MR. KNOTH:
5    Q. Okay. Mr. Miller, I've handed you
6  what's been marked as Deposition Exhibit 13
7  marked in a prior deposition. Is this the
8  sensitivity analysis you've been talking about?
9    A. I think that it is, but I --
10 again, I recall that there's one that is a full
11 page, and it may be a different deposition
12 number but --
13   Q. You think it's just larger?
14   A. Yeah, larger full page per slide,
15 sort of, format --
16   Q. Easier to read?
17   A. -- that's a little easier to read
18 and -- you know, so.
19   Q. Okay. Now, having looked at it,
20 is there any other criticisms that you have of
21 the sensitivity analysis that you haven't
22 mentioned already?
23   A. Let me look at the assumptions
24 here. Okay. This may go to the earlier one,
25 but on -- I guess it's MO0001773 is the page,

Page 251

1  this line on the top there talks about the -- I
2  guess the potential incremental cash flow over
3  ten years. Again, I read that as being not
4  discounted to present value.
5    Q. Right. So this --
6    A. Okay.
7    Q. -- slide is showing even with the
8  downside scenario of a twenty-five percent
9  decline in sales over a number of years, that
10 the company would still have net incremental
11 cash in the company of sixty-two million
12 dollars not discounted to present value; is
13 that right?
14   A. That's what that appears to show
15 to me, yes.
16   Q. Now, if you look down at the slide
17 below that on that page --
18   A. Uh-huh.
19   Q. -- there's a cash flow statement,
20 and it says despite sales decline and margin
21 erosion, enough cash is generated to pay bank
22 debts, subordinated debt, repurchase
23 obligation, and minimum level of capital
24 expenditures. Do you see that?
25   A. Yes, I do.

Page 252

1    Q. So this sensitivity analysis is
2  concluding that even if the company has a sales
3  decline of what it assumed of twenty-five
4  percent over a ten year period, the company
5  would still have enough money to pay its debts;
6  is that right?
7    A. That's what it says.
8    Q. Okay. If you look at the very
9  next page, which is a spreadsheet, is it your
10 understanding that this spreadsheet comes from
11 Deloitte?
12   A. I don't know precisely where it
13 comes from, and it does not appear to say.
14   Q. Okay.
15   A. But it appears to be the format
16 that Deloitte generated from its models, I will
17 say that much for it, and this is the one that
18 you'll have to pardon me on, I'm having a
19 little difficulty reading.
20   Q. Yeah, and I would too without my
21 glasses so I understand that. Well, you can put
22 that aside for now. I wanted to ask you some
23 more questions about your fraudulent conveyance
24 theory.
25   Let me ask you what your

Page 253

1  understanding is as to what the board was told
2  about what the fair market value was of the
3  assets in comparison with the liabilities
4  during the valuation process for the
5  transaction. Isn't it true that both Deloitte
6  and Houlihan Lokey informed the board that the
7  fair market value of the assets exceeded the
8  liabilities by over two hundred million dollars
9  post-transaction, that was at least their
10 projection?
11   A. And, again, if what we're -- if
12 we're talking about the same things here, the
13 valuations that were done, as I understood
14 them, were done on discounted cash flow and
15 market comparables, right?
16   Q. Is that what your --
17   A. That's my understanding, if that's
18 what you're talking about --
19   Q. Okay.
20   A. -- in terms of the valuation. And
21 the discounted cash flows were based upon the
22 company's future projections of sales beyond,
23 you know, the current period.
24   And the market comparables were
25 done using multiples, as I understand it, from

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 254

1   what were deemed to be comparable companies.
2   And the purpose of that, as I understood it,
3   was to value the stock of the company through
4   those two approaches.
5          I'm not aware that somebody came
6   in and actually went through the asset
7   classifications on the balance sheet and valued
8   those at fair market value.  If that happened,
9   maybe I missed that, but -- or maybe you can
10  point me to a document where that occurred.
11      Q.  Are you claiming that it's
12  inappropriate when valuing the assets of a
13  company for purposes of determining its fair
14  valuation as an ongoing business to use either
15  the discounted cash flow method or the market
16  comparison methodology?
17      A.  I think for purposes of a
18  fraudulent conveyance analysis, you're looking
19  at the assets at a fair valuation on -- you
20  know, what the assets are on the balance sheet.
21  That's my understanding of it.  And so I'm not
22  aware that that analysis was done in connection
23  with this.
24      Q.  Let's switch subjects, and I want
25  to go over your testimony yesterday about your

Page 255

1   theory about the sales process.  And I want to
2   make sure I understood what you were saying
3   first of all.
4          You were -- you were testifying
5   that you believed the company should have
6   engaged in a 363 sale at some point; is that
7   right?
8       A.  Yes.
9       Q.  And when in time are you saying
10  that the company should have filed bankruptcy
11  and pursued the 363 sale?
12      A.  Well, at some point in time
13  shortly after the valuations, I guess, from
14  what was the initial M&A process with the
15  initial Houlihan people brought back
16  indications of value that were not sufficient
17  to pay all the debt in full; and that, I
18  believe, was in the August, September '07 time
19  frame possibly.  And then it looked like again
20  there's a -- Houlihan has a pretty good outline
21  of what happened when and I defer to that,
22  but --
23      Q.  Right.  I think it's in front of
24  you.
25      A.  Is it?

Page 256

1       Q.  I think it's the November
2   presentation.  If I'm not mistaken, I think
3   it's Exhibit 183 or something like that.
4       A.  It's this one.  It's the one that
5   looks like an e-mail.  Let's see.  Let's take a
6   look here.  Okay.  That's through August and
7   then --
8       Q.  I think if you look at page 4163,
9   that's the -- we get into a discussion about
10  Sun Capital.
11      A.  Uh-huh.
12      Q.  You see that?  It talks about on
13  October 24th, 2007, Sun Capital delivered the
14  message they were not going to be in a position
15  to mark up the purchase order and submit a
16  final bid.  Do you see that?
17      A.  Just a second.  What number? I'm
18  sorry.
19      Q.  It's -- I think it's 4163.
20          MR. SCHEIER:  You mean purchase
21  agreement, right?
22          MR. KNOTH:  Pardon me?
23          MR. SCHEIER:  Purchase agreement.
24  You said purchase order.
25          MR. KNOTH:  Oh, I'm -- yeah, purchase

Page 257

1   agreement.  I'm sorry.
2           MR. SCHEIER:  That's okay.
3   BY MR. KNOTH:
4       Q.  Do you have that page in front of
5   you?
6       A.  Yeah, 63.  Uh-huh.
7       Q.  Okay.  This dates at least the Sun
8   Capital indication that they weren't going to
9   submit a final bid as of October 24th, 2007.
10  Do you see that?
11      A.  Yeah, but -- yeah, Jostens, I
12  guess, delivered a similar message, I guess --
13      Q.  Two days before?
14      A.  -- a couple days earlier, right.
15      Q.  Okay.
16      A.  I was trying to sort out in my
17  mind where Jostens was at.
18      Q.  Right.  And I'm trying to
19  determine what your theory is about timing
20  here.  So we have Sun Capital delivering its
21  message on October 24th, 2007.
22      A.  Uh-huh.
23      Q.  Are you contending that the next
24  day the company should have filed bankruptcy
25  and pursued the 363 sale --

Page 258

1    A. No.
2    Q. -- or what?
3    A. No. I think what we're contending
4  is that, you know, once those indications of
5  interest came back where they were at, and Sun
6  is saying, you know, here's a different
7  proposal we'll do, and in the midst of this
8  Candlewood and Lee Morgan are coming in within
9  a day or two of this with their proposal to the
10 special committee, in relatively short order,
11 it seems to me, the board should have been
12 going back with, you know, some sort of
13 response to Sun, and also having what they
14 ultimately had done, I guess, which was
15 Houlihan go out and look for distressed buyers
16 and to proceed in that instance toward going to
17 the 363 sale on a go-forward at that juncture
18 at -- you're in -- you're at the end of
19 October, November, you know, timingwise, it
20 seems that that's something that could be done
21 within the next, I don't know, sixty, ninety
22 days if the company can -- can do that. You
23 know, if -- or less, but, you know, depending
24 on how quickly the buyers are willing to move.
25 But, you know, you don't have indications of

Page 259

1  value from independent, you know, third-party,
2  financially responsible potential acquirers
3  that exceed your debt.
4    Q. Okay. So let me -- I don't mean
5  to cut you off here --
6    A. Sure.
7    Q. -- but I have a limited amount of
8  time here.
9    A. Of course.
10   Q. I just want to make sure I get the
11 timing right.
12      So we have end of October and
13 you're saying sixty to ninety days, maybe up to
14 around February 1st, for the company to go out
15 and either try to negotiate something with Sun
16 Capital and/or find a distressed buyer; is that
17 right?
18   A. Again, it's -- in terms of finding
19 a distressed buyer, given all that they've done
20 thus far as I sit here and think about it, you
21 know, it's the end of November, I don't know
22 why, you know, necessarily they couldn't move
23 that process through, you know, thirty,
24 forty-five days and be into a place where
25 they're in a process -- in a 363 sale, you

Page 260

1  know, pretty promptly, certainly before the end
2  of the year. Whether or not they would
3  close -- I mean, there -- I mean, you know, you
4  never know, but there's some reason for
5  potential buyers who may want to close before
6  the end of the year or not, who knows.
7    Q. Now, I take it you're not an
8  investment banker; is that right?
9    A. No, I am not.
10   Q. So how long it might take in order
11 to explore the distressed market you're not in
12 a position to say yourself, are you?
13   A. I am not.
14   Q. Okay. But you would at least
15 allow some time, whatever an adequate amount of
16 time would be, to do that --
17   A. Correct.
18   Q. -- before you would file your
19 bankruptcy action and your 363 motion, right?
20   A. I think the objective on what the
21 company was ultimately geared toward doing was
22 identifying a stocking horse purchaser, a party
23 from whom -- you know, who will establish a
24 floor of value for the company's assets in what
25 would be an auction process, and that's the

Page 261

1  process that would occur prebankruptcy.
2    Q. Now, are you suggesting that the
3  company should go through the bankruptcy
4  process and the 363 process if it does not have
5  a signed asset purchase agreement in hand?
6    A. No, I'm not suggesting that.
7    Q. Okay. And your understanding of
8  the facts is that Houlihan Lokey did go out
9  starting October and November and start looking
10 for buyers in a distressed market; is that
11 right?
12   A. I'm not clear on precisely when
13 they started, but at some juncture after this
14 they did. I think as I testified yesterday,
15 it's unclear to me what happened with Sun. It
16 does not appear that there was ever a response
17 to Sun.
18   Q. Let me just ask you about Sun real
19 quick --
20   A. Sure.
21   Q. -- since we're on that subject.
22 Looking at that same page of Exhibit 183 --
23   A. Uh-huh.
24   Q. -- under the second bullet it
25 talks about what you characterized yesterday as

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

---

Page 262

1    Sun's expression of interest.
2        A.  Correct.
3        Q.  And the first hash here says
4    senior lenders would need to be willing to roll
5    over their position of approximately
6    fifty-eight million dollars.  Do you see that?
7        A.  Yes.
8        Q.  Do you have any facts indicating
9    that the senior lenders were willing to roll
10   over their position?
11       A.  At that point in time, I don't
12   think the documents indicate that that had been
13   broached; but that was certainly something that
14   subsequently, I think, Candlewood had done and
15   that maybe two of the three were willing to do
16   it.
17       Q.  But one of them being LaSalle or
18   Bank of America?
19       A.  What became Bank of America.  My
20   understanding was they did not want to do that.
21       Q.  So as you sit here today, you
22   don't know if there's any facts supporting your
23   contention that the senior lenders may have
24   been willing to roll over the position?
25       A.  I did not make that contention.

---

Page 263

1        Q.  I know.  I mischaracterized it.
2    I'm sorry.  I misstated.
3            As you sit here today, you're not
4    aware of any facts that indicates that in
5    October of 2007 the senior lenders were willing
6    to roll over their position in order to
7    consummate a deal with Sun Capital; is that
8    right?
9        A.  I'm not aware of any facts as I
10   sit here today.
11       Q.  As you sit here today, are you
12   critical of Houlihan Lokey's efforts to find a
13   distressed buyer?
14       A.  Yes.  I mean, in the sense that
15   they appear to have a lot of expertise in the
16   area and they appear to have certainly
17   canvassed and they brought folks in, but it's
18   the timing issue that I think we're critical
19   of, allowing their process to be delayed by
20   Candlewood and Mr. Morgan and their efforts
21   knowing that those folks did not want to do a
22   change of control process and, you know,
23   having, from what we can tell, advised the
24   board that they ought to do a 363 sale here,
25   that there isn't, you know, the likelihood of

---

Page 264

1    being able to do something outside of
2    bankruptcy here is very slim and the board not
3    taking their advice in that regard.
4        Q.  Okay.
5        A.  Yeah, I mean, I think when, you
6    know, as a professional you're advising and a
7    client is not following your advice and there's
8    potential detrimental impact to the company
9    from them not following the advice, I think you
10   withdraw.
11       Q.  Now, let's go back to the 363
12   sale.  Now, if I understand what you're saying,
13   you're saying sometime early in 2008 the
14   company should have been able to find a buyer
15   in order to get a signed asset purchase
16   agreement by early 2007 -- 2008, correct?  Is
17   that your contention?
18       A.  I'm saying that it could have
19   happened prior to then.  I don't know.  But
20   certainly, you know, you've got a time frame
21   where, you know, end of October, first of
22   November efforts could have, should have been
23   focused on finding a buyer.  How long that
24   actually takes to get that party in there and,
25   you know, as you say, it's something for the

---

Page 265

1    investment bankers but --
2        Q.  But it's fair to say that at least
3    in early 2008 there was no signed asset
4    purchase agreement in place; is that right?
5        A.  Not that I'm aware of, no.
6        Q.  Okay.  And are you aware of any
7    facts indicating that the secured lenders were
8    willing to go through a bankruptcy action in
9    early 2008?
10       A.  Early 2008?  It was my
11   understanding that by early 2008 you have
12   covenant defaults and LaSalle has been
13   aggressive, I think, in the fall is my
14   recollection of the e-mail traffic; and, you
15   know, I'm not aware -- I guess nothing comes to
16   mind that the bank specifically wrote on that
17   topic, but I can't imagine why they wouldn't
18   want to do something that would get them paid.
19       Q.  Well, let me ask you this:  In
20   March of 2008 when the parties were considering
21   the GSC recapitalization proposal, isn't it
22   true that the banks indicated to the company
23   that it preferred pursuing the recapitalization
24   proposal by GSC as opposed to going through the
25   bankruptcy 363 process with one of the three

---

Page 266

1  companies that they had letters of intents
2  with?
3       A.  There is an e-mail to that effect
4  but not from the bank, as I understand it.
5       Q.  Do you have any facts as you sit
6  here today that disputes that contention that
7  the banks favored the GSC recapitalization
8  proposal in March of 2008 to pursuing a 363
9  sale with one of the companies that they had
10 letters of intent from?
11      A.  As I sit here today, I don't know
12 why the bank -- you know, if, in fact, the
13 banks did that as reported, I don't know why
14 they did that, you know.
15      Q.  That wasn't my question.  My
16 question was are you aware of any facts that
17 dispute that as you sit here today, that that
18 was the bank's position in March of 2008?
19      A.  Well, other than it didn't come
20 from the bank, from what I can tell in terms of
21 the documents, no, I suppose not.
22      Q.  Let me ask you about the ESOP
23 trustee's position about filing bankruptcy
24 starting in January 2008 going forward.  You
25 understood that the ESOP trustee at that time

Page 267

1  was Evolve?
2       A.  It was late January, I believe,
3  that they were engaged.  Is that not -- I
4  believe that's correct, if I recall, that
5  Reliance had indicated its desire to withdraw,
6  I thought, in October -- November and then
7  there was some period where the company was
8  looking for somebody new, and I thought it was
9  late January where Evolve got involved.
10      Q.  In any event, sometime in January
11 Evolve got involved; is that right?
12      A.  Correct.
13      Q.  Okay.  And isn't it true that
14 Evolve's position was that it did not want to
15 go through a bankruptcy and preferred a
16 recapitalization approach?
17      A.  Oh, yes.
18      Q.  And isn't it true that as the
19 dominant shareholder, the ESOP had the ultimate
20 decision-making authority on which approach to
21 take since if it disagreed with the board, it
22 could terminate the board?
23      A.  Well, I guess it could; but, I
24 mean, the board is responsible for making the
25 decisions with respect to the company, and a

Page 268

1  bankruptcy decision -- you know, a bankruptcy
2  filing would be a decision by the board.
3       Q.  Do you think it's wise for a board
4  to do something that's futile in the sense of
5  approving a transaction that they know that the
6  ESOP trustee has already indicated would not be
7  acceptable to the ESOP trustee and that the
8  ESOP trustee would take steps to negate that
9  decision?
10      A.  I don't know that it would have
11 been futile.  No shareholder really in any
12 circumstance probably ever wants to have a
13 company go into bankruptcy because shareholders
14 typically don't come out in bankruptcy.  The
15 board has to make a decision of what's in the
16 best interest of the company.
17      Q.  Isn't it the actual stated facts
18 in this case that the board -- the special
19 transaction committee was closing in on
20 closing -- or accepting a proposal and signing
21 an asset purchase agreement with J.H. Whitney
22 in late May, early June --
23      A.  Yes.
24      Q.  -- of 2008?
25      A.  Uh-huh.

Page 269

1       Q.  And that the ESOP trustee, along
2  with Kim Lipson Wilson as trustee of the 401(k)
3  subtrust, took action to terminate the board in
4  order to prevent that sale and ultimately 363
5  sale?
6       A.  That is correct.
7       Q.  As you sit here today, do you have
8  any facts that indicate that if the board had
9  followed your approach and attempted to enter
10 into a written purchase agreement with any of
11 the three entities that it had letters of
12 intent from and tried to pursue a 363 sale,
13 that the ESOP trustee would have allowed that
14 to go through without terminating the board
15 first?
16      A.  Oh, I don't know one way or the
17 other.
18      Q.  Have you ever filed a bankruptcy
19 petition and sought a 363 sale without having a
20 signed written asset purchase agreement for any
21 of your clients?
22      A.  That's a good question.  I've
23 certainly seen it done.  I don't -- I don't
24 know that I have ever done it certainly with
25 respect to certain significant assets, but

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 270

1  no -- I mean -- you're talking about a business
2  as a whole?
3         Q.  Right.  Exactly.
4         A.  I don't believe that I have.
5         Q.  Okay.  Let me change subjects here
6  and talk about the Condor --
7         A.  Okay.
8         Q.  -- situation, and I just have some
9  very brief questions because I don't have a
10 whole lot of time here.
11        A.  Okay.
12        Q.  Can you tell me how you believe
13 Antioch was harmed by Condor's inability to pay
14 on the surety bond?
15        A.  Well, as I understand it, and I'm
16 no expert in this area, but I understand it
17 that is an ERISA violation.  That it's an ERISA
18 violation that can cause the ESOP trust to lose
19 its qualified status and would eliminate all
20 the tax benefits that were otherwise supposed
21 to be available under the hundred percent ESOP
22 transaction.  And, in fact, I guess there's a
23 memo from the McDermott folks with respect to
24 that sometime in February of 2008.
25        There's also the more practical

Page 271

1  issue of, you know, it was certainly a
2  significant impact -- or it seemed to be an
3  impact on the restructure/sale process when
4  that came to light ultimately as I -- to
5  Houlihan at least.  I think that was in late
6  January of 2008.
7         So those are not good things.  I
8  mean -- and that's not something I think that
9  you would want the officers of your company
10 doing is, you know, issuing notes and not
11 getting them -- having adequate security as
12 required by federal law.
13        Q.  Okay.  Any other harm to the
14 company caused by Condor's inability to pay?
15        A.  That's what I can think of
16 presently.
17        Q.  Okay.  On the first one about the
18 ERISA violation and perhaps causing the ESOP to
19 lose its status and thereby eliminating tax
20 benefits to the company, that never happened;
21 is that correct?
22        A.  That is correct.
23        Q.  Okay.  On the restructure/sale
24 process let me ask you this --
25        A.  But, again, with respect to the

Page 272

1  first one, that's kind of the we just didn't
2  caught, right?  I mean, that's the -- it
3  happened and it wasn't adequately secured, and
4  the fact that it wasn't adequately secured
5  appeared to have been covered up for a while
6  but, you know, yes, they didn't get caught, you
7  are correct.
8         Q.  The IRS never took any action
9  because of that; is that correct?
10        A.  Correct.  That's my understanding.
11        Q.  And on the restructure/sale
12 process, let me make sure I understand what
13 you're saying here, and maybe I can get at this
14 a little bit differently, if Condor had paid on
15 the ESOP notes, that would not have reduced any
16 of the liabilities of The Antioch Company,
17 would it?
18        A.  No, it would not have; but it
19 would have changed creditors basically is how
20 that would have worked, and I think -- my
21 recollection of the e-mail traffic was that
22 there was some consternation over the fact that
23 that hadn't been disclosed sooner in that
24 process.
25        Q.  But just follow my thought here.

Page 273

1  If Condor had paid the ESOP note holders,
2  Antioch would have owed Condor the same amount
3  that Condor had paid on the ESOP notes, right?
4         A.  Correct, but from the sale process
5  standpoint and being out in a market and
6  marketing the company with this being a, you
7  know, probably pretty material fact to
8  purchasers, you can see why Houlihan would have
9  some heartburn over the fact that, you know,
10 they weren't aware of this sooner.
11        Q.  The ESOP note holders were
12 unsecured debtors, right?
13        A.  Unsecured creditors.
14        Q.  Creditors, I'm sorry.
15        A.  Yes, unsecured creditors of the
16 company.
17        Q.  And Condor would have been an
18 unsecured creditor, correct?
19        A.  Yes.
20        Q.  Let me go through some of the
21 advisors to the board in the ESOP transaction,
22 and I just want you to let me know if you are
23 challenging these advisors' qualifications or
24 expertise or reliability or competency, okay,
25 any of those four.

12 (Pages 270 to 273)

Page 274

1         As to Deloitte, are you
2    challenging its qualifications, expertise,
3    reliability, or competency?
4         A.  As a general matter, no.
5         Q.  In connection with the 2003 ESOP
6    transaction.
7              MS. ANDREW:  Well, I guess I object
8    just to the extent it's a compound question.  Do
9    you have in mind the four things?
10   BY MR. KNOTH:
11        Q.  Well, I can break it up, Marcia.
12   I'm trying to save time here.  But is it easier
13   for you if I --
14        A.  That might be easier if we could.
15        Q.  Okay.  In the context of the 2003
16   transaction --
17        A.  Yes.
18        Q.  -- as to Deloitte --
19        A.  Yes.
20        Q.  -- are you challenging their
21   qualifications?
22        A.  No.
23        Q.  Are you challenging their
24   expertise?
25        A.  No.

