**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)**

| | | |
|---|---|---|
| **THE ANTIOCH COMPANY** | : | **Case No. 3:10-CV-156** |
| **LITIGATION TRUST, W.** | : | |
| **TIMOTHY MILLER, TRUSTEE,** | : | **Judge Timothy S. Black** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LEE MORGAN, et. al,** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................ 1

II.  PROCEDURAL BACKGROUND .................................................................... 1

III.  FACTUAL BACKGROUND ............................................................................ 2

    A.  The Moving Defendants ............................................................................... 3

    B.  The 2003 Transaction .................................................................................. 4

    C.  The Materially Misleading 2003 Transaction Disclosures ....................... 5

        i.  <u>The Proxy Statement Heading</u> ........................................................ 5

        ii.  <u>The Scope of the Houlihan Opinion</u> ............................................... 5

        iii.  <u>Omission of the fact that the Board of Directors would receive 85% of the
        consideration in the 2003 Transaction</u> ............................................ 8

        iv.  <u>The Tender Offer does not fully disclose the risks the Company was taking in
        closing the transaction</u> .................................................................... 9

        v.  <u>Goals of the transaction</u> ................................................................ 10

      vi.  Additional material omissions ........................................................ 10

**D.  ESOP Participant Communications**......................................................... **11**

**E.  The Aftermath of the Transaction: the Defendants' misrepresentations regarding the health of the Company** ........................................................ **12**

      i.  The Company issues ESOP Notes without adequate security ....................... 12

      ii.  Misrepresentations to shareholders and employees regarding the Company's performance and sale process ........................................................ 14

      iii.  Further deception related to Condor ........................................................ 16

**IV.  SUMMARY JUDGMENT STANDARD**......................................................... **18**

**V.  LAW AND ARGUMENT** ......................................................................... **18**

**A.  ORC § 2305.09 does not preclude the doctrines of equitable tolling and adverse domination.**......................................................................... **20**

**B.  The statute of limitations on Plaintiff's claims should be tolled under the doctrine of "adverse domination."** ......................................................... **23**

      i.  The majority of states recognize the doctrine of "adverse domination" as applied to claims like Plaintiff's. ........................................................ 24

      ii.  The Supreme Court of Ohio would apply the doctrine of "adverse domination" to toll the statute of limitations on Plaintiff's claims. ............... 26

      iii.  The *Squire* and *Chinese Merchants* cases are inapplicable to Plaintiff's claims against Defendants. ........................................................ 28

**C.  The statute of limitations on Plaintiff's claims should be tolled under the doctrines of equitable tolling and equitable estoppel.**............................... **30**

      i.  The Company stakeholders' inability to bring an earlier action warrants application of equitable tolling. ........................................................ 31

      ii.  The Defendants' blatant misrepresentations and concealments justify the application of equitable tolling. ........................................................ 34

**VI.  CONCLUSION**......................................................................... **38**

# TABLE OF AUTHORITIES

## Cases

*Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) ........................................................ 19

*Allen v. Wilkerson*, 396 S.W.2d 493 (Tex. App. 1965) ................................................ 25

*Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618 (6th Cir. 2008)............................ 19

*Apicella v. PAF Corp.*, 17 Ohio App. 3d 245, 479 N.E.2d 315 (App. Ct. 1984) .................. 26, 27

*Bailey v. V&O Press Co.*, 770 F.2d 601 (6th Cir. 1985) ................................................ 24

*Bates Street Shirt Co. v. Waite*, 130 Me. 352, 156 A. 293 (1931) ................................ 25

*B-G Leasing Co. v. First Nat'l Bank*, No. H-89-56, 1991 WL 87113 (Ohio App. May 24, 1991) ........................................................................................................... 37

*Bridge v. Ocwen Fed. Bank FSB*, No. 1:07-CV-02739, 2013 WL 331095 (N.D. Ohio Jan. 29, 2013) ........................................................................................................... 29

*Brown v. Ohio Dept. of Job & Family Servs.*, No. 08AP-239, 2008 WL 5197157 (Ohio App. Dec. 11, 2008) ........................................................................................................... 31

*Bryant v. Doe*, 50 Ohio App.3d 19 (1988) ........................................................................ 34

*Byers v. Robinson*, No. 08AP-204, 2008 WL 4328189 (Ohio App. Sept. 23, 2008) .................. 20

*Chinese Merchants Ass'n v. Chin*, 159 Ohio App. 3d 292, 823 N.E.2d 900 (App. Ct. 2004)......... . ........................................................................................................... 23, 28

*Clark v. Milam*, 192 W.Va. 398, 452 S.E.2d 714 (1994) ........................................ 23, 25

*Collins v. Sotka*, 81 Ohio St. 3d 506, 692 N.E.2d 581 (1998) ................................ 20, 31

*Combs v. Int'l Ins. Co.*, 354 F.3d 568 (6th Cir. 2004) ................................................ 19

*Crego v. Baldwin-Lima-Hamilton Corp.*, No. 16515, 1998 WL 80240 (Ohio App. Feb. 27, 1998) ........................................................................................................... 21, 31, 32

*Crosby v. Beam*, 47 Ohio St. 3d 105, 548 N.E.2d 217 (1989)........................................ 26

*Cundall v. U.S. Bank*, 122 Ohio St. 3d 188, 909 N.E.2d 1244 (2009) ........................ 22

*Easterly v. Budd*, No. 4:06 CV 00186, 2006 WL 2404143 (N.D. Ohio Aug. 18, 2006)............. 30

*FDIC v. Berry*, 659 F.Supp. 1475 (E.D. Tenn. 1987) .................................................................. 25

*FDIC v. Carlson*, 698 F.Supp. 178 (D.Minn. 1988) .................................................................... 25

*FDIC v. Dawson*, 4 F.3d 1303 (5th Cir. 1993) ........................................................................... 27

*FDIC v. Gonzalez-Gorrondona*, 833 F.Supp. 1545 (S.D. Fla. 1993) ......................................... 25

*FDIC v. Hudson*, 673 F.Supp. 1039 (D. Kan. 1987) ................................................................... 25

*First Fed. S. & L. Assn. of Toledo v. Perry's Landing, Inc.*, 11 Ohio App. 3d 135, 463 N.E.2d 636 (App. Ct. 1983) ................................................................................................................. 37

*Flagstar Bank, F.S.B. v. Airline Union's Mortgage. Co.*, 128 Ohio St. 3d 529, 947 N.E.2d 672 (2011) ................................................................................................................................ 18, 22

*Freeland v. Enodis Corp.*, 540 F.3d 721 (7th Cir. 2008) ............................................................ 24

*Greenfield Sav. Bank v. Abercrombie*, 211 Mass. 252, 97 N.E. 897 (1912) .............................. 25

*Greenleaf v. Profile Cotton Mills*, 235 Ala. 530, 180 So. 582 (1938) ........................................ 25

*Helman v. EPL Prolong, Inc.*, 139 Ohio App. 3d 231, 743 N.E.2d 484 (App. Ct. 2000) ........... 37

*In re Am. Cont'l Corp.*, 794 F.Supp. 1424 (D. Ariz. 1992) ........................................................ 25

*In re O.E.M./Erie, Inc.*, 405 B.R. 779 (W.D. Pa. 2009); ............................................................. 25

*In re. Regency Village Certificate of Need Application*, No. 11AP-41, 2011 WL 4541358 (Ohio App. Sept. 30, 2011) ......................................................................................... 20, 22, 30

*Investors REIT One v Jacobs*, 46 Ohio St. 3d 176, 546 N.E.2d 206 (1989) ............................... 22

*Jacobson-Kirsch v. Poulos*, No. 26102, 2012 WL 3201697 (Ohio App. Aug. 8, 2012) ............. 21

*Jim Brown Chevrolet, Inc. v. S.R. Snodgrass, A.C.*, 141 Ohio App. 3d 583, 752 N.E.2d 335 (App. Ct. 2001) ...................................................................................................................... 18

*Jones v. Gen. Motors Corp.*, 939 F.2d 380 (6th Cir. 1991) ........................................................ 34

*Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543 (6th Cir. 2006) ....................................... 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................... 18

*McDonald & Co. Sec., Inc., Gradison Div. v. Alzheimer's Disease & Related Disorders Assn., Inc.*, 140 Ohio App. 3d 358, 747 N.E.2d 843 (App. Ct. 2000) .................................................. 20

*Michelsen v. Penney*, 135 F.2d 409 (2d Cir. 1943) ............................................................... 25

*Muhammad v. Close*, 379 F.3d 413 (6th Cir. 2004) .............................................................. 18

*Pratte v. Stewart*, 125 Ohio St. 3d 473, 929 N.E.2d 415 (2010) ....................................... 22

*Resolution Trust Corp v. Hecht*, 333 Md. 324, 635 A.2d 394 (1994) ........................ 23, 24, 25

*Resolution Trust Corp. v. Bernard*, No. 94-CV-475, 1995 WL 17164886 (M.D.N.C. Aug. 8, 1995) ................................................................................................................................. 23, 25

*Resolution Trust Corp. v. Fiala*, 870 F.Supp. 962 (E.D. Mo. 1994) .................................... 25

*Resolution Trust Corp. v. Grant*, 901 P.2d 807 (Okla. 1995) ............................................. 25

*Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer*, 840 F.Supp. 1270 (N.D. Ind. 1993) ........................................................................................................................................ 25

*Resolution Trust Corp. v. Scaletty*, 257 Kan. 348, 891 P.2d 1110 (1995) ......................... 25

*Resolution Trust Corp. v. Smith*, 872 F.Supp. 805 (D. Or. 1995) ...................................... 25

*Robert P. Butts & Co. v. Estate of Butts*, 119 Ill. App. 2d 242, 255 N.E.2d 622 (1970) .............. 25

*Ruch v. State*, No. 03AP-1070, 2004 WL 2893150 (Ohio App. Dec. 14, 2004) ...................... 34

*Smith v. Lyle*, 59 S.D. 534, 241 N.W. 512 (1932) ............................................................... 25

*Squire v. Guardian Trust Co.*, 79 Ohio App. 371, 72 N.E.2d 137 (App. Ct. 1947) .............. 23, 28

*State ex rel Lien v. House*, 144 Ohio St. 238, 58 N.E.2d 675 (1944). ................................ 28

*State v. Barker*, No. 21438, 2007 WL 2568352 (Ohio App. Sept. 7, 2007) ................... 21, 31, 32

*United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880 (Utah 1993) ................... 25

*Ventress v. Wallace*, 111 Miss. 357, 71 So. 636 (1916) ..................................................... 25

*Wasyk v. Trent*, 174 Ohio St. 525, 191 N.E.2d 58 (1963) ................................................... 31

*Welsh v. United States*, 844 F.2d 1239 (6th Cir. 1983) ................................................ 19, 23, 27

*Williams*, 599 F.Supp. at 1194 (D. Md. 1984). .................................................................... 25

*Wilson v. Brush Wellman, Inc.*, 103 Ohio St. 3d 538, 817 N.E.2d 59 (2004) .............................. 20

*Wilson v. Paine*, 288 S.W.3d 284 (Ky. 2009)....................................................................... 25, 37

*Wuliger v. Star Bank*, No. 3:02 CV 1513, 2008 WL 2323887 (N.D. Ohio June 4, 2008) .......... …
.................................................................................................................... 21, 29, 31, 32

*Young v. United States*, 535 U.S. 43 (2002) ............................................................................ 20

## Statutes

11 U.S.C. § 108(a) .................................................................................................................. 19

Ohio Rev. Code § 2305.09................................................................................................ 18, 21, 22

Ohio Rev. Code § 1701.60................................................................................................... 7

ORC § 2305.09 ..................................................................................................................... 21, 22

## Rules

Fed.R.Civ.P. 56(a) ................................................................................................................. 18

## SUMMARY

The sole issue presented in the Defendants' Motions for Summary Judgment is whether the claims asserted in Count One of the Plaintiff's Complaint are barred by the applicable statute of limitations. Due to the extraordinary inequitable circumstances present in this case, the doctrines of adverse domination and equitable apply to render the claims in Count One timely.

