UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THE ANTIOCH COMPANY                  :        Case No. 3:10-cv-156
LITIGATION TRUST,                    :
W. TIMOTHY MILLER, TRUSTEE,          :
                                     :
        Plaintiff,                   :        Judge Timothy S. Black
                                     :
vs.                                  :
                                     :
LEE MORGAN, *et al.*,                :
                                     :
        Defendants.                  :

**ORDER DENYING DEFENDANT MARTY MORAN'S
MOTION FOR SUMMARY JUDGMENT (Doc. 143)**

This civil action is before the Court on Defendant Marty Moran's motion for

summary judgment (Doc. 143) and the parties' responsive memoranda (Docs. 167, 189).

## I.    BACKGROUND FACTS[1]

Defendant Marty Moran moves for summary judgment on Plaintiff's tortious

interference with contract claim regarding a 2007 contract between the Antioch Company

("Antioch") and its financial advisor and investment banker Houlihan Lokey Howard &

Zukin ("Houlihan").  Marty Moran is Asha Morgan Moran's spouse.  (Doc. 111 at 15-

16).  Asha Morgan Moran was both a board member and CEO at Antioch.  (*Id.*)  Her

father, Lee Morgan, is Antioch's former CEO.  (Doc. 90 at 16).  Although Marty Moran

has never worked for Antioch nor acted as a board member of the company, his

---

[1] A full factual background is available at Doc. 6, Section III.

management consulting company, Clear Path, has been retained by Antioch to perform "a number of different projects." (Doc. 111 at 16).

Defendant argues that his motion for summary judgment should be granted for two reasons. First, Defendant claims that the evidence shows that the contract between Antioch and Houlihan was never breached, and thus Plaintiff cannot claim tortious interference with contract, as breach is one of the elements of the claim. (Doc. 143 at 4-6). Second, Defendant argues that there is no evidence to support Plaintiff's contention that Marty Moran interfered with the contract between Antioch and Houlihan. (*Id.* at 6-7). Moreover, Defendant maintains that summary judgment is proper because Plaintiff's tortious interference with contract claim is actually an aiding and abetting claim, which Ohio law does not recognize. (Doc. 189 at 2-5).

Plaintiff responds that summary judgment is inappropriate because there are genuine issues of material fact as to at least three matters: (1) whether the contract between Antioch and Houlihan was breached; (2) whether Marty Moran intentionally interfered with Houlihan's attempts to secure potential purchasers for Antioch; and (3) the extent of Antioch's damages caused by Moran's actions. (Doc. 167 at 12-13).

The relevant portion of the Trust's amended complaint, Count Ten, "Tortious Interference with Business Contracts with Respect to the Sale Process (Defendants Lee and Marty Moran)", reads:

 214. Antioch entered into a contract with Houlihan in 2007 to explore a sale or restructuring of the Company.

 215. Defendants Lee and Marty Moran knew or reasonably should have known of Antioch's contract with Houlihan.

216. Defendants Lee's and Marty Moran's conduct in engaging Candlewood and in disrupting Houlihan's efforts to identify a purchaser for Antioch interfered with that contract.

217. Defendants Lee and Marty Moran knew or reasonably should have known that their conduct interfered with that contract, causing Antioch to suffer damages.

218. Defendants Lee and Marty Moran acted with ill will.

219. Defendants Lee and Marty Moran acted with a conscious disregard for the rights of others and with knowledge that their conduct would cause substantial harm.

220. Defendants Lee and Marty Moran were not justified in their conduct.

221. As a result, Defendants Lee and Marty Moran caused Antioch to suffer damages.

(Doc. 275 at 47-48).

