UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE ANTIOCH COMPANY | : | Case No. 3:10-cv-156 |
| LITIGATION TRUST, | : | |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| LEE MORGAN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER DENYING DEFENDANT ASHA MORAN'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 146)

This civil action is before the Court on Defendant Asha Moran's motion for partial

summary judgment (Doc. 146) and the parties' responsive memoranda (Docs. 175, 190).

## I. BACKGROUND FACTS[1]

Defendant Asha Morgan Moran[2] moves for summary judgment on Plaintiff's

breach of fiduciary duty claim regarding the Antioch Company's ("Antioch") purchase of

a series of bonds to secure payment of promissory notes Antioch issued to former

employees in payment of their retirement benefits. (the "ESOP Notes"). (Am. Compl.

Doc. 275 at ¶¶ 150-156). Plaintiff alleges that the bonds did not constitute "adequate

security" for the ESOP Notes as required under ERISA because the insurer selected to

guarantee payment of the notes was financially insecure.

---

[1] A detailed factual background is available at Doc. 6, Section III.

[2] Lee Morgan, Asha Moran's father, is Antioch's former CEO. (Doc. 90 at 16).

Moran argues that summary judgment against Plaintiff is proper because: (1) its claims are preempted by ERISA; (2) there is no evidence that the Company suffered damages, or that Moran is linked to the events underlying Count Three; and (3) the business judgment rule bars Plaintiff's claim.

Plaintiff maintains that the motion for summary judgment must be denied because Moran's legal defenses lack merit and there are genuine issues of material fact as to whether she breached her fiduciary duties to the Company in approving premium payments to the insurer, Condor, when it was known to be insolvent, and authoring misleading letters to ESOP noteholders that covered up the fact that the guaranty of their notes was worthless.  The relevant portion of the Trust's amended complaint, Count Three, "Breach of Fiduciary Duty Related to Condor" reads:

176.  [Moran] owed common law and statutory fiduciary duties to Antioch of good faith, loyalty, and disclosure, to refrain from self-dealing and other conflicts of interest, and to avoid wasting and mismanaging corporate assets.

177.  Defendants [Moran], Hoskins, Lipson-Wilson, Feliz and Bevelhymer knew or reasonably should have known at the time that the Company issued the ESOP Notes that the Condor bond did not provide adequate security for the Company's obligations.  Despite that knowledge, they issued the ESOP Notes to terminating employees with no other security for payment of the Company's obligations.  In so doing, they wasted and mismanaged corporate assets, and exposed the Company to liability for violations of ERISA and tax law.

178.  [Moran] knew or reasonably should have known that Condor was insolvent or unable or unwilling to honor Condor's obligations with respect to the ESOP Notes.  Despite that knowledge, the above-named Defendants renewed Condor's coverage for the ESOP Notes.  In so doing, the above-named Defendants wasted corporate assets and failed to act as reasonably prudent officers of Antioch.

2

179.   [Moran] failed to provide substitute adequate security for the ESOP Notes.

180.   [Moran] made deliberate misrepresentations to the ESOP Noteholders.

181.   As a result, the Defendants Asha, CRG, Epstein, Ravaris, Lipson-Wilson, Felix, Hoskins, and Bevelhymer, jointly and severally, caused Antioch to suffer damages.

## II. UNDISPUTED FACTS[3]

## I.   PARTIES

1. Plaintiff, The Antioch Company Litigation Trust (the "Trust") is a liquidating trust created through the Second Amended Joint Prepackaged Plan of Reorganization (the "Plan") of The Antioch Company and Its Affiliate Debtors (the "Debtors"), whereby the Debtors transferred certain assets and prepetition causes of action to the Trust.  (Dep. Ex. 22 – The Antioch Company Litigation Trust Agreement; Miller Dep. at 13).  W. Timothy Miller is the trustee (the "Trustee") of the Trust.  (*Id*.)

2. Defendant Asha Moran is a former Chief Operating Officer and President of the Company's Creative Memories division, and a former Chief Executive Officer and Director of the Company.  (Moran Dep. at 17-18, 50-51).

3. Defendants Barry Hoskins, Kimberlee Lipson-Wilson, Karen Felix and Steve Bevelhymer were members of the Company's management team during the relevant time frames.  (Hoskins Dep. at 12-13; Wilson Dep. at 12-13; Felix Dep. at 11-12; Bevelhymer Dep. at 12-13).  Hoskins served as Chief Financial Officer and Vice President of Finance through December 31, 2005.  (Hoskins Dep. at 12-13).  Wilson served as Corporate Manager of Taxation and Director of Compliance and Administration.  (Wilson Dep. at 12-13).  Felix served as Chief Financial Officer from December 31, 2005 until August 1, 2008.  (Felix Dep. at 11-12).  Bevelhymer served as Treasurer during the relevant time period.  (Bevelhymer Dep. at 12-13).

## II.   JURISDICTION

4. The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b).  (Doc. 56).

---

[3] *See* Docs. 147 and 176.

