UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE ANTIOCH COMPANY | : | Case No. 3:10-cv-156 |
| LITIGATION TRUST, | : | |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| LEE MORGAN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING DEFENDANT WALKER'S
## MOTION FOR SUMMARY JUDGMENT (Doc. 151)

This civil action is before the Court on Defendant Frederick Walker's motion for

summary judgment (Doc. 151) and the parties' responsive memoranda (Docs. 183, 191).

## I.  BACKGROUND FACTS[1]

Defendant Walker[2] moves for summary judgment on Plaintiff's breach of

fiduciary duty claim regarding Defendant's alleged failure to prevent the Morgan family

from pursuing recapitalization alternatives for the Antioch Company ("Antioch").  (Am.

Compl. Doc. 275 at ¶¶ 191-196).

Walker argues that summary judgment against Plaintiff is proper because he

lacked authority to direct, control, or influence the 2007-2008 Sale Process, specifically:

---

[1] A detailed factual background is available at Doc. 6, Section III.

[2] Walker signed an Independent Consultant Agreement on December 1, 2007, agreeing to
provide the services of "Leader of the North American Sales and Marketing to support the
operations of the Creative Memories business division."  (Doc. 275 at ¶ 62).  The Agreement
was extended until May 31, 2008, which listed Walker's title as: "Contractor, Interim President,
North America."  (*Id.* at ¶¶ 63-64).

(1) Antioch's efforts to sell or restructure (the 2007-2008 Sale Process) were well underway before Walker's involvement; (2) Walker had no corporate authority and owed no fiduciary duties to Antioch as an independent contractor; and (3) Walker never had any role in the conduct about which Plaintiff complains because he did not engage service providers and never directed their efforts.

Plaintiff maintains that the motion for summary judgment must be denied because there are genuine issues of material fact as to whether Walker owed fiduciary duties to Antioch and whether he breached those duties when he participated in the failed efforts to sell the Company and took no action to prevent the misconduct of fellow officers and conflicted board members.  The relevant portion of the Trust's amended complaint, Count Six, "Breach of Fiduciary Duty With Respect to the Sale Process" reads:

> 192.  [Walker] owed common law and statutory fiduciary duties to Antioch and its creditors of good faith, loyalty, and disclosure, to refrain from self-dealing and other conflicts of interest, and to avoid wasting and mismanaging corporate assets.

> 193. [Walker] allowed the Morgan family to pursue or failed to prevent the Morgan family from pursuing recapitalization alternatives although the Board was paying Houlihan to find a purchaser.  This decision was not in the best interest of Antioch.

> 194.  The engagement of multiple professionals providing duplicative services that were unlikely to be successful and were not successful amounted to a waste of Antioch's assets.

> 195.  [Walker] failed to provide Antioch with prudent direction despite Antioch's deteriorating financial position.  This omission harmed Antioch.

> 196.  As a result, above-named Defendants, jointly and severally, breached their fiduciary duties to Antioch and its creditors, causing Antioch to suffer damages.

## II. UNDISPUTED FACTS[3]

## I. INTRODUCTION TO THE ANTIOCH COMPANY, THE 2007-2008 SALE PROCESS, AND SERVICE PROVIDERS SUPPORTING THE 2007-2008 SALE PROCESS

1. In 1946, Ernest Morgan incorporated the Antioch Company ("Antioch," originally known at The Antioch Book Plate Company), a privately held for profit Ohio corporation that Ernest Morgan originally founded while still a student at Antioch University in Yellow Springs, Ohio. (von Matthiesson I 49:12-24).

2. Antioch originally printed bookplates, and became known for producing bookstore sidelines such as bookplates, bookmarks, book covers and calendars. (Dep. Ex. 31 at 79).

3. Antioch formed an Employee Stock Ownership Plan ("ESOP") in 1979. (Hoskins I 133:6-21; L. Morgan I 20:5-12).

4. An ESOP is an ERISA (Employee Retirement Income Security Act) qualified retirement plan pursuant to which funds intended for employee retirement are invested primarily in the employer's stock. (Marchetti II 375:9-376:20).

5. The ESOP created a retirement program for Antioch employees, provided broad-based employee ownership, permitted employees to share in Antioch's success, helped Antioch retain capital, and created a record of value that outside shareholders might use for trading stock. (L. Morgan I 20:13-21:13).[4]

6. Antioch became 100% ESOP owned when it concluded a transaction whereby Antioch purchased its stock from all non-ESOP shareholders in 2003. (Marchetti II 430:7-24; Dep. Exs. 507, 763).

7. After purchasing Webway, Inc. (a photo album company) in 1985, Antioch formed Creative Memories in 1987 to sell photo albums and scrapbook supplies

---

[3] *See* Docs. 151, Ex. 1 and 184.

[4] Plaintiff admits this statement, but clarifies that while some employees got to share in Antioch's success, those employees who left the Company between 2004-2007, and those who were still employed as of November 14, 2008 (many of whom are now the Trust's beneficiaries), the date of the Company's bankruptcy, did not share in the Company's success equally with the non-ESOP shareholders who sold their shares to the Company in the 2003 transaction.

using a direct sales model.  (Dep. Ex. 31 at 79).

8.  By 1990, Antioch focused on direct marketing of scrapbooks and accessories. (Dep. Ex. 31 at 79).

9.  By 2003, Creative Memories was Antioch's largest and most profitable division and contributed approximately 90% of Antioch's sales.  (Luce I 141:1-9; L. Morgan I 19:13-19).

10.  Creative Memories accounted for nearly all of Antioch's consolidated profits from 1996-2002.  (Dep. Ex. 31 at 80).

11.  Creative Memories' sales peaked at $360 million in 2003, but declined to $268 million in 2006.  (Dep. Ex. 386 at 21).

12.  In early 2007, Antioch management held an "ESOP Summit" to discuss the Company's financial condition and future plans.  (Blair I 122:24-125:16; Dep. Ex. 339).

