UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE ANTIOCH COMPANY | : | Case No. 3:10-cv-156 |
| LITIGATION TRUST, | : | |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| LEE MORGAN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS LEE MORAN'S AND ASHA MORGAN MORAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 152)

This civil action is before the Court on Defendant Lee Morgan's and Asha Morgan Moran's ("Defendants") motion for partial summary judgment (Doc. 152) and the parties' responsive memoranda (Docs. 179, 192, 197, 198, 199).

## I.  BACKGROUND FACTS[1]

Defendants Lee Morgan ("Morgan") and Asha Morgan Moran ("Moran")[2] move for summary judgment on Plaintiff's breach of fiduciary duty claim with respect to the Levimo Transaction (Count Four).  (Am. Compl. Doc. 275 at ¶¶ 183-185).   Specifically, Plaintiff alleges that the Board failed to address a conflict of interest whereby Levimo, LLC, whose members are Lee and Vicki Morgan, purchased two of the Antioch Company's ("Antioch") St. Cloud, Minnesota properties at their appraised value ($26

---

[1] A detailed factual background is available at Doc. 6, Section III.

[2] Lee Morgan, Asha Morgan Moran's father, is Antioch's former CEO.  (Doc. 90 at 16).

million) and leased them back to Antioch (the "Sale-Leaseback Transaction").  (*Id.* at ¶¶ 101-05).  Lee and Vicki Morgan personally made a $5 million down payment and pledged the bulk of their personal assets as collateral to finance the remainder of the $26 million purchase price.  Plaintiff takes issue with the Board's prudence in positioning Levimo to be the owner-lessor of the St. Cloud Properties.  (*Id.*)

Morgan and Moran argue that summary judgment against Plaintiff is proper because: (1) they played no role in the Antioch Board of Directors' decision making process and abstained from the Board's vote with respect to the sale and leaseback transaction; (2) the sale and leaseback transaction was fair to Antioch; and (3) Antioch expressly waived breach of fiduciary duty claims arising from the lease and induced Morgan and Moran to enter into the Sale-Leaseback Transaction.

Plaintiff maintains that the motion for summary judgment should be denied because Morgan and Moran breached their fiduciary duties as officers and directors of Antioch by using their influence as CEO and President of Creative Memories, respectively, to induce the Board to enter into the Sale-Leaseback Transaction on terms that improperly favored the Morgan family.  Plaintiff further alleges that Morgan and Moran then benefited from the family's position as landlord, both by being enriched by the rents and various late fees paid to them and by using their position to try to control Antioch's future.  Additionally, Plaintiff alleges that during efforts to sell Antioch or recapitalize its debt, Morgan used his status as Antioch's landlord to pressure the Board

to grant his family periods of exclusivity and give his proposals preference over third parties.

The relevant portion of the Trust's amended complaint, Count Four, "Breach of Fiduciary Duty With Respect to the Levimo Transaction" reads:

183.  [Morgan and Moran] owed common law and statutory fiduciary duties to Antioch and to its creditors of good faith, loyalty, and disclosure, to refrain from self-dealing and other conflicts of interest, and to avoid wasting and mismanaging corporate assets.

184.  [Morgan and Moran] approved the Levimo transaction despite the conflicts of interest attendant to that transaction and the fact that the transaction was not in the best interest of Antioch.

185.  As a result, [Morgan and Moran], jointly and severally, breached their fiduciary duties to Antioch, causing Antioch to suffer damages.

## II. UNDISPUTED FACTS[3]

### I.    PARTIES

1.  Plaintiff, The Antioch Company Litigation Trust (the "Trust") is a liquidating trust created through the Second Amended Joint Prepackaged Plan of Reorganization (the "Plan") of The Antioch Company and Its Affiliate Debtors (the "Debtors"), whereby the Debtors transferred certain assets and prepetition causes of action to the Trust.  (Dep. Ex. 22 – The Antioch Company Litigation Trust Agreement; Miller Dep. at 13).  W. Timothy Miller is the trustee (the "Trustee") of the Trust.  (*Id.*)

2.  Defendant Lee Morgan is a former President, Chief Executive Officer and Chairman of the Board of Directors of The Antioch Company (the "Company" or "Antioch").  (Morgan Dep. at 16-17, 109-10).  Defendant Asha Moran is a former Chief Operating Officer and President of the Company's Creative Memories division, and a former Chief Executive Officer and Director of the Company.  (*Id.* at 17-18, 50-51).

---

[3]  *See* Docs. 153 and 180.

3. Defendants Nancy Blair, Jeanine McLaughlin, Denis Sanan, Alan Luce and Malte von Matthiessen served as Antioch Directors during time periods relevant to Count Four.  (Blair Dep. at 561; McLaughlin Dep. at 168; Sanan Dep. at 263-64, 400-03; Luce Dep. at 426; von Matthiessen Dep. at 498; Dep. Ex. 523 – December 6, 2006 Minutes of The Antioch Company Board of Directors Meeting; Dep. Ex. 510 – April 9, 2007 Minutes of The Antioch Company Board of Directors Meeting).

## II.     JURISDICTION

4. The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b).  (Doc. 56).

## III.    A DESCRIPTION OF THE TRUSTEE'S ALLEGATIONS IN COUNT I

5. The Trustee alleges that the Count Four defendants, all directors, breached their state law fiduciary duty when they approved a sale and leaseback transaction that was not in the best interests of the Company.  (Am. Compl., Doc. 275, ¶¶ 182-85).  Specifically, the Trustee alleges that the Board of Directors failed to address a conflict of interest whereby a Morgan family entity – Levimo, LLC ("Levimo") – purchased two of the Company's St. Cloud, Minnesota properties and leased them back to the Company for Creative Memories' use (the "Sale-Leaseback Transaction").  (*Id.* ¶¶ 101-05).[4]

6. As articulated by the Trustee in a Rule 30(b)(6) deposition of the Trust, the Sale-Leaseback Transaction and its terms were unfair to the Company in the following

---

[4]  The Trust admits that it alleges that all the relevant Director Defendants breached their fiduciary duties in connection with the Sale-Leaseback transaction which was unfair to and not in the best interest of the Company.  The Trust further admits that one of the multiple issues with the board's approval of the Sale-Leaseback Transaction was that the Transaction benefited the Morgan Family since Levimo, the entity that purchased two of the Company's St. Cloud, Minnesota properties and leased them back to the Company for Creative Memories' use was wholly owned by Lee and Vicki Morgan.  (Dep. Ex. 498, April 9 2007 Board Minutes). Further, the Board was uninformed about the terms of the lease, including the Change of Control Provision and Asset Transfer Provision which gave Lee Morgan the ability to use his position as landlord to influence or veto the sale of the Company to a third-party.  (Dep. Ex. 498; Dep. Sanan 266, 268; Dep. McLaughlin 171-75; Dep. Von Matthiessen 187, 193-94; Dep. Luce 426-27).

