```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION

 3                        - - -
   THE ANTIOCH COMPANY        :
 4 LITIGATION TRUST,          :
                              :
 5          Plaintiff,        :CASE NO. 3:10-cv-00156
                              :
 6 vs.                        :(Judge Timothy S. Black)
                              :
 7 LEE MORGAN, et al.,        :
                              :
 8          Defendants.       :
                           - - -
 9

10

11                      VOLUME I

12

13          Deposition of MARK A. GREENBERG, a

14 witness herein, taken as upon cross-examination by

15 the Defendants pursuant to the Ohio Rules of Civil

16 Procedure, before me, Kelly Green, RPR, a Notary

17 Public within and for the State of Ohio, at Taft,

18 Stettinius & Hollister, 425 Walnut Street, Suite

19 1800, Cincinnati, Ohio, on Monday, August 26,

20 2013, at 9:08 a.m.

21

22

23                   On-Time Reporting
                     8739 Landen Drive
24               Maineville, Ohio  45039
                     513.290.3233
```

```
 1  ‖                         APPEARANCES

 2  ‖        FOR THE PLAINTIFF:

 3  ‖             MARCIA VOORHIS ANDREW, ESQ.
    ‖             EMILY McNICHOLAS, ESQ.
 4  ‖             Taft, Stettinius & Hollister
    ‖             425 Walnut Street, Suite 1800
 5  ‖             Cincinnati, OH  45202

 6  ‖        FOR THE DEFENDANTS MORGAN, MORAN, ATTIKEN:

 7  ‖             MICHAEL L. SCHEIER, ESQ.
    ‖             DAVID T. BULES, ESQ.
 8  ‖             Keating, Meuthing & Klekamp
    ‖             One East Fourth Street, Suite 1400
 9  ‖             Cincinnati, OH  45202

10  ‖        FOR THE DEFENDANTS MCDERMOTT, WILL & EMERY:

11  ‖             JEFFREY S. SHARKEY, ESQ.
    ‖             Faruki, Ireland & Cox
12  ‖             500 Courthouse Plaza SW
    ‖             10 North Ludlow Street
13  ‖             Dayton, OH  45402

14  ‖        FOR THE DEFENDANTS BLAIR, LUCE, WALKER:

15  ‖             DANIEL J. GENTRY, ESQ.
    ‖             TERENCE L. FAGUE, ESQ.
16  ‖             Coolidge Wall
    ‖             33 West First Street
17  ‖             Dayton, OH  45402

18  ‖        FOR THE DEFENDANTS CARLSON, SANAN,
    ‖        McLAUGHLIN, VON MATTHIESSEN:
19  ‖
    ‖             THOMAS A. KNOTH, ESQ.
20  ‖             JENNIFER MAFFETT, ESQ.
    ‖             Thompson Hine
21  ‖             Austin Landing I
    ‖             10050 Innovation Drive, Suite 400
22  ‖             Dayton, OH  45342

23  ‖

24  ‖
```

```
 1    APPEARANCES (Cont'd)

 2         FOR THE DEFENDANTS LIPSON-WILSON, FELIX,
           BEVELHYMER:
 3
                ROBERT A. KLINGLER, ESQ.
 4              Robert A. Klingler Co., LPA!
                525 Vine Street, Suite 2320
 5              Cincinnati, OH  45202

 6         FOR THE DEFENDANT NORTHROP:

 7              R. DANIEL PRENTISS, ESQ.
                Prentiss Law Firm
 8              One Turks Head Place, Suite 380
                Providence, RI  02903
 9
      ALSO PRESENT:
10
           Tim Miller
11         Jess Ultz
           Asha Moran
12         Lee Morgan

13                              - - -

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                      EXAMINATION INDEX

 2                                                   PAGE
     MARK A. GREENBERG
 3        CROSS BY MR. SCHEIER....................6

 4


 5                       EXHIBIT INDEX

 6   Deposition
       795   Silverstone Invoice 1712.............20
 7
       796   Witness's Rates and Hours Chart and
 8           Invoice 1714.........................21

 9     797   Witness's Report.....................25

10     798   List of Exhibits Provided to Witness..35

11     799   Barbara Wagner's Report..............49

12     800   Federal Rule 26......................103

13     801   Time Table of Proposals.............227

14     802   Disclosure Statement................300

15

16

17

18

19

20

21

22

23

24
```

```
 1              MARK A. GREENBERG,
 2   a witness herein, having been duly sworn, was
 3   examined and testified as follows:
 4                CROSS-EXAMINATION
 5   BY MR. SCHEIER:
 6        Q.    What is your name?
 7        A.    Mark Alan Greenberg.
 8        Q.    Good morning, Mark Alan Greenberg.  My
 9   name is Mike Scheier.  I'm an attorney with the
10   law firm of Keating, Meuthing & Klekamp, and my
11   clients in this case are Lee Morgan and Asha
12   Moran, who are sitting right behind me.
13             In addition, I represent Marty Moran and
14   a former defendant, Chandra Attiken, and a number
15   of Morgan trusts.  I'll be asking you questions
16   today.  Have you ever been deposed before?
17        A.    Yes.
18        Q.    So you understand the ground rules?
19        A.    Mm-hmm.
20        Q.    I'll ask questions; you'll answer them
21   under oath.  I'll give you the courtesy of
22   allowing you to complete your responses, and I'd
23   ask for the same courtesy, to allow me to finish
24   my question, although you might be able to
```

1    anticipate what the end of the question is.

2            If you need a break, you let me know.

3    You'll also need to verbalize all answers so that

4    Kelly can take them down since she's going to be

5    transcribing our questions and your answers here

6    today.  What's your current home address?

7        A.    I live at 11535 Iron Liege Lane,

8    Cincinnati, Ohio, 45249.

9        Q.    How many times prior to this deposition

10   have you sat for a deposition?

11       A.    One, actually.

12       Q.    Were you deposed in your personal

13   capacity or as an expert witness?

14       A.    In my personal capacity.

15       Q.    Can you describe just very generally

16   what that piece of litigation involved?

17       A.    Sure.  I was on the board of directors

18   of a company.  I was the chairman, I was also CEO

19   of the company, and we were sued by an outside

20   shareholder.

21       Q.    When you say "we were sued," who was

22   sued?

23       A.    The board of directors was sued.

24       Q.    Were you named personally in that suit?

```
 1        A.     Yes.

 2        Q.     Do you know if that suit was alleging a

 3   brief of fiduciary duty?

 4        A.     Yes.

 5        Q.     Can you describe what the plaintiff's

 6   allegations were in that case, in particular

 7   against you, if they were particularized in that

 8   way?

 9        A.     I don't recall all the specifics of the

10   -- the general issue was that the board was --

11   consisted of members who were investors in another

12   company.  The two other members of the board were

13   member -- were private equity investors in the

14   company we had.  And as we were selling the

15   company, I became chairman of another one of their

16   companies.

17            And the complaint was generally that we

18   were not focusing on the company in selling the

19   company, which we, in fact, had, and that -- that

20   we were -- we somehow conspired to go where we

21   thought the better options were.

22        Q.     Do you recall in what court that

23   litigation was pending?

24        A.     It was Hamilton County.
```

```
 1        Q.    And state court, as far as you
 2   understand?
 3        A.    Yes.
 4        Q.    Do you recall who the judge was?
 5        A.    I don't.  Never got that far.
 6        Q.    Who represented you as counsel?
 7        A.    Thompson Hine.
 8        Q.    Anyone in particular there?
 9        A.    I don't remember a name.
10        Q.    Do you recall who represented the
11   plaintiff in that case?
12        A.    The Wolfe Law Firm.
13        Q.    Do you recall who the plaintiff was?
14        A.    Yes.  It was Robert Wolfe.
15        Q.    How did that lawsuit resolve, if you
16   recall?
17        A.    It was settled.
18        Q.    And was there a monetary payment made to
19   the plaintiff?
20        A.    Yes.
21        Q.    Do you recall the amount?
22        A.    It was about $200,000.
23        Q.    Did you make -- did you contribute from
24   any of your personal assets to that settlement?
```

```
 1        A.    I don't think so.

 2        Q.    Was that settlement covered by --

 3        A.    Sure.

 4        Q.    -- insurance?

 5        A.    Yes, it was.

 6        Q.    And what company was --

 7        A.    It was the Jay Industrial Technologies

 8   Group.

 9        Q.    Do you recall the year of the

10   litigation?

11        A.    I don't, not offhand.

12        Q.    Have you been sued as -- for anything

13   you've done or any decision you've made as an

14   officer or director other than the one instance

15   we've just --

16        A.    No.

17        Q.    -- discussed?

18        A.    It's the only suit I've ever had.

19        Q.    Have you ever given a deposition as an

20   expert witness before?

21        A.    No.

22        Q.    You have testified in court previously

23   as an expert witness, correct?

24        A.    Yes, in a bankruptcy case.
```

```
 1               (Off-the-record discussion.)
 2        Q.    (By Mr. Scheier)  Do you recall, in the
 3   lawsuit that Mr. Wolfe filed, were there any
 4   allegations made against you personally in regard
 5   to your conduct as the -- as a director or as a
 6   CEO?
 7        A.    There were all kinds of things in
 8   there.  I just don't recall what they were
 9   specifically.
10        Q.    Did you retain a copy of your deposition
11   transcript?
12        A.    No.
13        Q.    You're currently employed with
14   Silverstone Advisors; is that right?
15        A.    Yes.
16        Q.    And I notice that Silverstone Advisors,
17   LLC, is doing business as Silverstone
18   Advisors/Blackbird Capital Group; is that right?
19        A.    Yes.
20        Q.    At some point were there two entities --
21   Silverstone Advisors and Blackbird Capital?
22        A.    There were.
23        Q.    And was Blackbird Capital an
24   organization that Mr. Vota was affiliated with?
```

```
 1        A.    Yes.

 2        Q.    Were you a member of Blackbird or --

 3        A.    No.

 4        Q.    -- were you a member of Silverstone?

 5        A.    I was never a member of Blackbird.

 6        Q.    And as Kelly mentioned, I do understand

 7   you probably will anticipate my questions, but it

 8   will be much easier for the reporter --

 9        A.    Mm-hmm.

10        Q.    -- if you'd show some patience and allow

11   me to complete my questions.

12              So I understand that Silverstone is a

13   limited liability company?

14        A.    Yes.

15        Q.    Who are its members?

16        A.    Myself, John Hopper, and John Vota.

17        Q.    And are each of those three individuals

18   active members of that business?

19        A.    Yes.

20        Q.    Did any of those individuals assist you

21   in any way in executing your duties as an expert

22   witness in this case?

23        A.    Apart from listening to me go on about

24   it, the answer would be, generally, no.
```

1    Q.    What do you mean listening to you go on
2  about it?
3    A.    Just obviously talked about what I was
4  looking at and -- and some conversation around
5  that, but they never were involved with any of the
6  drafting or any of the opinion.
7    Q.    Other than you, Mr. Vota, and
8  Mr. Hopper, does Silverstone have any other
9  employees?
10    A.    Yes.
11    Q.    How many?
12    A.    Just one other.
13    Q.    Who's that?
14    A.    His name is Hardik Mehta.
15    Q.    Did Mr. Mehta assist you in any way in
16  executing your duties as an expert witness?
17    A.    No.
18    Q.    Now, I've referenced you as an expert
19  witness a number of times.  I just want to verify
20  for the record that you, in fact, have been
21  engaged by the plaintiff in this particular
22  litigation, Mr. Miller, to serve as an expert
23  witness on his behalf to give opinion testimony
24  against my clients; is that correct?

```
 1        A.    That's correct.

 2        Q.    Have you formulated any opinions that

 3   you are prepared to give at trial?

 4        A.    I have.

 5        Q.    Okay.  And you also prepared a written

 6   report in this case; is that right?

 7        A.    That's correct.

 8        Q.    And is it fair to say that the opinions

 9   that you will be offering at trial are contained

10   within that report?

11        A.    Largely contained in that report.

12        Q.    Is it the law firm of Taft, Stettinius &

13   Hollister that retained you, or somebody else?

14        A.    I was contacted by Taft and retained by

15   the Litigation Trust.  They're the ones paying the

16   bills, I would assume.

17        Q.    You don't know who's paying your bills?

18        A.    It's the Litigation Trust.

19        Q.    Have they paid all your bills?

20        A.    Yes, they have.

21        Q.    Your report indicated you were retained

22   in early June of 2013; is that right?

23        A.    That's correct.

24        Q.    Is there a document that evidences your
```

```
1    retention such as some sort of a contract or an
2    engagement letter?
3         A.   Yes, there is.
4         Q.   I didn't notice that in your document
5    production.  Do you know if you provided that to
6    the Taft lawyers to hand over as part of the
7    document production?
8         A.   I don't believe I did that.  I thought
9    that it was in the -- in the file; but if it's
10   not, that's easy to remedy.
11        Q.   Well, we didn't get it.  We did ask for
12   your entire file, correct?
13        A.   I believe that was the entire file.
14        Q.   Well, apparently it wasn't because we
15   didn't get your retention letter.  So is there any
16   document other than the retention letter from your
17   file that you failed to provide to the Taft
18   lawyers to turn over to us?
19        A.   Not that I know of.
20        Q.   Although you might have said it, who
21   initially from the Taft law firm contacted you
22   about serving as an expert witness in the case?
23        A.   Timothy Miller.
24        Q.   Do you recall when Mr. Miller contacted
```

1    you?

2        A.    I would think sometime in late

3    May/middle May, if I recall.

4        Q.    That was by phone call?

5        A.    Yes.

6        Q.    Prior to Taft engaging you in this

7    firm -- or their client, the trust -- had you

8    consulted with Taft in any other piece of

9    litigation as either a testifying expert or a

10   non-testifying consultant?

11       A.    No, I didn't.  I have not.

12       Q.    Mr. Greenberg, is it your understanding

13   that you've been personally retained by the Taft

14   law firm, or has it been Silverstone that was

15   retained, if you can think back to the engagement

16   letter --

17       A.    The engagement agreement is -- sorry.

18       Q.    That's okay.  -- if you can think back

19   to the engagement letter that you failed to

20   produce and we haven't seen?

21       A.    The engagement was with Silverstone

22   which specifies me as the person involved as the

23   witness.

24       Q.    Had you done any work for Mr. Miller

```
 1   before?
 2        A.    I have not.
 3        Q.    Have you done any work for Ms. Andrew
 4   before?
 5        A.    I have not.
 6        Q.    For any other attorney -- have you done
 7   any other work for any other attorney in the Taft
 8   law firm?
 9        A.    Let me think.  Not that I recall.
10        Q.    Has Silverstone or, to the best of your
11   knowledge, Blackbird done any work for the Taft
12   law firm before?
13        A.    I believe it has.  One of my partners is
14   a broker/dealer -- arbitration issues.
15        Q.    Were you involved at all in that
16   engagement?
17        A.    I was not.
18        Q.    Do you know whether Taft paid your --
19   the Silverstone Group for that engagement?
20        A.    I don't think so.
21        Q.    Was it done gratis?
22        A.    I don't believe so.  It was done as an
23   independent of the firm.
24        Q.    A client paid your bill?
```

```
 1         A.    (No response.)

 2         Q.    When I say "your bill," I mean

 3    Silverstone's.

 4         A.    I believe the bill was paid directly to

 5    Mr. Hopper, who was my partner, because that's --

 6    but -- and I'm not sure that it was done during

 7    the time it was Silverstone, to be honest with

 8    you, to clarify.

 9         Q.    It might have been -- was Hopper

10    associated with Blackbird before --

11         A.    Hopper was never associated with

12    Blackbird.  Hopper is an attorney by background

13    who has been involved with broker dealerships in

14    -- over the years and is -- is retained as an

15    arbitrator.

16         Q.    Are you related to any lawyer at the

17    Taft firm?

18         A.    I am not.

19         Q.    Do you have any personal or social

20    relationships with any attorneys at the Taft law

21    firm?

22         A.    I do not.

23         Q.    I understand you're being paid $350 an

24    hour for the work you've performed in this case?
```

```
 1        A.    Yes.

 2        Q.    Are you also being paid any expenses?

 3        A.    I haven't been paid any expenses.

 4        Q.    Have you incurred any expenses?

 5        A.    I have not.

 6        Q.    Have you actually been paid for the time

 7   that you've put in for the work you've done to

 8   date?

 9        A.    All the bills that I've submitted have

10   been paid for.

11        Q.    And you have been recording your time

12   since the initial contact, since you've actually

13   been engaged by the Taft firm?

14        A.    Yes.

15        Q.    Were you paid anything for work you did

16   prior to the formal engagement -- and when I say

17   "formal engagement," I mean before both parties

18   actually executed the engagement letter?

19        A.    No.

20        Q.    There were a couple of your invoices

21   that were produced as, I presume, part of your

22   file that indicated you've worked about 132 hours

23   through July 12, 2013.  Does that sound accurate?

24        A.    I'll have to take your word for it.  It
```

1  sounds like it could be accurate.

2      Q.    We only received invoices through

3  July 12, 2013, probably just based on the timing

4  of the document request.

5          Have you done any work since July 12,

6  2013, to the best of your recollection --

7      A.    Yes, I have.

8      Q.    -- on this case?

9      A.    Yes, I have.

10          (Jesse Ultz entered the room.)

11          MR. SCHEIER:  Can we go off the record

12  for a moment?

13          (Deposition Exhibit No. 795 was marked.)

14      Q.    (By Mr. Scheier)  I'm handing you what's

15  been marked as Deposition Exhibit 795, if you'd

16  take a look at that.  I understand this to be an

17  invoice that --

18          MS. ANDREW:  Excuse me.  Do you have

19  copies?

20          MR. SCHEIER:  Yes, sure.  See, Marsha, I

21  haven't done this in so long, I forgot protocols.

22      Q.    (By Mr. Scheier)  Exhibit 795, as I

23  understand it, is an invoice dated July 3, 2013,

24  from Silverstone to Ms. Andrew at the Taft firm

1   reflecting 78 hours' worth of work that you

2   performed, it looks like, if you turn to the

3   second page of the exhibit, in the month of June

4   2013.  And I just ask that whether you can verify

5   that that's, in fact, what this document is?

6        A.   Yes, it is.

7        Q.   Does it accurately reflect all the work

8   that you did beginning, it looks like, June 8th of

9   2013 through June 30, 2013?

10       A.   Yes, it does.

11       Q.   Did the trust or the Taft law firm pay

12  this invoice?

13       A.   Yes, it has.

14            (Deposition Exhibit No. 796 was marked.)

15       Q.   Sir, putting before you what I've marked

16  as Exhibit 796, it appears to be a second of two

17  invoices that you produced.  You'll see there's a

18  Bates number or document control number with your

19  name on it at the bottom right, Greenberg 54 and

20  Greenberg 363, but I believe they're all related

21  documents.

22            The second page actually is an invoice

23  to Marsha Andrew from Silverstone dated July 15,

24  2013.  And if you look at the first page of the

```
 1    document, it appears to be some detail backing up

 2    the invoice that is the second page of Exhibit

 3    796; is that right?

 4         A.   That's correct.

 5         Q.   And does Exhibit 796 accurately reflect

 6    the work that you performed as an expert witness

 7    for the Antioch Litigation Trust between July 1

 8    and July 12, 2013?

 9         A.   I believe it does.

10         Q.   Since July 12, 2013, can you estimate

11    for me how many hours of work you've put in for

12    the Litigation Trust as an expert witness?

13         A.   I cannot -- there's been several.  I

14    don't know exactly.

15         Q.   Have you generated any invoices?

16         A.   I have not generated any invoices, not

17    yet.

18         Q.   Has the Taft firm paid the invoice

19    that's Exhibit 796, to the best of your knowledge?

20         A.   Yes, they have.

21         Q.   Do you know how much you've billed Taft

22    or intend to bill the Taft firm for the work

23    you've completed since July 12th?

24         A.   I just answered that I don't.  I can't
```

```
1    estimate the hours, so I don't know what it is.
2        Q.    Well, there were two different
3    questions.  One was the hours and one was whether
4    you knew the amount that Taft owes you for the
5    work done since July --
6        A.    No.
7        Q.    Let me finish.  -- since July 12?
8        A.    No and no.
9        Q.    Did you meet with lawyers from Taft to
10   prepare for this deposition?
11       A.    I have.
12       Q.    When?
13       A.    On the 23rd, and prior to that --
14   probably about two weeks prior to that as well.
15       Q.    Did you meet, when it was two weeks ago,
16   Ms. Andrew?
17       A.    I have.
18       Q.    Was Mr. Miller involved in that meeting?
19       A.    He was not.
20       Q.    Was Emily McNicholas involved in that
21   meeting?
22       A.    She was not.
23       Q.    Was it just you and Ms. Andrew?
24       A.    No.  There was Chad Ziepfel as well.
```

1     Q.    Do you understand Chad Ziepfel to be an
2  attorney at the Taft firm?
3     A.    I do.
4     Q.    How long was that meeting?
5     A.    Sorry.  Which meeting?
6     Q.    The meeting I'm talking about that was
7  two weeks ago.  That's the meeting that's --
8     A.    Um...
9     Q.    -- the topic of the questions right
10  now.
11     A.    A few hours, couple hours.
12  Two-and-a-half hours, maybe.
13     Q.    How long was the meeting on the 23rd?
14     A.    We went from 9 a.m. to after lunch.
15  1:00, 1:30, something.
16     Q.    Who was involved in that meeting?
17     A.    Marsha Andrew and Chad Ziepfel and
18  myself.
19     Q.    If you could turn your attention back to
20  Exhibit 796 on the first page, you seem to
21  describe all your time other than some July 1st
22  time where you met with Taft lawyers as "Drafting
23  opinion and document review."  Do you see that?
24     A.    I do.

1      Q.   A total of 53.5 hours.  Do you have any

2   sense of the amount of time you spent drafting the

3   opinion versus document review among the 53.5

4   hours you billed for work up through July 12?

5      A.   I do not.

6      Q.   In the work that you've done since

7   July 12, was that only related to preparing for

8   this deposition, or have you done other work?

9      A.   Just related to preparing for the

10   deposition.

11           (Deposition Exhibit No. 797 was marked.)

12      Q.   Sir, I've marked your report as Exhibit

13   797.  And I would ask you to verify for the record

14   that Exhibit 797 is, in fact, the written report

15   that you prepared in this matter?

16      A.   Yes, it appears to be.

17      Q.   I have a narrow focus at this point of

18   the deposition on your report, not getting into

19   anything substantive just yet.  And in that

20   regard, I'd like you to, please, turn your

21   attention to page 4 which has the document control

22   number Greenberg 00303 at the bottom right.  Do

23   you see that?

24      A.   Mm-hmm.

```
 1          Q.    It says there that you've reviewed -- I
 2   think it's, quote, relevant portions of the
 3   testimony of the litigation defendants.  Do you
 4   see that?
 5          A.    Yes.
 6          Q.    Which of the defendants' deposition
 7   testimony did you review in this case?
 8          A.    I believe I read everybody's, everybody
 9   that I had in my folder -- in the file that I was
10   given.  So certainly the Morgans and a variety of
11   board members and a variety of lawyers that were
12   involved.  So whatever was in there, I read.
13          Q.    A variety of what?
14          A.    There were some lawyers that were in
15   testimony as well, so...
16          Q.    You refer oftentimes in your report to,
17   and you said it again, "the Morgans."  When you
18   say "the Morgans," who are you referring to?
19          A.    Lee Morgan and -- I apologize -- Asha
20   Morgan Moran as well.
21          Q.    Were you provided only deposition --
22   portions of deposition transcripts, or were you
23   provided the entire transcript?
24          A.    I believe they were the entire
```

1    transcript.

2        Q.    And it says here that you reviewed

3    relevant portions of the testimony.  Is that an

4    accurate statement?

5        A.    It's an accurate statement meaning that

6    it was the portions of the testimony that I had

7    available to me.  It's whatever was there.  I

8    don't know that I had all the testimony.  I just

9    had the file that I had.

10       Q.    I'd asked if the Taft lawyers had only

11   given you portions of the testimony.  Maybe I

12   should ask that again.

13            You write in your report that you

14   reviewed relevant portions of the testimony of the

15   litigation defendants.  How did you determine what

16   portions were relevant to your report?

17       A.    We're dealing with a semantic issue.

18   What I'm saying is that the -- what I had is what

19   I read, and I assumed that those were portions of

20   the testimony that was available in general.

21       Q.    Well, I would think someone of your

22   educational background and experience would know

23   whether they are reading an entire transcript or

24   whether you're reading portions of a transcript.

```
 1        A.    It appeared to me --

 2        Q.    If you'd allow me too complete --

 3        A.    Sure.

 4        Q.    -- I'd like to know whether your

 5   statement in your report that you've read relevant

 6   portions of the transcript is accurate or

 7   inaccurate?

 8        A.    Let me state what I did do.  I read the

 9   testimony that was there.  So to the extent that

10   that weren't -- they -- I didn't read parts of the

11   testimony; I read all the testimony that was made

12   available to me.

13        Q.    And do you know if only portions of the

14   testimony was made available to you or if all the

15   testimony of each of the litigation defendants was

16   provided to you?

17        A.    It appeared to me that whatever I had

18   was whole and not a part -- not a portion.

19        Q.    So when you write that you reviewed

20   relevant portions of the testimony, that's

21   inaccurate; you actually read the entire

22   transcript, all the testimony?

23              MS. ANDREW:  Objection.

24        A.    Yes, I read -- I read the entire
```

1    testimony that was made available to me.

2        Q.    So when you note that the points of view

3    expressed in this document are based on a review

4    of relevant portions of the testimony of the

5    litigation defendants made available to

6    Silverstone by Taft, that's inaccurate because

7    you're now testifying you've actually read the

8    entire transcripts of the litigation

9    defendants; is that correct?

10            MS. ANDREW:   Objection.

11       A.    I don't believe it's inaccurate in the

12    way that I've described what I've done, so...

13       Q.    So I'd like to know how you --

14       A.    I disagree with how you're

15    characterizing it.

16       Q.    I'd like to know how you chose what

17    portions of any given transcript was relevant.

18       A.    I read the transcripts of the testimony

19    that were provided to me.  I'm fairly certain that

20    I've read all of the transcripts that were

21    provided to me and that my reference in this

22    document is -- apparently inartful as it was,

23    really refers to the fact that there may be other

24    testimony that I -- was not made available to me.

1          Q.    Okay.  So you've read the entire

2     transcript of whatever litigation defendant's

3     testimony you were given to the best of your

4     understanding?

5          A.    Yes, I did.

6          Q.    If you'd think back -- and feel free to

7     refer to them -- to the invoices we looked at that

8     were Exhibits 795 and 796, you've billed time for

9     document review.  Does your description "document

10    review" encompass your review of litigation

11    transcripts?

12         A.    Yes, and exhibits.

13         Q.    As you sit here today, can you, to the

14    best of your recollection, identify for me each of

15    the defendants whose deposition transcript you

16    read?

17         A.    I certainly can try.

18         Q.    Okay.  Let's do it.

19         A.    Okay.  Well, off the top of my head

20    without seeing each of the names, it's not going

21    to be so easy, but certainly Mrs. Moran,

22    Mr. Morgan, Alan Luce.  I'm trying to think of...

23    If I had a list, I certainly could do a lot better

24    job.

```
 1        Q.    Do you recall reading Steven
 2   Bevelhymer's deposition?
 3        A.    I do.
 4        Q.    Nancy Blair's deposition?
 5        A.    I do.
 6        Q.    Do you remember that being multiple
 7   volumes or a single volume?
 8        A.    I don't recall.
 9        Q.    Ben Carlson's deposition?
10        A.    I believe so.
11        Q.    A deposition by a CRG representative
12   named Epstein?
13        A.    Yes.
14        Q.    Karen Felix's deposition?
15        A.    I don't recall specifically.  I
16   certainly remember many memos by her -- about her.
17        Q.    Ken Lenoir's deposition?
18        A.    Yes.
19        Q.    Steve Martin's deposition?
20        A.    I don't recall specifically, but
21   probably.
22        Q.    Why do you think probably?
23        A.    I just don't recall.  There was a lot of
24   documents.
```

```
 1        Q.    So you don't know whether it's probable
 2    or not; you just don't recall one way or the
 3    other?
 4        A.    I know I read everything that was
 5    provided to me; so if it's in there, then I did
 6    read it.
 7        Q.    Marsha Matthews' deposition?
 8        A.    Yes.
 9        Q.    Jeanine McLaughlin's deposition?
10        A.    I don't recall.
11        Q.    Marty Moran's deposition?
12        A.    Yes.
13        Q.    Jim Northrop's deposition?
14        A.    Not sure.
15        Q.    Glenn Pollack's deposition?
16        A.    Yes.
17        Q.    Dennis Sanan's deposition?
18        A.    I believe so.
19        Q.    Jim Shein's deposition?
20        A.    Yes.
21        Q.    Steven Spencer's deposition?
22        A.    Yes.
23        Q.    Malte von Matthiessen's deposition?
24        A.    Yes.
```

```
 1        Q.    Did you review, to the best of your

 2   knowledge, any other deposition transcripts of any

 3   litigation defendant that I didn't review with you

 4   just now?

 5        A.    I don't know all the names off the top

 6   of my head.

 7        Q.    Well, do you recall reading Barry

 8   Hoskins' deposition?

 9        A.    I don't recall, but I certainly recall

10   many, many items and memos and a variety of

11   testimony that involved him, but I don't recall

12   specifically.

13        Q.    You didn't produce Barry Hoskins'

14   deposition to us.  Does that mean you never

15   received Barry Hoskins' deposition?

16        A.    I'm not sure if -- I would need to look

17   at what I have there to tell you whether or not I

18   received it.

19        Q.    Well, we asked you for your entire file,

20   and you've produced multiple deposition

21   transcripts.  Barry Hoskins' deposition

22   transcript --

23        A.    If it's not there --

24        Q.    -- was not included in that production.
```

1      A.     Mm-hmm.

2      Q.     Does that mean you did not have Barry

3   Hoskins' deposition transcript?

4      A.     That would be correct.

5      Q.     Kim Lipson-Wilson, do you recall

6   reviewing her transcript?

7      A.     I don't.

8      Q.     You did not produce it, so I'll assume,

9   then, you've never received it --

10     A.     Mm-hmm.

11     Q.     -- from the Taft firm, correct?

12     A.     That would be correct.

13     Q.     Okay.  How about Chandra Attiken's

14  deposition that you did not produce to us?

15     A.     No, I haven't.

16     Q.     You have not read that?

17     A.     Hmm-mm.

18     Q.     Okay.

19     A.     No.

20     Q.     You also did not produce Lee Bloom's

21  deposition.  Did you read that?

22     A.     I did not.

23     Q.     Do you know who Lee Bloom is?

24     A.     I don't.

1      Q.   You also did not produce Marilyn

2  Marchetti's deposition.  Did you read that?

3      A.   I did not.

4      Q.   Do you know who Marilyn Marchetti is?

5      A.   I don't recall.

6      Q.   You did not produce Helen Morrison's

7  deposition.  Did you read that?

8      A.   I did not.

9      Q.   Do you know who Helen Morrison is?

10     A.   No, I do not.

11     Q.   Did you read Peter Abrahamson's

12  deposition?

13     A.   I don't recall.

14     Q.   You didn't produce it.  Do you know --

15     A.   Then I didn't read it.

16     Q.   Do you know who Peter Abrahamson is?

17     A.   No, not off the top of my head.

18     Q.   You did not produce Dan Holthaus's

19  deposition.  Did you read his transcript?

20     A.   No.

21     Q.   Do you know who Dan Holthaus is?

22     A.   Again, not off the top of my head.

23          (Deposition Exhibit No. 798 was marked.)

24     Q.   Mr. Greenberg, I've put before you

```
 1    Exhibit 798.
 2         A.    Mm-hmm.
 3         Q.    I'll have a few questions, but I'll wait
 4    at least until your -- at least the trust counsel
 5    receives a copy.
 6              Have you seen this document before?
 7         A.    Yes, I believe so.
 8         Q.    Do you know who prepared it?
 9         A.    I presumed it was an attorney at Taft.
10         Q.    Did you have an understanding of what
11    this was?
12         A.    Generally, yes.
13         Q.    And what's your general understanding of
14    the information contained in the document that's
15    Exhibit 798?
16         A.    That it was an identification of the
17    individual exhibits that were provided me in the
18    folders that they were in.
19         Q.    And does this document identify all the
20    documents that the Taft law firm gave you in
21    addition to the deposition transcripts we just
22    discussed?
23         A.    I can't -- I can't say.  I don't -- I
24    just don't know.
```

```
 1        Q.    Did you request that Taft give you these
 2   documents, or are the documents reflected on this
 3   Exhibit 798 that Taft gave you chosen by the Taft
 4   lawyers?
 5        A.    I'm not exactly sure of your question.
 6   If you can repeat it, please.
 7        Q.    Of course.  Did you choose what
 8   documents the Taft lawyers were going to give you,
 9   or did they choose the documents to give you that
10   are reflected on this Exhibit 798?
11        A.    Taft chose the documents that were given
12   to me.
13        Q.    Do you recall whether after receiving
14   the documents that are reflected on Exhibit 798
15   you asked the Taft lawyers to provide you with
16   additional documents?
17        A.    There were some additional documents
18   that I needed to take a look at that were not
19   initially provided to me.
20        Q.    And do you recall what prompted you to
21   ask for the additional documents?
22        A.    Questions I had concerning certain
23   transaction -- aspects of transactions.  In one
24   case, I needed to see the executed lease for the
```

```
 1    Levimo purchase of the St. Cloud property.  But
 2    that was generally it and what was provided.
 3        Q.    When you say that was generally it, is
 4    my understanding, then, that the documents you
 5    reviewed in conjunction with preparing your report
 6    are listed in Exhibit 798 other than the Levimo
 7    lease?
 8        A.    I believe so.
 9        Q.    Did you look at any documents other than
10    documents provided to you by the Taft lawyers in
11    conjunction with preparing your report?
12        A.    I did use some reference documents
13    that -- on a variety of things that I wanted
14    better language for and some clarification.
15        Q.    Did you produce those to us as part of
16    your file?
17        A.    Everything was in the file.  So there
18    were items regarding Article 9 transactions,
19    things like that.
20        Q.    Do you recall any specific documents
21    with regard to Article 9 transactions?
22        A.    I don't recall exactly.  It was -- it
23    was a discussion of the problems of doing Article
24    9 transactions, and I don't remember where exactly
```

```
 1    -- it came from the net, and it was a lawyer's --
 2    a law firm, so a presentation of it.
 3         Q.    If I recall your resume correctly, you,
 4    in one of your -- one of the companies in which
 5    you served as an officer or director, participated
 6    in an Article 9 transaction, correct?
 7         A.    Yes.
 8         Q.    Did you look at any other documents such
 9    as articles you had previously written?
10         A.    Maybe clarify the question.
11         Q.    Sure.  In the past, you've published
12    articles on various business investment banking
13    topics, correct?
14         A.    Yes.
15         Q.    Did you refer to any articles you had
16    previously written in conjunction with preparing
17    your report?
18         A.    No.
19         Q.    Have you produced to us, to the best of
20    your knowledge, in response to a subpoena we sent
21    you, every document that you reviewed and
22    considered in preparing your expert report in this
23    case?
24         A.    I believe I have.
```

1      Q.    If you would, please, turn back to your

2  report --

3      A.    Mm-hmm.

4      Q.    -- which is Exhibit 797, and I'd like

5  you to turn to page 5 --

6      A.    Okay.

7      Q.    -- and focus in particular on section

8  Roman 4, "Note on Opinion Contents."  Do you see

9  that?

10      A.    I do.

11      Q.    The last sentence of that particular

12  section refers to various reports and

13  communications made available to Silverstone.  Do

14  you see that?

15      A.    I do.

16      Q.    There's nothing outside of what we see

17  in Exhibit 798 and the Levimo lease that you're

18  referencing with regard to various reports and

19  communications made available to Silverstone,

20  correct?

21      A.    Please restate the question.

22      Q.    Sure.  Other than the documents

23  identified in -- your reference to various reports

24  and communications made available to Silverstone

1    references the documents that are identified in

2    Exhibit 798 and the Levimo lease, correct?

3         A.    Yes.

4         Q.    I also wanted to ask you a question in

5    regard to another reference in that particular

6    section, section 4 of your report.  If you'd

7    follow, I'll read the first sentence of that

8    section.

9              It says "The following opinion does not

10   attempt to restate nor does it attempt to sequence

11   chronologically all the issues and events that

12   impacted The Antioch Company in the five years

13   from the time the tender offer and wholly-owned

14   ESOP transaction occurred in 2003," period.  Did I

15   read that correctly?

16        A.    Yes, I believe you have.

17        Q.    Did you review the tender offer in

18   conjunction with your report?

19        A.    The actual tender offer, no.  What I

20   reviewed --

21        Q.    That's my question.

22        A.    The answer's no.

23        Q.    Did you review the actual tender offer

24   in conjunction with your report?

1    A.    The answer's no.

2    Q.    Did you ask the Taft law firm to provide

3    you with the tender offer?

4    A.    I did not.

5    Q.    I also noted in that section you refer

6    to ESOP transactions.  Do you see that?

7    A.    Yes.

8    Q.    Was it your understanding that there was

9    more than a single transaction with regard to the

10   ESOP in 2003?

11   A.    No.  It's a typo.

12   Q.    Okay.  I'd like to refer your attention

13   again to Exhibit 798, which is the list of the

14   deposition exhibits that the Taft firm provided to

15   you.  I noted on here with some interest that the

16   only document that was dated before 2006 was the

17   very first one, Exhibit 2.  Do you see that?

18   A.    Mm-hmm.

19   Q.    You do?

20   A.    Yes, I do see that.

21   Q.    All right.  Do you recall what Exhibit 2

22   was?

23   A.    I don't.

24   Q.    Well, other than Exhibit 2, the only

1    other document dated before 2006 that you produced

2    was a valuation report by a company known as

3    Business Valuations Inc.  Do you recall that?

4        A.    I do.

5        Q.    Did you review any documents other than

6    those two documents -- the BVI valuation and

7    Deposition Exhibit 2 -- that were dated prior to

8    2006?

9        A.    I'm thinking -- just thinking what the

10   bankruptcy documents were and the dates on those.

11       Q.    The bankruptcy documents would have been

12   in 2008.

13       A.    They would have been 2008.  The answer

14   is no.

15            MR. SCHEIER:  Could we go off the record

16   for a second?

17            (Off-the-record discussion.)

18       Q.    (By Mr. Scheier)  Sir, I'm going to hand

19   you what's been marked in a prior deposition as

20   Exhibit 2.

21       A.    Mm-hmm.

22       Q.    Do you recall looking at this document

23   in conjunction with preparing your report?

