# Silverstone Advisors/Blackbird Capital Group

## The Antioch Company Litigation Trust

Mark A. Greenberg, Member & Co-Owner



**DEPOSITION EXHIBIT**

797

8-26-13

Greenberg00300

Confidential

Greenberg00301

# Confidential

I.      About Silverstone.................................................................................................. 4

II.     Scope of Engagement and Opinion ..................................................................... 4

III.    Supplemental Disclosure...................................................................................... 5

IV.     Note on Opinion Contents .................................................................................. 5

V.      The 2003 Tender Offer and 100% ESOP Ownership Transaction...................... 5

VI.     Terms of the Tender Offer Transaction.............................................................. 7

VII.    Financial Outcomes of the Transaction ............................................................. 7

VIII.   Valuation Discussion ........................................................................................... 8

IX.     The ESOP Put Price Guarantee ......................................................................... 11

X.      Post Transaction Solvency................................................................................. 13

XI.     Sale/Lease-Back Transaction and LEVIMO ..................................................... 13

XII.    The Decision to Sell the Company .................................................................... 15

XIII.   Bringing the Company to Market...................................................................... 16

XIV.    Change in ESOP Trustee ................................................................................... 16

XV.     Engaging an Investment Banker........................................................................ 17

XVI.    Early Market Indications................................................................................... 17

XVII.   The Dual Path .................................................................................................... 18

XVIII.  Distressed Sale or "Congenial" Buyout/Recapitalization ................................ 20

XIX.    Firing of the Board and Rejection of the J.H. Whitney Offer........................... 23

XX.     Conclusions........................................................................................................ 24

Greenberg00302

Confidential

I.  About Silverstone

Silverstone Advisors, LLC, -- doing business as Silverstone Advisors/Blackbird Capital Group -- (hereinafter "Silverstone") is an Ohio-based investment banking and corporate financial advisory firm.  Silverstone was founded in 2008. Its three members and co-owners have decades-long business transaction experience working as advisors, deal intermediaries, investors, corporate executives, business owners and lawyers.

The firm is regularly engaged by clients to lead mergers and acquisition transactions, develop and execute capital formation strategies and provide financial advisory services for companies, their boards and shareholders. Silverstone also provides business valuations and frequently performs analytical work focused on asset disposition alternatives (for example divestitures, recapitalizations, etc.) and other transactions being contemplated by both public and private companies.

The firm in addition acts as financial advisor to companies and creditors both in and outside of bankruptcy. This work has included solvency and sponsor (bankruptcy emergence) plan opinions, bankruptcy credit committee advisory, expert testimony and opinions, in addition to acting as investment banker in section 363 sales under Chapter 11 Bankruptcy.

Mark A. Greenberg is a member and co-owner of Silverstone. Prior to joining Silverstone, he was a managing partner at LudlowWard Capital Partners and its broker dealer, LudlowWard Investment Partners. Mark has over 30-years of M&A, capital formation and restructuring experience. His clients include middle-market businesses, small-to-mid cap public companies and financial institutions. In addition to his work as an investment banker, he has been CEO and Chairman of three privately held companies, and was a senior division and group-level executive in the publishing and information services businesses of News Corp and Gulf & Western.  In the past ten years, Mark has published one article in the Cincinnati Business Courier titled "For Companies in distressed situations, a need-to-know primer."  This article was published on February 9, 2009. In the past four years, Mark has served as an expert in one case, *In re. Berean Christian Stores, LLC*, 1:09-bk-13640 (Bankr. S.D. Ohio), testifying on two occasions – June 30, 2009 and July 27, 2009.

II.  Scope of Engagement and Opinion

Silverstone was engaged by Taft Stettinius & Hollister LLP ("Taft") on June 5th 2013 to develop an opinion about specific aspects of the litigation matters *The Antioch Company Litigation Trust v. Morgan, et al* and *The Antioch Company Litigation Trust v. McDermott, Will & Emery LLP*. The opinions and points-of-views expressed in this document are based on a review of relevant portions of the testimony of the litigation defendants made available to Silverstone by Taft. At no time has the firm since their engagement, or Mark Greenberg, the author of this document, spoken with any of the defendants, their advisors or any of the participants and/or counterparties involved in the various events leading up to this litigation.

4

Greenberg00303

# Confidential

Silverstone is to be compensated at a rate of $350 per hour for all time spent by Mark Greenberg on this matter, including testimony.

In the Opinion that follows, there is a necessity to address legal issues, specifically in respect to proposed transactions and actions taken by defendants. Notwithstanding, the opinion is not, and should not be construed as, an attempt to provide legal opinion. The views of its author are that of a financial advisor and investment banker with direct experience in mergers and acquisitions, capital transactions, distressed businesses, recapitalizations, restructurings and bankruptcy.

III.    Supplemental Disclosure

Mark Greenberg, while a partner and co-owner of LudlowWard Capital Partners, was engaged by The Antioch Company to sell its publishing business. This was an approximately $10 million operating division providing various "front of store" incidental products which were typically sold in bookstores. LudlowWard Capital Partners completed this assignment with the sale of the business to a Canadian buyer sometime in the first quarter of 2008. All bills and fees were paid in full by Antioch to the firm. However, it is important to disclose that Mark Greenberg had some direct dealings with Kim Lipson Wilson who was the lead person at Antioch for the transaction and more limited interactions with Lee Morgan whom Greenberg met in initial meetings. There was and has been no subsequent contact.

IV.    Note on Opinion Contents

The following opinion does not attempt to restate, nor does it attempt to sequence chronologically, all the issues and events that impacted The Antioch Company in the five-years from the time the Tender Offer and wholly owned ESOP transactions occurred in 2003. Instead, the opinion examines specific aspects of and outcomes resulting from the transactions, while also occasionally examining the roles and actions of some of the defendants and participants. Financial values are rounded and dates are often approximations adopted from various reports and communications made available to Silverstone.

V.    The 2003 Tender Offer and 100% ESOP Ownership Transaction

**Background**
During 2003 Lee Morgan and Asha Morgan Moran (both significant shareholders, and Chairman & CEO and Chief Operating Officer, respectively) sought to diversify their financial assets and liquidate their personal holdings in Antioch while maintaining control of the

5

Confidential

Company. Accordingly, the Morgans, with the consent of the Company's board of directors, undertook a transaction through which Antioch made a tender offer to purchase the shares of the non-ESOP shareholders as a means to effect a transaction where The Antioch Company would become a 100% owned ESOP business.

Prior to that time and beginning in 1979, Antioch was partially owned by an ESOP, a vehicle set up by the Company's owners (the Morgans were majority owners) to provide retirement benefits to its employees on a tax-exempt basis. The initial ESOP was established without debt financing or recapitalization. At the time of the tender offer transaction in 2003, Antioch's ESOP owned 42.8% of the Company.

There were a few reasons driving the decision to sell the non-ESOP shares and establish the Company as 100% ESOP-owned. Lee Morgan, in particular, believed that the account-based participant allocation approach used by Antioch's ESOP was not optimal for the recruitment of more experienced and skilled executives as it systemically allocated to participant accounts according to tenure rather than position. As a part of the transaction being contemplated, this allocation scheme would be transformed to address both tenure and salary to achieve the aforementioned purpose. [1]

However, the paramount consideration driving the desire to undertake this transaction was financial: to monetize the non-ESOP shareholders holdings in Antioch and to eliminate the associated S-corporation income tax burdens borne by the non-ESOP shareholders for their ratable ownership in the Company. The Morgans, their trusts and other directors of the Company represented approximately 85% of non-ESOP shareholding.

