1          UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF OHIO
2                 WESTERN DIVISION

3                    - - -
THE ANTIOCH COMPANY        :
4   LITIGATION TRUST,        :
                             :
5          Plaintiff,        :CASE NO. 3:10-cv-00156
                             :
6   vs.                      :(Judge Timothy S. Black)
                             :
7   LEE MORGAN, et al.,      :
                             :
8          Defendants.       :
                             - - -
9

10

                       VOLUME II
11

12

             Deposition of MARK A. GREENBERG, a
13

   witness herein, taken as upon cross-examination by
14

   the Defendants pursuant to the Ohio Rules of Civil
15

   Procedure, before me, Kelly Green, RPR, a Notary
16

   Public within and for the State of Ohio, at Taft,
17

   Stettinius & Hollister, 425 Walnut Street, Suite
18

   1800, Cincinnati, Ohio, on Tuesday, August 27,
19

   2013, at 9:04 a.m.
20

21

22
                     On-Time Reporting
23                   8739 Landen Drive
                  Maineville, Ohio  45039
24                    513.290.3233


                     513.677.6188

```
 1                           APPEARANCES

 2        FOR THE PLAINTIFF:

 3             MARCIA VOORHIS ANDREW, ESQ.
               EMILY McNICHOLAS, ESQ.
 4             Taft, Stettinius & Hollister
               425 Walnut Street, Suite 1800
 5             Cincinnati, OH  45202

 6        FOR THE DEFENDANTS MORGAN, MORAN, ATTIKEN:

 7             MICHAEL L. SCHEIER, ESQ.
               DAVID T. BULES, ESQ.
 8             Keating, Meuthing & Klekamp
               One East Fourth Street, Suite 1400
 9             Cincinnati, OH  45202

10        FOR THE DEFENDANTS MCDERMOTT, WILL & EMERY:

11             JEFFREY S. SHARKEY, ESQ.
               Faruki, Ireland & Cox
12             500 Courthouse Plaza SW
               10 North Ludlow Street
13             Dayton, OH  45402

14        FOR THE DEFENDANTS BLAIR, LUCE, WALKER:

15             DANIEL J. GENTRY, ESQ.
               TERENCE L. FAGUE, ESQ.
16             Coolidge Wall
               33 West First Street
17             Dayton, OH  45402

18        FOR THE DEFENDANTS CARLSON, SANAN,
          McLAUGHLIN, VON MATTHIESSEN:
19
               THOMAS A. KNOTH, ESQ.
20             JENNIFER MAFFETT, ESQ.
               Thompson Hine
21             Austin Landing I
               10050 Innovation Drive, Suite 400
22             Dayton, OH  45342

23

24
```

```
1    APPEARANCES (Cont'd)

2        FOR THE DEFENDANTS LIPSON-WILSON, FELIX,
         BEVELHYMER:
3
             ROBERT A. KLINGLER, ESQ.
4            Robert A. Klingler Co., LPA!
             525 Vine Street, Suite 2320
5            Cincinnati, OH  45202

6        FOR THE DEFENDANT NORTHROP:

7            R. DANIEL PRENTISS, ESQ.
             Prentiss Law Firm
8            One Turks Head Place, Suite 380
             Providence, RI  02903
9
     ALSO PRESENT:
10
         Jess Ultz
11       Asha Moran
         Lee Morgan
12
                              _  _  _
13

14

15

16

17

18

19

20

21

22

23

24
```

1                         EXAMINATION INDEX

2                                                            PAGE
        MARK A. GREENBERG
3             CROSS BY MR. SHARKEY.....................346
              CROSS BY MR. KNOTH.......................433
4             CROSS BY MR. GENTRY......................479
              CROSS BY MR. PRENTISS....................513
5             CROSS BY MR. KLINGLER....................522
              RECROSS BY MR. SCHEIER...................527

6

7                          EXHIBIT INDEX

8       Deposition
         803    Witness Articles.......................353
9
         804    Witness Article – For companies in
10              distressed situations, a need-to-know
                primer.................................439
11
         805    Article – Silverstone finished huge
12              financial restructuring of
                BridgeStreet...........................451
13
         806    Silverstone Briefing...................481
14
         807    Antioch PublishingLudlow Ward Meeting
15              Notes..................................498

16       808    Email string...........................502

17

18

19

20

21

22

23

24

```
 1              MARK A. GREENBERG,
 2   a witness herein, having been previously duly
 3   sworn, was examined and testified as follows:
 4              CROSS-EXAMINATION
 5   BY MR. SHARKEY:
 6       Q.    Good morning, Mr. Greenberg.
 7       A.    Morning.
 8       Q.    We've met off the record.  My name is
 9   Jeff Sharkey, and as you know, I represent the law
10   firm of McDermott, Will & Emery.  I'm going to ask
11   you some questions, going to follow up on some of
12   the questions that Mr. Scheier asked you
13   yesterday, and we're going to look at a couple of
14   the same documents.
15              The first document I want you to take a
16   look at is Exhibit 799 that's been placed before
17   you.  And I believe you've previously identified
18   that as an expert report that was authored by
19   Barbara Wagner; is that right?
20       A.    That's correct.
21       Q.    And this is a document that you've read?
22       A.    I did.
23       Q.    Okay.  And is it your understanding that
24   Ms. Wagner sponsored certain opinions regarding
```

```
 1   whether or not McDermott, Will & Emery committed
 2   malpractice and whether any alleged acts of
 3   malpractice caused injury to the company?
 4        A.    That's my understanding of the document.
 5        Q.    And it's true, isn't it, that you are
 6   not an attorney?
 7        A.    I am not an attorney.
 8        Q.    And I have read your report diligently
 9   looking for references to MWE and haven't seen
10   any.  Is it accurate that your report does not
11   refer to or mention MWE?
12        A.    That's accurate.
13        Q.    A couple of background questions.  First
14   of all, have you ever been involved in your
15   capacity as an investment banker in a transaction
16   in which management was a potential buyer?
17        A.    Yes.
18        Q.    Okay.  About how many times?
19        A.    Well, I'm in one right now.  I've
20   actually had two in the last -- last three
21   months.  I have a management buyout in -- one in
22   Louisville and one in Cincinnati that we're
23   working on.  I'm trying to think of other times.
24   Probably five or six different times, I mean,
```

1    where there's been management buyouts that I've

2    been involved -- been an advisor.

3        Q.    Would you agree it's not uncommon that

4    management is a potential buyer of a business?

5        A.    Not uncommon at all.

6        Q.    Have you ever been involved in a

7    transaction in which members of the board owned

8    shares of the company that was to be sold?

9        A.    I'm involved with one right now.

10       Q.    Do you also agree that that's reasonably

11   common that members of the board would own shares?

12       A.    Yes.

13       Q.    Ever been involved in transactions in

14   which members of the board held debt?

15       A.    I'm trying to think.  Yes, actually.

16       Q.    Okay.  And have you ever been involved

17   in transactions in which members of the board held

18   options or warrants?

19       A.    Yes.

20       Q.    Okay.  You agree it's not common that

21   members of the board would hold either debt or

22   options or warrants?

23       A.    Do you mean uncommon?  Is that what you

24   meant?

1          Q.     Yes.  Let me rephrase.  Apparently I

2    misstated it.  Do you agree that it's not uncommon

3    that members of the board would hold either debt

4    or options or warrants?

5          A.     I agree.

6          Q.     Have you ever been involved in a sales

7    process in which you were unable to find a buyer

8    that would offer an acceptable price?

9          A.     Yes.

10         Q.     Okay.  Do you agree that's not uncommon

11   in the investment banking industry?

12         A.     It's not uncommon.

13         Q.     Have you ever been involved in what you

14   would describe as complex transactions?

15         A.     Yes.

16         Q.     Have you ever been involved in any as

17   complex as the 2007/2008 efforts to sell the

18   Antioch Company?

19         A.     Comparatively, yes, with a client of

20   mine for the last three years, yes.

21         Q.     Do you know what a workout specialist

22   is?

23         A.     I do.

24         Q.     What is it?

```
 1        A.    Typically, a workout specialist would be

 2    somebody -- might assume a chief restructuring

 3    role -- who comes in to assist the company,

 4    usually at the behest of the senior lenders, to

 5    come in and get a better handle on where the

 6    company really is financially and to assist the

 7    company in any manner of trying to improve its --

 8    its operating performance and its earnings and so

 9    forth.

10            I've actually -- by disclosure, I

11    actually came to Cincinnati originally as a

12    workout specialist for Fifth Third Bank as a

13    consultant, so...

14        Q.    Okay.  Is a workout specialist typically

15    engaged in a company that's experiencing some

16    level of financial distress at the request of the

17    banks?

18        A.    Very often, yes.

19        Q.    So it's not unusual that a workout

20    specialist would be engaged?

21        A.    It's not unusual.

22        Q.    Okay.  And you understand that CRG

23    served that role here?

24        A.    I do.
```

```
 1        Q.    Are you aware of any facts that suggest

 2   that CRG billed for work that it didn't perform?

 3        A.    I have no reason to believe that.

 4        Q.    Okay.  Had you heard of CRG before this

 5   case?

 6        A.    I've not heard of CRG before this case.

 7        Q.    Okay.  Did you review the -- any

 8   materials relating to CRG or Michael Epstein's

 9   qualifications?

10        A.    I'm trying to think what was in there.

11   I recall when he was -- when they were hired and

12   then -- and what the recommendations were, but I

13   don't recall looking at his specific

14   qualifications.

15        Q.    Any reason to doubt that Mr. Epstein was

16   qualified to perform the services he was --

17        A.    No reason to doubt.

18        Q.    Have you ever served on the board of

19   directors of a company?

20        A.    Yes.

21        Q.    How many times?

22        A.    One, two, three, four, five.

23        Q.    Okay.  What businesses were those?

24        A.    I was chairman of the board of an
```

1    industrial distribution and an engineering

2    company.

3         Q.    What was the name?

4         A.    It was the Jay Industrial Technologies

5    Group.  I was the chairman of the board of a

6    venture-backed company called -- it's -- it's

7    called Atomic Dog, unusual name.  It was funded by

8    River Cities Capital Fund and Blue Chip Venture

9    Company.

10        Q.    Okay.

11        A.    I was also the outside director

12   initially.  I was on the board of a couple

13   start-up companies over the years, but those are

14   the ones that immediately (inaudible)...

15             THE REPORTER:  Immediately what?

16        A.    Come to mind.  Yeah, I mean, I --

17   there's some small start-ups that I've...

18        Q.    Do you recall the names of those

19   start-ups?

20        A.    There was one -- I think it was called

21   Summit Tech.  It's long gone, and -- and I'm

22   trying to think of the other one.  There's another

23   one.  It'll come to me.  It's been a while.

24        Q.    Have you ever served on a Special

1    Transactions Committee?

2         A.    I haven't.

3         Q.    Have you ever been involved in a sale

4    process in which a Special Transactions Committee

5    was in place?

6         A.    Yes.

7         Q.    About how many times?

8         A.    Well, I've been in one -- involved with

9    one in the last three years essentially for a

10   company called BridgeStreet Worldwide.

11        Q.    Okay.  Is it common in your experience

12   that Special Transactions Committees are formed?

13        A.    Yes.

14        Q.    Let me ask you some questions generally

15   about the sales process, and I want to hand you a

16   document that was -- that will be marked as

17   Deposition Exhibit 803.

18             (Deposition Exhibit 803 was marked.)

19             Exhibit 803 appears to be an email from

20   you to Tom Rogers and Lee Morgan dated June 18,

21   2007.  First of all, do you recall having seen

22   this document before?

23        A.    I recall writing it.  I don't recall

24   sending it to him, but I do -- certainly looks

1   like my -- my work.

2        Q.    There appears to be two documents that

3   are attached to this email; is that correct?

4        A.    Looks like it, yeah, negotiating --

5   something on negotiating and then -- then the

6   first document, yes.

7        Q.    The cover email says "I wrote these a

8   while back.  Thought you might find a useful

9   kernel or two in these."  Is it accurate that you

10  did write both of these?

11       A.    Yes.

12       Q.    Okay.  And the first one is an article

13  titled "Selling Your Company:  A Few Important

14  Lessons in Deal-Making"?

15       A.    Mm-hmm.

16       Q.    And then the second one that you

17  authored was -- that was a yes?

18       A.    That was a yes.  Sorry.  I will work on

19  that.

20       Q.    Then the second one is an article

21  written by you titled "A few critical ideas for

22  negotiating M&A transactions," correct?

23       A.    Yes.

24       Q.    I would like to take a look at page

```
 1   246137.

 2        A.    Okay.

 3        Q.    Towards the bottom of the page, there's

 4   a paragraph that begins "The deal is not over

 5   until all the money is in the bank."  Do you see

 6   that?

 7        A.    I do.

 8        Q.    The focus of my current couple of

 9   questions is the next sentence that says "An M&A

10   transaction can take several months and even as

11   long as an entire year."  Did I read that

12   accurately?

13        A.    You have.

14        Q.    Okay.  First of all, is that an accurate

15   statement?

16        A.    Oh, yes.

17        Q.    Okay.  And when you refer to the time

18   period several months and even as long as an

19   entire year, I'm assuming the closing point is

20   when the money's in the bank?

21        A.    That's usually -- that's what I mean,

22   yes.

23        Q.    Okay.  What's the beginning point that

24   you're referring to there?
```

1          A.    Well, an M&A transaction has a --

2     there's a lot of process involved.  And from the

3     -- from what I do for a living's point of view, we

4     go from everything from initial discovery through

5     developing all the financial profiles pro forma.

6               We do initial evaluations.  We draft

7     information memoranda, pitch decs, blind

8     investment summaries.  We set up the initial deal

9     rooms in the initial part of it.  And that's

10    usually what -- what happens first.

11              You're -- you're becoming deeply

12    acquainted with the company so that you're able to

13    speak to the potential interjectories of the

14    business and -- and a handle on the company itself

15    and also to have a sense how you could -- how you

16    might calibrate reasonable valuations for the

17    company, what would be a reasonable offer.  That's

18    how you go about doing it.

19         Q.    So from the time an investment banker is

20    engaged to a time a deal is closed, it can be

21    several months to an entire year?

22         A.    Very often.

23         Q.    Have you been involved in transactions

24    that took longer than a year?

```
 1        A.    Yeah.  I closed one -- I sold a company

 2   to Waste Management last year that took us almost

 3   a year and a half.

 4        Q.    Let me ask you some questions generally

 5   about the sales process.

 6        A.    Mm-hmm.

 7        Q.    Is it common that an investment banker

 8   would send something called a teaser --

 9        A.    Yes.

10        Q.    -- to prospective buyers?

11        A.    Yes.

12        Q.    What's a teaser?

13        A.    It's a -- I call it -- it's a blind

14   investment summary.  It's a prospectus of the

15   company without necessarily indicating the

16   identity of the company.  You're looking to send

17   out -- to describe characteristics of the company

18   at very high level financial terms, what kind of

19   business they're in.

20             And you do that prior to -- and in the

21   process of trying to effect -- to get a

22   non-disclosure agreement so you can move to the

23   next level.  So that's what it is.

24        Q.    So is a teaser generally sent to a
```

1    substantial number of potential buyers?

2        A.    Well, I'm not sure what you mean by

3    substantial.  It depends on the opportunity and

4    how you -- what you might think the potential

5    buyers are.  But it can be, certainly.

6        Q.    Typically, I assume, that not everybody

7    to whom the teaser was sent would respond?

8        A.    True.

9        Q.    And those who do respond indicating they

10   have some level of interest, would they be

11   expected to sign some type of confidentiality

12   agreements?

13       A.    Yeah, absolutely.

14       Q.    And then what type of information would

15   be provided to them after they signed the

16   confidentiality agreements?

17       A.    The initial information is the

18   confidential information memorandum, the offering

19   memorandum, and there might be additional deal

20   room -- early stage process deal room information

21   that is additional -- additional -- could be --

22   could be financials -- you know, financial models,

23   a variety of different things that might be in

24   there.  There might be abstracts of leases or

1    actual leases.  But the initial discovery stuff

2    that somebody would want in preliminary due

3    diligence.

4         Q.    Just so I understand clearly, in the

5    teaser process, it's sort of high level

6    information that would hold the name of the

7    potential target, and it's just sort of high level

8    data about that?

9         A.    Correct.

10        Q.    And then after somebody has signed a

11   confidentiality agreement, they will be provided

12   additional information that you, as the investment

13   banker, have decided is something that's important

14   for prospective buyers to see and should be

15   interested in seeing?

16        A.    Yes, with the only proviso that also --

17   with -- that the company also -- the client also

18   agrees that this is reasonable information.

19        Q.    After that round of confidential

20   information has been reviewed, is it frequent that

21   more prospective buyers will fall out indicating

22   they're not interested in the opportunity?

23        A.    Oh, yes.

24        Q.    If some remain, what's the next step?

```
 1         A.    The next step is -- typically in the
 2    process is there's usually additional discovery --
 3    diligence type of discovery that goes on, and you
 4    -- you're fielding questions.  There might be
 5    management meetings.  There might be site visits,
 6    although we tend to -- in my group, we tend to
 7    push those way out.
 8              And -- and that leads to the point where
 9    you'll start putting out -- seeing who's
10    interested.  You might put out -- you might do it
11    in a way where you put out bid instructions to get
12    initial indications of interest or a letter of
13    intent.  And you try in the process to move
14    everybody along about the same time so that -- so
15    that people have reasonably equal access and time
16    with the information.
17         Q.    Okay.  And you mentioned a letter of
18    intent.  What is that?
19         A.    A letter of intent is the -- really the
20    indication of the level of interest.  Typically
21    what we would be looking for is how much they're
22    willing to pay for the company, so the valuation
23    that they're going in with.
24              We look for the conditions and terms,
```

1    you know, what kind of structure that might be.

2    Is it all cash?  Are there notes?  Earnouts, if

3    that's possible.  We look to see what the

4    structure of the deal would be.  Is this going to

5    be an asset purchase, or is it going to be a stock

6    purchase?

7            In our -- in our firm, we look for

8    substantial amounts of details in the letter of

9    intent such that when we finally have the finished

10   negotiated letter of intent, that when we go in to

11   do diligence, we have at least reasonable moral

12   suasion as to what the terms are of the deal

13   before you get into diligence.  Diligence can be

14   tricky if you're not careful going up front.

15           It will have all that.  They're

16   typically non-binding except for the exclusivity

17   provision if you go forward and all the

18   confidentiality and non-solicitation provisions

19   that are also attended to the agreement.

20       Q.    You mentioned that a letter of intent is

21   non-binding.  Can you describe why it is the

22   letter of intent is non-binding?

23       A.    Because it's subject to additional due

24   diligence.  And usually that -- that will be some

513.677.6188

```
 1    phrase of that sort, that this is our offer
 2    subject to initial and final due diligence.
 3         Q.    And then due diligence is even a more
 4    in-depth analysis done by the potential acquirer
 5    of the target company?
 6         A.    Yes.
 7         Q.    Still within Exhibit 803, I'd like to
 8    turn to page 246137.
 9         A.    I don't seem to have 137.  Sorry.  Maybe
10    I do.
11         Q.    It's the same --
12              MS. ANDREW:  What page were we on?
13         Q.    -- the same page we were on before.
14         A.    Oh, I just flipped it.  My fault.
15              MS. ANDREW:  Turn to the page you're on.
16         A.    I'll get with it.  It's early yet.
17         Q.    It's really in the same paragraph.  A
18    few sentences later, there's a sentence that
19    begins with the words "More value."  Do you see
20    that?
21         A.    More value is lost between the time --
22    yes.
23         Q.    It says "More value is lost between the
24    time there is a signed letter of intent and a
```

```
 1    closing than anyone ever cares to admit."  Did I
 2    read that accurately?
 3         A.    You have.
 4         Q.    Is it true?
 5         A.    It's often true.
 6         Q.    And why is that?
 7         A.    Because -- it depends.  I mean, if --
 8    the due diligence process is an opportunity for
 9    many -- particularly for private equity investors,
10    but potentially also strategic investors, to find
11    ways of basically reducing their level of
12    commitment in terms of share price or stock price
13    or total valuation.
14              And that could be any number of things.
15    It could be a revaluation of assets.  It could be
16    revaluation -- not untypically in distribution
17    companies, you end up seeing revaluations of
18    inventories, things that if weren't properly
19    disclosed up front and not already subject to some
20    of the LOI discounting up front, may become a
21    claim that some portion of the assets are impaired
22    or that some relationship with a customer is not
23    what they said it was.
24              It's an opportunity to -- to nick the
```

```
 1    seller.  And if it's not -- if you're not managing
 2    the distrib- -- the process well, then and that
 3    can happen and does happen.  It's happened to me.
 4         Q.    Is it common that a prospective
 5    purchaser will insist on some type of price
 6    concession between the time that a letter of
 7    intent is signed and the final agreement is
 8    signed?
 9         A.    It's not uncommon.
10         Q.    It's also true, isn't it, that during
11    this final due diligence process, it's not
12    uncommon that a prospective acquirer will decide
13    that they are not interested in the opportunity?
14         A.    It's true.
15         Q.    Assuming somebody -- a prospective
16    acquirer makes it through all the steps we've
17    discussed, there would be some type of final
18    binding agreement signed?
19         A.    Yes.
20         Q.    Okay.  If it's to be an asset sale,
21    there'd be an asset purchase agreement?
22         A.    That's correct.
23         Q.    Now, you've reviewed in this case the
24    process that Houlihan Lokey engaged in, correct?
```

```
 1          A.    I have.

 2          Q.    And you're familiar with the steps that

 3     they took to contact potential buyers?

 4          A.    Yes, very familiar.

 5          Q.    Does it appear to you that the process

 6     engaged by Houlihan Lokey was generally consistent

 7     with this process that we've just discussed?

 8          A.    Yes, it was.

 9          Q.    Let me ask you some questions about the

10     role of an investment banker.

11          A.    Mm-hmm.

12          Q.    Is it generally true that clients who

13     want to sell their businesses frequently hire

14     investment bankers?

15          A.    Yes.

16          Q.    Why?

17          A.    For a bunch -- for a number of reasons.

18     One, is it is a -- a process that is, (A),

19     enormously time consuming and would require

20     certain levels of expertise and experience to do.

21               Another reason would be access to a

22     buyer's market.  Another one would be expertise in

23     negotiating deals and what kinds of things are

24     available to negotiate in a deal.  And -- and
```

```
 1     those are primarily it.
 2          Q.    Is it fair to say that the job of the
 3     investment banker is to advise the client on the
 4     best way to get a deal to fruition?
 5          A.    Yes.
 6          Q.    And would you describe the advice an
 7     investment banker provides as business advice?
 8          A.    Yes.
 9          Q.    Let me ask you about some specific
10     things regarding investment banker's advice.  Is
11     it usually the investment banker's job to advise
12     the client who to send a teaser to?
13          A.    Yes.
14          Q.    What was the term you used instead of
15     teaser?
16          A.    We call it an investment summary -- a
17     blind investment summary, same thing.  We also
18     call them teasers.  Same thing.
19          Q.    And would it be the role of the
20     investment banker to advise the client on who the
21     teaser should be sent to?
22          A.    Yes, typically.
23          Q.    Okay.
24          A.    Depending on the sensitivity.  I mean,
```

1    if there's strategic buyers involved, there may be

2    a desire on the part of the client not to send it

3    to certain -- certain -- certain potential buyers.

