**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)**

| | |
|---|---|
| **THE ANTIOCH COMPANY LITIGATION TRUST, W. TIMOTHY MILLER, TRUSTEE,** | **Case No. 3:10-CV-156** |
| | **(Judge Timothy S. Black)** |
| **Plaintiff,** | **PLAINTIFF'S RESPONSE TO DEFENDANTS LEE MORGAN, ASHA MORGAN MORAN, AND MARTY MORAN'S LIMITED MOTION TO EXCLUDE PLAINTIFF'S EXPERT'S REPORT, OPINIONS AND TESTIMONY REGARDING DAMAGES** |
| **v.** | |
| **LEE MORGAN, et. al,** | |
| **Defendants.** | |

## I. INTRODUCTION

Plaintiff The Antioch Company Litigation Trust ("Plaintiff") submits this Response in Opposition to Defendants Lee Morgan's, Asha Morgan Moran's, and Marty Moran's ("Defendants") Limited Motion to Exclude Plaintiff's Expert's Report, Opinions and Testimony Regarding Damages.  (Doc. No. 213).  The Defendants' motion must be denied because Mr. Greenberg is qualified to testify to what he, in reality, did testify to.  Defendants' argument to the contrary is based on a straw man: the idea that Mr. Greenberg is or should be a "damages expert."  But the fact that Mr. Greenberg may be unqualified to provide the type of "damages expert" testimony he was not asked to give, did not in fact give, and never needed to give, matters not at all.  Plaintiff's damages from the sales process are based on the loss of value of the Company, and Mr. Greenberg is qualified to give opinions as to business valuations and how that value is impacted by the sale process.  Moreover, while Defendants assert that Mr. Greenberg's testimony is unreliable, every part of Mr. Greenberg's testimony passes muster under *Daubert*. He properly testified that the J.H. Whitney deal would have closed at least at the value stated in

the May 2008 letter of intent based on his professional experience, J.H. Whitney's substantial due diligence, and the effect the offer would have as a "stalking horse" in a section 363 bankruptcy sale process; and, from that, he properly subtracted the final value of the Antioch Company as determined by the Bankruptcy Court in order to determine the Plaintiff's compensatory damages. Defendants' motion should be denied.[1]

## II. ARGUMENT

Defendants argue that Mr. Greenberg is unqualified to testify regarding damages and that his opinions are unreliable. Under Fed. R. Evid. 702, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993). The rule is that "[a]nyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 588 (7th Cir. 2000); *see also Glover v. Hester*, No. 09–978, 2011 WL 1362103, at *1–2 (W.D. La. Apr.11, 2011) (noting that expert testimony will be admitted so long as the expert "has relevant expertise enabling him to offer responsible opinion testimony helpful to a judge or a jury"); Fed. R. Evid. 702 ("[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."). While district courts do act as gatekeepers to keep out unreliable expert opinions, "[r]ejection of expert testimony under *Daubert* is the exception rather than the rule." *Von Wiegen v. Shelter Mut. Ins. Co.*, No. 5:13–040–DCR, 2014

---

[1] Defendants do make one meritorious argument inasmuch as certain portions of Mr. Greenberg's testimony regarding the $6 million in fees is not reliable. As explained in Section II.D below, however, this does not make all of Mr. Greenberg's testimony regarding those fees unreliable. And his testimony in this regard was not planned and is superfluous, since the jury may clearly make such determinations itself.

WL 66516, *4 (E.D. Ky. 2014).

What the "gatekeeper" role means is that "the trial judge is imbued with discretion in determining whether or not a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (quoting *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 147 (1999)). A court may consider whether a theory or technique can be and has been tested; whether the theory has been subjected to peer review and publication; whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 682 (6th Cir. 2010). But these factors "should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001)). And, ultimately, "the gatekeeping inquiry must be tied to the facts of a particular case, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Johnson*, 484 F.3d at 430. Mr. Greenberg's testimony satisfies the *Daubert* standard as it applies here.

### A. Mr. Greenberg is Qualified to Testify to What he did Actually Testify to

Defendants present this Court with a seriously flawed view of Mr. Greenberg's engagement and of Plaintiff's representations regarding its sales process damages. From the start, Plaintiff made clear that its damages arising from the 2007-2008 sale process would be based, at least in part, on the decline in the Company's value during the protracted sale process, as shown by the $54 million J.H. Whitney proposal to purchase the Company in May 2008, as well as upon the expressions of interest the Company received from Jostens and Sun Capital

during the summer of 2007, which valued Antioch at between $148 million and $185 million. *See* Exhibit A, Plaintiff's Response to First Set of Interrogatories of Lee Morgan, et al., at 4-5 ("By May 2008, the Company's value had declined to approximately $54 million based on J.H. Whitney's proposal to purchase the Company" and "The Trust arrives at this calculation based on expressions of interest in the Company received from Jostens and Sun Capital during the summer of 2007, which valued Antioch at between $148 million and $185 million"); *see also* Exhibit B, Plaintiff's Response to First Set of Interrogatories of James A. Northrop, at 16-17.

