UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

THE ANTIOCH COMPANY          :
LITIGATION TRUST,            :
                             :
        Plaintiff,           :CASE NO. 3:10-cv-00156
                             :
vs.                          :(Judge Timothy S. Black)
                             :
LEE MORGAN, et al.,          :
                             :
        Defendants.          :
                             - - -


VOLUME I


        Deposition of MARK A. GREENBERG, a

witness herein, taken as upon cross-examination by

the Defendants pursuant to the Ohio Rules of Civil

Procedure, before me, Kelly Green, RPR, a Notary

Public within and for the State of Ohio, at Taft,

Stettinius & Hollister, 425 Walnut Street, Suite

1800, Cincinnati, Ohio, on Monday, August 26,

2013, at 9:08 a.m.


On-Time Reporting
8739 Landen Drive
Maineville, Ohio  45039
513.290.3233

Page 78

1  competitors in the 2003 to 2008 time frame in
2  regard to their financial performance?
3      A.  I did not.
4      Q.  In preparing your report and formulating
5  your opinion, sir, did you take into account the
6  -- whether the Internet had any effect on Creative
7  Memories' product lines and marketing model?
8      A.  I specifically mentioned that that was
9  one of the -- one of the -- one of the impacts
10 that they were -- they were experiencing, so...
11     Q.  Any other market developments that you
12 considered in formulating your report or in
13 preparing your opinions that affected Creative
14 Memories' financial performance between 2003 and
15 2008?
16     A.  I'm not really sure what your question
17 is.
18     Q.  Okay.  Other than the growth of the
19 Internet during that period, did you consider any
20 other market developments that impacted Creative
21 Memories' sales between 2003 and 2008?
22     A.  The only things that were considered
23 were the statements made by the defendants and
24 references that were in various exhibits by the

Page 79

1  investment bankers, in particular, but also the
2  evaluators in respect to retail competition,
3  Internet competition, and digital competition in
4  general.
5      Q.  Did you make any effort in preparing
6  your report or formulating your opinions to
7  determine how those market forces impacted the
8  scrapbooking and memory preservation industry
9  generally?
10     A.  No.
11     Q.  Did you review any treatises or
12 scholarship on the effect of those market forces
13 on scrapbooking or memory preservation?
14     A.  I did not.
15     Q.  Did you, in preparing your report or
16 formulating your opinions, consider the effect of
17 the emerging photo sharing technologies on
18 Creative Memories' core business of scrapbooking?
19     A.  I did not.
20     Q.  What about online photo storage?
21     A.  I did not.
22     Q.  Did you consider competition -- the
23 increasing competition in the marketplace for
24 memory preservation that Creative Memories was

Page 80

1  facing from a company called Shutterfly?
2      A.  Only to the extent that it was discussed
3  in the -- in the various exhibits and in
4  testimony.
5      Q.  Didn't do any independent investigation
6  of that?
7      A.  No.
8      Q.  How about Snapfish; are you familiar
9  with --
10     A.  I am.  I am familiar with who they are
11 but only to the extent it was specifically
12 referred to in the -- in the documents.
13     Q.  Did you take into account, in preparing
14 your report or formulating your opinions, the
15 effect that Google's Picaso Web Albums had on
16 Creative Memories' business?
17     A.  I didn't.  And I don't recall
18 specifically that being referred to, although it
19 may have been.
20     Q.  How about the effect that a product like
21 Flicker -- Internet-based product like Flicker had
22 on Creative Memories' scrapbooking business
23 between 2003 and 2008?
24     A.  Same answer as last.  Only to the extent

