UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| THE ANTIOCH COMPANY LITIGATION TRUST,          Plaintiff, vs. LEE MORGAN, *et al.*,          Defendants. | Case No.  3:10-cv-156 Judge Timothy S. Black |

**ORDER GRANTING THE MORGAN DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT REPORT REGARDING DAMAGES (Doc. 213)**

This civil action is before the Court on the Morgan Defendants'[1] motion to exclude Plaintiff's expert report, opinions, and testimony regarding damages (Doc. 213), and the parties' responsive memoranda (Docs. 259, 286).  The Court heard oral argument on April 1, 2014.

### I.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE

The Morgan Defendants allege that the report, opinions, and testimony of Plaintiff's expert witness, Mark A. Greenberg, should be excluded as unreliable.[2]

Mr. Greenberg expressed two damage opinions: (1) the Lost Value Damage Opinion, which relates to the enterprise value that the Antioch Company allegedly lost between May and November 2008; and (2) the Professional Fees Damage Opinion, which relates to professional fees the Antioch Company paid during an undefined period.

---

[1] The Morgan Defendants include Lee Morgan, Asha Moran, and Marty Moran.

[2] The Morgan Defendants claim that Mr. Greenberg's entire report should be excluded, but at this juncture seek limited relief corresponding to the pending summary judgment motions. (Doc. 213 at 1).

For both opinions, Mr. Greenberg admitted that he did not use any methodology in calculating the alleged damages. Instead, he lifted his baseline numbers and valuations from the work of others without any independent analysis or review of underlying documents. Accordingly, Defendants maintain that his testimony must be excluded as unreliable.

Additionally, Defendants argue that Plaintiff has not committed to a damage calculation nor disclosed its alleged damages, and, therefore, Plaintiff is precluded from offering such damage model and amount for the first time during its case in chief at trial.

Plaintiff maintains that Mr. Greenberg is qualified to give opinions as to business valuations and how that value is impacted by the sale process. Specifically, Plaintiff maintains that throughout the litigation it has alleged that its damages arising from the 2007-2008 sale process would be based, at least in part, on the decline in the Company's value during the protracted sale process, as shown by the $54 million J.H. Whitney proposal to purchase the Company in May 2008, as well as the interest from Jostens and Sun Capital during the summer of 2007, which valued Antioch at between $148 million and $185 million. (Doc. 259, Ex. A at 4-5).[3] Plaintiff maintains that Mr. Greenberg was not retained to perform an independent valuation of the Antioch Company, but rather to testify regarding the various offers the Company received during the sale process. For example, Mr. Greenberg testified that the May 2008 J.H. Whitney $54 million offer

---

[3] "By May 2008, the Company's value had declined to approximately $54 million based on J.H. Whitney's proposal to purchase the Company" and "The Trust arrives at this calculation based on expressions of interest in the Company received from Jostens and Sun Capital during the summer of 2007, which valued Antioch at between $148 million and $185 million." (*Id.*)

2

would have been the "worst" the Company would have received through the resulting Bankruptcy Code Section 363 sale, because J.H. Whitney had done "substantial due diligence" and because its offer would have served as a "stalking horse" that encouraged other bidders. (Doc. 259, Ex. C at 295).[4]

## II. STANDARD OF REVIEW

A party proffering expert opinion evidence bears the burden of proving its admissibility. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). While district courts do act as gatekeepers to keep out unreliable expert opinions, "[r]ejection of expert testimony under *Daubert* is the exception rather than the rule." *Von Wiegen v. Shelter Mut. Ins. Co.*, No. 5:13-040-DCR, 2014 U.S. Dist. LEXIS 1932, at *4 (E.D. Ky. Jan. 8, 2014).

Rule 702 of the Federal Rules of Evidence permits testimony based on "scientific, technical, or other specialized knowledge" by experts qualified by "knowledge, skill, experience, training, or education" if the testimony is both relevant and reliable. The trial judge must act as a gatekeeper, admitting only that expert testimony which is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). *Daubert* attempts to strike a balance between liberal admissibility for relevant evidence and the need to exclude misleading "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009). An expert must utilize in the courtroom the "same level of

---

[4] "They did a substantial amount of due diligence. If it went into an APA into a 363, it would have been a guaranteed bid…The worst it would have been would have been $54 million if there wasn't anybody else stepping up to the option of the 363 sale." (*Id.*)

intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 177.

