UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE ANTIOCH COMPANY | : | Case No. 3:10-cv-156 |
| LITIGATION TRUST, | : | |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| LEE MORGAN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING DEFENDANT HOSKINS', BEVELHYMER'S, LIPSON-WILSON'S, AND FELIX'S MOTIONS FOR SUMMARY JUDGMENT ON COUNT THREE (Docs. 240, 242, 244, 246)

This civil action is before the Court on the motions for summary judgment on Count 3 of Defendants Hoskins (Doc. 240), Bevelhymer (Doc. 242), Lipson-Wilson (Doc. 244), and Felix (Doc. 246) (the "Officer Defendants"), and the parties' responsive memoranda (Docs. 271, 293, 294, 295, 296).

## I. BACKGROUND FACTS[1]

Antioch was required by law to provide adequate security for the ESOP Notes. However, the Company had pledged all of its assets as security for the bank debt incurred in the 2003 Tender Offer. Defendant Hoskins, the CFO, undertook a search to obtain adequate Security. Hoskins selected Condor Insurance Limited ("Condor"), an offshore company, to guarantee the ESOP Notes through the issuance of bonds. (Doc. 82, Ex.

---

[1] A detailed factual background is available at Doc. 6, Section III. *See also* the undisputed facts at Doc. 240, Ex. 1; Doc. 242, Ex. 1; Doc. 244, Ex. 1; Doc. 246, Ex. 1; and Docs. 260-263.

332). Condor guaranteed the first three rounds of notes. (*Id.* at 339-344). A Bahamian entity called Condor Guaranty, Inc. ("Condor Guaranty") was the guarantor of the fourth round of ESOP Notes in 2007. (*Id.*, Ex. 705). The insurance broker at Acordia notified Hoskins that Condor had an AM-Best rating of "not rated" and that typically Acordia does not place business with insurers unless they are rated AVII or better; and Acordia required Hoskins to sign a waiver acknowledging these facts. (*Id.*, Ex. 49).

Hoskins asked attorneys at Dinsmore & Shohl, who represented the Company in connection with its credit agreements, to take a look at the Guaranty Agreement with Condor to ensure that it would not violate the credit agreements with the banks. Dinsmore advised that the Condor guaranty would not violate the credit agreement, but gave no advice as to whether it was prudent to pay premiums to Condor or whether doing so provided "adequate security" under ERISA. (Doc. 82, Ex. 40 at 1). Hoskins contracted with Condor to secure the first two rounds of ESOP Notes.

Hoskins retired in 2006 and was replaced by Karen Felix. (Doc. 82 at 344-345; Doc. 109 at 84). After Hoskins' departure, Felix, along with Kimberlee Lipson-Wilson, then director of corporate compliance, and Steve Bevelhymer, the Company's corporate treasurer, renewed coverage with Condor in 2006 and 2007. (Doc. 94 at 360-362). Ultimately, it was Ms. Felix's responsibility to ensure that there was adequate security in place for the ESOP Notes, but she delegated that responsibility to Mr. Bevelhymer. (Doc. 109 at 86-87).

Condor was insolvent and entered into bankruptcy proceedings in July 2007.

Despite knowing that Condor *Insurance* was going through bankruptcy, Bevelhymer

contracted with Condor *Guaranty* to provide a surety bond for the fourth round of ESOP

Notes in October 2007. (Doc. 105 at 118-120). On November 9, 2007, Lipson-Wilson

wrote in an email to Bevelhymer: "Steve—I believe we should have that phone call to

understand Condor's history. . . Like I mentioned to you, I'm concerned about any

Financial Guaranty's entered prior to this date [Nov. 8, 2006]." (Doc. 105, Ex. 108). In a

January 18, 2008 conference call, Lipson-Wilson told Ken Lenoir, the ESOP Trustee, that

"she does not feel comfortable with the surety bond on the ESOP debt – she doesn't think

it is worth the paper it is printed on – she said to do an internet search on the company

and we'll see why." (*Id.*, Ex. 413). The Board of Directors was made aware of Condor's

insolvency no later than January 31, 2008. (Doc. 105 at 119-120, Ex. 190).

