```
 1              UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF OHIO

 3                    WESTERN DIVISION

 4                        - - -

 5   THE ANTIOCH COMPANY LITIGATION :  CIVIL CASE NO. 3:10cv156
     TRUST,
 6                                  :
                       Plaintiff,  :  Cincinnati, Ohio
 7                                  :
            vs.                     :  Tuesday, April 1, 2014
 8                                  :  9:00 a.m.
     LEE MORGAN, et al.,            :
 9                                  :  MOTION TO EXCLUDE PLAINTIFF'S
                       Defendants. :  EXPERT WITNESS
10                        - - -

11                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
12                        - - -

13   APPEARANCES:

14   For the Plaintiff:          MARCIA VOORHIS ANDREW, ESQ.
                                 TIMOTHY MILLER, ESQ.
15                               Taft Stettinius & Hollister
                                 425 Walnut Street, Suite 1800
16                               Cincinnati, OH  45202

17   For the Morgan Defendants:  MICHAEL L. SCHEIER, ESQ.
                                 BRIAN MUETHING, ESQ.
18                               DANIELLE D'ADDESA, ESQ.
                                 Keating Muething & Klekamp
19                               One East Fourth Street
                                 Suite 1400
20                               Cincinnati, OH  45202

21

22   For McDermott Will and Emery:  JEFFREY S. SHARKEY, ESQ.
                                    Faruki Ireland & Cox PLL
23                                  500 Courthouse Plaza, SW
                                    10 N Ludlow Street
24                                  Dayton, OH  45402

25
```

Proceedings reported by stenotype.
Transcript produced by computer-aided transcription.

```
 1   For James Northrup:          R. DANIEL PRENTISS, ESQ.
                                  R. Daniel Prentiss, P.C.
 2                                One Turks Head Place
                                  Suite 380
 3                                Providence, RI  02903

 4

 5   For Nancy Blair and Wayne Luce:  DANIEL J. GENTRY, ESQ.
                                  TERENCE L. FAGUE, ESQ.
 6                                Coolidge Wall Co., L.P.A.
                                  33 West First Street
 7                                Suite 600
                                  Dayton, OH  45402
 8

 9   For Officer Defendants:      ROBERT A. KLINGLER, ESQ.
                                  525 Vine Street, Suite 2320
10                                Cincinnati, OH  45202

11   For Jeanine McLaughlin, Dennis Sanan and Malte Von Matthiessen:

12                                THOMAS A. KNOTH, ESQ.
                                  JENNIFER MAFFETT, ESQ.
13                                Thompson Hine
                                  Austin Landing I
14                                10050 Innovation Drive
                                  Suite 400
15                                Dayton, OH  45342

16

17

18   Courtroom Deputy:  Mary Rogers

19   Court Reporter:    Jodie D. Perkins, RMR, CRR

20

21

22

23

24

25
```

1          AFTERNOON SESSION, Tuesday, April 1, 2014

2          (Proceedings commenced at 4 o'clock p.m.)

3          THE COURT:  Good afternoon, ladies and gentlemen.

4  Here in the open courtroom on the record, Judge Barrett was

5  kind enough to make his courtroom available, in large part

6  because of the technology.  I understand we have some lawyers

7  appearing by phone and that works in this courtroom.

8          We're here on the motion of the Morgan defendants to

9  exclude plaintiff's expert report opinions and testimony.  I

10  would like the attorneys who are in the courtroom and will be

11  arguing to enter their appearance for the record, tell me who

12  is here with you.  And then I am going to identify who is on

13  the phone, and then we will proceed to argument.

14          So on behalf of the movant, the Morgan defendants,

15  Counsel?

16          MR. SCHEIER:  Good afternoon, Your Honor.  Michael

17  Scheier, of Keating Muething and Klekamp, on behalf of Lee

18  Morgan, Marty Moran and several Morgan family-related trusts,

19  along with my law partner Brian Muething.

20          THE COURT:  Good afternoon, gentlemen.

21          And on behalf of the plaintiff, Antioch Company

22  Litigation Trust?

23          MS. ANDREW:  Good afternoon, Your Honor.  Marcia

24  Andrew with the Taft firm, on behalf of Antioch Company

25  Litigation Trust.  I have with me today Timothy Miller, my

1  partner, who is the trustee of the Trust.

2          THE COURT:  Good afternoon to the both of you as well.

3          The phone is on, Ms. Rogers; is that right?

4          THE COURTROOM DEPUTY:  Yes, Your Honor.

5          THE COURT:  And is it transmitting through the

6  microphone I'm speaking with?

7          THE COURTROOM DEPUTY:  I believe so.

8          THE COURT:  Very well.  Who do we have on the

9  telephone on behalf of whom?

10         MR. SHARKEY:  Your Honor, this is Jeff Sharkey on

11 behalf of McDermott Will and Emery, and we can hear you very

12 clearly over the telephone.  Thank you for the courtesy of

13 having the phone available.

14         THE COURT:  Very well.

15         MR. PRENTISS:  Dan Prentiss, Your Honor, on behalf of

16 defendant James Northrup.

17         THE COURT:  Very well.  Good afternoon.

18         MR. PRENTISS:  Good afternoon, sir.

19         THE COURT:  Do we have further counsel on the line who

20 have not identified themselves?

21         MS. D'ADDESA:  Danielle D'Addesa, on behalf of the

22 Morgan defendants.

23         THE COURT:  Good afternoon, Counsel.  You're keeping

24 an eye via telephone on Mr. Muething and Scheier; is that

25 right?

1          MS. D'ADDESA:  That is correct.

2          THE COURT:  Very well.  Do we have others in the

3  courtroom who represent parties who wish to identify themselves

4  for me?

5          MR. FAGUE:  Your Honor, Terence Fague and Dan Gentry,

6  on behalf of defendants Nancy Blair and Wayne Alan Luce.

7          THE COURT:  Good afternoon.

8          MR. KNOTH:  Your Honor, Tom Knoth and Jennifer

9  Maffett, on behalf of Jeanine McLaughlin, Dennis Sanan and

10  Malte Von Matthiessen.

11          THE COURT:  Very well.  Good afternoon.

12          MR. KLINGLER:  Your Honor, Bob Klingler on behalf of

13  the officer defendants.

14          THE COURT:  Good afternoon, Mr. Klingler.

15          Are there others who wish to identify themselves?

16          (No response.)

17          THE COURT:  The other three decline at this time

18  because they're not attorneys of record?

19          (No response.)

20          THE COURT:  They appear to be especially silent.

21  Welcome to the courtroom.

22          Well, we're going to hear oral argument and it is on

23  one motion.  I am going to hear from the movant first and last.

24  I am going to hear from Antioch in between.  I've read the

25  pleadings and they have drawn my attention.

```
1              So who wishes to be heard on behalf of the movant?

2              MR. SCHEIER:  I would like to be heard, Your Honor.

3              THE COURT:  Very well.  And then are you prepared to

4    negotiate how much time you intend to consume?

5              MR. SCHEIER:  I will consume as much time as Your

6    Honor allows me.  If you have in mind an amount of time that

7    you would like for argument, I would be happy to negotiate with

8    you and with Ms. Andrew.  I can tell you that I believe if

9    I'm -- if the argument goes just with me talking, it could be

10   about, I would say twenty minutes or so.  I'll put in the

11   proviso that typically I undershoot my estimations by --

12   anywhere by 10 to 50 percent.  So anytime you get tired of

13   hearing me, I have great respect for Your Honor's instruction

14   to stop.

15             THE COURT:  I was hoping we could do this whole ball

16   of wax in an hour.  That would be probably a half-hour for you

17   and a half-hour for the other side.  I would assume that you're

18   going to want to reserve some time for reply, but I'm prepared

19   to listen carefully to you at this time.

20             MR. SCHEIER:  Thank you, sir.

21             THE COURT:  I am going to interrupt you so I am going

22   to consume your time, but go ahead.

23             MR. SCHEIER:  I welcome any questions that you have.

24   I find it probably to be the most useful part of argument.

25             THE COURT:  I agree.  I've read the paperwork pretty
```

1    carefully and I have some questions.

2            MR. SCHEIER:  Very well.  Again, Your Honor, Michael

3    Scheier on behalf of the Morgan defendants.  Rather than go

4    through what we've already put in our papers, because the Court

5    has indicated he has read them, I thought I would give a little

6    bit of a chronology to give the Court a sense of how we got to

7    where we are by way of this motion practice and, in particular,

8    the motion to exclude.

9            The first that my clients had ever heard a peep about

10   damages from the plaintiff in this case was a couple of years

11   after they filed litigation by way of supplemental Rule 26(a)

12   disclosures and interrogatory responses, both of which were

13   served on the same day, and it was on or about December 20th,

14   2011.

15           And I've placed those on the bench for Your Honor's

16   reference because I will reference them.  And just to get a

17   sense of what we were told back in December of 2011, I refer

18   the Court initially to the initial disclosures.  And because

19   the damage disclosures is identical in the initial disclosures

20   and interrogatories, there's no need to review both, so I am

21   going to key my remarks off of the initial disclosures.

22           And I would like to initially direct the Court's

23   attention to the page marked number three of the disclosure

24   itself and Category E, which is one of two damages categories

25   that relate to the claims that remain pending in the case.

1    And as Your Honor will see, what we were told back in
2 December of 2011, before undertaking any deposition discovery,
3 was that the Trust was forecasting its need for an expert to
4 give an opinion on the loss of enterprise value resulting from
5 whatever conduct they were complaining of, which was not much
6 of a surprise seeing how issues like loss of enterprise value
7 and those type of concepts typically are handled by way of
8 expert testimony.

9    But when you read further, the interrogatory goes on
10 to identify a couple of offers, or expressions of interest, as
11 the Trust noted, from a Jostens and Sun Capital in a certain
12 amount of money.  And also, as a top end of a damages
13 calculation, at the bottom end they note a $54 million figure
14 by a company known as J.H. Whitney in regard to a proposal that
15 they had supposedly made to purchase the Antioch Company.

16    But then I would note for the Court that the plaintiff
17 admirably discloses that some of that loss in value might not
18 be attributable to the conduct of the defendants, and I guess
19 impliedly telling us we're just going to have to wait and see.

20    Basically, as we put in our papers, the way we read
21 this is we're going to use an expert and we kind of think this
22 is what the expert is going to say, and we're not quite sure
23 but just wanted to give you kind of an initial disclosure.

24    And you'll note that just under that paragraph the
25 Trust acknowledges its obligations to supplement that

1  disclosure.

2          The second category --

3          THE COURT:  So they were suggesting here that the

4  damage calculation is simple mathematics, offer, minus the end

5  offer, gives you the loss in value?

6          MR. SCHEIER:  I don't mean to be flip, Your Honor, but

7  it is simple math but done wrong because they note that --

8  approximate their damages to be not less than $121 million.

9  But when you take the low end of the offer, the 148 million,

10  and subtract out the 54 million, that in fact is less than

11  $121 million.