Page 275

1         Q.  Are you challenging its
2    reliability?
3         A.  How do you mean reliability?
4    That's the one that, I guess, is throwing me a
5    bit.
6         Q.  Do you have anything as you sit
7    here today that suggests to you that they were
8    not reliable such that the company should not
9    be able to rely on their advice?
10        A.  Well, only in so far -- and from
11   the board's perspective, as they were brought
12   into the situation, as I understand it, having
13   done the Morgan's estate planning.  So, you
14   know, in terms of where their interests and
15   loyalties lie.  I mean, the board appears to
16   have been aware of that, as the other
17   professionals were aware of that; but everyone,
18   you know, should have been aware of the fact
19   that they were not necessarily, you know,
20   solely looking out for the company from what
21   the documents indicate to me.
22        Q.  And you talked about that
23   yesterday?
24        A.  Yes.
25        Q.  Okay.  And what about Deloitte's

Page 276

1    competency?
2         A.  They're, I'm sure, very competent.
3    I have no reason to question their competency.
4         Q.  Okay.  Same question and same
5    context, 2003 transaction, for Houlihan Lokey,
6    are you challenging its qualifications?
7         A.  No.
8         Q.  Its expertise?
9         A.  No.  They seem to be -- I mean,
10   appear to be experts in what they were doing.
11        Q.  Its reliability?
12        A.  Reliability is always the tough
13   one because with Houlihan, there appeared to be
14   issues with respect to -- as far as what maybe
15   the board understood and what -- certainly what
16   was placed into the tender offer that we talked
17   about yesterday in terms of the extent of which
18   the company and -- was entitled to rely on
19   their opinion and the board was entitled to
20   rely on their opinion; and they were very clear
21   about how in the opinion it was very much
22   limited to looking out for the selling
23   shareholders and not the company and they
24   weren't looking at any of those things for the
25   company.  Yet clearly the board, and I think

Page 277

1    maybe there's board meeting minutes in October
2    30th board meeting minutes where the
3    implication is the board is relying on them.
4    And, you know, particularly with respect to the
5    tender offer document, they appear to know --
6    you know, know and have reviewed that and saw
7    that, you know, their opinion was being used in
8    a way that was beyond the scope of what they
9    originally said they were providing.
10        Q.  Any other areas of concern as far
11   as Houlihan Lokey's reliability?
12        A.  That's what comes to mind.
13        Q.  And what about Houlihan's
14   competency?
15        A.  No reason to question their
16   competency.
17        Q.  Same questions for GreatBanc, do
18   you have any issues about its qualifications?
19        A.  No.
20        Q.  Its expertise?
21        A.  No.  As I sit here today, no.
22        Q.  Its reliability?
23        A.  Again, reliability is a tough one.
24   In what -- with respect to GreatBanc as the
25   ESOP trustee, what do you mean?  What are you

13 (Pages 274 to 277)

Page 278

1    getting at?  I'm --
2         Q.  Okay.  Let me ask you the question
3    a little differently.  As you sit here today,
4    do you have any reason to challenge the board's
5    appointment of GreatBanc as an independent ESOP
6    trustee for the 2003 transaction?
7         A.  No.
8         Q.  And do you have any issues with
9    GreatBanc's competency?
10        A.  No.  They seem to be competent.
11        Q.  Same sorts of questions for Duff &
12   Phelps.  Do you have any issues involving its
13   qualifications?
14        A.  No.
15        Q.  Its expertise?
16        A.  No.  Huh-uh.
17        Q.  Its competency?
18        A.  No.
19        Q.  And turning to McDermott Will &
20   Emery, do you have any issues with its
21   qualifications?
22        A.  As a general matter, no.
23        Q.  Its expertise?
24        A.  Again, broad brush, I -- there
25   are, in my view, and we've raised these, I

Page 279

1    think, in the separate litigation, that
2    there -- you know, we do have issues with
3    respect to the advice that was and/or wasn't
4    given by them through that process and through
5    the ESOP process.  And particularly with the
6    conflicts of interest and the fact that they
7    were the ones who were, you know, handling the
8    tender offer document and taking in comments
9    and producing that document, and, you know,
10   presumably putting the Houlihan opinion, and
11   all the issues we had were issues -- that I
12   spoke about yesterday were issues that were
13   issues that McDermott should have caught,
14   handled, or otherwise.
15        Q.  Let me just cut you off here --
16        A.  Sure.
17        Q.  -- because maybe my question
18   wasn't as clear as it could be.  I'm not
19   challenging -- I'm not asking you if you're
20   challenging McDermott Will & Emery actions.
21        A.  Okay.
22        Q.  I'm asking you whether or not
23   you're challenging its expertise --
24        A.  Well --
25        Q.  -- that it had sufficient

Page 280

1    expertise to -- such that it was --
2         A.  I'm not convinced that the people
3    that were deployed on the engagement had all of
4    the expertise that they needed to deal with the
5    situation, okay, I mean, to put it -- I mean,
6    I'm not convinced; and for those reasons, for
7    those action reasons, that reflects in my view
8    upon expertise --
9         Q.  Okay.
10        A.  -- and competency.
11        Q.  Let me ask a little different
12   question here.  Are you aware of any facts
13   indicating that the board was put on notice
14   that McDermott Will & Emery didn't have certain
15   sorts of expertise that you're contending it
16   should have had?
17        A.  Let me think about that one a
18   minute.  Again, to the extent the board is and
19   they were involved in the tender offer document
20   and that issue, and the issue particularly of
21   the various board members who had interests in
22   the company that they were selling and all of
23   these folks were getting seven figures or more
24   out of the transaction, the notion that, again,
25   in the tender offer document that Ohio law was

Page 281

1    satisfied by the opinion of Houlihan Lokey, I
2    would have thought that that might have raised
3    a question with a board member in terms of is
4    this really -- you know, does this work
5    legally?
6         Q.  And just to make sure I understand
7    it, are you talking about the write-up of
8    assets?  Is that what you're referring to?
9         A.  Well, we can talk about that
10   later; but, no, what I'm talking about is the
11   tender offer document itself where it says we
12   have these various interested directors who are
13   going to take this much money out of this
14   transaction and when you've got interested
15   directors, here are the three prongs of Ohio
16   law that you have -- you know, one of those
17   you've got to satisfy, and the very next
18   paragraph is the board went and talked to
19   Houlihan Lokey and they said, you know -- and
20   if you look at Houlihan Lokey's opinion, which
21   is attached, it's very limited.  It doesn't
22   deal with that issue.  And I would think that
23   if a board member read those two things, that
24   you might want to question your counsel as to
25   does this, in fact, satisfy.  I mean, I'm a

14 (Pages 278 to 281)

Page 282

1  board member here. I've got a personal
2  financial interest in this. Ohio law
3  definitely deals with this issue. I want to
4  make sure everything is done in -- you know,
5  appropriately with the law, wouldn't you ask
6  about that?
7        Q.  So you -- I'm not sure I
8  understand what you're saying here. Are you
9  saying that they should have challenged
10  McDermott Will & Emery's legal advice or are
11  you saying that they should have challenged
12  their competency?
13        A.  Well, again, I guess I view the
14  legal advice given as a function of the
15  competency on the issue with which -- with
16  respect to which it's being offered. So, you
17  know, I think there might be a question there
18  that was generated by that.
19        Q.  Okay. Let's move on just because
20  I have a limited amount of time here.
21        A.  Of course.
22        Q.  Can you identify for me any facts
23  that were presented -- strike that question.
24  Let me start over.
25        Are you aware of any facts

Page 283

1  indicating that the board was notified by its
2  advisors or by management that the price that
3  was to be paid for the shares in the 2003
4  transaction was above the market price or fair
5  market value for the shares?
6        A.  Yes. The Duff & Phelps response
7  that started in the September time frame in
8  terms of, you know, that there's too much value
9  going out for the warrants and that those ought
10  to be valued at a lower amount. And, again,
11  that's just vis-a-vis the ESOP, it's not
12  vis-a-vis the company because nobody is looking
13  out for the company here but it's just
14  vis-a-vis the ESOP. You've got that out there
15  from an advisor if that's how I understand your
16  question.
17        Q.  What facts do you have indicating
18  that that information was provided to the
19  board?
20        A.  Well, I believe that Nancy Blair
21  was clearly in the mix there. I guess I'd have
22  to --
23        Q.  She was not on the board.
24        A.  I understand. I guess I'd have to
25  go back and look at the e-mails, but I guess

Page 284

1  the Morgans were certainly aware and involved
2  in the meetings, right?
3        Q.  Do you have any facts indicating
4  that the Morgans were aware of this initial
5  Duff & Phelps position?
6        A.  Absolutely. Lee Morgan threatened
7  to fire them.
8        Q.  Okay. What information do you
9  have that the outside directors were made aware
10  of Duff & Phelps initial response indicating
11  that --
12        A.  Well --
13        Q.  Let me back up a second. I'm not
14  sure I'm understanding what you're saying Duff
15  & Phelps' initial response was. As I
16  understand it, let me make sure I understand
17  what you're saying, are you saying that Duff &
18  Phelps initially indicated that the warrants
19  were more valuable than what was being, sort
20  of, assigned to them as part of the
21  negotiations?
22        A.  Correct, that they had not been
23  valued appropriately.
24        Q.  All right.
25        A.  Okay.

Page 285

1        Q.  And that was part of the package,
2  right?
3        A.  Correct.
4        Q.  And at that point, I can't give
5  you the numbers, but there was a certain amount
6  of cash in the package, a certain promissory
7  note, and a warrant, right?
8        A.  Correct.
9        Q.  And Duff & Phelps was arguing that
10  the value of the package was -- as a whole was
11  too much because if you add up the cash that
12  was in the package at the time, the promissory
13  note and what Duff & Phelps thought was the
14  value of the warrants at the time, that that
15  was in excess of the eight hundred and fifty by
16  quite a bit, right?
17        A.  That's my understanding of it
18  broad brush, yeah.
19        Q.  And then ultimately as a result of
20  Duff & Phelps' analysis in the party's
21  negotiations, the cash element of the package
22  was reduced, the promissory notes portion of
23  the package was reduced --
24        A.  Uh-huh.
25        Q.  -- and then you still had the

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 286

1   warrants, right?
2        A.   Yes, and additional dollars went
3   out of the company in favor of the ESOP in
4   exchange for that.
5        Q.   Okay.  And then by the end of the
6   day, by the time the transaction closed, Duff &
7   Phelps had issued a fairness opinion which was
8   provided to the board indicating that Duff &
9   Phelps thought the consideration paid for the
10  shares was fair, right?
11       MS. ANDREW:  Objection.
12       THE WITNESS:  No, that wasn't what
13  the opinion said.  And if it was provided to the
14  board, it was for informational purposes.  It said
15  that it was -- the consideration was fair from a
16  financial standpoint, I believe, for the ESOP and
17  that any dilution caused was adequately addressed
18  by what was essentially, as I understand it, the
19  deal that was cut.
20       MR. KNOTH:  Let's go off the record
21  just for a second while I pull up an exhibit.
22       THE VIDEOGRAPHER:  We're off the
23  record.
24       (Pause in proceedings.)
25       THE VIDEOGRAPHER:  We're on the

Page 287

1   record.
2   BY MR. KNOTH:
3        Q.   Okay, Mr. Miller, during our break
4   I've handed you what's been marked as Exhibit
5   540 in a prior deposition, and is that the
6   fairness opinion from Duff & Phelps?
7        A.   It certainly appears to be, yes.
8        Q.   And I just want to make sure the
9   record is clear as to what the conclusions were
10  that Duff & Phelps reached; and if you would
11  turn to the last page, page five, do you see
12  the heading entitled conclusions?
13       A.   Yes.
14       Q.   Okay.  So let me just read this
15  into the record and see if you agree that I've
16  read it correctly.
17       A.   Uh-huh.
18       Q.   Based on our analysis and review
19  of relevant information related to Antioch and
20  the proposed transaction, and assuming the
21  accuracy and completeness of such information,
22  it is our opinion that: (i) the consideration
23  to be paid by the company for shares of the
24  company stock -- I'm sorry, company's common
25  stock held by shareholders other than the ESOP

Page 288

1   in the proposed transaction is fair and
2   reasonable to the ESOP from a financial point
3   of view; and (ii) the terms and conditions of
4   the proposed transaction are fair and
5   reasonable to the ESOP from a financial point
6   of view.  Did I read that correctly?
7        A.   You did.  And what I was referring
8   to was the paragraph at the very top of the
9   page which is how they arrived at their
10  conclusions where they say that they determined
11  whether the post-transaction aggregate economic
12  value of the ESOP as a whole is not less than
13  the pre-transaction economic value immediately
14  after the closing date, and (ii) whether there
15  is any decline in the fair market value of the
16  common stock as a result of the proposed
17  transaction and, to the extent there is a
18  decline, whether the proposed transaction
19  appropriately compensates the participants for
20  the decline.
21       Duff & Phelps determined that
22  there was a decline in the value, and that they
23  negotiated additional consideration out for the
24  ESOP to make up for that decline.  So, you
25  know, their focus is on, again, what's in --

Page 289

1   what's fair to the ESOP.  They're not looking
2   at what's fair to the company.
3        The ESOP was taking dollars out,
4   the outside shareholders were taking dollars
5   out, and they had professionals looking out for
6   the people who were taking the dollars out.
7   There were no professionals looking out for the
8   company from which -- that was paying the
9   dollars.
10       Q.   Well, I understand your position
11  and I guess we'll let Lee Bloom testify as to
12  what his position was.
13       A.   Very good.
14       Q.   Okay.  Let me -- just one final
15  subject here, and turning to the LEVIMO
16  transaction.  Can you tell me what financial
17  damages you are contending that Antioch
18  suffered as a result of the LEVIMO transaction
19  itself?
20       A.   Well, again, I think generally
21  speaking on the topic of damages, that is one
22  that would ultimately lead to expert testimony.
23       But in terms of LEVIMO itself, I
24  think as I testified yesterday, our focus is
25  upon the appropriateness and, you know, whether

16 (Pages 286 to 289)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 290

1     it was a breach of the board's fiduciary duty,
2     and our view that it was, to enter into that
3     particular agreement at that point in time with
4     that particular purchaser giving that
5     particular purchaser the various -- you know,
6     that control over what is the company's major
7     hard asset, you know, knowing all the issues
8     that there were with the Morgans.
9          Q.  And you testified to that
10    yesterday?
11         A.  Yeah, I did.
12         Q.  I don't --
13         A.  And I don't mean to burn up your
14    time by reiterating but I just want --
15         Q.  I understand, and that's fine.
16    What I'm asking, though, is can you tell me
17    what the financial loss was to the company as a
18    result of the LEVIMO transaction itself?
19         A.  Well, to the extent that the
20    position of -- his position as landlord was
21    used by Mr. Morgan in the sale process to delay
22    that process, it strikes me that it is, you
23    know, one more piece of, you know, the decline
24    in value that the company experienced through
25    that process.  It was one more lever that he

Page 291

1     used to try to delay a change of control
2     transaction.
3          Q.  Okay.  And I --
4          A.  That's where I would place it.
5          Q.  Okay.  I just want to make sure I
6     understand what you're saying as far as
7     financial loss, though.  I understand that you
8     have a position as to financial loss involving
9     the 2003 ESOP transaction, correct?
10         A.  Correct.
11         Q.  And I don't want to get into the
12    details there --
13         A.  Sure.
14         Q.  -- but you have a position on
15    that, right?
16         A.  Sure.
17         Q.  Okay.
18         A.  Again, subject to expert
19    testimony.
20         Q.  Right.  And you have a position as
21    to loss -- financial loss resulting from the
22    sales process --
23         A.  Yes.
24         Q.  -- in 2007, 2008, right?
25         A.  And, again, subject to expert

Page 292

1     testimony on that topic as well.
2          Q.  I guess what I'm trying to
3     determine is what is your testimony on
4     financial loss to the company resulting from
5     the LEVIMO transaction itself, the sale of the
6     properties to the LEVIMO entity --
7          A.  Uh-huh.
8          Q.  -- and the lease coming back?
9          A.  Absent --
10         Q.  Do you see any financial loss on
11    that transaction itself?
12         A.  I do not, but I am not a financial
13    expert so absent some financial expert or
14    testifying expert that the Trust may have in
15    the future, I don't see anything as I'm sitting
16    here today.
17         MR. KNOTH:  Okay.  I don't have any
18    further questions for you.  Thank you very much.
19         THE WITNESS:  Okay.  Thank you.
20         MR. KNOTH:  Off the record.
21         (Pause in proceedings.)
22         THE VIDEOGRAPHER:  We're on the
23    record.
24         CROSS-EXAMINATION
25    BY MR. KLINGLER:

Page 293

1          Q.  Good morning, Mr. Miller.  My name
2     is Bob Klingler.
3          A.  Good morning.
4          Q.  I represent Barry Hoskins, Kim
5     Lipson Wilson.
6          A.  Okay.
7          Q.  Karen Felix.
8          A.  Okay.
9          Q.  Steve Bevelhymer.
10         A.  Okay.
11         Q.  And G. Robert Morris.
12         A.  All right.
13         Q.  Let me start with this question:
14    Do you recall whether you reviewed the
15    depositions of any of my clients in preparation
16    for your testimony today?
17         A.  I believe that I've reviewed
18    portions of those depositions, Hoskins, Lipson
19    Wilson.  I'm not certain on Felix.  Refresh my
20    recollection again.  It's Hoskins --
21         Q.  Steve Bevelhymer.
22         A.  I don't know that I reviewed his.
23    I don't believe.
24         Q.  And what about Robert Morris, G.
25    Robert Morris?

Page 294

1    A.  I don't recall having reviewed
2  that one.
3    Q.  Did you review the interrogatory
4  answers that any of my clients submitted in
5  this case?
6    A.  Yes, I believe I did review all
7  the interrogatory answers.
8    Q.  All of them?
9    A.  I believe so, yes.
10   Q.  Now, I want to ask some questions
11 first with respect to Barry Hoskins.
12   A.  Okay.
13   Q.  It's true, isn't it, that you are
14 not asserting claims against Mr. Hoskins for
15 any role that he played in the 2003 transaction
16 itself?
17   A.  There are no claims asserted in
18 the complaint against him, that is correct.
19   Q.  And also you are not claiming that
20 he should return any of the funds or disgorge
21 the consideration that he received for his
22 shares?
23   A.  I guess to the extent that he's
24 not in that count, yes, that would be correct.
25   Q.  Count three of your amended

Page 295

1  complaint pertains to the Condor transaction,
2  and I'm going to ask you some questions about
3  that claim --
4    A.  Okay.
5    Q.  -- with respect to my clients
6  beginning with Barry Hoskins.
7    A.  Okay.
8    Q.  And I don't know if you've got
9  that in front of you, you might want to look at
10 it.
11   A.  I'm taking a look at it right now
12 if I could.
13   Q.  All right.  I believe count three
14 starts on page forty-two --
15   A.  Uh-huh.
16   Q.  -- and I'm looking specifically at
17 Paragraph 177 where you claim as the plaintiff
18 in this case that certain defendants, including
19 defendant Hoskins and Lipson Wilson and Felix
20 and Bevelhymer, knew or reasonably should have
21 known at the time the company issued the ESOP
22 notes that the Condor bond did not provide
23 adequate security for the company's
24 obligations.
25   A.  Yes.

Page 296

1    Q.  What facts do you have to support
2  that contention with respect to Barry Hoskins,
3  that he knew or should have known that Condor
4  did not provide an adequate security?
5    A.  Well, a couple things that I can
6  think of as I'm sitting here.
7         One is I think when he went and
8  got those surety bonds originally in, what my
9  recollection is, the summer of 2004, that his
10 insurance agent made him sign a statement that
11 indicated that, you know, there were potential
12 issues here.  It's not an A.M. Best rated
13 company and, therefore, you know, we want you
14 to sign off as knowing that you're placing this
15 insurance with a foreign -- whatever it was,
16 Bahaman or Cayman Islands entity, that it's not
17 A.M. Best rated.
18        And there's no indication that
19 we've seen from the documentation that there
20 was a lot of -- or anything much in the way of
21 due diligence done with respect to Condor or
22 its principal, this Harvey, is it Milam, at
23 that point in time.
24        And there was a second item but it
25 escaped my memory here presently.  Just a

Page 297

1  second.  Would you repeat his question to me
2  again, please?
3    Q.  Sure.  What facts do you have to
4  support the contention that Barry Hoskins knew
5  or should have known that the Condor guaranty
6  did not provide adequate security?
7    A.  Oh.  I think there should be some
8  question arisen from the transaction itself in
9  terms of, you know, the company was fully
10 levered and Condor was issuing a guaranty
11 without any collateral.  If it has to pay off,
12 how is it going to get paid?  That might raise
13 a question.
14   Q.  What else?
15   A.  Those are the two things I can
16 think of presently.
17   Q.  In Paragraph 177 you also allege
18 that Barry Hoskins, Lipson Wilson, Felix, and
19 Bevelhymer wasted and mismanaged corporate
20 assets with respect to the Condor guaranty.
21 What facts do you have to support that
22 contention?
23   A.  Again, I think with respect to
24 Hoskins, we were previously talking about
25 Hoskins, but with respect to Hoskins, you know,

18 (Pages 294 to 297)

Page 298

1  it's paying out the annual premiums under
2  those -- for those guaranty bonds without
3  really confirming whether or not this entity
4  had an ability to perform. It was as if they
5  were checking a box that was required by ERISA
6  without confirming that, in fact, the entity
7  had an obligation to inform, and, in fact, he's
8  been put on notice that it's not an A.M. Best
9  rated entity.
10         And I guess for him, if I recall
11 my dates correctly, that would have
12 been '04, '05. And then -- let me think '06,
13 if I'm correct, and then he leaves as trustee
14 in the '06 time frame and Lipson Wilson is in
15 there before Reliance into '07, and it's in mid
16 May of '07 that Condor Guaranty, the original
17 entity, as I understand it, and there were
18 apparently a couple -- two or three different
19 entities became subject to a chapter 15
20 bankruptcy proceeding in the United States.
21         And there's e-mail traffic
22 indicating that the -- these individuals, at
23 least -- I think it's Bevelhymer and Lipson
24 Wilson at least and maybe Felix as well, were
25 aware of that by July of '07 and they went

Page 299

1  ahead and again without, it appears, much in
2  the way of due diligence, any sort of -- that
3  they went ahead and renewed on the bonds that
4  year, dollars go out that year. And off the
5  top of my head, I don't remember the amount of
6  the dollars. It was in -- I believe it was in
7  the hundreds of thousands.
8          And then in November of '07
9  there's e-mail -- there's a McDermott Will
10 e-mail which appears to indicate that there's a
11 conversation with Lipson Wilson and McDermott
12 about this issue, but then there's nothing
13 beyond that until there are notes of, I think,
14 an interview with Evolve where Evolve is
15 interviewing Lipson Wilson.
16         And I think those notes indicate
17 that she's informing them that there's a surety
18 for those, you know, that there isn't an --
19 basically that there's a surety. You know,
20 they're ESOP notes but there's a surety for the
21 ESOP notes. There's nothing in the notes that
22 indicates that she has said, well, gee, there
23 might be an issue with respect to a surety.
24 That, I think, is in the December '07 time
25 frame.

Page 300

1          And then it's not until I believe
2  sometime in January of '08, and I talked about
3  this earlier this morning, that it apparently
4  becomes apparent to, I guess, Houlihan and the
5  board and others that there's an issue and then
6  there's kind of a mad scramble at that time to,
7  one, I guess, for McDermott to analyze the
8  situation and generate a memo and explain what
9  the consequences are and what the company
10 should do, and that takes from late January to
11 sometime in late February, I think. And then
12 there is a fair amount of e-mail traffic with
13 respect to people trying to find alternative
14 sureties. And ultimately no alternative
15 sureties were obtained.
16         And then I think didn't they then,
17 notwithstanding all of this, they reupped
18 again, if I'm correct -- if I recall this
19 correctly, in what would have been, what, the
20 August, September, October time frame of 2008
21 for another year.
22         So, you know, there's kind of this
23 whole history going back to '04 where, you
24 know, there are lots of folks going out of the
25 ESOP in '04, a hundred, a hundred and ten

Page 301

1  million dollars' worth going out that year.
2  The company clearly doesn't have the cash to
3  pay for that. And, in fact, you know, under
4  the ESOP provisions, as I understand them, and
5  I admit that they're a tad bit confusing to me,
6  you know, there's some portion over certain
7  amounts that people are entitled to be paid off
8  over a period of time. And so, you know, they
9  know that they're going to have to issue notes
10 and the notes get issued, it's like there
11 isn't -- I don't see where there's due
12 diligence done.
13         And it's like there's a mistake
14 made, placed the insurance in the wrong place,
15 and then kind of the reaction to that is we're
16 just going to cover it up and ride it out and
17 see what happens. And it ultimately comes to
18 light, but it doesn't come to light until
19 January of '08. Is that --
20         Q. When you say we're just going to
21 cover it up, what do you mean by that?
22         A. Well, at least from the e-mail
23 traffic, the -- you know, bankruptcy is a
24 public event. You can go on a PACER website
25 and search for bankruptcy for any entity. In

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                                W. Timothy Miller

Page 302

1    fact, they had done a PACER search of Mr. Milam
2    in '04, if Hoskins had done that or had
3    McDermott or somebody do that, they would have
4    seen that Milam and his wife filed bankruptcy
5    back in the early '90s.
6           You know, I think if even
7    rudimentary due diligence had been done on the
8    principal and the company, there would have
9    been some questions raised.  Now, you know,
10   that doesn't solve the problem obviously.  They
11   had the problem of being able to provide
12   adequate security, but they didn't have any
13   unencumbered assets left to provide the
14   adequate security with.
15          And what they were essentially
16   trying to do was get something for nothing, and
17   they went ahead and got the something -- were
18   paying for something, basically they paid, but
19   there wasn't really any adequate security at
20   the end of that.  They didn't have a capacity
21   to do that.
22          And, of course, in doing that, you
23   know, my recollection of that, is that
24   triggered defaults, of course, under their loan
25   documents, and there's a waiver with respect to

Page 303

1    that in September '04 time frame.
2           And so, you know, there's this
3    whole follow-on from that.  I'm sorry, I maybe
4    have gotten beyond your question.  If you could
5    go back.
6        Q.  Well, the question was what -- you
7    used the term they covered it up --
8        A.  Oh.
9        Q.  -- and my question was what did
10   they do to cover it up?
11       A.  I think -- yeah, I'm sorry, I got
12   sidetracked on the bankruptcy piece.
13          Bankruptcy is in May of '07, and
14   there's e-mail traffic indicating that -- I
15   think -- again, I'd have to look at the e-mail,
16   but I think it's Bevelhymer and Lipson Wilson
17   and maybe Felix may be in that string as well,
18   but that there are numbers that they need to
19   deal with with respect to Condor, an indication
20   that there's an issue with respect to Condor
21   from a solvency standpoint.  And then there is
22   a follow-on, as I said, in November of '07 with
23   Lipson Wilson and Marsha Matthews on the same
24   topic.  And all this time Houlihan is out there
25   running a sale process.