The Supreme Court of Ohio has not addressed the issues of adverse domination, and, although it has accepted the doctrine, the Supreme Court has not outlined all circumstances in which equitable tolling is applicable. Accordingly, this Court must make its best prediction of how the Supreme Court of Ohio would rule if confronted with the question. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004); *see also Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1983), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009). In making this prediction, the federal court may rely upon analogous cases and relevant dicta from the Ohio Supreme Court, opinions of the Ohio appellate courts (to the extent that they are persuasive indicia of the Ohio Supreme Court direction on the issue), and persuasive opinions from other jurisdictions, including the "majority rule." *Welsh*, 844 F.2d at 1245.

As a threshold issue, Defendants incorrectly argue that the relevant statute of limitations is not subject to equitable tolling or adverse domination. However, it is "hornbook law" that courts have the power to apply equitable tolling doctrines to statutes of limitations. *Byers v. Robinson*, No. 08AP-204, 2008 WL 4328189, at *13 (Ohio App Sept. 23, 2008). Furthermore, the cases cited by Defendants allegedly in support of this faulty argument each relate to the "discovery rule," not equitable tolling or adverse domination. Ohio law clearly permits equitable exceptions to the applicable four-year statute of limitations. Section V.A. Given the extremely

inequitable circumstances present in this case, the doctrines of adverse domination and equitable tolling should be adopted and applied.

Adverse domination would be adopted by the Supreme Court of Ohio because the doctrine is directly in line with relevant Ohio public policy and has been accepted by a majority of jurisdictions. *See Apicella v. PAF Corp.*, 17 Ohio App. 3d 245, 479 N.E.2d 315 (App. Ct. 1984). Adverse domination is directly applicable to Plaintiff's claims because the Defendants controlled and dominated the Company (and thus would not sue themselves), and further used such control and domination to actively misrepresent the true nature of the 2003 Transaction in an effort to avoid litigation. Section V.B.

Equitable tolling would also be adopted and applied under the circumstances in this case. Ohio courts have consistently recognized that the doctrine of equitable tolling may be used to avoid the inequitable use of the statute of limitations. *Wuliger v. Star Bank*, No. 3:02 CV 1513, 2008 WL 2323887 (N.D. Ohio June 4, 2008). Equitable tolling is applicable to this case for two primary reasons: (1) no disinterested party had the opportunity to bring this action within the limitations period; and (2) the Defendants actively concealed and misrepresented facts regarding the 2003 Transaction in an effort to avoid litigation. Section V.C.

Accordingly, the statute of limitations for the claims in Count One related to the 2003 Transaction should be tolled under the doctrines of adverse domination and equitable tolling, and Defendants' should be denied summary judgment.

## I.  INTRODUCTION

The central question in this litigation is whether Ohio law permits the directors and officers of a corporation – and the professionals who rubber-stamped their actions – to extract over $200 million from the company for their personal benefit, while simultaneously bankrupting a once-profitable enterprise, robbing creditors of their investments, and wiping out their employees' retirement savings.  In an attempt to avoid liability for having done just that, the Moving Defendants argue that Ohio law permits their egregious actions, so long as they were able to maintain control over the corporation long enough to run out the statute of limitations. Ohio law does not, and cannot, condone such behavior.  Rather, existing Ohio law permits this Court to employ the doctrines of adverse domination and equitable tolling to stop the limitations period from running, thereby allowing Plaintiff to pursue justice against these wrongdoers. These doctrines are widely accepted by the majority of states, are wholly consistent with Ohio public policy, and have been applied to similar circumstances in the Ohio courts.  Accordingly, were the Supreme Court of Ohio in this Court's position, it would adopt these doctrines.  This Court should do the same, and should deny Defendants' motions for summary judgment.

## II.  PROCEDURAL BACKGROUND

Count One of the First Amended Complaint (the "Complaint") [Adv. Doc No. 275] filed by The Antioch Company Litigation Trust (the "Trust"), by and through W. Timothy Miller, Trustee (the "Trustee"), alleges a cause of action for breach of fiduciary duty against certain of the Company's former directors and officers.  Defendants Ben Carlson, Jeanine McLaughlin, Denis Sanan, Malte von Matthiessen (the "Outside Director Defendants"), Lee Morgan, Chandra Attiken, Asha Moran (the "Morgan Defendants"), and Nancy Blair (collectively, the "Moving Defendants") have moved for summary judgment (the "Motions") [Doc Nos. 96, 98, 100] as to

Count One.  The sole issue presented by the Motions is whether Count One is barred by Ohio's four-year statute of limitations applicable to breach of fiduciary duty claims.  Because the statute of limitations should be tolled under the doctrines of adverse domination and equitable tolling, Count One is timely and the Motions should be denied.

## III.  FACTUAL BACKGROUND[1]

The Antioch Company (the "Company") – once a thriving business enterprise – was driven into the ground by those entrusted to lead it: (a) a conflicted Board of Directors (the "Board") who utilized a transaction through which the Company became 100% ESOP-owned (the "2003 Transaction") to cash out at the peak of its financial success, no matter the cost to the Company or the participants in its ESOP; (b) a group of officers who participated fully in the Board's actions and looked the other way when the Company began to show signs of distress, and (c) professional advisors who routinely approved the Board's actions in exchange for years of fees.

The "leaders" of the Company not only put it on a path to bankruptcy, but for years following the 2003 Transaction they also concealed the potential ramifications of their actions from those who could do something about it.  Specifically, they actively concealed the effects of the 2003 Transaction, put the interests of the Morgan family and themselves above those of the Company, and refused to change leadership as the Company endured four years of sustained

---

[1] Deposition testimony and exhibits supporting these facts are attached in Plaintiff's Appendix, filed herewith. Plaintiff also incorporates by reference the factual statements, deposition testimony, and exhibits cited in the following documents: Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment of Defendant McDermott Will & Emery LLP; Plaintiff's Statement of Disputed Issues of Material Fact (attached as Exhibit A); Plaintiff's Response to the Proposed Undisputed Facts in Support of Defendant Nancy Blair's Motion for Summary Judgment (attached as Exhibit B); Plaintiff's Response to the Statement of Proposed Undisputed Facts by Defendants Lee Morgan, Asha Morgan Moran, and Chandra Attiken (attached as Exhibit C); and Plaintiff's Response to Statements of Proposed Undisputed Facts of Defendants Ben Carlson, Jeanine McLaughlin, Denis Sanan, and Malte von Mattheissen (attached as Exhibit D).

sales declines.  In fact, all of the Moving Defendants (except Ben Carlson)[2] – along with the Company's legal counsel McDermott, Will & Emery, LLP ("MWE") – remained in positions of control and power at the Company through 2008.  Defendants alone possessed the information necessary to understand the effect of the 2003 Transaction on the Company's financial health, and the full extent to which the Board of Directors – who together took over $200 million in cash and consideration – were conflicted when approving the 2003 Transaction.  Defendants alone were in a position to take action against their prior wrongdoings.  Those same individuals now refuse to take responsibility for the effect of their self-serving actions.

Over the years, Defendants' concealment of relevant facts and misrepresentations to ESOP Noteholders, ESOP participants and other stakeholders as to material matters prevented any parties from taking action regarding the Defendants' multiple breaches of their fiduciary duties within the statutorily permitted timeframe.  The extent to which the 2003 Transaction had harmed the Company, and the ways that the directors and officers had concealed the urgency of the Company's financial distress in the interim, did not become clear until after the Trustee was appointed.

### A.  The Moving Defendants

The Moving Defendants are former members of the Antioch Board of Directors and various officers, all of whom were instrumental in the 2003 Transaction from conception to closing.  **Lee Morgan ("Lee")**, the son of the co-founder of the Company, served as President and Chief Executive Officer since 1971 and chairperson of the board since 1978.[3]  He remained CEO until 2008 when he was replaced by his daughter, Asha Morgan Moran.  **Asha Morgan**

---

[2] Ben Carlson retired in 2004 to make way for Nancy Blair to rejoin the Board after the 2003 Transaction. Deposition of Ben Carlson ("Dep. Carlson,") 130, June 6, 2012, Appendix Ex. 7; Deposition of Nancy Blair ("Dep. Blair II") 304, April 25, 2012, Appendix Ex. 4.
[3] Deposition of Lee Morgan ("Dep. Morgan I") 16, Apr. 12, 2012, Appendix Ex. 20.

Moran ("**Asha**") did not join the Company in a professional capacity until late 1999.[4] She was moved through various positions, including President of Creative Memories, and eventually became CEO of the Company. **Nancy Blair ("Blair")**, a close personal friend of Asha, served on the Board off and on from 2002 through 2008, only resigning in July 2003 to take an internal position as "Director of Corporate Strategy" to lead the development and execution of the 2003 Transaction, and rejoining the board in 2004.[5] **Ben Carlson ("Carlson")** joined the Board in 1973 and served through his resignation in October 2004, when he was asked to step aside so that Nancy Blair could rejoin the Board.[6] **Denis Sanan ("Sanan")** served on the Board from 1997 until June 2008, when he and all the other outside directors – Blair, von Matthiessen, McLaughlin and Northrop – were fired. **Malte von Matthiessen ("von Matthiessen")**, a family friend of Lee and his wife, Vicki, joined the Board in the late 1970s and served through June, 2008.[7] **Jeanine McLaughlin ("McLaughlin")** served on the Board from 1993 through June, 2008.[8]

## B. The 2003 Transaction

The 2003 Transaction is described in the factual background section of Plaintiff's Memorandum in Opposition to Motion of McDermott, Will & Emery, LLP for Summary Judgment, filed in the related case 3:09-cv-00218 ("Plaintiff's Opp. to MWE Motion"). To save the Court from repetition, Plaintiff incorporates such factual background as if fully restated herein. The same 2003 Transaction is at issue in the Motions.

---

[4] Deposition of Asha Moran ("Dep. Moran I") 16-18, Apr. 9, 2012, Appendix Ex. 18.
[5] Dep. Blair II 182-184, Appendix Ex. 4; Dep. Ex. 31, Appendix Ex. 29; Dep. Ex. 33, Appendix Ex. 30.
[6] Dep. Carlson 130, Appendix Ex. 7.
[7] Deposition of Malte von Matthiessen ("Dep. von Matthiessen I") 7-11, June 4, 2012.
[8] Deposition of Jeanine McLaughlin ("Dep. McLaughlin I") 6, June 19, 2012.