## II.    UNDISPUTED FACTS[2]

1. In early 2007 the Antioch Company's Board of Directors decided to pursue a transaction whereby the Company would either be sold or recapitalized (the "Sale Process"). The Antioch Board established a Special Transaction Committee of the Board, and hired Houlihan Lokey Howard & Zukin as the Board's financial advisor and investment banker to pursue this goal. (Ex. 208, (the "Houlihan Contract"); Blair Dep. 123:5-125:10, 127:11-128:2; Spencer Dep. 31:17-32:1). It is the contract between Houlihan Lokey and the Company that is the subject of Plaintiff's tortious interference claim against Mr. Moran. (*See* Ad. Pro. Doc. 272 (Amended Complaint) at ¶¶ 213-221)).[3]

2. The Houlihan Contract generally required the Company to compensate Houlihan Lokey to promote a potential transaction in the marketplace, and to assist the Committee's evaluation of any potential sale or recapitalization proposal Houlihan could find (or any proposal brought to the Committee

---

[2] *See* Docs. 144 and 168.

[3] The Trust admits to the above facts, but adds that the Special Transaction Committee initially included Lee Morgan and Asha Morgan Moran and other directors who had conflicts due to holding subordinated notes and warrants.

independent of Houlihan Lokey's effort). (Houlihan Contract, Ex. 208 at MWE-0096869; Blair Dep. at 124:5-125:10).[4]

3. The record developed in discovery is devoid of evidence that either party to the Houlihan Contract failed to perform their contractual duties. In fact, Nancy Blair, the chair of the Special Transaction Committee, and Steven Spencer, Houlihan's lead on the Antioch engagement, both testified that the Company and Houlihan performed their duties under the Houlihan Contract. (Spencer Dep. at 267:5-25; Blair Dep. at 618:25-619:9, 625:22-626:2). Moreover, rather than accuse each other of a breach or pursue a claim, the parties amended the Houlihan Contract on January 25, 2008. (Ex. 208; Spencer Dep. at 122:21-123:22).[5]

4. Plaintiff was deputized under Antioch's Plan of Reorganization to investigate and prosecute the Company's pre-petition causes of action. The Litigation Trustee's investigation led him to sue Houlihan Lokey in this case, but for aiding and abetting purported breaches of fiduciary duty only (Counts Two and Seven). Plaintiff did not assert a breach of contract claim against Houlihan Lokey.

5. To assist him [Lee Morgan] with [participating in a transaction with the Company], he engaged Candlewood Partners and its principal Glenn Pollack to serve as his investment advisor. (See Candlewood Engagement Letter, Ex. 232

---

[4] The Trust admits to the above facts, but clarifies that the Company agreed that Houlihan would be its exclusive representative for the Sale Process, that it would not initiate discussions regarding a transaction other than through Houlihan, and that in addition to retainer fees, Houlihan's compensation was tied directly to its ability to bring to the Company a transaction that was approved by the Special Committee. (Dep. Ex. 208). Following the contractual amendment, Houlihan would not receive a success fee for proposals developed by any other party that left the Morgan family in control of the Company. (*Id.*)

[5] The Trust admits that Houlihan made efforts to perform under the terms of the contract but that those efforts were impeded and interfered with by the intentional actions of Marty Moran and Lee Morgan. The Trust states further that it was Lee Morgan, in his role as CEO, who led the Company to breach the exclusive contract with Houlihan by hiring Candlewood, having Candlewood and Marty act on behalf of the Company in marketing it to potential investors, and by using leverage over the Special Committee to pressure it into paying Candlewood's fees. The Trust admits that the Houlihan Contract was amended on January 25, 2008, something Houlihan only agreed to because of its (correct) belief that Candlewood and the Morgans would not be able to put together a viable deal for the Company. The Company abandoned its efforts to perform under the agreement with Houlihan after Lee Morgan and the ESOP trustee replaced the Board of Directors in June, 2008. (Spencer Dep. at 22-24).