### III.    A DESCRIPTION OF THE TRUSTEE'S ALLEGATIONS IN COUNT THREE

5.    The Trustee alleges that the Count Three defendants, all corporate officers, breached their state law fiduciary duty when the Company purchased a series of surety bonds to secure payment of promissory notes issued to terminating ESOP participants from an insurance company that is alleged to have been financially insecure and that the bonds therefore failed to provide "adequate security" for the ESOP Notes as required by ERISA. (Doc. 275 at ¶¶ 177-81).[4]

6.    As articulated by the Trustee in a Rule 30(b)(6) deposition of the Trust, the Company was allegedly harmed by Condor's inability to pay the surety bond on the ESOP Notes in the following ways: "Well, as I understand it, and I'm no expert in this area, but I understand that it is an ERISA violation. That it's an ERISA violation that can cause the ESOP trust to lose its qualified status and would eliminate all the tax benefits that were otherwise supposed to be available under the hundred percent ESOP transaction."  (Miller Dep. at 270). The Trustee further explained: "There's also the more practical issue of, you know, it was certainly a significant impact – or it seemed to be an impact on the restructure/sale process when that came to light ultimately as I – to Houlihan at least. I think it was in late January 2008. So those are not good things.  I mean – and that's not something I think you would want the officers of your company doing is, you know, issuing notes and not getting them –

---

[4]  The Trust maintains that all Count Three Defendants breached their state law fiduciary duties when they either authorized, selected or consented to the purchase of a series of surety bonds to secure payment of the promissory notes issued to departing employees (the "EXOP Noteholders") from an off-shore surety bond provider that was indisputably financially insecure, not AM-Best Rated, and that required no collateral from the Company and that the bonds purchased failed to provide adequate security for the ESOP Notes as required by law.  The Trust states further that despite the failure to conduct due diligence on Condor Insurance prior to renewing the surety bonds, the Count Three Defendants, including Asha Moran, all knew or should have known of Condor Insurance's insolvency by no later than January 31, 2008.  (Dep. Bevelhymer at 119-120, Dep. Ex. 190, Notes by Lenoir of 1/31/08 call).  Despite being aware of Condor Insurance's solvency issues, Asha Moran and others did not do additional due diligence on Condor Guaranty, find another survey, or take any steps to provide adequate security other than simply making additional premium payments to Condor Guaranty.  (Andrew Aff., Ex. B).

having adequate security as required by federal law." (*Id*. at 270-71).[5]

## IV.    UNDISPUTED MATERIAL FACTS UNDERLYING TRUSTEE'S CLAIM AS TO COUNT THREE

### A.  Company History

7.    The Company was founded in 1926, and later incorporated in 1946, as Antioch Bookplate.  In 1996, its corporate and trade name was officially changed to The Antioch Company.  The Company was originally a printer of bookplates, but it eventually produced bookstore items such as bookmarks, book covers and calendars.  Following its acquisition of Webway, Inc, and Heritage Springfield, Inc., in 1985 and 1990 respectively, the Company's predominate product became photo albums.  After the rapid growth of is Creative Memories division, the Company became primarily a direct marketer of scrapbooks and accessories sold through the party plan direct sales method by tens of thousands of independent sales consultants.  (Dep. Ex. 31 – Offer to Purchase at KMK-02150).

### B. The ESOP and S Corporation Status

8.    The ESOP is a tax-qualified retirement plan established in accordance with sections 401(a) and 4975(e)(7) of the Internal Revenue Code of 1986, and section 407(d)(6) of ERISA, designed to invest primarily in stock of The Antioch Company.  (Dep. Ex. 31 – Offer to Purchase at KMK-01200; Hoskins Dep. at 111-12).  The ESOP was established in 1979 and was "a significant shareholder" of the Company's common stock thereafter.  (Dep. Ex. 31 – Offer to Purchase at KMK-01200).[6]

---

[5]    The Trust states that the Trustee's deposition testimony speaks for itself and clarifies further that in addition to the risks under federal law to the Company arising as a result of failing to adequately secure the ESOP Notes, the Company was also damaged by the officers' waste of corporate assets by expending premium payments in the amount not less than $1.1 million dollars.  (*See* Doc. 176 at ¶ 20).

[6]    The Trust admits to the above facts to the extent they intend to assert that the ESOP was a qualified plan before the 2003 transaction.  The Trust denies that the ESOP remained a qualified plan after the 2003 transaction in which the Company paid more than fair market value to parties in interest.  The Trust also denies that the ESOP presently exists as implied by Paragraph 8 as the employees who were members of the ESOP at the time the Company filed for Bankruptcy in November 2008 lost their ESOP shares and are not beneficiaries of the Trust.