13.  During the 2007 ESOP Summit, Antioch employees and representatives reviewed Antioch's projected cash flows and financial obligations (paying ESOP notes and bank financing), and determined that Antioch needed outside money to meet its obligations.  (Blair I 123:3-16).[5]

14.  On or about March 20, 2007, Antioch's Board of Directors hired Houlihan Lokey Howard & Zukin ("Houlihan") as its financial advisor and investment banker in the 2007-208 Sale Process.  (Dep. Ex. 2008 ("Houlihan Contract"); Blair I 124:5-125:10, 127:11-128:2; Spencer 31:17-32:1).[6]

15.  Antioch and Houlihan amended the Houlihan Contract on January 25, 2008. (Spencer 122-21:123:22; Dep. Ex. 208).

---

[5]  The Trust admits these allegations and states further that the Company's cash flow needs to pay ESOP Notes and bank debt from the transaction approved by a conflicted Board of Directors who received 85% of the consideration offered in the transaction (which amounted to as much as $200,618,700 in cash or consideration) saddled the Company with hundreds of millions of dollars in debt (the "2003 Transaction").  (Dep. Ex. 31; Dep. Ex. 294).

[6]  The Trust admits that on March 20, 2007, the Company hired Houlihan to serve as its *exclusive* investment banker and financial advisor for its efforts to sell the Company's assets or recapitalize its massive debt obligations.  (Dep. Ex. 208).

18. On May 10, 2007, Antioch's Board of Directors formed a special committee of Board members (Lee Morgan, Asha Morgan Moran, Nancy Blair, and Malte von Matthiessen, collectively, the "Special Committee") to consider and evaluate possible strategic capital structure alternatives in the 2007-2008 Sale Process. (Dep. Ex. 619).[7]

19. On August 23, 2007 Antioch engaged Reliance Trust Company ("Reliance") to serve as a discretionary trustee over the Antioch ESOP Trust and to be responsible for using its discretion to tender or vote the ESOP Trust's shares in connection with a transaction in the 2007- 2008 Sale Process. (Martin 17:14-23; Dep. Ex. 85).

20. When engaged, Reliance anticipated a relatively short engagement focused on working through a transaction to be concluded within a few months. (Martin 18:14-23).

21. Effective August 29, 2007, Lee Morgan personally engaged Candlewood Partners, LLC ("Candlewood") and its principal, Glenn Pollack, to serve as his investment advisor. (Dep. Ex. 126; Lee Morgan II 336:8-337:10).[8]

22. Morgan engaged Candlewood to pursue financing to recapitalize or restructure Antioch in the event that Houlihan could not find a buyer. (Houlihan's potential inability to locate a buyer and the need for a plan to address that contingency was referred to as "Plan B"). (Blair II 570:1-571:3).[9]

---

[7] The Trust admits that the Special Committee formed on May 10, 2007 was made up of Lee Morgan, Asha Morgan Moran, Nancy Blair, and Malte von Matthiessen. The Company states further that all members of the Special Committee were conflicted – they all held subordinated notes and/or warrants from the 2003 Transaction and stood to benefit from any potential transaction consummated by the Company. (Dep. Ex. 387; Dep. Ex. 496).

[8] The Trust admits that Lee Morgan engaged Candlewood, and its principal Glenn Pollack, only after he engaged Houlihan in his position as CEO of the Company. (Dep. Ex. 208).

[9] The Trust admits that Lee Morgan engaged Candlewood to pursue financing to recapitalize or restructure Antioch and that he did so under the guise of it being a contingency plan necessary only in the event that Houlihan could not find a buyer. However, almost immediately upon its engagement, Candlewood's efforts began to interfere with Houlihan's efforts and created confusion in the marketplace over the direction of the Sale Process. (Dep. Ex. 407). It also quickly became evident that Lee Morgan had hired Candlewood to exclusively promote deals and offers that would benefit the Morgan Family, something that Lee Morgan believed Houlihan's involvement would impede, so Lee Morgan began to advocate for the dismissal of Houlihan. (Dep. Ex. 252).

23. Lee Morgan and Candlewood modified Candlewood's engagement on October 29, 2007. (Dep. Ex. 341).

24. On or about September 24, 2007, Marsha Matthews of MWE advised Nancy Blair that an independent special committee should be in place "if and when the family [the Morgan family] makes a proposal." (Dep. Ex. 406).

25. On or about October 4, 2007, Antioch's Board of Directors recognized the Morgan family's desire for a "Plan B," and the fact that the Morgan family had engaged Candlewood. (*Id.*)

26. During the same October 4, 2007 meeting, Antioch's Board created a new Special Transaction Committee to handle the Sale Process. (*Id.*)[10]

27. The Special Transaction Committee had no involvement in negotiating Candlewood's engagement terms. (Blair II 570:14-17, 571:7-11).[11]

28. Reliance submitted its resignation as the ESOP Trustee in November 2007, but continued to serve while Antioch searched for a successor trustee. (Martin 35:5-16; 35:25-36:12; Dep. Exs. 649 and 651).[12]

---

[10] Plaintiff maintains that the new Special Transaction Committee consisted of Nancy Blair, Malte von Matthiessen, Alan Luce, Jeanine McLaughlin, and Denis Sanan. (Dep. Ex. 387). Of those five individuals, only one, Alan Luce, held no subordinated debt and could not benefit from a potential transaction in the Sale Process. (*Id.*) By October 4, 2007, it was already apparent that the market would not place sufficient value on the Company to permit all of the various classes of debt, including the Subordinated Notes held by Special Transaction Committee members, to be fully satisfied, and also that the equity in the Company was substantially impaired, putting the interests of Subordinated Noteholders and Warrant holders in conflict with the interests of ESOP Noteholders and ESOP participants.

[11] Plaintiff admits that the Special Transaction Committee as a whole was formed after Candlewood's engagement in August 2007.