   The Trust denies any implication that Paragraph 5 encompasses the whole of its allegations against Lee Morgan and Asha Morgan Moran.  The Trust further states that Lee and Asha breached their state law fiduciary duties when they misled the board about the nature of the Transaction, including the terms of the Levimo Lease, and induced the board to enter into the Sale-Leaseback Transaction with terms that unfairly benefited the Morgan Family and served to frustrate the Company's attempts to restructure.  (*Id.*)

ways: "And my answer is that given where the company had been and where it was at that time and appeared to be going, that entering into a transaction where the Morgan family, through the LEVIMO entity, became the owner of and landlord to what was probably one of the most significant assets of the company was not a prudent thing or was not something that the board should have done." (Miller Dep. at 48-49). The Trustee further explained: "Well, again, consistent with the earlier answer, I think the biggest part of the unfairness is putting the Morgans in that position of control at that point in time through the lease. " (*Id.* at 51). When asked whether the Trustee saw any financial loss to the Company resulting from the Sale-Leaseback Transaction, the Trustee stated: "I do not, but I am not a financial expert so absent some financial expert or testifying expert that the Trust may have in the future, I don't see anything as I'm sitting here today." (*Id.* at 292).[5]

---

[5] The Trust responds that the Trustee's testimony speaks for itself and denies any implication that the Trustee's testimony constitutes the totality of factual allegations related to Lee and Asha's breaches of their fiduciary duties with respect to the Sale-Leaseback transaction. The Trust states further that the Levimo lease was unfair to the Company for the reasons articulated in Doc. 179, Section III.B, and for the reasons that follow:

The Sale-Leaseback Transaction was not an arms-length transaction. Lee and Asha concede that the Company was pressured to enter into a Sale-Leaseback Transaction by its lenders. (Dep. Bevelhymer 64-65, 92-93). The Company did not enter into the Levimo Lease completely voluntarily and the Levimo Lease was negotiated with two entities with bargaining power superior to that of the Company: W.P. Carey and Levimo. Lee was a major investor in the W.P. Carey entity negotiating the W.P. Carey Lease and had a hand in negotiating its terms. (Dep. Morgan 374-375; Dep. Bevelhymer 89-90, 94-95; Dep. Ex. 602). Lee and Asha inserted a waiver provision to absolve themselves from any liability related to the Sale-Leaseback Transaction in the Levimo Lease. (Dep. Ex. 79, Levimo Lease § 3(g) (emphasis added)). The terms of the Levimo Lease unfairly benefited the landlord – the Company was to shoulder all maintenance costs, insurance, and other expenses, including fees and interest on Lee's mortgage – and the Company had no way to terminate the 15 year agreement. (Dep. Ex. 79, Lease between Levimo, LLC and the Company §§ 5, 7(a), 8(a), 16)). The Lease created a substantial cash burden for a Company already in a cash flow bind, to retain space that it was not fully using.

The Levimo Lease was also unfair to the Company because it was approved by an uninformed board. The disinterested board members who voted to approve the Sale-Leaseback Transaction were not given a copy of the Levimo Lease prior to voting to approve it, did not review the terms of the Levimo Lease prior to approval, and were unaware of the numerous provisions which favored Lee Morgan and the Morgan family. (Dep. Ex. 498; Dep. Sanan 266, 268; Dep. McLaughlin 171-75; Dep. Von Matthiessen 187, 193-94; Dep. Luce 426-27). The Trust reiterates the Trustee's position that the question of damages to the Company stemming from the Levimo Lease is an issue appropriate for the testimony of an expert witness.

## 7. UNDISPUTED MATERIAL FACTS UNDERLYING TRUSTEE'S CLAIM AS TO COUNT FOUR

### A. Events Leading to Sale-Leaseback Transaction

7. Beginning in 2006, the Company's senior lenders proposed various ideas geared at monetizing the Company's assets, including leasing technology, computers and other property to assist with the Company's cash flow needs. (Bevelhymer Dep. at 63-64).[6]

8. In late 2006, the senior lenders suggested that the Company consider the sale and leaseback of all of its properties – two in St. Cloud, Minnesota and one in Yellow Springs, Ohio. (McLaughlin Dep. at 305; Bevelhymer Dep. at 67-68). The Company's 2005 credit agreement was expiring on March 31, 2007, and one requirement the senior lenders imposed on the Company in order to renew the credit agreement was entering into the sale and leaseback transaction with respect to several of its properties. (Bevelhymer Dep. at 65). The potential sale and leaseback transaction would provide the Company with a much needed cash infusion by monetizing existing real estate assets and it would reduce the principal owed to the senior lenders under the credit agreement. (McLaughlin Dep. at 305-06; Bevelhymer Dep. at 65-66). From a financial standpoint, the sale and leaseback transaction would essentially change the value the Company had on its balance sheet in terms of real property by turning it into a different asset – cash. (McLaughlin Dep. at 310).[7]

---

While expert discovery is ongoing, Trust anticipates presenting expert testimony the Levimo Lease contained out of market terms that unfairly favored Levimo. The Trust reserves its right to respond further at the close of expert discovery.

[6] The Trust admits that the Company's senior lenders were not confident in the Company's cash-flow and ability to satisfy its debts as they came due and began to suggest various proposals geared at reducing the amount the Company's principal indebtedness. (Dep. Bevelhymer at 63-65).

[7] The Trust admits that in connection with negotiations related to the renewal of the Company's credit agreement in 2006, the Company's senior lenders suggested that the Company consider selling some or all of its real estate in an effort to reduce the amount of the Company's principal indebtedness. (Dep. Bevelhymer 64:16-17; 65-68). The Trust further admits that a Sale-Leaseback Transaction would impact the Company's balance sheets by exchanging the real property into a cash asset.

9. Eventually, the senior lenders focused on the sale and leaseback of two of the Company's properties in St. Cloud, Minnesota (the "St. Cloud Properties"), as the Yellow Springs, Ohio property was not considered leasable office space. (McLaughlin Dep. at 305; Bevelhymer Dep. at 64, 67-68).[8]

10. The St. Cloud Properties were appraised at a total value of $26 million as of September 19, 2006. (Morgan Dep. at 375; Bevelhymer Dep. at 96; Dep. Ex. 197 – April 9, 2007 Board of Directors Meeting Agenda and attachments).

11. The senior lenders continued to condition refinancing and restructuring the Company's debt on the Company selling the St. Cloud Properties and leasing them back from the purchaser to improve the Company's balance sheet and reduce the principal owed to the senior lenders under the credit agreement. (Blair Dep. at 559-60; Sanan Dep. at 400; Luce Dep. at 430; McLaughlin Dep. at 351-53; von Matthiessen Dep. at 197; Bevelhymer Dep. at 92-93; Morgan Dep. at 375-76).

### B. Potential Deals Fall Through

12. The Company's Treasurer – Steve Bevelhymer – had the responsibility for exploring the sale and leaseback options for the St. Cloud Properties, along with LaSalle, which was the lead bank in the lending syndicate renewing the credit agreement and also acted as an agent specializing in this type of real estate transaction. (Bevelhymer Dep. at 68, 72-74; Sanan Dep. at 400-01). LaSalle

---

The Trust states further that pressure of the Senior Lenders to finalize a transaction put the Company in a weak position when it went to negotiate the terms of a Sale-Leaseback transaction with W.P. Carey and Lee Morgan.

 The Trust states further that the Company had more space than was needed for manufacturing and distribution. However, Company did not consider selling the portions of its property that were not in use outright despite indications that the Company's manufacturing and distribution operations should have been consolidated as they were operating at approximately 30% of capacity in 2006. (Dep. Bevelhymer 68-39; Dep. Ex. 630; Email from Northrop transmitting Antioch Presentation, April 14, 2006; Dep. Ex. 631, Antioch Company Contingency Plan).