24       A.    I believe I do.  It certainly looks very

```
 1    familiar to me.  Certainly some of the -- the --
 2    yeah, some of the schedules and some of the bullet
 3    points look very familiar to me.
 4         Q.    I'd like you to look through it because
 5    I have a couple questions about the document.
 6         A.    (Examining document.)  Yeah.  Okay.
 7         Q.    Did you rely on this document in whole
 8    or in part in preparing your report?
 9         A.    I certainly recall looking at it.
10         Q.    Do you recall whether you relied on it
11    in writing any portion of your report?
12         A.    It's -- that's hard to say.  There's
13    details in here that have been picked up in other
14    summaries of the transaction that I've used from a
15    variety of sources including the investment
16    bankers and the valuation firms, so it's hard to
17    say.  You know, I -- to the extent that it may
18    have informed what I've done, that's certainly
19    possible, but I can't say directly.
20         Q.    You do recall looking at the document?
21         A.    I do.
22         Q.    Do you know the origin of this document?
23         A.    Not offhand.  I'm sure if you give me a
24    little time I'd find out, but...
```

```
 1        Q.    Did you think it important to find out
 2   as you were looking at it in preparing your
 3   report?
 4        A.    I certainly having looked at it --
 5   believing that I've looked at it -- certainly read
 6   through, and it was certainly part of my -- you
 7   know, would have -- you know, certainly could have
 8   informed some of my thinking about what's going on
 9   there, but...
10        Q.    That wasn't my question.  My question
11   was whether you knew the origin of this document;
12   and you said that if I gave you some time, you
13   could probably find out.  And in response, I asked
14   whether while you were preparing your report, if
15   you thought it was not important to find out what
16   the origin of this document was.
17        A.    In looking at it and trying to recall
18   what I was thinking when I did look at it, I
19   certainly believed it was -- the origin was the
20   company itself.  The origin was -- it originated
21   due to the desire to do this transaction, the ESOP
22   -- hundred percent ESOP owned transaction --
23   tender offer transaction.  So I certainly
24   understood that in that context.
```

1      Q.    That's just a guess, though, isn't it,

2   sir?  You don't know --

3      A.    Well, I don't know that it's a guess.

4   You're -- I don't think I'm guessing.

5      Q.    Well, I'll represent to you I don't know

6   who generated this document.  Can you tell me who

7   prepared this document?

8      A.    It looks -- when -- I'm trying to

9   remember what I remembered at the time -- what I

10  thought at the time, which is very difficult to do

11  and probably something I shouldn't do.  But

12  certainly looking at it, it looks like it was --

13  that it was a document that was set up to present

14  possibly to the board at the time or to the

15  company itself directly.

16     Q.    You don't know that for sure, though?

17     A.    No, I don't know that for sure.

18     Q.    And, in fact, you don't know what the

19  origin of this document is?

20     A.    I don't know who wrote the document.

21     Q.    And you don't know whether it's a

22  company document or it was made by a third party?

23     A.    I certainly assumed it was a company

24  document.

1      Q.     But that's an assumption you made; you

2   don't know?

3      A.     That's correct.

4      Q.     Did you read the deposition where this

5   document was used?

6      A.     (No response.)

7      Q.     I'll represent to you it's a deposition

8   of a Fifth Third employee -- a Fifth Third Bank

9   employee.  It's the only deposition where this was

10  used.

11     A.     I certainly don't recall reading it.

12     Q.     Do you know -- have you verified the

13  accuracy of any representations or remarks made in

14  the document that's Deposition Exhibit 2?

15     A.     No.

16     Q.     And you don't have any knowledge of why

17  this document was prepared by whoever prepared

18  it; is that right?

19     A.     I have no direct knowledge of who it was

20  -- who prepared it, no, of course not.

21     Q.     You can only guess?

22     A.     Of course.

23     Q.     The other document we discussed that was

24  generated prior to 2006 was the Business

1   Valuations Incorporated --

2        A.     Yeah.

3        Q.     -- valuation.  Do you recall that?

4        A.     Yes.

5        Q.     Did you rely on any part of that in

6   drafting your report?

7        A.     I did.

8        Q.     Did you rely on that in forming your

9   opinions?

10       A.     It certainly was constituent to my -- to

11  my opinion about the valuation in the tender

12  offer.

13       Q.     The draft of the BVI report that you

14  produced is missing some pages.  Do you know why?

15       A.     I don't.

16       Q.     Did you remove those pages?

17       A.     I don't believe so.

18       Q.     Did Taft tell you that they had removed

19  certain pages from the BVI exhibit?

20       A.     Not that I recall, no.

21       Q.     In preparing your report and formulating

22  your opinions in this case, sir, did you look at

23  an expert report that Taft commissioned by a

24  lawyer named Barbara Wagner?

1      A.    I did.

2      Q.    Did you ask Taft to produce Ms. Wagner's

3  report to you?

4      A.    I don't recall that I asked.  I

5  certainly -- certainly received it.

6           (Deposition Exhibit No. 799 was marked.)

7      Q.    Sir, I'm handing you what's been marked

8  as Exhibit 799.  I understand that to be the

9  expert report prepared by a Barbara Wagner.

10     A.    Mm-hmm.

11     Q.    And I'll ask you to verify that you had

12 this in your possession and reviewed it and relied

13 upon it in preparing your written report and

14 opinions in this case.

15     A.    That's a complex question.  If you can,

16 restate specific questions.  You asked me about

17 three questions in a row.

18     Q.    You're right.  I think lawyers call that

19 a compound question.

20     A.    Yeah, I was going to call it -- but I

21 didn't want to be pretentious.

22     Q.    You can.  I wouldn't consider it

23 pretentious.  I think it's taking a pretty good

24 stab at talking like a lawyer.

1            Could you verify that Exhibit 799 is the

2     report by Ms. Wagner that you had in your

3     possession at the time that you were preparing

4     your report and formulating your opinions that

5     you're going to give in this case?

6          A.    I did not have this report prior to my

7     drafting the opinion that I -- that I did draft.

8          Q.    When did you receive Ms. Wagner's

9     report?

10         A.    Subsequent to my final draft that was

11    submitted to -- to the Taft law firm.

12         Q.    I might be misremembering my question,

13    but I asked whether you relied upon Ms. Wagner's

14    report in preparing your written report and

15    opinion, and I thought you had answered yes.

16         A.    No.  The answer would be no.

17         Q.    Did you review this report subsequent to

18    drafting your report?

19         A.    Yes.

20         Q.    Did anything in this report lead you to

21    change the written report that has been produced

22    to all the defendants in this case?

23         A.    No.

24         Q.    Why did you review Ms. Wagner's report?

```
 1        A.    Curiosity.  Having read the documents

 2   and knowing the case, I wanted to see what her --

 3   what she had to say.

 4        Q.    Anything Ms. Wagner said has no -- you

 5   didn't rely upon whatsoever either in writing your

 6   report or formulating your opinions; is that

 7   correct?

 8        A.    I believe I answered that already, yes.

 9        Q.    And has anything you read in this report

10   led you to change your opinion or want to edit

11   anything you've written in your report?

12        A.    No.

13        Q.    Shifting gears a little bit, I want to

14   just talk briefly about a group that you worked

15   for prior to your affiliation with Silverstone

16   called LudlowWard.

17        A.    Yes.

18        Q.    You were a managing partner there; is

19   that correct?

20        A.    Yeah.  I was one of three owners of the

21   firm.

22        Q.    So you had an equity interest in that

23   firm?

24        A.    I did.
```

1      Q.    And what were the circumstances behind

2  you leaving LudlowWard Capital?

3      A.    Very briefly and very accurately, we

4  were going to 2008.  The capital markets had

5  become very difficult.  I did a lot of work in

6  restructuring and bankruptcy-related matters and

7  had a fairly brisk practice in that even during

8  that period.

9          One of the partners, Madeline Ludlow,

10  was looking at leaving, and most of the clients at

11  the time -- probably all of them at the time were

12  mine, and it just didn't make sense to stay in

13  that environment for me at that point to do it.

14      Q.    Who were the three partners at

15  LudlowWard?

16      A.    There was Madeline Ludlow, Kevin Ward,

17  and Mark Greenberg.

18      Q.    And does that entity still exist?

19      A.    No.

20      Q.    LudlowWard was engaged by The Antioch

21  Company's publishing division in 2007; is that

22  correct?

23      A.    Yes.

24      Q.    Were you LudlowWard's lead on that

```
 1    particular engagement?

 2         A.    I was not the lead on it.

 3         Q.    Who was the lead?

 4         A.    Madeline Ludlow.

 5         Q.    Did you do some work in that regard?

 6         A.    I did, absolutely.

 7         Q.    Did you retain any files from that

 8    engagement?

 9         A.    I have not retained any files, no.

10         Q.    Did you retain any of your LudlowWard

11    files?

12         A.    I have certain files that I worked on

13    when I was at LudlowWard that I certainly kept,

14    but this was a transaction -- it was a small

15    transaction, and it was one that I didn't lead,

16    and so I just didn't keep any of the files.

17         Q.    Are you aware that we asked Ms. Andrew

18    for the Antioch file of LudlowWard?

19         A.    Yes, I am.

20         Q.    And she asked you to take a look to see

21    whether you could find that?

22         A.    Yes, she did.

23         Q.    Did you make an effort?

24         A.    I did, indeed.
```

1      Q.    What did you do?

2      A.    I looked through whatever I had and

3   didn't find anything in the file.

4      Q.    I'd understood you were going to try to

5   contact your former partners at LudlowWard.  Did

6   you do that?

7      A.    I have.

8      Q.    Yes.  How did they respond when you

9   requested the Antioch Company file?

10     A.    Sure.  Madeline did not take any files

11  with her; and Kevin Ward, who's now the regional

12  president for Chase, said he has files and he was

13  on vacation and, when he got back, that he would

14  -- he would look to see what was there.

15     Q.    And where is Mr. Ward located these

16  days?

17     A.    He's in Cincinnati.

18     Q.    And with what company?

19     A.    He's with -- he's the regional president

20  for Chase -- Chase Bank.

21     Q.    Do you know where his office is?

22     A.    Yeah.  It's in Kenwood.  Mm-hmm.

23     Q.    I note with some interest that as part

24  of the Antioch transaction where you played a role

```
1    in 2007, you worked with a defendant in this case,

2    Kimberly Lipson-Wilson.  Do you recall that?

3        A.    Yes, I do.

4        Q.    In your dealings with Ms. Wilson, did

5    you find her to be competent?

6        A.    Yes.

7        Q.    And did you find her to be professional?

8        A.    I did.

9        Q.    Did you find her to be honest?

10       A.    Yes.

11       Q.    Did you find her to be forthcoming?

12       A.    Yes.

13       Q.    Did you find her to be prepared?

14       A.    If I recall, sure.  I certainly didn't

15   find her unprepared.

16       Q.    I wanted to talk a little bit now about

17   your general background.

18       A.    Sure.

19       Q.    I understand you graduated from Boston

20   University in '75?

21       A.    Yes.

22       Q.    And you obtained a bachelor's degree in

23   philosophy, logic, and mathematics; is that

24   correct?
```

```
 1        A.    (Witness nodded.)

 2        Q.    Yes?

 3        A.    Yes.

 4        Q.    You shook your head yes, and Kelly can't

 5   record that, so you'll have to respond as you

 6   did.  Any post-graduate degrees?

 7        A.    No.

 8        Q.    Any other post-graduate education that

 9   didn't result in a degree?  And what I'm referring

10   to is university education.

11        A.    No.

12        Q.    Do you hold any business-related

13   licenses?

14        A.    I don't.

15        Q.    Do you hold any certifications from

16   professional or business organizations?

17        A.    I do not.

18        Q.    Are you a member any of professional or

19   business organizations?

20        A.    I am.

21        Q.    Can you list those for me?

22        A.    Yeah.  Association for Corporate Growth,

23   and the Turnaround Association, the local TARC in

24   Cincinnati.
```

1   Q.  TARC, you called it?

2   A.  The -- I think that's it.

3      THE WITNESS: Tim, do I have that right?

4   Q.  Well, that's okay. I don't really need

5 Tim's --

6   A.  Turnaround Association.

7   Q.  -- testimony here.

8   A.  It's a -- it's a restructuring,

9 turnaround association.

10   Q.  See, now I might have to reopen Tim's

11 deposition and ask him that question under oath.

12   A.  Well, he didn't answer.

13   Q.  You probably don't want to address him

14 because you're going to cause problems. Anyway --

15   A.  I won't do that again.

16   Q.  Okay. Do you know -- assuming TARC is

17 correct, do you know what it's an acronym for?

18   A.  It's a -- it's the -- it's a turnaround,

19 restructuring association. That's about as far as

20 I'm going to get accurately at this point.

21   Q.  Okay. Fair enough.

22   A.  Mm-hmm.

23   Q.  Are you a member of any other

24 professional or business organizations?

```
 1        A.    No, I'm not.

 2        Q.    Do you hold any leadership roles in

 3   either of the groups you just identified?

 4        A.    Yes, in ACG, Association for Corporate

 5   Growth, I'm on the board of directors beginning

 6   this month.  September, actually.

 7        Q.    What is the professional business

 8   interest of Association for Corporate Growth?

 9        A.    It's primarily transactions, M&A

10   transactions, funding transactions.  It's the deal

11   community for this region, and then many others --

12   it's a national organization.  The Cincinnati

13   chapter is a very active chapter.

14        Q.    Are you active in the national chapter?

15        A.    I'm not.

16        Q.    Have you ever been active in the

17   national chapter?

18        A.    I have never been active in the national

19   chapter.

20        Q.    I want to talk a little bit about ESOPs.

21   Do you know what that acronym stands for?

22        A.    I sure do.

23        Q.    What?

24        A.    It's an Employee Stock Ownership Plan.
```

```
 1        Q.    Well, let me ask you this:  Do you have

 2   any experience with ESOPs?

 3        A.    Yes, I have.

 4        Q.    Can you describe that for me?

 5        A.    Yeah.  I've worked in M&A transaction

 6   work with ESOPs.  I'm currently involved with a

 7   management buyout where the ESOP is -- where the

 8   company's owned by public shareholders, ESOP, and

 9   insiders.  I'm trying to think other times when

10   I've been involved.  I have other clients that

11   I've advised that are ESOPs.

12        Q.    What I'd like you to do, please, is

13   identify for me each and every company that you've

14   been involved with, either as an advisor or as a

15   manager, that use an ESOP as the retirement

16   vehicle for its employees.

17        A.    Some of these are -- I'm under

18   confidentiality agreements, and so I'm going to

19   defer to counsel here whether or not I can bring

20   those up.

21        Q.    Please?

22        A.    I have some that are under

23   confidentiality.

24        Q.    I don't want you to breach any
```

```
 1    confidentiality, so why don't we start with the

 2    ones that aren't.

 3         A.    Sure.  There's a company called Saturday

 4    Night Lights that I've looked at.  There's --

 5         Q.    Hold on.  I'm going to ask you follow-up

 6    questions after you identify each one.  So

 7    Saturday Night Lights?

 8         A.    Light, I think, yeah.

 9         Q.    Saturday Night Light.

10         A.    Yeah.

11         Q.    What type of company is that?

12         A.    They produce various products -- cough

13    products for bathrooms, private label and under

14    their own label.

15         Q.    How many employees do they have?

16         A.    Geez, I don't know.  A hundred.

17         Q.    How many of those a hundred employees

18    are in the ESOP?

19         A.    It's all -- it's all -- it's a wholly-

20    owned ESOP.

21         Q.    And what did you do in regard to

22    Saturday Night Light?

23         A.    Just provided advisory work on looking

24    at potential M&A work.  It was very episodic.
```

```
1        Q.    Would you have supplied them any advice
2    with regard to ESOP matters?
3        A.    No.
4        Q.    Other than Saturday Night Light, any
5    other companies?
6        A.    I did some work several years back for
7    an ESOP-owned company that had a -- that were an
8    unsecured creditor in a bankruptcy matter.
9        Q.    And what company is that?
10       A.    It's a food distribution company.  For
11   the life of me, I can't remember.  They just
12   resold.  It'll come to me.  I just don't have it
13   off the top of my head.  It's a local company.
14       Q.    How many employees?
15       A.    I want to say around a hundred.
16       Q.    How many are in the ESOP?
17       A.    It was a wholly-owned ESOP.
18       Q.    Do you recall what the value of the
19   shares were in that ESOP?
20       A.    I don't offhand.
21       Q.    Do you recall what the value of the
22   shares were in the Saturday Night Light ESOP?
23       A.    I don't.
24       Q.    Did you provide this food distribution
```

```
1    company with any advice with regard to the ESOP?

2         A.    I did not.

3         Q.    Do you feel yourself competent to give

4    any advice with regard to an ESOP?

5         A.    I do.

6         Q.    Okay.  How so?

7         A.    I understand how they're -- how they're

8    constructed.  I understand the tax issues, I

9    think, relatively well.  I understand why you

10   would have an ESOP and why you wouldn't.  Yeah, I

11   think I have a fairly good knowledge of ESOPs.

12        Q.    Have you ever advised a company with

13   regard to management of their ESOP?

14        A.    No, I've never.

15        Q.    Are you a member of any ESOP

16   association?

17        A.    I am not.

18        Q.    Have you ever published any articles

19   about an ESOP?

20        A.    I have not.

21        Q.    Have you ever made a presentation to a

22   business or professional organization about an

23   ESOP?

24        A.    No.
```

```
 1        Q.      Have you ever been a member of an ESOP?
 2        A.      No.
 3        Q.      Did you review any scholarly articles or
 4   treatises about ESOPs in preparing your report or
 5   formulating your opinion in this case?
 6        A.      Apart from looking at specific things on
 7   409(p) regulations, I don't recall anything other
 8   than that.
 9        Q.      And what did you look at with regard to
10   409(p) regulations?
11        A.      Really just to look at the S Corp issue
12   and -- and the -- and the -- just how the -- how
13   the -- how the rule works relative to S Corps and
14   -- and creating -- the potential for creating a --
15   an unlawful tax shelter and what some of the
16   consequences are.
17        Q.      Did you ever make any presentations to
18   an ESOP association or interest group?
19        A.      I never have.
20        Q.      Have you ever performed a valuation of
21   an ESOP company stock?
22        A.      No.
23        Q.      Have you ever performed a valuation of
24   an S Corporation that had an ESOP component?
```

```
 1        A.    We're in the process of that now, but

 2   the answer is before that, no.

 3        Q.    And what company is that now that --

 4        A.    It's a company that I -- that's under

 5   confidentiality.

 6        Q.    Please allow me to finish my question.

 7   It's very frustrating for the court reporter when

 8   you don't.

 9              Can you identify the company whose stock

10   you're valuing now that's an S Corp with an ESOP

11   component?

12        A.    I can't.

13        Q.    Is that a Silverstone engagement?

14        A.    Yes.

15        Q.    Are you the lead on that engagement?

16        A.    Yes, I am.

17        Q.    Are you personally doing the valuation?

18        A.    I personally would be leading the

19   valuation.

20        Q.    Are they aware that you've never done a

21   valuation before of an S Corporation stock who

22   some of which is held in an ESOP?

23        A.    Oh, sure.  Yes.

24        Q.    Is that corporate stock owned a hundred
```

```
 1   percent by the ESOP?

 2        A.    No.

 3        Q.    Have you ever valued the shares of a

 4   company all of whose stock is held in an ESOP?

 5        A.    No.

 6        Q.    Have you served or prepared a repurchase

 7   obligation study in regard to ESOP stock?

 8        A.    No.

 9        Q.    Have you ever seen a repurchase

10   obligation study with regard to ESOP stock?

11        A.    No.

12        Q.    Did you look at any repurchase

13   obligation studies that were prepared for The

14   Antioch Company any time between 2002 and 2007?

15        A.    I didn't look at any studies.

16        Q.    Have you read any literature in

17   preparing your report or formulating your opinions

18   in this case about repurchase liability arising

19   from ESOPs?

20        A.    Certainly not in preparing for the

21   report, no.  The answer would be no.

22        Q.    Have you ever read any literature about

23   repurchase liability arising from ESOPs aside from

24   preparing for this case?
```

1  A.  No.

2  Q.  Okay.

3  A.  Not that I recall.

4  Q.  Have you ever advised a company about

5 managing its ESOP repurchase liabilities?

6  A.  No.

7  Q.  Are you aware that within the ESOP

8 community, the repurchase obligation of a company

9 are an off balance sheet accounting item?

10  A.  Am I aware that that's an off -- well,

11 it's... Yeah. It's certainly not on the

12 Antioch's balance sheet.

13  Q.  Well, that wasn't my question.

14  A.  Well, the answer --

15  Q.  The question you wanted to answer was

16 whether it was an off balance sheet item on the

17 Antioch balance sheet. What I'm asking you is

18 generally if you're aware that in the ESOP

19 community, a company's repurchase obligation is

20 considered an off balance sheet liability?

21  A.  I'm not aware.

22  Q.  Okay. Did you review any of Prairie

23 Capital Advisors' valuations of The Antioch

24 Company or its ESOP prepared between 2003 and

```
 1   2007?

 2        A.    Yes.

 3        Q.    Which ones?

 4        A.    I'm trying to think of the ones.  There

 5   was one that...  I certainly reviewed them.  I'm

 6   trying to figure what period they were, whether it

 7   was around the time of Evolve getting involved or

 8   Reliance or -- there were -- I don't recall

 9   specifically, but I certainly remember looking.

10        Q.    Do you recall reviewing Prairie

11   Capital's valuation of Antioch stock as of

12   December 31, 2003?

13        A.    That's the 889 a share?

14        Q.    No.  You've got that wrong in your

15   report.  It's actually 894 a share.

16        A.    Oh, I reversed it.  Sorry.

17        Q.    I'm sorry?

18        A.    I'm trying to think -- I -- if I --

19   where I picked that up from or whether I picked it

20   up directly from the Prairie Capital review.  I

21   think I probably picked it up from -- from some

22   testimony or from other exhibits.

23        Q.    You don't believe you reviewed the

24   Prairie Capital valuation of the Antioch Company
```

1    stock as of December 31st, 2003?

2        A.    I don't.  If it was in there, I

3    certainly reviewed it, and I -- but I don't recall

4    specifically reviewing it.

5        Q.    Prior to your engagement by Taft in this

6    case to serve as an expert witness, were you

7    familiar with Prairie Capital?

8        A.    Oh, sure.

9        Q.    Do you know anyone at Prairie Capital?

10       A.    I don't.

11       Q.    Have you ever spoken to a gentleman by

12   the name of Bob Gross?

13       A.    Not that I recall.

14       Q.    Did you attempt to reach out to Prairie

15   Capital to discuss their valuations of The Antioch

16   Company in this case in conjunction with preparing

17   your report or formulating your opinions?

18       A.    No.

19       Q.    Do you have any experience, sir, in

20   advising an ESOP trustee who has discretion to

21   vote the majority of company shares?

22       A.    No.

23       Q.    Do you have any experience in a

24   transaction in advising a trustee -- an ESOP

1    trustee in regard to a transaction where all of

2    the stock is owned by the ESOP?

3        A.    No.

4        Q.    Do you have any experience in advising a

5    company whose ESOP trustee controls the majority

6    of the stock?

7        A.    Please restate the question.

8        Q.    Do you have any experience advising a

9    company whose ESOP trustee controls the majority

10   of the company's stock?

11       A.    No.

12       Q.    Are you aware that in the 2007/2008 time

13   frame, the Antioch trustee controlled

14   approximately 85 percent of the company's stock?

15       A.    Yes, I am.

16       Q.    In forming your opinions in this case

17   and in writing your report, did you take into

18   account that the Antioch board in 2007 and 2008

19   could not execute a transaction without the

20   approval of the ESOP trustee?

21       A.    Fully aware.

22       Q.    Did you take that into account in

23   preparing your report --

24       A.    I did.

1       Q.    -- that fact?

2       A.    Mm-hmm.

3       Q.    Okay.  Have you ever advised a corporate

4 board or an ESOP trustee or other fiduciary about

5 Internal Revenue Code 409(p)?

6       A.    No.

7       Q.    Have you ever made any presentations to

8 any special interest groups or business

9 associations about Internal Revenue Code Section

10 409(p)?

11      A.    I have not.

12      Q.    Did you ever publish any materials

13 related to Section 409(p)?

14      A.    I have not, no.

15      Q.    Did you review any articles or treatises

16 in regard to Internal Revenue Code 409(p) in

17 conjunction with preparing your report here?

18      A.    I did.

19      Q.    What articles or treatises did you

20 review?

21      A.    It was a review of 409(p), and it was

22 something that I found online from a law firm,

23 just to get my -- get calibrated.  But I don't --

24 I don't believe I downloaded it; I just kind of

1    made sure I understood what was there.

2         Q.    Did you produce that to us?

3         A.    If it's not in there, then I didn't, and

4    I didn't download it.

5         Q.    I'd like you to download that and

6    produce that to us when you -- at your earliest

7    opportunity, please.

8         A.    Yeah.  I'll try to find it.

9         Q.    Okay.  Very well.  Had you ever heard of

10   409(p) -- Internal Revenue Code Section --

11        A.    Yes.

12        Q.    Had you ever heard of Internal Revenue

13   Code Section 409(p) prior to your engagement by

14   Taft in this case?

15        A.    Well, I believe I have.

16        Q.    In what context did you hear it?

17        A.    Well, I've dealt with a variety of --

18   you know, I deal with a lot of tax issues, and I'm

19   -- I believe I have.  I don't recall specifically,

20   but...

21        Q.    No specific recollection?

22        A.    No.  But when it was said, I knew what

23   it was, not all the details of it, and that's why

24   I looked.

1      Q.    What is it?

2      A.    Well, it's basically there to prevent an

3  ESOP from becoming a tax shelter, and it's a way

4  of regulating that process and making sure there's

5  balance between -- in terms of total ownership and

6  concentrations of ownership.

7      Q.    Moving on from ESOPs, do you hold any

8  commercial real estate licenses?

9      A.    I don't.

10      Q.    Are you a commercial real estate broker?

11      A.    I am not.

12      Q.    Are you a member of any commercial real

13  estate associations or professional organizations?

14      A.    No.

15      Q.    Have you authored any publications

16  regarding commercial real estate leases?

17      A.    No.

18      Q.    Have you reviewed any scholarship or

19  treatises regarding commercial real estate leases

20  in conjunction with preparing your report or

21  formulating your opinions that you intend to give

22  in this case?

23      A.    I haven't, but I deal with a whole lot

24  of leases.

```
 1        Q.    That wasn't my question.  You need --
 2        A.    I realize that.
 3        Q.    Well, you need to just answer the
 4   question I ask.
 5        A.    I did answer.
 6        Q.    You didn't, so here's the question:  Did
 7   you review any scholarship or treatises regarding
 8   commercial real estate leases in conjunction with
 9   the report you prepared in this case or the
10   opinions you've formulated to give in this case?
11        A.    I haven't.
12        Q.    Did you review any commercial real
13   estate leases other than the one at issue in this
14   case in conjunction with preparing your report or
15   formulating your opinions?
16        A.    So may I restate what I think you just
17   asked me?
18        Q.    No.  I'll restate it if you didn't --
19        A.    Please restate it.
20        Q.    Did you review any commercial real
21   estate leases, actual leases, other than the
22   Levimo lease at issue in this case in conjunction
23   with preparing your report or formulating the
24   opinions you're going to give in this case?
```

1        A.      The only other lease that I did look at

2    was the original Carey lease and then the Levimo

3    lease.

4        Q.      Other than the original Carey lease and

5    the Levimo lease, did you look at any other

6    commercial real estate leases in conjunction with

7    preparing your report or formulating your

8    opinions?

9        A.      No.

10        Q.      Do you have any familiarity with the

11    commercial real estate lease market in St. Cloud,

12    Minnesota, in 2007?

13        A.      No, I don't.

14        Q.      Have you ever been involved with a

15    company that has entered into a commercial real

16    estate lease in the state of Minnesota?

17        A.      I'm trying to think.  Not that I recall.

18        Q.      Switching topics.  With regard to any of

19    your prior experience that's referenced in your CV

20    and in your report, did you deal with any

21    companies that used the party plan method of

22    direct sales to move their product?

23        A.      I'm trying to think.  Certainly not as

24    an intermediary advisor, not that I recall.  No.

```
 1    No.  The answer is no.

 2         Q.    The answer to the question is no?

 3         A.    Yes.

 4         Q.    What is your understanding of the party

 5    plan method of direct sales, if you have one?

 6         A.    Well, I do have one.

 7         Q.    Okay.

 8         A.    It's -- it's a network sales

 9    organization.  It creates parties where it sells

10    its products.  And they're sales consultants that

11    run the parties, and they also then recruit other

12    sales consultants and -- and on and on.  And the

13    products -- they're independent of the company.

14    They're -- they're acting as essentially

15    commissioned salespeople of sorts, and so...

16         Q.    Did you understand Creative Memories

17    used that particular business model?

18         A.    I did.

19         Q.    Did you ever publish any articles with

20    regard to direct sales organizations?

21         A.    No.

22         Q.    Did you ever publish any articles with

23    regard to the party planning method of direct

24    sales?
```

1        A.      No.

2        Q.      Did you review any scholarship or

3    treatises in regard to the direct selling model?

4        A.      No.

5        Q.      Did you review any articles or treatises

6    in regard to the party planning method of direct

7    sales in conjunction with preparing your report or

8    formulating your opinions?

9        A.      No.

10       Q.      Have you ever been an officer or

11   director of a direct sales company?

12       A.      I have not.

13       Q.      Do you have any prior experience at all

14   with the party plan method of selling a company's

15   products?

16       A.      No.

17       Q.      Have you ever performed a valuation of a

18   company that uses direct sales?

19       A.      No.

20       Q.      Have you ever performed a valuation of a

21   company that uses a network of consultants through

22   a party planning network?

23       A.      No.

24       Q.      Do you have any prior experience with

1      companies in what I'll call the scrapbooking

2      industry?

3           A.    Apart from Antioch, no.

4           Q.    And what is your prior experience with

5      Antioch other -- when you refer to Antioch, are

6      you referring to your engagement as an expert in

7      this case?

8           A.    I'm referring to my previous engagement

9      as an investment banker to sell their publishing

10     group.

11          Q.    Their publishing group did not use

12     the --

13          A.    That's correct.

14          Q.    What was my question going to be?

15          A.    You tell me.

16          Q.    That's why you need to wait.

17               The publishing group did not use the

18     direct sales method, correct?

19          A.    No.

20          Q.    Okay.  And the direct -- and the

21     publishing group that you were involved with back

22     in 2007 did not use party planning as a means to

23     sell its product, correct?

24          A.    That's correct.

1      Q.    Do you have any prior experience at all

2  with companies in the memory preservation or photo

3  preservation industries?

4      A.    No, I have not.

5      Q.    And did you ever publish any articles

6  about either industry?

7      A.    I have not.

8      Q.    Did you ever publish any articles about

9  scrapbooking or the scrapbooking industry?

10      A.    No, I haven't.

11      Q.    Do you belong to any professional

12  associations or business associations that deal

13  with scrap -- the scrapbooking industry or memory

14  preservation?

15      A.    No.

16      Q.    Did you review any scholarly articles or

17  publications about the scrapbooking industry or

18  the memory preservation industry in preparing your

19  report in this case or in formulating your

20  opinions?

21      A.    No, I did not.

22      Q.    In preparing your report and formulating

23  your opinions in this case, Mr. Greenberg, did you

24  take a look at any of Creative Memories'

```
 1   competitors in the 2003 to 2008 time frame in

 2   regard to their financial performance?

 3        A.   I did not.

 4        Q.   In preparing your report and formulating

 5   your opinion, sir, did you take into account the

 6   -- whether the Internet had any effect on Creative

 7   Memories' product lines and marketing model?

 8        A.   I specifically mentioned that that was

 9   one of the -- one of the -- one of the impacts

10   that they were -- they were experiencing, so...

11        Q.   Any other market developments that you

12   considered in formulating your report or in

13   preparing your opinions that affected Creative

14   Memories' financial performance between 2003 and

15   2008?

16        A.   I'm not really sure what your question

17   is.

18        Q.   Okay.  Other than the growth of the

19   Internet during that period, did you consider any

20   other market developments that impacted Creative

21   Memories' sales between 2003 and 2008?

22        A.   The only things that were considered

23   were the statements made by the defendants and

24   references that were in various exhibits by the
```

          1    investment bankers, in particular, but also the

          2    evaluators in respect to retail competition,

          3    Internet competition, and digital competition in

          4    general.

          5         Q.    Did you make any effort in preparing

          6    your report or formulating your opinions to

          7    determine how those market forces impacted the

          8    scrapbooking and memory preservation industry

          9    generally?

         10         A.    No.

         11         Q.    Did you review any treatises or

         12    scholarship on the effect of those market forces

         13    on scrapbooking or memory preservation?

         14         A.    I did not.

         15         Q.    Did you, in preparing your report or

         16    formulating your opinions, consider the effect of

         17    the emerging photo sharing technologies on

         18    Creative Memories' core business of scrapbooking?

         19         A.    I did not.

         20         Q.    What about online photo storage?

         21         A.    I did not.

         22         Q.    Did you consider competition -- the

         23    increasing competition in the marketplace for

         24    memory preservation that Creative Memories was

```
 1    facing from a company called Shutterfly?
 2        A.    Only to the extent that it was discussed
 3    in the -- in the various exhibits and in
 4    testimony.
 5        Q.    Didn't do any independent investigation
 6    of that?
 7        A.    No.
 8        Q.    How about Snapfish; are you familiar
 9    with --
10        A.    I am.  I am familiar with who they are
11    but only to the extent it was specifically
12    referred to in the -- in the documents.
13        Q.    Did you take into account, in preparing
14    your report or formulating your opinions, the
15    effect that Google's Picaso Web Albums had on
16    Creative Memories' business?
17        A.    I didn't.  And I don't recall
18    specifically that being referred to, although it
19    may have been.
20        Q.    How about the effect that a product like
21    Flicker -- Internet-based product like Flicker had
22    on Creative Memories' scrapbooking business
23    between 2003 and 2008?
24        A.    Same answer as last.  Only to the extent
```

```
 1    it was in there, but I don't recall that it was.
 2          Q.    And if it was in there, did you just
 3    note it was in the deposition transcripts, or did
 4    you actually --
 5          A.    I noted --
 6          Q.    -- factor --
 7          A.    Just -- just noted that that was there.
 8    Sorry.
 9          Q.    Did you actually factor it into
10    formulating your opinions and in your report?
11    Because I didn't see any reference to any of that
12    in your report.
13          A.    I did not concern myself specifically
14    with those issues except to note that they were
15    there, and they were creating competitive pressure
16    for the company.
17          Q.    So when you say "those issues," you're
18    talking about the increasing capability to store
19    photos on the Internet and to share photos on the
20    Internet and the emergence of companies like
21    Shutterfly and products like Google's Picasa Web
22    Albums?
23          A.    To the -- let me be careful how I want
24    to answer this.  The -- the impact of the various
```

```
 1   other media technology and channels were certainly

 2   noted and understood to be impactful in my -- in

 3   my point of view about the business.  But they --

 4   but beyond that, did I go and look at some

 5   economic data in those -- in those respects?  No.

 6   The only things that I did review were the -- were

 7   the information that was available through a

 8   variety of sources inside those documents.

 9       Q.    Did you do any independent investigation

10   in preparing your report or formulating your

11   opinions as to the marketshare that any of the

12   emerging Internet-based companies or retail

13   outlets took from Creative Memories in regard to

14   memory preservation products and scrapbooking?

15       A.    No.

16       Q.    In preparing your report and formulating

17   your opinions, did you take into account the

18   emergence of Facebook as a photography storage and

19   sharing product?

20       A.    No.

21       Q.    Did you make any effort to determine the

22   marketshare of memory preservation and photo

23   sharing of that market that Facebook took from

24   Creative Memories?
```

 1      A.    No.

 2      Q.    In formulating your opinions and

 3  preparing your report, did you consider any other

 4  companies that ran into some trouble in the

 5  marketplace as a result of online photo and

 6  digital storage such as Eastman Kodak?

 7      A.    Well, the "such as" I certainly didn't

 8  recall, but the -- only to the extent there were

 9  discussions by some of the private equity funds

10  who had -- had done some research or had positions

11  in companies like that, if I recall, of some of

12  the impact and some of the -- some of the -- just

13  what the economic conditions of those companies

14  were.

15      Q.    And what were the economic conditions of

16  those companies?

17      A.    Some of those were struggling.

18      Q.    Do you recall which specific companies?

19      A.    I don't offhand.

20      Q.    Do you recall which -- what sources you

21  were looking at that you just referred to in terms

22  of investment bankers and others?

23      A.    What I recall is that it showed up in a

24  bulleted document probably from Houlihan on the

```
 1    response from -- from one or -- you know, or maybe
 2    more than one of the private equity funds.
 3         Q.    Do you remember which private equity
 4    funds?
 5         A.    I don't offhand.
 6         Q.    Have you ever published any articles on
 7    corporate governance?
 8         A.    No.
 9         Q.    Ever teach a course on corporate
10    governance?
11         A.    No.
12         Q.    Did you review any scholarship or
13    treatises on corporate governance in preparing
14    your report or formulating your opinions?
15         A.    Not specifically for this process, no.
16         Q.    Have you ever advised a corporate
17    director about corporate governance issues?
18         A.    Yes.
19         Q.    And can you tell me your general
20    experience there in giving such advice?
21         A.    Well, it's fairly ongoing.  In fact, I
22    have a client in the hospitality business with
23    a -- with a company that I did a fairly large
24    restructuring for in 2011.  And the CEO's on the
```

```
 1   board and I'm an advisor to the board and -- you

 2   know, infrequently but not -- not terribly, but --

 3   but I do advise him on governance issues.

 4           Their company's just been bought by --

 5   at least the debt's been bought out by a -- by a

 6   -- by a PE fund.  And there's issues on -- in

 7   terms of indemnification, and they're looking at

 8   doing an Article 9.  So yeah, sure.

 9       Q.    Well, describe for me the specific

10   governance issues that you've given advice on in

11   that one particular case you've just testified to.

12       A.    The issues are really what is the

13   responsibility of the board in terms -- it's a

14   Delaware company and what the -- you know, what --

15   what the -- how broad those -- those requirements

16   are, and these are conversations I had with the

17   CEO.

18       Q.    What requirements?

19       A.    In terms of what their obligations are

20   in terms of total stakeholder -- with the

21   stakeholders.

22       Q.    And what I'm trying to get at is what is

23   your advise to them about their obligations

24   vis-a-vis stakeholders?
```

```
1        A.     In this company in particular, there are
2    -- there are vast divisions between the holders of
3    the equity and the debt in the company.  The
4    company has gone -- underwent a very substantial
5    restructuring with a hedge fund as one of their
6    lenders.
7             The board is conflicted.  They came in
8    -- the primary, at least, decorum for the board
9    came in from the -- from the lenders and the
10   inside board of directors, the CEO and chief
11   operating officer of the company.
12            And there's been a lot of conflicts as
13   to what to do and what happens in respect to, for
14   example, if they did an Article 9 sale and
15   whatever type of liability might exist for those
16   particular board members.
17       Q.     Do you recall what advice you gave them
18   about dealing with conflicts?
19       A.     I'm trying to think specifically.  Not
20   specific.  I mean, I -- you know, the advice has
21   been around what their obligations are with these
22   -- this particular person's obligation is for the
23   whole company and what the potential consequences
24   would be if there was, for example, successor
```

 1  liability or -- or there was the -- the shell left

 2  -- was left over and they were still a fiduciary

 3  to that shell.

 4      Q.   You referenced a person.  Is this a

 5  director or --

 6      A.   He's a director and he's a -- he's a CEO

 7  and a director of the board.

 8      Q.   And what advice did you give him?

 9      A.   Just really -- just rounding out what --

10  you know, what I thought he needed to know about

11  what those things could be.

12      Q.   And what did you think he needed to

13  know?

14      A.   The questions he asked me was what

15  happens if they do an Article 9 and we -- and we

16  still have the C Corporation, the Delaware

17  corporation, and we have an Article 9 in a Newco,

18  and what's -- what happens if there is -- if

19  there's any type of lawsuit that occurs to the --

20  to the shell in which he's still fiduciary, and

21  basically just outlining what I think would be

22  generally the case.

23      Q.   Did you provide him advice on how to

24  avoid a conflict situation?