As a subchapter S corporation, Antioch's non-ESOP shareholders were responsible to pay income taxes associated with Antioch's profits based on their percentage ownership. Antioch historically distributed 45% of its profits to its shareholders who in turn paid the associated income taxes. The Morgans, as Antioch's largest individual shareholders, estimated that they would pay approximately $290 million in Antioch related federal income taxes over the following 10 years under the then capital and ownership structure, while the ESOP received its proportional allocation of the distributed profit exempted from income tax.

The tender offer would thus allow the non-ESOP shareholders to monetize their equity interests in the Company, and for those who were also employees and ESOP members (the Morgans, in particular), to personally benefit from the tax-exempt status of a 100% ESOP-owned business, while presumably allowing the Company to recycle its cash flows at a comparatively higher percentage of its now tax-exempt earnings. Lee Morgan and others in the Morgan family were significant participants in the ESOP Trust.

---

[1] While the ESOP was initially set up in this manner after the tender offer transaction, this approach to allocation was later reversed as non-compliant.

6

Greenberg00305

## Confidential

### VI.    Terms of the Tender Offer Transaction

On November 14, 2003 Antioch issued a prospectus and a tender offer to the non-ESOP shareholders, who included the Morgans, Morgan family trusts and certain directors of the board, among others. The tender offer to buy shares provided that shares could be sold for $850.00 cash or for a package of consideration consisting of $280.00 cash, $280.00 subordinated note with 2013 maturity, and a warrant to purchase one share of Company stock at a strike price of $850.00 exercisable in 2014. The notes and warrants would accelerate upon a change of control.

After the stock purchase transaction, Antioch would merge into a new Company ("TAC" or "Company") wholly owned by the ESOP. The transaction would be financed entirely with the use of Antioch's cash and debt, much of which was funded externally by means of bank loans. Each of the non-ESOP shareholders agreed to the terms of the tender offer. As a result, on December 16, 2003 the transaction closed.

During this time, Lee Morgan and Asha Morgan Moran were members of the three person ESOP Advisory Committee and directors of the Company's board of directors. Members of the ESOP Advisory Board were appointed by the board of directors and could only be removed by the unanimous consent of the board of directors. Shortly after the close of the transaction, GreatBanc, the ESOP Trustee prior to and through negotiations attendant to the transaction, ended its engagement as the Antioch ESOP trustee.

### VII.    Financial Outcomes of the Transaction

As a result of the transaction, Lee Morgan and Asha Morgan Moran and the Morgan family received approximately $111 million in cash, in addition to notes and warrants, while other directors of the board collectively received about $25 million. The post transaction 12/31/2003 balance sheet strikingly reflected the impact of the transaction.

**The Antioch Company**
Fiscal Year Ending 12/31

| Income Statement (in '000s) | 2002 | 2003 | Variances |
|---|---|---|---|
| Revenue | 351,229 | 374,745 | 23,516 |
| Operating Income | 87,604 | 85,250 | (2,354) |
| Net Income | 76,944 | 73,260 | (3,684) |

| Balance Sheet (in '000s) | 2002 | 2003 | |
|---|---|---|---|
| Total Assets | 150,240 | 163,682 | 13,442 |
| Total Liabilities* | 63,105 | 241,868 | 178,753 |
| Shareholders' Equity & Net Book Value | 87,135 | (78,186) | (165,321) |

| Breakdown of Debt | 2002 | 2003 | |
|---|---|---|---|
| Bank Loans | 16,396 | 136,218 | 119,822 |
| Subordinated Debt | - | 43,400 | 43,400 |
| Total Debt | 16,396 | 179,618 | 163,222 |

7

Greenberg00306

Confidential

In order to fund the transaction, the Company assumed an additional $120 million of bank loans and $43 million in subordinated notes as well as used approximately $25 million of the Company's cash on hand. This recapitalization substantially altered the Company's balance sheet: shareholders' equity that was a robust $85 million in 2002 became negative $78 million (-$78,186,000) by end of 2003, a $165 million negative (-$165,321,000) year-over-year variance. By any measure, the Company had become substantially leveraged.

VIII.    Valuation Discussion

The tender offer established a share price for the Company of $850.00.[2] In the previous year, Business Valuations, Inc. ("BVI") valued the Company's shares at $680.00 per share. The 2002 BVI valuation took into consideration Antioch's ESOP redemption/repurchase liability history that had averaged $12 million annually for the previous three-years. In a business valuation, historical ESOP share repurchases would be understood as a liability reducing shareholders' equity, as well as being understood as a call on the business's cash which may affect estimates of organically funded growth as developed in the valuation.

Remarkably, the valuation establishing the $850.00 share price failed to take into consideration the potential for acceleration of the ESOP share redemption liability, despite a 25% increase in year-over-year share price --- $680.00 per share in 2002 versus $850.00 per share in 2003.

The 25% increase in share price is perhaps reasonably disputable on several grounds, as more fully addressed below. It is certainly questionable in view of the difference in the Company's 2002 and 2003 financial statements as shown above, and in particular in that the transaction was not a sale of the Company to third-party acquirer but rather a debt-funded recapitalization where the Company bore 100% of the financing impact and debt obligations.

Moreover, despite marginally higher sales, in 2003 the Company experienced a $2.3 million year-over-year decline in Operating Profit and $3.7 million decline in net income and a variance in Shareholders' Equity, as noted earlier, of -$165 million[3]. The financial condition of the Company had clearly been significantly impacted by the transaction. As a wholly owned ESOP business, where all the employees had a meaningful stake in the business, the financial condition of the Company was presumably widely known.

---

[2] The Financial Advisory Services division of Houlihan. Lokey provided a fairness opinion on this valuation specifically relating to the equity. Houlihan did not, however, advise the Company in regard to the execution of the tender offer, its financing or the associated agreements and mechanisms needed to complete the tender offer.

[3] Net book value in 2002 was $87 million, 2003 net book value of -$78 million.

8

Greenberg00307

## Confidential

It is unclear from the records available to Silverstone whether the Morgans and their advisors established the $850.00 share price while taking into account the state of post-closing transaction balance sheet, which paid out Company cash and took on significant new levels of senior and subordinated debt. Had the share price in fact assumed the financing required to monetize the non-ESOP equity, the year-over-year difference in enterprise value, also commonly referred to as total capital[4] would be especially dramatic.

According to the 2002 BVI valuation, equity in 2002 is valued at $334 million. This calculation is derived by a commonly employed discounted cash flow ("DCF") valuation methodology that seeks to establish the Company's value. This DCF method present values (i.e., calculates future monetary value to reflect its current value) the Company's debt-free *pro forma* cash flows using a weighted cost of capital (WACC), in addition to deriving the Company's terminal or residual value, the capitalized value of the business beyond the forecasted *pro forma* period specifically addressed by the valuation. Based on BVI's results, the Company's initial enterprise value, before adjustments for debt and surplus cash (including cash value of life insurance), is $314 million.