4    But yeah, we -- our process is that we have -- we

5    get approval on who we're going to send it out to.

6         Q.    And I've been asking my questions using

7    the phrase advise.  Let me just clarify.  Is it

8    true that investment bankers provide advice, but

9    it's ultimately the client who makes the

10   decisions?

11        A.    Yes.

12        Q.    So you may advise that the teaser should

13   be sent to these 25 people; but without the

14   client's decision, you won't do that?

15        A.    That's correct.

16        Q.    Is it typically the role of the

17   investment banker to advise regarding whether

18   particular offers are fair?

19        A.    Yes.

20        Q.    Is it the role of the investment banker

21   to advise the client regarding whether to counter

22   to particular offers?

23        A.    Yes.

24        Q.    Is it the role of the investment banker

```
 1    to advise clients regarding when they should

 2    counter?

 3         A.    I would think so, sure.

 4         Q.    Is it the role of the investment banker

 5    to advise the client regarding who they should

 6    have negotiations with?

 7         A.    Yes.

 8         Q.    And how to handle those negotiations is

 9    also something an investment banker would do?

10         A.    Yes.

11         Q.    Okay.  In the piece you have in front of

12    you, I can point you to a page, but -- maybe I

13    will.  It's 246136, so one page earlier.

14         A.    Okay.

15         Q.    Towards the bottom of the page, there's

16    a paragraph that begins in bold.  It says "Slow

17    everything down and be patient."  Do you see that?

18         A.    I do.

19         Q.    Do you agree that it's the

20    responsibility of the investment banker to advise

21    the client regarding how quickly they should act

22    in response to indications of interest in the

23    market?

24         A.    Yes.
```

1      Q.   And why -- well, first of all, you

2  provided the advice in this piece that says "Slow

3  everything down and be patient."  Can you describe

4  why you provided that advice?

5      A.   Mostly because it's really about --

6  about not -- taking your time to make the decision

7  in responding, taking the time to make a decision

8  -- taking your time on what you're going to

9  negotiate.

10          People can get pretty anxious in these

11  things and react quickly without really having

12  full context.  And our process -- my process has

13  always been to -- is to slow it down.  Nobody's

14  going to run away if we don't get back to them

15  immediately.  Let's think through how we want to

16  respond.

17          So it's -- it's really an advice to a

18  seller and usually to someone who is really -- you

19  know, thinks that they need to be kind of --

20  negotiating is somehow a -- a head-on process,

21  which I don't think it really is.

22      Q.   Have you ever worked on transactions in

23  which the seller had legal counsel involved?

24      A.   Oh, yes, almost always.

1        Q.    You said almost always?

2        A.    Yes.

3        Q.    Is it fair to say that in your

4    experience, it's the role of the investment banker

5    to provide advice on the sales process and the

6    role of the lawyer to provide legal advice?

7        A.    Yes.

8        Q.    Is it generally true in a sales process

9    that having more prospective buyers is better than

10   having few prospective buyers?

11       A.    I would say almost always.

12       Q.    Turn, if you would, to your expert

13   report.  Do you still have that handy?

14       A.    I do.

15       Q.    What I'd like you to do is turn to the

16   back of page 24.

17       A.    Mm-hmm.

18       Q.    I want to ask you about the 2007/2008

19   sales process.  And it appears to me that you

20   identify three specific items of injury that were

21   suffered by The Antioch Company in this piece, and

22   I want to see if my reading is consistent with

23   yours.

24              First of all, you identify in your

1    report as an item of injury the failure to close

2    on the Sun deal, correct?

3        A.    No, that's not correct.  I don't say

4    it's a failure to close.  I said it was a verbal

5    offer, and it wasn't -- you know, and not followed

6    through from what I can see.  But that's -- but

7    I'm not saying that was specifically the case.

8        Q.    And you discussed that, the Sun deal,

9    yesterday with Mr. Scheier, right?

10        A.    We did.  I mean, we -- there was an

11    offer in '07, I guess, and -- and I think it was

12    63 million, and it didn't seem to proceed beyond

13    that, but it was pretty unspecified what that

14    offer would look like.

15        Q.    The next item of injury that appears is

16    the failure to pursue and close on the

17    J.H. Whitney deal.  Is that an item of injury that

18    you identify in your report?

19        A.    Yes, I have.

20        Q.    And then another item of injury that I

21    see in your report is a reference to waste;

22    namely, fees paid to advisors.  Is that an item of

23    injury as identified in your report?

24        A.    It - yeah.  It's incremental, but, yes,

1    it's in there.

2        Q.    Okay.  And is there any other specific

3    item of injury that Antioch suffered during the

4    sales process that you identify in your report?

5        A.    Define -- can we go back to -- define

6    injury for me.  What do you specifically mean when

7    you say...

8        Q.    Well, we've discussed a couple of

9    examples, one being the failure to close on the

10   J.H. Whitney deal, and the other being the

11   corporate waste.  And what I'm trying to determine

12   is if there's anything else that you identify in

13   your report that you can say, Here is a specific

14   item of injury suffered by The Antioch Company?

15       A.    Those are the items that would be

16   reasonably quantifiable in terms of what happened.

17   So that's -- if that's the answer you're looking

18   for, that's what I would say.  Those were the

19   reasonably quantifiable outcomes.

20       Q.    And those are the only ones that you've

21   identified in your report that you can think of?

22       A.    There were a lot of other things in

23   terms of process and different things that

24   happened, but in terms of anything quantifiable,

```
1    that's the only thing that I -- I do refer to.

2         Q.    Let me ask you about Houlihan Lokey.  Do

3    you agree that Houlihan Lokey is a well respected

4    investment banker?

5         A.    I do.

6         Q.    And they were well qualified for this

7    job?

8         A.    Absolutely.

9         Q.    On page 25 of your report, if you look

10   at the far left-hand column about ten lines down,

11   it begins with the phrase "Reasonably competitive

12   process by Houlihan"?

13        A.    Mm-hmm.

14        Q.    Do you see that phrase?

15        A.    Yeah, I do.

16        Q.    Do you believe that Houlihan ran a

17   reasonably competitive process?

18        A.    I do.

19        Q.    And why do you say that?

20        A.    Well, they went out to -- in two -- in

21   two phases, they went out to 170-plus potential

22   buyers.  They had -- some were able to get it

23   somewhere in the neighborhood of 70 NDAs, so that

24   meant at least roughly, I think, high 60s or
```

```
 1    70s -- NDAs that were -- which meant that people

 2    were looking at the offering memoranda and getting

 3    deeper into what the opportunity was.

 4              And then it obviously narrowed down to a

 5    very small number thereafter, but by any -- any

 6    count that I would say, I would think that's a

 7    reasonably competitive process given the scope

 8    that they were able to reach and the fact that --

 9    I'd add -- additional thought to that is when

10    Houlihan, being who they are, sends you a teaser

11    and you're an investment -- you're a private

12    equity fund, you're going to pay attention because

13    they're a very important force in this business,

14    so -- so I do think it was, yes.

15         Q.    Turn if you would, then, to page 18 of

16    your report.

17         A.    Okay.

18         Q.    Page 18 of your report towards the top,

19    the first full paragraph, says (as read)

20    Meanwhile, with Houlihan effort -- with Houlihan

21    -- with initial Houlihan efforts failing to bring

22    in a viable offer.

23              Despite having stuttered over that a

24    couple times, did I then read it correctly?
```

513.677.6188

```
 1        A.    Yes, you have.
 2        Q.    When you're referring to the initial
 3   Houlihan efforts, you're referring to the first
 4   round --
 5        A.    Yes.
 6        Q.    -- where you're contacting strategic and
 7   financial buyers?
 8        A.    Yes, I am.
 9        Q.    And then if you would turn to the
10   preceding page, you -- on page 17 under the
11   heading "Early Market Indications," the second
12   paragraph, you describe some items that describe
13   why the initial process was unable to identify any
14   viable offers; is that accurate?
15        A.    Yes.  It's a summary of statements made
16   by Houlihan in their -- some of their summarized
17   reports.  It's a paraphrasing of that.
18        Q.    And you say specifically that the
19   consensus of the strategic acquirers was that the
20   company's financial condition was still in
21   freefall, had not bottomed out.  The company
22   lacked a viable actionable strategy, that
23   management was not up to the task of running the
24   business and was incapable of effectively
```

513.677.6188

1    addressing the decline.  Is that accurate?

2         A.    Yes.

3         Q.    And first of all, is that an accurate

4    summary of your beliefs as to why it failed -- the

5    initial process failed to identify any --

6         A.    Yes, it is.

7         Q.    Okay.  Then towards the bottom of the

8    page, the last paragraph that runs onto the

9    following page begins with the phrase (as read)

10   With the company's financial condition and

11   business model providing an insuperable barrier to

12   generating sustained interest among strategic

13   acquirers and private equity funds.  First of all,

14   did I read that accurately?

15        A.    Not quite, but I liked yours better than

16   mine.  I said generating sustainable interest, but

17   sustained interest is probably a better use of...

18   But, yes.  Yes, you (inaudible)...

19             THE REPORTER:  You what?

20        A.    I used the word "sustainable," you read

21   "sustained," and that's the only difference.  It's

22   the same meaning.

23        Q.    Now, those items that you identify,

24   you'd agree with me, would have nothing to do with

```
 1   the nature of how Houlihan ran its initial

 2   process; is that correct?

 3        A.    Yes, I agree with that.

 4        Q.    You understand, then, that Houlihan then

 5   contacted a distressed buyer market; is that

 6   accurate?

 7        A.    Phase two was the distressed buyer

 8   market.  It moved over to Steven Spencer's group,

 9   or at least the group that he's in.

10        Q.    Do you recall when Houlihan Lokey sent

11   out -- let me step back.  What is a distressed

12   buyer market?

13        A.    It's typically hedge funds and private

14   equity funds that specialize in buying distressed

15   assets, distressed companies.  They usually are

16   very practiced in dealing through bankruptcy,

17   Article 9 sales.  And there's a market of them.

18   There are -- there are several that they contacted

19   that show up here, but there's -- there are many

20   others too, so...

21        Q.    I think you said earlier they contacted

22   roughly 70 prospective --

23        A.    Yeah, that's --

24        Q.    -- buyers in the distressed buyer
```

1     market?

2          A.     That's approximately what they

3     contacted, yes.

4          Q.     Do you recall when Houlihan made its

5     initial contacts into the strategic and financial

6     markets?

7          A.     They -- well, they were hired in March

8     '07, so I'm assuming that some period

9     thereafter -- through that period of '07 after --

10    after March, so...

11         Q.     And the contacts to the distressed buyer

12    market was effectively a start-over with a new

13    group of prospective buyers?

14         A.     Yes.

15         Q.     So you would expect that process to take

16    a substantial amount of time to walk through the

17    various steps that we've discussed previously?

18         A.     Yes.  Yeah, I do.

19         Q.     Let me show you a document that has been

20    marked as Exhibit 388 in a prior deposition.

21    Exhibit 388 is a February 29th, 2008, letter from

22    Marlin Equity.  Have you seen this document

23    before?

24         A.     I believe I have.

```
1           Q.    Would you describe this document as a

2     letter of intent?

3           A.    Yes.

4           Q.    And you understand that this is a

5     non-binding proposal on behalf of Marlin Equity?

6           A.    I do.

7           Q.    And --

8           A.    Generally non-binding.  There are

9     certain aspects of it that wouldn't be, but --

10    well, actually, they didn't -- they were not

11    concerned about the exclusivity.  So yeah, it's

12    non-binding.

13          Q.    Okay.  And do you know whether The

14    Antioch Company ever signed this letter?

15          A.    I don't believe they did.

16          Q.    I believe you're correct.  If you would,

17    turn to the page HL31605.

18          A.    Okay.

19          Q.    Do you see there's a proposed purchase

20    price of $40 million?

21          A.    Yes.

22          Q.    Okay.  Make a note of that or remember

23    it because we're going to come back to that.  I

24    just wanted to walk you through a little bit of
```

```
 1     the process.

 2             Then I want to show you a document that

 3     I believe you discussed with Mr. Scheier that was

 4     previously marked as Exhibit No 629.

 5         A.     Mm-hmm.

 6         Q.     That is a letter of intent from

 7     J.H. Whitney --

 8         A.     Yes.

 9         Q.     -- correct?

10         A.     Yes.

11         Q.     And do you see on page 1 the proposed

12     purchase price of $44 million?  It's under

13     "Purchase Price" towards the bottom.

14         A.     Oh, I'm sorry.  Yes, I do.

15         Q.     Do you know whether the company ever

16     accepted this letter of intent?

17         A.     It did not.

18         Q.     Let me step back.  I will hand you a

19     document that's been previously marked as Exhibit

20     240.  Exhibit 240 purports to be an executed GSC

21     term sheet.  Is this a document you've seen

22     before?

23         A.     I have.

24         Q.     And do you understand that in this
```

```
1   document, The Antioch Company gave GSC a 30-day

2   exclusive?

3       A.    Yes.  Page 4.

4       Q.    That's on page 4?

5       A.    Mm-hmm, yes.

6       Q.    Is it common in investment banking

7   transactions that a prospective buyer will ask for

8   some type of exclusivity?

9       A.    It's to be expected.

10      Q.    And why do they do that?

11      A.    Because they don't want to devote all

12  the resources to doing the deal that's required

13  even if they're being reimbursed for some of those

14  -- to move forward.

15            There's a lot of things to look at.

16  They look at a lot of different deals.  And if

17  they're going to get committed, they don't -- they

18  don't want to be in a position where others are

19  also acting at that point, so they -- they're

20  looking for a commitment to a -- and that's what

21  the exclusivity is for.

22      Q.    As a prospective seller as a practical

23  matter to get a deal done, do you frequently have

24  to grant exclusivity to prospective buyers?
```

1       A.      Not always, but mostly, yes.

2       Q.      Did you understand GSC to be a

3  third-party investor who wasn't affiliated with

4  any of the owners or directors of The Antioch

5  Company?

6       A.      Yes, I do.

7       Q.      Any reason to doubt that GSC had the

8  financial ability to execute on this deal if it

9  were decided to go forward?

10      A.      I had no reason to doubt.

11      Q.      And you understand GSC decided to not

12  close on that transaction?

13      A.      I do.

14      Q.      And you don't fault anybody for the

15  failure of that transaction to close?

16      A.      There were many reasons why it didn't

17  close; and ultimately, the reason was GSC backing

18  out.  I think the notification was in April,

19  but...  Was any of the parties from the company

20  and the investment banking groups -- were they at

21  fault?  No, I don't -- I don't see anybody...

22      Q.      You don't blame the process that was put

23  in place at all for the failure of GSC to close?

24      A.      No, I don't blame the process, but I do

1    think that the deal was pretty shaky, as did -- as

2    did others going through this, not only because of

3    who GSC was but also because of the cost of the

4    capital structure and whether or not the company

5    could afford to pay the debt service on it and

6    also in -- whether or not GSC was going to sit in

7    their position without crowding out the balance of

8    the equity and other -- other constituencies on

9    the balance sheet.

10        Q.    You thought it was, upon your review,

11   unlikely that the GSC deal would close; but at the

12   time, nobody knew for sure whether it would close

13   or not; is that fair?

14        A.    That's fair.

15        Q.    Let me then show you a document that was

16   marked in a prior deposition as Exhibit 470.

17        A.    Mm-hmm.

18        Q.    It's another letter of intent from

19   Marlin Equity; is that true?

20        A.    Yes.

21        Q.    And you recall that the prior Marlin

22   Equity letter of intent that we saw was dated

23   February 29th, 2008?

24        A.    I did.

1      Q.    So this one's roughly two months later?

2      A.    Yes.

3      Q.    And if you would turn to page 6724, you

4  will see that the purchase price is now $45

5  million?

6      A.    I do.

7      Q.    $5 million higher than the purchase

8  price that Marlin Equity had proposed in its

9  letter of intent two months earlier?

10     A.    Correct.

11     Q.    Okay.  And then I'm going to hand you

12  Exhibit No. 188, which is a May 8 letter of intent

13  from J.H. Whitney.  Is this a document you've seen

14  before?

15     A.    Yes.

16     Q.    And if you'd turn to the second page,

17  you'll see that the offer is now, in this letter

18  of intent, $54 million; is that correct?

19     A.    Yes.

20     Q.    So that has increased approximately $9

21  million?

22     A.    Yes.

23     Q.    And the prior offer was approximately

24  two months earlier -- the prior letter of intent,

1   rather?

2        A.    Yes.

3        Q.    Did you read the deposition of Steve

4   Spencer?

5        A.    I did.

6        Q.    Do you recall that Mr. Spencer testified

7   that he was able to use the fact that Mr. Morgan

8   and Candlewood Partners were potential acquirers

9   in negotiations to attempt and to, in fact,

10  negotiate higher prices from J.H. Whitney and

11  Marlin Equity?

12       A.    I don't recall that specifically.

13       Q.    Is it common in the investment banking

14  industry that as an investment banker, you can use

15  the fact that multiple parties are interested to

16  attempt to negotiate higher prices?

17       A.    Yes.

18       Q.    If Mr. Spencer testified as I've just

19  described, are you aware of any facts in the

20  record that would suggest that he's incorrect?

21       A.    There's no facts in the record that I...

22  I agree.  There are...  Do want to rephrase the

23  question so I can answer it in some way that works

24  for her?  (Indicating reporter.)

```
 1        Q.    Sure.  Assuming that Mr. Spencer
 2   testified as I've just described, the question
 3   then is, are you aware of any facts in the record
 4   that would suggest that his testimony was
 5   incorrect?
 6        A.    No.
 7        Q.    Are you aware of any facts in the record
 8   that explain why J.H. Whitney and Marlin's
 9   proposals in their letters of intent increased
10   during that two-month span?
11        A.    I have my assumptions, but I -- I don't
12   have facts in the record that I -- that I can
13   cite.
14        Q.    If you would turn to page 23 of your
15   report, there's a paragraph in the middle that
16   begins with the phrase "With the Special
17   Committee."  Do you see that?
18        A.    Yes, I do.
19        Q.    And then the second-to-last sentence in
20   that paragraph says "The reason" -- actually, let
21   me step back.  This paragraph relates to the
22   decision of the ESOP trustee, Kenny Lenoir, to
23   fire the board and kill the J.H. Whitney
24   transaction?
```

1          A.    That's correct.

2          Q.    And there's a sentence there, the

3    second-to-last sentence, that says "The reason for

4    this action was that there was nothing in the deal

5    for the ESOP and nothing in it for Lee Morgan."

6    Did I read that accurately?

7          A.    You have.

8          Q.    Let me ask you about that.  You

9    understood that the J.H. Whitney proposal at the

10   time was $54 million?

11         A.    Yes.

12         Q.    And that offer was a letter of intent

13   that was non-binding, correct?

14         A.    I do.

15         Q.    And so it was still possible that the

16   offer would be negotiated to a lower number during

17   an ongoing due diligence process?

18         A.    That could happen, yes.

19         Q.    And you understood -- let me step back.

20   Do you know how much the banks were owed?

21         A.    At that point, I think around 50

22   million, 51 million, something like this.

23         Q.    My understanding is that general range

24   as well.  And this was to be a bankruptcy

1    proceeding through chapter -- Section 363, rather?

2         A.    Yes.

3         Q.    In that bankruptcy proceeding, is it

4    accurate that the banks would have the right to be

5    paid first and completely before any other party

6    received any money?

7         A.    Yeah.  If there was DIP on top of it,

8    there would be super senior, and then the senior

9    would be allocated after that, but yes.  Generally

10   speaking, yes.

11        Q.    So there are some parties who might have

12   a right to be paid in advance of that 50 or 51

13   million dollars?

14        A.    The debtor-in-possession financing would

15   have seniority typically, and then you have senior

16   debt.  But generally, you know, often in these

17   cases, the banks would also provide the DIP so

18   that they're not -- they're not being -- they're

19   not being haircut.

20        Q.    What about Houlihan's fees; where would

21   they have been in the process if the J.H. Whitney

22   deal had closed?

23        A.    My reading of the documents is that

24   Houlihan negotiated some type of carve-out with

1    LaSalle and -- and they also in their agreement --

2    that they would be -- they'd be guaranteed

3    their -- their -- their fees through the process.

4         Q.    So that would be on top of and in

5    addition to the 51 or whatever it is that the

6    banks are owed?

7         A.    I don't know if it would have been in

8    addition to.  It might have been a carve-out of

9    what they were owed.  I'm just not exactly sure

10   how -- what the transaction would have been.

11        Q.    In any event, in addition to the bank

12   debt, do you know if The Antioch Company had any

13   subordinated debt?