Plaintiff did also state, as Defendants note, that it "anticipate[d] engaging one or more experts to opine on the loss in enterprise value that resulted from the . . . sale process." Exhibit A, at 5. Defendants seem to suggest that this meant Mr. Greenberg was retained or should have been retained to perform an independent valuation of the Antioch Company. But that is not the case. Plaintiff could have established the loss of enterprise value any number of ways, and the way it chose to establish that loss was to engage Mr. Greenberg to testify regarding the various offers the Company received during the sale process. Mr. Greenberg testified in relevant part that the May 2008 J.H. Whitney $54 million offer would have been accepted by the Company and would have been the "worst" the Company would have received through the resulting Bankruptcy Code Section 363 sale because J.H. Whitney had done "substantial due diligence" and because its offer would have served as a "stalking horse" that encouraged other bidders.[2] Exhibit C, Mark Greenberg Deposition ("Greenberg Dep."), at 295:2-10 ("They did a substantial amount of due diligence. If it went into an APA into a 363, it would have been a guaranteed bid . . . . The worst it would have been would have been $54 million if there wasn't anybody else stepping up to the option of the 363 sale . . .").

---

[2] Mr. Greenberg also testified that the verbal offer by Sun Capital was too preliminary to be reliable as an indicator of the value of the Company, and therefore decided to exclude it from his opinion on damages.

Defendants assert that because Mr. Greenberg is not a "damages expert" he cannot testify regarding damages at all.  They emphasize that Mr. Greenberg "has never been qualified as an expert with respect to damages or offered any prior testimony with respect to damages"; he is "not an accountant or economist"; he has "no background, training, experience, or expertise in the computation of damages"; he has "never published a trade piece or scholarship on damages"; and he "admits that he did not use any methodology in formulating his opinion because he is not familiar with any such methodologies."  (Doc. No. 213, at 4, PAGEID #: 19307).  All of this misses the point.  Even if there was such a thing as a universal "damages expert" (and there is not), Mr. Greenberg was clearly qualified to testify to what he did actually testify to: the value of a business as shown by market expressions of interest.  *See generally First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (noting the plaintiff's "unduly narrow approach to defining the central issue at trial" and unfamiliarity with some specific aspects of the subject at hand "merely affected the weight and credibility of [the] testimony, not its admissibility"); *see also Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919 (8th Cir. 2002) (finding an abuse of discretion where the district court excluded testimony of an expert witness qualified in a general field merely because that witness lacked expertise more specialized and related).

Mr. Greenberg has 30 years' experience in business valuation, deal structuring, financial and investment analysis, and has successfully led and completed numerous M&A, capital sourcing, recapitalization and restricting transactions in a wide variety of industries.  Exhibit D, Greenberg Report.  Mr. Greenberg has completed approximately 5 to 10 business valuations each year, and brought that experience to bear in formulating his opinion in this case, although he did not conduct a formal business valuation as part of his engagement.  Exhibit C, Greenberg Dep., at 89-92.  Based on his expert knowledge and experience as a professional dealing with

letters of intent, purchase offers, due diligence, and section 363 sales, Mr. Greenberg testified that the J.H. Whitney $54 million letter of intent was a reliable estimate of what the deal would have closed at. None of Defendants' assertions regarding Mr. Greenberg's lack of experience as a "damages expert" suggests that he lacks the requisite expertise to give this opinion. Indeed, Defendants do not and cannot credibly assert that Mr. Greenberg is unqualified to give this testimony since it is well within his experience to opine on the likelihood of closing a deal in a section 363 sale at a price stated in a letter of intent that was backed by substantial due diligence. Exhibit D, Greenberg Report, at 4; *cf. Von Wiegen v. Shelter Mut. Ins. Co.*, 2014 WL 66516 (E.D. Ky. 2014) ("expert testimony will be admitted so long as the expert 'has relevant expertise enabling him to offer responsible opinion testimony helpful to a judge or a jury.'").

### B. Mr. Greenberg's Testimony is Reliable

Defendants also argue that Mr. Greenberg's testimony is unreliable for a number of reasons, all of which are incorrect.