Page 81

1  it was in there, but I don't recall that it was.
2      Q.  And if it was in there, did you just
3  note it was in the deposition transcripts, or did
4  you actually --
5      A.  I noted --
6      Q.  -- factor --
7      A.  Just -- just noted that that was there.
8  Sorry.
9      Q.  Did you actually factor it into
10 formulating your opinions and in your report?
11 Because I didn't see any reference to any of that
12 in your report.
13     A.  I did not concern myself specifically
14 with those issues except to note that they were
15 there, and they were creating competitive pressure
16 for the company.
17     Q.  So when you say "those issues," you're
18 talking about the increasing capability to store
19 photos on the Internet and to share photos on the
20 Internet and the emergence of companies like
21 Shutterfly and products like Google's Picasa Web
22 Albums?
23     A.  To the -- let me be careful how I want
24 to answer this.  The -- the impact of the various

Page 82

1  other media technology and channels were certainly
2  noted and understood to be impactful in my -- in
3  my point of view about the business.  But they --
4  but beyond that, did I go and look at some
5  economic data in those -- in those respects?  No.
6  The only things that I did review were the -- were
7  the information that was available through a
8  variety of sources inside those documents.
9      Q.   Did you do any independent investigation
10  in preparing your report or formulating your
11  opinions as to the marketshare that any of the
12  emerging Internet-based companies or retail
13  outlets took from Creative Memories in regard to
14  memory preservation products and scrapbooking?
15     A.   No.
16     Q.   In preparing your report and formulating
17  your opinions, did you take into account the
18  emergence of Facebook as a photography storage and
19  sharing product?
20     A.   No.
21     Q.   Did you make any effort to determine the
22  marketshare of memory preservation and photo
23  sharing of that market that Facebook took from
24  Creative Memories?

Page 83

1      A.   No.
2      Q.   In formulating your opinions and
3  preparing your report, did you consider any other
4  companies that ran into some trouble in the
5  marketplace as a result of online photo and
6  digital storage such as Eastman Kodak?
7      A.   Well, the "such as" I certainly didn't
8  recall, but the -- only to the extent there were
9  discussions by some of the private equity funds
10  who had -- had done some research or had positions
11  in companies like that, if I recall, of some of
12  the impact and some of the -- some of the -- just
13  what the economic conditions of those companies
14  were.
15     Q.   And what were the economic conditions of
16  those companies?
17     A.   Some of those were struggling.
18     Q.   Do you recall which specific companies?
19     A.   I don't offhand.
20     Q.   Do you recall which -- what sources you
21  were looking at that you just referred to in terms
22  of investment bankers and others?
23     A.   What I recall is that it showed up in a
24  bulleted document probably from Houlihan on the

Page 84

1  response from -- from one or -- you know, or maybe
2  more than one of the private equity funds.
3      Q.   Do you remember which private equity
4  funds?
5      A.   I don't offhand.
6      Q.   Have you ever published any articles on
7  corporate governance?
8      A.   No.
9      Q.   Ever teach a course on corporate
10  governance?
11     A.   No.
12     Q.   Did you review any scholarship or
13  treatises on corporate governance in preparing
14  your report or formulating your opinions?
15     A.   Not specifically for this process, no.
16     Q.   Have you ever advised a corporate
17  director about corporate governance issues?
18     A.   Yes.
19     Q.   And can you tell me your general
20  experience there in giving such advice?
21     A.   Well, it's fairly ongoing.  In fact, I
22  have a client in the hospitality business with
23  a -- with a company that I did a fairly large
24  restructuring for in 2011.  And the CEO's on the

Page 85

1  board and I'm an advisor to the board and -- you
2  know, infrequently but not -- not terribly, but --
3  but I do advise him on governance issues.
4          Their company's just been bought by --
5  at least the debt's been bought out by a -- by a
6  -- by a PE fund.  And there's issues on -- in
7  terms of indemnification, and they're looking at
8  doing an Article 9.  So yeah, sure.
9      Q.   Well, describe for me the specific
10  governance issues that you've given advice on in
11  that one particular case you've just testified to.
12     A.   The issues are really what is the
13  responsibility of the board in terms -- it's a
14  Delaware company and what the -- you know, what --
15  what the -- how broad those -- those requirements
16  are, and these are conversations I had with the
17  CEO.
18     Q.   What requirements?
19     A.   In terms of what their obligations are
20  in terms of total stakeholder -- with the
21  stakeholders.
22     Q.   And what I'm trying to get at is what is
23  your advise to them about their obligations
24  vis-a-vis stakeholders?