The relevancy requirement stems from Rule 702s mandate that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Best*, 563 F.3d at 591. Relevance means that "there must be a 'fit' between the inquiry in the case and the testimony." *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993). The reliability requirement is drawn from Rule 702's requirement that the subject of an expert's testimony be "scientific knowledge." *Daubert*, 509 U.S. at 589-90. In this context, reliability means "evidentiary reliability" or "trustworthiness" which in turn connotes "scientific validity." *Bonds*, 12 F.3d at 555. A party proffering expert testimony has the burden of demonstrating by a "preponderance of proof that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

The trial court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The trial judge enjoys broad discretion in determining whether the factors listed in *Daubert* reasonably measure reliability in a given case. *Id.* at 153.

With this framework in mind, the Court will now address Defendants' motion.

### III. ANALYSIS

#### A. Qualifications

An expert witness's proposed testimony must relate directly to the area in which the witness claims expertise. *Smelser v. Norfolk S. R.R. Co.*, 105 F.3d 299, 305 (6th Cir. 1997). "An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007).

Mr. Greenberg has 30 years of experience in business valuation, deal structuring, financial and investment analysis, and has successfully led and completed numerous mergers and acquisitions, capital sourcing, recapitalization, and restricting transactions in a wide variety of industries. (Doc. 259, Ex. D). Mr. Greenberg completes approximately five to ten business valuations each year, and brought that experience to bear in formulating his opinion in this case, although he did not conduct a formal business valuation as part of his engagement. (*Id.*, Ex. C). Based on his knowledge and experience as a professional dealing with letters of intent, purchase offers, due diligence, and section 363 sales, Mr. Greenberg testified that the J.H. Whitney $54 million letter of intent was a reliable estimate of what the deal would have been worth at closing. While

Mr. Greenberg's lack of experience as a "damages expert"[5] does not suggest that he lacks the requisite expertise to give this opinion, whether a jury can rely on the letter of intent in calculating damages is a separate issue that this Court will address *infra*.

### B. Methodology

Defendants claim that Mr. Greenberg's opinions and testimony related to damages must be excluded from the evidence considered on summary judgment or at trial because both his Lost Value Damage Opinion and Professional Fees Damage Opinion are unsupported by any methodology or reliable principles. (Doc. 214 at 95-96, 332).[6] Opinion testimony is not reliable if it is based solely on the witness's say so, or an unrecognized methodology. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156-57 (1999).

Plaintiff maintains that Mr. Greenberg's methodology is "simple arithmetic," and therefore need not be supported by any specialized knowledge. (Doc. 214 at 291). Specifically, Mr. Greenberg took the value of the J.H. Whitney transaction, which he estimated to be worth at least $54 million based on the May 2008 letter of intent, and subtracted from it the value of the Company used by the bankruptcy court, thereby

---

[5] Mr. Greenberg has never been qualified as an expert with respect to damages or offered any prior testimony with respect to damages (Doc. 214 at 94-95); he is not an accountant or economist (Doc. 197-1 at 26); he has no background, training, experience, nor expertise in the computation of damages (Doc. 214 at 94-96); he has never published a trade piece or scholarship on damages (*Id.* at 95); and he admits that he did not use any methodology in formulating his opinion because he is not familiar with any such methodologies (*Id.* at 95-96). (*See, e.g.*, Doc. 214 at 95 ("Q: Are you familiar with any damages methodologies? A: No, I'm not.")).

[6] Mr. Greenberg's "opinion" with respect to damages is that "[m]ismanagement of, and interference with, the sale process by the directors and their advisors caused the Company to lose the opportunity to realize between $20 million and $30 million in value, and to waste $6 million on professional fees." (Doc. 259-4 at 25).