On February 29, 2008, the Company's counsel, McDermott Will & Emery,

warned the board of directors that Condor Guaranty was likely to be insolvent or possibly

the recipient of Condor's assets in a fraudulent transfer:

> A recent internet search raised concerns about the ability of Condor to
> fulfill its obligations under the Surety…There are, however, allegations
> in the bankruptcy proceedings in the United States Bankruptcy Court
> for the Southern District of Mississippi that assets were improperly
> transferred from Condor [Ins.] to Condor Guaranty Inc. With the
> legality of such transfers to Condor Guaranty in question, it may be
> difficult for the Company to rely on Mr. Milam's assurances and
> Condor Guaranty's financial statements until the facts are sorted out by
> the court.

(Dep., Ex. 112).

In emails dated March 27, 2008 and June 24, 2008, Felix notified Lee, Bevelhymer, and Lipson-Wilson that the Company could not make interest payments due to the subordinated noteholders, and warned that litigation could result "[i]f we do not pay 'any' subordinate notes, it would send a major red flag to those parties that are Not aware of our current considerations/negations. They might take actions and further complicate our ability of a successful resolution." (Dep., Ex. 202). Felix also noted, "[i]f we do not pay, we need to have a communication plan, etc. in place." (*Id*.) By late July 2008, the Company's new board (now consisting of Asha, Lee, and G. Robert Morris) knew that the Company lacked the cash to make the ESOP Note payments due on August 1, 2008. (Dep., Ex. 591). The Company did in fact default on the ESOP Note payments due on August 1, 2008. The Company made a claim under the Financial Guaranty Agreements for Condor to make the August payment on the Company's behalf. (Doc. 89 at 300-305). The Company then made a payment of another $113,022.07 to Condor Guaranty for its annual premium on August, 20, 2008. (*Id*. at 301-302; Dep., Ex. 112). Condor Guaranty failed to make the August 2008 payment within 30 days of the claim as required by the terms of the surety bonds.

Plaintiff argues that the actions of the Officer Defendants in continuing to pay premium payments ($414,494.00 for 2004; $290,125.00 for 2005; $256,965.62 for 2006, and $25,845.53 for 2007) to an unworthy entity resulted in corporate waste.[2] (Dep., Ex.

---

[2] An additional $113,022.07 was paid to Condor in August 2008.

50, 51, 405, 713).  Plaintiff maintains that there is a genuine dispute of material fact as to whether the Officer Defendants breached their fiduciary duties by selecting a sham insurer who they reasonably should have known could not fulfill the Company's obligation to provide adequate security for the ESOP notes, by continuing to waste corporate assets each year, by paying additional premiums to the same sham entity, by failing to actively seek alternatives, and by failing to inform the ESOP note holders that the guarantor of their notes was insolvent.

## II.     STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## III.   ANALYSIS

To prevail on a breach of fiduciary duty claim, the Trustee must show the existence of a duty, a failure to observe that duty, and a resulting injury.  *Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1998).  The Trustee has the burden of proving a breach of fiduciary duty by clear and convincing evidence.  *State ex rel. Atty. Gen. v. Vela*, 987 N.E.2d 722, 730 (Ohio App. 2013) (citing Ohio Revised Code § 1701.59).