12          So the simple math wasn't done particularly well in at

13  least that part of the interrogatory.  But that's not being

14  flip or critical, it is just by way of pointing out that this

15  seems to be a good faith effort to at least give us some

16  indication of what they're thinking by way of damages, and we

17  took it as such.

18          And then the second category of damages that the Trust

19  identified that remained pertinent to the claims at issue in

20  the case is on the prior page, page two under Category C, and

21  those relate purportedly to fees and expenses paid to

22  restructuring professionals as a result of the deepening

23  insolvency of Antioch.

24          And when you go on to read the brief paragraph under

25  that heading, the Trust notes that it intends to seek discovery

1   from such restructuring experts, restructuring professionals,

2   whatever that means, and that they will supplement their

3   initial disclosures once they receive that documentation.  I'll

4   give Your Honor a little bit of preview -- that never happened.

5   Don't ever recall seeing a subpoena to quote, unquote,

6   restructuring professionals, nor do I remember that

7   interrogatory ever being updated.

8          So that's where things stood in December of 2011, and

9   then the parties went off and began to undertake the discovery.

10  And we flew around the country between New York and California

11  and Minnesota and Dallas deposing dozens of witnesses, and all

12  along, I was waiting to receive a document subpoena to this

13  Jostens and Sun Capital, to J.H. Whitney, or to receive a

14  testimony subpoena seeking a representative of one of those

15  companies, but that never came.  And we find ourselves now some

16  time in the late fall of 2011 when it becomes relevant now, in

17  light of Mr. Greenberg's report testimony in the opposition

18  brief that's before us, and we took CRG's testimony by way of a

19  gentleman named Michael Epstein.

20         The plaintiff was represented in that deposition.  Not

21  a single question about enterprise value of the company, not a

22  single question about the CRG valuation, or purported

23  valuation, whose results appear in a disclosure statement the

24  company filed, and no discussion whatsoever about, generally,

25  value of the company.

1        And we got up from that deposition in Boston, flew

2   home, and the very next deposition was the last deposition,

3   fact deposition in the case, and that was the deposition of the

4   Trust, via or under Federal Rule of Civil Procedure 30(b)(6).

5   The Trust could have designated anybody to be its witness.  It

6   could have picked Robert De Niro, it could have picked any

7   number of people, but it chose Mr. Miller as its witness.

8        And under Rule 30(b)(6), of course, the Trust then

9   undertook an obligation to prepare Mr. Miller to testify.  It

10  was not a personal knowledge deposition of Mr. Miller.  It was

11  not an expert witness deposition of Mr. Miller.  We weren't

12  seeking any testimony from Mr. Miller based on his firsthand

13  knowledge.  The Trust, of course, doesn't have a brain, it

14  doesn't have eyes, it doesn't have a mouth, so you designate a

15  witness, as you would with a corporation, to testify as to what

16  the plaintiff's knowledge was.

17       And the federal rules also required us to -- put a

18  burden on us to identify the Trust, the topics that we want to

19  inquire about with regard to the Trust, and we did so,

20  dutifully, and identified several topics that we went through

21  on our 30(b)(6) notice.  One of them pertinent to this argument

22  asked the Trust to prepare a witness to testify about the type

23  and extent of damages that any of the defendants' conduct

24  caused the Antioch Company and to explain those damages.

25       And although the Trust counsel had objected to several

1    of our topics and we worked that out through negotiations, the

2    damages topic was not one of those.

3        So understanding, based on the interrogatories and the

4    disclosures and there not having been any further testimony

5    relating to damages, the plaintiff was apparently still going

6    to stick with these two categories of damages, those being Lost

7    Value Damages and Wasted Professional Fee Damages as we

8    approach Mr. Miller's deposition, but we were ready to hear

9    whatever else they had to say about it, or I should say the

10    Trust deposition.

11        When we get to the Trust deposition, Your Honor, and I

12    brought the transcript here -- because I think it will be most

13    useful rather than for me to give you my take on what

14    Mr. Miller testified to, or what the Trust testified to using

15    his mouth -- I thought I would read a couple of the excerpts so

16    that Your Honor has a full understanding of where the parties

17    stood vis-a-vis our knowledge of the damages that plaintiff was

18    claiming at the close of discovery.

19        Now I put that, a binder, in front of you, Your Honor,

20    and also provided it to opposing counsel, of Mr. Miller's

21    deposition. And if you would be so kind, I think the most

22    pertinent -- initially, I just want to highlight the Court or

23    draw the Court's attention to three separate pages and excerpts

24    of testimony.

25        The first would be on page 84 of the deposition, Your

1    Honor, and that appears on -- they're also just page numbers on

2    the bottom, page 22 of the actual page you're looking at.  This

3    is a Min-U-Script.  And you'll see that 84 begins on the top

4    right column and there's a question here that goes something

5    like this.

6            I asked:  "Okay.  With regard to Number Three --" and

7    that number, Your Honor, refers to the number of -- it was the

8    third topic on our Rule 30(b)(6) notice -- "fees and expenses

9    paid to restructuring professionals as a result of the

10   deepening insolvency of Antioch, did the Trust calculate what

11   those fees and expenses are as of today?"

12           And the Trust answer:  "Again, that's something I

13   think we have an expert do.

14           "Question:  Well, is the answer no, Mr. Miller, that

15   the Trust has not done that yet?

16           "Answer:  The answer is no."

17           And so Mr. Miller didn't shed any further light on the

18   damages relating to wasted professional fees any more than the

19   very dim light that they shed on that category damages in their

20   interrogatory responses and initial disclosures.  And

21   Mr. Miller's deposition, I might add, Your Honor, was almost a

22   year to the day after they served those discovery responses and

23   initial disclosures.  Both were in the December twenties.

24           The next pertinent question, Your Honor, is on the

25   very next page.  It is the next set of questions, and it is

1    after Mr. Miller for the Trust answers no as to the fees, I

2    move on and ask:

3            "Okay.  Category Number Five of damages, the loss of

4    enterprise value that resulted from a tendered offer in the

5    sale process.

6            "Do you see that?

7            "Yes."

8            And then if you turn to page 86, Your Honor, there's

9    just some discussion where Mr. Miller is giving me his

10   understanding of what enterprise value is.  If you turn to the

11   very next page, which is page 23 in your binder, it is page 86

12   top left column, I asked Mr. Miller:

13           "To this date has the Trust determined what the loss

14   and enterprise value is from the company allegedly resulting

15   from the tendered offer in the sale process?

16           "Answer:  No."

17           There's only one more area that I wanted to point out

18   to Your Honor, and that's on page 81 of the deposition

19   transcripts, which is on page 21 of the document in your

20   binder.  And I reference this because the Trust, in its

21   opposition brief, only quotes, Your Honor, a very small snippet

22   of this response for the proposition that somehow they haven't

23   abandoned their interrogatory responses and that those should

24   have been sufficient to put us on notice of what their damages

25   are here, and that they weren't going to rely on an expert.

1       There's a question and an answer, and I want to pick

2  up Mr. Miller's answer right in the middle of line eleven of

3  page 81.  I had asked Mr. Miller about some -- a question about

4  damages generally, and he responds, starting at line eleven on

5  behalf of the Trust:

6       "So at this juncture where we are in a case having not

7  yet engaged or gone forward with expert testimony for, you

8  know, identifying testifying experts and that sort of stuff, I

9  think our answer is, with respect to the damages, very much

10 remain what we placed in this interrogatory," comma -- and

11 here's the key to our motion -- "that these are the various

12 categories of damages and that, you know, through the use of a

13 testifying expert, we would expect to put specific dollar

14 amounts on that."

15      So that's the pertinent testimony of Mr. Miller,

16 vis-a-vis damages, a topic that the Trust had been aware about

17 for weeks before this deposition and they were obligated to

18 prepare a witness to testify to.  They apparently either didn't

19 prepare their witness or, as they state here, they intended all

20 along to use an expert to testify about damages.

21      So we close up our books and we did this deposition at

22 the Taft law firm.  They closed the conference room, closed the

23 lights and everyone goes home and that was the end of fact

24 discovery.  That was the last day.  And we did it on the last

25 day for a very specific reason, Your Honor.  Because at that

1    point in time, there were going to be no more documents and

2    there were going to be no more witnesses to support all aspects

3    of plaintiff's case, including damages.

4            And so we walked out of the Taft law firm that day and

5    we knew absolutely nothing about the damages.  In fact, it

6    appeared that Mr. Miller's testimony, he didn't do any sort of

7    simple mathematical calculation, he didn't refer back to the

8    interrogatory and tell me, let's see Jostens is 148 and Whitney

9    is 54, and you subtract this from that, so I could

10   cross-examine him on that.  He just said no, we haven't done a

11   lost value calculation and no, I haven't looked at professional

12   fees, I think I am going to have an expert do that.

13           And we left.  We are as in the dark as the conference

14   room was when they turned out the lights as to what the damages

15   were.  But that's okay, because we were told they're going to

16   have an expert.  And expert discovery now, we were right on --

17   right at the cusp of expert discovery.  And the way we had

18   things laid out --

19           THE COURT:  What facts were you precluded from

20   discovering that would be relevant to damages?

21           MR. SCHEIER:  Well, what their damages are is probably

22   in the broadest sense.  I left that deposition and asked the

23   Trust, not Mr. Miller, I asked the Trust:  What are the

24   damages?  Have they calculated their Lost Value Damages as of

25   this date, that date being the last day of discovery?  There is

1    no ambiguity.  The answer is one two-letter word -- no.

2           So what facts do I need to cross-examine him on?  What

3    their damages were but I couldn't.  Or, that's on the lost

4    value side.  What other facts didn't I have to cross-examine

5    him on?  What were the waste of professional fees?  What

6    professionals?  Which invoices?  What amount of time?  Nothing.

7    Those are the facts I didn't have.

8           THE COURT:  Well, I understand that as to the latter,

9    but as to the former, what facts were you precluded from

10   discovering that would interfere with your ability to

11   cross-examine their simple math of taking there was an offer

12   here and a final value here and that's the loss of value?

13          MR. SCHEIER:  Because Mr. Miller told me that they

14   hadn't calculated their damages a year later.  Not my

15   responsibility to ask him:  Well, didn't you send me an

16   interrogatory?  He knew he had that interrogatory.  As of a

17   year later, they apparently -- for all I assumed, they

18   abandoned and actually it turned out that they did abandon the

19   numbers and the theory in that interrogatory.  But I asked them

20   to prepare a witness to testify as to damages.  And when I

21   asked -- when I had asked, have you calculated the loss in

22   value damages, as we sit here today, the answer was an absolute

23   unequivocal, unmistakable, N-O, no.  What am I supposed to ask

24   after that?  There's no question to ask.

25          THE COURT:  So your position is they can't prove

18

1    damages without an expert, and the expert they've come up with

2    is unreliable and there's another adjective?