Page 304

1           And it doesn't appear -- from the
2    e-mail traffic in late '08, it appears that the
3    whole Condor issue comes as a surprise to
4    Houlihan in their process, that that was not
5    something that was disclosed.  And as well, the
6    notes, I think, from Mr. Lenoir of Evolve, or I
7    believe Michael New maybe actually took the
8    notes, but those notes of a December meeting,
9    an initial meeting, with Miss Lipson Wilson
10   don't indicate that there's an issue with
11   surety and you would think that there might
12   since it appears from the e-mail traffic that
13   they were aware or should be aware that there
14   was an issue with respect to Condor and the
15   guaranty on the notes.
16       Q.  Now, did you just refer to
17   notes -- notes of a -- I'm sorry, I missed --
18   what notes?
19       A.  The ESOP notes are what we're
20   talking about.
21       Q.  Oh, I see.  The ESOP notes you're
22   suggesting --
23       A.  No.  The issue with respect to the
24   guaranty on the ESOP notes.
25       Q.  You're suggesting that the notes

Page 305

1    themselves should have revealed that there was
2    a question about the financial health of
3    Condor?
4        A.  No, no.
5        Q.  Okay.
6        A.  No.
7        Q.  I'm not understanding.  I'm still
8    focusing on what -- on your comment that the
9    whole situation was covered up.  I'm trying to
10   understand what that means.
11       A.  Well, again, bankruptcy occurs in
12   May of '07.  There's e-mail traffic in the
13   company about potential issues with Condor I
14   believe in July of '07.  There may be some
15   follow-on to that.  I don't recall
16   specifically.  But then there is e-mail traffic
17   between Marsha Matthews and Kim Lipson Wilson
18   in November of '07 indicating --
19       Q.  Where's the cover -- who should
20   have been told -- to whom should this have been
21   revealed that didn't get the message?
22       A.  There's no indication that the
23   board knows about it.  There's no indication
24   necessarily that upper management knows about
25   it.  And there's no indication that Houlihan

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 306

1   knows about it. And, in fact, the e-mail
2   traffic around the late January time frame all
3   seems to indicate that this comes as a surprise
4   to all of those constituencies.
5        Q. So when you say it was hidden,
6   you're essentially saying that these officers
7   were hiding it from the board and from
8   Houlihan?
9        A. That is what the e-mail traffic
10  appears to indicate.
11       Q. Did you run across, in your
12  review, any documents indicating that Miss
13  Lipson Wilson or any of the other officers
14  named in the Condor count had sought advice of
15  counsel with respect to the Condor situation?
16       A. Other than the -- well, yes, I did
17  is the answer. And that would be in the '07 --
18  I'm sorry, November '07 time frame that I've
19  mentioned, there's an e-mail exchange, I
20  believe, between Miss Lipson Wilson and Marsha
21  Matthews and McDermott Will & Emery.
22       And then when the issue appears to
23  be disclosed to Houlihan -- and, again, I say
24  disclosed because if I recall the e-mail from
25  Houlihan correctly, they're somewhat

Page 307

1   complaining that they had asked the company
2   about this earlier on and either didn't get an
3   answer or got a different answer and then are
4   somewhat perturbed that they're finding out
5   about it now at the end of January.
6        And then there's a fair amount of
7   follow-on, I think, with legal counsel at
8   that -- from that point onward in terms of the
9   issue and, you know, what's to be done with the
10  current situation with the surety. The counsel
11  undertakes, I think, to -- you know, they
12  run -- they run the docket so they run the
13  PACER search at that juncture and find out
14  what's going on in the case, and they look into
15  stuff and I think the conclusion, if I recall
16  the -- again, Mr. New's notes from the Chicago
17  meeting in February of 2008, the surety is
18  discussed, and my recollection is that the
19  McDermott people indicate there that they don't
20  think that it's, you know, viable, basically
21  that the surety -- that there isn't going to be
22  a recovery, if I recall those notes correctly,
23  or it's not in a position to perform.
24       Q. Do you have any evidence that any
25  of the officers who you've named in this count

Page 308

1   dis -- disregarded whatever advice they
2   received from counsel once this Condor issue
3   was raised with counsel?
4        A. Well, I guess I'd have to look at
5   the timing precisely of the payment that was
6   made in the fall of '07 versus the e-mail
7   exchange in November of '07 for Lipson Wilson.
8   But my recollection is that the payment would
9   have -- maybe occurred before that.
10       I think that my recollection of
11  the Marsha Matthews e-mail was cautionary in
12  nature, and it indicated that there had maybe
13  been a telephone conversation preceding the
14  e-mail and, therefore, you know, whether or not
15  when that payment was made -- in terms of
16  precisely answering your question, I'd have to
17  know precisely when the payment was made, and I
18  presume we might have that information
19  somewhere.
20       Q. Well, why don't we do this. Why
21  don't we hold off and when we take a break,
22  I'll ask you to look at several of these
23  documents that you've mentioned.
24       A. Okay.
25       Q. But are you suggesting by your

Page 309

1   answer that you believe counsel, Marsha
2   Matthews, advised the officers, Miss Lipson
3   Wilson or others, not to make any further
4   premium payments to Condor?
5        A. I don't think that's what the
6   e-mail said, no.
7        Q. Okay.
8        A. I think it was to be careful to
9   make certain there was adequate security was my
10  recollection, but I could be recalling the
11  e-mail wrong.
12       Q. So the relation -- so the timing
13  of the e-mail with Marsha Matthews and the
14  payment of the premium in 2007 doesn't
15  really -- isn't really germane, is it, to the
16  question of whether Miss Lipson Wilson or
17  others followed the advice of counsel?
18       A. Again, if I'm recalling the e-mail
19  correctly, maybe not; but I'm trying to be
20  responsive to your question to make sure I --
21  you know, from what I can recall, that those
22  are the things -- that was the only instance in
23  which I'm aware of that counsel was consulted
24  with respect to that. Now, what the substance
25  of the conversation was, I don't know

21 (Pages 306 to 309)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 310

1  precisely.
2       Q.  All right.  I started off focusing
3  this question on Barry Hoskins and then, of
4  course --
5       A.  Yes.
6       Q.  -- we've inevitably gone over to
7  some of the -- others of my clients.  But with
8  respect to Karen Felix, let's just take her
9  individually if we could for a moment.  What
10 facts do you have to indicate -- excuse me --
11 that she breached her fiduciary duty to Antioch
12 with respect to the Condor guaranties?
13      A.  Well, as CFO, she was the top
14 person financially in the company, as I
15 understand it, and that -- you know, head of
16 that finance team and that Bevelhymer reported
17 to her.  And I'm not certain the extent -- I'd
18 have to go back and look at the e-mails to the
19 extent to see that she was copied, but
20 certainly one would expect that she would be
21 aware of payments going out to -- as a CFO of
22 that magnitude to the ESOP notes -- to the
23 surety in respect of the Condor payments on the
24 ESOP notes.
25      So, I mean, I think that's where

Page 311

1  she comes into that piece.  And I guess the
2  other one was the -- who all was on the e-mail
3  in July where there's first an issue raised
4  with respect to -- or appears to be that the
5  company has become aware of an issue with
6  respect to Condor July of '07.  I don't recall
7  if she was in that string or not.  We'd have to
8  look at the e-mail.
9      But, again, if she is aware of
10 that and if she's, you know, involved in the
11 sale process and/or interfacing with Houlihan,
12 the issue is whether or not, you know, one, the
13 board and Houlihan don't appear to know about
14 any of this stuff until late January of 2008.
15 And it does appear that these officers, one or
16 more of them, may or should have known about it
17 in July of 2007, about six months prior.
18      Q.  Same question then with respect to
19 Steve Bevelhymer, what did he do, do you
20 believe, to breach his fiduciary duty with
21 respect to Condor?
22      A.  My recollection of that is, again,
23 he may well have been on or involved in the
24 e-mail string or e-mail that pertained in
25 July '07, and I thought he was the individual

Page 312

1  who authored -- you know, that there's an
2  e-mail with respect to him actually doing the
3  payment in '07 for Condor knowing that there's
4  a potential issue there.
5      And then, again, you know, he's an
6  officer.  He knows what's going on here.  These
7  folks were involved in the sale process.  The
8  finance team was copied on various things
9  involved in the sale process.  They put in
10 their two cents, I think, in terms of a
11 response to -- in November of '07 they put in
12 their two cents on a response to Sun that we
13 can't figure out why or, you know, what
14 happened with that.
15      So, I mean, they're involved and
16 engaged in the sale process and, you know, this
17 is a material piece of information for that.
18 Now, you know, it's not a good piece of
19 information from the company standpoint, I
20 suppose, but it's certainly a material piece of
21 information that Houlihan indicates in late
22 2008 they've been requesting and haven't gotten
23 and are surprised to find out about at the end
24 of 2008.
25      Q.  Other than the payments of

Page 313

1  premiums that you have indicated I think you
2  believe constitute a waste of corporate assets,
3  was the company, Antioch, damaged in any other
4  way as a result of the Condor Guaranty issue?
5      A.  Well, I mean, I think I've
6  indicated earlier, obviously it -- it appeared
7  to have an adverse impact on the sale process.
8  There were certain -- a fair amount that goes
9  on post the two -- you know, the January 2008,
10 for lack of a better term, discovery of this at
11 least among Houlihan and the board and others.
12      It kind of -- it appears that it
13 changes an approach that Candlewood is taking
14 or at least, you know, nixes that out, not that
15 that approach was necessarily going to fly
16 anyway.
17      And then what ensues is a fair
18 amount -- you know, legal expense otherwise
19 dealing with the issue in two thousand -- in
20 February of 2008.
21      Q.  I didn't hear one of the words you
22 just used.  There was what expense?
23      A.  Legal expense.  I'm sorry.
24      Q.  That's all right.
25      A.  Legal expense with McDermott Will

22 (Pages 310 to 313)

Page 314

1   & Emery in assessing the situation and
2   generating a memo with respect to it and then
3   going out and canvassing sources for -- over a
4   period of several weeks, I think, trying to
5   find alternative security.
6          And then as I sit here, I think
7   that is -- well, I mean, I mentioned earlier,
8   obviously, the potential, you know, ESOP ERISA
9   issues which if I recall the e-mail exchange
10  correctly, I think that there is references
11  to -- and I'm a little fuzzy, but in that time
12  frame after which it becomes kind of generally
13  known within the company and the board and
14  Houlihan, January of 2008 onward, there's a
15  concern, and maybe it's in the notes from the
16  Chicago meeting.  And maybe it's the ESOP
17  trustee's attorney that raises the issue about
18  how if we file bankruptcy without these things
19  adequately secured, it's going to -- you know,
20  we'll lose -- the IRS will be all over it sort
21  of thing.  That's my recollection of that.  I'm
22  sure that's not the wording.
23         But I have a recollection that
24  there would -- the consequences of this being
25  discovered in a bankruptcy became a concern

Page 315

1   and, you know, potentially another reason for
2   those who don't want to go the bankruptcy
3   change of control approach to say, hey, wait a
4   minute, we've got this issue now with the ESOP
5   where we're not, you know, adequately secured
6   and what's going to happen when we file
7   bankruptcy and that -- since the light of that,
8   what will the IRS do.  That piece comes to
9   mind.
10         Let me think.  I think that's all
11  I can -- can think of presently.
12      Q.  I think you indicated earlier this
13  morning that the ESOP ERISA issues, the
14  potential liability to the company in that
15  respect, never -- never came to pass, correct?
16      A.  That's my understanding, yes.
17      Q.  Now, with respect to what
18  appeared, you said, to have had an -- it
19  appeared to have had an adverse impact on the
20  sale process, and then you mentioned a couple
21  of concerns about the IRS and whatnot, is there
22  any way that you, from the evidence you are
23  aware of, can say that it's more likely than
24  not that a sale -- an asset sale, 363 or
25  otherwise, was thwarted or delayed because of

Page 316

1   the Condor issue?
2       A.  Well, again, to the extent that
3   there are -- that that's raised as an issue by
4   one of the constituents in the process as being
5   a reason for not filing.  Beyond that, you
6   know, that's, you know -- that was something
7   that goes into the mix, the Condor -- the
8   failure to provide adequate security is
9   something that, you know, appears, to me from
10  the documents and the notes, to be in the mix.
11      Q.  But you don't know whether or not
12  the absence of the Condor issue in the mix
13  would have led to a different decision with
14  respect to --
15      A.  Yeah --
16      Q.  -- a sale?
17      A.  -- I don't know that anybody knows
18  the answer to that.
19      Q.  So in that respect, isn't it true,
20  Mr. Miller, that it's simply speculation to say
21  that the problem with the Condor guaranty
22  caused damage to the company with respect to
23  the sale process because we just really don't
24  know; isn't that right?
25      A.  Well, I would say it appears to me

Page 317

1   to have had an impact.
2       Q.  Something other than what you've
3   already articulated --
4       A.  No.
5       Q.  -- that it went into the mix?
6       A.  That's my -- I think I've -- yeah,
7   I think I've answered that one.
8       Q.  But if we -- if we take the Condor
9   issue out of the mix --
10      A.  Uh-huh.
11      Q.  -- there's no way to know, is
12  there, whether things would have worked out
13  differently with respect to the sale process?
14      A.  I suppose not.  We don't know.
15      Q.  So we have the potential ERISA
16  issues that didn't come to pass.  We have a
17  potential effect on the sale process which
18  you've just indicated we can't really know
19  whether the Condor issue made a difference in
20  the end in the sale process.  Are we left then
21  with the legal expenses to the law firm and the
22  premium payments to Condor as the only real
23  damages that are nonspeculative in your claim?
24      A.  Well, I think that as you roll
25  them out, those are the ones that we can put

Page 318

1  numbers on.  And with respect to all of the
2  damages, I defer to whatever expert testimony
3  we might ultimately obtain with respect to
4  that, and I don't know, you know, whether we
5  would or wouldn't.  But beyond that, I think
6  you -- as I sit here today, I think you've
7  defined the universe.
8      Q.  Let me stick with this Condor
9  topic for just a little bit longer.  Assuming
10 for the sake of discussion that you are correct
11 in your contention that Barry Hoskins should
12 have known -- knew or should have known when he
13 initially purchased the Condor guaranty that it
14 was inadequate security, assuming that that's
15 true, what alternatives did he have at that
16 point that you're aware of to obtain adequate
17 security for the ESOP notes?
18     A.  Well, I think he could have
19 obtained adequate security for the ESOP notes.
20 You know --
21     Q.  I'm asking how.
22     A.  -- maybe that's not from the
23 company.  Maybe that's from somebody else.
24 Maybe that's from him saying to the board, hey,
25 you know, all these dollars have gone out,

Page 319

1  we're all loaded up with debt, we've got this
2  issue with the ESOP, all these people are
3  leaving, we've got a problem here and we've got
4  to do something about it and we've got to make
5  certain that we've got adequate security or the
6  entire reason, the financial reason behind why
7  you do the ESOP transaction, which was we're
8  going to have all these tax savings over the
9  next ten years, is going to go away if we don't
10 have adequate security because the ESOP isn't
11 going to be qualified any longer.  It's not
12 going to be a tax exempt entity anymore.
13         It's a huge risk.  It's a huge
14 issue.  It's something that, you know, just
15 calling up your insurance agent, having him
16 find you somebody in the Caymans and signing
17 off that you don't mind that it's not an A.M.
18 Best rated thing doesn't strike me as being a
19 prudent thing for a CFO to do, and it strikes
20 me that that would breach the CFO's duties to
21 the company.
22         And I don't see where this is -- I
23 mean, I -- maybe there are board minutes where
24 it's mentioned that they do this Condor thing,
25 but I don't see that it's really dug into

Page 320

1  anywhere from the documents that we have, that
2  he does some extensive search, that he does any
3  due diligence, that he goes up the chain to
4  anybody and says, hey, you know, we've got a
5  problem here.  We've got to deal with this.
6  So, you know, that's kind of my impression of
7  it.
8      Q.  Okay.  I understand your
9  impression.  Other than running a flag up the
10 pole, are you aware of any other security that
11 Mr. Hoskins or any of the officers of the
12 company could have obtained at the time the
13 Condor guaranty was first purchased that would
14 have constituted adequate security?
15     A.  You know, he could have had the
16 Morgans or somebody else guarantee the notes if
17 they wanted to.  I mean, there are other
18 sources of funds he could go to.  In terms
19 of -- if you're asking about the corporate
20 assets, no, those are fully liened up.  I've
21 previously testified to that.  From the balance
22 sheet and from every -- you know, from the ESOP
23 transaction, those appear to be fully liened
24 up.  There's nothing that the corporation has
25 available to offer and -- you know, unless the

Page 321

1  banks would have been willing to do something
2  on that score.
3         But there's no indication that,
4  you know, negotiations were had or otherwise.
5  The company appears to have gone and done this,
6  issued the notes and obtained the bonds, and
7  they did it in violation of the loan documents
8  and then needed a waiver of the loan documents
9  in September to be able to get out from under
10 that.  So, yeah, from a -- it doesn't appear to
11 me as if the entire situation was handled at
12 all appropriately.
13     Q.  Well, and I'm -- maybe I'm just
14 not hearing you.  I hear you raising a lot of
15 questions, but I'm still not -- I guess you did
16 mention the possibility of having the Morgans
17 secure the notes.  Other than -- was that a
18 serious suggestion on your part that that was
19 an option?
20     A.  You're asking for the realm of any
21 possibility.  I mean, I made it clear, I think,
22 that I don't -- it didn't appear to me that
23 there are any unencumbered assets of the
24 corporation --
25     Q.  Okay.

24 (Pages 318 to 321)

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 322

1         A. -- that he could have offered up.
2    So, you know, beyond that -- you know, but it's
3    a large enough issue that maybe the input of
4    the board or others in management might have
5    been a prudent thing to obtain.
6         Q. Is it fair to say, Mr. Miller, as
7    you sit here today, you're not aware of any
8    adequate security that could have been obtained
9    at the time the Condor guaranty was first
10   purchased?
11        A. Again --
12        MS. ANDREW: Objection.
13        THE WITNESS: I think I've answered
14   that.
15   BY MR. KLINGLER:
16        Q. Well, you've answered why you
17   think it was a breach of fiduciary duty to not,
18   as understand it, raise the issue, maybe
19   bring it to the board or ask questions, but I
20   haven't heard you -- unless I've missed it, I
21   haven't heard you -- other than the Morgans
22   guaranteeing it, I haven't heard you suggest a
23   specific alternative.
24        A. Go to the banks.
25        MS. ANDREW: Objection to the extent

Page 323

1    your -- the witness is not here as any expert in
2    financing of adequate security for ESOP notes so
3    your question is asking a hypothetical. It's
4    asking for an expert opinion. He's given you his
5    best answer.
6         MR. KLINGLER: Well, I'm not sure
7    that's true but that's what I'm trying to find
8    exactly what the answer is and what the full
9    extent of his answer is.
10   BY MR. KLINGLER:
11        Q. So here's what I -- I understand
12   your position, I believe, that Barry Hoskins
13   and some of my other clients breached their
14   fiduciary duty with respect to the Condor note.
15   My question is, given the circumstances with
16   respect to Barry Hoskins specifically, given
17   the circumstance that he was in, are you aware
18   of any alternative adequate security that he
19   could have obtained other than the Condor
20   guaranty?
21        MS. ANDREW: Same objection. It's
22   hypothetical and it calls for an expert opinion.
23   You can answer to the extent you're able.
24        MR. KLINGLER: I'm not asking for an
25   opinion. I'm just asking if he knows any facts.

Page 324

1         THE WITNESS: Well, I mean, I think
2    it goes to the premise of, gee, we did this
3    transaction less than a year ago that's taken, you
4    know -- liened up all the company's assets and
5    left us with no way to have adequate security, and
6    doing something that can at least check the box is
7    better than doing nothing is not the right answer
8    in my view, but it appears to be what Mr. Hoskins
9    did.
10        I mean, I've indicated before, I'm
11   not aware of any company assets that were
12   available to provide adequate security. They were
13   unable, I think, legally to provide adequate
14   security through stock of the company to the
15   extent that might have been available. And so,
16   you know, that's tapping -- you know, without bank
17   consent on something or without some third party
18   coming in and providing the adequate security, you
19   know, those would have been the other options.
20   There's no indication that he pursued any of those
21   options.
22        But clearly, it does not appear that
23   the company had an ability to provide the adequate
24   security from its assets because they were all
25   encumbered as a result of the ESOP transaction.

Page 325

1    BY MR. KLINGLER:
2         Q. So a letter of credit or something
3    else issued by the company wouldn't have helped
4    the situation, correct?
5         A. Again, without bank involvement or
6    concept, which appears to have not been
7    obtained ahead of time since it precipitated a
8    breach in the necessary waiver, no, I mean, it
9    doesn't appear that there were unencumbered
10   assets available to offer that adequate
11   security.
12        Q. And do you have any evidence to
13   indicate that the banks would have been willing
14   to do whatever they needed to do to permit the
15   company to come up with adequate security to
16   secure the ESOP notes?
17        A. Well, we --
18        MS. ANDREW: Objection.
19   Hypothetical.
20        THE WITNESS: They granted the
21   waiver, but, you know, we'll never know since it
22   appears that they were never asked.
23   BY MR. KLINGLER:
24        Q. So I've asked the question several
25   times now and I just want to make sure, do you

25 (Pages 322 to 325)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                                    W. Timothy Miller

Page 326

1  have any other answer to my question about the
2  other -- the alternatives to adequate security
3  that Barry Hoskins had available to him, to
4  your knowledge?
5      A.  I think I've listed out the ones
6  that I think are -- were available.
7      Q.  My last line of questioning was
8  directed to Mr. Hoskins.  With respect from
9  later on to Kim Lipson Wilson, Karen Felix,
10  Steve Bevelhymer, are you aware of any
11  alternative -- alternative sources of adequate
12  security that might have been available to them
13  later on after the first round of notes were
14  secured?
15      A.  I think my answer with respect to
16  them would be similar, if not the same, as my
17  answer with respect to Mr. Hoskins.  And,
18  again, it doesn't appear that they undertook an
19  effort to try to find or pursue or do any sort
20  of alternatives until the issue was surfaced
21  with Houlihan in late January of 2008.
22      I mean, there was no ability in
23  the company in terms of unencumbered assets
24  available to provide the adequate security, to
25  my knowledge, or, you know, based upon what

Page 327

1  I've seen in the documents.  So, you know,
2  there would have had to have been other avenues
3  pursued and it doesn't appear that they were.
4      Q.  You're not aware of any that would
5  have been successful in your -- in your view?
6      A.  I have no way of knowing if they
7  weren't ever pursued.
8      Q.  Let me switch to count six, which
9  is your claim for breach of fiduciary duty with
10  respect to the sale process.  You've named
11  three of my clients in that count, Kim Lipson
12  Wilson, Karen Felix, and Steve Bevelhymer.
13      In Paragraph 193 of the amended
14  complaint, you indicate that the above named
15  defendants, who include defendants other than
16  my clients, the above named defendants allowed
17  the Morgan family to pursue or failed to
18  prevent the Morgan family from pursuing
19  recapitalization alternatives, although the
20  board was paying Houlihan to find a purchaser.
21      My question is with respect to Kim
22  Lipson Wilson, Karen Felix, Steve Bevelhymer,
23  to save time I'll just lump them together --
24      A.  Okay.
25      Q.  -- unless you need to divide them

Page 328

1  out --
2      A.  No, no, no.
3      Q.  -- what did they do to allow the
4  Morgan family to pursue recapitalization
5  alternatives?
6      A.  I mean, I think similar to maybe
7  some of the other board members, but they being
8  in the better position to have really the most
9  current information with respect to the
10  company's finances and its sales and its
11  projections, that, you know, they saw or should
12  have seen fairly early on in the sale
13  process -- in the April, May time frame of '07,
14  there is a fair amount of e-mail traffic
15  concerning the company's sales projections and
16  Mr. Bevelhymer is involved on that.  I believe
17  Miss Felix is.  I'm not certain with Miss
18  Lipson Wilson but she may well have been, with
19  respect to those sales projections and, you
20  know, how valid those are and these are the
21  projections that I think the company is coming
22  up with for Houlihan to use to market the
23  company.
24      And, you know, this is kind of
25  where it starts, but there -- I can recall

Page 329

1  specifically a Bevelhymer e-mail saying -- you
2  know, looking at the situation and saying, you
3  know, I'm absolutely convinced the company
4  needs to be sold.
5      And there are also e-mails between
6  him and Richard Wiser, and Wiser is the one
7  who's doing the projections, now they've got
8  somebody who's doing projections using an
9  econometric model, and, you know, Wiser and he
10  are back and forth about how, you know, there
11  are various issues, the sales decline, you
12  know, that there appears to be no end in sight
13  and Wiser is making the point that, you know,
14  there are various initiatives that need to be
15  undertaken but the company doesn't have the
16  capacity to do that.
17      It doesn't have the financial
18  wherewithal or the capacity to do that.  It has
19  been totally leveraged and overleveraged since
20  the 2003 ESOP transaction and that continued,
21  you know, to the very end.
22      And so there is, you know,
23  conscious knowledge among those folks that the
24  company needs to be sold; and Bevelhymer is in
25  on this and I think Felix may well have been as

26  (Pages 326 to 329)

Page 330

1  well, and this is in the May, June, July time
2  frame of '07. And, you know, surprise,
3  surprise, with those numbers going where
4  they're going and continue to be going where
5  they're going and, you know, the initial
6  indications of value from the initial Houlihan
7  process which was geared toward a -- you know,
8  a company that was not a distressed company,
9  they were looking for buyers that were
10 interested in a company that's not distressed,
11 the initial indications of value come back and
12 say, you know, there's not enough to pay the
13 debt. And we switch over to then in the
14 September, October time frame of it being more
15 in the nature of a distressed-type sale from
16 the Houlihan perspective. And then Mr. Morgan
17 comes in at that juncture in the November time
18 frame with a Candlewood proposal and we are
19 now, you know, several months beyond when
20 Bevelhymer is saying the company needs to be
21 sold.
22        And we then continue in the
23 process, much of which I think I talked about
24 yesterday, which is this -- the board not
25 pursuing the sale at the behest of Mr. Morgan.

Page 331

1        Q. You're aware, aren't you, that my
2  clients were not board members?
3        A. Oh, I understand --
4        Q. Okay.
5        A. -- but they are officers of the
6  company.
7        Q. True. So --
8        A. Okay. And --
9        Q. You're answering the question of
10 how did they allow -- how did they allow the
11 Morgan family to pursue recapitalization,
12 that's the question you're answering?
13       A. By -- and I apologize, it's a long
14 way of getting to kind of the background in my
15 mind of what they knew based upon what the
16 documents are and getting to the place where
17 the Morgans get involved. And again, trying
18 not to -- trying to keep the context in here.
19       That then as it rolls forward
20 through the November through, you know, May of
21 2008, November '07, May of 2008 time frame, you
22 know, you see these people participating in
23 this process. This process where they've
24 determined early -- you know, back in the late
25 spring of '07 the company needs to be sold, but

Page 332

1  they know that the company and the board is
2  pursuing a -- are not moving quickly to pursue
3  the process, they're moving to simply let
4  things ride while Mr. Morgan is given more and
5  more time to try to come up with some other
6  sort of deal. And I understand that we're out
7  of tape.
8        Q. We've got to go off the record.
9        A. So --
10       THE VIDEOGRAPHER: We're off the
11 record.
12       (Pause in proceedings.)
13       THE VIDEOGRAPHER: We're on the
14 record.
15 BY MR. KLINGLER:
16       Q. Mr. Miller, during a break we
17 identified at least three of the documents that
18 you had referred to earlier in response to my
19 questioning that pertained to the Condor issue,
20 and they are exhibits number 731, number 108,
21 and number 741. I'm not asking you to
22 stipulate that those are the only documents
23 that pertain to the issue, but are those -- are
24 those three of the documents that you've pulled
25 up in the -- during the break?