### C. The Materially Misleading 2003 Transaction Disclosures

The Company issued a prospectus and tender offer (the "Tender Offer") to the non-ESOP shareholders on November 14, 2003 containing the terms approved by the Board at their October 30 meeting.[9] The Tender Offer and accompanying Proxy Statement included a number of misleading statements and material omissions:

### i. The Proxy Statement Heading

The very first page of the proxy statement of the Tender Offer begins with the heading: "THE ANTIOCH COMPANY OFFER TO PURCHASE ALL OUTSTANDING SHARES OF COMMON STOCK..."[10] In fact, the transaction would not have closed if the Company had been required to purchase all outstanding shares of Company stock – closing of the 2003 Transaction was contingent on the ESOP Trustee declining the offer with respect to the common stock held in the ESOP.[11]

### ii. The Scope of the Houlihan Opinion

The scope of the Houlihan fairness opinion was repeatedly misrepresented throughout the entire Tender Offer. The very first paragraph of the proxy statement implies that the Board relied on advice from Houlihan to the Company in deciding to approve the Transaction:

> THE BOARD OF DIRECTORS OF THE COMPANY, IN RELIANCE ON ITS FINANCIAL ADVISOR, HAS (i) DECIDED THE CASH CONSIDERATION TO BE RECEIVED BY THE SHAREHOLDERS (OTHER THAN THE ESOP) IN EXCHANGE FOR TENDERING THEIR SHARES IS FAIR TO ANY SUCH SHAREHOLDER FROM A FINANCIAL POINT OF VIEW, (ii) DECIDED THE EXCHANGE CONSIDERATION (COMPRISED OF CASH, NOTE AND WARRANTS) TO BE RECEIVED BY THE SHAREHOLDERS (OTHER THAN THE ESOP) IN EXCHANGE FOR TENDERING SHARES OF COMMON STOCK IS FAIR TO ANY SUCH SHAREHOLDER FROM A FINANCIAL POINT OF VIEW, (iii) DECIDED THAT THE CASH CONSIDERATION OF $850 PER SHARE IS IN THE REASONABLE RANGE OF THE FAIR MARKET VALUE OF THE EXCHANGE

---

[9] Dep. Ex. 31, Appendix Ex. 29.
[10] *Id.*
[11] Deposition of Uri Doron ("Dep. Doron") 28, Oct. 24, 2012, Appendix Ex. 8.

CONSIDERATION, AND (iv) APPROVED THE OFFER, THE MERGER, AND THE OTHER TRANSACTIONS CONTEMPLATED IN CONNECTION THEREWITH.[12]

This statement is misleading in several ways.  First, there were three financial advisors engaged with respect to the transaction (not a singular "advisor" to the Board), but no advisor had been engaged to issue an opinion regarding the fairness of the transaction to the Company itself.  In fact, given that the Moving Defendants are now heavily relying on the supposed advice of Deloitte to justify their self-dealing, it is notable that the Tender Offer does not state that the Board relied on Deloitte in any way.

Furthermore, the paragraph, read as whole, falsely suggests to the reader that the Board consulted a financial advisor that had been specifically engaged on behalf of the Company, and relied on its opinion in approving the Tender Offer, the merger, and the transaction as a whole. In fact, this paragraph (with the exception of clause (iv)) directly tracks the language of Houlihan's written opinion of fairness from a financial perspective to the outside shareholders.[13] Houlihan's opinion, however, contains several very important disclaimers that were not included in the Tender Offer:

> **This Opinion does not address (a) the Company's underlying business decision to effect the Transaction**, (b) the fairness of the Transaction to the ESOP, or (c) the relative fairness of the Transaction to the shareholders electing to receive cash versus the Exchange Consideration.  In addition, the Opinion does not provide any investment advice with respect to whether any shareholder should elect to receive cash or the Exchange Consideration or whether they should tender their shares or common stock in the Company.
>
> **We have not been engaged to give advice as to whether the Company should engage in the Transaction nor have we been requested to seek or identify alternatives or to advise the Company with respect to its duties generally**.[14]

---

[12] Dep. Ex. 31 at 2, Appendix Ex. 29.
[13] *Id.* at Exhibit D-1; Dep. Ex. 64, Appendix Ex. 34.
[14] Dep. Ex. 31 at Appendix D-1 (emphasis added), Appendix Ex.29.

No advisor, including Deloitte, offered any opinion as to the fairness of the transaction to the Company, from a financial perspective or any other perspective.[15]  Thus, any implication that the Board received a professional opinion as to the propriety of the transaction as a whole is blatantly misleading.

Houlihan's role is again misrepresented on page 83 of the Tender Offer in a further effort to make it appear that an independent, non-conflicted financial advisor had evaluated the Transaction and determined it to be in the best interests of the Company, when actually the decision to proceed was made by self-dealing directors.  Page 83 purports to discuss the potential conflicts of interests with respect to the Board of Directors, and the safeguards required by Ohio law when, as here, directors or officers are personally involved in a transaction with the corporation.  After reviewing the shares held by the directors (but, inexplicably, not the officers), the Tender Offer paraphrases Ohio Rev. Code § 1701.60, which provides, *inter alia*, that a transaction between interested directors and a corporation will not be voidable if it is "fair to the corporation."  The Tender Offer then states "The Board of Directors of the Company has retained Houlihan Lokey as independent financial advisor to the Company to provide an opinion to the Board of Directors regarding the fairness of the consideration offered in the Transaction…The Board of Directors has approved the Transaction and determined that it is fair in reliance on the opinion of Houlihan Lokey."[16]  This statement clearly mischaracterizes the nature of the opinion delivered by Houlihan, and omits Houlihan's disclaimers that the Board may not rely on its opinion in the **exact manner** in which the Tender Offer states that the Board did.  This "disclosure" deliberately misleads the reader to believe that Houlihan issued an

---

[15] Deposition of Peter Abrahamson ("Dep. Abrahamson") 135-36, Feb. 28, 2012, Appendix Ex. 2.
[16] Dep. Ex. 31 at 83, Appendix Ex. 29.

opinion as to the fairness of the Transaction to the Company, not the limited opinion that the consideration was fair, from a financial perspective, to the selling shareholders only.

iii. <u>Omission of the fact that the Board of Directors would receive 85% of the consideration in the 2003 Transaction</u>

Throughout the Tender Offer, there is reference to the Board's deliberations and discussions with the various professionals.[17] For example, the Proxy Statement includes a "Questions and Answers about the Transaction" section.[18] The answer to the question "How was the value of my stock determined?" states: "The price of $850 per share resulted from the Board's deliberations and assessment of value of the Company, an opinion from the Board's independent financial advisor, and negotiations between Antioch and the Trustee."[19] What the Tender Offer fails to disclose is that the Board "deliberating" as to the value of the shares was receiving almost all of the consideration paid out by the Company in the transaction.

Page 83 of the Tender Offer, entitled "Conflicts of Interest" is allegedly intended to disclose just that: the Board's conflicts.[20] The document lists the number of shares and potential cash proceeds to be received by the members of the Board who were also outside shareholders. However, this page fails to include the shares held in trust for the benefit of Morgan family members – including Asha and her daughter – of which Asha was the trustee, thereby understating the amount by which the Morgan family would benefit from the Transaction by 61,098 shares, or $51,933,300.[21]

---

[17] *Id.*
[18] *Id.* at 2.
[19] *Id.* at 7.
[20] *Id.* at 83.
[21] Defendants suggest that recipients of the Tender Offer should have combed through the 84-page document and its numerous pages of appendices to find, on page 66, a table listing all of the shares owned by the Morgans. They would be on their own, however, in determining why the numbers did not match page 83, or the significance of the discrepancy.

The chart purporting to disclose the directors' conflicts, however, does not reveal what percentage of the shares being purchased by the Company belonged to the directors who were causing the Company to engage in the 2003 Transaction.  Nowhere in the Tender Offer is it disclosed that the members of the Board who approved the 2003 Transaction were taking 85% of the transaction's consideration, and that millions of dollars in consideration were going to officers of the Company, like Hoskins and Attiken, who had active roles in bringing about the transaction.[22]

    iv. <u>The Tender Offer does not fully disclose the risks the Company was taking in closing the transaction</u>

Page 68 of the Tender Offer purports to set forth the risks that "shareholders desiring to choose the Exchange Consideration comprised of cash, subordinated, notes and warrants" should consider.  It does not warn ESOP participants that these risks were also material to their symbolic vote as to whether to bless the merger.  Admittedly, the Tender Offer does identify the substantial amount of indebtedness the Company would incur to fund the transaction as a risk.  However, the Tender Offer document does not address the fact that the Company was being rendered balance-sheet insolvent by the transaction, or that Ohio law does not permit a corporation to buy its own shares if doing so would render the company insolvent.  Nor does the Tender Offer disclose that the transaction could be considered a fraudulent conveyance, subject to being unwound in the future.  The Tender Offer also does not explain that the transaction could be found to be a prohibited transaction under ERISA, if the Company paid more than fair market value for the shares.

---

[22] *Id.* at 66, 83; Dep. Ex. 294, Appendix Ex.62.

v.   Goals of the transaction

Page five of the Tender Offer cites the 75/25 ESOP account allocation issue as the reason for the transaction.  In fact, the transaction did not address the allocation issue.  The benefit allocation problem continued after the Transaction.  In the Equity Holder's Agreement attached to the Tender Offer, the Company agrees to continue to apportion future dividends of the company by account balance – the very issue the entire transaction was allegedly designed to address.[23]  At the end of the day, the only thing the 2003 Transaction accomplished was redistributing the Company's cash, along with other borrowed cash, to the Defendants and completely over-levering the Company.

vi.   Additional material omissions

The Tender Offer contained numerous other misleading statements and omissions, including:

• Disclosed the changes to the ESOP Advisory Committee approved by the board but did not disclose the identity of the chairperson (Asha) or that she could not be replaced without the unanimous vote of all other directors, including her father (Lee).[24]

 • Indicates that the Company would incur "significant repurchase obligations" as a result of the transaction and the Put Price Protection Agreement negotiated by GreatBanc, but does not disclose any projections of the amount of these repurchase obligations, or the fact that they are not included as liabilities on the balance sheet.[25]

• Never discloses the aggregate cost to purchase all non-ESOP shares in the 2003 Transaction, rather than just the per share offer price.

• Does not disclose the amount of consideration being paid to officers of the Company, even though the feasibility of the transaction hinges on the projections of future sales and expenses prepared by these officers.[26]

---

[23] Dep. Ex. 31 at Appendix I, Appendix Ex. 29.
[24] *Id.* at 70.
[25] *Id.* at 38-41, 70, 80-81.
[26] *See id.* at 83.

• Does not disclose that Cheryl Lightle, then-president of the Company's most successful and profitable business unit (Creative Memories), was leaving the Company and would be replaced by Asha, who had little experience with either the Company or direct sales.[27]

### D.  ESOP Participant Communications

In addition to the Tender Offer that was mailed to the non-ESOP shareholders and ESOP participants, the board-sanctioned communications team undertook the task of "selling" employees on the transaction.[28]  These communications were as misleading as the Tender Offer itself.  For example, individuals being "trained" to discuss the transaction with employee-owners were informed that the Board had undertaken "significant analysis, deliberation, and due diligence" to reach the decision to approve the transaction.[29]  The communications also represented that Deloitte had been engaged as a "Financial Advisor" in the same capacity that Houlihan and Duff & Phelps had been engaged.[30]  In reality, Deloitte, who handled the Morgan's personal tax and estate planning, was engaged to make the transaction happen.  It was not engaged to recommend whether the Company should undertake the transaction and issued no opinions on whatsoever in connection with the 2003 Transaction.[31]  Houlihan and Duff & Phelps had been engaged to opine on the fairness of the transaction to their respective constituencies, and only from a financial perspective.  This mischaracterization of Deloitte's role improperly conveyed that Deloitte was acting independently to ensure that the Transaction was in the best interests of the Company.  That was simply false.

Additionally, among "key messages" the communications team was instructed to pass on to employees was that the transaction was to be "celebrated" (employees were treated to pizza

---

[27] Lightle was a co-founder Creative Memories and was well-known to the field of consultants.  The field consultants did not know Asha and distrusted Lee and his wife, Vickie, who was a field consultant. Deposition of Rhonda Anderson ("Dep. Anderson") 35-39, 60-62, Nov. 20, 2012, Appendix Ex. 111.