("Investor" under the Agreement defined as "Lee Morgan"); Lee Morgan Dep. 336:8-337:10; Nancy Blair Dep. 150:14-25; Pollack Dep. 95:4-23). With Candlewood's assistance, Mr. Morgan (or entities in which he had an interest) presented the Special Transaction Committee with several proposals to buy or recapitalize the Company during the Sale Process. (Pollack Dep. 70:22-71:16; 1-3:15-23). Houlihan Lokey participated in the Special Transaction Committee's evaluation of the Candlewood proposals. (Spencer Dep. 284:11-16).[6]

6. Marty Moran had no contractual or other commercial relationship with Candlewood, nor did he have any ownership or other interest in Candlewood. (Moran Dep. 20:14-24).[7]

7. Marty Moran is Mr. Morgan's son-in-law with an MBA from Northwestern University's Kellogg School of Management. He occasionally provided informal investment advice to Mr. Morgan. Mr. Moran has never been an employee, officer, or director of the Antioch Company. (Moran Dep. at 16:7-11). He had no power to control any of the Company's decisions.[8] (*Id.*)

8. Of the dozens of witnesses deposed in this case, many had never even met him [Marty Moran] and certainly not one could identify any conduct by Mr. Moran that any witness thought was wrongful or that in some way harmed the Company.[9]

---

[6] The Trust admits to the above facts, adding that Lee Morgan presented the Special Committee with a number of unworkable proposals to buy or recapitalize the Company, all of which lacked committed financing and several of which would have left the Company in even deeper financial ruin. (Dep. Ex. 255; 257; Dep. Ex. 353; Dep. Ex. 344). The Trust Admits that Houlihan advised the Special Committee on the serious deficiencies in the Morgan proposals. ( *Id.*)

[7] The Trust admits to the above facts, also stating that Marty Moran worked closely with Candlewood to put together proposals to buy or recapitalize the Company on behalf of the Morgan family. (Dep. Ex. 333; Dep. Ex. 322; Dep. Ex. 273; Dep. Ex. 326; Dep. Ex. 328; Dep. Ex. 329). The Trust further states that Marty Moran had an ownership interest in MAMAMO, LLC. (Marty Moran Dep. 27:7-12).

[8] The Trust admits to the above facts, but clarifies that Marty Moran worked with and advised others at the Company, including Karen Felix, and his wife, Asha Morgan Moran, a board member, President of Creative Memories, and eventual CEO of the Company. (Dep. Ex. 203, Dep. Ex. 243). Marty Moran provided advice to Lee Morgan informally and also completed work for the Company through his company, Clear Path, LLC, unrelated to the Sale Process. (Marty Moran Dep. 14-17).

[9] The Trust admits to the above facts, adding that many of [the] witnesses were defendants in this case and offered self-serving testimony.

### III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes concerning material facts.  *Celotex*, 477 U.S. at 323.  Genuine issues of material fact exist when there are "disputes over facts that might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  All facts and inferences must be construed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.  The court reviewing a motion for summary judgment "must not make credibility determinations, weigh the respective value of evidence, or resolve material factual disputes."  *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013).

### IV.    ANALYSIS

Plaintiff's tortious interference with contract claim arises when "one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another."

*Dougherty v. Parsec, Inc.*, 872 F.2d 766, 769 (6th Cir. 1989) (internal citations omitted). The claim must satisfy the following five elements: "(1) the existence of a contract, (2) the wrongdoer's knowledge of a contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E. 2d 863, 866 (Ohio 1995).

The Court notes that Defendant is correct in highlighting that Ohio does not have a cause of action for "aiding and abetting" a claim for tortious interference with a contract. (Doc. 189 at 2). In support of this argument, Defendant cites *DeVries Dairy, L.L.C. v. White Eagle Cooperative Ass'n, Inc.*, 974 N.E.2d 1194, 1194 (Ohio 2012): "[D]oes Ohio law recognize a cause of action for tortious acts in concert under the Restatement (2d) of Torts § 876? . . . . The certified question is answered in the negative." Thus, the Court must evaluate Marty Moran's conduct independently from that of Lee Morgan or Candlewood to determine whether Marty Moran's motion for summary judgment should be granted. That is, the Court must examine whether Marty Moran's conduct by itself was wrongful, and/or whether there are material facts in dispute on this issue.