9.  The ESOP is a tax-exempt entity that incurs no tax liability on any distribution it receives from the Company.  (Morgan Dep. at 28; Dep. Ex. 31 at KMK012401).  ESOP participants do not incur taxes on the common stock allocated to their individual ESOP accounts when the Company makes distributions to the ESOP.  (Morgan Dep. at 28).  ESOP participants only incur tax liability when they receive their accumulated account balance upon termination or retirement.  (*Id*.)[7]

10.  The Company elected to become an IRS Subchapter S Corporation January 1, 1998.  (Morgan Dep. at 26).  IRS Subchapter S Corporations do not incur income tax liability on earnings, but rather shareholders of S Corporations incur personal income tax liability on their proportionate share of the S Corporations' earnings.  (*Id*. at 26-27).

11.  The Company later became 100% ESOP-owned on December 16, 2003.  (Marchetti Dep. at 430; Dep. Ex. 507 – Letter from Lee Morgan as Chief Executive Officer of The Antioch Company to Ben Carlson Regarding Completion of the 100% ESOP Transaction; Dep. Ex. 763 – Letter from Lee Morgan as Chief Executive Officer of The Antioch Company to Rhonda Anderson Regarding Completion of the 100% ESOP Transaction).[8]

12.  As long as it remained a 100% ESOP-owned S Corporation, the Company would be entirely exempt from federal (and most state) income taxes.  (Marchetti Dep. at 102-10; Dep. Ex. 537 – 100% ESOP Transaction Documents at DT2150-51).

## C.  The Company Issues ESOP Notes

14.  In the summer of 2004, the Company began issuing the promissory notes (the "ESOP Notes") to departing ESOP participants.  (Hoskins Dep. at 435-36).

---

[7]  The Trust admits that the allegations with respect to the ESOP were true prior to the 2003 transaction.

[8]  The Trust admits to the fact that the Company later became 100% ESOP owned through a transaction approved by a conflicted Board of Directors who received 85% of the consideration offered in the transaction (which amounted to as much as $200,618,700 in cash or consideration) and which saddled the Company with hundreds of millions of dollars in debt.  (Dep. Ex. 31, Dep. Ex. 294).

15. The Company continued issuing ESOP Notes to departing ESOP participants in 2005, 2006 and 2007, ultimately issuing a total of four rounds of ESOP Notes from 2004 through 2007.  (Hoskins Dep. at 248-49; Bevelhymer Dep. at 106-10).

## D.  Adequate Security

16. In accordance with ERISA and the Internal Revenue Code, the Company was required to provide "adequate security" for the ESOP Notes to ensure that the ESOP Notes would be paid in the event the Company defaulted on its obligation to make payments on the ESOP Notes.  (Hoskins Dep. at 255-58, 329-333; Dep. Ex. 41 – Email from Ross Fuller regarding Repurchase Obligation Guarantees).

## E.  The Company Secures the ESOP Notes with Surety Bonds from Condor

17. Barry Hoskins engaged an insurance broker to seek out an insurance company to provide financial guarantes in the form of surety bonds for the ESOP Notes, in accordance with ERISA and Internal Revenue Code requirements that employers provide "adequate security" for the repurchase of employer securities and distributions made to plan participants upon their departure from the ESOP. (Hoskins Dep. at 255-58; Dep. Ex. 40; Dep. Ex. 41).

19. Hoskins ultimately engaged Condor Insurance to issue surety bonds to secure the ESOP Notes in 2004.  (Hoskins Dep. at 248-49, 256).  The responsibility of engaging Condor Insurance fell solely with Hoskins.  (*Id*. at 249).

20. Condor Insurance issued a surety bond to secure the first round of ESOP Notes On August 20, 2004.  (Hoskins Dep. at 339-40; Dep. Ex. 50).

21. Hoskins again engaged Condor Insurance to issue surety bonds to secure the ESOP Notes in 2005.  (Hoskins Dep. at 249).

22. Condor Insurance issued a surety bond to secure the second round of ESOP Notes on September 30, 2005.  (Hoskins Dep. at 340-42; Dep. Ex. 51).

23. After Hoskins resigned as Chief Financial Officer at the end of 2005, Karen Felix – the Company's new Chief Financial Officer – and Steve Bevelhymer – the Company's Treasurer – took over the responsibility of engaging an insurance company to issue surety bonds to secure the ESOP Notes in 2006 and 2007, and renewing the surety bonds issued to secure the ESOP Notes previously issued in 2004 and 2005.  (Felix Dep. at 84-87; Bevelhymer Dep. at 106- 10).

24. Bevelhymer engaged Condor Insurance to issue surety bonds to secure the ESOP Notes in 2006. (Bevelhymer Dep. at 106-08).

25. Condor Insurance issued a surety bond to secure the third round of ESOP Notes on December 11, 2006. (Bevelhymer Dep. at 106; Dep. Ex. 713).

26. When it came time to engage an insurance company to issue surety bonds to cover the ESOP Notes in 2007, Bevelhymer engaged a different company – Condor Guaranty, Inc. ("Condor Guaranty"). (Bevelhymer Dep. at 109-10).[9]

27. Condor Guaranty issued a surety bond to secure the fourth round of ESOP Notes on October 1, 2007. (Bevelhymer Dep. at 109; Dep. Ex. 714).