[12] The Trust admits that Reliance submitted its resignation as ESOP Trustee in November 2007, citing the Special Committee's complete conflict of interest and lack of leadership at the Company. (Dep. Ex. 086; Dep. Ex. 651). Steve Martin, the ESOP Trustee noted "Given what was Creative Memories' market position, the company management and board has now overseen the decline in value from approximately $125 million to a near zero Equity Value since the ESOP transaction in 2003. That was a key reason our committee felt continuing this assignment was not in our best interest"). Reliance agreed to stay on until the Company could locate a

6

29. Antioch engaged Evolve Bank & Trust ("Evolve") as its independent, discretionary ESOP Trustee (succeeding to the position from which Reliance resigned) pursuant to a written engagement letter dated January 16, 2008.  (Lenoir 16:3-16; Dep. Ex. 738).

30. As an independent, discretionary ESOP trustee, Evolve did not take orders from Antioch's Officers, Board of Directors, Special Transaction Committee, or ESOP Committee.  (Lenoir 17:2-11).[13]

31. Evolve made its own decisions based upon its view of the best interests of ESOP participants and beneficiaries.  (*Id.* 15:2-7, 17:12-17).[14]

32. Evolve's duties included evaluating proposed transactions in the 2007-2008 Sale Process.  (Dep. Ex. 738).[15]

33. Evolve desired that the 2007-2008 Sale Process produce a transaction that would pay off Antioch's debt and leave sufficient value for ESOP beneficiaries to have positive account balances.  (*Id*. 33:13-20).

## II.   THE 2007-2008 SALE PROCESS WAS WELL UNDERWAY BEFORE WALKER'S AFFILIATION WITH ANTIOCH

34. Houlihan developed sales materials following its initial engagement and began distributing them to potential strategic and financial buyers during the week of

---

successor trustee after being threatened with legal action by the Company's CFO, Karen Felix.  (Dep. Ex. 222).

[13]  The Trust states that as an independent, discretionary ESOP trustee, Evolve was not supposed to take orders from Antioch's Officers, Board of Directors, Special Transaction Committee, or ESOP Committee.  (Lenoir Dep. 17:2-11).

[14]  The Trust states that as an independent, discretionary ESOP trustee, Evolve was supposed to take make its own decisions based upon its view of the best interests of ESOP participants and beneficiaries.  (Lenoir Dep. 15:2-7, 17:12-17).  The Trust states further that many decisions made by Evolve were not in the best interests of the ESOP participants and beneficiaries, including a decision to torpedo a transaction with J.H. Whitney and fire the majority of the board – only to replace them with a smaller, conflicted board made up of Lee, Asha, and a friend of Ken Lenoir, G. Robert Morris.  (Dep. Ex. 323; Dep. Ex. 355; Dep. Ex 325).

[15]  However, the Special Committee was the primary contact with Houlihan, and screened offers before sharing them with Evolve.

July 2, 2007.  (Blair I 117:19-118:10; Dep. Ex. 386 at 29; Spencer 270:19-271:1, Dep. Ex. 466 at 3).

35. Houlihan distributed materials to more than one hundred potential buyers, and narrowed proposed purchasers down to four credible buyers by July 17, 2007. (Dep. Ex. 386 at 29).[16]

36. Two credible buyers presented letters of interest that Antioch's Board of Directors, legal counsel, and financial advisors reviewed in August of 2007. (Dep. Ex. 386 at 32-34).

37. The two prospective buyers engaged in due diligence between September and October of 2007, but withdrew from the process by the end of October.  (Dep. Ex. 386 at 4-16).[17]

39. Both buyers cited Antioch's declining financial performance for reluctance to go forward with the Sale Process.  (Dep. Ex. 386 at 15-16).

40. In November of 2007, Houlihan began marketing Antioch to potential "distressed buyers."  (Spencer 53:4-17, 275:7-18; Dep. Ex. 466 at 3).[18]

41. On or about November 5, 2007, Lee Morgan submitted to the Special Transaction Committee an offer to acquire Antioch's assets through an entity named "Antioch Acquisition, Inc."  (Dep. Ex. 100).

42. The Special Transaction Committee responded in writing on November 8, 2007, rejected elements of the proposal, and asked for more information to demonstrate the proposal's viability.  (Dep. Ex. 235).

---

[16]  The Trust denies the implication that there were only four credible potential buyers in the marketplace.

[17]  One of these prospective buyers, Sun Capital, remained interested in pursuing some type of transaction, but the Special Committee failed to make a counter offer or continue discussions. (Dep. Spencer 51("Sun did not say no, full stop, we're out.").

[18]  The Trust admits that Houlihan eventually began marketing Antioch to potential distressed buyers beginning in November 2007. The Trust denies the implication that Dep. Ex. 466 is a document from 2007 as it clearly describes a number events, such as the J.H. Whitey, Marlin Equity, and Monomoy Capital offers which occurred in 2008.

44. By November 9, 2007, Reliance recognized that the possibility of a quick transaction in which a buyer provided consideration to ESOP participants had "evaporated," given the fact that the buyers Houlihan located had not made an offer for Antioch.  (Martin 25:5- 16; Dep. Exs. 649 and 651).[19]

45. Following its conclusion about the lack of possibility of a quick transaction, Reliance resigned later in November 2007 and predicted that Antioch could not complete a sale by March 31, 2008.  (*Id.*, Dep. Ex. 651).[20]

## III. ANTIOCH'S INDEPENDENT, DISCRETIONARY ESOP TRUSTEE PREVENTED THE TRANSACTION THAT THE SPECIAL TRANSACTION COMMITTEE ATTEMPTED TO ACCEPT

46. On May 8, 2008, the Special Transaction Committee received an offer from J.H. Whitney to acquire Antioch's assets pursuant to a "363" sale that required Antioch to seek bankruptcy protection and reorganize.  (Blair I 172:8-24; Dep. Ex. 188).

47. The Special Transaction Committee decided to accept the Whitney offer, and was close to a final deal by May 28, 2008.  (Blair 176:3-12).

48. Evolve did not approve of the Whitney offer because the transaction would not provide any money to ESOP participants, and would ultimately result in ESOP participants being terminated when Antioch was restricted.  (Lenoir 54:12-55:6).[21]

---

[19]  The Trust denies any implication that Reliance resigned solely because of the possible length of the Sale Process.