[8] The Trust admits that eventually the Company's lenders and the Company focused on the sale of Company properties in St. Cloud, Minnesota.  The Trust states that Stephen Bevelhymer, the Company's treasurer who took the lead in putting together the Levimo Transaction, stated that the "building in Yellow Springs was not deemed leasable office space, you know for other tenants." (Dep. Bevelhymer 68:11-13).  The Trust denies that McLaughlin testified as to the reasons why the St. Cloud Properties were the focus of the Sale-Leaseback transaction.  (Dep. McLaughlin 305).

identified various potential purchasers for the St. Cloud Properties.  (Bevelhymer Dep. at 73-74).[9]

13. During the December 6, 2006 Board of Directors meeting, Bevelhymer reported that the Company was in the process of refinancing its credit facility and restructuring its debt obligations with a syndication of banks.  (McLaughlin Dep. at 304-06; Dep. Ex. 523 – December 6, 2006 Board of Directors Meeting Minutes).

14. As part of its refinancing efforts, Bevelhymer also reported that the Company had received a signed letter of intent from a third party – G.E. Capital – for the sale and leaseback of the St. Cloud Properties.  (McLaughlin Dep. at 304-06; Morgan Dep. at 374; Dep. Ex. 523 – December 6, 2006 Board of Directors Meeting Minutes). The potential deal fell through when G.E. Capital withdrew from the transaction. (Morgan Dep. at 374; McLaughlin Dep. at 306).

15. The Company and LaSalle continued to pursue the sale and leaseback transaction with other third parties because it was a condition (and therefore essential) to completing the refinancing with the bank syndication.  (McLaughlin Dep. at 306).

16. W.P. Carey was identified as potential partner for a sale and leaseback transaction in late 2006.  (Bevelhymer Dep. at 74, 88-89; McLaughlin Dep. at 169).  The Company pursued the transaction with W.P. Carey into 2007 and, through LaSalle, informed other potential purchasers of its intent to pursue the transaction with W.P. Carey.  (Bevelhymer Dep. at 88-89).[10]

---

[9]  The Trust admits that Steve Bevelhymer, as the Company's treasurer, took the lead in negotiating renewal of the Company's credit agreements with its lenders and was heavily involved in the Sale-Leaseback Transaction.  (Dep. Bevelhymer 72-74).  The Trust denies any implication that Bevelhymer was a real estate agent who specialized in this type of real estate transaction or that there is any evidence that he had any specialized experience relating to real estate transactions.  (Dep. Bevelhymer 72).  In fact, Bevelhymer, specifically noted that his involvement in the Sale-Leaseback Transaction arose solely because of his involvement in his role in refinancing the Company's debt as treasurer.  (*Id.*).

[10]  The Trust further states that WP. Carey offered to purchase the St. Cloud properties with Lee Morgan as a financing partner, and to enter into a long term fifteen year lease with the Company. (Dep. Bevelhymer 81-82; Andrew Aff., Ex. B, Letter of Intent from Corporate Property Associates 16 (an affiliate of W.P. Carey)).  Lee Morgan agreed to invest $7 million in the W.P. Carey affiliate formed to effectuate the transaction, ANT-LM, LLC.  (Andrew Aff., Ex. B; Dep. Ex. 524, Draft Lease Agreement between ANT-LM, LLC and the Antioch Company).  Lee Morgan would serve as a member of ANT-LM, LLC and had the opportunity to participate in the

17. Despite the efforts of all parties, W.P. Carey was unable to secure necessary financing and ultimately declined to enter into the sale and leaseback transaction with the Company. (McLaughlin Dep. at 169-70; Bevelhymer Dep. at 91; Sanan Dep. at 401-02; Morgan Dep. at 374).

18. The Company communicated W.P. Carey's decision to LaSalle and requested an extension on the existing 2005 credit agreement, but LaSalle continued to take the position, on behalf of the syndicate of senior lenders, that a sale and leaseback transaction was necessary to renew and/or extend the credit agreement. (Bevelhymer Dep. at 92-93).[11]

19. During the same time, credit markets had tightened around the country in 2007, and the pace and flow of transactions had slowed considerably. (Sanan Dep. at 402-03). As one director described: "The market was getting difficult and the urgency for us to get extra cash in the business was escalating." (*Id.* at 403).[12]

### C. The Senior Lenders Ask the Morgan Family to Step In

20. Following the failed transactions with G.E. Capital and W.P. Carey, the solution the senior lenders proposed in order to complete refinancing of the credit agreement was for Lee and Vicki Morgan to purchase the St. Cloud Properties and lease them back to the Company – essentially stepping in for W.P. Carey who had recently backed out at the eleventh hour. (Morgan Dep. at 374; Bevelhymer Dep. at 93).[13]

---

negotiation of the terms of the lease. (Dep. Bevelhymer 89-90; Dep. Ex. 602, Email from Matthews to Bevelhymer, March 16, 2007).

[11] The Trust admits that the Company informed LaSalle of W.P. Carey's decision and LaSalle, rightfully concerned about the Company's ability to pay back the debt it owed, continued to communicate to the Company that it would not renew or extend the Company's credit agreement without additional action.

[12] The Trustee states that Sanan's testimony speaks for itself and states further that the status of the financial markets in 2007, along with the Company's bargaining power, need for cash and other issues related to the Sale-Leaseback Transaction, are appropriate subjects for expert testimony and reserves the right to respond further at the close of expert discovery.

[13] The Trust admits that given Lee Morgan's previous involvement with the W.P. Carey deal and his plans to finance the transaction with W.P. Carey, the Company and the senior lenders believed it made sense for Lee Morgan and his wife to set up an entity and be the sole purchasers of the property. (Dep. Bevelhymer 93). The entity set up was called Levimo, LLC. (*Id.* at 94).

21. The Board was not aware of any other potential purchaser who was ready, willing and able to partner with the Company to complete the sale and leaseback transaction at that time. (McLaughlin Dep. at 308; Sanan Dep. at 402).

23. The Board also knew the transaction would allow the Company to continue using the St. Cloud properties. (McLaughlin at 309-10).[14]

25. Lee and Vicki Morgan then formed the Levimo entity to purchase the two St. Cloud Properties from the Company and lease them back to the Company. (Morgan Dep. at 374-75; McLaughlin Dep. at 308; Bevelhymer Dep. at 94).

26. The lease negotiated by the Company and W.P. Carey (the "W.P. Carey Lease") was used as a template to draft the lease agreement between the Company and Levimo (the "Levimo Lease"). (Bevelhymer Dep. at 85-88; McLaughlin Dep. at 94-95; 310-19; Morgan Dep. at 319; Dep. Exs. 79 and 315 – Lease Agreements between Levimo, LLC and The Antioch Company; Dep. Ex. 524 – Draft Lease Agreement between ANT-LM, LLC and The Antioch Company). The Board understood that the Levimo Lease generally followed the form of the earlier proposed W.P. Carey Lease. (von Matthiessen Dep. at 505).[15]

27. In many ways, the Levimo Lease afforded more favorable terms to the Company than the W.P. Carey Lease, including: a lower charge for late rent payments (2% vs. 5%), a longer grace period for rent payments (10 days vs. 5 days); a lower default interest rate (2% vs. 5%); the elimination of a $5,000 charge for late tender of quarterly financial statements by the tenant; the release of assets remaining in a

---

The Company's lenders indicated that if Lee Morgan were willing to finance the entire transaction, the lenders would consider renewal of the credit agreement. (*Id.*)

[14] The Trust admits that the Board knew the transaction "would allow" the Company to continue operating out of the St. Cloud properties – at a price of $2.6 million per year in rent payments, not including all of the maintenance and insurance expenses, and various other fees, including late fees charged by Lee Morgan. (Dep. Ex. 316, Email from Lee Morgan ("It appears we make more money when the rent is late than when it is on time, Gee, I hope it lasts.").