1          A.    Not specifically, no.

2          Q.    Okay.  Did you provide only him advice,

3    or were you advising the entire board?

4          A.    In various times, I've advised the

5    entire board but more on financial transaction

6    matters.  This case -- this has been more on him

7    as a director than as a fiduciary.

8          Q.    Did you provide any other governance

9    advice to that particular board?

10         A.    Not -- not that I recall.

11         Q.    Is there any other experience you have

12   in dispensing what you consider to be corporate

13   governance advise to a director or a manager or a

14   corporate board?

15         A.    Not specifically.  I've been on several

16   boards and advised several boards.

17         Q.    I didn't ask you if you were on several

18   boards; I'm asking whether you recall other than

19   the instance you just described.

20               Do you recall, as an advisor, providing

21   a director, a board, or corporate manager advice

22   with regard to corporate governance issues?

23         A.    I don't recall specifically.

24         Q.    The one company and one situation you

```
1    did provide advice in conjunction with an Article
2    9 sale, can you tell me who that company is?
3         A.   I can.  It's BridgeStreet Worldwide,
4    Incorporated.
5         Q.   Who is the particular director that you
6    were principally advising?
7         A.   His name is Sean Worker, W-O-R-K-E-R.
8         Q.   Have you reviewed any scholarship or
9    treatises addressing the duties of an interested
10   director in a transaction under Delaware and
11   Minnesota law in preparing your report or in
12   formulating your opinions in this case?
13        A.   No.
14        Q.   Do you have any experience in advising
15   an officer or director of an Ohio corporation
16   about their -- about corporate governance matters?
17        A.   I have a lot of clients.  I'm trying to
18   think.  Specifically governance matters, nothing
19   that I specifically recall.
20        Q.   I note in your report at page 4 that
21   Silverstone provides, among many other services,
22   business valuations; is that -- is that right?
23        A.   That's correct.
24        Q.   How many valuations have you personally
```

    1    performed since 2008?

    2        A.    Oh, geez.  We do five to ten a year.

    3    I'm serious.  It's about five to ten a year.

    4        Q.    Oh, no, I appreciate that.  I only

    5    laughed a little, which wouldn't be reflected on

    6    the record, because that was going to be a follow-

    7    up question, is how many -- how many times does

    8    Silverstone perform business valuations per year,

    9    and I think now the answer is five to ten.

   10           Of those five to ten since 2008, how

   11    many of those business valuations are you the lead

   12    on, Mr. Greenberg?

   13        A.    Almost all of them.

   14        Q.    Well, when you say almost all of them,

   15    can you give me an estimate?

   16        A.    I would actually say all of them.  I

   17    have somebody that works for me that will do the

   18    detailed work of it, but I oversee it, and it's

   19    based on the models that I've developed, and so...

   20        Q.    With regard to your business valuations,

   21    have you ever valued a non-public S Corporation?

   22        A.    Oh, yeah.

   23        Q.    Can you give me any examples?

   24        A.    Yeah, I have -- I have a bunch.  I'm

 1   trying -- let me think.  Yeah, I did valuation

 2   work for the Ryan Style Company.  I've done

 3   valuation work for an S Corp broker-dealership in

 4   Cincinnati.  I don't want to say who it is.  I'm

 5   under confidentiality.

 6           I've done -- I've done a lot -- a lot of

 7   my -- a lot of my clients are S Corps, so a fair

 8   number of them.  And I can't remember all of them,

 9   but quite a few.

10   Q.    In general, for what purpose were you

11   preparing valuations for these companies?

12   A.    Usually to -- you know, usually in

13   anticipation of a transaction, so a sale of the

14   company; in anticipation of a buy-sell agreement,

15   a buy-out of the company; sometimes it's an annual

16   requirement; and we do it for 409(a) -- IRC 409(a)

17   requirements for options, phantom stock plans,

18   stock appreciation right plans, stock grants,

19   things like that.

20   Q.    In preparing your report and formulating

21   your opinions in this case, sir, did you bring to

22   bear any of that experience in attempting an

23   independent valuation based on historical data

24   available on the record of Antioch's value in the

1    2003 time frame?

2         A.    That's a fairly complex question.

3         Q.    Thank you.

4         A.    I bring a fair amount of my expertise in

5    valuation to what I -- what I -- what my opinion

6    was on the one hand, but did I do an actual

7    valuation --

8         Q.    Yes, sir.

9         A.    -- if that's what you're asking --

10        Q.    That's what I'm asking.

11        A.    -- the answer is no.

12        Q.    Did you bring to bear your prior

13   experience to attempt an independent valuation of

14   The Antioch Company in the 2007/2008 time frame in

15   conjunction with preparing your report or

16   formulating your opinions in this case?

17        A.    You'll have to repeat the question.  I'm

18   sorry.

19             MR. SCHEIER:  Can you read it back,

20   please, Kelly, when you get a chance?

21             (The question was read back.)

22        A.    The -- the broad answer is we didn't do

23   -- I didn't do a valuation of The Antioch Company

24   in preparation of this report.

1        Q.    In one of your prior answers, you

2    mentioned that you've developed valuation models?

3        A.    Mm-hmm.

4        Q.    Is that your own model that you

5    developed?

6        A.    The model is -- we use several models,

7    but the model is not idiosyncratically mine.  It's

8    the -- we use Gordan Growth Models and Capital

9    Asset Pricing Models, which are fairly standard

10   valuation models that are used in the -- in the --

11   you know, from professional valuators.

12            In fact, Prairie Capital and BVI use

13   very similar methods.  There's little differences

14   in how some of the calculations are approached,

15   but the same concepts are there.  It's discounted

16   cash flow.  You're capitalizing present values of

17   discounted cash flow and residual and terminal

18   values.

19       Q.    You didn't use any of that modeling to

20   do independent valuations of Antioch at any time

21   in conjunction with your expert engagement

22   here; is that correct?

23       A.    That's correct.

24       Q.    Have you ever published any articles

1    with regard to business valuation methodologies?

2         A.    Yeah, I've -- several things that I've

3    written there that refer to valuation

4    methodologies and flaws in valuation

5    methodologies, sure.

6         Q.    And were those published in the last ten

7    years?

8         A.    I think so.  There's one on -- an

9    article I did, which you should have, called

10   "Allocating Value to the Market."

11        Q.    Have you ever taught any classes in

12   regard to business valuation?

13        A.    I actually have, yeah.

14        Q.    Okay.  And do you have any

15   certifications or belong to any business or

16   professional associations that deal with corporate

17   valuations?

18        A.    No.

19        Q.    Have you ever served as an expert

20   witness offering opinions about damages in a piece

21   of litigation?

22        A.    No.

23        Q.    Have you ever been qualified by a state

24   or federal court to provide damages testimony in

 1  any case?

 2      A.    No.

 3      Q.    Have you ever written any articles about

 4  damages in litigation?

 5      A.    No.

 6      Q.    And have you ever taught any courses in

 7  regard to damages in litigation?

 8      A.    No, I haven't.

 9      Q.    Are you familiar with any damages

10  methodologies?

11      A.    No, I'm not.

12      Q.    Have you ever made any presentations to

13  a professional or business organization about

14  damages and proving damages in litigation?

15      A.    No.

16      Q.    Have you made any presentation or have

17  you published any articles about calculating the

18  damages that a company suffers based on breaches

19  of its officers' or directors' fiduciary duties?

20      A.    No.

21      Q.    Are you familiar with any methodologies

22  typically used by damages experts?

23      A.    No.

24      Q.    I take it, then, you didn't bring to

1  bear any specifically identifiable damages

2  methodology in preparing your report or

3  formulating your opinions in this case?

4       A.    That would follow from my previous

5  answers, yes.

6       Q.    Other than the one case identified in

7  your report -- In Re: Berean Christian Stores --

8  have you been retained in any other matter to act

9  or serve as an expert witness on any topic?

10      A.    That's the only time I've been in court

11  as an expert witness, yes.

12      Q.    Well, that wasn't quite what I asked.

13  I'm asking whether you've ever been engaged before

14  as an expert witness other than the Berean

15  Christian Stores bankruptcy back in 2009?

16      A.    Yeah.  The reason I parsed what you said

17  was because I have been engaged in the Ventilex

18  363 bankruptcy, but we settled it before it went

19  to court.

20      Q.    You were engaged to be an expert witness

21  in that case?

22      A.    Yes.

23      Q.    Did you prepare a report?

24      A.    No.  I was going -- I was in the process

1    of preparing the report, and it was settled.

2         Q.    Do you have a draft of the report you

3    prepared?

4         A.    I may.  I have to -- it didn't -- it

5    wasn't finished, but I might have some vestige of

6    it sitting there somewhere.

7         Q.    What year was that?

8         A.    I think it was two summers ago, so...

9         Q.    Were you hired by a law firm?

10        A.    Yes, from -- a law firm out of

11   Cleveland.  Loeser and -- Loeser and something.  I

12   forget the name of it.

13        Q.    Do you remember the name of the lawyer?

14        A.    If you give me a little time, I can

15   remember it.  It's a pretty distinct name, an

16   Italian name.  The first name is Rocco something

17   or other.  He was the bankruptcy lawyer for Loeser

18   and whatever, and he was referred to me through

19   bankruptcy attorneys in Cincinnati.

20             MR. SCHEIER:  Maybe I'll give you a

21   little bit of time now since we'll take a short

22   break.

23             THE WITNESS:  Okay.

24             MR. SCHEIER:  Thank you.

```
 1              (A brief break was taken.)
 2        Q.    (By Mr. Scheier)  Welcome back from
 3   break, sir.  I wanted to follow up on one line of
 4   questioning prior to the break.  It has to do with
 5   commercial real estate leases.
 6              I probably didn't give you an
 7   opportunity to talk about something you did want
 8   to talk about, and that is your experience --
 9        A.    Mm-hmm.
10        Q.    -- general experience, I take it.  Is it
11   negotiating commercial real estate leases, or what
12   did you want to talk about?
13        A.    Well, I've negotiated many commercial
14   real estate leases.  I've unwound commercial real
15   estate leases.  It's an inevitable part of my
16   practice.  My clients often own property or lease
17   property.  We work on transactions primarily,
18   so -- so we -- we see a lot of leases.
19        Q.    And you refer to the -- I don't know if
20   it's the royal "we" or to what you're referring.
21   Tell me -- I'm interested in your experience.
22        A.    My experience principally is what I'm
23   referring to.
24        Q.    Have you ever negotiated a commercial
```

```
 1   real estate lease?

 2        A.    Many.

 3        Q.    When you say "many," what is the

 4   magnitude of many?

 5        A.    Fifty to a hundred.

 6        Q.    And over what time period?

 7        A.    Last 30 years.

 8        Q.    Can you tell me the general value --

 9   economic value of those leases in terms of either

10   the rent stream or however else you would

11   determine that?

12        A.    I've worked on negotiating a lease in

13   Chicago for a client somewhere in the neighborhood

14   of $5 million a year in rent.

15        Q.    Any other examples that you want to give

16   me?

17        A.    We deal with a lot of commercial and

18   industrial properties, and they're all over the

19   place.  I just renegotiated a workout lease where

20   we're -- we have a hundred plus thousand square

21   feet of space and -- with a firm that's owned --

22   the landlord is in Chicago.  You know, I'm trying

23   to think of what that is.  It's probably in the

24   neighborhood of, you know, $750,000 a year in
```

1    rent.

2         Q.    Have you in the past, other than the one

3    lease in Chicago you reference with about a $5

4    million revenue stream, dealt with commercial real

5    estate leases the size of the Levimo lease?

6         A.    I'm trying to think of what the -- what

7    the size is.  I mean, square footage-wise?  Is

8    that what you're referring to?

9         Q.    No.  I apologize.  It was an inartful

10    question.  In terms of the rent stream.

11         A.    I'm trying to think if I've done -- I'm

12    not sure that I've -- specifically at that level,

13    but I've done many in middle market companies, so

14    it's hard for me to say.

15         Q.    Have you ever been involved in a

16    sale-leaseback transaction of the type that Levimo

17    undertook with The Antioch Company?

18         A.    Yes.

19         Q.    How many?

20         A.    Ten, maybe.

21         Q.    Did any deal with the purchase price of

22    the property involved in that transaction that was

23    as high as the price in the Levimo transaction of

24    $26 million?

```
 1        A.    That probably -- not -- probably not,
 2   no, I'd say.  Just smaller properties.
 3        Q.    I'd like you, please, to focus your
 4   attention again on Exhibit 797, and that would be
 5   the report that the Taft firm gave us as your
 6   report.
 7        A.    Mm-hmm.
 8        Q.    And I just -- I might have asked this.
 9   I'm sorry if I did.  Will you just, please,
10   identify this as the report -- written report you
11   prepared in this case?
12        A.    Yes, it is.
13        Q.    Who drafted this report?
14        A.    I did.
15        Q.    Did any of the other members of
16   Silverstone, LLC, assist in drafting this report?
17        A.    They did not.
18        Q.    Did your one employee, Mr. Mehta, assist
19   in drafting this report?
20        A.    He did not.
21        Q.    Did anyone edit the report other than
22   you?
23        A.    The report was given in a -- in a
24   penultimate final draft to Taft to look -- make
```

1      sure that the factual statements were correct.

2          Q.    And the Taft law firm confirmed for you

3      that the factual statements were correct?

4          A.    There were a few small nits on the -- on

5      -- I can't remember specifically what it was, but

6      it was minor.

7          Q.    Did any attorney from the Taft law firm

8      draft any part of the report?

9          A.    No.

10              (Deposition Exhibit No. 800 was marked.)

11          Q.    Well, sir, you're probably going to be

12      proud to know that you are part of a milestone

13      event in the case, and that is the marking of

14      Deposition Exhibit 800.

15          A.    I feel privileged.

16          Q.    I'm sure you do.

17              Sir, I've handed you what I've marked as

18      Exhibit 800, and it is a copy of the Federal Rule

19      of Civil Procedure 26.  Do you see that?

20          A.    I do.

21          Q.    Have you seen this rule before?

22          A.    No.

23          Q.    Have you ever heard of it before?

24          A.    No, not specifically this, no.

1      Q.    Anyone at Taft mention Rule 26 to you?

2      A.    Not that I recall.

3      Q.    I have some questions to better

4    understand your report that key off of a section

5    on the second page of Exhibit 800.

6      A.    Mm-hmm.

7      Q.    And if you would take a look there down

8    about a third of the way, there is a, parens, 2,

9    close parens, Disclosure of Expert Testimony.  Do

10   you see that, sir?

11     A.    I do.

12     Q.    And if you'd go down to subsection,

13   parens, capital B, close parens, Witnesses who

14   must provide a written report -- and let me know

15   when you get there.

16     A.    I'm there.

17     Q.    All right.  I'd ask you to read that

18   paragraph, but I'm going to focus my questions on

19   the very last sentence that says "The report must

20   contain..."  But I'd like, just for some

21   background, if you'd just take a moment and read

22   the paragraph through that last sentence I just

23   quoted.

24     A.    (Examining document.)  Just through the

1    end of B?  Is that what you're asking for?

2        Q.    Yes, just through the words "The report

3    must contain," colon.  And when you're done with

4    that, you can look up, and I'll know that you're

5    done.

6        A.    (Witness looked up.)

7        Q.    Okay.  Very good.  You, of course, have

8    been specially employed to provide expert

9    testimony in this case on behalf of the plaintiff,

10    correct?

11        A.    That's correct.

12        Q.    Then I'd like you to look at the

13    subsections that follow what the report must

14    contain.  You'll see a paragraph little "I" --

15    strike that -- parens, little "I," close parens?

16        A.    Mm-hmm.

17        Q.    It says there "The report must contain a

18    complete statement of all opinions the witness

19    will express and the basis and reasons for them."

20    Did I read that correctly?

21        A.    You did.

22        Q.    Does your report contain a complete

23    statement of all opinions that you will express

24    and the basis and reasons for them?

1      A.    I believe it does.

2      Q.    Well, I'm asking you if it does.

3      A.    Yes.

4      Q.    Okay.  Little Roman ii says "The report

5  must contain the facts or data considered by the

6  witness in forming them."

7            Does your report identify all facts and

8  data that you considered in forming your opinions?

9      A.    To the best of my knowledge, it does.

10     Q.    Well, you wrote the report, so your

11  knowledge is really kind of the beginning and the

12  end, isn't it?

13     A.    I would think so.

14     Q.    Okay.  Little iii notes that the report

15  must contain any exhibits that will be used to

16  summarize or support the opinions you're going to

17  be giving in this case.

18            I didn't notice any exhibits attached to

19  your report other than your CV, so I'm assuming

20  there aren't any that we're going to see?

21     A.    No.  All the exhibits were -- to the

22  extent I had any exhibit, they were integrated

23  into the text, so they weren't separate from.

24     Q.    I'm sorry.  I read this so frequently as

1    a lawyer and you don't, and I just think you've

2    misread it slightly or misunderstood.  It's

3    referring to any exhibits that you've prepared

4    that will be used to summarize or support your

5    opinions other than your CV that was attached as

6    an exhibit to your report.

7              Were you planning or did you prepare any

8    exhibits that will be used to summarize or support

9    the opinions that you'll be giving in this case?

10         A.    I did not.

11         Q.    Little iv, or 4, says that the report

12   must contain your qualifications including a list

13   of all publications authored in the previous ten

14   years.

15             Does your report comply with that aspect

16   of the rule?

17         A.    Yes.

18         Q.    And lastly, the reports require -- the

19   rule requires that your report contain a list of

20   all other cases in which, during the previous four

21   years, you testified as an expert by trial or by

22   deposition.

23             Does your report comply with that aspect

24   of the rule?

1     A.    Yes, it does.

2     Q.    In preparing for this deposition -- I'm

3  sorry if I asked you this already -- did you

4  review any documents that you hadn't reviewed

5  while preparing the report and formulating the

6  opinions that are in it?

7     A.    I'm not sure what you're asking.

8     Q.    Okay.  It happens often in depositions.

9           Did you look at any documents in

10 preparing for this deposition with the Taft

11 lawyers that you hadn't considered in preparing

12 your report and formulating your opinions?

13    A.    I'd say no.  By the way, you haven't

14 asked, but the name of the attorney is Rocco

15 Debitetto at Hahn and Loeser in Cleveland.

16    Q.    Well, thank you.  I appreciate that.

17    A.    Pretty good, huh?

18    Q.    Yeah, you were probably chomping at the

19 bit waiting for me to get to that question.  It

20 was coming, I promise.

21    A.    I figured it was.

22    Q.    The last requirement of the report under

23 the rule, sir, is it must contain a statement of

24 the compensation to be paid for the study and

1    testimony in the case.

2              And I did see reference to that in your

3    report, and I presume you've complied with that

4    aspect of the rule?

5        A.    Yes.

6        Q.    Are you going to be asking the Taft

7    firm, or the Litigation Trust as probably better

8    said, to pay you any more than $350 an hour for

9    actually appearing and testifying in court?

10       A.    No.  It's -- the agreement's at 350.

11       Q.    350 for all services --

12       A.    Yes.

13       Q.    -- including your appearance here at

14   this deposition?

15       A.    Yes.

16       Q.    Okay.  Thank you.  You can put that

17   deposition exhibit aside.

18             And now having confirmed that all the

19   opinions you'll be giving in this case are

20   contained in this report that you prepared, I'd

21   ask you to state for me now each and every opinion

22   that you anticipate giving at the trial of this

23   matter.

24             MS. ANDREW:  Objection.  Do you want him

```
 1    to read the report to you?

 2              MR. SCHEIER:  The report's the report.

 3    I'm wondering what his opinions are...

 4        Q.   ...what opinions you'll be testifying to

 5    at trial.

 6              MS. ANDREW:  Objection.

 7        A.   I'm not -- the report is my opinion or

 8    opinions.  So do you want me to orally commit

 9    these to you, is what you're asking for

10    specifically right now?

11        Q.   Well, I'm wondering if you're asked at

12    trial by a Taft lawyer or one of the defendant's

13    lawyers what opinions will you be offering in this

14    case, if you're able to articulate a specific

15    opinion or multiple opinions that you will be

16    giving.

17              I understand you wrote a 25-page report,

18    but in my experience, there's normally a report

19    that provides principally support for opinions

20    that will be given.

21        A.   Mm-hmm.

22        Q.   So with that understanding --

23        A.   Yes.

24        Q.   -- or if that distinction is meaningful
```

 1   to you, it may not be, I'm asking you to

 2   articulate on this record each and every opinion

 3   that you will be giving at trial in support of the

 4   plaintiff's case.

 5            MS. ANDREW:  Same objection.

 6            MR. SCHEIER:  What's the basis for the

 7   objection?

 8            MS. ANDREW:  That it's unduly

 9   burdensome.  You've asked him basically to repeat

10   his report.  His report is there.  You know, are

11   you saying are there opinions other than what's in

12   his report?

13            MR. SCHEIER:  No.  He said all his

14   opinions are in the report.  I'm wondering what

15   those opinions are.  The rule requires a report

16   that contains, among other things such as facts

17   and data supporting an opinion, the opinions.

18       Q.   (By Mr. Scheier)  I read the report, and

19   I wasn't sure if your opinions were contained in

20   the conclusion section or if you omitted a section

21   that was called "opinions."

22            But what I'm wondering is, at trial,

23   what will you testify to as to your opinions in

24   this case.

```
 1        A.    So if -- may I -- if I enumerate each --

 2   each category that I would address as an opinion,

 3   whatever I'm going to opine on, is that what

 4   you're looking for me to give you right now?

 5        Q.    I'm asking what you're going to opine on

 6   at trial.  What will your opinions be in this

 7   case?

 8        A.    Sure.  My opinions are the following:

 9   The 2003 tender offer transaction was poorly

10   thought out, poorly executed, poorly advised,

11   inadequately advised, and -- for a number of

12   reasons:  that the information -- well, you've

13   asked me, so --

14        Q.    No.  I've asked you for your opinions,

15   not the bases yet.  So one opinion is that the

16   2003 tender offer was poorly thought out?

17        A.    Poorly thought out.  I would even say

18   reckless.

19        Q.    What is your understanding of the phrase

20   "reckless"?

21        A.    That there was certainly plenty of

22   opportunity to review what the impact of the

23   transaction would have been, that it was ignored

24   and went ahead anyway to essentially enrich the
```

```
 1    non-ESOP shareholders.

 2         Q.    Any other opinions?

 3         A.    Sure.  That the dual-track, so called,

 4    was highly irregular.  I've never seen anything

 5    like it before.  That there was active

 6    interference between the wishes of the Morgan

 7    group represented by Candlewood with Houlihan.

 8         Q.    Is that an independent opinion?  The

 9    opinion is the dual-track was highly irregular.

10    Is that the opinion?

11         A.    The dual-track was detrimental to the

12    company is the opinion and to the process and to

13    the outcome.

14         Q.    Okay.  Any other opinions that you'll be

15    offering at trial?

16         A.    The two major areas that I covered.  I

17    also discuss the Levimo lease.

18         Q.    Sir, I don't want to know what you

19    discuss.  I'd like to know what opinion you'll be

20    giving at trial.

21         A.    I'm getting there.  My opinion would be

22    that the Levimo lease, given the context known by

23    everybody involved, including the board of

24    directors, acted and had the potential to act as a
```

1    poison pill in the benefit of the -- of Mr. Morgan
2    and his -- primarily Mr. Morgan.
3            I would also opine on -- I'm trying to
4    think on what other things I've covered.  Just
5    bear with...  Um...
6            MS. ANDREW:  Feel free to look at your
7    report.
8        A.    Yeah, let me just -- if you don't mind,
9    thanks.  (Examining document.)  Related to the
10   2003 transaction, I certainly would opine that the
11   post-transaction capital structure and balance
12   sheet prevented the company from really addressing
13   the problems that it had, and that in addition to
14   competitive technologies and competitors in
15   general, largely contributed to the business's
16   inability to address its problems.
17           I would further opine in related to the
18   2003 transaction that the board should have known
19   and should have contemplated at a great level of
20   detail with numerous scenarios that having over a
21   thousand individual shareholders have a put right
22   over a three-year period after the founder
23   basically de-equitized the company and enriched
24   themselves by $120 million was a dramatic mistake

```
 1    and one that led to the ultimate demise of the
 2    company.
 3         Q.    The put right -- the three-year put
 4    right...
 5         A.    Mm-hmm.
 6         Q.    ...led to the demise of the company.
 7    Okay.
 8         A.    It drained the money of all capital
 9    between that and the debt structure that they took
10    on.  I would further opine that the various offers
11    that Mr. Morgan was attempting to put in place,
12    including Mr. Moran and in conjunction with the
13    Candlewood Investment bankers, were demonstrably
14    over the market value of the company, and that in
15    consideration of the fact that Houlihan had
16    contacted over 170 individual potential buyers,
17    had close to 70 NDAs and multiple other offers
18    that -- to consider that a group in this one
19    company -- to think that that -- the market wasn't
20    talking to them and that they would delay other
21    actions that would benefit the company was an
22    enormous lack of judgment and -- and that the
23    board was highly compromised in allowing that to
24    happen by its relationship with Mr. Morgan.
```

1      Q.   Any other opinions?

2      A.   Give me a minute.  (Examining document.)

3 Yeah, I do have other opinions.  One is that the

4 board, through Houlihan Lokey and to some extent

5 through McDermott, Will & Emery -- or certainly in

6 the context of the state of the solvency of the

7 company and the various valuations, was actually

8 giving them fairly good advice, but they were not

9 heeding that advice.  And that also led to --

10     Q.   What time frame?

11     A.   Certainly '07 and '08.  Primarily I

12 think the fall of '07 -- the fall through the end

13 of the year to -- to -- to the 2008 bankruptcy, so

14 through the summer.

15     Q.   When you say "the board," are you

16 referring to the Special Transaction Committee

17 prior to June 2008?

18     A.   I'm referring to the Special Transaction

19 Committee but also the board in general.

20     Q.   Okay.  Any other opinions?

21     A.   Yeah.  I mean, I think the correlate --

22 correlating to that, I believe that the 363 offers

23 were -- particularly the Whitney offer -- the --

24 the -- in the late spring -- early/late spring of

1   2000 -- 2008, sorry -- were -- were the best

2   offers, and they should have accepted those

3   offers.

4        Q.    That's an opinion you'll be giving at

5   trial, that the board should have accepted the

6   Whitney offer?

7        A.    Well, the Special Transaction Committee

8   accept the Whitney offer.  It got blown up by

9   Lenoir and by Evolve and by Mr. Morgan.

10       Q.    So what's your opinion?

11       A.    My opinion is that it was the best offer

12  out there, is my simple -- simple opinion; that it

13  wasn't acted on.  That's my opinion.

14       Q.    Your opinion is that the J.H. Whitney

15  offer was the best out there, and it was not acted

16  upon?

17       A.    Best offer out there and best offer for

18  the company and for its continuation post-tran --

19  post-363.

20       Q.    Okay.  Any other opinions?

21       A.    Well, I think I -- I certainly opine

22  that I thought the Candlewood process and offer be

23  -- the offers that Candlewood came up with were

24  just -- just rife with execution risks and

1    overvalued the company well beyond where the

2    market is.  But I think that's implied in some of

3    what I've said.

4         Q.    Yeah, I think that was your sixth

5    opinion, yes?

6         A.    If you --

7         Q.    That's not an independent opinion,

8    correct?  You've already given me that, or is that

9    another opinion?

10        A.    That's -- it's -- no, it's -- it's

11   integral to one of those.

12        Q.    Okay.

13        A.    You're doing the counting; I'm not,

14   so...

15        Q.    Well, I would think you would have come

16   in here knowing the opinions you're giving and the

17   number of them, so --

18        A.    Well, I do.

19        Q.    -- but I'll count them up for you.

20        A.    I appreciate that.

21        Q.    Eight opinions.

22        A.    I accept that.

23        Q.    Sir, other than those eight opinions,

24   will you be giving any other opinion at the trial

1   of this matter?

2       A.    Apart from elaborations of those, I

3   don't think so.

4       Q.    Well, I need to know definitively

5   whether you'll be giving any other opinions at

6   trial other than the eight you've just identified.

7       A.    Those are the principal opinions.  I

8   don't -- I don't imagine having others.  So the

9   answer would be that would all -- that is all I'll

10  opine on, yes.

11      Q.    The eight opinions you just gave me is

12  the total of opinions that you'll be giving in the

13  trial of this matter?

14      A.    I just confirmed that, yes.

15      Q.    Okay.  A couple of questions to start

16  with.

17      A.    Please.

18      Q.    Are you aware that the district court in

19  this case dismissed all of the plaintiff's claims

20  relating to the 2003 transaction?

21      A.    I'm aware that -- I guess the way I've

22  understood it is that that was the assumption,

23  that -- that it didn't want to be brought back up

24  again, so... so...  So actually dismissed, I

```
1    didn't know that.  That you believed or all the
2    defendants' counsel believed we'd already gotten
3    through that, that I understood.
4         Q.   Okay.  So you understood those claims no
5    longer exist in this case?
6         A.   No, I didn't under -- I didn't say that.
7         Q.   Okay.
8         A.   I didn't -- what I understood was
9    that -- it was that it was the belief of
10   defendants' counsel that that hadn't already --
11   that that had already passed and there -- was not
12   going to be readdressed.  That it was dismissed
13   definitively and ultimately and so on, that I was
14   not aware of.
15        Q.   Okay.  I'll represent to you that the
16   liability based on the 2003 transaction has been
17   completely dismissed out of this case.  It doesn't
18   matter if it's the defendants telling you that or
19   the plaintiffs.  So I'll make that representation
20   to you as we sit here today.
21             MS. ANDREW:  Well, objection.
22        Q.   I want to first talk about your opinion
23   at the -- I think the way you articulated it was
24   the 2003 tender offer was poorly thought out and
```

1    reckless.  Do you recall that?

2         A.    I do.

3         Q.    In forming that opinion, it's true you

4    did not look at the tender offer document,

5    correct?

6         A.    I did not.

7         Q.    And in coming to that opinion, you

8    didn't look at any of the board of directors

9    meeting minutes between January 2003 and December

10   of 2003; is that correct?

11        A.    If they weren't in my document folder,

12   then the answer would be yes.  I recall reading an

13   awful lot about the transaction, but if it was

14   specifically that, I don't -- I don't -- I can't

15   say yes.

16        Q.    Well, sir, earlier in the deposition, we

17   identified two documents that you received that

18   were dated prior to 2006.  One was the BVI

19   valuation.  The other was a document of unknown

20   origin that was marked as Exhibit 2 in a Fifth

21   Third Bank deposition.

22        A.    Mm-hmm.

23        Q.    You don't recall looking at any of the

24   minutes of board of directors meetings in 2003

1    where the terms of the transaction and the

2    progress of the -- negotiating the transaction was

3    discussed?

4         A.    I'll take your -- I'll take your

5    representation that it's not there and I didn't --

6    but I obviously have a fair knowledge of what the

7    transaction was through other documents.

8         Q.    Well, that isn't my question.

9         A.    I know.

10        Q.    Whether you have a fair knowledge of it

11   or not, someone else will determine.  I'm asking

12   whether you looked at any of the board of

13   directors meeting minutes in the calendar year

14   2003 where the transaction was discussed?

15        A.    I've already answered the question.

16        Q.    And what's the answer to the question?

17        A.    I said if it's not there, then I didn't

18   see it, and I didn't -- I didn't review it.

19        Q.    Did you review any of the transaction

20   work papers put together by Deloitte & Touche on

21   behalf of the board?

22        A.    I did not.

23        Q.    Did you look at any of the work product

24   prepared by the Duff & Phelps group underlying the

1    fairness opinion that it gave to GreatBanc?

2         A.    I did not.  I knew of it, and I -- it

3    was stated, but the answer is I didn't look at the

4    -- it wasn't -- didn't have the details of it.

5         Q.    You didn't have those documents, in

6    fact --

7         A.    Right.

8         Q.    -- did you, sir?

9         A.    Correct.

10        Q.    Did you look at the Duff & Phelps

11   fairness opinion in formulating your opinion that

12   the 2003 tender offer was poorly thought out and

13   reckless?

14        A.    No.

15        Q.    You didn't have that, did you?

16        A.    I did not.

17        Q.    Did you look at any -- did you take into

18   account the prominence of Duff & Phelps in the

19   marketspace of ESOP valuation?

20        A.    I'm well aware of Duff & Phelps.  In

21   more general terms, we compete with them, so I

22   certainly know who they are.

23        Q.    In coming of the opinion with regard to

24   the 2003 transaction that it was poorly thought

1    out and reckless, did you review any testimony by

2    a Duff & Phelps representative or employee?

3         A.   If it was not in the document, I

4    don't -- certainly don't recall.  If it was in

5    there, I've read through it, but I wouldn't -- I

6    don't --

7         Q.   I'm representing to you it was not in

8    there.

9         A.   Then I haven't.

10        Q.   Okay.  And by the way, you've done this

11   work within the last 60 days, correct?  It's not

12   like you need to draw back a very long time to

13   remember what you reviewed and what you didn't

14   review, right?

15        A.   Again, true.

16        Q.   Do you recall reviewing any deposition

17   testimony from GreatBanc Trust Company?

18        A.   No.

19        Q.   Do you know what role GreatBanc Trust

20   Company played in the 2003 transaction?

21        A.   I do.

22        Q.   What role was that?

23        A.   They were -- they were the trustee of

24   the -- of the ESOP.

```
 1        Q.    Did your --

 2        A.    Um...

 3        Q.    Go ahead.

 4        A.    You got another question?

 5        Q.    No.  I cut you off and I apologize.

 6        A.    Oh, okay.  They were the trustee.  They

 7   negotiated a quick price guarantee as a way of

 8   allowing the non-ESOP shareholders to complete the

 9   tender offer, essentially asked -- got them to

10   stand down in the transaction.

11        Q.    Who got who to stand down?

12        A.    Well, the trust -- well, apparently the

13   non-ESOP shareholders got an agreement with the

14   trust that they would not participate in the

15   tender offer.

16        Q.    Did you review any of GreatBanc's or

17   Duff & Phelps' work product that led them to

18   decide not to tender the ESOP shares in the

19   transaction?

20        A.    No, I didn't.

21        Q.    Okay.  Were you aware that if the ESOP

22   chose -- if GreatBanc chose to tender the ESOP

23   shares, the company retained the right to waive

24   that condition and close the transaction in any
```

1    event?

2         A.    Please repeat that.

3         Q.    Were you aware that the condition that

4    GreatBanc choose not to tender the ESOP shares was

5    a waivable condition of the transaction?

6         A.    I'm not sure that I understand exactly

7    what you're -- what you're specifying.

8         Q.    I thought you testified you understood

9    that a condition of the transaction was that

10   GreatBanc decide not to tender the ESOP shares to

11   the company?

12        A.    What I said is that in my -- the report,

13   what I specifically said was that they stood down

14   and that it would seem hard to imagine that they

15   could have not -- they could have participated in

16   the tender offer because of the -- just the call

17   on the -- on the capital to try to satisfy

18   everybody at that -- at the tender offer price.

19        Q.    Did you review any documentation or

20   testimony from anyone at GreatBanc or at Duff &

21   Phelps that was used in their fiduciary process in

22   making the decision not to tender shares in the

23   transaction?

24        A.    I did not.

1      Q.   Did you see any evidence that GreatBanc

2  chose not to tender the shares because of

3  insufficient funding to purchase the ESOP shares?

4      A.   No.  That conclusion was drawn by just

5  looking at what happened and the number of

6  shareholders and what would occur.

7      Q.   But you have no evidence that GreatBanc

8  took that into account?

9      A.   No, but that they should have.

10      Q.   Okay.  Did you take a look at any of the

11  modeling that Deloitte & Touche prepared and

12  presented to the board showing the financial

13  feasibility of the transaction?

14      A.   Only to the extent it was reflected in

15  various documents that were subsequent to that in

16  some type of restatement of what occurred.

17      Q.   No.  I'm asking you whether or not you

18  reviewed any of Deloitte & Touche's underlying

19  work product supporting their advice to the

20  Antioch Board of Directors that the transaction,

21  as ultimately closed, was financially feasible?

22      A.   I did not.

23      Q.   Did you review any of the deposition

24  testimony of Helen Morrison?

```
 1        A.    I don't believe so.

 2        Q.    Do you know who Helen Morrison is?

 3        A.    I don't.

 4        Q.    Never heard of her?

 5        A.    I can't say I've never heard of her.  I

 6   just don't recall her name at the moment.

 7        Q.    Okay.  I'll represent to you she was

 8   Deloitte & Touche's lead in negotiating the

 9   transaction on behalf of the company.

10        A.    Okay.

11        Q.    Never read her deposition testimony?

12        A.    I did not.

13        Q.    You're also aware that Houlihan Lokey

14   was hired by the board to offer a fairness opinion

15   that the transaction was financially fair to the

16   selling non-ESOP shareholders?

17        A.    Yes, sir.

18              MS. ANDREW:  Objection.  I believe that

19   misstates Houlihan's opinion.  But you may answer

20   the question.

21        A.    My understanding -- (A), I was aware

22   that Houlihan had done that, but my understanding

23   of Houlihan was a fairness opinion on the

24   financial value of the -- of the tender offer at
```

1   the share price level.  It was not a review of the

2   total transaction or the impact it may have on the

3   company.

4        Q.    Did you review Houlihan Lokey's

5   fairness --

6        A.    I didn't.

7        Q.    -- opinion?

8             Did you review any of the underlying

9   work product supporting Houlihan Lokey's fairness

10  opinion?

11       A.    I didn't.

12       Q.    Did you review any testimony by either

13  GreatBanc or Deloitte & Touche relating to their

14  negotiation of the terms of the transaction?

15       A.    I have not.

16       Q.    Where did you gain an understanding of

17  the terms of the put price protection agreement?

18       A.    Through the various documents that were

19  available to me including the bankruptcy documents

20  and a number of other places.

21       Q.    Can you identify --

22       A.    Whatever was in there.

23       Q.    Can you identify any specific documents?

24       A.    Not off the top of my head.  I mean,

1    there were -- certainly the complaint that was

2    filed.  There are a number of documents where it's

3    identified.  It's in the Houlihan statements

4    and -- and summarizations.  It's in one of the --

5    some Candlewood stuff.  It's -- I mean, it's --

6    that's where it came from.

7         Q.    Did you consider the repurchase

8    obligation study that Mr. Hoskins prepared in

9    conjunction with the 2003 transaction so the board

10   could consider its impact on its repurchase

11   liability of the ESOP shares?

12        A.    I'm aware of it, but I -- but I did not

13   -- I did not have the document.

14        Q.    Did you review any of Mr. Hoskins'

15   testimony about the repurchase obligation study

16   that he prepared, in particular, December of 2003?

17        A.    I don't believe I have.

18        Q.    Did you review any of the sensitivity

19   analyses that were presented to the board in

20   December of 2003 prior to it voting to approve the

21   2003 transaction?

22        A.    No, just references that it was -- it

23   was -- there was a sensitivity analysis.  That's

24   it.

```
 1        Q.     That wasn't my question.  Did you review

 2   the sensitivity analysis or no, sir?

 3        A.     I just did answer your question.

 4        Q.     You did not.  Did you review it or not?

 5        A.     I did not review it.  I just --

 6        Q.     Okay.  Thank you.  That answers the

 7   question.

 8               Did you review any of the testimony with

 9   regard to the reasons why the company explored the

10   2003 transaction?

11        A.     Yes.

12        Q.     And what did you understand the

13   paramount reason to be from what you saw?

14        A.     Well, what I believed is the paramount

15   reason is --

16        Q.     I'm not asking what you believed.  I'm

17   asking you based on the evidence you read --

18        A.     Based on the documents, if I may, there

19   was an attempt to -- they saw it as an attempt to

20   realign the allocation system or -- for the ESOP

21   membership itself.  And then in addition to that,

22   it was a chance to diversify the Morgans' personal

23   wealth while doing -- basically doing an equity --

24   debt recap of their equity.
```

1          Q.     And with regard to diversifying the

2    Morgans' wealth, as you put it, which Morgans are

3    you talking about?