By comparison, if one assumes that the senior and subordinated debt funding the transaction was accounted for in $850.00 share price tender offer valuation, enterprise value would have had to have been approximately $588 million (see schedule immediately below) and possibly higher when cash is accounted for.[5] Presuming these calculations are reasonable, this would amount to an approximate difference and increase in initial enterprise value of 87% in a matter of one year. Initial enterprise value meaning in this case the value of the Company prior to adjustments made for funded debt and surpluses or deficiencies in working capital and other liquid assets.

| BVI 2002 Equity Value Calculation (in '000s) | | 2003 Estimate of Tender Offer Valuation (in '000s) | |
|---|---|---|---|
| Enterprise Value/Total Capital | $314,256 | | |
| Debt | ($17,907) | Estimated Enterprise Value or Total Capital | $587,922 |
| Cash in Excess of 2% of Revenue & cash Value | $37,806 | Post Tender Offer Funded Debt | ($179,618) |
| 2002 Equity Value | $334,155 | 2003 Equity Value at $850 per share | $408,304 |

The BVI valuator does not apply a discount for lack of marketability in the 2002 valuation since the ESOP shares the valuator is singularly concerned with are systemically "puttable," that is to say, they have a built-in liquid market by way of the ESOP's contractual share repurchase agreement. The BVI valuator does suggest, but does not assign, a 20% discount

---

[4] Enterprise Value or Total Capital is an economic measure reflecting the market value of a whole business. It is a sum of claims of all claimants: creditors (secured and unsecured) and equity holders (preferred and common). Accordingly, equity value is the arithmetic product of enterprise value netted for the impact of debt and surpluses and/or deficiencies in working capital, other liquid assets and any material contingent obligations.

[5] In attempting to tie out sources and uses of capital for the transaction using the 12/31/2003 statements we were able to account for all but $25 million, including equity value associated with the warrants. We presume that this difference, once the warrants are priced at $290 per $850 of exercisable share, was made up in cash consideration from the Company's pre-12/31 cash balances.

Greenberg00308

Confidential

for lack of marketability to the non-ESOP shares and this specific discount is not factored in the 2002 valuation.

By any standard, the differences in estimated enterprise value and year-over-year share price are stunning. This is particularly so when, as shown above, the Company's 2003 income statements were characteristically similar to those of 2002 and from an earnings perspective actually down $2.3 million in operating income and $3.7 million in net income.

For sake of argument, if on the other hand, the foregoing analysis and estimate of enterprise value is inaccurate, and the valuation method that arrived at the $850.00 share price did not consider the new funding required to monetize the non-ESOP shares (as if it were a sale of the Company to an arms-length buyer wherein the seller would be indifferent to funding sources), then the post transaction equity value would have been closer to $689.00 per share, on a fully diluted basis (including warrants provided as partial consideration in the transaction to the non ESOP shareholders). This assumes, that 2003 debt levels and offsetting cash surpluses prior to funding of the tender offer would have been more or less equivalent to 2002 levels.[6] If this was the approach (as improbable as it may seem), the Company's value would have declined considerably and immediately upon the funding of the transaction.

| | |
|---|---|
| Equity Valuation | $408,304,399 |
| Debt/Cash/Liquid Assets (on as-if basis 2002) | $19,899,000 |
| Enterprise Value | $428,203,399 |
| | |
| Equity Valuation | $408,304,399 |
| Debt/Cash/Liquid Assets (on as-if basis 2002) | $19,899,000 |
| Funded Debt as of 12/31/ 2003 | ($179,618,000) |
| Adjustment for Post Transaction Debt | ($159,719,000) |
| Post Transaction Adjusted Equity Value | $248,585,399 |
| | |
| **Post Transaction Estimate of Fully Outstanding & Diluted** | |
| ESOP shares | 205,593 |
| Warrants & other | 155,000 |
| Shares Outstanding | 360,593 |
| | |
| **Post Transaction Adjusted Share Price** | $689,379 |

Presuming the $588 million enterprise value scenario approximates how Morgan and his advisors derived the share price; in market terms this would place the enterprise value at around 7.5 times 2003 EBITDA. This is well within the range of potential market valuations that a Company such as Antioch may have received in 2003 in an arms-length sale transaction, if one knows no more than is evident in the financial statements. The Company was highly profitable and had been growing impressively, even though it had missed its

---

6 The business was impressively profitable, with 22% EBITDA and so would likely not have materially increased its debt prior to the closing of the tender offer transaction.

Greenberg00309

Confidential

forecasts in the previous quarters and was beginning to lose share to digital, retailer and online competitors.

The question, of course, is whether this "as-if sold to a third-party acquirer" perspective is an appropriate means of value attribution for a recapitalization of the magnitude undertaken by Antioch's non-ESOP shareholders and given how the transaction would be funded and in light of some of the unique aspects of the ESOP. When a business is sold to a third-party in an arms-length sale transaction, the selling shareholder is generally unaffected by whether the capital is funded with equity or debt.

Regardless of whether the Morgans' $850.00 share price took into account the debt and cash depletion required to fund the non-ESOP shares or, as may have improbably occurred, failed to take the debt funding into account, any decision to go forward should have demanded careful consideration. Any analysis would have to justify and reconcile either an extraordinary difference in year-over-year enterprise value or a precipitous decline in value immediately upon funding the transaction. And it would have to consider the resulting state of the Company and whether in that context the transaction as contemplated was properly constructed or should be undertaken at all.  Proper fiduciary care should have been exercised with the engagement of a qualified disinterested financial professional to review the entirety of the transaction, its underlying assumptions and potential Company outcomes. According to the record, this did not occur. Houlihan Lokey[7] opined on the valuation of the equity -- possibly agreeing to the valuation in the context of an arms-length sale transaction -- without however providing a formal view of the entire transaction and also specifically indicating that they were not opining on the advisability of the transaction being contemplated. Apart from an equity-based fairness opinion, the record indicates that only debt service scenarios were examined.

IX.    The ESOP Put Price Guarantee

According to the records reviewed for this Opinion, there were issues that purportedly prevented the ESOP from participating in the tender offer, including the absence of a formal valuation. However, the overwhelming reason had to be the inability of the business to fund a yet broader recapitalization. In direct terms, the non-ESOP shareholders could not finance and monetize their Antioch equity holdings and achieve their desired personal financial outcomes unless the ESOP (then 42.5% owners of the Company) stood down. While there was no specific evidence of discussion of this point identified in the documents reviewed in preparation for this document, it is difficult to believe that this "bargain" was not discussed at length.

---

[7] This was Houlihan Lokey's Financial Services Advisory Services group, not the firm's M&A transaction group

Greenberg00310

Confidential

To effect the transaction, an agreement was reached by the ESOP trustee (then GreatBanc), the Morgans and Company's board of directors providing for a put price guarantee of $850.00 per share for ESOP redemptions for a period of three years from the date the transaction was executed. A valuation commissioned by the ESOP trustee shortly after the transaction in 2003 established the share price at $889.00, again a remarkable outcome given the state of the Company's balance sheet and when compared to the $680.00 per share valuation of just one year prior.