14        A.    It did.

15        Q.    What subordinated debt did it have?

16        A.    It had the ESOP notes, and it had the --

17   the -- the notes -- the subordinated notes from

18   the -- from the tender offer transaction.

19        Q.    Do you know if it also had any typical

20   trade debt?

21        A.    Yes, of course.

22        Q.    And just so a jury understands if they

23   were reading this, trade debt just means the

24   ordinary debt that a business acquires through the

```
 1    ordinary operations of its business?
 2         A.    Right.  Ordinary course payables, right,
 3    and accruals, right.
 4         Q.    So that debt would have had a right
 5    under the bankruptcy proceeding to be paid only
 6    after the banks were paid, the
 7    debtor-in-possession financing was paid, and
 8    possibly after any additional Houlihan fees were
 9    paid?
10         A.    Yes.
11         Q.    And the ESOP then owned the equity
12    interest, right?
13         A.    Yes.
14         Q.    Okay.  So when you say in your -- in
15    your sentence here that nothing in the deal --
16    there was nothing in the deal for the ESOP, the
17    idea is that there was no realistic possibility in
18    your view that the ESOP, as the shareholders,
19    would receive any money through the J.H. Whitney
20    deal?
21         A.    According to everything in the record
22    that I've read including descriptions of the
23    desires of Whitney written up by -- by Houlihan
24    suggested exactly that.
```

```
 1          Q.    Okay.  And you also say that there was

 2    nothing in it for Lee Morgan, correct?

 3          A.    Yeah.  There would have been -- there

 4    would have been nothing.  The 54 million would

 5    have covered the debt and -- and some Houlihan

 6    fees, and there might have been some small --

 7    relatively small incremental available capital to

 8    deal with other -- other -- other credit.

 9          Q.    You understand that Mr. Morgan, in

10    addition to any equity interest he had, also held

11    subordinated debt associated with the 2003

12    transaction?

13          A.    I do.

14          Q.    Okay.  And when you say here that

15    there's nothing in it for Lee Morgan, is it your

16    view that, as a practical matter, Lee Morgan

17    shouldn't have expected reasonably to get any

18    money on that subordinated debt?

19          A.    Yes.

20          Q.    And so first of all, you don't know what

21    Lee Morgan was thinking, correct?

22          A.    No way I could.

23          Q.    But from an objective financial

24    prospective for Lee Morgan, he's better off
```

1    rejecting a sure zero personally and pursuing a

2    slim chance, whatever the chance may be, of a

3    payout through -- by continuing to look for

4    prospective buyers?

5        A.    If the question is was Lee Morgan

6    personally better off to hope for some --

7    something else besides this for some recovery of

8    what he -- what he had on -- in terms of

9    obligations, yes.

10       Q.    It was possible, for example, that The

11   Antioch Company may have turned around its sales;

12   and if it would have done so, that may have

13   increased the interest of prospective buyers in

14   the market?

15       A.    At that time?  Is that what you're

16   saying?

17       Q.    Sure.  As they were sitting on June 5,

18   2008, it was possible that the Antioch sales could

19   have improved dramatically, correct?

20       A.    It was remotely possible that something

21   like that could happen, but very remotely at that

22   time.

23       Q.    You understand -- step back.  The other

24   debt holders, meaning the other people who held

1    ESOP notes and the other people who held

2    subordinated notes, sat in the same position as

3    Lee Morgan as to the likelihood of their getting

4    any money from the J.H. Whitney deal, correct?

5         A.    It's my understanding that all the

6    subordinated debt including the ESOP notes were

7    Pari-passu.  So yes, they were in the same

8    position.

9         Q.    Turn to page 19.

10        A.    Of...

11        Q.    Of your report.  That would be helpful

12   if I told you the right document.

13        A.    No.  We got there.

14        Q.    You say in the paragraph that begins "In

15   early 2008" -- do you see that paragraph?

16        A.    Yes, I do.

17        Q.    There's a sentence that the line begins

18   "certainly must undoubtedly."  Do you see that?

19        A.    No.  But also -- already I don't like

20   the sentence, but okay.

21        Q.    On the far left, the word begins with

22   "certainly."

23        A.    Yeah, I do.

24        Q.    You're describing, in the beginning of

1    that sentence, Mr. Morgan's insistence on being

2    paid his debts in Candlewood marketing efforts,

3    and then you say, quote, "certainly must

4    undoubtedly have had a chilling effect on

5    Houlihan's efforts."  Did I read that phrase

6    correctly?

7         A.    You have.

8         Q.    And my question to you is, are you aware

9    of any specific facts in the record that suggest

10   that any prospective buyer refused to provide a

11   letter of intent or other offer to The Antioch

12   Company based upon the fact that Mr. Morgan would

13   refuse to forfeit his debt or that Candlewood was

14   engaging in its various marketing efforts?

15        A.    I'm clearly making a presumption there,

16   so I have no factual evidence of that fact.  I'm

17   just piecing together what I believed would be the

18   impact.

19        Q.    You're making your best guess?

20        A.    I'm making my best assumption, right.

21        Q.    You're not aware of any facts that show

22   that that's true?

23        A.    Not specifically, no.

24        Q.    Then in the next paragraph, you refer to

1    questions that were posed to witnesses about

2    whether they were confused by the dual-track

3    process.  Do you see that?

4        A.    I do.

5        Q.    And you say in the third sentence "These

6    investors were not likely confused."  Why did you

7    say that?

8        A.    What I'm -- what I'm referring to is how

9    the question was posed by the lawyers in the

10   testimony and how the question was answered and

11   very specifically that.  And what my statement is,

12   that these are very -- private equity folks are

13   very bright people.  They're lawyers and financial

14   professionals and very experienced people at the

15   senior levels.

16            So I don't think they were confused in

17   the sense that they weren't sure what was going on

18   in terms of what -- what the process was.

19            The question -- really what I'm trying

20   to address is if we knew that there was a

21   secondary process going on with -- in respect to

22   -- involving an insider who had substantial

23   influence in the company, that that -- that might

24   be something that would -- would result in them

```
 1    deciding not to go too far on this, noting that in

 2    addition to that that there were only a handful of

 3    bids that ever did come in out of many, many -- of

 4    a very large distribution, so...

 5         Q.    In effect, in your next sentence, you

 6    say, beginning with the word "however," (as read)

 7    However, they may have been -- they may have been

 8    reluctant to become engaged and continue past the

 9    preliminary screening.  And that sentence goes on,

10    but did I read that portion accurately?

11         A.    You have.

12         Q.    Okay.  Again, are you aware of any

13    specific facts in the record that show that

14    specific investors were reluctant to proceed due

15    to this -- these facts that you just identified

16    and described to me?

17         A.    Well, first, I haven't described facts

18    to you.  What I said is that they may have been

19    reluctant.  So the locution is clearly my

20    assumption that may have -- that this may have

21    occurred.  That's all I'm saying.

22         Q.    But you're not aware of any facts in the

23    record that show that it did occur?

24         A.    No.
```

1      Q.     Just so we're clear, when you say "no,"

2   you're agreeing with me; there's no facts in the

3   record you're aware of?

4      A.     I'm agreeing with you.

5      Q.     Regarding Lee Morgan and Candlewood's

6   involvement in the process, is it fair to say that

7   the most you can opine is maybe there would have

8   been a better deal but for Candlewood and Lee

9   Morgan's actions?

10      A.     I don't think I'm saying that at all.

11   What I'm saying is -- well, yeah, let's go back on

12   that.  There could have been a better deal, and

13   the -- what I considered to be un-executable

14   offers, including in my view the GSI (sic) offer,

15   that -- that that had the effect of -- of taking

16   up a lot of -- a lot of the -- the -- the parties,

17   including the Special Transaction Committee's

18   thinking about what to do.

19           And, in fact, there are many

20   circumstances in the documents where -- where they

21   are going back and readdressing, you know, We want

22   to have a consensual deal, and so on and so

23   forth.

24           So what I'm saying is it was -- it was

 1    a -- a substantial distraction.  And in addition

 2    to that, I'm saying that that process which had --

 3    which was an undercurrent throughout the '07/'08

 4    period, particularly after they went into phase 2

 5    with Houlihan to the distressed buyers, that that

 6    process certainly in that time frame was, I

 7    thought, burdensome.

 8              And I believe that anybody who really

 9    understood valuation of the business and where

10    things were would never have spent the time to

11    even look at it.  That's my view.

12        Q.    I don't believe that answers my

13    question.  My question simply is that you can't

14    identify any specific deals that failed to close

15    due to the actions of Lee Morgan or Candlewood

16    Partners; is that true?

17        A.    I can't except I would say that the

18    action on the Whitney deal was -- the reason that

19    occurred in my view was -- in May/June -- the

20    rejection of the Whitney deal occurred because

21    there was this presumption that somehow there was

22    some better deal out there that was perpetuated,

23    you know, between Mr. Morgan and Candlewood and

24    the Special Transaction Committee and the board,

1    that somehow they thought that there was somehow a

2    way to get value to all the constituent parties.

3              And if one understood that the best deal

4    was really already laid out and these other -- you

5    know, these other parties -- the sub debt and the

6    equity was going to be probably a hundred percent

7    impaired, that maybe the best thing to do for the

8    company would be to go through the 363 sale with a

9    substantial sponsor who had the ability to -- to

10   finance the company appropriately and so on, in

11   addition to which the 363, if we could have came

12   in at 54 million as the committed bid, would

13   potentially be just the starting point on what the

14   total recovery might have been.

15        Q.    Let me ask you about the ESOP trustee.

16   You understand that that was Evolve?

17        A.    I do.

18        Q.    And that Ken Lenoir was in the lead for

19   Evolve?

20        A.    I do.

21        Q.    Do you know whether Evolve and Ken

22   Lenoir were well qualified for that position?

23        A.    I can't say.  The -- there are documents

24   and there's emails between members of Evolve

1    talking when Reliance -- when they were being --

2    looking at being hired after Reliance resigned --

3    it seemed to indicate to me they didn't have a lot

4    of experience in these -- in complex

5    transactions.

6              And there are other things in there that

7    would indicate to me that they -- they certainly

8    had a concern also about -- about the fees, which

9    is not the question you've asked, but my -- my --

10   my reading of that was that they were looking to

11   this as a way of creating kind of a bellwether for

12   themselves as a firm and -- which indicated to me

13   that they didn't have deep experience in complex

14   transactions.

15        Q.    Which documents are you referring to?

16        A.    There are documents where -- it's an

17   email document between the Evolve people -- the --

18   you know, it's Ken Lenoir and a couple other

19   people within Evolve including one of their

20   lawyers.

21              The document would have been somewhere

22   at the late '07 period or whenever Reliance had

23   left and whenever they were starting to look for

24   -- they were starting -- they were looking to --

1    they put their bid out.  It was four times the fee

2    that Reliance was charging.  So I'd be happy to

3    identify it exactly for you, but I -- I know the

4    document.

5        Q.   Have you ever seen any documents that

6    list or describe Evolve's qualifications?

7        A.   I'm trying to think.  I don't think I

8    have.  I just remembered that one document.

9        Q.   Relating to the amount of fees that

10   Evolve was going to be charging?

11       A.   Not just the fees, but there -- there --

12   there was a list of reasons why they wanted to do

13   this.  And one of the reasons was -- (A), was

14   revenue, because the fees were substantially

15   higher than Reliance; and (B), because this was to

16   be something that they thought they could hang

17   their hat on in going forward as a -- as a -- as

18   an indication of their expertise.

19       Q.   And that would be described in a

20   document that you produced as part of the

21   discovery process in this case?

22       A.   Yes.  It was in the -- in the document.

23       Q.   Do you know whether Evolve had a

24   financial advisor?

1      A.    They did.

2      Q.    Who was that?

3      A.    I think it was Prairie Capital at the

4  time.

5      Q.    I'll represent to you that it was.  Any

6  reason -- what do you know about Prairie Capital's

7  qualifications?

8      A.    Very qualified.  They're a well known

9  firm.

10      Q.    What type of advice was Prairie Capital

11  providing, if you know?

12      A.    They were a valuation firm in this

13  business respect particularly.

14      Q.    Okay.  And do you know if Evolve had a

15  law firm engaged to represent it?

16      A.    I believe they did.

17      Q.    Do you know who they had?

18      A.    I don't recall offhand.

19            (Attorney Fague left the room.)

20      Q.    Are you aware of any facts that suggest

21  that Evolve did not understand the nature of its

22  actions relating to terminating the board?

23      A.    I have -- there's no facts that I know

24  of that discuss their not understanding what they

1    were doing, so from that point... that I know.

2        Q.    Turn, if you would, back to the article

3    that you -- the articles, rather, that you had

4    written in Exhibit 803.  I'd like you to turn to

5    page 246136 again.

6        A.    Okay.

7        Q.    It's a page we've looked at twice, and

8    here's the third time.

9        A.    Okay.

10        Q.    At the bottom of the page, the very

11    bottom, you say "Have more than just you in the

12    decision loop."  Then the next sentence is "There

13    are numerous advantages to having a team approach

14    to a transaction.  Chief among these are the

15    ability to tell the other party that you need to

16    discuss their proposals with others in your team.

17    This immediately takes the pressure off any

18    across-the-table direct encounters where a snap

19    response is anticipated.  It also imposes a sense

20    of uncertainty for the other party as he is forced

21    to think through his position in terms of how and

22    who within the group might respond."

23           First of all, did I read that

24    accurately?

```
 1          A.    Yes.

 2          Q.    Okay.  And this is advice that you

 3   provide to your prospective clients?

 4          A.    I wrote this a fairly -- a long time

 5   ago, but I -- I don't think I would retract any of

 6   it at this point.

 7          Q.    And, in fact, you provided it at least

 8   as recently as 2007?

 9          A.    It seems like a long time ago.

10          Q.    It does.  Why is it that you provided

11   that advice?

12                (Attorney Fague entered the room.)

13          A.    It just -- just it's my experience

14   that -- that being able to really -- really break

15   things down and knock them around and have other

16   people looking at it is just a better way to do

17   it.  It also takes the pressure off in

18   negotiations where you think you have to get back

19   to somebody right away.  It just -- it's just a

20   good process in my view.

21          Q.    Why do you consider it to be desirable

22   to impose a sense of uncertainty regarding who in

23   the group might respond to a proposal?

24          A.    Mostly because it's difficult...  I'm
```

1    trying to think what my thinking there is.  I

2    think what I meant and what I mean is that it's a

3    way of not -- essentially not negotiating against

4    yourself, and -- and it allows -- I'm trying to

5    think what I -- what I really meant there.  It

6    seemed like really good advice, but I'm struggling

7    to give you an articulate read on that.

8            But mostly because it -- it allows a

9    sense that whatever they've offered across the

10   table is not necessarily going to be taken and

11   there might be others inside the -- inside the

12   group that's reviewing the offer, if it's an offer

13   that's the -- or whatever the negotiation point

14   is.

15           It provides a -- it -- you know, it kind

16   -- it's just a way of getting more cards turned

17   over on the table.  So I guess I'm not being

18   terribly articulate about it, but I agree with

19   it.  That's the sentiment.

20       Q.    Turn, then, in your report to page 16.

21       A.    Okay.

22       Q.    In the middle of the page, there's a

23   sentence -- let me step back.  You, at the top of

24   the page, are describing the fact that the sales

1    of the company had fallen dramatically between

2    2004 and 2006, right?

3        A.    I say at first marginally, and then by

4    2006 dramatically, yes.

5        Q.    Fair enough.  And then you say later in

6    that subsection "Therefore, two choices remain:

7    Sell the business, or find a way to eliminate the

8    ESOP through a management buyout."  Did I read

9    that accurately?

10       A.    You have.

11       Q.    Would you agree that it was prudent for

12   the Special Transaction Committee to consider the

13   two choices that were available to it?

14       A.    Yeah.  I mean, I think, initially to

15   figure out what was going to -- what was really

16   possible is certainly a reasonable approach.

17       Q.    And you have described at other places

18   in your report that some of the proposals being

19   made by Lee Morgan and Candlewood were two times

20   or greater the value than the proposals that were

21   being made by the parties identified by Houlihan

22   Lokey, correct?

23       A.    Yes.  Yes, I have.

24       Q.    You would agree with me, wouldn't you,

1    that the only way for the Special Transactions

2    Committee to determine whether the proposals being

3    made by Lee Morgan were executable would be for

4    the Special Transactions Committee to read them?

5         A.    Yes.

6         Q.    So you don't deny that it was reasonable

7    for the Special Transactions Committee to read the

8    proposals that came from Lee Morgan when they came

9    in the door?

10        A.    I don't deny them.

11        Q.    And Mr. Scheier discussed with you the

12   fact that the Special Transactions Committee

13   rejected three of those proposals.  Do you recall

14   that?

15        A.    I do.

16        Q.    And you don't disagree with the Special

17   Transactions Committee to reject those proposals,

18   correct?

19        A.    Correct.

20        Q.    Let me show you a document that has been

21   previously marked as Exhibit No. 68.  These are

22   notes that appear to be notes from a Special

23   Transactions Committee that was -- a committee

24   meeting that was on November 7th, 2007.  Have you

```
 1    seen these notes before?

 2         A.    I think so.

 3         Q.    I believe, but I'm not sure, they were

 4    made by Kim Lipson-Wilson.  So take that for what

 5    it's worth, or you don't have to take that for

 6    anything at all.  But what I want you to turn to

 7    is page 70.

 8         A.    Okay.

 9         Q.    Towards the bottom, there is a heading

10    that says "HLHZ Recommendations."  Do you see

11    that?

12         A.    I do.

13         Q.    And you understand HLHZ to be --

14         A.    Houlihan.

15         Q.    -- Houlihan Lokey?

16         A.    I do.

17         Q.    And you'll see there are a series of

18    bullet points underneath the Houlihan

19    recommendations, one of which was "Keep working

20    with Lee."  Do you see that?

21         A.    I do.

22         Q.    And I believe you told me earlier that

23    it would be part of the role of an investment

24    banker to advise clients regarding who they should
```

1    communicate with, correct?

2        A.    Yes, I do.

3        Q.    And so this is the type of advice that

4    would be typical for an investment banker to give

5    regarding whether or not to be communicating with

6    somebody like Lee Morgan?

7        A.    That's what they gave them, so, yeah.

8        Q.    That's the type of advice that was

9    within the realm of advice to be provided by an

10   investment banker?

11       A.    Yeah.  I mean, yeah.  I mean, the only

12   qualification I would say under that is if I

13   thought there was no reasonable way to do what

14   they were going to do and they wanted to do, that

15   I -- that I may -- I may decide that that's not --

16   that's not good advice.

17       Q.    Are you aware of any time that Houlihan

18   retracted this advice and advised The Antioch

19   Company to stop working with Lee?

20       A.    I'm not aware of that.

21       Q.    Do you know whether CRG's role included

22   management of the sales process in any way, shape,

23   or form?

24       A.    I don't believe they do.

513.677.6188

 1          Q.    Okay.

 2          A.    They were there as chief restructuring

 3    officer and then temporary CFO at one point,

 4    but...

 5          Q.    Let me show you then a document that's

 6    been previously marked as Exhibit 767.  It's a

 7    letter that is signed by CRG and The Antioch

 8    Company by Nancy Blair dated April 22, 2008.  Is

 9    this a document you've seen before?

10          A.    Yes, I have.

11          Q.    The first bullet point identifies one of

12    CRG's responsibilities as "Leading the company's

13    efforts towards completion of a recapitalization

14    or change of control transaction."  Do you see

15    that?

16          A.    I do.

17          Q.    Does this refresh your recollection that

18    CRG had some responsibilities towards advising the

19    company regarding how to manage the sales process?

20          A.    I certainly didn't read it that way.  I

21    read that they were a constituent of the inside

22    process, but that they -- when I first understood

23    your question, I understood that to be that they

24    were involved in the selling process itself in

1    which the banker would have been.

2              To the extent that they were -- they

3    were active in the company helping them to -- then

4    clearly, yes, I agree, but not as a sales agent of

5    the company.  But that's the way I -- the way I

6    read your -- understood your question.  Sorry.

7         Q.    Fair enough.  Sorry if my question was

8    confusing, because it may have been, but just so

9    I'm clear that we have a clear record here, it was

10   your understanding, first of all, that CRG was not

11   going to be contacting prospective buyers in the

12   market in the way that Houlihan was doing?

13        A.    That's correct.

14        Q.    But that CRG had some type of

15   responsibility within the company to lead its

16   efforts towards a completion of a transaction?

17        A.    That's what it says here, so, yes.

18        Q.    Did you understand that CRG had some

19   responsibilities in that role to advise the

20   company regarding how to maintain or operate a

21   sales process?

22        A.    I certainly don't have that

23   understanding.  That may be true, but I'm -- I'm

24   reading it that they were going to help them work

1    with -- I guess with the investment bankers and

2    whatever else they needed to provide.

3         But I'm not sure...  I'm not making the

4    connection that they're involved in the sale

5    process; I'm making the connection that they're at

6    the company's side in support of the sale process.

7         Q.   What do you understand CRG's

8    responsibilities would be in light of this

9    paragraph, then?

10        A.   There are a substantial amount of

11   information requirements, modeling requirements,

12   scenario, development requirements.  There's a lot

13   of reporting involved in terms of things that

14   aren't just necessarily in financial statements

15   about what's going on in the company, and my

16   understanding was that's -- they were doing that.

17        MR. SHARKEY:  Let's go off the record.

18        (A brief break was taken.)

19        Q.   (By Mr. Sharkey)  Back on the record.

20   Mr. Greenberg, if you would, turn to page 19 of

21   your report.

22        A.   Okay.

23        Q.   At the top of the page in the paragraph

24   that had continued on from the prior page, there's

1    a phrase that refers to "Candlewood's apparent

2    unfettered access to board of directors."  Do you

3    see that?