First, Defendants assert that Mr. Greenberg's "blind reliance" on "the Whitney LOI" makes his testimony "unreliable because [the Whitney LOI] is not the product of any analysis by Mr. Greenberg (or, as far as we know, J.H. Whitney)." (Doc. No. 213, at 7, PAGEID #: 19310). This is not the law. As this Court explained in *Info-Hold, Inc. v. Muzak LLC*, No. 1:11-cv-283, 2013 U.S. Dist. LEXIS 117953 (S.D. Ohio Aug. 20, 2013) (Black, J.), Fed. R. Evid. 703 requires only that an expert not unquestionably accept another's subjective opinion or offer another's analysis as part of his own without examining that opinion or analysis. *Id.* at *5-*6. The letter of intent from J.H. Whitney is not a subjective opinion nor is it offered as Mr. Greenberg's opinion; instead, it is a proposal for an arms-length transaction brokered by a knowledgeable third party, and thus is objective proof of what the value of the Company would have been had

the deal gone through.  *See United States v. Cartwright*, 411 U.S. 546, 551 (1973) ("The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant fact."); *United States v. Campbell*, 704 F.Supp. 715, 726 (N.D. Tex. 1988) ("Valuation is necessarily an approximation. Arms length sales are, other things being equal, the best evidence of the value of the assets of a business.").

Moreover, there are at least two reasons why the value stated in the J.H. Whitney letter of intent is especially reliable and appropriate in this case.  One, after examining the record, Mr. Greenberg testified that in his extensive and specialized experience the transaction would have closed at or above the price offered in J.H. Whitney's May 2008 letter of intent in a section 363 sale.  *Kumho Tire Co., Ltd.*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); Greenberg Dep., at 295:2-10.  Two, the reason the transaction did not close, and the reason why no one knows with certainty what the actual closing value would have been, is because of Defendants' misconduct, and that cannot be held against Plaintiff or its expert.  *See BCS Services, Inc. v. BG Investments, Inc.*, 728 F.3d 633 (7th Cir. 2013) ("In cases in which defendants' misconduct prevent plaintiffs from calculating damages accurately, damages can be estimated by methods that would be deemed impermissibly speculative in other contexts."); *Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996) ("[S]peculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.") (quotation omitted); *see also Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("Any other rule would enable the wrongdoer to profit by his wrongdoing.").

Second, Defendants claim that Mr. Greenberg's testimony is unreliable because he previously stated that "[there is] only one signal[] that the deal is done, and that is when the money is in the bank . . . . More value is lost between the time there is a signed letter of intent and a closing than anyone ever cares to admit." (Doc. No. 213, at 11, PAGEID #: 19314).[3] However, the fact that offer prices are *generally* reduced between letters of intent and closing does not in any way make Mr. Greenberg's testimony that the J.H. Whitney offer price would not have been reduced *in this case* unreliable. Mr. Greenberg's general observations are just that: general observations. He was not making a statement about the facts of this case, or about cases in which the offer would act as a "stalking horse" in a 363 bankruptcy sale or in which the offer was backed by substantial due diligence, both of which were relevant facts Mr. Greenberg cited in support of his specific opinion here. And, even if Mr. Greenberg's general statements were relevant, they would at most bear on the weight of his testimony, not its reliability.

Third, Defendants claim that Mr. Greenberg's reliance on the CRG valuation makes his opinion unreliable. Again, this is wrong. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" *Wash Solutions, Inc. v. PDQ Mfg.*, 395 F.3d 888, 895 (8th Cir. 2005) (quotation omitted). In *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993), for example, the plaintiff argued that the "fact that [its expert witness] assumed the sales figures projected by [another expert] and assigned dollar values to them [did] not diminish [his] testimony in any way," and the Eighth Circuit Court of

---

[3] Defendants take quotes out of context from Mr. Greenberg's previous publications. He also previously stated in a published article, "There is an inextricable relationship between time and capital in distressed situations. The importance of moving quickly to realistic solutions and alternatives cannot be understated." Dep. Ex. 804, at 3. This is consistent with the essence of Mr. Greenberg's conclusions as to the flaws in the sale process conducted by the Antioch directors and officers—they failed to move quickly to a realistic solution because they were bending backward to try to accommodate Lee Morgan's unrealistic value and control expectations.

Appeals agreed. *Id.* at 731. It noted that "[t]he fact that [the expert] assumed certain sales figures does not necessarily make his testimony inadmissible . . . this is the classic form of the 'hypothetical question,' which has long been recognized as a proper method of bringing out expert testimony." *Id.* The problem, the court explained, was that the plaintiff then failed to prove at trial the facts that the expert had assumed. *Id.* at 732 ("The fact that [the expert] relied upon the report in performing his calculation of lost profits did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report.") The same reasoning applies here.