Page 86

1    A.    In this company in particular, there are
2  -- there are vast divisions between the holders of
3  the equity and the debt in the company. The
4  company has gone -- underwent a very substantial
5  restructuring with a hedge fund as one of their
6  lenders.
7          The board is conflicted. They came in
8  -- the primary, at least, decorum for the board
9  came in from the -- from the lenders and the
10  inside board of directors, the CEO and chief
11  operating officer of the company.
12          And there's been a lot of conflicts as
13  to what to do and what happens in respect to, for
14  example, if they did an Article 9 sale and
15  whatever type of liability might exist for those
16  particular board members.
17    Q.    Do you recall what advice you gave them
18  about dealing with conflicts?
19    A.    I'm trying to think specifically. Not
20  specific. I mean, I -- you know, the advice has
21  been around what their obligations are with these
22  -- this particular person's obligation is for the
23  whole company and what the potential consequences
24  would be if there was, for example, successor

Page 87

1  liability or -- or there was the -- the shell left
2  -- was left over and they were still a fiduciary
3  to that shell.
4    Q.    You referenced a person. Is this a
5  director or --
6    A.    He's a director and he's a -- he's a CEO
7  and a director of the board.
8    Q.    And what advice did you give him?
9    A.    Just really -- just rounding out what --
10  you know, what I thought he needed to know about
11  what those things could be.
12    Q.    And what did you think he needed to
13  know?
14    A.    The questions he asked me was what
15  happens if they do an Article 9 and we -- and we
16  still have the C Corporation, the Delaware
17  corporation, and we have an Article 9 in a Newco,
18  and what's -- what happens if there is -- if
19  there's any type of lawsuit that occurs to the --
20  to the shell in which he's still fiduciary, and
21  basically just outlining what I think would be
22  generally the case.
23    Q.    Did you provide him advice on how to
24  avoid a conflict situation?

Page 88

1    A.    Not specifically, no.
2    Q.    Okay. Did you provide only him advice,
3  or were you advising the entire board?
4    A.    In various times, I've advised the
5  entire board but more on financial transaction
6  matters. This case -- this has been more on him
7  as a director than as a fiduciary.
8    Q.    Did you provide any other governance
9  advice to that particular board?
10    A.    Not -- not that I recall.
11    Q.    Is there any other experience you have
12  in dispensing what you consider to be corporate
13  governance advise to a director or a manager or a
14  corporate board?
15    A.    Not specifically. I've been on several
16  boards and advised several boards.
17    Q.    I didn't ask you if you were on several
18  boards; I'm asking whether you recall other than
19  the instance you just described.
20          Do you recall, as an advisor, providing
21  a director, a board, or corporate manager advice
22  with regard to corporate governance issues?
23    A.    I don't recall specifically.
24    Q.    The one company and one situation you

Page 89

1  did provide advice in conjunction with an Article
2  9 sale, can you tell me who that company is?
3    A.    I can. It's BridgeStreet Worldwide,
4  Incorporated.
5    Q.    Who is the particular director that you
6  were principally advising?
7    A.    His name is Sean Worker, W-O-R-K-E-R.
8    Q.    Have you reviewed any scholarship or
9  treatises addressing the duties of an interested
10  director in a transaction under Delaware and
11  Minnesota law in preparing your report or in
12  formulating your opinions in this case?
13    A.    No.
14    Q.    Do you have any experience in advising
15  an officer or director of an Ohio corporation
16  about their -- about corporate governance matters?
17    A.    I have a lot of clients. I'm trying to
18  think. Specifically governance matters, nothing
19  that I specifically recall.
20    Q.    I note in your report at page 4 that
21  Silverstone provides, among many other services,
22  business valuations; is that -- is that right?
23    A.    That's correct.
24    Q.    How many valuations have you personally