6

producing a range of value lost by the Company's inability to close the transaction. This is a classic compensatory damages calculation, which puts Plaintiff in the position it would have been in but for Defendants' conduct. *William Beaumont Hosp. v. Fed. Inc. Co.*, 13-1468, 2014 U.S. App. LEXIS 1050 (6th Cir. 2014). Plaintiff argues that, aided by Mr. Greenberg's testimony regarding the reliability of the J.H. Whitney $54 million letter of intent, a jury could readily subtract the two numbers itself.[7]

While the Court finds that a jury could certainly perform a simple compensatory damages calculation, in order to perform such a calculation, Plaintiff must proffer two reliable base values from which to perform the calculation. According to Plaintiff, the J.H. Whitney letter of intent provides the top-end value of $54 million (the "Top-End Value") and CRG's valuation of between $31 million to $38 million is the bottom-end value (the "Bottom-End Value"). (Doc. 259 at 13).[8]

With respect to the Top-End Value, Plaintiff maintains that Mr. Greenberg's testimony establishes that the letter of intent is a reliable data point for determining the Company's value, but the report says nothing of the sort. Mr. Greenberg simply opines that the Whitney offer was the "strongest" and "more certain." (Doc. 214-12 at 20). Greenberg does not allege that the Whitney offer was a reasonable approximation of the value of the Company. Mr. Greenberg only states that "the worst it would have been

---

[7] *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 468 (6th Cir. 2012) (noting that "jurors must be allowed to hear relevant evidence, and they understand from their own life experience that objects set on a slope will move downward with the force of gravity unless restrained").

[8] Plaintiff confirmed at oral argument "our damages are…54 minus 42 million." (Transcript at 57).

7

would have been [sic] $54 million[,]" **but** conceded that **"[t]here's no way to know that."** (Doc. 214 at 294) (emphasis supplied). Moreover, no J.H. Whitney representative was deposed, so there is no evidence from that company about the letter of intent. Therefore, the letter of intent is hearsay. And while an expert can rely upon hearsay, s/he cannot do so blindly, without independently confirming its reliability.

With respect to the Bottom-End Value, the Antioch Disclosure Statement,[9] and the CRG value range contained in it, are not part of any Bankruptcy Court entry, were never "adopted" by the Bankruptcy Court in any finding of fact, and were not incorporated into the Bankruptcy Court's Confirmation Order. (Doc. 259 at 9).[10] As a result, the Bottom-

---

[9] The sole purpose of a disclosure statement in a bankruptcy case is to provide "adequate information" sufficient to allow a "hypothetical investor…to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). It is a document prepared, sponsored and filed by a party soliciting votes to accept or reject a reorganization plan. *Id.* **This is one reason why courts do not look to values set forth by a plan proponent in a disclosure statement as admissible evidence.** *See W.P. Hickman Sys. v. V & R Sheet Metal*, No. 10-2289JAD, 2012 Bankr. LEXIS 2201, at *15-18 (W.D. Pa. July 13, 2012) (rejecting use of liquidation analysis included in disclosure statement as an established fact and entering judgment, because debtors could not carry the burden they sought to establish through the disclosure statement). The issue of the Company's value was never litigated in the Bankruptcy Court and there was never a finding of fact or other factual determination made by the Court other than the fact that the Disclosure Statement complied with Bankruptcy Code Section 1125(a). (Doc. 259 at 9). Furthermore, The Disclosure Statement clearly warns in all capital letters: "The Disclosure Statement may not be relied upon for any purpose other than to determine whether to vote to accept or to reject the Plan, and nothing stated herein will constitute an admission of any fact or liability of any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed a representation of the tax or other legal effects of the Plan on the Debtors or holders of claims of interests." (Doc. 214-17 at 8). The Disclosure Statement also states that the CRG estimate "does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets." (Doc. 214-20).

[10] Mere status as a bankruptcy record does not "magically result in the contents of the document attaining a sufficient degree of reliability to overcome evidentiary objections such as hearsay to its admissibility in a trial before a bankruptcy court." *Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.)*, 457 B.R. 441, 443 (M.D.N.C. 2011).

8

End Value is hearsay, and its source document, the Disclosure Statement, is also inadmissible hearsay. Hearsay cannot be used to create a genuine dispute of material fact because "hearsay evidence cannot be considered on summary judgment." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 580 (6th Cir. 2012).

Therefore, even permitting Plaintiff leeway to prove damages by "simple arithmetic," rather than through a damage expert, Plaintiff has failed to identify any reliable base values.