### A. Barry Hoskins

#### *1. Duty*

Barry Hoskins was the CFO who made the initial decision to use Condor to provide a guaranty for the ESOP Notes.  "[D]irectors and officers have a fiduciary relationship and position of trust with respect to the corporation they serve."  *In re Amcast Indus. Corp.*, 365 B.R. 91, 103 (S.D. Ohio 2007).  Ohio Revised Code Section 1701.59, which codifies the duties a director owes to a corporation, states in part:

> A director shall perform the director's duties as a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

Ohio Rev. Code § 1701.59(B).  "Although the fiduciary obligations of officers of a corporation have not been so codified, Ohio courts impose a similar common law duty on officers."  *In re Amcast Indus. Corp.*, 365 B.R. at 103.  This fiduciary relationship between officers and the corporation entails a duty of care, a duty of good faith, a duty of

loyalty, a duty to refrain from self-dealing, and a duty of disclosure. *Wing Leasing, Inc.*

*v. M&B Aviation*, 542 N.E.2d 671, 676 (Ohio App. 1988).

As the CFO, Barry Hoskins had a fiduciary duty to the Company.

### 2. Failure to observe the duty

#### a. Adequate Security

Acordia, the broker Hoskins used to locate a surety, certified the absence of other

options:

> We made every effort to place this Insurance coverage with a carrier
> who has an A.M. Best rating of A-VII or higher. Due to the unique
> circumstances surrounding your operations, Condor, LTD was the
> only market willing to provide coverage.

(Doc. 82, Ex. 49).[3] The "unique circumstances" referred to Antioch's status as being

ESOP owned. (*Id.* at 338). "We didn't have any other choices," Hoskins testified. (*Id.*)[4]

---

[3] The A.M. Best's Ratings "reflect their independent opinion of a company's financial strength
and ability to meet its obligations to policyholders. Best's Ratings are not a warranty of an
insurer's current or future ability to meet its obligations to policyholders, nor are they a
recommendation of a specific policy form, contract, rate or claim practice." (Doc. 82, Ex. 49).
Additionally, there is nothing in the "Guide To A.M. Best's Ratings" to indicate that an unrated
company is inferior. The fact that Condor Insurance was "not rated" by A.M. Best means
nothing more than that it was "not rated."

[4] The Trustee blames Hoskins for failing to obtain an alternate source of security for the ESOP
notes in the wake of Condor's financial difficulties. (Doc. 275 at ¶ 179). However, Acordia was
able to locate only one insurance company willing to provide adequate security on the ESOP
notes. (Doc. 82 at 332, Ex. 49). Even the Trustee's expert, Mark Greenberg, was unable to
identify a single alternate entity willing to provide adequate security for the ESOP notes. (Doc.
215 at 525-526). In fact, in early 2008, Antioch engaged an insurance broker to search for an
alternative entity. (Doc. 94, Ex. 109). On April 1, 2008, the insurance broker informed Antioch
that it had not located an entity willing to provide security for the company's ESOP notes. (*Id.*)
This supports a finding that there simply was no other available insurer.

A decision not to engage Condor would have been a breach of duty resulting in immediate harm to the Company.[5]

Hoskins testified that he requested, received, and reviewed Condor Insurance's financials and concluded "they were a very strong company."  (Doc. 82 at 338). Dinsmore & Shohl, the law firm that reviewed the financial guaranty agreement and the surety bond from Condor Insurance, advised Hoskins that "the bank group should not object to the Guaranty Agreement."  (*Id.* at 254-255, Ex. 40).  Furthermore, the Company's lenders were satisfied with the Condor guaranty, waived the existing covenant default, and "permitted the company to issue the ESOP notes and bond them with…Condor…"  (*Id.* at 212, Ex. 36).  Additionally, Acordia, the insurance broker, sent Hoskins "an opinion from [his] law firm that validate[d] the use of off shore insurance companies for providing 'adequate security' to ESOP Repurchase programs."  (*Id.*, Ex. 41).

The Trustee argues that a simple internet search of Condor and its principal would have revealed Condor's financial difficulties.  (Doc. 271 at 11-12).  However, the only support for this contention is an "Offshore Alert" article published on May 31, 2007, nearly three years after Hoskins first purchased surety bonds from Condor.  (*Id.*, Ex.