3              MR. SCHEIER:  Well, he's unqualified.

4              THE COURT:  Okay.

5              MR. SCHEIER:  And he's unreliable, and that kind of

6    segues into the next step of the case.  I was anticipating the

7    day we would get the expert report, because the Trust didn't

8    have any information for me about their damages the last day of

9    discovery.  And I received, the next stage in the case, I

10   received Mr. Greenberg's report.

11             Now, I don't know if you looked at it, Your Honor, but

12   the report is a mess.  More than half of the report deals with

13   issues that are no longer in the case and Mr. Greenberg was

14   engaged after those weren't in the case, those being the 2003

15   transaction, and much of what he had to say about that was just

16   flat out wrong factually and from a mathematical calculation.

17   But I don't want to waste my time talking about that because

18   those claims aren't live.

19             When you read the rest of the report which, by the

20   way, was nothing more than -- it was noncompliant with Rule 26.

21   It didn't list his opinions nor did it cite the record at all.

22   It was really nothing more than a narrative form of their

23   amended complaint.

24             So you read through it, and I'm still searching for a

25   damages opinion.  I don't think there was one, but to be

1  charitable, when you look at the very last sentence of the

2  report, 25-page report, I've read through now 25 pages, I get

3  to the last sentence -- and I've left that for you up there

4  too, Your Honor.  There's a binder with Mr. Greenberg's report.

5  And what I read when I got to the very last sentence of

6  Mr. Greenberg's report, page 25, he wrote:  Mismanagement of

7  and interference with the sale process by the directors and

8  their advisers caused the company to lose the opportunity to

9  realize between twenty and thirty million dollars in value and

10  to waste $6 million of professional fees.

11        Okay.  Is that an opinion?  I don't know, but it seems

12  to be, charitably, a stab at a damages opinion.

13        So with that in mind, the next event in the case was

14  Mr. Greenberg's deposition, and of course, based on the fact

15  that I received no factual testimony from the Trust as to their

16  damages, I didn't hear about a simple mathematical calculation,

17  I didn't hear about offers, I didn't hear about enterprise

18  value.  I heard only -- I heard, and I think it's pointed out

19  by the record, that an expert will tell me all about their

20  damages.

21        I got that one sentence and I went in to the

22  deposition.  And in that deposition, because the report was not

23  compliant, one of the first questions I asked Mr. Greenberg

24  was:  What opinions are you going to be giving at trial?

25        And there was some wrangling by the -- by counsel, but

1    finally Mr. Greenberg got around to listing eight opinions.

2    And I believe they start at page 111 of his deposition

3    transcript, and I won't burden Your Honor with going through

4    those, but I can tell you that only three of those opinions

5    related to the sale process.  And they were that the so-called

6    dual track was detrimental to the company, the Board of

7    Directors should not have allowed Lee Morgan to participate in

8    the sale process or considered his offers; and then the Board

9    of Directors did not heed the advise of its advisers; and J.H.

10   Whitney was the best offer out there, that it wasn't acted on,

11   that's my opinion.

12         So he didn't articulate in the deposition under oath

13   any opinion that I could decipher as relating to damages.  But

14   you know what?  I gave him the benefit of the doubt that maybe

15   he forgot that one sentence as it appears in his report.  So I

16   went ahead, because now I've been led to believe that that one

17   sentence must be his damages opinion, and I cross-examined him

18   on the J.H. Whitney $54 million offer, the -- this concept of a

19   CRG valuation at somewhere between 31 and 38 million, don't

20   know if it is 32, 33, 34, 35, 36, somewhere in that range.  And

21   we've briefed Your Honor at length in response to those

22   questions.  Did no analysis of any of those numbers, basically

23   just plucked them out of a couple different documents, did 54

24   minus, who knows, some number between 31 and 38, and he

25   believes that's going to be his damages -- he believes those to

1  be the damages on lost value.

2        I'm not -- unless you have questions, I think it is

3  pretty clear that what we believe about his testimony and those

4  numbers, they are unreliable and he brought to bear no

5  methodology in arriving at those numbers.

6        And what's worse is sticking with, again, the

7  two-category damage analysis that we first learned back in

8  December 2011.  Mr. Greenberg said, yeah, $6 million in

9  professional fees.  But he never saw an invoice, didn't

10 understand what professionals, when, for which board, what they

11 did, said that some of them did give value, some of them didn't

12 give value but has no idea.  Just a number plaintiff's counsel

13 gave him.  And the $54 million?  Just some hearsay number out

14 of -- out of a letter of intent.

15        And this is where we were left at the end of

16 Mr. Greenberg's deposition, a testimony -- no fact testimony as

17 to damages, and only an expert's testimony that didn't seem

18 reasonably related to any facts or the admissible facts in the

19 record.  And that, Your Honor, that entire -- that entire

20 chronology I just gave you was to try to focus the Court on why

21 we filed our motion and what the record looked like when we

22 filed our motion.

23        And I don't think I need to, you know -- the papers

24 are what they are and you read them.  The important next event

25 is the opposition brief.  I get the opposition brief and it

1   appears that plaintiff is, once again, done kind of a little

2   bit of a soft shoe and has shifted positions again.  They seem

3   to have abandoned Mr. Greenberg as an expert damages witness

4   because, hey, it is just simple math.  Simple math that the

5   Trust couldn't tell me about six months earlier in their

6   deposition, and now it is just simple math.

7           And guess what?  The only thing Mr. Greenberg is

8   actually going to testify to is an opinion he never gave.  In a

9   passing remark he said something like -- and we can look at it

10  in a moment -- the $54 million offer, if there was an Asset

11  Purchase Agreement ever closed, and if there was a 363 sale

12  would have been the minimum that the company would have gotten

13  in a 363 sale.  That's it.  It's not an opinion.  It's in

14  response to a question I asked him, and it was two hours into

15  the deposition.

16          And it was really in response to me asking him:  Can

17  you guess what might have -- can you give me a guess as to what

18  the real value of the J.H. Whitney offer was?

19          And he said, yeah, you know, my guess is that they had

20  done some due diligence -- no, I asked, rather, whether he knew

21  for certain that the J.H. Whitney deal or proposed transaction

22  yielded $54 million to the company.  And he said, frankly, he

23  didn't.

24          And to kind of drive home that point of where we are,

25  I get now an opposition brief for the only opinion I'm being

1    told he's going to give, is that the $54 million was the

2    minimum bid the company would have gotten, the 363 sale with a

3    citation to his testimony.

4             And I thought to myself, I don't really recall that

5    being an opinion, and lo and behold it's not an opinion in his

6    report, it's not an opinion in his deposition.  And if Your

7    Honor would indulge me, I put before you a binder with

8    Mr. Greenberg's deposition, and I would like to just have us

9    take a look at just a brief question and answer session on

10   pages 294 and 295, the numbers at the top right corner.

11            THE COURT:  Very well.

12            MR. SCHEIER:  Thank you, Your Honor.

13            On 294 I begin at line eleven where I ask:

14            "Do you recognize that the $54 million price that

15   Whitney had stated in that letter of intent was contingent on

16   additional due diligence by Whitney and ultimately the closing

17   of a definitive agreement?

18            "Answer:  Yes, which is more than customary.

19            "Question:  And you don't know one way or the other,

20   if the Board of Directors accepted that offer, that the company

21   would actually realize the $54 million amount of consideration

22   that is set forth in Whitney's letter of intent, correct?

23            "Answer:  There's no way to know that."

24            And then I asked:  "And there's certainly no evidence

25   in this record to venture a guess?"

1        I didn't even think he could guess.

2        And Mr. Greenberg's answer was:  "Well, they did a

3   substantial due diligence."

4        This is on 292, line two.

5        "They did substantial due diligence.  If it went -- if

6   it went into an APA --" which, in his vernacular, is an Asset

7   Purchase Agreement, he says:  "If it went into an APA into a

8   363, it would have been a guaranteed bid."

9        And then we cut each other off a little bit and then

10  is the quote you see in their opposition brief.  He says:  "The

11  worst it would have been, would have been $54 million if there

12  wasn't anybody else stepping up to the option of the 363 sale."

13       So, and then I asked him a question at 11:  "Although

14  J.H. Whitney never, by way of definitive agreement, agreed to

15  pay $54 million because it never actually completed its due

16  diligence, correct?

17       "Answer:  They'd done a fair amount of due diligence

18  ahead of that, but --"

19       And then I asked:  "Did you see any evidence that they

20  completed their due diligence on the $54 million price?"

21       And on line 21, Answer:  "There's no way to know that

22  would be the final price."

23       So, right now, as we sit here today, I'm told that's

24  all they want Mr. Greenberg to testify to before a jury as an

25  expert.  And I'm here to argue, A, it is not an opinion.

1  That's not the way litigation should go where I find out in

2  his -- I find out in an opposition brief what his opinion's

3  actually going to be, and it is not an opinion that he gave me

4  in his deposition or in his report, completely different

5  opinion, and it is so narrow that I never even thought of that.

6  When I went in the deposition, that was never their position.

7        And that just came out based on a back and forth of a

8  witness, and you look at that and you try to figure out even,

9  again, being charitable, that it is some sort of a, quote,

10  unquote, opinion, it is really not based on -- he's not

11  qualified to give such an opinion because -- and even though in

12  their brief they say something like, Scheier can't even, he

13  doesn't even have the gall to question Greenberg's

14  qualifications to say that the $54 million was going to be a

15  minimum bid.

16        But when I checked to see what they cite for his

17  qualification to talk about a 363 transaction, you go into --

18  they cite page four of his report.  Now when you look at page

19  four of his report, Your Honor, all it says is that -- and I

20  have it here and I invite you to have a look at it if you think

21  it would be useful.

22        But this is what they cite, even assuming that that's

23  an opinion that they can give to a jury, that he can give to a

24  jury, that the $54 million would have been the minimum bid, the

25  only thing they cite is page four of his report.

1            And I scanned page four of the report, and I'm looking

2     for what this guy Greenberg has done vis-a-vis 363 sales, and

3     the first time I see something about a 363 sale is in the third

4     paragraph under the heading talking about the firm,

5     Silverstone.  And the only reference is that in addition to

6     some other things, quote, Silverstone acts as an investment

7     banker in Section 363 sales under Chapter 11 bankruptcy.

8     That's the company.

9            You go to the next paragraph and it talks about

10    Greenberg and his qualifications.  Not a mention of 363, not a

11    mention of bankruptcy.  He didn't testify about 363.  As far as

12    I can tell from this report and his deposition testimony, the

13    first time he heard the 363 was when he was scribbling out what

14    Silverstone does, and he has a couple of partners there.

15           So frankly, I don't think there's any -- the

16    plaintiff, whose burden it is to prove that this witness has

17    testified, even in their new-found opinion, that $54 million is

18    a valid data point to measure damages, hasn't put forth any

19    evidence that I can see that this witness is qualified to opine

20    on what ultimately a transaction would look like had it in fact

21    closed through 363.