Page 333

1        A. Yes, although we have not pulled
2  up 741 yet for me to see it, but we think that
3  that's the number.
4        Q. Okay.
5        A. But the other two I've definitely
6  looked at.
7        Q. Let me move on here for the sake
8  of time --
9        A. Sure.
10       Q. -- and go back to the question --
11 to the count we were discussing before the
12 break, count six, breach of fiduciary duty with
13 respect to the sale process.
14       A. Yeah.
15       Q. And I'll ask you with respect to
16 my clients named in that count, Kim Lipson
17 Wilson, Karen Felix, and Steve Bevelhymer, are
18 you aware of any things -- anything or things
19 that they could or should have done to prevent
20 the recapitulation -- I'm sorry, the
21 recapitalization efforts that are the subject
22 of this count?
23       A. From what I've seen, I mean, it
24 seems to me that they should have been more
25 adamant with the board about the need to sell

Page 334

1  the company. If anybody knew that the value
2  was declining over time, it was these folks. I
3  mean, this is the CFO, it's the treasurer.
4  These people were, you know, aware that the
5  sale projections -- you know, the econometric
6  models in the spring were considerably, you
7  know, less positive than what the -- you know,
8  what management's projections were from earlier
9  that year, that there needed to be adjustments
10 downward in those things and they were the ones
11 that were in the best position and had the most
12 current information, I would think, with
13 respect to the company's financial position.
14         And the treasurer is saying the
15 company needs to be sold and, you know, during
16 the midst of this, of course, they're
17 negotiating and asking for stay bonuses, which
18 they obtained, and payments on which, as I
19 understand it, were made in December of '07,
20 and, you know, they are then participating --
21 there are e-mails with Steve Bevelhymer I know
22 in the -- I think it's in the March time frame
23 where -- and I mentioned this one yesterday, I
24 think, where Mr. Morgan is complaining to him
25 that he -- he's not getting information from

Page 335

1  Mr. Bevelhymer I think with respect to a
2  recapitalization because Mr. Bevelhymer is busy
3  giving -- you know, getting information
4  together for Houlihan for the 363 process and,
5  you know, Mr. Morgan is unhappy about that.
6         And, you know, I think that these
7  people knew that the company -- or should have
8  known that the company needed to be sold, was
9  not increasing with value with time, and I
10 don't see anything in the e-mail traffic of
11 them going to the board and saying, hey, this
12 needs to be sold, this is an issue.
13         When Richard Wiser thought that
14 there were issues with respect to Asha's guess,
15 the sales projections that she came up with in
16 the May 2007 time frame, he went to Alan Luce,
17 a board member, and he went to Nancy Blair who
18 was on the board than to say, hey, I'm
19 concerned about this. And he also went to Asha
20 on that. And there's e-mails where in other
21 circumstances, other corporate officers stepped
22 up and said, hey, you know, there's an issue
23 here to the board and made the board aware of
24 that.
25         Q. With respect to Mr. Wiser's

Page 336

1  actions that you just referred to, did that
2  action -- did that end up making a difference
3  in the board's actions?
4         A. From the e-mail traffic, it
5  appears that it did. That they didn't go with
6  Asha's -- Asha -- I'm sorry for the
7  pronunciation -- Asha's guess.
8         Q. Are you aware of any facts with
9  respect to Kim Lipson Wilson, Karen Felix, or
10 Steve Bevelhymer that support the contention
11 that it's more likely than not that the board
12 would have decided not to pursue the
13 recapitalization efforts if any of these
14 officers had spoken up or done more than you
15 think they've done?
16         MS. ANDREW: Objection.
17 Hypothetical.
18         THE WITNESS: Yeah, again -- you
19 know, that's purely hypothetical. We will never
20 know because the e-mail traffic indicates that
21 they did not speak up.
22 BY MR. KLINGLER:
23         Q. So we'll never know whether their
24 failure to speak up made any difference at all
25 in the end, will we?

Page 337

1         A. Well, and again, I think --
2         Q. Well, will we? Isn't that what
3  you just said. Just to save time, isn't that
4  what you just said?
5         MS. ANDREW: Objection
6  BY MR. KLINGLER:
7         Q. We'll never know?
8         A. We can't know because they didn't
9  speak up and our issue is that they didn't
10 speak up.
11         Q. But we don't know whether that
12 damaged the company, do we?
13         A. Well, clearly the company not
14 doing a sale process within the time frames
15 that were permitted here damaged the company
16 from the Trust point of view. So --
17         Q. Well, I don't want to go around in
18 circles here or beat a horse; but my clients,
19 the officers, did not vote on any issue with
20 respect to recapitalization of the sale
21 process, did they?
22         A. Not that I'm aware of, no.
23         Q. Can you identify, Mr. Miller, any
24 sale -- asset sale or other transaction that
25 probably would have gone through were it not

28 (Pages 334 to 337)

Page 338

1    for the recapitalization efforts of the Morgan
2    family?
3              MS. ANDREW: Objection. Vague and a
4    hypothetical.
5              MR. KLINGLER: Well, it's no more
6    hypothetical than the claim, I guess. That's what
7    I'm trying to get at here.
8    BY MR. KLINGLER:
9         Q. Is there anything behind the claim
10   other than speculation?
11        A. The J.H. Whitney proposal and
12   letter of intent in May 2008 which the company
13   was moving forward to present in a Section 363
14   bankruptcy sale at some time presumably in June
15   while at the same time both Marlin and Monomoy
16   were still interested in the company.
17             So you had a situation where
18   you've got a party that's submitted a letter of
19   intent. It's not conditional on financing.
20   There's some -- at that juncture, I have to
21   look back, but the extent to which due
22   diligence was necessary.
23             But, I mean, I think they were
24   talking time frames at that juncture that were
25   relatively short, and the indication is that

Page 339

1    Marlin and Monomoy were still out there and
2    interested. So what you're setting it up for
3    is a three-party auction, the starting place is
4    like fifty-two or fifty-four million dollars.
5         Q. My question is just this -- I
6    mean, I'd love to spend the time listening to
7    your theory, and we've heard a lot of it and I
8    don't mean to be snide here, but my question
9    was simple. Can you identify any sale that
10   probably would have occurred if Kim Lipson
11   Wilson, Karen Felix, and/or Steve Bevelhymer
12   would have not breached their fiduciary duty of
13   the company with respect to the sale process?
14             MS. ANDREW: Objection.
15             THE WITNESS: I think I just answered
16   that question.
17   BY MR. KLINGLER:
18        Q. Okay. Was the answer yes or no?
19             MS. ANDREW: It wasn't a yes or no
20   question.
21             THE WITNESS: It's a hypothetical
22   question.
23   BY MR. KLINGLER:
24        Q. Well, can you identify a sale that
25   probably would have gone through? You think

Page 340

1    that sale probably would have gone through if
2    my clients hadn't breached their fiduciary duty
3    as you suggest?
4         A. Well, originally the question was
5    phrased as if the sale -- I thought if the sale
6    process hadn't been delayed, that that was the
7    issue in terms of the breach of the fiduciary
8    duty. And Kim Lipson Wilson was the one who
9    voted to take out the board, right, in the
10   midst of that? So --
11        Q. Well, she was --
12        A. Yeah, that's the one.
13        Q. She was a minority vote in it,
14   yes.
15        A. Okay. But she participated, and
16   that's, you know -- that's what we've --
17        Q. You're saying that that initial --
18   that J.W. -- is it J.H. --
19        A. J.H. Whitney.
20        Q. -- J.H. Whitney sale, in your
21   mind, probably would have gone through if Kim
22   Lipson Wilson had not voted as she did?
23        A. I'm saying that the company was
24   set up to a place where -- and were pursuing a
25   363 sale process with three potential

Page 341

1    interested bidders and a fifty-two, fifty-four
2    million dollar starting place. One of those
3    three in that process most likely would have
4    come out had the process gone forward, again
5    speaking what might have happened had, you
6    know, Miss Lipson Wilson not voted to take out
7    the board and forestall that process.
8         Q. And with respect to Karen Felix
9    and Steve Bevelhymer on that issue --
10        A. On that issue --
11        Q. -- do you fault them on that
12   issue?
13        A. I fault them on having not spoken
14   up to the board with respect to the need to
15   pursue the 363 process sooner. And since
16   Marlin, Monomoy, and J.H. Whitney were
17   interested in the mix, from -- you know, from
18   what I can tell early, you know, '08, February
19   at least onward, you know, a sale could well
20   have occurred. Again, we're talking what might
21   have occurred. It could well have occurred
22   much sooner.
23        Q. You don't know whether it would?
24        A. Nobody does, right, because --
25        Q. Right.

Page 342

1     A. -- people breached their fiduciary
2 duties from the Trust position.
3     Q. But we don't know the real result
4 of that, do we?
5     A. Well, yeah, we do. We know where
6 the company ended up, in bankruptcy, and we
7 know that there are a lot of beneficiaries of
8 the trust who remain unpaid while a lot of
9 creditors have got paid.
10     Q. Let me switch quickly to your
11 claim in count eight, breach of fiduciary duty
12 with respect to the sale process, and this is
13 the sale process -- I believe refers to the
14 sale process after the board had been
15 terminated and Mr. Morris had been appointed to
16 the board?
17     A. Correct.
18     Q. What evidence do you have that
19 Robert Morris rejected the Whitney proposal?
20     A. Well, switching out the board was
21 a rejection of the Whitney proposal.
22     Q. Well, he didn't -- he didn't --
23     A. Right.
24     Q. -- do that, right?
25     A. Well, I mean, he became a member

Page 343

1 of the board as a part of that event, and he
2 and the Morgans then did not move forward with
3 the Whitney transaction, right? They wanted to
4 then try to do some other sort of restructuring
5 and that precipitated, you know, the bank
6 pursuing all the funds in the debtor's
7 account -- basically offsetting against the
8 funds in the debtor's account and there was an
9 acceleration and default notice sent not too
10 long after that.
11     Q. Was the Whitney proposal still on
12 the table in June of 2008 when the new board
13 was in place?
14     A. I'd have to go back and look, but
15 I thought that it -- my understanding was that
16 they were -- you know, it was a 363 process and
17 they were expecting to do that; and when the
18 board switched out and decided we're not going
19 a 363 route, then the Whitney proposal isn't a
20 viable proposal anymore because they're not
21 going to go into bankruptcy.
22     Q. You know -- you're aware of who
23 appointed Robert Morris to the board?
24     A. I understand that the ESOP trustee
25 brought him in.

Page 344

1     Q. Was there ever a subsequent
2 Whitney proposal that summer?
3     A. It was my understanding that there
4 was one later but at a much -- I don't know
5 that it was that summer. I thought there was
6 one later in maybe it was August, September
7 time frame that the banks rejected as being too
8 low. My recollection of that was that there
9 was -- it was like down to twenty-two million
10 dollars. It had dropped by like thirty million
11 dollars from May to --
12     Q. So --
13     A. -- whenever that subsequent
14 proposal was or indication of interest.
15     Q. So your claim with respect to
16 Robert Morris and the Whitney proposal doesn't
17 pertain to that second lower proposal but only
18 to the first one?
19     A. I think that's -- yeah, I think
20 that's accurate.
21     Q. What is -- what's your definition
22 of enterprise value, Mr. Miller? Can you tell
23 me what you mean by that?
24     A. Well, again, I'm not a valuation
25 expert. I think it's -- those were

Page 345

1 references -- I think that's a reference to
2 kind of the valuations that were coming out of
3 the Houlihan process and are those that are
4 defined by a multiple of EBITDA. That somebody
5 is looking at it saying, you know, here's what
6 the enterprise should have a value of if you
7 approach value from a multiple of EBITDA.
8     Q. And in -- as of May 2008, the
9 company had an enterprise value of at least
10 fifty-four million dollars; is that right?
11     A. Well, I suppose at that juncture
12 when, you know, what you've got is, you know,
13 third-party bids for the company, those two
14 things, you know, would be similar. But,
15 again, I would defer to an expert on those
16 issues.
17     Q. Okay. I thought we looked at some
18 things yesterday where you've indicated in
19 interrogatory responses, I believe --
20     A. Yes.
21     Q. -- that the company had a value of
22 at least fifty-four million by -- as of May
23 2008; is that right?
24     A. As reflected in that bid from --
25 or the letter of intent from J.H. Whitney, yes.

Page 346

1    Q.  So at least J.H. Whitney believed
2  that it had a value of at least fifty-four
3  million at that time?
4    A.  Correct.
5    Q.  This may be an expert question.
6  If it is, I'm sure you'll tell me.  But do you
7  have evidence that indicates that the J.H.
8  Whitney offer that resulted in the board being
9  changed, do you have evidence to indicate that
10 that offer was in the best interest of the ESOP
11 note holders?
12   A.  Yes, to the extent that the
13 company is declining in value and this is the
14 value that's out there, and what you're talking
15 about is starting an auction from the point
16 that covers the bank's debt and maybe some
17 additional debt beyond that and you've got two
18 other parties interested in the auction, I
19 mean, that at that juncture, given all that had
20 occurred in the last over a year since the
21 company decided to sell -- the board decided to
22 sell the company, it's at that juncture was the
23 best hope of value for anybody beyond the
24 banks.
25   Q.  You're aware that the ESOP was

Page 347

1  against that deal because Ken Lenoir concluded
2  that there would be no value for the ESOP,
3  right?  You're aware --
4    A.  Yes.
5    Q.  -- that that was his reasoning?
6    A.  Sure.  Sure.  Yeah.
7    Q.  And you're suggesting that he
8  might have -- he may have been wrong because it
9  could have actually resulted in some positive
10 value for the ESOP?
11     MS. ANDREW:  Objection.  I think your
12 question is confusing two different things.
13 BY MR. KLINGLER:
14   Q.  Okay.  Did you not understand my
15 question?  Maybe it wasn't clear.
16   A.  Why don't you repeat it if you
17 would?
18   Q.  Are you suggesting that the ESOP
19 trustee was incorrect in concluding that the
20 Whitney proposal would result in no value for
21 the ESOP?
22   A.  I think I've indicated earlier
23 that, you know, a bankruptcy filing is probably
24 unlikely to result in value for the equity,
25 although you never know until the auction

Page 348

1  happens, and so for that reason, you know, a
2  shareholder is typically not inclined to go the
3  bankruptcy route because if there's any
4  possibility to somehow generate more dollars,
5  they'll want to do that.  But that isn't
6  necessarily in the best interest of the
7  company; and so, you know, that's a position
8  where the board needs to act --
9    Q.  Okay.
10   A.  -- and this board didn't.
11     MR. KLINGLER:  I believe that's all
12 I've got.  Thank you.
13     MS. ANDREW:  All right.  Lunch break.
14 Forty-five minutes, did that work for everyone
15 yesterday?
16     THE VIDEOGRAPHER:  We're off the
17 record.
18     (Pause in proceedings.)
19     THE VIDEOGRAPHER:  We're on the
20 record.
21     CROSS-EXAMINATION
22 BY MR. GENTRY:
23   Q.  Good afternoon, Mr. Miller.
24   A.  Good afternoon.
25   Q.  I introduced myself to you

Page 349

1  yesterday.  My name is Dan Gentry --
2    A.  Of course.
3    Q.  -- and I'm an attorney with
4  Coolidge Wall representing Alan Luce, Nancy
5  Blair, and Guy Walker.
6    A.  Okay.
7    Q.  Each of those are defendants in
8  the case that you brought on behalf of the
9  Litigation Trust?
10   A.  Okay.
11     (Thereupon, Exhibit 791, defendants
12 Nancy Blair, Wayne Alan Luce, and Frederick
13 Walker's notice of deposition of The Antioch
14 Company Litigation Trust pursuant to Fed. R. Civ.
15 P. 30(b)(6), was marked for purposes of
16 identification.)
17 BY MR. GENTRY:
18   Q.  I'm going to start by handing you
19 a copy of our deposition notice which has been
20 marked as Exhibit 791 --
21   A.  Okay.
22   Q.  -- and ask you whether you have
23 seen that before?
24   A.  Yes, I have.
25   Q.  And did you review that deposition

31 (Pages 346 to 349)

Page 350

1   notice, Exhibit 791, in advance of today's
2   deposition?
3       A. I did.
4       Q. Have you had time to locate
5   documents, information pertaining to the
6   subjects addressed in our notice?
7       A. Yes, we have.
8       Q. Are you the person the Litigation
9   Trust has charged with answering the questions
10  on the Trust's behalf for the topics listed in
11  Exhibit 791?
12      A. Yes, I am.
13      Q. Thank you. In terms of
14  preparation for today's deposition, did you
15  review the transcripts for our clients Alan
16  Luce, Nancy Blair, and Guy Walker?
17      A. Yes, I reviewed portions of each
18  of those transcripts.
19      Q. And I take it from your prior
20  answers that you reviewed all of the exhibits
21  that were addressed in the depositions of
22  Nancy, Alan, and Guy?
23      A. Yes.
24      Q. And have you reviewed anything
25  after concluding testimony yesterday or this

Page 351

1   morning to help refresh your memory with
2   respect to the topics that we've identified for
3   you in our notice?
4       A. I took a look back at the Nancy
5   Blair deposition. I think that's -- in terms
6   of your notice. Yeah, I think that's it.
7       Q. I believe there's a binder of
8   documents in front of you, and can -- are you
9   going to refer to those from --
10      MS. ANDREW: That's from this
11  morning, I think.
12      THE WITNESS: No, that's from this
13  morning. I'm sorry.
14  BY MR. GENTRY:
15      Q. Is there a binder of documents
16  that you need in front of you to help you with
17  your testimony this afternoon?
18      A. I believe that there's a binder
19  that goes to your item number two that I've not
20  seen, which is the Trust --
21      MS. ANDREW: The informal discovery,
22  is that it?
23      THE WITNESS: Yeah, the informal
24  discovery.
25  BY MR. GENTRY:

Page 352

1       Q. Oh, yeah. I'm not going to start
2   with that but you might as well have it.
3       A. Yeah, why don't we get that out.
4   And there may be -- as we go, I guess,
5   depending on what you ask, there's a binder
6   probably on LEVIMO that we probably ought to
7   have as well. Let's see. Okay.
8       Q. If you're looking at the
9   confirmation order, I have that --
10      A. Yeah.
11      Q. -- marked as an exhibit so I can
12  give you the pages that I'll be asking you
13  about, that will be a little easier.
14      A. Okay. That's fine.
15      Q. Why don't we -- just to start off
16  with and so, you know, in a major effort not to
17  re-cover the same ground that we discussed
18  before --
19      A. Sure.
20      Q. -- in looking at our deposition
21  notice, topics three and four pertain to the
22  LEVIMO transaction?
23      A. Yes.
24      Q. And then topic five refers
25  generally to the subject of facts concealed,

Page 353

1   and I'll be specific as to that, facts
2   concealed in connection with the 2003 ESOP
3   transaction. And as to all three of those
4   subjects, you've already testified yesterday
5   and today?
6       A. Yeah, I was a little fuzzy on what
7   you were looking for in five since it wasn't --
8   didn't seem to be temporally limited or, you
9   know, subject matter; but if you're telling me
10  2003 ESOP transaction, that's helpful.
11      Q. Well, for the purposes of these
12  questions, let's limit it that way.
13      A. Okay.
14      Q. But you've testified on those
15  subjects yesterday and today?
16      A. Correct.
17      Q. And rather than ask you some of
18  the same questions and answers, I want to ask
19  you generally whether you're aware of facts
20  pertaining to those subjects that you have not
21  identified or testified to already? And go
22  ahead and look at the notice. If there are
23  facts that you feel you need to add, feel free
24  to do so.
25      A. Well, I mean, sure, of course

Page 354

1    there are facts that are -- you know, would be
2    in addition.
3              There's seven hundred and
4    eighty-seven deposition exhibits and there's a
5    lot of facts in all those.  We did not discuss
6    all of those deposition exhibits yesterday.
7    There were over a million pages of documents
8    that I believe that we've produced in this
9    case.
10             So -- you know, I answered the
11   questions yesterday to the best of my knowledge
12   and best of my recollection having reviewed
13   what I've reviewed and, you know, I would have
14   to review the transcript of yesterday to
15   determine what facts were there and what
16   weren't there and then go through the various
17   deposition exhibits to supplement those facts.
18        Q.  Okay.  That's fair.  You're here
19   pursuant to a 30(b)(6) -- 30(b)(6) deposition
20   notice.
21        A.  Uh-huh.
22        Q.  And I've identified -- we'll just
23   go topic by topic.
24             Topic number three, we've asked
25   for you to be prepared to identify and discuss

Page 355

1    and testify regarding any and all facts
2    pertaining to the fair consideration at the
3    time of the LEVIMO transaction described in
4    counts four and five of the first amended
5    complaint for the real estate involved in such
6    transaction.  Do you see that?
7         A.  Yes.  Uh-huh.
8         Q.  And do you have any facts
9    pertaining to the fair consideration that you
10   have not testified about up to this point?  And
11   if you need to review seven hundred and eighty
12   deposition exhibits, that's certainly your
13   prerogative, although we'll do it off the
14   records.
15        A.  With respect to the fair
16   consideration, I think that I testified that
17   there were appraisals done in the spring of
18   2006 and the transaction took place in
19   spring -- or, I'm sorry.  The appraisals were
20   done in the fall of 2006, and there are
21   appraisals -- or the transaction was done in
22   the spring of 2007 at or -- at approximately
23   that appraised price.
24             And I think I also testified that
25   there was -- we weren't raising an issue with

Page 356

1    respect to adequacy of consideration, if that's
2    what your question is going to.  We were
3    raising the issue as to the prudence of the
4    board of having entered into that transaction
5    at that point in time knowing what the board
6    should have known with respect to Mr. Morgan
7    and what was going on with the company.
8         Q.  I appreciate that.  And just so
9    we're clear for the record, you're not raising
10   any issues regarding the adequacy of
11   consideration exchanged in connection with the
12   LEVIMO transaction that's described in your
13   complaint?
14        A.  In terms of what the company gave
15   versus what it gave up, I think the issue
16   goes -- in our view, goes to more of who it was
17   giving it up to and what amount of leverage
18   that allowed that individual to have over the
19   company on the go-forward on a
20   dollars-for-dollars basis.  I don't think that
21   we are suggesting the real estate was worth
22   more than the twenty-six million that was paid.
23        Q.  Going to topic number four, we've
24   asked you to be prepared to testify regarding
25   each and every term in the LEVIMO lease

Page 357

1    agreement to which the Trust objects.  How such
2    terms harm The Antioch Company and the Trust's
3    efforts to identify commercially unreasonable
4    terms, if any, within such agreement, and all
5    facts relating to The Antioch Company's
6    decision to assume the LEVIMO lease agreement
7    in the bankruptcy proceedings.  Do you see
8    that?
9         A.  Yes, I do.
10        Q.  And I know you testified regarding
11   the issue of leverage in favor of the landlord.
12        A.  Uh-huh.
13        Q.  So you don't need to repeat any of
14   your testimony as far as I'm concerned.  What
15   I'm looking for are facts --
16        A.  Uh-huh.
17        Q.  -- that relate to these claims
18   that you haven't identified for us on the
19   record already.
20        A.  Okay.
21        Q.  So have you knowledge of facts
22   about commercially unreasonable terms within
23   the LEVIMO lease agreement?
24             MS. ANDREW:  Do you have that for an
25   exhibit, Dan?

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 358

1          MR. GENTRY:  The lease agreement?
2          MS. ANDREW:  Yes.
3          MR. GENTRY:  It's an exhibit, but I
4    don't intend to hand it to him unless he wants to
5    look at it.  I'm sure you have it.
6          THE WITNESS:  Do we have a signed
7    copy?
8          MS. ANDREW:  There is a deposition
9    exhibit that's a signed copy.
10          THE WITNESS:  Okay.
11          MS. ANDREW:  And if you are going to
12    discuss what terms are objectionable, unless you
13    have that memorized, I think we should have the
14    document.
15          THE WITNESS:  No.  We need to look at
16    the lease.
17          MR. GENTRY:  All right.  Let's go off
18    the record.
19          THE WITNESS:  Why are we going off
20    the record?
21          THE VIDEOGRAPHER:  We're off the
22    record.
23          (Pause in proceedings.)
24          THE VIDEOGRAPHER:  We're on the
25    record.