[28] Dep. Ex. 25(B) at 9, Appendix Ex. 28; Dep. Ex. 760; Dep. Ex. 758, Appendix Ex. 108.

[29] Dep. Ex. 385, Appendix Ex.71.

[30] *Id.*

[31] Dep. Abrahamson 135-136, Appendix Ex. 2; Deposition of Dan Holthaus ("Dep. Holthaus I") 215-16, Apr. 18, 2012, Appendix Ex. 10.

parties and cake!).[32]  It was emphasized that the Board had determined the transaction to be the Company's "best option," without disclosing that the Board had cursorily rejected alternatives and that none of the professionals had been engaged to identify or evaluate alternatives that would not result in the Board paying itself $200 million.[33]

The conflicted directors had breached their fiduciary duties to the Company, the impact of which would become dramatically clear in the coming months and years as sales were in free-fall and the Company took on increasing debt to service notes issued to departing ESOP participants.  However, after the transaction closed, the conflicted Board members now held sub-debt and warrants and had the most to lose if the transaction were unwound.  Thus, the Defendants continued to make misrepresentations in an effort to prevent any action (such as a lawsuit) that might unwind the transaction. As a result of these misrepresentations, the directors themselves, and MWE, were the only parties with the information necessary to understand how the directors had breached their duties, until the Trustee was appointed.

### E.  The Aftermath of the Transaction: the Defendants' misrepresentations regarding the health of the Company

#### i.  The Company issues ESOP Notes without adequate security

Nearly 800 employees either left the Company or were laid off from 2004 through 2006.[34]  Many of these employees left voluntarily to lock in the high share price for their ESOP accounts that resulted from the 2003 Transaction.  Because the 2003 Transaction left the Company without cash reserves, it was forced to incur additional debt to meet its obligation to purchase the shares of the departing employees.  Less than a year after the 2003 Transaction

---

[32] Dep. Ex. 25(B) at 9, Appendix Ex. 28; Dep. Ex. 760; Dep. Ex. 758, Appendix Ex. 108.
[33] Dep. Ex. 385 at 52, Appendix Ex. 71.
[34] KMK-018856, Executive Summary, Confidential Information Memorandum.  *See* Affidavit of Marcia Voorhis Andrew, Appendix Ex. 110.

closed, the Company already found itself without adequate cash to meet its ESOP obligations and unable to offer security for additional debt.

Because it lacked the necessary cash, the Company issued promissory notes to its departing employees to pay for their ESOP balances (the "ESOP Notes").[35]  The Company issued four rounds of ESOP Notes (on August 20, 2004, July 11, 2005, August 2, 2006 and October 1, 2007) having an aggregate principal balance of $79.9 million.[36]

The Company was required by law to provide adequate security for the ESOP Notes.  However, the Company had pledged all of its assets as security for the bank debt incurred in the 2003 Transaction.  Thus, Hoskins, as CFO, selected Condor Insurance Limited ("Condor Ins.") to guarantee the ESOP Notes through the issuance of surety bonds.[37]  Condor Ins., a Bahamian Company, guaranteed the first three rounds of ESOP Notes.[38]  A clearly related entity called Condor Guaranty, Inc. was the guarantor for the fourth round of ESOP Notes in 2007.[39]

The Company, having no unencumbered assets as a result of the 2003 Transaction, did not provide collateral to Condor Ins. or Condor Guaranty, Ltd.  Hoskins knew that Condor Ins. was not an AM-Best Rated entity and was required to sign a waiver by his insurance broker acknowledging that fact.[40]  Despite these warning signs that Condor Ins. was too good to be true, Hoskins continued paying the premiums to Condor and never undertook any due diligence on Condor Ins. or its principal.[41]  He was simply happy to have found someone – anyone – to

---

[35] Dep. Ex. 338, 68.
[36] Dep. Ex. 38, Appendix Ex. 31; Dep. Ex. 39 at 7, Appendix Ex. 32; Dep. Ex. 76 at 000113, Appendix Ex. 37; Dep. Ex. 705, Appendix Ex. 104.
[37] Deposition of Barry Hoskins ("Dep. Hoskins I") 332, 339-344, Jan. 30, 2012 Appendix Ex. 11.
[38] Dep. Ex. 50; Dep. Ex 51; Dep. Ex. 52.
[39] Dep. Ex. 705, Appendix Ex. 104.
[40] Dep. Ex. 49, Appendix Ex. 33.
[41] Due diligence would have revealed multiple lawsuits for fraud against Condor and its President, Harvey Milam. Dep. Ex. 730, Appendix Ex. 105.

guaranty the ESOP Notes.[42]  However, the departing employees were not told that the guarantor of their ESOP Notes was an un-rated, off-shore company, or that the Company had no unencumbered assets with which to back their ESOP Notes.  Instead, they were simply notified that their ESOP Notes were "guaranteed."[43]

Hoskins contracted with Condor to secure the first two rounds of ESOP Notes, but retired in 2006 and was replaced as CFO by Karen Felix ("Felix").[44]  After Hoskins' departure, Felix, along with Lipson-Wilson, then director of corporate compliance, and Steve Bevelhymer, the Company's treasurer, renewed coverage with Condor in 2006 and 2007.[45]

ii.    Misrepresentations to shareholders and employees regarding the Company's performance and sale process

Following the 2003 Transaction, Lee, Asha and the other directors and officers concealed the true state of the Company's finances and ignored warnings from key members of the Company's own financial staff that their sales projections were too optimistic.[46]  Creative Memories' sales, which had experienced headwinds in 2003, started to free fall in 2004, and never recovered.  Additionally, internal problems with financial modeling, which had plagued the Company since before the 2003 Transaction, continued to obfuscate observers' abilities to evaluate the Company's health and future potential.  Asha, who as President of Creative Memories had ultimate authority to establish revenue projections, manipulated sales figures in an attempt to present a brighter outlook of the Company's finances to bankers and potential

---

[42] "We – I think my – my broker, he looked for anybody out there that would offer surety bond coverage and this is the only one he came back with...I didn't think we'd be able to find a surety bond provider at all.  At least they didn't think that I would be able to find one. And so we all celebrated when we actually were able to find Condor as a surety bond provider just because we didn't know if we were going to be able to find collateral for those promissory notes." Dep. Hoskins I 332:11-25, Appendix Ex.11.

[43] Dep. Ex. 50; Dep. Ex 51; Dep. Ex. 52; Dep. Ex. 705, Appendix Ex. 104.

[44] Dep. Hoskins I 344-45, Appendix Ex. 11; Deposition of Karen Felix ("Dep. Felix") 84, Mar. 8, 2012, Appendix Ex. 9.

[45] Deposition of Stephen Bevelhymer ("Dep. Bevelhymer") 118-20, Nov. 5, 2012, Appendix Ex. 3.

[46] Dep. Ex. 212, Appendix Ex. 52; Dep. Ex. 451, Appendix Ex. 74.

purchasers or investors.[47]  For example, in an email entitled "Asha's Guess," Asha manipulated the Company's financial data, noting that she in "no way" had confidence that the Company could hit her "forecast."[48]

Finally reaching the conclusion that the capital structure of the Company put in place by the 2003 Transaction was unworkable, the Board retained Houlihan on March 20, 2007 to market the Company and sell it as a going concern.[49]  For a factual discussion of the reasons the Board decided to look for a buyer, and the sales process conducted by a special committee of the Board, see Plaintiff's Opp. to MWE Motion, which is incorporated herein by reference.

By early November, 2007, it became obvious that Houlihan's efforts would not yield a buyer in a change of control transaction who valued the Company at more than its debt.[50]  It was also clear that, although Lee Morgan wanted to construct a deal that would keep he or Asha in control, Lee had no financing source and was either not willing or not able to put his own money into a deal.[51]  The directors and officers concealed from employees and ESOP Noteholders the information it had gained through this process – specifically hiding that the market placed a zero valuation on the Company's equity.

While it was obvious sales had been in decline since the 2003 Transaction, the true extent of the Company's financial issues was hidden from employees.  For example, each spring, Prairie Capital would provide a value of the ESOP as of December 31 of the previous year.[52]  However, in 2008, as a result of the Company's financial difficulties, its auditors were unable to issue an audit opinion of the Company's 2007 financials without a qualification as to the

---

[47] Dep. Ex. 214, Appendix Ex. 53.
[48] Dep. Ex. 687, Appendix Ex. 102.
[49] Dep. Ex. 617, Appendix Ex. 97; Dep. Ex. 208, Appendix Ex. 51.
[50] Dep. Ex. 183, Appendix Ex. 49; Dep. Ex. 472, Appendix Ex. 77; Dep. Ex. 614 at 31-36, Appendix Ex. 96.
[51] Dep. Ex. 475, Appendix Ex. 78; Dep. Ex. 455, Appendix Ex. 75; Dep. Ex. 614, Appendix Ex. 96.
[52] Deposition of Kenneth Lenoir ("Dep. Lenoir") 85-88, Nov. 14, 2012, Appendix Ex. 13.

Company's ability to continue as a going concern.[53] The Company and the ESOP Trustee then failed to obtain a formal valuation from Prairie Capital of the fair value of the Company shares held by the ESOP as of December 31, 2007.[54] However, Ken Lenoir, an Evolve representative and ESOP trustee, had received a letter from Prairie Capital in Spring or Summer 2008 indicating that the ESOP had no value.[55] The Board and the Company were aware that the shares were valueless no later than February 13, 2008, but never shared this information with current or former ESOP Participants.[56] ESOP shareholders were left unaware that their shares were valueless until the bankruptcy filing in November 2008.

### iii. Further deception related to Condor

As noted, Condor Ins. was insolvent and entered into bankruptcy proceedings in May 2007 and Bevelhymer, Felix, and Lipson-Wilson became aware that Condor Ins. was insolvent shortly thereafter. Despite this knowledge, the Company continued contracting with Condor Guaranty, Ltd. to provide security for the fourth round of ESOP Notes.[57] The full Board of Directors, along with MWE, became aware of Condor Ins.'s insolvency before January 31, 2008.[58] Yet, this information was never provided to the ESOP Noteholders, and no action was taken to seek a new surety for the ESOP Notes.