It is undisputed that both the first and second elements of the claim are met in the instant situation. In early 2007, Antioch's Board of Directors formed a Special Transaction Committee and hired Houlihan to act as the company's financial advisor and investment banker. (Doc. 144 at 1; Doc. 168 at 10). These simultaneous steps were designed to assist Antioch in its efforts to either sell or recapitalize the Company. (*Id.*) Additionally, Moran's knowledge of the contract between Antioch and Houlihan is not

- 7 -

disputed.  In his deposition, Moran explained that his "understanding was that Houlihan

Lokey was engaged [by Antioch] to sell the company."  (Doc. 111 at 7).

To successfully oppose Defendant's motion for summary judgment, Plaintiff must

make a "showing sufficient to establish the existence of [any] element essential to [its]

case, and on which [it] will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 323.

Thus, the Court will consider the remaining three elements of the claim to determine if

there are genuine issues of material fact.

### A.  Wrongdoer's Intentional Procurement of the Contract's Breach

Defendant maintains that summary judgment must be granted because Plaintiff is

unable to demonstrate that the contract between Antioch and Houlihan was breached.

(Doc. 143 at 4).  The undisputed facts show that after Antioch contracted with Houlihan

in March 2007, Lee Morgan hired Candlewood in August 2007 to act as an additional

financial advisor.  (Doc. 90 at 118; Doc. 145-8 at 4).  Candlewood's engagement with

Morgan outlined that "Candlewood shall serve as financial advisor to Investor [Lee

Morgan] in connection with the issues and options concerning a potential recapitalization

or acquisition of The Antioch Company."  (Doc. 145-8 at 4).  Lee Morgan testified that

he decided to hire Candlewood because of his concerns that "[a]s the conventional sales

process began to look like it was not going to work, I felt we had to explore alternative

models, refinancing, whatever."  (Doc. 90 at 118).

After Lee Morgan hired Candlewood, Antioch and Houlihan amended various

terms of the Houlihan contract.  (Doc. 145-3 at 2).  The parties revised the terms of their

engagement provision, but retained the language identifying "Houlihan Lokey as its

exclusive financial advisor to provide financial advisory and investment banking services in connection with a possible Transaction." (*Id.*)  The parties chose not to alter a section of that same provision that delineates that "[t]he Company agrees that none of it, its controlling equity holders or other affiliates, or its management will initiate any discussions regarding a Transaction during the term of this Agreement, except through Houlihan Lokey or except as provided in Section 8 of this Agreement." (*Id.* at 8). Finally, the parties amended the definition of "Transaction" to encompass the "refinancing of a material portion of the Company's outstanding indebtedness in a transaction in which Houlihan Lokey . . . participated in the structuring, negotiation of terms, and/or implementation of such refinancing or provided significant services with respect to such refinancing." (*Id.* at 3).  Stephen Spencer, a Houlihan employee, testified that this provision was designed to "also have Houlihan Lokey compensated if . . . working in collaboration with Glenn [Candlewood], we were able to accomplish a recapitalization or alternative transaction." (Doc. 138 at 123).  Defendant claims that the very fact that Antioch and Houlihan amended the terms of their contract after Lee Morgan hired Candlewood demonstrates that neither party believed that contracting with Candlewood violated the exclusivity provision.  (Doc. 143 at 2).

Defendant also points to the deposition of Timothy Miller, the Litigation Trustee, who testified that he did not "recall seeing any documents" that showed that Houlihan believed that Antioch breached the exclusivity provision of the contract by retaining Candlewood.  (Doc. 88 at 16).  Moreover, Defendant emphasizes that Antioch is the only

party that could have violated the exclusivity provision, and thus only Houlihan may

come forth with a claim for breach, not Moran.  (Doc. 143 at 7).