**F. The Company Learns of the Financial Difficulties of Condor Insurance After the Company Purchased the Last Round of Surety Bonds from Condor Guaranty and Renewed the Previously Issued Surety Bonds with Condor Guaranty**

31. The Company requested that McDermott Will & Emery (legal counsel to the Company) investigate the situation to gather as much information as it could regarding the Condor entities. (Felix Dep. at 96).[10]

**G. The Company Made All ESOP Note Payments Until the Senior Lenders Refused to Allow the Company to Make the August 2008 ESOP Note Payments**

33. The Company made all scheduled periodic payments on the ESOP Notes from 2004 through June 2008. (Moran Dep. 295-97; Miller Dep. at 467-68; Felix Dep. 109).

---

[9]  The Trust admits that Bevelhymer engaged a different company, Condor Guaranty, Inc., to issue surety bonds in 2007. The Trust further states that at the time the Company entered into the agreement with Condor Guaranty, Bevelhymer and others at the Company knew that Condor Insurance had gone through bankruptcy and that Condor Guaranty was a similar organization owned by the same individuals. (Dep. Bevelhymer at 109-111). Bevelhymer admitted that he did no research as to the financial viability of Condor Guaranty, Inc. before entering into the 2007 guaranty agreement. (*Id.* at 111-112).

[10]  The Trust admits that the Company finally requested that MWE conduct research into the statutes of the Condor entities in early 2008. (Dep., Ex. 728).

35.  In August 2008, the Company sent a letter to ESOP Noteholders informing them that the ESOP Notes were still secured by the surety bonds issued by Condor Guaranty and that the Company would be submitting a claim to Condor Guaranty for payment of the ESOP Notes.  (*Id*. at 301).[11]

## H. The Company Submits a Claim to Condor on the ESOP Notes

37.  The Company submitted a claim to Condor Guaranty for payment of the ESOP Notes in accordance with the terms of the surety bonds.  (Moran Dep. at 302 03).

38.  Led by its new Chief Financial Officer, Paul Ravaris, the Company engaged in active discussions with Condor Guaranty regarding documentation required to consider the claim and the dynamics of the claim. Condor Guaranty, like any other insurance company, continued to gather information from the Company regarding the claim.  (*Id*. at 302).[12]

41.  While the discussions continued, and the Company and Condor Guaranty continued to exchange information regarding the claims, the Company sought relief by filing voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code on November 13, 2008.  (Moran Dep. at 302-04; *see also* Case No. 3:08-bk-35741 at Doc. 1).

42.  Despite the Company submitting multiple claims to Condor Guaranty for Payment of the ESOP Notes, and providing the information requested by Condor

---

[11]  The Trust Admits that in August 2008, Moran sent out a letter to ESOP Noteholders stating that the ESOP Notes were still secured by the surety bonds issued by Condor Guaranty and that the Company would be submitting a claim to Condor Guaranty for payment of the ESOP notes, despite knowing that it was incredibly unlikely that Condor Guaranty was solvent and/or would make a payment on its claim. (*See* Dep. Ex. 112).  The letter did not inform the ESOP noteholders of any of the information that the Company had learned as to the insolvency of Condor Insurance, the claim by Condor Insurance against Condor Guaranty for fraudulent transfer of assets, or the multiple judgments for fraud and nonpayment against Condor's principal, Harvey Milam.  (Dep. Ex. 112; Dep. Ex. 730).

[12]  The Trust admits that its new Chief Financial Officer, Paul Ravaris, communicated with Harvey Milam regarding documentation necessary to pay the claim.  Almost immediately, Milam began giving Ravaris the runaround, requesting unnecessary documents and pursuing delay tactics to avoid paying the notes.  (Andrew Aff., Ex. D, 2008 Email from Paul Ravaris, TAC-CC-02994556).  All the while, Moran continued to send out letters to Noteholders assuring them that Condor Guaranty would pay their claims.  (Dep. Ex. 311; Dep. Ex. 312; Dep. Ex. 593; Dep. Ex. 313; Dep. Ex. 202).

Guaranty to assess the claims, Condor Guaranty never made a payment to the ESOP Noteholders in accordance with its obligations to do so under the terms of the surety bonds.  (Moran Dep. at 302-05).

## III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## IV.    ANALYSIS

A breach of fiduciary duty claim under Ohio law must satisfy the following three elements: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom."  *Valente v. Univ. of Dayton*, 438 F. App'x 381, 387 (6th Cir. 2011).  Any such alleged duty, however, must be related to the officer's position and job responsibilities.  In other words, "a director or

10

officer of a corporation is not liable, merely because of his official character, for the fraud or false representations of the other officers or agents of the corporation…if such director or officer is not personally connected with the wrong and does not participate in it." *Seale v. Citizens Sav. & Loan Assoc.*, 806 F.2d 99, 106 (6th Cir. 1986).[13]

### A. ERISA Preemption

It is well settled that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." ERISA § 514, 29 U.S.C. § 1144. To deter the repackaging of ERISA claims under the guise of state law, the Sixth Circuit has held that ERISA preempts "substitute common law claims" that "merely attach new, state-law labels to ERISA claims." *Smith v. Provident Bank*, 170 F.3d 609, 615-16 (6th Cir. 1999). Moran maintains that the claims in Count Three are preempted under this standard.