[20]  The Trust denies any implication that Reliance resigned solely because of the possible length of the Sale Process.

[21]  The Trust admits that Evolve was not in favor of the Whitney offer because ESOP Trustee Ken Lenoir believed the proposed deal did not provide any money to ESOP participants through its initial offer.  It is unclear what ESOP participants would have received if the Company had pursued a sale of its assets through a 363 auction under Title 11 of the United States Code. Whitney's offer would have been the floor – the starting place for bidding in the Auction.  (*See* 11 U.S.C. § 363; Dep. Ex. 491).  At least two other parties were interested in participating in the auction, but it is unknown what the result of such a process would have been and what ESOP participants may have garnered from a successful Section 363 process.

49. Acting as an Antioch ESOP Trustee (Antioch's majority shareholder), Evolve terminated the Antioch Board of Directors (except Lee Morgan and Asha Morgan-Moran) and Special Transaction Committee, and formed a new Antioch Board of Directors on or about June 4, 2008. (Lenoir 57:18-59:14; Dep. Ex. 107).[22]

50. On or about June 5, 2008, Antioch's reconstituted Board of Directors engaged Timothy Pohl of the Skadden, Arps, Slate, Meagher & Flom, LLP law firm to replace McDermott Will & Emery as Antioch's counsel. (Lenoir 175-15-176:14; Dep. Ex. 746).

51. The reconstituted Antioch Board of Directors met on June 12, 2008. (Walker 23:10-24; Dep. Ex. 586).

52. The minutes reflect the fact that Antioch's counsel, Timothy Pohl, attended the June 12, 2008 meeting. (Dep. Ex. 586).

53. The June 12, 2008 meeting minutes reflect the fact that Mr. Pohl recommended that Antioch attempt to refinance debt using Candlewood and continue to pursue a sale using Houlihan. (Dep. Ex. 586).[23]

55. Despite continuing such efforts, Antioch sought bankruptcy protection on November 13, 2008. (Doc. 275 at ¶¶ 6, 157-160).

---

[22] The Trust admits that Evolve, with collaboration from Kimberlee Lipson Wilson, trustee of a subtrust which held a number of shares, and with input from Lee Morgan, voted the majority of the Company's share's to terminate the Antioch Board of Directors and the Special Transaction Committee on June 4, 2008. (Dep. Ex. 323; Dep. Ex. 355; Dep. Ex 325). Lee, Asha, and Lenoir's friend, G. Robert Morris, were appointed to the new Antioch Board of Directors. (*Id.*).

[23] The Trust denies, however, that the New Board actually did continue to pursue a sale using Houlihan, its exclusive financial advisor and investment banker. Instead, the New Board focused their attention on the pursuit of a sale that benefited the Morgan family through Candlewood. (Lenoir Dep. at 186-188; Dep. Ex. 326; Dep. Ex. 328; Dep. Ex. 329). Although Houlihan was still technically the Company's investment banker, Candlewood appeared to be acting on the Company's behalf, negotiating as if the Company's representative. (*Id.*) In August 2008, the Company's lenders forced the Company to re-engage Houlihan in the process. (Dep. Ex. 700, Minutes of the Antioch Company Board of Directors, August 15, 2008 ("the Lenders requested that the Company re-engage Houlihan in its sale process by mid-August")).

## IV.    ANTIOCH RETAINED WALKER AS CONTRACTOR WITH NO ABILITY TO BIND THE COMPANY

56.  Frederick Guy Walker is an individual with approximately thirty years of direct sales experience gained by working for Tupperware UK from 1964-1993 and then Jafra Cosmetics until approximately 1999.  (Walker 8:1-21).

57.  Walker knew Lee Morgan from interactions with Morgan through the industry association, the Direct Sales Association ("DSA"), an organization that Walker and Morgan served as board members.  (*Id.* 11:16-19).

58.  Walker provided consulting services to Antioch by putting on seminars to help management understand direct sales on two occasions (approximately 1999 and 2006).  (*Id.* 11:15-12:21).

59.  In November of 2007, Alan Luce and Denis Sanan contacted Walker to inquire about Walker working with Antioch.  (*Id.*)

60.  Walker signed a Non-Disclosure Agreement on November 17, 2007.  (Dep. Ex. 583).

61.  Walker learned before joining Antioch that the Company had engaged a turnaround expert, and that part of his work would be to assist the turnaround expert.  (Walker 32:6-33:12).

62.  Walker did not know, however, of any specific recommendations from the turnaround expert and did not discuss implementing such recommendations with Asha Morgan Moran.  (*Id.* 69:16-70:18).[24]

63.  Walker signed an Independent Consultant Agreement ("Agreement") that became effective on December 1, 2007 and originally lasted only three months.  (*Id.* 13:4-18, Dep. Ex. 584).[25]

64.  Pursuant to the Agreement, Walker agreed to provide the services of "leader of North American Sales and Marketing to support the operations of the Creative

---

[24]  The Trust denies that Walker never learned of CRG's recommendations or assisted with their implementation.  (Dep. Walker 43-47).

[25]  The Trust denies that such an agreement is dispositive as to whether Walker was serving the Company as an independent contractor or as an employee.  (*See* Doc. 185 at Section II.B).

Memories business division."  (Dep. Ex. 584).

65.  Antioch and Walker extended his Agreement to last until May 31, 2008 pursuant to "Amendment A."  (*Id.* 16:5-22, Dep. Ex. 585).

66.  Amendment A listed Walker's title as "Contractor, Interim President, North\ America," but changed no terms other than duration.  (Dep. Ex. 585).

68.  On or about June 12, 2008, the reconstituted Antioch Board of Directors met without Walker, and elected Walker as one of Antioch's Vice Presidents. (Walker 23:10-24; Dep. Ex. 586).