[15] The Trust admits that the lease negotiated by the Company and W.P. Carey was used as a template to draft the lease agreement between the Company and Levimo with some major and significant differences, including a waiver of the Company's breach of fiduciary duty claims against Lee and Asha. (Dep. Ex. 79; Dep. Ex. 524). There is no evidence that any board members had ever reviewed or even looked at the W.P. Carey lease, let alone had the knowledge to compare the two.

restoration fund to the tenant; and the elimination of post-closing obligations on the part of the tenant. (McLaughlin Dep. at 314-19; Bevelhymer Dep. at 214-15; Dep. Exs. 79 and 315 – Lease Agreement between Levimo, LLC and The Antioch Company; Dep. Ex. 524 – Draft Lease Agreement between ANT-LM, LLC and The Antioch Company).[16]

### D. The Board Approves the Sale-Leaseback Transaction

29. During the April 9, 2007 Board of Directors meeting, Bevelhymer made a presentation about the Sale-Leaseback Transaction, including the structure of the deal, which disclosed that Levimo was obtaining financing through the pledge of Lee and Vicki Morgan's personal assets and mortgages as collateral, and that the Sale-Leaseback Transaction would allow the Company's credit agreement with senior lenders to close within 10 days. (Bevelhymer Dep. at 96; Dep. Ex. 197 – April 9, 2007 Board of Directors Meeting Agenda and attachments).[17]

30. Bevelhymer informed the Board that the Sale-Leaseback Transaction was substantially the same transaction that was previously negotiated with W.P. Carey. (Bevelhymer Dep. at 99).[18]

31. The Board's objectives in considering the Sale-Leaseback Transaction were to satisfy the senior lenders' requirement to refinancing the Company's debt obligations of selling the two St. Cloud properties and ensure that the Company received fair market value for the properties. (McLaughlin Dep. at 351). The

---

[16] The Trust states that the terms of the Levimo Lease speak for themselves and states further that the Levimo Lease contained a number of provisions that favored the Morgan family over the interests of the Company, the most significant being the waiver of the Company's ability to pursue breach of fiduciary duty claims related to transaction (which had not been included in the W.P. Carey Lease) and the Change of Control and Asset Transfer Provisions that gave Lee Morgan the ability to control a sale of the Company to a third-party. (Dep. Ex. 79).

[17] The Trust admits that Bevelhymer made a presentation on April 9, 2007 but denies any implication that the members of the Board who voted to approve the Sale-Leaseback Transaction were then fully informed of the relevant details of the transaction.

[18] The Trust states that when asked "At the – when this lease was presented to the board to approve with LEVIMO, was the board told that this was substantially the same transaction as had been negotiated with W.P. Carey?", Bevelhymer responded "I believe I would have communicated that, yes." (Dep. Bevelhymer 99). The fact was, as previously discussed, the Levimo Lease contained material differences (including the Board's alleged waiver of the Company's claims) from the W.P. Carey Lease. (Dep. Ex. 79; Dep. Ex. 524).

Company needed cash and the Sale-Leaseback Transaction was going to allow it to close the refinancing of the credit facility. (McLaughlin Dep. at 319).[19]

32. The Board knew that it was voting to approve the sale of the St. Cloud properties to Levimo at their appraised values, totaling $26 million, as determined by an independent appraiser. (McLaughlin Dep. at 171, 209; Blair Dep. at 561).

33. The Board knew that Levimo was an entity owned by Lee and Vicki Morgan. (McLaughlin Dep. at 169; Blair Dep. at 560; Luce Dep. at 426; von Matthiessen Dep. at 197-98).

34. The Board was aware that members of the Morgan family took out loans and put liens on their personal property to finance the Sale-Leaseback Transaction. (Blair Dep. at 560¬61; von Matthiessen Dep. at 499-500).[20]

35. The Board also knew of the conflict of interest on the part of Lee Morgan and Asha Morgan Moran. (von Matthiessen Dep. at 503). They were members of the Board of Directors and at the same time Levimo – a Morgan family entity – was set to acquire assets of the Company. (*Id.*)

36. Despite the conflict of interest, the Board was not concerned that the Sale-Leaseback Transaction involved members of the Morgan family. (von Matthiessen Dep. at 197¬98; Bevelhymer Dep. at 99-100). The Board was relieved that the Morgan family was willing to put in $26 million because the Company was "in dire straits." (McLaughlin Dep. at 174).[21]

---

[19] The Trust states that whatever the Board's stated objectives in closing the Sale-Leaseback Transaction were (which the Trust admits included to obtain refinancing of the Company's debt obligations), the Board was not fully informed when considering the Sale-Leaseback Transaction, and thus could not have had a full understanding of the Sale-Leaseback Transaction or its consequences, including whether the Sale-Leaseback Transaction would satisfy the Board's "objectives." The Trust also states that the Sale-Leaseback Transaction worked contrary to the Company's need for cash, because the proceeds of the sale went to the banks to pay down principal, whereas the lease created new cash flow obligations of at least $2.6 million per year.

[20] The Trust admits that the Board was aware that members of the Morgan family financed the Sale-Leaseback Transaction and that the financing involved loans which required collateral, which would initially involve personal assets, but only until the Morgans could place a mortgage using the Company's St. Cloud properties themselves as collateral. The Board was not aware that the Morgan family had been willing to do the same with respect to the W.P. Carey lease.

[21] To the extent that the Trust can admit or deny the opinions or feelings of the Board, the Trust admits that the uninformed Board saw no problem with and was not concerned by the Morgan

37. When asked if he had any concerns with respect to the nature of the Sale-Leaseback Transaction, another director explained: "So it seemed like a reasonable proposal at this point in time because we were looking at a significant requirement to recapitalize the deal with the banks and restructure the bank debt and this was an opportunity for us to respond to the demands of the banks in terms of reorganizing the debt, restructuring the debt." (von Matthiessen Dep. at 197).[22]

39. The Board also knew of the potential for conflict in the future wherein the Company could become adverse to the landlord – Levimo – which was owned and controlled by Lee and Vicki Morgan. (Luce Dep. at 429).[23]

40. When asked if the Board discussed the difficulties such a conflict could create, one director stated: "Actually at the time the – we were facing a significant cash crunch. Our lenders, whose good will [sic] we needed, suggested that this was one way to resolve that. The Morgan family was willing to step into the transaction to put cash back into the business, roughly twenty-six million dollars, as I recall, which we needed to deal with immediate concerns. So while we were aware – excuse me – while we were aware that there could be potential conflicts down the road, our focus necessarily at that time was handling the immediate needs of the Antioch corporation. And the immediate need was to be able to stay in our covenants with our lenders and we needed the cash to do that, and to pay ESOP notes, as I recall." (Luce Dep. at 429-30).[24]

---

family's involvement and the conflict of interest in the $26 million transaction. The Trust states further that the board's lack of concern with the Morgans' conflict of interest is one of the many facts that supports the Trust's claims against the uninformed board members who voted to approve the Sale-Leaseback Transaction.