4          A.     I thing principally Lee Morgan, but that

5    may include Asha as well.

6          Q.     And specifically what evidence of that

7    concern and purpose did you see?

8          A.     I'm just recalling testimony and -- that

9    I -- that I recall.  That's what I recall.

10         Q.     Can you identify here the testimony

11   you're recalling?

12         A.     Not --

13         Q.     Whose testimony?

14         A.     Not specifically.

15         Q.     So you can't, as we sit here today,

16   identify to me a shred of evidence that you've

17   seen supporting your understanding that Mr. Morgan

18   sought to diversify his financial portfolio

19   through this transaction?

20         A.     It was my understanding in reading it,

21   and I'm not exactly sure where, or various

22   conversations with counsel that that was the --

23   one of the impetuses for making the decision to do

24   this.

```
 1        Q.    Can you point to any document or

 2   testimony, sir, is what I'm asking you?

 3        A.    Not specifically here right now.  No, I

 4   can't.

 5        Q.    Okay.  Very good.  With regard to your

 6   understanding of the terms of the put price

 7   protection agreement, can you review those for me?

 8        A.    Yeah.  The -- there was a -- the

 9   redemptions were -- had a floor of $850 per

10   share.  The redemption -- the put -- the put price

11   guarantee was available to the members of ESOP

12   upon leaving the company for a period of three

13   years, and -- from the time the transaction

14   closed.  And -- and that was primarily my

15   understanding of it.

16        Q.    And nothing more than that?

17        A.    Well, you asked me what was the -- what

18   was the put price guarantee?

19        Q.    Mm-hmm.

20        A.    The put price guarantee is a guarantee

21   that they would get no less than $8 -- $850 per

22   share for a period of three years if they redeem

23   their -- redeem their equity interest in the ESOP.

24        Q.    And Taft didn't correct that aspect of
```

1   your report or tell you that it was factually

2   incorrect?

3        A.    No.  No one's told me it's factually

4   incorrect.

5        Q.    As far as you know, as you sit here

6   today, that's factually correct?

7        A.    As far as I know and from everything

8   I've read, it's factually correct.

9             MR. SCHEIER:  Okay.  Can we go off the

10  record for a second?

11            (A brief break was taken.)

12       Q.    (By Mr. Scheier)  Sir, I've put in front

13  of you Exhibit 31.  And if you would, turn to page

14  -- it's internal page 27 of the tender offer

15  document.  The Bates number in the right is

16  KMK-012121.

17       A.    Mm-hmm.

18       Q.    You there?

19       A.    I'm there.

20       Q.    You see towards the bottom of the page

21  there's a section that reads "ESOP Share Put

22  Price"?

23       A.    Yes, I do.

24       Q.    Why don't you go ahead and read that,

1  and when you're done reading it, look up.  It

2  carries onto page 28, the very next page.

3      A.    (Examining document.)  Okay.

4      Q.    Do you now recognize that your

5  understanding of the put price protection

6  agreement was incorrect?  There was no three-year

7  floor price?

8      A.    Based on this, yes, there's a

9  difference.

10      Q.    Can you think of any document or

11  testimony, sir, that you looked at that indicated

12  the put price protection agreement had a

13  three-year $850 floor and identify it for me

14  specifically as we sit here?

15      A.    I can't do it specifically as we sit

16  here, but it certainly was not made out of -- I

17  didn't make it up, so it's in there somewhere.

18      Q.    But you now see that you were wrong?

19      A.    I see that this document does not agree

20  with what my understanding was.

21      Q.    Any reason to dispute the accuracy of

22  this document?

23      A.    I have no reason to dispute it.

24      Q.    Did you review, in coming to the opinion

1    that the 2003 tender offer was poorly thought out

2    and reckless, any of the underlying financial

3    analysis of the transaction in the tender offer

4    document?

5         A.    I didn't in the tender offer document.

6         Q.    Okay.  What is the basis for your

7    opinion that the tender offer was poorly thought

8    out and reckless in regard to the board of

9    directors' decision with all the information that

10   they had and all the advice they were given by

11   Deloitte & Touche, Houlihan Lokey, and GreatBanc

12   as of December 16, 2003, to enter into that

13   transaction?

14        A.    Well, the beginning basis is what

15   happened, and that in 2004, there was over a

16   hundred million dollars of redemptions that in the

17   previous three years -- you're going to let me

18   finish, right?

19        Q.    Mm-hmm.

20        A.    -- previous three years, there was

21   approximately 35 to 36 million dollars.

22        Q.    Now, did you see any evidence of how the

23   company planned to take care or whether they

24   projected that they would have that amount of

1    rejections, the amount of cash they would need to

2    have to deal with that liability?  See any

3    evidence at all of that?

4        A.    I didn't see any evidence of anyone

5    expecting there'd be 190 million dollars' worth of

6    redemptions and that 800 out of over a thousand

7    dollars would leave the company and redeem within

8    the three-year period, no.

9        Q.    Did you look at all in coming to your

10   opinion at Mr. Hoskins' December repurchase

11   obligation study that predicted almost to the

12   dollar the amount of cash the company would

13   actually need based on the level of redemptions

14   that actually occurred?

15       A.    The answer is I didn't see the report.

16       Q.    Okay.  Would it have been helpful to

17   you, do you think, to see that, in fact, the board

18   properly predicted, based on Mr. Hoskins'

19   repurchase obligation study, the amount of cash it

20   would need to come up with to fund $110 million in

21   redemptions in 2004?

22       A.    Restate the question.

23       Q.    Yes.  Would it alter your opinion in any

24   way if it turned out that the company planned for

1    and had sufficient cash at the time they voted to

2    go forward with the transaction the level of

3    redemptions they actually experienced in 2004?

4              MS. ANDREW:  Objection.

5         A.    Let me answer very carefully.  The

6    answer is that in view of actually what did occur,

7    i.e., over a hundred million dollars in

8    redemptions in the year following the transaction

9    and subsequently another $85 million more or less

10   over the next two years -- it was 190 total, so --

11   over three years -- and the -- and the cycling out

12   of 800 of 1,115 employees, that if anybody looked

13   at that and thought that that was a good plan,

14   then I would be highly suspect of their knowledge,

15   role, and judgment in this matter.

16        Q.    Well, you don't have any experience in

17   undertaking repurchase obligation studies or

18   predicting what will trigger any particular

19   employee to make the decision to terminate

20   employment and cash out their retirement account

21   and then look for new work, do you?

22        A.    Specifically, no.

23        Q.    Okay.  In terms of corporate board

24   planning, do you -- and in terms of coming to your

```
 1    opinion, do you know how much cash -- although you

 2    say $180 million of redemptions --

 3        A.    190.

 4        Q.    -- 190, do you analyze at all the cash

 5    demand that that would make on the company?  I

 6    want to focus first on the $110 million in

 7    redemptions at the end of 2004.  Do you know --

 8    did you take into account any cash management

 9    protections the company and board put in place to

10    be sure that that did not stress -- put any stress

11    on the company's finances and ability to do

12    business?

13        A.    Are you -- you're asking me did I look

14    at anybody's forecasts to say that it didn't do

15    that?

16        Q.    No.  Did you look at anything that --

17    any planning the company undertook prior to

18    agreeing to the transaction in case redemptions

19    came in at such a high level?

20        A.    The only thing I saw was a reference to

21    this might be an exposure, didn't quantify the

22    exposure.  And the other things that I looked at

23    was what was the consequence of the cost of the

24    capital structure and the redemptions on the
```

1   liquidity and solvency of the company, which was

2   not good.

3       Q.    Did you take into account that the

4   company had $65 million in cash in the ESOP that

5   it was going to use to fund the first year

6   redemptions of about $110 million?

7       A.    I took into account the state of the

8   balance sheet and the relative solvency of the

9   company.

10      Q.    Did you take into account that the board

11  knew the ESOP had $65 million in cash that could

12  be used to fund $110 million in redemptions at the

13  end of 2004?

14      A.    That could be used to contribute to the

15  funding of 105 million dollars' worth of

16  redemptions?  Is that your question?

17      Q.    Yes.

18      A.    Because it wasn't 110.

19      Q.    Were you aware that the ESOP had that

20  level of cash --

21      A.    Not of the cash.  I was strictly looking

22  at the state of the balance sheet of the company

23  and its solvency.

24      Q.    And you're also aware that that

1    liability is not on the company's balance

2    sheet; is that correct?

3         A.    Yes.  We discussed that earlier.

4         Q.    Well, we discussed the fact -- I'd like

5    to know whether or not you felt that to be

6    irregular based on your experience or lack

7    thereof?

8         A.    I'm happy to be informed of that, and

9    thank you.

10        Q.    Okay.  Did you take into account, in

11   coming to your opinion, the advice that the

12   Deloitte & Touche firm gave the board in regard to

13   the 2003 transaction?

14        A.    No.

15        Q.    Do you dispute the board's entitlement

16   to rely on the advice it was given by Deloitte &

17   Touche?

18            MS. ANDREW:  Objection.

19        A.    Unless I know exactly what the advice

20   that Deloitte's been giving, it'd be hard for me

21   to say that they're not -- let me answer your

22   question specifically.  Are they entitled to

23   listen to Deloitte & Touche is your question, and

24   the answer is yes, sure.

1      Q.    And is the board entitled to listen to

2   reports and advice it was getting from Houlihan

3   Lokey?

4      A.    They're entitled to listen to that,

5   although I think the Houlihan Lokey report was a

6   fairness opinion produced in common valuation

7   methods using customer valuation methods about the

8   share price as if it was an arm's length

9   transaction.

10      Q.    And you understand that because there

11   were ESOP shares involved, this was like an arm's

12   length transaction since there had to be some

13   assurance that the 850 strike price was within a

14   range of fair market value at the time?

15      A.    Understand perfectly.  My difference

16   here, if I may, is that -- is that by comparison,

17   it was a private equity fund, for example.  No one

18   would buy a company for that price and have a

19   capital structure where 100 percent of the owners

20   of the equity can redeem out their shares in a

21   matter of three years.  It's a lot of volatility

22   to have on a balance sheet and in a company.

23      Q.    So do you believe that Houlihan Lokey,

24   Deloitte & Touche, and Duff & Phelps all made

```
 1    serious errors here in their advice to the board?
 2         A.    I do.
 3         Q.    And did you review any of their work
 4    product --
 5         A.    I just --
 6         Q.    -- in coming to that decision?
 7         A.    -- reviewed the -- the -- the outcome --
 8         Q.    It's a yes or no answer.  You've not
 9    reviewed any of the work product that any of those
10    three advisors undertook in formulating the advice
11    they gave to the board by way of fairness opinion
12    or otherwise; isn't that right?
13         A.    That's correct.
14         Q.    Okay.  You recognize that all three of
15    those advisors are at the top of their field and
16    nationally known for what they do?
17         A.    I absolutely know that.
18         Q.    Yeah.  And you don't take issue with the
19    fact that a board of directors is entitled to
20    listen to and rely upon the opinions and views
21    expressed by advisors that the board reasonably
22    believes are within the competence of the
23    particular expert or advisor they're relying
24    upon; is that right?
```

1      A.    That's correct.

2      Q.    Okay.  And did you, in forming your

3  opinion, take into account any advice or any other

4  communications that any of Deloitte, Duff,

5  GreatBanc, or Houlihan were communicating to the

6  board directly or indirectly?

7      A.    In what period?

8      Q.    2003.

9      A.    Only what was reported in the various

10  summaries and complaints and a variety of other

11  things and testimony.

12      Q.    The truth of the matter is that you've

13  never seen any of the advice or the basis for the

14  advice that any of those advisors gave to the

15  board?

16      A.    The truth of the matter is I have not

17  seen the reports.

18      Q.    Nor have you seen any of the underlying

19  work product?

20      A.    True.

21      Q.    In coming to your opinion that the 2003

22  tender offer was poorly thought out and reckless,

23  did you take into account the income tax savings

24  that the company anticipated realizing over the

1    ten-year window of the transaction?

2        A.    I took into account that if -- if you

3    have a lot of assumptions, you can make anything

4    work in a -- in a -- in an Excel spreadsheet.

5        Q.    Did you look at any of the assumptions

6    that the board considered and its advisors used in

7    concluding the level of the tax savings the

8    company would realize?

9        A.    I certainly understood that they

10   believed there would be substantial tax savings.

11       Q.    That wasn't my question.  Did you look

12   at any of the assumptions you've just criticized?

13       A.    I've criticized the outcomes.

14       Q.    The question is, did you ever see any of

15   the assumptions any of the advisors made or that

16   the board made in regard to the tax savings the

17   company was projected to realize over ten years?

18       A.    The only thing I've seen is what they

19   thought they would -- they would accrue in their

20   benefit in terms of --

21       Q.    In other words, the answer is no, you've

22   never seen the assumptions -- the underlying

23   assumptions made; is that right?

24       A.    That's right.

```
 1          Q.    I want to move to your second opinion,

 2    and that is the dual-track was detrimental to the

 3    company.

 4          A.    Mm-hmm.

 5          Q.    What's the basis for that opinion?

 6          A.    A variety of exhibits, emails,

 7    discussions, and treaties from Mr. Morgan to the

 8    Special Transaction Committee and treaties from

 9    Mr. Morgan's lawyer at Deckard -- I guess Jerry

10    Schwartz or whatever his name was -- that, in

11    fact, the -- it was even detrimental to their

12    process and asked the Special Transaction

13    Committee to -- to stand them down, in fact even

14    got them to do it, so...

15                Also from communications concerning --

16    from the -- the various counter-parties in the --

17    potential counter-parties in the transaction; the

18    private equity funds getting phone calls from

19    Mr. Pollack and then immediately calling

20    Mr. Spencer at Houlihan to say, What is going on

21    here?

22                Yeah, I think there's a lot of -- a lot

23    of information that this was a -- was creating a

24    lot of issues and a lot of drag on the process and
```

1    a lot of confusion.

2            And confusion, let me be clear, is not

3    confusion that -- that -- that very smart people

4    who are these counter-parties, which they tend to

5    be mostly lawyers and profes- -- and finance

6    professionals who are running the private equity

7    firms; the confusion is that is -- is -- is that

8    it created a -- an environment in which it would

9    have been very hard to figure out whose -- whose

10   -- whose information should be used, who should --

11   who has the decision power inside the company, and

12   what currents inside the company might -- might

13   derail certain levels of efforts and so on.  So

14   there's a lot of that in this -- in this -- in the

15   documents.

16       Q.    Did you see any evidence that any

17   particular potential bidder for the company was so

18   confused by those issues you just identified?

19       A.    It's my experience --

20       Q.    I'm not asking for your experience; I'm

21   talking about this record.  Do you see any

22   evidence in this record that any specific

23   potential bidder labored under the confusion, the

24   inability to recognize who the decision makers

```
 1   were and who was authorized to put information out
 2   into the marketplace and it affected their
 3   decision whether or not to make a bid?
 4        A.    Well, very few made a bid, so it would
 5   be -- but there were few that were -- certainly
 6   had -- had -- that were very frustrated with the
 7   process because of it.
 8        Q.    Such as?
 9        A.    It comes to my -- Marlin, for example,
10   Capital was certainly frustrated by the process.
11   There were others.  There was -- there were --
12   I'll think of them, but there were others as well.
13        Q.    I'd like you to think of them.
14        A.    Yeah, I'm -- I'm working on it.  I
15   just -- don't immediately come to mind.
16        Q.    Well, let's sit here and wait.
17        A.    Okay.  We can wait.  Well, Marlin comes
18   to one -- to mind.  There were certainly -- well,
19   the GSC thing was a different issue.  The lenders
20   themselves were having problems with it.  Those
21   were -- those were the -- that's the one I have to
22   mind right now.
23        Q.    And what detriment did Marlin's
24   confusion cause to the process?
```

1    A.    Well, they eventually -- you know, they

2    eventually backed out of the -- of the process.  I

3    think --

4    Q.    What evidence do you have that Marlin

5    backed out of the process?

6    A.    Well, at the end in -- I think in the

7    spring -- late spring of 2008, they eventually

8    left the process.

9    Q.    Do you know why?

10    A.    Yeah.  I think they're -- they're --

11    apart from the frustration there, I think one of

12    the principal reasons was the Whitney exclusivity

13    requirements and some of the Whitney --

14    Q.    Well, that really is the reason why

15    they --

16    A.    Well, as I said, I --

17    Q.    The Whitney exclusivity provisions was

18    the real reason why Marlin dropped out of the

19    process; isn't that true, sir?

20    A.    It appears to be the principal reason,

21    yes.  But let me -- if I may, it was certainly the

22    case so much so that Mr. Schwartz, who was

23    Mr. Morgan's attorney, and Mr. Morgan wanted

24    Houlihan to stop doing anything for any -- and

1    trying to go out to the market for anything

2    post-December 31st, 2012 -- 2007.

3            So it was clearly creating a problem.

4    And it was also creating a problem in that it was

5    the -- the dual-track, as it were, was also

6    delaying decisions because there was a lot of time

7    spent looking at un-executable transaction models

8    and offers made by Morgan and Candlewood.

9        Q.    How much time did the Special

10   Transaction Committee spend on looking at

11   Mr. Morgan and Candlewood's proposals?

12       A.    Looks like a fair amount.  In fact --

13       Q.    I don't know what that means.  What's a

14   fair amount?

15       A.    I don't have the hours.  All I know is

16   that when you're looking at the various

17   transactions and even at one point kind of saying,

18   okay, this is the one we're going to look at even

19   though it was -- the capital structure was way too

20   expensive for the cash flow.

21       Q.    Which one was that?

22       A.    GSC.

23       Q.    Did you take into account that the

24   secured lenders supported the Special Transaction

 1    Committee providing exclusivity to Candlewood to

 2    close the GSC transaction?

 3         A.    I take that into account except that as

 4    they started looking closer at the transaction, it

 5    became pretty clear that it was not executable.

 6         Q.    That wasn't the question.  You're aware,

 7    of course, that the secured lenders in the ESOP

 8    trustee encouraged the board to put aside the

 9    Whitney, Marlin -- Whitney and Marlin and Monomoy

10    letters of intent and instead focus on GSC and

11    pursue that transaction through a 30-day

12    exclusivity?

13         A.    I'm aware that it would have been -- if

14    they could have found a way to do that with taking

15    out $31 million of their -- of their -- of their

16    loans, that that might be attractive to them and

17    that they -- but -- but executionally, it was

18    never going to happen.

19         Q.    Well, that may or may not be, but --

20         A.    It was.

21         Q.    -- you need to look at decisions that

22    are made at the time.  What I'm asking you is if

23    you took into account, in terms of the Special

24    Transaction Committee's consideration of the GSC

1    deal, that they were encouraged to do so and to

2    give Candlewood 30 days of exclusivity by the

3    secured lenders and by the ESOP trustee?

4         A.    I'll grant that.

5         Q.    Okay.  And that once that 30-day period

6    expired and the GSC deal didn't close, the Special

7    Transaction Committee again began considering the

8    letters of intent by Whitney, Monomoy, and Marlin,

9    correct?

10        A.    Yeah, there was -- primarily, I would --

11   what -- April/May period.

12        Q.    Now, you're aware that the 30-day

13   exclusivity period for GSC occurred in about March

14   of 2008?

15        A.    Yes.

16        Q.    Do you know what Whitney's offer was as

17   of that date?

18        A.    Um...

19        Q.    If I told you 44 million, would that

20   refresh your recollection?

21        A.    It wouldn't.  I don't recall the 44

22   million.  I remember the 54 million.

23        Q.    Okay.

24        A.    That 363 offer.

```
 1        Q.    Yeah.  Well, I'll represent to you that
 2   the Whitney LOI that was in the Special
 3   Transaction Committee's hands in March of 2008 was
 4   for $44 million.  But that's not refreshing your
 5   recollection?
 6        A.    No, it's not.
 7        Q.    I'll represent to you it was.  You are
 8   aware, of course, that three months later, Whitney
 9   came in at $10 million higher in May of 2008 --
10        A.    I am.
11        Q.    -- correct?
12              Fair to say that possibly the process
13   actually increased the bids that the Special
14   Transaction Committee was getting rather than in
15   some way hurt the Special Transaction Committee
16   over the process?
17        A.    I don't think it's fair to say that.  I
18   think that there was -- there were -- Houlihan was
19   actively engaged with finding 363 -- it looks like
20   all three -- I think there was Monomoy, the
21   Marlin, and Whitney were looking to do a 363 sale,
22   because of all the -- the baggage of the company,
23   it was the cleanest way to get through, and that
24   those, themselves -- that Houlihan were effective
```

1    in -- in -- in negotiating with them to get a

2    better deal out of Whitney, and even that Marlin

3    thought they had a better deal, and that -- and

4    would agree to a -- to a -- to a non-exclusivity

5    for the period because they thought they had a

6    better deal.

7              But I think those were more of an effort

8    later on after many, many -- going back and forth

9    to try to find, in quotes, consensual deal, all of

10   which were at valuations two times or greater than

11   what the market was saying to them.  And there was

12   a lot of market transactions out there that -- the

13   market was fairly well scoured by -- by Houlihan.

14   There was 172 people contacted -- groups

15   contacted.

16       Q.    Was that before the distress group came

17   into the picture or after Steve Spencer --

18       A.    Well, there was --

19       Q.    -- after Steve Spencer came into the

20   picture?

21       A.    There were two phases.  The first one

22   was about a little over -- I think it was 101

23   contacts for the first phase of Houlihan.  And

24   when Steve Spencer's group came in for the

1    distress group, there was an additional 70, more

2    or less.

3        Q.    And during the first phase, Candlewood

4    was not an issue at all, correct?  They weren't

5    out in the market, and Mr. Morgan was not a bidder

6    at that point; is that right?

7        A.    I'm trying to recall.  There was a --

8    there was a point -- I'm not sure exactly the

9    date.  There was a point at which there was a

10   carve-out that Candlewood and Mr. Morgan requested

11   of three funds that Houlihan wouldn't go out to,

12   and I'm not exactly sure when that was, but it was

13   sometime in that '07/early '08 period.

14       Q.    So as we sit here today, you can't

15   delineate for me the phase of the transaction

16   where Houlihan was looking for strategic or

17   financial buyers versus the phase of the process

18   where Houlihan then went out and was looking for

19   more buyers in the more distressed marketplace?

20       A.    Yeah, I certainly can.  I mean, there

21   was phase 1 when they were first hired.  Houlihan

22   was first hired in the -- in 2007 in either -- I

23   think March, and then -- and then after much

24   effort to try to find --

 1        Q.    March 2007?

 2        A.    Yes.  -- much effort to try to find a

 3   strategic and/or a private equity buyer, the --

 4   and with no -- with no results, they ended up

 5   moving over to the distress group run by Steve

 6   Spencer -- the engagement was run by Steven

 7   Spencer.

 8        Q.    And in the first phase, you don't have

 9   any evidence that Mr. Morgan or Candlewood were

10   out in the market trying to find bidders that they

11   could bring to the Special Transaction Committee,

12   correct?

13        A.    I think that's correct, yes.

14        Q.    Okay.  After, in the second phase, do

15   you know how many potential bidders Houlihan

16   brought to the Special Transaction Committee?

17        A.    Second phase?

18        Q.    Yes.

19        A.    Yeah, I do.  There were -- there were

20   three.

21        Q.    Okay.  And during that second phase, one

22   of those bidders, Whitney, increased its offer

23   from 44 million to 54 million between March and

24   May of 2008, correct?

```
1         A.    Yes, that's what...  I'm -- I'm taking

2    what you're representing that the original offer

3    was 44.

4         Q.    So if in that period -- and that's a

5    period in which Candlewood was also canvassing the

6    market for potential bidders; is that correct?

7         A.    It was the period in which they were

8    trying to find financing for the consensual deal,

9    as they called it.

10        Q.    And it's during that period that

11   Houlihan and Whitney presented an increased offer

12   to the company after Candlewood had been in the

13   market, correct?

14        A.    Yes.  I wouldn't make the nexus -- I'm

15   not sure there's causality specifically there, to

16   be -- to be honest with you, so...

17        Q.    What would cause them to increase the

18   offer?

19        A.    Because Monomoy and Marlin were also

20   actively bidding for the market.

21        Q.    And what bids were they making, based on

22   your recollection of the evidence?

23        A.    I'm not exactly -- and don't remember

24   exactly.  It was under -- Marlin was certainly
```

```
 1    under -- I think it was in the 40s -- mid 40s --
 2    was under where -- where Whitney was.
 3         Q.    Yes.
 4         A.    And Monomoy I don't recall specifically.
 5         Q.    Monomoy and Marlin were always under
 6    where Whitney was.
 7         A.    Yes.
 8         Q.    He has a 45 million --
 9         A.    That's my recollection.  That's my
10    recollection.
11         Q.    Is there any room in your mind for the
12    proposition that Candlewood's participation in the
13    process and the competition engendered, as
14    Mr. Spencer recognized in his deposition, actually
15    was in whole or in part the reason that Whitney
16    came in with a higher offer three months after its
17    $44 million offer in March of '08?
18         A.    You're asking if there's any room in my
19    mind, and the answer would be I don't think that's
20    what happened.
21         Q.    Well, I'm not asking you what you think
22    happened.  Is there any room in your mind for that
23    proposition?
24         A.    That's a very strange question.  You're
```

 1   asking me -- you're asking me do I -- am I capable

 2   of imagining that that -- that there is this

 3   causal nexus occurring between these events and

 4   between Candlewood's activity, and the answer is

 5   anything's possible.

 6       Q.    True.  That's what I'm asking.

 7       A.    That's my answer.

 8       Q.    You're also imagining a causal nexus

 9   between anything Candlewood did and some sort of

10   detriment to the process.

11       A.    I'm not imagining what -- what happened.

12   It's from what I could gather from the testimony

13   and various reports and documents.

14       Q.    Whose testimony?

15       A.    Well, let me go back.  From certainly --

16       Q.    Let me just try to give you some

17   background.  Your report contains no citation to

18   any evidence in the record.  It contains a lot of

19   caustic language, but there's no citation to any

20   email, to any deposition testimony, to any other

21   particular document.  Am I right about that?

22       A.    Yes.

23       Q.    Is there a reason you didn't cite any of

24   the evidence that you were relying upon?

1    A.   Well, I knew that all the documents were

2    going -- that I reviewed were going to be

3    available and -- and that everybody was relatively

4    familiar with the case and that they would know

5    what I was talking about.

6        Q.   But I don't know what you're talking

7    about, so that's why I'm asking you to provide me

8    with any specific evidence you can think of that

9    Candlewood's participation in the process was

10   detrimental to the -- to the Special Transaction

11   Committee's ability to deliberate on the

12   transactions that were being brought to it for

13   consideration.

14       A.   My consideration is that it caused the

15   board -- and I used the phrase "to dither" -- to

16   spend time with things that weren't going

17   anywhere; that anybody could recognize initially

18   that they weren't going anywhere.  An Article 9

19   transaction, for example, was initially

20   contemplated by Candlewood and Morgan in the fall

21   -- in the, I guess, early winter/late fall of

22   2007.

23       Q.   Let's focus on that.  Do you know how

24   much time the Special Transaction Committee took

1    to consider that deal?

2        A.    I don't.  I just -- you know, my -- my

3    intuitions -- and you'll have to -- that's what I

4    was going on, is that you're spending a lot of

5    time going back and forth to see whether or not

6    something would work in those circumstances.

7        Q.    So is it right that basically your

8    opinion that the dual-track was detrimental to the

9    company is just based on your intuition?

10       A.    No, that's not correct.

11       Q.    Okay.

12       A.    When -- if I can give a more elaborate

13   answer.  When you have a substantial private

14   investment banking firm who handles the largest

15   middle market private equity firm probably in the

16   world --

17       Q.    Well, you talked about dithering, and so

18   I want to understand if you --

19       A.    Well --

20       Q.    I need your --

21       A.    I don't get a chance to finish?

22       Q.    No.

23       A.    Okay.

24       Q.    What I'd like to know is if you took

```
 1    into account the amount of time -- you just

 2    mentioned the Article 9 transaction -- the Special

 3    Transaction Committee took in evaluating the

 4    Article 9 transaction that Candlewood proposed?

 5         A.    I don't know the exact amount of time.

 6    I don't even -- I don't have an approximation of

 7    the amount of time.

 8         Q.    Okay.  If the committee took less than

 9    48 hours from the time they received the offer to

10    rejecting it, in your mind is that considered

11    dithering?

12         A.    If it was 48 hours, I wouldn't consider

13    it dithering.

14         Q.    Okay.  Let's look at another transaction

15    known as the Antioch Acquisition Company offer.

16    Do you recall that one that Candlewood made to the

17    Special Transaction Committee in November 2007?

18         A.    Refresh me, but I'm sure I do.

19         Q.    It was the first offer that Candlewood

20    brought to the --

21         A.    Right.

22         Q.    -- Special Transaction Committee.

23         A.    Mm-hmm.

24         Q.    Okay?
```

1        A.    Yeah, I do.

2        Q.    If I told you that the committee,

3    between the time it received the offer and

4    rejected the offer, took 72 hours, would you

5    consider that dithering?

6        A.    I'm considering that it certainly

7    appeared to be a waste of time.

8        Q.    Three days?

9        A.    I live in a different world.  I live in

10   a world where you've got a marketplace, and you

11   have a lot of valuations coming in not even close

12   to any of those numbers.  It's a stretch for me to

13   believe that you should be spending a lot of time

14   on things that are just, on the face of it,

15   un-executable.

16       Q.    That's what I'm asking you.  It seems to

17   me that the Special Transaction Committee, for

18   example, received an offer from the Antioch

19   Acquisition Inc. Company on November 5th, 2007,

20   and rejected on November 8th, 2007.

21           Did you take the three-day period into

22   account when you said that the Special Transaction

23   Committee was dithering?

24       A.    Let me -- let -- may I give a more

 1   elaborate answer?

 2        Q.    You need to answer my question, which is

 3   whether you took into account that the Special

 4   Transaction Committee took a total of three days

 5   to review and reject that proposal?

 6        A.    Specifically, the answer would be no.

 7   The concatenation of all these offers, the time

 8   spent in deference to Mr. Morgan and family on

 9   many offers that none of which made any sense is

10   -- my view is, in total value, dithering.

11        Q.    Okay.  Well, let's -- you see, it's easy

12   to make very general statements, but you need to

13   back those up with some sort of factual basis.

14   Okay?  So there were four total offers that

15   Candlewood brought to the Special Transaction

16   Committee.  You're aware of that, correct?

17        A.    There's two memos...  Yeah, that's about

18   -- that sounds right.

19        Q.    Four.

20        A.    That sounds right.

21        Q.    The first one was on November 5th, 2007,

22   and the committee responded November 8th, 2007,

23   rejecting it.  You were unaware of that time

24   frame, correct, as we --

1      A.    Yes.

2      Q.    Okay.  The Article 9 transaction was

3    presented to the committee at a board meeting on

4    February 6th, 2008, and rejected on February 10th,

5    2008.  Were you aware of that timing?

6      A.    The timing again, please?

7      Q.    February 6th, response mailed February

8    10th, four days.  Did you take into account what

9    else the committee was doing during those four

10   days when you claim that they were dithering?

11     A.    Did I take into account -- they were

12   certainly involved with other Houlihan things

13   coming through.

14     Q.    All right.  The next deal is a GSC term

15   sheet that was submitted on March 11th, and the

16   company accepted that offer and granted

17   exclusivity on March 14th, a total of three days.

18   And at that time, the committee was encouraged to

19   do so by the ESOP trustee.  Do you recall that?

20     A.    I do.

21     Q.    And the committee couldn't execute any

22   deal without the approval of the ESOP trustee

23   which at the time was Reliance.  Are you aware of

24   that?

```
 1         A.    I don't remember it as Reliance.  That's

 2    where I'm stuck.  I thought it was --

 3         Q.    Maybe it's Evolve.

 4         A.    It's Evolve.  Reliance was out of there

 5    by the end of 2007.

 6         Q.    You're right.  I misspoke.

 7         A.    Yeah.  The answer's yes.

 8         Q.    Okay.  And they, in fact, granted

 9    exclusivity based on the encouragement of the

10    secured lenders and the ESOP trustee, correct?

11         A.    Yes.

12         Q.    Do you have any -- take any issue with

13    that grant of exclusivity in light of what the

14    ESOP trustee and the secured lenders were asking

15    the board to do?

16         A.    Please rephrase.

17         Q.    Do you take any issue with the Special

18    Transaction Committee's grant of exclusivity to

19    Candlewood with regard to the GSC deal in light of

20    the preference expressed by the ESOP trustee and

21    the secured lenders that they, in fact, provide

22    Candlewood with the 30-day exclusivity?

23         A.    You're asking me if I have any issue

24    with it?  The -- early on in that transaction,
```

1   there was a fair amount of worry over whether or

2   not the company's capital structure -- the company

3   could pay for the post-transaction capital

4   structure with GSC.  And that soon shook out as

5   again one more un-executable offer at a value way

6   in extent of anybody else's.

7       Q.    That might be, but what I'm asking you

8   is this:  Did the Special Transaction Committee

9   make any error in heeding the suggestion of the

10  company-secured lenders and the ESOP trustee, who

11  had ultimate veto rights on the transaction, to

12  grant exclusivity to GSC because they felt it was

13  the best offer on the table at the time?

14      A.    Yeah, I do -- I do have an issue with

15  that.

16      Q.    Okay.  What should they have done?

17      A.    I think what needed -- before they got

18  into an exclusivity agreement, knowing what the

19  transaction would look like, they should have been

20  working through all the -- the post-transaction

21  financial statements to see whether or not this

22  thing would cash flow appropriately and so on.

23          I mean, the ultimate value of that offer

24  in terms of just -- in terms of fixed charge

1    for -- for debt service was generally in extent --

2    including principal and interest was generally

3    equal to or greater than the EBITDA of the prior

4    following year.  So, yeah, they should have looked

5    at it.

6         Q.    And do you know that they did not?

7         A.    I -- you know...

8         Q.    You don't know one way or another what

9    they looked at?

10        A.    No, obviously these people looked at it

11   and said, We're not sure that this capital

12   structure is going to -- going to be affordable

13   for the company.  I mean, that would be prior to a

14   30-day exclusivity.  That's the point I'm making.

15        Q.    And what about the bank and the ESOP

16   trustee; do you also criticize their view of the

17   various offers that were available to the

18   special --

19        A.    No.

20        Q.    -- transaction committee at the time?

21        A.    Senior lender wants to find a way to get

22   his money back.  The ESOP trustee, in my view, was

23   very naive and was looking for anything that would

24   provide some type of value for the ESOP and -- you

1    know, but those were not to happen.

2        Q.    And you're familiar with the MAMAMO

3    deal --

4        A.    I am.

5        Q.    -- submitted on June 2nd and rejected on

6    June 4th --

7        A.    Yeah.

8        Q.    -- 48 hours?

9        A.    And run again later on and brought back

10   out.

11       Q.    I wasn't aware of that.  But the MAMAMO

12   deal was presented on June 2nd and rejected on

13   June 4th, correct?

14       A.    Yes.  There was -- because it was -- it

15   required the concessions from the bank that

16   weren't going to happen, and it was generally --

17       Q.    Well, I understand that.  I'm focused on

18   the Special Transaction Committee's, quote,

19   unquote, dithering because it seems to me that you

20   have a total of fewer than ten days that they

21   spent, at least in part, on the Candlewood offers

22   other than the GSC deal --

23       A.    I think --

24       Q.    -- and over -- that's over a one-year

1    period.

2        A.    Yeah.   There's -- there's -- the larger

3    of the issue is that despite all evidence to the

4    contrary -- and there was a substantial amount of

5    evidence about valuation at the time -- the offers

6    were rejected, particularly the Whitney offer at

7    the end.

8              That was the best offer because there

9    was some hope that there was some congenial

10   creative offer available to the Morgans with some

11   magic by Candlewood that it was going to work.

12   And it -- and it -- and it -- and it pulled the

13   entire board and the trans -- Special Transaction

14   Committee continually, so -- and I don't think

15   that's -- I don't think that's in question.  It

16   did.

17       Q.    Well, the Special Transaction Committee

18   at the end of the day chose to pursue what you

19   conceive was the best deal available at the time,

20   and that was Whitney's 54 million --

21       A.    Right.

22       Q.    -- dollars, correct?

23       A.    Yes.

24       Q.    And as far as we know, at the time

```
 1    Candlewood was involved in the process, Whitney

 2    actually increased its offer $10 million, correct?

 3         A.    You're making causality.  I don't think

 4    there is, but...

 5         Q.    Well, I'm talking about facts.

 6         A.    Well, those aren't -- that isn't a fact.

 7         Q.    The fact is that Whitney's offer was

 8    44 million in March of '08, and it was 54 million

 9    in May of '08.

10         A.    So -- okay.  But I would -- I would

11    argue that they're not -- that the reason that the

12    Whitney offer is -- is -- it's likely that there

13    were other 363 bidders in the market.

14         Q.    You don't know one way or the other?

15         A.    And neither do you.

16         Q.    Well, but I'm not the expert here.

17    You're testifying.  You don't know one way or the

18    other --

19         A.    I don't.

20         Q.    -- is that correct?

21         A.    I don't.

22         Q.    Okay.

23         A.    But I wouldn't make that conclusion.

24         Q.    Right.  In fact, you can't make any
```

| 1 | reasonable conclusion about why the Whitney deal |
| 2 | increased from 44 million to 54 million, correct? |
| 3 | A.    Not beyond what I believe. |
| 4 | Q.    Okay.  The fact of the matter is that |
| 5 | the Special Transaction Committee pursued a deal |
| 6 | with Whitney -- |
| 7 | A.    Yes. |
| 8 | Q.    -- isn't that right? |
| 9 | A.    Yes. |
| 10 | Q.    Okay.  And do you know whether or not |
| 11 | any definitive agreement was ever executed? |
| 12 | A.    There was an APA. |
| 13 | Q.    I don't know what APA means. |
| 14 | A.    Asset purchase agreement. |
| 15 | Q.    Okay.  Have you ever seen an executed |
| 16 | asset purchase agreement? |
| 17 | A.    It was never executed. |
| 18 | Q.    Correct.  Do you understand that there |
| 19 | were numerous contingencies to Whitney's $54 |
| 20 | million offer and that that money wasn't in the |
| 21 | bank or you couldn't count on bringing in $54 |
| 22 | million until the APA, as you called it, was |
| 23 | actually executed by both sides? |
| 24 | A.    That's true of any transaction, yes. |

```
 1        Q.    Right.  For reasons unrelated to

 2   Candlewood's participation in the process or the

 3   dual process, ultimately the Whitney deal did not

 4   close; is that right?

 5        A.    The Whitney deal did not close because

 6   Ken Lenoir from Evolve in conjunction with the

 7   trust folks from the sub trusts for Mr. Morgan --

 8        Q.    Was that Ms. Lewis -- Ms. --

 9        A.    Kim was the -- Kim Lewis Wilson --

10   Lipson-Wilson was the trustee of the sub trust.

11        Q.    Mm-hmm.

12        A.    -- got together and fired the board to

13   eliminate the transaction.

14        Q.    And Mr. Lenoir was going to exercise the

15   trust right to vote 85 percent of the shares to

16   remove the board.  He didn't need Ms. Lipson-

17   Wilson's --

18        A.    That's what happened.  I'm just saying

19   what happened -- what he -- there's communication

20   between them.  Can you get the -- Mr. Morgan's sub

21   -- the sub trust to vote with them, and that

22   happened.

23        Q.    Who said that?

24        A.    I believe it's a memo from -- there was
```

1    -- from Lenoir to Ms. Wilson.