The three-year put price guarantee effectively allowed the ESOP participants to join in the tender offer, just not contemporaneously with the non-ESOP shareholders. With a 25% increase in share price guaranteed for three years and a subsequent valuation placing the share price at 31% higher than that of 2002, there is little need to wonder why the Company had a three-year "run on the bank." In view of the fact that Antioch ESOP redemptions averaged $12 million since 1999 (at lower shares prices and when the Company was considerably more solvent), the decision to move forward with the tender offer, convert the Company to 100% ESOP-owned and agree to a share price redemption guarantee has to be considered stunningly reckless and at best, monumentally naïve. Incontrovertible evidence of this blunder came in 2004 when ESOP annual redemptions reached $108 million—magnitudes higher than the $12 million per year average and more than ten-fold higher than 2002.



In the three years that followed (through December 2006) 800 of 1,115 ESOP participants redeemed their equity interests generating repurchase obligations of $190 million. The shares were primarily redeemed into Treasury, thus taking shares out of circulation and partially offsetting the decline on a per share basis that otherwise would result from the overall decline in the value of the Company. It is unclear how this impacted the behavior of the ESOP shareholders, but one might conclude that it may have stemmed additional acceleration. Notwithstanding, a steady decline in revenue and earnings also resulted in reductions in force, which in turn resulted in additional ESOP redemptions.

It is impossible to know whether the Company had the ability, including the executive talent, to effectively address the emergent weaknesses in its business model. But it is clear that

12

Confidential

ESOP redemptions and substantial debt service requirements set in motion by the non-ESOP shareholders' desire to monetize and avoid S-corp income taxes, diverted significant capital away from the kinds of initiatives that may have allowed the Company to capitalize on its significant market share and pioneer status.

X.     Post Transaction Solvency

With the completion of the tender offer and ESOP transaction in 2003 the Company became seriously undercapitalized, despite still comparatively robust earnings. Capital that would otherwise have gone to the Company's balance sheet as working capital and to fund new capital investment and product development became absorbed by debt service and ESOP redemptions. Commonly employed measures of a business's near term solvency[8] along with the Company's book value illustrate how, in spite of still significant EBITDA, the Company was unable to accrue the benefits of its earnings. The money just went out the door to pay principal and interest on bank loans, subordinated debt and ESOP share repurchases.

*TAC Solvency Ratios*

|  | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Total Assets | $163,682 | $148,925 | $135,132 | $118,695 | $100,586 |
| Total Liabilities | $241,868 | $223,570 | $219,702 | $222,206 | $206,929 |
| Net Book Value | ($78,186) | ($74,645) | ($84,570) | ($103,511) | ($106,343) |
| *Solvency Ratios (to 1)* |  |  |  |  |  |
| Current Ratio | 0.81 | 0.49 | 0.6 | 0.45 | 0.74 |
| Quick Ratio | 0.37 | 0.1 | 0.13 | 0.14 | 0.3 |
| Leverage Ratio | -0.43 | -0.51 | -0.49 | -0.75 | -0.72 |

XI.     Sale/Lease-Back Transaction and LEVIMO

In 2007, owing to continued deterioration of the Company's financial condition and unabated decline in sales, the senior lenders led by LaSalle Bank required that the Company enter into a sale/lease back transaction for its buildings as a condition precedent to renewing its loan facilities. The proceeds resulting from the sale of the properties would be used to reduce the lenders' principal balances.  Initially the sale/lease-back was to occur between the Company and ANT-LM LLC (an entity jointly owned by Lee Morgan and W.P. Carey & Co., LLC).  The properties, both of which located in St. Cloud Minnesota, were together valued at $26 million. Lee Morgan was to contribute $7 million to the investment. The deal was negotiated by and between the acquiring real estate entity and officers of the Company and approved by the Company's board.

---

[8]  Current and Quick Ratio measure a company's ability to meet its short-term obligations -- Current Ratio is calculated as Current Assets/Current Liabilities whereas Quick Ration is calculated as the sum of Current Assets minus Inventory/ Current Liabilities. Generally a ratio of one to one (1-1) is indicative a business's ability to meet its current period obligations.

13

Greenberg00312

Confidential

At some point after negotiating the final lease, W.P. Carey decided to back out of the deal, presumably in response to the perceived financial instability of the tenant (the Company), but also no doubt as a result of tightening credit markets which by 2007 were already retreating from commercial real estate. With the lenders still insistent on a sale of the properties to renew the Company loan facilities, Lee Morgan, through an entity set up by him by the name of LEVIMO, LLC, provided the equity financing and personal guarantees required to effect the sale/lease-back transaction. LEVIMO, LLC adopted the lease without substantial change as originally negotiated with W.P. Carey and ANT-LM, LLC and the Company's board of directors and officers.

Although the Lease (there was just one lease for both properties) in most respects is what would be expected for a commercial/industrial property, it does contain some unusual out-of-market provisions.

For example, section 3 (f) of the Lease attempts to preclude and pre-empt the kinds of negotiations that often occur in Chapter 11 Bankruptcy where the bankruptcy estate can decide to accept or reject an executory contract.[9] Although the bankruptcy estate can accept or reject a lease, this court-empowered right in bankruptcy often instead leads to negotiating more favorable lease terms, including lower rates, reductions in term and recharacterization of square footage, etc.

The Lease also contains rigorous lease assignment definitions and requirements that become triggerable under the terms of the Lease in the event of a transfer of substantially all of the Company's assets and/or a change of control as defined in the Securities Exchange Act of 1934, sections 13(d) and 14(d).[10] Although not contractually subjecting the Company to Landlord consent for it to effect a change of control or sell its assets, the practical effect of these provisions are arguably tantamount to change of control consents. In any sale of the Company the assignment of this Lease, and/or the negotiation of a new lease for the larger of the two St. Cloud properties had to be viewed as virtually mandatory. The Company could not without significant and undoubtedly insurmountable expense move its operations. And any potential acquirer of the Company would immediately understand that an assignment of the Lease was a condition precedent to closing an acquisition, as would the Company when looking to sell to a third-party buyer. Insofar as the Landlord under the terms of the Lease was in a position to singularly deny assignment (and on numerous grounds), the Landlord in

---

9 ...3(f) Tenant, On Behalf of Itself and ANY TRUSTEE OR LEGAL REPRESENTATIVE (UNDER FEDERAL BANKRUPTCY CODE OR ANY SIMILAR STATE INSOLVENCY PROCEEDING) EXPRESSLY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE PROVISIONS OF PARAGRAPH 18 HEREOF OR ANY OTHER PROVISION IN THIS LEASE TO THE CONTRARY, IT IS THE EXPRESS INTENT OF LANDLORD AND TENANT TO CREATE, AND THAT THE LEASE CONSTITUTES, A SINGLE LEASE WITH RESPECT TO EACH AND EVERY PARCEL LAND, IMPROVEMENTS AND EQUIPMENT INCLUDED [...] AND SHALL NOT BE (OR DEEMED TO BE) DIVISIBLE OR SEVERABLE INTO SEPARATE LEASES FOR ANY PURPOSE WHATSOEVER, AND TENANT, ON BEHLAF OF ITSELF AND ANY SUCH TRUSTEE OR LEGAL REPRESENTATIVE, HEREBY WAIVES ANY RIGHT TO CLAIM OR ASSERT A CONTRARY POSITION IN ANY ACTION OR PROCEEDING..]