4        A.   I do.

5        Q.   I want to ask you some questions about

6    that.  First of all, you understand that

7    Candlewood made a number of proposals on behalf of

8    Lee Morgan to The Antioch Company, correct?

9        A.   I do.

10       Q.   And a company that has made a proposal

11   to a company, is it common that they would meet

12   with a Special Transactions Committee of the

13   board?

14       A.   Yes.

15       Q.   So you don't object to the fact that

16   Candlewood had access to discuss its proposals

17   with the Special Transactions Committee?

18       A.   No objection to that.

19       Q.   And do you know whether MWE advised the

20   company that Candlewood should not have access to

21   information relating to proposals made by other

22   third parties?

23       A.   I believe I'm aware of that.

24       Q.   Okay.  And I'm not asking you for a

1   legal opinion here.  This is a process question --

2        A.    May I get a clarification?

3        Q.    Sure.

4        A.    Would that have come from -- from Marsha

5   Matthew as advice by an email?  I think that's

6   what I've read, so I'm just...

7        Q.    I believe, yes.

8        A.    Okay.

9        Q.    And I don't want to ask you about legal

10  advice provided by MWE, but just as a process

11  question, as an investment banker, do you agree

12  that it's appropriate that one party should not

13  have access to -- one party who's a prospective

14  buyer should not have access to information

15  regarding other prospective buyer's

16  communications?

17       A.    Yeah, absolutely not.  Agree.

18       Q.    Turn if you would to page 21.

19       A.    Okay.

20       Q.    You say in the third paragraph "In

21  contrast, Lee Morgan, et al., together with

22  Candlewood as early as fall of 2007 proposed a

23  variety of deals to recapitalize and buy out the

24  company."  The question to you is, who is et al.?

1          A.     I think at that time it was just Lee

2     Morgan, so I would -- I would -- I would certainly

3     change that.

4          Q.     Okay.  On page 22, the first full

5     paragraph, you again refer to Morgan, et al.?

6          A.     Again, same -- same comment.  I would --

7     I would redact that.

8          Q.     Turn if you would to page 18.  Under the

9     heading "The Dual Path," the second paragraph that

10     begins with the phrase "The dual path" refers to

11     two camps with the Special Committee.  Do you see

12     that?

13          A.     Yes.

14          Q.     First of all, was it intended to be two

15     camps "within" the Special Committee?

16          A.     (Reading) "The dual path, as it was

17     referred to, created two separate, often

18     conflicting processes and two camps with the

19     Special Committee attempting to navigate to a

20     viable outcome."

21          Q.     So you're not saying there were two

22     camps within the Special --

23          A.     I am definitely not saying that, no.

24     The two camps I meant were the dual path on one

1　side and Houlihan, etc., and Mr. Morgan and

2　Candlewood on the other and that the Special

3　Committee was attempting to navigate a viable

4　option.

5　　　Q.　　Then on page 20, in the phrase -- in the

6　paragraph that begins with "Given these kinds of

7　valuations..."

8　　　A.　　Yes, I see it.

9　　　Q.　　You discuss the fact that the ESOP notes

10　were all required to be reasonably guaranteed,

11　right?

12　　　A.　　I did.

13　　　Q.　　And you understand that Condor -- there

14　were a couple different Condor entities who were

15　engaged to provide some type of surety for these

16　sub notes?

17　　　A.　　I do.

18　　　Q.　　And do you understand that Condor

19　eventually -- neither of those entities ever made

20　any payments on these sub notes after --

21　　　A.　　I understand that, yes.

22　　　Q.　　Do you also understand that if Condor

23　had been solvent and had paid the ESOP notes, then

24　the company would have owed to Condor the amounts

```
 1    that Condor had paid on the ESOP notes?

 2         A.    I think I understand that, yes.  I'm not

 3    -- I didn't -- I understood that -- just to be

 4    clear, I understood that there was real issues

 5    relative to the surety itself, that Condor

 6    initially in its initial evolution went into --

 7    into a bankruptcy, and that there was a secondary

 8    entity made up of former Condor principals who

 9    then assumed the assets of -- of the former

10    Condor, and that there was some unlawful

11    conveyance issues that -- that came about as a

12    result of that, and that they were, in effect,

13    incapable of -- of paying any of the -- the

14    surety.

15         Q.    As a result of Condor's failure to pay,

16    the ESOP note holders were creditors of The

17    Antioch Company in the bankruptcy, correct?

18         A.    Yes.

19         Q.    If Condor would have paid on those

20    notes, then it's true, as you understand it, that

21    Condor would have been a creditor of The Antioch

22    Company in the same amount?

23         A.    Following what you've represented

24    before, yes, that would be the case.
```

513.677.6188

```
 1         Q.    And you, in the last sentence of the
 2    paragraph we were looking for, say, quote, "This
 3    was certainly more than a background issue for
 4    anyone considering acquiring the company outside
 5    of bankruptcy," close quote.
 6              First of all, Houlihan, in its efforts
 7    to deal with the distressed buyers, was
 8    contemplating potential bankruptcy transactions,
 9    correct?
10         A.    Correct.
11         Q.    So this paragraph's not referring to
12    Houlihan's efforts to deal with the distressed
13    buyer market, correct?
14         A.    I'm not sure what your -- what your
15    question just was.
16         Q.    The sentence I just referred to is not a
17    reference to any prospective buyer that Houlihan
18    was bringing to the table such as J.H. Whitney in
19    the distressed buyer market?
20         A.    I'm not sure that it doesn't in general
21    terms.  What I'm saying in effect was that the --
22    the -- the issue with the ESOP notes -- in fact,
23    this even comes up in a comment that I just looked
24    at this morning from -- that -- from -- actually,
```

1    from Glen Pollack at Candlewood, that unless -- if

2    the surety issue on those bonds or the notes

3    stayed as it was and remained, that it would be

4    very difficult to do a deal outside of bankruptcy.

5            And so I think I'm -- although not

6    referring to his comment specifically which was

7    made in sometime 2007 -- in late 2007, but I'm

8    referring to also the sense that -- or my

9    experience that with that type of liability, that

10   it would be very difficult to do a deal on a

11   consensual basis at the valuations that were there

12   particularly since these -- these represent a

13   fairly substantial potential for litigation and

14   certainly a very large liability.

15       Q.    First of all, are you aware of any

16   prospective buyer that cited the issues associated

17   with Condor solvency as a reason for not going

18   forward with the deal or as a reason for offering

19   a lower price in a letter of intent?

20       A.    Nothing specifically to Condor.  Not

21   even sure that they understood what that -- from

22   anything that I read that they understood where

23   that was, dispositionally speaking, but that

24   certainly Whitney, Marlin -- probably Monomoy as

1  well, but certainly Whitney and Marlin had real

2  issues with the -- trying to do anything that

3  would resolve the ESOP notes because of just all

4  the challenges of trying to do that and some of

5  the impact it might have in the company, and that

6  was why the -- one of the reasons that bankruptcy

7  was a favored outcome.

8      Q.   So when you're referring to the

9  difficulty that J.H. Whitney, Marlin, and Monomoy

10 had with the ESOP notes, that was a reference to

11 an out-of-bankruptcy transaction?

12     A.   Yes, and the reason to do it in

13 bankruptcy.  But there -- I don't recall any --

14 any discussion on their part about the surety

15 issue with the -- with the -- with the ESOP

16 notes.  It may be in there, but I don't recall.

17     Q.   The entity who cited some concern about

18 the Condor issue relating to an out-of-court --

19 out-of-bankruptcy sale was Candlewood Partners?

20     A.   Yeah, actually in November.  It's a --

21 there's a quote in one of the documents in late --

22 late 2007 that this would -- the surety issue

23 would certainly confound any -- any attempt to try

24 to do it outside of bankruptcy.  That's a

1    paraphrase, but that's basically what he said.

2         Q.    In terms of out-of-bankruptcy

3    proceedings that were contemplated, we've already

4    discussed, right, the reasons that Houlihan's

5    initial efforts failed; and those were related to

6    business and financial problems that The Antioch

7    Company was suffering, right?

8         A.    That's correct.

9         Q.    And then the other entity who was

10   contemplating a potential out-of-bankruptcy

11   transaction was Candlewood Partners and Lee

12   Morgan, correct?

13        A.    Correct.

14        Q.    And you've already discussed the reasons

15   that their various offers didn't close or were

16   un-executable, correct?

17        A.    I have, yes.

18        Q.    Can you describe for me the conditions

19   in the investment markets during 2007 and 2008?

20             Actually, I'll withdraw that question

21   and clarify.  I'm talking specifically to

22   investors who are interested in acquiring

23   businesses in the sort of small to mid market

24   area.  So I'm not talking about the stock market

1    or the banking market.

2         A.    I understand.   There was some softening

3    in '07 as I recall.   I was with LudlowWard Capital

4    Partners at the time as a partner there.   We saw

5    more softening in the credit market certainly,

6    although deals were certainly being transacted in

7    '07.

8              By the time '08 came around, certainly

9    as we went into the early fall, the -- it was

10   getting pretty ominous, and this was before the

11   big -- the big crash, but things were seizing up,

12   credit was getting very hard.

13             The investment markets in privately held

14   -- private equity business is -- is in large

15   part -- a lot of their liquidity to do deals comes

16   from credit and bank deals, mezzanine loans,

17   structured finance deals, and -- as a part of what

18   their -- how they finance their deals.

19             That started to get fairly soft and then

20   completely seized up by the time you hit November

21   of '08.   The phones just stopped ringing.   I mean,

22   nobody could do a deal in that period.

23        Q.    Just to be sure I understand and the

24   jury understands, the private equity investors --

1  when they look to buy a company, they borrow money

2  to fund some or all of the acquisition price that

3  they agree to?

4      A.    Often but not always.  Sometimes they

5  will, as Whitney was proposing at least in the

6  documents from Houlihan -- were going to not lever

7  their deal.

8           But typically what they would do in that

9  circumstance is they would then lever out later

10 on.  They would do equity recap with leverage

11 later on as the company became more stable and

12 more dependable in terms of its cash flows.

13          But typically back then, debt/equity

14 packages were -- could be anywhere from 4:1 debt

15 to equity.  And today, they're roughly half at

16 50/50 for most private equity deals.  So the

17 answer is yes, but not always.

18     Q.    I'm sorry.  What was 4:1?

19     A.    Debt to equity.  Back then, you saw

20 deals even more leveraged than that where you'd

21 have, you know, four parts debt for every one part

22 equity, essentially.

23          Today that's much more modified.  You're

24 seeing more deals where it's 1:1 debt to equity in

```
 1    terms of the purchase package -- financing
 2    package.
 3         Q.    Is debt to equity a measure that is
 4    commonly used by businesses to determine whether
 5    they are overleveraged?
 6         A.    Yes.  As a -- the way I'm using it is as
 7    a -- as a -- as a sources and uses comment in
 8    terms of the purchase price, how that purchase
 9    price is funded.  In the way you just mentioned
10    it, it's really a function of a -- it's a -- it's
11    a leverage ratio, that you would look at a company
12    to see how leveraged they were, so...
13         Q.    And 4:1 in 2007/2008 was considered an
14    acceptable leverage ratio?
15         A.    For -- for a sponsor, meaning a private
16    equity fund that had deep reserves in capital, the
17    lenders, both senior structured and mezzanine,
18    would go along with that to the extent that there
19    was a belief that the private equity fund would be
20    able to -- had the resources to pony up capital if
21    it was required.
22               In non-sponsored deals, you wouldn't see
23    that typically, but certainly in sponsored deals
24    where there was a large private equity fund with
```

```
 1    millions of dollars of capital available to it,

 2    you would see that.

 3         Q.    In non-sponsored deals, what type of

 4    leverage issues would you see?

 5         A.    It just really depends.  I mean, you

 6    know, it really depends.  You know, it's very

 7    different.  If you had a strategic buyer, there's

 8    other advantages that exist in terms of potential

 9    hard dollar synergy on cost, sales integration,

10    things like that.

11              If it's a management buyout, trying to

12    overleverage a management buyout is usually not a

13    good idea because you still have additional

14    resources.

15         Q.    In a management buyout, then, by

16    example, what type of leverage ratios would you

17    see?

18         A.    I certainly wouldn't see 4:1 typically.

19         Q.    2:1?  3:1?

20         A.    You're just getting down into looking at

21    what the funding debt -- what the EBITDA levels

22    would be -- you know, depending on the company,

23    how rich the EBITDA contribution was.  You know, I

24    wouldn't -- I mean, in today's market, you'd see
```

```
 1    somewhere between 2-1/2 and 3 times EBITDA kind of

 2    levels for debt.

 3            You know, back then, you might see a

 4    little bit more.  But a management buyout is

 5    different.  It doesn't have the equity cash

 6    resources that a large private equity sponsor has

 7    to bail out a problem.  And so they're treated

 8    differently and looked at differently in the

 9    marketplace.

10        Q.   Are today's numbers sort of historically

11    conservative?

12        A.   You know, I was just looking recently --

13    we get reports from PitchBook and Capital IQ.  We

14    use those services.  You know, the recent deals

15    since January through June are more or less at,

16    you know, a little over 50 percent debt in a deal.

17            It's certainly conservative relative to

18    2006, '5, '4, '3, yeah.  So I think that's --

19    certainly in the decade worth of time, it's

20    conservative.

21        Q.   And let me ask you a hypothetical.  A

22    company has $20 in cash --

23        A.   Right.

24        Q.   -- and then the fair market value of its
```

1   operations assets and goodwill is $80.  Okay?

2        A.    Mm-hmm.

3        Q.    No debt.  The company's market value:  a

4   hundred dollars, right?

5        A.    Not necessarily.  It would depend on

6   what the -- what -- I mean, you could add the cash

7   back.  You might be able to do it that way on a

8   cash free/debt free basis.

9             On the other hand, depending on what --

10  the working capital requirement, that cash might

11  be such that in the current assets, it is within a

12  reasonable current ratio or a quick ratio basis,

13  that you wouldn't consider that plus dollars to

14  the -- to the equity of the company.

15       Q.    But if it's excess cash for the

16  company --

17       A.    If it's surplus cash above the working

18  capital requirement, I would agree.

19       Q.    Suppose the company then wastes $10

20  worth of cash.  So it now it has $10 in cash, and

21  the value of its business as a going concern then

22  declines from $80 to $70.  Okay?  The total market

23  value of the company is now $80, right?

24       A.    Okay.  I'm trying to see where you're

1    going, what you're trying to ask me.

2         Q.    Well, in that example, the -- if there

3    was a claim that the company had somehow been

4    damaged by the waste of the cash and the decline

5    in market value, that the total of those would be

6    $20 for those damages, correct?

7         A.    That would be the delta that -- based on

8    your example, yes.

9         Q.    Your method would subtract the two

10   market values, namely $100 minus $80, the change

11   in the total market value, right, and then you add

12   in the waste?

13        A.    I'm really not sure what...

14        Q.    Here's the question:  You have

15   determined what the decline in the market value is

16   of The Antioch Company between two periods and

17   said that those were damages, right?

18        A.    From the -- from the Whitney offer to

19   the CRG valuation.  Let me also add some

20   additional thought to that.  The Whitney offer

21   is -- I'm assuming was -- if they got through the

22   diligence at that value, was a stalking-horse bid

23   offer -- committed bid offer which may have been

24   higher in an auction environment as well, so --

```
 1    just to be clear.
 2        Q.    You don't know whether it would be
 3    higher or not, though, do you?
 4        A.    I was speculating that it could be
 5    higher.  I wasn't certainly saying that it would
 6    be.
 7        Q.    You then, to the change in market value,
 8    add in the corporate waste amounts that you've
 9    identified, correct, of $6 million?
10        A.    That was an incremental number in there
11    for fees and things, yes.
12        Q.    Those expenditures of cash on those fees
13    would have been occurring at the same time as the
14    decline in market value, right?
15        A.    Presumably.
16        Q.    So the decline in market value between
17    the two periods would already take into account
18    the fact that the company had allegedly wasted $6
19    million in cash, wouldn't it?
20            MS. ANDREW:  Objection.
21        A.    Yeah, I mean, if we assume that the $6
22    million was expended, by example -- I'm not saying
23    it did -- through to the $54 million Whitney offer
24    as an example?  That it's already discounted in
```

1    that value, and the difference between that value

2    and the value CRG came up with?  If that's what

3    you're getting at, that that would already have

4    been consistent of that valuation?  Is that what

5    you're saying to me?

6        Q.    All right.  Well, I'm saying some of the

7    waste that you've identified occurred between the

8    J.H. Whitney offer and the CRG valuation; is that

9    true?

10       A.    I've identified those $6 million of

11   fees.  If that -- if those fees were already --

12   I'm trying to make this in a reasonable statement.

13   If they were already part of the value associated

14   with the $54 million offer, then that's already

15   discounted, and then I would agree with you, if I

16   think what you're saying -- versus the 31 to 38

17   million-dollar offer that was -- not offer,

18   sorry -- the valuation that CRG did for the

19   bankruptcy.

20       Q.    So presumably, any waste of cash that

21   occurred between the CRG offer would have already

22   been reflected in the amount that CRG had proposed

23   in its letter of intent?

24       A.    Yeah, I'm certainly not...

```
 1        Q.    Right?

 2        A.    I'm certainly not suggesting that

 3   there's...

 4              MS. ANDREW:  I think you misspoke.

 5   CRG's letter of intent?

 6              MR. SHARKEY:  Thank you.  I misspoke

 7   badly.

 8        A.    I understand what you meant.  You meant

 9   the CRG valuation.

10        Q.    (By Mr. Sharkey)  Yes.  So let's start

11   over.  To the extent there was corporate waste

12   before the J.H. Whitney offer, what you've told me

13   is the J.H. Whitney offer would have already

14   incorporated that corporate waste in the $54

15   million value, correct?

16        A.    Yeah.  It was a valuation to acquire the

17   entire company.  I think there was some question

18   as to whether or not, if I recall, in the LOI --

19   and there wasn't necessarily agreement between

20   Whitney and its attorney, that that might also be

21   -- not be a cash free deal, but it -- but might --

22   it might also include cash.  But I -- that was one

23   thing that came up.

24        Q.    But then you'd agree with me that to the
```

1    extent that $6 million in waste occurred between

2    the J.H. Whitney deal -- I'm sorry -- the

3    J.H. Whitney letter of intent and the GSC

4    proposal, that the waste of cash would be taken

5    into account in terms of the difference between

6    those two amounts?

7         A.    I'm agreeing that it would have -- the

8    $54 million would have discounted for that

9    already --

10              MR. GENTRY:  You said GSC.

11              MR. SHARKEY:  GSC valuation.

12              MR. GENTRY:  CRG.

13              MR. SHARKEY:  CRG, sorry.  Thank you

14   very much.  I butchered it.

15        Q.    (By Mr. Sharkey)  To the extent there

16   was any wasted cash between the J.H. Whitney

17   letter of intent and the CRG valuation, that

18   wasted cash would be taken into account in terms

19   of the difference between those values?

20        A.    Provided that the -- the Whitney offer

21   was a value for a 100 percent of the assets of the

22   company at the time as the valuation, then I would

23   agree that's correct.

24              MR. SHARKEY:  Okay.  I have no further

1    questions at this time, so let's go off the

2    record.

3                (Off-the-record discussion.)

4                     CROSS-EXAMINATION

5    BY MR. KNOTH:

6        Q.    Mr. Greenberg, my name's Tom Knoth with

7    the law firm Thompson Hine, and I've got three of

8    the outside directors I'm representing today --

9    Malte von Matthiessen, Dennis Sanan, and Jeanine

10   McLaughlin.

11               I'm going to try to avoid going over a

12   lot of the same things.  I'll ask some questions

13   about things that have been covered and then some

14   other new areas hopefully.

15               Let me start off with the damages

16   calculations that you were talking about before.

17   And I think you indicated that there were two

18   categories of quantifiable damages; is that right?

19       A.    I believe I did, yes.

20       Q.    And one is the difference between the

21   amount of the J.H. Whitney offer and the CRG

22   valuation?

23       A.    Those are the benchmarks I referred to,

24   yes.

1      Q.    And that was, I think you said,

2   somewhere between 16 and 23 million dollars,

3   right?

4      A.    If one doesn't make any conclusion about

5   what would have happened in the 363 auction.

6      Q.    Right.  Or the other way, what would

7   have happened in the due diligence with the

8   J.H. Whitney deal and that J.H. Whitney would have

9   reduced its purchase price as well?

10      A.    That's certainly possible.

11      Q.    And the J.H. Whitney deal had some

12   adjustments as part of it, too?

13      A.    Working capital adjustments.  Pretty

14   typical.

15      Q.    And we don't know which way those would

16   have gone?

17      A.    No way to know.

18      Q.    Okay.  I want to make sure I understand

19   your testimony, and correct me if I'm wrong.  I

20   believe what you're saying is that the

21   J.H. Whitney deal should have been accepted,

22   right?

23      A.    That's correct.

24      Q.    And that the board had decided to accept

1    that deal, right?

2        A.    They did.

3        Q.    And that Ken Lenoir terminated the board

4    and thereby prevented the deal to go forward; is

5    that right?

6        A.    That's right.

7        Q.    But if Ken Lenoir had not terminated the

8    board, the J.H. Whitney deal would have gone

9    forward and would have been concluded at somewhere

10   near $54 million as a stalking horse in the 363

11   sale?

12       A.    That's my presumption, yes.

13       Q.    Okay.  And if that had happened, there

14   would be no damages for that category of

15   quantifiable damages that you've laid out,

16   correct?

17       A.    Yeah.  I'm -- what I'm -- what I'm

18   assuming was that there was a fair value of $54

19   million at the time, you know, plus or minus

20   working capital adjustments and however they

21   wanted to handle the cash; and that if that went

22   forward, that was the fair value for the company

23   at the time.

24       Q.    Now, Mr. Sharkey showed you some prior

 1    letters of intent by Whitney and Marlin.  Do you

 2    remember those?

 3         A.    I do.

 4         Q.    Is it your position that the Special

 5    Transaction Committee should have accepted one of

 6    those prior letters of intent?