In this case, Mr. Greenberg's reliance on the CRG valuation figure in no way makes his opinion unreliable; it just means that the Plaintiff will have to sufficiently prove the CRG figure at trial. Indeed, unlike the scenario in *Info-Hold, Inc*, Mr. Greenberg did not incorporate the opinion of CRG as his opinion; instead he relied on the CRG opinion's valuation figure as an assumed fact because it was the accepted value of the Company as incorporated in the Plan of Reorganization confirmed by the Bankruptcy Court. Case 3:08-bk-35741, Doc. No. 319, at 7 (approving Disclosure Statement). Because the Bankruptcy Court's adoption of the CRG valuation as the actual value of the Company is more than the minimal evidence required to support Mr. Greenberg's assumption of the fact for purposes of *Daubert* (or, for that matter, the factfinder's reliance at trial), Defendants' argument must be rejected.[4] *See, e.g., Jahn v. Equine*

---

[4] Defendants make two other arguments, both of which fail for this same reason, and for other reasons. First, Defendants assert that the "the CRG value range, on its face, confesses its unreliability" because it includes a disclaimer that "[t]he value of an operating business . . . is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business." However, Defendants have cited no authority for this proposition, and that is not surprising, as *Daubert* does not require certainty. *Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation— i.e., 'good grounds,' based on what is known."). Second, Defendants emphasize that Plaintiff's counsel, on behalf of the Unsecured Creditors Committee, challenged the CRG valuation during the bankruptcy, and assert that Plaintiff "admit[s] that the CRG valuation is unreliable." (Doc. No. 213, at 11, PAGEID #: 19314). However, Defendants do not explain that the expert hired by the Unsecured Creditors Committee never testified in the bankruptcy, his report was never admitted into evidence or accepted by the bankruptcy court, and the Debtor's

*Services*, 233 F.3d 382, 390-93 (6th Cir.2000) (reversing a district court's decision holding inadmissible proposed expert testimony, explaining that although the opinions of the proffered testimony "may very well be 'shaky,'" because the opinions were based upon facts in the record, and were not "assumptions" or "guesses," the challenges merely went to the accuracy of the conclusions, not to the reliability of the testimony."); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'") (citation omitted).

Fourth, Defendants fault Mr. Greenberg for not considering whether "evidence [of] the economic conditions in 2008 . . . may have contributed to all or some of Antioch's alleged loss in value" or whether the "continuing pressure on the Company's business model from changing customer behaviors (placing and sharing pictures online or otherwise electronically), contributed to or caused the alleged decline in Antioch's value."  (Doc. No. 213, at 9; PAGEID #: 19312) (citing Greenberg Dep. at 487:19-490:10).  However, contrary to Defendants' assertions, Mr. Greenberg did consider the impact on the Company of competitive pressures from the Internet and increased retail competition, and mentioned it in his report.  Exhibit D., Greenberg Report, at 10-11; Exhibit C, Greenberg Dep., at 78-82.  He just did not perform independent research as to these factors.  Moreover, this is not a case where the expert's conclusion is that the company simply decreased in value over time, in which instance an expert might need to consider all of

---

Plan of Reorganization was confirmed based on CRG's valuation—which makes CRG's valuation a much more reliable data point than the Unsecured Creditor Committee's expert report, which came to a different conclusion than CRG based on information that had developed since CRG performed its valuation and based on different analyses that CRG did not use.  (Doc. No. 213, Exhibit A).  None of this suggests that CRG's valuation is not reliable for purposes of this case; and, indeed, it would be absurd if one expert opinion could render another expert opinion unreliable simply by disagreeing with it.

the factors affecting that decrease. This is a case where the Company's decrease in value is the result of the Company's specific failure to close the J.H. Whitney transaction. It therefore makes no sense to fault Mr. Greenberg for failing to consider the economy or the pressure on the Company's business model when those factors (and any other similar ones) would have been nonfactors if the Company had closed the J.H. Whitney transaction. They were not *causes* that Mr. Greenberg needed to consider in determining whether to discount the damage to the Company wrought by the failure to close the J.H. Whitney transaction; they were *effects* of the Company's failure to close that transaction and thus part and parcel of the Company's damages.