23  (Pages 86 to 89)

Page 90

1  performed since 2008?
2      A.   Oh, geez.  We do five to ten a year.
3  I'm serious.  It's about five to ten a year.
4      Q.   Oh, no, I appreciate that.  I only
5  laughed a little, which wouldn't be reflected on
6  the record, because that was going to be a follow-
7  up question, is how many -- how many times does
8  Silverstone perform business valuations per year,
9  and I think now the answer is five to ten.
10      Of those five to ten since 2008, how
11  many of those business valuations are you the lead
12  on, Mr. Greenberg?
13      A.   Almost all of them.
14      Q.   Well, when you say almost all of them,
15  can you give me an estimate?
16      A.   I would actually say all of them.  I
17  have somebody that works for me that will do the
18  detailed work of it, but I oversee it, and it's
19  based on the models that I've developed, and so...
20      Q.   With regard to your business valuations,
21  have you ever valued a non-public S Corporation?
22      A.   Oh, yeah.
23      Q.   Can you give me any examples?
24      A.   Yeah, I have -- I have a bunch.  I'm

Page 91

1  trying -- let me think.  Yeah, I did valuation
2  work for the Ryan Style Company.  I've done
3  valuation work for an S Corp broker-dealership in
4  Cincinnati.  I don't want to say who it is.  I'm
5  under confidentiality.
6      I've done -- I've done a lot -- a lot of
7  my -- a lot of my clients are S Corps, so a fair
8  number of them.  And I can't remember all of them,
9  but quite a few.
10      Q.   In general, for what purpose were you
11  preparing valuations for these companies?
12      A.   Usually to -- you know, usually in
13  anticipation of a transaction, so a sale of the
14  company; in anticipation of a buy-sell agreement,
15  a buy-out of the company; sometimes it's an annual
16  requirement; and we do it for 409(a) -- IRC 409(a)
17  requirements for options, phantom stock plans,
18  stock appreciation right plans, stock grants,
19  things like that.
20      Q.   In preparing your report and formulating
21  your opinions in this case, sir, did you try to
22  bear any of that experience in attempting an
23  independent valuation based on historical data
24  available on the record of Antioch's value in the

Page 92

1  2003 time frame?
2      A.   That's a fairly complex question.
3      Q.   Thank you.
4      A.   I bring a fair amount of my expertise in
5  valuation to what I -- what I -- what my opinion
6  was on the one hand, but did I do an actual
7  valuation --
8      Q.   Yes, sir.
9      A.   -- if that's what you're asking --
10      Q.   That's what I'm asking.
11      A.   -- the answer is no.
12      Q.   Did you bring to bear your prior
13  experience to attempt an independent valuation of
14  The Antioch Company in the 2007/2008 time frame in
15  conjunction with preparing your report or
16  formulating your opinions in this case?
17      A.   You'll have to repeat the question.  I'm
18  sorry.
19      MR. SCHEIER:  Can you read it back,
20  please, Kelly, when you get a chance?
21      (The question was read back.)
22      A.   The -- the broad answer is we didn't do
23  -- I didn't do a valuation of The Antioch Company
24  in preparation of this report.

Page 93

1      Q.   In one of your prior answers, you
2  mentioned that you've developed valuation models?
3      A.   Mm-hmm.
4      Q.   Is that your own model that you
5  developed?
6      A.   The model is -- we use several models,
7  but the model is not idiosyncratically mine.  It's
8  the -- we use Gordan Growth Models and Capital
9  Asset Pricing Models, which are fairly standard
10  valuation models that are used in the -- in the --
11  you know, from professional valuators.
12      In fact, Prairie Capital and BVI use
13  very similar methods.  There's little differences
14  in how some of the calculations are approached,
15  but the same concepts are there.  It's discounted
16  cash flow.  You're capitalizing present values of
17  discounted cash flow and residual and terminal
18  values.
19      Q.   You didn't use any of that modeling to
20  do independent valuations of Antioch at any time
21  in conjunction with your expert engagement
22  here; is that correct?
23      A.   That's correct.
24      Q.   Have you ever published any articles