### C. Reliability

#### 1. Independent Analysis

"[A]n expert's testimony must be based on independent analysis and objective proof." *Info-Hold, Inc. v. Muzak, LLC*, No. 1:11cv283, 2013 U.S. Dist. LEXIS 117953, at *12 (S.D. Ohio Aug. 20, 2013). In *Info-Hold*, the expert fell short where he "relie[d], without verification, on plaintiff's employees and plaintiff's counsel for information crucial to his opinions." *Id.* at 13. The expert was also found to be unreliable where he "relie[d] entirely on the numbers provided in the report" of a different expert "without examining any of Defendant's underlying documentation or independently verifying [the other expert's] numbers." *Id.* at 14-15.[11] As explained *supra* at Section III.B, Greenberg fell short in these two regards.

---

[11] At oral argument Plaintiff stated that: "our understanding of [*Info-Hold*] from reading the published opinion is that there was no other evidence in the record on damages beyond the expert report. And so once the expert report was thrown out, there was nothing that the defendants, that the plaintiffs could put forward. This is not that case because we have quite a bit of factual evidence that's in the record that other witnesses will testify to regarding the underlying facts as to the declining value of the company and the different expressions of interest overtime."

### 2. Lost Value Damage Opinion

<u>First</u>, Mr. Greenberg's "blind reliance" on "the Whitney LOI" (letter of intent for $54 million) makes his testimony "unreliable because [the Whitney LOI] is not the product of any analysis by Mr. Greenberg (or, as far as we know, J.H. Whitney)." (Doc. 213 at 7).[12] Federal Rule of Evidence 703 provides "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3rd Cir. 1994). While an expert has a "wide latitude to offer opinions" and an expert's opinion need not be based on "first-hand knowledge or observation," this "wide latitude" is "premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Brown v. Wal-Mart Stores, Inc.*, Case No. 98-5965, 1999 U.S. App. LEXIS 32031, at *3 (6th Cir. Nov. 24, 1999).[13] Therefore, while Mr. Greenberg need not have performed his own

---

(Transcript at 61). However, whether fact witnesses will testify about the declining value of the company is irrelevant since Plaintiff has failed to offer any factual evidence to support its damage figure.

[12] Mr. Greenberg also considered the Sun Capital offer. However, the record confirms that the Sun Capital "verbal offer" of $63 million was not in fact an "offer" or reliable data point. Mr. Greenberg agreed:
  Q. It's [the Sun Capital oral offer] not a reliable data point, is it?
  A. That'd be – sure.
  Q. You agree with me?
  A. I agree.
(Doc. 214 at 293).

[13] *See also Info-Hold, Inc*, 2013 U.S. Dist. LEXIS 117953 (Fed R. Evid. 703 requires that an expert not unquestionably accept another's subjective opinion or offer another's analysis as part of his own without examining that opinion or analysis).

independent valuation of the company, the sources that he relied on must be reliable.[14] They were not.

    Second, Mr. Greenberg's reliance on the CRG valuation figure requires Plaintiff to prove the CRG figure. As explained *supra* at Section III.B, the Court cannot rely on the bankruptcy record because it constitutes inadmissible hearsay evidence. *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993) ("The fact that [the expert] relied upon the report in performing his calculation of lost profits did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report."). Therefore, the CRG valuation is unreliable.

    Accordingly, with or without Mr. Greenberg's testimony, a reasonable jury cannot find that Plaintiff was damaged by the sale process without Top and Bottom-End values (the Whitney LOI and bankruptcy documents).

---

[14] In fact, Mr. Greenberg stated that "[there is] only one signal[] that the deal is done, and that is when the money is in the bank…More value is lost between the time there is a signed letter of intent and a closing than anyone ever cares to admit." (Doc. 213 at 11). Mr. Greenberg further testified that letters of intent are non-binding and therefore not a cash equivalent. (*Id.* at 364-364).