---

[5]  Without the Condor guarantees in place, the banks could have declared the Company in default.  This fact cannot be ignored in assessing the overall reasonableness of Hoskins's decision to engage Condor.

730).[6]  Hoskins testified that he had no knowledge that Condor Insurance was

experiencing financial difficulties:

> Q:  Okay.  At any time between 2004 and the date that you resigned as the
> ESOP trustee, Barry, did you come into any knowledge that Condor
> Insurance Limited was experiencing financial difficulties?
> A:  I did not.

(Doc. 82 at 255).  The insolvency proceedings were not initiated by Condor until mid-

2007.  Hoskins was no longer at Antioch when the Condor bankruptcy was filed, and he

had no involvement with Condor after 2005.  (Doc. 82 at 250; Doc. 109 at 84-87).

The undisputed facts evidence that Hoskins exercised judgment and diligence in

searching for security for the ESOP notes, that he was exposed to the advice of many

advisors and experts on the issue, and that he made the best decision available to him

under the circumstances.

### b.  Wasted Corporate Assets

The Trustee also argues that Hoskins wasted corporate assets by paying Condor

Insurance's annual premiums in 2004 and 2005.  (Doc. 88 at 297-298).

Corporate waste occurs when corporate fiduciaries cause the corporation to enter a

"transaction on terms that no person of ordinary, sound business judgment could

conclude represent a fair exchange."  *In re LTV Steel Co., Inc*., 333 B.R. 397, 424 (N.D.

Ohio 2005).  "If under the circumstances any reasonable person might conclude that the

deal made sense, the judicial inquiry ends."  *Id.*  The standard for corporate waste is

---

[6]  The article is inadmissible hearsay and cannot be considered for the truth of the matter asserted
on summary judgment.

9

onerous and very rarely satisfied. *In re Walt Disney Co. Deriv. Litig*., 906 A. 2d 27, 74-75 (Del. 2006). To prevail on a claim for corporate waste, the plaintiff must show that the officer "irrationally squandered corporate assets – for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all." *White v. Panic*, 783 A.2d 543, 554 (Del. 2001).

Hoskins identified a valid corporate purpose for making the premium payments to Condor Insurance – to provide adequate security for the ESOP notes as required by Antioch's credit agreements and ERISA. (Doc. 240 at 7-8). The Trustee admits that Antioch's credit agreements and ERISA both required Antioch to provide adequate security for the ESOP notes:

> 3.      In accordance with ERISA and the Internal Revenue Code, Antioch was required to provide adequate security for the ESOP notes to ensure that the ESOP notes would be paid in the event Antioch defaulted on its obligation to make payments on the ESOP notes.
>
> RESPONSE: Admit
>
> 4.      A loan covenant in Antioch's credit agreement with Bank One required Antioch to provide security of the ESOP notes.
>
> RESPONSE:  Admit

(Doc. 262 at ¶¶ 3, 4). Hoskins engaged Condor to issue a security bond to secure the ESOP notes that were otherwise unsecured obligations of the company. (Doc. 82 at 248). If the Condor premiums had not been made, Antioch would have immediately been in violation of its loan covenants and the requirements of ERISA. Complying with Antioch's credit agreements and federal law, serve valid corporate purposes. The Trustee

cannot establish Hoskins wasted corporate assets without establishing that the premium payments served no corporate purpose.  *See Disney*, 746 A.2d at 263 ("courts are ill-fitted to attempt to weigh the 'adequacy' of consideration under the waste standard or, ex post, to judge appropriate degrees of business risk.").

Since no claims were made during the years for which Hoskins paid premiums, there is no evidence that those premium payments were wasteful or would not have resulted in paid claims.  Moreover, there is no evidence that Mr. Hoskins failed to observe his fiduciary duty.

### 3. Injury

A director is only liable for breach of fiduciary duty where the breach is the proximate cause of the injury.  *In re Amcast Indus.*, 365 B.R. 91, 110 (Bankr S.D. Ohio 2007).