22           THE COURT:  Well, bear with me on this.

23           MR. SCHEIER:  Yes.

24           THE COURT:  Based on his knowledge and experience as a

25    professional dealing with letters of intent, purchase offers,

1  due diligence and Section 363 sales, he proposes to testify

2  that the J.H. Whitney 54 million letter of intent was a

3  reliable estimate of what the deal would have been worth at

4  closing.

5         Now, whether or not he has any damages -- experience

6  to be a damages expert based on his life work, is he not in a

7  position to say that the letter of intent was a reliable

8  estimate of what the deal would have been worth at closing?

9         MR. SCHEIER:  Not in the context of a 363 sale he

10 doesn't.

11        THE COURT:  Because he didn't identify any work in

12 that area?

13        MR. SCHEIER:  None in that area.

14        THE COURT:  Okay.

15        MR. SCHEIER:  But he's got other problems with the

16 fact that he's not qualified.

17        THE COURT:  Well, isn't the real problem that this

18 $54 million letter of intent from J.H. Whitney is hearsay?  And

19 there's nobody from J.H. Whitney who has testified to it?  And

20 Mr. Greenberg did not analyze the reliability of it at all, he

21 simply accepted it as true?  How in heaven's name does that

22 hearsay come into evidence?

23        MR. SCHEIER:  I agree, and you saw we briefed that.

24 There's no way it comes into evidence.

25        And by the way, Your Honor, there is no evidence that

1  J.H. Whitney was ready, willing and able to close at

2  $54 million.  Zero.  Not a piece of testimony.  Not a piece of

3  paper that indicates they were ready, willing and able to pay

4  $54 million in cash if there was no better deal offered at a

5  363 auction and bankruptcy.

6          So not only is the letter of intent hearsay itself,

7  because they would be attempting to get it in for the truth of

8  the matter asserted, but what they really need is evidence from

9  J.H. Whitney that, yes, we were ready, willing, and able to

10  close, but -- and then something happened and it is that,

11  whatever happened, it's one of the defendants' fault.  There's

12  no evidence like that.

13          And what you see in their brief is that somehow,

14  because my client purportedly took action to fire the board --

15  which -- well, I'll accept that for now, I'll even except their

16  conspiracy theory for now -- that their action is what killed

17  the Whitney proposal.  There's absolutely -- and they say

18  that's why they should not be precluded from entering into the

19  evidence Mr. Greenberg's prognostication as to how that deal

20  would have turned out.  The truth of the matter is the way they

21  could have proven that the $54 million -- that LOI would have

22  been over the $54 million would be to depose J.H. Whitney, and

23  nobody stopped them from deposing J.H. Whitney by way of

24  documents or by way of testimony.

25          And so the claim in their brief that somehow my

1    client's action or actions of other non-defendants in the case

2    should not be held against them, that they can't definitively

3    show or that Greenberg can't say with certainty that that deal

4    would have closed is -- well, I probably shouldn't use the

5    word, and I won't, but it is just not -- it is not a credible

6    argument, because the plaintiff had one solid year, if not

7    longer, to talk to someone at J.H. Whitney, to get an in-court

8    declarant that would have been able to tell us everything about

9    what J.H. Whitney was thinking, how they got to the

10   $54 million.  Was it really a reflection of the company's

11   enterprise value?  Were they really going to pay $54 million?

12          And by the way, by the way, Mr. Greenberg notes that

13   the only reason, the only basis for his, quote, unquote,

14   opinion that the $54 million deal would have closed is because

15   J.H. Whitney had done a substantial amount of due diligence.

16          Recall the letter of intent.  The inadmissible letter

17   of intent was just that -- a nonbinding letter of intent.  And

18   he said, well, they did a lot of due diligence and, in my

19   experience, once you're that far down the road in due diligence

20   you're pretty close to that number.

21          I have to tell you, Your Honor, you can comb that

22   record clean.  There is no evidence of what J.H. Whitney did or

23   didn't do vis-a-vis due diligence.  That is nothing more than

24   rank speculation and self-serving words that's nothing more

25   than now being the plaintiff's position.

```
 1          So there are so many problems, other than just the
 2   hearsay problem, that they have now with this extremely narrow
 3   opinion that they've called upon Mr. Greenberg to give that
 4   there's really no -- from our perspective, you can tell from
 5   our papers, there's really nowhere for them to go in that
 6   regard.  And he's not in a position -- Mr. Greenberg is not in
 7   a position to support any damages calculation they could offer.
 8          And as a result, it's our view that, first, that they
 9   abandoned him as an expert; but, if you want to give credence
10   to that one sliver of an opinion, it's not even something that
11   they could ever get to a jury, and so we would ask the Court to
12   grant our motion to exclude Mr. Greenberg.
13          Happy to talk about the implications to that going
14   forward in the case.  I don't know if the Court wants me to do
15   that now or today at all, because that bleeds into our summary
16   judgment motion on damages.  But the Court -- I await the
17   Court's direction on how to proceed further.
18          THE COURT:  The issue as to whether J.H. Whitney would
19   have actually closed on the letter of intent and whether this
20   expert takes into consideration that, why isn't that a subject
21   for cross rather than admissibility?
22          MR. SCHEIER:  Well, like I mentioned to Your Honor,
23   we're at the summary judgment stage now.  And the question is,
24   really, whether there's evidence to take to a jury.  And there
25   is no admissible evidence.  We've cited you a myriad of Sixth
```

 1  Circuit cases that hearsay matters on summary judgment.

 2          THE COURT:  I thought experts could rely on hearsay.

 3          MR. SCHEIER:  Experts may be able to rely on hearsay,

 4  but then you have to determine whether or not the expert did

 5  any diligence or any investigation of what that hearsay is.

 6          THE COURT:  And the reliability of the hearsay

 7  statement?

 8          MR. SCHEIER:  Checking out the reliability of the

 9  $54 million figure, to checking that the record shows that

10  there was actually due diligence done in approaching that

11  number.

12          THE COURT:  So experts can rely on hearsay but they

13  have to do more than simply accept it at face value; they have

14  to analyze its reliability.

15          MR. SCHEIER:  Well, it also has to be tied to the

16  facts of the case.  They're really, the only inadmissible

17  document here is the offer itself, is the J.H. Whitney letter

18  of intent.  All that tells us is that J.H. Whitney offered

19  $54 million.  And Mr. Greenberg goes on to say that the

20  $54 million would have been the minimum amount that the company

21  could have realized at a 363 sale, but he doesn't have the

22  expertise to say that.  Nor is there any basis in fact for his

23  factual basis saying that they did due diligence and they were

24  far down the path in due diligence.  But there's no --

25  actually, there's no evidence of that at all from J.H. Whitney,

1  which is who you have to get it from.

2          THE COURT:  And the other problem is that you have the

3  J.H. Whitney number and then you have to have a number to

4  subtract from it.  And they proposed to subtract from it the

5  number that arose out of the bankruptcy proceeding?

6          MR. SCHEIER:  And that was kind of another slight of

7  hand that threw us for a loop, in light of the history that I

8  related to Your Honor, from the point of the disclosures to the

9  point of the deposition.

10          In the opposition brief, again, they've taken another

11  turn.  It is not fair.  I'm litigating, I'm chasing ghosts all

12  the time.  And once I catch the ghost and try to get my arms

13  around it, there's another aberration set up I have to chase.

14  Now Greenberg is not going to testify about the 54 million.  He

15  was told to assume it as a fact.  And they write in their brief

16  that the bankruptcy -- as if this somehow affects its

17  admissibility.  They write in their brief that the bankruptcy

18  court adopted that number as the company's enterprise value?

19  Nothing of the sort, Your Honor.  It is contained in a piece of

20  hearsay, the disclosure statement, that, in itself, contains

21  hearsay, and that's the CRG valuation.

22          And unlike J.H. Whitney, that they didn't go bother to

23  depose and seek documents from, they deposed CRG and didn't ask

24  him a single question about their valuation.

25          It's absolutely inadmissible.  He has done no -- as

1  you saw in our brief, I asked him several questions about that

2  number.  He accepted it blindly.  And now, in their opposition

3  brief, I learned, let's just assume fact.

4       Guess what?  You have to prove, you have to prove the

5  assumed fact is actually in the record.  And we're at the

6  summary judgment stage.  No more playing games now.  There's no

7  more initial disclosures and no more interrogatories.  We're at

8  the summary judgment stage.  There is no basis to get that CRG

9  valuation in front of a jury to consider.

10      THE COURT:  Because it's hearsay?

11      MR. SCHEIER:  Because it's hearsay and there's no

12 credible way that they can argue Mr. Greenberg can rely on that

13 number, because he did nothing in terms of investigating the

14 CRG valuation.  He didn't even see the valuation itself.  He

15 didn't see the valuation.  He didn't see CRG's underlying work

16 papers.  He doesn't know who at CRG did the valuation.  He

17 doesn't know what financial assumptions were built into the CRG

18 valuation, nor does he know what financial data the company

19 gave to CRG to work up those valuations.

20      Nor -- get this.  Nor did Mr. Greenberg get the

21 opportunity to look at Mr. Miller's and Ms. Andrew's Periculum

22 report that they commissioned in the bankruptcy that indicated

23 the value of the company was probably, at a minimum,

24 $80 million and possibly up to $100 million in enterprise

25 value, and that was a real expert report.

1    So when Mr. Miller and Ms. Andrew want to commission

2 an expert to value a company, they know how.  And it ain't on

3 my say so.  You just have to look at the Periculum report that

4 we put in the record, and they didn't even bother to show that

5 to Mr. Greenberg.

6    So the guy was told nothing other than to look at a

7 number in a disclosure statement and base his -- what clearly

8 was going to be a damages opinion.  When you look at that

9 report, there's no other way to read it.  That was their best

10 stab at it.  He was told to rely on that and he did nothing to

11 verify anything about the credibility of that number.

12    And that's where we are, Your Honor.

13    THE COURT:  So the plaintiff Trust is relying upon

14 this bankruptcy number of 31 or 32 to 38, and yet, in another

15 piece of related litigation, they hired an expert to attack the

16 credibility and reliability of that number?

17    MR. SCHEIER:  That's precisely what happened.  And we

18 put that before you.  They were prepared -- they say they never

19 sponsored the witness actually getting on the stand and

20 testifying?  They certainly sponsored that report and paid good

21 money out of Antioch's treasury.  Don't forgot, they represent

22 creditors.  Their legal fees, expert fees, are funded out of

23 Antioch.  Antioch paid Periculum.  I don't know how much, but

24 that's a real expert report, to do discounted cash analysis, to

25 consider the firm's financial projections, and they chose not

1    to disclose that to the court.

2            But more importantly, I'm not here to quibble with

3    them over that issue.  I find it astounding that they didn't

4    provide that to their expert in this case.

5            And by the way, you say it's related.  It is basically

6    the same litigation.  It is really the same litigation.  The

7    question is what the value of Antioch was at any given time.