Page 359

1    BY MR. GENTRY:
2          Q.  Back on the record.  Mr. Miller
3    has had the opportunity to review in connection
4    with topic four identified in Exhibit 791
5    Exhibit 79 which I believe is the LEVIMO lease
6    agreement?
7          A.  That is correct.
8          Q.  And you've had a chance to take a
9    look at the LEVIMO lease agreement and identify
10    for us the terms to which the Trust objects
11    within the lease agreement?
12          A.  Correct.  There's a provision on
13    page twelve, Section 3(g), that deals with what
14    appears to be a prospective waiver by the
15    tenant of any breach of fiduciary duty claim by
16    entry of the landlord and the tenant into this
17    lease or the exercise of any rights granted
18    thereunder.  So the company purports to have
19    waived that in advance.
20          It's not clear to me, thinking
21    back to the board minutes approving this, that
22    that appears to be a term that was vetted at
23    that board meeting as reflected in the minutes.
24    The following authorized corporation -- that
25    exhibit is Exhibit 498 is the board minutes of

Page 360

1    April 9, 2007.
2          That's a fairly long resolution --
3    authorizing resolution, but I don't see in here
4    that it specifically indicates that the company
5    is agreeing to waive any breach of fiduciary
6    duty claims that might arise in the future.
7          Q.  And you're referring to Exhibit
8    498?
9          A.  Correct, 498.
10          Q.  And I'm asking you more
11    specifically as to Exhibit 79, the lease
12    agreement --
13          A.  Yes.
14          Q.  -- the terms within the lease
15    agreement to which you object, and you
16    identified page twelve, I think you said
17    Section 3(g)?
18          A.  Correct.
19          Q.  All right.  Are there other terms
20    within the lease agreement to which the Trust
21    objects?
22          A.  Yeah, the other term that we
23    object to -- I believe this is a change from
24    the prior version of the lease, and I was
25    looking back at that from the W.P. Carey

Page 361

1    version in the events of default.  This is on
2    page thirty-six of the lease.  It's Section
3    22(a)(14), tenant shall enter into an asset
4    transfer in violation of Paragraph 21(j) or a
5    change of control in violation of Paragraph
6    21(k) shall have occurred, and I believe the
7    default in the Carey lease -- and let's see
8    that --
9          Q.  Well, I want to focus on Exhibit
10    79 for present purposes.  I'm not asking you to
11    compare them.  And I understand you're
12    identifying on page thirty-six Section
13    22(a)(14)?
14          A.  No, Section -- yes, Section
15    22(a)(14).
16          Q.  Are there --
17          A.  It references Paragraph 21(k) of
18    the lease.  And Paragraph 21(k) provides --
19    let's see.  As I read it, that any change of
20    control basically gives the landlord, you know,
21    another veto power over change of control.
22          Now, if it's a credit -- what's
23    defined as a credit entity, and I believe
24    that's by reference to a certain rate -- you
25    know, credit rating, if it's by reference to a

34  (Pages 358 to 361)

Page 362

1  credit entity, the landlord is limited to
2  basically being entitled to a guaranty, you
3  know. Should be approved -- let's see.
4      Q. Well, let me make sure I have a
5  clean record. We've identified page twelve,
6  Section 3(g).
7      A. Uh-huh.
8      Q. Page thirty-six, Section
9  22(a)(14). And now page thirty-four, Section
10 21(k)?
11     A. Correct, and those latter two were
12 in connection with one another.
13     Q. Are there other provisions within
14 the lease to which the Trust objects?
15     A. I think the other thing we were
16 concerned about was the term. I believe it's
17 an initial fifteen year term.
18     Q. You mean the duration of the lease
19 itself?
20     A. Yes, the duration of the lease.
21     Q. All right. Anything else?
22     A. I'm missing this. Yeah, I think
23 that -- those are the things that we found most
24 concerning under these circumstances with
25 LEVIMO, an entity controlled by Lee Morgan as

Page 363

1  the landlord.
2      Q. As to each of the terms that
3  you've identified, is it the Trust's position
4  that they were commercially unreasonable at the
5  time that the lease was executed?
6      A. What do you mean by commercially
7  unreasonable?
8      Q. Commercially unreasonable,
9  contrary to the custom for similar leases in
10 the industry and the location, St. Cloud,
11 Minnesota, a commercial lease for like, kind
12 buildings based on the price. Do you have any
13 facts that suggest to you that those terms are
14 commercially unreasonable?
15     A. No, not as I sit here today.
16     Q. You're aware that the reorganized
17 debtor assumed the LEVIMO lease in the
18 bankruptcy proceedings, true?
19     A. I presume that would be a
20 provision in the plan, but I -- it was my
21 understanding that it did. I don't -- yeah, I
22 believe it did.
23     Q. Okay. Well, let's, for the sake
24 of discussion, assume that it's true and it's
25 in the plan someplace --

Page 364

1      A. Okay.
2      Q. -- without us going through it.
3      A. Sure.
4      Q. What's the significance of the
5  fact that the reorganized debtor assumed the
6  lease, if any, relative to your claims that the
7  lease contains terms to which you object?
8      A. I don't see the relative
9  significance of those two things.
10     Q. So no significance?
11     A. The fact that the reorganized
12 debtor, which was controlled by the banks,
13 wanted to continue to operate --
14     Q. It's a yes or no question. Is it
15 significant or not significant? And I think
16 you said no. I'm just looking to make sure I
17 understand your answer.
18     A. Yeah, I don't understand why --
19 no, I don't see the significance of it.
20     Q. Thank you. Now, two of our
21 clients, Nancy Blair and Alan Luce, are
22 defendants on the breach of fiduciary duty and
23 aiding and abetting claims connected with the
24 LEVIMO transaction, right? Are you aware of
25 that?

Page 365

1      A. They were board members, yes.
2  Uh-huh. Yes. Uh-huh.
3      Q. There are no facts that you're
4  aware of suggesting that Nancy Blair or Alan
5  Luce had any personal stake in the LEVIMO
6  transaction, true?
7      A. I'm not aware of any. What do you
8  mean by personal stake? Let me take it back.
9  What do you mean by personal stake?
10     Q. Well, you've alluded, I think,
11 more than once to the fact that LEVIMO is a Lee
12 Morgan entity, right?
13     A. Correct.
14     Q. He's the owner?
15     A. Correct.
16     Q. All right. And part of your
17 problem with the transaction is that he stood
18 on more than one side of the transaction,
19 essentially, because he's going to be the
20 landlord and continue to be the CEO?
21     A. Correct.
22     Q. You don't have any facts to
23 suggest to you that Alan Luce or Nancy Blair
24 had any interest in the LEVIMO entity, true?
25     A. I'm not aware of them having any

35 (Pages 362 to 365)

Page 366

1  interest in LEVIMO.
2      Q.  And you're not aware of them
3  having any personal interest or stake in the
4  LEVIMO transaction personally?
5      A.  Again, what do you mean by
6  personal stake?
7      Q.  Did they -- did Alan Luce or Nancy
8  Blair, to the best of your knowledge and based
9  upon the documents that you've reviewed and the
10  research that the Trust has undertaken, benefit
11  in any way from the fact that the LEVIMO
12  transaction went forward?
13      A.  Well, Nancy Blair had a close
14  personal relationship with Asha Morgan Moran,
15  Lee Morgan's daughter.
16      Q.  I'm asking in the sense of dollars
17  and cents.
18      A.  I'm not aware of any dollars and
19  cents.
20      Q.  Let's move on to another topic.
21  And just real -- you've testified -- in topic
22  five I asked you about facts that were
23  concealed in connection with the 2003 ESOP
24  transaction from the Trust's point of view.
25      A.  Yes.

Page 367

1      Q.  Do you see that?
2      A.  Yeah, let me pull it up here.
3  Just a second.  Do I need this still?
4      Q.  The LEVIMO?  No, we're done with
5  that for now.
6      A.  Can I hand that away then?  Thank
7  you.
8      Q.  If you want to look at that topic.
9  My question really is very simple because
10  you've been asked a lot of questions and you've
11  gone through Exhibit 31 or Exhibit 560 at
12  length --
13      A.  Uh-huh.
14      Q.  -- and I don't intend to recover
15  that ground.
16      A.  Okay.
17      Q.  I'm asking you whether you have
18  knowledge of any facts relating to the issue of
19  concealment in connection with the 2003 ESOP
20  transaction that you haven't testified about
21  already in the last day and a half?
22      A.  Concealment from whom?
23      Q.  Concealment from anyone who
24  received the proxy materials.  Because we spent
25  the most time on those.

Page 368

1      A.  Well -- yeah, I think I went into
2  some amount of detail on that and what the
3  issues were with the proxy materials.  And do
4  you -- is that separate and apart from the
5  board or -- you know, the universe of the proxy
6  people were all of the selling shareholders,
7  the selling -- I'm sorry, selling nonESOP
8  shareholders and ultimately the ESOP
9  participants received that, as I understand it.
10      Q.  Let's start with -- whoever
11  received the proxy materials and within the
12  proxy materials you've testified at length.
13      A.  Yes.
14      Q.  Are there any other facts that you
15  haven't got a chance to tell us about?
16      A.  With respect to the proxy
17  materials --
18      Q.  Right.
19      A.  -- or something else?
20      Q.  The proxy materials.
21      A.  We did not use and go over the
22  cover letters that went to the participants.
23  You'll recall that we were using the two
24  different exhibits, and my focus was on the
25  proxy -- you know, the actual proxy statement

Page 369

1  document itself.
2          In terms of the cover letter and
3  communication thing, it's my recollection that
4  there are similar issues with that as those
5  that I identified in the proxy statement with
6  respect to Houlihan Lokey's role and to the
7  extent of its opinion and that sort of stuff.
8  So it's in the same vein but in a different
9  part of the document that we did not discuss.
10      Q.  Fair enough.  And I recall that
11  there were -- there were some language or
12  description of Houlihan Lokey in different
13  places in the document --
14      A.  Correct.
15      Q.  -- that was very similar?
16      A.  Correct.
17      Q.  And you objected to it in each
18  instance where it appeared?
19      A.  That was the intention, yes, of
20  what I tried to convey yesterday.  We just --
21  we didn't have an exhibit that had that
22  additional -- those additional pages to it.  I
23  was working off of a different exhibit, and my
24  recollection of those additional pages is that
25  there were similar issues in those pages as

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 370

1   there were in what was in the proxy statement
2   as it pertains to Houlihan Lokey's opinion and
3   role in the transaction.
4        Q.   Now, based upon your question to
5   me about the universe outside the proxy
6   materials, are you aware of facts that were
7   misrepresented or concealed from, let's say,
8   the service providers who worked in connection
9   with the 2003 ESOP transaction?
10       A.   Well, I think I've expressed
11  concern previously about the company's
12  projections in light of what the monthly
13  financial statements -- at least the financial
14  narrative, I should say, the monthly financial
15  narrative that Mr. Morgan generated in the
16  late -- I guess it would be -- I think they're
17  2002 and then into 2003 and '04 with respect to
18  productivity of the consultants, keeping in
19  mind that the revenue driver here is the
20  consultants and it's the metrics on the
21  consultants that are significant and --
22       Q.   Let me break down --
23       A.   Sure.
24       Q.   -- just for a minute --
25       A.   Sure.

Page 371

1        Q.   -- if I may.  As it pertains to
2   the 2003 ESOP transaction --
3        A.   Uh-huh.
4        Q.   -- people within The Antioch
5   Company provided projections and estimates
6   regarding a host of financial issues and
7   performance going forward into the future,
8   right?
9        A.   That's my understanding, yeah.
10       Q.   And those projections were
11  provided to various constituencies?
12       A.   Correct.
13       Q.   Deloitte, right, was one of them?
14       A.   That's my understanding, yeah, and
15  the documents tend to indicate that.  Yes.
16       Q.   All right.  And you're telling us
17  that in terms -- and I'm asking specifically as
18  to the issue of misrepresentation --
19       A.   Uh-huh.
20       Q.   -- or concealment, and you're
21  saying that you believe that there was
22  misrepresentation or concealment within those
23  projections and that's a concern to you?
24       A.   No.  What I'm concerned about is
25  there are e-mails from two of the board members

Page 372

1   in the January, February 2001 time frame where
2   they are explaining to Asha what the issues are
3   with the company and company management.
4        And one of the issues in those
5   board members are board members who were on the
6   board at the time of this ESOP transaction who
7   voted in favor of it and who profited from it.
8   And that was Mr. Carlson and Mr. -- is it
9   Sanan?  I believe that they each sent e-mails
10  at about that same time period with respect to
11  issues with management and the company.
12       And one of the issues that they
13  raised, which is the company was unable to
14  forecast at all or basically had -- I forget
15  the precise language.  But an issue was raised
16  by one, and possibly both of them, with respect
17  to the company's ability to forecast.
18       And then if you fast-forward to
19  the 2005, 2006 time frame where Richard Wiser
20  is brought in, and the company has the same
21  problem.
22       Q.   Right.  But I'm asking you
23  specifically about misrepresentations and
24  concealment to service providers in connection
25  with the 2003 ESOP transaction.

Page 373

1        A.   Uh-huh.  And I'm telling you that
2   you have two board members --
3        Q.   So 2005 doesn't come into play in
4   that, right?
5        A.   Well --
6        Q.   It couldn't because 2005 hadn't
7   happened yet.  So let's focus on the time frame
8   that I'm asking you about.
9        Let me ask you first about this
10  e-mail from Carlson and Sanan.  Is that an
11  exhibit in the case at this point, to your
12  knowledge?
13       A.   Yes, it is.
14       Q.   And do you know which exhibit it
15  is?
16       A.   Not off the top of my head, no.
17       Q.   So you're addressing the issue of
18  forecasting and problems the company had
19  forecasting and prior to 2003, generally
20  speaking, the problem with forecasting was
21  their forecasts were always too low, right?
22       A.   I don't believe that it was in
23  terms of low.  I think it was they cannot
24  forecast the business on the go-forward, and
25  that that condition appears to have continued

37 (Pages 370 to 373)

Page 374

1  up until 2007 and possibly beyond.
2      Q.  And just so we're clear on my
3  question, which is asking about
4  misrepresentation or concealment --
5      A.  Uh-huh.
6      Q.  -- to service providers --
7      A.  Uh-huh.
8      Q.  -- you're identifying the
9  company's inability to forecast.  And is that
10  the same thing as misrepresentation in your
11  mind?
12      A.  No.  The concern is --
13      Q.  Is that the same thing as
14  concealment, in your mind?
15      A.  Again, I'm not seeing
16  documentation indicating that those service
17  providers were made aware of that issue.
18      Q.  The forecasting issue, that's
19  fine.  I'm asking you --
20      A.  The forecasting issues.  And
21  also --
22      Q.  Hold on.  Let me ask you the
23  question and you can answer the question.
24      A.  You're not letting me finish the
25  answer that I'm giving.

Page 375

1      Q.  You're going in a different
2  direction and we just don't have time for that
3  anymore.
4      I asked you about
5  misrepresentation, and your answer was the
6  inability to forecast is not the same as
7  misrepresentation.  My next question is, as to
8  concealment, is the company's inability to
9  forecast equivalent to concealment, in your
10  mind, as it relates to the 2003 ESOP
11  transaction and the information provided to
12  service providers?  Yes or no, please?
13      THE WITNESS:  Can you read the
14  question back for me, please?
15      MR. GENTRY:  That's fair.
16      (Record read.)
17      THE WITNESS:  I don't understand your
18  question, I guess.  Is concealment the same thing
19  as -- is an inability to forecast the same thing
20  as concealment?  I thought you were asking is --
21  you're wanting to know what things are concealed.
22  I'm trying to tell you that it appears to me that
23  there's knowledge on the part of a couple board
24  members that the company can't forecast its
25  numbers.  They're doing a transaction, the

Page 376

1  valuations for which are based almost entirely
2  upon the forecasting numbers.  They're not hitting
3  the forecast that year, that piece I think those
4  folks know.  I don't know that that was concealed.
5      But it's not clear to me that the
6  fact that the board members had concerns about the
7  ability -- the company's ability to forecast, I
8  don't see any indication that that was shared with
9  anyone or other board members.
10  BY MR. GENTRY:
11      Q.  Do you see an indication at the
12  time that the 2003 transaction was being
13  undertaken -- and I'll make it more specific.
14      As to the time that service
15  providers received forecasts, do you see an
16  indication anywhere in the record that the
17  concern you identified from Sanan and Carlson
18  still existed in 2003?  I want to hear about
19  2003, not 2005, not 2002.
20      I'll reformulate it for you.
21      A.  Other than the fact -- other than
22  the fact that the company is not meeting its
23  forecasted sales, no; but I don't concede that
24  the fact that they weren't able to forecast in
25  2001 and weren't able to forecast as late as

Page 377

1  2007, I don't concede that those two things are
2  not relevant to what was going on in 2003.
3      Q.  Let's move on to the next topic.
4  And we've asked you in topic number six to be
5  prepared to testify regarding each and every
6  fact that the Trust relies upon to support its
7  claim that the defendant Frederick Guy Walker
8  had authority to direct, influence, or control
9  the restructuring/sale process described in
10  count six and seven of the first amended
11  complaint.  Do you see that?
12      A.  Yes.
13      Q.  And are you prepared to testify
14  regarding such facts?
15      A.  Yes.
16      Q.  Please do.
17      A.  I may have touched on this
18  yesterday; but as I understand it, Mr. Walker
19  was brought in as a consultant and then came in
20  as president of Creative Memories North America
21  in the December of 2007 time frame, and that in
22  that capacity he was working with Asha Moran
23  and he was out doing and involved in the sale
24  process in doing the presentations to potential
25  purchasers and interested parties.

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                        W. Timothy Miller

Page 378

1      There is also e-mail traffic with
2 respect to him being at least copied and in the
3 loop on, you know, the subsequent letters that
4 went later that year with respect to the
5 Condor -- I'm sorry, with respect to the ESOP
6 notes and the fact that those notes would not
7 be paid.
8      I think the Trust's view of that
9 is he's an officer of the company. It's the
10 largest revenue driving company -- part of the
11 company. In that capacity, you know, he
12 should -- if he didn't know, he should know
13 what the financial situation of the company --
14 in that portion of the company was.
15      And if he was involved in the sale
16 process in which Houlihan and others were
17 involved in, he should have known the
18 importance of getting a sale done and, you
19 know, should have worked to facilitate that.
20 And we don't see any indication that he did or
21 that he was going to the special committee
22 saying, hey, we've got to sell this thing and
23 we've got to bring, you know, new dollars in,
24 you know, to improve the sale situation.
25      Q. Did you review Exhibit 584, the

Page 379

1 independent consultant agreement for
2 Mr. Walker?
3      A. Yes, I did.
4      Q. It's dated December 1st of 2007,
5 right?
6      A. Yes.
7      Q. And it runs through February 29th
8 of 2008, right?
9      A. Correct.
10      Q. And among other things, the
11 independent contractor agreement says that
12 Mr. Walker and his employees are not authorized
13 to and shall not represent themselves or hold
14 themselves out as employees of the company,
15 meaning Antioch --
16      A. Uh-huh.
17      Q. -- and are not authorized to and
18 shall not enter into any contracts, agreements,
19 or other commitments on behalf of the company.
20 That's on page four of Exhibit 584. Did you
21 read that?
22      A. Yes.
23      Q. And are you saying to us it's the
24 Trust's position that despite this language,
25 Mr. Walker had authority to negotiate on behalf

Page 380

1 of the company?
2      A. Lee Morgan represented to other
3 parties, to the bank, that he was the new
4 president of CM North America.
5      Q. I think it said interim president
6 of Creative Memories North America and
7 identified him as a consultant. So my question
8 is really more specifically to the actual issue
9 of whether Guy walker could, and this says he
10 couldn't, could he enter into any contracts on
11 behalf of The Antioch Company as an independent
12 consultant pursuant to this agreement?
13      A. Pursuant to that agreement, no.
14      Q. Do you have any knowledge that he
15 ever did enter into any contracts or negotiated
16 on behalf of the company while he was an
17 independent consultant for the company?
18      A. Not as I sit here today, no.
19      Q. All right. And that agreement was
20 extended until May 31st of 2008, right?
21      A. I believe so.
22      Q. And if you want to look at Exhibit
23 585. I can give you that.
24      A. I'll trust you.
25      Q. So during that period of time

Page 381

1 Mr. Walker was an independent contractor?
2      A. That's what those contracts say.
3      Q. And he was not -- and you have no
4 facts to show that he did anything but be an
5 independent contractor?
6      A. I thought we had more than one
7 e-mail where he was represented as being
8 president of Creative Memories North America
9 post the one that we discussed.
10      Q. Did those e-mails -- did
11 Mr. Walker ever act with that authority based
12 upon those e-mails that you're addressing, to
13 your knowledge?
14      A. Well, not to my knowledge.
15      Q. And did you read in Mr. Walker's
16 deposition transcript where he addressed the
17 question of whether he actually negotiated on
18 behalf of The Antioch Company?
19      A. I believe that he indicated that
20 he did not.
21      Q. And do you have any facts to
22 contradict that testimony?
23      A. Again, other than what we've seen
24 in the e-mails, I don't -- sitting here now, I
25 don't think we do.

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 382

1      Q.  And are the e-mails you're
2  referring to exhibits to Mr. Walker's
3  deposition already?
4      A.  I believe that they are.
5      Q.  And to the best of your knowledge,
6  did -- Mr. Walker became an officer of The
7  Antioch Company only as of June 12th of 2008,
8  right?
9      A.  It was some point in time at or
10  toward the end of that -- the second tier of
11  the consulting.  I don't recall the precise
12  date but --
13      Q.  Well, I'll give you -- you can
14  look at Exhibit 586 if you like, if that's
15  helpful.  It's minutes from a board meeting.
16      A.  If that's what -- if that's what
17  it says, that's what it says.
18      Q.  That's what it says.
19      A.  Okay.  Very good.
20      Q.  And you don't have any facts to
21  contradict that, I suppose?
22      A.  I do not.
23      Q.  Fair enough.  And the minutes
24  don't reflect that Mr. Walker was in attendance
25  at the meeting.

Page 383

1      A.  Okay.
2      Q.  So what facts do you know of to
3  suggest that Mr. Walker actually knew he became
4  an officer on June 12th of 2008?
5      A.  You're suggesting that they made
6  him an officer and didn't tell him?
7      Q.  I think Mr. Walker has testified
8  to that fact already.
9      A.  Okay.
10      Q.  If you read his transcript, you
11  might have seen that.
12      A.  Again, it's -- okay.
13      Q.  Do you have any facts as you sit
14  here today that tend to establish that
15  Mr. Walker was an officer prior to June 12th of
16  2008?
17      A.  Aside from how he was represented
18  to third parties by others in the company in
19  the e-mails that I previously referenced, the
20  one of which you say is an interim president
21  and a consultant, and -- I thought that there
22  was at least one or more others but possibly
23  not.
24      Q.  Now, by June 12th of 2008, the
25  sale process had been ongoing for a long time,

Page 384

1  true?
2      A.  Correct; and, in fact, by that
3  time the board had been changed.
4      Q.  Right.  In fact, the board of
5  directors, including two of our clients, Alan
6  Luce and Nancy Blair, was terminated in the
7  first week of June of 2008?
8      A.  Correct.
9      Q.  And the reason why they were
10  terminated is because they were in favor of
11  accepting the J.H. Whitney offer, true?
12      A.  That's my understanding, yes.
13      Q.  So -- and it's your position that
14  Mr. Walker aided and abetted breaches of
15  fiduciary duty -- or breached fiduciary duties
16  in connection with the sale process, right?
17      A.  I think our issue was with respect
18  to his role which appeared to us to be of a
19  presidential nature despite what's in the
20  contract.  His involvement in the sales
21  presentations, and the fact that that process
22  is dragging on and he's one more of those
23  people that is involved in this process that is
24  dragging on when, as I've testified earlier, it
25  appears to us that the process needed to move

Page 385

1  to a 363 -- you know, a prompt sale process
2  much earlier than what it actually did.
3      Q.  But Mr. Walker wasn't involved in
4  that time frame?
5      A.  Well, he was involved for the --
6  you know, certainly it seems -- it appeared to
7  us from the January -- at least January -- you
8  know, December 2007, January on time frame and,
9  you know, all of that is the -- really the -- a
10  fair portion of the sale process.
11      Q.  Let's talk about June 12, 2008
12  forward.
13      A.  Okay.
14      Q.  What facts are you aware of where
15  Mr. Walker utilized his authority as an officer
16  of the company to influence the sale process?
17      A.  I'm not aware that he did, I
18  guess, at that -- from June 12th, 2004 -- or
19  2008 going forward.
20          Again, I think our issue is
21  focused on the January through May time frame,
22  his role represented as being the president of
23  the largest division and the fact that he is --
24  we're not finding anywhere where he is saying,
25  hey, we need to get this thing sold and going

40  (Pages 382 to 385)

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 386

1    to the special committee saying we need to get
2    this thing sold.
3         Q.   I want to move on to another topic
4    and talk a little bit about some of the claims
5    against Nancy Blair.
6         A.   Sure.
7         Q.   Now, the Litigation Trust is suing
8    Nancy Blair for breaches of fiduciary duty
9    connected with the 2003 ESOP transaction, true?
10        A.   Yes, she is in the count one, I
11   believe, is she not?
12        Q.   Alan Luce is not a defendant -- or
13   actually Nancy Blair is a defendant on counts
14   one and two, right?
15        A.   Let me look to confirm, but I
16   believe that that is the case.  Yes.  She's in
17   count two.  Count one is the -- oh, I'm sorry,
18   yes, she's in one and two.  I'm sorry.
19        Q.   And Alan Luce is not listed as a
20   defendant in counts one and two, true?
21        A.   That is correct.
22        Q.   Now, Alan Luce was a director at
23   the time that the 2003 ESOP transaction was
24   approved by the Antioch board of directors,
25   true?