As described in Plaintiff's Opp. to MWE Motion, by the summer of 2008, the Company had undergone dramatic changes and was suffering from immense financial trouble.[59] The

---

[53] Letter from Larson Allen, Ap. 22, 2008. *See* Affidavit of Marcia Voorhis Andrew, Appendix Ex. 110.
[54] Dep. Ex. 751, Appendix Ex. 107.
[55] Dep. Lenoir 85-88, Appendix Ex. 13.
[56] Dep. Ex. 431, Appendix Ex. 72. As late as September 21, 2008, members of the ESOP were desperately asking the Trustee for information about the value of their shares. Dep. Ex. 748, Appendix Ex. 106; Dep. Ex. 751, Appendix Ex. 107.
[57] Dep. Bevelhymer 118-20, Appendix Ex. 3.
[58] Dep. Bevelhymer 119-20, Appendix Ex. 3; Dep. Ex. 190, Appendix Ex. 50.
[59] Dep. Ex. 309.

majority of the Board of Directors had been fired in June and the Company was insolvent.[60]  Due to its financial situation, by July 2008, Company management and the new board of directors (now consisting of Lee, Asha, and G. Robert Morris) knew the Company could not make ESOP Note payments due on August 1, 2008.[61]  With the first missed payment, and knowing full well that Condor Guaranty, Ltd. would not and could not pay, the Company defaulted on the ESOP Note payments and made a claim with Condor under the guaranty and surety agreement.[62]

In the meantime, Company officers and directors continued to deliberately mislead ESOP Noteholders.  In four separate letters dated August 6, 2008, September 2, 2008, October 2, 2008, and November 1, 2008 and sent to the holders of the ESOP Notes, Asha misrepresented that because Antioch was in "technical default" under its secured credit agreement, Bank of America, N.A. ("BOA"), its senior secured lender, would not allow Antioch to make the payments due on the ESOP Notes.[63]

The Defendants were in fact misleading the ESOP Noteholders about the reason for non-payment in order to keep the Company's dire financial situation, and Condor's insolvency, secret from the employee-owners.[64]  The Defendants did not want ESOP Noteholders to know the truth – that Antioch simply had insufficient cash to pay the ESOP Notes and the Condor "guarantee" was worthless.[65]  Although Asha knew that Condor failed to make the August 2008 payment within 30 days of the claim as required, and that Condor Ins. was insolvent, her September, October, and November letters repeated the assurance that Condor had guaranteed the Notes.[66]

---

[60] *Id.*
[61] Dep. Ex. 591, Appendix Ex. 89.
[62] Deposition of Asha Morgan Moran ("Dep. Moran II") 32-36, Apr. 10, 2012, Appendix Ex. 18.
[63] Dep. Ex. 311, Appendix Ex. 64; Dep. Ex. 312, Appendix Ex. 65; Dep. Ex. 593, Appendix Ex. 90; Dep. Ex. 313, Appendix Ex. 66.
[64] Dep. Ex. 202.
[65] *Id.*
[66] Dep. Ex. 311, Appendix Ex. 64; Dep. Ex. 312, Appendix Ex. 65; Dep. Ex. 593, Appendix Ex. 90; Dep. Ex. 313, Appendix Ex. 66.

Each letter assured the Noteholders that the Company was financially strong and that they were protected by the Condor Guaranties, even as late as November 1, 2008 – twelve days before the Company filed its bankruptcy petition and a prepackaged plan of reorganization that provided for no distributions to the holders of the ESOP Notes.[67]

Rather than take appropriate action, the Defendants' took steps to hide the Condor situation as long as possible. Hoskins' inability to find a financially responsible guarantor for the ESOP Notes in 2004, or otherwise collateralize those Notes with Company assets, was the canary in the coal mine that would have signaled much more serious financial issues. However, due to the Defendants' misrepresentations regarding the Company's financial despair, and the further misrepresentations regarding Condor's inability to honor its guaranty of the ESOP Notes, any and all interested stakeholders were deceived as to the dire reality of the situation.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is only proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a) (emphasis added). When deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).

## V. LAW AND ARGUMENT

While recognizing that statutes of limitations serve an important gate-keeping function, the Supreme Court of Ohio has long held that "statutes of limitations are remedial in nature and are to be given a liberal construction to permit cases to be decided upon their merits, after a court

---

[67] *Id.*

indulges every reasonable presumption and resolves all doubts in favor of giving, rather than denying, the plaintiff an opportunity to litigate." *Flagstar Bank, F.S.B. v. Airline Union's Mortgage Co.*, 128 Ohio St. 3d 529, 531, 947 N.E.2d 672 (2011). Plaintiff agrees with Defendants that the four-year statute of limitations in Ohio Rev. Code ("ORC") § 2305.09(D) applies to this case, and that Plaintiff's cause of action for breach of fiduciary duty accrued on December 16, 2003, "when his interest [was] impaired" by the 2003 Transaction. *Jim Brown Chevrolet, Inc. v. S.R. Snodgrass, A.C.*, 141 Ohio App. 3d 583, 587, 752 N.E.2d 335 (App. Ct. 2001). Over the next four-plus years, however, Defendants avoided any accountability for their actions by dominating the Company and actively misleading other stakeholders in an effort to avoid any lawsuits that may expose their wrongdoing. This Court should therefore apply the doctrines of adverse domination and equitable tolling to stop the statute of limitations during these years, and should determine that the limitations period had not expired as of November 13, 2008, when the Company filed for bankruptcy.[68]

When making determinations concerning substantive state law, federal courts are bound by decisions of the state's highest court, "unless that court would overrule its decisions on similar facts." *Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 624 (6th Cir. 2008). When the state's highest court has not spoken on an issue, a federal court must make the "best prediction, even in the absence of direct state precedent, of what the [state's highest court] would do if confronted with [the] question." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004); *see also Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1983), *overruled on other*

---

[68] Pursuant to 11 U.S.C. § 108(a), the Company's bankruptcy filing automatically tolled the time to file this action. "If applicable nonbankruptcy law...fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of (1) the end of such period...or (2) two years after the order for relief." *Id.* Because of the Company's bankruptcy filing, the statute of limitations was tolled to November 13, 2010, making the commencement of this action timely.

*grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009). In making this prediction, the federal court "may rely upon analogous cases and relevant dicta in the decisional law of the State's highest court, opinions of the State's intermediate appellate courts to the extent that they are persuasive indicia of State Supreme Court direction, and persuasive opinions from other jurisdictions, including the 'majority rule.'" *Welsh*, 844 F.2d at 1245. [69] Although the Supreme Court of Ohio has not ruled on the doctrine of adverse domination, it would recognize the doctrine under the facts of this case because its underlying policies are wholly consistent with Ohio law, and because the vast majority of jurisdictions have accepted it. But even if this Court does not adopt adverse domination, the Supreme Court and other Ohio courts have already recognized and applied the doctrine of equitable tolling, and this Court should apply it to prevent the inequitable use of the statute of limitations in this case.

### A. ORC § 2305.09 does not preclude the doctrines of equitable tolling and adverse domination.

"It is hornbook law that limitations periods are 'customarily subject to equitable tolling.'" *Byers v. Robinson*, No. 08AP-204, 2008 WL 4328189, at *13 (Ohio App. Sept. 23, 2008) (citing *Young v. United States*, 535 U.S. 43, 49-50 (2002)). "In equitable matters, the court has considerable discretion in attempting to fashion a fair and just remedy…It has the power to fashion any remedy necessary and appropriate to do justice in a particular case." *Id.* at *14 (citing *McDonald & Co. Sec., Inc., Gradison Div. v. Alzheimer's Disease & Related Disorders*

---

[69] The decision in *Fish v. Greatbanc Trust Company*, Case No. 09-cv-01668, 2012 U.S. Dist. LEXIS 129699 (N.D. Ill. Sept. 12, 2012) has no persuasive authority whatsoever to the issue before this Court, for several reasons: (1) that case involved different claims governed by a different statute of limitations; (2) discovery in that case had been limited to the statute of limitations issue, and perhaps because plaintiffs had not had the opportunity to conduct discovery on the merits, they did not argue for the application of the doctrines of adverse domination or equitable tolling or discuss the misrepresentations and concealments by the Defendants that justify tolling the statute of limitations; (3) the plaintiffs in that case were denied an opportunity to fully brief the motion for summary judgment on statute of limitations grounds; and (4) the Illinois district court may have erred in substituting a "willful blindness" standard in place of the statutory requirement of "actual knowledge." *See* Brief of Plaintiffs-Appellants on appeal to the U.S. Court of Appeals for the Seventh Circuit (January 22, 2013), Appendix Ex. 112.

*Assn., Inc.*, 140 Ohio App. 3d 358, 366, 747 N.E.2d 843 (App. Ct. 2000)).  Accordingly, the Ohio Supreme Court and several Ohio appellate courts regularly apply equitable tolling principles to statutes of limitations under Ohio law.  *See, e.g., Wilson v. Brush Wellman, Inc.*, 103 Ohio St. 3d 538, 551-52, 817 N.E.2d 59 (2004) (recognizing that equitable tolling can overcome a statute of limitations defense); *Collins v. Sotka*, 81 Ohio St. 3d 506, 692 N.E.2d 581 (1998) (creating an equitable discovery rule despite strict language in the wrongful death statute of limitations); *In re Regency Village Certificate of Need Application*, No. 11AP-41, 2011 WL 4541358, at *8 (Ohio App. Sept. 30, 2011) (recognizing the "use of equitable tolling to stop the clock on a statutory look-back period"); *Byers*, 2008 WL 4328189 (recognizing application of equitable tolling for period of time during which attorney was incapacitated); *State v. Barker*, No. 21438, 2007 WL 2568352 (Ohio App. Sept. 7, 2007) (applying equitable tolling to a criminal statute of limitations); *Crego v. Baldwin-Lima-Hamilton Corp.*, No. 16515, 1998 WL 80240, at *1 (Ohio App. Feb. 27, 1998) (recognizing equitable tolling of the product liability statute of limitations).

In spite of the clear affirmation of this Court's equitable powers, the Outside Director Defendants wrongly argue that ORC § 2305.09 forbids the Court from even considering equitable doctrines such as adverse domination or equitable tolling.  Specifically, Defendants argue that equitable tolling is precluded because ORC § 2305.09 does not contain an explicit "discovery rule" for breach of fiduciary duty claims, [Doc. No. 100 at 1-2, 13-18], claiming their "extensive research" shows that no Ohio court has applied equitable tolling to ORC § 2305.09. [Doc. No. 100 at 25.]  Defendants apparently missed *Wuliger v. Star Bank*, which <u>expressly</u> applied equitable tolling under ORC § 2305.09 to stop the statute of limitations on a breach of fiduciary duty claim.  No. 3:02 CV 1513, 2008 WL 2323887, at *4 (N.D. Ohio June 4, 2008)

(holding that "Ohio recognizes that the doctrine of equitable tolling may be used to avoid the inequitable use of the statute of limitations"). Moreover, other Ohio courts implicitly recognize that equitable tolling is applicable to breach of fiduciary duty claims under ORC § 2305.09. *See, e.g., Jacobson-Kirsch v. Poulos*, No. 26102, 2012 WL 3201697, at *3 (Ohio App. Aug. 8, 2012) (analyzing equitable tolling for a breach of fiduciary duty claim under ORC § 2305.09, but concluding that even if tolling were applied, the plaintiff's claims were time-barred).

Because this Court has the inherent power to employ equitable doctrines, Defendants' reliance on four Supreme Court cases that address the so-called "discovery rule" under ORC § 2305.09 is fundamentally misplaced. *See Investors REIT One v Jacobs*, 46 Ohio St. 3d 176, 546 N.E.2d 206 (1989); *Cundall v. U.S. Bank*, 122 Ohio St. 3d 188, 909 N.E.2d 1244 (2009); *Pratte v. Stewart*, 125 Ohio St. 3d 473, 929 N.E.2d 415 (2010); *Flagstar Bank, F.S.B. v. Airline Union's Mortgage. Co.*, 128 Ohio St. 3d 529, 947 N.E.2d 672 (2011). In those cases, the Supreme Court simply enforced the legislature's creation of a limited discovery rule, which otherwise prevents a cause of action from accruing (i.e. the clock never starts running), but never addressed the equitable doctrines at issue in the present case. *See Investors REIT One*, 46 Ohio St. 3d at 179 ("The issue presented for our consideration…queries whether the discovery rule is available to extend the governing statute of limitations."); *Cundall*, 122 Ohio St. 3d at 193-94 (holding that the statute of limitations "begins to run" when the claimant has knowledge of the wrongdoing); *Pratte*, 125 Ohio St. 3d at 484 (holding that the Court's previously created equitable "discovery rule" had been abrogated by the legislature's "unambiguous enactment");[70] *Flagstar Bank*, 128 Ohio St. 3d at 533 (declining to recognize a "delayed damages" rule under

---

[70] As Bankruptcy Judge Humphrey astutely recognized, the *Pratte* decision did not establish "any law in Ohio...other than the very specific and limited principles concerning the statute of limitation for childhood sexual abuse claims." Recommendations for the United States District Court for the Southern District of Ohio to Deny in Part and Grant in Part Various Defendants' Motions to Dismiss Certain Non-Core Causes of Action ("R&R") 82 n.31 [Doc. No. 6].