Plaintiff counters Defendant's claims by maintaining that Moran's own

involvement with Candlewood led to a breach of Houlihan's exclusivity provision with

Antioch.  (Doc. 167 at 16).  Moran participated in the preliminary interviews in hiring

Candlewood and in the negotiations surrounding the agreement between Lee Morgan and

Candlewood.  (Doc. 111 at 48; Doc. 169-5 at 2).  Glenn Pollack, the managing director of

Candlewood, also e-mailed Moran directly with a draft of Candlewood's Engagement

Letter, to which Moran replied that he would review it and pass it along to the Morgan

family.  (Doc. 170-17).  In his deposition, Moran testified as to his role in relation to

Candlewood:

> Q. From a 50,000-foot view can you describe the nature of any involvement that you had in the process?
>
> A. I worked on behalf of the Morgan family and worked with Candlewood to restructure the debt, to look for options to restructure the debt.
>
> Q. Were you engaged by Lee Morgan, paid to provide any services?
>
> A. No.
>
> Q. You were just providing a little bit of your thoughts just because you were related to Asha and Lee?
>
> A. Yes.
>
> Q. Okay.  Can you describe very generally the nature of any advice that you may have provided to Mr. Morgan or to your wife, Ms. Moran?
>
> ***

THE WITNESS: I helped them evaluate the Candlewood – the offers that Candlewood brought to the table.

(Doc. 111 at 6).

Although Plaintiff provides evidence showing that Moran was involved in the business dealings with Candlewood, Plaintiff fails to provide evidence to confirm that the business dealings with Candlewood led to a breach of the Houlihan contract. Notwithstanding this shortcoming, Plaintiff insists that Defendant's motion for summary judgment must fail because Ohio law does not require an actual breach of the contract in order to satisfy this tortious conduct claim.  (Doc 167 at 15).  The Court finds that various Ohio and Sixth Circuit cases have in fact held that <u>interference with a prospective contract, rather than an actual breach, is sufficient to establish this tort</u>.  S*ee, e.g.*, *Am. Mar. Officers v. Marine Eng'rs Benefit Ass'n*, 503 F.3d 532, 537 (6th Cir. 2007); *Dougherty v. Parsec, Inc.*, 872 F.2d 766, 796 (6th Cir. 1989); *Kenneth J. Majcen Assocs. v. Phoenix Assocs., Inc.*, No. 76454, 2001 Ohio App. LEXIS 140, at \*17 (Ohio App. Jan. 18, 2001).

To support its assertion of interference with a prospective contract, Plaintiff highlights that Houlihan presented a revised purchase proposal to Antioch from J.H. Whitney in May 2008.  (Doc. 171-21 at 3-7).  By that time, Antioch and J.H. Whitney had progressed to the late stages of their sale process in which Whitney intended to purchase Antioch's assets for $54 million.  (*Id.*)  Upon learning of this deal, which would prevent the Morgans from retaining their positions at Antioch (Doc. 170-17; 171-3; 171-

- 11 -

21), Moran and the Morgan family created MAMAMO, LLC in an effort to bring other

offers to Antioch.  (Doc. 111 at 27).  Moran was the owner of MAMAMO.  (*Id.*)

During the same time period as the potential J.H. Whitney deal, MAMAMO

submitted an alternative offer to Antioch's Special Committee on June 2, 2008.  (Doc.