Moran made identical arguments in her 2010 motion to dismiss. However, as Magistrate Judge Humphrey explained, the Count Three "allegation is that the failure to provide adequate security for [the repurchase] obligations damaged the Company because the Company, not the ESOP, was liable under the ESOP Notes" and "[t]he allegations relating to the post-2003 Transaction events have no discernible relationship to the ESOP

---

[13] *See also In re Amcast Indus. Corp.*, 365 B.R. 91, 103 n.4 (S.D. Ohio 2007) (discussing breach of fiduciary duty claim against former officers of bankrupt company, stating "while officers are held to a similar standard of care [as directors] toward a corporation, they will not be held personally liable for acts of a corporation merely by virtue of their status as officers"); *Condos. Ass'n v. Bruner*, Case No. 2:09cv339, 2011 U.S. Dist. LEXIS 16029, at *11-15 (E.D. Cal. Feb. 17, 2011) (dismissing breach of fiduciary duty claims against officers against whom participation in the wrong was not alleged; mere status as officer insufficient to allege liability.).

except for the fact the Company was wholly-owned by the ESOP after the transaction. The Condor cause of action (Count 3) concerns obligations of the Company to pay the ESOP Notes."  (Doc. 239 at 67).  Thus, this Court determined that Count Three as alleged against Asha Moran was not preempted by ERISA.  (*Id.* at 60; Doc. 272 at 4).  Plaintiff's Count Three claim against Moran is not an ESOP claim, but a claim "against [her] based on [her] independent legal dut[y] owed in [her] role[] as [a] corporate fiduciary – not to the ESOP – but to the Company."  (Doc. 239 at 60-61; Doc. 272 at 7).  The Court made this finding as a matter of law.  Nothing has changed between Moran's 2010 motion to dismiss and the present motion.  Therefore, the Court declines to revisit the issue.[14]

## B.  Evidence Linking Moran to the Events in Count Three

Moran does not dispute that she owed a fiduciary duty to the Company, both in her role as an officer and as a director.  It is well established that a "corporate officer occupies a position of trust in relation to [her] corporation."  *Wing Leasing, Inc. v. M&G Aviation*, 542 N.E.2d 671, 676 (Ohio App. 1988) *citing Thomas v. Matthews*, 113 N.E. 669, 671 (Ohio 1916).  This fiduciary relationship between directors and the corporation entails a duty of care, a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure.  *Id.*  The corporate director's duty of care generally

---

[14] *See, e.g., Hagy v. Demers & Adams*, LLC, No. 2:11cv530, 2013 U.S. Dist. LEXIS 15338, at *9 n.3 (S.D. Ohio Feb. 5, 2013) ("In their [summary judgment] reply brief, the Law Firm Defendants also make the assertion that the June 30 letter was not in violation of the FDCPA because the communication was to an attorney.  The Court addressed this argument previously in its Order on the motion to dismiss and found it to be without merit.  As such, the Court shall not revisit the issue here.").

requires that the director shall perform his or her duties in good faith and in a manner the director reasonably believes to be in the best interest of the corporation, and where such care as an ordinarily prudent person in a like position would exercise under similar circumstances.  *See* Ohio Rev. Code §1701.60 (outlining statutory duty of care for directors).

Defendant's argument, that no duty is breached by a passively ignorant director, was rejected by an Ohio court in *Geygan v. Queen City Grain Co*., 593 N.E.2d 328, 332-33 (Ohio App. 1991).  In *Geygan*, a director claimed that her decision to entrust operations to her director husband was protected by the business judgment rule. However, the Court was "not persuaded by Geneva's argument that her passive participation in Queen City's decision-making process precluded her from breaching her fiduciary duty to the corporation."  *Id.* at 332.  "Directors may not shut their eyes to corporate misconduct and then claim that because they did not see the misconduct, they do not have a duty to look.  The sentinel asleep at his post contributes nothing to the enterprise he is charged to protect."  *Id.* at 333.  The court held that "[w]hen a director has knowledge of a fellow director's improprieties and does not act upon the information, her decision to stand idly by is not a defense."  *Id.*

A director's fiduciary duty to the corporation includes the duty to act to prevent breaches of duty by other directors and officers.  *In Re Nat'l Century Fin. Enter., Inc.*, 504 F. Supp.2d 287, 313-14 (S.D. Ohio 2007).  "[W]hen a director has knowledge of a fellow director's improprieties and does not act upon that information, [the director's]