69.  Walker did not know that the meeting was going on, and did not receive a copy of the meeting minutes.  (Walker 23:17-24).[26]

70.  Walker did not know that he had been made a company officer until approximately July 31, 2008, when Lee Morgan informed Walker of the fact while preparing for a sales meeting.  (Walker 77:3-23).[27]

71.  Walker served Antioch through its bankruptcy, terminated employment in October of 2010, and continued as a consultant to Antioch through the end of March of 2011.  (*Id.* 28:7-12).

## V.  WALKER'S PARTICIPATION IN THE 2007-2008 SALES PROCESS WAS EXTREMELY LIMITED AND HE NEVER EXERCISED ANY AUTHORITY OVER THE PROCESS OR ANTIOCH'S NEGOTIATIONS

72.  Walker reported directly to the Special Transaction Committee and Asha Morgan

---

[26]  The Trust admits that Walker claims that he did not receive a copy of the meeting minutes nor did he know that the meeting occurred.  Walker makes these claims despite having a record of regularly attending Board meetings from the time he joined the Company in December 2007 and being in regular communication with Asha Morgan Moran, who was present at the June 12, 2008 meeting. (Dep. Ex. 485, Minutes of the Antioch Company Board of Director's Meeting, December 21, 2007; Dep. Ex. 614, December 10 – Special Transaction Committee Conference Call at 64-65; December 17, 2007, Conference call of Special Committee at 66-69; Dep. Ex. 511, December 21, 2007 Minutes of the Antioch Company Board of Directors).

[27]  The Trust admits that Walker claims that he did not know that he had been appointed a company officer until approximately July 31, 2008, when Lee Morgan informed Walker of the fact while preparing for a sales meeting.  (Walker 77:3-23).

Moran managed his activities on a day-to-day basis.  (*Id*.; Walker 14:3-12).

73. Walker reported to the Special Transaction Committee to represent Antioch's management and report on the business; he did not review, evaluate, or discuss letters of intent to purchase Antioch.  (Walker 71:18-72:4).[28]

74. Walker worked with Antioch's sales team in order to develop marketing programs to help turn around Antioch's sales trends and improve the company's profitability.  (Walker 22:25-23:9).

75. Walker lacked authority to hire or fire Antioch employees.  (*Id*. 42:23-43:1).

77. While Walker served to explain direct sales in general and Antioch's future business prospects to creditors and potential purchasers.  (*Id*. 20:12-22:20).[29]

79. Walker was not involved in any negotiations for selling Antioch.  (*Id*. 40:18-22).[30]

---

[28] The Trust maintains Walker was present at many meetings where these items were discussed in great detail and where he gave input on their effect on the sales force. (Dep. Ex. 485, Minutes of the Antioch Company Board of Director's Meeting, December 21, 2007; Dep. Ex. 614, December 10 – Special Transaction Committee Conference Call at 64-65; December 17, 2007, Conference call of Special Committee at 66- 69; Dep. Ex. 511, December 21, 2007 Minutes of the Antioch Company Board of Directors; Dep. Ex. 587).

[29] The Trust admits that Walker participated in presentations to potential purchaser and creditors and assisted with explaining the Company's future business prospects, but the Trust denies that he had "no involvement in details for potential transactions or recapitalizing Antioch."  In addition to meeting with most, if not all, potential purchasers and also with the Company's lenders, he regularly worked on and put together financial projections that were used in the negotiation of potential transactions.  (Dep. Walker 78-79; Dep. Ex. 589, Email from Asha Morgan Moran, March 26,2008; Dep. Ex. 590,Email from Kathy Swanson; Dep. Ex. 587, Email from David Shapiro to Lee Morgan, Jan. 22, 2008).  Walker was also a party to specific communications between Lee Morgan and David Shapiro of LaSalle regarding the Sale Process and Candlewood's involvement.  (Dep. Ex. 587).

[30] The Trust admits that Walker was not specifically tasked with negotiating with potential purchasers but denies that he was not involved in the negotiations to sell the Company.  From the time he started and throughout 2008, Walker regularly attended meetings with potential purchasers. (Dep. Walker 20-2; Dep. Ex. 614, December 10 – Special Transaction Committee Conference Call, pp. 64-65. Dep. Ex. 587; Dep. Ex. 614, Conference Call of Special Committee at 66-69, Special Transaction Committee meeting, Jan. 21 at 81-83; Dep. Ex. 419).

80. Walker never had any duties to negotiate a potential sale or recapitalization for Antioch.  (*Id.* 108:10-13).[31]

81. Walker never had authority to bind Antioch to a potential sale or recapitalization deal.  (*Id.* 108:14-16).[32]

82. Walker did not know why Evolve terminated Antioch's Board of Directors in June of 2008.  (Walker 106:9-11).

83. Walker had only very limited contact with Antioch's transactional attorneys at MWE.  (*Id.* 18:4-19:1).

84. Walker did not know who Mr. Pohl was and had no knowledge of Mr. Pohl's advice to Antioch about the 2007-2008 Sale Process.  (*Id.* 23:25-24:22).

## III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be

---

[31]  The Trust denies any implication that, as a result, he had no duties to the Company with respect to the Sale Process.  As an officer of the Company, he had a duty to adhere to a certain standard of care and not to stand idly by as his fellow officers and a conflicted Board put decisions in their interest over the interests of the Company and wasted corporate assets.

[32]  The Trust denies any implication that Walker thus had no duty to speak up or act when his fellow officers and a conflicted Board put decisions in their interest over the interest of the Company and wasted corporate assets.

construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).


## IV.    ANALYSIS

A breach of fiduciary duty claim under Ohio law must satisfy the following three elements: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom."  *Valente v. Univ. of Dayton*, 438 F. App'x 381, 387 (6th Cir. 2011).  Any such alleged duty, however, must be related to the officer's position and job responsibilities.  In other words, "a director or officer of a corporation is not liable, merely because of his official character, for the fraud or false representations of the other officers or agents of the corporation…if such director or officer is not personally connected with the wrong and does not participate in it."  *Seale v. Citizens Sav. & Loan Assoc.*, 806 F.2d 99, 106 (6th Cir. 1986).[33]

---

[33] *See also In re Amcast Indus. Corp.*, 365 B.R. 91, 103 n.4 (S.D. Ohio 2007) (discussing breach of fiduciary duty claim against former officers of bankrupt company, stating "while officers are held to a similar standard of care [as directors] toward a corporation, they will not be held personally liable for acts of a corporation merely by virtue of their status as officers"); *Condos. Ass'n v. Bruner*, Case No. 2:09cv339, 2011 U.S. Dist. LEXIS 16029, at *11-15 (E.D. Cal. Feb. 17, 2011) (dismissing breach of fiduciary duty claims against officers against whom participation in the wrong was not alleged; mere status as officer is insufficient to allege liability).