[22] The Trust states that von Matthiessen's testimony speaks for itself and notes further that because the voting board members were not fully informed about the terms of the Sale-Leaseback Transaction and because they approved it without ever even seeing or reading the lease documents, the opinion of whether or not the Transaction caused any concern is unreliable at best.

[23] The Trust admits that the Board knew that Levimo was owned and controlled by Lee and Vicki Morgan and thus knew that the there was a potential for conflicts in the future. The Trust denies that the Board knew they were waiving the Company's claims related to those conflicts when the Board approved the Sale-Leaseback Transaction, or that they gave any serious contemplation to the various ways the future conflict might manifest itself and impact the Company. (Dep. Ex. 498; Dep. Sanan 266, 268; Dep. McLaughlin 171-75; Dep. Von Matthiessen 187, 193-94; Dep. Luce 426-27).

41. The Board also did not believe it was unreasonable for Lee Morgan to seek a waiver of breach of fiduciary duty claims, given that the banks and the Company asked the Morgan family to put $26 million of their assets on the line to help the Company. (von Matthiessen Dep. at 505-06).[25]

42. After the Board discussed the Levimo proposal at the April 9, 2007 meeting, the disinterested directors in attendance were unanimous in their belief that it was a good transaction for the Company, especially given the facts and circumstances surrounding the Company's financial position at that point in time. (von Matthiessen Dep. at 504). The Board viewed the Sale-Leaseback Transaction as being in the best interests of the Company. (McLaughlin Dep. at 308-09; von Matthiessen Dep. at 501-02).[26]

43. During the same meeting, the Board passed resolutions approving the Sale-Leaseback Transaction, with each of the disinterested directors in attendance

---

[24] The Trust states that Luce's testimony speaks for itself and is further evidence of the Board's failure to fully consider the impact of the Sale-Leaseback transaction.

[25] The Trust states that after learning of the breach of fiduciary duty waiver in the lease at his deposition in 2012, Lee Morgan's counsel asked Malte von Matthiessen the following self-serving question: "Drawing from your experience as a businessperson and a corporate director, do you believe it to be unreasonable for Mr. Morgan to seek such a waiver where he is being asked to put skin in the game, so to speak, in other words, to put twenty-six million dollars of his own assets on the line to help the company?" To which von Matthiessen (and not the Board) answered "No." The Trust denies any implication that the Board had any knowledge or belief whatsoever related to the waiver contained in the Levimo Lease *at the time they approved* the Sale-Leaseback Transaction, given that they were not aware of the provision. Earlier in the same deposition, von Matthiessen had testified that he had never read the Levimo Lease in its entirety, that he did not know who negotiated the Levimo Lease, that he did not recall if he was aware of the conflict waiver provision or if that waiver was ever discussed at a board meeting. (Dep. Ex. 498; Dep. Sanan 266, 268; Dep. McLaughlin 171-75; Dep. Von Matthiessen 187, 193-94; Dep. Luce 426-27).

[26] The Trust admits that, despite not having read the lease document or having discussed the various provisions that worked against the Company and in the favor of the Morgan family, the board of directors discussed the Levimo proposal at the April 9, 2007 meeting, with Lee Morgan and Asha Morgan Moran present and in attendance, and unanimously voted to approve the Transaction. (Dep. Ex. 498). The Board was not fully informed in making its decision and thus the Board's view on whether the decision was in the best interests of the Company was irrelevant.

voting in favor of the Sale-Leaseback Transaction. (McLaughlin Dep. at 169-71, 306-07; Blair Dep. at 562; Luce Dep. at 425-30; von Matthiessen Dep. at 195-96, 501; Bevelhymer Dep. at 96-97; Dep. Ex. 510– April 9, 2007 Board of Directors Meeting Minutes). The Board authorized the Company to enter into an agreement for the sale of the St. Cloud Properties to Levimo. (Dep. Ex. 510 – April 9, 2007 Board of Directors Meeting Minutes; Dep. Ex. 353 – April 17, 2007 Agreement of Purchase and Sale between Levimo, LLC and The Antioch Company). The Board authorized the Company to enter into the lease with Levimo. (von Matthiessen Dep. at 185-86; Bevelhymer Dep. at 100-01; Dep. Ex. 510 – April 9, 2007 Board of Directors Meeting Minutes; Dep. Ex. 79 – April 17, 2007 Lease Agreement between Levimo, LLC and The Antioch Company).[27]

44. Lee Morgan and Asha Morgan Moran were involved in the Board's process and consideration of the potential G.E. Capital and W.P. Carey transactions. (Moran Dep. at 330-31; Morgan Dep. at 374).[28]

45. Lee Morgan and Asha Moran both abstained from voting on the Sale-Leaseback Transaction. (von Matthiessen Dep. at 503; Dep. Ex. 510 – April 9, 2007 Board of Directors Meeting Minutes). Because of their conflicts, through the Morgan family's interest in Levimo, the Board viewed their abstentions on the Sale-Leaseback Transaction vote as a matter of good corporate governance. (von Matthiessen Dep. at 503).[29]

### E.  The Parties Close the Sale-Leaseback Transaction

46. Levimo entered into an agreement to purchase the St. Cloud Properties from the Company on April 17, 2007 for a total of $26 million, the appraised value of the

---

[27] The Trust admits that the Board took various actions to authorize the Company to sell the St. Cloud Properties and entered into a Lease with Levimo on April 9, 2007.

[28] The Trust admits that Lee Morgan and Asha Morgan Moran were involved in the Board's consideration of the potential G.E. Capital and W.P. Carey Transaction and that Lee and Asha were both conflicted when they participated in any consideration of the W.P. Carey Transaction. (Andrew Aff., Ex. B).

[29] The Trust admits that Lee Morgan and Asha Morgan Moran both recused themselves from voting on the Sale-Leaseback Transaction but denies the implication that the mere fact that Lee and Asha recused themselves from the Board's deliberations and abstained from voting on the Sale-Leaseback Transaction absolves them from liability on the Company's claims that they breached their fiduciary duty related to the Sale-Leaseback Transaction. (*See* Doc. 179 at 13-17).

St. Cloud Properties. (Morgan Dep. at 320, 375; Dep. Ex. 353 – April 17, 2007 Agreement of Purchase and Sale between Levimo, LLC and The Antioch Company).

47. The Company received fair market value ($26 million) for the St. Cloud Properties and addressed its higher, related priority of restructuring its debt obligations. (McLaughlin Dep. at 351-53).[30]

48. Lee and Vicki Morgan personally made a $5 million down payment and financed the remainder of the $26 million purchase price through a loan from National City by pledging personal assets and the real estate itself as collateral. (Morgan Dep. at 374-75). In fact, they pledged the bulk of their personal assets as collateral to purchase the St. Cloud Properties. (Morgan Dep. at 374-75; von Matthiessen Dep. at 509-10; Dep. Ex. 255 – January 2, 2008 Email attaching Letter from Lee Morgan to Special Committee of Board of Directors).

49. Levimo also entered into an agreement to lease the St. Cloud Properties to the Company on April 17, 2007. (von Matthiessen Dep. at 185-86; Bevelhymer Dep. at 100-01; Dep. Ex. 79 – April 17, 2007 Lease Agreement between Levimo, LLC and The Antioch Company).