2         Q.    Okay.  Mr. Lenoir, though, could have

3    taken that action and removed the board without

4    Ms. --

5         A.    Not disputing that.

6         Q.    -- Wilson's --

7         A.    Not disputing that.

8         Q.    You're not disputing that.

9              And that's the only reason, as far as

10   you can tell on the record, that the Whitney deal

11   did not close?

12        A.    What fact are we saying is related --

13        Q.    Mr. Lenoir's decision to vote 85 percent

14   of the shares he controlled to remove the board of

15   directors that was considering finalizing a deal

16   with J.H. Whitney.  Is that right?

17        A.    It was -- let me restate what I think

18   you said.  Because he could vote 85 percent and

19   took that decision that he didn't want to do the

20   Whitney deal, that he had the power to do

21   that?  Is that what you're suggesting?

22        Q.    He had the power to do that; in fact,

23   exercised the power --

24        A.    Yes.

1      Q.    -- to veto --

2      A.    Absolutely.

3      Q.    -- the deal?

4      A.    Mm-hmm.

5      Q.    Okay.

6      A.    Agreed.

7      Q.    What I'd like to know is that -- well,

8  actually, what I'd like to -- what I'd like to

9  confirm is that there's nothing about Candlewood's

10  participation in the process that somehow led the

11  company not to close a deal with Whitney at

12  whatever price ultimately would have been

13  negotiated?

14      A.    My answer to that is that to the extent

15  that there were parties in the company, including

16  Mr. Morgan and supported by Candlewood, that

17  believed that somehow there was another deal out

18  there that would avoid the 363 sale and ownership

19  by a -- by a private equity fund through the aegis

20  of a 363 auction, whoever turned out to be the

21  buyer, that there's somehow something else that

22  would provide value to the other constituencies,

23  including the former non-ESOP shareholders'

24  subordinated debt, including the ESOP redemption

```
 1    debt that had piled up, and including the ESOP
 2    shareholders themselves.
 3              Because there was some thought that this
 4    value was somehow out there if we just would find
 5    it, it caused, I think, substantial harm to the
 6    company and, in fact, did.  And, in fact, the
 7    better opportunity -- and because that was always
 8    a current in this whole process, they -- they
 9    decidedly missed the other opportunities and --
10        Q.    What other opportunities did they miss?
11        A.    Well, they should have -- they should
12    have closed on the Whitney deal, in my view, is
13    what you're asking me.
14        Q.    Right.  But they could not because 85
15    percent of the --
16        A.    Agreed.
17        Q.    -- shares were voted to remove the
18    board --
19        A.    Agreed.
20        Q.    -- before you could even see whether --
21        A.    Right.
22        Q.    -- that deal could be closed, correct?
23        A.    Right.  And if there was a -- a -- if
24    there was a material view of what was going on
```

```
 1    instead of it being kind of a fantasy fulfillment

 2    on trying to get a hundred-plus-million dollars of

 3    value out to every -- so that everybody could

 4    participate, whether it was convergent to

 5    preferred shares or it was some type of

 6    recharacterization of warrants.

 7            And so a sub debt, whatever it was, was

 8    something that I think dragged the company all

 9    over the place through '07 and '08 and certainly

10    through the last half of '07 and '08 until it went

11    into a prepackaged bankruptcy in November of '08.

12        Q.    What I'm not following, though, is that

13    at the end of the process in May '08, the company

14    did have a letter of intent for $54 million from

15    Whitney?

16        A.    Right.

17        Q.    And there's no evidence that the company

18    could have gotten anything better than that in May

19    of 2008 whether or not Candlewood was in the

20    process?

21        A.    We keep referring specifically to

22    Candlewood, but it was Morgan and Candlewood.  It

23    was Mr. Morgan who was looking to get the better

24    deal.  And -- and Lenoir, in my view, acting --
```

1  not really thinking through everything, thinking

2  somehow he was going to get relief of some sort

3  for -- for his constituency in this process made a

4  decision that I think was dramatically ill advised

5  at the time.

6      Q.    Well, I understand, but what I -- your

7  opinion was that the dual-track was detrimental to

8  the company where the company, in May of '08, had

9  a $54 million deal --

10     A.    Right.

11     Q.    -- that it could accept or reject --

12     A.    Right.

13     Q.    -- and it pursued that deal until the

14 ESOP trustee voted shares to remove the board,

15 correct?

16     A.    Yes, that's true.

17     Q.    Is there any evidence that the company

18 could have gotten any better deal than the 54

19 million as of May 2008 but for Candlewood's

20 participation in the process?

21     A.    That's a question that's very hard for

22 me to really answer, because I'm not sure you're

23 characterizing what I'm saying in the way that I

24 intended, so maybe let me try it again.  I

```
 1   believe --
 2        Q.    Well, do you believe the company could
 3   have gotten a better deal than Whitney's
 4   $54 million deal in May 2008 if Candlewood and
 5   Mr. Morgan were not participating in the process?
 6        A.    It's hard to know.
 7        Q.    You don't know one way or the other?
 8        A.    Yeah, of course not.
 9        Q.    Okay.
10        A.    How could I know?
11             MR. SCHEIER:  Let's take a short break.
12             (A break was taken for lunch, and
13   Attorney Miller left the deposition for the day.)
14        Q.    (By Mr. Scheier)  Sir, the third opinion
15   I heard you say was that the Levimo lease, given
16   the context, acted as a poison pill?
17        A.    I did say that.
18        Q.    That's a criticism, I take it?
19        A.    That's my opinion.
20        Q.    Okay.  Fair enough.  Let's look at your
21   report.  If you could, turn to page 13.
22        A.    Mm-hmm.
23        Q.    And I want to focus on some of your
24   remarks on page 14.
```

1          A.    Okay.

2          Q.    At the top, you write (as read) At some

3     point after negotiating the final lease,

4     W.P. Carey decided to back out of the deal

5     presumably in response to the perceived financial

6     instability of the tenant, parens, the company,

7     close parens, comma.  Do you see that?

8          A.    I do.

9          Q.    You have no evidence at all or have seen

10    none that that is, in fact, a reason that

11    W.P. Carey pulled out of the deal?

12         A.    That's why I used the word "presumably."

13         Q.    Okay.  So the answer is you have no

14    evidence of that at all; it's just your guess?

15         A.    That's my presumption, yes.

16         Q.    That's your guess?

17         A.    That's my presumption.

18         Q.    That's your guess, correct?

19         A.    You characterize it the way you want to.

20    It's my presumption.

21         Q.    Well, can you point to any evidence

22    supporting your presumption?

23         A.    Yeah.  The presumption was not just a

24    guess.  The presumption is based on some -- some

1    -- some issues that, (A), they did back out; (B),

2    the company was a questionable credit at the time;

3    and then in addition to that, I add to the fact

4    that the credit markets were starting to seize up

5    in the commercial real estate markets.

6         Q.    Well, I understand that as a reason you

7    gave.  I'm wondering whether you saw any evidence

8    in the case that you reviewed -- email, letter,

9    communication in any way, shape, or form --

10   indicating that W.P. Carey decided to back out

11   because of the financial -- perceived financial

12   instability of Antioch?

13        A.    As I said, it says presumption, so

14   there's no change in my point of view about what I

15   said.

16        Q.    You believe that -- you said something

17   about the company being a bad credit, did you say?

18        A.    I didn't mean bad credit.  I did say

19   that, but let -- I can -- let me retract that.

20              That -- that -- the way most real estate

21   leases will go, they need to be -- there's usually

22   a lender involved with the acquisition of the real

23   estate property, and that given what was going on

24   in the company, that -- that there may be some

1    question from the lender's point of view as to

2    whether or not this is a good lease to be entering

3    into and a good deal to be financing on behalf of

4    Carey.

5        Q.    Did you look at any documents generated

6    by W.P. Carey other than the lease?

7        A.    No.  Again, this was a presumption.

8        Q.    Okay.  You also reference tightening

9    credit markets which by 2007 were already

10   retreating from commercial markets.  Do you see

11   that?

12       A.    Yes.

13       Q.    Do you generally believe that in 2007,

14   the credit markets were tightening in regard to

15   various other lending areas in addition to

16   commercial real estate?

17       A.    What my perception of that period was is

18   that the real estate markets were tightening well

19   ahead of other credit markets which really hit

20   the -- hit the wall in 2008.  But 2007 and '6 was

21   already some -- some drawback of credit and

22   commercial real estate.

23       Q.    The next paragraph says (as read)

24   Although the lease, parens, there was just one

1    lease for both properties, close parens, in most

2    respects is what would be expected of a

3    commercial, slash, industrial property, it does

4    contain some unusual out-of-market provisions.

5    Did I read that correctly?

6        A.    You have.

7        Q.    What market are you referring to there?

8        A.    I'm talking -- the market is -- when I

9    say out of market, it's an expression to me that

10   it's something that is unusual relative to what

11   you'd expect in the market.

12       Q.    What market?

13       A.    Commercial real estate lease market.

14       Q.    So in your mind, there's just a single

15   market covering the entire United States?

16       A.    In my mind, there is a generalization

17   that -- that this is unlike anything else I've

18   seen and that it was out of market.

19       Q.    But what market, is what I'm wondering?

20       A.    Well, it's presuming it's the United

21   States, things that I'm most familiar with.

22       Q.    Okay.  And the first example you give is

23   Section 3(f)...  Do you see that?

24       A.    I do.

1     Q.   ...of being out of market.

2          Prior to looking at the Levimo lease,

3  have you ever seen anything similar to 3(f), which

4  I think you term, and maybe rightfully so, as a

5  single -- single lease provision?

6     A.   (No response.)

7     Q.   In other words, a single lease covering

8  multiple properties; in this case, two?

9     A.   I'm not sure that's what I'm

10  characterizing.  I know that that's what it is --

11     Q.   Okay.

12     A.   -- and refer to that.

13     Q.   Have you ever seen that before?

14     A.   I'm trying to think.  I don't know that

15  I have or haven't.  I just -- I've dealt with a

16  lot of leases, but...  Yeah, actually, I have a

17  client that has a single lease for two properties

18  right now.

19     Q.   Do you consider that client's lease to

20  be out of -- unusual, out of market in that

21  regard?

22     A.   But I -- I'm not saying it's out of

23  market for that -- in that regard, but I've never

24  -- that's not the intention of what I've said

1   here.

2       Q.    Well, I'm sorry, your report says "It

3   does contain some unusual out-of-market

4   provisions."  And it's followed by "For example,

5   Section 3(f) of the lease attempts to" -- do you

6   see what I'm saying in Section 3(f)?

7       A.    (No response.)

8       Q.    What Section 3(f) says is that it's a

9   single lease for two properties and is indivisible

10  in that regard, correct?

11      A.    Um...

12      Q.    Let me take a step back.  Are you saying

13  that Section 3(f) is not an out-of-market

14  provision?

15      A.    Well, why don't you let me answer first.

16      Q.    Well, I withdrew the question and asked

17  you a new one.

18      A.    Well, you didn't --

19      Q.    That's the right I have.

20      A.    You should let me know.

21      Q.    I just did let you know.

22      A.    Okay.  Thanks.  Yeah, I think what I'm

23  specifically referring to (reading) it's a single

24  lease with respect to each and every parcel land

```
 1    improvements and equipment included and shall not
 2    be or deemed to be divisible or separable --
 3    severable into separate lessor -- leases for any
 4    purpose whatsoever; and tenant, on behalf of
 5    itself, and any such trustee or legal
 6    representative, hereby waives any right to claim
 7    or assert a contrary position in any action or
 8    proceeding.
 9               And what I'm referring to goes back to
10    the paragraph that we're referring to which was
11    that the ability under -- in bankruptcy to decide
12    on whether or not to retain or reject an executory
13    contract.
14        Q.    And do you consider yourself having a
15    level of expertise in that regard?
16        A.    I've worked on bankruptcies.
17        Q.    Are you aware that under Minnesota law,
18    a single lease for multiple properties is a valid
19    contract and enforceable as such?
20        A.    I'm not aware of that.
21        Q.    Okay.
22        A.    But that's not the point I'm making.
23        Q.    No, but I'll -- we'll get to the point.
24    Are you aware that bankruptcy courts routinely
```

```
 1   enforce provisions such as this as long as it's

 2   valid under the particular state law that controls

 3   the lease?

 4        A.   I'm -- well, I'm not --

 5        Q.   It's a yes or no question.

 6        A.   The answer is -- is no, specifically.

 7        Q.   You're not aware of that.  Okay.  Very

 8   good.

 9             Are you also aware that the bankruptcy

10   scope contains a provision, Section 365(f), that

11   allows a bankruptcy court to invalidate such a

12   clause if it was put in specifically for the

13   purpose of frustrating a reorganization?

14        A.   (Indicating.)

15        Q.   I'm asking if you're aware of it.  You

16   don't have to wave your hand at me or shake your

17   head.  I'm asking if you're aware of that

18   provision.

19        A.   I'm -- I'm -- I'm now aware of it.

20        Q.   You understand that Section 3(f) in the

21   Levimo lease is an enforceable legal contractual

22   provision?  Or you have no reason to doubt that,

23   do you?

24        A.   I have no reason to doubt it.  My
```

1    reference was to the 363 action, and the 363 are

2    under -- in the bankruptcy.

3        Q.    And you're now aware that if it was a

4    provision that would prevent reorganization, the

5    bankruptcy court has the authority to invalidate

6    that provision?

7        A.    I'm now aware that's what you told me.

8        Q.    You also note in the next paragraph that

9    the lease also contains rigorous lease assignment

10   definitions.  Do you see that?

11       A.    I do.

12       Q.    And you go on to say -- you go on to

13   refer to a provision that requires landlord

14   consent with regard -- or a change of control

15   provision, I should say?

16       A.    Mm-hmm.

17       Q.    Okay.  But you can see that the

18   provision that you're referring to in the lease,

19   which I believe is Section 21, paragraphs J and K,

20   do not contractually subject the company to

21   landlord consent to effect a change in control; is

22   that right?

23       A.    I'm agreeing that it's true, yes.

24       Q.    If you go a little further down in that

1    paragraph, it's about the fifth line up from the

2    bottom, it begins "And any potential acquirer of

3    the company..."

4        A.    Mm-hmm.

5        Q.    You write "And any potential acquirer of

6    the company would immediately understand that an

7    assignment of the lease was a condition precedent

8    to closing an acquisition, as would the company

9    when looking to sell to a third-party buyer."

10            Wouldn't you agree, based on what you

11    claim to be some experience in commercial real

12    estate leases, that in virtually every case, there

13    would have to be an assignment -- such an

14    assignment of the lease?

15        A.    Absolutely agree to that.

16        Q.    Okay.  Nothing unusual there?

17        A.    Most leases require assignment.

18        Q.    So if you look at the last paragraph of

19    that section, you write (as read) These, quote,

20    poison pill, closed quote, terms.  What terms are

21    you talking about?

22        A.    (No response.)

23        Q.    Is it Section 3(f) and Section 21?

24        A.    Not 3(f).  3(f) --

```
1         Q.    Is it just Section 21?  Is that the
2    poison pill?
3         A.    I'm referring specifically to the
4    rigorous assignment clauses.
5         Q.    Is that Section 21?
6         A.    If that's what you say, yeah, whatever I
7    cited.
8         Q.    That's all?
9         A.    Yes.
10        Q.    Okay.  And when you state in that last
11   paragraph that Lee Morgan -- that these poison
12   pill terms are unfairly -- unfairly favor the
13   landlord, Lee Morgan, and clearly were intended to
14   make the company less attractive to potential
15   purchasers in the future, did you see any
16   testimony or documentary evidence in the record
17   other than your interpretation of the lease terms
18   that support that statement?
19        A.    What I saw at the time when this was all
20   -- when this --
21        Q.    Sir, I'm asking you for evidence in the
22   record that that was Mr. Morgan's intention.
23             MS. ANDREW:  And I'd object because he
24   started to answer your question and you
```

```
 1   interrupted him.  So, you know, let him answer the
 2   question.
 3       A.    There is nothing in the record that says
 4   that's his intention...
 5       Q.    Thank you.  Was --
 6       A.    ...that I read.
 7       Q.    -- there any...  That you recall?
 8       A.    That I read or recall.
 9       Q.    Okay.  Is there anything in the record
10   that you've seen where any potential purchaser you
11   can identify pointed to the Levimo lease as making
12   the company less attractive as a potential
13   acquisition?
14       A.    Well, considering that the -- that the
15   actual bids -- it got down to two at the end.  And
16   in those bids, in fact, there was discussion as to
17   whether or not there was too much real estate and
18   some potential to recharacterize leases under --
19   in Chapter 11.  Apart from that and other
20   discussions about --
21       Q.    Here's my question:  Can you identify
22   any potential purchaser that identified what you
23   phrase to be the one poison pill term in the
24   contract as making the company a less attractive
```

1    acquisition?

2        A.    None of the offers got that far.

3              MR. SCHEIER:  Could you read back the

4    question, please?

5              (The question was read back.)

6        A.    No.

7        Q.    The fourth opinion is that the post-

8    transaction balance sheet contributed to the

9    company's inability to address its problems.  Do

10   you remember that?

11       A.    I do.

12       Q.    What post-transaction balance sheet are

13   you referring to?

14       A.    I'm referring to the post-transaction

15   balance sheet.

16       Q.    Does that post-transaction balance sheet

17   appear in your report?

18       A.    I think it's summarized at different

19   points in the report, yes.  There was a negative

20   $78 million in shareholder equity.  There was a

21   variance year over year from 2002 to 2 -- 2003 to

22   2004, I think that's the measure I used, of $165

23   million of variance in shareholder equity.  There

24   was -- in addition to that, there was a current

```
 1    assets and measurements --

 2         Q.    Well, I asked you to point that to me in

 3    the report.  If you can --

 4         A.    Well --

 5         Q.    Sir, take a deep breath and relax a

 6    second.  Can you point to me a particular balance

 7    sheet?  Not in various parts of the report where

 8    you say things; I'm looking to know whether any of

 9    the tables in your report --

10         A.    Sure.

11         Q.    -- is the balance sheet you're referring

12    to.

13         A.    (Examining document.)  Let me go...

14    Bear with me.  (Examining document.)  Yeah, here's

15    a high -- I'm sorry.  Yes.  Here's a high level on

16    page 7, and you'll see 2002 to 2003 variances --

17         Q.    I just asked you to point it out.  So on

18    page 7 at the bottom --

19         A.    At the bottom.  There's a schedule on

20    the bottom where I do a high level breakdown of

21    the total assets and liabilities and shareholder

22    equity.

23         Q.    All right.  Very good.  Let's get to

24    that in a second.  Keep that page open.  I'd like
```

1    to ask you this:  In coming to the opinion that

2    the post-transaction balance sheet contributed to

3    the company's inability to address its problems,

4    you are aware that throughout 2004 and part of

5    2005, the company was doing well enough to prepay

6    a significant portion of its secured debt ahead of

7    schedule?  Were you aware of that in rendering

8    your opinion?

9         A.    Give me the periods again.  I'm sorry.

10        Q.    2004 and part of 2005, post-transaction.

11        A.    Paid down its senior debt?

12        Q.    If you consider senior debt to be the

13   secured debt that the company borrowed to

14   effectuate the 2003 transaction, then yes.

15        A.    No, not completely aware -- no, not

16   aware of that.

17        Q.    You were not aware of that?

18        A.    Hmm-mm.

19        Q.    Were you aware that in 2005, the CFO of

20   the company, Barry Hoskins, was able to

21   renegotiate the loan terms to get a lower interest

22   rate and higher debt-to-equity debt ratios that

23   benefited the company because it had been

24   performing ahead of schedule under its loan

1    agreements?

2        A.    I'm not aware of that.

3        Q.    Were you aware that between the close of

4    the transaction and the summer of 2008, the

5    company had never missed a payment to either its

6    secured or unsecured creditors, both trade debt

7    and debt arising out of the transaction?

8        A.    I am aware of that.

9        Q.    Okay.  Were you aware that the company,

10    after the transaction, continued to invest money

11    in new product lines and new innovations that, if

12    you might have read Sandra Borstad's deposition,

13    you would -- she described it as being exciting or

14    energizing the field?

15        A.    I'm aware that there was investment made

16    in a digital product of some sort and -- and with

17    mixed results and...

18        Q.    What evidence can you point to that

19    there were mixed results?

20        A.    Just -- just what was -- what was stated

21    in the various documents.

22        Q.    What documents, sir?

23        A.    Well, they're in the exhibits.  I'd have

24    to -- I'd have to find time to go do that.

1      Q.    We can look at the exhibit list right

2  now.  Can you point them out?

3      A.    I can't point it out based on the --

4      Q.    You can't point to me a single document?

5      A.    That's not what I said.  I said I can't

6  point it out based on the exhibit list.

7      Q.    In preparing for this deposition, you

8  didn't look at the documents that were the basis

9  for this opinion?

10      A.    I looked at all the documents.

11      Q.    Okay.  So I'd like to know which

12  documents you're deriving your view you just

13  expressed --

14      A.    Well --

15      Q.    -- that the innovation met with mixed

16  results.

17      A.    I'll give a variety of contexts.

18      Q.    The only context I need is evidence,

19  documents, or testimony.  That's the question

20  right now.

21      A.    Well, I can give you where it shows up

22  in various statements from a variety of private

23  equity funds, from Houlihan Lokey, as well as

24  Candlewood.

```
 1        Q.    What Houlihan Lokey document are you
 2   speaking of?
 3        A.    I don't recall the exact report, but
 4   there was several kinds of reports where they kind
 5   of laid out the -- summarized the -- the history
 6   that they've been -- since they've been involved
 7   with the company.
 8        Q.    Do you realize all the lawyers around
 9   this room represent clients that were asked by
10   Ms. Andrew over and over again about events in
11   2003, many, many years ago, and they remembered
12   these events, and I'm asking you about documents
13   you referred to in writing a report in the last 60
14   days, and you can't point me to a single
15   document --
16             MS. ANDREW:  Objection.
17        Q.    -- other than generalities?
18             MS. ANDREW:  Objection.  You're
19   mischaracterizing his testimony and your own
20   clients' testimony because there was a heck of a
21   lot they did not remember.  He's trying to tell
22   you that he can point to exhibits --
23             MR. SCHEIER:  I'm not asking you any
24   questions, Marsha.
```

```
 1              MS. ANDREW:  -- and you won't let him
 2     answer the question.  I know you're not.
 3          Q.   (By Mr. Scheier)  I'd like to know --
 4              MS. ANDREW:  But you're badgering the
 5     witness --
 6          Q.   I'd like to know what the problem --
 7              MS. ANDREW:  -- and we're not going to
 8     continue doing that.
 9          Q.   -- why you can't recall documents you
10     looked at in the last 60 days that support this
11     report.
12          A.   You're asking me why I can't recall?
13          Q.   You can't.
14          A.   You're asking me why I can't -- you just
15     asked me why I can't recall, and I can't answer
16     you why I can't recall.  I can only say that I
17     can't recall specifically, but they're there.
18          Q.   Okay.  Fair enough.
19          A.   Okay?
20          Q.   Did you analyze or take a look at any of
21     the company's expenditures between 2004 and 2008
22     for product development?
23          A.   Not specifically, no.
24          Q.   Generally?
```

1      A.    I followed what was -- the documents

2  that were in here and the various statements and

3  valuations and so on.

4      Q.    Well, generally, what did you understand

5  -- what did you derive from these documents you

6  looked at in regard to the amount of money the

7  company was investing in new product development

8  after the transaction?

9      A.    What I derived was there was some effort

10  to invest in certain new products.

11      Q.    Did you compare whether that effort to

12  invest in new products was comparable to what

13  other companies in the same marketspace were

14  investing in new products?

15      A.    I certainly did not.

16      Q.    Did you take a look at all to determine

17  whether or not the rate by which Antioch was

18  paying back its secured debt was similar to other

19  comparable companies in that marketspace at the

20  same time in regard to how they were handling

21  their secured debt?

22      A.    That would be unobtainable information.

23      Q.    Did you take a look in analyzing

24  Antioch's post-transaction performance generally

1    at the performance during the same time period of

2    any comparable company in the marketplace?

3         A.    No.  I just looked at what they did.

4         Q.    Are you able to conclude whether or not

5    Antioch's financial performance was different than

6    the financial performance of any of its

7    competitors in the scrapbooking or memory

8    preservation marketplace during the 2004 to 2008

9    time frame?

10        A.    No.

11        Q.    What other problems can you identify

12   that the company was unable to address because of

13   its post-transaction balance sheet?

14        A.    What other problems?

15        Q.    I mean, what problems?  They were paying

16   their debts on time.  They were developing

17   product.

18        A.    Well, look, I deal with balance sheets

19   in companies all -- every day of the week and have

20   for years.  The problem was that the company was

21   de-equitized.  The problem was that all the cash

22   was not making it back into equity into the

23   company or into working capital of the company.

24   It was going out the door.

1       Q.    Well, how much -- how much cash was

2  going out the door?

3       A.    Well, we can -- I can back into it if

4  you'd want to -- but certainly, for purp- -- happy

5  to provide that for you.

6       Q.    Did you do that calculation?

7       A.    I just looked -- what I've looked at is

8  I looked at whether the current assets were in the

9  company and looked at the current asset position,

10  which would be an indication of whether the -- how

11  well the company would be able to pay its bills in

12  the short term.

13       Q.    And --

14       A.    I've looked at the balance sheet and

15  looked at where a shareholder's equity was and the

16  preponderance of both funded debt and short -- and

17  subordinated notes and ESOP notes.  The balance

18  sheet was a -- was a train wreck.

19       Q.    The balance sheet might have been a

20  train wreck, but you're talking about a balance

21  sheet that looked at assets based on book value,

22  correct?  Did you ever do an analysis of the

23  balance sheet looking at the assets at market

24  value -- at fair market value?

1       A.     The auditors certainly weren't prepared

2    to do that.

3       Q.     I'm not asking you about the auditors.

4    I'm asking about you, sir.

5       A.     Well, if you're asking me, you would

6    have to attribute certain goodwill to the company

7    in order to -- to try to figure out what that is.

8    But that goodwill, I would think, would be

9    substantially diminished if you had a proper

10   forecast as to what would possibly happen with 800

11   out of 1,115 employees leaving the company and

12   redeeming in a period of three years.

13      Q.     You can pontificate on the record and

14   talk to me all you want about the number of

15   employees that left.  I'm asking you whether you

16   analyzed the company's balance sheets looking at

17   its assets as fair market value as opposed to book

18   value?

19      A.     Well, as I said --

20      Q.     Did you or did you not?

21      A.     I didn't because --

22      Q.     Did you at all look at how much cash or

23   whether the company, in fact, did use cash to pay

24   salaries and to develop new products?

1        A.      I know that they did.

2        Q.      Okay.  So not all the cash went to pay

3    secured debt and unsecured debt, did it?

4        A.      Substantial amounts of it did.

5        Q.      How much?  What percentage of the

6    company cash went to pay secured debt and debt to

7    ESOP note holders versus cash that was used to

8    fund new product development initiatives, for

9    example?

10       A.      For example -- and the way I approached

11   it -- and --

12       Q.      First answer my question, not the

13   question you want me to ask you.  I'm asking you

14   what percentage of the company cash was used to

15   pay senior secured debt and ESOP note debt

16   relative to the amount of cash used, for example,

17   to develop new products after the transaction?

18       A.      I don't know offhand.

19       Q.      Okay.  Did you look at any evidence in

20   the record at all that tracked the company's cash

21   flow, both the inflow of cash and the expenditures

22   for which the company used the cash that it

23   generated?

24       A.      No.

```
 1          Q.    Your next opinion is that the board of
 2   directors should have known and contemplated that
 3   the three-year put right was a dramatic mistake
 4   that led to the demise of the company.
 5          We've now seen that you misinterpreted
 6   what the three-year put right was, correct?
 7          A.    My conclusion would be the same anyway.
 8   The same thing happened.  Whether I was
 9   technically correct or otherwise, the same result
10   happened.  You had 800 of 1,115 employees leave
11   the company with $190 million of obligation -- of
12   value leaving the company as a result.
13          Q.    What about the put right, as you now
14   learned that it is, that you can make -- I think
15   you were big in the morning session with talking
16   to me about causal nexuses.
17          What experience do you bring to bear to
18   make the conclusion that the put price protection
19   agreement that the company entered into with the
20   ESOP trustee is what incentivized employees to
21   leave the company?  What about that put price
22   protection agreement -- what terms incentivized
23   the employees to leave the company?
24          A.    What incentivized the employees to leave
```

 1    the company are the following --

 2         Q.    I'm asking you what about the put price

 3    protection agreement?

 4         A.    Well, the put price protection agreement

 5    certainly laid down -- laid down a track for

 6    these, even on that document, for one year.  They

 7    had 105 million leave in the first year.

 8         Q.    Well, you understand, don't you, sir,

 9    that the people that left the first year left

10    based on an independent valuation of a purchase

11    price that was --

12         A.    Higher.

13         Q.    -- $49 in excess of the floor price?

14         A.    And 31 percent ahead of the BVI

15    valuation from the previous year.

16         Q.    And you're aware that the 2002 price

17    that you're referring to, which is about 680 a

18    share, was 30 percent higher than the 2001

19    purchase price, are you aware of that?

20         A.    Very aware, yes.

21         Q.    Were you aware that, in fact, a 25 to 30

22    percent increase in the value of Antioch shares

23    from year to year was standard for the seven years

24    before 2003?

1      A.     Yes.  However -- can I finish the

2   however?  You're going to let me do that, right?

3   The however is --

4      Q.     I didn't answer yet your question, but I

5   will let you complete your sentence.

6      A.     However, the difference is now the

7   company is a substantially different company.

8   It's dramatically altered because of the

9   transaction.

10          There was -- there was the view it's an

11  ESOP, yet everybody was a shareholder that worked

12  for the company in view of what had happened with

13  the founders and other entity -- other players

14  that were involved with the -- with the -- with

15  the tender offer transaction.

16          And you had a substantial increase in

17  price of the shares, and you also saw a balance

18  sheet that was decimated by the transaction,

19  and -- and you saw the owners walk out with $120

20  million minimally.

21     Q.     The owners stayed, correct?  No one

22  walked out; the owners stayed?

23     A.     The $120 million left the company.

24  Okay?  That doesn't include the warrants and --

```
 1        Q.    The company did receive shares back for
 2   that 120 million --
 3        A.    I understand.
 4        Q.    -- dollars, correct?
 5        A.    I understand.
 6        Q.    Very good.
 7        A.    So you saw that happen --
 8        Q.    Well, that is correct, the company got
 9   something back in return for the $120 million,
10   correct?
11        A.    Sure.  They got back in return a
12   disaster of a balance sheet and with the ability
13   to get out now on their own because they saw what
14   had happened.
15        Q.    Well, I do understand that you want to
16   use a lot of adjectives and describe things, but
17   as we've noted, regardless of the balance sheet,
18   the company operated for five years post-
19   transaction by paying all its debts, paying all
20   its employees, developing new product, and
21   continuing to be a market leader.
22            So your adjectives aside, we kind of
23   have a more simple question here.  Prairie Capital
24   valued the company's stock at 894 as of
```

```
 1    December 31, 2003.  You understand that to be the

 2    case, correct?

 3         A.    Yes.

 4         Q.    Did you review Prairie Capital's work

 5    product and work papers in coming to that

 6    valuation?

 7         A.    I didn't, but I understand how they did

 8    the valuation.

 9         Q.    How did you come to that understanding

10    without looking at their work papers?

11         A.    Because I've seen other valuations

12    they've done, and it's fairly standard, so...

13         Q.    Okay.  So nothing -- nothing unusual

14    about that valuation as far as you can tell;

15    you're assuming it was done properly and done

16    above board, correct?

17         A.    The valuation was done on a fair market

18    value.

19         Q.    And that's necessary under the law for

20    an ESOP --

21         A.    I understand.

22         Q.    -- correct?

23         A.    There was no discount for lack of

24    marketability.  I understand that there's inherent
```

1    put right.  The difference is that that would

2    presume least -- most fair market value valuations

3    are done on a -- on a -- on a balance sheet

4    neutral basis.

5            The basic -- primarily done on a free

6    cash flow basis without the assumption of the

7    impact of the debt or anything else.  It's what --

8    it's what a financial buyer might acquire the

9    company for.

10            No financial buyer would have bought the

11   company where 100 percent of the shares could have

12   been put in a period of three years.  That

13   wouldn't happen.

14            So to me, the relative -- the relevance

15   of the valuation relative to what the total -- to

16   the company is -- is somewhat -- somewhat marginal

17   in terms of what the total -- what was going on.

18       Q.   You just keep talking and not really

19   answering questions.

20       A.   I thought I did.

21       Q.   No, I don't think you did.  The first

22   question was -- this was all prompted by your

23   broad remark that you don't care what the put

24   price protection agreement was; it somehow

1    incentivized employees to leave the company.

2         A.    Obviously, it did.

3         Q.    Well, what's so obvious about it?  Are

4    you -- do you have any expertise in regard to

5    repurchase obligation projections?

6         A.    I have -- when I look at the company --

7         Q.    Yes or no?

8         A.    The answer's no.

9         Q.    Okay.  Did you interview any employees

10   to determine why they chose to leave the company?

11        A.    No.

12        Q.    Okay.  Did you take into account any

13   personal factors that would lead an employee to

14   decide whether or not to leave a company?

15        A.    All 800 of them?

16        Q.    One of them.

17        A.    Let's talk about all 800.

18        Q.    No.  There's evidence in the record of

19   why certain employees left the company.  Did you

20   review that evidence before making your broad

21   comment?

22        A.    I looked at 800.  It's a substantial

23   percentage of the total.

24        Q.    And your mantra is 800.  All I'm

       1   asking --

       2        A.    It's a big number.

       3        Q.    -- is what about the...

       4        A.    Individually?  No.

       5        Q.    Your opinion is that the purchase --

       6   that the put price protection agreement --

       7        A.    And the transaction.

       8        Q.    That wasn't your opinion.  Your opinion

       9   was the board of directors should have known and

      10   contemplated that the three-year put right was a

      11   dramatic mistake that led to the demise of the

      12   company.  I would like to know -- and your basis

      13   in your report was that it set a floor.  It

      14   guaranteed a price for three years.

      15             We've now learned that's not what that

      16   provision has done.  But you're going to stick

      17   with your opinion, not even understanding what the

      18   put price protection agreement was, that it

      19   somehow led to the demise of the company.

      20             I would like you to tell me what aspect

      21   of the put price protection agreement as it was

      22   actually effectuated led to the demise of the

      23   company.

      24        A.    Um...

```
1         Q.    Go ahead.

2         A.    Oh, you're ready for me?

3         Q.    I'm always ready for you.

4         A.    I hope so.  My view is that the put

5    price guarantee, even -- even if modified here by

6    this agreement -- by the -- this disclosure

7    agreement --

8         Q.    It wasn't modified by anything.

9         A.    Well, no, no, if I modify my point of

10   view by that.  That's what I meant.

11        Q.    Does it modify your point of view now

12   that you've seen the actual put price --

13        A.    It doesn't -- it doesn't modify my point

14   of view about what happened algorithmically in the

15   company.  That, it does not do.

16        Q.    Well, let's -- algorithmically meaning

17   the 800 employees leaving?

18        A.    Yes, and the $105 million of redemptions

19   in the year immediately following the transaction.

20        Q.    Okay.  Let's handle that in a moment.  I

21   just would like to know if you can point me to any

22   aspect of the put price protection agreement that

23   led to the demise of the company.

24               It used to be that there was a
```

1    three-year floor.  We've learned that there was no

2    such thing.

3         A.    Mm-hmm.

4         Q.    I will tell you that the floor was

5    irrelevant in the first year because fair market

6    value came in above --

7         A.    Higher.

8         Q.    -- the floor; and the second two years,

9    all the employees got was fair market value plus a

10   small kicker of $21 and then $12 per share.

11             Understanding that, what about the put

12   price protection agreement led to the demise of

13   the company?

14        A.    Well, I'll just take for that -- that --

15   105 -- well, better than 50 percent of it went out

16   in a matter of one year, I mean...  And yeah, I

17   grant there was -- at a higher value, which I

18   still find inexplicable, and -- and that continued

19   on.  And in view of the fact of what happened with

20   all the founders' equity and how much money was

21   taken out of the company and in view of the

22   balance sheet, people were compelled to leave the

23   company, yet people making, you know, under a

24   hundred thousand dollars a year --

```
 1        Q.    I know it's hard for you to say so, but
 2   basically there's nothing you can point to in the
 3   put price protection agreement that incentivized
 4   anyone to leave the company; isn't that right?
 5        A.    First, I'm not saying -- let me back up
 6   two seconds.  What I'm saying that incentivized
 7   them to leave the company was a very good price on
 8   the stock, in addition to the fact that they saw
 9   what the founders had taken out and in addition to
10   the fact that it's an ESOP, the numbers were
11   available, and they saw what happened to the
12   company's financial profile.  And those are the --
13   in aggregate, the incentives to have left the
14   company and get out while it was time to get out.
15        Q.    Your opinion was the board of directors
16   should have known and contemplated that three-year
17   put right was a dramatic mistake that led to the
18   demise of the company.  Is that still your
19   opinion?
20        A.    I certainly would modify it somewhat
21   based on what I've just said.
22        Q.    Okay.  You didn't modify it.
23        A.    I did.
24        Q.    Okay.  Did you see any evidence in the
```

1    record that the payments to the non-ESOP

2    shareholders through the tender offer incentivized

3    anyone to leave the company?

4        A.    There's -- no.  There's no -- there's

5    no --

6        Q.    Thank you.

7        A.    -- direct causal --

8        Q.    Thank you.

9        A.    -- of discussions that I saw.

10       Q.    Did you see any basis in the record to

11   speculate as to why any individual employee left

12   the company between 2004 and 2007?

13       A.    No.

14       Q.    Okay.  Do you know of the 800 employees

15   in what year how many employees left?

16       A.    I know what the financial outcomes were

17   per year.  That's it.

18       Q.    And when you talk about $109 million in

19   redemptions --

20       A.    190.

21       Q.    Well, I'm talking about the first year.

22       A.    It was 105.

23       Q.    Well, it wasn't.  It was higher than

24   105.  But you do -- you recognize the company

1    didn't need to come up with $105 million in cash

2    to satisfy that obligation in 2004?

3         A.    We discussed that before.

4         Q.    Do you realize that to be the case?

5         A.    I realize that there was $65 million to

6    pay the additional off balance sheet funding in

7    the ESOP to handle some of the redemptions.

8         Q.    And do you also understand that what

9    remained after the $65 million was used was spread

10   out over five years with the company only having

11   to come up with 20 percent of that balance in cash

12   to pay those that redeemed their shares in 2004?

13        A.    Say it again, please.

14        Q.    That the company, after using the $65

15   million that was in the ESOP, leaving about $40

16   million in liability, was able to fund those

17   redemptions with just 20 percent of the 40 million

18   and a note for the balance?

19        A.    Yes, generally.

20        Q.    And in your view, why does the departure

21   of 800 employees, why did that lead to the demise

22   of the company?