10 Section 21 paragraphs (j) and (k) of the Lease

Greenberg00313

Confidential

effect became a *de facto* gatekeeper under the Lease. In practical terms the Landlord is empowered to consent to or deny a change of control. Notably, the Lease also waives all conflict of interest for the Landlord, a clear acknowledgement of inherent conflicts interest between the Landlord and the Company.

These "poison pill" terms unfairly favor the landlord, Lee Morgan, and clearly were intended to make the Company less attractive to potential purchasers in the future.

XII.    The Decision to Sell the Company

Sales and income were in continual decline and the lenders by early 2007 were becoming increasingly concerned about the financial condition of the Company and their ability to get paid back. The wholly owned ESOP structure proved conclusively unsustainable, having drained the Company of critical working and investment capital. Furthermore, owing to the unceasing onslaught of ESOP share redemptions, the ESOP and S- Corp became in danger of violating critical provisions of Internal Revenue Code Section 409(p).

Internal Revenue Code 409(p) seeks to prevent S corporation ESOPs from being used as abusive tax shelters. Section 409(p) is satisfied if "disqualified persons" do not own 50% or more of the S Corporation's "stock." Stock, in this meaning, includes allocated and yet-to-be allocated ESOP shares, synthetic equity of the S corporation, and any shares held directly in the S corporation. The ESOP shares and any synthetic equity are considered to be "deemed-owned" shares for purposes of Section 409(p).

In consideration of the non-ESOP shares sold in the tender offer, the non-ESOP shareholders could take all cash, or take a package of cash, subordinated notes and warrants. Others, but in particular Lee Morgan, who was also a significant participant in the ESOP, took warrants in partial consideration for shares sold. Due to the high level of ESOP share redemptions where in the three years following the transaction 800 of 1,115 participants redeemed their interests, the relative proportion of Morgan's "deemed owned shares" threatened to disqualify the ESOP and the Company's S-corporation status. Disqualification, were it to occur, would have had potentially disastrous financial implications for the Company in terms of penalties and clawback for taxes presumed owed, were the Company to be recharacterized by an IRS disqualification. In order to avoid this and re-weight deemed-owned shares, some of Morgan's warrants (considered synthetic equity under 409(p)) were converted to subordinated debt while 15% of the outstanding equity of the ESOP attributable to Morgan had to be placed in a taxable 401k-plan sub-trust.[11]

Not only had the structure imposed on the Company by the tender offer transaction decimated the Company's financial health, but the corporate and tax structure also had become untenable. And there was no guarantee that the most recent deemed-owned shares

---

[11] Kimberly Lipson Wilson, the Company's Treasurer became the Sub-Trust trustee

Greenberg00314

Confidential

"fix" would not require further jockeying as ESOP participants continued to bail out of the Company. IRC 409(p) was always just around the corner and threatening.


XIII.    Bringing the Company to Market

Since 2004 the Company's financial performance continually declined – at first marginally and then by 2006, dramatically. Despite what were believed to be strategic additions to management, including the hiring of experienced direct-sales business executives; despite new compensation plans meant to further incentivize the Company's consultant sales channel and irrespective of efforts to launch new products meant to shore up lost market share and create excitement in the sales channel, the Company was unable to adequately address the continued deterioration.

The Antioch Company
FYE 12/31
(in '000s)

| | 2003 (A) | 2004 (A) | 2005 (A) | 2006 (A) | 2007 (A) | 5- Year CAGR | 3-Year CAGR |
|---|---|---|---|---|---|---|---|
| Revenue | 374,745 | 364,048 | 337,599 | 283,162 | 242,051 | -10.35% | -15.33% |
| Net Income | 73,260 | 48,499 | 32,156 | 9,742 | (2,743) | na | na |
| | | | | | | | |
| EBIT | 74,033 | 56,665 | 41,717 | 207,000 | 10,012 | -39.36% | -51.01% |
| EBITDA | 83,837 | 68,869 | 54,017 | 31,711 | 18,806 | -31.18% | -41.00% |

Therefore two choices remained: sell the business or find a way to eliminate the ESOP through a management buyout or other means that would permit the transfer of ownership without the ESOP structure.


XIV.    Change in ESOP Trustee

As the Company became seriously engaged in exploring its dispositional options, it had hired the Reliance Trust Company as the new ESOP trustee. This decision was predicated on Reliance's experience as an ESOP trustee for companies contemplating and undergoing material dispositional (M&A, buyout) transactions. Soon into their engagement as independent trustee however, in a matter of a few months, Reliance would resign as independent trustee with the contention that it believed that the engagement would require too much time and require more resources than they were prepared to devote to the Company. They believed the board was conflicted and would if they continued on as trustee likely have to remove the board as well as make significant changes to executive management. While it is unsaid, it is hard not to conclude that Reliance understood that its

16

Greenberg00315

Confidential

role as independent trustee exposed the firm to all manner of potential risk and litigation and a level of involvement well beyond what they could be paid for. Soon after Reliance's resignation, Evolve Trust Company became the Company's independent ESOP trustee.

XV.    Engaging an Investment Banker

After interviewing three investment banks in the first quarter of 2007, the investment-banking firm of Houlihan Lokey ("Houlihan") was selected and engaged in early April of that year by the board of directors to sell the Company. Houlihan is one of the largest middle-market investment banking firms in the U.S. and globally. It is known for its exhaustive marketing efforts on behalf of its clients, its analytical resources and the quality and experience of its deal professionals. The engagement agreement executed by the parties made Houlihan the exclusive financial advisor to the Company under terms that included a range of transaction structures, including, for example, the sale of the Company's capital stock, a sale of substantially all of its assets, a recapitalization, etc. As in most investment banking engagement agreements, the list of potential transaction for which Houlihan would receive a success fee, and under which they would be the exclusive advisor, was comprehensive.

XVI.    Early Market Indications

By August of 2007 Houlihan had established the preliminary interest of a handful of prospective acquirers: none would proceed to a definitive offer.

The consensus of the strategic acquirers was that the Company's financial condition was still in free-fall, had not "bottomed out"; that the Company lacked a viable, actionable strategy; that management was not up to the task of running the business and was incapable of effectively addressing the decline. In October 2007 Sun Capital, a multi-billion dollar private equity firm known for its ability to act and fund quickly, made a "verbal" (oral, undocumented) offer of $63 million for the Company. This "verbal" offer, according to the record, never made it past the discussion stage.

In October of 2007, the lenders, led by LaSalle, strongly urged the Company to engage a turnaround firm. Accordingly, the Company engaged CRG (now a division of Deloitte), a restructuring, turnaround management, bankruptcy reorganization and financial advisory services firm. By the fourth quarter of 2007 the Company was in covenant default under its credit agreement.

With the Company's financial condition and business model proving an insuperable barrier to generating sustainable interest among strategic acquirers and private equity funds the

17

Greenberg00316

Confidential

engagement was moved to Houlihan's distressed mergers and acquisition group, a division specializing in the sale and recapitalization of financially distressed companies.