 7         A.    No, not necessarily.  These things get

 8    negotiated.  They have a -- they have a shelf

 9    life, for certain, in terms of that; but they do

10    get negotiated, and they -- and competitive

11    pressure does result often in a better offer,

12    which I believe it had.

13         Q.    Would you have been critical of the

14    Special Transaction Committee if they had accepted

15    the $44 million proposal by Whitney in March of

16    2008?

17         A.    That's a good question.  It's hard for

18    me to say.  I mean, you know, the -- if the $44

19    million was a fair value offer competitively

20    worked by Houlihan -- if it was the first

21    over-the-table offer, yeah, I would be critical.

22              If it was an offer that had resulted in

23    -- from, rather, a fair amount of negotiation and

24    -- and really working -- working both sides of it,

```
 1    then -- then I would -- I wouldn't be critical of

 2    it.

 3         Q.    Let's assume for purposes of discussion

 4    that it was the latter, that it was -- had been

 5    further negotiated, and it was an offer that you

 6    would not be critical of.  Okay?  So let's assume

 7    that.  And then let's further assume that at that

 8    time, the Special Transaction Committee said,

 9    Okay, we're going to go ahead with this 44 million

10    Whitney letter of intent.  And then further assume

11    that Ken Lenoir at that time said, No, I want to

12    terminate the board now.  Okay?

13              So assuming all that, using your damage

14    methodology, would you say, then, that the damages

15    would have been the 44 million minus the CRG

16    valuation in November?

17         A.    Under that hypothetical, I think I'd

18    have to.  I couldn't conclude one without

19    concluding the other.  That would be inconsistent.

20         Q.    So the fact that the deal improved by

21    $10 million, according to your analysis, would

22    lead to an additional $10 million damages even

23    though the 44 million letter of intent by Whitney

24    might have been an acceptable letter of intent at
```

1    that point?

2        A.    Yeah, if one accepts the conditions of

3    all that, sure.

4        Q.    Now, the second category of quantifiable

5    damages that you're claiming has to do with the

6    professional fees of $6 million; is that right?

7        A.    Yes, as an incremental...  Yes, yeah.

8        Q.    I don't want to go over everything that

9    was discussed yesterday and today about that.  I

10   just want to make sure I understand it.  As you

11   sit here today, you don't know which fees -- let

12   me back up -- which providers are included in that

13   professional fees?

14       A.    I don't have it broken out at all, no, I

15   don't.

16       Q.    Do you know which entities are within

17   that -- or the professionals that are within that

18   $6 million?

19       A.    Yeah, I believe I generally do, sure.

20       Q.    Which professionals --

21       A.    I think the law firms, the investment

22   banker, CRG.  There are probably a whole bunch of

23   folks in there.

24       Q.    But as you sit here today, you don't

1     know which ones exactly are within that?

2          A.    I don't.

3          Q.    By "the law firms," are you talking

4     about McDermott, Will & Emery and Skadden Arps?

5          A.    Skadden came afterwards, but yeah,

6     that's...

7          Q.    Those are the two law firms?

8          A.    Those are the two law firms.  There'd

9     also be fees that would've been charged to them

10    through the banks and things like that as well.

11         Q.    Okay.

12         A.    Banks would off load the fees, though.

13               (Deposition Exhibit No. 804 was marked.)

14         Q.    Mr. Greenberg, I've handed you what's

15    been marked as Exhibit 804, and this appears to be

16    an article that you wrote entitled "For companies

17    in distressed situations, a need-to-know primer"?

18         A.    That's correct.

19         Q.    And it's dated February 9, 2009.  Do you

20    see that?

21         A.    I do.

22         Q.    If you would turn to the last page of

23    that exhibit, at the very top it says "Don't wait

24    to act or bring in legal, financial, and

1    accounting professionals to advise you."  Do you

2    see that?

3         A.    I do.

4         Q.    I take it, then, that you -- that was

5    your opinion then and it's your opinion now that

6    it's inadvisable to bring in legal, financial, and

7    accounting professionals at the outset?

8         A.    That's certainly my advice, yes.

9         Q.    So I take it you're not critical of the

10   Special Transaction Committee or the board to

11   retain Houlihan Lokey and McDermott, Will & Emery

12   at the outset?

13        A.    I'm not.

14        Q.    Okay.  And before we're done with this

15   exhibit, if you would turn to the page before that

16   second page, do you see at the very bottom you

17   state, quote, "Bankruptcy is also an exceptionally

18   expensive process, is a last resort, and not

19   applicable to every distressed situation," end

20   quote?  Do you see that?

21        A.    I do.

22        Q.    Is that still your opinion, that

23   bankruptcy is an exceptionally expensive process

24   and is to be a last resort?

 1        A.    Yes, and it's all the -- yes, completely

 2    agree.

 3        Q.    Okay.  So if you agree that Houlihan

 4    Lokey should have been brought in at the outset of

 5    the sales process, why is it your opinion that the

 6    professional fees associated with Houlihan Lokey

 7    were wasted?

 8        A.    Specifically, it's -- it's a number

 9    that's in there for total fees.  I don't think

10    they were specifically wasted on Houlihan Lokey.

11    It's an aggregate number.  Certainly, Houlihan had

12    a -- it made sense to have them in there.

13        Q.    Yeah.

14        A.    I don't disagree with that.

15        Q.    So whatever the Houlihan Lokey's portion

16    of the $6 million, you believe that should be

17    excluded from any amount that would be included in

18    some sort of argument that fees were wasted; is

19    that right?

20        A.    I think so, yes.

21        Q.    Okay.  What about the fees associated

22    with McDermott, Will & Emery; since your article

23    indicates that legal advice should be brought in

24    at the outset, are you contending that the fees

 1    associated with the McDermott, Will & Emery firm

 2    were wasted?

 3        A.    Did they need a law firm in this

 4    process?  I agree they needed a law firm in this

 5    process.

 6        Q.    So you don't believe that the McDermott,

 7    Will & Emery fees were wasted by Antioch?

 8        A.    I can't say that I don't think they were

 9    wasted.  I can't -- I can only say that they

10    certainly need a law firm.

11        Q.    Well, as you sit here today, are you

12    rendering an opinion that the fees associated with

13    McDermott, Will & Emery's services were wasted?

14        A.    As I -- as I look at it today, the

15    question I guess more -- more -- more begs what

16    the -- what -- what -- what they were spent on in

17    terms of:  Was there a streamline process; was

18    there reasonableness to everything that went

19    through; were legal fees spent because there was a

20    lot of going back and forth between parties, in

21    particular Mr. Morgan and Candlewood and then

22    parties from Houlihan and all the board meetings?

23            It would be hard for me to conclude that

24    some of that could have been spared -- that could

1   -- it's hard for me to conclude that not some --

2   that some of that should have been spared.

3        Q.    McDermott, Will & Emery was providing

4   legal advice to the Special Transaction

5   Committee; is that correct?

6        A.    Yes.

7        Q.    And whenever Candlewood or Mr. Morgan

8   made a proposal, the Special Transaction Committee

9   needed to draw on professional services like

10  Houlihan Lokey and McDermott, Will & Emery to

11  evaluate the proposals; is that correct?

12       A.    Yes, generally.

13       Q.    So I take it you're not critical, are

14  you, of McDermott, Will & Emery being involved in

15  the process of evaluating proposals by

16  Candlewood; is that right?

17       A.    To the extent that the Special

18  Transaction Committee and the board thought that

19  it was worthy of doing it, of reviewing -- then to

20  the extent that's a valid assumption, then -- then

21  they're at the -- the law firm would be at the --

22  at the -- serving the board, so they'd have to --

23  they'd have to -- you know, they're really dragged

24  along in all that.

1      Q.    You don't expect the directors to be

2  experienced lawyers in M&A transactions; is that

3  right?

4      A.    I don't.

5      Q.    And, in fact, it's prudent of the board

6  to hire a firm like McDermott, Will & Emery to

7  provide legal advice whenever they get a proposal

8  by any entity to purchase the company, is that

9  right, or recapitalize the company?

10     A.    Yeah, I think what I'm saying -- I'm not

11 disagreeing with that.  What I'm saying is that

12 the screen might have been a lot different

13 relative to what was reasonable in the -- in the

14 other offers relative to what -- where I think the

15 offers really should have been focused.

16     Q.    And I take it, based on your prior

17 testimony, you have not reviewed the McDermott,

18 Will & Emery bills to determine whether or not

19 there's any sort of improper billing having to do

20 with Candlewood or Mr. Morgan's proposals?

21     A.    I have no -- no -- no knowledge

22 whatsoever of what -- of whether that occurred.

23     Q.    I think you indicated you thought the

24 CRG bill may have been included in this $6 million

     1    of professional fees; is that right?

     2         A.    Yeah, but I'm not absolutely sure.

     3         Q.    But in any event, you're not critical of

     4    Antioch for hiring CRG, are you?

     5         A.    They didn't have a choice.  They were...

     6    When the bank tells you you need to bring in a

     7    consultant, a CRO, you do it.

     8         Q.    So that would not be a waste by the

     9    company to hire CRG given the bank's request?

    10         A.    I agree.

    11         Q.    Now, some of these fees, if I understand

    12    you correctly, you think you associated with the

    13    Skadden Arps firm, right?

    14         A.    Yeah.  Skadden came in, I guess, in June

    15    when the board was reconstituted or late May,

    16    something like that, so...

    17         Q.    If I refer to the old board as being the

    18    board before the board termination in June 2008,

    19    is that -- do you understand what I'm saying

    20    there?

    21         A.    I do.

    22         Q.    Is it your understanding that the old

    23    board played no role in retaining Skadden Arps?

    24         A.    Yes, it is my understanding.

```
 1          Q.    So you're not claiming that the old
 2    board committed waste in association with anything
 3    having to do with the Skadden Arps bills; is that
 4    right?
 5          A.    I would -- I would agree with that, yes.
 6          Q.    Let's talk about Mr. Morgan retaining
 7    Candlewood.  I want to make sure I understood what
 8    you testified to this morning and what you state
 9    in your report.
10               One of the two options that the company
11    had by the end of 2006 was to either sell the
12    company or to have a management buyout; is that
13    right?
14          A.    Those were the -- the -- the most
15    obvious options, yes.
16          Q.    Okay.  And as far as the management
17    buyout is concerned, it would be natural to think
18    that Lee Morgan would be part of the team of
19    management personnel that would be interested in a
20    buyout; is that right?
21          A.    Yeah, contextually that seems correct to
22    me, yes.
23          Q.    Okay.  And you also understood that
24    Mr. Morgan had a lot invested in Antioch?
```

1       A.    I understood that he had notes.

2       Q.    And do you know how much those notes

3   were valued at at face value?

4       A.    I think par value -- doing this off the

5   top of my head.  I'm trying to think of what was

6   in there.  It was 50 million, in that range.  I --

7   I -- but it was a lot of money.

8       Q.    But most of it would have been

9   associated to his sub debt?

10      A.    That's what I assumed, yeah.

11      Q.    And he was a warrant holder as well?

12      A.    Yes.

13      Q.    Do you know how many warrants he held?

14      A.    Not -- not offhand.  I looked at it, but

15  I don't know off the top of my head.

16      Q.    A substantial amount?

17      A.    A substantial amount of warrants, yes.

18      Q.    Okay.  And he was also an ESOP

19  participant?

20      A.    Yes, he was.

21      Q.    Do you know how much his ESOP amount

22  was --

23      A.    I know his --

24      Q.    -- his account?

```
 1        A.    I know when they had to -- they had to

 2   pull -- put together the sub trust, so I'm

 3   assuming it was around 15 percent or -- or

 4   consolidated Morgan around 15 percent when they

 5   had to set up the sub trust.  So I'm not --

 6   it's -- it's a rough estimate based on what the

 7   action was, so...

 8        Q.    Okay.  And through his company called

 9   Levimo, he and his wife had invested $26 million

10   into buying the Antioch real estate in St. Cloud,

11   right?

12        A.    I don't believe they invested $26

13   million.  They invested $5 million capital and

14   borrowed the balance in pledged assets.

15        Q.    I mean, if you take out a loan, you've

16   committed yourself to pay the 21 million, right?

17        A.    Yeah, I'm -- yeah.  I'm just breaking it

18   down into constituent parts.

19        Q.    I gotcha.  So I take it, since you're in

20   the business of advising both companies and

21   owners/shareholders of companies, that you don't

22   have a problem with Mr. Morgan retaining an

23   investment advisor given what was going on here

24   and his substantial investment in Antioch, right?
```

```
1        A.    No, I don't.

2        Q.    Okay.  And as part of a management

3   buyout, he would need an investment advisor as

4   well, right?

5        A.    Yeah, sure.

6        Q.    And if the company was going to be

7   considering a recapitalization, since he had a lot

8   of capital in various stages, he would need an

9   investment advisor for that process, too, if that

10  was going to be one of the things they were going

11  to look at?

12       A.    Yeah, probably the same investment

13  advisor, yes.

14       Q.    Right.  And given all that, isn't it

15  fair to say that the old board had no right or

16  ability to prevent Mr. Morgan from retaining

17  Candlewood to give him advice?

18       A.    I agree with that.

19       Q.    Would you also agree that Mr. Morgan had

20  a right to make an offer to buy or recapitalize

21  Antioch?

22       A.    It's America.  He can.

23       Q.    Okay.  And that happens --

24            MR. SCHEIER:  So is the answer yes?
```

```
 1              THE WITNESS:  I said he can, yes, so the
 2   answer's definitely yes.
 3        Q.    (By Mr. Knoth)  And that happens a lot,
 4   doesn't it, where a management person who has a
 5   substantial stake in the company does make an
 6   offer to buy the company or to recapitalized the
 7   company, right?
 8        A.    It definitely happens, yes.
 9        Q.    And you've been involved in that kind of
10   transaction?
11        A.    Yes, I have.
12        Q.    In fact, I think you mentioned
13   BridgeStreet's deal recently.  That was a
14   situation in which the stakeholders restructured
15   their stakes in the company; isn't that right?
16        A.    Yeah.  There was a hedge fund and -- and
17   a large money center bank through their bond group
18   had substantial loans to the company, and there
19   was -- yeah.  Everything got restructured.
20        Q.    And that restructuring took over a year,
21   right?
22        A.    That restructuring closed in January of
23   2011.  I started on it eight, nine months prior to
24   that, that specifically.  I was engaged by the
```

```
 1   client before that, but the restructuring was...

 2        Q.    Who was your client in that one?

 3        A.    BridgeStreet Worldwide, the company.

 4        Q.    The company?

 5        A.    Mm-hmm.

 6             (Deposition No. 805 was marked.)

 7        Q.    Mr. Greenberg, I've handed you what's

 8   been marked as Exhibit 805.

 9        A.    Yeah.

10        Q.    And this appears to be an article that

11   was in the Cincinnati Business Courier, and you're

12   quoted in the article having to do with the

13   BridgeStreet restructuring.  Do you see that?

14        A.    I do.

15        Q.    Okay.  And the second paragraph here

16   says that -- that you at least reported that you

17   spent about a year as the main advisor on that

18   deal; is that right?

19        A.    Yeah, it says that.  It's -- it's the --

20   I've been an advisor to the company more than a

21   year, but the -- the actual in earnest

22   restructuring process -- well, maybe it was about

23   a year.  It started -- pretty much started in

24   January of that year, so yeah, that's about right.
```

```
 1        Q.    Okay.

 2        A.    That's correct.

 3        Q.    And it looks like about midway through

 4   that it talks about the company having $200

 5   million in annual revenue.  Do you see that?

 6        A.    Yes.

 7        Q.    And various levels of debt?

 8        A.    Yes.

 9        Q.    And so the restructuring was quite

10   complex.  Do you see that?

11        A.    Yes.

12        Q.    Now, the $200 million in annual revenue,

13   that's a smaller company than The Antioch Company

14   was in 2007 and 2008, right?

15        A.    That's correct.

16        Q.    And you quoted it at the very end of the

17   article that that's the biggest restructuring

18   you've ever done.  Do you see that?

19        A.    Yeah, in terms of capital, not

20   necessarily the size of the company.

21        Q.    And you say it was completely

22   exhausting; is that right?

23        A.    It was.

24        Q.    So a one-year exhausting effort, right?
```

 1       A.    It was non-stop.

 2       Q.    Okay.  It's a big undertaking to

 3   restructure a company with significant levels of

 4   debt; is that right?

 5       A.    And very different parties, yes.  It's

 6   -- it's daunting.

 7       Q.    You've indicated you've advised boards

 8   of directors in the past; is that right?

 9       A.    Yes.

10       Q.    Is it your understanding that a board

11   has a fiduciary duty to consider all proposals

12   that are made to the company to buy the company?

13       A.    Yeah, it's my understanding, yeah.

14       Q.    And will you agree with me that the

15   Special Transaction Committee had a fiduciary duty

16   to consider all proposals that might be made that

17   would possibly be useful to resolve or improve

18   Antioch's financial condition?

19       A.    I would agree with that.

20       Q.    And would you agree with me that the

21   Special Transaction Committee could be found to

22   have breached its fiduciary duty if it refused to

23   even consider proposals made by Mr. Morgan or

24   Candlewood?

 1              MS. ANDREW:  Objection.

 2         A.    Yeah.  I mean, let's -- the -- that's

 3    qualitatively what "consider" means.  If -- if

 4    they looked at it and said that's not going to

 5    work, and we were done with it, I would generally

 6    agree.  But there's a qualitative/quantitative

 7    aspect to what we're talking about in terms of

 8    considering, so...

 9         Q.    So they should at least consider it?

10         A.    I think they have a general obligation

11    to.

12         Q.    And in considering it, they should

13    look -- they should look to their financial

14    advisors like Houlihan Lokey and their law firm

15    like McDermott, Will & Emery to weigh in on the

16    proposal; is that right?

17         A.    Yeah, to the extent that there's a

18    reasonableness to it, and, again, that's what's

19    worth really considering.

20         Q.    But you don't expect the board members

21    themselves to determine if it's a reasonable offer

22    or not without running it past their financial

23    advisor or the law firm, do you?

24         A.    Well, I'd expect some knowledge of what

 1   would be reasonable, yes, I do, actually.

 2        Q.    But you don't fault them for wanting to

 3   get that analysis from the financial advisor or

 4   law firm before responding to an offer?

 5        A.    I don't know.  I mean, I've worked with

 6   boards where offers came in that were rejected out

 7   of hand at the board level, and nobody else was

 8   brought in to review them because they weren't

 9   going to -- on the face of them weren't going to

10   work or the quality of the potential buyer was in

11   question or -- I mean, there's a lot of reasons

12   that you may not go any further than simply

13   looking at it.

14        Q.    But in this case, you're not critical of

15   the Antioch Board or Special Transaction Committee

16   to consult with their investment advisor and their

17   law firm, are you?

18        A.    I'm not critical in -- yeah, in the

19   sense that that's something that they would do,

20   no.

21        Q.    I think you indicated in your report and

22   maybe even in your deposition that you were

23   involved in sell efforts to sell The Antioch

24   Publishing Company; is that right?

1   A. Yes, I was.

2   Q. And that took almost a year; isn't that

3 the case?

4   A. It may have been that long.  I don't

5 recall exactly, but that sounds -- it certainly

6 could be.

7   Q. Now, looking through documents, we can

8 -- I can show them to you if you want, but I

9 looked at a document that indicated that the

10 target date for closing the transaction for

11 Antioch Publishing was August 15, 2007.  Do you

12 recall that?

13   A. I don't.

14   Q. Do you dispute that?

15   A. I don't dispute it.  I just don't -- I

16 just don't recall.

17   Q. Do you recall when, in fact, it closed?

18   A. I'm thinking it didn't close until early

19 '08, but I could be wrong.

20   Q. If I represent to you that the asset

21 purchase agreement was dated February 15, 2008,

22 does that sound right?

23   A. That sounds right to me.

24   Q. And it closed sometime after that?

```
 1        A.     That sounds right to me.

 2        Q.     In your opinion, was Antioch Publishing

 3   a distressed company?

 4        A.     Yeah, in my opinion it was kind of a

 5   mess.  It had -- it was reporting income

 6   internally as a division.  It wasn't a -- you

 7   know, really a -- but if you -- one of the remarks

 8   I think I initially made when I met with the

 9   company with my partner Madeline Ludlow was we

10   just looked at -- immediately went to the balance

11   sheet and saw that its -- its inventory turn as a

12   -- in relationship to its Cost of Goods Sold was

13   just abysmal.

14             I mean, they were buying a lot of

15   inventory at -- at high volume to -- to get margin

16   levels, not necessarily surreptitious -- or trying

17   to hide anything, but -- to get it at margin

18   levels that would produce profits.  But if you do

19   cash-on-cash basis, the company really was not

20   positive cash flow from an internal point of view.

21        Q.     Was it -- I'm sorry?

22        A.     That was my point of view.  I mean, I

23   didn't think it was a strong or well run business.

24   And they were off shoring a lot of their
```

1    production, and -- and it went through large

2    production runs that created very low return on

3    their inventory, so...

4        Q.    Was it making a profit?

5        A.    It was making a profit, but if you wrote

6    off the inventory and you adjusted for inventory

7    excess and inventory, you -- it certainly wouldn't

8    be making a profit, if I recall.

9        Q.    Just turning to the Levimo transaction

10   just briefly -- because you've talked about that a

11   lot -- I want to make sure I understand.  You're

12   not critical of using a sale-leaseback transaction

13   to raise cash?

14       A.    It happens all the time.

15       Q.    Okay.  And you're not giving the opinion

16   that Levimo paid too little for the properties,

17   are you?

18       A.    I have no -- no -- no context in which

19   to judge that.