Fifth, Defendants claim that Mr. Greenberg's damages opinion is not reliable because at no point did he "attempt to assign or apportion responsibility, liability, or damages among the twenty defendants to this matter and the others who at one point were defendants or were never sued." (Doc. No. 213, at 14, n. 7; PAGEID #: 19317). But Mr. Greenberg need not have considered such apportionment for three reasons. One, apportionment is not applicable because the law is clear that directors and officers of a corporation are jointly and severally liable if they jointly participate in a breach of fiduciary duty or approve, acquiesce in, or conceal a breach by a fellow officer or director. *Radol v. Thomas*, 772 F.2d 244, 259 (6th Cir. 1985) (citations omitted); *see also Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir. 1980) ("The law in this area is well settled. Where two or more directors jointly participate in a breach of fiduciary duty, the liability is joint and several."); *Resolution Trust Corp. v. Block*, 924 S.W.2d 354, 355-56 (Tenn. 1996) ("While officers and directors' liability to the corporation has been attributed to various legal theories, it has been unanimously recognized that officer and director liability to the corporation for their collective actions is joint and several.") (citations omitted). Two, even if apportionment was necessary, the jury does not need expert testimony to determine

which individuals caused which damages; they can draw their own conclusions from the evidence admitted at trial.  And three, the issue of apportionment has no bearing on Mr. Greenberg's testimony that the J.H. Whitney $54 million proposal is reliable, and it therefore has no place in the Court's *Daubert* analysis.

In sum, Mr. Greenberg's actual testimony (as opposed to the testimony Defendants want this Court to believe Mr. Greenberg was supposed to give) is reliable and relevant to the jury's determination of damages and should be admitted.  *Cole v. Homier Distrib. Co.*, 2009 U.S. Dist. LEXIS 23641 (E.D. Mo. Mar. 20, 2009) ("The expert's testimony must be excluded only if it is so fundamentally unsupported by the facts that it can offer no assistance to the jury.").

### C.  Mr. Greenberg Used an Accepted Methodology to Calculate Damages and Even if his Calculation Were Excludable, A Jury Could Properly Perform the Calculation Itself

Defendants also complain that Mr. Greenberg's calculation of Plaintiff's sale process damages was not done through the use of any methodology whatsoever.  (Doc. No. 213, at 5, PAGEID #: 19308).  This is not true.  Mr. Greenberg's calculation of those damages was straightforward, and clearly within his expertise as an investment banker and business-valuation professional.  It was, after all, "simple arithmetic."  Greenberg Dep., at 291; *cf. Tuf Racing Products, Inc.*, 223 F.3d at 591 (reversing exclusion of expert testimony where accountant testified "[f]rom financial information furnished by [company] and assumptions given him by counsel of the effect of the termination on [company's] sales, the accountant calculated the discounted present value of the lost future earnings that [company] would have had had it not been terminated. This was a calculation well within the competence of a C.P.A.").  Mr. Greenberg took the value of J.H. Whitney transaction which he estimated as at least $54 million based on the May 2008 letter of intent and subtracted from it the value of the Company used by

the bankruptcy court, thereby producing a range of value lost by the Company's inability to close the transaction.  This is a classic compensatory damages calculation, which puts Plaintiff in the position it would have been in but for Defendants' conduct.  *See William Beaumont Hosp. v. Federal Ins. Co.*, --- F. App'x ----, 2014 WL 185388 (6th Cir. 2014).  Accordingly, this Court should reject Defendants' arguments regarding Mr. Greenberg's supposed failure to use any proper methodology.

If Mr. Greenberg was not allowed to perform this calculation, it would not be because he is not qualified to perform the calculation or because he employed no methodology, but only because it is so simple that it is not a proper subject of expert testimony.  *Cf. United States v. Llera Plaza*, 188 F.Supp.2d 549, 573 (E.D. Pa. 2002) (admitting expert testimony because its subject matter did not "come within the common experience of all men of common education in the ordinary walks of life.").  And if Mr. Greenberg's calculation was excluded on this basis (a basis that Defendants have not even argued), it would not support Defendants' motion for summary judgment.  Aided by Mr. Greenberg's testimony regarding the reliability of the J.H. Whitney $54 million letter of intent, a jury could readily subtract the two numbers itself.  *Cf. V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 468 (6th Cir. 2012) (noting that "jurors must be allowed to hear relevant evidence, and they can understand from their own life experience that objects set on a slope will move downward with the force of gravity unless restrained"); Fed. R. Evid. 703, Comment ("an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts."); *see, e.g., Etienne v. United Corp.*, No. 99–205, 2001 WL 1568598, at *7 (D.V.I. Oct. 15, 2001) (finding expert testimony unnecessary where, among other things, the knowledge was within the common knowledge of any juror).