24  (Pages 90 to 93)

Page 294

1    (The previous few questions and answers
2  were read back.
3    Q.   (By Mr. Scheier)  Then putting aside the
4  $63 million verbal offer from Sun that you
5  reference that's no longer a part of your analysis
6  and focusing on the $54 million letter of intent
7  from J.H. Whitney, did you review the J.H. Whitney
8  letter of intent in preparing this report and in
9  formulating your opinions?
10    A.   I did.  I read it.
11    Q.   Did you recognize that the $54 million
12  price that Whitney had stated in that letter of
13  intent was contingent on additional due diligence
14  by Whitney and ultimately the closing of a
15  definitive agreement?
16    A.   Yes, which is -- which is more than
17  customary.
18    Q.   And you don't know one way or the
19  other -- if the board of directors accepted that
20  offer -- that the company would actually realize
21  the $54 million amount of consideration that is
22  set forth in Whitney's letter of intent, correct?
23    A.   There's no way to know that.
24    Q.   And there's certainly no evidence on

Page 295

1  this record to venture a guess?
2    A.   They did substantial due diligence.  If
3  it went into an APA into a 363, it would have been
4  a guaranteed bid.
5    Q.   But that never --
6    A.   The worst --
7    Q.   Go ahead.
8    A.   The worst it would have been would have
9  been $54 million if there wasn't anybody else
10  stepping up to the option of the 363 sale, so...
11    Q.   Although J.H. Whitney never, by way of
12  definitive agreement, agreed to pay $54 million
13  because it never actually completed its due
14  diligence, correct?
15    A.   It had done a fair amount of due
16  diligence ahead of that, but...
17    Q.   Did you see any evidence that they
18  completed their due diligence and --
19    A.   There's -- there's --
20    Q.   -- and set on the $54 million price?
21    A.   There's no way to know that that would
22  be the final price.
23    Q.   Let's look at the number you have at the
24  other end of your calculation.  That's a CRG

Page 296

1  estimated value at 31 to 38 million dollars that
2  appears in your report and that you rely upon.  Do
3  you know the purpose that CRG prepared that
4  estimate of company value?
5    A.   Well, it's part of the -- part of the --
6  part of the -- part of the -- that requirement for
7  that bankruptcy filing, so...
8    Q.   Did you review any of CRG's work
9  underlying its value estimate?
10    A.   I didn't.
11    Q.   Did you review any of CRG's underlying
12  work papers?
13    A.   I didn't.
14    Q.   Did you review the models that it
15  prepared in coming up with that number?
16    A.   No, just that I knew it was relatively
17  consistent to everything else we'd seen.
18    Q.   Did you review any of CRG's assumptions
19  that it used in coming up with --
20    A.   I didn't.
21    Q.   -- that value number?
22    A.   No.
23    Q.   Did you review any of the underlying
24  corporate financial reporting that CRG relied upon

Page 297

1  in coming up with its value estimate in the
2  disclosure statement?
3    A.   I'm certainly aware of where things were
4  financially and what the statements look like; but
5  did I look at their actual analysis, the answer's
6  no.
7    Q.   Do you know what documents they
8  considered?
9    A.   I don't, no, because I didn't see their
10  analysis.
11    Q.   Did you review any of the underlying
12  corporate forecasting that CRG relied upon in
13  estimating the value of the business?
14    A.   I didn't see the actual forecasting,
15  just the comments about their forecasts.
16    Q.   And whose comments were those?
17    A.   Oh, I think I knew there was -- they
18  were estimating a 7-1/2 percent decline, and I
19  can't remember exactly where, but it was somewhere
20  in the -- in the -- after the Whitney offer went
21  down, there was a report from Houlihan back to the
22  -- to the -- to the lenders, the senior lenders,
23  who were being asked to be reviewed -- asking for
24  a review of what the current activity was, and

75  (Pages 294 to 297)