11

### 3. *Professional Fees Damage Opinion*[15]

In his report, Greenberg asserted that Antioch's assets were wasted on professional fees of $6 million incurred as a result of the Sale Process.[16] (Doc. 259-4 at 25). However, during his deposition testimony, Greenberg admitted that he had not reviewed any information or documents relating to any of these professional fees or done any analysis of the fees that were charged. (Doc. 214 at 332). Specifically, Greenberg testified that the $6 million amount was an estimated amount he received from Plaintiff's counsel (Doc. 214 at 332; Doc. 215 at 519), and that he did not know which professionals received what part, if any, of that total amount (Doc. 214 at 330-331; Doc. 215 at 438-439). Greenberg admitted that he was unable to provide an opinion as to what amount, if any, of the total estimated $6 million of fees, was actually wasted as a result of the Sale Process. (Doc. 215 at 521).

---

[15] To establish waste, a plaintiff must show that a director approved the use of corporate resources and got nothing in return. *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del Ch. Ct. 1993) ("Directors are guilty of corporate waste only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration"). Additionally, "[i]n order to recover damages, the injury resulting damage must be ascertained with reasonable certainty and not left to conjecture and speculation." *Adams v. Pitorak & Coenen Invs., Ltd.*, No. 2011-G-3019, 2012 Ohio App. LEXIS 2661, at *12 (Ohio App. June 29, 2012).

[16] However, at oral argument, Plaintiff represented that it was not relying on Greenberg for its damage calculation relating to professional fees:
**The Court:** And how does Mr. Greenberg's expertise apply to that [professional fees]?
**Ms. Andrew:** He does not have a particular expertise in that regard, and I believe in our brief we did state that we are not relying on Mr. Greenberg for that part of our damages.
**The Court:** Are you relying on Greenberg for any part of your damage calculation relating to unnecessary professional fees?
**Ms. Andrew:** No, Your Honor.
(Transcript at 54).

Greenberg conducted no independent review of the payment records and invoices for any professional fees alleged to be a waste of company assets, but rather simply adopted an estimated figure of total fees paid to professionals for 2007 and 2008. This "expert opinion" fails to satisfy the requirements under Federal Rule of Evidence 702. *Info-Hold*, 2013 U.S. Dist. LEXIS 117953 at 12-17.[17]

### D. Judicial Economy

Plaintiff indicated in its Rule 26(a) initial disclosures that it would retain "one or more experts" to quantify its claimed damages. (Doc. 213, Ex. B).[18] Plaintiff repeated this position in responding to interrogatories regarding damages. (*Id.*, Ex. C). Accordingly, the Morgan Defendants argue that as a matter of estoppel and fundamental fairness, now that discovery is closed, Plaintiff cannot now seek to prove its damages

---

[17] Furthermore, at oral argument, Plaintiff's counsel stated "I will admit that we did not supplement our interrogatory to identify those [professional fees]. The $6 million in fees is a number that was just calculated by adding up invoices. All of those invoices were produced to all of the parties in this case." (Transcript at 53). Fed. R. Civ. P. 26(a)(1)(A)(iii) and 37(c)(1) bar recovery of damages not disclosed in initial disclosures. *Roberts ex. Rel. Johnson v. Galen of Virginia, Inc*., 325 F.3d 776, 782 (6th Cir. 2003)).

[18] For example, in this Court's Order Denying Defendant Moran's **prior** motion for summary judgment as to damages, the Court stated: "Plaintiff claims that as a result of Moran's actions, Antioch suffered damages in the amount of the value of a Section 363 bankruptcy action that had been proposed in the J.H. Whitney offer. (Doc. 167 at 20). Plaintiff is constrained to speculation on this point. The issue of damages is a factual issue best suited for expert testimony. (*Id*.) At this stage in the litigation, expert discovery is not yet complete. Accordingly, the Court holds that a genuine issue of material fact exists as to the extent of damages, if any, suffered by Antioch because of Moran's interference with the Houlihan contract." (Doc. 202 at 16-17). In Plaintiff's memorandum on this very point, it stated that "the damages caused by [Moran]…are factual subjects appropriate for expert testimony." **In denying the summary judgment motion, the Court relied on Plaintiff's representation that it would produce expert testimony.** Now, Plaintiff admits that it does not intend to have an expert calculate its compensatory damages. (Doc. 259 at 5-6) ("Mr. Greenberg will only testify about the J.H. Whitney letter of intent"); (*Id.* at 12) (damages calculation is "simple arithmetic").

otherwise. *See, e.g., Cole v. Homier Distrib. Co.*, No. 4:07cv01493, JCH, 2009 U.S. Dist. LEXIS 23641, at *17 (E.D. Mo. Mar. 20, 2009) (the court excluded plaintiffs' damages expert and "Plaintiffs [then] assert[ed] that they can support their damages claim through their own testimony and calculations, without the assistance of an expert…[but] [p]laintiffs' assertion that they can provide evidence of their damages absent the testimony and report of their excluded expert…is so contradictory to everything else that it raise[s] only a sham issue.").