Although the Trustee contends that Hoskins's decision or engage Condor Insurance in 2004 and 2005 exposed Antioch to liability for violations of ERISA and the Internal Revenue Code, the Trustee admits that these events never came to pass:

> Q.    Okay.  On the first one about the ERISA violation and perhaps causing the ESOP to lose its status and thereby eliminating tax benefits to the company, that never happened; is that correct?
>
> A.    That is correct.

(Doc. 88 at 271).  Hoskins cannot be liable for an injury that could have occurred, but, in fact, did not occur.

The Trustee's allegation that Hoskins's decision to engage Condor Insurance in 2004 and 2005 had an adverse impact on the sale process is nothing but unsupported speculation. The Trustee's expert, Mark Greenberg, admitted that he was unaware of any prospective buyer who cited the issues associated with Condor's solvency as a reason for not going forward with the Sale Process. (Doc. 214 at 419-420). Additionally, the Trustee admitted he could not say whether the absence of the Condor issue would have changed the Sale Process:

> Q.    But you don't know whether or not the absence of the Condor issue in the mix would have led to a different decision with respect too –
> A.    Yeah –
> Q.    a sale?
> A.    -- I don't know that anybody knows the answer to that.
> Q.    So in that respect, isn't it true, Mr. Miller, that it's simply speculation to say that the problem with the Condor guaranty caused damage to the company with respect to the sale process because we just really don't know; isn't that right?
> A.    Well, I would say it appears to me to have had an impact.
> Q.    Something other than what you've already articulated –
> A.    No.
> Q.    -- that it went into the mix?
> A.    That's my – I think I've – yeah, I think I've answered that one.
> Q.    But if we take the Condor issue out of the mix –
> A.    Uh-huh
> Q.    --there's no way to know, it there, whether things would have worked out differently with respect to the sale process?
> A.    I suppose not. We don't know.

(Doc. 88 at 316-317).

The only damage alleged by the Trustee is the premium payments made to the Condor entities. (Doc. 271 at 17). Hoskins was only responsible for the premium payments made to Condor Insurance in 2004 and 2005:

      2004   Premium Payments: $414,494.00

      2005   Premium Payments: $290,125.00

(Doc. 271 at 9).  There is no evidence that the premium payments Hoskins made to Condor in 2004 and 2005 did not provide adequate security on the ESOP notes or that any claims made for the ESOP notes covered by the 2004 and 2005 premiums would not have been paid by Condor.[7]  There is no evidence of damages from anything Hoskins did or failed to do.  Therefore, there is no evidence of injury to the Company.

      Accordingly, the Trustee's breach of fiduciary duty claim against Mr. Hoskins fails as a matter of law.

      **B.**     **Steven Bevelhymer**

        ***1. Duty***

      Bevelhymer was employed as Antioch's Treasurer and as the CFO from November 2004 through May 2008.  (Doc. 105 at 11-12).  Bevelhymer was tasked with obtaining surety bonds for the ESOP notes in 2006 and 2007, and renewing the surety bonds for the ESOP notes previously issued in 2004 and 2005.  (Doc. 109 at 84-87; Doc. 105 at 105-109).

      Accordingly, Mr. Bevelhymer had a fiduciary duty to the Company.

---

[7] It is well-settled that proof of damages must be shown with a reasonable degree of certainty and that speculative damages are not recoverable.  *Pietz v. Toledo Trust Co.*, 577 N.E.2d 1118 (Ohio App. 1989) ("injury and the resulting damage must be shown with certainty and not be left to conjecture and speculation").

### 2. *Failure to Observe the Duty*

Mr. Bevelhymer paid the annual surety bond premiums to Condor Insurance in 2006 and Condor Guaranty in 2007, to secure the ESOP notes that were otherwise unsecured obligations of the company.  (Doc. 105 at 112).