8            And by the way, I might add, Your Honor, just so you

9    understand what that 30 to 38 million dollar number is, that

10   appears to be or purports to be the valuation of the

11   reorganized company as of the petition date.  It is not even --

12   I mean, on its face, it is not even a valuation of the company

13   that existed that's the subject of this litigation.

14           It is all messed up.  It really is.  What it is is a

15   product of an inability to stake out a position and work with

16   it.  They're always -- the Trust is always reacting.  And

17   that's -- this is where you end up when you're not -- when

18   you're just reactionary basically.  You end up where they are

19   today which, from our perspective, is without a damages'

20   expert, multiple representations that they will use an expert

21   thereby foreclosing discovery, and at this point unable to

22   prove the most critical element of every single cause of action

23   in a complaint -- damages.

24           THE COURT:  So your position is, you'll state it to me

25   in five sentences or less, that if the Court excludes this

1  expert witness, the case is over?

2          MR. SCHEIER:  Yes, sir, except for, as we noted, a

3  few, a number of low value preference claims and a claim for

4  fees paid to Condor Insurance Company of about $1.1 million.

5          THE COURT:  Are you relying on any legal authority

6  that if I preclude the expert, they can't prove damages and,

7  therefore, the case is amenable to dismissal?  Are you relying

8  on any legal authority other than the *Info-Hold* decision?

9          MR. SCHEIER:  The *Info-Hold* decision, the *Cole*

10  decision, several other cases we cited.  I will admit to the

11  court that I didn't write them down, but they're in our papers.

12          THE COURT:  You understand *Info-Hold* is in the Court

13  of Appeals?

14          MR. SCHEIER:  I did understand that it is on appeal.

15  There's also *Cole* authority.

16          But the bottom line is I really don't -- I'm also

17  relying on general concepts of evidentiary -- of the Rules of

18  Evidence.  I mean, what I can tell you that maybe the *Info-Hold*

19  parties didn't have is I can tell you, Judge, even if you

20  don't, even if you exclude them, let's analyze whether they can

21  prove their damages any other way.  I'm willing to have that

22  discussion.  They can't.

23          What are they going to do?  They gonna -- they can't

24  use the 54 million and the 31 million.  You don't even have

25  that out, that an expert can rely on inadmissible hearsay

1  because then there is no expert. They would just be putting on

2  or try to put on factual evidence. But like I said, there is

3  no in-court declarant from J.H. Whitney to talk about that to a

4  jury, and there's no one from CRG that can talk about that,

5  that is going to come into court and talk about the valuation.

6  So you can't get that in front of the jury.

7          There again, in terms of chasing ghosts all over the

8  landscape, there are hints in their opposition brief that they

9  still might talk about the November 2007 expressions of

10  interest from Suns and Jostens, but how are they going to get

11  that in front of the jury? The only evidence of that in the

12  record is a presentation that Houlihan made at some point in

13  2007 and 2008.

14          So you have a double hearsay problem. They have no

15  basis, even if you say they're not estopped and they're not

16  waived because, you know, lack of concepts or we're unsure

17  about what the circuit is going to do with your holding in

18  *Info-Hold* in that regard. Here, I'm saying, put the prejudices

19  aside. I don't have to show prejudice, by the way, under

20  Rule 37, but put it aside and look at how are they going to get

21  any damages into evidence? There's no admissible evidence of

22  damages in the record, and that is the basis of our summary

23  judgment motion.

24          But because they raise the issue in opposition, we

25  briefed it at length on this specific motion to exclude in our

1    reply brief.  There is no way they can get the expressions of

2    interest in front of the jury that I can conceive of.  Maybe

3    Ms. Andrew will enlighten us.  There's no way to get the

4    $54 million letter of intent in front of the jury, and there's

5    absolutely no way to put before the jury the valuation, or the

6    purported valuation, of the CRG group.

7            So at the end of the day, Your Honor, you don't have

8    to stick your neck out and on some technicality say, hey, say

9    to them, you're out because you represented you were going to

10   use an expert and you didn't.  I think that's a good basis and

11   a solid basis on the cases that you cited in *Info-Hold*, on the

12   cases *Cole* cites as a matter of fundamental fairness, to my

13   clients as well.  But it's also justifiable because when you

14   peel that onion away and say, all right, I'm going to forgive

15   them those sins, I'm going to forgive them those sins, let me

16   see what they've got, they got nothing to prove damages.

17           THE COURT:  Very well.  Are you able to enter an

18   appearance in the Court of Appeals on *Info-Hold*?

19           MR. SCHEIER:  Well, maybe it would give me an

20   opportunity to enter one here, but whatever Your Honor needs,

21   I'm at your service.

22           THE COURT:  Very well.  Let the record reflect you

23   took 50 minutes --

24           MR. SCHEIER:  Five zero?

25           THE COURT:  -- on a 30-minute estimate.

1    MR. SCHEIER:  But I did give you the percent.  I

2    typically underestimate by 10 to 50 percent.

3    THE COURT:  So 50 percent of 30 is 15, that gets us to

4    45.

5    MR. SCHEIER:  That's -- I --

6    THE COURT:  You may be seated.

7    MR. SCHEIER:  I learned my math from the Trust.

8    THE COURT:  Very well.

9    Ms. Andrews, if you're still breathing.

10   MS. ANDREW:  Thank you, Your Honor.  I don't know what

11   you prefer, if I start by --

12   THE COURT:  I'm really worried about this.  I don't

13   understand how you're going to get into evidence J.H. Whitney,

14   and I don't understand how you're going to get into evidence

15   the number 32 to 38 and then do the simple math.  That's why I

16   set this for oral argument.  It's causing me extraordinary

17   pause.

18   MS. ANDREW:  Okay.  Well, why don't I start, then, by

19   going right into trying to respond to some of the concerns you

20   raised during Mr. Scheier's argument?

21   THE COURT:  How are you going to get those hearsay

22   statements into evidence?

23   MS. ANDREW:  Well, to begin with, all of the

24   expressions of interest were produced in this case.  They were

25   deposition exhibits.  There was testimony about them by

1    numerous witnesses in the case.

2          THE COURT:  That doesn't affect the hearsay analysis,

3    does it?

4          MS. ANDREW:  Well, these are testimony by Houlihan's

5    representative that brokered and solicited the expressions of

6    interest, that talked to J.H. Whitney about them, and by the

7    members of the Board of Directors who received and considered

8    the expressions of interest.

9          THE COURT:  The J.H. Whitney letter of intent is an

10   offer from J.H. Whitney.  How does that statement of Whitney

11   come into evidence?

12         MS. ANDREW:  Well, it is an expression of the value

13   that the market was placing on the company.  This is a company

14   that --

15         THE COURT:  J.H. Whitney needs to say that, right?

16         MS. ANDREW:  Well, J.H. Whitney has been listed as a

17   potential -- representatives of J.H. Whitney were listed by the

18   Trust as a potential witness on witness identification lists

19   early in the case, as were representatives of Sun and Jostens

20   and Marlin.  The defendants did not choose to depose those

21   people, but they are on the potential witness list.  And

22   there's been extensive testimony in deposition testimony about

23   these expressions of interest.

24         THE COURT:  I don't care about the testimony about

25   them.  I want to know how the estimate, the offer of J.H.

1   Whitney, is coming into evidence.  And what I'm hearing is,

2   they're on our witness list.  We're going to call them at

3   trial.  Is that the answer?

4          MS. ANDREW:  That is a possibility, as well as all of

5   the other testimony that's already been taken on those

6   expressions of interest and Houlihan's discussions with Whitney

7   that came to that point of bringing forth a written expression

8   of interest to the company.  Houlihan did --

9          THE COURT:  We must be --

10          MS. ANDREW:  -- an exhaustive --

11          THE COURT:  We may be -- we must be passing in the

12   night and missing.  I mean, this is -- I wasn't very good at

13   it.  This is an evidence question.  This is a hearsay.  This is

14   a statement, an out-of-court statement by Whitney that we'll

15   offer 54 million, and you want to offer that for the truth of

16   the matter.  How are you going to get that into evidence?

17          MS. ANDREW:  Because we can have evidence, testimony

18   of the conduct around the statement and that the parties were

19   proceeding forward to close the deal, to they exchanged Asset

20   Purchase Agreements and further conduct of the parties --

21          THE COURT:  I make an out-of-court statement.  You

22   want to put it into evidence for the truth of the matter.

23   You're going to do that by saying what everybody else said

24   about my statement?

25          MS. ANDREW:  Well, what everyone else did about your

1   statement, the conduct of the parties is evidence.

2           THE COURT:  Okay.

3           MS. ANDREW:  It's evidence.  You know, this was a

4   company that was declining in value throughout the time that

5   they were trying to sell it.  Their sales were continuing to

6   decline and it was what several witnesses, including

7   Mr. Spencer of Houlihan, have called "to catch a falling knife"

8   scenario, where parties didn't know where the sales decline was

9   going to end.  And so it is difficult to do traditional

10  valuations of a company, discounted cash flow type of

11  valuations where you need to know historical sales and earnings

12  and projected sales and earnings.  And the company, at that

13  time period, seemed unable to accurately project sales, even

14  month to month.

15          THE COURT:  So why don't you hire an expert to value

16  the company at that time?

17          MS. ANDREW:  Well, an expert -- any expert would be

18  faced with that same problem.  There was no good data coming

19  out of the company during that time period because it was the

20  catch a falling knife.  Everything was changing week to week,

21  month to month, irreliable forecasts.

22          And so an expert looking at that couldn't have done a

23  reliable discounted cash flow analysis at any point in time.

24  So instead, what Mr. Greenberg did is, let's look at what the

25  market was actually saying, given the chaotic situation at the

 1 │ company.  Houlihan did an exhaustive sale process.  They

 2 │ canvassed more than 100 potential purchases in the first phase

 3 │ and more in the second, and this is what they were coming

 4 │ forward with was their expressions of interest.

 5 │            THE COURT:  So you're telling me that nobody could

 6 │ ever value the company accurately because it was a knife

 7 │ falling to the floor?

 8 │            MS. ANDREW:  Not in the traditional ways that these

 9 │ financial people do discounted cash flow.

10 │            THE COURT:  Then how are the fact finders going to

11 │ value the company?

12 │            MS. ANDREW:  A jury can look at the fact that there

13 │ were buyers who made offers --

14 │            THE COURT:  You better get those offers into evidence.

15 │            MS. ANDREW:  I understand, Your Honor.

16 │            THE COURT:  And how are you going to do that?

17 │            MS. ANDREW:  -- who were looking to move forward.  And

18 │ then, in a bankruptcy auction, bid up the price or bid in

19 │ additional liabilities might have been assumed that these

20 │ are -- there's evidence beyond Mr. Greenberg of what happens in

21 │ a bankruptcy sale process and that it is very typical for the

22 │ price to go higher.  And a jury could look at that and make a

23 │ reasonable estimate of if they believe, based on the facts

24 │ before them, that if the bankruptcy process had been allowed to

25 │ proceed with J.H. Whitney, the 363 auction, whether there would

1   have been a purchaser and at what price.