Page 387

1         A.   That is correct.
2         Q.   And there were two employee-owner
3    directors on the board of directors at that
4    time, too, right?
5         A.   Yes.
6         Q.   Now, did the employee-owner
7    directors owe fiduciary duties to The Antioch
8    Company by virtue of their membership on the
9    board of directors?
10        A.   I would expect so, yes.
11        Q.   Did they owe the same duties as
12   other members of the board of directors?
13        A.   I would think so, but that may be
14   a legal issue that I frankly don't know the
15   answer to as I sit here today --
16        Q.   Fair.
17        A.   -- but --
18        Q.   And Alan Luce and those
19   employee-owners certainly owed fiduciary duties
20   to The Antioch Company at the time of the
21   transaction as members of the board of
22   directors, true?
23        A.   Yes, Luce certainly would.  Yes.
24        Q.   Is it the Trust's contention that
25   Alan Luce or the employee-owner directors, I

Page 388

1    think it's Sandy Borstad and Debra
2    Brooks-Cain --
3         A.   Uh-huh.
4         Q.   -- is it the Trust's position that
5    those three members of the board of directors
6    breached any fiduciary duties by failing to
7    vote against the 2003 ESOP transaction?
8         A.   I think the Trust's position is
9    that because the board, was it six of nine,
10   were conflicted and had a personal financial
11   interest in the outcome, that an independent --
12   there had to be an independent fairness
13   evaluation with respect to the transaction from
14   the standpoint of the company.
15        Q.   I understand that's your
16   position --
17        A.   Uh-huh.
18        Q.   -- relative to the structure of
19   the transaction.
20        A.   Correct.
21        Q.   And my question really is as to
22   those three individuals -- and I'll take a step
23   back if that's helpful.
24        A.   Uh-huh.
25        Q.   To your knowledge, Alan Luce did

Page 389

1    not vote against the transaction?
2         A.   Correct.
3         Q.   To your knowledge, Debra
4    Brooks-Cain did not vote against the
5    transaction?
6         A.   Correct.
7         Q.   And to your knowledge, Sandy
8    Borstad did not vote against the transaction?
9         A.   Correct.
10        Q.   Is it the Trust's position that
11   the failure of those three people to vote
12   against the transaction was a breach of their
13   fiduciary duties?
14        A.   I don't think that -- as indicated
15   in our complaint, I don't think the Trust has
16   taken a position with respect to that.
17        Q.   And you haven't sued them for
18   that, though, have you?
19        A.   No.
20        Q.   Is there any reason why you
21   wouldn't sue them for that if you thought that
22   they had violated their fiduciary duties by
23   voting or failing to vote --
24        A.   Well.
25        Q.   -- in connection with the 2003

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                    W. Timothy Miller

Page 390

1   ESOP transaction?
2        A.  It's my understanding that none of
3   them took any dollars out; and with respect to
4   the employees, I'm not convinced that their
5   duties would necessarily be the same.  And as I
6   stated earlier, I think the issue was one that
7   under Ohio law could only be dealt with through
8   an independent fairness opinion for the
9   company.
10       Q.  I understand that.  And my
11  question was whether if you as the Litigation
12  Trustee believed that those three people had
13  violated their fiduciary duties in connection
14  with the 2003 ESOP transaction, that you would
15  have sued them for that breach of fiduciary
16  duty?  Yes or no or I don't know?
17       A.  Again, that was not -- it's not
18  reflected in the -- that's not what we done
19  and, in my view, that's hypothetical.
20       Q.  Well, the fact that you didn't sue
21  them isn't hypothetical, right?
22       A.  No, that's true.
23       Q.  That's a fact?
24       A.  Correct.
25       Q.  Nancy Blair resigned from the

Page 391

1   board of directors on or around August 21st,
2   2003 as noted in Exhibit 381.  Are you aware of
3   that fact?
4        A.  Yes.  Uh-huh.
5        Q.  And at that point Nancy became a
6   director of corporate strategy as an employee
7   of The Antioch Company, true?
8        A.  That's my understanding, yes.
9        Q.  And that position is not a
10  position on the Antioch board of directors?
11       A.  That's correct.
12       Q.  And that position is not an
13  officer of The Antioch Company either, true?
14       A.  Okay.
15       Q.  Do you agree or disagree?
16       A.  I don't have a list of their
17  officers for that year in front of me.  Is
18  there a -- do you have information that she's
19  not an officer?
20       Q.  I don't have it in front of me but
21  I will state it another way.  Do you have
22  knowledge of any facts that suggest to you that
23  the director of corporate strategy was an
24  officer of The Antioch Company at the time that
25  Nancy Blair assumed that position and performed

Page 392

1   her duties in 2003?
2        A.  I know that Nancy Blair was a
3   member of the board since 2001; and when it
4   came time to do this transaction, she hopped
5   off the board until about a year after the
6   transaction.
7        Q.  You're not answering my question.
8   My question was about the issue of whether
9   Nancy Blair, when she became an employee of The
10  Antioch Company holding the title of director
11  of corporate strategy -- do you have that in
12  mind?
13       A.  Yes.
14       Q.  -- was that position -- did that
15  position make her an officer of The Antioch
16  Company, to your knowledge?
17       A.  To my knowledge as I sit here
18  presently, I do not know.
19       Q.  What fiduciary duties does the
20  Trust contend that Nancy Blair owed to Antioch
21  as an employee in connection with the 2003 ESOP
22  transaction?
23       A.  I think as an employee who had
24  formerly been on the board and while she was on
25  the board was involved in the formulation of

Page 393

1   this what subsequently became the ESOP
2   transaction --
3        Q.  Well, let me ask you a question
4   generally.
5        A.  Yeah.
6        Q.  To your knowledge, do board
7   members continue to owe fiduciary duties to a
8   corporation after they resign from the board of
9   directors on a go-forward basis?
10       A.  Well, I guess from my experience
11  in the bankruptcy realm, folks that -- whether
12  or not -- the title is not as important as the
13  level of control over which the individual
14  exercises.  Whether they are a director or not
15  doesn't necessarily define whether they're an
16  insider and subject to higher duties.  And so
17  that's where I think, you know, Miss Blair was
18  the lead person on this -- you know, basically
19  the lead project manager on this transaction
20  and she was a board member up through the time
21  that the transaction was planned and hopped off
22  as the project moved forward but then was back
23  on a year later.
24       Q.  Do you have any knowledge of facts
25  suggesting to you that Nancy Blair had the

Page 394

1    discretion to stop pursuing the 2003 ESOP
2    transaction?
3        A.  She clearly had a lot of influence
4    over the process.
5        Q.  As an employee of The Antioch
6    Company, did she report to someone else, to the
7    best of your knowledge?
8        A.  I would think that she did, but I
9    don't know precisely who she reported to.
10       Q.  Now, prior to the 2003 ESOP
11   transaction up until about November of 2003,
12   Nancy Blair held no shares of stock in The
13   Antioch Company, true?
14       A.  I believe that to be the case,
15   yeah.
16       Q.  The fact of the matter is that the
17   board of directors and management decided to
18   award her seventy-five shares as a bonus in
19   recognition of her service to the company as an
20   employee, true?
21       A.  That is my understanding, yes.
22       Q.  Now, you don't have any knowledge
23   of facts that Nancy knew in advance about this
24   bonus, true?
25       A.  No, I don't.

Page 395

1        Q.  And you have no facts to suggest
2    that Nancy Blair made any decisions in
3    performing her duties as an employee based on
4    the possibility that she might receive a bonus,
5    true?
6        A.  I don't have any information to
7    that effect as I sit here, no.
8        Q.  And Nancy Blair was an employee,
9    not a director when the board of directors
10   approved the 2003 ESOP transaction in the fall
11   of 2003, true?
12       A.  That is true.
13       Q.  Nancy Blair had no vote as a
14   member of the board of directors at the time
15   that the board of directors approved the 2003
16   ESOP transaction, true?
17       A.  That's my understanding, yes.
18       Q.  I'll move on to another topic and
19   ask you some questions about the sales process,
20   if I may.
21       A.  Of course.
22       Q.  What facts do you know of that
23   suggests to you that Antioch's EBITDA -- you
24   know what EBITDA is --
25       A.  Yes.

Page 396

1        Q.  -- generally?
2        A.  Yes.
3        Q.  And when a company is going
4    through a transaction, EBITDA is a common
5    figure used to -- in conjunction with a
6    multiplier to determine value for a
7    transaction, true?
8        A.  Sure.
9        Q.  What facts do you know of that
10   suggest to you that Antioch's EBITDA declined
11   because of the sale process between April of
12   2007 and the bankruptcy filing?
13       A.  The EBITDA declined because of the
14   sale process.  Well --
15       Q.  Maybe I should say it a different
16   way.  Did it decline because of the sale
17   process, to your knowledge?
18       A.  Well, certainly the company was
19   incurring more expenses and the expenses would
20   reduce the EBITDA and the expenses through the
21   process, including Houlihan and, you know,
22   legal fees and, in fact, I believe Mr. Morgan
23   on more than one occasion complains about the
24   cost of the process, so I suppose that's
25   something that would reduce EBITDA.

Page 397

1        Q.  How significant is that figure
2    relative to the company's sales in influencing
3    EBITDA, if you know?
4        A.  I do not know.
5        Q.  Other than what you may have just
6    testified to regarding costs for service
7    providers --
8        A.  Uh-huh.
9        Q.  -- what facts do you know that
10   suggest Antioch's enterprise value -- I'm
11   sorry.  That's fine.  I'll start over.  All
12   right.
13           Other than what you've just
14   testified to about costs associated with
15   service providers --
16       A.  Uh-huh.
17       Q.  -- what facts do you know that
18   suggest Antioch's enterprise value declined
19   because of the sales process?
20       A.  And how are you defining
21   enterprise value?
22       Q.  I'm asking you.  You have alleged
23   in your complaint that the enterprise value --
24       A.  Oh, okay.
25       Q.  -- declined over time, right?

43 (Pages 394 to 397)

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 398

1    A. Yes. I mean --
2    Q. The timing is a critical factor in
3  all of these claims.
4    A. Absolutely. Absolutely.
5    Q. So my question is -- to you is
6  what facts are you aware of that suggests to
7  you that Antioch's enterprise value declined
8  because of the sales process?
9    A. It declined over the time period
10 during the sale process. And I think what
11 we're alleging is that because of that, a
12 faster sale generates more value than a later
13 sale, which is, in fact, what occurred here.
14       So, again, aside from the cost of
15 the sale process, which is going to reduce the
16 value of the company, I suppose, I don't -- the
17 sales process itself -- the enterprise value is
18 something that's determined by how the company
19 is doing, and its sales are continuing to
20 decrease with time and it was projected to
21 continue to decrease with time. And so the
22 more time you go out in the process, the less
23 valuable the company is going to be, which
24 means you need to sell it sooner rather than
25 later.

Page 399

1    Q. It's really a factor of sales?
2    A. Well, yes, it's a factor of sales.
3    Q. And sales could have recovered at
4  any time during this process, true?
5    A. But the projections were clear
6  that they weren't going to.
7    Q. But we all know projections can be
8  wrong, right? We've seen that.
9    A. Well --
10   Q. They can be, right?
11   A. Sure. But there was --
12   Q. You don't have a crystal ball,
13 Richard Wiser doesn't have a crystal ball,
14 true?
15   A. Sure. But you have --
16   Q. And if the sales had improved, the
17 enterprise value of Antioch would have
18 improved, too, true?
19   A. Here's the thing, you've got the
20 same management that is in control of the
21 company during the entire period of the
22 decline. And you've got people like Mr. Luce
23 in 2004 saying here are the things you need to
24 do, Asha, to improve the business in an e-mail.
25   Q. And he said new products, right?

Page 400

1    A. New products.
2    Q. And the company introduced new
3  products, right?
4    A. Well --
5    Q. It's true, right, they did that?
6  I'll withdraw the question. I don't need any
7  more on that.
8        If I understand the testimony that
9  you've given so far, I think you identified the
10 J.H. Whitney sale as one that might have gone
11 forward or that process but for breaches of
12 fiduciary duties by various people involved?
13   A. I think that's probably correct.
14 And, again, that was sort of the hypotheticals
15 that we were talking about earlier.
16   Q. The board of directors that got
17 terminated favored moving forward with that
18 transaction?
19   A. Finally at that juncture, yes,
20 that's what was going on.
21   Q. And that includes Alan Luce and
22 Nancy Blair, right?
23   A. They were on the board at that
24 time.
25   Q. They were on the special

Page 401

1  committee?
2    A. Yes, the special committee.
3    Q. And they approved going forward
4  with J.H. Whitney?
5    A. They did.
6    Q. And do you recall -- I'll just
7  represent to you the approximate figure for
8  J.H. Whitney was fifty-four million dollars.
9    A. Okay.
10   Q. Do you recall how much of the
11 fifty-four million would have reached beyond
12 the company's institutional debt?
13   A. Not a lot, I imagine; but as I
14 testified earlier, you had two other parties
15 that were interested so the fifty-four million
16 was a floor for an auction sale process. At
17 least that was the potential that was gone by
18 switching up the board.
19   Q. And it was the ESOP trustee's
20 concern that there would be no money going
21 beyond the institutional owners that caused him
22 to fire the board of directors, to the best of
23 your knowledge, true?
24   A. Well, yeah, he was not happy with
25 the deal apparently.

44 (Pages 398 to 401)

Page 402

1      Q.  I am almost finished.  I have a
2  couple more minutes.
3           Let's switch back to topic number
4  two from our notice.  If you want to take a
5  look at that.  Rather than read it, I'm just
6  going to ask you if you can take a look at
7  topic two --
8      A.  Uh-huh.
9      Q.  -- on your own.  Are you prepared
10 to testify on that topic?
11     A.  Yeah.
12          (Thereupon, Exhibit 792, excerpt of
13 Exhibit 319, was marked for purposes of
14 identification.)
15 BY MR. GENTRY:
16     Q.  I'm going to hand you what's been
17 marked Exhibit 792, and 792 is an excerpt of
18 Document 319 from the bankruptcy with just --
19 actually I need to mark the next one.  Can we
20 do that?
21          Exhibit 792 is an excerpt of
22 Document Number 319 from the bankruptcy
23 proceeding.  It includes pages ninety-four
24 through ninety-seven, in addition to a cover
25 page.  Do you see that?

Page 403

1      A.  Yes.  Uh-huh.
2      Q.  This portion of the overall
3  document is a subdocument that's got a title
4  that says list of reorganized Antioch's and/or
5  debtors' business litigation claims and
6  litigation claims.  Do you see that?
7      A.  Yes.  Uh-huh.
8      Q.  And, now, this document identifies
9  claims that are being assigned to the
10 Litigation Trust?
11     A.  Yes.  Uh-huh.
12     Q.  And this is January 27th of 2009?
13     A.  Yes.
14     Q.  The document identifies insiders
15 and noninsiders of the debtors and nondebtor
16 affiliates including but not limited to the
17 following parties --
18     A.  Uh-huh.
19     Q.  -- at the bottom of page
20 ninety-five.
21     A.  Yes.
22     Q.  And there's a long list of people,
23 many of whom are defendants in this case?
24     A.  Yes.
25     Q.  What was the purpose of listing

Page 404

1  those people in here, if you know?
2      A.  To be certain that the claims
3  against those individuals were properly
4  preserved to be -- to be pursued by the
5  Litigation Trust.
6      Q.  Have you acquainted yourself with
7  the facts and information relating to contacts
8  with potential defendants before suit?
9      A.  We've got a binder on that.  Yeah,
10 do we have all of that there, all of the
11 contact stuff?
12          MS. McNICHOLAS:  Yes.
13          (Thereupon, Exhibit 793,
14 correspondence from Jeanine McLaughlin, Alan Luce,
15 Denis Sanan, and James Northrop to Miss Andrew or
16 Christina Fischer, was marked for purposes of
17 identification.)
18 BY MR. GENTRY:
19     Q.  Let's do this, before we get into
20 the binder, I'm going to hand you Exhibit 465
21 and 793 to look at.
22          MS. ANDREW:  This is, what, 793?
23 You're marking this new one?
24          MR. GENTRY:  Yes.
25 BY MR. GENTRY:

Page 405

1      Q.  And for the purposes of the
2  record, Exhibit 465 is a document Bates
3  numbered LUCE00016 through 17 and it's dated
4  August 29th of 2009.  It appears to be
5  correspondence from Alan Luce to Marcia Voorhis
6  Andrew of Taft, Stettinius & Hollister.  Do you
7  see that?
8      A.  I see that, uh-huh.
9      Q.  And Exhibit 793 is actually a
10 collection of documents, most of which do not
11 have Bates numbers, but which includes
12 correspondence from Jeanine McLaughlin, Alan
13 Luce, Denis Sanan, and James Northrop to Miss
14 Andrew or Christina Fischer.  Do you see that?
15     A.  Yes.
16     Q.  And to the best of your knowledge,
17 this correspondence -- the dates on the
18 correspondence is accurate?
19     A.  These dates here?
20     Q.  Uh-huh.  August, September of
21 2009.
22     A.  That's the right time frame, I
23 would think.
24     Q.  And they're all before the Trust,
25 filed suit, right?

Page 406

1    A. Yes, they are. Uh-huh.
2    Q. And all the people that are
3 providing this document -- these documents and
4 information are people who are listed in
5 Exhibit 792 as potential defendants, right?
6    A. Yeah, I believe they are. Uh-huh.
7    Q. And as to the binder you have in
8 front of you, is that correspondence directed
9 to these folks generally?
10    A. Yeah, it is, I believe. Yeah, in
11 that same time frame.
12    Q. And for the purposes of our
13 topics, to the best of your knowledge, do you
14 have all of the correspondence addressed to the
15 people that are covered by topic number two in
16 our deposition notice?
17    THE WITNESS: Okay. But this is the
18 earlier stuff?
19    MS. ANDREW: Yeah.
20    THE WITNESS: Okay. I believe so.
21 This looks like just a whole -- a whole bunch of
22 the correspondence here.
23 BY MR. GENTRY:
24    Q. Is any of that correspondence
25 Bates numbered?

Page 407

1    A. I don't believe that it is. No,
2 it's not.
3    Q. To your knowledge, has any of it
4 been produced in connection with discovery in
5 our case?
6    A. I'm not aware that it has been.
7    Q. And I'm not saying it was covered
8 by a request. I don't know.
9    A. No, I don't believe that it has
10 been.
11    Q. Have you had a chance to look at
12 the correspondence?
13    A. I believe all the letters are
14 identical.
15    Q. To the potential defendants I
16 mean.
17    A. Oh, the ones to these -- which
18 ones?
19    Q. The ones addressed to them? And
20 that's -- I think you're looking at it, the
21 correspondence.
22    A. Yeah, but there's -- it's a bunch
23 of -- I mean, you want the ones to these
24 particular people?
25    Q. Anyone who's listed in Exhibit

Page 408

1 792.
2    A. Okay. Let me look and see if I
3 can find one here. 793. Oh, to 792.
4    MR. SCHEIER: Dan, I'm not sure what
5 kind of process you're asking the witness to
6 undertake; but if it's going to be a while, we
7 should go off the record to preserve time.
8    MR. GENTRY: Fair enough.
9 BY MR. GENTRY:
10    Q. I have some questions -- some
11 general questions for you which you may need to
12 look at the documents to answer but let me ask
13 you some of the questions and see whether you
14 can answer them. Fair enough?
15    A. Okay. Sure.
16    Q. To your knowledge, did you or
17 persons acting on your behalf tell the
18 potential defendants whether they might be
19 sued?
20    A. The -- this list that's attached
21 to the plan, which was and should have been as
22 the plan and the confirmation order were served
23 on all parties in the case, and these I believe
24 were all parties in the case, we'd have to
25 check the certificate of service, but they

Page 409

1 would have received a copy of the plan that
2 would have listed them as potential targets of
3 the lawsuit -- of lawsuits, potentially.
4    Q. And you're referring to Exhibit
5 792?
6    A. I'm referring to the plan and the
7 confirmation order that, yeah, I guess that's a
8 portion of that, right.
9    Q. And you're not -- but my question
10 is really whether you or people acting on your
11 behalf in communications with these people told
12 them that they might be sued?
13    A. Again, I think these people got
14 notice of -- that they were -- this is a public
15 record document.
16    Q. I'm asking about something other
17 than 792. You have a pile of letters in front
18 of you --
19    A. Yes.
20    Q. -- which you've had a chance to
21 look at.
22    A. Okay.
23    Q. Did you or persons acting on your
24 behalf tell potential defendants whether they
25 might be sued by the Litigation Trust?

46 (Pages 406 to 409)

Page 410

1    A.  Why don't we go off the record and
2  let me read this.
3    Q.  Sure.
4    A.  Okay.
5        THE VIDEOGRAPHER:  We're off the
6  record.
7        (Pause in proceedings.)
8        THE VIDEOGRAPHER:  We're on the
9  record.
10       MR. GENTRY:  Back on the record.
11  While we took a break and Mr. Miller reviewed some
12  of the correspondence that is responsive to
13  30(b)(6) deposition topic number two in our
14  notice, plaintiff's counsel and I conferred and
15  we've agreed that plaintiff's counsel will produce
16  copies of the correspondence and we'll forego
17  questioning of Mr. Miller at this time on those
18  documents with the understanding that plaintiff's
19  counsel will entertain not more than five
20  interrogatories from my clients as to the subjects
21  covered by the documents that we're agreeing to
22  exchange.  Did I get that right?
23       MS. ANDREW:  That's correct.
24       MR. GENTRY:  All right.  And with
25  that, I will say no further questions pending the

Page 411

1  expiration of all time and turn it over to the
2  next lawyer and say thank you very much for your
3  time and patience with what must be a pretty
4  frustrating process.  Thank you.
5        THE WITNESS:  Thank you.
6        MR. GENTRY:  Greg, are you ready to
7  proceed or do you want us to go off?
8        MS. ANDREW:  Greg.
9        MR. GENTRY:  Let's go off the record.
10       MR. OTSUKA:  I'm sorry, I had it on
11  mute.  Could we go off real quick?
12       MR. GENTRY:  Yes.
13       THE VIDEOGRAPHER:  We're off the
14  record.
15       (Pause in proceedings.)
16       THE VIDEOGRAPHER:  We're on the
17  record.
18       (Thereupon, Exhibit 794, The Antioch
19  Company Litigation Trust's response to first set
20  of interrogatories of defendants Houlihan Lokey,
21  Inc., Houlihan Lokey Financial Advisors, Inc. and
22  Houlihan Lokey Capital, Inc., was marked for
23  purposes of identification.)
24       CROSS-EXAMINATION
25  BY MR. OTSUKA:

Page 412

1    Q.  Mr. Miller, my name is Greg
2  Otsuka.  I represent three defendants in this
3  lawsuit, Houlihan Lokey, Inc.; Houlihan Lokey
4  Capital, Inc.; and Houlihan Lokey Financial
5  Advisors, Inc.  I know that I'm on the phone
6  and I know it's not ideal.  I'll do my best to
7  keep my voice up.  If at any time you can't
8  understand me or you can't hear me or need me
9  to speak louder, let me know.
10       And I will just say at times
11  during today's testimony I've had a little
12  difficulty hearing some of your answers so if
13  you could do your best to speak into the phone
14  and I will let you know if at any time I cannot
15  hear you.
16    A.  I'm happy to do that.  Thank you.
17    Q.  Thank you.  Mr. Miller, do you
18  have in front of you a document that's been
19  marked as Exhibit 794?
20    A.  Yes, I do.
21    Q.  Have you seen this document before
22  today?
23    A.  Yes, I have.
24    Q.  What is it?
25    A.  It appears to be the Trust's

Page 413

1  responses to the various, if I may call them,
2  the Houlihan Lokey entities, those various
3  entities first set of interrogatories.
4    Q.  And, yes, for clarification, I
5  will refer to all of my clients collectively as
6  Houlihan Lokey, and if at any time your answer
7  depends on one or the other of the defendants
8  or you need me to clarify, I'm happy to do
9  that.
10    A.  Okay.
11    Q.  If you could turn to page sixteen
12  of this document.  It's titled verification.
13  Do you see that?
14    A.  Yes.
15    Q.  It states, I am the plaintiff in
16  this action and state that the foregoing
17  responses to interrogatories are true and
18  correct to the best of my knowledge,
19  information, and belief.  Do you see that?
20    A.  Yes.
21    Q.  Is that your signature beneath --
22  on this page?
23    A.  Yes, that is.
24    Q.  Mr. Miller, what did you do to
25  satisfy yourself that these responses were true

47 (Pages 410 to 413)

Page 414

1      and correct before you signed the verification?
2          A.  Well, I, of course, reviewed them
3      and discussed them with my counsel and had
4      reviewed certain, although probably not all, of
5      the various documents that are listed by Bates
6      number in -- in the responses.
7          Q.  Sitting here today, do you have
8      any reason to believe that any of these answers
9      are no longer true and correct?
10         A.  Not -- I don't believe so.  I
11     mean, you know, obviously this was done at an
12     earlier point in time in the litigation and
13     some amount of information has, you know, been
14     obtained since then; but I think by and large,
15     you know, I think this is -- I'm not -- I
16     didn't see anything in here that, you know, had
17     materially changed, I guess.
18         Q.  I assume if you became aware that
19     something in here was inaccurate, you would
20     have supplemented your responses accordingly;
21     is that right?
22         A.  Absolutely.
23         Q.  If I could direct your attention
24     to page eleven of the document.  Specifically
25     the bottom of the page.

Page 415

1          A.  Uh-huh.
2          Q.  And at the bottom of page eleven
3      is reprinted the interrogatory number eleven --
4          A.  Yes.
5          Q.  -- from my client.  Do you see
6      that?
7          A.  Yes.
8          Q.  And the interrogatory number
9      eleven reads, identify and describe with
10     specificity every alleged breach of fiduciary
11     duty that you claim Houlihan Lokey aided and
12     abetted, including the defendant who committed
13     each alleged breach.  Is that correct?
14         A.  Yes.
15         Q.  Do you understand that the Trust
16     has sued Houlihan based on claims for aiding
17     and abetting breaches of fiduciary duty?
18         A.  Yes, I do understand that.
19         Q.  Not an actual breach of any duty
20     that Houlihan Lokey owed?
21         A.  That is correct, yes.
22         Q.  Turning the page to page twelve,
23     thirteen, and fourteen, the Trust's response
24     carries over those three pages, correct?
25         A.  Yes.  Uh-huh.