ORC § 2305.09 because "[b]oth the discovery rule and the delayed damages-damages rule relate to when a cause of action <u>accrues</u>") (emphasis added).

Plaintiff is not urging this Court to apply a discovery rule, delayed damages rule, or any other rule affecting when its claims from the 2003 Transaction <u>accrued</u>. Instead, Plaintiff merely asks the Court to use its equitable powers to stop – or "toll" – the running of the statue of limitations during a period in which extremely inequitable circumstances existed. *See Regency Village*, 2011 WL 4541358, at *8 (explaining that the equitable tolling doctrine "does not expand the limitations period beyond its statutorily mandated boundaries; it, instead, merely halts the limitations clock from ticking during the tolling period"). Plaintiff understands that ORC § 2305.09 may limit the discovery rule, but nothing in Ohio law precludes this Court from exercising its inherent equitable powers to toll the statute of limitations in this case. To the contrary, Ohio law clearly permits equitable exceptions to the four-year statute of limitations set forth in ORC § 2305.09, and the logic of *Investors REIT One*, *Cundall*, *Pratte*, and *Flagstar Bank* are simply inapplicable to the present case. Given the extremely inequitable circumstances presented in this case, the Court should find that the statute of limitations was tolled pursuant to the doctrines of adverse domination and equitable tolling.

### B. The statute of limitations on Plaintiff's claims should be tolled under the doctrine of "adverse domination."

The doctrine of adverse domination permits a Court to toll the statute of limitations for claims against directors and officers of a corporation "for so long as the corporation is controlled by those acting against its interests." *Clark v. Milam*, 192 W.Va. 398, 402, 452 S.E.2d 714 (1994).

This is reasonable since "control of the association by culpable directors and officers precludes the possibility of filing suit because these individuals can hardly be expected to sue themselves or to initiate any action contrary to their own interests."

*Resolution Trust Corp. v. Bernard*, No. 94-CV-475, 1995 WL 17164886, at *6 (M.D.N.C. Aug. 8, 1995) (quoting *Resolution Trust Corp v. Hecht*, 333 Md. 324, 339, 635 A.2d 394 (1994)). Although the Ohio Supreme Court has not yet addressed this issue, it would accept and apply the doctrine in this case based on the inequitable facts present, the doctrine's acceptance by a clear majority of states, and the doctrine's direct relationship with relevant Ohio public policy. *See Welsh*, 844 F.2d at 1245. Plaintiff recognizes that one Ohio Appellate Court – the Eighth District – has previously declined to apply adverse domination, *see Chinese Merchants Ass'n v. Chin*, 159 Ohio App. 3d 292, 823 N.E.2d 900 (App. Ct. 2004); *Squire v. Guardian Trust Co.*, 79 Ohio App. 371, 72 N.E.2d 137 (App. Ct. 1947), but in neither of those cases had the defendant avoided a "timely" lawsuit by actively concealing prior wrongdoing. By contrast, Defendants in this action avoided earlier litigation by using their control over the Company to conceal their wrongdoing through active misrepresentations to the non-insider parties following the 2003 Transaction. Accordingly, this Court can freely apply adverse domination – and need not defer to *Chinese Merchants* and *Squire*. *See Bailey v. V&O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985) (holding that a federal court applying state law "is not bound by lower court determinations if convinced by other data that the state's highest court would determine otherwise").

  i.  The majority of states recognize the doctrine of "adverse domination" as applied to claims like Plaintiff's.

For decades, Courts have recognized adverse domination due to the common-sense practicality that self-interested "officers and directors who have harmed the entity cannot be expected to take legal action against themselves." *Freeland v. Enodis Corp.*, 540 F.3d 721, 741 (7th Cir. 2008); *see also Hecht*, 333 Md. at 346 ("In an adverse domination situation the agent

cannot reasonably be expected to act upon or communicate knowledge of his own wrongdoing to the corporation.").  As Judge Humphrey previously noted in his Recommendations regarding the Defendants' Motions to Dismiss:

> The crux of adverse domination is that the individuals who are in the position of bringing the claims are ill-suited from a motivational, ethical, and practical perspective to bring such claims due to their needing to take adverse action against themselves or actions attacking their own decisions, actions, or transactions.  Those individuals, and the corporation which they control, are in effect incapacitated from bringing the claims.

[Doc. No. 6 at 88.]  Adverse domination acknowledges the reality that "defendants' control of the corporation will make it impossible for the corporate plaintiff independently to acquire the knowledge and resources necessary to bring suit." *Hecht*, 333 Md. at 346.  By tolling the statute of limitations until "the appropriate parties [are] in a position to assert claims against the wrongdoers," [Doc. No. 6 at 88], the doctrine of adverse domination thus prevents self-dealing insiders "from benefiting from their lack of action on behalf of the corporation." *Wilson v. Paine*, 288 S.W.3d 284, 288 (Ky. 2009) (quoting *Hecht*, 333 Md. at 351).

The doctrine of adverse domination is "the law in the majority of the states which have considered the issue."  *Resolution Trust Corp. v. Grant*, 901 P.2d 807, 812 (Okla. 1995).  At least 23 states recognize adverse domination, either expressly or by referring to the doctrine by another name.[71]  In at least 10 of these cases, a <u>federal court</u> first recognized the doctrine under

---

[71] *Greenleaf v. Profile Cotton Mills*, 235 Ala. 530, 180 So. 582 (1938); *In re Am. Cont'l Corp.*, 794 F.Supp. 1424, 1453 (D. Ariz. 1992) (California law); *FDIC v. Gonzalez-Gorrondona*, 833 F.Supp. 1545 (S.D. Fla. 1993); *Robert P. Butts & Co. v. Estate of Butts*, 119 Ill. App. 2d 242, 255 N.E.2d 622 (1970); *Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer*, 840 F.Supp. 1270 (N.D. Ind. 1993); *Resolution Trust Corp. v. Scaletty*, 257 Kan. 348, 891 P.2d 1110 (1995); *Wilson v. Paine*, 288 S.W.3d 284 (Ky. 2009); *Bates Street Shirt Co. v. Waite*, 130 Me. 352, 156 A. 293 (1931); *Hecht*, 333 Md. 324; *Greenfield Sav. Bank v. Abercrombie*, 211 Mass. 252, 97 N.E. 897 (1912); *Ventress v. Wallace*, 111 Miss. 357, 71 So. 636 (1916); *FDIC v. Carlson*, 698 F.Supp. 178 (D.Minn. 1988); *Resolution Trust Corp. v. Fiala*, 870 F.Supp. 962 (E.D. Mo. 1994); *Michelsen v. Penney*, 135 F.2d 409 (2d Cir. 1943) (New York); *Bernard*, 1995 WL 17164886 (M.D.N.C. Aug. 8, 1995); *Resolution Trust Corp. v. Grant*, 901 P.2d 807 (Okla. 1995); *Resolution Trust Corp. v. Smith*, 872 F.Supp. 805 (D. Or. 1995); *In re O.E.M./Erie, Inc.*, 405 B.R. 779 (W.D. Pa. 2009); *Smith v. Lyle*, 59 S.D. 534, 241 N.W. 512 (1932); *FDIC v. Berry*, 659 F.Supp. 1475 (E.D. Tenn. 1987); *Allen v. Wilkerson*, 396 S.W.2d 493 (Tex. App. 1965); *United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880 (Utah 1993); *Clark*, 192 W.Va. 398.

state law, by presuming that the state high court would do the same.[72]  And one federal court –

the Northern District of Indiana – recognized adverse domination in spite of unfavorable

precedent from a lower Indiana court that had refused to adopt the doctrine of "presidential

domination." *O'Bear, Overholser, Smith & Huffer*, 840 F.Supp. at 1284-85 (holding that the

Indiana Supreme Court, "faced with the facts in this case, would apply the adverse domination

doctrine to toll the statute of limitations until the board was no longer dominated by the

defendants in this lawsuit").

> ii.  The Supreme Court of Ohio would apply the doctrine of "adverse
> domination" to toll the statute of limitations on Plaintiff's claims.

Ohio courts have long valued the policy behind adverse domination, and have denied

timeliness defenses where it was the defendant who was responsible for the expiration of the

relevant timeframe after a wrongful transaction.[73]  *See, e.g., Apicella v. PAF Corp.*, 17 Ohio

App. 3d 245, 248, 479 N.E.2d 315 (App. Ct. 1984) (refusing to apply the doctrine of laches to

bar a plaintiff's breach of fiduciary duty claims against corporate directors).  In *Apicella*, the

plaintiff was a corporate director who had previously assented to conflicted transactions of the

board, but later dissented and sued the other directors for actions that had given the defendant

directors personal benefit "to the detriment of [the corporation] and its shareholders."  *Id.* at 246,

248.  The defendant directors sought to bar plaintiff's claims on the grounds that he failed to

object when the directors first began engaging in the conflicted transactions, but the court denied

the defense and found the directors liable, noting:

---

[72] *See In re O.E.M./Erie, Inc.*, 405 B.R. 779, 786 (W.D. Pa. 2009); *Bernard*, 1995 U.S. Dist. LEXIS 12819, at *19 (M.D.N.C. Aug. 8, 1995); *Resolution Trust Corp. v. Smith*, 872 F.Supp. 805, 814 (D. Or. 1995); *Resolution Trust Corp. v. Fiala*, 870 F.Supp. 962, 974 (E.D. Mo. 1994); *FDIC v. Gonzalez-Gorrondona*, 833 F.Supp. 1545, 1557 (S.D. Fla. 1993); *Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer*, 840 F.Supp. 1270, 1284 (N.D. Ind. 1993); *FDIC v. Carlson*, 698 F.Supp. 178, 180 (D.Minn. 1988); *FDIC v. Hudson*, 673 F.Supp. 1039, 1043 (D. Kan. 1987); *FDIC v. Berry*, 659 F.Supp. 1475, 1486 (E.D. Tenn. 1987); *Williams*, 599 F.Supp. at 1194 (D. Md. 1984).
[73] Judge Humphrey keenly recognized that "[t]he doctrine of adverse domination is consistent with Ohio corporate and agency law."). R&R at 89 [Doc. No. 6].

> Otherwise, this court would be condoning and encouraging catatonic boards of directors, the failure to recognize and dissent to wrongdoing, and continuing harms to corporations. We cannot permit such inequitable results.

*Id.* at 248.

In this case, Defendants used their control of the Company post-2003 Transaction to avoid any claims, by continuing their misrepresentations regarding the health of the Company, the value of the ESOP shareholders' stock, and even the value of the notes paid to departing shareholders. Based on these facts, the Supreme Court would apply adverse domination against Defendants. This is even more certain because Antioch was a closely-held corporation,[74] to which the Supreme Court applies "a heightened fiduciary duty between majority and minority shareholders." *Id.* at 108 (noting that "the close corporation structure gives majority or controlling shareholders opportunities to oppress minority shareholders").