170-11).  Moran called the chair of the Special Committee, Nancy Blair, to talk to her

about the MAMAMO deal and his "hope" that she would accept the proposal.  (Doc. 111

at 21).  Part of the offer specified that "the Company will grant MAMAMO: The right to

nominate 4 of a total of 5 Directors."  (Doc. 170-18 at 2).  The Special Committee

rejected the offer on June 4, 2008.  (Doc. 17-12 at 1).  James Shein, the McDermott Will

& Emory attorney writing on behalf of the Special Committee, explained that "[t]he

transaction and the MAMAMO Letter are not adequate for a company that is in default

on its debt.  We also do not know if the MAMAMO entity has adequate resources to

close any transaction."  (*Id.*)

Plaintiff's complaint alleges that Lee Morgan and Asha Morgan Moran then

convinced the Evolve Trustee to fire Antioch's board of directors and name Lee and Asha

as two-thirds of the new board.  (Doc. 275 at ¶ 145).  Evolve sent Lee Morgan, Asha

Morgan Moran, and Marty Moran an email on June 5, 2008 announcing the unanimous

consent of Antioch's shareholders in the removal of the board.  (Doc. 170-21 at 1).  After

the instatement of the new board, J.H. Whitney retracted its proposal.  (Doc. 275 at ¶

148).

Plaintiff contends that Moran's involvement in MAMAMO, and MAMAMO's

interference with the J.H. Whitney offer is sufficient to establish a genuine issue of

material fact as to breach.  (Doc. 167 at 19).  In response, Defendant claims that there is

no evidence that Marty Moran ever participated in tendering recapitalization proposals to

Antioch.  (Doc. 143 at 7).  Yet, Defendant never mentions MAMAMO or Moran's role as

owner of MAMAMO during the time that MAMAMO presented an alternative offer to

the J.H. Whitney proposal.

In furtherance of its position that Moran interfered with the prospective J.H.

Whitney deal, Plaintiff presents e-mail evidence to show that Moran received information

directly from Glenn Pollack, Candlewood's managing director.  Moran would often

analyze and digest this information personally before forwarding his business suggestions

to Lee Morgan.  For example, in May 2008 Moran sent an e-mail to Lee Morgan and

Asha Morgan Moran that explained the terms of the "Morgan recapitalization term sheet"

that he and Pollack had discussed, and informed Lee and Asha that Moran would let them

know if he thought the Morgan family's MAMAMO deal was "worth pursuing."  (Docs.

171-3, 171-4).  A few days later, Pollack and Moran conversed via e-mail again

regarding the MAMAMO deal they were crafting to allow the Morgan family to retain

control of Antioch.  (Doc. 170-17).  After the Special Committee rejected the MAMAMO

deal, Pollack e-mailed another Candlewood employee in August 2008 to inform him "I

told Marty we'd be interested in buying the company with the family."  (Doc. 171-1).

When parties present conflicting evidence at the summary judgment stage, such

as the differing views about Moran's involvement in MAMAMO and Candlewood, the

Court's task is not to evaluate the credibility of the parties' evidence. *Cabaniss v. City of

Riverside*, 497 F. Supp. 2d 862, 872 (S.D. Ohio 2006).  That task is reserved to the fact-

- 13 -

finder. *Id.* Here, the accumulation of evidence that Plaintiff presents to show that Marty Moran independently interfered with Antioch's prospective deal with J.H. Whitney is not merely indicative of "aiding and abetting" Lee Morgan, as Defendant suggests. Thus, when viewing the facts in the light most favorable to Plaintiff, the Court finds that a genuine issue of material fact exists as to whether Marty Moran's role as member and one-time owner of MAMAMO constitutes interference with Antioch's prospective deal with J.H. Whitney, and hence with the Houlihan contract.

## B. Lack of Justification

Lack of justification, the fourth element of a tortious interference with contract claim, requires "proof that the defendant's interference with another's contract was improper." *Fred Siegel Co. L.PA. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1998). The impropriety of the interference is determined by weighing certain factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the societal interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* at 860 (citing § 768 of Restatement (Second) of Torts). As applied to the instant situation, factors such as the interests sought to be advanced by Moran, the proximity of Moran's conduct to the interference, and the relations among Moran and Lee Morgan are especially salient in determining impropriety.