13

decision to stand by idly is not a defense." *Id.* Such idleness "amounts to a breach of fiduciary duty unprotected by the business judgment rule, even if the director does not personally benefit from the other's self-dealing." *Id.* Directors and officers owe the corporation a duty to "maintain a reasonable control and supervision over the affairs" of the company and cannot "shut their eyes" to misconduct going on around them. *Atherton v. Anderson*, 99 F.2d 883, 888-89 (6th Cir. 1938).[15]

Defendant claims that she was not involved in "the initial decision to secure ESOP Notes through Condor Insurance or to renew coverage of ESOP Notes." (Doc. 146 at 15444). Additionally, she maintains that there is no evidence linking her to anything related to Condor in advance of August 2008.[16]

Plaintiff alleges that Moran, who was then serving as president of Creative Memories, along with the remainder of the Board of Directors, became aware of Condor's insolvency no later than January 31, 2008. (Bevelhymer Dep. 119-20; Dep. Ex. 190, January 31, 2008, Notes by Ken Lenoir of 1/31/08 call ("will the situation be a

---

[15] Defendant cites *Seale v. Citizens Sav. & Loan Assoc.*, 806 F.2d 99, 106 (6th Cir. 1989), for the proposition that a director cannot be liable for the fraud or false representations of the corporation unless he personally participated in the wrong. However, this case is inapposite as it addresses when a director can be held liable to third parties for torts committed by the corporation, not when the director can be held liable to the corporation itself, for failing in his duties. As discussed above, it is well-settled that the scope of a director's fiduciary duty includes a duty to be informed and not to passively permit other fiduciaries to engage in self-dealing.

[16] The Court declines to adopt Moran's argument that her email approving the invoice in August 2008 is merely a "scintilla" of evidence insufficient to create a dispute of material fact. Plaintiff's case does not "rest on a two-word email more than four years after Condor was originally engaged." As recited herein, Plaintiff presents significant evidence that Moran knew about Condor Insurance's insolvency and misrepresented the Company's financial condition to noteholders.

surprise to Mgmt. Morgan & Candlewood? not at all – they are all aware of the situation regarding Condor.").  As the ESOP Trustee, Kenneth Lenoir stated that the insolvency was publically available information "…this was not the first bond surety that I have seen that has been offshore and has been a farce.  So we Googled Condor Guaranty and we found out that Condor Guaranty was basically a sham…"  (Dep. Lenoir at 98-102).  This information was never provided to the holders of the ESOP Notes and no one at the Company took any action as a result of learning the same.

On February 29, 2008, Antioch's counsel, McDermott Will & Emery, warned the Board of Directors that Condor Guaranty was likely to be insolvent or possibly the recipient of Condor Insurance's assets in a fraudulent transfer:

> A recent internet search raised concerns about the ability of Condor to fulfill its obligations under the Surety…There are, however, allegations in the bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Mississippi that assets were improperly transferred from Condor [Ins.] to Condor Guaranty Inc. With the legality of such transfers to Condor Guaranty in question, it may be difficult for the Company to rely on Mr. Milam's assurances and Condor Guaranty's financial statements until the facts are sorted out by the court.

(Dep. Ex. 112).  On March 28, 2008, Antioch filed a "Proof of Debt" in Condor Insurance's official liquidation proceedings pending in Nevis, in which it noted its concern that Condor Guaranty may be the alter ego of the insolvent Condor Insurance. (Andrew Aff., Ex. E).

Antioch did in fact default on the August 2008 ESOP Note payments.  Antioch made a claim under the Financial Guaranty Agreements for Condor to make the August

2008 payment on the Company's behalf.  (Dep. Moran at 300-305).  Moran then

personally approved payment of another $113,022.07 to Condor Guaranty for its annual

premium on August 20, 2008.  (Dep. Moran 301-302; Dep. Ex. 112; Andrew Aff, Exs. A,

B).

Plaintiff maintains that Moran and other Company officers orchestrated a public

relations campaign to deliberately mislead ESOP Noteholders about the financial

condition of the Company and the status of Condor Guaranty.  Moran helped author and

revise four separate letters, dated August 6, 2008, September 2, 2008, October 2, 2008,

and November 1, 2008, to the holders of the ESOP Notes.  (Dep. Exs. 311, 312, 593, 313;

Andrew Aff., Ex. G).  In each letter, Moran stated to Noteholders that because Antioch

was in "technical default" under its secured credit agreements, Bank of America, its

senior secured lender, would not allow Antioch to make the payments due on the ESOP

Notes.  (*Id.*)  Plaintiff alleges that the Moran did not want ESOP Noteholders or

employee-owners to know the truth – that Antioch had insufficient cash to pay the ESOP

Notes.  (Dep. Epstein at 142-144; Dep. Exs. 784, 785).

Although Moran knew that Condor Guaranty failed to make the August 2008

payment within 30 days of the claim as required by the terms of the surety bonds,

Moran's September 2008 letter to Noteholders stated:

> I am writing to inform you that due to a technical violation of our loan
> agreements, our lenders have informed us that they will not allow the
> Company to make the September 1, 2008 ESOP notes payments.
> However, the payments under the ESOP notes are guaranteed by
> Condor Guaranty, Inc., a surety, and the Company will, therefore,

request that the September 1, payments be made by Condor.