15

### A. Whether The Relevant Conduct Occurred Before Walker Was An Independent Contractor For Antioch

The 2007-2008 Sale Process began with an ESOP Summit in early 2007 and Walker had no involvement in Antioch at that time. (Doc. 151, Ex. 1 at ¶ 13). Moreover, Antioch engaged Houlihan more than a year before Walker became an employee. (*Id.* at ¶¶ 15, 18). The Morgan family engaged Candlewood in August 2007, months before Walker's employment. (*Id.* at ¶¶ 21, 23). Antioch received purchase offers through Houlihan (between July and October of 2007) and Candlewood (beginning in November 2007) before engaging Walker as an independent contractor. (*Id.* at ¶¶ 34-42). Prospective suitors for Antioch's business withdrew, and Houlihan began marketing Antioch to distressed buyers, before Walker had any connection to Antioch. (*Id.* at ¶¶ 36-38). Reliance submitted its resignation before Walker joined Antioch. (*Id.* at ¶¶ 43-44). This conduct occurred between March and November 2007, before Walker had any relationship with Antioch.

Houlihan developed sales materials, began distributing them to potential strategic and financial buyers in July 2007, and narrowed proposed purchasers down to four "credible" buyers by July 17, 2007. (Doc. 151, Ex. 1 at ¶¶ 34-35). These potential buyers engaged in due diligence between August and October of 2007. (*Id.* at ¶ 37). One buyer, Jostens, notified Houlihan that it was "not able to move forward in reviewing the opportunity," on October 22, 2007. (Dep. Ex. 21 at 15). The other buyer, Sun Capital, notified Houlihan that "they were not going to be in a position to mark up a purchase

16

agreement and submit a final bid…" on October 24, 2007.  (Dep. Ex. 21 at 16).  Both

buyers cited Antioch's declining financial performance as a reason for not going forward.

(Doc. 151, Ex. 1 at ¶ 38).  Houlihan responded by marketing Antioch to "distressed

buyers" in November.  (*Id.* at ¶ 39).  Walker had still yet to be hired.

On December 1, 2007, Walker entered into a contract labeled "Independent

Consultant Agreement" with Creative Memories.  He was termed the "Interim President

of Creative Memories North America."  (Dep. Ex. 456; Dep. Walker 44-45).  The

agreement described his engagement:

> Mr. Walker agrees to lend his expertise as a consultant to the Company
> in providing the services of leader of the North American Sales and
> Marketing to support the operations of the Creative Memories business
> division.  In the course of providing deliverables to the Company, Mr.
> Walker may interact with various employees of the Company from time
> to time as required.  Mr. Walker will report on the progress of his
> deliverables directly to the Special Committee of the Board of Directors
> as requested.  Mr. Walker may also be expected to prepare and deliver
> presentations on the status of his deliverables to other senior management
> team members of the Company.

(Dep. Ex. 584).

Plaintiff argues that Walker regularly attended meetings of the Board and the

Special Committee,[34] participated in the meetings of the Special Committee, commented

on the progress of the Sale Process and its effect on Creative Memories, and became

---

[34] The sole function of the Special Committee was to direct Houlihan's efforts to find a
purchaser for Antioch and to consider possible recapitalization structures coming from
Candlewood.

involved in Houlihan's efforts to sell the company. (Dep. Ex. 485; Dep. Ex. 511; Dep. Ex. 587[35]; Dep. Ex. 614; Dep. Walker 37-38).

However, the documents cited do not support such a finding. Deposition Exhibit 614 is 120 pages of meeting notes that Marsha Matthews (an attorney for McDermott Will & Emery, Antioch's transaction counsel) prepared. The pages Plaintiff cites do not address Walker's understanding or contain statements from Walker about Candlewood's role. Instead, the pages reflect Matthews' notes regarding Walker's questions and concerns about (a) Houlihan representatives coming to Antioch facilities; (b) messages to provide to Antioch employees about such visits (p. 67); (c) information about Antioch sales (p. 81); and (d) consultants questioning Antioch's viability (p. 82). None of these points address Plaintiff's argument that Walker was aware of Candlewood's efforts earlier than 2008.

Deposition Exhibit 614 states:

> Guy Walker discusses his background; in direct sales since 60's; Tupperward [sic] UK, then US, Canada, US . . . . Denis hired him to out to Janrey (sp?) until sale to Gilette [sic]; been doing some consulting work; his quick assessment—impressed w/team giving the circumstances; young; some good signs; as for the field, knows there are some issues going back to 2 things early this year (charges for delivery -- although small can be signficiant [sic]; change in career plan b/c well published ahead of time and then pulled) so good deal of suspicion in field but think it can be turned around

---

[35] Deposition Exhibit 587 is a January 22, 2008 email string regarding obtaining a name badge for David Shapiro, one of Antioch's lenders. Lee Morgan and Mr. Shapiro copied Walker on these emails for the purpose of introducing Walker to Shapiro. Neither Candlewood nor Candlewood's role is mentioned in these exchanges.

> Numbers won't be good in first quarter given 10,000 less consultants, but will take time; recruiting down; he thinks there's hope but won't be a magical turnaround; there are some big meetings coming up.

(Dep. Ex. 614 at 64).

Additionally, Plaintiff maintains Walker knew when bids had been submitted by a number of potential purchasers, including offers from J.H. Whitney, Monomoy, and Marlin, along with potential recapitalization offers from the Candlewood. Plaintiff claims Walker attended meetings where those bids were discussed and received email communications about the steps the Special Committee and the Company were going to take immediately thereafter. (Dep. Ex. 419; Dep. Ex. 205[36]).