50. After Levimo purchased the St. Cloud Properties and leased them back to the Company, the senior lenders and the Company completed the refinancing. (Morgan Dep. at 376).

### F. The Company Assumes the Levimo Lease Following Reorganization

51. The Company later took advantage of the Bankruptcy Code provision (11 U.S.C. § 365) that affords a debtor the opportunity to aid its reorganization by rejecting certain executory contracts if they do not benefit the estate. The Company rejected a host of leases and unexpired contracts – leases that were "not necessary," "provided[d] no prospective benefit," and were a "drain" on the Company's cash flow. The Company determined that the Levimo Lease did not meet these criteria when it chose to assume the Levimo Lease and live by its terms

---

[30] The Trust admits that the St. Cloud Properties had been appraised for $26 million in 2006 and states that the fair market value of the St. Cloud Proprieties at the time of the transaction is a subject appropriate for expert testimony and reserves its right to respond to this allegation until the close of expert discovery.

post-petition.[31]

### III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

---

[31]  The Trust admits that the Company assumed the Levimo Lease in its first bankruptcy and states further that it was necessary to retain the St. Cloud Properties as the Company was attempting to restructure and stay in operation and the St. Cloud Properties were the location of the Company's most important division, Creative Memories.  Further, Lee Morgan and Asha Morgan Moran were still on the Board and running the Company when the Company assumed the lease during the first bankruptcy.

The Trust further states that the assumption of the Levimo Lease and its terms seems to have led to the bankruptcy of the restructured entity that emerged from the Company's 2008 Bankruptcy, The Antioch Company, LLC ("New Antioch").  New Antioch filed for Chapter 11 bankruptcy protection on April 16, 2013 in United States Bankruptcy Court in the District of Minnesota, Case No. 13-41898.  As part of its first-day pleadings, New Antioch explained that the latest bankruptcy filing was precipitated by the fact that "the optimistic revenue growth predicted by the former board of directors and management as part of the 2008 plan has not come to fruition," resulting in the "obligations left intact by the 2008 Plan were and are extremely burdensome to what is now a much smaller company."  *Notice of Hearing and Joint Motion for Expedited Relief and for an Order Authorizing Debtors to Honor Certain Prepetition Consultant Obligations and Customer Programs*, Doc. 8, U.S. Bankr. D. Minn., Case No. 13-41898.  Those obligations include "a real property lease with the former owners of the Company that is both oversized for the Company's current operations and set at above-market rates."  (*Id.*)

17

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

The corporate officer's duty of care generally requires that the officer shall perform his or her duties in good faith and in a manner the director reasonably believes to be in the best interest of the corporation, and where such care as an ordinarily prudent person in a like position would exercise under similar circumstances.  *See* Ohio Rev. Code §1701.60 (outlining statutory duty of care for directors).  Ohio Rev. Code § 1701.60 further provides that conflicted transactions between a corporation and its directors or officers is void or voidable unless: (a) the transaction is approved by a majority of disinterested directors fully informed as to the material facts of the transaction and the insider's interest in it; (b) the transaction is approved by a majority of disinterested shareholders fully informed as to the material facts of the transaction and the insider's interest in it; or (c) the transaction is fair to the corporation at the time it was approved.

### A. Recusal

First, Defendants maintain that they are entitled to summary judgment on Count Four because they played no role in the consideration of the Sale-Leaseback Transaction and abstained from the vote that ultimately approved it.[32]

Defendants cite *In re Tri-Star Pictures, Inc., Litig.*, where a Delaware court, applying Delaware law, found that a director's abstention from voting to approve a contested transaction shielded the director from liability predicated on the board's decision to approve the transaction. *Id.*, No. 9477, 1995 Del. Ch. LEXIS 27, at *9 (Del. Ch. 1995). However, in reaching this conclusion, the court recognized that no "per se rule unqualifiedly and categorically relieves a director from liability solely because that director refrains from voting on the challenged transaction." *Id.* at 8. Rather, the court's finding of no liability was based on the particular facts of the case. Specifically, that the directors had not "played any role, open or surreptitious, in formulating, negotiating or facilitating the transaction complained of." *Id.* In fact, subsequent to the *Tri-Star Pictures* decision, the court in *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1166 (Del. Ch. 2006), held that just because a director did not vote on the contested transaction did not absolute him from liability where he was closely involved with the challenged transaction from the very beginning. *Id.* at 202.

---

[32] While it is clear that Defendants abstained from the vote, what role they may have played in any discussions leading up to the vote and what effect, if any, their physical presence during the vote had on the Board, are all disputed issues of fact. (Dep. Ex. 498).

Accordingly, given the facts of this case as explained here, specifically Morgan's role in the Levimo Lease negotiations, Defendants' abstention from voting on the Sale-Leaseback Transaction does not entitle them to summary judgment.

## B. Whether the Sale-Leaseback Transaction Was Fair

Next, Defendants maintain that Count Four fails because the Sale-Leaseback Transaction was fair to Antioch.

An officer or director is free to engage in a transaction with the company as long as the transaction is fair to the company. *Granada Invs., Inc., DWG Corp*., 823 F. Supp. 448, 456 (N.D. Ohio 1993). An interested director bears the burden of demonstrating that "the transaction was fair and reasonable to the corporation notwithstanding his or her personal interest." *Koos v. Cent. Ohio Cellular*, 641 N.E.2d 265, 273 (Ohio App. 1994). To do so, the director must show that the transaction was approved at a fair price through fair dealing. *Gries v. Sports Enter. v. Cleveland Browns Football, Co.*, 496 N.E.2d 959, 963, 966 (Ohio 1986).[33]

### 1. Fair Dealing

Fair dealing is characterized as embracing "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to directors, and how the approval[] of the director[s]…[was] obtained." *Gries*, 496 N.E.2d at 966.

Defendants maintain that the Levimo Lease was fair because it is substantially the same transaction as the W.P. Carey Lease, which was negotiated at arm's length.

---

[33] *See also Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del. 1983) ("The concept of fairness has two basic aspects: fair dealing and fair price.").

20

Additionally, Morgan argues there is no evidence that he played any role in formulating or negotiating the sale-and-leaseback transaction, much less the material role Plaintiff alleges.

Plaintiff alleges that when Antioch began negotiations with W.P. Carey in the fall of 2006, the deal structure contemplated including the Morgan family as investors.  (Dep. Ex. 601).  In February 2007, E.P. Carey offered to purchase the St. Cloud properties for $27.5 million, with Lee Morgan as a financing partner, and enter into a long term fifteen year lease with Antioch.  (Dep. Bevelhymer 81-82; Andrew Aff., Ex. B).  Morgan agreed to invest $7 million in the W.P. Carey affiliate formed to effectuate the transaction, ANT-LM, LLC.  (Andrew Aff., Ex. B; Dep. Ex. 524).  Morgan would serve as a member of ANT-LM, LLC and had the opportunity to participate in the negotiation of the terms of the lease.  (Dep. Bevelhymer 89-90, Dep. Ex. 602). [34]  In fact, Morgan had the terms of the ANT-LM, LLC lease and other relevant documents reviewed by his legal counsel.