23        A.    Well, let's just -- let's just -- the --

24   in my view, the 800 is, first, a substantial

1  number which indicates that I'm correct or largely

2  correct about the incentives and the disincentives

3  to stay that existed at the same time.  So I think

4  that's what it's an indication to me of.

5      Q.    Did you take any look at whether any of

6  those employees chose to leave the company because

7  of the continuing decline in sales of the company?

8      A.    I definitely understood that in the

9  later years, there was -- the revenue was dropping

10  off fairly briskly and that there were reductions

11  in force that occurred as a result.

12      Q.    When you say later years, what do you

13  mean?

14      A.    You know, if I recall, you know, '05,

15  '06, you know, things were starting -- there was a

16  -- there was some deterioration in revenue.  In

17  '04, it really didn't get really more -- it became

18  more dramatic in the later years.

19      Q.    Do you know how many of the 800

20  employees left in 2005 and 2006?

21      A.    I don't know the exact number.  I just

22  know the total count and the -- and the amount of

23  capital income obligations, so...

24      Q.    So you didn't analyze how many employees

 1    left in any given year, correct?

 2        A.    No.

 3        Q.    And you didn't analyze what incentivized

 4    those employees to leave?

 5        A.    I -- I -- based on what I saw and what I

 6    read and what I surmised, that they left because

 7    they -- it was the time to get out.

 8        Q.    Okay.  It had nothing to do, though,

 9    with the put price protection agreement?

10        A.    It had to do with the fact that --

11    certainly in the first year that -- what was that?

12    Did you say 894 a share? -- that it was time to

13    leave given where the state of the company was in

14    terms of the change of the balance sheet, in terms

15    of the -- what the founders did in taking out

16    equity.  I understand that you believe that was in

17    exchange for stock and that's what happened.

18        Q.    No.  What I'd like to know is what

19    evidence you have that any employee, be it one or

20    a dozen or whatever number, left because the

21    non-ESOP shareholders exchanged their shares for

22    cash as part of the transaction?

23        A.    There was no -- there's nothing in the

24    evidence or the documents that I had that suggests

1    that specifically.

2         Q.    Okay.  The next opinion you have is that

3    various offers by Candlewood were demonstrably

4    over market value of company.  Did I get that

5    right?

6         A.    Sounds right.

7         Q.    We've already dealt with that, though.

8    The Special Transaction Committee ultimately

9    rejected three of those four offers, and the

10   financial backer for the fourth withdrew its

11   support; is that correct?

12        A.    They withdrew their support, but there

13   was also a fair amount of skepticism on the senior

14   lenders at the time, that they weren't going to be

15   able to effectively afford the capital structure

16   that was being suggested.

17        Q.    That's the GSC deal you're talking

18   about?

19        A.    That's correct.

20        Q.    What evidence are you referring to?  Did

21   you see an email?

22        A.    There were emails.  There was --

23        Q.    Okay.  Can you -- can you describe for

24   me who wrote the emails or what dates were on

1   those emails?

2        A.    There was emails back and forth, I

3   believe.  I can't remember the dates.  It's when

4   the transaction was being looked at, which would

5   have been, I would think, in the early part of

6   '08, something like that and -- maybe it was late

7   '07.  But the -- Steven Spencer of Houlihan had

8   brought it up.  There was -- it showed up in a

9   list of summaries of what had gone on.

10       Q.    Did you review Mr. Spencer's deposition?

11       A.    I'm trying to think.  Did I review his

12  deposition?

13       Q.    Well, let me be --

14       A.    Yeah.

15       Q.    -- more specific.  Did you review --

16       A.    Yeah, I believe I did.

17       Q.    Did you review Mr. Spencer's testimony

18  that he supported providing Candlewood with a

19  30-day exclusivity because at the time it was the

20  best deal presented to the Special Transaction

21  Committee?

22       A.    Yeah.

23       Q.    Ring a bell?

24       A.    It does.

```
 1          Q.    Do you recall seeing emails during the

 2    relevant time period that the secured lenders

 3    likewise thought that the deal that Mr. Morgan

 4    brought to the Special Transaction Committee

 5    through Candlewood was better than the Whitney

 6    deal, was better than the Monomoy deal, and was

 7    better than the Marlin deal?

 8          A.    I wouldn't characterize it that way.

 9    What I --

10          Q.    Well --

11          A.    Are you going to let me finish, or do

12    you want to ask another question?

13          Q.    Yeah, I was going to ask you if you --

14          A.    Sure.

15          Q.    -- if you recall specifically what was

16    said in those emails?

17          A.    What I recall in the emails was that

18    they were going to take a look at it because it

19    took $31 million of their obligation off the

20    books, off the table, and that they were willing

21    to take a look at it from that, but there was

22    skepticism about -- there was skepticism about the

23    ability to pay for the capital structure that was

24    being proposed, on the one hand --
```

1      Q.    Were these emails prior to the time that

2  Candlewood was granted the exclusively?

3      A.    It was at the point the first -- the

4  proposal was made, if I recall.

5      Q.    Which would have been before exclusivity

6  was granted to Candlewood; is that what you're

7  saying?

8      A.    I'm not saying that.  If you...

9      Q.    Sir, I'm handing you what's been marked

10  as Exhibit 205.  It's an email from Anita Brown to

11  a number of officers and directors of the company

12  along with others including the turnaround

13  specialist from CRG.  Do you see that?

14      A.    I see the email.

15      Q.    If you turn to the second page, there's

16  a draft resolution there for the board.

17      A.    Mm-hmm.

18      Q.    Do you see it?  The first clause

19  references letters of intent received from

20  Whitney, Marlin, and Monomoy.

21      A.    I do.

22      Q.    Do you see that the second paragraph

23  references the GSC proposal that Mr. Morgan made

24  to the Special Transaction Committee through

1    Candlewood?

2         A.    Mm-hmm.

3         Q.    Yes?  Do you see that?

4         A.    I do.

5         Q.    Do you see the third paragraph where the

6    committee notes that it delivered copies of the

7    letters of intent from Whitney, Marlin, and

8    Monomoy and the GSC proposal to both the secured

9    lenders?

10        A.    Mm-hmm.

11        Q.    You call them senior lenders because

12   that's what they're called here.  And Evolve

13   Bank & Trust is the ESOP trustee.  Do you see

14   that?

15        A.    I do.

16        Q.    In the fourth paragraph, do you see it

17   states "Whereas, on March 13th, 2008, the senior

18   lenders communicated to the Special Committee the

19   senior lenders' preference for the terms and

20   transactions outlined in the recapitalization term

21   sheets over the terms of any of the acquisition

22   LOIs and requested that the Special Committee work

23   with the GSC to clarify certain terms in the

24   recapitalization term sheets and proceed to

1    negotiate with GSC the terms set forth in the

2    recapitalization term sheets."

3             Did I read that correctly?

4        A.    I believe so.

5        Q.    Any reason to doubt the accuracy of that

6    comment?

7        A.    No.

8        Q.    Do you see the next paragraph notes the

9    ESOP trustee's similar preference, that the

10   committee pursue the GSC transaction?

11       A.    Mm-hmm.

12       Q.    Now, these emails you're talking about

13   from the secured lenders, did they postdate this,

14   to the best of your recollection?  This is dated

15   March 14, 2008, and "this" being the remarks in

16   Exhibit 205.

17       A.    They may well have, and I'd have to

18   look.

19       Q.    Well, would you agree that the lenders'

20   preference set forth in Exhibit 205 and the ESOP

21   trustee's preference set forth in Exhibit 205 that

22   the Special Transaction Committee pursue a deal

23   with Mr. Morgan and not Whitney or the other 363

24   proposals is consistent with Mr. Spencer's

1    testimony that as of March 14, 2008, the GSC

2    proposal was the best proposal the committee had

3    seen to date?

4         A.    Are you asking me if it's consistent?

5         Q.    Yes.

6         A.    It appears to be consistent based on

7    what you've said to me.

8         Q.    You don't hold a different view than

9    Mr. Spencer, the bank's, and --

10        A.    I do.

11        Q.    -- and Mr. Lenoir?

12        A.    I do.

13        Q.    You do.  Okay.  Fair enough?

14        A.    Would you like to hear that?

15        Q.    No, but I appreciate it's different.

16   They all must have been wrong, and you must be

17   right is, I guess, what the --

18        A.    Occasionally that happens.

19        Q.    -- what the view is.  I figured.  Okay.

20             The other three offers that Candlewood

21   brought to the table we discussed this morning.

22   Do you recall that?

23        A.    I do.

24        Q.    And they were all rejected by the

 1   Special Transaction Committee in very short time

 2   periods of between 24 and 72 hours.  Is that your

 3   recollection of what we looked at this morning?

 4        A.   Are we talking about the other offers

 5   from Candlewood?

 6        Q.   The other three Candlewood offers.

 7        A.   I'll agree that's what you said to me in

 8   terms --

 9        Q.   Do you have any reason to doubt the

10   timing that I gave you?

11        A.   Well, I have a reason to doubt how you

12   would characterize what actually went on in terms

13   of what was spent and time spent, because in my

14   view, there was a lot of time spent chasing a

15   variety of offers, and it wasn't just when the

16   offer hit the table and when they decided on it.

17   There was a lot going on.

18        Q.   Well, can you tell me some evidence of

19   what was going on -- well, actually, let's kind of

20   peg it to time frames.  How about that?  Because

21   you're giving some pretty significant opinions

22   here that are hurtful to a lot of people and to a

23   process, and you're Monday morning quarterbacking

24   it many years later.  We should try to figure out

1      what evidence you have.

2              The first offer -- let me mark this and

3      see if we can actually peg it to dates and see

4      what you have to say.

5              (Deposition Exhibit No. 801 was marked.)

6              It's going to be Exhibit 801, and I put

7      that before you now.  I'll represent to you that

8      this document in terms of its dates is accurate;

9      and, unlike your report, we've even given you

10     citations to the record for the assertions we're

11     making.  So if you look at the first proposal,

12     which is Antioch Acquisition Inc., do you see

13     that?

14         A.    Yes.

15         Q.    That was made on November 5, 2007, to

16     the committee.  Do you see that?

17         A.    I do.

18         Q.    And the Special Transaction Committee

19     Action was rejecting that offer on November 8,

20     2007.  Do you see that?

21         A.    I do.

22         Q.    Did you analyze how much time the

23     Special Transaction Committee took as a

24     deliberative body along with its financial

 1   advisor, Houlihan Lokey, in analyzing that first

 2   transaction between November 5th and November 8th?

 3        A.   I did --

 4        Q.   Yes or no, sir?

 5        A.   I said I didn't.

 6        Q.   You did not.  Do you have any evidence

 7   that the Special Transaction Committee spent any

 8   time on the Antioch Acquisition Inc. proposal at

 9   any point prior to November 5, 2007?

10        A.   No.

11        Q.   Do you have any evidence that the

12   Special Transaction Committee spent any time

13   whatsoever after November 8, 2007, considering the

14   Antioch Acquisition Inc. proposal?

15        A.   I don't.

16        Q.   The next proposal that Candlewood -- and

17   you like when I use Mr. Morgan's name -- that

18   Mr. Morgan through Candlewood presented to the

19   Special Transaction Committee was what we term

20   here the Article 9 proposed transaction.  Do you

21   see that, sir?

22        A.   I do.

23        Q.   That was presented to the Special

24   Transaction Committee on February 6, 2008, at a

1    meeting via PowerPoint presentation.  Do you see

2    that?

3        A.    Yes.

4        Q.    Do you recall looking at that PowerPoint

5    presentation?

6        A.    Absolutely.

7        Q.    And the Special Transaction Committee

8    responded to that proposal by rejecting it on

9    February 10th, 2008.  Do you see that, sir?

10       A.    Yes.

11       Q.    Did you analyze how much time and what

12   the committee did in deliberating over the Article

13   9 proposal with the Houlihan Lokey folks between

14   February 6th and February 10th?

15       A.    I did not analyze the time.

16       Q.    Okay.  Do you have any knowledge of any

17   time the Special Transaction Committee spent in

18   considering the Article 9 proposed transaction

19   prior to February 6, 2008?

20       A.    Well, there were a lot of emails back

21   and forth and discussions about what would happen

22   in an Article 9 transaction.  So the specific

23   times of that I don't have.

24       Q.    Not good enough for me.  My question

```
 1   is --
 2        A.   I'm just answering --
 3        Q.   -- can you identify any emails prior to
 4   February 6, 2008, or any evidence that the Special
 5   Transaction Committee concerned itself with a
 6   potential Article 9 transaction prior to
 7   February 6, 2008?
 8        A.   As I said, there were -- there were
 9   several emails and discussions about what would
10   happen in an Article 9 from a variety of folks
11   involved, and I don't know what the actual dates
12   are.
13        Q.   You don't?
14        A.   I don't.
15        Q.   So you can't point me to any specific
16   evidence that the Special Transaction Committee
17   spent more than a nanosecond considering an
18   Article 9 transaction prior to February 6, 2008,
19   when it was presented to them by Candlewood?
20        A.   Well, that's kind of -- kind of an
21   interesting characterization.  I'm not saying that
22   at all.  I'm just saying I don't have any specific
23   dates that I looked at.  I saw that there were a
24   lot of emails and a lot of correspondence.
```

```
 1        Q.    Who wrote the emails?

 2        A.    A variety of people.

 3        Q.    Give me some examples.

 4        A.    Ms. Moran.  There were things from Steve

 5   Spencer.  There were things from Candlewood.

 6   There were discussion in board -- amongst board

 7   members in emails going back and forth.

 8        Q.    Sir, these are emails that you looked at

 9   over the last 60 days?

10        A.    Yes.

11        Q.    You don't recall a single date on any of

12   them and whether they predated February 6th or

13   postdated February 6th?

14        A.    I don't recall a single date.

15        Q.    Okay.  Do you have -- do you recall

16   seeing any evidence that the Special Transaction

17   Committee spent any time after February 10, 2008,

18   considering Candlewood's Article 9 proposal?

19        A.    No, I don't.

20        Q.    Okay.  The next transaction on the list

21   is the GSC term sheet deal.  Do you see that?

22        A.    I do.

23        Q.    We discussed that already, didn't we?

24        A.    I think so.
```

1          Q.    Okay.  Then let's move on down to

2    MAMAMO.  Do you see that the MAMAMO offer was sent

3    to the Special Transaction Committee on June 2nd,

4    2008, but delivered June 3rd?

5          A.    Are you ask -- yeah.

6          Q.    I misspoke.  I will state that again.

7    Do you see that the MAMAMO offer was delivered to

8    the Special Transaction Committee on June 3rd of

9    2008?

10         A.    I see that's what it says here.

11         Q.    And do you see that the Special

12   Transaction Committee took action rejecting that

13   proposal the very next day on June 4, 2008?

14         A.    I do.

15         Q.    All right.  Do you remember seeing any

16   evidence at all that the Special Transaction

17   Committee spent any time whatsoever considering

18   the MAMAMO deal prior to June 2nd, 2008?

19         A.    (No response.)

20         Q.    Deliberating over it, talking to the

21   Houlihan folks about it any time whatsoever prior

22   to June 2nd, 2008, sir?  Any evidence?

23         A.    No.

24         Q.    Okay.  Do you have any evidence

1    whatsoever that the Special Transaction Committee

2    paid any attention to the proposed MAMAMO deal

3    after June 4th, 2008?

4         A.    There was another MAMAMO proposal that

5    came up that was substantively the same, and that

6    was also rejected.

7         Q.    Okay.  Do you know what date that was?

8         A.    I'm thinking it was June, but it was

9    later in June.  Something else came back up, and

10   there was a -- pretty much a -- no change, a

11   rejection on it.

12        Q.    Are you thinking about a proposal MAMAMO

13   made to the board after Mr. Lenoir had exercised

14   his 85 percent of shares?

15        A.    Yeah, I believe that's the one.

16        Q.    Okay.  Then you need to listen to my

17   questions.  Okay?

18        A.    Mm-hmm.

19        Q.    I was talking about the Special

20   Transaction Committee.  All right?

21        A.    I apologize.  Absolutely.

22        Q.    MAMAMO made one proposal to the Special

23   Transaction Committee; is that right?

24        A.    On that sequence, yeah, you'd be right.

1      Q.     And within 24 hours, the Special

2   Transaction Committee rejected that offer?

3      A.     Mm-hmm.

4      Q.     And you have no evidence, do you, sir,

5   that the Special Transaction Committee spent any

6   time reviewing the MAMAMO proposal with its

7   financial advisors or in any other sort of

8   deliberative process before June 2nd -- or before

9   June 3rd, rather, or after June 4th?

10      A.     No, but -- do I get a "but" in

11   here?  But the whole concept of the consensual

12   deal at valuations that were always -- primary

13   predicate that it would be substantially more

14   because it would -- it wouldn't leave all the

15   other parties impaired was going on all the time.

16      Q.     Would it --

17      A.     It went out -- it went on throughout

18   from -- from fall of '07 right through -- right

19   through June and prior to the -- the actual

20   rejection of the Whitney offer and filing

21   bankruptcy.

22      Q.     Well, all I -- all I can show you is the

23   evidence.  I had the courtesy of showing you

24   specific evidence and specific proposed

1    transactions.

2        A.    Well, if you want to confine it just to

3    that, then I don't disagree with you.

4        Q.    I would like you to identify for me a

5    specific email, communication, document that

6    supports your statement that the Special

7    Transaction Committee considered any other

8    proposal, any other general structure for a

9    consensual deal of the type similar to what

10   Candlewood is proposing outside of the context of

11   the four proposals made that are reflected on

12   Exhibit 801.

13       A.    If one confines their activity around

14   just these proposals, then you are completely

15   correct.

16       Q.    Were there any proposals made other than

17   those by Candlewood of a similar nature?

18       A.    If you confine just there being an

19   instantiated proposal, then your answer's

20   correct.  If you look at what was going on in

21   terms of all the back and forth about trying to

22   get consensual deals --

23       Q.    Let's stop there.  Back and forth

24   between who?

1       A.    Well, between Mr. Morgan, the -- and

2  Nancy Blair of the Special Transaction Committee.

3  There were -- there were -- there's a lot.  It was

4  just the undertow on the entire period.

5       Q.    And did you do any analysis or see any

6  evidence that indicated to you the amount of time

7  that Ms. Blair or any member of the Special

8  Transaction Committee devoted to consideration of

9  conceptually the type of deals that Candlewood had

10 been proposing at the time, whether it was by

11 letter from Mr. Morgan or otherwise?

12      A.    If you equate the whole thing to a

13 matter of quantified time, I don't have -- I don't

14 have specific things to address in terms of

15 quantifiable time.

16      Q.    Do you know how frequently the Special

17 Transaction Committee met between -- let's call it

18 the summer of 2007 and the day that the ESOP

19 trustee removed that board?

20      A.    I don't.

21      Q.    Okay.

22      A.    I know that there was a lot of back and

23 forth in emails and a lot --

24      Q.    Did you analyze any minutes of the

```
 1    Special Transaction Committee in preparing your
 2    report or formulating your opinion?
 3        A.    I read the responses, and I read some of
 4    the reports in the meetings.
 5        Q.    Responses meaning you've read -- how
 6    many -- you've read communications to the
 7    committee and the committee's responses?
 8        A.    Communications to the committee,
 9    committee responses, communications between the
10    committee and Mr. Morgan.
11        Q.    Let's stop there.  How many
12    communications between Mr. Morgan and the
13    committee --
14        A.    Oh.
15        Q.    -- did you look at?
16        A.    Several.
17        Q.    Several's not good enough.  How many?
18        A.    Well, several's the best I can do.  More
19    than two.
20        Q.    You've looked at them over the last 60
21    days and you don't remember any more than several?
22        A.    Well, I can -- I can give you the
23    content of some of them if you'd like.
24        Q.    No, because I'm more interested in terms
```

1    of right now the amount of time -- you seem to

2    think the committee spent an inordinate amount of

3    time dealing with Mr. Morgan, and I'm trying to

4    figure out what is the factual basis for that

5    comment by asking you to identify for me evidence

6    that supports your general statement.

7        A.    I'll just repeat what I've said, that

8    the -- the concepts of consensual deal, in

9    addition to the actual proposals -- to come up

10    with them was an undercurrent throughout that

11    whole period and the subject of many, many emails,

12    many, many Special Transaction Committee

13    discussions, discussions with the investment

14    bankers, discussions with Mr. Morgan and the

15    Special Transaction Committee.  It's -- it's

16    throughout the record.

17        Q.    And do you have the same sort of

18    communications that you've seen with regard to the

19    Special Transaction Committee considering 363-type

20    sales?

21        A.    Not nearly as much.

22        Q.    And can you give me the relative --

23    that's the problem I'm having with you, sir.  You

24    speak in generalities and you use adjectives.  But

1    the rule as I showed you early on requires you in

2    your report, actually, to identify what you're

3    relying upon, and you failed to do that.

4            And now I'm coming here today and in

5    good faith trying to discover what you're relying

6    upon, and you're unable to identify for me the

7    precise nature of these communications, who wrote

8    them, and, in particular, how many there were, and

9    how much time the committee spent considering LOIs

10   versus considering a consensual deal.

11           You're unable to tell me with any level

12   of precision the amount of time the committee

13   spent considering consensual deals or considering

14   a 363 deal; is that right?

15       A.    With any precision, no, I can't.

16       Q.    Thank you.

17           Sir, in terms of the testimony that the

18   committee spent more time dealing or considering

19   consensual deal structures versus 363, how do you

20   -- how are you able to articulate how much time

21   was spent doing one versus how much time was spent

22   doing the other, other than just a general

23   statement that you believe they spent more time

24   doing one than the other?

```
 1        A.    Just -- just from the level of traffic
 2   on the discussion.
 3        Q.    Did you count up the number of emails
 4   relating to each issue?
 5        A.    I certainly did not.
 6        Q.    Okay.  Is there any way you can help me
 7   quantify that and substantiate your --
 8        A.    Sure.
 9        Q.    -- speculation?
10        A.    We could certainly go back into all the
11   exhibits and identify every email and every --
12   every -- every correspondence that there was in
13   respect to the consensual deal, and you can
14   certainly identify those.
15        Q.    And you believe that's a valid measure
16   of the time the committee was spending on looking
17   at consensual deals versus 363, just counting up
18   the various correspondence?
19        A.    Well, you seem to think that's the way
20   to do it.
21        Q.    I don't.  I'm asking you how you did it
22   without having been in the room.
23        A.    What I -- what I said, and to
24   recharacterize what I said again, is that the
```

1   consensual deal was an undercurrent throughout

2   that whole period.  There was a lot of discussion

3   about it, a lot of -- a lot of requests, a lot of

4   requests from Mr. Morgan to the Special

5   Transaction Committee.

6        Q.    When you say a lot, how many?

7        A.    Numerous.

8        Q.    How many does numerous mean?

9        A.    More than three.  More than five.

10       Q.    More than ten?

11       A.    Don't know.  I'd have to go back and

12   count.  We can certainly do that.

13       Q.    Have you ever done that count?

14       A.    No, I've not.

15       Q.    Okay.  When you were looking at this

16   issue, is it true that you only looked at

17   documents that the Taft law firm gave you?

18       A.    Yes.

19       Q.    Okay.  And is there room for the

20   possibility that Taft didn't give you all of the

21   email traffic between committee members and

22   between committee members and Houlihan discussing

23   potential 363 deals?

24       A.    Are you asking me is that a possibility?

1      Q.    Yes, sir, that's what I'm asking you.

2      A.    Yes, that's a possibility.

3      Q.    You don't know one way or the other?

4      A.    If I say it's a possibility, I don't

5    know.

6      Q.    Your next opinion was that the Special

7    Transaction Committee, but also the board of

8    directors in general through Houlihan Lokey and

9    McDermott, Will & Emery, got good advice but did

10   not heed the advice in 2007 and 2008.  Do you

11   remember that opinion?

12     A.    Yes.

13     Q.    Okay.  Can you identify for me each and

14   every piece of advice that Houlihan Lokey gave the

15   board and the Special Transaction Committee in

16   2007 and 2008 that they failed to follow?

17     A.    Failed to follow is a question of at

18   what time and how much time was spent before they

19   followed one thing or another.

20     Q.    Well, I agree, so I hope your answer

21   takes that into account.

22     A.    I try to take that into account.

23   Although I certainly have no opinion about the

24   additional legal counsel that McDermott, Will &

1    Emery provided, I thought Jim Shein was correct

2    about what the company needed to do in '07 in

3    respect to a -- to a 363 sale in a Chapter 11

4    bankruptcy.

5            I thought that Houlihan's advice,

6    particularly Steve Spencer, throughout that period

7    was button on.  I just think their evaluation of

8    the offers Candlewood were making, the evaluation

9    and the management of the -- of what was available

10   in the market were very good advice.

11       Q.    Well, you're falling back, once again,

12   into really not answering the question but using

13   your chair there as kind of a soapbox to speak.

14           The question really was, what advice,

15   specific advice, did Houlihan Lokey give -- I

16   think you said the Special Transaction Committee,

17   but all the board of directors in general, that

18   they did not follow or did not heed, I think was

19   your word, H-E-E-D?

20       A.    Well, yeah, let me -- fine.  What I

21   believe happened was Houlihan advised that this

22   was going to have to go through a 363 because

23   there was just too much complex liability that --

24   and the valuations were falling off anyway.

```
1         Q.    Excellent.  And ultimately, the Special
2    Transaction Committee followed that advice and
3    pursued a 363 deal with J.H. Whitney, correct?
4         A.    And may have done it well earlier had it
5    not been for the drag on the time from the
6    consensual deal.
7         Q.    Actually, you're right.  They might have
8    done that back in March when Whitney's proposal
9    was $10 million less than it ultimately was in
10   May; isn't that right?
11        A.    Or potentially --
12        Q.    Am I right or wrong?
13        A.    Or potentially with Sun Capital when
14   that offer would have been somewhat higher.
15        Q.    Well, Sun Capital was not a 363 deal --
16        A.    No.
17        Q.    -- was it?
18        A.    They could have -- they could -- no, it
19   wasn't.  You're correct.
20        Q.    I know I'm correct, and now you're
21   mixing apples and oranges because you're talking
22   about Mr. Spencer and you're talking about 363.
23   Okay?
24        A.    Mm-hmm.
```

```
 1        Q.    Sun was part of the first phase.

 2        A.    I -- I -- I --

 3        Q.    Do you agree?

 4        A.    I do agree.

 5        Q.    Okay.

 6        A.    It was a mistake on my part.  The offer

 7   could have been there.  The other thing, too,

 8   is --

 9        Q.    Well, let's --

10        A.    Are you going to let me finish?

11        Q.    There was an earlier 363 deal for $44

12   million that Mr. Spencer, Mr. Lenoir, Fifth Third

13   Bank, National City Bank, and the third bank all

14   felt was not as good as the GSC deal.  Do you

15   recall that?

16        A.    I recall that.

17        Q.    Was there any other 363 deal that you've

18   seen in the record that was better than Whitney's

19   $44 million deal proposed in March of 2008?

20        A.    No, not that I know of.

21        Q.    There is one in the record, and that's

22   Whitney's $54 million deal three months later,

23   correct?

24        A.    That's right, in May.
```

```
 1        Q.    And the Special Transaction Committee
 2   chose to pursue that, correct?
 3        A.    It did.
 4        Q.    And actually, Ms. Moran supported the
 5   committee's decision to pursue the 363 deal,
 6   didn't she?
 7        A.    Until she didn't.
 8        Q.    Excuse me?
 9        A.    Until she didn't.  Yeah, she -- there's
10   a -- well, no, time out.  There's -- there's a --
11   there's an email saying she did.  There's a draft
12   release -- press release saying she did.
13        Q.    Okay.  Do you have any reason to believe
14   that wasn't an accurate representation of
15   Ms. Moran's viewpoint at the time she made those
16   representations?
17        A.    I have no reason to believe it wasn't --
18        Q.    Okay.
19        A.    -- except --
20        Q.    Thank you.
21        A.    -- except the -- Lenoir and the sub
22   trust came in and voted off the board and killed
23   off the transaction and subsequently made the two,
24   Mr. and Mrs. -- Ms. Moran and Mr. Morgan as board
```

 1 | members with one other.

 2 |     Q.    And those board members understood that

 3 | any transaction with Whitney or a bankruptcy sale

 4 | would not win the approval of the sub trustee,

 5 | correct?

 6 |     A.    Certainly that would have been an

 7 | indication at that point.

 8 |     Q.    Sir, let's kind of be honest with each

 9 | other.  Okay?  You know from this record that

10 | Mr. Lenoir was not going to approve a transaction

11 | that involved the sale of the company as a going

12 | concern through a 363 sale; isn't that right?

13 |     A.    Is it right, except he did that because

14 | he believed somehow there was a consensual deal

15 | that was this undercurrent that somehow the value

16 | would be better, which was nonsense.

17 |     Q.    Well, you might believe that, and

18 | Mr. Lenoir's not here.  Did you read his

19 | deposition testimony?

20 |     A.    I did.

21 |     Q.    Okay.  Whatever you want to believe of

22 | Mr. Lenoir's financial or business acumen, the

23 | point is he controlled 85 percent of the shares at

24 | the time --

```
 1        A.    Agreed.

 2        Q.    -- did he not?

 3        A.    Yes, he did.

 4        Q.    And any responsible board would have to

 5   take into account its 85 percent shareholder's

 6   views, wouldn't they?

 7        A.    They had no choice.

 8        Q.    Thank you.  Your next opinion and last

 9   one that you gave was the J.H. Whitney offer was

10   the best offer for the company and its -- can you

11   read my handwriting? -- and its continuation.

12        A.    Yes.

13        Q.    Your opinion was the J.H. Whitney offer

14   was the best offer for the company and its

15   continuation?

16        A.    Yes.

17        Q.    Okay.  I don't think I have many

18   questions about that.  In fact, I have none.  But

19   that's your eighth opinion.

20        A.    You're keeping count.

21        Q.    I did keep count.  It was important for

22   me to keep count.  It was supposed to be in your

23   report, but they weren't.  But I appreciate the

24   fact you articulated them here on the record.
```

```
 1              MS. ANDREW:  Objection.

 2              MR. SCHEIER:  Let's take a short break.

 3              (A brief break was taken.)

 4         Q.   (By Mr. Scheier)  Welcome back from the

 5    break, sir.

 6         A.    Thank you.

 7         Q.    We talked a little bit about

 8    Mr. Lenoir's decision to exercise his control over

 9    85 percent of the shares to remove the board from

10    what the evidence indicates was an intent to

11    frustrate the Whitney transaction, correct?

12         A.    Yes.

13         Q.    And you had some criticism of

14    Mr. Lenoir's business acumen or decision in that

15    regard, I believe, correct?

16         A.    That's correct.

17         Q.    Did you take a look to see at all how

18    Mr. Lenoir's constituents -- namely, ESOP

19    participants and ESOP note holders -- faired as a

20    result of Mr. Lenoir hanging in there and agreeing

21    to eventually a bankruptcy in November 2008?

22         A.    Through the subsequent bankruptcy?

23         Q.    Yes, sir.

24         A.    No, I haven't.
```

```
 1        Q.    I'll represent to you that by rejecting

 2   the Whitney deal where Mr. Lenoir's constituency

 3   would have gotten zero -- both ESOP note holders

 4   and equity -- by holding out and agreeing

 5   ultimately to a reorganization, Mr. Lenoir's

 6   constituents, both the ESOP note holders and the

 7   ESOP participants, received a 15 percent interest

 8   in the common stock trust.  Were you aware of

 9   that?

10        A.    I am.

11        Q.    You'd agree that that potentially is

12   better than getting nothing, assuming that

13   Ms. Andrew (sic) and others can add value to that

14   particular asset?

15        A.    I don't want to agree to the -- to your

16   comment.

17        Q.    Well, I know it's tough, but --

18        A.    Well, no, it's not tough.  It's just

19   you're making a statement, and you're asking me to

20   -- let's break it down into a couple questions.

21             MS. ANDREW:  And I'm not sure, Mike, I

22   thought your first question said they received

23   percentage in the stock trust?

24             MR. SCHEIER:  I believe they did.
```

1    MS. ANDREW:  And then you asked about

2    adding value through Mr. Miller and myself.

3    MR. SCHEIER:  No, I strike that.  That

4    was not right.

5    A.    Okay.  Start again.

6    Q.    (By Mr. Scheier)  Sure.  Are you aware

7    that Mr. Lenoir's constituents received a 15

8    percent interest in the common stock trust that

9    resulted from the ultimate reorganization of The

10   Antioch Company?

11   A.    I read the petition going into '08, so I

12   understood it, so...

13   Q.    And would you then agree that they

14   received -- "they" being Mr. Lenoir's

15   constituents -- value that they would not have

16   gotten had Mr. Lenoir permitted the Special

17   Transaction Committee to pursue a 363 sale with

18   J.H. Whitney?

19   A.    Yeah.  My understanding of the Whitney

20   deal was that they weren't terribly interested in

21   having additional equity participation outside of

22   their own position, so...

23   Q.    So is the answer that Mr. Lenoir's

24   decision to remove the board and veto the Whitney

1    deal actually benefited his constituents?

2         A.    No, that's not the answer.

3         Q.    Okay.

4         A.    The answer -- well, let me finish.  The

5    answer is that you could certainly impute value in

6    the same way that the Morgans imputed value for

7    their sub debt and the warrants that just simply

8    wasn't there.  And as it turned out, it wasn't

9    there.

10        Q.    Although he got them some value through

11   the bankruptcy, that being a 15 percent interest

12   in the --

13        A.    That's --

14        Q.    -- common stock trust?

15        A.    That's just -- that's an imputable

16   potential out there piece of number.  It's a piece

17   of sub equity that may or may never have come into

18   anything.

19        Q.    And you would agree that that's better

20   than having absolutely no chance of anything?

21        A.    When you're somewhere between an

22   asymptote to zero and zero, it's pretty hard to

23   say that that's a better -- a better deal.

24        Q.    Well, is it better to have a chance at

1    making some recovery than having no chance of

2    recovery at all?

3         A.    I think it's better to have a chance

4    with a -- with a sponsor partner with substantial

5    capital and ability to -- to -- to move the

6    company out of bankruptcy.

7         Q.    Well, unfortunately, sir, that wasn't an

8    option available to Ms. Lenoir or anyone else,

9    so --

10        A.    No.  Let's --

11        Q.    -- let's look at -- let's look at

12   something that is seemingly difficult for you to

13   do, and that's look at this record.

14        A.    You're asking --

15        Q.    On this record --

16        A.    On this record.

17        Q.    -- is it fair to say that it's better

18   for Mr. Lenoir's constituencies to have an

19   opportunity to monetize a 15 percent share in a

20   common stock trust than agree to a transaction

21   where they're guaranteed to get zero?

22        A.    I'll go back to what I said before, if I

23   might.  The extent to which that had any value at

24   all is more than hypothetical.  And I don't think

1   it had any value, and it turned out it didn't.

2       Q.    What didn't?

3       A.    The 15 percent.

4       Q.    It might still.

5       A.    You're hopeful.

6       Q.    But you still for some reason insist on

7   avoiding an answer to the question, and that is,

8   aren't Mr. Lenoir's constituents better off with a

9   contingent recovery than a guaranteed no recovery?

10      A.    If you're saying to me that if they had

11  any kind of probability of getting that, would

12  that be better than having no probability of

13  getting it, and if you -- if you accept that --

14  that characterization -- if we accept that

15  probability is a value given the total

16  circumstances of the company in bankruptcy, then I

17  would concede your point, but no other way that I

18  would concede your point.

19      Q.    Let's look at the -- get back to your --

20  now that we've gone through your opinions, let's

21  get back to your balance sheet that you pointed

22  out on page 7.

23      A.    Okay.

24      Q.    Let me know when you're there.

```
 1        A.    I'm there.

 2        Q.    Okay.  Do you believe that Antioch

 3   Company's equity really was negative $78,186,000

 4   after the transaction?

 5        A.    I believe that the book equity was

 6   negative $78 million after the transaction.

 7        Q.    What about fair market value?

 8        A.    I don't know what the fair market value

 9   was after the transaction because you'd have to

10   look at the impact of the transaction on the -- on

11   the value of the company, which I don't think

12   anybody did.

13        Q.    You certainly didn't do it for purposes

14   of preparing your report?

15        A.    I certainly looked at it from the point

16   of view of what happened and what the various

17   valuations were up to that point.

18        Q.    Do you believe that looking at book

19   value, the equity of The Antioch Company was a

20   negative --

21        A.    Yes.

22        Q.    -- after the 2003 transaction?

23        A.    Yes.

24        Q.    Taking book value into account?  That's
```

1    taking book value into account, correct?

2         A.    The book value was negative in the

3    company at the -- at the close of 2012.

4         Q.    And --

5         A.    2003, I'm sorry.

6         Q.    Okay.  Do you believe that shareholder

7    equity was less than zero if you would take fair

8    market value into account?

9         A.    At that point, sure.

10         Q.    Can you state your answer?

11         A.    If one was able to impute fair market

12    value, which I don't think anybody was able to do

13    at this point given everything that was going on,

14    then you might be able to make the argument in a

15    valuation that the fair market value of the equity

16    was greater than zero.

17         Q.    Okay.  Could there ever be a possibility

18    where, taking fair market value into account,

19    equity is less than zero?

20         A.    Of course there's the possibility, but

21    are we talking about this deal or some other deal?

22         Q.    I'm talking about just the possibility.

23         A.    Seems hard to believe.

24         Q.    Okay.

```
 1        A.    You have positive...  It wouldn't be the

 2   market valuation.  You'd have -- you'd have

 3   positive fair market value.

 4        Q.    And with regard to fair market value, I

 5   guess you confused me a little bit only because

 6   it's not my area, but don't you look at the assets

 7   of a company and determine what it could be sold

 8   for, including desks and chairs, including

 9   goodwill, including buildings, including basically

10   all of the physical assets that the company owns,

11   plus goodwill?

12        A.    Let me answer your question.  If you

13   liquidated the company on the basis of its book

14   value of assets and liabilities, you'd have a

15   negative $78 million of value at the end of the

16   day.

17        Q.    Okay.  Are you going to answer my

18   question or --

19        A.    That is.  You asked me what the

20   liquidation value would be --

21        Q.    I'm not asking you the liquidation

22   value; I'm asking you sale of fair market -- sale

23   of assets at fair market value.

24        A.    Oh, okay.  I don't -- I don't believe
```

```
 1    you asked me that, but, yeah, if you sold the
 2    company at fair market value at the time this
 3    balance sheet closed, there would be -- there
 4    should be positive value.
 5         Q.    Right.
 6         A.    But in terms of the assets of the
 7    company and in terms of the liabilities of the
 8    company, that would be negative.
 9         Q.    At book value -- taking the liabilities
10    at book value?
11         A.    How else would you take them?
12         Q.    At fair market value.
13         A.    Liabilities are also at book value.
14         Q.    I'm talking about assets, sir.
15         A.    Well --
16         Q.    If I looked at the assets of the company
17    at fair market value at the close of the 2003
18    transaction --
19         A.    I think you're confusing between book
20    value and fair market value.  The assets of the
21    company -- there may be some step-up in the basis
22    of the -- of the fixed assets under a 338 elec- --
23    H election or something like that.  But to the
24    extent these are fairly recorded, it's not
```

 1    unreasonable to conclude that you'd have

 2    $78 million of negative book of value at the end

 3    of the day on a book value basis.

 4         Q.    You had -- I understand what it means to

 5    value assets at fair market value, and I'm asking

 6    -- and you had told me that you don't believe it

 7    was possible to value Antioch's assets at fair

 8    market value post-transaction.  And my question

 9    was, why?