Meanwhile, with initial Houlihan efforts failing to bring in a viable offer, Lee Morgan decided to hire his own financial advisor, whereupon he hired Candlewood Partners, a Cleveland Ohio-based investment-banking firm. Glen Pollack, a founder and managing director of the firm, led the engagement. The initial scope of the engagement, according to the testimony, was to evaluate and develop options for Lee Morgan and his family to possibly acquire and retain control of the Company. Soon, however, the engagement would evolve into one in which Candlewood both advised and represented Lee Morgan, and various entities formed by Morgan and family members, as a potential acquirer of The Antioch Company. The various deals proposed by Candlewood on behalf of Morgan *et al* (addressed more fully below) characteristically proposed to keep the Morgans in control of the Company, and attempted to satisfy all debt and equity constituencies of the Company, including Morgans' considerable sub debt.

With the board of directors aware of Lee Morgan becoming a potential acquirer, a Special Committee of the board, previously formed in order to facilitate and review dispositional alternatives for the Company, was reconstituted specifically eliminating Lee Morgan and Asha Morgan Moran from the Committee owing to Morgan's role as a potential acquirer, as well as others whose interests were conflicted. Certain members, Nancy Blair the Special Transaction Committee chairperson for example, would dutifully walk away from subordinated notes she received as partial consideration in the tender offer, as would one other, in order to remain on the Special Committee.

XVII.    The Dual Path

With the hiring of Candlewood by Lee Morgan and with Houlihan's engagement now focused on the distressed buyers market, certain dynamics began to emerge in 2007 that would continuously challenge the Company's ability to act resolutely and singularly on behalf of its various stakeholders. In addition, despite the measures taken to limit Lee Morgan's influence over dispositional considerations undertaken by the Special Transaction Committee, his influence on the directors is readily apparent and hard to minimize based on the testimony and documents reviewed for this opinion.

The dual path, as it was referred to, created two separate, often conflicting processes and two camps with the Special Committee attempting to navigate to a viable outcome.

On one side, Lee Morgan was seeking to retain control for his family and ensure a positive outcome for his and his family's financial stake in the Company. To assist in achieving this goal he hired Candlewood. Candlewood's involvement, it was argued early on, would be just as an advisor to Morgan. Candlewood would assist Morgan just as other advisors assisted

18

Confidential

other potential buyers. While this was the argument put forth, Morgan's continual request to have the Company pay Candlewood's fees, Candlewood's apparent unfettered access to board directors, bankers and its involvement in numerous Special Transaction Committee and board meetings would suggest anything but that.

On the other side was Houlihan, officially the Company's exclusive advisor; the lenders concerned about repayment of their loans and, as evidenced by the kinds of indications of interest that came from Houlihan's efforts, apparently the marketplace itself.

In early 2008, Morgan made it known to the Special Transaction Committee that he would not discount his notes for an outside buyer. His insistence on full financial recognition for his and his family's subordinated debt and the influence he wielded inside the Company as son of the founder and long-time chief executive, in addition to Candlewood's marketing efforts, certainly must undoubtedly have had had a chilling effect on Houlihan's efforts, as well as potential investors they contacted.  In a somewhat ironic twist in fall of 2007, Morgan's own attorney sent notice to Nancy Blair, Chair of the Special Transaction Committee exhorting the Committee to halt Houlihan's efforts as it could have the effect of reducing the value of offers that Morgan/Candlewood might otherwise receive. There are instances where Candlewood contacted investors already contacted by Houlihan and where, without properly executed confidentiality agreements, an investor group contacted by Candlewood approached the Company's lenders directly in attempt to buy their loans.

Throughout the testimony, the question was posed to witnesses as to whether they felt the buyers/investors were "confused" by the dual track.  This question trivializes and mischaracterizes what was really at issue. These investors were not likely confused – private equity investors are typically highly educated and experienced financial and legal professionals.  However, they may have been reluctant to become engaged or continue past a preliminary screening when it was so uncertain whose interest had priority inside the Company and which advisor represented the Company and its decision-makers, whoever they were.

Identifying which party had the authority to make a decision would have been difficult enough for anyone having to deal with The Antioch Company, given that it was wholly ESOP-owned and given the various conflicted parties. Presented with so much uncertainty, investors likely decided to spend their time on other potential, far less ambiguous opportunities. This in fact happened. It is also important to bring out that the dual track process created numerous delays in responding to investors who went to the trouble of issuing letters of intent to the Company. Sometimes the delays were due to the Company extending time to Morgan/Candlewood proposals, all of which were characteristically rife with obvious execution risks and, in the opinion of this writer, over-valued.

Greenberg00318

Confidential

XVIII.    Distressed Sale or "Congenial" Buyout/Recapitalization

In the months that followed the shift in focus to distressed asset buyers, the offers
generated by Houlihan's efforts uniformly proposed acquiring the assets of the Company
under section 363 of Chapter 11 Bankruptcy. In such a transaction, an acquirer would
become the stalking horse, commit to a guaranteed bid, and negotiate a break-up fee and
other transaction terms: they essentially assume the "pole position" in a bankruptcy process
that requires a reasonably publicized market auction.

The reasons for this preferred approach are immediately understandable. Foremost,
valuations from potential acquirers were coming in at levels just below, at or just barely
above the senior debt. The private equity fund J.H. Whitney, the most experienced in the
direct sales/network marketing space, had the strongest overall offer of $54 million, just $4
million higher than the Company's senior debt balances at the time.

Given these kinds of valuations, the subordinated debt, as well as the ESOP notes would
obviously be impaired (i.e., unrecoverable), as might other creditors of the Company. Also
informing this choice of transaction structure was the sheer number of ESOP notes
outstanding, about 300 individual notes by January of 2008 with an aggregate par value of
just over $21 million. Furthermore, under ERISA, ESOP notes are required to be reasonably
guaranteed.  Unable to use the Company balance sheet to guarantee the notes and given
the Company's teetering finances and risks of payment default, the Company's insurance
broker was only able to find an off-shore, unrated insurance company to underwrite surety
for the ESOP notes. The insurer, Condor Insurance, was shaky at best and subsequently was
entered involuntarily into "Administration," (i.e., bankruptcy).[12] It never made a payment for
claims brought to it by the Company. This was certainly more than a background issue for
anyone considering acquiring the Company outside of bankruptcy.

The private equity firms were likewise wary of trying to put together a settlement for the
ESOP note holders outside of bankruptcy, insofar as there were so many and because they
were all former employees. The belief, one need not speculate, was that attempting to put a
deal together with these stakeholders without the agency of bankruptcy was inherently
uncertain as to outcome, could take an inordinate amount of time and might only serve to
further erode the Company's already damaged goodwill.

Furthermore, J.H. Whitney and Marlin Equity Partners, for example, believed that
stabilization of the Company was contingent upon its complete de-leveraging (Whitney), or
at least a substantial reduction of the Company's debt (Marlin). This could only be achieved
through bankruptcy.  Whitney, in fact, intended initially to fund the entire transaction with

---

[12] The Condor principals re-emerged as Condor Guaranty taking with them insurance assets and surety bonds,
including those associated with The Antioch Company, and were soon after sued for unlawful conveyance.  In
any event, Condor never made one payment for any claims made by the Company on behalf of the ESOP note
holders.

Greenberg00319

Confidential

equity. All wished to reject or negotiate certain legacy liabilities, including certain property leases.

The difficulty, of course, with undertaking a sale of the business through a 363 sale process was that Company's equity would be wiped out, even though equity participation in the post-bankruptcy business might possibly be negotiated. In any event, no investor would consider giving up control or allocating much in the way of equity.