20       Q.    Okay.  And you're not contending that

21   Antioch was paying too much rent --

22       A.    Again, I have no context to judge that.

23       Q.    If you would, turn to your report at

24   page 12.  At the very bottom of that page, page

```
1    12, you talk about the emergent weakness of its

2    business model.  Do you see that?

3         A.    Um...

4         Q.    The very last line.

5         A.    (Reading) "Notwithstanding, a steady

6    decline in revenue and earnings also resulted in

7    reductions..."  I'm sorry.  I'm not seeing where

8    you are.

9         Q.    On the very last line, you talk about --

10   you have the phrase "the emergent weaknesses in

11   its business model."

12        A.    Yeah, I do see that.

13        Q.    And I think you testified earlier today

14   about the business model proving to be an

15   inseparable barrier to generating sustainable

16   interest among strategic buyers; do you remember?

17        A.    Yeah, the "insuperable" barrier is what

18   I said, yeah.

19        Q.    What do you mean by emergent weakness in

20   its business model?

21        A.    Well, a couple things.  The business

22   model was a direct sales model -- a party plan

23   direct sales model.  It was primarily paper

24   product.  That was where the lion's share of all
```

1    the revenue was.  The -- the -- their competition

2    was increasingly moving to online and digital

3    technologies.

4              And that's generally what I meant.  It

5    was just -- that it was a business model that was

6    becoming -- getting lapped by some of the other --

7    other technology offerings that were out there.

8         Q.    But was it your understanding that the

9    other businesses in sort of the paper scrapbooking

10   business were having similar problems?

11        A.    I've read some -- some -- some items

12   about that in one of the -- there was one of the

13   P funds that had a position in a -- in a -- in a

14   scrapbooking business, and there was softness

15   there, so -- so I generally got that that's

16   probably the case.

17        Q.    Was it your understanding that

18   Mr. Morgan was opposed to going through bankruptcy

19   because he thought it might affect the future

20   sales of the company?

21        A.    I recall specifically that his view was

22   having -- there was another company that I believe

23   he was referring to that went through a party plan

24   type of company -- network-type company that

1    bankruptcy was highly detrimental to, and -- but

2    I'm not sure I'm answering your question.

3         Q.    No, you are.  You are.

4         A.    Okay.

5         Q.    You understood that was his position, at

6    least?

7         A.    Yeah, I understood he was very concerned

8    about going into bankruptcy.

9         Q.    As you sit here today, are you aware of

10   any direct marketing company or party planning

11   company that has ever survived the filing of a

12   bankruptcy petition?

13        A.    Not that I know.  I just don't have that

14   knowledge at this point.

15        Q.    And as far as the mechanism that we're

16   talking about there about why bankruptcy might be

17   a bad idea, the concern was by, I think,

18   Mr. Morgan and Mr. Lenoir was that the sales

19   consultants would leave Antioch once it found out

20   about financial distress in the company and go

21   sell for some other business; isn't that right?

22        A.    I think I recall reading something like

23   that.  It certainly -- it sounds -- it sounds

24   correct to me.

```
1        Q.    Now, I don't know if you recall this

2    exactly, but the 2007 sales for Antioch was about

3    $242 million; is that right?

4        A.    What year?

5        Q.    2007, the last full year.

6        A.    I'll take that as -- to be the case.

7    I've got it written down here, but...

8        Q.    That seems to be about --

9        A.    Sounds right to me, yes.

10       Q.    Are you familiar with the fact that

11   Antioch filed bankruptcy again in 2013?

12       A.    Yes, I am.

13       Q.    Have you reviewed any of the bankruptcy

14   filings from that case?

15       A.    The only thing I saw -- I looked at --

16   when I was first contacted by Taft, I went online

17   to see what the petition looked like.  That's it.

18   That's it.

19       Q.    And did you notice when you looked at

20   whatever you looked at that Antioch was reporting

21   that its 2012 sales was about $94 million?

22       A.    I don't recall exactly.  I know it was a

23   lot smaller than when it started.

24       Q.    That decline would be consistent with,
```

1    at least, the argument that the filing of the

2    bankruptcy petition impacted the company

3    negatively; is that right?

4        A.    I'm not sure I would see it that way.

5    What I would see is that when you go through a

6    reorganization under Chapter 11 and it's a

7    protracted time to get that done, I would agree

8    that that might have a fair amount of impact.

9              It also looked to me, because the

10   company went in on a prepackaged deal and the

11   lenders got their money out in a variety of ways,

12   that the company was significantly

13   undercapitalized at the same time through that

14   period.  And, in fact, I believe that was one of

15   the comments that was made in the petition.

16             Whereas in a 363 -- Section 363 sale,

17   those things can happen pretty quickly.  I've done

18   them in -- you know, we filed in June and closed a

19   -- closed the -- closed the auction by mid

20   August.  So you can get through them pretty

21   quickly if...

22       Q.    Do you know what happened as far as the

23   number of consultants for Antioch --

24       A.    I don't.

1       Q.    I'll represent to you that the

2    bankruptcy filings indicated that in 2008, they

3    had 55,000 consultants; and by 2013, they had

4    21,000 consultants.

5       A.    Yeah, that...

6       Q.    Does that seem about right to you from

7    what you understand?

8       A.    Yeah.  That would certainly seem

9    consistent with everything else.

10      Q.    Look at page 7 of your report.

11      A.    Yes, sir.

12      Q.    In the third paragraph, second sentence,

13   you say "Members of the ESOP advisory board were

14   appointed by the board of directors and can only

15   be removed by the unanimous consent of the board

16   of directors."  Do you see that?

17      A.    I do.

18      Q.    What's your source of information for

19   that proposition?

20      A.    I think from one of the filings,

21   something -- I think that's mostly where that came

22   from, from the -- from the complaint, I think,

23   from Taft law firm.

24      Q.    Okay.

```
 1        A.    It was in the -- in fact, I think that's
 2   exactly where I got it from.
 3        Q.    From the complaint?
 4        A.    Yeah.
 5        Q.    Okay.
 6        A.    Yeah.
 7        Q.    I take it you didn't look at the tender
 8   offer to see if that was the case?
 9        A.    I didn't have the tender offer.
10        Q.    And you didn't look at any other
11   corporate document to determine if that was
12   actually the case?
13        A.    I took it at face value.
14        Q.    Okay.  If you'd look further down that
15   page right above your chart, you say that -- that
16   as part of the 2003 transaction, the other
17   directors of the board, meaning the non-Morgan
18   directors, collectively received about $25
19   million.  Do you see that?
20        A.    I do.
21        Q.    What's the source of your information?
22        A.    Again, probably from the -- from the
23   complaint as well.
24        Q.    Do you know whether or not -- based upon
```

1    your review, whether or not that's accurate or

2    not?

3         A.    Again, I took it for what it said.

4         Q.    Did that number have any impact on your

5    analysis that -- your assumption that the other

6    board directors received $25 million as part of

7    that transaction?

8         A.    I'm not sure what your question is.

9         Q.    Well, I mean, you put this in your

10   report as a fact that, I guess, I thought maybe

11   you were basing your opinions on.  Are any of your

12   opinions based upon the fact that you're claiming

13   in your report that the other directors of the

14   board collectively received about $25 million?

15        A.    No.  I think from an opinion point of

16   view, whether they had 5 million or 25, it didn't

17   -- it was the -- the general thrust of it was how

18   much actually had come out at the closing of the

19   tender offer.

20        Q.    Do you know whether or not the

21   non-Morgan defendants took at least part of their

22   consideration in the form of the package?

23        A.    Yes, they -- yeah.

24        Q.    Would you agree with me that an investor

```
 1    taking a package must believe that the company's

 2    going to prosper in the future in order to make

 3    that a good deal?

 4         A.    As opposed to taking all cash?

 5         Q.    Right.

 6         A.    I would assume that's what they were

 7    thinking, yes.

 8         Q.    Let me have you turn to the next page,

 9    page 9.  You went over your chart there yesterday,

10    and I want to make sure I understood what you're

11    doing there.  Let me see if I can summarize this,

12    and tell me if I'm right about this.

13              It looks like on the left side of the

14    chart, you're looking at what the equity value

15    calculation was as of 2012 as determined by BVI,

16    right?

17         A.    2002.

18         Q.    2002.  I'm sorry.

19         A.    Yeah, that came out of BVI's evaluation.

20         Q.    And on the right side, you're trying to

21    determine what the estimated enterprise value was

22    of the company based upon the $850 per share after

23    the transaction, correct?

24         A.    Yeah.  I'm trying to estimate what it
```

 1    would have looked like post-transaction based on

 2    that enterprise, exactly.

 3        Q.    And I take it you knew or could multiply

 4    out the equity value, right, as part of your --

 5        A.    If I know the number of shares and I

 6    know the price of the shares, I can do that.

 7        Q.    And then the funded debt you knew

 8    because it was a number from the financials that

 9    you picked up for that, right?

10        A.    Yes.

11        Q.    And so really what you were trying to

12    solve for was the estimated enterprise value; is

13    that right?

14        A.    Yeah.  I was backing into it.

15        Q.    Okay.  Would it be fair to say that if

16    you're doing the equity value at 850 per share,

17    since you were looking at it from a

18    post-transaction situation, you would have to use

19    the post-transaction number of shares that were

20    outstanding, right?

21        A.    Yes.

22        Q.    Okay.  If you look at this number, isn't

23    it the case that you actually used the number of

24    shares that were pre-transaction?

```
1           A.    I believe that I calculated on a post-
2      transaction basis.
3           Q.    Here's a calculator.  Do you want to --
4           A.    Oh, don't ask me -- please don't ask me
5      to do that.  I can't go through...  I mean, I need
6      to look at a spreadsheet to do...
7           Q.    Well, I mean, it's an easy -- if you
8      take $408,304 and divide it by 850, you get the
9      number of shares, right?
10          A.    Mm-hmm.
11                MR. SCHEIER:  Was that a yes?
12          Q.    Was that a yes?
13          A.    If you take the...
14          Q.    408,000 --
15          A.    ...thousand and divide it by the 850,
16     yes, that would be correct.
17          Q.    So do you want to divide it out and see
18     what number you come up with?
19          A.    Yeah, sure.  (Using calculator.)  I come
20     up with 4 million 80471 (as said).
21          Q.    Try it again.
22          A.    I'm sorry.
23          Q.    408,000 --
24          A.    I'm not used to your calculator.  (Using
```

1    calculator.)  8, zero, zero, zero, divided by

2    850...  It's 480,357.

3         Q.    Okay.  And isn't that the number of

4    shares that were in existence pre-transaction?

5    And if you need to look at the next page, you have

6    the post-transaction number of shares in the chart

7    on page 10.

8         A.    Yeah, I think -- I'm trying to

9    understand what I -- what I was doing for a

10   minute.

11        Q.    Just so it's clear, the post-transaction

12   number of shares --

13        A.    There were fewer shares.

14        Q.    -- is 205,593.

15        A.    Mm-hmm.

16        Q.    Is that right?  Yes?

17        A.    Yeah, ESOP shares were 205,593.  There

18   was another 155,000 in warrants.

19        Q.    But as far as the number of shares

20   outstanding that you would have to multiply by

21   850, you should have used the 205,593 shares as

22   opposed to the 480,000 shares that you used,

23   correct?

24        A.    Um... (Using calculator.)  Say that

1  again.  I'm sorry.

2       Q.    Okay.  If you're trying to determine the

3  equity -- or the estimated enterprise value post-

4  transaction, you should have multiplied $850 per

5  share by the number of shares that were

6  outstanding post-transaction, not by the number of

7  shares that were outstanding pre-transaction as

8  you did in your chart?

9       A.    Yeah, I'd agree with that.

10      Q.    Okay.  We can do the math, but, you

11  know, I've done the math, and I calculated that if

12  you'd done it correctly, the estimated enterprise

13  value would be about $354 million.  Does that

14  sound about right?

15      A.    Yeah.

16      Q.    Okay.  And that 354 million is not that

17  far off from the 314 million that was determined

18  by BVI in 2002, right?

19      A.    Yeah, that's BVI's number.  I think what

20  I was doing here, just to -- I say (reading) By

21  comparison, if one assumes that the senior and

22  subordinated debt funding was accounted for in the

23  850 share -- yeah, I don't disagree with you.

24      Q.    Okay.

```
 1        A.    I think that's misleading.
 2        Q.    So your report makes an error in
 3   comparing the 2002 enterprise value of $314
 4   million to an enterprise value for 2003 post-
 5   transaction of $588 million, right?
 6        A.    I think so.
 7        Q.    Okay.  So then turning to page 10, let's
 8   talk about the chart that's in the middle of that
 9   page.  Now, if I understand what you did here
10   correctly, you took the post-transaction adjusted
11   equity value of $248 million, right?
12        A.    (No response.)
13        Q.    Let me back up.  The equity valuation
14   you used in that example was what number?  Was
15   that the 408 million that you used from before?
16        A.    That was the initial value of the
17   equity, right.
18        Q.    So here, you're trying to determine
19   what?
20        A.    I need to read -- give me a moment,
21   please.
22        Q.    Yeah.
23        A.    (Examining document.)  I'm just -- I'm
24   trying to do two things, and I may have not done
```

1    it completely correctly.  But what I'm trying to

2    do is I'm trying to establish what the enterprise

3    value was based on the 850 a share because I

4    didn't have the valuation --

5         Q.    Right.

6         A.    -- I mean as a starting point.  The

7    second thing I was looking at -- well, okay, let's

8    look at it on a post-transaction basis what had

9    happened on the new number of shares and what that

10   post-transaction adjusted share price would look

11   like and netting out the debt and adjustments for

12   post-transaction debt.

13        Q.    So what you're trying -- if I'm

14   understanding, you're trying to determine what the

15   share price should be post-transaction based upon

16   the number of shares outstanding after the

17   transaction, right?

18        A.    Yes.

19        Q.    Okay.  And so when you did your

20   calculation, you divided the post-transaction

21   adjusted equity value by both -- by the sum of the

22   ESOP shares and the warrants?

23        A.    Yeah, total outstanding.

24        Q.    Let me understand how the warrants

1    worked.  In order to be able to exercise a

2    warrant, you had to pay the strike price of

3    $850; is that right?

4         A.    Yes.

5         Q.    Where in your calculation do you adjust

6    the numbers to reflect the $850 a share that a

7    warrant holder has to pay into the company in

8    order to convert the warrant into a share?

9         A.    I don't.  I have not made it -- I've not

10   accounted for the -- the -- the exercise value of

11   the warrants in this.

12        Q.    And isn't it appropriate that you should

13   do that so that you can determine exactly what the

14   share value would be?  Don't you have to add in

15   the 850 per share?

16        A.    Yeah.  It would be -- it would be a

17   proceed value that would -- a cash value that

18   would accrue to the benefit of the -- of the

19   company's balance sheet and so forth.

20        Q.    And you haven't done that, right?

21        A.    I haven't done it.  Just so we don't get

22   overly elaborate, what I'm just trying to do is

23   look at what would be an estimated enterprise

24   value, what was the fully diluted outstanding, and

```
 1    really just trying to look at what the assumptions
 2    may have been at the time without having the
 3    valuations themselves.
 4         Q.    I know, but what you're trying to do
 5    here -- I mean, at least the conclusion you've
 6    reached here is that the 689 adjusted share price
 7    that you've calculated -- you're comparing that to
 8    the 850 share price and concluding that there's
 9    something wrong here.
10              And what I'm suggesting here is that you
11    needed to put the $850 per share per warrant into
12    the calculation before you did your division; is
13    that right?
14         A.    I'm not arguing with you.
15         Q.    You agree with me?
16         A.    I agree with you.
17         Q.    Okay.  Now, I did the math on that, and
18    if you did that, the share -- adjusted share price
19    would be 1,054.  Does that sound right to you?
20         A.    I'd have to do the -- look at the
21    numbers, but I'll take your -- your -- your word
22    for it.
23         Q.    Assuming that's correct, would that
24    cause you to conclude that the deal was actually a
```

```
 1    good deal on a post-transaction basis?

 2         A.    (No response.)

 3         Q.    At least on a per share adjusted share

 4    price post-transaction basis?

 5         A.    If all the warrants were fully exercised

 6    in the period in which they would have exercised

 7    down the road at the time that they were allowed

 8    to be exercised -- if it all happened way down

 9    then, I would conclude that you're correct.

10         Q.    Okay.

11         A.    But that's -- I wasn't addressing when

12    they were fully exercised.

13         Q.    Okay.  Well, if you exclude the

14    warrants, because you don't know if they're going

15    to be exercised or not, and just divide by the

16    number of ESOP shares outstanding after the

17    transaction, I did that math and I got a number of

18    $1,209.  Does that sound about right to you?

19         A.    Sounds about right.

20         Q.    Does that indicate to you, at least

21    based upon this analysis -- you know, there may be

22    other ways to analyze this, but at least based on

23    this analysis, that would indicate that, at least

24    on a financial post-transaction adjusted share
```

1    price, that the 2003 transaction resulted in a

2    higher share price post-transaction than the 850?

3        A.    Based on all that math, I'm not -- I

4    wouldn't contend otherwise, if that's really what

5    was going on.

6        Q.    Right.  If you --

7        A.    I mean, it was at 890 -- I mean, the

8    valuation by the valuator at the time was 894, I

9    think the number was I got corrected on yesterday.

10   You know, I think there's certainly a range of

11   dispute as to exactly what that share price would

12   be, but given the fact that the valuator did it a

13   -- for the ESOP on a -- on a fair market basis,

14   so...

15       Q.    And that was on a post-transaction

16   valuation?

17       A.    Yes.  It was above the 850, so yes.

18       Q.    Turn to page 11 of your report.  Let's

19   skip on.  I can't find what I was looking for, so

20   I'll skip that for now.  Let's go off the record.

21           (A brief break was taken.)

22       Q.    (By Mr. Knoth)  Turning to page 11 of

23   your report, under the heading Roman numeral 9, do

24   you see that there?

```
 1        A.    I do.

 2        Q.    You say "There were issues that

 3   purportedly prevented the ESOP from participating

 4   in the tender offer including the absence of a

 5   formal valuation."  Do you see that?

 6        A.    Mm-hmm.

 7        Q.    What are you talking about there?

 8        A.    This is.. I'm trying to recall where I

 9   got that from, but it was one of the reasons that

10   I was given.  And whether I read it or it was a

11   part of a discussion, I don't recall

12   specifically -- that one of the reasons they --

13   GreatBanc decided not to do it was because they

14   had not yet done their formal valuation, but it

15   was -- I don't know exactly where I got that from.

16        Q.    What do you mean GreatBanc decided not

17   to do it?  What are you --

18        A.    Not to participate in -- they hadn't

19   done a valuation.  They wanted to do an

20   independent valuation, and that was just one of

21   the reasons that I was given.  I'm not sure how

22   material the reason is, but...

23        Q.    Do you know who gave you that reason?

24        A.    I think it came either -- either I read
```

```
 1    it, or it was given in conversation to me by the

 2    Taft attorneys.

 3         Q.    But you don't remember as you sit here?

 4         A.    I really don't.  It was a while back.

 5              MR. KNOTH:  That's all I have.  Thank

 6    you very much.

 7              (Off-the-record discussion, and a break

 8    was taken for lunch.)

 9                    CROSS-EXAMINATION

10    BY MR. GENTRY:

11         Q.    Good afternoon, Mr. Greenberg.

12         A.    Good afternoon.

13         Q.    My name is Dan Gentry.  And I along with

14    Terry Fague at Coolidge Wall represent Alan Luce

15    and Nancy Blair in this matter along with Guy

16    Walker who has been dismissed.

17              This is the time in the deposition when

18    the shuffling of chairs picks up speed because

19    there's diminishing returns to lawyers asking you

20    questions, and we're all trying not to be

21    repetitive, and I'll follow that too.  So bear

22    with me as I make those adjustments.

23         A.    Mm-hmm.

24         Q.    The first thing I want to do is hand you
```

1  Deposition Exhibit -- actually, before I do that,

2  are you -- have you had a chance to review

3  documents in connection with your testimony

4  yesterday and today?

5      A.   Did I -- are you asking did I look back

6  at the documents that I had?

7      Q.   Yes.

8      A.   Yes, I have.  I looked this morning.

9      Q.   And what documents did you look at?

10     A.   There were a variety of documents.

11 There were summaries -- list of summaries from

12 Houlihan, some interchange of memos with Evolve,

13 things like that, some...

14     Q.   To your knowledge, were all those

15 documents included with the production that the

16 defense attorneys received in the case?

17     A.   Yes, they are.

18     Q.   And I'll tell you how we know that is

19 they say "Greenberg" at the bottom and have a

20 little number next to them.  Does that ring a

21 bell?

22     A.   Well, I'm not sure we're saying the same

23 thing.  The documents that I looked at this

24 morning were the documents that were in my file

1    from -- that I received from Taft law firm, and

2    that's what I've looked at so far.  So anything

3    I've looked at has been disclosed.  I just

4    reviewed some things this morning.

5           (Deposition Exhibit 806 was marked.)

6       Q.   I'm going to hand you Deposition Exhibit

7    806, and this is a document that has been produced

8    through --

9       A.   Yeah.

10      Q.   -- subpoena responses.  And if you would

11   take a look at that and identify that for me,

12   Mr. Greenberg, that would be great.

13      A.   Yeah.  It's an article I wrote sometime

14   back.  I'm not exactly sure what the date -- it

15   says September 2009, but it -- I'm not sure that's

16   precisely correct, but I wrote it.

17      Q.   So you're the author, and this document

18   says "Silverstone Advisors" "Silverstone Briefing"

19   at the top of it?

20      A.   Mm-hmm.

21      Q.   And it's got a Bates number Greenberg

22   00051 through 53.  Do you see that at the bottom?

23      A.   I do.  I see 5100...

24           MS. ANDREW:  No, the other page.

1          A.    Oh, I'm sorry.

2          Q.    It's three pages.

3          A.    I'm sorry.  Yeah, I do.  I see it.

4          Q.    And you say you authored the document,

5     and the title is "How a Market Allocates Value,

6     Getting Calibrated in the Middle Market."  Do you

7     see that?

8          A.    I do.

9          Q.    What was your purpose in writing this

10    briefing?

11         A.    Well, I think that -- I'm assuming from

12    -- I'm speculating what I was thinking, but I

13    think at the time I was writing it, it was simply

14    to -- to kind of create a way of thinking about

15    how businesses get valued, particularly middle

16    market businesses, and what some of the factors

17    are and what one would generally expect in broad

18    strokes as well as in more detailed level.  That's

19    what I was trying to do.