### D. Mr. Greenberg's Challenged Testimony Regarding Professional Fees Damages is Partially Reliable and Wholly Superfluous

Defendants also argue that Mr. Greenberg's testimony that the Company wasted $6 million in fees that it paid to professionals during the sales process is unreliable.  While Plaintiff does not disagree that Mr. Greenberg's high-level statements regarding the totality of these fees are unreliable, this does not mean all of his testimony bearing on this issue is unreliable.  Indeed, some of Mr. Greenberg's testimony is clearly proper.  Specifically, he stated in his report that "the board of directors dithered throughout the process of selling the Company," including by failing to "pursu[e] the $63 million 'verbal' offer from Sun Capital," Exhibit D, Greenberg Report, at 24, and he testified during his deposition that the Candlewood offers and the Board's consideration of them were a "waste of time" because they were "not even close to any of those numbers" and were "on the face of it, un-executable."  Greenberg Dep., at 162:2-16. Defendants' assertion that Mr. Greenberg "lacks the knowledge . . . to opine as to the appropriateness of professional fees generally" is irrelevant to this testimony.  Mr. Greenberg does not have to be qualified to opine as to the appropriateness of professional fees generally; all that matters is that he is qualified to opine on whether the Board was acting appropriately when it delayed accepting Houlihan's advice to make a quick decision that a sale through bankruptcy court was the only viable alternative, and instead continued to pay multiple professionals to consider deals that were facially unexecutable.

Moreover, Mr. Greenberg's testimony regarding such fees was neither planned nor necessary.  From the start, Plaintiff expected to have, or at least left open the possibility of having, the jury calculate such damages based directly on the invoices.  *See* Exhibit E, Plaintiff's First Supplement to Rule 26A Initial Disclosures, at 2 ("Based on its review of documents provided to the Trust and/or the Committee, the Trust believes its records of fees the Company

paid to restructuring professionals as a result of Antioch's deepening insolvency are incomplete. The Trust has requested detailed invoices from restructuring professionals and will supplement its Initial Disclosures with respect to this category of damages."); *see also* Exhibit A, at 5 (same). Such a calculation is well within the jury's competence to perform.  As one example, the jury might readily conclude that if the J.H. Whitney proposal should have been consummated, any fees paid after that time were wasted and are therefore properly part of the Company's damages; or, as another example, the jury might readily conclude that the Board's failure to follow up on the Sun Capital inquiry for nearly a month also caused the Company to wastefully pay advisor fees during that time.  Mr. Greenberg's testimony in this regard is at worst superfluous.

### E. Plaintiff Never Represented that it Would Rely on Only Expert Testimony to Establish Every Aspect of its Damages and it Never Prevented Defendants from Pursuing any Meaningful Factual Discovery on Damages

Defendants claim that "Plaintiff represented that it would prove damages through an expert, and thereby prevented fact discovery on that element of its claims" and that Plaintiff therefore "may not seek to prove its damages otherwise as a matter of estoppel and fundamental fairness[.]"  (Doc. No. 213, at 15, PAGEID#: 19318).  Aside from being moot because Mr. Greenberg's testimony that the J.H. Whitney deal would have closed at least at the price stated in the May 2008 letter of intent is reliable and relevant, and because his testimony regarding delays and wasted time soliciting and reviewing facially unexecutable proposals will likewise assist the jury in making determinations regarding Plaintiff's sale process fees damages, this argument is meritless for three reasons.  One, Plaintiff made clear from the start that its sales process damages would be based on the Sun Capital, Jostens, and J.H. Whitney offers, and not on expert testimony to the exclusion of everything else.  Two, Plaintiff never committed to using an expert, let alone exclusively relying on an expert, to establish its sale-process fees damages.  And three,

Defendants have failed to substantiate how it would be "fundamentally unfair" to allow the jury to make its own determinations based on the record evidence.

Defendants contend that *Cole v. Homier Distrib. Co.*, 2009 U.S. Dist. LEXIS 23641 (E.D. Mo. Mar. 20, 2009) is "directly on point." (Doc. No. 213, at 15, PAGEID #: 19318). However, in *Cole*, Plaintiffs "at all times previously (in depositions and written discovery) stated that they were not able to calculate their damages and were relying instead on the calculations of Dr. Basi." *Id.* at *15. The court pointed out that in Interrogatory Number 12, the defendant asked plaintiffs to "[s]tate in detail and identify, by category, the amount of damages you are seeking in this lawsuit, and for each such amount, identify all facts, documents, or other evidence used to calculate said amount." *Id.* at *16. And, in response, plaintiffs stated only that they "have retained Dr. Bart Basi, a CPA, to calculate their damages. His work is not yet complete." *Id.* Based on these representations, the court found that plaintiffs' later and last-minute "assertion [in the form of an affidavit attached in opposition to summary judgment] that they [could] provide evidence of their damages absent the testimony and report of their excluded expert, Dr. Basi, '[was] *so contradictory to everything else that it raise[s] only a sham issue*.'" *Id.* at *17 (emphasis added). This case is far from the same.