Plaintiff claims that it made clear from the beginning of the case that its damages arising from the 2007-2008 sale process would be based, at least in part, on the Company's value as shown by the $54 million J.H. Whitney proposal to purchase the Company in May 2008, as well as upon the expressions of interest in the Company received from Jostens and Sun Capital during the summer of 2007, which valued Antioch at between $148 million and $185 million. (Doc. 259, Ex. A at 4-5).[19] However, Plaintiff's claim is undermined by the testimony of Plaintiff's own Mr. Miller. Plaintiff designated Mr. Miller as the witness who would testify about damages. However, when asked about damages at the Rule 30(b)(6) deposition (which was scheduled for the last day of fact discovery so that the factual record would be complete), Mr. Miller testified:

---

[19] "By May 2008, the Company's value had declined to approximately $54 million based on J.H Whitney's proposal to purchase the Company" and "The Trust arrives at this calculation based on expressions of interest in the Company received from Jostens and Sun Capital during the summer of 2007, which valued Antioch at between $148 million and $185 million" *Id.*

> [i]n connection with the damages and the damages calculations, I think the Trust's view is that is something that is properly the province of expert testimony, and that is something that we would – the Trust would anticipate having an expert testify with respect to. So at this juncture, where we are in the case, having not yet engaged or gone forward with expert testimony – or, you know, identifying testifying experts and that sort of stuff, I think our answer is with respect to the damages very much remain what we've placed in this interrogatory, that these are the various categories of damages and that, you know, through the use of a testifying expert, we would expect to put specific dollar amounts on that.

(Doc. 88 at 80-81). Mr. Miller was repeatedly asked whether as of "this date" – that "date" being the last day of fact discovery, the Trust had determined its damages, Mr. Miller said that the Trust had not done so. Therefore, the factual record closed with Plaintiff providing no information about its claimed damages. Now, the Trust says it does not need an expert because it relies on simple math using numbers that were available at the time of the deposition, but to which Mr. Miller represented an expert was required.

Plaintiff's refusal to disclose and quantify its lost value damages on the last day of fact discovery precludes Plaintiff's new attempt to claim that its damages can be proven without an expert. **If calculating damages were as easy as simple arithmetic, and is based on the facts in the record, then Plaintiff's 30(b)(6) witness should have answered questions about damages.** *Bessemer & Lake Erie R.R. v. Seaway Marine Transp.*, 596 F.3d 357, 366-370 (6th Cir. 2010) (affirming district court's exclusion of

damages – related evidence based on plaintiff's failure to provide sufficient information in initial disclosures or during discovery).[20]

In sum, the Court finds that: (1) Mr. Greenberg's report as to damages is excluded as unreliable; (2) based on the principals of estoppel and fundamental fairness, Plaintiff is precluded from proving damages without an expert; and (3) even if the Court permitted Plaintiff to prove damages through "simple arithmetic," Plaintiff would fail because the values required to evidence damages are inadmissible hearsay.

### E. Summary Judgment

Plaintiff's failure to establish that Defendants caused any damages as a result of the Sale Process entitles Defendants to summary judgment on claims based on the same. Therefore, Count 4 (breach of fiduciary duty with respect to the Levimo transaction[21]),

---

[20] *See also Info-Hold,* 2013 U.S. Dist. LEXIS 117953 at 14-17 (the pre-trial exclusion of a plaintiff's damages expert left the plaintiff with no vehicle to prove damages and entered summary judgment for the defendant).