In 2006, Bevelhymer reviewed Barry Hoskins's file on Condor Insurance and looked through his initial search for a surety bond carrier.  (Doc. 105 at 108).  There is no evidence that a search for alternate security in 2006 and 2007 would have located another entity willing to provide security on the ESOP notes.  In fact, as explained *supra* at Section III.A.2, besides Condor, the Company could not find an entity willing to provide security for the company's ESOP notes.  (*See also* Doc. 94 , Ex. 109).

Accordingly, there is no evidence that Bevelhymer breached his fiduciary duty.

### 3. *Injury*

Condor Insurance never defaulted on an obligation to Antioch, and there is no evidence that Condor Guaranty was unable to provide adequate security on the ESOP notes when Bevelhymer made the premium payments in August and October 2007. (Doc. 105, Ex. 714).  Condor Guaranty never defaulted on an obligation to Antioch during Bevelhymer's tenure.

Moreover, there is no evidence that Condor would not have paid any claims made in 2007, had any claims against the bond been made.  Additionally, there is no evidence that if the Company had defaulted on any ESOP note payments during 2006 or 2007, Condor would not have fulfilled its obligations under the guarantees.  The Company did

not make a claim under the guarantees until mid-2008. The affected ESOP notes had been secured by the 2007 premium payment.

The Trustee admits that Antioch made all scheduled periodic payments on the ESOP notes until June 2008. (Doc. 263 at ¶ 46). Bevelhymer was no longer at Antioch when the Company paid Condor Guaranty's annual bond premium for the ESOP notes in August 2008. (*Id.* at ¶ 48).

Antioch did not submit a claim to Condor Guaranty for payment on the ESOP notes until August 2008. (*Id.* at ¶ 49). Therefore, the premium payment that was allegedly "wasted" during Bevelhymer's tenure was the payment made in the fall of 2007, which covered the following 12 months and amounted to $25,543.53. (Doc. 203 at 17; Doc. 271 at 9). However, there is no evidence that Antioch's claim on this bond has not been paid, has been diligently pursued, or that any refusal of Condor Guaranty to pay the claim is the result of a financial inability to pay rather than some other factor. In fact, the bankruptcy documents indicate that Condor Guaranty is not in bankruptcy and gives no indication that its failure to pay Antioch's bond claims has anything to do with a financial inability to do so. (Doc. 294, Ex. B). Rather, Condor Guaranty asserts various alleged breaches by Antioch of its obligations under the Financial Guaranty Agreements, including inadequate or defective notice, failure to provide financial information, and other alleged defenses. (*Id.*)

Accordingly, the Trustee's breach of fiduciary duty claim against Mr. Bevelhymer fails as a matter of law.[8]

## C.    Karen Felix

### 1. Duty

As the CFO, Ms. Felix had a fiduciary duty.  *See supra* at Section III.A.1.

### 2. Failure to Observe the Duty

For the reasons explained *supra* at Section III.A.2, there is no evidence that alternative security was available or that Felix wasted corporate assets.

The Trustee also contends that Felix breached her fiduciary duty by allowing the Morgan family to pursue recapitalization alternatives.  (Doc. 275 at ¶ 193).  However, Felix had no authority, let alone a duty, to prevent the Morgan family from pursuing recapitalization efforts.  Moreover, there is no evidence that anything Felix did or did not do with respect to recapitalization efforts stalled the Sale Process or injured Antioch.