2           THE COURT:  So that's the 54-ish?  That's the top end?

3           MS. ANDREW:  That's the 54-ish --

4           THE COURT:  How do you get the bottom end in?

5           MS. ANDREW:  That's not the absolutely top end.  The

6   bottom end is, and perhaps Mr. Scheier just doesn't understand

7   what we're saying, and we'll give him the benefit of the doubt

8   on that --

9           THE COURT:  And I don't like that sort of stuff, but

10  he started it.  Go ahead.

11          MS. ANDREW:  He did.

12          This company, there's not speculation about what

13  happened ultimately to the company.  It went into bankruptcy.

14  It went through a pre-packaged plan of reorganization in Dayton

15  bankruptcy court.

16          The pre-packaged plan of the organization treated some

17  classes of unsecured creditors differently than others, which

18  is a no-no in bankruptcy court.  Similarly-situated unsecured

19  creditors need to be treated the same, so they all get one cent

20  on the dollar, or they all get nothing.

21          This plan called for trade creditors that the company

22  wanted to pay to keep doing business with to be paid in full,

23  and other unsecured creditors, including the subordinate

24  noteholders who Mr. Morgan represents and the ESOP noteholders,

25  to get nothing.  And in order to do that, the debtor and CRG,

1   its restructuring adviser, had to persuade the court that the

2   value of the company as it entered bankruptcy was worth less

3   than the total amount of the secured loans, which was in the

4   neighborhood of, excuse me, of $42 million at the time that the

5   company entered bankruptcy.

6        And so that was the purpose of CRG's valuation in its

7   disclosure statement was to prove to the court this company is

8   worth less than we owe the secured creditors and, therefore,

9   they can choose.  It is really their money, and they can choose

10   to pay some of these secured creditors and others and you, the

11   court, should approve this.

12        We, on behalf of the unsecured creditors, "we" being

13   Taft, did retain Periculum to try to do valuation of the

14   company going forward.  Not the company that was in bankruptcy,

15   but what was the value of the company going forward as a going

16   concern?  To argue that it was actually worth more than the

17   value of the secured loans and, therefore, the court could not

18   accept the plan of reorganization that was proffered by the

19   company and the secured lenders.

20        The court rejected that.  Mr. Scheier would like to

21   tell you that the court did not, quote, adopt CRG's report but

22   the court did confirm the plan of reorganization, which was

23   based on that concept that the company was worth less than the

24   amount of the secured debt.  And, in fact, if you look at the

25   order of the confirming the reorganization, which is a judicial

1    order, this Court can take judicial notice of an order of a

2    district court.  The bank, the secured lenders, received

3    rollover loans in the amount of $31 million, even though they

4    were owed more than that.  And then they received preferred

5    equity in the reorganized debtor.  And that's it.  They didn't

6    receive any other value.  The unsecured creditors received

7    junior equity in the reorganized debtor, if they chose to opt

8    in and waive claims against certain parties.

9           Those, the equitable value, both the preferred and the

10   junior, turned out to be worth nothing because the company then

11   entered the second bankruptcy a year ago.

12          So the actual value of the company is not speculative.

13   We know the bottom end.  The bottom end is the company went

14   into bankruptcy and the secured lenders got 31 million of their

15   loans rolled over and perpetuated and eventually those were

16   paid off.

17          But all other value of the company was wiped out by

18   that bankruptcy.  And so that's not a speculative number.

19   That's not hearsay.

20          THE COURT:  What number are you speaking of?

21          MS. ANDREW:  I'm speaking of the $31~million loans to

22   the secured lenders and --

23          THE COURT:  And that reflects a bottom end valuation

24   of the company?

25          MS. ANDREW:  Yes; yes, Your Honor.

47

1              THE COURT:  And that's reflected in the Order of

2   Confirmation?

3              MS. ANDREW:  Yes.

4              THE COURT:  The Order of Confirmation says that the

5   creditors get 31 million?

6              MS. ANDREW:  It listed it all out.  It listed what the

7   banks had going in, the balance of their loans, what the loans

8   would be coming out.

9              THE COURT:  And what statement says that because these

10  creditors got 31 million that's the bottom end of the valuation

11  of the company?  What valuation opinion is reflected in the

12  Order of Confirmation?

13             MS. ANDREW:  Perhaps I'm not following your question.

14             THE COURT:  What number are you trying to get out of

15  bankruptcy?  You're trying to get a number to subtract from the

16  54 million, right?

17             MS. ANDREW:  Right.

18             THE COURT:  And you're getting to 31.

19             MS. ANDREW:  So I'm getting to 31, and the reason it's

20  not a hard flat 31 is somebody could argue, well, the secured

21  lenders also got this preferred equity that you could say had

22  some value at the time, even though it turned out to have no

23  value.

24             THE COURT:  Who states the opinion that at the time of

25  the bankruptcy the valuation of the company was 31 million?

1    MS. ANDREW:  Well, it is not an opinion.  It's a fact.

2    THE COURT:  And that fact is reflected in the truth

3 that the creditors got 31 million?

4    MS. ANDREW:  Right.  Yes, Your Honor.

5    THE COURT:  And who is going to explain that to the

6 jury?

7    MS. ANDREW:  Well, any number of witnesses could

8 explain that.

9    THE COURT:  Well, give me one example.

10    MS. ANDREW:  One example would be the trustee of the

11 Trust, Mr. Miller.

12    THE COURT:  So what are your damages?

13    MS. ANDREW:  Well, our damages are --

14    THE COURT:  In terms of lost valuation of the company.

15    MS. ANDREW:  In terms of loss of value of the company,

16 as a minimum, the difference between the $31~million floor and

17 the $54~million Whitney offer, with the potential that that

18 could have actually been higher through the auction process in

19 bankruptcy court.

20    THE COURT:  How could it be higher?

21    MS. ANDREW:  Because we know for a fact that we had

22 two other bidders still alive at the time, Marlin and Monomoy,

23 who would have been likely to have bid in an auction process.

24 You would have had at least three companies, if not more,

25 bidding to purchase the assets of the company.  And that

49

1   process would have been likely to bid up the price or, equally

2   relevant in this situation, a bidder could have said, I won't

3   pay more in cash but I will -- I will assume liability for some

4   percentage of these other unsecured creditors, the ESOP notes

5   or the subordinate numbers.

6       THE COURT:  So what number changes, the 54 or the 31?

7       MS. ANDREW:  The 54 could go higher, and it is our

8   position that a jury could reasonably determine that, based

9   on --

10      THE COURT:  That someone would come in and offer more

11  than J.H. Whitney?

12      MS. ANDREW:  Correct, Your Honor.  Based on evidence

13  in the record that there were at least two other parties who

14  had been competitively bidding with J.H. Whitney.

15      THE COURT:  Who were those, Sun Capital and somebody

16  else?

17      MS. ANDREW:  No.  At that time it was Marlin and

18  Monomoy.

19      THE COURT:  Sounds really speculative.

20      MS. ANDREW:  Well, it is not really speculative.

21      THE COURT:  Somebody might have come in --

22      MS. ANDREW:  I guess --

23      THE COURT:  I guess we should reach an agreement who

24  gets to talk over whom.

25      MS. ANDREW:  Yes, I'm sorry.  Definitely you win.

1    THE COURT:  Very well.  I'm trying to get my questions

2    answered.  I'm not trying to be a jerk.

3    MS. ANDREW:  Okay.

4    THE COURT:  And I lost my train of thought.

5    MS. ANDREW:  You were asking whether it was

6    speculative.

7    THE COURT:  Yeah.  The response is, well, some company

8    may have come in and bid more than J.H. Whitney because?  Yeah?

9    MS. ANDREW:  Okay.  I would phrase it differently --

10   THE COURT:  Okay.

11   MS. ANDREW:  -- and I would say not just some company

12   might bid but two companies that had already placed bids for

13   the company just weeks prior.

14   THE COURT:  And what bids were those?

15   MS. ANDREW:  They were bids by Marlin and by Monomoy

16   in --

17   THE COURT:  And what did they bid?

18   MS. ANDREW:  -- in May of 2008.  And off the top of my

19   head, I want to say one was 51 million and one was 45 million,

20   but those bids were right at the same time, in early May.  And

21   Houlihan's representative, Spencer, testified that they were

22   still alive and interested.

23   So it is not that I'm just hoping randomly that some

24   company would come in and bid but, Your Honor, you are correct,

25   there is an element of not knowing because the process was cut

1    off by the actions of the defendants.  So we never had this

2    auction, and so we can't know for sure what would have happened

3    in the auction, that's true, and that's why Mr. Greenberg said

4    that under oath, no, I can't tell you exactly what would have

5    happened.  He says he believes that the 54 would have been the

6    worst result, but he can't know for sure because of their

7    conduct.

8          And there's case law we cited in our brief that says

9    where the defendants' actions create the uncertainty, that

10   can't be held against the plaintiffs.  Rank speculation is not

11   a permissible way to show damages, but this is reasonable

12   estimation based on known facts that are in the record.

13         THE COURT:  Are you going to evidence your damages on

14   loss of valuation by expert testimony or fact testimony?

15         MS. ANDREW:  Your Honor, we would use a combination.

16   There is, excuse me, as I said, quite a bit of factual

17   testimony in the record that goes to damages, that goes to the

18   value of the company as it was falling, the falling knife, but

19   we would also use Mr. Greenberg and his expertise in having

20   been through many circumstances like this, sales of distressed

21   companies, restructuring.

22         He looked at all of the evidence relevant to the sale

23   process, all of the deposition testimony, all of the exhibits,

24   and it was his opinion that Houlihan had conducted an

25   exhaustive marketing process for the company and, therefore,

1   the expressions of interest that were coming in were reliable

2   expressions of the value of the company.  Fair market value is

3   ultimately the best measure of the value of a company.  And so

4   these were expressions of fair market value that were coming

5   in.

6           THE COURT:  So where in Mr. Greenberg's written

7   25-page opinion does he state the valuation, his opinion as to

8   loss of valuation of the company?

9           MS. ANDREW:  He states it in the last paragraph of his

10  opinion.  And Mr. Scheier says that it is only in the last

11  sentence, but the whole paragraph relates to damages and

12  actually explains how he arrived at the number in the last

13  sentence.

14          So that last paragraph starts on page 24 and is really

15  a combination of causation and damages opinion, but he

16  discusses the $63~million Sun offer, the $54~million letter of

17  intent, and the ultimate value in bankruptcy of 31 to

18  38 million.  And then at the very end, discusses -- puts in an

19  actual number for that.