Page 416

1          Q.  And listed here are eleven
2      breaches of fiduciary duty by other defendants
3      that the trust alleges Houlihan Lokey aided and
4      abetted; is that correct?
5          A.  That's what is here, yeah.
6          Q.  I wanted to walk through some, if
7      not all, of these allegations.
8          A.  Okay.
9          Q.  Turning to number one --
10         A.  Uh-huh.
11         Q.  -- the Trust contends that other
12     defendants breached their fiduciary duties by
13     failing to obtain an independent opinion as to
14     whether the tender offer transaction was fair
15     to the company or as to the prudence of the
16     underlying business decision to enter into the
17     transaction.  Is that correct?
18         A.  Correct.  We have alleged that,
19     yes.
20         Q.  Can you tell me, how did Houlihan
21     Lokey aid and abet that alleged breach?
22         A.  Well, I think that the Trust's
23     view of that is that Houlihan Lokey was brought
24     in to provide a fairness opinion with respect
25     to, I guess, the consideration going to the

Page 417

1      nonESOP shareholders as a result of the
2      transaction.
3              That in connection with their due
4      diligence, Houlihan, I believe, knew or should
5      have known that the board here was interested,
6      that the majority of the value for this
7      transaction was going to those selling
8      shareholders who were also six of the nine
9      board members.
10             That Houlihan Lokey has extensive
11     experience doing ESOP-type transactions and
12     issuing fairness opinions, and that I think,
13     you know, that our view is that -- that
14     Houlihan had knowledge of all of those things
15     and that no one was looking out from a fairness
16     standpoint or providing a fairness opinion on
17     behalf of the company.
18             Houlihan was back and forth with
19     Duff & Phelps over the valuation, but it
20     wasn't -- there wasn't a three-party
21     negotiation there.  There were actually three
22     constituencies involved, the -- the selling
23     shareholders whom Houlihan Lokey was providing
24     an opinion to, the ESOP whom Duff & Phelps was
25     providing an opinion to, and the company who no

Page 418

1  one was providing an opinion to.
2         And my understanding, at least
3  from the documents, that Houlihan was aware
4  that there was not an opinion being -- you
5  know, that that was a -- those -- that was
6  the -- that was what was going on, that there
7  wasn't a separate fairness opinion.
8         And, in fact, Houlihan then
9  subsequently, of course -- you know, this
10 fairness opinion issue then is addressed in the
11 tender offer document subsequently and, you
12 know, in lieu of there being a separate
13 fairness opinion for the company and
14 particularly in the section of the document
15 that pertains to the conflict of interest,
16 Houlihan's opinion is cited there for the
17 basis -- for the board to have satisfied Ohio
18 law on the topic of determining that the
19 transaction was fair to the company, yet
20 Houlihan knew to a certainty that it was not
21 providing that opinion.
22        So, you know, I think that's kind
23 of it in a nutshell in terms of what I can
24 recall as I'm sitting here presently.
25        Q.  And I'll get to the statements in

Page 419

1  the tender offer documents; but putting any
2  statements in the document itself aside for
3  now, what specific act did Houlihan do that, in
4  your view, aided and abetted this alleged
5  breach described in number one?
6         A.  Well, I would think that to the
7  extent that the company is needing to satisfy
8  as it does because of the interested directors,
9  the requirement of Ohio law that the
10 transaction be determined as being fair to the
11 corporation, that in lieu of Houlihan allowing
12 its opinion to be used for that purpose when,
13 in fact, its opinion specifically did not go to
14 that issue, Houlihan would have recommended to
15 the company that they get an independent
16 opinion to be able to cite in that provision of
17 the tender offer document.  That's one of those
18 items.
19        Q.  Are you saying that based on
20 Houlihan's role in the 2003 ESOP transaction,
21 Houlihan had the duty of advising the company
22 as to what types of opinions it needed to
23 obtain to have satisfied its legal obligations?
24        A.  Knowing that the company was using
25 Houlihan's opinion to satisfy the legal

Page 420

1  obligations when, in fact, Houlihan knew that
2  its opinion did not go to that -- to satisfy
3  that legal obligation, yeah, I think the
4  conversation goes like, guys, you can't put our
5  opinion in that part of the tender offer
6  document because it doesn't go to that issue.
7  You need to get somebody else to give that
8  opinion to you.  That's how that conversation
9  goes.
10        Q.  Okay.  So, again, just to be
11 clear, is there something separate and apart
12 from what language is used in the tender offer
13 documents that you're claiming Houlihan did
14 that aided and abetted this breach of fiduciary
15 duty?
16        A.  Well, I think that's the most
17 obvious one.
18        I guess if we look at the -- at
19 the back and forth on the warrant issue, and,
20 of course, that occurs earlier in time as
21 between Houlihan and Duff & Phelps, you know,
22 there is the issue of back-and-forth.
23        I guess -- you know, I think
24 that -- at least as I sit here today, I think
25 the issue with the tender offer document just

Page 421

1  in terms of Houlihan's knowledge of the fact
2  that it was being used in that fashion and not
3  having done something about it is, you know,
4  our primary issue with Houlihan with respect to
5  the sale process.
6         And I think -- or I'm sorry, the
7  ESOP note -- the ESOP transaction.
8         Q.  Is that the end of your answer?
9         A.  I think so.  Let me think a moment
10 just over your question if I could.
11        THE WITNESS:  Could you repeat the
12 question to me?  I apologize if I've run on there.
13 BY MR. GENTRY:
14        Q.  My question is --
15        A.  I'm sorry.  I've just asked --
16        Q.  -- apart from --
17        A.  -- the court reporter to repeat is
18 so that you don't have to go to the trouble.
19        (Record read.)
20 BY MR. OTSUKA:
21        Q.  I'm sorry if I'm interrupting, but
22 was there anything more?
23        A.  I'm taking a minute, if I could,
24 to look back through the interrogatory.
25        Yeah, I guess we say in

49 (Pages 418 to 421)

Antioch Litigation Trust, et al.  v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 422

1    interrogatory number three -- let's see.  By,
2    again -- there appears to be from the
3    documentation and, in fact, from the October
4    30th board meeting minutes confusion with
5    respect to the extent of Houlihan's role and
6    the extent of its opinion, and obviously that
7    carries over into the tender offer document
8    subsequently.
9              But the issue there is, you know,
10   Houlihan does know that the directors are the
11   ones that are taking the dollars out here; and
12   it's a little unclear, I guess, in terms of
13   the -- my recollection of the portion of
14   Mr. Jackson's depo that I reviewed was that he
15   didn't seem to have much of a recollection of
16   anything pertaining to this transaction.
17             And so, you know, I think what the
18   documents appear to indicate to us was that,
19   you know, Houlihan is in this to give the
20   opinion -- the very limited and narrow opinion
21   for the selling shareholders knowing that the
22   selling shareholders are all of the directors
23   and that those dollars, you know, are going out
24   and that ultimately the board both in the
25   tender offer document and what appears to be in

Page 423

1    the board minutes -- meeting minutes of the
2    October 30th meeting appear to be relying on
3    Houlihan's opinion as the basis for why the
4    transaction is fair to the corporation yet
5    Houlihan is saying no, that's not -- not the
6    case.
7         Q.   Do you know who advised the
8    company as to what opinions it needed in
9    connection with the 2003 transaction?
10        A.   I don't other than I know that
11   McDermott Will & Emery advised them not to get
12   a solvency opinion.
13             But beyond that, I don't know who
14   and, you know, whether they -- whether there
15   was advice with respect to getting that
16   opinion.  Clearly the issue is raised by the --
17   by the provision of the Ohio statute that is
18   quoted in the tender offer document.
19        Q.   Let's move on to number three on
20   page twelve --
21        A.   Okay.
22        Q.   -- of Exhibit 794.
23        A.   Okay.
24        Q.   In number three, the Trust
25   contends that certain defendants breached their

Page 424

1    fiduciary duties by preparing and distributing
2    a prospectus and proxy statement for their
3    tender offer and merger that was materially --
4    materially misleading.  Is that correct?
5         A.   That is the Trust's position, yes.
6         Q.   Do you have Exhibit 31 in front of
7    you?
8         A.   Yes, I do.
9         Q.   What is Exhibit 31?
10        A.   It is the tender offer document,
11   right?  It's the one that does not have the --
12   I guess the information that was sent to the
13   participants.
14        Q.   Can you point me in Exhibit 31 to
15   the materially misleading statements that you
16   allege are in this document for which Houlihan
17   aided and abetted a breach of fiduciary duty?
18        A.   I don't know that I understand the
19   question.
20             MS. ANDREW:  Do you want him to
21   repeat his testimony from yesterday as to what he
22   sees as misleading and inaccurate in this
23   document?
24   BY MR. OTSUKA:
25        Q.   Well, I want to know which

Page 425

1    statements that the Trust contends are
2    materially misleading, the Trust contends
3    Houlihan aided and abetted those -- the
4    breaches of fiduciary duty that it related
5    thereto.
6         A.   I guess -- yeah, I mean, I guess
7    we'll go through what we went through
8    yesterday.
9         Q.   Well, is the answer all of them or
10   some subset of them that you think Houlihan
11   Lokey should be liable for?
12        A.   Well, I think with respect to all
13   of those places where Houlihan Lokey is
14   mentioned and the opinion is mentioned, when
15   the language isn't consistent with what's in
16   the opinion or if it isn't -- or if it is
17   consistent yet doesn't contain the disclaimers
18   with respect to we're not rendering any opinion
19   with respect to whether the company should do
20   this transaction or whether it's fair to the
21   company, and there are several instances of
22   that, and I think I may or may not have put
23   this on the record earlier, but, I mean, I
24   believe I did earlier today, and I apologize
25   we're in hour eight plus and it's all kind of

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 426

1    running together in my head, but the -- there
2    were similar statements, I think, made in the
3    pages that are not in this particular exhibit
4    but is in the subsequent exhibit that was sent
5    to the participants that -- you know, that
6    characterize the scope of Houlihan's opinion in
7    a way that was not accurate intended to give
8    the impression that the board had an
9    independent party looking out for the fairness
10   of the transaction to the company and that the
11   purchase price was fair to the company and not
12   just to the selling shareholders.
13          And so, you know, there are
14   various -- in fact, I think, you know, even on
15   the very first page, I thought that Mr. Jackson
16   testified that it wasn't -- the language didn't
17   identically track even on the very first page
18   of the document, the language in the opinion --
19   pardon me -- but -- I mean, I think that's what
20   we're talking about. I'm happy to go through
21   that with you more specifically.
22          There's also, I recall, mentioning
23   a reference to how Houlihan got to the
24   valuation and the fact that, you know, they
25   were valuing the eight fifty a share based upon

Page 427

1    the balance sheet as is and didn't really take
2    into consideration the balance sheet post the
3    transaction in terms of subtracting out the
4    debt piece that I thought was, you know, again,
5    not entirely -- in terms of what the effect of
6    the transaction would be, you know, that piece
7    I thought was questionable or something that
8    possibly required clarification. Those are, I
9    guess, kind of the -- I don't probably fully
10   remember my testimony from yesterday, but those
11   are the two areas.
12          It's primarily the use of the
13   opinion and the language with respect to the
14   use of the opinion, particularly in the
15   conflicts section, but elsewhere as well,
16   including the pages sent to the participants
17   that are not part of this exhibit, as well as
18   this issue --
19       Q. Okay.
20       A. -- with respect to the, you know,
21   subtracting out the debt as a result of the --
22   of the transaction.
23       Q. Okay. Just so I understand, so
24   the statements that you contend are materially
25   misleading in the tender offer documents -- I

Page 428

1    understand -- let me phrase it differently.
2          I understand you are contending
3    that there are phrases or language or portions
4    of the tender offer document that are
5    materially misleading, correct?
6       A. Correct.
7       Q. What did Houlihan do or not do
8    that you contend constituted aiding and
9    abetting the promulgation of those misleading
10   statements?
11      A. They didn't cause the company to
12   change them. You know, they -- the e-mail
13   traffic indicates that Houlihan got drafts of
14   that, and I believe that -- got drafts of this
15   document, and I believe that Mr. Jackson
16   testified to that effect, and it wasn't clear
17   as to why, for example, the reference to the
18   Houlihan opinion in the conflicts of interest
19   section, why that wasn't changed or deleted or
20   when it was seen, why somebody didn't say, hey,
21   if you've got to have that under Ohio law, you
22   need to go get a separate opinion.
23          We're still, you know, a month or
24   more away from closing on this transaction. If
25   that's what you've got to do to satisfy Ohio

Page 429

1    law, you can't use our opinion for that
2    purpose, we specifically said it's not -- it
3    doesn't address the impact on the company,
4    whether the company should do it or whether
5    it's fair to the company.
6       Q. Did you believe that Houlihan
7    Lokey had a duty to advise the company as to
8    what it should or should not do to satisfy Ohio
9    law?
10      A. I believe that Houlihan Lokey when
11   it was presented with a document that did not
12   accurately depict its opinion, and Houlihan
13   Lokey knows that this document is going out to
14   however many hundred participants -- ESOP
15   participants there are and the nonselling
16   shareholders, however many of those there are,
17   that it had an obligation to speak up and say,
18   hey, you can't use our opinion in this document
19   in a way that it's not accurate or that
20   misleads these folks as to, you know, it
21   satisfying Ohio law because the opinion
22   specifically does not address the issue that
23   Ohio law requires -- you know, is geared toward
24   satisfying.
25      Q. Okay. Looking at number four on

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

---

Page 430

1    page twelve of this exhibit -- I'm sorry, on
2    Exhibit 794 --
3        A.  Yeah.
4        Q.  -- if you could just read that.
5    I'm not going to read it into the record.  If
6    you could just read that to yourself.
7        A.  Yeah.
8        Q.  Let me know when you're done.
9        A.  Okay.  I'm done.
10       Q.  Okay.  If my question is for
11   number four what did Houlihan do to aid and
12   abet this breach of fiduciary duty, would your
13   answer for number four be different than it was
14   for number three?
15       A.  Well, one of the other issues that
16   we had with the tender offer document, and,
17   again, the document that Houlihan has received
18   and reviewed and hopefully is knowledgeable in
19   this area, Houlihan knows that the company is
20   going negative equity as how they referred to
21   it or balance sheet insolvent as a result of
22   the transaction, and Houlihan is a
23   sophisticated financial player, and looking
24   through the risk factors it should be evident
25   that there's no indication of a risk factor,

---

Page 431

1    that this might be a fraudulent conveyance
2    and -- or might be avoided as such because the
3    company is being rendered balance sheet
4    insolvent as a result.
5            And so I don't think, you know,
6    for, you know, the fee incurred that, you know,
7    certainly part of the service, I would presume,
8    would be to, you know, take a look at it and
9    make sure the document is accurate as to these
10   financial things, that it doesn't strike me as
11   unreasonable to think that somebody might have
12   said something about that from Houlihan's
13   standpoint, that, hey, you know, here's a risk
14   factor that you might want to consider.
15       Q.  Houlihan should have advised the
16   company as to what the tender offer document
17   should say with respect to certain risk
18   factors; is that what you're saying?
19       A.  Well, I think in terms of that
20   particular breach, yes.
21       Q.  Okay.  Moving on to number five.
22   In number five the Trust alleges that certain
23   other defendants breached their fiduciary duty
24   by focusing --
25           MR. GENTRY:  Greg.

---

Page 432

1    BY MR. OTSUKA:
2        Q.  -- on the interest --
3            MR. GENTRY:  This is Dan Gentry.
4    We're close to the end of a tape.  If you don't
5    mind taking a break, we'll change tapes.
6            MR. OTSUKA:  Not at all.  Thanks,
7    Dan.
8            THE VIDEOGRAPHER:  We're off the
9    record.
10          (Pause in proceedings.)
11          THE VIDEOGRAPHER:  We're on the
12   record.
13   BY MR. OTSUKA:
14       Q.  All right.  Mr. Miller, I'm
15   actually going to skip ahead to number six on
16   page thirteen of Exhibit 794.
17       A.  Okay.
18       Q.  In number six the Trust alleges
19   that other defendants breached their fiduciary
20   duties by engaging multiple professionals with
21   inconsistent objectives to sell, refinance,
22   and/or recapitalize the company, thereby
23   jeopardizing realistic alternatives for the
24   company and wasting the company's assets.  Do
25   you see that?

---

Page 433

1        A.  Yes, I do.
2        Q.  What are the realistic
3    alternatives that are referred to in this
4    answer?
5        A.  I think the 363 sale process.
6        Q.  And was Houlihan hired by the
7    board to pursue a -- to find a buyer that
8    ultimately would buy the company either out of
9    court or in a 363 process?
10       A.  Yes, I -- yes, initially that
11   was -- yes.
12       Q.  To your knowledge -- I'm sorry?
13       A.  I'm done answering.  Yes.
14       Q.  To your knowledge, did Houlihan
15   Lokey actually pursue those alternatives?
16       A.  It appears that they -- my
17   understanding is that they were engaged in
18   March of '07 and commenced a process ultimately
19   in the summer of '07 that was geared toward,
20   you know, a -- finding a buyer for the company
21   under circumstances where the company is not
22   distressed, I guess, for lack of a better term.
23   I'm sure there's a better term, I'm just not
24   thinking of it right now.
25           And that after the initial

---

Antioch Litigation Trust, et al.   v. McDermott Will & Emery LLP                                    W. Timothy Miller

Page 434

1    indications of value came in late summer, early
2    fall, the engagement from Houlihan's
3    perspective changed to a -- really more of a
4    distressed-type of transaction, which is when I
5    understand Mr. Spencer became involved on
6    behalf of Houlihan and, you know, the focus
7    shifted there to more of a -- to a 363-type
8    process, at least from -- I think from his
9    perspective, as I understood the portion of
10   the -- of his testimony that I reviewed.
11           And I do think he indicated that
12   they investigated -- what did he refer to it
13   as -- maybe loan-to-own-type companies in the
14   late 2007 time frame, if I'm recalling that
15   correctly.  But I think the focus was -- or
16   should have been the 363 sale process.
17       Q.  Let me ask you this:  With respect
18   to the alleged breach of fiduciary duty
19   described in number six, what did Houlihan
20   Lokey do to aid and abet these other defendants
21   jeopardizing realistic alternatives?
22       A.  Mr. Spencer struck me as -- and I
23   was not at his deposition, did not see the
24   video but just from, again, what portion of the
25   deposition I read, he struck me as somebody who

Page 435

1    was fairly knowledgeable and experienced and,
2    frankly, pretty bright in terms of the
3    distressed asset sales and 363-type sales.
4            And as consistent with the e-mail
5    traffic that I -- you know, we see from him as
6    well through the process, my sense of it was
7    that he concluded pretty early on that this --
8    the only way this thing is going to sell is a
9    363 sale.
10           And, in fact, I thought he
11   testified to the effect that, you know, they
12   agreed to modify their -- Houlihan agreed to
13   modify its engagement letter in the January '08
14   time frame to create, I guess, some space for
15   Candlewood to bring in a transaction that was
16   not a change in control transaction.  That
17   Houlihan would be entitled to a commission if
18   it was a change in control 363 or a change in
19   control outside of court because -- and he was
20   willing to do that because he thought it highly
21   unlikely that Candlewood would ever be able to
22   do any transaction here that wasn't a change in
23   control transaction.
24           And so, you know, the issue, I
25   guess, in my mind is knowing in the -- you

Page 436

1    know, when you're getting involved in this
2    thing, October, November time frame -- I guess
3    he said he got involved in September but let's
4    give him thirty days to get up to speed, that
5    the indications of value are where they are and
6    this thing, if it's going to go is only going
7    to go in a change of control transaction and
8    you know that Candlewood isn't pursuing a
9    change in control transaction.  They're
10   pursuing a transaction that leaves the Morgan
11   family in control, and you have very little
12   belief in their two or three, I think, e-mails
13   that I can think of subsequently where
14   Mr. Spencer is saying how unlikely it is he
15   thinks that Candlewood is going to be able to
16   do anything, you know, bring any deal to the
17   table.  Why is it you don't just say to the
18   board, look, you need to do a 363 sale.  You
19   want to maximize value here, do the 363 sale,
20   and get it done.
21           And, you know, if you're not going
22   to follow our advice, then, fine, you know,
23   basically to a point where, you know, look, if
24   you want to go the Candlewood route, which we
25   think is highly unlikely of ever getting done,

Page 437

1    you know, go that way but, you know, we're not
2    going to run a competing process next to you
3    that, you know, you're not going to ultimately
4    go with when we're advising you that the
5    process that we're wanting you to pursue is
6    really the only viable way of maximizing the
7    value here.
8        Q.  Do you know if Houlihan ever
9    advised the board or the special transaction
10   committee that it should pursue a 363 sale
11   process?
12       A.  I thought from Mr. Spencer's
13   testimony that, you know, that was -- I guess
14   that was the take-away that I had, that he
15   viewed this as being 363 -- at least a change
16   in control process -- a change in control sale
17   was the most likely to occur here, so much so
18   that he was willing to, you know, concede to
19   Candlewood a nonchange in control sale and felt
20   very comfortable with that risk, if you will,
21   in terms of getting his fee paid.  And -- I'm
22   sorry, I've already lost my train of thought.
23   Could you please read me back the question?
24       Q.  Let me ask you a different
25   question because what I'm trying to understand

53  (Pages 434 to 437)

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                    W. Timothy Miller

Page 438

1    is, do you take issue with the recommendation
2    that Houlihan made to the board or the special
3    transaction committee -- let me ask you that?
4         A.   What recommendation are you
5    talking about?
6         Q.   The recommendation that the most
7    prudent path to take is to pursue a 363 sale or
8    a change of control transaction.
9         A.   No.  Again, I think it's the
10   Trust's position that, you know, when it was
11   clear that there wasn't value in this deal that
12   was going to satisfy all the creditors in full
13   in the fall of '07 time frame, that the company
14   needed to move to a Section 363 sale process at
15   that juncture to maximize value knowing that,
16   you know, internally the projections were
17   showing that the sales decline was continuing
18   and there wasn't going to be -- there wasn't an
19   end to that or at least, you know, short term
20   and that more investment needed to be made in
21   the company and the company didn't have an
22   ability to make that investment because, you
23   know, all its assets were liened up.  So, you
24   know, no, we don't take issue with recommending
25   that a 363 sale be pursued by the board -- or

Page 439

1    by the special committee.
2         Q.   Okay.  Can you tell me then, in
3    connection with the 2007, 2008 sale process,
4    and there's a whole host of alleged breaches of
5    fiduciary duty that you allege in the answer,
6    my question is, what do you allege Houlihan did
7    to aid and abet these breaches of fiduciary
8    duty?
9         A.   They, I guess, in a nutshell,
10   maybe, went along to get along sort of with the
11   board and with Candlewood when they should have
12   really been pushing the board and the special
13   committee given the knowledge and expertise
14   that Mr. Spencer seems to have had in this
15   area, that they really should have insisted on
16   the company maximizing its value through the
17   363 process sooner rather than later and not
18   allowing the board to get sidetracked with
19   proposals from Lee Morgan that Houlihan was
20   consistently saying, you know, these don't make
21   any sense and is consistently saying, you know,
22   I think it's highly unlikely that Candlewood is
23   going to be able to bring something here
24   because -- and talking about the lack of
25   sophistication of Candlewood.  And I may be

Page 440

1    confusing that with somebody else.
2         But in any event, the theme was
3    the same that Houlihan didn't have a lot of
4    confidence in Candlewood being able to bring a
5    deal that's going to maximize value here.  In
6    fact, as I said, was willing to bet their fee
7    on it and didn't force the issue with the board
8    to say, hey, you know, you need to choose.  You
9    know, either take us or not.
10        And, you know, there is -- because
11   they were being paid a monthly fee after a
12   certain point in time, there's not necessarily
13   a downside to Houlihan from the delay but
14   there's definitely a downside to the company
15   from the delay.
16        So, I mean, I guess, you know, my
17   view of it is, this guy was very bright, he
18   knew what he was doing, he knew how the 363
19   sale proces worked.  The indications are he
20   shared that with the board and he certainly
21   shared his misgivings about Candlewood with the
22   board and others, and he certainly -- he had
23   some very cogent rejections of the various
24   proposals that Morgan and Candlewood came
25   forward with at various points in time as to

Page 441

1    why they wouldn't work and yet, you know, he
2    went along to get along and, you know, for a
3    while they -- you know, the deal sits on hold
4    because their exclusivity is granted to GSC,
5    which is a company that, you know, Houlihan
6    knows and thinks highly unlikely that it's
7    going to do this deal once they see the numbers
8    and have a real feel for the company.
9         And, you know, all these things
10   where it -- you know, the impression is rather
11   than giving their, you know, un -- I'm sorry --
12   giving their best advice to the special
13   committee with respect to how to maximize value
14   here, they kind of went along with this process
15   that ultimately never resulted in the company
16   being able to maximize value.
17        Q.   Are you contending that Houlihan
18   did not convey to the special transaction
19   committee Houlihan's opinion that the best way
20   to maximize value was through a change of
21   control transaction?
22        A.   No, I'm not contending that.
23   I'm --
24        Q.   I just want to be clear --
25        A.   Yeah.

54 (Pages 438 to 441)

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 442

```
1        Q.  -- is your contention or your
2   claim against Houlihan, it's not based on the
3   actual advice or opinions that it conveyed to
4   the special transaction committee, is it?
5        A.  Well, only in the sense that
6   Houlihan wasn't saying to the special
7   transaction committee you need to get this
8   thing sold, you need to maximize value, you
9   need to give us instructions to go back to Sun
10  Capital with, for example, and not let that go
11  away.  And, again, as I indicated yesterday, we
12  don't know precisely why that went away,
13  whether that was Houlihan or whether that was
14  the special committee.  Don't know.  But, yeah,
15  I mean --
16       Q.  So if there is evidence that
17  Houlihan did, in fact, communicate with the
18  special transaction committee saying just what
19  you said, we need to get this sold, this is the
20  best way to maximize value through a change of
21  control transaction, then you have no issue
22  with what Houlihan did?
23       A.  No, that's not true because even
24  if they said that, that's not what they
25  insisted that the board do.  They went along
```

Page 443

```
1   then with a process that didn't result in that
2   occurring in any sort of prompt fashion.
3        You know, you don't get to --
4   they're in February with three potential
5   bidders for a 363 sale and the process goes on
6   hold for thirty days while they sit passively
7   by, you know, watching the special committee
8   do -- give exclusivity to GSC, an entity that
9   they say in e-mails, you know, they don't think
10  there's any high likelihood the deal is going
11  to get done.
12       Q.  Who has ultimate authority to make
13  decisions on what direction the company is
14  going to follow in terms of whether it will
15  pursue a sale process, whether it would pursue
16  or consider a recapitalization alternative?
17       A.  The board of directors.
18       Q.  Not Houlihan?
19       A.  But not Houlihan.
20       Q.  When you said that Houlihan should
21  have insisted, was your word, insisted to the
22  board that it take a course of action --
23       A.  Uh-huh.
24       Q.  -- what did you mean by that?  How
25  can Houlihan dictate what the board does?
```

Page 444

```
1        A.  Well, you know, it would start
2   with an e-mail, something in writing that we
3   haven't seen that indicates very clearly here's
4   what they ought to do and here's why they ought
5   to do it and here's the importance of
6   maximizing value in this process and here's,
7   you know, what you need to do and --
8        Q.  Well, wait.  You said that
9   Houlihan did give that advice.
10       A.  The testimony was to the effect
11  that it was verbal.  I've not seen the e-mail.
12  If you've got an e-mail where they do that, say
13  that to the board in the, you know, fall of '07
14  time frame, I'd be happy to see it.  I haven't
15  seen that e-mail --
16       Q.  Wait.
17       A.  -- but --
18       Q.  So you have reason to believe that
19  Houlihan never gave the advice to the board
20  that it should pursue a change of control
21  transaction?  Is that right?
22       A.  No.  There's a difference between
23  giving advice verbally, which is what I
24  understood Mr. Spencer's testimony to indicate,
25  and actually putting the advice in writing; and
```

Page 445

```
1   I don't see that they put the advice in
2   writing.
3        Q.  So if Houlihan would have written
4   an e-mail to the special transaction committee
5   saying we believe that the best course of
6   action for The Antioch Company to maximize
7   value is to pursue a change of control
8   transaction, that would satisfy you?
9        A.  And then when the special
10  transaction committee despite that advice does
11  not pursue that transaction, then why is
12  Houlihan still involved?  I mean, they've --
13       Q.  Okay.
14       A.  -- given their best advice to the
15  client -- and here's the other thing, the
16  impact would be, I suppose, potentially with
17  the bank because the bank is expecting Houlihan
18  to be involved and running the sale process,
19  and when -- if Houlihan says to the bank we
20  can't -- you know, they won't let us run the
21  sale process -- and, again, timingwise it's
22  kind of some juncture whenever the banks are
23  looking to do this, you know, that might put
24  the board in a position where they've got to do
25  something or at least get -- at least it gets
```

                                            55 (Pages 442 to 445)

Page 446

1    Houlihan out of the line of fire, it seems to
2    me, in terms of an aiding and abetting type of
3    claim.
4        Q.   So according to you, what Houlihan
5    should have done in order to avoid being sued
6    here was to go to the banks and tell the bank
7    that this is what's happening because the bank
8    was not aware?
9        A.   No.  What I'm saying is that they
10   should go to the board, and they should have
11   been very explicit with the board, and if they
12   had to be explicit in writing, that would have
13   been even better, to say to the board here's
14   our -- in our professional judgment, here's
15   what you should do.  And if you're not going to
16   follow our professional judgment, we're not
17   going to continue to facilitate you doing --
18   you know, going in a -- pursuing an -- you
19   know, a course that is not consistent with what
20   is our best professional judgment in this
21   situation.
22       Q.   Well, you just told me that it's
23   not up to Houlihan, it's up to the board what
24   path to take.  So how can Houlihan dictate to
25   the board which path to take?