Based on Ohio's longstanding policy to hold directors of a close corporation to a heightened standard and to deny those directors a time-based shield to hide from their own misdeeds, and based on highly persuasive authority from the vast majority of other states that have considered the doctrine, the Supreme Court of Ohio would recognize adverse domination. *See Welsh*, 844 F.2d at 1245 (holding that a federal court applying state law may rely upon "persuasive opinions from other jurisdictions, including the 'majority rule'"). Furthermore, given the Defendants' blatant misconduct and affirmative misrepresentations in this case, the Court should apply adverse domination to toll the statute of limitations, and therefore deny Defendants' request for summary judgment based on the statute of limitations. To do otherwise would "condon[e] and encourage[e] catatonic boards of directors, the failure to recognize and dissent to wrongdoing, and continuing harms to corporations." *Apicella*, 17 Ohio App. 3d at 248.

---

[74] "[A] close corporation is a corporation with a few shareholders and whose corporate shares are not generally traded on a securities market." *Crosby v. Beam*, 47 Ohio St. 3d 105, 107, 548 N.E.2d 217 (1989).

iii.    The *Squire* and *Chinese Merchants* cases are inapplicable to Plaintiff's claims against Defendants.

Defendants' argument regarding adverse domination boils down to this faulty contention: because the Eighth District Court of Appeals has twice declined to apply adverse domination to the particular facts of those two cases, the Supreme Court of Ohio would categorically reject adverse domination in the present action.  A careful analysis, however, reveals that the *Squire* and *Chinese Merchants* cases involved mere passive concealment of the defendants' prior acts, and therefore did not trigger the generally-accepted requirement of active concealment or misrepresentation.  *See FDIC v. Dawson*, 4 F.3d 1303, 1312 (5th Cir. 1993) (limiting adverse domination "to those cases in which the culpable directors have been active participants in wrongdoing or fraud, rather than simply negligent").  In the present action, by contrast, Defendants' active misrepresentations led to the limitations period expiring before any non-insider was in a position to challenge them.  The present action therefore merits application of the adverse domination doctrine, whereas *Squire* and *Chinese Merchants* did not.

In *Squire*, the Ohio Superintendent of Banks took control of a bank, and in the process of a liquidation, asserted various claims against the bank's former directors on behalf of the bank, shareholders, depositors, and other creditors.  79 Ohio App. at 379.  In deciding whether the Superintendent's claims were barred by the statute of limitations, the court considered tolling the statute under "the doctrine of continuing dominion," by which "some courts hold that the limitation runs only from the time when the wrongdoing directors relinquish their control" over the company.  *Id*. at 386.  The *Squire* court declined to apply the doctrine, since the Superintendent had not alleged that the directors engaged in fraud or affirmative misrepresentations to hide their alleged prior wrongs.  *See id*. at 384, 385, 386, 389, and syllabus (noting – on five separate occasions – that the directors were only accused of "mere

concealment" by "failing to negative the effects of the original tort").  The court highlighted a critical distinction, however, by emphasizing that statutes of limitations may be tolled if "concealment or undiscovered fraud on the part of the defendant is found to exist." *Id.* at 384 (quoting *State ex rel Lien v. House*, 144 Ohio St. 238, 247, 58 N.E.2d 675 (1944)).

Likewise, in *Chinese Merchants*, the plaintiff sued a law firm alleging legal malpractice for alleged conflicts of interests in real estate transactions. 159 Ohio App. 3d at 294.  The statute of limitations had expired before the plaintiff filed its claims, and the plaintiff made no allegation that the defendant law firm had engaged in any continuing deceit or misrepresentations in order to conceal its prior alleged malpractice.  To the contrary, the *Chinese Merchants* court found that the plaintiff was all along aware of the potential conflict of interests that led to its claims. *Id.* at 296.  Under those facts, the Court declined to adopt "the doctrine of adverse domination" to toll the statute of limitations. *Id.* at 297.

In contrast to *Squire* and *Chinese Merchants*, and as discussed in more detail previously, Defendants in the present action engaged in a series of affirmative actions to misrepresent the value of the ESOP shareholders' property following the 2003 Transaction.  These misrepresentations in turn deceived the non-insider parties into believing their shares and notes constituted a valuable asset, thereby preventing the non-insiders from bringing any claims before the limitations period expired.  Accordingly, *Squire* and *Chinese Merchants* are inapposite to Plaintiff's claims in this case and therefore are not persuasive indicia of whether the Supreme Court of Ohio would accept and apply adverse domination under the extremely inequitable circumstances presented in this case.[75]

---

[75] Defendants also incorrectly claim as binding "law of the case" Judge Humphrey's previous *dicta* which noted that Ohio courts have not applied the doctrine. [Doc. No. 96 at 6; Doc. No. 100 at 8, 26.]  That statement is not the "law of the case," because the Recommendations – and Court's ruling adopting them – represented an interlocutory, rather than final, order.  Ohio law is well-settled that the law of the case doctrine requires adherence only to a final,

## C.  The statute of limitations on Plaintiff's claims should be tolled under the doctrines of equitable tolling and equitable estoppel.

As discussed earlier, Ohio courts have consistently recognized that – distinct from the discovery rule – "the doctrine of equitable tolling may be used to avoid the inequitable use of the statute of limitations." *Wuliger*, 2008 WL 2323887, at *4.  Although the Supreme Court of Ohio has not defined the outer parameters of the equitable tolling doctrine, *see Bridge v. Ocwen Fed. Bank FSB*, No. 1:07-CV-02739, 2013 WL 331095, at *12 (N.D. Ohio Jan. 29, 2013), the facts of this case militate in favor of its application.  First, the Supreme Court would equitably toll the statute of limitations because no disinterested party had the opportunity to bring this action within the limitations period.  Second, even if – as Defendants argue – the Supreme Court would limit equitable tolling to cases of "fraudulent concealment" or "misrepresentation," the Court would still equitably toll the statute in this case because Defendants' constant and active misrepresentations following the 2003 Transaction perfectly satisfy this standard.

Although they are technically distinct, the doctrines of "equitable tolling" and "equitable estoppel" are often confused with each other. *See Easterly v. Budd*, No. 4:06 CV 00186, 2006 WL 2404143, at *9-10 (N.D. Ohio Aug. 18, 2006) ("Equitable tolling applies where there lacks any allegation of impropriety on the defendant's part, while equitable estoppel (otherwise referred to as fraudulent concealment) applies exclusively in situations where demonstrated egregious wrongdoing by a defendant prevents a plaintiff from bringing suit on a claim of which plaintiff is aware.").  Some Ohio courts, on which Defendants rely, have conflated the doctrines

---

appealable order of a trial or appellate court, because a court is always free under Civ.R. 54(B) to revisit its previous interlocutory rulings.  *See Creaturo v. Duko*, No. 04 CO 1, 2005 WL 678513, at *4 (App. Ct. March 14, 2005) (holding that a ruling on a motion to dismiss was not "law of the case" for purposes of a later motion for summary judgment).[75]  Additionally, Ohio law is clear that "[d]icta is not authoritative, and, by definition, cannot be the binding law of the case," because the doctrine applies only to the essential holding of a court's final decision.  *See Gissiner v. Cincinnati*, No. C-070536, 2008 WL 2550755, at *3 (App. Ct. June 27, 2008).  The only "essential holding" of the Court's prior rulings was that any determination on tolling the statute of limitations "is a factual matter," and therefore any comments on adverse domination were simply *dicta*.  [Doc. No. 26 at 5.]

by stating that equitable tolling is premised on fraudulent concealment, misrepresentation, or promise of a better settlement offer.  [Doc. 100 at 21.]  Other Ohio courts have been more precise, distinguishing the misrepresentations required for equitable estoppel from the broader circumstances in which equitable tolling may be applied.  *See, e.g., Regency Village*, 2011 WL 4541358, at *9 (holding that equitable tolling was available where the plaintiff has been diligently pursuing his rights, but some extraordinary circumstance stood in his way).  Given the facts of this case, both theories are applicable and should be adopted to toll the statute of limitations.

> i.   The Company stakeholders' inability to bring an earlier action
>       warrants application of equitable tolling.

Courts can apply equitable tolling wherever justice requires, and "[e]quitable tolling is thus determined on a case-by-case basis." *Brown v. Ohio Dept. of Job & Family Servs.*, No. 08AP-239, 2008 WL 5197157, *4 (Ohio App. Dec. 11, 2008).  Contrary to Defendants' claims, numerous Ohio courts have applied equitable tolling in circumstances other than fraudulent concealment, misrepresentation, or promises of a better settlement offer.  *See, e.g., Collins*, 81 Ohio St. 3d 506; *Wasyk v. Trent*, 174 Ohio St. 525, 191 N.E.2d 58 (1963); *Crego*, 1998 WL 80240; *Barker*, 2007 WL 2568352; *Wuliger*, 2008 WL 2323887.  Based on these cases, the Supreme Court of Ohio would apply equitable tolling to remedy the extraordinarily inequitable circumstances in this case.

In *Wasyk*, the Supreme Court used its equitable powers to salvage a claim that was technically subject to the statute of limitations.  174 Ohio St. 525.  The plaintiff filed an Ohio state court action after an earlier federal action had been dismissed for lack of diversity jurisdiction, but the statute of limitations had expired in the intervening time before the state-court complaint was filed.  *Id.* at 526.  In order to "permit the decision of cases upon their merits

rather than upon mere technicalities of procedure," the Court implemented a "liberal construction" of Ohio's savings statute (ORC § 2305.19) and allowed the claim to survive. *Id.* at 528-29. Applying these same equitable principles, the Supreme Court in *Collins* created an equitable discovery rule to Ohio's wrongful death statute. *See* 81 Ohio St. 3d at 510 ("It is illogical to penalize the victim's survivors, who have already suffered a great loss, by shortening or extinguishing the time in which they may bring a wrongful death lawsuit. To do so merely rewards the criminal defendant.").

Other Ohio courts have followed the Supreme Court and affirmed the judiciary's broad powers to apply equitable tolling. In a case precisely like the present litigation, the *Wuliger* court equitably tolled a breach of fiduciary duty claim where it would have otherwise been barred by the strict terms of ORC § 2305.09. 2008 WL 2323887. The underlying claims in *Wuliger* arose from the *Liberte Capital Group* litigation, which involved an allegedly fraudulent investment scheme. *See Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 547 (6th Cir. 2006). A receiver was appointed and sued several banks for breach of duty of good faith, and the banks argued that the receiver's claims were barred by the statute of limitations. *Wuliger*, 2008 WL 2323887 at *2, 4. Because the receiver did not have access to the bank records until 1999 and was not authorized to pursue claims against the banks until 2002, the court equitably tolled the statute of limitations to prevent injustice. *Id.* at *4.

Similarly, in *Crego*, the court equitably tolled the product liability statute of limitations "in the interest of justice" where the plaintiff conducted a "reasonable and diligent inquiry" but failed to prosecute his claims within the limitations period for "reasons beyond his control." 1998 WL 80240 at *6 (holding that the equitable tolling doctrine does not require a showing of fraudulent concealment or misrepresentation); *see also Barker*, 2007 WL 2568352, at *3

(applying equitable tolling "to prevent [defendant's] own actions from depriving the State of an opportunity to have his competence restored").