Defendant emphasizes that Moran's own conduct was remote from the interference, as he only aided and abetted Lee Morgan in his own tortious behavior.

- 14 -

(Doc. 189 at 4).  According to Defendant, Moran merely provided input to Lee Morgan and assisted him in his endeavors to keep the Morgan family in control of Antioch.  (*Id.* at 3-4).  Plaintiff refutes this contention by outlining Defendant's prominent role in MAMAMO, including MAMAMO's actions in "thwarting" the prospective J.H. Whitney deal, to demonstrate Defendant's close proximity to the interference.  (Doc. 143 at 19-20); *see also* Section IV, A, *supra*.

Moreover, Plaintiff highlights Moran's personal interest in preventing a J.H. Whitney transaction organized by Houlihan, as Moran is the husband and son-in-law to Antioch's current and former CEOs.  (Doc. 167 at 17).  A Section 363 bankruptcy sale arranged by Houlihan could have caused the Morgans to lose their positions at Antioch, as well as the millions of dollars they held in subordinated note debt in Antioch.  (*Id.*)  Any deal proposed by MAMAMO, a group whose only members were Moran and members of the Morgan family, would likely attempt to advance the interests of the Morgan family.  In support, Plaintiff provides an email from Lee Morgan to Marty Moran and the Morgan family, sent after MAMAMO submitted its proposal to the Special Committee.  In the email, Lee Morgan expresses his hope that the Morgan family still has a chance to retain control of Antioch, saying "[i]t appears we will not be firing the Board. Let the negotiations begin."  (Doc. 170-19 at 1).

After weighing the factors used to determine improper interference, including the nature of Moran's personal conduct through the MAMAMO group, and the interests sought to be advanced by Moran based on his relationships with members of the Morgan

family, the Court finds that there is a genuine issue of material fact as to whether

Defendant's interference with the Houlihan contract was improper.

### C. Resulting Damages

Finally, the parties dispute the extent of the damages resulting from Moran's role

in the negotiations and offers arranged by both Candlewood and MAMAMO.  Defendant

claims that there are no damages, because neither party to the Houlihan contract breached

the agreement.  (Doc. 143 at 1-2).  Defendant maintains that the terms of the Houlihan

contract were fulfilled and therefore Plaintiff may not claim damages.  (*Id.*)  If any party

breached the contract, Defendant argues, it was Antioch, through Lee Morgan's decision

to retain Candlewood.  (Doc. 189 at 6).  In that case, Antioch, as the breaching party, may

not recover damages.  (*Id.*)

Plaintiff is, reasonably, unable to respond with extensive evidence that Moran's

actions actually caused Antioch to suffer damages.  Plaintiff claims that as a result of

Moran's actions, Antioch suffered damages in the amount of the value of a Section 363

bankruptcy auction that had been proposed in the J.H. Whitney offer.  (Doc. 167 at 20).

Plaintiff is constrained to speculation on this point.  The issue of damages is a factual

issue best suited for expert testimony.  (*Id.*, citing *In re Dwight's Piano Co.*, No. 1:04-cv-

066, 2009 U.S. Dist. LEXIS 1724, at *7-10 (S.D. Ohio Jan. 5, 2009)).  At this stage in the

litigation, expert discovery is not yet complete.  *See* Doc. 67 at 3:09-cv-218.

Accordingly, the Court holds that a genuine issue of material fact exists as to the extent

of damages, if any, suffered by Antioch because of Moran's interference with the Houlihan contract.

## V.    CONCLUSION

Upon careful review of the evidence presented, the Court finds that there are disputed issues of fact that are material to Count Ten.  Accordingly, for the reasons stated here, Defendant Marty Moran's motion for summary judgment on Count Ten (Doc. 143) is **DENIED**.

**IT IS SO ORDERED.**

Date:  8/2/13                                              */s/ Timothy S. Black*
                                                          Timothy S. Black
                                                          United States District Judge