(Dep. Exs. 312, 311, 312, 593, 313). Moran repeated these assurances in identical letters in October and November 2008. (Dep. Exs. 593, 313; Andrew Aff., Ex. G). Each letter assured the ESOP Noteholders that Antioch was pursuing a restructuring process. However, Plaintiff alleges Moran knew at the time that the restructuring process had already failed and that Antioch was pursuing a bankruptcy filing instead. (Dep. Ex. 312; Dep. Ex. 593; Dep. Ex. 313). On November 1, 2008, twelve days before the Company field its bankruptcy petition with a prepackaged plan of reorganization that provided for no distributions to the Noteholders, Moran assured the Noteholders that Antioch was financially strong and that they were protected by the Condor guaranties. "The [November payments] are guarantees by Condor Guaranty, Inc., a surety, and the Company, will, therefore, request that the November 1 payments be made by Condor...Our commitment to returning the Company to a solid capital position is unwavering…" (Dep. Ex. 313). Condor Guaranty never paid Antioch's claims.

Antioch paid the following annual premiums for the surety bonds:

    2004: $414,494.00
    2005: $290,125.00
    2006: $256,965.62
    2007: $ 25,845.53

(Dep. Exs. 50, 51, 713, 705). In fact, Moran personally approved an additional premium payment in August of 2008 for $113,022.07. (Andrew Aff., Exs. A, C). In total, Moran

paid no less than $1.1 million dollars cash in premium payments to a sham, offshore, unrated, and unknown surety.

At a minimum, there is a genuine issue of material fact related to Moran's knowledge of Condor Insurance's insolvency.[17] There is also a genuine issue of disputed fact as to whether Moran breached her fiduciary duty of good faith by failing to encourage Antioch to find a different guarantor, and by making material misrepresentations to various constituencies after the truth had become evident that Condor Guaranty would not be paying any claims the Company made upon it.

## C. Damages

Next, Moran claims she is entitled to summary judgment because Antioch was not damaged by her approval of the final surety bond premium payment to Condor Guaranty.

As explained *supra* at Section IV.C, there is evidence to support a finding that Antioch was damaged by Moran's action and inaction related to Condor. Specifically, Antioch paid no less than $1.1 million in premiums to Condor Insurance and Condor Guaranty, when Moran and the other officers knew or should have known that the Condor entities were unreliable and insolvent. (Dep. Ex. 705). The misrepresentations regarding Condor and Antioch's financial health left interested stakeholders without notice until November 2008 that Anitoch shares and ESOP notes were valueless, or any reason to suspect that the directors had breached their fiduciary duties with respect to the

---

[17] The effect of Moran's misrepresentations to ESOP Noteholders (and employees of the Company who did not know the extent of the Company's financial woes) include, but are not limited to, the inability of interested stakeholders to bring claims related to the 2003 Transaction within the statutorily proscribed time period.

2003 transaction. Moreover, it resulted in the loss of millions of dollars to the Company's former employees and Trust beneficiaries.[18]

### D. Business Judgment Rule

Moran alleges that an independent ground for summary judgment exits. Specifically, Moran maintains that her decision to secure the ESOP Notes with Condor is protected by the business judgment rule. In order to advance the business judgment rule the following prerequisites must be met: (1) a business decision; (2) the absence of a personal interest in the transaction or self-dealing; (3) the exercise of due care; (4) no evidence of abuse of discretion or a reasonable belief that the best interest of the corporation shareholders will be served by the decision; and (5) good faith. *Geygan*, 593 N.E.2d at 328.

Decisions by a board of directors are afforded the protection of the business judgment rule. *Aronson v. Lewis*, 473 A.2d 805, 809 (Del. 1984). This rule presumes that directors are acting in good faith to do what they believe to be in the best interests of the corporation. *Id.* However, "[t]he business judgment rule governs only where the directors are not shown to have a self-interest in the transaction at issue." *Plaza Sec. Co. v. Fruehauf Corp.*, 643 F. Supp. 1535, 1543 (E.D. Mich. 1986). The business judgment

---

[18] The Court acknowledges that the Company had to pay premiums to a guarantor to provide adequate security for the ESOP Notes. However, if the Company had paid premiums to a solvent surety bond provider who paid the claims on the ESOP Notes it would have had to pay the surety back. Still, the Company would have received something in exchange for those premiums -- adequate security for the Notes. Instead, the Company paid premiums, received nothing, and was still obligated to the ESOP Noteholders when the Company filed for bankruptcy in November 2008.

rule is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. *Aronson*, 473 A.2d at 812. This presumption applies when there is no evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment" on the part of the directors. *In re Walt Disney*, 907 A.2d at 747. However, when it is shown that a board action is not the product of an informed, disinterested, and independent board, the business judgment rule presumption is overcome and the decision is reviewed under the "entire fairness" standard. *Mills Acquisition Co. v. MacMillian, Inc.*, 559 A.2d 1261, 1279 (Del. 1989).