Deposition Exhibit 419 is an email string between March 10 and March 13, 2008 that starts with a message from Nancy Blair noting that the Special Committee was going to set up a call and discuss letters of interest; the string does not specify who the bidder was or terms that they may have offered. Walker notes in the email chain that he and Asha met with KKP, but it was too early to know if KKP was willing to bid for Antioch. This document is consistent with Walker's testimony about his limited role:

---

[36] Deposition Exhibit 205 is a March 14, 2008 email with draft resolutions for the Antioch Special Transaction Committee. The document identifies entities that submitted proposed letters of intent (no terms specified) and a recapitalization structure (no terms identified). This document demonstrates Walker's lack of influence or control over the 2007-2008 Sale Process because Antioch's Senior Lenders and Antioch's ESOP Trustee were directing the Special Committee. The Senior Lenders and the ESOP Trustee instructed the Special Committee to proceed with the Recapitalization Term Sheet. (Dep. Ex. 205 at 2). Walker reported to the Special Committee, and the Special Committee took direction from the Senior Lenders and ESOP Trustee.

Q.  Do you remember participating in bank calls in which your role was to update the bank as to management actions and plans?

A.  From time to time there were calls with the bank, and somewhat similar to the special committee I would do a report as to what the current programs that we were doing on recruiting, the meetings, et cetera, et cetera, going forward. *There might have been some questions, but it was generally me just, you know, giving a five- or ten-minute report, and then I would go off the call.*

(Walker 67:21-68:6) (emphasis added).  As indicated in this testimony, the Special

Committee and financial advisors typically did their work on proposed transactions after

Walker dropped off the call.  To the best of Walker's recollection, he always left

conference calls before participants discussed transaction details.  (Doc. 191, Ex. 3 at

¶¶ 5-6).[37]

Accordingly, there is no evidence that Walker was involved in the 2007-2008 Sale

Process.

### B.  Whether Walker Owed a Fiduciary Duty to Antioch as an Independent Contractor

Even if there were evidence that Walker was involved in the 2007-2008 Sale

Process, he did not owe a fiduciary duty to Antioch because he was an independent

contractor.

A fiduciary relationship is recognized by the Supreme Court of Ohio as "a

relationship 'in which special confidence and trust is reposed in the integrity and fidelity

---

[37]  Plaintiff cites to multiple documents under the heading "Walker's involvement in the Sale Process" (Doc. 183 at 6-9), but most of these documents have nothing to do with Walker. Walker did not author them or receive copies, and he is rarely even mentioned.  (*See, e.g.,* Dep. Exs. 390, 634, 240, 494, 422, 120, 449, 491, 480, 505, 348, 331, 321, 333, 322, 273, 274, 323, 355, 325, 586, 326, 328, 329, 700, 311, 312, and 313).

of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" *Ed Schory & Sons, Inc. v. Society Nat'l Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996). "A fiduciary duty may arise through formal agreement or through an informal relationship, a de facto fiduciary relationship." *Capogreco v. Pro Ins. Agency, Inc.*, No. No. 4:01cv1608, 2007 U.S. Dist. LEXIS 92761, at *11 (N.D. Ohio Dec. 18, 2007). Ohio law provides that a *de facto* fiduciary duty exists "where a 'person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic, or merely personal.'" *Anchor v. O'Toole*, 94 F.3d 1014, 1023-24 (6th Cir. 1996) (quoting *Craggett v. Adell Ins. Agency*, 635 N.E.2d 1326, 1331 (Ohio App. 1993)). Importantly, a *de facto* fiduciary relationship cannot be unilateral, as "[t]he Ohio Supreme Court has explained that a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust or confidence has been reposed." *Anchor*, 94 F.3d at 1024. "Under Ohio law there is generally no fiduciary relationship or duty between an independent contractor and his employer unless both parties understand that the relationship is one of special trust and confidence." *Schulman v. Wolske & Blue Co., L.P.A.* 708 N.E.2d 753 (Ohio App. 1998). "Moreover, this fiduciary relationship cannot be unilateral." *Id.*

Walker was engaged by Antioch as an independent contractor. (Doc. 151, Ex.1 at ¶ 61). The Agreement described Walker as the "interim leader of the North American Sales and Marketing for Creative Memories." (Dep. Ex. 584). Walker was permitted to hire his own employees (outside of Antioch) to support his efforts. (*Id.* at ¶ 3). Antioch

21

was not responsible for training Walker or his employees.  (*Id*.)  Antioch did not provide

benefits to Walker or any of his employees.  (*Id.* at ¶ 6).  Walker had to defend and

indemnify Antioch against claims made by his employees and obtain his own indemnity

insurance.  (*Id.* at ¶ 13, 15).  Walker was not authorized to bind Antioch.  (*Id.* at ¶ 17).[38]

Walker claims that although he learned before joining Antioch that the Company

had engaged a turnaround expert, and that part of his work would be to assist the

turnaround expert, he did not know of any specific recommendations from such expert

and did not discuss implementing them with Asha Moran.  (Doc. 151, Ex. 1 at  ¶¶ 59-60).

Walker reported to Antioch's Special Transaction Committee, and Asha Morgan-Moran

supervised his daily activities.  (*Id.* at ¶ 70).  He worked with Antioch's sales team to

develop marketing programs to help turn around Antioch's sales trends and improve the

company's profitability, but lacked authority to hire or fire Antioch employees.  (*Id.* at

¶¶  72-73).  Antioch and Walker extended his service as an independent consultant with

no change in responsibilities through May 31, 2008.  (*Id.* at ¶ 63, Dep. Ex. 585).  Walker

---

[38]  Plaintiff maintains that "Houlihan touted Walker's credentials and relationship to the
Company in its marketing materials to interested purchasers."  (Dep. Ex. 485, 511).  However,
the cited materials state:

**OUTSIDE CONSULTANTS**
The Company has recently retained CRG Partners to assist management in executing ongoing
operational realignment initiatives and to help identify and execute further cost reduction and
efficiency improvement strategies.  To assist in identifying further operational opportunities, the
Company has also retained Guy Walker, an experienced direct selling professional with over 25
years of industry experience, having spent the majority of his career as the President of Product
Development at Tupperware Corporation.