---

[34] Defendants maintain that "Exhibit 602 does not contain any negotiation or suggestion that Lee [Morgan] was involved with the terms or drafting of the lease.  It merely shows that he received documents from others."  (Doc. 109, fn. 2).  However, the Court finds the email does in fact suggest Morgan was involved in the contract negotiations.  The email chain (Dep. Ex. 602) reveals that Morgan had the Lease and related documents in late February, well before the April 9, 2007 meeting during which the Board adopted the Sale-Leaseback Transaction.  Additionally, Morgan forwarded the documents to multiple parties seeking legal advice in formulating and/or negotiating the Lease.  For example, one email reads: "The document is a potential minefield…How do you get your 7.5 mil back?...If Antioch defaults on the lease you're probably dead…After 15 years you have 90 days to give notice to get out…suggest a requirement for them to notify you before the 90 day period begins…I couldn't imagine from a legal standpoint that I had anywhere near the ability to protect you (sic) rather sizable investment."  Plaintiff also cites deposition testimony from Bevelhymer as evidence that Morgan was involved in structuring the transaction.  Bevelhymer testified that he "thinks" the W.P. Carey lease might have been sent to Morgan and then, when asked, had no recollection of ever having received any comments concerning the lease from Morgan or his counsel.  (Bevelhymer Dep. 89).

(*Id.*)  After W.P. Carey backed out of the deal, Lee and Vicki Morgan formed Levimo to enter the Sale-Leaseback Transaction.  (Dep. Morgan 374-75; Dep. Bevelhymer 94-95). Despite Morgan's involvement in the W.P. Carey deal as an investor, the proposed ANT-LM transaction was represented to the disinterested directors as "arms-length."  (Dep. Bevelhymer at 94-95).  Thus, Plaintiff maintains that the directors relied on the misconception that the Sale-Leaseback Transaction was fair because it was modeled on the failed deal with W.P. Carey without understanding that Morgan was to be a party to that deal.  (Sanan Dep 257-58; Dep Bevelhymer 89-90).

The Board agreed to the Sale-Leaseback Transaction, which locked Antioch into a 15-year lease term with no right or ability to terminate the lease.  (Dep. Ex. 79).  The Board obligated Antioch to pay basic rent of $2.6 million each year for 15 years.  (*Id.*) Furthermore, all costs of financing the transaction were to be borne by the Company, including reimbursement for any charges and fees and interest incurred by Levimo to finance the purchase of the property.  (Dep. Ex. 79; Dep. Ex. 197).  Additionally, the Levimo Lease had a waiver of the Company's ability to pursue claims against any Company officer and director (which did not appear in the W.P. Carey Lease).  (Dep. Ex. 79).

> At no time during the Term shall any person or "group"…pursuant to a single transaction or series of related transactions (i) acquire, directly or indirectly, more than 50% of the voting stock, partnership interests, membership interests or other equitable ban/or beneficial interests of Tenant or its permitted assignee ("Control") or (ii) obtain, directly or indirectly, the power (whether or not exercised) to elect a majority of the directors of the Tenant or voting control of any partnership or limited liability company or other entity acting as its general

22

> partner or managing member (including through a merger or consolidation of Tenant with or into any other Person), unless the purchaser of such Control, or Person who acquires such voting power: (A) after taking into account the transaction that resulted in the acquisition of such Control or voting power, be a Credit Entity and such Person shall enter into a guaranty **satisfactory to the Landlord** pursuant to which it guarantees the payment and performance under this Lease, or (B) **be approved in writing by Landlord….**

(the "Change of Control Provision") Dep. Ex. 79, Levimo Lease § 21(k) (emphasis added). Also, the transfer of the Company's assets would constitute an event of default (the "Asset Transfer Provision"). (Dep. Ex. 79, Levimo Lease § 22(a)(xiv)). The Change of Control Provision and Asset Transfer Provision are significant because prior to entering into the Levimo Lease, Morgan as CEO engaged Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan") on behalf of the Company to market Antioch to third-party purchasers. (Dep. Ex. 208).[35]

The Board could not have known anything about the alleged similarity of the W.P. Carey Lease and the Levimo Lease because, prior to voting on the approval of the Levimo transaction, the members of the Board had neither seen the Levimo Lease nor reviewed its terms. (Dep. Ex. 498; Dep. Sanan 266, 268; Dep. McLaughlin 171-175; Dep. von Matthiessen 187, 193-194; Dep. Luce 426-27). Board members admit that they were not provided with and did not review the terms of the Levimo Lease. (Dep. McLaighlin 171-72; Dep von Matthiessen 185-187, 196-197). Instead, they were provided with a bullet point summary. (Dep. Ex. 197; Dep. Bevelhymer 98). The Board

---

[35] Plaintiff maintains that it will offer expert testimony that the Levimo Lease contained out of market terms that unfairly favored the landlord and made the Company less attractive to a potential purchaser. (Doc. 179 at 15).

was not aware of the Change of Control Provision, the Asset Transfer Provision, or the waiver of Antioch's right to pursue breach of fiduciary duty claims, nor did the Board discuss the fact that the Morgan Family would have the right to approve (or not approve) any sale of Antioch following the transaction. (Dep. Ex. 498; Dep. Sanan 266, 268; Dep. McLaughlin 171-175; Dep. von Matthiessen 187, 193-94; Dep. Luce 426-27).[36] Accordingly, the Court finds that there is a genuine issue of material fact as to whether the directors who voted on the Levimo Lease were fully informed.

An arm's length transaction is characterized as being voluntary, without compulsion or duress, and one where the parties act in their own self-interest. *Walters v. Knox County Bd. of Revision*, 546 N.E.2d 932 (Ohio 1989). Bevelhymer, who negotiated the transaction for Antioch, admitted that Antioch needed the transaction to close and had no other alternatives, which gave W.P. Carey (and Levimo) superior bargaining power. (Dep. Bevelhymer 88). When W.P. Carey pulled out of the deal, Antioch was in an even worse bargaining position. Antioch was under pressure from its lenders to effectuate the Sale-Leaseback Transaction in order to renew a credit agreement, and the only option

---

[36]  Plaintiff maintains that the obligations of the Levimo Lease continue to plague the restructured entity that emerged from Antioch's 2008 Bankruptcy. The Antioch Company, LLC ("New Antioch") filed for Chapter 11 bankruptcy protection on April 16, 2013 in United States Bankruptcy Court in the District of Minnesota, Case No. 13-41898. As part of its first-day pleadings, New Antioch explained that the latest bankruptcy filing was precipitated by the fact that "the optimistic revenue growth predicted by the former board of directors and management as part of the 2008 plan has not come to fruition," resulting in the "obligations left intact by the 2008 Plan were and are extremely burdensome to what is now a much smaller company." (Doc. 8, U.S. Bank. D. Minn., Case No. 13-41898). Those obligations include "a real property lease with the former owners of the Company that is both oversized for the Company's current operations and set at above-market rates." (*Id.*)

Antioch had was the Levimo Lease. Plaintiff maintains that Defendants were under so much pressure to close that they included a waiver provision to absolve themselves from any liability related to the Sale-Leaseback Transaction. Thus, there is a genuine issue of material fact as to whether the Sale-Leaseback Transaction was an arm's length transaction. *See, e.g., Gries*, 496 N.E.2d at 966 (fair dealing is characterized as embracing "questions of when the transaction was timed, how it was initiated, structured, negotiated…").