10         A.    No, I didn't say that.

11         Q.    Okay.

12         A.    And if I did, you -- if I did, I

13    misunderstood a question and you misunderstood

14    what I said.  What I'm saying is -- the only thing

15    I'm saying is the -- it had negative shareholder

16    equity at the closing, period.  That's what it

17    is.

18              If you liquidated the assets apart from

19    a potential step-up in the basis of the -- of the

20    fixed asset values and maybe something else that's

21    on there that I don't know about, you might have

22    some difference; but it's hard to believe you

23    would have -- you'd have positive difference on a

24    book value basis.  That's book equity.

```
 1        Q.    But I want to talk about -- well, I want
 2   to talk about fair market value of the assets.
 3        A.    Well, the only --
 4        Q.    And you have to tell me if that's just a
 5   concept that doesn't exist; in other words, you
 6   couldn't value the assets of the company as of
 7   December 31 of 2003 at fair market value?
 8        A.    If we're just looking at what's on the
 9   balance sheet and we're not -- we're not -- we're
10   not allocating for any goodwill -- so we're just
11   talking about the balance sheet, is there -- the
12   question you're asking me, is there a possibility
13   that those assets are worth more than what they're
14   recorded for?
15        Q.    Correct.
16        A.    Okay.  And the answer is potentially.
17        Q.    Yes.
18        A.    You know, you have a piece of real
19   estate on there at the time; you had, you know,
20   desks and chairs, which I kind of doubt that they
21   would be worth much more.
22        Q.    We're talking about examples.
23        A.    Yeah, but -- but -- you know, and the
24   real estate asset might be worth a little bit
```

1    more, but any of the current assets and certainly

2    any of the liabilities would be exactly what they

3    are.  And, you know, they might have some

4    equipment that they -- you could make an argument

5    that they're worth more than their depreciated

6    value.

7         Q.    Did you make any effort to take a look

8    at what the fair market value of the whole basket

9    of Antioch's assets were as of December 31, 2003?

10        A.    Really had no reason to.  Just was

11   looking at what -- where the balance sheet was.

12        Q.    Did you take a look at Houlihan's

13   write-up of the assets, the fair market value, for

14   purposes of providing a view that the transaction

15   would not render the company insolvent when assets

16   are measured at fair market value?

17        A.    Is this the transaction analysis that

18   they did in the 2003 transaction?

19        Q.    I don't know what you're referring to.

20   What I'm talking about is a document that the Taft

21   law firm apparently didn't give you, and that is

22   the board of directors December 4, 2003, meeting

23   minutes where the board considered Houlihan's

24   evaluation of the company's fair market value of

1   its assets minus its liabilities post-transaction

2   would yield a positive.

3       A.    I know about that meeting, and I know

4   about the general content of the meeting.

5       Q.    Well, actually, tell me about the

6   general content of the meeting.

7       A.    The general content of the meeting was

8   that there -- it had to do with the ability to

9   make dividend distributions with negative book

10  value.

11      Q.    We might be talking about different

12  meetings.

13      A.    Could be.  But my understanding --

14      Q.    Are you talking about the December 4,

15  2003 --

16      A.    I'm not exactly sure of the date.  I

17  know it was in December, and there --

18      Q.    Sir, you can't just --

19      A.    Well, you asked me.

20      Q.    The rules require you to know facts and

21  to provide me with the facts upon which you base

22  things you have to say in this report, which you

23  don't, but since you haven't, in this room.

24              And you're talking to me about a

```
 1    document you think you kind of thought you saw

 2    that had to do with a meeting in 2003.  So let me

 3    be very specific.

 4              I'm asking you what your understanding

 5    of the general topics were that were discussed at

 6    the December 4th, 2003, meeting of The Antioch

 7    Company's board of directors.

 8              MS. ANDREW:  Before you answer, I just

 9    want to state for the record an objection as to

10    your characterization and your question as to what

11    his obligations are.  He is not -- he is not

12    obligated to memorize millions of pages of

13    documents and their dates to spit them out for

14    you.  You may go ahead.

15        Q.    That's what would be the great benefit

16    of highlighting in the report the factual sources

17    for comments made.  Go ahead.

18        A.    Well, I don't -- I don't comment on that

19    at all in the document.

20        Q.    Yes, we know that.

21        A.    Well, we don't because I did what -- did

22    not have the document.  There was discussion about

23    trying to put goodwill on the books -- that the

24    board was trying to come to a decision to put
```

```
 1    goodwill on the books.  And I understood it in the

 2    context of them being able to deliver a dividend

 3    given the fact that the company had negative book,

 4    and this would be a way of righting that.  That's

 5    all I know.

 6        Q.    Take any issue with Houlihan's analysis?

 7        A.    Well...

 8        Q.    You haven't seen it, right?

 9        A.    I haven't seen it, so it's hard to take

10    issue with it, yeah.

11        Q.    Is your only knowledge of that meeting

12    something that the Taft lawyers told you?

13        A.    Yes.

14        Q.    At the close of the 2003 transaction,

15    was The Antioch Company's enterprise value greater

16    than the debt after the transaction?

17        A.    I would think so.

18        Q.    I'd like you to take a look, please, at

19    page 9 of your report.

20        A.    Okay.

21        Q.    And I'm looking at the very top of that

22    page where you write "It is unclear from the

23    records available to Silverstone whether the

24    Morgans and their advisors established the $850
```

1    share price while taking into account the state of

2    post-closing transaction balance sheet, which paid

3    out company cash and took on significant new

4    levels of senior and subordinated debt," period.

5            Did I read that correctly?

6        A.    I believe you have.

7        Q.    A couple of questions.  Who are the

8    Morgans?

9        A.    I was referring to Mr. Lee Morgan, I'm

10   referring to Asha Morgan, and -- and I believe his

11   wife was also in that.  And I was using that as --

12   you know, as the -- as the impetus for these

13   decisions.

14       Q.    What specific evidence are you referring

15   to -- by the way, what is Lee's wife's name?

16       A.    I just saw it yesterday.  I just don't

17   know offhand.  I don't want to guess.

18       Q.    Okay.  Where did you see his wife's name

19   yesterday?

20       A.    In one of the documents I was going back

21   through.

22       Q.    What document, sir?

23       A.    Oh, we're going through this again.

24   I've looked at thousands of documents.  I don't

1  know exactly which one I looked at.

2      Q.    What document did you look at that gave

3  you any indication that Vicki Morgan had anything

4  to do with establishing any term of the 2003

5  transaction, sir?

6      A.    Let's go back to what you asked me.

7      Q.    No.  Let me ask you that question.

8      A.    No.  Let me finish.

9      Q.    No.  Let me -- you answer my question

10  now.  What document did you look at that

11  establishes that Lee Morgan's wife, Vicki, had

12  anything to do, any input whatsoever, with regard

13  to any of the terms that were ultimately

14  established and closed upon in the 2003

15  transaction?

16      A.    First of all, I didn't say that.  Let's

17  be clear.

18      Q.    When I asked you who the Morgans were in

19  this sentence, sir, you said it was Lee Morgan,

20  his wife, and their daughter, Asha.

21      A.    No.  That's not exactly what I said.  I

22  said it was Lee Morgan, it was Asha Morgan, and I

23  believe his wife was involved at some level at

24  least as one of the people in this...

```
1         Q.    Do you know of any evidence that Vicki

2   Morgan had anything to do at any time with

3   establishing, discussing, evaluating, analyzing

4   any aspect of the 2003 transaction?

5         A.    I -- look, I...

6         Q.    The answer's yes or no.

7         A.    The answer's no.

8         Q.    Okay.  Thank you.

9               Do you have any evidence whatsoever that

10  you can point me to that Asha Moran had anything

11  to do with negotiating, evaluating, analyzing, and

12  establishing any material term of the 2003

13  transaction outside of her role as a board member

14  like all the other board members?

15        A.    I'm not clear that I'm -- clear that I'm

16  stipulating anything different than that.

17        Q.    Is the answer no --

18        A.    Well...

19        Q.    -- that you haven't seen any such

20  evidence?

21        A.    She was part of the management group.

22  She was one of the shareholders.

23        Q.    I understand what her different hats

24  were.
```

```
 1        A.    Are you going to badger me, or are you
 2   going to let me finish?
 3        Q.    No, I'm not going to let you finish
 4   until you answer my question.
 5        A.    I'm trying to.
 6        Q.    You need to listen to the question and
 7   answer it and not start -- not start dancing
 8   around here with terms and generalities.  I'm
 9   asking have you seen any evidence that Asha Moran
10   analyzed, established, negotiated, or chose any
11   material term of the 2003 transaction?
12             MS. ANDREW:  Other than all her roles?
13        A.    Other than all her roles as a director
14   of the board of the company and a major
15   shareholder.
16        Q.    She did nothing different than any other
17   director vis-a-vis the 2003 transaction; is that
18   right?  Is that your understanding?
19        A.    The impetus of the -- of the comment
20   here was that this was largely driven by at least
21   Lee Morgan and -- and I'm assuming also because
22   Asha Morgan was also a major shareholder and was
23   part of the discussion as to what to do to fix
24   whatever they were intending to fix.
```

1    Q.  What document did you look at that

2 indicated Asha Moran was part of that discussion?

3    A.  I don't recall offhand except that she

4 was part of the general transaction, part of the

5 board of the directors, an officer of the company,

6 and a major shareholder.  That's all.

7    Q.  So you can't point to me any specific

8 aspect of the 2003 transaction that Asha Moran

9 established?

10    A.  Well, I can't.

11    Q.  You cannot?  You can or cannot?

12    A.  I know she was involved as one of the

13 parties, a large shareholder, and an officer of

14 the company, and a director of the board.

15    Q.  And what's your understanding of her

16 involvement?  I need specifics of what evidence

17 you saw that she was involved.

18    A.  Well, it's hard to believe that she

19 wouldn't have been involved.

20    Q.  Well --

21    A.  Well, no.

22    Q.  No, it's hard to believe in the man in

23 the moon also, but there's some people that do.

24    A.  Yeah, I suppose so.

1      Q.    Right.  So the question is, have you

2   seen any evidence that Asha Moran --

3      A.    It -- it -- it doesn't --

4      Q.    -- established any aspect of the 2003

5   transaction including the $850 share price?

6      A.    Nothing's negated by what I said.  It

7   just -- it says the Morgans and their advisors

8   established the $850 share price.

9      Q.    Yeah.  I'm asking you, who are the

10   Morgans?

11      A.    Well, principally Lee Morgan, I would

12   assume.

13      Q.    Was there any other member of the Morgan

14   family that you're aware of that had any role in

15   establishing the $850 share price?

16      A.    I said what I said.

17      Q.    Well, answer my question, please.

18      A.    Um...

19      Q.    The answer's no as I heard it.

20      A.    So then take the no.

21      Q.    Is the answer no?

22      A.    I have no evidence that they were, apart

23   from their role as directors of the board,

24   shareholders, and officers of the company.

```
1          Q.    And who are "they"?

2          A.    In particular, Asha -- Asha Moran.

3          Q.    Any other member of the Morgan family

4     that you know is a member of the board or

5     shareholder of the company?

6          A.    Not as far as I know.

7          Q.    Okay.  And what evidence do you have

8     that Asha Moran played any role whatsoever in

9     establishing the $850 share price over and above

10    what any other -- the role that any other director

11    had?

12         A.    That's fair enough, right?  She was on

13    the board of directors, and she was an officer of

14    the company, and she was a major shareholder.

15         Q.    What did Lee Morgan do other than --

16    different than any other director of the company,

17    different than any other manager of the company?

18         A.    Oh, come on.  The entire impetus for

19    this came from that, from Mr. Morgan.  This wasn't

20    just generated ex nihilo at the board saying, Hey,

21    look, let's go off and let's do a tender offer and

22    recapitalize the company.

23         Q.    I don't know if the jury knows what ex

24    nihilo means.
```

```
 1         A.     It means out of nothing.

 2         Q.     Okay.

 3         A.     It's Latin.  Sorry.

 4         Q.     Were you given any evidence by the Taft

 5    lawyers as to whose idea this transaction was?

 6         A.     The transaction, from what I understand,

 7    was brought to Mr. Morgan through consultation

 8    with Deloitte looking at their wealth management

 9    issues.  That's what I understood.

10         Q.     Okay.  Well, then that's the problem

11    with not looking at evidence, sir.  You just get

12    it wrong.  And on a record like this, you make

13    comments that are offensive and wrong.

14         A.     Whatever.  So what was it?

15         Q.     Did you learn any facts regarding the

16    2003 transaction from any source other than the

17    lawyers from Taft, Stettinius & Hollister?

18         A.     Yeah, from the documents that I -- that

19    had -- were made available to me.

20         Q.     Sir, there were two documents from the

21    2003 time frame that you had.

22         A.     Yeah, there was also -- there was --

23    there was many summaries of a variety of what

24    happened, what the values were, how they were --
```

```
1          Q.     Which of those documents identified Lee

2    Morgan as originating the 2003 transaction and the

3    concept for it?

4          A.     Well, the concept of it, as I've said,

5    from what I've understood came from consultation

6    with Deloitte and with the impetus from

7    Mr. Morgan.  The board certainly didn't come up

8    with it out of -- out of thin air.

9          Q.     Anyone from Taft tell you the idea came

10   from Helen Morrison?

11         A.     Well, if she was from Deloitte, that may

12   well...

13         Q.     Anyone from Taft tell you that Lee

14   Morgan never knew Helen Morrison before he met her

15   for the first time at a meeting in January of

16   2003?

17         A.     If that's -- any of it relevant, then,

18   no, I've not heard that.

19         Q.     Would it make a difference to you that

20   the entire concept of a 100 percent ESOP

21   transaction that included a tender offer of 90 sub

22   shares originated solely with and was brought to

23   the board by not Lee Morgan but Helen Morrison?

24   If that were the fact, would that change your
```

 1   opinion in any way?

 2        A.    No, because I don't believe that's what

 3   happened.

 4        Q.    Okay.  Can you identify any document you

 5   looked at that discussed the origin of the 2003

 6   transaction and the deal structure?

 7        A.    I've already indicated what I knew.

 8        Q.    It was just brought to my attention that

 9   although you testified you looked at thousands of

10   documents, my understanding is that you produced

11   only 550 documents to us.  So is thousands of

12   documents just an exaggeration?

13        A.    Well, there were pages and pages of

14   testimony, there were exhibits.  Whatever was in

15   there is what I've read, so if it's an

16   exaggeration --

17        Q.    Did you read --

18        A.    -- it's not my intention.

19        Q.    Did you read any deposition testimony

20   that established that Mr. Morgan originated the

21   idea for a tender offer and a 100 percent ESOP

22   transaction?

23        A.    I'm not sure that I've ever said that he

24   originated the idea.  You're the one saying that.

1      Q.    No.  You keep telling me --

2      A.    No.  I said it's unclear from the

3   records available whether the Morgan Trust -- the

4   Silverstone -- whether the Morgans and their

5   advisors established the share price while taking

6   into account the state of the post-transaction

7   balance sheet.

8      Q.    Well, I just don't even know where

9   you're getting -- first of all, you use the phrase

10  "the Morgans," and we've established that really

11  means nobody other than Lee Morgan, and then you

12  say that Mr. Morgan with his advisors.  Who are

13  his advisors?

14     A.    Well, I thought Deloitte was his

15  advisors.

16     Q.    Did you ever look at Deloitte's

17  engagement letter with the company?

18     A.    No, I've not seen their engagement

19  letter.

20     Q.    Okay.  Did you ever have an

21  understanding that Deloitte's wealth management

22  group, a completely different set of folks, were

23  helping Mr. Morgan with his estate planning at a

24  different period in time?

```
 1              MS. ANDREW:  Objection.

 2    Mischaracterizes the facts.

 3              MR. SCHEIER:  Well, your witness doesn't

 4    know the facts, Marsha, so I'm trying to educate

 5    him.

 6              MS. ANDREW:  Well, and you're trying to

 7    give him one set of facts that's incorrect with

 8    the record --

 9              MR. SCHEIER:  I'll withdraw the

10    question.

11        Q.    (By Mr. Scheier)  What evidence have you

12    seen in this record by way of deposition testimony

13    or a document created by anyone other than the

14    lawyers at Taft that support your contention that

15    Mr. Morgan established the $850 share price?

16        A.    It doesn't say that.

17        Q.    (Reading) It is unclear from the

18    records --

19        A.    Whether the Morgans --

20        Q.    -- whether the Morgans and their

21    advisors established the $850 share price while

22    taking into account the state of post-closing

23    transaction balance sheet, so on and so forth.

24              Are you telling me that you do not
```

```
 1    believe -- and this will be good to hear -- that
 2    Mr. Morgan established the $850 strike price for
 3    the transaction?
 4         A.   I -- let me go on what I -- what I
 5    believe.  I don't think Morgan -- Mr. Morgan was
 6    someone who would be able to do that financially
 7    speaking, analytically speaking, but that with
 8    the -- with the aid of his advisors, came about to
 9    that number.  I'm not saying he sat down there and
10    did a valuation of the business.  That's
11    ludicrous.
12         Q.   Well, what document do you have to
13    indicate that Mr. Morgan personally employed
14    advisors or engaged advisors to come up with an
15    $850 share price?
16         A.   Well, I don't think anybody personally
17    employed someone to come up with an $850 share
18    price.
19         Q.   What evidence in the record can you
20    point to that Mr. Morgan individually engaged
21    advisors to give him advice personally in regard
22    to the 2003 transaction?
23         A.   I don't have any direct evidence except
24    that the -- I still contend that the impetus to do
```

1    this was driven out of his wealth -- his wealth

2    planning efforts and got to the board as looking

3    at a transaction.

4         Q.    And who testified that way, that you

5    believe -- you believe that from what testimony in

6    this record?

7         A.    Well, certainly none of the defendants,

8    because nobody would say that's what -- exactly

9    what happened.

10        Q.    Did you read any third-party testimony,

11   sir, that would -- from where you derive that

12   information?

13        A.    Well, I recall a statement by Mr. Morgan

14   explaining to somebody that he screwed up this

15   whole thing.  So, I mean, I -- it's -- you know,

16   it's just -- you can't -- I just can't in my mind

17   take him out of the line of responsibility for

18   what happened here.  You may want to, but I don't.

19        Q.    No.  To tell you the truth, do you know

20   what I want to do?  I want to establish the facts,

21   and that's what I spent the last three years

22   doing.  So what I'm asking you is to help me and

23   point to any evidence in the record that

24   Mr. Morgan engaged any advisor, financial or

1   otherwise, to advise him in respect to the 2003

2   transaction.

3        A.    I told you what I -- what I -- you know,

4   I've not seen the Deloitte documents, so I don't

5   know.

6        Q.    Have you seen any evidence in this

7   record, be it sworn testimony or a document,

8   indicating that Mr. Morgan had a personal

9   financial advisor advising him in regard to the

10  2003 transaction?

11       A.    No, I've not seen any document.

12       Q.    Have you seen any document or viewed any

13  testimony supporting your contention that

14  Mr. Morgan wanted to enter into the 2003

15  transaction as part of his personal financial

16  wealth planning or estate planning?

17       A.    That was a -- that conclusion was drawn

18  from my conversations with -- with Taft counsel

19  and looking at the documents.

20       Q.    Did you say with Taft counsel?

21       A.    Yes, we were -- as we were talking about

22  the transaction.

23       Q.    And what documents are you referring to?

24       A.    I'm not referring to documents.

1          Q.    Okay.  Thank you.

2                All right.  So next is this portion of

3     your statement that -- something about you weren't

4     sure if whoever it was that came up with the $850

5     share price took into account the state of

6     post-closing transaction balance sheet which paid

7     out company cash and took on significant levels of

8     senior and subordinated debt.  Do I understand

9     that right?  That's what you wrote?

10         A.    Yes.

11         Q.    Are you saying there -- and I apologize

12    if I don't understand this -- that the transaction

13    price should have taken into account the state of

14    post -- the state of the post-closing transaction

15    balance sheet?

16         A.    What I'm stating, if you read through

17    the document, is that I find it hard to believe

18    that it didn't.  It would be improbable if it

19    didn't.  If it did, it created minimally a

20    valuation of just under 600 million.  If you add

21    the cash back and you reconcile the purchase price

22    of the warrants, it's probably around $600

23    million.  That's all I'm saying.

24         Q.    Well, I apologize for being a little

1    dense on this point.  You might think I'm dense on

2    most points.  But what I'm wondering is whether

3    you believe that in establishing and negotiating a

4    transaction price, the borrowing that the company

5    undertook as part of the transaction and the post-

6    closing transaction balance sheet should have been

7    taken into account?

8         A.    Absolutely.

9         Q.    Okay.  Do you believe in general, sir,

10   that equity value is calculated as enterprise

11   value less net debt?

12        A.    Less funded debt and any deficiencies

13   and working capital and things like that.

14        Q.    Is it fair to say net debt is basically

15   debtless cash?

16        A.    No.  I mean, it -- if there's -- it

17   depends on the working capital.  I mean, the cash

18   might be -- you know, current assets might be

19   neutral and you need the cash.

20        Q.    Well, then, I guess based on your --

21   what you just testified, based on that premise, in

22   a stock redemption funded a hundred percent with

23   new debt, do you believe that the value of the

24   stock should be based on enterprise value

1    pre-transaction debt or post-transaction debt?

2         A.    You're asking the wrong kind of

3    question.

4         Q.    Okay.

5         A.    The right question is enterprise value

6    is established typically -- certainly Prairie's

7    done it and BVI did it as well -- is usually

8    established on a -- on a pre-cash flow balance

9    sheet neutral basis.

10             The difference between that and the

11   funded debt and any deficiencies or surpluses in

12   working capital and any non-operating assets --

13   you know, cash value, life insurance -- would

14   certainly be added back into it, and the net of

15   those things are what you come up with equity.

16             Equity is a result of -- you know, just

17   as in a public company, the cap value of the stock

18   plus the debt is the total capital.

19        Q.    And I get that, but I'm speaking

20   specifically in the context of a stock redemption,

21   a company redeeming stock of some or all of its

22   shareholders.

23             In that situation, in coming up with an

24   enterprise value to attach a value to the stock

1    that it's going to pay the shareholders, is it

2    appropriate that the value of the stock should be

3    based on, in any circumstance, post-transaction

4    borrowings or the post-transaction balance sheet?

5         A.    The value of the stock should be the

6    difference between enterprise value and funded

7    debt and surplus deficiencies and working capital

8    and any non-operating asset that might have cash

9    value like cash value life insurance.

10        Q.    And the debt you just referred to is

11   debt before the deal or after the deal?  Before

12   the redemption or after the redemption?

13        A.    Enterprise value is enterprise value.

14   Debt is debt.  Whatever the debt is at the time is

15   where you'd be.  If you close the deal and you had

16   sources and uses and you came out and you'd --

17   you'd net the two of them together and there you'd

18   be.

19        Q.    You're not advocating that the debt the

20   company is going to undertake to fund the

21   redemption should be taken into account in

22   establishing --

23        A.    You said redemption.  Do you mean the

24   tender offer?

1      Q.    No.  Well, any redemption.  The tender

2    offer was a redemption of shares.

3      A.    Well, we're just talking about the post-

4    transaction balance sheet and the valuation

5    associated with the tender offer, and that's what

6    we're talking about.  I'm not sure what else

7    you're talking about.

8      Q.    If you want to use the tender offer, we

9    can.  In terms of establishing the price for the

10   tender offer, do you believe that the parties

11   doing so should have taken into account the debt

12   that the company would incur as part of the

13   transaction, or did they only need to take into

14   account the debt as it existed on the books prior

15   to the transaction?

16     A.    Well, if you don't take into account the

17   post-transaction capital structure, then the

18   effect would be that you would actually end up

19   with a valuation of the business at a lesser value

20   post-closing than you did at the moment you did

21   the deal.  So you would have to have concluded the

22   post-transaction capital structure.  I don't know

23   how else you would do it.

24     Q.    In valuing the shares pre-transaction

1   for purposes of what you're going to pay for the

2   shares?

3       A.    No.  You value -- the share -- the share

4   value is a derivative number.  It's derivative of

5   the enterprise value less the various parts of the

6   value sheet that would be netted from it or added

7   back to it.

8       Q.    You're not contending in this report in

9   any spot, are you, that the debt used to finance

10  an equity buyout is considered as debt already on

11  the books in determining the price the company is

12  going to pay for the shares?

13      A.    Please say that again.

14      Q.    Sure.  Are you contending anywhere in

15  this report that the debt used to finance the

16  redemption, in this case the tender offer, should

17  be considered as debt already incurred -- in other

18  words, already on the books -- in determining the

19  share price to be paid to the tendering

20  shareholders in the transaction?

21      A.    I am.  If you didn't do that, then post-

22  closing, the share price would be less because now

23  you have more debt to offset the share price.  I

24  mean, you'd have to.  I mean, if you did basic

1   sources and uses, you'd come up with the same

2   answer.

3       Q.    And what about the fact that you just

4   redeemed half the shares; does that have any

5   impact on the analysis?

6       A.    (No response.)

7       Q.    In this case, the company redeemed

8   almost half the shares through --

9       A.    Understood.

10      Q.    -- through the transaction.

11      A.    I mean, I'm not sure you're

12  understanding me.

13      Q.    That could very well be.

14      A.    Well, let's -- simple approach to it.

15  You would value the company.  Customarily, that's

16  done on a free cash flow basis with a balance

17  sheet neutral assumption, right?  So you're not

18  making any assumptions about what kind of capital

19  structure it has.

20           You're going to make some adjustments

21  for changes in working capital.  You might have

22  some historical numbers for unfunded capital

23  expenditures.  You're going to presume a tax

24  effect to come to something that would approximate

1    a free cash flow number.

2           That -- those values -- it's very hard

3    to talk if they're going to be conferring when I'm

4    talking (indicating).  Just give me a break for

5    two seconds.

6       Q.    You need to focus.

7       A.    I'm trying.  That -- those values, pro

8    forma basis, typically based on historical

9    information, are generally present value based on

10   a variety of measured -- different techniques of

11   discounting and capitalized in addition to the

12   residual value of the business is classically how

13   it's done.  That creates an enterprise value.

14          The enterprise value less any of the

15   debt we've been talking about and other

16   adjustments to the balance -- from the balance

17   sheet would be what the equity would be worth on a

18   first day, one moment after the thing closes

19   basis.

20      Q.    Okay.

21      A.    So you wouldn't do a deal where the one

22   moment after it closes, all of a sudden the stock

23   price is less because you haven't accounted for

24   all the debt because the equity is a smaller

1    number.

2        Q.    Right.  Is it true that if a company

3    redeems a shareholder his entire shares, that the

4    total equity value of company would decline by the

5    amount of the redemption?

6        A.    Yeah.  I mean, you've basically --

7    excuse me.  You've netted out the debt for the

8    equity.

9        Q.    And this is true whether the company

10   uses its own cash or if it takes on debt to redeem

11   those shares, right?

12       A.    (Coughing.)  Excuse me.

13       Q.    Sure.  I'll repeat the question.  It was

14   that good a question, huh?

15       A.    We've been talking a lot, you and I.

16       Q.    This is true whether the company use its

17   own cash or if it takes on debt to redeem those

18   shares, correct?

19       A.    In effect, you have -- you have reduced

20   the assets of the company either by the effect of

21   increasing the liability or reducing the cash.

22       Q.    Okay.  What do you understand the term

23   "enterprise value" to mean?

24       A.    Enterprise value is the -- is the claims

 1  of total -- of the total capital of the company,

 2  including the value of the equity and the value of

 3  the debt.

 4      Q.    So is it fair to say an enterprise value

 5  is the sum of total equity and total debt of a

 6  company net of cash?

 7      A.    Not necessarily no cash.

 8      Q.    If a company's enterprise value is a

 9  hundred dollars and the company had no debt or

10  cash, what would the equity value be?

11      A.    A hundred dollars.

12      Q.    If that company borrowed $50 of debt

13  from the bank to redeem a 50 percent owner, how

14  much would the company have to pay the 50 percent

15  owner to redeem his stock?

16      A.    I'm going to ask you to repeat that just

17  because I want to hear it all over again.

18      Q.    No problem.  I'm happy to.  It's a very,

19  very good question, isn't it?

20      A.    I'm not sure.  I don't -- I'm not sure

21  what you asked.

22      Q.    If that company borrowed $50 of debt

23  from a bank to redeem a 50 percent owner, how much

24  would the company have to pay the 50 percent owner

1    to redeem his stock?

2        A.    Do you want me to sit there and work

3    that out?  So hold on.

4            MS. ANDREW:  It's a final exam question.

5        Q.    My expert witness can.

6        A.    Well, go ahead.

7        Q.    He'll be deposed.

8        A.    He's not been asked every -- been

9    talking the last six hours.

10       Q.    He'll have his day.  I think the

11   answer's $50, I'm being told.

12       A.    Sounds like it would probably be

13   correct.

14       Q.    See how good my expert is?

15       A.    I'll make sure to hire him next time.

16       Q.    In all seriousness, sir, what would the

17   total enterprise value be before and after the

18   hypothetical redemption you and I just discussed?

19       A.    The enterprise value would be the same.

20       Q.    What would the total equity value be

21   before and after the hypothetical redemption we

22   just discussed?

23       A.    The equity value would -- if we did the

24   redemption, if I bought the company, my equity is

```
 1   whatever my equity is netable, whatever my
 2   enterprise value, whatever my debt is at the time.
 3   Another reason why the put price guarantee is
 4   pretty hard to believe, but go ahead.
 5        Q.    Can you, for the record, state what the
 6   put price guarantee is?
 7        A.    Well, at least for the first year, it
 8   looks like it's $840 per share, but it was 889
 9   based on the valuation.
10        Q.    894.
11        A.    894, sorry.  I keep reversing...
12        Q.    Yeah.
13        A.    Right.
14        Q.    But you didn't tell me what the put
15   price protection is, what the -- you keep -- for
16   some reason, you felt a need to raise that issue
17   again, and we've learned that somehow, someway the
18   material term of the deal you just got flat out
19   wrong.
20             Now that you understand what the term of
21   the deal is, do you want to tell me what you
22   understand the term of the put price agreement is?
23        A.    Well, let's even take the first year.
24        Q.    You can't just take the first year.
```

1    It's an agreement that ran -- spanned three

2    years.  So what are the terms, sir?

3         A.    Well, I'd have to go back and look at

4    what was on there.

5         Q.    Let's focus on a different area of your

6    report, and that has to do with your conclusions.

7    So if you would go there, I would appreciate it.

8              I want to initially focus on the last

9    paragraph of your conclusions that's on page 25.

10        A.    Okay.

11        Q.    And in particular, for this segment of

12   the deposition, the very last sentence.

13        A.    Okay.

14        Q.    You write "Mismanagement of and

15   interference with the sale process by the

16   directors and their advisors caused the company to

17   lose the opportunity to realize between 20 million

18   and 30 million in value and to waste 6 million on

19   professional fees."  Did I read that correctly?

20        A.    Yes.

21        Q.    Is it your view that this is the --

22   between 20 and 30 million -- or, actually, why

23   don't you tell me, what is the 20 to 30 million

24   dollars in value there in your view?  What was

1    your purpose in writing that?

2         A.    Just looking at what the CRG valuation

3    was in the bankruptcy petition in '08 relative to

4    what the offer was from -- the baseline offer was

5    from Whitney.

6         Q.    Is it your view that 20 million to 30

7    million dollars is a reasonable damages

8    calculation for the plaintiff in this case based

9    on the 2007/2008 sale process?

10        A.    That's what I believe was the amount of

11   money that was not realized as a result of the

12   actions taken by the company.

13        Q.    And do you get there through simple

14   arithmetic by taking --

15        A.    Simple arithmetic.

16        Q.    It's just simple arithmetic?  Okay.

17             And that simple arithmetic relies, if

18   you go to the first page, on either the Sun verbal

19   offer or the $54 million letter of intent and you

20   subtract out from that something between 31 and 38

21   million dollars of enterprise value that CRG

22   estimated in the bankruptcy?

23        A.    Most -- the Whitney offer.

24        Q.    Can we take the 63 million out?  You're

```
 1   not considering that any further for purposes of

 2   determining what the company lost by way of value,

 3   in your mind?

 4        A.    Yeah.  To me, the offer was the

 5   J.H. Whitney offer in May.

 6        Q.    Do you disclaim any reliance on the $63

 7   million, quote, unquote, verbal offer as you put

 8   it in your report?

 9        A.    I don't -- I don't disclaim it.  I mean,

10   the -- it's hard to know what that was really

11   going to turn into.  It never got past a certain

12   point, so...

13        Q.    Okay.  It's not a reliable data point,

14   is it, in terms of figuring out what the company

15   actually --

16        A.    It never became a -- it never became an

17   official offer.

18        Q.    It's not a reliable data point, is it?

19        A.    That'd be -- sure.

20        Q.    You agree with me?

21        A.    I agree.

22        Q.    So looking at --

23             MR. SHARKEY:  Can I hear the question

24   and the answer, please?
```

```
 1              (The previous few questions and answers
 2    were read back.
 3         Q.    (By Mr. Scheier)  Then putting aside the
 4    $63 million verbal offer from Sun that you
 5    reference that's no longer a part of your analysis
 6    and focusing on the $54 million letter of intent
 7    from J.H. Whitney, did you review the J.H. Whitney
 8    letter of intent in preparing this report and in
 9    formulating your opinions?
10         A.    I did.  I read it.
11         Q.    Did you recognize that the $54 million
12    price that Whitney had stated in that letter of
13    intent was contingent on additional due diligence
14    by Whitney and ultimately the closing of a
15    definitive agreement?
16         A.    Yes, which is -- which is more than
17    customary.
18         Q.    And you don't know one way or the
19    other -- if the board of directors accepted that
20    offer -- that the company would actually realize
21    the $54 million amount of consideration that is
22    set forth in Whitney's letter of intent, correct?
23         A.    There's no way to know that.
24         Q.    And there's certainly no evidence on
```

1    this record to venture a guess?

2         A.    They did substantial due diligence.  If

3    it went into an APA into a 363, it would have been

4    a guaranteed bid.

5         Q.    But that never --

6         A.    The worst --

7         Q.    Go ahead.

8         A.    The worst it would have been would have

9    been $54 million if there wasn't anybody else

10   stepping up to the option of the 363 sale, so...

11        Q.    Although J.H. Whitney never, by way of

12   definitive agreement, agreed to pay $54 million

13   because it never actually completed its due

14   diligence, correct?

15        A.    It had done a fair amount of due

16   diligence ahead of that, but...

17        Q.    Did you see any evidence that they

18   completed their due diligence and --

19        A.    There's -- there's --

20        Q.    -- and set on the $54 million price?

21        A.    There's no way to know that that would

22   be the final price.

23        Q.    Let's look at the number you have at the

24   other end of your calculation.  That's a CRG

1    estimated value at 31 to 38 million dollars that

2    appears in your report and that you rely upon.  Do

3    you know the purpose that CRG prepared that

4    estimate of company value?

5         A.    Well, it's part of the -- part of the --

6    part of the -- part of the -- that requirement for

7    that bankruptcy filing, so...

8         Q.    Did you review any of CRG's work

9    underlying its value estimate?

10        A.    I didn't.

11        Q.    Did you review any of CRG's underlying

12   work papers?

13        A.    I didn't.

14        Q.    Did you review the models that it

15   prepared in coming up with that number?

16        A.    No, just that I knew it was relatively

17   consistent to everything else we'd seen.

18        Q.    Did you review any of CRG's assumptions

19   that it used in coming up with --

20        A.    I didn't.

21        Q.    -- that value number?

22        A.    No.

23        Q.    Did you review any of the underlying

24   corporate financial reporting that CRG relied upon

```
 1    in coming up with its value estimate in the

 2    disclosure statement?

 3        A.    I'm certainly aware of where things were

 4    financially and what the statements look like; but

 5    did I look at their actual analysis, the answer's

 6    no.

 7        Q.    Do you know what documents they

 8    considered?

 9        A.    I don't, no, because I didn't see their

10    analysis.

11        Q.    Did you review any of the underlying

12    corporate forecasting that CRG relied upon in

13    estimating the value of the business?

14        A.    I didn't see the actual forecasting,

15    just the comments about their forecasts.

16        Q.    And whose comments were those?

17        A.    Oh, I think I knew there was -- they

18    were estimating a 7-1/2 percent decline, and I

19    can't remember exactly where, but it was somewhere

20    in the -- in the -- after the Whitney offer went

21    down, there was a report from Houlihan back to the

22    -- to the -- to the lenders, the senior lenders,

23    who were being asked to be reviewed -- asking for

24    a review of what the current activity was, and
```

1    that the other 363 bidders were going to be either

2    not playing or substantially lower than they were

3    before.

4         Q.    Well, that might be, sir, but I asked

5    whether you reviewed any of the underlying

6    corporate forecasting that CRG relied upon, not

7    anything --

8         A.    I'm just pointing out where I picked it

9    up.

10        Q.    But did you look at any of the

11   underlying --

12        A.    No.

13        Q.    -- corporate forecasting?

14        A.    I'm just pointing out where I -- where I

15   -- where I saw it.

16        Q.    The answer is, no, you did not look at

17   any of those documents?

18        A.    That's the answer.

19        Q.    Do you know who at CRG performed that

20   valuation?

21        A.    I think it was Michael Epstein.

22        Q.    Do you know if he did it on his own?

23        A.    Don't know.  I do not -- it certainly

24   was under their name, under CRG, so I assumed it

```
 1    was him.
 2         Q.    But you don't know one way or the other
 3    if it was actually Michael Epstein that prepared
 4    the --
 5         A.    I presumed it was.
 6         Q.    But you don't know for certain?
 7         A.    I don't think I know for certain,
 8    although it might be indicated in the report, but
 9    I don't -- I'm not sure that it's in the petition.
10         Q.    Did you get that number out of the
11    disclosure statement?
12         A.    Well, I got it out of the -- I believe
13    what was the bankruptcy petition, and I'm not sure
14    which actual document it was.
15         Q.    Did you talk to anyone at CRG about --
16         A.    I did not.
17         Q.    -- that valuation?
18               Sir, I'm going to mark the disclosure
19    statement dated November 12, 2008, from The
20    Antioch Company's bankruptcy.
21               (Deposition Exhibit No. 802 was marked.)
22               It's marked as Exhibit 802, and I'll
23    hand that to you.  And don't fret, I have
24    questions relating only to a single page.
```

     1          A.     Okay.

     2          Q.     And I will in a moment identify that

     3     page for you.  It is page 70 of the disclosure

     4     statement.  You produced this disclosure

     5     statement, and I say that based on the Bates label

     6     Greenberg 01646 on the first page.  Do you recall

     7     reviewing this --

     8          A.     Yes.

     9          Q.     -- as part -- while you were preparing

    10     your report and formulating your opinions?

    11          A.     I remember reading this paragraph, yes.

    12          Q.     Okay.  This paragraph E you're referring

    13     to is on page 70 of the disclosure statement?