In contrast, Lee Morgan *et al* together with Candlewood as early as the fall of 2007 proposed a variety of deals to recapitalize and buy out the Company. These proposals are all at implied enterprise values two times or greater than the best offer solicited by Houlihan. While the proposed deals changed and evolved, they all put the Morgans in control and all were to occur outside of bankruptcy.

In February of 2008, Candlewood, on behalf of the Morgans, proposed a deal in which the senior lenders would serve notice of their intention to sell the Company's assets securing their loans in an Article 9 sale (under UCC Article 9).[13] Thereupon the entity, Morgan Acquisition Company ("MAC") would acquire 100% of the Company's secured bank debt. MAC would then "credit bid" (Candlewood's term), the loans it had acquired, taking possession of the Company's assets in satisfaction of its outstanding and unpaid debt. In other words, MAC, under its acquired rights and remedy as a creditor would foreclose on the loan collateral and assume ownership of the assets.

While this deal was rejected by the Company in a letter from Nancy Blair dated February 10, 2008 in her role as Chair of the Special Transaction Committee and was soon superseded by another proposal in March (addressed below), a few generally illustrative points can be made in connection with the quality of advice being offered by Candlewood and being followed by Morgan *et al.*

The first is that senior lenders will avoid becoming a party to Article 9 transactions in instances where there is potential for successor liability and unlawful conveyance claims. As summarized, Candlewood assumes that the current lenders would themselves become a party to the Article 9 transaction in giving notice and that Fifth Third Bank and National City Bank (already co-lenders to the Company with LaSalle) would then become the

---

[13] The basic requirements for a successful Article 9 sale are timely notice to interested parties and the conduct of the sale in a "commercially reasonable" manner. The secured creditor, or an auctioneer or other sales professional, conducts the sale. The sale need not be approved or confirmed by court action. However, Article 9 mandates that all aspects of a sale--method, manner, time, place and other terms-must be commercially reasonable. A sale is generally commercially reasonable if it is conducted (i) in the usual manner on any recognized market, (ii) at the price current in any recognized market at the time of the sale, or (iii) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the sale. By contrast, if it can be demonstrated that any aspect of the sale led to a reduction in the value of the assets sold, the sale may be challenged as not deemed commercially reasonable.

Greenberg00320

Confidential

recapitalization lenders to the acquisition entity. Also under the March proposal, the Company, i.e., the remaining incorporated entity would be left with significant unresolved liabilities, including ESOP notes, other employee obligations, in addition to the ESOP's equity interest. Given this, the Company's only recourse would be to file for bankruptcy protection in order to protect the Company's directors and officers: a nd this by no means wo uld prevent further actions by creditor committee lawyers.

In the subsequent proposal of March 2008, Candlewood on behalf of Morgan *et al* revised its offer to address the unresolved liabilities of the February proposal. The new proposal assumes that the GSC Group (itself having filed bankruptcy in August, 2010) would loan $31 million in partial recapitalization of the senior secured debt (estimated at $51 million) with the senior lender providing $20 million, in addition to a $10 million revolving line of credit with $3 million drawn at closing.  The ESOP notes would be assumed unimpaired in the transaction with four-year amortization.  $16 million worth of the Morgan subordinated debt is converted to equity, with the remaining $36 million of Morgan notes becoming subordinated to the ESOP notes, with the balance of the sub debt ($3.6 million) amortized over three years, while the ESOP would receive warrants, and tax coverage for its "pre-warrant exercise."

| | |
|---|---|
| **Restructured Senior Debt** | |
| Revolver ($10,000 facility) | $3,000 drawn at closing |
| Term Debt | $20,000 fully drawn at closing |
| Term B Second Lien | $31,000 12% cash interest, 6% PIK, 2% commitment fee |
| ESOP Notes | $21,200 prime plus .05%, amortization |
| Existing Sub Debt | |
| Morgan Trusts | ($12,000) 60% of Common Equity plus detachable warrants for 15% of recapitalized common equity |
| Remaining Morgan Trusts | $16,000 subordinated to ESOP Notes |
| Remaining Sub  Debt | $3,600 |
| Total Restructured Debt | $102,800 |

Although this proposal would have the effect of reducing the lenders exposure by $31 million, the lenders expressed skepticism about the Company's ability to service the post-recapitalization capital structure. By end of 2008, the Company's once significant earnings had dwindled to a loss of ($2.7 million), with EBIT of $10 million and EBITDA of $18.8 million.

14

| Initial Period Estimated Debt Service of GSI Proposal | principal balance | cash interest | principal amort |
|---|---|---|---|
| Term Debt | $20,000 | $970 | $5,000 |
| Revolver (est. average balance) | $5,000 | $705 | - |
| Term B Second Lien | $31,000 | $3,100 | - |
| ESOP Notes | $21,200 | $1,399 | $7,100 |
| Remaining Morgan Trusts | $36,000 | $720 | - |
| Remaining Sub  Debt | $3,600 | $288 | $600 |
| | | $6,682 | $17,700 |
| | | total estimated debt service | $19,382 |

---

[14] The "Initial Period Estimated Debt Service for the GSI Proposal follows the term sheet of March 11, 2008. LIBOR rates and Prime Rates are best estimates.

Greenberg00321

Confidential

While certainly the most comprehensive of the Morgan/Candlewood proposals, the lenders had every reason to be skeptical given the Company's continually declining cash flows and in view of the high relative cost of debt service. As estimated above, debt service under this proposal would have been higher than 2007 EBITDA. In the end GSC would back out anyway, expressing their uncertainty with regard to management and business model.

XIX.    Firing of the Board and Rejection of the J.H. Whitney Offer

At the end of May of 2008, the Special Transaction Committee entered into a definitive agreement in which J.H. Whitney would acquire Creative Memories as a going concern from The Antioch Company. In a draft press release, the parties were prepared to announce that, in order to facilitate the sale process, The Antioch Company had filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. The draft announcement further quotes Asha Moran Morgan as saying "After completing a comprehensive strategic view of the business, Creative Memories' management and Board of Directors, with the guidance of industry experts and turnaround specialists, determined a financial restructuring and sale of the business was in the best interest of the company."

With the Special Committee agreeing to the Whitney deal and a 363 sale, the independent ESOP Trustee, Ken Lenore of Evolve Trust Company immediately contacted Kimberly Lipson Wilson, the trustee for the 15% sub-trust to have her get the consent of Lee Morgan to join the ESOP in immediately firing the board of directors and reappointing a board consisting of Asha Moran Morgan, Lee Morgan and a lawyer associated with Evolve in order to reject the deal. A unanimous consent resolution was issued whereupon the board was summarily fired, and the Whitney transaction rejected. The reason for this action was that there was nothing in the deal for the ESOP and nothing in it for Lee Morgan. Now united in common cause the trustee and the Morgans were now in a position to continue to seek out a "congenial" recapitalization.