20         Q.    And this document's intended to be

21    distributed, I supposed, to potential clients?

22         A.    Well, clients and potential clients,

23    yes.

24         Q.    And the document reflects your personal

1    views?

2         A.    Certainly, yes.

3         Q.    Have your views changed, to your

4    knowledge, since you wrote the article?

5         A.    It's been a while since I read it, so I

6    can't tell you exactly, but probably generally

7    not, but specifically maybe.  I'd have to -- I'd

8    have to see.

9         Q.    And the article begins with a reference

10   to "an unusually long business cycle."  Do you see

11   that?

12        A.    I do.

13        Q.    It says "16 years' worth and some

14   counting"?

15        A.    Yes.

16        Q.    All right.  And this piece was written

17   in September of 2009.  So when you're addressing

18   this market or business cycle, are you intending

19   to address generally 16 years before the time that

20   you wrote the article?

21        A.    I don't know how I came up with the

22   16-year estimate, but yes, it's all periods prior

23   to that for at least 16 years, right.

24        Q.    And then that, of course, includes the

1    period of time that The Antioch Company -- the

2    events that we're discussing here in the last

3    couple of days occurred between 2003 and 2008,

4    true?

5         A.    Clearly, yes.

6         Q.    And in that first paragraph, the

7    language says "Business owners could look out over

8    the next five years or so, and barring any

9    unforeseen calamities" -- do you see that?

10        A.    I do.

11        Q.    Can you read the rest of that paragraph

12   to yourself?

13        A.    Yes.  (Examining document.)

14        Q.    And what that paragraph is saying is

15   that during the 16-year business period, business

16   owners could look out over a five-year period and

17   feel reasonably assured that they could predict

18   what might happen with their business?

19        A.    It does say that.  It also says (as

20   read) Clearly a degree of optimism was required.

21   Things would need to go reasonably well.  The

22   stars would need to be aligned.

23             So it's just not -- there's

24   qualifications to... (inaudible)

1            THE REPORTER:  Qualifications to what?

2            THE WITNESS:  To what the statement that

3    the -- that I was -- that was made by the lawyer.

4        Q.    (By Mr. Gentry)  And then the article

5    says that these things changed with the financial

6    crisis that you referred to in November of 2008.

7        A.    Yes.

8        Q.    So that's when things changed?

9        A.    Dramatically changed, yes.

10       Q.    And if you look over to the second

11   column, the first full paragraph begins with the

12   words "An important lesson."  Do you see that?

13       A.    Yes, I do.

14       Q.    And the language says "We learned that

15   credit markets are an essential value driver, and

16   that exuberant credit markets spurred on by

17   aggressive equity investors can and will create

18   valuation bubbles."  Do you see that?

19       A.    I do.

20       Q.    Are you saying that the availability of

21   credit affects valuation for a company?

22       A.    I'm saying absolutely that's true.

23       Q.    And that was true during the 16-year

24   period?

```
 1          A.     It's true now.

 2          Q.     And it was true during 2007 to 2008?

 3          A.     It is true.

 4          Q.     And how influential or how much of an

 5   impact would you say that credit markets are on

 6   valuation, if you can?

 7          A.     May I provide some context so you

 8   understand what I -- where I get...  The way

 9   private equity investors typically generate

10   returns is certainly through the growth of the

11   business that they acquire so that the value's

12   greater at some point.

13              They also -- they also generate

14   returns -- internal rates of return on equity

15   investments by de-leveraging the -- the entity

16   that they've -- they've acquired.  So -- or it's

17   not necessarily de-leveraging by -- by using the

18   leverage and getting the value of the leverage,

19   how to leverage the equity.

20              So clearly, credit markets and credit is

21   a very important part of how certainly private

22   equity funds think about their returns.  So today,

23   where the markets are roughly 50/50 dead equity,

24   IRRs which may have been anticipated in the high
```

```
 1    20s to 30 percent ranges are in the low 20s, even

 2    high teens, because the credit is not as

 3    available.

 4         Q.    I'm just asking you -- I appreciate the

 5    context of the question, but I'd like --

 6         A.    My pleasure.

 7         Q.    -- to phrase it for simply for my own

 8    purposes, and you can agree or disagree.  What you

 9    just said and what this article says is telling

10    whoever reads the article that credit markets have

11    a direct impact upon the value that a person

12    selling a company may receive?

13         A.    Yes.

14         Q.    And that was true then in 2009?

15         A.    Mm-hmm, yes.

16         Q.    And it was true during the transaction

17    process?

18         A.    It's true for all these periods.

19         Q.    If you go to the next page, it's a page

20    with a Bates numbers ending 52.

21         A.    Yes.

22         Q.    There's a paragraph heading that says

23    "Business Models and Value Propositions."  Do you

24    see that?
```

```
 1          A.     Yes.

 2          Q.     And if you go down about midway, there's

 3     a sentence that begins "What has happened to

 4     virtually every daily newspaper in the U.S."  Do

 5     you see that?

 6          A.     I do.

 7          Q.     And you're referring to daily

 8     newspapers -- many categories of retailing and the

 9     music business by way of examples of certain types

10     of businesses, right?

11          A.     I am.

12          Q.     And then you say "These are just some

13     examples where web commerce, where our vast

14     digitally-enabled interconnectedness and the

15     ability to disintermediate customer-facing value

16     and supply chains, as well as gauge and pay for

17     performance in real-time, have radically impacted

18     business models and are clearly changing and in

19     some cases, rapidly invalidating entire

20     industries."  Did I read that correctly?

21          A.     That was a good sentence.  Well -- yes.

22          Q.     It was a mouthful.

23          A.     It was.

24          Q.     But the simple version of the statement
```

```
1    for my own purposes is that what you're alluding

2    to here is the web changes how businesses may

3    work?

4         A.    Not just the web, but digital technology

5    in general terms.  But the web certainly is a very

6    big part of that.

7         Q.    And it can change them quite a lot in

8    some cases, right?

9         A.    The music industry.

10         Q.    And you say that this web commerce may

11    "rapidly invalidate entire industries."  Do you

12    see that?

13         A.    Yes.

14         Q.    And do you still agree with that?

15         A.    Well, it did.

16         Q.    And was it true --

17         A.    It ---

18         Q.    -- during the transaction process?

19         A.    It was true for certain industries

20    during the transaction process, sure.

21         Q.    Do you -- and I guess I shouldn't phrase

22    it that way.  I'll try it again.  Your opinions

23    don't address web commerce and its impact on The

24    Antioch Company, do they?
```

1      A.    I refer to web competitors.  And I

2   certainly allow that it was an impact.  I don't

3   discount that it wasn't -- that it was.

4      Q.    Was it a negative impact?

5      A.    It would certainly been -- pressured

6   their sales.  They would have -- I would think

7   they lost marketshare, too.

8      Q.    And do any of the defendants, to your

9   knowledge, control the stream of web commerce?

10     A.    Not that I know of.

11     Q.    Go ahead and turn, if you would, to

12   Deposition Exhibit 803.

13     A.    What is 803?

14     Q.    That's the "Selling Your Company" email.

15     A.    Okay.  I'm there.

16     Q.    And not to cover this in too much detail

17   again, but if you turn to the second page of

18   Exhibit 803...

19     A.    Mm-hmm.

20     Q.    This is again a piece that you wrote

21   yourself?

22     A.    I did, yeah.

23     Q.    In the first paragraph, the last

24   sentence says "Success takes a steady hand,

```
 1    knowledge of the process, in addition to an

 2    ability to anticipate the twists and turns a deal

 3    often will take."  Do you see that?

 4         A.    I do.

 5         Q.    And when you say twists and turns a deal

 6    often will take, what are you referring to?

 7         A.    Transactions are not linear.  They --

 8    you know, you never really know what's going to

 9    come up, what type of deal tracks you're going to

10    end up having to negotiate, what will show up in

11    discovery that you did not understand that was

12    there that may have some impairment -- basis in

13    impairment.  Things just happen.  The deals are

14    fairly complicated.

15         Q.    I'm going to ask you just for

16    clarification of your testimony because I was

17    sitting in here, and I heard you reference

18    discovery as part of a transaction process.  And

19    discovery has a special particularized meaning for

20    lawyers.

21         A.    Mm-hmm.

22         Q.    And when you say "discovery" in this

23    sentence, are you referring to due diligence and

24    investigation of a target company?
```

1       A.    More specifically preliminary due

2    diligence on the part of the investment bank and

3    in part -- yeah, I -- there's -- fair enough.

4    It's due diligence, so -- and it may be

5    preliminary, but that's typically how I think

6    about it.

7       Q.    Thank you.  When you go further down the

8    page here, there's a heading that says "Preparing

9    Yourself," and there's a line that begins

10   "Business values ebb and flow with the liquidity

11   of capital markets, borrowing rates, and the flow

12   of similar identifiable deals in addition to the

13   fundamentals of the company being put up for

14   sale."  Did I read that correctly?

15       A.    You have.

16       Q.    And here again, the gist of that

17   statement is that a company's value can ebb, which

18   is to go down, or flow, which is to go up,

19   depending upon these factors that you've listed

20   here?

21       A.    Yes.

22       Q.    So the liquidity of capital markets can

23   cause a company's value to go up or down?

24       A.    Up.  Typically up.  Or, I mean, if

1    you're saying the company -- the markets --

2    there's abundance of liquidity in that context,

3    certainly up.

4        Q.    Borrowing rates can cause the value of a

5    company to go up or down?

6        A.    Could go down, cause the capital...  It

7    could go down or up.  It depends what the credit

8    -- if it's low cost of capital or it's high cost

9    of capital, it could go either way.

10       Q.    The flow of similar identifiable deals

11   can cause values to go up or down?

12       A.    Sure.  There I mean comparables.  People

13   look out and see that companies are being bought

14   and sold at these values, and -- and in a

15   competitive environment, that -- that's fairly

16   common to -- to kind of lock in or calibrate where

17   deals are going to be valued at.

18       Q.    How much influence can any of the three

19   factors that we've discussed -- how much influence

20   can they have on value in a transaction?

21       A.    Oh, substantial.

22       Q.    Now, as to the liquidity of capital

23   markets, you'd agree with me that none of the

24   defendants have any control over the liquidity of

1    capital markets, true?

2         A.    I agree.

3         Q.    The same thing as to borrowing rates;

4    none of the defendants in this case have any

5    control over borrowing rates?

6         A.    Agree.

7         Q.    And the same thing is true over similar

8    identifiable deals; they didn't, to your

9    knowledge, have any influence over any similar

10   identifiable deals during the time that Antioch

11   engaged in the transaction process from 2007 to

12   2008?

13        A.    Yes, I agree.

14        Q.    And your opinions in your report and

15   your testimony here don't take into account or at

16   least they don't address the liquidity of capital

17   markets, do they?

18        A.    Not specifically, no.

19        Q.    Borrowing rates are not addressed?

20        A.    No.

21        Q.    Similar identifiable deals are not

22   addressed?

23        A.    Not directly, no.

24        Q.    Turning to the page that ends with the

1    Bates numbers 135 of this document, there's a

2    heading that says "One Last Thought," if you want

3    to take a look at that paragraph.

4         A.    Mm-hmm.

5         Q.    The words say "While the letter of

6    intent may only be legally binding with regard to

7    confidentiality..."  Do you see that sentence?

8         A.    Yes, I do.

9         Q.    And the idea conveyed in that sentence

10   is that a deal isn't done when the legal -- or the

11   letter of intent doesn't bind a party to actually

12   consummate a deal?

13        A.    That's correct.

14        Q.    And the next sentence says "As a seller,

15   you do not want to negotiate major issues in the

16   middle of due diligence."  Do you see that?

17        A.    I do.

18        Q.    And is it true that you do not want to

19   negotiate major issues in the middle of due

20   diligence because the deal can still fail in the

21   middle of due diligence?

22        A.    That's always possible.  What I'm really

23   meaning there, if that's what you're asking me, is

24   that when you've already agreed to go into an

 1    exclusive period of due diligence and all the

 2    other buyers are now sidelined, you don't want to

 3    be in a position where you're negotiating major

 4    deal turns when everybody's gone, and that it's

 5    always best to have this in extremely detailed

 6    letters of intent ahead of time so that the game

 7    plan is agreed to by the parties and all the

 8    disclosures are made relative to whatever needs to

 9    be disclosed at that point.

10         Q.    And as the seller, when other buyers

11    have dropped out and you're dealing with only one,

12    you're losing bargaining leverage as the seller?

13         A.    What I'm saying is you are now fairly --

14    yeah, you're -- you have the least bargaining

15    leverage at that point now that everybody else is

16    gone.  Yes, that's what I'm saying.

17         Q.    Go ahead and turn to -- there's a

18    separate article in here.  I believe it says "A

19    few critical ideas for negotiating M&A

20    transactions."  And the page number's ending in

21    page 137.  It's the second-to-last page of the

22    document.

23         A.    Okay.

24         Q.    And I think somebody already asked you

```
 1    about the bold italicized type that says "The deal
 2    is not over until all the money's in the bank."
 3    The paragraph before that, do you see that?  It
 4    begins with "In other words"?
 5         A.    Yes, I do.
 6         Q.    And the language that you've written
 7    here says "Entrepreneurial, financial, and
 8    strategic buyers will all have different financing
 9    capacities and rate of return thresholds.  This
10    clearly impacts what and how they will pay."  Do
11    you see that?
12         A.    I do.
13         Q.    And is that sentence saying that
14    different buyers will pay different amounts of
15    money for the same target company?
16         A.    Yes, it, in essence, says that.
17         Q.    And some will pay more?
18         A.    Yes.
19         Q.    And --
20         A.    Or less.
21         Q.    As the seller, you want to look for
22    whoever might pay the most for your company?
23         A.    Yes.
24         Q.    And it's not fantasy fulfillment to look
```

1  for opportunities with other buyers where they

2  might pay more money?

3      A.    No.  It's fantasy fulfillment to try to

4  get a deal in place that is substantially

5  overvalued.  One of the things we do as an

6  investment banking firm is we -- we get good

7  calibration and agreement with our seller as to

8  what we think the business is worth, and that's

9  the issue.

10      Q.    You can put that aside.  I'm going to

11  hand you what's been marked as Deposition Exhibit

12  807.

13          (Deposition Exhibit No. 807 was marked.)

14          Go ahead and take a look at Exhibit

15  807.  I'm not sure whether it's something you will

16  have seen before or not.

17      A.    I don't recall seeing it.

18      Q.    Do you want to take a minute to look at

19  the contents, or are you comfortable answering

20  questions about it?

21      A.    Let me just take a look for a minute.

22      Q.    Sure.

23      A.    (Examining document.)  Okay.  I've got

24  it.

```
 1        Q.    All right.  Deposition Exhibit 807 is a

 2    document that bears a heading Antioch Publishing,

 3    slash, LudlowWard Capital Advisors Meeting –

 4    April 11, 2007, Notes.  And I understand you

 5    haven't seen it before.  It has a document control

 6    number that begins TAC-CC-0245719 through 21.

 7        A.    Mm-hmm.

 8        Q.    And it appears to be meeting notes

 9    without regard to who prepared the notes.  Did you

10    participate in the meeting with Antioch Publishing

11    on April 11, 2007, to the best of your

12    recollection?

13        A.    I don't recall that specific date or

14    time, but it says that, and I don't -- I've no

15    reason to doubt it.

16        Q.    And you're listed as a participant at

17    the top of the page.

18        A.    Mm-hmm.

19        Q.    And do you know the other participants

20    that are listed there?

21        A.    Certainly Madeline Ludlow was one of my

22    business partners.  Kim Wilson I know.  Mr. Morgan

23    I know.  Tom Rogers I'm -- you know, I -- I don't

24    -- I don't recollect who he was.  Steve Bevelhymer
```

```
 1    -- I'm not sure I'm saying that correctly -- I
 2    recognize only because of him showing up in
 3    documents that I reviewed for this.  Anita
 4    Brown -- I don't know who she is.  I don't recall.
 5        Q.    Without regard to who prepared the notes
 6    or whether the date is accurate, you were present
 7    at a meeting like the one that's described here?
 8        A.    Yeah.  I -- I -- I believe I was, yes.
 9        Q.    And the notes discuss an engagement
10    letter?
11        A.    Mm-hmm.
12        Q.    And Antioch and LudlowWard Capital
13    Advisors would have been discussing an engagement
14    letter in April of 2007, true?
15        A.    Yes.
16        Q.    And then it addresses "Offering
17    Materials" and "Potential Buyers."  Do you see
18    that?
19        A.    Yes.
20        Q.    Looking at item number 3, "Potential
21    Buyers," there are three potential buyers listed
22    there.  Do you have a recollection of discussing
23    those buyers at a meeting either on or about
24    April 11 of 2007?
```

1      A.    I certainly remember CM Paula.  I

2  remember the discussion about Mead.  Oak Patch I

3  just -- I don't recall, but... but I don't doubt

4  that we did.

5      Q.    Who is CM Paula?

6      A.    CM Paula is a local Cincinnati-based

7  company.  I'm trying to think what all the things

8  they did.  They have a variety of novelty-type

9  products that they -- I think they manufacture and

10  sell, but I don't remember all -- but they're

11  based in the Cincinnati area, so...

12      Q.    Under the list of potential buyers,

13  there's a note.  Do you see that?

14      A.    I do.

15      Q.    And the note says in the second sentence

16  "Forward all ideas on potential buyers to

17  LudlowWard.  Do not exclude financial buyers or

18  those who may wish to team up with management."

19  Do you see that?

20      A.    I do.

21      Q.    Do you recall having a discussion about

22  encouraging people to investigate buyers who may

23  wish to team up with management?

24      A.    I don't.  I don't doubt that it

513.677.6188

1    occurred, but I don't remember.

2        Q.    Is there anything inappropriate in your

3    mind about considering buyers who wish to team up

4    with management?

5        A.    No.

6        Q.    All right.  And then the next two pages

7    of this exhibit appears to be a list of people

8    that are involved in the Antioch Publishing

9    transaction.  Do you see that?

10       A.    Yes.

11       Q.    And just for the record, it shows Mark

12   Greenberg on the last page of that list.

13       A.    Mm-hmm, yes.

14       Q.    You can put that aside.  Shuffling

15   papers is always a challenge.  Are you ready for

16   the next one?

17       A.    I'm ready for you.

18             (Deposition Exhibit No. 808 was marked.)

19       Q.    I'm going to hand you what's been marked

20   as Deposition Exhibit 808.  If you would, take a

21   look at that, please.

22       A.    (Examining document.)

23       Q.    While you're looking at that, for the

24   record, Deposition Exhibit 808 is a two-page

 1    document with the Bates numbers TAC-CC-0166648

 2    through 49.  And it appears to be an email string,

 3    the latest of which appears to be from Christine

 4    Van Buren and dated November 23 of 2007 with the

 5    subject "Letter of Intent."

 6            Have you had a chance to look at the

 7    document, Mr. Greenberg?

 8        A.    Yeah.  I've just -- I just -- just

 9    scanned it quickly.  Yeah, I got it.

10        Q.    And can you tell us just generally what

11    this email string is referring to?

12        A.    Let me first preface that I don't recall

13    this, but it's clearly from me and I'm in there

14    and...  There was apparently -- Christine Van

15    Buren was looking to potentially acquire the

16    business that we were selling, the Antioch

17    Publishing business.

18            And I had requested from Christine and

19    John -- I guess that's Mr. Hartley -- certain

20    things that I would like to see in the -- in a

21    letter of intent just as a starting point.  And

22    I've also asked for confirmation letters from

23    qualified financing sources to insure that there

24    was some means to -- to finance any deal that we

 1   might move into.

 2            There's a quote there.  I have to read.

 3   (Examining document.)  Yeah, I'm just giving them

 4   kind of a hint as what we're looking to -- as a

 5   starting point to -- the way to address it, and

 6   that's it.

 7        Q.   I understand you don't remember

 8   precisely what happened on November 21st of 2007.

 9   If you go back to the second page, you'll see that

10   the email string appears to originate with an

11   email from Christine Van Buren on November 20th of

12   '07, and it's addressed to you?

13        A.   Yes.

14        Q.   And do you recall who Christine Van

15   Buren is or was at the time?

16        A.   I really don't.  I don't.

17        Q.   Do you see next to Christine Van Buren's

18   "from" line there's an address in brackets?  It

19   says "mailto:CVanBuren@antioch.com."

20        A.   I do.

21        Q.   Do you have a recollection of whether

22   Christine Van Buren was an Antioch or an Antioch

23   Publishing employee at the time that she sent this

24   message to you?

1      A.    I have no recollection of it, but I

2  don't doubt it.  I just don't remember.

3      Q.    As it appears here, it looks like

4  Christine -- and we'll just represent for the

5  purposes of my questions that she was an employee

6  at the time.

7      A.    I accept that.

8      Q.    Christine is expressing an interest in

9  buying Antioch Publishing, fair?

10      A.    Yes.

11      Q.    And you're addressing her letter of

12  intent with your response?

13      A.    Yes.

14      Q.    And this was not a deal that you brought

15  to Antioch in connection with your role as the

16  investment banker?

17      A.    It looks that way, yes.

18      Q.    And it looks to me you're engaging in

19  the process with John and Christine and telling

20  them what you need in order to review and assess

21  their offer?