Here, as mentioned, Plaintiff made clear from the beginning of this case that its damages arising from the 2007-2008 sale process would be based, at least in part, on the Company's value as shown by the $54 million J.H. Whitney proposal to purchase the Company in May 2008, as well as upon the expressions of interest in the Company received from Jostens and Sun Capital during the summer of 2007, which valued Antioch at between $148 million and $185 million. *See* Exhibit A, at 4-5 ("By May 2008, the Company's value had declined to approximately $54 million based on J.H. Whitney's proposal to purchase the Company" and "The Trust arrives at

this calculation based on expressions of interest in the Company received from Jostens and Sun Capital during the summer of 2007, which valued Antioch at between $148 million and $185 million"); Exhibit B, at 16-17 (same).  Although the Trust did state that it "anticipate[d] engaging one or more experts to opine on the loss in enterprise value that resulted from the . . . sale process," Exhibit A, at 5, the Trust certainly never negated everything else it said in its interrogatory responses, nor did it vow to rely only on expert testimony for every aspect of this category of its damages, especially when it made clear that its use of an expert was only "anticipated" and not even certain.

Plaintiff likewise never represented in its interrogatory responses that it would use only expert testimony to provide its sale-process fees damages.  Plaintiff said:

> Based on its review of documents provided to the Trust and/or the Committee, the Trust believes its records of fees the Company paid to restructuring professionals as a result of Antioch's deepening insolvency are incomplete.  The Trust has requested detailed invoices from restructuring professionals and will supplement its Initial Disclosures with respect to this category of damages.

Exhibit A, at 5; *accord* Exhibit E, at 2.  Nowhere in this paragraph did Plaintiff commit itself to using an expert to prove these damages at all, much less exclusively.  On the contrary, Plaintiff's interrogatory response indicates that it might well base its damages on the invoices from the restructuring professionals themselves, which it does indeed plan to do, with or without Mr. Greenberg's testimony regarding the delays in the sale process such as the Board's failure to respond to the Sun inquiry.

Ignoring the glaring differences between the *Cole* plaintiff's interrogatory response and Plaintiff's interrogatory responses in this case, Defendants attempt to support their argument by lifting several of Mr. Miller's deposition statements out of context.  They quote Mr. Miller as saying that "that's another thing [the interest, fees, and other charges Plaintiff seeks as damages]

that we would expect an expert to go through the financials and calculate that." Doc. No. 213, at 15, PAGEID #: 19318 (citing Miller Dep. (Doc. 88) 84:9-11.). This testimony, however, is not directed to the sale process; it is directed to interest, fees, and other charges relating to the 2003 transaction. The context omitted by Defendants makes this clear:

> Q. Okay. The second category of damages is interest, fees, and other charges debt incurred by Antioch in order to finance the 2003 stock purchases and subsequent repurchase obligations in connection with the departing employees. Do you see that?
>
> A. Uh-huh.
>
> Q. Okay. How much in interest, fees, and other charges are you seeking with regard to damages in this case?
>
> A. Again, that's another thing that we would expect an expert to go through the financials and calculate that.

Exhibit F, Miller Dep., 83:24-84:11. Accordingly, Defendants citation to this testimony is misleading and irrelevant.

Nor is Mr. Miller's actual testimony regarding Plaintiff's sale-process damages at all like the conclusive statements of exclusive expert reliance in *Cole*. He testified as follows:

> Q. Okay. Category number five of damages is the loss in enterprise value that resulted from the tender offer and the sale process. Do you see that?
>
> A. Yes.
>
> Q. Has -- well, first of all, can you tell the jury your understanding what enterprise value is in that response?
>
> A. Well, I think it would be the value assigned by a third party to the enterprise; and, again, this is usually done through a multiple, it looks like, of EBITDA and would approximate, I suppose, the approach that the valuation people took in valuating -- in valuing the company for the 2003 ESOP transaction. But that approach was also taken or at least initially indicated by certain of the parties in the 2007 sale transaction in terms of how they would approach a valuation of it. So, again, this is something -- and particularly this would be something that would be the basis, in our view -- in the Trust's view of expert testimony. I'm not a valuation expert.