[21] Court Four involves a sale-leaseback of two Antioch properties in St. Cloud, Minnesota. Lee Morgan and his wife Vicki formed a company called Levimo, Inc. and purchased the properties and leased them back to Antioch. Plaintiff maintains that Defendants breached their fiduciary duty by approving the Levimo Transaction. However, **Greenberg failed to identify any economic loss to Antioch. Moreover, Plaintiff's failure in its initial disclosures to disclose any damages resulting from the Levimo transaction prevents Plaintiff from presenting evidence of such damages at trial pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii) and 37(c)(1).** *See Bessemer & Lake Eris R.R. v. Seaway Marine Transp.*, 596 F.3d F.3d 357, 366-70 (6th Cir. 2010) (affirming district court's exclusion of damages evidence because plaintiff failed to provide sufficient information in initial disclosures or during discovery). **Additionally, Plaintiff's designated 30(b)(6) designee on the topic of damages testified that Anitoch did not suffer any financial loss from the Levimo Transaction.** (Doc. 88 at 292). *See, e.g., Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 152-53 (S.D.N.Y. Oct. 3, 2007) (trial court precluded party from using evidence on designated matter because it failed to provide a prepared witness for Rule 30(b)(6) deposition, since Rule 30(b)(6) places an "affirmative duty" on the party's designee to "give complete, knowledgeable and binding answers' on its behalf," and "[p]roducing an unprepared witness is tantamount to a failure to appear").

Count 6 (breach of fiduciary duty with respect to the sale process), Count 8 (breach of fiduciary duty with respect to the sale process), Count 10 (tortious interference with business contracts with respect to the sale process), and Count 13 (attorney fees in connection with Counts 4, 6, 8, and 10) fail as a matter of law.[22]

## IV. CONCLUSION

Accordingly, for these reasons, the Morgan Defendants' motion to exclude (Doc. 213) is **GRANTED**. Furthermore, since Counts 4, 6, 8, 10, and 13 fail as a matter of law:

(1) Defendant Marty Moran's motion for summary judgment on Count 10 (Doc. 217) is **GRANTED**;

(2) Defendants Marty Moran, Lee Morgan, and Asha Moran's motion for summary judgment on Counts 4, 6, 8, 10, and 13 (Doc. 222) is **GRANTED**; and Mr. Marty Moran is **TERMINATED** from this action

(3) Defendants Blair and Luce's motion for summary judgment on Counts 4 and 6 (Doc. 231) is **GRANTED**; and Ms. Blair and Mr. Luce are **TERMINATED** from this action;

(4) Defendant Northrop's motion for summary judgment on Count 6 (Doc. 232) is **GRANTED** and Mr. Northrop is **TERMINATED** from this action;

(5) Defendants McLaughlin, Sanan, Matthiessen's motion for summary judgment on Counts 4 and 6 (Doc. 236) is **GRANTED** and Defendants McLaughlin, Sanan, and Matthiessen are **TERMINATED** from this action;

(6) The Morgan Defendants' motion for partial summary judgment on Count 8 (Doc. 237) is **DENIED** as **MOOT**;

---

[22] *See, e.g.*, *PNH, Inc. v. Alfa Laval Flow, Inc.*, 958 N.E.2d 120, 128 (Ohio 2012) (**damages are an essential element of a tortious interference with contract claim**); *Helfrich v. Strickland*, No. 08CA 101, 2009 Ohio App. LEXIS 4055, at *11-12 (Ohio App. Sept. 11, 2009) (**failure to put forth evidence of damages, an essential element for a breach of fiduciary duty claim, mandates summary judgment in favor of defendant**).

(7) Defendant Morris's motion for summary judgment on Count 8 (Doc. 238) is **GRANTED**; and Defendant Morris is **TERMINATED** from this action;

(8) Defendant Bevelhymer's motion for partial summary judgment on Count 6 (Doc. 242) is **GRANTED**;

(9) Defendant Lipson-Wilson's motion for partial summary judgment on Count 6 (Doc. 244) is **GRANTED**;

(10) Defendant Felix's motion for partial summary judgment on Count 6 (Doc. 246) is **GRANTED**; and

(11) The Morgan Defendants' motion for partial summary judgment on Count 6 (Doc. 248) is **DENIED** as **MOOT**.

**IT IS SO ORDERED**.

Date:  4/7/14                              *s/ Timothy S. Black*
                                           Timothy S. Black
                                           United States District Judge