---

[8] Furthermore, even if the Trustee could establish that Bevelhymer breached a duty to Antioch, there is no evidence to overcome the business judgment rule.  A party challenging a decision made by a corporate official bears the burden of rebutting the presumption that the decision was a proper exercise of business judgment.  *Gries Sports Ent. Inc. v. Cleveland Browns Football Co.*, 469 N.E. 2d 959, 964 (Ohio 1986).  To do so, the challenging party must set forth evidence of fraud, bad faith, or self-dealing.  *Id.*  The Trustee cannot meet this burden.  Furthermore, the Trustee's argument that Bevelhymer is not entitled to the protection of the business judgment rule because he had a personal interest in the selection of Condor is not supported by the evidence.  Specifically, there is no evidence that Bevelhymer "personally benefited from the decision to use Condor because it hid [his] earlier malfeasance" with respect to the 2003 ESOP Transaction.  (Doc. 271 at 15).  The Trustee never asserted any claim against Bevelhymer or any of the Officer Defendants in connection with the 2003 transaction.  Therefore, the Trustee cannot now, for the first time, argue that Bevelhymer's desire to hide some unspecified "malfeasance" is what motivated him to purchase insurance from Condor.  *See also Granada Inv., Inc. v. DWG Corp.*, 823 F. Supp. 448, 455 (N.D. Ohio 1993) ("Courts are generally ill-equipped to evaluate business judgments or to second guess the validity of a business decision.").

16

Felix was first alerted that the Condor entities were experiencing financial difficulty in November 2007.  (Doc. 109 at 111, Ex. 195).  Felix never approved or paid a renewal premium to Condor after she was alerted that Condor was experiencing financial difficulty.  (*Id*. at 93-94).  Felix was no longer at Antioch when  the company paid Condor Guaranty's annual surety bond premium to renew the surety bonds for the ESOP notes in August 2008.  (Doc. 263 at ¶ 48).

### 3.  Injury

Mark Greenberg, the Trustee's expert on damages, testified that he was unable to attribute any of the damage allegedly incurred by Antioch to Felix:

> Q.    And with respect to Karen Felix, is it true that you will not be giving any opinion that attributes any damage allegedly suffered by The Antioch Company to anything Ms. Felix did or did not do?
>
> A.    That's true.

(Doc. 215 at 523).

Additionally, there is no evidence to support the Trustee's allegation that Antioch was injured by recapitalization efforts.  The testimony supports a finding that the Morgan family's efforts played a positive role in keeping as many viable options available as possible.  (Doc. 76 at 164-168; Doc. 226 at 36, 193).  For example, Stephen Spence from Houlihan Lokey testified that Candlewood's involvement aided Houlihan's efforts and introduced additional competition in the bidding for Antioch, which resulted in more and higher offers for the firm from potential third-party investors.  (Doc. 139 at 287-288, 296-297).  In fact, the Trustee's own expert admitted that there is no evidence that Antioch

would have received a higher offer for its assets if Candlewood had not been pursuing

recapitalization:

> Q.   Well, do you believe the company could have gotten a better deal than
>       Whitney's $54 million deal in May 2008 if Candlewood and Mr. Morgan
>       were not participating in the process?
> A.   It's hard to know.
> Q.   You don't know one way or the other?
> A.   Yeah, of course not.  How could I know?
> Q.   Okay.
> A.   How could I know?

(Doc. 214 at 178).  Spencer testified that he was unaware of any possible transaction that

Houlihan brought to the company that did not close because Candlewood was seeking a

possible transaction.  (Doc. 138 at 287-288).

Furthermore, for the same reasons explained *supra* at Section III.B.3, the Trustee

has not presented any evidence that the claims will not be paid or that they have not been

paid or compromised or that the reason for a lack of payment is Condor's financial

inability to pay.

Accordingly, Plaintiff's breach of fiduciary duty claim as to Karen Felix fails as a

matter of law.[9]

### D.   Kim Lipson-Wilson

#### *1. Duty*

Ms. Lipson-Wilson was employed as the Antioch Company's Direct of

Compliance and Administration.  (Doc. 94 at 13).  As the Director of Compliance and

---

[9] For the same reasons discussed *supra* in footnote 7, Ms. Felix is also protected by the business
judgment rule.