20          And while Mr. Scheier says he couldn't figure this out

21  at deposition, all of the attorneys who asked Mr. Greenberg

22  questions were able from their questions to see that

23  Mr. Greenberg was subtracting those numbers as values in

24  points --

25          THE COURT:  I thought you told the parties and the

```
 1   Court repeatedly on each and every opportunity that you were

 2   going to prove damages through expert testimony.

 3        MS. ANDREW:  Well, we told -- we said two things.  We

 4   said we are looking at the loss of enterprise value through

 5   expressions of interest of value, expressions of value at

 6   different points of time, and we also said we expect to have

 7   expert testimony on that.  Both of those things remain true.

 8   We have expert testimony on those expressions of interest and

 9   which are the most critical ones to look at in terms of point

10   in time comparisons.

11        THE COURT:  Your 30(b)(6) witness said:  We don't know

12   anything about damages.  We're going to get an expert to pull

13   that together for us.

14        MS. ANDREW:  The 30(b)(6) witness said:  We said what

15   we said in our interrogatories, that we're looking at

16   expressions of interest at different points of time and that we

17   expect to have an expert witness testify to that.  And that's

18   in fact what happened.  We had an expert witness testify to

19   different expressions of interest at different points in time

20   as a way to look at the value of the company.

21        The expert, and this is somewhat of an aside, but

22   Mr. Greenberg, a lot of his report goes to causation, and this

23   motion that's before the Court today is a limited motion as to

24   his opinions as to damages.  So we have not addressed his

25   opinions as to causation and whether those are reliable and
```

1   credible.

2         And so they're just seeking to -- I guess, according

3   to Mr. Scheier, it is just one sentence of the report he's

4   asking you to strike.  In his view, that's the only part of the

5   report that goes to damages, and he's only seeking to strike

6   the expert testimony as to damages.

7         THE COURT:  Is Mr. Greenberg a damages expert for you?

8         MS. ANDREW:  He is our expert as to the valuation of

9   the company, the damage that was caused by the loss in

10   enterprise value.  He's not -- I don't know what a, quote,

11   damages expert is.

12         THE COURT:  An expert who is going to testify about

13   damages.

14         MS. ANDREW:  Well, in this case, yes.

15         THE COURT:  Okay.  What's going on with this

16   $6 million of unauthorized or wasted professional fees?  Have

17   you not identified those $6 million worth of fees?

18         MS. ANDREW:  Your Honor, I will admit that we did not

19   supplement our interrogatory to identify those.  The $6 million

20   in fees is a number that was just calculated by adding up

21   invoices.  All of those invoices were produced to all of the

22   parties in this case.  In fact, most of them came from

23   defendants, the professionals that we're talking about all, at

24   one point in time at the time that they produced documents,

25   were defendants in this case.  They've since been dismissed.

1    That's CRG and Houlihan, McDermott Will and Emery, which still

2    remains a defendant in a related case, and --

3          THE COURT:  And some other professional.

4          MS. ANDREW:  I'm leaving one out.

5          THE COURT:  That's all right.  You've seen one

6    professional, you've seen them all.

7          MS. ANDREW:  And all of those invoices have been

8    produced.  I admit, and I fall on my sword, that we did not

9    supplement our interrogatory to list out all of those invoices

10   with totals.

11         THE COURT:  So --

12         MS. ANDREW:  There is evidence in the record that the

13   process, this sales process, was delayed by the actions of the

14   defendants, and a jury could look at that and decide that the

15   process should not have taken so long and therefore some

16   portion of the professional fees were unnecessary and wasted

17   because, as the process went on, all of the tickers were

18   ticking on all of these professionals.

19         THE COURT:  And how does Mr. Greenberg's expertise

20   apply to that?

21         MS. ANDREW:  He does not have a particular expertise

22   in that regard, and I believe in our brief we did state that we

23   are not relying on Mr. Greenberg for that part of our damages.

24         THE COURT:  Are you relying on Greenberg for any part

25   of your damage calculation relating to unnecessary professional

```
1   fees?
2           MS. ANDREW:  No, Your Honor.
3           THE COURT:  You're just going to say these were the
4   professional fees incurred and you're going to argue to the
5   jury that they were unnecessary?
6           MS. ANDREW:  Well, I guess I would take a step back
7   and I would say we are relying on Greenberg as to causation, so
8   to the fact that he has an opinion that the process took too
9   long and was unnecessarily delayed and prolonged, to the extent
10  that that is a necessary predicate to say some of the fees were
11  unnecessary, then, yes, we are relying on him for that.  But
12  we're not relying on him for any calculation of that or any
13  identification of which part of the fees were excessive.
14          THE COURT:  Is his opinion reflected in his 25-page
15  report to the effect that the process went on too long and,
16  therefore, any professional fees incurred were unnecessary?
17          MS. ANDREW:  His report does discuss that the process
18  went on too long.
19          THE COURT:  And does he opine that the expenses
20  incurred for professionals were therefore unnecessary?
21          MS. ANDREW:  He does in that last paragraph.
22          THE COURT:  He does?
23          MS. ANDREW:  Yes.
24          THE COURT:  This isn't crucial, but I don't really get
25  it.  Are you relying on a number that came out of the
```

1    bankruptcy court that you all actually challenged the

2    reliability of in those proceedings?

3            MS. ANDREW:  We did.  We did challenge -- well, we

4    were attempting to challenge it.  We never got to a hearing on

5    that, so we never presented the Periculum witness as a witness.

6    His report was filed in anticipation of the hearing.

7            THE COURT:  Well, how can you represent to this Court

8    that this is a reliable figure when previously you've been

9    attacking its reliability in the same or related litigation?

10           MS. ANDREW:  Because it turned -- at the point that

11   the court confirmed the plan of reorganization, it changed from

12   parties opining about what the company might be worth going

13   forward to the court, through the bankruptcy process, actually

14   determining this is what the company is worth.  This is no

15   longer a speculation.  This is it.  This is what you're getting

16   out of this company.  You're getting -- the secured lenders are

17   getting $31 million of their loans and trade vendors are

18   getting paid to continue to be trade vendors, and no one else

19   is getting anything.  It became a fact.  It became what

20   actually happened as opposed to CRG and Periculum debating what

21   should happen.  It became fact.

22           THE COURT:  So what's the number?

23           MS. ANDREW:  So we lost.  Our guy that we were putting

24   forth lost.

25           THE COURT:  So what's the number, the fact that came

1    out of the bankruptcy proceedings as to the valuation of the

2    company?

3           MS. ANDREW:  The fact is that the company was worth

4    $31 million, and then potentially you could put some value on

5    the preferred equity that the secured lenders took out of that

6    as well.  It turned out to not be worth anything, but in the

7    plan of reorganization, that preferred equity was valid at

8    11 million.

9           So if you accept that valuation, then the company was

10   worth 42 million at the time that it -- that the plan of

11   reorganization was accepted.

12          THE COURT:  So then we go 54 minus 42 to for damages,

13   except that the 54 might be higher, it could be any number?

14          MS. ANDREW:  Correct, Your Honor.

15          THE COURT:  You're presenting a damages claim where

16   you don't know the top number?  It could be anything?

17          MS. ANDREW:  Well, no, I wouldn't agree it could be

18   anything.

19          THE COURT:  What are your damages?

20          MS. ANDREW:  Our damages are what you just described,

21   54 minus 42 million and, potentially, if a jury believes, based

22   on the evidence, that there would have been competitive bidding

23   in a bankruptcy, some amount higher than that, but it is not

24   going to, you know, double.

25          THE COURT:  Higher than what, 42?

1          MS. ANDREW:  That it could have sold at higher than 54

2    in an auction in May of 2008.

3          THE COURT:  I understand your argument.  You've

4    addressed my fundamental primary questions.  If there's other

5    stuff you want to argue, go ahead.

6          MS. ANDREW:  Thank you, Your Honor.

7          I just want to briefly touch on a few things that you

8    raised before there was a discussion between you and

9    Mr. Scheier about Mr. Greenberg's experience, relevant

10   experience.

11         We have set forth in our brief why we believe he's

12   qualified to discuss these market expressions of interest and

13   sales process of a distressed company.  He has quite a bit of

14   experience in those areas.  He does have quite a bit of Section

15   363 sales experience as well.

16         In fact, the case that he refers to on page four of

17   his report, the one case where he's served as an expert witness

18   in the last four years, In re Beria Christian stores, a

19   bankruptcy case, that was a Section 363 sale case.  The

20   defendants didn't ask him about that, but it is right there.

21   He also had quite a bit of other experience that they didn't go

22   into at his deposition.

23         THE COURT:  It's your burden to establish his

24   expertise, is it not?

25         MS. ANDREW:  It is, Your Honor, and we have.  He

```
 1    summarized in his report his expertise.

 2            THE COURT:  Where does he say anything about 363

 3    experience?

 4            MS. ANDREW:  Well, for one thing he refers to the case

 5    that he was an expert witness in he refers -- I'm sorry.

 6            THE COURT:  Am I supposed to infer from that, oh, that

 7    must be a 363 case?  Aren't you supposed to tell me that?

 8            MS. ANDREW:  Well, with all due respect, Your Honor --

 9            THE COURT:  Right.

10            MS. ANDREW:  -- I don't have to list every fact about

11    that case in the report.

12            THE COURT:  Well, what it says here, it is his

13    experience.  He's worked as an expert in one bankruptcy case in

14    the last four years.  How am I to use that to determine whether

15    he has adequate 363 experience?

16            MS. ANDREW:  It also says in the paragraph preceding

17    that the firm, which consists of only three people, acts as

18    investment banker in Section 363 sales under Chapter 11

19    bankruptcy.  And these are all the subject; that's what an

20    expert deposition is for, to explore the background.

21            THE COURT:  An expert report is for the purpose of

22    establishing the expertise of the person you promote.  I

23    understand your position on the 363.  I mean, this is an

24    experienced guy who has seen a lot of deals, I get that.

25            MS. ANDREW:  Mr. Scheier also stated that there was
```

1  absolutely no evidence in the record regarding the Whitney

2  offer and the likelihood that it would have closed, and there

3  is testimony, at the very least, from Mr. Spencer who was the

4  Houlihan representative, in his deposition at page 101, that

5  Whitney was ready, willing and able to close the transaction.

6          THE COURT:  How does he have the basis to say that?

7          MS. ANDREW:  Because he had worked with them for

8  months on developing a process and testing their viability as a

9  purchaser.

10         THE COURT:  Okay.  What else does Mr. Scheier say that

11  set you off?

12         MS. ANDREW:  Well, the discussion that we can't claim

13  that our damages are uncertain because of the acts of the

14  defendants, because we could have deposed J.H. Whitney and

15  eliminated all uncertainty.  Well, with all due respect to

16  Mr. Scheier, deposing J.H. Whitney would not have taken away

17  the uncertainty because they were ready, willing and able.  We

18  could have taken their deposition and they could have said

19  that, but there was still actions by the company that prevented

20  the auction from going forward.  And so that's what created the

21  uncertainty.

22         We can't know, would -- if it's three or four weeks

23  passing, would that have actually happened and at what price,

24  because the process was shut off when the board was removed and

25  by the Morgans, and they declined to pursue that opportunity.

1   That's what creates the uncertainty, not the lack of testimony.

2            THE COURT:  I wrote down defendants' conduct created

3   the uncertainty.  That's your argument?