Page 447

1        A.   Well, Houlihan can say here's our
2    professional judgment.  You're paying us for
3    our professional judgment.  If you're going to
4    ignore our professional judgment, you know, we
5    should go do other deals.  We shouldn't be
6    taking the company's money knowing that the
7    company isn't going to follow our advice and is
8    going to do -- and not follow our advice to the
9    company's detriment because the value is
10   decreasing with time.
11       Q.   So to cut to the chase, are you
12   saying that if Houlihan gave the special
13   transaction committee its opinion that the best
14   way to maximize value was to pursue a sale
15   transaction and the board chose not to follow
16   that advice, Houlihan should have withdrawn?
17       A.   I think that's pretty close to
18   what I'm saying.
19       Q.   Okay.  At what point should -- in
20   your opinion, should Houlihan have withdrawn
21   then?
22       A.   Well, again, because those things
23   didn't happen, it's a little hard to say; but
24   it seems to me that things --
25       Q.   Well, which of those things didn't

Page 448

1    happen?
2        A.   Well, Houlihan saying follow our
3    advice or we're going to withdraw.
4        Q.   Well -- well, I understand they
5    didn't say that.  I'm asking -- Houlihan
6    provided advice to the board, correct?
7        A.   It's not clear when they provided
8    the 363 advice, at least from what I can tell.
9        Q.   Okay.  According to you, when
10   should Houlihan have gone to the board and
11   said, follow our advice or we will withdraw?
12       A.   Well, I think there were various
13   points in time.
14       Q.   What's the earliest one?
15       A.   I think the earliest one is
16   probably in the November, December 2007 time
17   frame.  And that's driven by the fact that
18   you've got your indications of value in in late
19   summer or early fall, not enough value here to
20   pay -- cover the debt.  You know that this is
21   going to a distressed situation.  Candlewood
22   and Lee Morgan come in with a proposal that, I
23   think, Houlihan doesn't think much of at that
24   time in early November.  Lee Morgan sends an
25   e-mail in mid November saying he isn't going to

Page 449

1    put more money into this thing.  He's already
2    made enough sacrifices.  And at that juncture
3    you've got Sun Capital out there who has an
4    expression of interest that Houlihan is saying
5    let's go back to these people with something.
6    The company's finance team comes back with a
7    proposal for that, and it's unclear what
8    happens to Sun Capital from there or, frankly,
9    what goes on between there and, say, early
10   January when Lee Morgan sends a letter saying,
11   you know, I'm real unhappy about being kept out
12   of the loop of everything here.  I want to be
13   involved in the special transaction committee
14   stuff.  I'm not going to waive any of my
15   subdebt, and all of that stuff, and I want, you
16   know, basically Candlewood involved in the
17   process on the go-forward and more information
18   from Houlihan.  And, you know, at that juncture
19   again Houlihan has another opportunity there to
20   say, hey, you know, we're not going to do that.
21   You've got the CEO of the company out wanting
22   to run a competing transaction to what we're
23   doing and, you know, that's not -- they're out
24   there running interference.
25            And they ultimately ran into

Page 450

1    issues in April of confusion as between -- at
2    least with Marlin, you know, with Candlewood
3    out there pursuing one sort of transaction
4    while Houlihan is pursuing another.
5         Q.  Okay.  Let me stop you.  I
6    appreciate the answer but I'm running short on
7    time.  Let me just see if I can shortcut this a
8    little bit.
9         So you said in November, December
10   2007 -- is it correct that in that time frame
11   the board chose to follow a dual path process?
12        A.  Yes.
13        Q.  And it's your view that the board
14   should have focused solely on finding a buyer
15   in a change of control transaction; is that
16   correct?
17        A.  Correct.  And what is in -- you
18   know, would be most likely a 363-type
19   transaction.
20        Q.  Okay.  If Houlihan would have
21   withdrawn at that point, do you believe the
22   board would have been more likely to focus
23   solely on finding a buyer once Houlihan is
24   withdrawn?
25        A.  Maybe, maybe not.  I don't know

Page 451

1    what the board would have done.
2         But from Houlihan's perspective is
3    what you're asking me to look at this for, I
4    mean, I don't see an issue with Houlihan
5    saying, you know, we've given them our best
6    advice, this is what they ought to do.  They
7    don't want to do it so, you know, we're not
8    going to continue to take their money and we're
9    not going to continue to participate in a
10   process that we don't think is going to
11   resolve -- or has a very high likelihood at all
12   of resulting in a successful -- successful
13   sale.
14        Q.  Well, let me ask you this:  Whose
15   interest do you represent?
16        A.  We represent the Litigation Trust.
17        Q.  So --
18        A.  And ultimately --
19        Q.  -- you look at this from the
20   standpoint of what benefits the company; is
21   that right?
22        A.  Yeah.  Ultimately we are in the
23   shoes of the company; that's correct.
24        Q.  Okay.  So how would the company
25   have benefited in November, December 2007 from

Page 452

1    Houlihan withdrawing as the company's
2    investment banker?
3         A.  I think the company would have
4    benefited from the board having been given, you
5    know, Houlihan's clear and unequivocal advice
6    with respect to how best to maximize the value
7    of the company at this point in time.  And I
8    don't think -- while, again, there's indication
9    that Houlihan spoke to the special committee in
10   terms of what its preference was, it certainly
11   went along with a process that didn't
12   result in maximizing the value and also,
13   frankly, you know, it was a process that
14   Houlihan thought wasn't going to work, I mean,
15   in terms of Candlewood being able to bring
16   somebody else on a nonchange in control basis.
17   And that was even more so once Houlihan found
18   out about the fact that the ESOP notes were not
19   adequately secured.
20        Q.  Well, but we -- you've agreed that
21   Houlihan advised the board that it should
22   pursue a change of control transaction, and I
23   understand that you think that that advice
24   should have been in writing rather than
25   verbal --

Page 453

1         A.  Well --
2         Q.  -- however --
3         A.  It's just not clear to me when --
4    when precisely that advice was given --
5         Q.  So wait.  So you're not taking --
6         A.  -- and how it was given.
7         Q.  Your questions are not about
8    whether it was clear and unequivocal advice,
9    your issue is in what form and when?
10        A.  No.  The questions are about clear
11   and unequivocal.  I mean, if I don't know
12   precisely what form and when, I don't know how
13   clear and unequivocal the advice was.
14        Q.  Okay.  But to continue with --
15   your position is that Houlihan, once it gave
16   its advice to the board that it should pursue a
17   sale transaction and the board chose to follow
18   a dual path transaction, in that instance
19   Houlihan should have withdrawn and they would
20   not be sued right now; is that right?
21        A.  Well, I think from the company
22   standpoint, you know, if the board doesn't
23   follow the advice of its professionals, then
24   that's on the board.  But if the professionals
25   aren't clearly and unequivocally giving the

57 (Pages 450 to 453)

Page 454

1   advice and going along with the board pursuing
2   a path that is not in the best interest of the
3   company, then that's where the aiding and
4   abetting piece comes in, it seems to me.
5       Q.  Once the board decided to follow
6   what I'm calling the dual path strategy, was
7   Houlihan still out looking for potential
8   buyers?
9       A.  Yes, it's my understanding that
10  they were.
11      Q.  And by Houlihan continuing to
12  search for potential buyers, are you contending
13  that that harmed the company?
14      A.  No, not at all.
15      Q.  So if Houlihan had withdrawn as
16  soon as the dual path strategy was chosen,
17  would that have harmed the company because
18  then there's no one out there looking for a
19  potential buyer?
20      A.  Well, I think there are a host of
21  things that potentially could or could not have
22  arisen from Houlihan's, you know, withdrawing.
23  As we sit here today, we don't know what, you
24  know, all those might be.  But --
25      Q.  So you have -- you have no reason

Page 455

1   to think that Houlihan withdrawing as the
2   company's investment banker in November or
3   December of 2007 would have benefited the
4   company in any way, do you?
5       A.  Well, it would have -- it would
6   have not had a professional advisor, Houlihan,
7   on board for and continuing along in a process
8   that, in our view, was the directors breaching
9   their fiduciary duty by not maximizing the
10  value through the most likely means to maximize
11  value for the company at that time.
12      Q.  But how was Houlihan continuing to
13  be the investment banker, how was that harming
14  the company?
15      A.  Well, it's being the investment
16  banker while they know that there's another
17  competing process going on that they know and
18  their belief is has a very low likelihood of
19  bringing anything successful, and that
20  ultimately results in some confusion among the
21  bidders, as evidenced by the e-mails, and a
22  significant amount of delay in terms of getting
23  to deals with potential purchasers.
24      Q.  Did Houlihan advise the board that
25  it should follow this dual path strategy and

Page 456

1   explore a recapitalization transaction through
2   Candlewood?
3       A.  It certainly -- I think the
4   e-mails certainly indicate that Houlihan was on
5   board for this dual track process after this
6   January, you know, 2nd e-mail.
7       Q.  So after the board indicated that
8   it was going to follow the dual track process,
9   Houlihan continued to look for a buyer,
10  correct?
11      A.  Correct.
12      Q.  And, in fact, Houlihan found
13  potential buyers, didn't they?
14      A.  It did.
15      Q.  And did Houlihan finding potential
16  buyers, did that harm the company?
17      A.  No, not -- no.  Huh-uh.
18      Q.  You testified -- switching gears.
19  You testified that Houlihan at some point
20  sought an amendment to its engagement letter by
21  obtaining what we've referred to as a carve-out
22  for the payment of its fees.  Do you remember
23  that?
24      A.  Yes, that was -- yes.  Uh-huh.
25      Q.  Do you claim that by seeking a

Page 457

1   carve-out, Houlihan somehow aided and abetted
2   any breach of fiduciary duty?
3       A.  No.  It wasn't seeking the
4   carve-out that was the issue.
5       Q.  What was the issue?
6       A.  The issue was, you know, basically
7   doing the -- as I understood Mr. Spencer's
8   testimony, the scope of the definition --
9   defined term transaction was such that it
10  apparently created space for Candlewood to get
11  a fee if their -- if they could come forward
12  with a recapitalization transaction that did
13  not involve change in control but, from
14  Mr. Spencer's view, anything that involved a
15  change of control Houlihan would be able to
16  get.
17          So instead of -- you know,
18  basically Houlihan had an exclusive deal here
19  and instead of insisting on their exclusivity,
20  they agreed to let somebody else come in and
21  that somebody else isn't some independent third
22  party that's out there that has some unique
23  source or access to capital, the somebody else
24  is the financial advisor to the CEO who doesn't
25  want to sell the company when Houlihan is

58 (Pages 454 to 457)

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                    W. Timothy Miller

Page 458

1   saying that the best result here and the best
2   way to maximize value is to change control.
3           So it's not like, you know,
4   there's some unique thing that Candlewood is
5   providing.  There -- what they're -- they're
6   allowing space in their exclusivity under their
7   agreement with the company to have somebody
8   come in and interfere with their sales process.
9   Somebody who they know doesn't want to sell,
10  doesn't want to do a change in control process.
11      Q.  Okay.  Let me stop you there.  Can
12  we go off the record?
13      A.  Sure.
14          THE VIDEOGRAPHER:  We're off the
15  record.
16          (Pause in proceedings.)
17          THE VIDEOGRAPHER:  We're on the
18  record.
19          MR. OTSUKA:  Mr. Miller, we checked
20  the time.  I'm out of time.  Thank you for your
21  time.  I appreciate it.
22          THE WITNESS:  Thank you.
23          FURTHER CROSS-EXAMINATION
24  BY MR. SCHEIER:
25      Q.  Tim, hi.  Because you asked for

Page 459

1   another four minutes' worth of questions, I'm
2   going to ask you one.
3       A.  I don't think that accurately
4   reflects but okay.
5       Q.  All right.  Fair enough.  You're a
6   lawyer after all, right?
7           Is it fair to say that the
8   declining enterprise value in The Antioch
9   Company between 2003 and 2008 was driven
10  primarily by its declining sales and revenues?
11      A.  That's difficult to say, and I
12  will say that it is something that we would
13  also defer to expert testimony on.
14          But from what the evidence that
15  we've seen is that there's declining
16  productivity.  There's declining consultant
17  count.  Activity rate is up and down --
18      Q.  Well, let me ask you this.
19      A.  -- but --
20      Q.  Is the company -- how did The
21  Antioch Company, to the best of your knowledge,
22  from its Creative Memories division, sell its
23  products?
24      A.  Through consultants at parties
25  where the consultants would come and, I guess,

Page 460

1   see the goods and then order them from the
2   consultants.
3       Q.  And so is it my understanding
4   that -- is my understanding correct that
5   consultants would sell product through a party
6   they would put together in their homes or
7   another location and once they made those
8   sales, they would then put an order in with the
9   Creative Memories division of Antioch who would
10  then fulfill that order, send it out to the
11  consultants who would then deliver it to the
12  consultants' customers; is that right?
13      A.  That's my understanding of how it
14  worked.
15      Q.  Okay.  Can you identify for me
16  what aspect of the 2003 transaction, if any --
17      A.  Uh-huh.
18      Q.  -- contributed to or caused the
19  decline in sales by Creative Memories
20  consultants to their customers out in the
21  field?
22      A.  What I've seen in the e-mail
23  transaction -- or e-mail on that topic is the
24  issue of in the 2004 and on time frame and
25  maybe, I guess, e-mail traffic in the 2005,

Page 461

1   2006 traffic, maybe '07 time frame of a notion
2   that sales are declining, that things need to
3   be done in terms of new product line, new other
4   sorts of things beyond consultant compensation
5   and that sort of stuff, that it requires the
6   investment of funds and that the company
7   doesn't have the funds to invest.
8           And that appears as well -- you
9   know, the capital constraints of the company
10  appear also, for example, in Houlihan's
11  PowerPoint that they do to try to -- in May
12  of '07 to try to go get a new ESOP trustee
13  involved.  And there are other references to
14  that post.
15          So, I mean, there's clearly an
16  impact -- or an acknowledged impact of the ESOP
17  transaction on drawing up the company's
18  liquidity and ability to respond to the
19  declining sales that were starting in 2002,
20  2003 time frame.
21      Q.  And what aspect of the 2003
22  transaction in particular, in your mind,
23  contributed to the inability of the company to
24  devote cash to certain areas that you think
25  they needed to devote cash in terms of product

Page 462

1   development and so forth?
2        A.  The fact that you're taking so
3   much value of the company, two hundred and
4   forty-four million dollars, rendering the
5   company somewhere between seventy-five and
6   ninety-one, depending on the numbers, balance
7   sheet insolvent and then -- you know, and doing
8   that without really, I think, taking
9   consideration of the potential repurchase
10  liability when you've got forty or more people
11  that are going to be millionaires as a result
12  of this or could be more than that, and these
13  folks are cashing out, and just, you know --
14  all of that liquidity drain from that
15  transaction was an overhang on the company that
16  it never got out from under.
17       Q.  Do you know what the company's
18  actual repurchase liability was and cash needs
19  were in the 2004 through 2006 period?
20       A.  I understood that there were eight
21  hundred employees who left --
22       Q.  No, I'm asking from a cash
23  perspective.
24       A.  I'm sorry.  From a cash
25  perspective, a hundred and ninety million

Page 463

1   dollars -- that's not the cash piece.  That
2   would be the cash and debt.
3        Q.  If you'd just pay attention to the
4   question because we're short on time.
5        A.  I'm sorry.
6        Q.  Do you have an understanding from
7   the materials you reviewed --
8        A.  Uh-huh.
9        Q.  -- of what the company's cash
10  needs were to fund the repurchase liabilities
11  in 2004, 2005, and 2006?
12       A.  As I sit here presently, no, but
13  I'm sure the information can be obtained.  I
14  mean --
15       Q.  Well, you were supposed to have
16  prepared for the deposition and have that
17  information with you.  But to the extent you
18  don't, did you take into account --
19       MS. ANDREW:  He didn't say he didn't
20  have it with him.  He said he doesn't have it in
21  his head.  That's a different --
22  BY MR. SCHEIER:
23       Q.  Do you want to take a look?
24       A.  Well, what the cash needs were for
25  the repurchase obligations?

Page 464

1        Q.  Yes, sir.
2        A.  Well, whatever they were, the
3   company was satisfying the cash needs as it
4   went until the summer of 2008.
5        Q.  Uh-huh.
6        A.  But they were also incurring a
7   significant amount of debt.  And the debt
8   picture doesn't change really over the --
9        Q.  Well, that's what I'm trying to
10  pinpoint.
11       A.  -- time period.
12       Q.  What aspect of the 2003
13  transaction specifically affected the -- or
14  caused or contributed to a decline in sales
15  between 2004 and 2008?  What term of the
16  transaction is what I'm looking for?
17       A.  Well, I don't know that it's one
18  specific thing.  I think what you're looking at
19  is a transaction that significantly impaired
20  the liquidity of the company on a go-forward
21  basis, and that impaired the company's ability
22  to deal with the declining sales issue, a
23  declining sales issue that had started before
24  they did the transaction and that they should
25  have known about.

Page 465

1        Q.  Do you -- is it your position that
2   any aspect of the 2003 transaction caused a
3   decline in sales or caused the inability of
4   consultants to continue selling product at the
5   level that they had been selling it prior to
6   2003?
7        A.  Well, again, subject to having
8   expert testimony and experts look at that
9   issue, which we'd certainly reserve the right
10  to do, based on what I know now, it appears
11  that the lack of liquidity, and there's
12  indications in the e-mails to this effect, that
13  the company wasn't able to invest in programs
14  that they -- that at least -- the financial
15  projection people, the modeling people thought
16  might improve the sales at later points in
17  time, say in 2006, 2007 time frame, and that
18  they were constrained from doing that because
19  all the dollars were going elsewhere to deal
20  with the consequences of the 2003 ESOP
21  transaction.
22       Q.  So other than the lack of dollars,
23  in your mind, that the company could use to
24  invest in new product that some financial
25  people thought would improve the ability of the

Antioch Litigation Trust, et al. v. McDermott Will & Emery LLP                                    W. Timothy Miller

Page 466

1  consultants to sell, can you identify any other
2  aspect of the 2003 transaction that caused
3  sales to decline?
4      A.  I don't think that that accurately
5  states my answer.  I think that it's not just
6  new products.  There were IT issues.  There
7  were various other issues in the company that
8  if you look at the e-mails in the total in that
9  time frame, that the company did not have
10  necessary liquidity to deal with because all
11  the moneys -- you know, those dollars had gone
12  out in the ESOP transaction and the aftermath
13  of that.  That's what it appears to me from the
14  e-mails and the documents that we've seen.
15      Q.  Is it generally your view that the
16  ESOP transaction -- that the lack of liquidity,
17  as you called it -- well, let's take a step
18  back.
19          When you call it lack of
20  liquidity, let's just nail down a couple of
21  benchmarks.  You don't have any knowledge or
22  facts that the company was unable to make any
23  payment to any of its creditors through the
24  first quarter of 2008, do you?
25      A.  Through when?

Page 467

1      Q.  The first quarter of 2008.
2      A.  I don't know about that.  Again, I
3  think this is a topic that's probably better
4  said --
5      Q.  Sir, whether or not they paid --
6  I'm asking you whether you have any facts that
7  the company failed to make a payment to any of
8  its creditors through the first quarter of
9  2008, and I will tell you it does not require
10  an expert's opinion.  Either they did or they
11  didn't make a payment to any specific creditor.
12      A.  Again, testing my memory, I can't
13  think of anything right now; but I'm not -- I'm
14  not --
15      Q.  You're suing a lot of people for
16  an awful lot of money, and this is our only
17  chance to talk to you; and so I'm asking you,
18  based on your best recollection, based on all
19  the preparation you've done over the last few
20  days with your lawyers, with whoever else
21  you've prepared with, looking at seven hundred
22  and fifty or so deposition exhibits and
23  reviewing deposition transcripts or portions
24  thereof, do you have any knowledge that The
25  Antioch Company failed to make any payment to

Page 468

1  any creditor between the date the transaction
2  closed and the first quarter of 2008?
3      A.  I can't think of anything sitting
4  here presently.
5      Q.  Okay.
6      A.  I'm sorry.
7          MS. ANDREW:  Are you finished?
8          THE WITNESS:  Yes.
9          MS. ANDREW:  We're over time.
10          MR. SCHEIER:  Well, we've always
11  given each other courtesy of going a little over
12  time so I just have a couple of follow-up
13  questions.
14          MS. ANDREW:  If it's on the same
15  question basically.
16          MR. SCHEIER:  It is.
17          MS. ANDREW:  Okay.
18  BY MR. SCHEIER:
19      Q.  And the same question being this
20  lack of cash.  So the company is making all of
21  its payments to its creditors throughout that
22  period.  Are you also aware that the company
23  did introduce at least four new web-based
24  products during that same period, that period
25  being the date of the closing of the

Page 469

1  transaction and the first quarter of 2008?
2      A.  I understood that there were
3  various things introduced, yeah.
4      Q.  Did you review Miss Borstad's
5  transcript and her testimony that the field, in
6  her view, that she felt she was close to, is
7  very excited about those four products?
8      A.  I don't recall that specific part
9  of her transcript; but, okay, if you say that
10  that's there, that's there.
11      Q.  All right.  Do you have any
12  expertise to render an opinion on whether or
13  not, in fact, the company invested an
14  appropriate or an inappropriate amount of money
15  between the closing of the transaction and the
16  first quarter of 2008 in new product
17  development?
18      A.  I do not have any expertise in
19  that area.
20      Q.  Have you engaged an expert to give
21  you such an opinion, without disclosing who
22  that might be?
23      A.  No.
24      Q.  You have not.
25          MR. SCHEIER:  Okay.  I have no

61  (Pages 466 to 469)

Page 470

1 further questions.
2        THE WITNESS:  Thank you.
3        THE VIDEOGRAPHER:  We're off the
4 record.
5        (Thereupon, the deposition was
6 concluded at 4:21 p.m.)

Page 471

1        I, W. TIMOTHY MILLER, do hereby certify
2 that the foregoing is a true and accurate
3 transcription of my testimony.
4
5
6        _____
7
8 Dated _____

Page 472

1 STATE OF OHIO        )
2 COUNTY OF MONTGOMERY )  SS: CERTIFICATE
3        I, Kathy S. Wysong, a Notary
4 Public within and for the State of Ohio, duly
5 commissioned and qualified,
6        DO HEREBY CERTIFY that the
7 above-named W. TIMOTHY MILLER, was by me first
8 duly sworn to testify the truth, the whole truth
9 and nothing but the truth.
10        Said testimony was reduced to
11 writing by me stenographically in the presence
12 of the witness and thereafter reduced to
13 typewriting.
14        I FURTHER CERTIFY that I am not a
15 relative or Attorney of either party, in any
16 manner interested in the event of this action,
17 nor am I, or the court reporting firm with which
18 I am affiliated, under a contract as defined in
19 Civil Rule 28(D).

Page 473

1        IN WITNESS WHEREOF, I have hereunto set
2 my hand and seal of office at Dayton, Ohio, on
3 this _ _ _ _ day of _ _ _ _ _ _ _ _, 2012.
4
5        _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
6        KATHY S. WYSONG, RPR
         NOTARY PUBLIC, STATE OF OHIO
         My commission expires 12-1-2013

472

1  STATE OF OHIO              )

2  COUNTY OF MONTGOMERY )   SS: CERTIFICATE

3          I, Kathy S. Wysong, a Notary

4  Public within and for the State of Ohio, duly

5  commissioned and qualified,

6          DO HEREBY CERTIFY that the

7  above-named W. TIMOTHY MILLER, was by me first

8  duly sworn to testify the truth, the whole truth

9  and nothing but the truth.

10          Said testimony was reduced to

11  writing by me stenographically in the presence

12  of the witness and thereafter reduced to

13  typewriting.

14          I FURTHER CERTIFY that I am not a

15  relative or Attorney of either party, in any

16  manner interested in the event of this action,

17  nor am I, or the court reporting firm with which

18  I am affiliated, under a contract as defined in

19  Civil Rule 28(D).

20

21

22

23

24

25

473

1           IN WITNESS WHEREOF, I have hereunto set

2 my hand and seal of office at Dayton, Ohio, on

3 this  31st   day of   December   , 2012.

4                           _Kathy S. Wysong_

5                           _____

6                           KATHY S. WYSONG, RPR
                            NOTARY PUBLIC, STATE OF OHIO
7                           My commission expires 12-1-2013

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25