The circumstances present in this case are strikingly similar to the circumstances that justified equitable tolling in *Wuliger*, *Crego*, *Barker*, *et al.*, and warrant resolution on the merits rather than dismissal under a rigid application of the statute of limitations. Defendants conceived of, planned, and implemented the 2003 Transaction. After they had "cashed out," the now 100% employee-owners were left with a Company that was balance sheet insolvent, highly leveraged, and failing to meet unrealistic and inflated sales projections. To make matters even more inequitable, the new 100% employee-owners and the Company's creditors, who held all the risk of the company's failure, did not even get a say in the control and management of the company. Instead, Defendants – the directors and officers that received millions of dollars from this transaction – retained all control over the Company and prevented the employee-owners from understanding that the 2003 Transaction sent the Company into a financial free fall. Just as in *Wuliger*, until the Trust was created through the bankruptcy proceeding and the Trustee was assigned the Company's claims and given access to the relevant records, there was no party capable of asserting claims against Defendants. This is not a case in which the Trust simply failed to assert its rights in a timely manner. Instead, this is an exceptional situation where, during the limitations period, no party existed to bring the claims that are now being asserted. Equity therefore requires that the statute of limitations be tolled from the date of the 2003 Transaction until the date when the Trust was assigned the Company's claims.

The Outside Director Defendants seek protection in arguing that, because Defendants had access to the information necessary to assert timely claims against themselves, the Company by definition must have possessed that information as well. [Doc. No. 100 at 27-28.] In essence,

Defendants are asking this Court to hold that since the conflicted, interested, and self-serving directors and officers did not sue themselves, they can never be sued because they were able to keep control for four years after closing the 2003 Transaction.  Such a position is untenable. Based on the policies in its own decisions and the persuasive decisions of other Ohio courts, the Supreme Court of Ohio would clearly apply equitable tolling to the inequitable circumstances presented in this case.  Accordingly, this Court should toll the statute of limitations on Plaintiff's claims related to the 2003 Transaction until the date when the Trust was created.

      ii.    The Defendants' blatant misrepresentations and concealments justify the application of equitable tolling.

Even if this Court finds that equitable tolling is constrained to cases involving fraudulent concealment or misrepresentation, the Court should still toll the statute of limitations based on Defendants' constant barrage of misrepresentations and concealments after the 2003 Transaction. *See Ruch v. State*, No. 03AP-1070, 2004 WL 2893150, at *3 (Ohio App. Dec. 14, 2004) ("To successfully raise a claim of equitable tolling, a party must show a misrepresentation <u>whether made in good faith or not</u> that was calculated to induce a plaintiff to forgo the right to sue…Actual fraud or <u>an intent to deceive is not an essential element</u> of an estoppel to plead the statute of limitations.") (emphasis added) (citing *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991); *Bryant v. Doe*, 50 Ohio App.3d 19, 21 (1988)).

Specifically, Defendants made a number of misrepresentations in a blatant effort to avoid a lawsuit by masking the fact that the 2003 Transaction drove the company to insolvency. Plaintiff has already explained the egregious misrepresentations in the Tender Offer itself, as well as misrepresentations of the board-sanctioned communications team that undertook the task of selling employees on the Transaction.  *See supra* Sections III.C., III.D.  More importantly, however, <u>after the 2003 Transaction</u> Defendants engaged in a lengthy series of

misrepresentations in order to mislead any interested parties from initiating legal action. *See supra* Section III.E.

First, Defendants manipulated the Company's sales figures – thereby inflating the stated value of the ESOP's shares – in an attempt to present a more positive picture of the Company's finances to shareholders, bankers, and other interested parties.[76]  For example, in an email entitled "Asha's Guess," Asha manipulated the Company's financial data, noting intentionally that she in "no way" had confidence that the Company could hit her "forecast."[77]

Second, Defendants kept ESOP shareholders and employees in the dark about the true extent of the Company's financial problems following the 2003 Transaction.[78]  For example, the Company and the ESOP Trustee failed to obtain a valuation of the ESOP's shares for 2007.[79]  In fact, just a few months later – in 2008 – Defendants were made aware of a letter from Prairie Capital indicating that the ESOP had no value.[80]  They avoided a lawsuit, however, by declining to share this information with the ESOP shareholders.[81]

Third, by the summer of 2008, the Company had undergone dramatic changes and was suffering from immense financial trouble.[82]  The majority of the Board of Directors had been fired in June and the Company was insolvent.[83]  Due to its financial situation, by July 2008, Company management and the new board of directors (now consisting of Lee, Asha, and G. Robert Morris) knew the Company could not make ESOP Note payments due on August 1,

---

[76] Dep. Ex. 214, Appendix Ex. 53.
[77] Dep. Ex. 687, Appendix Ex. 102.
[78] Dep. Lenoir 85-88, Appendix Ex.13.
[79] *Id.*
[80] *Id.*
[81] As late as September 21, 2008, members of the ESOP were desperate for information about the value of their shares and asking the Trustee for information.  Dep. Ex. 748, Appendix Ex. 106; Dep. Ex. 751, Appendix Ex. 107.
[82] Dep. Ex. 309.
[83] *Id.*

2008.[84]  With the first missed payment and knowing full well that Condor Guaranty, Ltd. would not and could not pay, the Company notified Condor of the Company's default on the ESOP Notes payments and made a claim under the guaranty and surety agreement for Condor to make the payments on the company's behalf.[85]  While this was happening, company officers and directors continued to deliberately mislead Noteholders about the financial condition of the Company and Condor.  In mid-2007, some Defendants became aware that Condor Insurance was insolvent, and all Defendants learned of that insolvency before January 31, 2008.[86]  They hid this information from the holders of the ESOP Notes, however, and still contracted with Condor Guaranty, Ltd. to provide security for the fourth round of ESOP Notes.[87]  In doing so, Defendants actively concealed information that otherwise could have led to an earlier lawsuit against the Company.

Fourth, in four separate letters sent dated August 6, 2008, September 2, 2008, October 2, 2008, and November 1, 2008 to the holders of the ESOP Notes, Asha told the Noteholders that Antioch was in "technical default" under its secured credit agreement and that Bank of America, N.A. ("BOA"), its senior secured lender, would not allow Antioch to make the payments due on the ESOP Notes.[88]  The officers of the Company were in fact misleading the Noteholders about the reason for non-payment, in order to keep the Company's dire financial situation secret from the employee-owners.[89]  The officers did not want Noteholders or employee-owners to know that

---

[84] Dep. Ex. 591, Appendix Ex. 89.
[85] Dep. Moran II 32-36, Appendix Ex. 18.
[86] Dep. Bevelhymer 119-20, Appendix Ex. 3; Dep. Ex. 190, Appendix Ex. 50 ("will the situation be a surprise to Mgmt. Morgan & Candlewood? "not at all – they are all aware of the situation regarding Condor."); Dep. Lenoir 98-102, Appendix Ex. 13 ("...this was not the first bond surety that I have seen that has been offshore and has been a farce. So we Googled Condor Guaranty and we found out that Condor Guaranty was basically a sham...").
[87] Dep. Bevelhymer 109, Appendix Ex. 3.
[88] Dep. Ex. 311, Appendix Ex. 64; Dep. Ex. 312, Appendix Ex. 65; Dep. Ex. 593, Appendix Ex. 90; Dep. Ex. 313, Appendix Ex. 66.
[89] Dep. Ex. 202.

Antioch simply had insufficient cash to pay the ESOP Notes.[90]  The letters contained other misleading statements.  Although Defendant Asha knew that Condor failed to make the August 2008 payment within thirty days of its claim as required, and that Condor Ins. was insolvent, her September, October, and November letters still assured Noteholders that Condor had guaranteed the Notes.[91]  Each letter assured the Noteholders that the Company was pursuing a sale process, and even as late as November 1, 2008 – twelve days before the Company filed its bankruptcy petition and a prepackaged plan of reorganization that provided for no distributions whatsoever to the Noteholders – Asha assured the Noteholders that Antioch was financially strong and that they were protected by the Condor Guaranties.[92]

In an attempt to avoid the impact of these blatant misrepresentations, the Moving Defendants argue that because the knowledge of the directors and officers is imputed to the Company, equitable tolling is not available because the Company was supposedly aware of all the directors' and officers' misdeeds.  [Doc. No. 100 at 27-28.]  Such a circular and misleading argument has no basis in Ohio law.  *See B-G Leasing Co. v. First Nat'l Bank*, No. H-89-56, 1991 WL 87113, at *5 (Ohio App. May 24, 1991) ("Knowledge of a corporate officer is not ipso facto, the knowledge of the corporation merely because he occupies a corporate office…If knowledge acquired is not within the scope of authority, or if he is acting fraudulently or adversely to the corporation, the corporation is not bound by the knowledge of its officers where the relation of the agent to the subject matter renders it certain that he will not disclose such knowledge."); s*ee also Wilson v. Paine*, 288 S.W.3d 284, 287 (Ky. 2009) ("knowledge is not imputed if the agent is acting in a manner adverse to the interests of the principal.")

---

[90] *Id.*
[91] Dep. Ex. 311, Appendix Ex. 64; Dep. Ex. 312, Appendix Ex. 65; Dep. Ex. 593, Appendix Ex. 90; Dep. Ex. 313, Appendix Ex. 66.
[92] *Id.*

At a minimum, there is a genuine issue of material fact as to whether these misrepresentations are sufficient to justify the application of equitable tolling or equitable estoppel.  Ohio law is clear that the "applicability of the doctrine of equitable estoppel is generally an issue to be determined by the trier of fact."  *Helman v. EPL Prolong, Inc.*, 139 Ohio App. 3d 231, 246, 743 N.E.2d 484 (App. Ct. 2000) (citing *First Fed. S. & L. Assn. of Toledo v. Perry's Landing, Inc.*, 11 Ohio App. 3d 135, 147, 463 N.E.2d 636 (App. Ct. 1983)).  In *Helman*, plaintiffs asserted claims against a company's owners and officers (who were significant shareholders) related to the purchase of "preprimary" shares that were never delivered.  *Id.* at 235-36.  Although the relevant statute of limitations had expired, the plaintiffs asserted that the doctrine of equitable tolling should be applied based on the defendants' repeated assurances that they would receive shares of stock.  *Id.* at 246.  The court held that it was "a question of material fact whether any defendants made fraudulent statements" and "whether such statements induced [plaintiffs] to forgo their rights under the statute of limitations."  *Id.* at 247.  Similarly, it is a question of material fact as to whether the Defendants' repeated misrepresentations in this case had the effect of inducing the Company's stakeholders to forgo or delay any lawsuit related to the 2003 Transaction.  Accordingly, summary judgment is inappropriate and the Motions should be denied.

## VI.  <u>CONCLUSION</u>

The Moving Defendants conceived of, executed, and benefitted from the 2003 Transaction.  They took no action to ensure that any objective, disinterested party protected the Company's interests before, during, or after the transaction.  They repeatedly withheld material facts from stakeholders.  They sabotaged efforts to preserve the assets of the Company and facilitated the Morgan's efforts to retain control of the Company.  Permitting these Moving

Defendants to escape responsibility because of their own failures to act in accordance with their duties to the Company would sanction their wrongful conduct. Accordingly, the statute of limitations for the claims in Count One related to the 2003 Transaction should be tolled under the doctrines of adverse domination and equitable tolling. At a minimum, there is a genuine issue of material fact as to whether the Moving Defendants' misrepresentations following the 2003 Transaction had the effect of preventing stakeholders from bringing claims, and therefore the Motions should be denied.

Respectfully submitted,

/s/ Marcia Voorhis Andrew
Marcia Voorhis Andrew (0040289)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 381-2838 Phone
(513) 381-0205 Fax
andrew@taftlaw.com

*Counsel for The Antioch Company Litigation Trust,
W. Timothy Miller, Trustee*

## CERTIFICATE OF SERVICE

I certify that on February 22, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system at the email address registered with the Court.

/s/ Marcia Voorhis Andrew
Marcia Voorhis Andrew