The Court finds that disputed issues of fact exist as to whether: (1) Moran knew or should have known that Condor Insurance and/or Condor Guaranty was a sham based on the information available to her at that time and yet chose Condor and continued to pay Condor; and (2) Moran breached her fiduciary duty to the Company by making multiple misrepresentations in letters dated August 6, 2008, September 2, 2008, October 2, 2008, and November 1, 2008 to the holders of the ESOP Notes.

With respect to the decision to use Condor, Moran had a "personal interest" in the transaction. *Koos v. Cent. Ohio Cellular, Inc.*, 641 N.E.2d 265 (Ohio App. 1994).[19] Plaintiff argues that Moran personally benefitted from the decision to use Condor because

---

[19] *Id.* (In shareholder actions against directors alleging breach of fiduciary duties, the business judgment rule can be claimed only by disinterested directors under Ohio Rev. Code §1701.59(B), and "disinterested directors" are those who neither appear on both sides of transaction nor expect to derive any personal financial benefit from it in sense of self-dealing, as opposed to benefit which devolves upon corporation or all stockholders generally.).

it hid her earlier malfeasance.  Specifically, using Condor made it appear that the 2003 transaction was legitimate, when in reality Moran and the other conflicted directors had drained the company of cash, leveraged all of its assets, put it in an untenable financial position, and kept control, such that the Company had no assets with which to secure the ESOP notes, and no legitimate business was willing to guarantee the ESOP notes.

Moran also failed to exercise due care approving the use of Condor.  The Board, including Moran, became aware of Condor Insurance's insolvency no later than January 31, 2008.  (Dep Ex. Bevelhymer at 119-120; Dep. Ex. 190).  Plaintiff argues that Moran either ignored information showing that Condor Guaranty was "basically a sham," or failed to exercise diligence in investigating the company.  (Dep. Lenoir at 98-120 ) ("…this was not the first bond surety that I have seen that has been offshore and has been a farce.  So we Googled Condor Guaranty and we found out that Condor Guaranty was basically a sham…").  The fact that Condor was supposedly the "only surety willing to provide coverage of the ESOP Notes" (Doc. 146, PageID 15439) does not make the decision to use Condor a reasonable exercise of due care; rather, Plaintiff maintains that by dealing with Condo,r the directors were knowingly or recklessly throwing away the Company's money.  *Apicella v. PAF Corp.*, 479 N.E.2d 315, 318 (Ohio App. 1984) ("It is well-established 'that directors of a corporation occupy a fiduciary relationship to the corporation and its shareholders and are held strictly accountable and liable if the corporate funds or property are wasted or mismanaged[.]") (quoting *Ohio Drill & Toll Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir. 1980)).

The business judgment rule does not protect corporate officers from wasting assets of an insolvent company. *DeNune v. Consol. Capital of N. Amer., Inc.*, 288 F. Supp. 2d 844, 859 (N.D. Ohio 2003). Additionally, the rule does not protect officers who fail to prevent waste or self-dealing. *Biggins v. Garvey*, 630 N.E. 2d 44, 55 (Ohio App. 1993). Upon learning that Condor Insurance was insolvent, Moran (and others) failed to stop paying premiums to Condor and failed to do additional due diligence into the status of Condor Guaranty.

Additionally, the evidence is that in order to keep Antioch's financial condition from the employee-owners, Moran misrepresented to the noteholders that because Antioch was in "technical default" under its secured credit agreement, Bank of America, its senior secured lender, would not allow Antioch to make the payments due on the ESOP notes; in reality, however, Antioch simply did not have sufficient cash to make the payments. (Dep Exs. 311, 312, 593, 313, 202). Furthermore, although Moran knew that Condor failed to make the August 2008 payment within 30 days of the claim as required and knew that Condor Insurance was insolvent, Moran continued to assure the noteholders that Antioch was financially strong and that they were protected by the Condor guaranties until just days before Antioch filed for bankruptcy.[20] (*Id.*) These misrepresentations cannot be construed as "business decisions" within the meaning of the business judgment rule. The misrepresentations evidence bad faith, an abuse of

---

[20] Moran maintains that Antioch's motives with respect to the August 2008 premium payment to Condor Guaranty were not financial, but rather were necessary in order to be compliant with ERISA and its regulations that required security for notes given in connection with retirement plans.

discretion, and a personal interest in the transaction -- which all preclude application of the business judgment rule.

## V.   CONCLUSION

Accordingly, for the foregoing reasons, Defendant Asha Moran's motion for partial summary judgment on Count Three (Doc. 146) is **DENIED**.

**IT IS SO ORDERED**.

Date:  8/2/13                                                 */s/ Timothy S. Black*
                                                              Timothy S. Black
                                                              United States District Judge