(Dep. Ex. 485 at 8). The same materials list Creative Memories' management team, but do not
list Walker.  (*Id.* at 18).

did not become an Antioch employee until approximately May 8, 2008. (Doc. 151, Ex. 1 at ¶ 65).

In the instant case, there is no evidence of a mutual understanding regarding the special confidence Antioch placed in Walker. Walker had no such understanding and never agreed to such a relationship until, at the very earliest, he learned that he had been appointed as an officer at the end of July or beginning of August 2008.

For example, in *Lovejoy Electronics v. O'Berto*, a corporation had a long-term relationship with an independent contractor that it eventually gave the title of Vice President. 873 F.2d 1001, 1003 (7th Cir. 1989). The corporation clothed the contractor with apparent authority and permitted him to act on its behalf (something Antioch never did with Walker), but never actually elected him as an officer. After the contract terminated, O'Berto sued Lovejoy for unpaid compensation and Lovejoy counterclaimed for breaches of fiduciary duty involving kickbacks O'Berto received from Lovejoy contracts. The trial court granted a directed verdict eliminating the counterclaim because the parties to O'Berto's agreement (Lovejoy Inc. and O'Berto) always understood their relationship:

> Next Lovejoy complains that the judge should not have granted O'Berto's motion for a directed verdict on Lovejoy's claim that O'Berto had breached his fiduciary obligations as a corporate officer by accepting kickbacks from the chip supplier. The judge's ground was that O'Berto, as a mere independent contractor, owed no fiduciary obligation to Lovejoy. The parties agree that a corporate officer is a fiduciary of his corporation. And Lovejoy argues that O'Berto was a vice president, and therefore a corporate officer. The ―therefore puzzles us. The corporation law of Illinois provides for corporate

23

officers, see Ill.Rev.Stat. ch. 32, p 8.50, but leaves it to each corporation to decide what to call them. Lovejoy stresses O'Berto's apparent authority, but that is irrelevant.  The corporation did represent O'Berto to the world as an officer, and this bound it in its dealings with the world.  *See, e.g., Levin v. 37th Street Drug & Liquors, Inc.*, 103 Ill.App.2d 248, 243 N.E.2d 504 (1968).  *But both Lovejoy and O'Berto knew the truth--that he was an independent contractor--and this knowledge is controlling in a suit between them.*

*Id.* at 1006 (emphasis supplied).  Under *Lovejoy*, Plaintiff's contention about Lee Morgan and others touting Walker as Interim President to third parties is irrelevant, because Antioch and Walker understood that Walker was an independent contractor and had no authority to act on Antioch's behalf.[39]  While describing Walker as the Interim President of Creative Memories North America might have created apparent authority for Walker to act as an officer, Moran and Antioch's directors all knew Walker was an independent contractor and could not rely on apparent authority to create liability.  The knowledge between Antioch and Walker is controlling.

Even if Walker were an Antioch employee, he still would not owe the same fiduciary duties as a corporate officer.  "In some instances, an employee can be a fiduciary of an employer; however, employees typically owe nothing more than a duty of good faith and loyalty to their employer."  *Gracetech Inc. v. Perez*, No. 96913, 2012 Ohio App. LEXIS 604, at *10 (Ohio App. Feb. 23, 2012).  The employee's duty of loyalty precludes the employee from competing with the employer while employed, giving away corporate property, using company property as his own, taking kickbacks, or

---

[39] The Special Committee, acting on behalf of Antioch's board of directors, determined the extent of Walker's authority, and gave him no authority to direct the sale process.  (McLaughlin II at 348).

24

converting the employer's money or property.  *Veterinary Dermatology, Inc. v. Bruner*, No. C-040648, 2005 Ohio App. LEXIS 5024, at *8-9 (Ohio App. Oct. 21, 2005).[40]  Since Plaintiff does not accuse Walker of any activities that would violate an employee's duties, accepting Walker to be an employee does not bar summary judgment.

### C.  Whether Walker Owed A Fiduciary Duty To Antioch As An Officer

Finally, Plaintiff argues that Walker owed a fiduciary duty to the Company from at least June 12, 2008 (when the newly constituted Antioch board elected him, although the board did not tell him) through the bankruptcy filing.[41]  (Doc. 183 at 12-13).  While Walker may have owed fiduciary duties to Antioch after learning (in late July or early August of 2008) of his election, Plaintiff testified that the Litigation Trust was focused on conduct in the period of time *preceding* Walker's election.  (Miller II at 385:14-386:2).  Therefore, the Court finds there is no genuine dispute regarding Walker's status; he was not a fiduciary during the relevant timeframe (January through May of 2008).

### IV.   CONCLUSION

Accordingly, for the foregoing reasons, Defendant Frederick Guy Walker's motion for summary judgment on Count Six (Doc. 151) is **GRANTED**, as there is no genuine dispute as to any material fact regarding Walker's role, and he is entitled to

---

[40]  Walker's contract excused some of these duties even if he were considered an employee because his contract permitted him to perform services "for any other business or enterprise" as long as such services did not interfere with Walker's contract.  (Dep. Ex. 584 at 4).

[41]  Walker was elected as one of Antioch's Vice Presidents on June 12, 2008.  (Doc. 151, Ex. 1 at ¶¶ 66-67).  Walker did not know that he had been made a company officer until approximately July 31, 2008.  (*Id.* at ¶ 68).

judgment as a matter of law.  The Clerk shall enter judgment in favor of Defendant

Frederick Guy Walker, dismissing him from this case.

**IT IS SO ORDERED**.

Date:  8/2/13                                                    */s/ Timothy S. Black*
                                                                Timothy S. Black
                                                                United States District Judge