Accordingly, Morgan has failed to meet his burden of demonstrating that "the transaction was fair and reasonable to the corporation nothwithstanding his personal interest." *Koos*, 641 N.E.2d at 273. However, the Court finds, as a matter of law, that Asha Morgan Moran did not have any procedural or substantive connection to the Levimo transaction. Moran was not an investor in Levimo, she did not originate or negotiate the transaction, and she abstained from voting on the transaction. Plaintiff argues that even without active participation in the negotiation of the Sale-Leaseback Transaction, Moran cannot ignore Morgan's breach of fiduciary duty.[37] However, there

---

[37] "Directors may not shut their eyes to corporate misconduct and then claim that because they did not see the misconduct, they do not have a duty to look. The sentinel asleep at his post contributes nothing to the enterprise he is charged to protect." *Geygan v. Queen City Grain Co.*, 593 N.E.2d 328, 332-333 (Ohio App. 1991). "When a director has knowledge of a fellow director's improprieties and does not act upon the information, her decision to stand idly by is not a defense." *Id. See also In Re Nat'l Century Fin. Enters.*, 504 F. Supp.2d 287, 313-14 (S.D. Ohio 2007) ("[W]hen a director has knowledge of a fellow director's improprieties and does not act upon that information, [the director's] decision to stand by idly is not a defense.").

is simply no evidence that Moran even knew about Morgan's alleged involvement in the Levimo negotiations.

### 2. *Fair Price*

Defendants maintain that the $26 million Antioch received through the Sale-Leaseback Transaction was a fair price. Specifically, the real estate subject to the Sale-Leaseback Transaction was independently appraised at $26 million immediately before the Board's vote. (Doc. 154 at ¶ 10). While Plaintiff does not expressly state that the $26 million was an unfair price,[38] it argues that the transaction was not financially fair as: (1) it bound the Company to a 15 year lease for space it was not using; (2) a number of the lease terms were restrictive;[39] and (3) lease payments were above market rates.[40]

---

[38] "[F]air price 'relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.'" *In re S. Peru Copper Corp. Shareholder Derivative Litig.*, 52 A.3d 761, 787-88 (Del. Ch. Ct. 2011) *quoting Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[39] Plaintiff's expert, Mark Greenberg of Silverstone Advisors, found that the lease contained "unusual out-of-market provisions," including change of control and asset transfer clauses that made the landlord a "*de facto* gatekeeper" with the power to consent to or deny a change of control transaction. (Doc. 199, Ex. 1A) ("These 'poison pill' terms unfairly favor the landlord, Lee Morgan, and clearly were intended to make the Company less attractive to potential purchasers in the future.").

[40] Defendants cite *Pittsburgh Terminal Corp. v. B&O R.R.*, 875 F.2d 549 (6th Cir. 1989), where the Sixth Circuit questioned whether alleged procedural unfairness or lack of fair dealing was even relevant concluding that the "dominant consideration of fairness or a transaction remains price." *Id*. at 554. In *Pittsburgh Terminal*, the district court "specifically found that there had been an adequate analysis of information upon which to determine the value of the stock and that the historical price/earnings ratio, which was used by defendants to value the stock, was a more appropriate method of determining value than other methods suggested by Pittsburgh Terminal." *Id*. at 553. In the instant case, however, there are disputed facts surrounding the transaction "price."

Accordingly, whether the "price" was fair is a disputed issue of material fact.

 **C. Waiver**

It is undisputed that the Levimo Lease contains a provision waiving on behalf of Antioch the exact claims Plaintiff has asserted in Count Four.  The only question before the Court is whether the lease provision should be enforced.  The specific question is whether there was a voluntary relinquishment of the right to sue for breach of fiduciary duty.

Waiver is the "*voluntary* relinquishment of a *known* right."  *Glidden Co. v. Lumbermens Mut. Cas. Co*., 861 N.E.2d 109 (Ohio 2006) (emphasis supplied).  "As a general rule, the doctrine of waiver is applicable to all personal rights and privileges, whether secured by contract, conferred by statute, or guaranteed by the Constitution, provided that the waiver does not violate public policy."  *Sanitary Commercial Servs., Inc. v. Shank*, 566 N.E.2d 1215 (Ohio 1991).

Defendants maintain that Antioch waived any and all breach of fiduciary duty claims arising from the Sale-Leaseback Transaction, and Plaintiff, standing in Antioch's pre-petition shoes, is bound by it.

> [ANTIOCH], ON BEHALF OF ITSELF AND ANY TRUSTEE OR LEGAL REPRESENTATIVE (UNDER THE FEDERAL BANKRUPTCY CODE OR ANY SIMILAR STATE INSOLVENCY PROCEEDING) EXPRESSLY ACKNOWLEDGES THAT CERTAIN AFFILIATES OF LANDLORD [LEVIMO] HAVE BEEN, ARE, OR MAY IN THE FUTURE BE OFFICERS, DIRECTORS, OR AFFILIATES OF TENANT, AND, ON BEHALF OF ITSELF AND ANY SUCH TRUSTEE OR LEGAL REPRESENTATIVE, HEREBY WAIVES ANY RIGHT TO CLAIM OR ASSERT DAMAGES AGAINST ANY SUCH AFFILIATE FOR ANY BREACH OF FIDUCIARY DUTY ARISING

DIRECTLY OR INDIRECTLY FROM THE ENTRY BY LANDLORD AND TENANT INTO THIS LEASE OR THE EXERCISE OF ANY RIGHTS GRANTED TO ANY PARTY HEREUNDER.

(Dep. Ex. 79).

The waiver provision for the Levimo Lease did not appear in the W.P. Carey Lease.  The Board of Directors which approved the Levimo Lease did not review the terms of the Lease and were not provided a copy of the Lease.  (Dep. McLaughlin 171-172; Dep. von Matthiessen 185-187, 196-197).  Therefore, the directors voting in favor of the transaction had no knowledge that they were relinquishing the Company's right to sue for breach of fiduciary duty.  A party cannot waive its claims without "full knowledge of all the facts."  *N. Olmsted v. Eliza Jennings, Inc*., 631 N.E.2d 1130 (Ohio App. 1993).  Thus, the Court finds the waiver provision to be unenforceable as a matter of law. [41]

## V.   CONCLUSION

Accordingly, for the foregoing reasons, Defendant Lee Morgan's motion for partial summary judgment on Count Four (Doc. 152) is **DENIED** and Asha Moran's motion for partial summary judgment on Count Four (Doc. 152) is **GRANTED**,

---

[41]  If a jury finds Morgan breached his fiduciary duty, the waiver would violate public policy and be unenforceable.  *Sanitary Commerical Servs.*, 560 N.E.2d 1215.  A contract provision violates public policy if it is "injurious to the public or against the public good."  *Dixon v. Van Sweringen Co.*, 166 N.E. 887, 889 (1929).  Ohio has established significant safeguards to protect corporations when their directors engaged in conflicted transactions.  *See, e.g.,* Ohio Rev. Code §§ 1701.59, 1701.60.  Ultimately, Anitoch defaulted on the Employee Stock Ownership Plan ("ESOP"), which provided retirement benefits to Antioch employees, leaving noteholders with no redress and significant injury.

as there is no genuine dispute as to any material fact relating to Asha Moran's role, and she is entitled to judgment as a matter of law.

**IT IS SO ORDERED**.

Date:  8/2/13                                         */s/ Timothy S. Black*
                                                      Timothy S. Black
                                                      United States District Judge