    14          A.     Yes.

    15          Q.     And that's on Greenberg 01721?

    16          A.     Correct.

    17          Q.     The first sentence under E says "At the

    18     request of the debtors, CRG Partners performed a

    19     discounted cash flow valuation analysis of

    20     Reorganized Antioch.  The total enterprise value

    21     of Reorganized Antioch was assumed for the

    22     purposes of the plan by the debtors, based on

    23     advice from CRG Partners, to be between

    24     approximately $31.6 million and $38 million."

```
 1               Is that the source of the CRG estimate
 2      of $31 million to $38 million that appears on page
 3      24 of your report --
 4           A.    Yes.
 5           Q.    -- that's Exhibit 797?
 6           A.    Mm-hmm.
 7           Q.    I'd like to skip down to the next
 8      paragraph, and it states there "The foregoing
 9      valuations are based on a number of assumptions."
10      Did you review and analyze any of those
11      assumptions?
12           A.    I have not.
13           Q.    The last sentence of that second
14      paragraph under Section E states "The value of an
15      operating business such as debtor's business is
16      subject to uncertainties and contingencies that
17      are difficult to predict and will fluctuate with
18      changes in factors affecting the financial
19      condition and prospects of such a business,"
20      period.  Did I read that correctly?
21           A.    Yes.
22           Q.    Do you believe that to be an accurate
23      statement?
24           A.    Yes, I do.
```

1    Q.    You can put that aside.  I'd now like to

2    look at another aspect of your conclusions, and

3    that is -- or remark again on page 25.

4         It's in the third line on that page

5    where you write "The board's inability to come to

6    real decisions was aided by a stream of inherently

7    un-executable proposals brought to them by Lee

8    Morgan and Candlewood.  Candlewood, besides

9    disrupting the marketing and negotiating processes

10   of Houlihan, appeared to just feed Lee Morgan's

11   fantasies."  Do you see that?

12   A.    I do.

13   Q.    You understood Candlewood was submitting

14   proposals between November 2007 and about June

15   2008, correct, to the Special Transaction

16   Committee?

17   A.    Yes.

18   Q.    Do you attribute any part of the 20 to

19   30 million dollars in alleged lost value to

20   anything Candlewood had done?

21   A.    Not to what Candlewood specifically had

22   done, but certainly to holding out the idea that

23   somehow there was this better deal at much higher

24   valuation, which Candlewood in my view certainly

1    aided that, and that created that fantasy, if you

2    will.

3       Q.    Well, again, those fantasies and that

4    course language aside, the question is whether you

5    can attribute any part of the 20 to 30 million

6    dollars in alleged lost value to Candlewood's or,

7    as you like me to do, Mr. Morgan's participation

8    in the sale process?

9       A.    I absolutely do.

10      Q.    How much of the 20 to 30 million

11   dollars?

12      A.    By my guess, because of the idea that

13   somehow there was a consensual deal available to

14   them, that somehow Candlewood nor -- and

15   Mr. Morgan together, because they couldn't get

16   what they wanted, ended up basically killing off

17   the -- the Whitney deal, and that was the

18   undercurrent throughout that whole '07/'08 period.

19      Q.    How did Candlewood kill the Whitney

20   deal?

21      A.    They didn't kill the Whitney deal.

22      Q.    How did Mr. Morgan --

23      A.    I'm making a causal argument.  I'm

24   saying that -- that the belief that somehow there

```
 1    was a better deal out there despite the fact that

 2    over 170 contacts were made with buyers in this

 3    marketplace for this particular company and

 4    numerous NDAs executed, in review of the

 5    confidential information, memorandum and -- and

 6    actual bids in that whole process -- despite all

 7    that, they still held out the idea that somehow

 8    there was a better deal out there for the -- for

 9    all the constituents.

10         Q.    And, in fact, it turns out, doesn't it,

11    that Mr. Morgan and Candlewood were a little

12    prescient because during the time that they were

13    participating in the process, J.H. Whitney

14    increased its offer by $10 million?

15         A.    I disagree with your -- with your --

16    with your making that connection.

17         Q.    I'm not making any connection.  Just

18    telling you that during the time Candlewood and

19    Mr. Morgan were participating in the process

20    between March 2008 and June 2008, Whitney, as a

21    matter of fact, increased its letter of intent

22    price from 44 million to 54 million; isn't that

23    correct?

24         A.    They did.
```

1      Q.    Okay.  Let me ask you this:  When it

2   comes to the 20 to 30 million dollars in alleged

3   lost value, how much of that lost value is

4   attributable to anything Mr. Morgan did as opposed

5   to anything the board of directors generally did,

6   in particular the Special Transaction Committee?

7       A.    You'll have to restate the question.

8       Q.    Sure.  How much, if any, of the 20 to 30

9   million dollars in alleged lost value do you

10  consider to have been caused by anything

11  Mr. Morgan or Candlewood partners did?

12      A.    I think they were very much involved

13  with the loss of that -- that amount of money

14  including actions taken by the board and -- and --

15  yeah, I do.

16      Q.    I'm asking you do you attribute a

17  specific part of the 20 to 30 million dollars in

18  lost value to any specific conduct of Mr. Morgan

19  or Candlewood, and how much of that alleged loss

20  in value do you attribute or do you consider being

21  caused or proximately caused by their conduct?

22      A.    I certainly think it's proximately

23  caused by their conduct and by their -- and by how

24  the business and the company and the board of

1    directors and the Special Transaction Committee

2    interacted with them and with the -- despite all

3    evidence that this was not going -- there was not

4    going to be a better deal, and there was a lot of

5    evidence to that.

6         Q.    And the only reason the company lost

7    that value, in your mind, is because it didn't

8    close the Whitney deal, correct?

9         A.    Yes, principally, yes.

10        Q.    And the reason the Whitney deal didn't

11   close on this record is because an independent sub

12   trustee voted 85 percent of the company's shares

13   to remove the board that was considering the

14   definitive agreement with Whitney; isn't that

15   true?

16        A.    I believe it's true that his action --

17   Ken Lenoir's action certainly -- certainly did

18   that, but --

19        Q.    And but for Ken Lenoir's action, is it

20   also true that presumably the Special Transaction

21   Committee would have pursued a deal through a 363

22   sale with J.H. Whitney if not a higher bidder?

23        A.    It looked that way.

24        Q.    Sticking with your conclusion section,

1    I'd like you to go to the first paragraph, please,

2    of page 24.

3        A.    Okay.

4        Q.    You conclude there that it would

5    trivialize matters to opine on the decisions that

6    led to the demise of The Antioch Company as simply

7    being miscalculations.

8            Are those the decisions in 2003 to enter

9    into the hundred percent ESOP transaction?

10       A.    That's correct.

11       Q.    Okay.  And you're saying they weren't

12   just miscalculations?

13       A.    I think they saw what was there, and

14   they neglected to really deal with what -- what

15   would be potentially the case.

16       Q.    Are you saying it's something other than

17   miscalculations?

18       A.    I'm saying that they decided to move

19   ahead despite some reasonable evidence that things

20   could be a lot worse than they turned -- than they

21   thought they would be -- or that things could be a

22   lot worse and they decided to go anyway.

23       Q.    And you said that despite never having

24   seen a single board of director's presentation or

1    a slide presentation made during the entire 2003

2    calendar year to the board of directors?

3         A.    Please restate.

4         Q.    I'm asking that that is your view

5    despite the fact that you have never seen or

6    reviewed a single presentation made to The Antioch

7    Company Board of Directors during the entire

8    calendar year 2003 about the transaction?

9         A.    I'm trying to think if I've seen

10   anything in that regard.

11        Q.    You've already testified a number of

12   times that you did not.

13        A.    It's based on --

14        Q.    Sir, I'm not asking what it's based on;

15   I'm asking you a simple question.

16        A.    Yeah.

17        Q.    The very, very serious allegation you

18   make against people who spent countless hours with

19   some of the best advisors in the country in trying

20   to do the right thing by the company and its

21   employees -- you're making very serious

22   allegations here.

23        A.    I am.

24        Q.    What I'm saying is if it was -- your

```
 1    holding your views without ever having -- I'm just

 2    confirming you're holding those views without ever

 3    having reviewed a single presentation made to the

 4    board of directors throughout the entire year 2003

 5    that included information upon which they based

 6    their decision to proceed with the transaction?

 7         A.   In that narrow, narrow characterization,

 8    yes.

 9         Q.   Okay.  And you're also making those very

10    serious allegations against, you know, very

11    dedicated and smart people who worked very hard to

12    close a very complex transaction without ever

13    having reviewed any GreatBanc or Duff work papers

14    in regard to analyzing the fairness of the

15    transaction from the ESOP's perspective?

16              MS. ANDREW:  Objection to the

17    assumptions in the question.  You can answer.

18         A.   Please restate.  I lost my flow.

19         Q.   You maintain to hold your very harsh

20    judgment of a group of people that worked very

21    hard over a -- throughout a year-long process to

22    consider a transaction without ever having

23    reviewed any of the work papers of GreatBanc Trust

24    or Duff & Phelps or any of the analyses of either
```

```
 1     of those entities that led them to conclude that

 2     the transaction was financially fair to the ESOP

 3     and its beneficiaries?

 4               MS. ANDREW:  Same objection.

 5          A.    I'm struggling with your question.

 6          Q.    I don't know why.

 7          A.    Why don't you try me again.

 8          Q.    Sure.  I'm just confirming that your

 9     views about the board's decision to move forward

10     with this transaction -- that it was something

11     more than just a miscalculation -- is made despite

12     the fact you did not review any of the work papers

13     or analysis performed by the GreatBanc Trust

14     Company or Duff & Phelps leading to their opinion

15     that the transaction terms and the transaction

16     price was fair to the ESOP and its participants

17     from a financial point of view?

18          A.    Fair to the ESOP and the participants...

19     I'm struggling with that part of it.  Are you --

20          Q.    Did you look at any work that GreatBanc

21     and Duff did to improve the transaction on behalf

22     of the ESOP?

23          A.    I did not have access to that

24     information.
```

```
 1        Q.    Did you review any emails or
 2   correspondence between Lee Bloom and Helen
 3   Morrison, neither of which you knew before I
 4   introduced them to you at this deposition,
 5   negotiating the transaction on the one side Lee
 6   Bloom for the ESOP, and on the other side Helen
 7   Morrison for the company?
 8        A.    I have not seen those.
 9        Q.    And yet you still feel confident in your
10   opinion that the board's decision to move forward
11   was more than just a miscalculation?
12        A.    Yes.
13        Q.    Okay.  And you also hold that view even
14   though you haven't looked at a single repurchase
15   obligation study that Mr. Hoskins prepared and
16   presented to the board about the effect of the
17   transaction on the company's liabilities in that
18   regard?
19        A.    I understand Mr. Hoskins' repurchase
20   liability --
21        Q.    I'm not asking for your understanding of
22   it.  The simple question is this --
23        A.    My understanding is he was nowhere near
24   what happened, not even close.
```

```
 1         Q.    You're making that judgment because the
 2   Taft lawyers told you that?
 3         A.    Making that judgment because that was a
 4   conversation that we discussed with the Taft
 5   lawyers at various times when we went through
 6   this.
 7         Q.    You're not --
 8         A.    It was nowhere near the redemption level
 9   that happened.
10         Q.    You're not basing that in any review --
11         A.    I want to make sure that people know
12   that it's not what -- it's not that somebody was
13   estimating was $110 million, because it was
14   nowhere close.
15         Q.    Well, the point is you didn't look at
16   any work Mr. Hoskins did to estimate the
17   repurchase obligation liability; is that right?
18         A.    I didn't, but I was told that it was
19   somewhere around 25 million at the max.  It was
20   obviously far less than what happened.
21         Q.    If what you were told was wrong, might
22   that change your opinion?
23         A.    I'd have to see it.
24         Q.    Okay.  But you didn't see it?
```

1        A.      Hmm-mm.

2        Q.      The answer was you did not see it?

3        A.      The answer is I did not see it.

4        Q.      And did you look at any of Mr. Hoskins'

5    PowerPoint presentations about the repurchase

6    obligation that the board relied upon in part in

7    voting in favor of the transaction?

8        A.      I did -- I did not.

9        Q.      Okay.  Did you review any of the

10   presentations the board received from Helen

11   Morrison of Deloitte that they took into account

12   in approving the transaction?

13       A.      If it wasn't in my group of things that

14   I had, I have not.

15       Q.      Did you look at any presentations that

16   Lee Bloom or Marilyn Marchetti made to the Antioch

17   board that they took -- that the board took into

18   account in voting to approve the transaction?

19       A.      No.

20       Q.      Did you take a look at any of Marilyn

21   Marchetti's or Duff & Phelps through Lee Bloom's

22   report to the GreatBanc Trust Fiduciary Committee

23   that the GreatBanc Trust Fiduciary Committee

24   relied upon in approving an opinion that the

```
 1   transaction was fair to the ESOP and its

 2   participants?

 3        A.   I did not.

 4        Q.   Did you review any of the due diligence

 5   materials contained in the files of the banks that

 6   lent into the 2003 transaction?

 7        A.   I didn't.

 8        Q.   Did you review any of the deposition

 9   transcripts of the bank representatives who were

10   called upon to analyze the transaction from the

11   bank's perspective, in particular, the company's

12   ability to repay the debt that they were lending

13   into the transaction?

14        A.   They were not in my file.

15        Q.   Okay.  Did you ask the Taft lawyers to

16   provide you with any of that information as you

17   were going through and preparing your report and

18   formulating your opinions?

19        A.   No.  I took from the various reports

20   that I had, the data from there.

21        Q.   If you look at the third sentence of

22   your first paragraph, you write "The Morgans, the

23   board of directors, and the ESOP trustee, both

24   GreatBanc and Evolve, had every opportunity to act
```

1    otherwise to review and heed the historical

2    evidence and to call upon disinterested expertise

3    to assist them in making responsible fiduciary

4    decisions," period.  "This did not happen,"

5    period.  Do you see that?

6         A.    I do.

7         Q.    Pretty severe judgment you're making

8    there, isn't it?

9         A.    It is.

10        Q.    You're making that without ever having

11   seen anything that GreatBanc or any of its

12   employees or advisors did to try to satisfy their

13   fiduciary duties?

14        A.    No, I did not.

15        Q.    Okay.  And you don't have any experience

16   at all, do you, in advising ERISA fiduciaries

17   about their particular duties, do you?

18        A.    No.

19        Q.    Again you use this phrase "the Morgans."

20   Who do you mean there?

21        A.    I suppose I mean specifically Lee

22   Morgan, and I'm probably including in that, having

23   thought through this, Asha Moran Morgan at the

24   same time, but Lee Morgan principally.

```
 1        Q.    Okay.  And do you believe that GreatBanc
 2   did not call upon disinterested expertise to
 3   assist them in making a responsible fiduciary
 4   decision?
 5        A.    I believe they got the advice they got,
 6   and I certainly wasn't -- wasn't -- I think they
 7   got the advice they got, and I didn't think it was
 8   very good advice.
 9        Q.    Sir, you don't even know what advice
10   they did get, do you?  You've never seen a work
11   paper, a single piece of advice that GreatBanc got
12   from any of its advisors, did you?
13        A.    No.
14        Q.    Did you know GreatBanc hired independent
15   counsel from Jenkens & Gilchrist?  Are you
16   familiar with that law firm?
17        A.    I am.
18        Q.    Are you familiar with their spot in ESOP
19   and ERISA space?
20        A.    I assume by your comment that it must be
21   highly regarded.
22        Q.    It's very highly regarded.  Do you
23   believe that the board's engagement of Houlihan
24   Lokey was not a call upon disinterested expertise
```

1    to assist the board in making a responsibile

2    fiduciary decision?

3        A.    I believe that the -- the Houlihan Lokey

4    opinion was highly narrow -- it was very narrow

5    relative to the share price and not the -- they

6    didn't -- there was not an opinion or a -- or a --

7    or an advisory as to the total transaction.

8        Q.    I didn't see you produce the Houlihan

9    opinion.  I take it you didn't read it?

10        A.    I didn't read it.

11        Q.    I didn't see a single piece of Houlihan

12    modeling or work papers in your production.  I

13    assume you didn't see that either?

14        A.    Not from that period, no.

15        Q.    You don't know how narrow or appropriate

16    the opinion was, do you, sir?

17        A.    I know what I've been told as we were --

18        Q.    Told by who?

19        A.    Through my -- with Taft counsel -- with

20    Taft.

21        Q.    I don't even know if Kelly could get

22    that down.  By who were you told?

23        A.    In conversations with the Taft lawyers

24    about the transaction.

1      Q.     Okay.

2      A.     And in addition to doc- -- as it was --

3  as it's summarized in some of the complaint

4  documents.

5      Q.     Do you believe that the board didn't

6  call upon disinterested expertise when it engaged

7  McDermott, Will & Emery to advise it as legal

8  counsel in respect to the 2003 transaction?

9      A.     They're a law firm.  They advise them.

10      Q.     So the board had McDermott, Will, you

11  recognize, as its legal advisors?

12      A.     I do.

13      Q.     You recognize McDermott, Will & Emery is

14  also a prominent law firm in the ERISA/ESOP

15  advisory space?

16      A.     If you say so.

17      Q.     You have no reason to disbelieve that?

18      A.     I do not.

19      Q.     And you have no reason to disbelieve

20  that Houlihan Lokey is one of the most prominent

21  national advisors in the ERISA, slash, ESOP

22  space; is that right?

23      A.     Yes.

24      Q.     And you have no reason to doubt that

```
 1    Deloitte & Touche is one of the most prominent, if
 2    not the most prominent, financial advisor in the
 3    ERISA/ESOP space, and in particular, in 2003?
 4         A.    Mm-hmm, yes.
 5         Q.    So the board, in considering over a full
 6    year a very complex transaction in 2003 where the
 7    company was going to become owned 100 percent by
 8    its ESOP, engaged McDermott, Will & Emery, a top
 9    law firm in that space, Houlihan Lokey, a top
10    financial advisor in that space, Deloitte &
11    Touche, a top financial advisor in that space,
12    GreatBanc, one of the leading institutional
13    independent ESOP trustees who, in turn, hired Duff
14    & Phelps, one of the most prominent financial
15    advisors in that space, and GreatBanc also hired
16    Jenkens & Gilchrist, one of the most prominent
17    legal advisors in that space -- knowing all that
18    now, do you still believe that the board somehow
19    failed to call upon disinterested expertise to
20    assist it in making responsible fiduciary
21    decisions?
22         A.    I believe that they did not look at what
23    needed to be looked at, and they were cherry
24    picking what they thought was the right thing to
```

1    do.

2         Q.    You haven't seen a single document --

3         A.    You asked me what I believe.

4         Q.    Okay.  Very well.  I just want to

5    confirm you've not seen a single document that

6    identifies what advice the board took or might not

7    have taken from any one of those financial

8    advisors?

9         A.    I think I confirmed that already.

10         Q.    Okay.  I want to turn your attention,

11    please, if you would to the third paragraph of

12    your conclusions where you write (as read) In

13    spite of the overwhelming evidence, dash, evidence

14    that would be incontrovertible to any qualified

15    financial and transaction professional, double

16    dash, of the precariousness of their underlying

17    assumptions, the Morgans, with the consent of the

18    board of directors, entered into a bargain with

19    the ESOP trustee that literally drained the

20    company of its working capital while at the same

21    time creating an irresistible incentive for

22    numerous employees to leave the company.  Did I

23    read that correctly?

24         A.    Yes.

1       Q.    What evidence are you referring to there

2   that will be incontrovertible to the qualified

3   financial and transactional professionals that we

4   just identified were engaged by the board to

5   assist it in executing it's fiduciary

6   responsibilities?

7       A.    Well, first, nobody looked at what would

8   happen with the impact of the redemptions.

9       Q.    How do you know that, sir?

10      A.    Well, because it -- how could you -- if

11  you did, would you go ahead and do this?

12      Q.    Did you see any of the repurchase

13  obligation studies that were performed by

14  Mr. Hoskins?

15      A.    I haven't, but I understood.

16      Q.    Did you see any of the repurchase

17  obligation studies performed by Duff & Phelps on

18  behalf of GreatBanc?

19      A.    I have not.

20      Q.    Did you see any other repurchase

21  obligation study done by Deloitte & Touche in

22  assessing the feasibility of the transaction to

23  the board?

24      A.    If they came out with the -- if the

```
 1   feasibility studies showed what occurred even

 2   close, nobody would have done this.

 3        Q.    Sir, you recognize that -- well, let's

 4   move on.

 5        A.    Mm-hmm.

 6        Q.    What evidence did you see that was

 7   before the board of directors as of December 16th,

 8   2003, immediately before deciding to proceed with

 9   the transaction that would be incontrovertible to

10   any qualified financial and transactional

11   professional to lead them to believe that the

12   underlying assumptions of the transaction were

13   precarious, as you state?  What evidence?  Point

14   me to a single piece of evidence.

15        A.    Evidence of what?

16        Q.    The evidence you're referring to.

17        A.    Evidence of the capital restructure?

18   Evidence of the redemption levels?  What

19   evidence?

20        Q.    I didn't write this report.

21        A.    I know, but you're asking me the

22   questions.

23        Q.    Well, I'm asking you what you mean.  In

24   spite of the overwhelming evidence --
```

1          A.    You had a --

2          Q.    -- evidence that would be

3    incontrovertible -- let me put it -- instead of

4    using your words, let me substitute in the names

5    of the advisors.

6               Let's look at it this way,

7    Mr. Greenberg:  In spite of the overwhelming

8    evidence, evidence that would be incontrovertible

9    to Duff & Phelps and GreatBanc and Deloitte &

10   Touche and Houlihan Lokey and McDermott, Will &

11   Emery and Jenkens & Gilchrist of the

12   precariousness of the underlying assumptions, I'd

13   like to know what evidence all of those nationally

14   prominent advisors had before them that should

15   have been incontrovertible to them that the

16   assumptions underlying the proposed transaction

17   were precarious?

18               (Attorney Maffett left the room.)

19          A.    I've said it many times.  You had a

20   catastrophe of a balance sheet.  You had -- you

21   had all the potential -- which it increasingly

22   occurred anyway, it just took time through the

23   2003 through 2008 period -- of insolvency.

24               You had enormous amounts of redemptions

1    and people leaving the company.  You've burdened

2    the company with substantial amounts of debt.

3    There's a lot of things that were evidence of it.

4    And let me finish.

5            And not only that, you had prior

6    years -- where in a period of three years prior,

7    you had somewhere close to 30, 33 million dollars'

8    worth of redemptions, and then you end up with 110

9    million -- I'll use your number -- in the

10   following -- in the year following the

11   transaction.

12           800 out of 1,115 employees leave the

13   company, and you're burdened with this enormous

14   amounts of debt that certainly assumed a lot of

15   capital and cash of the company, prevented it in

16   my view from doing a lot of different things that

17   may have prevented it going into the bankruptcy it

18   did.

19       Q.   What analyses of the company's ability

20   to fund the debt it was undertaking that was

21   before the board of directors and all of the

22   advisors we just mentioned did you look at and

23   analyze to determine whether or not it was

24   reasonably prepared?

```
 1         A.    I'm looking at --

 2         Q.    What you're doing basically is in 2013

 3  looking back to what happened, and I'm asking you

 4  to focus on December 15th, 2003.

 5         A.    Mm-hmm.

 6         Q.    And I'd like to know how, not having

 7  looked at a single work paper prepared by any of

 8  the most prominent financial professionals, folks

 9  far more prominent than you, sir, prepared and

10  gave to a board of directors to support a

11  transaction -- how you are able to give an opinion

12  about the board's conduct without ever having seen

13  a single work paper, analysis, board minute, or

14  evidence of a board discussion about this

15  transaction.  How could you do that?

16         A.    I've done it.  I've looked at it.  I saw

17  what happened.  I looked at the decisions that

18  were made.  And I have to scratch my head and

19  figure out how would -- why would anybody do this?

20         Q.    And you know why you're scratching your

21  head?  Because you didn't see a single piece of

22  information that the board was relying upon --

23         A.    That's your --

24         Q.    -- that they were given --
```

```
 1          A.    That's your --
 2          Q.    -- by some of the most prominent
 3   financial advisors in the country at the time;
 4   isn't that true?
 5          A.    No, that's not true.
 6          Q.    Okay.
 7          A.    You cannot make assumptions about what
 8   I'm thinking.  You're pretty good.
 9          Q.    I am pretty good at that.
10          A.    Oh, yeah, you're wonderful.
11          Q.    You said something about the company in
12   your view in your 20/20 -- I think the jury will
13   recognize the term Monday morning quarterback look
14   back -- an issue that the company could have
15   undertaken that would have prevented the
16   bankruptcy.  What issue are you talking about,
17   that they didn't have cash to fund that would have
18   prevented a bankruptcy?
19          A.    I think you would -- this whole -- I'm
20   not suggesting that it would have prevented the
21   bankruptcy; what I'm suggesting is they probably
22   wouldn't have done it the way they did it to start
23   with.
24          Q.    Well, I don't think anybody would tell
```

```
 1    you that looking back in hindsight they may or may

 2    not have done the transaction.  The question is

 3    really what information the board had at the time.

 4    And you don't know that, so I'm trying to -- I'm

 5    trying to move from that --

 6         A.    I'm trying to find where you -- what

 7    you're referring to.

 8         Q.    I'm referring to your testimony.

 9         A.    Well, show me where you're referring to.

10    Is it anything in here?

11         Q.    No.  It's in your testimony.

12         A.    No.  What I'm saying is that if you

13    looked at what happened, you -- they would have --

14    they would have looked at the potential for what

15    would have occurred given -- given the dramatic

16    change in the financial profile of the company and

17    its financial characteristics -- given all that

18    and given the evidence of what the previous

19    redemption levels were, you may have considered

20    doing this very differently.

21              Instead, the cash went out the company.

22    It went to pay service -- very expensive service

23    debt, service sub debt, and redemptions.  None of

24    it made it really back in.  I know you argue that,
```

```
 1    but if I look at current assets over the same
 2    period, it's very clear to me that the money
 3    wasn't really making it back into the capital of
 4    the company.
 5        Q.    Yeah, you haven't seen any evidence,
 6    though, of how the company used its post-
 7    transaction cash at all to fund, for example, new
 8    initiatives that would help it compete in the
 9    marketplace?
10        A.    With the -- yeah, what I've read is that
11    there are -- were numerous -- and we'll -- I can't
12    point out each one of them because I don't
13    remember every document.  There were many comments
14    by the private equity groups and certainly also in
15    the summaries by the investment bankers that these
16    initiatives were not terribly promising.
17        Q.    Which --
18        A.    The digital.
19        Q.    And did you analyze or take into account
20    whether any of the private equity group people
21    making those remarks had the expertise in the
22    scrapbooking and memory preservation industry to
23    make that judgment?
24        A.    I believe one did.
```

1      Q.    Who?

2      A.    I can't offhand...

3      Q.    Yeah, I figured.

4      A.    It's been a long day.  I know you

5  figured.

6      Q.    I figured as much.

7      A.    It's there.  We could certainly find it

8  for tomorrow, if you like.

9      Q.    Well, sir, I'm here today, and you knew

10  we were coming here today, and you knew the

11  purpose today was to do some discovery and to go

12  through your opinions, and you should have been

13  prepared in that regard.

14      A.    Mm-hmm.

15      Q.    One other aspect of the conclusion in

16  your report has to do with $6 million on

17  professional fees in the process?

18      A.    Yeah.

19      Q.    First of all, that $6 million figure,

20  what period does that cover?

21      A.    '7/'8.  2007/2008.

22      Q.    And how many of those fees were spent by

23  the company before Mr. Lenoir exercised his rights

24  as an 85 percent shareholder and removed the

```
 1  board?

 2       A.    I don't know.

 3       Q.    You don't know?

 4       A.    You're asking how much those fees were

 5  spent prior to Mr. Lenoir exercising his right to

 6  dismiss the board?

 7       Q.    Yes.

 8       A.    The answer is I don't know.

 9       Q.    Okay.  And I take it, then, you don't

10  know how many of those fees were spent by the new

11  board that Mr. Lenoir appointed after he fired

12  what I'll call the old board?

13       A.    I know that Skadden came in.  I know

14  that --

15       Q.    I wasn't asking you who came in.  I was

16  asking you to --

17       A.    I don't -- I don't have -- I don't have

18  it broken out.

19       Q.    So you can't allocate that $6 million --

20       A.    I haven't, no, and I can't.

21       Q.    You can't allocate that $6 million

22  between the new board and the old board, correct?

23       A.    That's correct.

24       Q.    Can you allocate that $6 million among
```

```
 1    different advisors?

 2         A.    Not offhand, no.

 3         Q.    Do you believe that the company received

 4    any value out of the fees it paid Houlihan Lokey

 5    that ultimately brought the Whitney deal to the

 6    company and that it couldn't close for no reason

 7    other than Mr. Lenoir's actions?

 8         A.    (No response.)

 9         Q.    Under your view.

10         A.    Restate your question.

11         Q.    Do you know how much of that $6 million

12    was spent on Houlihan Lokey, for example?

13         A.    I don't remember exactly what their

14    retainer fees were.  I don't remember.

15         Q.    Do you feel that the company -- that

16    Houlihan Lokey provided value to the company

17    throughout the sale process?

18         A.    I do.

19         Q.    Were there any other professionals other

20    than Houlihan Lokey who received any aspect of

21    that $6 million that you can recall?

22         A.    Were there any other advisors that

23    received some of that money?

24         Q.    Yes.
```

```
 1        A.   I would assume that the law firms were

 2   receiving some of that money and...

 3        Q.   Did you ever see any underlying

 4   documentation to --

 5        A.   I have not.

 6        Q.   I'm sorry?

 7        A.   I have not.

 8        Q.   Have you done any sort of independent

 9   analysis to determine what value, if any, the

10   company got from any of the advisors that were

11   paid any portion of that $6 million?

12        A.   I don't know how you would do an

13   analysis of what value they got.  The company went

14   into bankruptcy.

15        Q.   So the answer is, no, you haven't done

16   an analysis?

17        A.   The answer is I wouldn't know how to do

18   it anyway.

19        Q.   Fair enough.  What's the source of the

20   $6 million figure that you list in your report?

21        A.   It was an estimate that I received.

22        Q.   Who did you receive that from?

23        A.   From the Taft lawyers.

24        Q.   I'm sorry?
```

1       A.      From the Taft lawyers.

2               MR. SCHEIER:  I'll have to take a short

3       break.

4               (A brief break was taken.)

5       Q.      (By Mr. Scheier)  Mr. Greenberg, I want

6       to stick with the numbers with regard to loss of

7       value and professional fees that appear on page 25

8       of your report.

9       A.      Mm-hmm.

10      Q.      When you had written that the lost value

11      as was -- whatever you attribute that to -- the

12      lost value you reference there you say is between

13      20 and 30 million dollars, is that independent of

14      the 6 million in professional fees?

15      A.      Yes.

16      Q.      Now, am I to understand that at this

17      point, to measure lost value, your two data points

18      are, at the one end, the $54 million that Whitney

19      offered in its LOI and the 31 to 38 million

20      dollars that CRG estimated as being the value of

21      the company in the disclosure statement?

22      A.      Yes.  Fair enough.

23      Q.      And so I want to just kind of bring to

24      bear -- you probably learned how poor I am at math

1    generally, but I just want to understand, then, is

2    it fair to say that in looking at lost value and

3    doing the simple arithmetic using your two data

4    points, it's somewhere between -- at the low end

5    of the lost value, you take 54 million of Whitney

6    and subtract 38 from CRG to get to $16 million in

7    lost value, and at the other end, you take the 54

8    from Whitney and you subtract out the 31 million,

9    the low end of CRG's value, to get to 23 million?

10        A.    Close enough.

11        Q.    And so as I understand that, then, the

12   value ranges of what the company lost in terms of

13   value in your opinion is somewhere between 16 and

14   23 million dollars?

15        A.    Yeah, I guess if we do it off the

16   Whitney number.

17        Q.    And you've advocated here today doing it

18   off the Whitney number, correct?

19        A.    Fair enough.

20            MR. SHARKEY:  Can I hear that answer?

21            MR. SCHEIER:  He said, Fair enough.

22        Q.    (By Mr. Scheier)  I take it "fair

23   enough" means yes, which is probably why

24   Mr. Sharkey wanted to hear that response again?

1      A.    It did.

2      Q.    In considering any lost value that you

3  perceive the company suffered between May of 2008

4  and the time that CRG undertook its analysis, did

5  you consider any other economic or market factors

6  that might have impacted the company's value

7  between the May time frame and the bankruptcy?

8      A.    You mean interim from the Whitney offer?

9      Q.    Yes.

10     A.    Post -- the interim post-Whitney?

11     Q.    Yes.  From about the time of the Whitney

12 offer through the bankruptcy in terms of

13 estimating lost value, did you take into account

14 any economical market factors that may have

15 impacted the value of the company?

16     A.    I haven't.

17     Q.    Let me take a step back.  In looking at

18 the deterioration in The Antioch Company's sales

19 and financial condition between 2003 and 2008, did

20 you take or -- take into account or consider any

21 economic or market factors that might have

22 impacted the company's sales and business and

23 value in general during that period?

24     A.    I'm not sure what you mean by take into

```
 1   account.
 2       Q.    Yeah.   In terms of an opinion or the
 3   general tenor of your report that there was
 4   something about the 2003 transaction that caused
 5   the company ultimately to fail, I was wondering
 6   whether in coming to that conclusion, to the
 7   extent it is your conclusion, that -- whether you
 8   took into account economic or market factors that
 9   might have either completely caused or in part
10   caused the company's declining financial condition
11   between 2003 and 2008?
12       A.    Fair enough.   The way I've addressed it
13   is that to the extent the company was very
14   burdened with the redemptions and with the -- with
15   its debt, that it was in a position where it was
16   not able to address issues that could have been
17   occurring at the time.   But there's no doubt
18   that -- that, you know, we went through some
19   different types of economic times from '07 and
20   '08.
21       Q.    I apologize.   My question might not have
22   been clear or you didn't hear it right.   The last
23   question involved the time period stretching from
24   let's call it December 16th, 2003, through the
```

```
 1   filing of the bankruptcy and whether you took into
 2   account any market or economic factors independent
 3   of the 2003 transaction that caused the company
 4   financial distress?
 5        A.    If you're asking me do I -- do I -- do I
 6   agree that market factors, including competition,
 7   was putting pressure on the company financially,
 8   the answer's yes.
 9        Q.    And can you identify the factors that
10   you considered and took into account that the
11   company -- that affected -- impacted the company's
12   financial condition between 2003 and 2008?
13        A.    In addition to its capital structure and
14   all that?
15        Q.    Yes.  Yes, that's a -- thank you for the
16   clarification.
17        A.    Yeah, um --
18        Q.    Market or economic factors --
19        A.    Yeah, they were -- they were losing
20   marketshare to -- to other forms of competitors
21   including different technologies and retailers,
22   e-tailors, and variety of other means to acquire
23   the product.  That was certainly having an impact.
24   And they were -- they were not able to certainly
```

1    adequately change the curve on that during that

2    whole period.  But certainly, you know, I do

3    believe that had an impact on the company.

4         Q.    Anything other than competition that had

5    a negative impact on the company's financial

6    condition such as the general economic climate?

7         A.    Certainly the general economic climate

8    beginning probably in earnest in '08 but -- but

9    the beginnings of it in '07 would have had some

10   impact.

11        Q.    Okay.

12        A.    I have others.  The -- there were also

13   the -- you know, from what I know of network

14   marketing companies of the sort and -- and that

15   the ability to keep the consultants and the

16   recruitment levels higher, that seemed to have

17   been falling off at the same time.  That may also

18   be an impact of any number of things -- the

19   competition, economic environment.  So there

20   were -- there were several things that were

21   involved.

22        Q.    And did you make any effort to quantify

23   the impact of those economic or market forces that

24   operated to the company's detriment independent of

```
 1    its capital structure or the 2003 transaction?

 2         A.    I just saw the -- the -- there changes

 3    in revenue as an indicator that obviously they

 4    were getting hit and there was multiple issues

 5    there.

 6              My point about the capital structure

 7    more than anything was -- it hamstrung their

 8    ability to address competitive issues and other

 9    issues.  The company became essentially insolvent

10    and becomes very difficult to address issues when

11    you're -- you don't have the cash.

12         Q.    Just a few additional questions, sir.

13    Were you asked to formulate any opinion in this

14    matter other than the ones you've given but you

15    felt you were unable to give?

16         A.    No.

17         Q.    Has the Taft law firm asked you to do

18    any of the work in regard to this engagement since

19    you finalized your opinions?

20         A.    No.  The only work we've done has been

21    discussion about the deposition and my reviewing

22    documents.  That's all.

23         Q.    Have you completed all the work that you

24    deem to be necessary to finalize your opinions in
```

1    your report?

2         A.    I believe so.

3              MR. SCHEIER:  I believe that's all I

4    have.  Thank you for your time today.

5              (Whereupon, the deposition was adjourned

6    at 5:10 p.m.)

7

8

9                        _____

10                        MARK A. GREENBERG

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                         CERTIFICATE

 2   STATE OF OHIO       :
                         : SS
 3   COUNTY OF HAMILTON:

 4            I, Kelly Green, the undersigned, a duly

 5   qualified and commissioned Notary Public within

 6   and for the State of Ohio, do hereby certify that

 7   before the giving of the aforesaid deposition, the

 8   said MARK A. GREENBERG was by me first duly sworn

 9   to tell the truth; that the foregoing is a true

10   and accurate record of the testimony given at said

11   time and place by said deponent; and that said

12   deposition was taken by me in stenotype and

13   transcribed by computer-aided transcription, and

14   that signature is not waived.

15            I certify that I am not a relative,

16   employee of, or attorney for any of the parties or

17   attorneys in the above-captioned action; I am not

18   financially interested in the action; I am not

19   under a contract as defined in Civil Rule 28(D).

20            IN WITNESS WHEREOF, I hereunto set my

21   hand and official seal of office at Cincinnati,

22   Ohio, this 29th day of August, 2013.

23            _____
     My Commission expires:      Kelly Green, RPR
24   August 10, 2014        Notary Public, State of Ohio
```

# ERRATA SHEET

United States District Court – Southern District of Ohio
Western Division - Case No. 3:10-cv-00156
The Antioch Company Litigation Trust vs. Lee Morgan, et al.
Volume II

Listed below are any changes made to the transcript of MARK A. GREENBERG taken on August 26, 2013.

| PAGE | LINE | CHANGE |
|---|---|---|
| 356 | 13 | "interjectories" should be "trajectories" |
| 356 | 7 | "pitch decs" should be "pitch decks" |
| 361 | 12 | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I, MARK A. GREENBERG, do hereby swear or affirm that I have read the transcript of my deposition taken on August 26, 2013, and listed above are all the changes that I wish to make to that transcript.

_____
MARK A. GREENBERG

# ERRATA SHEET

United States District Court – Southern District of Ohio
Western Division - Case No. 3:10-cv-00156
The Antioch Company Litigation Trust vs. Lee Morgan, et al.
Volume I

Listed below are any changes made to the transcript of MARK A. GREENBERG taken on August 26, 2013.

| PAGE | LINE | CHANGE |
|---|---|---|
| 86! | 8 ! | "decorum" should "quorum," |
| 91! | 2 ! | "Ryan Style" should be "Rhinestahl" |
| 124! | 7 ! | "quick price guarantee" should be "put price guarantee" |
| 136! | 5 & 6 ! | "... 1000 dollars" should be "... 1000 employees"_ |
| 141! | 7! | "customer" should be "customary" |
| 145! | 9! | " Dechard" should be "Dechert" |
| 163! | 23! | "you were unaware ..." should be "you were aware..." |
| 166! | 6! | "extent" should be "excess" |
| 167! | 1! | "extent" should be "excess" |
| 176! | 4! | "convergent" should be "converted" |
| 181! | 21! | "and" should be "in" |
| 186! | 10! | "scope" should be "code" |
| 251! | 22! | "asymptote" should be "asymptote" |
| 283! | 21! | "concluded" should be "included" |

I, MARK A. GREENBERG, do hereby swear or affirm that I have read the transcript of my deposition taken on August 26, 2013, and listed above are all the changes that I wish to make to that transcript.

MARK A. GREENBERG