Although not addressed specifically in the documents and testimony, there was also the risk to Morgans that they would have to negotiate his St. Cloud Lease with the bankruptcy estate had the Company entered into the 363 sale bankruptcy deal with J.H. Whitney. The Company had excess real estate capacity (an issue being considered by Whitney), and, in order to finance the $26 million purchase of the properties, Lee Morgan had made a $5 million down payment and pledged the bulk of his personal assets as collateral to finance the remaining $21 million required to purchase the properties. Thus, the Morgans faced significant risks in bankruptcy where the bankruptcy estate can accept or reject –and as a result, be in a position to negotiate-- executory contracts. One such risk was the possibility of LEVIMO becoming in default of the mortgage/credit agreement. And while there was at best a 50/50 chance of realizing value from the subordinated notes, the investments made to

Greenberg00322

## Confidential

acquire the St. Cloud properties required hard cash and a pledge of the bulk of the Morgans' assets.

In June with the Morgan Entity MAMAMO, Morgan/Candlewood presented a plan to provide funding for the ESOP notes. The deal required additional cooperation and concessions from the lenders. This was also rejected.

The Company would subsequently seek bankruptcy protection under a prepackaged Chapter 11 in November of 2008.

XX.   Conclusions

It would trivialize matters to opine on the decisions that led to the demise of The Antioch Company as simply being miscalculations. It would further trivialize matters to attribute the substantial loss in economic value and the personal and financial dislocations that came with the Company's decline as simply manifestations of unintended consequences. The Morgans, the board of directors and the ESOP trustees (both GreatBanc and Evolve) had every opportunity to act otherwise, to review and heed the historical evidence and to call upon disinterested expertise to assist them in making responsible fiduciary decisions. This did not happen.

Immediately upon the closing of the 2003 transaction the Company went from being a stable, highly solvent business, with deep financial resources readily able to fund new initiatives and growth, and if necessary, ride out more difficult economic times, to a highly leveraged business with significant, ahistorical built-in claims on its capital and cash flows and a decidedly inadequate ability to withstand any downturn in business.

In spite of the overwhelming evidence—evidence that would be incontrovertible to any qualified financial and transaction professional -- of the precariousness of their underlying assumptions, the Morgans, with the consent of the board of directors, entered into a bargain with the ESOP trustee that literally drained the Company of its working capital, while at the same time creating an irresistible incentive for numerous employees to leave the Company. It is hard to conceive of how any responsible CEO and any board of directors would enter into the put price guarantee as they did, unless, of course, they too stood to benefit--- which in fact they did. Their deal could not have occurred without the agreement of the ESOP trustee to stand down. It was not as if the significant risks the Company could be taking on were hidden or not easy to extrapolate from the Company's recent history.

The board of directors dithered throughout the process of selling the Company.  Rather than pursuing the $63 million "verbal" offer from Sun Capital, or the significantly more certain $54 million letter of intent offer from J.H. Whitney, the board of directors sat idly by until a bankruptcy filing was the only option and the value of the company had deteriorated to $31-$38 million (as estimated by CRG in the bankruptcy), a significant drop in value over the May

24

Confidential

J.H. Whitney offer. Not only did the board sit by and watch the value of the Company crumble, but they spent $6 million on professionals in the process, further draining the Company's assets. The board's inability to come to real decisions was aided by a stream of inherently unexecutable proposals brought to them by Lee Morgan and Candlewood. Candlewood, besides disrupting the marketing and negotiating processes of Houlihan, appeared to just feed Lee Morgan's fantasies of retaining control and seeing value for his and his family's subordinated notes. All the Candlewood proposals were rife with obvious executions risks, valued the business well beyond the market offers established in a reasonably competitive process by Houlihan, or were distinctly unmanageable in terms of debt service coverage. The "dual track" only served to undermine the credibility of the Company and its investment banker. Mismanagement of, and interference with, the sale process by the directors and their advisors caused the Company to lose the opportunity to realize between $20 million and $30 million in value, and to waste $6 million on professional fees.

/s/ Mark A. Greenberg
Mark A. Greenberg
Silverstone Advisors/Blackbird Capital Group

Greenberg00324

# Mark A. Greenberg

mark@silverstoneadv.com
600 Vine Street, Suite 1900
Cincinnati, Ohio 45202
513.298.1946 (office)
513.833.7444 (cell)

## Partner/Owner
## Silverstone Advisors/Blackbird Capital Group, LLC
### Current: January 2009 to Present

I am entirely committed to my client's success, to delivering objective, highly qualified financial and transaction advice and providing incomparable deal representation. I am expert in business valuation, deal structuring, financial and investment analysis and I am highly skilled and experienced deal negotiator. I have successfully led and completed M&A, capital sourcing, recapitalization and restructuring transactions in a wide variety of industries.

While my clients are typically middle market businesses, from time to time I have been engaged by public companies seeking advice and analysis relating to potential acquisitions and divestitures.

I am a passionate problem-solver with exceptional analytical skills, able to quickly make sense of complex financial and transaction challenges. I am also frequently engaged in a strategic planning capacity by shareholders and boards seeking to understand company dispositional alternatives, including equity monetization.

My practice also includes creditor and debtor-side restructuring advisory and representation in and outside of bankruptcy.

My client engagements cover a wide spectrum of industries, including manufacturing, wholesale distribution, national and regional retail and restaurant, hospitality, professional services, banking and financial services, software and Internet-enabled businesses, healthcare services and healthcare IT, publishing and energy, among others.

## Managing Partner at Ludlow, Ward Capital Partners & Ludlow Ward Investments, LLC
### April 2005 - December 2008

Ludlow, Ward Capital Partners (including Ludlow, Ward Investments) is a boutique investment banking firm and registered broker/dealer. The firm specialized in middle market M&A and capital sourcing. Joined the firm one-year after it was formed as a third full partner.

Page1

Greenberg00325

### Chairman & CEO at Atomic Dog Publishing
**2002 - 2005**
Venture capital fund backed pioneer in digital, web-delivered educational textbooks and interactive media. I was originally the outside board director, and was then asked by the board to assume leadership of company, initially as non-operating Chairman, then as Chairman & CEO. I sold company after 3 + years to Thomson Corporation (now Cengage).

### Chairman & CEO at (Jay) Industrial Technologies Group
**1996 - 2002**
An upper middle-market engineering, maintenance service company and distributor of industrial valves and controls to the process manufacturing, refining and power generation markets throughout the central and northern Midwest and Southeast United States. The business was a result of an eight company roll-up executed over three-years. Acquired the first business Jay Instrument, Inc. from the Resolution Trust Corporation. The 8-company roll-up was achieved in a period of 3-years. After 6-years, I sold to the Company to a New York City-based private equity firm.

### Chairman & CEO at Paige Maren Group, LLC
**1991 - 1996**
Initially became involved with this business as a workout /restructuring consultant to Fifth Third Bank. I acquired initial the business in an Article 9 transaction from Fifth Third and then acquired two additional newspapers in the first 4 years.  Sold the entire company to American City Business Journals after five highly successful and profitable years.

### Division President at HarperCollins (a News Corp Company).
**1988 - 1991**
Was executive in charge of operating divisions of HarperCollins. Was part of acquisition team that acquired Scott Foresman Company from Time, Inc., and lead divestitures of Ballinger Publishing Company and Allen & Unwin, among others.

## Education
**Boston University**

Bachelors Degree  majoring in Philosophy, Logic and Mathematics
Graduated *Magna Cum Laude*
Teaching Assistant in Department of Philosophy for Professor then holding Borden Parker Bowne endowed chair.

Greenberg00326