22      A.    To begin reviewing, yes.

23      Q.    And that wasn't a waste of time for you

24  to look at their offer, I take it?

```
 1        A.    I don't know.  I can't express an

 2   opinion.  I don't remember.

 3        Q.    Based upon the letter of intent, which

 4   apparently didn't address cash at closing or

 5   assets assumed or detail and amounts relating to

 6   assumption of liabilities or assumption of lease

 7   obligations or financial assumptions, all of which

 8   you were asking for -- despite not having those

 9   things, you thought it was at least worth an email

10   to ask her to provide you with more detail and

11   information?

12        A.    Very clearly, yes.

13        Q.    And that wasn't a waste of your time, or

14   you wouldn't have done it?

15        A.    Likely not, yeah.

16        Q.    And that back and forth between you and

17   John and Christine didn't slow down the process of

18   selling Antioch Publishing, did it?

19        A.    I don't recall that it did.  I assume

20   that it didn't.

21        Q.    And it didn't adversely affect the value

22   that Antioch ultimately received for Antioch

23   Publishing, did it?

24        A.    Not as far as I know.
```

```
 1          Q.    I want to talk a little bit about
 2   information that may or may not have been
 3   available to you, and I -- this unfortunately is
 4   something of a memory test.  And you can tell me
 5   whether your memory serves you or not, but I'll
 6   represent to you that we have looked at the
 7   documents that were produced to us in response to
 8   our subpoena and that the documents that were
 9   produced to us do not include a number of
10   deposition transcripts.
11             And I believe that you've already
12   identified some, but I would like to have a list.
13   And if you agree or disagree, let me know.
14          A.    Mm-hmm.
15          Q.    By my count, there were 17 witnesses
16   whose depositions that you were never provided
17   with.  And I'll identify the witnesses for you if
18   I can, and you tell me whether you have seen it or
19   not seen it.
20          A.    You're saying there's 17 that I have not
21   seen?
22          Q.    You have not seen these.
23          A.    Fair enough.  Okay.
24          Q.    Barry Hoskins?
```

```
 1        A.    I've not seen.

 2        Q.    Kimberlee Lipson-Wilson?

 3        A.    I don't believe I've seen it.

 4        Q.    Peter Abrahamson?

 5        A.    Don't recall seeing.

 6        Q.    Kreg Jackson?

 7        A.    Don't recall.

 8        Q.    Chandra Attiken?

 9        A.    She shows up in a lot of things as does

10   Kimberlee Lipson-Wilson, but I don't recall

11   reading...

12        Q.    Her deposition, that is.  You didn't

13   receive her deposition?

14        A.    If I didn't receive it, I certainly

15   haven't read it.

16        Q.    Dan Holthaus?

17        A.    If I didn't receive it, I didn't -- I

18   didn't read it.

19        Q.    Marilyn Marchetti?

20        A.    Again, same answer.

21        Q.    Lee Bloom?

22        A.    Same answer.

23        Q.    Helen Morrison?

24        A.    Same answer.
```

```
 1          Q.    Guy Walker?

 2          A.    Same answer.

 3          Q.    Cheryl Lightle?

 4          A.    Same.

 5          Q.    Uri Doron?

 6          A.    Same answer.

 7          Q.    Richard Wiser?

 8          A.    Same answer.  If I didn't receive it, I

 9     didn't receive it -- didn't read it.

10          Q.    G. Robert Morris?

11          A.    If I didn't receive it, I didn't read

12     it.

13          Q.    And by the way, G. Robert Morris was a

14     director after June 5th of 2008.  Were you aware

15     of that?

16          A.    Was he the -- yeah, he was the one who

17     was brought in by Evolve.  Yes, I do.

18          Q.    But you didn't receive his transcript,

19     and you haven't read it?

20          A.    If I didn't receive it, I haven't read

21     it.

22          Q.    Sandra Borstad?

23          A.    Again, same.

24          Q.    Rhonda Anderson?
```

```
 1         A.     Same.

 2         Q.     And then plaintiff W. Timothy Miller?

 3         A.     Haven't seen it.  Didn't read it.

 4         Q.     Now, when we looked at the materials

 5    that were provided to you and reviewed by you, I

 6    personally -- and you can correct me if I'm

 7    wrong -- I didn't notice whether you had received

 8    any of the corrections pages for any of the

 9    witnesses for whose transcripts you may have

10    reviewed.

11             Are you familiar with the process by

12    which witnesses review their transcripts for

13    errors?

14         A.     Very vaguely, and -- but if I haven't

15    received it, if they're not there, I have not read

16    them and I did not receive them.

17         Q.     I don't recall seeing in the materials

18    that you were provided -- but I could be wrong

19    about this one -- Deposition Exhibit 586.  And

20    just for the record, Deposition Exhibit 586 has

21    already been identified and testified to by

22    another witness, but that document is minutes from

23    a June 12, 2008, Antioch Company Board of

24    Directors meeting.  Does that ring a bell with you
```

1    at all?

2         A.    June 12th?  If it's not in there, I have

3    not read it.

4         Q.    Now, when Mr. Knoth asked you questions,

5    you and he agreed that you could talk in terms of

6    the old board and the new board with reference to

7    what happened in June of 2008?

8         A.    Yes.

9         Q.    So June 12th is within the period of

10   time for the new board, fair?

11        A.    Fair.

12        Q.    You're aware, I think, based upon your

13   testimony, that the new board had new legal

14   counsel?

15        A.    Yes, I am aware.

16        Q.    The Skadden Arps firm?

17        A.    That's correct.

18        Q.    And do you have an awareness of whether

19   Skadden Arps advised the board to continue with

20   the dual-track process?

21        A.    I'm thinking about communications with

22   Skadden Arps in the -- when they were first hired

23   and how they responded.  I can't say -- I just --

24   I don't recall.

```
1          Q.    Does it make a difference to your

2    opinions if Mr. Pohl, who's the lawyer for Skadden

3    Arps, recommended to the new board that Candlewood

4    take the lead with respect to potential

5    refinancing transaction and that Houlihan continue

6    to have responsibility for preparing for a

7    potential sale of the company's assets?

8               If that's the advice from Skadden Arps,

9    does that have any effect on your opinions?

10         A.    Actually, let me qualify if I can.  If

11   there was a refinancing that could occur in some

12   valuation that would make some sense, then it

13   would be hard to argue that that would be

14   something that one ought to pursue.

15              But to the extent that that hadn't

16   occurred, then I would think that that was a

17   preliminary comment on the part of the Skadden

18   Arps lawyer and -- and that would be my best

19   guess.  But, you know, on the face of it, that's

20   what he's saying for sure.

21         Q.    It sounds like the dual-track process,

22   true?

23         A.    It does.

24         Q.    And it sounds like they're saying
```

 1   continue that, true?

 2        A.    They're saying continue it, yes.

 3             MR. GENTRY:  Thank you.  I have no

 4   further questions right now.  There may be others

 5   who are waiting.  I thank you for your time and

 6   attention.  I know it's very frustrating to be in

 7   that chair for as long as you have been.  Thanks.

 8             Let's go off.

 9             (A brief break was taken.)

10                  CROSS-EXAMINATION

11   BY MR. PRENTISS:

12        Q.    Mr. Greenberg, I'm Dan Prentiss.  I

13   represent James Northrop.  Do you know who he is?

14        A.    I do.

15        Q.    Who is he?

16        A.    He became a board member...  I'm trying

17   to remember when he came on the board.  He was --

18   it was late in the game he became a board member.

19   I don't remember the exact time frame.

20        Q.    Do you know offhand which of your

21   opinions you believe apply to Mr. Northrop?

22        A.    Well, to the extent that -- that he was

23   a part of the board in the decision process

24   through '07 and through '08 prior to the ending of

1    the firing of the board, I suppose he would be

2    part of those -- part of those opinions.

3         Q.    All right.  Now, I want to just clarify

4    for my understanding and possibly for the record

5    your opinions regarding losses that you've

6    described.

7             And as I understand it, you testified in

8    response to several questions that you have two

9    categories of loss.  One category is in the range

10   of 16 to 23 million, which is a diminution in

11   value of the business; is that true?

12        A.    That's true.

13        Q.    And the second category is $6 million in

14   professional fees?

15        A.    Yes.

16        Q.    As to the diminution of value of the

17   business, you testified yesterday in response to

18   Mr. Scheier's questions that that is derived from

19   two different data points, correct?

20        A.    Yes, from the Whitney offer and from the

21   CRG valuation in the bankruptcy position.

22        Q.    Although you have experience in doing

23   business valuations, you did not, for the purpose

24   of giving an opinion in the trial of this case,

```
 1    did not perform an independent business valuation

 2    of The Antioch Company as to either of those

 3    dates -- operative dates; is that true?

 4         A.    That's true.

 5         Q.    You accepted or have relied on the

 6    J.H. Whitney proposed deal as the proxy for the

 7    value of the Antioch business as of June 2008?

 8         A.    I have.

 9         Q.    Okay.  And you have accepted as -- for a

10    valuation as of December 31, 2008, the description

11    in the disclosure statement of a valuation

12    performed by CRG?

13         A.    Yes.

14         Q.    Okay.  And so the diminution in value

15    took place over the period from June 5th, 2008, to

16    December 31st, 2008, correct?

17         A.    That would be a fair estimate, yeah.

18    Yeah, I agree.

19         Q.    As of June 5th, 2008, the business was

20    worth, based on the materials that you rely on,

21    $54 million, plus or minus?

22         A.    Yes.

23         Q.    And as of December 31st, according to

24    the materials you rely on, the business was worth
```

 1     between 31.6 and 38 million dollars?

 2          A.     Correct.

 3          Q.     And that delta is the 16 to 23 million

 4     dollars?

 5          A.     Yes, sir.

 6          Q.     You'll agree with me, then, that the

 7     Special Transaction Committee, which was

 8     terminated as of June 5th, 2008, has no

 9     responsibility for any of the diminution in value

10     of the business that took place from June 5th,

11     2008, to December 31st, 2008?

12          A.     If those are the benchmarks and those

13     are the periods, then I would tend to agree, yes.

14          Q.     I mean, the Special Transaction

15     Committee recommended to the board to pursue the

16     J.H. Whitney deal to completion, correct?

17          A.     Correct.

18          Q.     And you commend that recommendation by

19     the Special Transaction Committee?

20          A.     I believe that was the right thing to

21     do.

22          Q.     And you commend the board's decision --

23     the old board's decision to accept the

24     recommendation and to pursue that transaction to a

1    closing, correct?

2         A.    Yeah, from the point of view of how

3    we're estimating the damages, it was -- the 54

4    million was the -- was the number that it should

5    have closed out; and presuming that if it did,

6    we'd -- nobody in this room would be sitting here

7    right now, so...

8         Q.    My question was, you commend the

9    decision by the board of directors, the old board

10   of directors of The Antioch Company, to pursue the

11   J.H. Whitney offer, too?

12        A.    I believe it was the right decision at

13   the time when that offer was made.  It didn't mean

14   that I didn't think the board could have had

15   better offers earlier, but it certainly indicated

16   at that time that's where they were.

17        Q.    And the reason -- the sole reason for

18   the delta, the diminution in value of The Antioch

19   Company, was the action of the ESOP trustee in

20   firing the board and rejecting the J.H. Whitney

21   deal, right?

22        A.    It was certainly the act that caused

23   that to occur.  Was it the sole reason?  I don't

24   -- I don't -- I wouldn't -- I would -- I would

1  take issue with that, but it certainly was the act

2  that created that circumstance.

3      Q.    What other reason besides the

4  termination of the board caused the rejection of

5  the J.H. Whitney deal?

6      A.    In my view, the -- the -- one of the

7  causes of that -- and -- is the -- was the belief

8  that somehow there was another kind of deal out

9  there that would recognize value associated with

10  the ESOP, the ESOP notes, and the sub debt -- and

11  the sub debt.  And that was, again, an

12  undercurrent in this whole process.

13          And then with the belief that I had that

14  if one really understood that it would have been

15  very difficult to do a deal outside of a 363

16  bankruptcy auction, that -- that you probably

17  would have potentially closed the deal much

18  earlier if that was the predicate that you went

19  into the market with.

20      Q.    But the board of directors -- the old

21  board of directors when it voted to pursue

22  J.H. Whitney offer0?

23      A.    Was not holding back anything in hope of

24  a better deal; it made a commitment to close on

 1   J.H. Whitney?

 2        A.   I agree.

 3        Q.   Now, as to the $6 million in

 4   professional fees, your understanding of that

 5   figure is that that is a total amount of fees paid

 6   by The Antioch Company to professionals for

 7   professional services over what period of time?

 8        A.   I'm thinking it's probably the '07 --

 9   '07/'08 period.

10        Q.   And when you say you think it's

11   probably, you don't have a firm --

12        A.   I don't have a specific --

13        Q.   -- grasp of that?

14        A.   I don't.

15        Q.   You got the figure from the Taft

16   lawyers, correct?

17        A.   I did.

18        Q.   You testified to that yesterday.  And

19   your assumption now, in looking back on it, is

20   that they were giving you a figure for a 2007/2008

21   time frame --

22        A.   Yes.

23        Q.   -- correct?

24        A.   That's correct.

1     Q.    And you've testified in response to

2     other questioners that at least some of the $6

3     million that was paid out for professional fees by

4     Antioch was money well spent for professional

5     advice that Antioch really needed, correct?

6     A.    Yes.

7     Q.    So the only part of that $6 million that

8     would contribute to a claim of a loss would be

9     excess expenditures over and above what reasonably

10    was required by The Antioch Company for

11    professional services, right?

12    A.    Yes.  And if -- may I frame that?  I

13    believe that as -- certainly as early as the late

14    fall of '07 and -- for several reasons, but a

15    major reason was the -- the -- the surety issue on

16    the -- on the ESOP notes, that it was pretty clear

17    that you would have needed to go through

18    bankruptcy.

19          And a 363 is a highly efficient process.

20    We -- I've closed 363s in two-and-a-half months

21    right through auction and purchase.  And -- and my

22    belief is that that could have accelerated, and

23    this -- this -- this whole process could have come

24    to a better end earlier than it -- than it

1   actually ended up doing.

2       Q.    What you're saying when you say you

3   believe this process could have been accelerated,

4   you say events could have transpired that could

5   have changed the dates or effective dates of the

6   outcome; but to actually give an opinion as to

7   when or how would be speculation, right?

8       A.    I agree.

9       Q.    So would this be true:  You're unable to

10  quantify a figure that, in your opinion,

11  constitutes excess expenditures for professional

12  fees incurred by the old board of directors up

13  until June 5th, 2008, when the board was fired?

14      A.    I couldn't do that without making

15  assumptions about how that process would

16  accelerate.

17      Q.    As we are sitting here and you are here

18  to explain to us your opinions, you have no

19  opinion as to a figure that, in your professional

20  opinion, is excess fees incurred and expended by

21  The Antioch Company for professional services?

22      A.    As I'm sitting here now, I do not.

23          MR. PRENTISS:  Thank you.  That's all I

24  have.

```
 1              MR. KLINGLER:  I have a few questions.
 2                    CROSS-EXAMINATION
 3   BY MR. KLINGLER:
 4       Q.    Good afternoon, Mr. Greenberg.  I'm Bob
 5   Klingler.  I represent G. Robert Morris, Kim
 6   Lipson-Wilson, Barry Hoskins, Karen Felix, and
 7   Steve Bevelhymer.
 8              We've been here for the better part of
 9   two days, and I've listened to all the testimony
10   and read your report.  I just have a few questions
11   about how your opinion might or might not pertain
12   to my clients.
13              With respect to Steve Bevelhymer first
14   of all -- by the way, do you remember reading his
15   deposition?
16       A.    I don't recall.  If it's in there, I
17   have, and I certainly understood who he was in
18   the...
19       Q.    Is it true that you will not be giving
20   any opinions that attribute any damage allegedly
21   suffered by The Antioch Company to anything that
22   Steve Bevelhymer did or did not do?
23       A.    There's nothing that I know of that I --
24   that I would attribute to him.
```

1          Q.    Is it true that you will not be giving

2     any opinions that attribute anything that Barry

3     Hoskins did or did not do to any damage allegedly

4     suffered by The Antioch Company?

5          A.    That would be true.

6          Q.    And with respect to Karen Felix, is it

7     true that you will not be giving any opinion that

8     attributes any damage allegedly suffered by The

9     Antioch Company to anything Ms. Felix did or did

10    not do?

11         A.    That's true.

12         Q.    And with respect to G. Robert Morris, is

13    it true that you will not be giving any opinion

14    that attributes any damage allegedly suffered by

15    The Antioch Company to anything Mr. Morris did or

16    did not do?

17         A.    I'm trying to think who Mr. Morris was

18    in this process.  Could you refresh my memory?

19         Q.    Yes.  His name doesn't appear in your

20    report, but he's referred to, I think, in your

21    report as the attorney who was appointed by

22    Evolve --

23         A.    Oh, Evolve.

24         Q.    -- to the board of directors.

```
 1        A.    Okay.  No, I have nothing in my opinion

 2   about him.

 3             MR. KLINGLER:  Okay.  That's all I have.

 4   Thank you.

 5             Actually, I'm sorry.  I do have one more

 6   question.

 7             THE WITNESS:  You didn't cover Kim

 8   Lipson-Wilson.

 9             MR. KLINGLER:  Thank you.

10             THE WITNESS:  Should I help you?

11             MR. KLINGLER:  Yes, thank you very much.

12   I have two more questions.

13        Q.    (By Mr. Klingler)  With respect to

14   Kim --

15        A.    Gotta stay on top of things over here.

16   You guys gotta stay alert.  A little more coffee

17   might help.

18        Q.    With respect to Kim Lipson-Wilson, is it

19   true that you will not be giving any opinion that

20   attributes any alleged damage suffered by The

21   Antioch Company to anything she did or did not do?

22        A.    I will not.

23        Q.    The other question I wanted to ask you

24   was with respect to the Condor transaction, you
```

1  indicate on page 20 of your report -- you don't

2  need to pull it out.  You can if you want --

3      A.    Yeah, I know what's in there.

4      Q.    -- but let me just read it to you.  You

5  say on page 20, and I quote, "Unable to use the

6  company balance sheet to guarantee the notes, and

7  given the company's teetering finances and risks

8  of payment default, the company's insurance broker

9  was only able to find an off shore unrated

10 insurance company to underwrite surety for the

11 ESOP notes," end quote, and that insurer was

12 Condor.

13     A.    Yes.

14     Q.    Do you have any information -- you

15 apparently didn't when you wrote this report.  Do

16 you have any information to indicate that there

17 was any insurer available other than Condor to

18 insure these ESOP notes?

19     A.    Based on the exhibits and various

20 testimony, it appeared that the broker couldn't

21 find anybody other than Condor to insure the

22 notes.

23     Q.    And do you have any information that

24 there was, in fact, some other insurer out there

```
 1   that the broker or somebody else didn't find?
 2        A.   I have no information as to the extent
 3   of the broker's attempt to source another --
 4   another -- another insurance company.  I have no
 5   idea.
 6        Q.   Okay.  So just to nail it down here,
 7   you're not aware of any other source that this
 8   broker did not find that he could or should have
 9   found?
10        A.   That's a very strange question to ask in
11   the way you've asked it.  I am not aware of any
12   other insurance provider for the surety of the
13   notes.
14             MR. KLINGLER:  Okay.  Am I finished?
15             THE WITNESS:  I don't know.
16             MR. KLINGLER:  Thank you.  I'm done.
17             THE WITNESS:  You're welcome.
18             MS. ANDREW:  Are we done?
19             MR. SCHEIER:  I'd like to take a short
20   break and just caucus with my clients.  I think I
21   have no more questions, but I'd like to have the
22   opportunity to recross.
23             (A brief break was taken.)
24
```

```
 1                    RECROSS-EXAMINATION
 2   BY MR. SCHEIER:
 3       Q.    Hello, Mr. Greenberg.  Mike Scheier
 4   again.  You recall I represent Lee Morgan, Asha
 5   Moran, and Marty Moran, and a group of Morgan
 6   family trusts, and I one time represented a former
 7   defendant in this case, Chandra Attiken.
 8             I just have a couple follow-up questions
 9   for you based on some of the responses you gave to
10   other counsel.
11             Initially I'd like to ask, have you seen
12   any evidence -- let me take a step back.  I want
13   to stick with the nomenclature of "old board" and
14   "new board."  When I use those phrases, you'll
15   understand what I mean, correct?
16       A.    Yes, I do.
17       Q.    Can you point to any evidence of
18   anything the new board did that caused decrease in
19   the value of the company as you testified from the
20   $54 million that Whitney had set forth in its LOI
21   to the point that CRG gave its valuation estimate?
22       A.    I can't point to anything specifically.
23             MR. SCHEIER:  Okay.  Thank you.  I have
24   no further questions.
```

```
 1              (Whereupon, the deposition was adjourned

 2    at 2:43 p.m.)

 3

 4

 5                              _____

 6                              MARK A. GREENBERG

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        CERTIFICATE

 2   STATE OF OHIO     :
                       : SS
 3   COUNTY OF HAMILTON:

 4           I, Kelly Green, the undersigned, a duly

 5   qualified and commissioned Notary Public within

 6   and for the State of Ohio, do hereby certify that

 7   before the giving of the aforesaid deposition, the

 8   said MARK A. GREENBERG was by me first duly sworn

 9   to tell the truth; that the foregoing is a true

10   and accurate record of the testimony given at said

11   time and place by said deponent; and that said

12   deposition was taken by me in stenotype and

13   transcribed by computer-aided transcription, and

14   that signature is not waived.

15           I certify that I am not a relative,

16   employee of, or attorney for any of the parties or

17   attorneys in the above-captioned action; I am not

18   financially interested in the action; I am not

19   under a contract as defined in Civil Rule 28(D).

20           IN WITNESS WHEREOF, I hereunto set my

21   hand and official seal of office at Cincinnati,

22   Ohio, this 31st day of August, 2013.

23                      _____

     My Commission expires:      Kelly Green, RPR
24   August 10, 2014         Notary Public, State of Ohio
```

513.677.6188

528

```
 1              (Whereupon, the deposition was adjourned
 2    at 2:43 p.m.)
 3
 4
 5    _____
 6              MARK A. GREENBERG
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1    your report?

2         A.    I believe so.

3              MR. SCHEIER:  I believe that's all I

4    have.  Thank you for your time today.

5              (Whereupon, the deposition was adjourned

6    at 5:10 p.m.)

7

8

9         _____

10                 MARK A. GREENBERG

11

12

13

14

15

16

17

18

19

20

21

22

23

24