> Q.   To this date has the Trust determined what the loss in enterprise value is from the company allegedly resulting from the tender offer and the sale process?
>
> A.   No.

Exhibit F, 83:24-84:11.  All this stands for is that Mr. Miller was not qualified to perform a valuation, and that if Plaintiff was going to obtain a valuation, it would hire an expert do it. Moreover, any ambiguity in Mr. Miller's testimony could only reasonably be read in one way, as he made clear to Defendants that he was not narrowing what Plaintiff previously stated in its interrogatory responses.  Exhibit F, at 85:15-21 ("I think our answer is with respect to the damages very much remain what we've placed in this interrogatory . . .").

Mr. Miller likewise did not testify that Plaintiff would use only an expert to prove its sale-process fees damages.  The context that was again omitted by Defendants makes this clear:

> Q.   Okay.  With regard to number three, fees and expenses paid to restructuring professionals as a result of the deepening insolvency of Antioch.  Did the Trust calculate what those fees and expenses are as of today?
>
> A.   Again, that's something I *think* we'd have an expert do.
>
> Q.   Well, is the answer no, Mr. Miller, that the Trust has not *done that yet*?
>
> A.   The answer is no.

Exhibit F, 84:16-22. (emphases added).  This testimony, in which Mr. Miller states that he "thinks" Plaintiff would have an expert testify and acknowledges that Plaintiff has "not done [the calculation] yet," in no way forecloses Plaintiff's option to eventually show its sale-process fees damages without the aid of expert testimony, especially where Plaintiff's interrogatory response to the same question did not so much as mention an expert.

Finally, Defendants have not even attempted to explain how Mr. Miller's answers prevented any potentially relevant factual discovery on either Plaintiff's general sales-process damages or its sales-process fees damages.  And, even if they had, it certainly would not be

"fundamentally unfair" for Plaintiff to simply rely on such evidence *in addition to* expert opinion, as it currently plans and has always planned to do.  After all, Plaintiff's interrogatory responses accurately outlined exactly what Plaintiff engaged an expert to do: provide context for the various offers received during the sale process as measures of value of the Company at each point in time.  And Mr. Miller's deposition testimony confirmed this:

> Q.  Well -- but you go on in your answer to actually give some figures –
>
> A.  Yeah.
>
> Q.  – on what you claim as being loss of enterprise value, right?
>
> A.  And those come from – at least the figures come from the sale process, right?
>
> Q.  Well, I'm asking you.  The figures you've got here for loss of enterprise value, are those figures that you attribute both to the tender offer and the sale process?
>
> A.  . . . there are three points in time.  There's a value at the time of the tender offer, there's expressions of interest in the summer, and then there are – then there's a value – then there's a J.H. Whitney offer, and those are decreases at each point in time.  So – and, again, it's all subject to having an expert really weigh in on that and provide greater specificity, detail, et. cetera.

Exhibit F, at 191:7-25; 192:1-9.  The jury can conclude from the fact that the value of the Company clearly and continually dropped over time,[5] and that the directors and officers failed to act quickly and decisively to implement realistic solutions, that the Company was damaged by Defendants' breaches of duties during the sale process.  Defendants' attempt to compare this case to *Cole* is meritless, and this Court should reject it.

### III. CONCLUSION

For all of the foregoing reasons, this Court should deny Defendants' motion to exclude Mr. Greenberg's testimony.

---

[5] The offers and expressions of interest, as well as the Company's financial statements, have been produced and were the subject of extensive deposition testimony.  Nothing prevented the Defendants from conducting further discovery on the issue of damages, and they have not identified any specific prejudice.

March 4, 2014                               Respectfully submitted,

                                            /s/ Marcia Voorhis Andrew
                                            Marcia Voorhis Andrew (0040289)
                                            Casey Cantrell Swartz, Esq. (0079563)
                                            Chad R. Ziepfel (0084274)
                                            Matthew D. Lawless (0090281)
                                            Taft Stettinius & Hollister LLP
                                            425 Walnut Street, Suite 1800
                                            Cincinnati, OH 45202-3957
                                            Ph: (513) 381-2838
                                            Fx: (513) 381-0205
                                            andrew@taftlaw.com


                                            *Counsel for W. Timothy Miller, Trustee of
                                            The Antioch Company Litigation Trust*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all registered

ECF participants on March 4, 2014, through the Court's ECF system at the email addresses

registered with the Court.

                                            /s/ Marcia Voorhis Andrew