Administration, Lipson-Wilson had a fiduciary duty to the Company. However, finding a surety bond provider for the ESOP notes did not fall under Lipson-Wilson's responsibilities. (*Id.* at 175). She was not involved in engaging Condor Insurance as a surety in 2004, 2005, or 2006. (*Id*. at 174-175). Additionally, Lipson-Wilson had no role or involvement in selecting Condor Guaranty to secure the ESOP notes in 2007. (*Id.* at 175). A corporate officer "will not be held personally liable for the act of the corporation by mere virtue of his status as a corporate officer." *State ex rel. Fisher v. Am. Courts, Inc.*, 644 N.E.2d 1112, 1114 (1994). Officers are only liable for the acts of a corporation "if they took party in the act, specifically directed the act to be done, or participated or cooperated in the act." *In re Antioch Co.*, 456 B.R. 791, 860 (S.D. Ohio 2011).

The Trustee admits that Lipson Wilson had no involvement with the engagement of Condor Insurance in 2004, 2005, or 2006. (Doc. 263 at ¶¶ 31, 32, 33). With respect to 2007, Steve Bevelhymer was responsible for obtaining surety bonds for the ESOP notes. (Doc. 264 at ¶ 22).

Notwithstanding the substantial evidence that Lipson-Wilson did not have a duty with respect to the alleged breaches, this Court will continue the analysis.

### 2. *Failure to Observe the Duty*

Lipson-Wilson's only "participation" in the election of Condor is that she discussed Condor with Bevelhymer and Felix after the 2007 payment had already been made. Specifically, on November 9, 2007, she informed Antioch's legal counsel, Felix, and Bevelhymer, that she was concerned about the financial guaranties Antioch had

executed with Condor Guaranty.  (Doc. 94, Ex. 108).  It is undisputed that Bevelhymer

had already secured the fourth round of ESOP notes with Condor Guaranty when Lipson-

Wilson expressed her concern.  (Doc. 105 at 114).  Lipson-Wilson was not aware Condor

was involved in bankruptcy proceedings prior to the Company placing a surety bond with

Condor and she never approved or paid a renewal premium to a Condor Guaranty after

she was alerted that the Condor entities were experiencing financial difficulty.  (Doc. 94

at 179).  She left the Antioch Company on August 1, 2008.  (*Id*. at 24-25).

### 3.  *Injury*

Lipson-Wilson had no involvement in the engagement or payment of Condor

Insurance or Condor Guaranty and therefore she cannot have injured Antioch.  (Doc. 94

at 174-175).  Moreover, as explained *supra* at Section III.B.3, there is no evidence that

Antioch's claim on the bond has not been paid or that any refusal of Condor Guaranty to

pay the claim was the result of a financial inability to pay rather than some other factor.[10]

The Trustee has the burden of proving a breach of fiduciary duty by clear and

convincing evidence, and has failed to carry this burden as to Defendants Hoskins,

Bevelhymer, Lipson-Wilson, and Felix.  *Vela*, 987 N.E.2d at 730 (citing Ohio Revised

Code § 1701.59).

---

[10] For the same reasons discussed *supra* in footnote 7, Ms. Lipson-Wilson is also protected by
the business judgment rule.

## V.   CONCLUSION

Accordingly, for the foregoing reasons:

(1) Defendant Hoskins's motion for summary judgment on Count Three (Doc. 240) is **GRANTED** and Barry Hoskins is **TERMINATED** from the lawsuit;

(2) Defendant Bevelhymer's motion for summary judgment on Count Three (Doc. 242) is **GRANTED**;

(3) Defendant Lipson-Wilson's motion for summary judgment on Count Three (Doc. 244) is **GRANTED**; and

(4) Defendant Felix's motion for summary judgment on Count Three (Doc. 246) is **GRANTED**.

**IT IS SO ORDERED**.


Date:  4/14/14                                        *s/ Timothy S. Black*
                                                      Timothy S. Black
                                                      United States District Judge