4            MS. ANDREW:  That's my argument, yes, Your Honor.

5   Thank you.

6            THE COURT:  Okay.

7            MS. ANDREW:  Just a couple other quick points.  I

8   think I've already made clear from my answers to your questions

9   that we are not abandoning Mr. Greenberg as our damages expert,

10  as the defendants have said in their reply brief.  I said that

11  I already addressed that.

12           The defendants rely on essentially two cases for their

13  proposition that if the Court finds that our expert is

14  unreliable and throws out his opinion as to damages, we are not

15  permitted to use any other evidence of damages, and those two

16  cases are the ones that you identified, *Info-Hold* and *Cole*.

17           And the *Info-Hold*, our understanding of that, from

18  reading the published opinion, is that there was no other

19  evidence in the record on damages beyond the expert report.

20  And so once the expert report was thrown out, there was nothing

21  that the defendants -- that the plaintiffs could put forward.

22           This is not that case because we have quite a bit of

23  factual evidence that's in the record that other witnesses will

24  testify to regarding the underlying facts as to the declining

25  value of the company and the different expressions of interest

1  over time.

2         So we believe that this is not an *Info-Hold*.  And this

3  is also not *Cole* because in *Cole* what happened was once the

4  court -- once the defendants filed their motion to exclude the

5  expert, the plaintiffs then filed affidavits and errata sheets

6  to their deposition testimony trying to add new facts to the

7  record that contradicted their prior positions.

8         We're not adding new facts.  We're pointing the Court

9  to facts that are already in the record.  Some of the facts

10  were developed by different defendants in their depositions of

11  witnesses.  So the facts are all out there.  And they're not

12  new facts.  They're not facts we're trying to create by a

13  self-serving affidavit.

14         THE COURT:  So *Info-Hold* is not necessarily wrongly

15  decided, it is just distinguishable?

16         MS. ANDREW:  Exactly, Your Honor.

17         THE COURT:  Very well.

18         Did you get that?

19         MS. ANDREW:  And then finally, to one of your last

20  questions of Mr. Scheier, if you were to hold that our expert

21  could not opine on damages and we could not offer any other

22  factual evidence of damages, that would, of all of the pending

23  motions for summary judgment, that would only relate to the

24  ones that go to Count 6 and Count 8 on the sale process.

25         Count 3 goes to Condor.  Mr. Greenberg's report is not

 1  relevant to that.

 2          Count 4 is the Levimo transaction, and that's not

 3  affected.

 4          The preference claims, which is Count 11, I believe,

 5  and the claim -- the motion for summary judgment of the Morgan

 6  Trust on equitable subordination.  So it would not resolve all

 7  of the pending motions.

 8          THE COURT:  Very well.

 9          MS. ANDREW:  And if you have no further questions,

10  then that's all I have.

11          THE COURT:  Was Greenberg hired as an expert witness

12  to opine on causation of loss of value?

13          MS. ANDREW:  Yes.

14          THE COURT:  Or damages?

15          MS. ANDREW:  Both, Your Honor.

16          THE COURT:  And he states in his report that, I'm

17  going to give opinions on causation and damages?

18          MS. ANDREW:  Yes.

19          THE COURT:  Very well.  Actually, oral argument has

20  been really helpful to me.  Thank you.

21          MS. ANDREW:  Thank you, Your Honor.

22          THE COURT:  Did you reserve time for rebuttal?

23          MR. SCHEIER:  I believe I did, Your Honor.

24          THE COURT:  I don't recall that.

25          MR. SCHEIER:  It was in that little bit of fat I built

1    in with my percentage.

2            THE COURT:  The fat is gone.

3            MR. SCHEIER:  I'm at your --

4            THE COURT:  You feel compelled to reply?

5            I love to ask lawyers that.  They all say yes.

6            MR. SCHEIER:  I don't feel compelled.  I believe it

7    might be useful.

8            THE COURT:  Five minutes or less.

9            MR. SCHEIER:  Okay.

10           THE COURT:  Mr. Muething, put it on your watch.

11           MR. MUETHING:  Yes, Your Honor.

12           MR. SCHEIER:  Your Honor, the broadest response is,

13   since I only have up to five minutes is that --

14           THE COURT:  Because you took 50.

15           MR. SCHEIER:  No, I recognize that, Your Honor.

16           -- is that I didn't hear any response to how the

17   evidence its going to come in over hearsay objections.  As

18   Ms. Andrew was speaking, I looked at the hearsay rules and

19   there's no exception that says it's not hearsay if people acted

20   in conformance with what was supposedly said, so I don't think

21   that -- and that was the best answer I heard.

22           THE COURT:  That's on the 54 million?

23           MR. SCHEIER:  That's on the 54 million.  On the other

24   side of the transaction, I got to tell you, another ghost,

25   another aberration appeared.  It had to do with secured

1   creditor debt and preferred stock value.  I have read dozens of

2   times through the opposition brief, I have lived this case for

3   five years.  I have never heard that before, ever.

4          THE COURT:  I had a sense you had been living this

5   case for five years.

6          MR. SCHEIER:  First time I heard anything about the

7   value secured, the secured debt, which was a settlement.  There

8   was some settlement with the secured creditors.  Somewhere that

9   settlement now is morphed into an indication of enterprise

10  value of the company or the fair market value of the company?

11  And in terms of the fair market value of the company, it is the

12  first time I'm ever hearing that in the case, and that's what

13  is astounding.

14         The interrogatories and their expert talk about

15  enterprise value.  Now Ms. Andrews stands up and talks about

16  fair market value and talks about negotiated settlement figures

17  in the bankruptcy as being indications of value.

18         I encourage you and invite you to read Mr. Greenberg's

19  report as frequently as you want.  Nothing of the sort is in

20  there.  He relies on the CRG number in the disclosure

21  statement.

22         And by the way, the bankruptcy court did not adopt

23  that number.  That number was in a disclosure statement, a

24  disclosure statement that says, this shall not be used as

25  indications of any expression of market value of the company,

 1  and its purpose was solely to solicit votes on a plan.  It

 2  didn't go to the court.  It wasn't anything that the court

 3  needed to pay attention to, other than were the disclosures

 4  accurate.  There were no objections to the disclosures, so the

 5  court approved the use of that disclosure statement to send to

 6  the various creditors' constituencies who could then read it

 7  and say:  Do you want to vote in favor or reject the plan?

 8         THE COURT:  And that's the CRG number?

 9         MR. SCHEIER:  That's the CRG number, and that's the

10  only place it appeared.  At the end of the day, the court

11  really confirmed the consensual -- not really that the court

12  confirmed the consensual plan, all of the creditors, unsecured

13  and otherwise, including Mr. Miller's client, agreed on

14  numbers.

15         The court didn't have to do any work.  The court never

16  scrubbed the $31 million.  The court never adopted it.  The

17  court had a consensual plan.  All objections to the plan were

18  dropped and that's why we never saw the Periculum report ever

19  admitted into evidence, but it certainly was served as a

20  proposed exhibit, if there was going to be a contested

21  confirmation hearing, which there wasn't.

22         So, again, I've heard opposing counsel's argument here

23  and they seem to be now running at high speed from the CRG

24  number and talk about secured debt and preferred stock values.

25  I never heard those things before, and that's the pickle I'm

1    in.

2         THE COURT:  You heard the Order of Confirmation of the

3    bankruptcy court?  That's admissible.

4         MR. SCHEIER:  You know something?  I never researched

5    it because it was never briefed and, again, more ghosts, more

6    aberrations.  I'm never able to understand what their case is.

7    What I know is I know what their expert told me, and that is

8    that he pulled the 31 to 38 million-dollar enterprise value out

9    of the disclosure statement.  And I then dutifully

10   cross-examined him on that, and the result of that

11   cross-examination is in the transcript and in our brief.

12        He never mentioned anything about anything other than

13   that being in the disclosure statement.  I don't know whether

14   they confirmed -- the order confirming the plan is admissible,

15   nor do I think that it is relevant.

16        Okay.  It is confirming.  It is confirming a

17   consensual plan.  There was no evidence taken, there are no

18   supporting findings of fact and conclusions of law, even

19   assuming those would be admissible, against my clients in this

20   case.

21        THE COURT:  Aren't all sales consensual agreements?

22        MR. SCHEIER:  Not all.  All confirmed bankruptcy plans

23   are not by consensual agreement.  What was by way of consensual

24   agreements was the fact that this plan was confirmed.  The

25   bankruptcy court didn't have to hear testimony and didn't take

```
 1   testimony as to the value of the company.

 2           THE COURT:  Very well.  How is he doing, Mr. Muething?

 3           MR. MUETHING:  He has about a minute left.

 4           MR. SCHEIER:  Yeah, well, grant our motion.  How is

 5   that?

 6           You know, Judge, just -- I'll close by saying I didn't

 7   really hear any response as to how that stuff gets into

 8   evidence.  And I will respect the time restriction, but much of

 9   what I heard today, for example, by the various offers -- and

10   you talk about the upper end.  I still don't know what the

11   upper end of the damages calculation is.  And the speculation

12   that there are other, quote, unquote, bidders, no such thing in

13   the record.

14           Anyway, we briefed the rest of the points.  Thank you

15   so much for your time.  I'm here to answer your questions if

16   you have any; otherwise, I'll be happy to take my seat.

17           THE COURT:  Did you get Mr. Muething's notes and have

18   you addressed those?

19           MR. SCHEIER:  You know, basically my entire arguments

20   are derived from Mr. Muething's notes so --

21           THE COURT:  That's my understanding.

22           MR. SCHEIER:  So, long ago I picked up on --

23   identified the brains behind the operation, and it's no

24   different here today.

25           He did apparently want to me to point out that we
```

1  cited the *Hickman* case at page eleven of our reply brief

2  indicating that that court rejected the use of a liquidation

3  analysis in a disclosure statement as an established fact, and

4  then entering judgment because the debtor could not carry their

5  burden they sought to establish through the disclosure

6  statement.  It is rank hearsay, Your Honor.  That's the bottom

7  line.

8            MR. MUETHING:  As an officer of the court, I have to

9  tell him he's used his time.

10           THE COURT:  Thank you Mr. Muething.  I've always

11 thought highly of you.

12           MR. SCHEIER:  As my partner, I wonder if that comports

13 to his judiciary duty to me, but that's another day.

14           Thank you, Judge.  Appreciate the time very much.

15           THE COURT:  Very well.  Well, oral argument was

16 helpful to me.  We'll move expeditiously on it, and I believe

17 that concludes what we can do.

18           The Court prepares to recess.

19           (The proceedings concluded at 5: 40 p.m.)

20                          - - -

21

22

23

24

25

1                    C E R T I F I C A T E

2              I, Jodie D. Perkins, RMR, CRR, the undersigned,

3    certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

6                                   s/Jodie D. Perkins
                                    _____
7                                   Jodie D. Perkins, RMR, CRR
                                    Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25